UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

## Page 1

ROUGH DRAFT TRANSCRIPTION DISCLAIMER

The following transcript of proceedings, or any portion thereof, in the above-entitled matter, taken on any date, is being delivered UNPROOFREAD and UNCERTIFIED by the certified court reporter at the request of MR. JOHN GRINNAN.

The purchaser agrees not to disclose this transcription in any form (written or electronic) to anyone who has no connection to this case. This is an unofficial transcription which should NOT be relied upon for purposed of verbatim citation of testimony.

This transcription has not been checked, proofread or corrected. It is a draft transcript, NOT a certified transcript. As such, it may contain computer-generated mistranslations of stenotype code or electronic transmission errors, resulting in inaccurate or nonsensical word combinations, or untranslated stenotype symbols which cannot be deciphered by non-stenotypists. Corrections will be made in the preparation of the certified transcription, resulting in differences in content, page and line numbers, punctuation, and formatting.

This rough draft contains no appearance page, certificate page, index, or certification.

## Page 2

1  THE VIDEOGRAPHER:  Today's date is
2  January 16th, 2023.  The time is 10:10 a.m.  We're on
3  the record.
4       Will counsel please state their
5  appearances for the record.
6       MR. GRINNAN:  John Grinnan on behalf of
7  the claimant, and we are here today pursuant to the
8  Court's December 7th, 2022, order for the limited
9  purpose about -- "about when he received surgical
10 recommendations, and if/when he communicated this
11 information to his counsel," which I'd like to mark as
12 Exhibit No. 1.
13      MR. RIBARITS:  I think that was December
14 8th, John.  You mentioned the 7th.
15      (Exhibit 1 was marked.)
16      MR. GRINNAN:  The ECF number is ECF 418
17 and the ECF file stamp at the top says December 7th,
18 2022, but yes, the actual order down on the second page
19 does say the 8th day of December 2022.  Thanks for the
20 clarification.
21      MR. RIBARITS:  Yep.
22      MR. GRINNAN:  There's the other.  I think
23 we all have a copy of this but ...
24      MR. GRINNAN:  Thank you.
25      THE WITNESS:  Is this plugged in to me?

## Page 3

1       MR. GUILLOT:  I'm Gavin Guillot.  I
2  represent Shore Offshore Services and Modern American
3  Railroad Services.
4       MR. RIBARITS:  I'm John Ribarits.  I
5  represent Premier Offshore Catering.
6       MR. GUILLOT:  Will those who are
7  participating by Zoom please make an appearance, who
8  wish to make an appearance.
9       MR. BRENNAN:  This is Sean Brennan on
10 behalf of Oceaneering.
11      MR. BULLOCK:  Lance Bullock on behalf of
12 Dawn Services.
13      MR. RUFTY:  Alfred Rufty on behalf of
14 (inaudible).
15      THE REPORTER:  We can't hear you.
16 Mr. Roffe [sic], we couldn't hear you.
17      MR. RUFTY:  Alfred Rufty for Crosby
18 (inaudible).
19      THE REPORTER:  For who?
20      THE WITNESS:  Crosby Tugs.
21      MR. RUFTY:  Crosby Tugs.
22      MR. RIBARITS:  Is there a volume control
23 we can turn up?
24      MR. DEMOSTHENIDY:  Laurent Demosthenidy
25 for Weeks Marine.

## Page 4

1       MR. DONEWAR:  Blake Donewar for Greater
2  Lafourche Port Commission.
3       THE REPORTER:  Can you repeat that?
4       MR. DONEWAR:  Blake Donewar for Greater
5  Lafourche Port Commission.
6       MR. PARKER:  J. D. Parker for Shore
7  Offshore Services and Modern American Railroad Services.
8       THE REPORTER:  Ms. Sellers?
9       MS. SELLERS:  Kala Sellers.  I'm also
10 with Arnold & Itkin.
11      THE REPORTER:  Laurent?
12      MR. DEMOSTHENIDY:  Yes.  Laurent
13 Demosthenidy for Weeks Marine.  I made an appearance a
14 little earlier.
15      THE REPORTER:  Thank you.
16      (Witness sworn.)
17 BY MR. GUILLOT:
18      Q.  Mr. Burnett, we met before the deposition
19 started.  My name is Gavin Guillot.  I represent Shore
20 Offshore Services and Modern American Railroad Services.
21 Thanks for your time here today.
22      Can we please have your full name and
23 date of birth?
24      A.  Patrick Antwan Burnett, 1982.
25      Q.  The month and day, sir?

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 5

1    A.  January 16th, 2022.
2    Q.  No, no, I was asking for the -- your date of
3  birth, full date of birth.
4    A.  Oh.
5    Q.  I thought you just gave the year?
6    A.  August 12th, 1982.
7    Q.  August 12th, 1982.  I'm sorry.  I didn't hear
8  you.
9        You understand that the court reporter
10  just administered an oath to you and that's the same
11  oath that you would take if you were in a court of law?
12    A.  Yes, sir.
13    Q.  Okay.  Have you ever given a deposition before?
14    A.  No.
15    Q.  Okay.  A couple of ground rules.  This
16  shouldn't take very long today, but it will make it flow
17  a lot smoother.
18        If I ask a question, please wait for me
19  to finish asking the question before you answer.  Is
20  that fair?
21    A.  Yes, sir.
22    Q.  And I'll do my best not to interrupt you if
23  you're answering a question and I'll wait for you to
24  finish before I ask my next question.  Okay?
25    A.  Yes, sir.

Page 6

1    Q.  Okay.  And just like you're doing now, audible
2  responses -- "yes", "no" -- rather than "huh-uh" or
3  "uh-huh" make it a lot easier for the court reporter on
4  the transcript.  Okay?
5    A.  Yes, sir.
6    Q.  All right.
7        If you don't understand a question I'm
8  asking, tell me.
9    A.  I will.
10    Q.  Are you on any medications today?
11    A.  Yes, sir.
12    Q.  What medications are you on?
13    A.  A muscle relaxer and a nerve pill.
14    Q.  What's the second one?
15    A.  Pregabalin for back nerve.
16    Q.  Are you on any medication that would affect
17  your ability to give testimony here today.
18        MR. GRINNAN:  Object to the form.
19    A.  No.
20  BY MR. GUILLOT:
21    Q.  Do you know why we're here today for your
22  limited deposition?
23    A.  Yes, I've been briefed on that.
24    Q.  Okay.  What's your understanding of why we're
25  here for today's deposition?

Page 7

1        MR. GRINNAN:  And object to the form.
2        Go ahead.
3  BY MR. GUILLOT:
4    Q.  That will happen several times where objections
5  might be lodged.  It's something that's part of the
6  legal process here.  If you understand my question, you
7  can go ahead and answer it.
8        MR. GRINNAN:  Without divulging any
9  attorney-client privileged communications.
10    A.  Something about them -- about my surgery.
11    Q.  What's your understanding of why you're here
12  today without divulging any information that you and
13  your attorney have discussed?
14    A.  Saying I went forward with the surgery knowing
15  I wasn't supposed to or something like that.
16    Q.  Okay.
17    A.  Something in that nature.
18    Q.  The document in front of you that your attorney
19  marked as Exhibit 1, which is Record Doc 418, have you
20  seen that before?
21    A.  "It is ordered that" -- no.
22    Q.  This is your first time seeing that document
23  here today?
24    A.  Yes, sir.
25    Q.  Okay.  Did you review any documents in

Page 8

1  preparation for this deposition today?
2    A.  Review documents?
3    Q.  Yes, sir.
4    A.  No.
5    Q.  No documents?
6    A.  No.
7    Q.  Okay.  Other than discussing this with your
8  attorney did you discuss this with anybody else in
9  preparation for today?
10        MR. GRINNAN:  Form.
11    Q.  If you understand my question, you can go ahead
12  an answer it.
13    A.  I'm really -- I'm really not understanding your
14  question.
15    Q.  I'm happy to ask it again.
16        Other than speaking with your attorneys
17  have you discussed preparation for this deposition today
18  with anyone else?
19    A.  No.
20    Q.  Okay.  I'm going to call your attention to that
21  document right in front of you --
22    A.  Right.
23    Q.  -- Exhibit 1 with the yellow sticker in the top
24  right-hand corner.
25    A.  Yes, sir.

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 9

1    Q.  You see about halfway down the page it says
2  "Order"?  In the center, bold, all caps.
3    A.  Where it say it's ordered -- "It is ordered"?
4    Q.  Yes, sir, that first paragraph.
5       It says, "It is ordered that Claimant
6  Patrick Burnett will be deposed about when he received
7  surgical recommendations, and if [and] when he
8  communicated this information to his counsel."
9       Did I read that correctly?
10   A.  Yeah.
11   Q.  So that's basically what we're going to be
12  talking about here today.  Okay?
13   A.  Okay.
14   Q.  All right.  Who are your attorneys?
15   A.  Arnold & Itkin.
16   Q.  To your knowledge is anybody else representing
17  you?
18   A.  Yes, John Grinnan, Kyle and -- you're talking
19  about in the law firm?
20   Q.  Just to your knowledge how many attorneys are
21  representing you -- let's takes a step back.
22      We're here because of injuries that you
23  claim to have sustained back on the THOR in
24  October 2020, right?
25   A.  Right.

