## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF MODERN | * | CIVIL ACTION NO. 2:21-CV-00258- |
| AMERICAN RAILROAD | * | JCZ-KWR (lead case) c/w 21-337, 21-464, |
| SERVICES, LLC, as Owner, and | * | 21-822, 21-1968, 21-1969, 21-1981, 21- |
| SHORE OFFSHORE SERVICES, | * | 1982, 21-2075, 21-2227 |
| LLC, as Bareboat Charterer and | * | Pleading applies to all cases. |
| Owner *Pro Hac Vice* of D/B THOR | * | |
| PETITIONING FOR | * | JUDGE JAY C. ZAINEY |
| EXONERATION FROM AND/OR | * | |
| LIMITATION OF LIABILITY | * | MAGISTRATE JUDGE KAREN WELLS |
| | * | ROBY |

## MEMORANDUM IN SUPPORT OF
## J. KYLE FINDLEY'S OBJECTIONS TO, AND MOTION FOR REVIEW OF, THE
## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.     INTRODUCTION

Mr. Findley represents claimants, including Mr. Patrick Burnett, in this now-settled, personal-injury matter. Without addressing anything substantive about this case or the Report and Recommendation at issue, the Court should deny the underlying motion for sanctions as moot and vacate the Report and Recommendations for the simple reason that this dispute with the parties who filed the underlying motion has settled and they have agreed to release and waive any claims that Mr. Burnett or Mr. Findley committed any sanctionable conduct.

But even if that were not the case, the Court should decline to adopt the Report and Recommendation on the merits.  The main facts giving rise to the Magistrate Judge's Report and Recommendation for sanctions against Mr. Findley are that on Friday, September 2, 2022, the Magistrate Judge issued an order compelling an independent medical exam (IME) of Mr. Burnett, but Mr. Burnett underwent a back surgery just four days later—right after the Labor Day weekend and before the IME occurred. The relevant defendants to Mr. Burnett's personal-injury claims— Premier Offshore Catering, Inc. and the "THOR Interests," which are Modern American Railroad

Services, L.L.C. and Shore Offshore Services, LLC. (the "Movers")—seized upon that turn of events and moved for the Court to sanction Mr. Burnett because he allegedly "spoiled" evidence by undergoing surgery before his IME.

The Magistrate Judge issued a Report and Recommendation. She recommended that the Court grant the Movers' motion, sanction Mr. Burnett and Mr. Findley, and exclude from trial the evidence of over $800,000 in surgical costs related to Mr. Burnett's personal-injury claim. She also recommended that the Court give an adverse inference instruction for a pre-cursor weight loss surgery that Mr. Burnett underwent and that the Court award the Movers attorneys' fees and costs.

Mr. Findley urges this Court to reject the Report and Recommendation for several reasons. First, the Movers failed to satisfy the elements of a spoliation claim. "A spoliation claim has three elements: (1) the spoliating party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the moving party must show that the spoliating party acted in bad faith."[1]

The Movers failed to satisfy the duty element because, although Mr. Findley had an initial duty to preserve Mr. Burnett's condition such that he could be medically evaluated, that duty was fulfilled when the Movers' own doctor examined Mr. Burnett right after his injury and when Mr. Burnett had a host of medical records made and imaging taken before surgery that documented the pre-surgical state of his back. Indeed, the Movers' own IME physician testified that an IME was not necessary to render his opinion because the records were so comprehensive. The Movers also did not establish that Mr. Findley intentionally destroyed evidence. Mr. Burnett testified that he did not tell Mr. Findley when his surgery was happening. So at worst, Mr. Findley merely did not

---

[1] *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 574 (5th Cir. 2020) (citing *Port of S. La. v. Tri-Parish Indus.*, 927 F. Supp. 2d 332, 346 (E.D. La. 2013); *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 190 (5th Cir. 2018)).

inform his client of an order related to an IME motion over a holiday weekend. Finally, the Report and Recommendation's finding that Mr. Findley acted in bad faith fails to place due weight on the peculiar circumstances of this case and the short timing between the IME order and the surgery mere days later and fails to consider the evidence supporting the fact that Mr. Burnett's condition was previously preserved.

Further, the Court should reject the Report and Recommendation because even if sanctions were warranted, the Magistrate Judge's recommended sanctions are unreasonable. The seriousness of sanctions for spoliation depends on:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.[2]

As mentioned, Mr. Findley's degree of fault was low—if existent at all—because he did not alter or destroy evidence; at most, he overlooked communicating to one of his clients about the need to undergo an IME before surgery over a holiday weekend. Moreover, the Movers suffered little prejudice because of the voluminous radiological images and their past examinations of Mr. Burnett. Again, the Movers' chosen IME physician testified that he did *not* need a pre-surgery IME to render his opinion. Last, the need for deterrence here is low given the uniqueness of the Magistrate Judge's order, the short time-lapse over the holiday weekend, and Mr. Burnett's changed surgery schedule that was never relayed to Mr. Findley before the surgery took place. The Magistrate Judge thus erred in recommending that the Court exclude Mr. Burnett's surgeries from this case. At most, the recommendation should have been an adverse inference on the surgeries in

---

[2]     *Id.* (quoting *Menges v. Cliffs Drilling Co.*, No. CIV. A. 99-2159, 2000 WL 765082, at *1 (E.D. La. June 12, 2000)).

question. The Court should thus reject and set aside the Magistrate Judge's report and recommendation.

## II.   BACKGROUND

### II-A. The underlying incident and the Movers' performance of medical examinations on Mr. Burnett in the days after the incident.

Mr. Burnett is a personal-injury claimant. On October 28, 2022, he was aboard the D/B THOR, a barge that was tied up to a dock in the path of Hurricane Zeta.[3] Mr. Burnett's employer was Premier and the barge itself was owned by the THOR Interests.[4] When the hurricane impacted the area, its storm surge caused Mr. Burnett to suffer serious injuries aboard the barge.[5]

Three days after the incident, Premier—a Mover—sent Mr. Burnett in for an examination with its chosen doctor (on October 31, 2020).[6] In connection with that visit, Mr. Burnett gave Premier's representative permission to be present in the room during his treatment, and by all indications, that representative was present during the examination.[7] Not only does Premier's company representative's name appear in the records in connection with the visit itself,[8] that company representative also signed papers in connection with the exam.[9] Said differently, within days after Mr. Burnett sustained the injuries for which he now sues, Premier, a Mover herein, not only selected a doctor for Mr. Burnett to see but actually supervised an examination of Mr. Burnett.

