UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| All COAST, LLC, ET AL. | CIVIL ACTION |
| VERSUS | NO. 21-258 and consolidated cases |
| SHORE OFFSHORE SERVICES, LLC, ET AL. | SECTION A(4) |

**ORDER AND REASONS**
**[Ref: All Cases]**

The following motion is before the Court: **Motion for Partial Summary Judgment (Rec. Doc. 686)** filed by defendants and counter-claimants Martin Operating Partnership, L.P. and Martin Energy Services, LLC (collectively "Martin"). Crosby Tugs, LLC ("Crosby") opposes the motion. The motion, noticed for submission on May 14, 2025, is before the Court on the briefs without oral argument.

**I.**

The numerous consolidated cases in this matter pertain to an incident that occurred in October 2020 as Hurricane Zeta hit Louisiana. In anticipation of the storm, the D/B THOR had been moved from its offshore worksite to Martin's dock located in Port Fourchon, Louisiana. This was done at the request of THOR's operator, Shore Offshore Services. During the storm THOR broke free from its moorings at the dock and caused significant damage as it floated freely up Bayou Lafourche striking other vessels and structures in its path. Numerous claims for personal injuries and property damage ensued. These claims have been consolidated into this lawsuit.

1

Crosby is a towing company offering services for ship docking and inland and offshore towing. Crosby's ENDEAVOR had towed the THOR from its pre-storm offshore worksite to Port Fourchon. Once in the port, two harbor tugs (not affiliated with Crosby), LA MADONNA and LA ELITE, took over to push THOR up against Martin's Dock 16 and hold THOR in place during the pre-storm mooring operation, which was conducted by THOR's crew. Crosby did not participate in the mooring operation. Thus, neither Crosby nor ENDEAVOR played any role in mooring THOR to Martin's Dock 16. ENDEAVOR departed the area after LA MADONNA and LA ELITE took over and headed home for Crosby's dock.

It is undisputed that Martin and Crosby had no business dealings or discussions or other interactions with respect to the docking and mooring of THOR at Martin's Dock 16.

At Shore's request, on the morning of October 28, 2020, ENDEAVOR returned to assist THOR, which was still moored at Martin's Dock 16. At THOR's request, ENDEAVOR tied up to THOR's outboard side, which was the side opposite from Martin's dock. Thus, THOR was adjacent to Martin's Dock 16, and ENDEAVOR was moored to THOR on the side facing the open water of the bayou. In this configuration, and given the massive size of the THOR (approximately 137 feet in width), ENDEAVOR was floating in the waters of Bayou Lafourche at least 140 feet from Dock 16. ENDEAVOR had no physical contact whatsoever with Dock 16 and from its position on the far side of THOR could not receive any services from Martin had it wanted any, which it did not.

It is undisputed that Martin and Crosby had no business dealings or discussions or other interactions with respect to ENDEAVOR's return and mooring to THOR at Martin's Dock 16. This was all arranged between Shore and Crosby.

The weather began to deteriorate in the storm and when THOR began to break away from its moorings at Dock 16, THOR asked ENDEAVOR's crew via radio to try to push THOR back into the dock to keep it in place. ENDEAVOR's effort had no effect given the looming size of THOR and the hurricane conditions. THOR broke free from its moorings at the dock and floated freely up Bayou Lafourche causing the damage at issue in the consolidated cases.

A judicial determination as to fault for the breakaway must await the trial on the merits. But questions have been raised regarding whether the THOR had been properly moored by its crew, and whether defects in Martin's Dock 16 either caused or contributed to the breakaway.

