## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ALL COAST, LLC** | **CIVIL ACTION NO: 21-258** |
| | **c/w 21-337, 21-464, 21-822, 21-1968, 21-1969,** |
| **VERSUS** | **21-1982, 21-1981, 21-2075, 21-2227, 23-3220** |
| | |
| **SHORE OFFSHORE SERVICES, LLC** | **SECTION "A"** |
| | **HON. JAY C. ZAINEY** |
| | |
| | **MAGISTRATE: (3)** |
| | **HON. EVA J. DOSSIER** |
| | |
| | **APPLIES TO ALL CASES** |

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE REPORT AND TESTIMONY OF ALDON G. WAHL, JR.

MAY IT PLEASE THE COURT:

Limitation Petitioners, Modern American Railroad Services, L.L.C. and Shore Offshore Services, LLC (collectively the "THOR Interests"), submit this Memorandum in Support of their Motion in Limine to strike the expert report of Aldon G. Wahl, Jr.,[1] the proffered accounting expert[2] of Claimants, RAF, Inc., Global Towing Services, LLC, and Offshore Towing, Inc. (collectively the "ROLAND FALGOUT Interests"),[3] and exclude Mr. Wahl from testifying regarding ROLAND FALGOUT Interests' loss of revenues, use, and profits claim at trial. For the reasons addressed below, Mr. Wahl is not qualified to render the opinions expressed in his report

---

[1] Rec. Doc. 756, ROLAND FALGOUT Interests Exhibit List, p.2, Exhibit 16, "Report of Alden Wahl, Jr., LLC dated July 6, 2022".
[2] Rec. Doc. 755, ROLAND FALGOUT Interests Witness List, p.2 ("Mr. Wahl will provide testimony regarding the amount of lost revenues resulting from the loss of use for the M/V ROLAND A. FALGOUT as a result of being struck by the M/V THOR on October 28, 2020, and the resulting effect on profits.").
[3] Claimants are alleged to be the owner, operator and operator / broker of the ROLAND FALGOUT respectively. *See* Rec. Doc. 11, ¶34-36.

and his conclusions regarding ROLAND FALGOUT Interests' purported loss of profits are not sufficiently reliable to survive scrutiny under Rule 702 of the Federal Rules of Evidence.

To put it simply, a vessel was damaged, so a substitute vessel was provided with no loss in revenue related to the charter party under which the damaged vessel was operating. Mr. Wahl ignored this mitigation of damages to multiply the revenue the damaged vessel was earning at the time of the incident by the repair period, less some reductions. The revenue loss was wholly mitigated, so the inquiry should have been to what extent the substitute vessel had a lost opportunity for earning revenue, less appropriate reductions. This is not what Mr. Wahl did and he was flat wrong.

## 1.    **Factual and Procedural Background**

The ROLAND FALGOUT Interests filed a claim against THOR Interests for loss of use of the vessel ROLAND FALGOUT as a result of physical damage incurred by the vessel during Hurricane Zeta in 2020. Specifically, they claim that the derrick barge THOR, a non-self-propelled vessel, broke free from her moorings at Martin Energy Dock No. 16 in Port Fourchon, Louisiana, during Hurricane Zeta. After the breakaway, the THOR, with her tug, the CROSBY ENDEAVOR, coupled to her, came into contact with certain vessels and other property in and along the Bayou Lafourche channel, including the ROLAND FALGOUT (hereinafter the "Breakaway Incident").[4]

At the time of the Breakaway Incident, the ROLAND FALGOUT was on a time charter to Murphy Exploration and Production Company[5] ("Murphy") at rate of $6,000 per day[6] (the "Murphy Charter"). The vessel was supporting "shuttle tanker operations at FPSO WR249,"[7]

---

[4] Rec. Doc. 11.
[5] Exhibit "1", Murphy Charter No. CW2258494, 16 January 2020, The charter was executed by and between Murphy and Offshore Towing, but Global Towing was listed as a "related company," with the notation that "[w]hen one of these OWNER affiliated companies is listed as OWNER on any particular Notice of Hire, that company will be deemed as Vessel OWNER for that particular Vessel's Charter."
[6] Exhibit "2", ROLAND FALGOUT Notice of Hire, 1 July 2020.
[7] *Id*.

which refers to the M/V BW PIONEER Floating Production, Storage, and Offloading Vessel operating at the Walker Ridge 249 Block in the Gulf of Mexico. The ROLAND FALGOUT, like the THOR, sought safe harbor in Port Fourchon during Hurricane Zeta.

