UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST, LLC<br><br>VERSUS<br><br>SHORE OFFSHORE SERVICES, LLC | CIVIL ACTION NO: 21-258<br>c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227, 23-3220<br><br>SECTION "A"<br>HON. JAY C. ZAINEY<br><br>MAGISTRATE: (3)<br>HON. EVA J. DOSSIER<br><br>APPLIES TO ALL CASES |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO C-PORT, LLC'S RECOVERABLE DAMAGES**

**MAY IT PLEASE THE COURT:**

Modern American Railroad Services, LLC and Shore Offshore Services, LLC (collectively, the "THOR Interests") move this Court for judgment in their favor and against Claimant-in-Limitation, C-Port, LLC ("C-Port"), as to the measure of recoverable damages claimed by C-Port. C-Port claims to have owned 12 mooring dolphins located in the Bayou Lafourche channel in Port Fourchon, Louisiana that were destroyed during Hurricane Zeta when the derrick barge THOR and its tug, the CROSBY ENDEAVOR, broke away from the Martin Energy Services dock and allided with the dolphins. There are no genuine issues of material fact that the 12 mooring dolphins, owned by C-Port since their installation in 1997, are a total loss. Accordingly, the general maritime law (1) precludes C-Port's claims for loss of use and consequential damages, and (2) requires that C-Port's recoverable damages be limited to replacement costs, less required depreciation, and costs for removing the 12 mooring dolphins.[1]

---

[1] For reasons set forth below, C-Port's recoverable damages must be limited to, at most, 17/40 of the cost to replace the 12 mooring dolphins, as determined at trial, and expenses associated with the removal of the dolphins.

1. **Background**

C-Port owns multiple berths, mooring bollards, mooring dolphins, and other property in Port Fourchon, where it provides vessel-related services.[2] In total, C-Port owned 12 mooring dolphins which were installed in 1997 in the Bayou Lafourche channel in Port Fourchon.[3] C-Port claims that all 12 of their mooring dolphins were either destroyed or damaged during a marine casualty involving the Derrick Barge THOR, owned and operated by the THOR Interests, on October 28, 2020, as the eye of Hurricane Zeta passed over southeast Louisiana near Port Fourchon.[4] More particularly, C-Port's corporate deponent testified that nine of the dolphins were "totally destroyed" and that all 12 dolphins had to be replaced:

> **Q:** So it's your testimony that all of them were damaged during the incident?
> **A:** Yes. All of them sustained damage during the incident. Nine of them were totally destroyed.[5]
>
> ***
>
> **Q:** Is it a fair statement that some of them could have remained, and that only the ones that were destroyed could have been replaced?
> **A:** No, sir.
> **Q:** Why?
> **A:** Due to the overall condition of them.[6]

C-Port has owned these dolphins since they were installed in 1997 and would charge a fee for vessels to "park" or moor at the dolphins.[7] The only known repairs to these dolphins occurred

---

[2] *See* Rec. Doc. 27, p. 7 at ¶ 2.
[3] *See* the excerpted deposition testimony of C-Port's Rule 30(b)(6) deposition at pp. 41:25 – 42:3, attached hereto as Exhibit "A." *See further* at pp. 25:16 – 26:1. The THOR Interests dispute whether C-Port owns or possesses the requisite proprietary interests to recover economic losses for the alleged damage it claims to the 12 mooring dolphins at issue here pursuant to *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), however, and solely for the purposes of this Motion, it is assumed that C-Port owned the 12 mooring dolphins.
[4] *See* Rec. Doc. 27, p. 9 at ¶¶ 13 – 15.
[5] *See* Ex. "A," at p. 91:10 – 17.
[6] *Id.* at pp. 97:19 – 98:1.
[7] *Id.* at pp. 27:15 – 28:8.

