

EXHIBIT

A

Transcript of the Testimony of
# Rule 30(b)(6) Deposition of C-Port, LLC through Lee Bouziga

**Date: July 24, 2024**

**All Coast, LLC v. Shore Offshore Services, LLC, et al**

All electronic deposition & exhibit files
are available at **www.psrdocs.com**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**

# Professional Shorthand Reporters, Inc.
**Phone:  504-529-5255**
**Fax:  504-529-5257**
**Email:  reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Page 25

```
 1   EXAMINATION BY MR. GUILLOT:

 2        Q     Do you have any projection of when

 3   it will not be cost-prohibitive, under

 4   C-Port's definition of that term, to replace

 5   the dolphins?

 6        A     No.

 7        Q     Have there been any discussions at

 8   C-Port regarding plans to replace the

 9   dolphins?

10        A     No.

11        Q     So as we sit here today, there is

12   nothing on the horizon, no date or anticipated

13   moment in time, when the dolphins will be

14   replaced; is that correct?

15        A     Yes.

16        Q     To try to guide this along, I'm

17   going to attempt to do things in a bit of a

18   timeline fashion.  So we're going to start in

19   the nineties and then we're going to go

20   through the present, all right.  What I want

21   to talk to you about first has to do with the

22   installation of these dolphins.  What is

23   C-Port's understanding of when these dolphins,

24   these 12 dolphins, were first installed in the

25   Bayou Lafourche channel?
```

Page 26

1       A     Early 1997.

2       Q     Do you know who installed the

3   dolphins?

4       A     I know that E&L Enterprises was the

5   contractor.

6       Q     I'm sorry, I should have asked you

7   a clearer question.  I'm not asking which

8   specific contractor installed the dolphins.

9   I'm asking if C-Port was the entity that made

10  arrangements for the dolphins to be installed.

11      A     Yes.

12      Q     Now, you think that the contractor

13  who installed the dolphins may have been E&L?

14      A     Yes.

15      Q     Do you have any knowledge of

16  anybody else who was engaged in the

17  installation of the dolphins?

18      A     I believe E&L subcontracted another

19  company to do the work.

20      Q     Do you know who that was?

21      A     I do not.

22      Q     What was the original reason for

23  installing the dolphins?

24      A     To give our tenants at C-Port

25  additional area to park vessels, as they

Page 27

1    waited for availability at our location.

2        Q    So I asked you what was the

3    original or initial reason.  From the end of

4    1997 when these dolphins were installed,

5    through the date of the incident in

6    October 2020, was there ever any period of

7    time where these dolphins were not in service?

8        A    Just for a period in late 2012,

9    where we did some blasting and painting on

10   them.  A month, six weeks, you know.

11       Q    So they were more or less

12   continuously in service except for a period of

13   maintenance in 2012?

14       A    Correct.

15       Q    What purpose did the dolphins serve

16   from the period of their installation in 1997

17   through the date of the incident?

18       A    It gave our tenants, who work out

19   of our facility, an additional area to park

20   their vessels.

21       Q    That has always been the utility

22   served by these dolphins?

23       A    That's correct.

24       Q    Has there been any other purpose

25   served by these dolphins?

Page 28

1      A      There has been outside customers

2  that have used the dolphins for mooring space,

3  but they've always been a mooring space for

4  vessels, no other type of service there, you

5  know.

6      Q      The 12 dolphins have always served

7  as a mooring space for vessels?

8      A      Right.

9      Q      Is it fair to say that the primary

10 purpose is to provide additional space for

11 servicing the C-Port customers, in Port

12 Fourchon, and a secondary purpose would be for

13 third parties?

14     A      That's correct, ad hoc, yeah.

15     Q      Pardon me?

16     A      What we call "ad hoc."

17     Q      Ad hoc.

18     A      Right.

19     Q      For what we'll call the primary

20 purpose, for existing C-Port customers, is the

21 use of the mooring dolphins something that is

22 logged, if a C-Port customer is using the

23 dolphins?

24     A      No, sir.

25     Q      If it's used for what we just

Rule 30(b)(6) Deposition of C-Port, LLC through Lee Bouziga
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 34

1   dolphins were installed in 1997?