Page 10

1    Q.  Okay.  How many attorneys are repre- -- who is
2  representing you for the injuries you claimed to sustain
3  back in October 2020?
4    A.  Arnold & Itkin.
5    Q.  Okay.  Do you have knowledge of any other
6  attorneys besides attorneys at Arnold & Itkin
7  representing you?
8    A.  No.
9    Q.  Okay.  As we sit here today, you don't know if
10  any other law firms are representing you besides Arnold
11  & Itkin?
12   A.  There is not no other law firms representing
13  me.
14   Q.  So do you know the name Tony Clayton?
15   A.  No.
16   Q.  Okay.  Do you have any knowledge one way or the
17  other whether he's representing you in this case?
18      MR. GRINNAN:  And this is getting way
19  outside the scope --
20      THE WITNESS:  Yeah.
21      MR. GRINNAN:  -- of what we're supposed
22  to be here for --
23      MR. GUILLOT:  Well, I'll --
24      MR. GRINNAN:  -- so I'm trying to -- and
25  I'm trying to give you some leeway, but we're supposed

Page 11

1  to be here for the limited purposes of when he received
2  surgical recommendations and if/when he communicated
3  this information to his counsel, not about Arnold &
4  Itkin co-counsel agreements.
5      MR. GUILLOT:  Okay.  The reason I'm
6  asking it -- so we can make a record here -- is when he
7  communicated this information to his counsel.  So we'd
8  like to identify who his counsel are.
9      MR. GRINNAN:  Sure.
10      MR. GUILLOT:  Okay.
11      MR. GRINNAN:  And I gotcha but -- and
12  that's why I was giving you some leeway, but go ahead.
13  BY MR. GUILLOT:
14   Q.  Okay.  So you don't have any knowledge of
15  whether an individual named Tony Clayton represents you?
16   A.  Tony Clayton?
17   Q.  Yes, sir.
18   A.  No.  I ain't never heard that name.
19   Q.  Okay.
20      Okay.  We just talked about you claim
21  that you sustained some injuries on October 28th, 2020,
22  during Hurricane Zeta aboard the THOR.  Is that right?
23   A.  Yeah.
24   Q.  Okay.  Have you had any surgeries as a result
25  of the injuries that you claim to have sustained on that

Page 12

1  date?
2    A.  Yes.
3    Q.  Do you know what those surgeries are as we sit
4  here today?
5    A.  Yes.
6      MR. GRINNAN:  Form.
7  BY MR. GUILLOT:
8    Q.  What are those surgeries that you have
9  undergone as a result of the injuries you claim to have
10  sustained on the THOR in October 2020?
11      MR. GRINNAN:  Form.
12      You can answer.  Unless I tell you don't
13  answer, answer.  I'm just objecting to the form
14  preserving something with the Court.
15      THE WITNESS:  Oh, okay.
16   A.  Gastric -- gastric bypass sleeve and back
17  surgery.
18  BY MR. GUILLOT:
19   Q.  Any other surgeries besides those two that you
20  listed?
21   A.  No, not -- it was supposed to be some more, but
22  it didn't happen.
23   Q.  Okay.
24      The gastric surgery, it's a weight loss
25  surgery?

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 13

1    A.  Uh-huh.
2    Q.  We're going to talk about that one first.
3    Okay?
4    A.  Okay.
5    Q.  All right.
6        Do you know when you underwent this
7    surgery?
8    A.  November 5th, 2021.
9    Q.  Do you know when this surgery was first
10   recommended?
11   A.  Yes.
12   Q.  When was this surgery first recommended?
13   A.  At the beginning of my case back in 2020.
14   Q.  At the beginning of your case back in 2020.
15   Can you be more specific about when this surgery was
16   first recommended, if you know?
17   A.  When I started seeing my doctors -- my doctor.
18   Q.  Which doctor?
19   A.  Dr. Henry Small.
20   Q.  Okay.  I have some of Dr. Small's medical
21   records.
22   A.  Okay.
23   Q.  Have you seen any of his medical records?
24   A.  No.
25   Q.  No?

Page 14

1        Was it the first visit that you had with
2    Dr. Small when he made this recommendation for the
3    weight loss surgery?
4        MR. GRINNAN:  Form.
5    A.  I can't recall.
6    BY MR. GUILLOT:
7    Q.  Okay.  So I just showed your attorney a copy of
8    what's identified as Burnett Authorization 01332 through
9    01333.
10   A.  Uh-huh.
11       MR. GRINNAN:  What he's talking about is
12   the Bates stamp at the bottom right-hand corner.
13   Q.  (Indicating) This little number down here is
14   what I read out.
15   A.  Okay.
16   Q.  All right.  Have you ever seen this document
17   before?
18   A.  No.
19   Q.  Okay.  To the best of your knowledge -- the
20   date on this document is December 3rd, 2020.
21   A.  Uh-huh.
22   Q.  Is that the first time you were examined by
23   Dr. Small?
24   A.  I'm not sure.  May have been two years and some
25   ago.  I'm not sure.

Page 15

1    Q.  Okay.  If this record notes that -- you see
2    down here where it says "Recommendations -- "Discussed
3    with patient that he will need weight loss surgery
4    before Lumbar Laminectomy and Fusion of Lumbar Spine,"
5    does this refresh your recollection that at least as of
6    December 3rd, 2020, you had met with Dr. Small and he
7    had made that recommendation for a weight loss surgery?
8        MR. GRINNAN:  Form.
9    A.  Where are you seeing this at?
10       Oh.
11   BY MR. GUILLOT:
12   Q.  So see the date's up here in the top right,
13   December 3rd, 2020?
14   A.  Right.
15   Q.  Okay.  And then down here --
16   A.  (Indiscernible.)
17   Q.  -- you see No. 6?
18   A.  Okay.
19   Q.  Okay.  And then it says "Recommendations," and
20   I'm reading that third hyphenated point (indicating).
21   A.  (Reading) Patient needs wedge -- okay.
22   Discussed with patient -- yeah.
23   Q.  Okay.
24   A.  Okay.
25   Q.  So this is dated December 3rd, 2020.

Page 16

1    A.  Right.  Right.
2    Q.  It says he's meeting with you.
3    A.  Okay.
4    Q.  Okay.  And it mentions in here that he
5    recommended a weight loss surgery.
6    A.  Yeah.
7    Q.  So my --
8        MR. GRINNAN:  Form.
9    Q.  -- question is that at least as of
10   December 3rd, 2020, you had been recommended for a
11   weight loss surgery?
12       MR. GRINNAN:  Form.
13   A.  Yes.
14       MR. GUILLOT:  Okay.  All right.  Good.
15   We'll attach this as the next exhibit,
16   No. 2, if you wouldn't mind.
17       (Exhibit 2 was marked.)
18   BY MR. GUILLOT:
19   Q.  Had you ever seen Dr. Small before that
20   examination?
21   A.  I can't recall.  I don't remember.  I really
22   can't remember.
23       Like was that the first visit?  Is that
24   what you're asking?
25   Q.  Yes.

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 17

1    A.  I can't recall.
2    Q.  Do you remember if this was a telehealth visit.
3  Do you remember visiting online on a computer screen
4  versus in person?
5    A.  No.  It was in person.
6    Q.  The first time you saw him was in person?
7    A.  Uh-huh.
8    Q.  When you were with Dr. Small when he made the
9  recommendation for the weight loss surgery, was anyone
10  with you?
11    A.  No.  No, I can't remember.
12         Somebody like my wife or something?
13    Q.  Anyone else besides you.  Was anybody there?
14    A.  No.
15    Q.  Okay.
16    A.  No.
17    Q.  Did you tell your attorneys that Dr. Small had
18  recommended the weight loss surgery to you as noted on
19  the December 3rd, 2020, record?
20         MR. GRINNAN:  Going to object to the
21  form and I'm going to go ahead and preserve the
22  attorney-client privilege.  This is clearly asking for
23  attorney-client protected communications.  The Court's
24  order does, though, say that for the limited purposes
25  that you'd like Mr. Burnett deposed on this.  So subject

Page 18

1  to that reservation, which we're not waiving at all, we
2  will let him answer this question and questions that
3  would be similar to just this very, very, very limited
4  purpose.  But it is still our position that this is
5  clearly protected by the attorney-client privilege.
6         But in recognition of the Court's order
7  you can go ahead and answer, and if you need him to
8  reask the question again --
9    A.  Yeah.  Can you reask the question again?
10  BY MR. GUILLOT:
11    Q.  Sure.
12         Did you ever communicate this
13  recommendation from Dr. Small for the weight loss
14  surgery to your attorneys?
15    A.  No.
16    Q.  As we sit here today, from the date of the
17  accident through the present you have never communicated
18  any recommendation for weight loss surgery from
19  Dr. Small to your attorneys?
20         MR. GRINNAN:  And object to the form.
21         And don't -- you can't answer that
22  question, because you said to the present.
23         MR. GUILLOT:  I'll rephrase it.
24  BY MR. GUILLOT:
25    Q.  From the date of the accident on October 28,

Page 19

1  2020, through the date of your weight loss surgery on
2  November 5th, 2021, did you ever tell your attorneys
3  that you were recommended for a weight loss surgery?
4         MR. GRINNAN:  And object to form.  Same
5  reservation of privilege.
6         You can answer.
7         THE WITNESS:  Okay.
8    A.  No.
9  BY MR. GUILLOT:
10    Q.  Okay.
11         MR. GUILLOT:  Just a moment.
12         (Sotto voce discussion.)
13  BY MR. GUILLOT:
14    Q.  I'm going to move away from the weight loss
15  surgery and go into the other surgery that you talked
16  about, the back surgery.  Okay?
17    A.  Okay.
18    Q.  Do you know what kind of back surgery you
19  underwent?
20         MR. GRINNAN:  Form.
21         MR. GUILLOT:  What's the basis for that?
22         MR. GRINNAN:  This is asking for an
23  expert sort of question.
24         MR. GUILLOT:  Okay.
25  BY MR. GUILLOT:

Page 20

1    Q.  You can answer if you understand the question.
2         Do you understand the back surgery you
3  underwent?
4    A.  Yeah.
5    Q.  Okay.  Why don't you tell us your understanding
6  of the back surgery you underwent?
7    A.  Say my joints was sitting on (indicating) -- I
8  don't -- I mean --
9         THE WITNESS:  What is he asking, John?
10         MR. GRINNAN:  You're not allowed to ask
11  me.
12    A.  I mean, what are you asking, like, like --
13  BY MR. GUILLOT:
14    Q.  If you don't understand it, I'm happy to ask it
15  again.
16    A.  Like what kind of surgery was it or --
17    Q.  Did you --
18    A.  -- or what -- what they had to do in there?
19    Q.  I'm not -- I know you're not a physician --
20    A.  Right.
21    Q.  -- so I'm not asking you anything technical.
22         Do you understand the kind of surgery
23  that you underwent to your back?  Can you describe what
24  it was?
25    A.  Yeah.