---

[3]   Rec. Doc. 491, report and recommendation, p. 1.

[4]   *Id*.

[5]   *Id*. at pp. 1–2.

[6]   Rec. Doc. 467-2, Occupational Medicine records, workers' comp medical records from Occupational Medicine Services, p. 34 (October 31, 2020 medical record).

[7]   *Id*. at p. 19 ("I give permission for my company representative to accompany me in the room during the exam.").

[8]   *Id*. at p. 20 ("Company Name: Premiere Catering."); *id*. ("Company Contact: Jamie Owens.").

[9]   *Id*. at p. 24 ("Authorized by: Jamie.").

Within a week (on November 6), another examination followed with a different healthcare provider selected by Premier. Once again, Premier requested, authorized, and paid for this treatment.[10] Significantly, this treatment included a physician paid for by Premier conducting an examination of Mr. Burnett's back before any surgical procedure.[11] This examination involved a complete physical examination of Mr. Burnett that included reviewing his history and systems, a general exam, and a lumbar spine exam.[12] Based upon that exam, and previous x-rays taken, that doctor diagnosed Mr. Burnett with acute lumbar strain and left lumbar radiculopathy and he ordered a lumbar MRI.[13]

### II-B.  The Movers file a limitation action and stay discovery.

On November 16, 2020, Mr. Burnett filed suit in Texas state court against Premier, one of the THOR Interests (Shore), and certain other entities.[14] About a week later, the defendants removed the case to federal court and declined to respond to Mr. Burnett's issued discovery on grounds that it could not take place until after the Rule 26 conference in federal court.[15] The Rule 26 conference didn't happen until March 4, 2022—and on that same day, the THOR Interests filed the limitation of liability action originally docketed at 2:21-cv-464 (and consolidated here).[16] This Court then entered a restraining order days later (on March 10, 2021) restraining the Texas federal case from proceeding.[17] The THOR Interests immediately notified the Southern District of Texas

---

[10]   Rec. Doc. 467-3, workers' comp medical records from Mississippi Sports Medicine, pp. 5–6, 16 (authorization by Premier Offshore Catering for a lumbar MRI of Mr. Burnett).

[11]   *Id*. at pp. 20–22.

[12]   *Id*. at pp. 20–21.

[13]   *Id*. at pp. 21–22.

[14]   Rec. Doc. 491, report and recommendation, p. 2.

[15]   *Id*. at p. 3 (email from John Ribaritis).

[16]   2:21-cv-464, Rec. Doc. 1, initial complaint.

[17]   2:21-cv-464, Rec. Doc. 4, restraining order.

of that order. And the matter proceeded in this forum under their limitation action, which was consolidated into this docket number. Mr. Burnett filed a claim in this action.[18] Meanwhile, discovery did not move forward in the Texas federal case.[19]

Amid all of this, Mr. Burnett continued with necessary recommended treatment being provided by his treating doctors for the severe injuries he sustained in the incident and produced medical records on February 10, 2022, months before the July 11, 2022 exchange date.[20]

### II-C.  The THOR Interests and Premier move to compel an IME, which Mr. Burnett opposes.

On July 11, 2022, after review of MRI films of Mr. Burnett's lumbar spine, Mr. Burnett's doctor recommended him for back surgery.[21] That day, the surgery was simultaneously set for August 30, 2022.[22] Around the same time, on July 13, 2023, Premier moved to compel an IME of Mr. Burnett.[23] Mr. Burnett opposed that motion, noting that he had a pending motion to bifurcate damage proceedings from liability proceedings in this case.[24]

During the pendency of the motion to compel, Mr. Burnett arrived in Houston on August 24, 2022, so that he might have the surgery on August 30, 2022.[25] His return flight was already

---

[18]    Rec. Doc. 491, report and recommendation, p. 2.

[19]    Rec. Doc. 467-5 at p. 1 (email from Gavin Guillot of the THOR Interests refusing to respond to Mr. Burnett's notice of deposition).

[20]    Rec. Doc. 345-4, p. 2 (email with February 10, 2022 production for Mr. Burnett); Rec. Doc. 342, p. 1 (noting initial discovery to be answered on July 11, 2022).

[21]    Rec. Doc. 405-11, p. 1 (July 11, 2022 office note).

[22]    *Id*. at p. 2.

[23]    Rec. Doc. 345, motion to compel IME.

[24]    Rec. Doc. 353, opposition to motion to compel IME. The motion to bifurcate was lodged as Rec. Doc. 352. After all of the events in question, the Court later denied the motion to bifurcate as premature on October 12, 2022. Rec. Doc. 401, order denying motion as premature.

[25]    Rec. Doc. 487, affidavit in response to court order.

booked for September 8, 2022.[26] Mr. Burnett's surgery was ultimately pushed back by his doctor, and without notice to Mr. Findley, until September 6, 2022.[27] Mr. Burnett testified that he did not communicate with his lawyers regarding this change in surgical date.[28] Mr. Findley was not involved with the scheduling of Mr. Findley's medical procedures, was not aware of any scheduling changes to the surgery made by Mr. Burnett's doctor, and did not learn of the new surgery date until after it occurred.[29]

On Friday, September 2, 2022, at approximately 3:50 pm, the Magistrate Judge granted the motion to compel Mr. Burnett's IME.[30] Mr. Burnett did not communicate to his counsel that the surgery he was scheduled to undergo before the IME motion was granted had not gone forward and had instead been moved to September 6, 2022. Therefore, his back surgery went forward on September 6, 2022, unbeknownst to Mr. Findley.[31] The surgery was not without complications, however. Two emergency wound care cleaning procedures were required to protect Mr. Burnett's life and went forward on September 22, 2022,[32] and September 29, 2022.[33]

---

[26]    *Id.*

[27]    Rec. Doc. 467-1, deposition of Mr. Burnett, pp. 9, 34–35.