Notwithstanding that Martin and Crosby had no business dealings or discussions or other interactions whatsoever with respect to the mooring of THOR at Martin's Dock 16 or ENDEAVOR's return to assist THOR, or any of the events leading up to the breakaway incident at issue, Martin nonetheless seeks indemnity (including defense costs) from Crosby for all of the property damage and personal injury claims being asserted against it. The basis for Martin's indemnity claim against Crosby is an old Facility Access and Indemnity Agreement between Martin and Crosby, which according to Martin, remained in effect on the day of the breakaway incident and contractually obligates Crosby to provide the indemnity sought, or at a minimum to pay Martin's defense costs (including attorney's fees and expenses). In other words, if Martin is

3

found liable for any part of the damages (property damage or personal injury) caused by THOR'S breakaway—liability that would be based on defects in Martin's dock, whether caused by Martin's own failure to maintain its facility or some other omission by Martin—Martin wants Crosby to pay for it, along with all of its defense expenses.[1]

Via its motion for partial summary judgment, Martin moves for judgment as a matter of law on its claim against Crosby for contractual defense and indemnity. Martin seeks an order that Crosby must protect, indemnify, and hold harmless Martin for all costs, including its defense costs, as to all the property damage and personal injury claims being asserted against it.

## II.

The first issue is whether there was an enforceable contractual obligation to indemnify in effect on the date of the breakaway incident.

At the outset, the Court notes that in its Memorandum in Support Martin repeatedly and consistently refers to "the Agreement" in the singular even though Exhibit A to Martin's motion, where Martin has attached "the Agreement," contains two versions of what is obviously a form Facility Access and Indemnity Agreement that Martin was using back in 2007. There is a Facility Access and Indemnity Agreement dated October 31, 2007, that was signed by a Crosby principal, (Rec. Doc. 686-4, Exhibit A at 2-3), and there is also a Facility Access and Indemnity Agreement dated April 24, 2007, signed by Crosby's personnel manager, who was simply an employee of the company, (*id.* at 4-5). In its otherwise extensive Memorandum in Support, Martin completely ignores that there were two Facility Access and Indemnity Agreements

---

[1] Some experts have opined that defects in Martin's dock, specifically with certain bollards that THOR was moored to, were a contributing cause of the breakaway.

executed on different dates, and Martin never indicates which of the two documents is "the Agreement" that it is referring to in the singular in its motion.

The fact that Martin required Crosby to execute more than one Facility Access and Indemnity Agreement certainly calls into question Martin's contention that there was an enforceable indemnity obligation in effect on the date of the breakaway. The Court is compelled to agree with Crosby's suggestion that the Facility Access and Indemnity Agreement dated April 24, 2007 was actually executed on April 24, 2008. The face of the form contains a typewritten notation that the form was "REVISED 9/27/07," which means that it could not have been signed by Crosby's employee months earlier on April 24, 2007. Furthermore, the form has a fax date/time stamp of April 25, 2008, and a received stamp dated April 28, 2008. Martin's form Facility Access and Indemnity Agreement had the year of execution, "2007," typed in as part of the form's standard text. Since the form was Martin's, it is obvious that Martin provided the form to Crosby's employee with the wrong year included on the form and Crosby's employee did not alter it when he signed it. Surely, the April 24, 2007 Facility Access and Indemnity Agreement was not executed in 2007. So what exists is a Facility Access and Indemnity Agreement dated October 31, 2007, that was signed by a Crosby principal, whose authority to bind the company is not in question, and a Facility Access and Indemnity Agreement (while dated April 24, 2007) signed on April 24, 2008 by Crosby's then personnel manager, whose authority to bind the company on an indemnity agreement is certainly questionable.

Presumably "the Agreement" that Martin's claim for contractual indemnity is grounded upon is the Facility Access and Indemnity Agreement dated October 31,

5

2007, which was signed by a Crosby principal. Martin's argument is that the Agreement remained in full force and effect when the breakaway incident occurred, which was years later. If this is correct, then the Agreement must surely have been in effect on April 24, 2008 yet on that date Martin required that Crosby execute the form again. Crosby posits that the only conceivable reason that its personnel manager would have signed the form is that Martin's personnel required him to do so as a condition for using Martin's dock for a crew change. Crosby stresses that the fact that Martin required Crosby to execute the form on two separate occasions within about six months suggests that Martin sought a signature each time Crosby accessed Martin's facility, a circumstance that undermines Martin's contention that any indemnity agreement that Crosby executed in 2007 remained in force in 2020.