The ROLAND FALGOUT Interests claim that, as a consequence of the physical damages she sustained during the Breakaway Incident, the ROLAND FALGOUT was put off hire by Murphy at 1200 hours on 31 October 2020. No documentation has been found in ROLAND FALGOUT Interests' production to verify this date. Indeed, the Murphy Charter and Notices of Hire were the only records produced between Murphy and ROLAND FALGOUT Interests. However, the records do show that the ZION FALGOUT (a vessel owned by Zion Falgout, LLC[8]) was brought in on 22 November 2020 as a substitute vessel under the Murphy Charter at the same rate of $6,000 per day, while the ROLAND FALGOUT remained off hire undergoing repairs until 30 July 2021.[9]

No records of accounts receivable from Murphy have been produced, but ROLAND FALGOUT Interests claim that the ROLAND FALGOUT remained off hire for 271.75 days (from 31 October 2020 to 30 July 2021) resulting in a financial loss of $1,492,161.[10] This is the amount sought in loss of use damages against the THOR Interests and other defendants.

To attempt to support this financial loss claim, the ROLAND FALGOUT Interests have identified Mr. Wahl as their expert witness for purposes of quantifying and calculating the $1,492,161 in alleged damages,[11] and have deferred to Mr. Wahl's report to provide an itemized

---

[8] Exhibit "3", Continental Underwriters, Additional Assured/Loss Payee Schedule, GT000055.
[9] Exhibit "4", ZION FALGOUT Notice of Hire, 22 November 2020.
[10] Exhibit "5", ROLAND FALGOUT Omnibus Discovery Responses, 6 July 2022.
[11] Rec. Doc. 755, ROLAND FALGOUT Interests Witness List, p.2 ("Mr. Wahl will provide testimony regarding the amount of lost revenues resulting from the loss of use for the M/V ROLAND A. FALGOUT as a result of being struck by the M/V THOR on October 28, 2020, and the resulting effect on profits.").

description of their loss of use claim, "the reason for the alleged loss," and a "methodology for calculating that loss of use claim."[12]

While Mr. Wahl claims to have over 30 years of experience "providing tax and accounting services to numerous clients owning and operating offshore vessels,"[13] nothing in his resume speaks to lost profits or loss of use calculations. Further, the absence of "a list of all other cases in which, during the previous 4 years, [Mr. Wahl has] testified as an expert at trial or by deposition"[14] makes it apparent (or at a minimum suspect) that Mr. Wahl does not have the experience necessary to opine on such damages as an expert as required by law.

As an initial matter, Mr. Wahl's report does not identify the party or parties that incurred the lost profits claimed. Claimants in the pleadings are RAF, Inc. ("RAF"), Global Towing Services, LLC ("Global Towing"), and Offshore Towing, Inc. ("Offshore Towing"), which are alleged to be the owner, operator, and operator / broker of the ROLAND FALGOUT vessel, respectively.[15] The claim states generally that "[b]ecause of the physical damage caused by the allision and subsequent need for repairs, Owners/Operators lost the use of the ROLAND A. FALGOUT during the time the vessel was out of service"[16]—and all three, RAF, Global Towing, and Offshore Towing, pray for a judgment in their favor for those losses purportedly incurred.

Mr. Wahl's report is addressed to RAF and Offshore Towing only (notably, not Global Towing),[17] but Mr. Wahl does not distinguish between those losses purportedly sustained by RAF and Offshore Towing and does not address any losses sustained by Global Towing.

---

[12] Exhibit "5", ROLAND FALGOUT Omnibus Discovery Responses, 6 July 2022.
[13] Exhibit "6", Wahl Curriculum Vitae, 27 December 2023.
[14] Fed. R. Civ. Proc. 26(a)(2)(B)(v).
[15] Rec. Doc. 11, ¶34-36.
[16] Rec. Doc. 11, ¶46.
[17] Exhibit "7", Wahl Report, 6 July 2022, GT000001.