in 2012.[8] Indeed, C-Port has no records of any other maintenance to these mooring dolphins,[9] had no routine inspection protocol,[10] and the extent to which they were inspected such was limited to visual surveys (that were not documented)[11] or if a customer notified C-Port of any issues:

> **Q:** How would C-Port learn of deficiencies in the mooring dolphins, as an ordinary course?
> **A:** By a vessel telling us, you know, something's wrong with the mooring dolphin or something of that nature.
> **Q:** There was no established routine inspection protocol in place for the mooring dolphins, correct?
> **A:** Correct. We talked about that already.
> **Q:** Right. And so if you were to learn there was a deficiency in the mooring dolphins, you were relying upon a customer telling you about the deficiency?
> **A:** Correct.[12]

Following Hurricane Zeta, C-Port had all 12 dolphins removed and its corporate deponent testified that the costs incurred associated with their removal was between $45,000 and $50,000.[13] This appears to be composed of $33,661.33 in costs paid to Grand Isle Shipyard, Inc. ("GIS") to remove the bollards,[14] and $16,440 in associated diving costs.[15] It has also claimed $40,003.29 in survey expenses associated with the removal of all 12 dolphins.[16] C-Port did not carry any property insurance covering damage to the dolphins,[17] and, to date, has not produced any repair estimates or records of repairs to the dolphins.

---

[8] *Id.* at p. 27:2 – 10.
[9] *Id.* at pp. 45:25 – 46:6.
[10] *Id.* at pp. 77:19 – 78:4.
[11] *Id.* at pp. 45:19 – 47:10.
[12] *Id.* at pp. 77:19 – 78:9.
[13] *Id.* at pp. 148:13 – 149:2.
[14] *See* the $33,661.33 in costs from GIS, produced as CPORT 000168, CPORT 000179, CPORT 000183, and CPORT 000192, attached hereto *in globo* as Exhibit "B," with other costs understood to be associated with the removal of the 12 mooring dolphins.
[15] *Id.* at the $4,346.25 invoice from Ougel Diving Services, LLC, produced as CPORT 000163, and the five invoices from Bagala's Diving, Inc. totaling $12,093.75, produced as CPORT 000206, CPORT 000208, CPORT 000210, CPORT 000212, and CPORT 000214.
[16] *See* the seven invoices from Lanier & Associates Consulting Engineers, Inc. ("Lanier") and C-Port's Second Supplemental Response to Omnibus Request for Production No. 14, attached hereto as Exhibit "C."
[17] *See* Ex. "A," at pp. 104:24 – 105:2.

C-Port obtained three bids to replace the 12 dolphins ranging from $638,606.06 to $1,090,000.[18] As of July 24, 2024, none of these bids had been accepted and the dolphins had not been replaced.[19] Discovery closed on October 2, 2025, and no records have been produced by C-Port showing that any of these dolphins has been replaced.

As discussed further below, as a general rule plaintiffs claiming property damage are limited in their recovery by the extent to which the property has been depreciated. In other words, a near-fully-depreciated asset that is damaged beyond repair does not require a tortfeasor to replace that near-fully-depreciated asset at full cost because the asset was near the end of its useful life. The length of time for depreciation is important. To this specific issue, C-Port's corporate deponent testified that C-Port was not aware of any scheduled depreciation for these 12 dolphins,[20] and then later acknowledged that it has a depreciation schedule for "Bulkhead and Mooring Assets" to which a straight line depreciation was applied but could not "confirm" that such applied to the dolphins.[21] Similarly, C-Port has not produced any evidence of, nor is it aware of, the scheduled useful life of its 12 mooring dolphins,[22] which prior to the incident, were already in a state of deterioration. For example, the broken mooring cleat, as testified to by C-Port,[23] shown in the photograph below that was taken one day before the incident:

---

[18] *See* the GIS bid estimate, produced as CPORT 000125, the SeaLevel Construction bid estimate, produced as CPORT 000001, and the Low Land Construction Co. bid estimate, produced as CPORT 000002, attached hereto as Exhibit "D."
[19] *See* Ex. "A," at pp. 150:20 – 151:17.
[20] *Id.* at p. 34:19 - 22.
[21] *See* C-Port's Supplemental Answer to Omnibus Interrogatory No. 34, attached hereto as Exhibit "E."
[22] *See* Ex. "A," at p. 44:13 - 18.
[23] *Id.* at p. 80:7 – 82:25.