2        A    That's correct.

3        Q    Okay.  Are you familiar, you being

4   C-Port, with any other plans that exist

5   regarding the installation of the dolphins,

6   besides this document that we're discussing,

7   Exhibit 466?

8        A    No, sir.

9        Q    What was the original installation

10  cost?

11       A    I do not have that number.

12       Q    Is there any record at C-Port that

13  would have that information?

14       A    No, sir.

15       Q    Are you aware of anywhere that we

16  could find that information?

17       A    No, sir.  Not that many years

18  later.

19       Q    Do you know how these dolphins were

20  scheduled for depreciation purposes with

21  C-Port?

22       A    No, sir.

23       Q    Do you know who would know that?

24       A    Potentially someone in our

25  accounting department.

Page 41

1       Q       -- but as C-Port, LLC?

2       A       Understood.

3       Q       Do you have any knowledge of

4    whether these mooring dolphins were fully

5    depreciated at the time of the incident?

6       A       I do not know that.

7       Q       Do you have any knowledge of how

8    much they were depreciated on an annual basis,

9    from the date of their construction?

10      A       No, sir.

11      Q       Do you have any knowledge if they

12   were on an accelerated depreciation schedule

13   or a straight-line depreciation schedule?

14      A       No, sir.

15      Q       And when I asked you earlier,

16   before we had a little dispute about cost

17   basis, --

18      A       Right.

19      Q       -- I will define that term as

20   follows.  Do you have any knowledge of what

21   the total used for depreciating the mooring

22   dolphins was at any point in time, in C-Port's

23   corporate records?

24      A       No, sir.

25      Q       Throughout the entirety of the time

Page 42

1    of these dolphins' existence, have they always

2    been owned by C-Port, LLC?

3         A     Yes, sir.

4         Q     What knowledge does C-Port have of

5    the load capacities of these mooring dolphins?

6         A     Except for what's listed on these

7    drawings here, we do not have any load

8    capacities.

9         Q     So Exhibit 466, which is C-Port 121

10   through 123, is it your testimony that the

11   only documentation that C-Port has, in any

12   way, in reference to load capacities of the

13   mooring dolphins, is captured by that

14   document?

15        A     That's correct.

16        Q     Other than that documentation, does

17   C-Port have any knowledge of the load

18   capacities of the mooring dolphins that isn't

19   captured by this document?

20        A     No, sir.

21        Q     Does C-Port have any rules in place

22   or policies in place that restrict the size

23   and type of vessels that can use these

24   dolphins?

25        A     No, sir.

Page 44

1    Interrogatory No. 1."

2              MR. GUILLOT:

3                   If you know.

4              THE WITNESS:

5                   No, sir.

6              MR. GUILLOT:

7                   Linda, read back the question,

8         please.

9                   (Whereupon, the court reporter

10        read back the requested testimony as

11        follows:)

12             THE COURT REPORTER:

13                  Question:  Does C-Port have any

14        knowledge of the useful life of these

15        dolphins?

16   EXAMINATION BY MR. GUILLOT:

17        Q    The answer to that question is

18   "no"?

19        A    Correct.

20        Q    Let's talk a little bit about the

21   condition and maintenance of the dolphins

22   before the incident.  You mentioned this 2012

23   repair work?

24        A    Uh-huh (affirmative response).

25        Q    Leaving aside the 2012 repair work,

Page 45

1    does C-Port have any documentation showing the

2    condition of the mooring dolphins, from

3    construction through the point of the

4    incident?

5         A     No, sir.

6         Q     Is the only document that might

7    speak to this is work records related to the

8    2012 repair work?

9              MR. MORRISON:

10                  Object to the form, and only

11          because also the post-incident survey

12          that we all did, so --

13             MR. GUILLOT:

14                  Okay, and that's a fair point.

15   EXAMINATION BY MR. GUILLOT:

16        Q     I'm talking about up to the moment

17   of the incident, okay.

18        A     Okay.

19        Q     And so why don't I ask it more

20   broadly.  Does C-Port have any documentation

21   that discusses the condition of the mooring

22   dolphins, from the moment of their

23   construction, through October 28th, 2020?