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

## Page 21

1  MR. GRINNAN: Form.
2  BY MR. GUILLOT:
3  Q. Okay. Would you describe it?
4  A. (Indicating) Coming from the middle of my back
5  to my posterior crack, and they said they had to put
6  rods in there to go up my spine and spaces in my --
7  between my discs and build like a 3D cage around my
8  spine to protect my spine.
9  Q. Okay. When did this surgery first get
10  recommended to you?
11  MR. GRINNAN: Form.
12  A. Had to be --
13  MR. GUILLOT: What's the basis for that?
14  MR. GRINNAN: Is it recom--- well, vague
15  and recommended.
16  MR. GUILLOT: It's from the term of the
17  order.
18  MR. GRINNAN: Got it. Still.
19  MR. GUILLOT: Well, I want to cure it
20  so --
21  MR. GRINNAN: So recommended, scheduled,
22  which one?
23  MR. GUILLOT: Recommended.
24  MR. GRINNAN: Okay.
25  BY MR. GUILLOT:

## Page 22

1  Q. When did this surgery first get recommended to
2  you?
3  MR. GRINNAN: Form.
4  Q. Okay. What's the basis?
5  MR. GRINNAN: Okay. By who?
6  MR. GUILLOT: Okay.
7  BY MR. GUILLOT:
8  Q. When did this surgery -- who ultimately
9  performed the surgery on you?
10  A. Dr. Small.
11  Q. Who was the first physician to recommend the
12  surgery to you?
13  A. We went and seen a workman's comp -- workman's
14  comp physician and he examined me and it was out of his
15  field so that's when we got to looking for a good
16  orthopedic.
17  Q. Who was that physician who examined you --
18  A. I --
19  Q. -- the workman's comp physician?
20  A. I have no idea, but it was at Jackson
21  Mississippi Sports Medicine.
22  Q. And my question was: Who was the first doctor
23  who recommended the surgery that you underwent? Do you
24  know the identity of that person?
25  A. Oh, yeah. That was Dr. Small.

## Page 23

1  Q. Dr. Small.
2  A. Yeah.
3  Q. Okay.
4  A. Yeah.
5  Q. All right. So back to my original question, do
6  you know when Dr. Small first recommended the surgery
7  that you underwent?
8  A. Yes.
9  Q. When?
10  A. In the beginning of -- in '20 -- the
11  accident was '20 -- October 28, '20. So it was at the
12  end of '20, the beginning of '21 whenever he got the
13  MRI's back.
14  Q. Okay. So it's your understanding that
15  Dr. Small recommended a back surgery for you within,
16  what, six months of the accident?
17  A. No. He recommended a weight loss surgery
18  first.
19  Q. Okay. I'm only asking you about the back
20  surgery.
21  A. Okay.
22  Q. When did Dr. Small first recommend any type of
23  back surgery to you?
24  A. After he got the MRI back. I don't know if
25  that was late 2020 or early '21.

## Page 24

1  Q. Okay. So it's your understanding that it was
2  either in 2020 or 2021. Is that fair?
3  A. Yeah, whenever he got the MRI's back.
4  Q. So it's 2023 now, right?
5  A. Right.
6  Q. Okay. So in 2022 you already knew that he had
7  recommended this back surgery for you?
8  A. In 2022 I had the back surgery.
9  Q. Right. So before you -- all right. Let's ask
10  it a little differently. We'll go through some of the
11  records.
12  Let's see.
13  (Sotto voce discussion.)
14  BY MR. GUILLOT:
15  Q. So, to be clear, you've never seen any records
16  from Dr. Small's office?
17  A. No.
18  Q. Okay. If I show you a record from July 11th,
19  2022, that details that Dr. Small had recommended what's
20  called a lumbar laminectomy, would you have any basis to
21  disagree that on that specific date, July 11th, 2022,
22  was the first time he had recommended that specific
23  surgery to you?
24  MR. GRINNAN: Object to the form.
25  THE WITNESS: I mean, I still answer the

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 25

1  question?
2          MR. GRINNAN:  Oh, yeah.  You have to
3  answer the question --
4          THE WITNESS:  Okay.
5          MR. GRINNAN:  -- unless I instruct you
6  not to.
7     A.  That's when he found out the surgery -- I mean
8  that's when he found out that my back was worse than
9  what it was.
10 BY MR. GUILLOT:
11    Q.  Right.
12         Is it your understanding that maybe in
13 2020 or early 2021 Dr. Small thought that you might need
14 a back surgery after a weight loss surgery?
15    A.  Yeah.
16    Q.  Okay.  And -- but what the specific type of
17 surgery was, that was to be determined?
18         MR. GRINNAN:  Object to the form.
19    A.  It was going to be -- he thought it was going
20 to be where he just go in and put some little spaces on
21 my -- on my -- in my --
22         THE WITNESS:  What you call them?
23 Your --
24    A.  I'm not a doctor but the little spaces in
25 between your joints in your back, that's what he

Page 26

1  thought.
2  BY MR. GUILLOT:
3     Q.  Okay.
4     A.  In early '20 -- '20 or beginning of '21 that's
5  what he thought.
6     Q.  Okay.  And what I've got here --
7          MR. GUILLOT:  I'm sorry.  John, I only
8  have one copy of this.
9          MR. GRINNAN:  It's the July 11th record?
10         MR. GUILLOT:  Yeah, and it's has my
11 highlights on it.
12         MR. GRINNAN:  Got it.
13         MR. GUILLOT:  Okay.
14         MR. GRINNAN:  Are you going to mark it as
15 an exhibit?
16         MR. GUILLOT:  Probably.
17         MR. GRINNAN:  Okay.
18 BY MR. GUILLOT:
19    Q.  (Indicating) This document here, it's got a
20 little number at the bottom.  It says
21 "Burnett-Auth-01319".  Do you see that?
22    A.  Uh-huh.
23    Q.  Okay.  And it says the date of July 11th, 2022.
24    A.  Okay.
25    Q.  Your name is in the top right.

Page 27

1     A.  Right.
2     Q.  I'll represent to you this came from
3  Dr. Small's office.  Okay?
4     A.  Okay.
5     Q.  And it says that a specific type of surgery has
6  been recommended.  Do you see that here?
7          MR. GRINNAN:  Here, let me come across.
8  Then we can look at it.
9     A.  L2, L3, L4, L5, L5-S1.
10         Yes.  Yeah.  Sorry.
11 BY MR. GUILLOT:
12    Q.  Okay.  Do you know if that's the type of
13 surgery that you ended up undergoing?
14         MR. GRINNAN:  Form.
15    A.  I'm not a doctor, man.  I don't.
16 BY MR. GUILLOT:
17    Q.  So you don't know?
18    A.  Huh-uh, I don't know.
19    Q.  Okay.  To your knowledge is this the first time
20 that this specific type of surgery was recommended to
21 you?
22         MR. GRINNAN:  Form.
23    A.  Yeah.
24 BY MR. GUILLOT:
25    Q.  Okay.  Do you know when this surgery was

Page 28

1  scheduled?
2     A.  Yes.
3     Q.  When was it scheduled?
4     A.  Late August.  Late, late -- late August.
5     Q.  Late August.  Okay.
6          So is it fair to say that on July 11th,
7  2022, around that time, the surgery that's listed here
8  was scheduled for late August?
9     A.  Uh-huh.
10    Q.  Can you give a "yes" or a "no"?
11    A.  Yes.
12    Q.  Okay.  So let's talk about that surgery from
13 July 11th, 2022, that was scheduled for late August.
14 Okay?
15    A.  Okay.
16         MR. GUILLOT:  I'll mark this as Exhibit
17 3.  That's the next one.
18         MR. GRINNAN:  Just object to the form of
19 that prior question.
20 BY MR. GUILLOT:
21    Q.  Okay.  Do you remember meeting with Dr. Small
22 on --
23         MR. GUILLOT:  Thank you.
24    Q.  -- on July 11th, 2022?
25         (Exhibit 3 was marked.)

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 29

```
 1        A.  Not that I can recall.
 2   BY MR. GUILLOT:
 3        Q.  See this Exhibit 3, this medical record, says,
 4   "The patient has consented to a telehealth visit using a
 5   video streaming service."
 6            Do you remember visiting with him online
 7   to discuss your surgery?
 8        A.  Yeah.  Okay.
 9            You said did I visit him.  I talked to
10   him.
11        Q.  On a computer?
12        A.  No, on the phone.
13        Q.  On the phone?
14        A.  Yeah.
15        Q.  Okay.  And is that when you first learned about
16   the specific type of surgery and scheduling it for late
17   August?
18        A.  Yeah.
19        Q.  Okay.
20            MR. GRINNAN:  Form.
21   BY MR. GUILLOT:
22        Q.  All right.  And so is it fair to say that on
23   July 11th, 2022, you spoke with Dr. Small and that's
24   when he told you the type of surgery he was recommending
25   that you undergo?
```

Page 30

```
 1            MR. GRINNAN:  Object to form.
 2        A.  Yes.
 3   BY MR. GUILLOT:
 4        Q.  All right.  Do you know when in late August it
 5   was scheduled?
 6        A.  August 30, 30th.
 7        Q.  August 30th is your understanding of when it
 8   was scheduled?
 9        A.  I think 29th, 30th.  Yeah, I think August 30th.
10        Q.  Okay.  What makes you think it -- that was the
11   date?
12        A.  I flew down the day -- my dad had passed away
13   so it was six days -- yeah, August 30th.
14        Q.  What did you say, you flew down?
15        A.  Yeah.
16        Q.  I didn't understand what you said.
17        A.  My birthday is in August so I was like a
18   month -- my birthday is August 12th, I had to come down
19   August the 24th and they were supposed to do the surgery
20   August the 30th.
21        Q.  Okay.  You flew in the 24th?
22        A.  Yes.
23        Q.  All right.  Let's talk about your conversation
24   with Dr. Small where he recommended that you undergo
25   this surgery and it was scheduled for August 30th.  Did
```