[28]    *Id.* at pp. 10–11, 40-41.

[29]    *See* Ex. "A," 12/7/22 Hr'g Tr. 30:21-22 ("Mr. Findley: We didn't find out until after it was completed.").

[30]    Rec. Doc. 377, order granting IME.

[31]    Rec. Doc. 467-1, deposition of Mr. Burnett, pp. 10–11, 40–41.

[32]    Rec. Doc. 409-6, p. 2.

[33]    Rec. Doc. 409-7, p. 2.

**II-D. The THOR Interests and Premier's IME physician, Dr. David Vanderweide, admits a lack of prejudice.**

The Thor Interests and Premier moved for sanctions solely against Mr. Burnett contending that the surgery days after the Court's IME order amounted to the spoliation of evidence.[34] After a hearing, the Magistrate Judge ordered further discovery.[35] Namely, the Magistrate Judge ordered that Mr. Burnett be deposed about when he knew of the surgical recommendations, and that the movers' IME physician, Dr. David Vanderweide, provide an affidavit on whether the surgery spoliated evidence.[36]

Around the same time, Mr. Burnett sought to depose Dr. David Vanderweide and not merely accept an untested affidavit on his opinions.[37] The Thor Interests and Premier opposed that effort,[38] but the Court granted Mr. Burnett's motion.[39] As the Magistrate Judge recognized, prejudice was a "critical component" of a spoliation inquiry. As its order explained: "The Court finds that since the parties must show that they were prejudiced by the inability of Dr. Vanderweide to perform a pre-surgery IME, and spoliation is a critical component in assessing the pending sanctions motion, Burnett's deposition of Dr. Vanderweide is necessary."[40]

At his deposition, Dr. Vanderweide first confirmed a basic point. He can, and regularly does, render medical opinions on the necessity of surgery based solely on medical records (and

---

[34]     Rec. Doc. 405, motion for sanctions.

[35]     Rec. Doc. 418, court order.

[36]     *Id*.

[37]     Rec. Doc. 449, motion to compel deposition of David Vanderweide.

[38]     Rec. Doc. 452, opposition to motion to compel deposition of Dr. David Vanderweide.

[39]     Rec. Doc. 462, order granting motion to compel.

[40]     *Id*. at pp. 1–2.

without the need for a physical examination).[41] And so the affidavit he submitted meant one and

only one thing: That although medical records of other pre-surgical physical exams on Mr. Burnett

exist, Dr. Vanderweide did not *personally* conduct a physical examination of Mr. Burnett before

the surgery and, therefore, cannot speak to what his own *personal* physical exam would have

shown.[42]

Turning to Mr. Burnett himself, Dr. Vanderweide conceded that he *was*, in fact, able to

render an opinion that Mr. Burnett did not need surgery based solely on the records presented, and

that he had all the information he needed to render that opinion.[43] Further Dr. Vanderweide

---

[41]    Rec. Doc. 478-1, deposition of Dr. David Vanderweide, pp. 141–46 ("Q. All right. And you'd agree
with me that when you provide opinions, you provide opinions based on records only on numerous
occasions, correct? A. Yes. Q. Okay. And, in fact, you do it all the time where you can provide an
opinion about the necessity of surgery with just reviewing records without seeing a plaintiff,
correct? A. Correct. Q. Okay. And that's something you've done throughout the course of your
career, is you're able to generate reports solely based on medical records and MRI films, correct?
A. Correct. Q. And those reports that you have generated based solely on medical records and MRI
films without seeing a plaintiff, you still stand by those opinions, don't you? A. I do. Q. Okay. And
you do it all the time, you issue reports on injuries, causation and necessity of surgery on a regular
basis without actually examining a plaintiff, correct? A. Correct. Q. Okay. And you do it also as a
part of your practice, you will issue reports on injuries, causation and the necessity of surgery
without seeing a plaintiff, correct -- or a patient, rather? A. Correct.").

[42]    *Id*. at pp. 27–28 ("A. Yeah. My point in constructing the – the affidavit was that I personally am --
am unable to testify to his presurgical state because I didn't see him prior to surgery. There are
medical records that are replete with physical examinations -- Q. Okay. A. -- but I cannot personally
testify to what he looked like prior to his surgery. Q. Sure, and let -- let's -- let's break that down
for a moment. What you're saying is you can't personally state what your own physical exam
shows, correct? A. That's correct. Q. Okay. But what you can testify to and what you do testify to
in numerous cases is what other physical examinations show for the presurgical medical condition,
correct? A. That's correct."); *id*. at p. 84 ("Q. Okay. You're not making -- and just so I'm clear,
your affidavit is not stating that other defense doctors have not been able to perform those various
exams. That's not what you're saying, correct? A. No. All I'm saying is that I am unable to
personally attest to any preoperative presurgical physical findings or complaints on Mr. Burnett.")
(objections omitted); *id*. at p. 92 ("Q. . . As it relates to your affidavit, and we touched on this
earlier, not to belabor a point, but if we want to narrow down what your affidavit says, it basically
says I wasn't able to examine him before his surgery, correct? A. Correct.").

[43]    *Id*. at pp. 141–46 ("Q. Okay. All right. The other thing that I wanted to ask you is you were asked
questions earlier that there was an instruction for so let me clear it up. In this particular case, based
on the medical records that you do have, the physical examination, documents that you do have
that were recorded, the imaging, the discography, you are able to render an opinion as it relates to
Patrick Burnett, true? A. I would be. Q. Okay. And you're able to do that based on your education,

testified that the absence of a pre-surgical physical exam had no ultimate impact *at all* on his medical opinions on Mr. Burnett.[44] While quoted in the lengthy footnote exchange provided here, it bears repeating for purposes of the instant motion: When questioned directly on whether he had all the information he needed in order to render an opinion regarding Mr. Burnett's necessity for surgery, **despite having not physically examined him**, Dr. Vanderweide agreed that he had everything he needed.[45] Again, Dr. Vanderweide said that his ability to render an opinion on Mr.