In its Reply, Martin did attempt to dispute Crosby's suggestion that the Agreement was not a one-time consent for access form because there would have been many more such agreements if that were the case. (Rec. Doc. 709, Reply at 3 & n.3). In support Martin provides a declaration stating that numerous times from 2008 through 2019 Crosby accessed Martin's facility. (Rec. Doc. 709-2, Exhibit A King Declaration). But still Martin has not explained why Crosby was required to execute another Facility Access Agreement after it had executed the agreement of October 31, 2007, if that agreement remained in effect.

Further, the Court is not impressed with Martin's contention that Crosby "admitted" that "the Agreement" was in force on October 28, 2020. At Crosby's 30(b)(6) deposition Martin's counsel elicited a legal conclusion from Crosby's representative as to whether in the absence of a document revoking the Agreement it would remain in

effect. (Rec. Doc. 686-5, Exhibit B at 6-7). Of course, the premise underlying that question is that the Agreement remained in effect at all, which is questionable to say the least.

In sum, the Court is not persuaded that Martin has established as a matter of law that the Facility Access and Indemnity Agreement dated October 31, 2007 remained in force on the day of the breakaway incident. Summary judgment must be denied on this basis alone, whether for indemnification or defense costs.

The Court's analysis could end here.[2] But even if somehow the 13-year old Facility Access Agreement was in force on October 28, 2020, Crosby argues that the undisputed facts regarding the breakaway incident demonstrate that the incident does not fall under the Agreement or under the indemnity provision contained in the Agreement. Crosby makes convincing arguments.

The Agreement is governed by Texas law. (Rec. Doc. 686-4 at 3 ¶ 8). Under Texas law, courts apply general contract law principles when construing indemnity agreements. *Cannon Oil & Gas Well Servs. Inc. v. KLX Energy Servs. LLC*, No. 4:20-CV-1164, 2021 WL 823996, at *5 (S.D. Tex. Jan. 29, 2021), *aff'd sub nom. Cannon Oil & Gas Well Servs., Inc. v. KLX Energy Servs., L.L.C.*, 20 F.4th 184 (5th Cir. 2021) (citing *Weeks Marine, Inc. v. Standard Concrete Prods., Inc.*, 737 F.3d 365, 369 (5th Cir. 2013)). "Texas courts examine the entire contract in an effort to harmonize and give effect to all provisions so that none is rendered meaningless." *Id.* When a contract's

---

[2] As for indemnity, the issue is premature anyway. Under Texas law indemnity agreements are not ripe for enforcement until the underlying liability lawsuit is resolved. *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d523, 529 (5th Cir. 2004) (citing *Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997)). Thus, if Martin's position had merit the Court would be compelled to decline to grant relief at least as to indemnification.

meaning is disputed, the "primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *Id.* (citing *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018)). Courts "presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Id.* (citing URI, 543 S.W.3d at 763-64).

Martin's analysis myopically proceeds to the indemnity provision found in paragraph 2 of the Agreement, but by its terms the Agreement applies only when Crosby accesses a Martin facility, which the Court is persuaded did not occur at any time leading up to the breakaway incident. By its express terms the Agreement itself only applies when Crosby actually accesses a Martin facility and this limitation is reflected throughout the Agreement's terms. Crosby suggests that "access" means actual entry into or onto a Martin facility because paragraph 4 of the Agreement states that the privilege of access granted in the Agreement can be revoked by Martin at any time and when that happens "all access cards and/or keys" must be returned to Martin. (Rec. Doc. 686-4 at 3). So Martin's first problem in pursuing Crosby for contractual indemnification based on the Facility Access and Indemnity Agreement is establishing that ENDEAVOR "accessed" Martin's facility when it was at all times located at least 140 feet from Martin's dock on the opposite side of THOR. Martin has not presented any evidence that THOR was required to obtain Martin's consent to be moored to THOR on the side opposite Dock 16 or that Martin demanded proof of insurance pursuant to the Agreement or that anyone would have reasonably believed that such consent was required based on the notion that Crosby was "accessing" Martin's facility

8

by being moored to THOR on the open waters of the bayou. In other words, it is implausible to characterize Crosby or ENDEAVOR as having accessed Martin's facility by being moored to THOR.[3] Thus, even if Martin could establish that the Facility Access and Indemnity Agreement was in effect on the day of the breakaway incident, summary judgment would not be appropriate because Martin cannot establish that the Agreement even applies under the undisputed facts of this case.