Indeed, Mr. Wahl's report is extraordinarily brief—totaling less than 300 words in all and less than 250 words of substance. His report relies upon a single page of rudimentary calculations based solely on a multiplication of the Murphy Charter hire rate,[18] and reads as follows:

> The Vessel was working for Murphy Exploration and Production Co. at a rate of $6,000 per day at the time of the collision. The Vessel was out of service for repairs and lost revenues for the period 10/28/2020 through 07/30/2021.
>
> The Vessel was replaced by another vessel during this period of time and returned to the job at 0600 on 07/30/2021. The charter rate continued at $6,000 per day. The Vessel lost 271.75 days of revenue at a rate of $6,000 per day for a total of loss of revenues of $1,630,500 as per the attached schedule.
>
> As discussed, the vessel's expenses, with the exception of payroll, remained the same during the period it was out of service for repairs. It still had the same insurance and other expenses. Fuel was paid for by Murphy so it was not a consideration.
>
> Average salary cost (compared to the same quarter for the year before and the year after) for the first quarter or 2021 and the second quarter of 2021 declined $57,338 and $68,425 respectively, for a total decline in salary expenses of $125,763. I would estimate an additional decline in payroll taxes and related cost of $12,576 for a total decline in payroll cost of $138,339.
>
> The net effect of the loss in revenues of $1,630,500 and the savings in payroll expenses of $138,339 was a reduction in the company's profits of $1,492,161.[19]

It is apparent from this truncated report, and the lack of accompanying "facts and data considered by [Mr. Wahl] in forming" his conclusions regarding ROLAND FALGOUT Interests' purported losses,[20] that Mr. Wahl made inappropriate assumptions and ignored facts and data that would certainly have affected his damages calculations, including, but not limited to, Mr. Wahl:

1. Utilized the incorrect benchmark for calculating lost revenue, where the record makes clear that the ZION FALGOUT was substituted for the ROLAND FALGOUT, such that the Murphy Charter continued and Offshore Towing received payment of daily charter hire at the rate of $6,000 per day throughout the duration of ROLAND FALGOUT's repairs;

---

[18] *Id*.
[19] Exhibit "7", Wahl Report, 6 July 2022, GT000001.
[20] Fed. R. Civ. Proc. 26(a)(2)(B)(ii).

2. Assumed incorrectly that the loss period was identical to the repair period of 271.75 days, when the ZION FALGOUT was actually substituted for the ROLAND FALGOUT under the Murphy Charter on 22 November 2020;

3. Did not consider delays experienced by Murphy as a result of Hurricane Zeta, including whether the M/V BW PIONEER, with which the ROLAND FALGOUT was working, demobilized from offshore to seek safe harbor from the storm;

4. Did not account for forces majeure, acts of God, unavoidable weather delays, or port closures the ROLAND FALGOUT would have experienced under the Murphy Charter regardless of the Breakaway Incident;

5. Did not consider provisions in the Murphy Charter addressing the effect of damage to the vessel, and owner's election to repair or replace a damaged vessel;

6. Did not consider whether ROLAND FALGOUT Interests mitigated their alleged losses by substituting ZION FALGOUT at the same charter hire rate under the Murphy Charter;

7. Assumed incorrectly that ROLAND FALGOUT Interests' daily profits under the Murphy Charter would be equal to the ZION FALGOUT's daily profit but for the Breakaway Incident, where the record shows that ZION FALGOUT had been under charter at a rate of $5,750 per day prior to her being substituted for the ROLAND FALGOUT;[21]

8. Did not account for distinctions in ownership between the ROLAND FALGOUT and ZION FALGOUT;

9. Did not account for expenses incurred or saved as a consequence of the ZION FALGOUT substitution, where the record makes clear that operating and stand-by insurance premiums were less for the ZION FALGOUT than they were for ROLAND FALGOUT;[22]

10. Assumed without record evidence that the ZION FALGOUT had to forego other work to act as the substitute vessel for the ROLAND FALGOUT during the entire loss period;

11. Assumed an incredible 100 percent daily utilization rate for the fleet during the loss period of 271.75 day without any support;

---

[21] Exhibit "8", ZION FALGOUT Invoice, GT000295.
[22] Exhibit "9", Operating and Stand-By Premiums.

12. Did not consider any records of accounts receivable from Murphy or his client's *actual revenues and expenses* under the Murphy Charter;

13. Did not conduct an independent accounting of his client's saved payroll expenses;

14. Did not account for the savings of other expenses that were the responsibility of ROLAND FALGOUT under the Murphy Charter that are apparent upon a simple reading of the charter (for example, stores, provisions, victuals, crew's wages, taxes, insurance, license fees, port charges);

15. Did not consider financial and operational information documenting actual conditions at RAF, Global Towing, and Offshore Towing before, during, and after the loss period; and

16. Did not consider the effect of the COVID 19 Pandemic on market conditions.

Based on the foregoing lapses and as will be detailed below, Mr. Wahl's report should be stricken as a proffered exhibit,[23] and he should be excluded from testifying as to ROLAND FALGOUT Interests' loss of use damages claim at trial. These are not just areas to be explored through cross-examination at trial — Mr. Wahl's lack of qualifications and lack of reliability in his methods and calculations render his opinion unnecessary and unusable to this Honorable Court as a matter of law. To be sure, granting this Motion is not fatal to the ROLAND FALGOUT Interests' loss of use claim, but it is fatal to unqualified, unreliable, and laconic opinions that overlook necessary and fundamental issues vital to being able to testify as an expert.

## 2.    <u>Law and Argument</u>

As the Court knows well, it is the duty of the trial judge[24] to ensure that any evidence or

---

[23] THOR Interests reserve the right to make further objections to Mr. Wahl's report and proffered testimony as may be appropriate in accordance with this Court's Motions in Limine Deadline (5 December 2025) and at the trial of this matter.

[24] Even in a bench trial, an expert's opinion should be excluded where it is more likely to confuse rather than assist the factfinder. *Thompson v. Rowan Cos.*, No. 06-3218, 2007 WL 724646, at *1 (E.D. La. Mar. 6, 2007); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Expert opinion testimony falls into this category when that testimony would not actually assist the factfinder in arriving at an intelligent and sound verdict. *Id.* (citing See J. Weinstein & M. Berger, Weinstein's Evidence § 702[1] (1985) (assistance of trier of fact is central concern of Federal Rules of Evidence regarding opinion witnesses)). Likewise, if an expert's opinion is fundamentally unsupported, then it offers no expert assistance to the court, and its lack of reliable support may render it more

testimony based on "technical" and "other specialized" knowledge is both relevant and reliable before it is admitted into evidence.[25] Rule 702 of the Federal Rules of Evidence provides general standards for this Honorable Court to use in assessing the reliability and helpfulness of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[26]

In other words, an expert must identify the facts and data that form the basis for his testimony so that this Honorable Court can assess the sufficiency of those facts and data. To be admissible, the expert's opinions must be based in scientific methods and procedures, not mere subjective belief or unsupported speculation.

As the proponent of the proffered testimony, the ROLAND FALGOUT Interests bear the burden of proving that Mr. Wahl's opinions should be admitted.[27] And where, as is here, there is "too great an analytical gap between the data and the opinion proffered," the testimony should be precluded.[28]

Based on the foregoing standards and considering the analysis below, Mr. Wahl is not qualified by knowledge, skill, experience, training, or education to render an opinion in this case. Even if he were qualified, Mr. Wahl's opinions are not reliable. His report should be stricken, and

---

prejudicial than probative, making it inadmissible under Rule 403 of the Federal Rules of Evidence. Id. (citing *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.*, 739 F.2d 1028, 1035 (5th Cir.1984).
[25] *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999).
[26] Fed. R. Evid. 702.
[27] *Bourjaily v. United States,* 483 U.S. 171, 175 (1983).
[28] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

he should be precluded from testifying regarding ROLAND FALGOUT Interests' damages and loss of profits claim at trial.

*Mr. Wahl's scientific, technical, or other specialized knowledge will not help the trier of fact understand the evidence or determine a fact in issue.*[29] Mr. Wahl claims to have over 30 years of experience "providing tax and accounting services to numerous clients owning and operating offshore vessels,"[30] but nothing in his resume speaks to "courtroom" experience, much less "professional studies or personal experience" calculating loss of profits or loss of use claims involving time charters. "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a particular subject."[31]

While Mr. Wahl may have a background in accounting, the U.S. Supreme Court has made clear that the objective of *Daubert* is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[32] An accounting expert does not employ "the same level of intellectual rigor"[33] and may be disqualified to testify by reason of errors in their methodology or when it is clear their opinions are not "grounded on appropriate principles and methodology."[34]

In other words, simply claiming to have knowledge and experience in a particular field does not render one an expert in that area.[35] For instance, in *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, the court found that a forensic accountant was not qualified to testify as an expert

---

[29] Fed. R. Evid. 702(a).
[30] Exhibit "6", Wahl Curriculum Vitae, 27 December 2023.
[31] *Robichaux v. Settoon Towing LLC*, W.D. La. Civil Action No. 20-1173, Rec. Doc. 33, p.6 (Apr. 18, 2022) (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).
[32] *Kumho Tire*, 526 U.S. at 152; see also *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).
[33] *Id.*
[34] *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1246 (M.D. Fla. 2003).
[35] *Price v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000).

with respect to valuation of an insurance agency when the accountant did no independent research or analysis of the market, did not consider the various approaches for appraising a businesses, or the factors an appraiser should consider when conducting a business appraisal, but merely calculated future income and reduced that figure to present value.

Here, through his methodologies, or lack thereof, Mr. Wahl has proved himself unqualified to testify regarding the lost profits ROLAND FALGOUT Interests claim to have incurred.

*Mr. Wahl's proffered testimony is <u>not</u> based on sufficient facts or data.*[36] As detailed above, Mr. Wahl did not consider facts crucial to any professional accounting of lost profits. He simply multiplied the repair period (271.75 days) by the Murphy Charter hire rate ($6,000) and deducted a payroll savings figure provided to him through discussions with his client ($138,339) to come up with "a reduction in the company's profits of $1,492,161."[37] This is basic math (no expert is necessary for the Court in this respect) and missing any real professional appreciation of a lost profit calculation in the most elementary of respects.

Lost profits or loss of use must be provided with "reasonable certainty."[38] When a vessel is on charter, loss of use sustained may be calculated according to the charter hire in the most simplistic of circumstances, but "expenses saved that would have been expended to perform the charter"[39] must be accounted for and "the owner who claims lost profits or other damages [also] has a duty to use reasonable efforts to mitigate damages and minimize his losses."[40]

---

[36] Fed. R. Evid. 702(b).
[37] Exhibit "10", Wahl Schedule, GT000473.
[38] *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1000 (5th Cir. 1984), *on reh'g,* 753 F.2d 378 (5th Cir. 1985). "The unquestioned general rule governing the award of detention damages is that 'demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty.'" *Crain Bros., Inc. v. Duquesne Slag Prods. Co.*, 273 F.2d 948, 950 (3d Cir. 1959) (quoting *The Conqueror*, 166 U.S. at 125).
[39] *Id.* at 1009.
[40] § 14:7. Damages, 2 Admiralty & Mar. Law § 14:7 (6th ed.).

With respect to mitigation, the U.S. Fifth Circuit has made clear that "[t]he use of substitute vessels to replace a damaged vessel is a form of mitigation of damages by a shipowner."[41] If, as here, a claimant is able to use other vessels in its fleet to perform the work that would have been done by the vessel undergoing repairs, the claimant has not suffered a compensable economic injury.[42] If a claimant has substitute vessels at its disposal, the claimant must show that the "substitute vessels would have been hired" for other jobs before it can be awarded lost profits for the substitute vessel's use in the job that the casualty prevented the original vessel from completing.[43]

The changes in revenues and expenses and mitigation are critical "elements in the formula" when calculating loss of use, and here, Mr. Wahl has done nothing more than try to "vindicate a conclusion for which there is no underlying [ ] support"[44]—a practice the U.S. Fifth Circuit and U.S. Supreme Court have rejected.

The U.S. Supreme Court has instructed that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[45] In other words, the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[46] An "analytical gap" exist and an expert should be excluded for "making unsupported assertions and projections," "deliberately ignoring documents and figures which would strike a certified public accountant in the face, and of picking and choosing among purported facts to maximize plaintiff's damages."[47]

---

[41] D*elta S.S. Lines*, 747 F.2d at 1007 (5th Cir. 1984).
[42] *Bolivar Cty. Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306, 1309 (5th Cir. 1978) (discussing *Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170 (1932)).
[43] See *Maya Special Mar. Enter. v. Crochet*, No. 4:13-CV-1871, 2016 WL 4190153, at *15 (S.D. Tex. Aug. 9, 2016) (citing *Domar Ocean Transp., Ltd., v. M/V Andrew Martin*, 754 F.2d 616, 620 (5th Cir. 1985)).
[44] *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999).
[45] *Gen. Elec. Co.*, 522 U.S. at 146.
[46] *Id.*
[47] *De Jager Const., Inc. v. Schleininger*, 938 F. Supp. 446, 455 (W.D. Mich. 1996).

By choosing to rely on party representations, Mr. Wahl was necessarily "picking" facts to maximize his client's damages and "ignoring documents and figures" contained within the record "which would strike a certified public accountant in the face,"[48] including the timing of the ZION FALGOUT's substitution,[49] the ownership of the ZION FALGOUT, the ZION FALGOUT's charter hire rate prior to her being substituted for the ROLAND FALGOUT,[50] and the cost differences between operating the ZION FALGOUT.[51]

Additionally, by failing to conduct an independent accounting, Mr. Wahl cannot accomplish the task he was retained to perform[52] because the record is void of certain facts and data Mr. Wahl would need to consider to form a reliable opinion even if he were qualified to do so. Namely, but not limited to, records of accounts receivable from Murphy, records of savings of expenses that were the responsibility of ROLAND FALGOUT under the Murphy Charter (i.e., stores, provisions, victuals, crew's wages, taxes, insurance, license fees, port charges), an accounting of variable causes for the down time, such as forces majeure, acts of God, repair/replacement allowances, unavoidable weather delays, port closures, or operations delays caused by Murphy or as a result of any demobilization of the BW PIONEER, and evidence ZION FALGOUT would have been hired for other jobs during the loss period but for the substitution.

In sum, the record makes clear and Mr. Wah's report reiterates that his proffered testimony can and will not be based on sufficient facts or data to be admissible.

---

[48] *Id*.
[49] Exhibit "4", ZION FALGOUT Notice of Hire, 22 November 2020.
[50] Exhibit "8", ZION FALGOUT Invoice, GT000295.
[51] Exhibit "9", Operating and Stand-By Premiums.
[52] Mr. Wahl was retained to "provide testimony regarding the amount of lost revenues resulting from the loss of use for the M/V ROLAND A. FALGOUT as a result of being struck by the M/V THOR on October 28, 2020, and the resulting effect on profits." *See* Rec. Doc. 755, ROLAND FALGOUT Interests Witness List, p.2.

*Mr. Wahl's proffered testimony is <u>not</u> the product of reliable principles and methods.*[53] Based on the foregoing, Mr. Wahl's opinions are not sufficiently reliable to survive scrutiny under Rule 702 of the Federal Rules of Evidence. As Rule 702 makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, after determining whether the expert is qualified, the proffered opinions must be assessed for reliability.[54]

To perform its "gatekeeper" function, this Honorable Court must assess the reasoning and methodology underlying [Mr. Wahl's] opinion and determine whether it is both scientifically valid and applicable to a particular set of facts.[55] "It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant."[56] Here, ROLAND FALGOUT Interests have not and cannot demonstrate "that the process by which [Mr. Wahl] derived his … opinions is reliable."[57]

The fundamental problem is that Mr. Wahl has ignored or refused to consider evidence crucial to any professional accounting of lost profits. When a damaged vessel was on charter, loss calculations must take into consideration "expenses saved that would have been expended to perform the charter,"[58] and any mitigation of losses, including by the substitution of another vessel, must be accounted for.[59] Here, Mr. Wahl ignored certain available facts and data and the record is

---

[53] Fed. R. Evid. 702(c)
[54] *Daubert*, 509 U.S. at 589.
[55] *Id.* at 592-93.
[56] *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 16-1301, 2020 WL 2839302, *2 (D. Colo. June 1, 2020) (where the court found the expert's opinions regarding profits "unreliable because he fail[ed] to distinguish profits allegedly resulting from the affiliation and profits allegedly resulting from conduct predating the affiliation," and "did not calculate separate figures for disgorgement of profits attributed specifically to th[at] affiliation.").
[57] *Id.*
[58] *Delta S.S. Lines*, 747 F.2d at 1009.
[59] § 14:7. Damages, 2 Admiralty & Mar. Law § 14:7 (6th ed.).

devoid of other facts and data he would need to consider in order to form a reliable opinion, and yet, he has not explained and ROLAND FALGOUT Interests will not be able to explain, how Mr. Wahl could reliably determine the profits it claims it lost as a result of the Breakaway Incident.

Rule 702 requires more of Mr. Wahl than he has given the Court through truncated report and rudimentary math, which "does nothing more than assume the conclusion" the repair period (271.75 days) multiplied by the Murphy charter hire rate ($6,000) reduced by a payroll savings figure provided to him through discussions with his client ($138,339) amounts to anything more than a "guesstimate" of ROLAND FALGOUT Interests' lost profits.[60]

As one district court put it, an accounting expert's report must "seriously contend with potentially confounding causes of revenue gains and losses."[61] In that case, *TruGreen Companies, L.L.C. v. Scotts Lawn Service*, the moving party offered various factors which should have been taken into account by the accounting expert in developing his calculation:

a.  The impact of the confidential information taken on the Plaintiff's alleged damage elements including sales, profits, margins, expenses, and management efficiencies.
b.  Historical patterns of financial performance by the Plaintiff.
c.  Identification of customers lost by the Plaintiff or obtained by the Defendant as a result of Defendant's utilizing Plaintiff's confidential customer databases.
d.  Analysis that would show that but for the actions of the Defendants, the Plaintiff would have obtained the revenues obtained by the competitor.
e.  The dates that each Defendant quit the Plaintiff's company.
f.  The effect of one of Plaintiff's locations closing.
g.  Alternative reasons for the Plaintiff's decreased sales and profitability.
h.  Alternative reasons for the competitors' increased sales and profitability.[62]

The defendant in the *TruGreen* case argued that these issues directly related to "a proper assessment of damages and impact the calculation of damages," and the court found that they were "not adequately addressed" or "considered" by the plaintiff's expert in preparing his report, such

---

[60] *TruGreen Companies, L.L.C. v. Scotts Lawn Service*, 508 F. Supp. 2d 937, 959 (D. Utah 2007).
[61] *Id.*
[62] *Id.* at 960.

that the court found that it was "required to conclude" that the plaintiff's expert's report was unreliable.[63] Based on these findings, the court precluded damage testimony from that expert at trial.

Here, as in the *TruGreen* case, there are "confounding causes" of the loss that weren't taken into consideration by Mr. Wahl. As a result, his opinions regarding ROLAND FALGOUT Interests' loss of profits claim are unreliable and should be excluded.

Judge Doughty of the U.S. District Court of the Western District of Louisiana came to a similar conclusion in *Robichaux v. Settoon Towing LLC*.[64] There, the court found:

> Because the evidence that Plaintiff's experts…relied on to support his future loss of earning capacity [wa]s based on his subjective belief, unreliable and speculative, any economic analysis extrapolating Plaintiff's future lost earnings on the basis of a Captain's salary is devoid of any basis in fact, and thus misleading, unreliable, and irrelevant. Thus, the Court finds that any testimony…that Plaintiff would have been promoted to a higher wage-earning position [] but for his alleged injuries…is not grounded in fact, will not assist the trier of fact and should be excluded.[65]

The same result is warranted here.

### 3.    CONCLUSION

In sum, and for the foregoing reasons, Mr. Wahl is not qualified to render the opinion expressed in his report and his conclusions regarding ROLAND FALGOUT Interests' purported loss of profits are not sufficiently reliable to survive scrutiny under Rule 702 of the Federal Rules of Evidence. As a result, this Motion in Limine to strike Mr. Wahl's expert report and exclude Mr. Wahl from testifying regarding ROLAND FALGOUT Interests' loss of revenues, use, and profits claim at the trial of this matter should be granted.

---

[63] *Id*. at 960-61.
[64] W.D. La. Civil Action No. 20-1173, Rec. Doc. 33 (Apr. 18, 2022).
[65] *Id*. at 12.

Respectfully Submitted:

*/s/ **Meredith W. Blanque***
Gavin H. Guillot, T.A. (#31760)
Salvador J. Pusateri (#21036)
Aaron B. Greenbaum (#31752)
Meredith W. Blanque (#32346)
Jacob A. Altmyer (#36352)
Jonathan D. Parker (#35275)
**PUSATERI, JOHNSTON, GUILLOT &
GREENBAUM, LLC**
1100 Poydras Street, Suite 2250
New Orleans, LA 70163
Telephone: 504-620-2500
Facsimile: 504-620-2510
Gavin.Guillot@pjgglaw.com
Salvador.Pusateri@pjgglaw.com
Aaron.Greenbaum@pjgglaw.com
Meredith.Blanque@pjgglaw.com
Jacob.Altmyer@pjgglaw.com
Jonathan.Parker@pjgglaw.com
**ATTORNEYS FOR MODERN AMERICAN
RAILROAD SERVICES, L.L.C., AND
SHORE OFFSHORE SERVICES, LLC**