24

Photographs, like the one taken below when the dolphins were removed a few months after the incident, further highlight their deteriorated state at the time of the incident.



25

---

[24] *Id.* This photo was produced as part of HGIM-EV-005894 and attached as Exhibit "470," to C-Port's Rule 30(b)(6) deposition.
[25] This photo was produced by C-Port as shown in Lanier's Daily Status Report, produced without bates label, dated March 6, 2021. *See* certain Lanier Daily Status Reports, produced without bates label, at p. 13, attached hereto as Exhibit "F."

5

The claim C-Port filed against the THOR Interests alleges that the THOR Interests "are indebted to C-Port" for damages related to the physical damage to its 12 mooring dolphins.[26] The various elements of damages alleged by C-Port are (a) business interruption, (b) loss of use, (c) repair costs, (d) loss of dolphins, (e) survey expenses, (f) contractor expenses, and (g) employee expenses.[27] C-Port is not entitled to recover all the foregoing damages because its 12 mooring dolphins were a total loss. At best, C-Port is able to recover the reasonable costs to replace the 12 dolphins, after taking into account depreciation. Given that C-Port has maintained its entitlement to all such damages and to streamline the evidence required for trial (as well as potentially to promote settlement), summary judgment as to the measure of C-Port's recoverable damages is appropriate and (1) C-Port's claims for loss of use and other consequential damages must be dismissed, and (2) C-Port's maximum recovery at trial must be limited based upon, at most, a 40-year depreciation schedule which is regularly accepted by the jurisprudence.

2. **Law and Argument**

   a. *Summary Judgment Standard*

Rule 56(a) of the Federal Rules of Civil Procedure provides that courts "shall grant summary judgment if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." "Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact."[28] The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine

---

[26] *See* Rec. Doc. 27, p. 9 at ¶ 15.
[27] *Id.* at ¶¶ 14 – 15.
[28] *See Wilcox v. Max Welders, LLC*, Civ. No. 122389, 2013 WL 6044368, *2 (E.D. La. Nov. 14, 2013) (Africk, J.) (citing Fed. R. Civ. P. 56).

issue of material fact.[29] When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence in order to satisfy its summary-judgment burden.[30]

After the party seeking summary judgment carries its initial burden, "Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment."[31] "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."[32] Thus, "to demonstrate that summary judgment should not lie, the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."[33]

   b. *C-Port's Mooring Dolphins Were a Total Loss*

"Under general maritime law, where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good a position pecuniarily as of his property had not been destroyed."[34] "If property is damaged beyond physical repair, it is considered a 'total loss' or 'actual total loss.'"[35] The maritime doctrine of total loss applies equally

---

[29] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[30] *See Sanders v. Weeks Marine, Inc.*, Civ. No. 23-7317, 2024 WL 4346515, *2 (E.D. La. Sep. 30, 2024) (Ashe, J.) (citing *Celotex*, at 322-25 (1986) and Fed. R. Civ. P. 56(c)(1)(b)).
[31] *See C-Port/Stone, LLC v. Gulf Logistics, LLC*, Civ. No. 17-256, 2018 WL 4680123, *2 (E.D. La. Sep. 28, 2018) (Zainey, J.) (citing *Jones v. Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996)).
[32] *See Bollinger Quick Repair, LLC v. M/V CAPT. ADRIAN HARGROVE*, Civ. No. 07-273 (lead case), 2008 WL 11515311, *3 (E.D. La. July 25, 2008) (Zainey, J.) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (1993)).
[33] *See Webre v. Azalea Fleet, Inc.*, Civ. No. 03-1190, 2005 WL 711608, *2 (E.D. La. March 23, 2005) (Africk, J.), (citing *Celotex*, 477 U.S. at 324 (1986)) (quoting *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 155 (1925)).
[34] *Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F.Supp. 738, 763 (E.D. La. 1989) (quotations omitted) (citation omitted).
[35] *In the Matter of Complaint of Grand Famous Shipping Ltd.*, Civ. Nos. 18-2046 and 18-4678, 2024 WL 3620313, *36 at No. 79 (S.D. Tex. Aug. 1, 2024) (quoting and citing, *Pillsbury*, 715 F.Supp. at 763) (citing also *Moench v. Marquette Transportation Co. Gulf-Inland, L.L.C.*, 838 F.3d 586, 592 (5th Cir. 2016)) (additional citation omitted).

to both vessels and other maritime structures or property.[36] The determination of the measure of recoverable damages the injured party may be able to claim at trial for a total loss is appropriate for summary judgment.[37]

There is no genuine issue of material fact that C-Port's dolphins were a total loss. Following the incident, C-Port has admitted that nine of the dolphins were "totally destroyed,"[38] all 12 dolphins were removed at C-Port's direction, no repair quotes or records have been ever produced, and three companies have provided bids ***for the replacement of all 12 dolphins*** between $638,606.06 to $1,090,000. No evidence has been presented by C-Port that they could be repaired at a lower cost and the determination of C-Port's mooring dolphins as a total loss is underscored by C-Port's testimony that nine of the dolphins were "totally destroyed" and that all 12 of the dolphins had to be replaced.[39] It is axiomatic, and consistent with the jurisprudence, that if the dolphins must be replaced then they are a total loss. Discovery closed on October 2, 2025, and there is no record evidence to suggest that the 12 dolphins could have been repaired. Consequently, there is no genuine issue of material fact that C-Port's mooring dolphins were a total loss.

  c. *C-Port's Recoverable Damages are Limited*

The burden is on C-Port to prove its recoverable damages.[40] The measure of damages to a structure totally lost in an allision is the market value at the time of the destruction less salvage value.[41] It is well settled that in the case of a total loss, loss of use and consequential damages are

---

[36] *Id.* at No. 85 (collecting cases).
[37] *See Matter of Ocean Runner, Inc.*, Civ. No. 04-530 (lead case), 2006 WL 8455953 (E.D. La. April 10, 2006) (Berrigan, J.) (dismissing on summary judgment a vessel owner and operator's claims for loss of business, loss of profits and business interruption where vessel was a total loss and stating) (citing and quoting *Marquette Transportation Co., Inc. v. Louisiana Machinery Co., Inc.*, Civ. No. 00-1504 (E.D. La. May 4, 2001) (Feldman, J.)); *See also T. Moore v. Rentrop*, Civ. No. 10-1221 (lead case), 2012 WL 692418 (W.D. La. March 2, 2012) (dismissing loss of use and other consequential damage claims on summary judgment where vessel was a total loss).
[38] *See* Ex. "A," at p. 91:10 – 17.
[39] *Id.* at pp. 97:19 – 98:1.
[40] *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F.Supp.2d 987, 1005 (E.D. La. 2000) (Mentz, J.).
[41] *See Entergy New Orleans, LLC v. Magnolia Fleet, LLC*, Civ. No. 22-5285, 2023 WL 5672036, *3 (E.D. La. Sep. 1, 2023) (Vance, J.); *See also* Thomas Schoenbaum, 2 Admiralty & Mar. Law § 14:7 (6th ed.) (citing *Orange Beach*

not recoverable by the injured party.[42] In such cases where the property is a total loss, "the ceiling of recovery" is the market value of the lost property.[43]

Absent evidence of recent comparable sales, the determination of the market value (*i.e.*, ceiling of recoverable damages) for the total loss of a maritime structure is generally undertaken by considering the cost to replace the maritime structure, depreciation, expert opinion, or insured value.[44] However, "replacement costs are the best indicia of 'market value'" for the total loss of non-vessel maritime property.[45] "This position comports with a number of cases that have either used the replacement-cost approach to calculate damages for marine structures such as pilings, docks, mooring cells, **and mooring dolphins**, or held that no general, trading market exists for these structures."[46]

However, this "new for old rule" requires that the "'party suffering injury is entitled to recover only that which is necessary to restore his damaged property to the same condition as existed immediately prior to the delict.'"[47] The purpose of this rule is to avoid creating a windfall to the injured party, and courts commonly use a linear, or straight line, depreciation method for

---

*Water, Sewer, and Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1383 (11th Cir. 1982); *BP Exploration & Oil v. Moran Mid-Atlantic Corp.,* 147 F. Supp. 2d 333, 2001 AMC 2438 (D. N.J. 2001).

[42] *Grand Famous Shipping Ltd.*, 2024 WL 3620313, at *40 at No. 117 ("When a structure or vessel is a total loss, the damaged party is precluded from recovering loss of use or other consequential damages.") (citing, *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 253 (5th Cir. 1988), and, *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1187 (5th Cir. 1984)). *See also T. Moore*, at *4 ("The defendant-towers argue that when a vessel is a total loss or a constructive total loss, maritime law does not permit the vessel owner to recover for the loss of use of the vessel or any other consequential damages. [Plaintiff] argues that it went out of business as a result of the sinking of Rig 61 in the Charenton Canal. The Court finds it is well-settled that consequential damages are not allowed in such a situation. Accordingly, the defendant-towers' [summary judgment] motion will be granted with regard to this category of claimed damages.").

[43] *Grand Famous Shipping Ltd.*, 2024 WL 3620313, *40 at No. 118 (citing *Galapagos Corporacion Turistica Galatours, S.A. v. Panama Canal Comm'n*, 190 F.Supp.2d 900, 908 (E.D. La. March 8, 2002) (Barbier, J.) (quoting *Gaines Towing and Transp., Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999))).

[44] *Entergy New Orleans, LLC*, 2023 WL 5672036, at *3 (citations and quotations omitted).

[45] *Pillsbury Co.*, 715 F.Supp. at 765. *See also Entergy New Orleans, LLC*, 2023 WL 5672036, at *4.

[46] *Entergy New Orleans, LLC*, 2023 WL 5672036, at *4 (collecting cases) (emphasis added).

[47] *Id.* at *3 (quoting *City of New Orleans ex rel. Sewerage & Water Bd. Of New Orleans v. Am. Com. Lines, Inc.*, 662 F.2d 1121, 1124 (5th Cir. 1981)). *See also Pillsbury*, 715 F.Supp. at 764 (citations omitted).

property with a fixed life span.[48] Consequently, depreciation must be applied to reduce C-Port's ultimate recovery for the cost to replace the 12 dolphins,[49] and, absent evidence in the record of useful life, the Court may adopt 40 years as the useful life of a mooring dolphin to assist in determining the appropriate depreciation rate to be applied.[50]

Because C-Port's mooring dolphins were a total loss, C-Port cannot recover for any claimed loss of use of the mooring dolphins or other consequential damages, such as business interruption, lost profits, and loss of business opportunity, as a matter of law. For the same reason and because there is no evidence of an insured value or comparable sales for the dolphins, the measure of C-Port's damages is the cost to replace the 12 mooring dolphins, less depreciation.

The mooring dolphins were installed in early 1997 – more than 23 years before this incident in October 2020 – and were damaged and deteriorating prior to the incident, as shown in the photographs above and its expert's engineer's Daily Safety Reports,[51] depreciation must be applied for C-Port's recoverable damages. C-Port has not offered any evidence of the mooring dolphins' useful life. Therefore, it is appropriate for this Court to apply what other courts and the experts in this case have applied absent any evidence to the contrary: a 40-year useful life as the basis for a

---

[48] *Id*. (citing *Sewerage & Water Bd. Of New Orleans*, 662 F.2d at 1124) (additional citation omitted).

[49] *See Crescent Towing & Salvage Co., Inc. v. M/V CHIOS BEAUTY*, Civ. No. 05-4207, 2008 WL 3850481, *10 (E.D. La. Aug. 14, 2008) (Duval, Jr., J.) ("**Because the mooring dolphins and pilings were not new at the time of the loss, the replacement costs must be depreciated to reflect the remaining useful life of the dolphins and pilings.**") (emphasis added). *See also Grand Famous Shipping Ltd.*, 2024 WL 362031, at *40 at No. 100 (awarding damages for the total loss of a dock "based on the cost of replacement minus depreciation").

[50] *See Campania Minera Caopas, S.A. de C.V. v. M/V CSL ACADIAN*, No. 07-04722, 2009 WL 585856 (N.D. Cal. March 6, 2009) **("[T]he record contains no evidence identifying the useful life or rate of depreciation of the dolphin or the terminal. As explained, plaintiff evidenced its out-of-pocket expenses for the repairs, it is defendants who urge that any recovery be reduced by the facility's remaining useful life yet neither side provided evidence on the subject. A forty-year useful life is adopted.**") (emphasis added) (citing *In Matter of Complaint M&M Towing Co.*, Civ. No. 94-3264 (lead case), 1997 WL 96377, *6 (E.D. La. March 4, 1997) (finding a forty year useful life for a mooring dolphin and awarding the plaintiff 2/40 of the costs of the dolphin, based on a 40 year useful life and a 38/40 depreciation factor), and, *Crescent Towing & Salvage Co., Inc.*, 2008 WL 3850481, at *10)).

[51] *See* Ex. "F," and the photographs of C-Port's mooring dolphins at pp. 3 – 8 and pp. 11 – 15. *See also* Rec. Doc. 753, at pp. 1 – 2, designating representatives of Lanier as experts for C-Port.

10

depreciation rate.[52] Applying a straight line depreciation method (as C-Port does for its "Bulkhead and Mooring Assets") to a 40 year useful life for C-Port's mooring dolphins, C-Port's recovery of damages for the loss of its mooring dolphins must be limited to no more than 17/40 of the cost to replace the 12 mooring dolphins, as determined at trial, and expenses associated with the removal of the dolphins.

Respectfully submitted:

*/s/ Gavin H. Guillot*
Gavin H. Guillot, T.A. (#31760)
Salvador J. Pusateri (#21036)
Aaron B. Greenbaum (#31752)
Meredith W. Blanque (#32346)
Jacob A. Altmyer (#36352)
Jonathan D. Parker (#35275)
**PUSATERI, JOHNSTON, GUILLOT &
GREENBAUM, LLC**
1100 Poydras Street, Suite 2250
New Orleans, LA 70163
Telephone: 504-620-2500
Facsimile: 504-620-2510
Gavin.Guillot@pjgglaw.com
Salvador.Pusateri@pjgglaw.com
Aaron.Greenbaum@pjgglaw.com
Meredith.Blanque@pjgglaw.com
Jacob.Altmyer@pjgglaw.com
Jonathan.Parker@pjgglaw.com
**ATTORNEYS FOR MODERN AMERICAN RAILROAD SERVICES, L.L.C., AND SHORE OFFSHORE SERVICES, LLC**

---

[52] This is consistent with the expert opinion of the THOR Interests designated marine surveyor expert, Gary L. Rankin, who has opined that "[t]he normal useful life of a steel pile in a saltwater environment would be between 30 to 40 years if maintained." *See* the expert report of Gary L. Rankin, attached hereto as Exhibit "G," at p. 4.