24        A     No, sir.

25        Q     Does C-Port have any documents that

Page 46

1    discuss the maintenance of the mooring

2    dolphins, from the moment of their

3    construction, through October 28th, 2020,

4    besides what you testified to earlier

5    regarding the repairs in 2012?

6         A    No, sir.

7         Q    Is it a correct statement that

8    C-Port, from 1997 through the date of the

9    incident on October 28th, 2020, never

10   conducted any surveys of the mooring dolphins,

11   period?

12        MR. MORRISON:

13            Object to the form.  You can

14        answer.

15        THE WITNESS:

16            I don't think that it is.  I

17        think surveys were done.  They just were

18        not recorded.  They were not documented,

19        right.  Visual inspections, but nothing

20        that would have been recorded or

21        documented.

22   EXAMINATION BY MR. GUILLOT:

23        Q    So tell me if I'm correct.  Is it a

24   fair statement, am I correct that there may

25   have been, over time, representatives of

Page 47

1    C-Port or third parties who viewed the

2    dolphins, but that their interpretations of

3    what they had seen were not recorded?

4         A    That's correct.

5         Q    And that would be the extent of

6    surveys that were conducted, from the date of

7    construction in '97, through the date of the

8    incident on October 28th, 2020, besides the

9    2012 repair work?

10        A    That's correct.

11        Q    Do you have any knowledge of

12   whether the dolphins sustained any damage from

13   hurricanes, other bad weather, or collisions

14   with vessels, from the date of construction to

15   the date before this incident?

16        A    No, sir, I do not.

17        Q    Do you have any knowledge of

18   whether these dolphins sustained any damage

19   from any event at all, from date of

20   construction through the day before this

21   incident?

22        A    No, sir, I don't.

23        Q    At the time of the incident, did

24   C-Port have any maintenance, renovation or

25   improvement work planned for the dolphins?

Page 77

1   damaged during the incident?

2       A    No, sir, but I can assume that they

3   did.

4       Q    It's your assumption that the

5   HARVEY SEAS made contact with nine of the

6   mooring dolphins?

7       A    No, sir.  I'm just saying that my

8   assumption is that the HARVEY SEAS was struck

9   by the THOR, which caused it to push against

10  our mooring dolphins.  How many of them,

11  throughout the process, I don't know that.

12      Q    Okay.  What is your understanding

13  of the condition of the mooring dolphins just

14  before the incident?

15      A    We were not aware of any

16  deficiencies that were told to us or we were

17  not informed of any deficiencies of any of the

18  mooring dolphins prior to the incident.

19      Q    How would C-Port learn of

20  deficiencies in the mooring dolphins, as an

21  ordinary course?

22      A    By a vessel telling us, you know,

23  something's wrong with the mooring dolphin or

24  something of that nature.

25      Q    There was no established routine

Page 78

1    inspection protocol in place for the mooring

2    dolphins, correct?

3         A     Correct.  We talked about that

4    already.

5         Q     Right.  And so if you were to learn

6    that there was a deficiency in the mooring

7    dolphins, you were relying upon a customer

8    telling you about the deficiency?

9         A     Correct.

10        Q     Have you seen any of the

11   pre-incident photographs of the mooring

12   dolphins, from October 27th, 2020?

13        A     Pre-incident?

14        Q     Yes, sir.

15        A     I'm not aware that any were taken.

16        Q     I'm going to go over a couple of

17   them with you.  There's four pages that I'm

18   going to mark as "Exhibit 470."  It's

19   HGIM4012, HGIM4013, HGIM-EV5890, HGIM-EV5894.

20        A     Okay.

21        Q     Four photos.  Just let me know if

22   you've seen them before.  I should have

23   mentioned to you, sir, that anytime you want

24   to take a break, you're more than welcome to.

25        A     I'm fine.  No, sir, I was not

Page 80

1    because I'll represent to you that these are

2    the C-Port mooring dolphins, but if you can't

3    actually identify that they are the C-Port

4    mooring dolphins, from the photograph that

5    we're looking at, I understand.

6         A    Okay.

7         Q    So looking at these now, you can't

8    tell if they're the C-Port mooring dolphins,

9    but you recognize them as being a mooring

10   dolphin?

11        A    Correct.

12        Q    All right.  What do you call the

13   part at the top of the mooring dolphin that

14   the lines tie around?

15        A    Call it the ear.

16        Q    The ear?

17        A    Bollard, yeah.

18        Q    The bollard?  Maybe the cleat, ear

19   or the bollard?

20        A    Cleat, yeah.

21        Q    Okay.  In the Photograph

22   HGIM-EV5890, that ear or bollard or cleat is

23   completely severed in half and nonfunctional,

24   correct?

25        A    Yes.

Page 81

1      Q     All right.  And, in fact, the way

2    that the vessel is tied to that mooring

3    dolphin is below the steel superstructure that

4    holds the bollard, correct?

5      A     Yes.

6      Q     All right.  Would C-Port approve of

7    that method of mooring at one of its dolphins,

8    for any of its customers?

9          MR. MORRISON:

10             Object to the form.

11         THE WITNESS:

12             No, sir.

13         MR. MORRISON:

14             I don't know that -- I'm almost

15         a thousand percent certain that how they

16         should do their mooring is not part of

17         testimony that he's supposed to be

18         providing.  But anyway, he already

19         answered it.  But then, let's limit that

20         questioning, because that's questioning

21         for them, not us, but go ahead.

22    EXAMINATION BY MR. GUILLOT:

23      Q     Would you agree that the condition

24    of the dolphin that's depicted in HGIM5890

25    demonstrates that it is not fit for use

Page 82

```
 1   because the cleat or bollard or ear is

 2   completely severed?

 3           MR. MORRISON:

 4               Object to the form.  Subject to

 5       the objection, you can answer it.

 6           THE WITNESS:

 7               I'm not an engineer to tell you

 8       that that mooring dolphin still couldn't

 9       hold the weight of that vessel.

10   EXAMINATION BY MR. GUILLOT:

11       Q    Okay.  And I'm not asking you about

12   an engineering component.  I'll ask it this

13   way.  Would you market, would C-Port market

14   that mooring dolphin for use, if it were in

15   the condition as depicted in HGIM5890?

16           MR. MORRISON:

17               Same objection.

18           THE WITNESS:

19               No, sir.

20   EXAMINATION BY MR. GUILLOT:

21       Q    Why?

22       A    Because there's no mooring cleat on

23   it.

24       Q    Because it's broken, right?

25       A    Right.
```

Page 91

1        Q      Okay.  We took a brief break.  You

2    and your attorney were looking at some of the

3    Lanier reports?

4        A      Right.

5        Q      Okay.  Were you able to find

6    reference in any of those reports, which

7    specific mooring dolphins were damaged during

8    the incident?

9        A      Yes.

10       Q      Which specific mooring dolphins is

11   C-Port claiming were damaged during the

12   incident?

13       A      So all of them were damaged.  They

14   had nine of them that were destroyed, so if I

15   can clarify myself on what I said earlier.

16   But you were referencing, prior to us leaving

17   here, these photos, right?

18       Q      No, we had finished with the

19   photos.

20       A      All right.

21       Q      I was asking you, can you identify

22   by mooring dolphin number which were the

23   mooring dolphins that C-Port claims were

24   damaged during the incident, and that's when

25   we broke.

Page 97

1    bit about removal of the dolphins following

2    the incident and the cost to replace the

3    dolphins.  Why did C-Port remove the 12

4    dolphins?

5         A    There was no --

6              MR. MECHE:

7                   Objection, form.

8              THE WITNESS:

9                   There was no more use for them.

10   EXAMINATION BY MR. GUILLOT:

11        Q    For all of them or nine of them?

12        A    So they had some of them that were

13   underwater obstructions now, at the time,

14   right.  After the incident, there were some of

15   them that were underwater obstructions.  We

16   pulled them out for that reason, and if we're

17   going to replace any, replace these one day,

18   we might as well replace them all.

19        Q    Is it a fair statement that some of

20   them could have remained, and that only the

21   ones that were destroyed could have been

22   replaced?

23        A    No, sir.

24        Q    Why?

25        A    Due to the overall condition of

Page 98

1   them.

2       Q       The overall condition required

3   their removal?

4       A       Yes.  Or it could have -- it

5   potentially could have been patched, but when

6   you're there working, spending that much, you

7   might as well fix it right, you know, do it

8   100 percent right.

9       Q       I know you used the term "patched."

10  I think I know what you mean.  They could have

11  been repaired?

12      A       Right.

13      Q       Was there ever any consulting done

14  with any engineers or surveyors on whether

15  some of the dolphins could have been patched

16  or repaired, in lieu of being replaced?

17      A       Not that I recall, sir.

18      Q       The next one is CPORT 00125, and

19  I'll attach it as "Exhibit 471."  Do you

20  recognize that?

21      A       Yes, sir.

22      Q       This is the Grand Isle Shipyard

23  quote, dated December 4th, 2020, to remove and

24  replace the 12 dolphins?

25      A       Yes, sir.

Professional Shorthand Reporters, Inc.
reporters@psrdocs.com                        1-504-529-5255
                                             www.psrdocs.com

Page 104

```
 1        Q     How do you spell that?

 2        A     O-U-G-E-L.  And Bagala Diving

 3   Services.

 4        Q     How do you spell the second one?

 5        A     B-A-G-A-L-A.

 6        Q     Any other costs besides the two

 7   diving services that you referenced in

 8   connection with removing the bollards?

 9        A     Not that I recall right now.

10        Q     Do you know what was paid to those

11   two diving companies?

12        A     Not off the top of my head.

13        Q     Do you know if it was over $10,000?

14        A     Roughly, it would be in that area,

15   yes, sir.

16        Q     Total?

17        A     Yes.

18             MR. MORRISON:

19                 How did you spell the second

20         one, Bagala?

21             THE WITNESS:

22                 B-A-G-A-L-A.

23   EXAMINATION BY MR. GUILLOT:

24        Q     At the time of this incident, did

25   C-Port maintain any property insurance on
```

Rule 30(b)(6) Deposition of C-Port, LLC through Lee Bouziga
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 105

1  these dolphins?

2      A     Not that I'm aware of.

3      Q     I guess it follows that you're not

4  aware of C-Port having made any claim with any

5  insurance carrier to remove and replace the

6  dolphins?

7      A     That's correct.  We did not make

8  any.

9      Q     Does C-Port maintain liability

10 insurance that covered the dolphins?

11     A     We have a liability policy.  I'm

12 not sure -- I'm not 100 percent if the mooring

13 dolphins are specifically in that policy.

14     Q     We talked a little bit earlier

15 about C-Port's decision not to replace the

16 dolphins?

17     A     Uh-huh (affirmative response).

18     Q     What is the reason, when C-Port

19 received this quote presumably in

20 December 2020, that it did not also proceed

21 with installing 12 new bollards?

22     A     Because of the cost factor.

23     Q     Can you explain that further?

24         MR. MORRISON:

25             I'm going to object to this

Page 148

1    in Hurricane Zeta?

2              MR. MORRISON:

3                   Can we split that, Wayne?  This

4         is you, buddy.

5              THE WITNESS:

6                   Yeah.

7              MR. MORRISON:

8                   Can we split that, Wayne, into

9         repair versus removal?

10             MR. ZERINGUE:

11                  Well, yeah, that will be fine.

12   EXAMINATION BY MR. ZERINGUE:

13        Q    I'm looking for a total, and then,

14   yeah, split it up any way you want.  How much

15   in removal costs has been paid by C-Port with

16   respect to the 12 dolphins C-Port claims were

17   damaged in Zeta?

18        A    Between 45 and $50,000.

19        Q    That's total or per dolphin?

20        A    Total.

21        Q    Okay.  Between 45 and 50.  And how

22   much has been expended by C-Port in repair

23   costs with respect to those dolphins?

24        A    All of them were removed.

25        Q    Okay.  So nothing in repairs, to

Page 149

1    date, since the storm, correct?

2        A    Correct.

3        Q    All right.  I believe you mentioned

4    some incidental costs, such as diver costs,

5    associated with the removal of the dolphins.

6    How much were your diver costs?

7        A    Those were the numbers I was going

8    to provide, but it's in the neighborhood of

9    eight to $10,000.

10       Q    About eight to $10,000?

11       A    Yes, sir.

12       Q    Total, your diver costs?

13       A    Yes.

14       Q    Were there any other incidental

15   costs associated with the removal of those

16   dolphins, other than the divers, that have

17   been expended?

18       A    No, sir.

19       Q    And then I know you were questioned

20   extensively about revenues associated with

21   those dolphins, the 12 dolphins, and that was

22   broken down into what three of those dolphins

23   would be on a day rate and have been on a day

24   rate to Anadarko prior to the storm, for

25   several years?  I believe that was your

Rule 30(b)(6) Deposition of C-Port, LLC through Lee Bouziga
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 150

1    testimony?

2        A      Yes, sir.

3        Q      And that day rate at the time of

4    the storm, Hurricane Zeta, was $150 for the

5    three dolphins leased to Anadarko, correct?

6        A      That is correct.

7        Q      $150 per day?

8        A      Per day.

9        Q      And then there was another revenue

10   stream from the ad hoc/third parties, and that

11   would be on a per-linear-foot basis of the

12   vessel that was moored, and that rate was how

13   much per linear foot at the time of the storm?

14       A      $3.00.

15       Q      Do you have any estimate of the

16   revenues that would be generated monthly for

17   those other nine dolphins, on that ad hoc

18   basis?

19       A      No, sir, I do not.

20       Q      You have two bids to replace the

21   12 dolphins, correct, one from SeaLevel and

22   one from Low Land Construction, correct?

23       A      I have a third bid from Grand Isle

24   Shipyard.

25       Q      Third bid from Grand Isle Shipyard.

Rule 30(b)(6) Deposition of C-Port, LLC through Lee Bouziga
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 151

1    All right.  The Grand Isle Shipyard bid was

2    dated December 4, 2020, correct?

3         A     That's correct.

4         Q     And the SeaLevel bid was

5    December 8, 2022?

6         A     Correct.

7         Q     And I believe the other bid from

8    Low Land was December 8, 2022, correct?

9         A     Correct.

10        Q     All right.  None of those bids have

11   been accepted, correct?

12        A     Correct.

13        Q     And what is the status of the

14   repairs to those 12 dolphins?

15        A     Nothing has been done besides the

16   removal.

17        Q     Nothing is in the process of being

18   done to replace those 12 dolphins?

19        A     No, sir.

20            MR. ZERINGUE:

21                Thank you.  Those are all my

22        questions.

23            MR. MORRISON:

24                Anybody else?  Have you got any

25        more?

Page 153

1             REPORTER'S CERTIFICATE

2

3        This certification is valid only for a
transcript accompanied by my original

4    signature and original required seal on this
page.

5

6            I, Linda G. Griffin, RPR,
Certified Court Reporter in and for the

7    State of Louisiana, as the officer before
whom this testimony was taken, do hereby

8    certify that Lee Bouziga, after having been
duly sworn by me upon authority of

9    R.S. 37:2554, did testify as hereinbefore
set forth in the foregoing 152 pages; that

10   this testimony was reported by me in the
stenotype reporting method, was prepared and

11   transcribed by me or under my personal
direction and supervision, and is a true and

12   correct transcript to the best of my ability
and understanding; that the transcript has

13   been prepared in compliance with transcript
format guidelines required by statute or by

14   rules of the board, that I have acted in
compliance with the prohibition on

15   contractual relationships, as defined by
Louisiana Code of Civil Procedure Article

16   1434 and in rules and advisory opinions of
the board; that I am not related to counsel

17   or the parties herein, nor am I otherwise
interested in the outcome of this matter.

18

19

20

21            _____
              LINDA G. GRIFFIN, RPR
              CERTIFIED COURT REPORTER

22

23

24

25

**From:** Corby Autin <corby@harveygulf.com>
**To:** Scarlet Dobson <Scarlet.Dobson@harveygulf.com>
**Subject:** IMG_20201027_131641.jpg
**Date:** Fri, 30 Oct 2020 21:44:31 +0000
**Importance:** Normal
**Inline-Images:** IMG_20201027_131641.jpg

---

Digital file please



**Regards,**

**Corby Autin**
**Executive Vice President**

HGIM-EV-005894