Page 31

```
 1   you communicate that information to any of your
 2   attorneys?
 3            MR. GRINNAN:  Form and preserving the
 4   privilege I stated earlier.
 5            Subject to that, you can go ahead and
 6   answer.
 7        A.  No.  Why would I do that?
 8   BY MR. GUILLOT:
 9        Q.  So, well, my question is just simple, and then
10   we'll go into your question.
11        A.  Okay.
12        Q.  Did you tell any of your attorneys that surgery
13   had been recommended by Dr. Small, for you to be -- for
14   you to undergo that surgery on August 30th?
15            MR. GRINNAN:  Object to the form.
16            Subject to preserving the privilege for
17   attorney-client -- those communications, go ahead.
18        A.  No.  I don't talk to my lawyers about medical.
19   I don't -- no.
20   BY MR. GUILLOT:
21        Q.  Okay.  So we're clear, as we sit here today did
22   you ever tell your attorneys from July 11th, 2022,
23   through August 30th, 2022, that you were recommended for
24   this surgery?
25            MR. GRINNAN:  Object to the form.
```

Page 32

```
 1        A.  No.
 2            MR. GRINNAN:  Subject to the same
 3   privilege, answer that.
 4   BY MR. GUILLOT:
 5        Q.  And for the same period -- July 11th, 2022,
 6   through August 30th, 2022 -- did you ever tell any of
 7   your lawyers that you had been scheduled for this
 8   surgery?
 9            MR. GRINNAN:  Object to the form.
10        A.  No.
11            MR. GRINNAN:  We're preserving the
12   privilege too on that.
13   BY MR. GUILLOT:
14        Q.  Why?
15        A.  Why what?
16        Q.  Why not tell them?
17        A.  My lawyers don't do medical.  My lawyers do --
18            THE WITNESS:  What they call it, John?
19            Well, I mean, I'm not asking.
20        A.  They handle my court stuff and my -- I mean I
21   can't call up my lawyers and tell them to write me a
22   prescription or do you think I need this kind of surgery
23   so that's not his field.  That's not their field.
24   BY MR. GUILLOT:
25        Q.  Isn't it true that your lawyers referred you to
```

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT – 1/16/2023

Page 33

1    Dr. Henry Small?
2        A.  No.
3              MR. GRINNAN:  Objection to form.
4    BY MR. GUILLOT:
5        Q.  They didn't?
6        A.  No.
7        Q.  How did you find Dr. Small?
8        A.  Back in 20 -- what it was?  2020 -- shit.
9              Me and my wife was -- googled or
10   something best orthopedic -- best orthopedic or most
11   talented, like (indiscernible) -- something in that
12   nature, best orthopedic surgeon or most, I mean,
13   talented orthopedic, something in that nature.
14       Q.  So you independently learned of Dr. Small --
15             MR. GRINNAN:  And --
16       Q.  -- without any referral?
17             MR. GRINNAN:  And hold on.  Don't answer.
18   This is getting outside the scope of the
19   limited purpose of this deposition, which is "about when
20   he received surgical recommendations, and if/when he
21   communicated this information to his counsel," not about
22   how he found out about a doctor.
23             So you need to stay limited to the
24   limited express purpose of this deposition.
25   BY MR. GUILLOT:

Page 34

1        Q.  Did you undergo the surgery on August 30th?
2        A.  No, I didn't go August 30th.
3        Q.  Why not?
4        A.  My, what they stated, hardware wasn't in yet.
5        Q.  Do you know when you ultimately underwent the
6    surgery?
7              MR. GRINNAN:  I think the court reporter
8    has a question for you.
9              What is it?
10             THE REPORTER:  Why did you not undergo
11   the surgery on August 30th?
12             THE WITNESS:  Because the parts that they
13   ordered, they haven't come in yet.
14             THE REPORTER:  Thank you.
15       A.  And I had the surgery September 6th.
16   BY MR. GUILLOT:
17       Q.  Is that the reason why it was pushed back from
18   August 30th to September 6th?
19             MR. GRINNAN:  Form.
20       A.  No.  It got pushed back twice.
21   BY MR. GUILLOT:
22       Q.  Okay.  Why was it pushed back the first time?
23       A.  Because the parts weren't in.
24       Q.  Okay.  Why was it pushed back the second time?
25       A.  The same.

Page 35

1        Q.  So absence of parts for both reasons?
2        A.  Yes.
3        Q.  Were the reasons for the pushing back both
4    surgeries?
5        A.  Uh-huh.
6              MR. GRINNAN:  Form.
7        Q.  All right.  We're almost done, Mr. Burnett?
8        A.  Okay.
9        Q.  Appreciate your time.
10             Did you have any surgeries after your
11   September 6th surgery?
12       A.  No.
13       Q.  All right.  Before I had asked you some
14   questions about any communications with your attorneys
15   recommending surgery between July 11th, 2022, and
16   August 30th, 2022.
17       A.  Right.
18       Q.  I was asking you that.
19       A.  Right.
20       Q.  Now I want to expand it until the date that you
21   actually underwent the surgery.  Okay?
22       A.  Okay.
23       Q.  So originally I was asking about July 11th,
24   2022, through August 30th, 2022.
25       A.  Uh-huh.

Page 36

1        Q.  Now I'm going to ask from July 11th, 2022,
2    through the date you had the surgery on September 6th,
3    2022.
4        A.  Okay.
5        Q.  Okay.  Did you ever communicate with any of
6    your lawyers about a recommendation to proceed with
7    surgery on September 6, 2022?
8              MR. GRINNAN:  Object.  Object to the
9    form.
10             Subject to the same reservation of
11   privilege, go ahead and answer.
12       A.  Could you repeat that question?
13   BY MR. GUILLOT:
14       Q.  Sure.  And you know what?  I'm going to break
15   it down a little bit.
16       A.  Please.
17       Q.  The surgery was scheduled from August 30th to
18   September 2nd, right?
19       A.  Right.
20             MR. GRINNAN:  Form.
21   BY MR. GUILLOT:
22       Q.  And then it was scheduled from September 2nd to
23   September 6th?
24       A.  No.
25             MR. GRINNAN:  You misspoke I think.

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 37

1    BY MR. GUILLOT:
2        Q.  It was scheduled from September 2nd to
3    September 6th?
4            MR. GRINNAN:  You said August 30th to
5    September 6th and then September 2nd.
6    BY MR. GUILLOT:
7        Q.  I'm sorry.  The surgery was scheduled from
8    August 30th to September 2nd, right?
9            MR. GRINNAN:  Form.
10       A.  Yes.  Yes.
11   BY MR. GUILLOT:
12       Q.  Do you know?
13       A.  It's something like that.  It's real -- you're
14   real close to it.
15       Q.  I can show you the forms if you don't want to
16   go by memory.
17       A.  Okay.  Yeah.
18       Q.  It's easier.  But --
19       A.  Yeah, it's fine with me.
20       Q.  -- what I have here is a surgery ordering form
21   we'll mark as the next exhibit, Exhibit 4.  It's
22   Burnett-Auth-01384.
23           (Exhibit 4 was marked.)
24           MR. GRINNAN:  You have a copy?
25           MR. GUILLOT:  Yeah.  Here you go, John.

Page 38

1            MR. GRINNAN:  Thanks, Gavin.
2    BY MR. GUILLOT:
3        Q.  Okay.  Have you ever seen this document before
4    that I've marked as Exhibit 4?
5        A.  No.
6        Q.  All right.  To me it looks like on July 11th,
7    2020 [sic] at the bottom --
8        A.  Okay.
9        Q.  -- your surgeon scheduled surgery for
10   August 30th, 2022?
11       A.  Okay.
12       Q.  And the type of surgery that's specified is in
13   the middle.  Okay?
14           MR. GRINNAN:  Form.
15       A.  Yeah.  I don't know -- okay.
16   BY MR. GUILLOT:
17       Q.  All right.  And so this is what you were
18   telling me earlier, July 11th, 2022 --
19       A.  Uh-huh.
20       Q.  -- Dr. Small scheduled a surgery for
21   August 30th, 2022, right?
22       A.  Correct.
23       Q.  Okay.  We know it didn't take place on
24   August 30th, 2022.
25       A.  Okay.

Page 39

1        Q.  And you told me that for two times it was
2    pushed back because of the hardware.
3        A.  Yeah.
4        Q.  Right.  Okay.
5            So let's just nail down the dates so that
6    we're on the same page.  Okay?
7        A.  Yeah.
8            MR. GUILLOT:  So that's Exhibit 4.  The
9    next exhibit is Burnett-Auth-1382.
10           Thank you.
11           (Exhibit 5 was marked.)
12           MR. GRINNAN:  Is this Exhibit 5?
13           MR. GUILLOT:  Yeah.
14   BY MR. GUILLOT:
15       Q.  So this is a pretty similar form?
16       A.  Uh-huh.
17       Q.  Okay.  And at the bottom there's a date that
18   says "8-30-2022"?
19       A.  Okay.
20       Q.  All right.  And it says surgery date at the top
21   of 9-2-2022.
22       A.  Okay.
23       Q.  Did you see that?
24       A.  Yeah.
25       Q.  Does this seem right that this is when the

Page 40

1    surgery was rescheduled the first time?
2        A.  Yeah --
3        Q.  Okay.
4        A.  -- that's it.
5        Q.  Did you have any communication with your
6    attorneys about this surgery being rescheduled?
7            MR. GRINNAN:  Object to the form.
8            Subject to the same reservation of
9    privilege for attorney-client privilege, you can go
10   ahead and answer.
11       A.  No.
12       Q.  Okay.
13           (Exhibit 6 was marked.)
14   BY MR. GUILLOT:
15       Q.  And Exhibit 6 is Burnett-Auth-1380.  Again it's
16   a similar form, Mr. Burnett.  Do you see this?
17       A.  Yes, sir.
18       Q.  The bottom has the date 9-2-2022.  Do you see
19   that?
20       A.  Yes, sir.
21       Q.  And at the top it's got a surgery date of
22   September 6th, 2022.
23       A.  Yeah.
24       Q.  You see that?
25           And this surgery date is actually when

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 41

1  the surgery went forward, right?
2  A.  Yes, sir.
3  Q.  Okay.
4  A.  Uh-huh.
5  Q.  Now, between the time of when your surgery was
6  supposed to take place after it was first rescheduled --
7  A.  Uh-huh.
8  Q.  -- September 2nd, through September 6th --
9  A.  Uh-huh.
10  Q.  -- did you have any communications with your
11  attorneys about this rescheduling?
12      MR. GRINNAN:  Object to the form.
13      Subject to the same reservation of
14  privilege, you can answer.
15  A.  No.
16  BY MR. GUILLOT:
17  Q.  Okay.  Thank you.
18      From the records it looks like that
19  you had two further surgical procedures after your
20  September 6th surgery -- September 6, 2022 -- is that
21  correct?
22      MR. GRINNAN:  Form.
23  A.  No.
24  BY MR. GUILLOT:
25  Q.  No?

Page 42

1  A.  No.
2  Q.  Have you had any type of procedures
3  where you've been under general anesthesia since
4  September 6, 2022?
5  A.  Yeah.  I had wound care cleaning.
6  Q.  Wound care cleaning?
7  A.  Yes.
8  Q.  Were you under general anesthesia?
9      Do you know what that means, general
10  anesthesia?
11  A.  Yes.
12  Q.  You're knocked out, right?
13  A.  Uh-huh.
14  Q.  Okay.  Have you -- how many wound care
15  cleanings, to use your word -- your term, have you had
16  since September 6, 2022?
17      MR. GRINNAN:  Form.
18  A.  I had two.
19  BY MR. GUILLOT:
20  Q.  All right.  Do you remember what month those
21  were in?
22  A.  Yeah.  One was in September.
23  Q.  Right.
24  A.  And the other one I think's -- I think that was
25  in September too.

Page 43

1  Q.  All right.
2      (Exhibit 7 was marked.)
3      MR. GUILLOT:  We'll mark
4  Burnett-Auth-1378 as the next exhibit.
5      MR. GRINNAN:  7?
6      MR. GUILLOT:  7.  So this is a --
7      MR. GRINNAN:  Do you have a copy?
8      MR. GUILLOT:  I'm sorry.  Yes.
9      MR. GRINNAN:  Thank you.
10  BY MR. GUILLOT:
11  Q.  You ever seen this document before?
12  A.  No.
13  Q.  Okay.  It's similar to the other documents
14  we've seen, but it shows at the bottom a date of
15  September 21st, 2022.
16  A.  Uh-huh.
17  Q.  Do you see that?
18  A.  Yeah.
19  Q.  And then a surgery date of September 22nd,
20  2022.  Do you see that at the top?
21  A.  Okay.
22  Q.  All right.  And then the procedure case, it
23  says "I and D of Lumbar Wound."
24      Do you know what that means?
25  A.  It says "Infected Lumbar Spine Wound."

Page 44

1  Q.  Above that it says "Infected Lumbar Spine
2  Wound" --
3  A.  Okay.
4  Q.  -- right?
5      And then below that it says:  "Procedure
6  Code:  I and D of Lumbar Wound."
7  A.  Okay.
8  Q.  Okay.  So what's your understanding of this
9  procedure?
10  A.  They --
11      MR. GRINNAN:  Form.
12  A.  They was trying to get the infection out.
13  BY MR. GUILLOT:
14  Q.  Okay.
15  A.  That's not a -- I don't -- I mean, that's life
16  or death.  Yeah.  At the time of surgery that's trying
17  to get an infection out of my body.
18  Q.  Okay.  And how did this manifest itself --
19      MR. GRINNAN:  Form.
20  Q.  -- to you?  How did you come to learn that the
21  wound was infected?
22      MR. GRINNAN:  Form.
23  A.  Through the surgery.
24  BY MR. GUILLOT:
25  Q.  From the surgery it got infected?

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 45

1    A. Yes.
2    Q. So you had the surgery on September 6th --
3    A. Yes.
4    Q. -- right?
5        And it got infected after the surgery --
6    A. Yeah.
7    Q. -- to your knowledge?
8    A. Yes.
9    Q. Okay. And it was painful?
10   A. Yes.
11   Q. Okay. And so you made an appointment?
12   A. No. They didn't know -- they didn't know that
13   I was infected in there.
14   Q. How did they know that it was infected?
15       MR. GRINNAN: Form.
16   A. That -- later that night, the night they had
17   the surgery, I just -- like I got a cold in me and
18   (descriptive sound). Every time I do that I -- it will
19   hurt real, real bad. And it's still in there now, but
20   they're still working on the infection.
21   BY MR. GUILLOT:
22   Q. Okay. So to your knowledge at some point
23   after the surgery, maybe the night of the surgery, an
24   infection came about?
25       MR. GRINNAN: Object --

Page 46

1    A. Yeah.
2        MR. GRINNAN: -- to the form.
3    A. Well --
4        MR. GRINNAN: And Gavin, we're getting
5    outside the scope again. It's not about surgical
6    recommendations. You're talking about actual medical
7    treatment now.
8        MR. GUILLOT: I'm just -- all right. I
9    appreciate that, John. I'm just laying the foundation
10   to discuss this procedure which --
11       MR. GRINNAN: And I hear you. I'm trying
12   to give you a little bit of leeway because I understand
13   what you're saying. But try to keep it -- or please
14   keep it within the Court's order.
15       MR. GUILLOT: All right. Well, I'm glad
16   we're cooperating on this, and that's my intention so
17   appreciate that.
18   BY MR. GUILLOT:
19   Q. So I'm just asking you when you got to a point
20   where you realized you would need to have this surgery
21   that's identified on Exhibit 7.
22       MR. GRINNAN: Form.
23   A. I -- I -- again, it's wound care cleaning.
24   You-all keep saying surgery. It's wounds care cleaning.
25   BY MR. GUILLOT:

Page 47

1    Q. Okay. We can call it that.
2    A. Okay.
3    Q. So whatever you'd like to call it.
4        The wound care cleaning --
5    A. Yes.
6    Q. -- on Exhibit 7, when is it that you learned
7    you'd have to undergo this wound care cleaning?
8    A. While I was in the hospital.
9    Q. Do you remember how many days it was --
10   A. Yes.
11   Q. -- after your original surgery, your original
12   back surgery?
13       You say it happened 9/22?
14   Q. The first one, yes.
15       So your surgery was on September 6th --
16   A. Okay.
17   Q. -- and the first wound care --
18   A. Wound care --
19   Q. -- cleaning surgery was on September 22nd.
20   A. Okay.
21   Q. And I'm trying to figure out when did you learn
22   when it would be ultimately recommended for you to
23   undergo this procedure?
24   A. When they got my blood work back.
25   Q. So when was that?

Page 48

1    A. While I was in the hospital. I mean, I still
2    was in the hospital.
3    Q. Were you in the hospital from September 6th
4    through September 22nd?
5    A. September 6th through 22nd? I got out one day
6    and I had to come back. I can't remember exactly what
7    day, but they let me go one day and I was right back.
8    Q. Okay.
9    A. I went to the emergency room I think that night
10   that they let me go.
11   Q. So let me ask it this way.
12       September 6th is the first back surgery,
13   right?
14   A. Yeah.
15       MR. GRINNAN: Form.
16   BY MR. GUILLOT:
17   Q. All right. To use your words, shortly after
18   the surgery, within 24 hours, they discover infection?
19       MR. GRINNAN: Form.
20   BY MR. GUILLOT:
21   Q. Is that right?
22       MR. GRINNAN: And this is outside the
23   scope.
24       MR. GUILLOT: It's trying to figure out
25   when he got the recommendation to proceed with this.

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 49

1    MR. GRINNAN: That's inside the scope of
2  when a doctor discovered an infection.
3    THE WITNESS: Yeah.
4    MR. GRINNAN: It's clearly outside --
5    Hold on. Hold on. Stop.
6    When a doctor discovered the infection
7  would be clearly outside the scope.
8    MR. GUILLOT: All right. Well, I think
9  what we're trying to do here --
10  BY MR. GUILLOT:
11    Q. What I'm trying to do, Mr. Burnett, is figure
12  out when you learned, you personally, that you would
13  need to undergo this cleaning procedure. Okay?
14    And so if you had the surgery on
15  September 6th and you underwent this procedure for the
16  first time on September 22nd, when in that window of
17  time did we learn -- did you learn that you would have
18  to undergo it?
19    A. I don't recall. It was sometime when I was in
20  the hospital, though.
21    Q. Okay. And were you in the hospital that entire
22  time except for one day?
23    A. Yes, except for one -- I think I got out one --
24  like one day, yes.
25    Q. So from September 6th through September 22nd

Page 50

1  you were in the hospital the whole time except for one
2  day?
3    A. I --
4    MR. GRINNAN: Form.
5    A. Yes. I was in the hospital until October.
6  BY MR. GUILLOT:
7    Q. Okay. So did you -- at some point between
8  September 6th and when this was scheduled on
9  September 21st it was recommended to you that you
10  underwent this procedure?
11    MR. GRINNAN: Form.
12    MR. GUILLOT: What's the objection?
13    MR. GRINNAN: You keep calling it a
14  procedure. He keeps on telling you that it was wound
15  care cleaning.
16    MR. GUILLOT: How is that not a
17  procedure? I'm not using the term "surgery."
18    MR. GRINNAN: We've talked --
19    (Speaking simultaneously.)
20    MR. GRINNAN: Well --
21    MR. GUILLOT: What would you like me to
22  call it, wound care cleaning?
23    MR. GRINNAN: That's what his
24  understanding of it is so I don't want you to confuse
25  him.

Page 51

1  BY MR. GUILLOT:
2    Q. Okay. I don't want to confuse you or anybody
3  else here --
4    A. Okay.
5    Q. -- so this wound care cleaning it calls it a
6  procedure right here.
7    If I refer to it as a procedure, I'm not
8  trying to trick you. It's just at some point between
9  September 6th and September 21st the wound care cleaning
10  was recommended to you, right?
11    A. Right.
12    Q. Before you actually underwent the wound care
13  cleaning on September 22nd, 2022, did you ever
14  communicate to your attorneys that you were going to be
15  undergoing this procedure?
16    MR. GRINNAN: Object to the form.
17    Subject to the same reservation of
18  privilege, you can answer the question again.
19    A. No. What -- my lawyers handle my legal fees --
20  I mean my legal stuff, and my doctors handle my doctor
21  stuff. I don't call my lawyers every time my doctors
22  tell me something. I mean, they're not doctors.
23  BY MR. GUILLOT:
24    Q. So if I understood the answer to your question,
25  you did not discuss --

Page 52

1    A. No.
2    Q. -- any -- let me get the question out. I think
3  you understand where I'm going, but I just want to make
4  it clear? Okay. So between September 6th, 2022, and
5  September 21st, 2022, you didn't have any communication
6  with your attorneys about the wound care -- the wound
7  care described on Exhibit 7 being scheduled for
8  September 22nd?
9    MR. GRINNAN: Objection; form.
10    Subject to the same privilege, you can
11  answer.
12    A. That was -- (indicating) this was an emergency.
13  That's not -- that was an emergency, man. That's not
14  just -- I mean, it's not just something I could have got
15  away from. I could have died from that.
16    So why do you keep judging me on -- about
17  this.
18    Q. So I'm not going to -- I'm not trying to be
19  rude by not answering your question.
20    A. No, no. I just -- no. I'm just --
21    Q. I'm just going to -- if you think it was an
22  emergency surgery or not, my question is just very
23  simple.
24    A. Okay.
25    Q. It's did you ever communicate with your lawyers

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT – 1/16/2023

Page 53

1  that this surgery was -- excuse me. Let me start over.
2       Did you ever communicate with your
3  lawyers that this wound cleaning that took place on
4  September 22nd was going to take place before you
5  underwent it?
6            MR. GRINNAN: Object to the form.
7       A. No.
8            MR. GRINNAN: Asked and answered.
9       A. No.
10 BY MR. GUILLOT:
11      Q. Okay.
12      A. No.
13      Q. All right. And you had to undergo a wound
14 cleaning a second time, right?
15      A. Yes, I did.
16      Q. All right.
17           MR. GRINNAN: This 8?
18           MR. GUILLOT: This is 8.
19           (Exhibit 8 was marked.)
20 BY MR. GUILLOT:
21      Q. All right. Mr. Burnett, I've shown -- I'm
22 showing you a document marked as Exhibit 8. It's
23 Burnett-Auth-01376. Looks pretty similar to the other
24 document we were just looking at, right?
25      A. Hmm.

Page 54

1       Q. Okay. As we sit here today, do you know when
2  you underwent the second wound care cleaning?
3       A. It says 10/4/22.
4       Q. That's what the form says. I didn't ask you
5  before I showed you the form, but does that sound right
6  to you?
7       A. I don't -- I mean, I don't remember. I was in
8  the hospital a long time.
9       Q. Okay. From the first wound care to the second
10 wound care were you in the hospital the whole time?
11      A. Yes.
12      Q. Okay. So that's September 22nd, 2022, through
13 October 4th 2022? You were in the hospital the whole
14 time?
15      A. Yes.
16      Q. All right. For this second wound care, do you
17 remember when it was recommended that you undergo this
18 second wound care treatment?
19      A. I don't know. I don't recall.
20      Q. Before undergoing this second wound care
21 treatment on October 4th, 2022, did you ever communicate
22 to your attorneys that this had been recommended?
23           MR. GRINNAN: Object to the form.
24           Subject to the same reservation of
25 privilege, you can answer.

Page 55

1       A. No.
2  BY MR. GUILLOT:
3       Q. Okay. Same question. Did you ever communicate
4  to your attorneys in that time period before
5  October 4th, 2022, that this second wound care treatment
6  had been scheduled?
7            MR. GRINNAN: Object to the form.
8            Subject to --
9       A. No.
10           -- same reservation of privilege, you can
11 answer.
12 BY MR. GUILLOT:
13      Q. Okay.
14           MR. GUILLOT: That's No. 8.
15 BY MR. GUILLOT:
16      Q. As we sit here today, are any other surgeries
17 recommended for you?
18      A. Yes.
19      Q. What are those, is that or those?
20      A. My knee replacements.
21      Q. Plural? Both knees?
22      A. Yes, sir.
23      Q. Are any surgeries scheduled for those?
24           MR. GRINNAN: Object to the form.
25      A. No.

Page 56

1            MR. GRINNAN: And Gavin, that's outside
2  the scope.
3            MR. GUILLOT: All right. Let's see?
4            MR. GRINNAN: We've been going about an
5  hour.
6            MR. GUILLOT: I really only have just
7  probably minutes left, but if you want to take a break
8  we could certainly take a break.
9            THE WITNESS: No. We -- I want to do it.
10           MR. GUILLOT: In fact, that might be good
11 so John and I can talk.
12           MR. GRINNAN: Okay. We can -- we can
13 take a quick break.
14           MR. GUILLOT: Take five?
15           MR. GRINNAN: Yeah, let's take five.
16           THE VIDEOGRAPHER: We're off record.
17 Time is 10:59 a.m.
18           (Break taken)
19           THE VIDEOGRAPHER: We are back on record.
20 Time is 11:12 a.m.
21 BY MR. GUILLOT:
22      Q. Ready to continue, Mr. Burnett?
23      A. Yes, sir.
24      Q. I don't have much longer. Some of the other
25 lawyers that are participating may have a few questions.

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 57

1    A.  Okay.
2    Q.  Thanks for your time.
3        So one thing I'd like to clear up, make
4    sure I understand it, about the communications that you
5    had with your lawyers on the surgery recommendations:
6    Did you ever authorize anyone to discuss surgery
7    recommendations on your behalf with your attorneys?
8        MR. GRINNAN:  Object to the form.
9    A.  Did I ever do -- ask anybody else?
10   BY MR. GUILLOT:
11   Q.  Yes.  Did you ever authorize anyone else to
12   discuss the surgery recommendations that we've been
13   discussing here today with your attorneys?
14   A.  No.
15       MR. GRINNAN:  Object to the form.
16   BY MR. GUILLOT:
17   Q.  No?
18   A.  No.
19   Q.  Okay.
20       To your knowledge has anyone else
21   discussed your surgery recommendations with your
22   attorneys?
23       MR. GRINNAN:  Object to the form.  That's
24   outside the scope.
25       MR. GUILLOT:  I disagree.  If you're

Page 58

1    going to instruct him not to answer, that's one thing,
2    but I think this would be a roundabout.
3        MR. GRINNAN:  Well, it's when someone
4    else communicates.  But this order specifically says
5    "he" as in Mr. Burnett, not other people, and you know,
6    doesn't say "other people."  It says "he."
7    Q.  Okay.  So let's just make the record.  I'm
8    going to ask --
9        MR. GRINNAN:  Gavin, I'm not trying to
10   like step on your toes, but it's about communications
11   with him and his lawyers.
12       MR. GUILLOT:  Okay.  The question that
13   I am going to ask is is he aware of anybody else who on
14   his behalf discussed his surgery recommendations with
15   his attorneys.
16       MR. GRINNAN:  Yeah, you asked that, but
17   then you asked -- that's not the question you just
18   asked.  What that was saying was outside the scope.
19   BY MR. GUILLOT:
20   Q.  Well, the question that I -- the question that
21   I just asked, are you okay with that question?
22       MR. GRINNAN:  Well, yeah, but you already
23   asked.
24       MR. GUILLOT:  I don't remember the answer
25   I'm going to ask that question.

Page 59

1    BY MR. GUILLOT:
2    Q.  Have you -- to your knowledge has anyone on
3    your behalf spoken with your lawyers about any of your
4    surgery recommendations?
5        MR. GRINNAN:  Object to the form.
6    A.  No.  No.  No.
7    BY MR. GUILLOT:
8    Q.  Okay.  So that includes your wife?
9    A.  No.
10   Q.  She's never done that on your behalf?
11       MR. GRINNAN:  Object to the form.  This
12   is way outside -- this is outside the scope.
13   A.  Why would my wife?  I mean, we don't talk
14   medical to my lawyers.
15   BY MR. GUILLOT:
16   Q.  Okay.  Did you ever authorize Dr. Small to
17   discuss his recommendations with your attorneys?
18       MR. GRINNAN:  Object to the form.  This
19   is outside the scope, Gavin.  It really is.  And so
20   please comply with the Court's order and the scope.
21       MR. GUILLOT:  Okay.  Are you instructing
22   him not to answer?
23       MR. GRINNAN:  I'm not instructing him not
24   to answer.  I'm asking you to comply with the court
25   order, and how -- I don't even know how we would have a

Page 60

1    foundation to talk about that, but it's separate.  But
2    the court order says what it says and we are supposed to
3    follow it.
4        MR. GUILLOT:  All right.  Well, this is
5    what I see.  It says "if [and] when he communicated this
6    information to his counsel."
7        Did he do it directly?  He's talked about
8    that.  Has he done it indirectly?  And you asked him
9    that.  I think you've asked him that a few times now.
10       MR. GUILLOT:  I'm asking now specifically
11   about Dr. Small.
12       MR. GRINNAN:  Uh-huh.  But -- yeah, but
13   you're ask --
14       THE WITNESS:  You asked the same
15   question.
16       MR. GRINNAN:  Hold on.  Hold on.  Stop,
17   stop.  Stop.
18       THE WITNESS:  Okay.
19       MR. GRINNAN:  Stop.
20       THE REPORTER:  So --
21       MR. GRINNAN:  You asked him did Dr. Small
22   talk to us about it, and that's different.  It's very
23   different and you would have no foundation to even talk
24   about that.
25       MR. GUILLOT:  I think that I do have the

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT – 1/16/2023

Page 61

1  foundation to talk about that, and I'd like to get an
2  answer to the question unless you tell him not to answer
3  it because if Dr. Small's office is communicating the
4  recommendations directly to his attorneys, what is
5  recommended to him is communicated to you-all.
6              MR. GRINNAN: Got it. I don't know how
7  he would ever know that but ...
8              MR. GUILLOT: I think that -- that's
9  coaching now.
10             MR. GRINNAN: Well --
11             MR. GUILLOT: I'm ask --
12             MR. GRINNAN: I'm not trying to but --
13             MR. GUILLOT: Let's see if -- unless
14  you're going to tell him he can't answer the question.
15             MR. GRINNAN: So I've been giving you
16  leeway in the -- what -- I'll give you an example.
17  Authorized on his behalf to speak to his attorneys,
18  that's what I was giving you leeway on. I think that
19  that probably arguably might be within the scope. But
20  when you start talking about outside of that where it's
21  did Dr. Small communicate this information, then that's
22  not. That's completely not a communication between him
23  and counsel.
24             MR. GUILLOT: Okay. So are you
25  instructing him not to answer?

Page 62

1              MR. GRINNAN: I'm not instructing him not
2  to answer. I'm asking you to comply with the Court's
3  order. It's about -- if we read it, "It is ordered that
4  Claimant Patrick Burnett will be deposed about when he
5  received surgical recommendations, and if/when he
6  communicated this information to his counsel."
7              It's limited to Mr. Burnett. It is
8  not -- it does not go broad enough to expand to other
9  people just by the very terms of the order.
10             MR. GUILLOT: If he authorized Dr. Small
11  to communicate with his attorneys about the surgical
12  recommendations, how does that not constitute --
13             MR. GRINNAN: But that's not what you
14  asked.
15             MR. GUILLOT: -- him --
16             MR. GRINNAN: You asked that question and
17  then you started asking questions that were not about an
18  authorized communication between -- that was from him to
19  counsel.
20             MR. RUFTY: Hey, guys. This is Alfred
21  Rufty again. You guys probably aren't going to reach an
22  agreement on this and I think the way --
23             MR. GRINNAN: No, I think we are.
24             (Speaking simultaneously.)
25             MR. RUFTY: -- through Texas keep a

Page 63

1  record, the question gets asked subject to an objection
2  and the judge looks at it later.
3              MR. GRINNAN: Okay. I think that we
4  actually are pretty much close to an agreement because I
5  think that we've been working well together throughout
6  this deposition.
7              Why don't you ask your question. And if
8  I have a problem with it, I'll set forth the basis. But
9  I'm giving you leeway to ask about communications that
10  he might authorize to his counsel, which you asked
11  about. But when you get beyond that, that's when it's
12  not a communication between him and counsel.
13             MR. GUILLOT: All right. Well, I mean --
14             MR. GRINNAN: Go ahead.
15             MR. GUILLOT: -- this is the question.
16  Mr. Burnett, I'm not your lawyer so I
17  can't tell you to answer something or not to answer it.
18             THE WITNESS: Yeah.
19             MR. GUILLOT: But I'm having a discussion
20  with your lawyer and so why don't you wait until he and
21  I resolve this before you answer my question.
22             THE REPORTER: Go head, man.
23             MR. GUILLOT: Is that fair?
24             THE WITNESS: Yeah. Yeah. I'll tell
25  you, yeah.

Page 64

1  BY MR. GUILLOT:
2      Q.  Okay. The question that I have is: Is he
3  aware of Dr. Small communicating with his attorneys
4  about Dr. Small's surgery recommendations on behalf of
5  Mr. Burnett?
6              MR. GRINNAN: On behalf of Mr. Burnett.
7  Okay. I think that that's probably -- I think that's
8  probably real close. I'm going to let you answer it if
9  you know.
10  BY MR. GUILLOT:
11     Q.  All right. Would you mind answering that
12  question, sir?
13     A.  Do I know if Dr. Small communicated with them?
14  That was --
15             MR. GRINNAN: On your behalf.
16     A.  I would have no earthly idea.
17  BY MR. GUILLOT:
18     Q.  Okay.
19     A.  How would I know that?
20     Q.  Did you ever discuss with Dr. Small his
21  communications with your lawyers --
22     A.  I --
23             MR. GRINNAN: Object to form. That's
24  a --
25     Q.  -- on your behalf?

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 65

1    MR. GRINNAN: Hold on. Hold on.
2    A. Me and Dr. Small never talked about my lawyers.
3    MR. GUILLOT: Well, he's -- okay. Thank
4  you for your time.
5    I pass the witness.
6  BY MR. RIBARITS:
7    Q. Mr. Burnett, I just have a couple of questions.
8    I'm John Robarits. I represent Premier
9  Offshore Catering.
10    A. Okay.
11    Q. Appreciate you coming in here today.
12    A. Okay.
13    Q. And I'll try to be brief.
14    A. All right.
15    Q. I'm trying to understand the sequence of when
16  you were in the hospital --
17    A. Uh-huh.
18    Q. -- as opposed to not being in the hospital from
19  the time you had your back surgery until you were
20  discharged. Okay?
21    A. Okay.
22    Q. And I think your testimony was you were
23  admitted to the hospital right around the day of your
24  surgery, maybe the day before your surgery?
25    MR. GRINNAN: Form.

Page 66

1    A. I was admitted on the 25th.
2    Q. Of what month?
3    Remember --
4    A. No.
5    Q. -- the surgery --
6    A. No, no, no.
7    Q. -- was September 6th.
8    A. No, no, no. No, no, no. No, no, no.
9    I went in to go get blood work done on
10  the 25th for surgery for the 20 -- I mean for the 30th
11  so when that surgery got pushed back they had to do
12  blood work again so I got admitted on the 5th -- I mean
13  on the 5th or 4th, something like that.
14    Q. Okay. So about a day or two --
15    A. Yeah, give or take.
16    Q. Okay. Was it your testimony -- and I may have
17  written this down wrong, but was it your testimony that
18  you were in the hospital continuously from a day or two
19  before you had the surgery until sometime in October?
20    MR. GRINNAN: Objection to form.
21    A. Repeat that.
22  BY MR. RIBARITS:
23    Q. Yeah.
24    Were you in the hospital continuously
25  from a day or two before you had the back surgery on

Page 67

1  September 6th through the end of September, beginning
2  October?
3    A. I got out one -- I got out one day and I had to
4  go to the emergency room that night and the next day I
5  was admitted back into the hospital.
6    Q. Do you recall what day that was?
7    A. I do not.
8    Q. Okay. Let me attach as Exhibit 9 -- it's --
9    MR. RIBARITS: I don't have another copy,
10  John. I'm sorry.
11    MR. GRINNAN: What is it?
12    MR. RIBARITS: It is P. Burnett 259 --
13    MR. GRINNAN: What's that?
14    MR. RIBARITS: -- Bates stamp.
15    MR. GRINNAN: I don't have the medical
16  records.
17    MR. RIBARITS: Yeah. Here you go.
18    MR. GRINNAN: The discharge?
19    MR. RIBARITS: Yeah.
20    MR. GRINNAN: And this is the -- I'm
21  looking for the date so I can ...
22    MR. RIBARITS: I think it's on the second
23  page.
24    MR. GRINNAN: Okay.
25  BY MR. RIBARITS:

Page 68

1    Q. Okay. So if you could take a look at that,
2  Mr. Burnett.
3    MR. GRINNAN: And just because I don't
4  have a copy, I'm coming in to look over his shoulder.
5    MR. RIBARITS: Sorry, Gavin.
6    Yeah, I'm going to look -- that's the
7  only copy I have.
8    A. "I am very happy that we were able to replace
9  the wound dressing. Just keep an eye on the tubing ...
10  make sure" -- (indiscernible).
11    Yeah, I'm wheezing.
12    Okay.
13    Q. Okay. So this is my handwriting in the top
14  right-hand corner, September 9, 2022.
15    A. Uh-huh.
16    Q. But I got that from page 2 of Exhibit No. 9
17  where -- is that your signature where it says "Patient's
18  Signature"?
19    A. Uh-huh.
20    Q. Is that a "yes"?
21    A. Yes, sir.
22    Q. Okay. And it says September 9, 2022, at 2 --
23    A. 25 p.m.
24    Q. -- 2:25 p.m.
25    So is that your understanding about when

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 69

1  you were discharged --
2         MR. GRINNAN:  Form.
3      Q.  -- from the hospital?
4         MR. GRINNAN:  Form.
5      A.  Yes.
6  BY MR. RIBARITS:
7      Q.  Okay.  So in looking at this, it looks like
8  they tried to put in -- I'm just reading it.  Give me a
9  second here.  Okay?
10        Okay.  So they're talking about wound
11 dressings and things of that nature so based upon this
12 document that's entitled "Patient Discharge
13 Instructions" from AD Hospital East is it your
14 understanding that the day you were discharged after the
15 initial back procedure on September 6th would have been
16 on September 9, 2022?
17     A.  Could you repeat that?
18     Q.  Sure.
19        (Indicating) Let me just go back and show
20 you here it says "Patient Discharge Instructions."
21     A.  Right.
22     Q.  And we've already looked at September 9 --
23     A.  Yeah.
24     Q.  -- 2022 and your signature at 2:52 [sic] p.m.
25        Would have been the date and time

Page 70

1  that you were discharged from AD Hospital East after
2  you had that back surgery on September 6th, 2022?
3      A.  Oh.  Yes, sir.  Yes, sir.
4      Q.  Okay.
5      A.  Yes, sir.
6      Q.  And how long were you out of the hospital after
7  being discharged on that day?
8         MR. GRINNAN:  Object to the form, and
9  this is getting outside the scope.
10        MR. RIBARITS:  I've only got a few more
11 left on that.
12        MR. GRINNAN:  I'm going to get you a
13 little bit of leeway but --
14        MR. RIBARITS:  Thank you.  Okay.
15     A.  One day.
16 BY MR. RIBARITS:
17     Q.  Okay.  And then you went back to -- was it the
18 same hospital, AD Hospital East?
19     A.  I went to the emergency room that night.
20     Q.  Okay.  That same night, September 9th?
21     A.  Yes, sir.
22        MR. GRINNAN:  Form.
23 BY MR. RIBARITS:
24     Q.  Okay.
25     A.  Then I was back in the hospital the next day.

Page 71

1      Q.  And then from September -- the evening of
2  September 9, 2022, until after you had the second wound
3  care procedure --
4      A.  Uh-huh.
5      Q.  -- you stayed in the hospital continuously?
6         MR. GRINNAN:  Form.
7      A.  Yes.
8  BY MR. RIBARITS:
9      Q.  Okay.  How many days after the September 29
10 second wound cleaning procedure did you stay in the
11 hospital, as best you recall?
12        MR. GRINNAN:  Object to the form.
13        We're --
14     A.  This --
15        MR. GRINNAN:  -- now getting outside the
16 scope again.
17     A.  I don't think -- they didn't clean this again
18 on the 9th.
19 BY MR. RIBARITS:
20     Q.  No.  You were discharged on the 9th and you
21 had --
22     A.  And I had my surgery on the 6th.
23     Q.  Right.  And you had the wound cleaning on
24 September 22nd I think?
25     A.  Yeah.  Okay.

Page 72

1      Q.  Then you had the second wound cleaning on
2  September 29th.
3         MR. GRINNAN:  Form.
4      A.  Okay.  Went into the hospital October or
5  something.
6         (Sotto voce discussion.)
7  BY MR. RIBARITS:
8      Q.  Do you recall specifically what day the second
9  wound cleaning was?
10     A.  I don't.
11     Q.  Okay.
12     A.  I don't.  I was in the hospital.
13     Q.  All right.
14     A.  I don't remember a lot of stuff.
15     Q.  And thank you for clearing that up for
16 me because --
17     A.  Yeah.
18     Q.  -- I think I understand now you were in the
19 hospital from Septem -- say a day or two before your
20 September 6th operation up until September 9 --
21     A.  Uh-huh.
22     Q.  -- you were discharged, and then you came back
23 to the hospital later on that day because you were
24 experiencing concerns with the wound.
25     A.  Yeah.

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 73

1        MR. GRINNAN: Object to the form.
2   BY MR. RIBARITS:
3        Q.   And then you went back to the hospital and
4   stayed in the hospital from then until after your second
5   wound cleaning procedure?
6        MR. GRINNAN: Form.
7        A.   When I went back in the hospital, I stayed till
8   Oct-- -- I can't even remember.  Was something --
9   October.  It was -- it was a -- it was awhile.
10  BY MR. RIBARITS:
11       Q.   Okay.
12       A.   A month or so.
13       Q.   But there were no discharges in between this
14  date of September 9, 2022, and sometime --
15       A.   From the 6th --
16       MR. GRINNAN: Hold on.  Hold on.
17       This is outside the scope, John.
18       MR. RIBARITS: This is my last question.
19  Give me a little leeway on this --
20       MR. GRINNAN: I'm trying to give you --
21       MR. RIBARITS: -- and I'm done.
22       MR. GRINNAN: I've been giving you some
23  leeway, but we're talking about some --
24       MR. RIBARITS: I appreciate that.
25       MR. GRINNAN: It needs to be tied back to

Page 74

1   the recommendation.
2        MR. RIBARITS: Okay.  It's coming.
3   BY MR. RIBARITS:
4        Q.   This was the only time that you were discharged
5   between a day or two before September 6, 2022, and later
6   on after the second wound cleaning procedure.  Is that
7   correct?
8        MR. GRINNAN: Form.
9        A.   No.  No.  They didn't do a second wound
10  cleaning procedure before that day.
11  BY MR. RIBARITS:
12       Q.   Right.
13       A.   Okay.  I had to go -- that's three days after
14  surgery.
15       Q.   Right.
16       A.   So, no, they didn't do the second wound
17  cleaning then because when I got out and I was feeling
18  bad, that's when I went back and they had to do the
19  wound care, all that.
20       Q.   And I'm following you.  It's just when you went
21  back --
22       A.   Uh-huh.
23       Q.   -- you didn't get discharged again until after
24  the second wound cleaning procedure?
25       A.   Right.

Page 75

1        MR. GRINNAN: Object to the form.
2        Q.   Got it.  Okay.  I'm done with that.
3        MR. GRINNAN: Okay.
4   BY MR. RIBARITS:
5        Q.   Now, at any time during the time that you were
6   in AD Hospital East did you ever communicate with your
7   attorneys that you had been discharged from AD Hospital
8   East?
9        MR. GRINNAN: Form.
10       A.   No.
11  BY MR. RIBARITS:
12       Q.   At any time when you went back following your
13  discharge from AD Hospital East did you ever communicate
14  with your attorneys that you had been readmitted to AD
15  Hospital East?
16       MR. GRINNAN: Stop.  Don't answer.
17       This is protected by attorney-client
18  privilege and it's not even within the scope.
19       MR. RIBARITS: Are you instructing him
20  not to answer?
21       MR. GRINNAN: Yeah, I'm going to instruct
22  him not to answer --
23       MR. RIBARITS: Okay.
24       MR. GRINNAN: -- unless it's within the
25  very limited -- and we believe all of this is protected

Page 76

1   by the attorney-client privilege, but we're letting him
2   answer very, very limited questions that are protected
3   subject to the privilege if they are related to when
4   he received surgical recommendations and when that
5   communication was communicated to counsel.
6        So that communication so not about being
7   admitted to a hospital, not about being admitted, stuff
8   like that.
9        MR. RIBARITS: Well, it's asking about
10  any communications about the additional wound cleaning
11  procedures, and that's what I asked.
12       Let me ask it again, John, and you tell
13  me if you have an objection to it.
14       MR. GRINNAN: Go ahead.
15  BY MR. RIBARITS:
16       Q.   At any time after you were readmitted to the
17  hospital?
18       A.   Uh-huh.
19       Q.   Did you ever communicate with your attorneys
20  about either the first wound cleaning procedure or the
21  second wound cleaning procedure?
22       MR. GRINNAN: Okay.  Object to form.
23       Subject to the same reservation of
24  privilege, you can answer.
25       A.   With all due respect, I wouldn't study my

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT
PATRICK ANTWAN BURNETT - 1/16/2023

Page 77

1    attorneys.  I was more worried about my life than
2    contacting my attorneys every time this doctor told me
3    something.  No, I did not?
4            (Sotto voce discussion.)
5    BY MR. RIBARITS:
6        Q.   Do you know if anybody on your behalf ever
7    communicated with your attorneys that -- after you were
8    readmitted to the hospital on September 9, 2022, that
9    these two additional wound cleaning procedures were
10   going to be performed?
11       A.   No.
12           MR. GRINNAN:  Object to the form.
13           MR. RIBARITS:  That's all I have, sir.
14   Thank you very much.
15           MR. RUFTY:  Hi.  This is Alfred Rufty
16   for --
17           THE REPORTER:  I can barely --
18           MR. GUILLOT:  We can't hear.
19           THE REPORTER:  -- hear you, sir.  We're
20   going to have to go off the record.
21           MR. GRINNAN:  Why?
22           THE REPORTER:  We haven't been able to
23   get the volume up yet.  I can't hear him.
24           MR. GRINNAN:  Want to go off real quick?
25           MR. RIBARITS:  Yeah.

Page 78

1            THE VIDEOGRAPHER:  We're off record.
2    Time is 11:30 a.m.
3            (Break taken.)
4            THE VIDEOGRAPHER:  We are back on record.
5    Time is 11:32 a.m.
6            THE REPORTER:  Okay, sir.
7            MR. RUFTY:  Okay.
8    BY MR. RUFTY:
9        Q.   You mentioned that you never talked to
10   Dr. Small about your lawyers.  You remember that
11   testimony?
12       A.   Yes.
13       Q.   Just to follow up on that point, did you ever
14   authorize Dr. Small to talk to your lawyers about his
15   surgical recommendations?
16           MR. GRINNAN:  Object to the form.  This
17   has been asked and answered a few times now.
18   BY MR. RUFTY:
19       Q.   Subject to the objection, you can answer.
20           MR. GRINNAN:  Okay.  Actually, we're
21   going to -- subject to our reservation of privilege, you
22   can answer one more time and then this question is not
23   getting asked again.
24       A.   No.
25   BY MR. RUFTY:

Page 79

1        Q.   Okay.  You mentioned that in your operation a
2    cage was put in your back to protect your spine.  To
3    your knowledge was -- do you recall that testimony?
4        A.   Yes, sir.
5        Q.   Okay.  To your knowledge was anything taken out
6    of your back --
7            MR. GRINNAN:  Object --
8            (Speaking simultaneously.)
9            MR. GRINNAN:  Object to form.
10           Don't -- don't -- hold on.
11           This is outside the scope.
12       A.   I don't --
13           MR. GRINNAN:  This is outside the scope
14   so I'm not going to let him -- I'm not going to let him
15   answer the question because your question is not
16   complying with the court order.
17           It's supposed to be about the limited --
18   it's a limited purpose deposition.  Judge Roby said, "It
19   is ordered that Claimant Patrick Burnett will be deposed
20   about when he received surgical recommendations, and
21   if/when he communicated this information to his
22   counsel," so I ask you to please comply with the court
23   order.
24           MR. RUFTY:  No further questions.  Thank
25   you.

Page 80

1            MR. GRINNAN:  Okay.  Are we done?
2            (No response.)
3            THE VIDEOGRAPHER:  All right.  This
4    concludes today's deposition.  We're off record.  Time
5    is 11:34 a.m.
6            (Off the video record.)
7            THE REPORTER:  Any other pertinent
8    matters for the record?
9            MR. GRINNAN:  Yes.  Can we please read
10   and sign?
11           THE REPORTER:  Off the record.
12           (Deposition concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

20  (Pages 77 to 80)

UNCERTIFIED, UNPROOFREAD, UNCORRECTED, UNEDITED ROUGH DRAFT