---

training and experience and being able to review medical records and imaging and come to a conclusion about the necessity of surgery, correct? A. I would be. Q. Okay. And you are able to do that in this case despite having not physically examined him as it relates to Patrick Burnett, fair? A. Correct.  Q. Said another way, despite having not been able to physically examine him for purposes of a medical opinion for necessity and causation, you have all the information that you need in order to render that opinion? A. Correct. Q. Sir? A. Correct. Q. Thank you.  And we talked about some of the physical examinations, straight leg raise test, tenderness test, all of those types of tests. What you rely on is the document-recorded information and  the medical records as well as the imaging as it relates to presurgical condition, true? A. Correct. Q. Okay. And the other thing that I was going to ask you is in this case, you are able to give an opinion about Patrick Burnett's presurgical condition based on those medical records, those imaging findings and all of the medical documentation you've received that shows his presurgical condition, true? A. Correct. Q. So if someone were to say at a later date that you somehow are unable to render an opinion about Patrick Burnett's medical condition presurgery, that would not be true. You can based on the evidence that you have, correct? A. Correct. Q. Thank you. The only thing that has changed is you're not able to say you saw him before surgery, correct?  A. That is correct. Q. But you don't -- Q. -- need that in order to render an opinion, true? A. Correct. . . . Q. In this case, you weren't able to see Mr. Burnett prior to his surgery, fair? A. Correct. Q. Okay. Q. But despite the fact of not seeing him, you are able to render all of your opinions that you normally would based on the copious amounts of medical records, imaging, discography that does exist presurgery, true? A. Correct. Q. Okay. And what I'm saying is the only thing is that you -- the only thing you can't say is that you saw him, right? Q. Before surgery? A. Yeah. I mean, the only thing I can't do is testify to my personal examination of him. Q. Fair. Okay. What you're saying is the only thing you can't do is testify to your own personal exam, correct? A. Correct.") (form objections omitted).

[44]   *Id.* at p. 180 ("Q. What I'm saying is it does not impact your ability to form a medical opinion as it related to Patrick Burnett, correct? A. Correct.") (form objections omitted); *id.* at pp. 185-86 ("Q. Okay. Based on the medical records you reviewed, the physical examinations that you've reviewed, the imaging that you've reviewed, your ability to render a medical opinions for the defendants as it relates to Patrick Burnett has not been impacted at all by not seeing him, true? A. Correct.") (form objections omitted); *id.* at p. 194 ("Q. Based on what you have reviewed and the information that you do have and you have seen, you feel comfortable being able to provide an opinion just like you do in other cases about the necessity of surgery, correct? A. Correct.").

[45]   *Id.* at p. 143 ("Q. Said another way, despite having not been able to physically examine him for purposes of a medical opinion for necessity and causation, you have all the information that you need in order to render that opinion? A. Correct.").

Burnett without seeing him before surgery had "not been impacted at all."[46] Dr. Vanderweide's testimony is clear, concise, and telling: Movers suffered no prejudice in having Dr. Vanderweide perform an examination after surgery had occurred because Dr. Vanderweide had everything he needed from records that predated the surgery. In fact, Dr. Vanderweide's ultimate opinion that Mr. Burnett did not require surgery as a result of the incident would be the same regardless of whether he performed an IME before or after any surgical intervention.

The existence of prejudice is a critical component to the spoliation inquiry. Here, the opinions of the very doctor whom the Movers alleged would be prejudiced due to the surgery, flatly disagrees.

**II-E. The Magistrate Judge issues the report and recommendation naming Mr. Findley.**

The Magistrate Judge ultimately issued a report and recommendation that recommended sanctioning Mr. Burnett.[47] The Magistrate Judge went further to state Mr. Findley's name individually, though no sanction against him was requested and no sanction was specifically identified in the report. The Magistrate determined that Mr. Findley acted in bad faith although no evidence existed that Mr. Findley knew about Mr. Burnett's surgery being scheduled for a date after the Court's IME order. This determination is dependent in large part on imputing the knowledge or actions of Mr. Findley's staff and co-counsel.[48]

---

[46]   *Id.* at pp. 187–88 ("Q. Okay. Based on the medical records you reviewed, the physical examinations that you've reviewed, the imaging that you've reviewed, your ability to render a medical opinion for the defendants as it relates to Patrick Burnett has not been impacted at all by not seeing him, true? A. Correct.") (form objections omitted).

[47]   Rec. Doc. 491, report and recommendation.

[48]   *Id.* at 12 ("[Mr. Findley] clearly knew that the surgery had been scheduled for August 30, 2022, per the 'document dump' of August 26, 2022, but did not disclose to the court or opposing counsel while the motion to compel an IME was pending."); *id.* at 22 ("[T]he scheduling attorney is deemed to be staff within the firm and thus, communication from the scheduling attorney is imputed to the attorney.").

As to whether Premier and the THOR Interests were prejudiced, the report and recommendation noted that Dr. Vanderweide testified that he could not perform certain tests on Mr. Burnett in light of Mr. Burnett having undergone surgery.[49] The report and recommendation did not address Dr. Vanderweide's express testimony that his ability to render his opinions in this case—that Mr. Burnett did not need the surgery—was not impacted, and therefore, no prejudice was sustained. It also did not give weight to the fact that Premier had previously scheduled and paid for two medical examinations of Mr. Burnett prior to surgery taking place.

**II-F. On October 8, 2023 Shore, Premier, and Mr. Burnett settle their differences.**

On October 8, 2023, Mr. Burnett entered into a settlement agreement with the Thor Interests and Premier Offshore Catering, Inc. The settlement agreement provides that the Thor Interests and Premier Offshore Catering, Inc. agreed to release and waive all claims, theories, and arguments of any kind related to spoliation of evidence and/or conduct to date in Case No. 21-258 and any case consolidated with it.

In light of the foregoing, Mr. Findley now objects to the report and recommendation as set forth herein.

### III.   LAW AND ARGUMENT

**III-A. The Court Should Deny the Motion for Sanctions as Moot and Vacate the Magistrate Judge's Report and Recommendation.**

The parties here have recently entered into a settlement agreement. In the agreement, the Movers agreed to release and waive all claims, theories, and arguments of any kind, that Patrick Burnett and/or his counsel J. Kyle Findley committed spoliation of evidence and/or conduct to date that is otherwise sanctionable in Case No. 21-258 for the United States District Court for the

---

[49]     *Id*. at pp. 15–16.

Eastern District of Louisiana and any case consolidated with it.  Accordingly, without reaching any of the substantive arguments below, the Court should deny the motion for sanctions (Rec. Doc. 405) that was based on such alleged spoliation. Further, the Court should vacate the Report and Recommendation on Defendants' motion for sanctions (Rec. Doc. 491) because the motion underlying it is moot and because the Court has not had an opportunity to review the Magistrate Judge's determinations.

### III-B. If the Court Reaches the Merits, the Court Reviews the Report and Recommendation De Novo.

"In reviewing the Magistrate Judge's Report and Recommendations, the Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected." *Leboeuf v. Bickham*, No. CV 21-2147, 2023 WL 2326963, at *2 (E.D. La. Mar. 2, 2023) (citing 28 U.S.C. § 636(b)(1)(C) ("[A] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which an objection is made.")); *see also* 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3070.1 (3d ed.) ("Rule 72(b)(2) sets forth procedures to be followed by parties who object to the magistrate judge's recommendations and by the district judge to whom the case is assigned. . . . By filing a timely and adequate objection, a party obtains the right to de novo review of the magistrate judge's recommendation.").

### III-C. The Report and Recommendation Should Be Vacated.

A federal court has the inherent power to sanction a party who has abused the judicial process.[50] Here, the Magistrate Judge pointed to the purported spoliation of evidence as such an abuse and recommended that it warrants excluding evidence of $800,000 of surgeries that Mr.

---

[50]     *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)

Burnett underwent as a result of his injury. The Court should not adopt that recommendation because the Movers failed to satisfy the elements of a spoliation claim and because the recommended sanctions are far too harsh.

### III-C(1). The Movers did not prove the elements of a spoliation claim.

"The spoliation of evidence doctrine governs the intentional destruction of evidence."[51] "A spoliation claim has three elements: (1) the spoliating party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the moving party must show that the spoliating party acted in bad faith."[52] "It is insufficient to show that a party acted negligently, rather than intentionally, in spoliating the evidence."[53] And the party seeking sanctions must prove a spoliation claim by "clear and convincing evidence."[54]

The Movers failed to satisfy any element of their spoliation claim. To start, although Mr. Findley had an initial duty to preserve Mr. Burnett's condition such that he could be medically evaluated, that duty was fulfilled by the Movers' past examinations of Mr. Burnett and by the many records documenting the state of his back. The Movers also did not establish that Mr. Findley intentionally destroyed evidence.  Mr. Burnett did not tell Mr. Findley of his changed surgery date.

---

[51]     *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 573 (5ᵗʰ Cir. 2020) (citing *Menges v. Cliffs Drilling Co.*, No. CIV. A. 99-2159, 2000 WL 765082, at *1 (E.D. La. June 12, 2000)).

[52]     *Id.* at 574 (citing *Port of S. La. v. Tri-Parish Indus.*, 927 F. Supp. 2d 332, 346 (E.D. La. 2013); *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 190 (5th Cir. 2018)).

[53]     *Id.* at 573 (citing *Catoire v. Caprock Telecommunications Corp.*, No. 01-3577, 2002 WL 31729484, at *1 (E.D. La. Dec. 2, 2002); *Garnett v. Pugh*, No. CIV. A. 14-479, 2015 WL 1245672, at *4 (E.D. La. Mar. 18, 2015)).

[54]     *In re Booker*, 624 F. App'x 319, 320 (5th Cir. 2015) ("However, we could not determine from the record whether the district court found that Booker acted in bad faith by clear and convincing evidence, as is required when a court sanctions an attorney under its inherent powers." (citing *In re Sealed Appellant*, 194 F.3d 666, 670–71 (5th Cir.1999); *In re Thalheim*, 853 F.2d 383, 389 (5th Cir.1988)).

So at worst Mr. Findley overlooked informing his client of an IME order over a holiday weekend while having no knowledge a surgery had been moved to occur immediately after the weekend. And the Report and Recommendation's finding that Mr. Findley acted in bad faith is unsupported because it fails to properly consider the peculiar circumstances of this case and the short timespan between the IME order and the surgery mere days later.

### III-C(1)(a). Mr. Findley fulfilled his duty to preserve Mr. Burnett's condition.

The first element of a spoliation claim is that "the spoliating party must have controlled the evidence and been under an obligation to preserve it *at the time of destruction*."[55] While a duty to preserve Mr. Burnett's back condition such that Mr. Burnett could be medically evaluated may have existed immediately following his injuries, by the time of Mr. Burnett's surgery in late 2022, that duty had long been fulfilled. Just days after Mr. Burnett's accident, the Movers' own doctors examined his back—twice.[56]  And in the two years between Mr. Burnett's accident and his surgery, hundreds of medical records and images so fully documented the state of his back that the Movers' own IME physician testified that he did not need to conduct an IME in order to determine whether Mr. Burnett needed surgery.[57] By the time of Mr. Burnett's surgery, then, the evidence of Mr.

---

[55]   *Coastal Bridge Co.*, 833 F. App'x at 574 (emphasis added) (citing *Port of S. La.*, 927 F. Supp. 2d at 346; *Herster*, 887 F.3d at 190).

[56]   Rec. Doc. 467-2, Occupational Medicine records, workers' comp medical records from Occupational Medicine Services, p. 34 (October 31, 2020 medical record); Rec. Doc. 467-3, workers' comp medical records from Mississippi Sports Medicine,  pp. 5–6, 16 (authorization by Premier Offshore Catering for a lumbar MRI of Mr. Burnett).

[57]   Rec. Doc. 478-1 at p. 180 ("Q. What I'm saying is it does not impact your ability to form a medical opinion as it related to Patrick Burnett, correct? A. Correct.") (form objections omitted); *id*. at pp. 185–86 ("Q. Okay. Based on the medical records you reviewed, the physical examinations that you've reviewed, the imaging that you've reviewed, your ability to render a medical opinions for the defendants as it relates to Patrick Burnett has not been impacted at all by not seeing him, true? A. Correct.") (form objections omitted); *id*. at p. 194 ("Q. Based on what you have reviewed and the information that you do have and you have seen, you feel comfortable being able to provide an opinion just like you do in other cases about the necessity of surgery, correct? A. Correct.").

Burnett's back injury was sufficiently preserved such that Mr. Burnett did not spoil anything by having a surgery to relieve his pain. Thus, Mr. Findley did not breach any duty to preserve evidence.

### III-C(1)(b). Mr. Findley did not intentionally destroy evidence.

The intentional destruction of evidence is at the heart of a spoliation claim—"[i]t is insufficient to show that a party acted negligently, rather than intentionally, in spoliating the evidence."[58] Here, nothing—much less clear and convincing proof—shows that Mr. Findley intentionally destroyed evidence.

To start, Mr. Findley was not involved in the day-to-day scheduling of Mr. Burnett's medical procedures.[59] Indeed, Mr. Burnett testified that he did not speak with Mr. Findley about his surgery date or about his medical procedures generally.[60] And regarding the surgery being rescheduled to take place after the Magistrate Judge issued her IME order, Mr. Burnett testified:

> Q. Did you have any communications with your attorneys about this surgery being rescheduled?
>
> A. No.[61]

That means Mr. Findley at most knew or should have known that Mr. Burnett had a surgery scheduled for August 30, 2022, which was two days before the Magistrate Judge issued the order compelling the IME. So Mr. Findley had no reason to think that he needed to call Mr. Burnett immediately and tell him not to have an operation once that order came down—for all he knew,

---

[58]   *Coastal Bridge Co.*, 833 F. App'x at 573 (citing *Catoire*, 2002 WL 31729484, at *1; *Garnett*, 2015 WL 1245672, at *4).

[59]   *See* Ex. "A," 12/7/22 Hr'g Tr. 30:21-22 ("Mr. Findley: We didn't find out until after it was completed.").

[60]   Rec. Doc. 467-1, deposition of Mr. Burnett, pp. 10–11 of 20, 40-41.

[61]   *Id.* at pp. 10, 40.

any operation was already complete. Mr. Findley thus was not intentionally trying to flout the court's IME order or destroy evidence.

Because Mr. Findley's office arranged for Mr. Burnett's medical travel, the Court dismisses Mr. Burnett's testimony as deceptive.[62] At his deposition, however, Mr. Burnett was not asked whether he spoke with support staff. He was asked specifically whether he spoke with his "attorneys" about his medical scheduling and he truthfully answered no.[63] Ascribing "tactics" to his truthful and correct answers is not supported by the evidence.[64]  More importantly, regardless of whether Mr. Burnett purposefully omitted speaking with Mr. Findley's support staff, there was no evidence that Mr. Burnett spoke with *Mr. Findley*, or that Mr. Findley was otherwise aware of Mr. Burnett's medical procedures.

In the end, there is zero evidence, much less *clear and convincing* evidence, to show that Mr. Findley intentionally destroyed evidence. Indeed, the only direct evidence submitted on the issue—the testimony of Mr. Burnett—supported Mr. Findley's explanation that he did not know that Mr. Burnett was scheduled for surgery after the Magistrate Judge issued her IME order.

---

[62]     Rec. Doc. 491, report and recommendation, p. 21 (claiming that Mr. Burnett "tactically neglected to mention that he communicated with his attorney about the surgery on August 19, 2022, to secure his travel arrangements.").

[63]     Rec. Doc. 467-1, deposition of Mr. Burnett, at pp. 10–11, 40–41.

[64]     The other ways that the report and recommendation seeks to discredit Mr. Burnett's testimony as not sufficiently complete or stating dates incorrectly are likewise uncompelling. Rec. Doc. 491, report and recommendation, pp. 20-21. These trivial errors are not grounds for dismissing Mr. Burnett's testimony entirely, especially as Burnett acknowledged that he did not review any materials before his deposition to refresh his memory. Rec. Doc. 467-1, deposition of Mr. Burnett, pp. 2, 8.

**III-C(1)(c). Mr. Findley did not fail to inform Mr. Burnett of the IME order in bad faith.**

"Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence."[65]  Bad faith is not proven when the destruction of evidence could stem from mere negligence or incompetence.[66]

For the same reasons that the Movers did not show that Mr. Findley intentionally destroyed evidence, they also did not show that Mr. Findley destroyed any evidence in bad faith. Rather, as already fully explained, Mr. Burnett's pre-IME surgery was the result of tight timeframes, miscommunications, and holidays. Nothing suggests that Mr. Findley sought to "hid[e] adverse evidence."[67] Instead, the record supports that Mr. Findley provided voluminous medical records to the Movers documenting every image and medical examination related to Mr. Burnett's pre-surgical condition. No evidence related to Mr. Burnett's physical medical condition has ever been hidden.

**III-C(2). The Report and Recommendation's Suggested Sanctions Are Unreasonable.**

"If a party *intentionally* destroys evidence, the trial court may exercise its discretion to impose sanctions on the responsible party."[68] The seriousness of those sanctions depends on:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.[69]

---

[65]  *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (citing *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)).

[66]  *See, e.g.*, *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 346 (M.D. La. 2006) (failure to timely inform employees of a duty to preserve emails did not constitute bad faith).

[67]  *Guzman*, 804 F.3d at 713 (5th Cir. 2015).

[68]  *Coastal Bridge Co.*, 833 F. App'x at 573 (citing *Menges v. Cliffs Drilling Co.*, No. CIV. A. 99-2159, 2000 WL 765082, at *1 (E.D. La. June 12, 2000).

[69]  *Id.*

Even if sanctions were warranted here, the Magistrate Judge's recommended sanctions are unreasonable. As mentioned, Mr. Findley's degree of fault was low—if existent at all because he did not alter or destroy evidence—at most, he overlooked communicating to one of his clients about the need to undergo an IME before surgery over a holiday weekend. Further, the Movers suffered little prejudice because the Movers' IME doctor testified under oath that the absence of a pre-surgical IME did not affect his opinion. So even if he would have performed more tests on Mr. Burnett in his pre-surgery state, it would not have changed anything. Last, the need for deterrence here is small given the oddities of how the Court's order timed with the holiday weekend and Mr. Burnett's changed surgery schedule. So at most, the recommended sanction should have been an adverse inference on the surgeries in question.

### III-C(2)(a). Mr. Findley's degree of fault was low.

Without being overly repetitive, again Mr. Findley was at little to no fault in failing to tell Mr. Burnett of the IME order before his surgery. Mr. Burnett did not tell Mr. Findley that his surgery had been rescheduled from August 30 (before the September 2 IME Order) to September 6 (four days after the IME order). So Mr. Findley had no reason to think that he needed to call Mr. Burnett immediately and tell him not to have an operation after the IME order came down. If he knew anything about Mr. Burnett's surgery, it was only that any operation was already complete. Mr. Findley thus had little fault to merit a harsh sanction.

### III-C(2)(b). The Movers did not suffer prejudice.

The Magistrate Judge's report and recommendation improperly casts aside the overwhelming evidence that the Movers suffered no prejudice in this case.

First, as noted above, the Movers' own elected and compensated doctors examined Mr. Burnett within days of the incident that led to his injury and specifically conducted examinations

of his back.[70] Therefore, the Movers did not miss anything by not getting to do another exam years after the surgery.

Second, the pre-surgical condition of Mr. Burnett's back is extraordinarily well-documented in medical records and medical imaging. There are over 650 radiology images that provide detailed radiological images of Mr. Burnett's lumbar spine from all angles and all levels.[71] These images were taken on three separate occasions over the approximate two-year period preceding the September 2022 surgery.[72] In addition, Mr. Burnett's treating physicians documented their analyses on the condition of Mr. Burnett's lumbar spine in radiology reports and medical records.[73]

Third, the testimony of the Movers' chosen IME doctor definitively shows that the Movers did not suffer prejudice. He testified that he is able to render an opinion that Mr. Burnett did not need surgery based solely on the available records.[74] He also testified that the absence of a pre-

---

[70]   Rec. Doc. 467-2, Occupational Medicine records, workers' comp medical records from Occupational Medicine Services, p. 34 (October 31, 2020 medical record); Rec. Doc. 467-3, workers' comp medical records from Mississippi Sports Medicine, pp. 5–6, 16 (authorization by Premier Offshore Catering for a lumbar MRI of Mr. Burnett).

[71]   Rec. Doc. 409-1, 11-18-2020 MRI Images: Burnett's Lumbar Spine, R001590a (containing 71 MRI images of Burnett's lumbar spine on Nov. 18, 2020); Rec. Doc. 409-2, 2-22-2022 MRI Images: Burnett's Lumbar Spine, R000280a (containing 71 MRI images of Burnett's lumbar spine on Feb. 2, 2022); Rec. Doc. 409-10 and 409-11, 5-18-2022 CT Scan Images: Burnett's Lumbar Spine, R001558a (containing 536 CT Scan images of Burnett's lumbar spine on May 18, 2022).

[72]   *See generally, id.* (imaging recorded on November 18, 2020, Feb. 2, 2022, and May 18, 2022 respectively).

[73]   *See, e.g.*, Rec. Doc. 409-3, 11-18-2020 Radiology Report: Burnett's Lumbar Spine, R000246-R000247 (analyzing the MRI imaging captured on Nov. 18, 2022 of Mr. Burnett's lumbar spine); Rec. Doc. 409-5, 2-3-2022 Dr. Henry Small Medical Record for Burnett, R000594-R000596 (describing the medical condition of Mr. Burnett's lumbar spine as it existed on Feb. 3, 2022).

[74]   Rec. Doc. 478-1, deposition of Dr. David Vanderweide, pp. 141–46 ("Q. In this particular case, based on the medical records that you do have, the physical examination, documents that you do have that were recorded, the imaging, the discography, you are able to render an opinion as it relates to Patrick Burnett, true? A. I would be.") (form objections omitted).

surgical physical exam had no effect *at all* on his medical opinions regarding Mr. Burnett.[75] As a result, the Movers did not suffer prejudice that warranted the exclusion of evidence.

### III-C(2)(c). The need for deterrence is small.

On the deterrence side of the sanction's equation, the incredibly short timeframe between the IME order and the surgery in this case—mere days—creates a unique and unfortunate situation that is unlikely to occur again. The exclusion of Mr. Burnett's surgeries is thus far too harsh under the facts, especially as the weight of the sanction falls primarily on Mr. Findley's client. Any possible aspect of deterrence is sufficiently met in this case by the entry of an adverse inference for the surgeries at issue. The *exclusion* of Mr. Burnett's surgeries is not warranted. And the Report and Recommendation is wrong for recommending that path.

### III-D. Mr. Findley Did Not Otherwise Act in Bad Faith.

Although primarily concerned with Mr. Findley's alleged spoliation of evidence, the Report and Recommendation also concludes that Mr. Findley improperly failed to produce his client for an IME "for a two-year period" without a court order.[76] Unquestionably, Mr. Findley, as well as other lawyers at his firm, engaged in a lengthy back and forth with the Movers over Mr. Burnett's IME. But during that time, discovery was governed by a Scheduling Order that did not

---

[75] *Id.* at p. 180 ("Q. What I'm saying is it does not impact your ability to form a medical opinion as it related to Patrick Burnett, correct? A. Correct.") (form objections omitted); *id.* at pp. 185-86 ("Q. Okay. Based on the medical records you reviewed, the physical examinations that you've reviewed, the imaging that you've reviewed, your ability to render a medical opinions for the defendants as it relates to Patrick Burnett has not been impacted at all by not seeing him, true? A. Correct.") (form objections omitted); *id.* at p. 194 ("Q. Based on what you have reviewed and the information that you do have and you have seen, you feel comfortable being able to provide an opinion just like you do in other cases about the necessity of surgery, correct? A. Correct.").

[76] Rec. Doc. 491, report and recommendation, p. 10 ("This type of conduct disregards the Federal Rule of Civil Procedure 1, which requires cooperation in the discovery of evidence. Fed. R. Civ. P. 1.").

require responses until July 11, 2022 (the tail end of this two-year period).[77] To the extent that the Movers believed that they were entitled to an IME in advance of that deadline, they did not press the issue, instead waiting until after responses were due before filing a motion to compel.[78] In other words, the Magistrate Judge sanctioned Mr. Findley, in part, for refusing to produce his client for an IME during a time when discovery was suspended (or, alternatively, when the opposing side could have litigated the matter but did not). This was error because Mr. Findley did nothing in bad faith.

Mr. Findley also did not act in bad faith by requiring his opposing counsel to file a motion to compel once the scheduling deadline had passed. Under Rule 35, the THOR Interests and Premier had the burden to show "good cause" why an IME was necessary.[79] Although it was not his client's burden to do so,[80] Mr. Findley and his co-counsel advanced several reasons why good cause was lacking. For one, Mr. Findley believed that Mr. Burnett's damages case should be severed and sent back to where the case was initially filed.[81] The Magistrate Judge dismissed this legal position as "debunked" by Judge Vance's decision in *Midland v. M/T American Liberty*.[82] But Mr. Findley's failure to adhere to an unpublished district court opinion lacking precedential

---

[77]    *See* Rec. Doc 342, Scheduling Order.

[78]    Rec. Doc. 345, motion to compel IME.

[79]    Fed. R. Civ. P. 35(a)(2).

[80]    *Matter of Chem Carriers Towing, LLC*, No. CV 21-1025, 2022 WL 1702507, at *2 (E.D. La. Feb. 8, 2022) ("To the extent movant improperly attempts to shift the burden to claimant to establish that 'good cause' does not exist for the second requested IME, that effort must fail.")

[81]    Rec. Doc. 353, opposition to motion to compel IME. The motion to bifurcate was lodged as Rec. Doc. 352. Burnett's motion to bifurcate was later "DENIED as premature" but not until after the motion to compel was granted. Rec. Doc. 401, order denying motion as premature.

[82]    Civ. No. 19-10525, 2020 WL 12583838, at *2 (E.D. La. Dec. 2, 2020) (Vance, J.) (holding that the issue of bifurcation was irrelevant to the issue of spoliation).

value was not bad faith,[83] especially as the bifurcation motion was not the only reason given by Mr. Findley to resist the IME.

Last, as explained above, the Movers had previously examined Mr. Burnett before any surgical procedures and Mr. Burnett's pre-surgical condition was extensively documented by other means. As a result, Mr. Findley took the position that there wasn't good cause for *another* physical examination or that the information could be obtained through less restrictive means.[84] This was hardly a trivial objection—whether the movant has pursued alternative discovery procedures is a *requirement* of good cause,[85] and the order of a second IME was hardly a foregone conclusion. The Movers disagreed with Mr. Findley's objections and their position was ultimately vindicated after their motion to compel was granted. But Mr. Findley's pressing his client's legal interests in good faith (even if unsuccessfully) is not grounds for sanctions.[86]

---

[83]    *Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting Moore's Federal Practice § 134.02 (3d ed. 2011))).

[84]    *See, e.g*., Rec. Doc. 491, report and recommendation, p. 20 (quoting Mr. Findley's 3/10/22 email). In the same email, Mr. Findley invites opposing counsel to submit proposals for the scope of the examination. *Id.*

[85]    *Guidry v. Noble Drilling Servs*., No. 16-4135, 2018 WL 2418835, *2 (E.D. La. May 29, 2018) (Feldman, J.) ("When determining if a party has shown good cause, courts consider whether 'a plaintiff plans to prove his claims through the testimony of expert witnesses,' if an examination would preserve the 'equal footing of the parties,' and whether the movant has "exhausted alternative discovery procedures.") (quoting *Lahr v. Fulbright & Jaworski*, L.L.P., 164 F.R.D. 169, 200 (N.D. Tex. 1995)) (citing *Diaz v. Con-Way Truckload, Inc*., 279 F.R.D. 412, 419 (S.D. Tex. 2012)).

[86]    *Dawson v. United States*, 68 F.3d 886, 896–97 (5th Cir. 1995) ("[A] district court's disagreement with the merits of a position asserted in good faith by counsel cannot serve as the basis for sanctions."); *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1298–99 (5th Cir. 1994) (district court abused its discretion by imposing sanctions where argument was not "implausible, unreasonable, or otherwise frivolous").

### III-E. Mr. Findley Is Entitled to a Hearing

"When a court contemplates sanctions under its inherent power, 'it must comply with the mandates of due process.'"[87] "Due process requires 'fair notice and an opportunity for a hearing on the record.'"[88] That hearing must "allow[] the party facing sanctions 'an opportunity to present their objections' and 'an opportunity to mount a defense.'"[89]

Although the Court could easily reject the Magistrate Judge's Report and Recommendation on the papers alone, if it is considering adopting the recommendations, it must afford Mr. Findley a hearing and an opportunity to be heard before sanctioning him.

Mr. Findley never received notice that he might be subject to personal sanctions because the Movers sought only to sanction his client, Mr. Burnett. And as a result, the Magistrate Judge never conducted a hearing in which Mr. Findley had "'an opportunity to present … objections' and 'an opportunity to mount a defense'" to the sanctions that he—rather than his client—might receive. The Magistrate Judge instead went beyond the scope of requested relief and amorphously recommended "sanctioning" Mr. Findley sua sponte without specifying what the recommended sanctions even would be. Mr. Findley is thus entitled to a hearing in front of this Court before the Court imposes any sanctions on him.

---

[87]   *CEATS, Inc. v. TicketNetwork, Inc.*, 71 F.4th 314, 323 (5th Cir. 2023) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)).

[88]   *Id.* (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752 (1980)).

[89]   *Id.* (first quoting *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) then quoting *Kenyon Int'l Emergency Servs., Inc. v. Malcolm*, No. 12-20306, 2013 WL 2489928, at *5 (5th Cir. May 14, 2013)).

## IV.   CONCLUSION

The Court should grant review of the report and recommendation and reject it. Alternatively, the sanctions issued should be reduced to no more than the entry of an adverse inference on all items therein.

Respectfully submitted,

*/s/ William P. Gibbens*
William P. Gibbens, 27225
SCHONEKAS, EVANS, MCGOEY &
MCEACHIN, LLC
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
Facsimile: (504) 680-6051
Billy@semmlaw.com

*Attorney for J. Kyle Findley*