But even if the Agreement was in effect and applied under the facts, Martin has not established as a matter of law that the Agreement's indemnity provision applies to the breakaway incident.

The indemnity clause found in paragraph 2 of the Agreement provides in relevant part:

> [Crosby] agrees to protect, defend, indemnify, and hold harmless Martin . . . from any and all claims, demands, causes of action and expenses (including cost of defense), for injury to or death of any persons ***while on or adjacent to the facility***, and from loss of or damage to any property, in any way arising, in whole or in part, out of the presence or activities of any kind or character of [Crosby] ***on or adjacent to the facility*** . . . .

(Rec. Doc. 686-4, Exhibit A at 2 ¶ 2) (emphasis added).

Clearly both indemnification for property damage and personal injury include a locational requirement such that the personal injury must occur "while on or adjacent to

---

[3] Even though ENDEAVOR was at all times on the navigable waters of the bayou because it was on the opposite side of THOR, which again was no small vessel, Martin raises the rather creative argument that its facility lease with the Greater Lafourche Port Commission included the waters extending into the bayou from its dock thereby making those waters part of its "facility." This argument lacks merit because nothing in Martin's lease suggests that the Maximum Mooring Zone depicted in the drawings was part of the facility lease. The Court agrees with Crosby's contention that the Maximum Mooring Zone is in the nature of a limitation and not a property right, which as Crosby points out, the Port Commission would have been without legal authority to confer.

the facility," and the property damage must arise out of Crosby's presence or activities "on or adjacent to the facility." And while Martin contends that the contractual indemnity obligation contained in the foregoing paragraph is broad and encompasses the claims asserted against Martin in this lawsuit, Martin is patently incorrect insofar as the personal injury claims are concerned. It is undisputed that no person injured as a result of the breakaway incident sustained those injuries while on or adjacent to Martin's Dock 16 or in the Maximum Mooring Zone (see footnote 3 above) or anywhere near Martin's facility. Thus, aside from all of the other problems with Martin's contractual indemnity claim against Crosby, the text of the indemnity provision itself would expressly foreclose application for the personal injury claims.

  The locational requirement for property damage indemnification is somewhat more relaxed insofar as the property damage itself need not occur on or adjacent to Martin's facility. The factual question insofar as the property damage claims are concerned is whether ENDEAVOR was "on or adjacent to" Martin's Dock 16 when the breakaway incident occurred. Notwithstanding Martin's heavy reliance on dictionary resources to expound upon what "on" means, ENDEAVOR was not "on" Martin's facility at any time leading up to the breakaway.

  Martin's argument that ENDEAVOR was adjacent to the facility (while once again relying on dictionary resources) is slightly better than its argument that ENDEAVOR was on the facility but the Court is not persuaded that ENDEAVOR was adjacent to Martin's facility at any time leading up to the breakaway incident. Clearly THOR was adjacent to Martin's facility because it was moored to the dock but ENDEAVOR was located on the other side of THOR on the open waters of the bayou at a significant distance from

10

Martin's dock. Martin relies on dictionary definitions to supply a broader meaning to "adjacent" than what is suggested by the Facility Access and Indemnity Agreement and what would be the ordinary usage of the term "adjacent" but the Court remains unmoved.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Partial Summary Judgment (Rec. Doc. 686)** filed by defendants and counter-claimants Martin Operating Partnership, L.P. and Martin Energy Services, LLC is **DENIED**.

May 22, 2025

_____
JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE