UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ALL COAST, LLC** | \* | **CIVIL ACTION NO. 21-258 (LEAD),** c/w 21-337, 21-464, 21-822, 21-1968, |
| **VERSUS** | \* | **21-1969, 21-1982, 21-2075, 21-2227** |
| **SHORE OFFSHORE SERVICES, LLC; MODERN AMERICAN RAILROAD SERVICES, LLC; and MARTIN ENERGY SERVICES, LLC** | \* | **SECTION A(3)** |
| | | **DISTRICT JUDGE JAY C. ZAINEY** |
| | \* | |
| | | **MAG. JUDGE EVA DOSSIER** |
| | \* | |
| | | **APPLIES TO ALL CASES** |

\*   \*   \*   \*   \*   \*   \*   \*   \*

### WEEKS MARINE'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Weeks Marine, Inc. provides this memorandum in support of its motion for partial summary judgment. Weeks Marine is not at fault and did not cause damages to any vessel with respect to the THOR's breakaway.

**I.   INTRODUCTION**

This case arises out of a series of maritime allisions that followed when the D/B THOR broke free from its moorings in Bayou Lafourche during Hurricane Zeta. When the hurricane struck, the THOR's lines parted, dock bollards snapped, and its assist tug proved inadequate. Lacking propulsion or steering, the barge began to "ping pong" out of control up the bayou, crashing into vessels and property on both sides of the waterway before eventually running aground.

Among the vessels struck by the THOR was the E.W. ELLEFSEN, a cutter dredge owned by Weeks Marine. Certain parties have vaguely asserted that the stationary ELLEFSEN was at fault for being hit by the careening THOR. The assertion is meritless for two overarching reasons.

First, there is no basis to find that Weeks Marine breached any duty. This area of the bayou, closed to all navigation for the duration of the storm, does not qualify as a "narrow navigational channel" for relevant purposes. Special circumstances, including the bayou's closure for the hurricane, existed that allowed Weeks Marine's cutter dredge to anchor where it did. Moreover, Weeks Marine's hurricane plan did not prohibit that anchorage location. On the contrary, it gave the ELLEFSEN's captain discretion to select a suitable anchoring location under the circumstances. The undisputed facts show that Weeks Marine violated no rule and therefore cannot be found to have committed any breach by anchoring safely where it did.

Second, even if there were a factual dispute concerning duty, summary judgment should be granted because no party can prove that any breach by Weeks Marine caused any damages. Factual causation asks whether the same incident would have occurred even if the actor's conduct were different. Here, even if Weeks Marine's cutter dredge supposedly anchored on the "wrong" side of Bayou Lafourche, the THOR's path of destruction demonstrates that anchoring in a different spot would not have changed anything. The THOR, pushed randomly by the wind and storm surge, hit vessels and property up and down either side of the bayou, not just those moored or anchored in certain spots. The specific location where Weeks Marine's cutter dredge anchored makes no difference as respects an oncoming barge that is zigzagging and out of control. It is not a factual cause of any allision with respect to this incident.

Additionally, the location of the ELLEFSEN's anchorage is not the legal or proximate cause of the allision. The THOR's breakaway, while preventable on the part of the defendants, was an unforeseeable risk from the perspective of Weeks Marine. Any duty to anchor only in certain areas as opposed to others—if such a duty even applied here—is not meant to protect against this

sort of extraordinary incident or to ensure free passage to an unpowered barge that is drifting helplessly out of control in a waterway closed to all maritime traffic.

Because Weeks Marine cannot be found liable at trial, it is entitled to partial summary judgment regarding the issue of its alleged fault, including all claims for contribution or indemnity by any party.

## II.   BACKGROUND

### A.   Factual Background.

The THOR is a massive offshore derrick barge—370 by 140 feet.[1] It lacks any means of self-propulsion or steering and, accordingly, must be maneuvered by assist tugs.[2] Without one or more assist tugs, the THOR is essentially a "dead ship."[3]

Prior to Hurricane Zeta, the THOR was working in the Gulf of Mexico. As the hurricane was forming in the Gulf and making its way towards south Louisiana, the THOR's owners engaged Crosby Tugs, LLC and/or Crosby Marine Transportation, LLC to tow the barge to Port Fourchon.[4] On October 26, 2020, the THOR's crew moored her at the Martin Energy Services, LLC dock in Port Fourchon, on the east bank of (and at the mouth of) Bayou Lafourche.[5] The THOR

---

[1]   Exh. 1, Joe Douglass depo., p. 306.

[2]   Exh. 2, Dustin Lowe depo., p. 187 (the THOR is non-self-propelled); Exh. 3, Darren Walker depo., p. 177 (same); Exh. 1, Douglas depo., pp. 469, 480, 518 (assist tugs are a lifeline to the dead barge); Exh. 4, Brian Cloyd depo., p. 495 (tugs are responsible for the THOR's navigable movements).

[3]   Exh. 1, Douglas depo., p. 480; *see also id*. at pp. 198–99 ("Does the D/B Thor have its own propulsion system where it can just navigate around the Gulf of Mexico on its own? A. No, it does not. Q. Does it utilize assist tugs or tractor tugs, like, for example, the Crosby Endeavor, to navigate from place to place? A. Yes. . . . [W]ithout their propulsion, I can't do nothing. I can't get anywhere. . . . Q. Without their propulsion, if you're in the water, the D/B Thor basically just becomes a sitting duck, right? A. Correct.") (form objection omitted).

[4]   Exh. 5, Cpt. Daley report (July 2024), pp. 11, 15.

[5]   Exh. 1, Douglas depo., p. 136; Exh. 5, Cpt. Daley report (July 2024), pp. 27, 32, 34.

was moored with its starboard side against the dock; later, the Crosby assist tug M/V ENDEAVOR was made up alongside the THOR's port side.[6] The plan was for the THOR to ride out the storm in Port Fourchon and then promptly head back offshore to return to work.[7]

Meanwhile, the ELLEFSEN was engaged in a dredging and restoration project near Timbalier Bay, just to the west of Port Fourchon. With Zeta approaching, it also took shelter in Bayou Lafourche, on the east bank, and just north of the THOR's location.[8] The ELLEFSEN was secured by three anchors, its massive cutter head (which was lowered into the bed), and two assist tugs: the M/V SEA CYPRESS and the M/V TRENT JOSEPH. Other accompanying vessels were moored or anchored nearby.[9]

On October 27, the day before the hurricane made landfall, dangerous storm conditions were expected in Bayou Lafourche. Accordingly, authorities closed the port to all vessel traffic, prohibiting navigation up into and down out of the bayou.[10]

Hurricane Zeta made landfall the afternoon of October 28.[11] Around 4 p.m., the THOR's mooring lines and several of Martin's bollards failed, and the THOR broke away from the Martin dock.[12] The lines connecting the THOR to the Crosby ENDEAVOR soon parted.[13] At that point,

---

[6] Exh. 1, Douglas depo., p. 175; Exh. 5, Cpt. Daley report (July 2024), pp. 32, 34.

[7] Exh. 1, Douglas depo., p. 472.

[8] *See*, *e.g.*, Exh. 6, Charles Goodwin depo., pp. 61–62.

[9] Exh. 6, Goodwin depo., pp. 53–54 & depo. exhibit 322 (diagram of the mooring arrangement).

[10] Exh. 7, Walter Everett, Jr. depo., pp. 242–43 & depo. exhibit 69 ("The COTP [Captain of the Port] has closed the Louisiana Offshore Oil Port (LOOP), Port Fourchon, and Port of Terrebonne."); *see also*, *e.g.*, Exh. 6, Goodwin depo., pp. 31–32 & depo. exhibit 320, WM00020 (note on 10/29/20: "Port still closed to river traffic").

[11] Exh. 5, Cpt. Daley report (July 2024), p. 15.

[12] Exh. 1, Douglas depo., p. 254; Exh. 5, Cpt. Daley report (July 2024), p. 15.

[13] Exh. 1, Douglas depo., p. 234 (lines tying the THOR to the ENDEAVOR parted or were disengaged shortly after the breakaway).

the THOR was free-drifting on its own in the winds and current.[14] It proceeded to "ping-pong[] up the channel" like a "wrecking ball."[15]

Initially, the THOR shot across Bayou Lafourche to the west bank, where it struck C-Port dolphins and an offshore supply ship called the HARVEY SEAS.[16] The THOR then spun up the bayou on that side and hit other vessels.[17] Later, the THOR flipped around and drifted back to the east bank where it struck the ELLEFSEN and accompanying vessels.[18]

After hitting the ELLEFSEN and accompanying vessels, the THOR rotated around to the west side of those vessels and pushed them up the bayou into another grouping of vessels including the M/V STINGRAY and M/V GROUPER.[19] The ELLEFSEN came to rest there.[20] The THOR,

---

[14] Exh. 4, Cloyd depo., p. 545 & depo. exhibit 55 (OII-000093) ("1605: Mooring lines parted. Winds 100+mph. Barge in a free drift up the channel 8–10kts. . . ."); Exh. 3, Walker depo., p. 60 (after the THOR broke away, nothing was holding it; it was on its own); Exh. 1, Douglas depo., p. 448 ("Q. . . . [W]as the THOR under control of any vessel, including the Crosby ENDEAVOR? A. No. Q. . . . [A]m I correct in understanding your testimony, is that the THOR was being pushed by the—the winds of the hurricane northward on Bayou Lafourche? A. Correct."); Exh. 7, Everett depo., pp. 326–27 (Crosby's tug initially tried to stay with the THOR and push on it but with no effect).

[15] Exh. 3, Walker depo., pp. 60, 62 (after the breakaway, the THOR, being unconnected to any tugboat, was "flying up the channel" in "100-something miles per hour winds" and commenced "hitting a bunch of vessels"); Exh. 1, Douglas depo., p. 248 (agreeing that THOR was free-floating with the current); Exh. 4, Cloyd depo., p. 552 (describing the THOR's movements as "ping-ponging up the channel"); id. at p. 560 & depo. exhibit 56, p. 4 (stating that the THOR "broke all mooring lines and became a wrecking ball to other ships and boats").

[16] Exh. 1, Douglas depo., pp. 239–40 (the THOR initially headed west and hit dolphins); Exh. 4, Cloyd depo., p. 513 (the THOR headed west and hit a few vessels); Exh. 4, Cloyd depo., pp. 505–08 & depo. exhibit 51 (video depicting the THOR breaking away, crossing the bayou, and striking dolphins and the HARVEY SEAS followed by the MR. COLBY and other vessels).

[17] Exh. 4, Cloyd depo., pp. 505–08 & depo. exhibit 51.

[18] Exh. 1, Douglas depo., p. 448 (saw the THOR hit the ELLEFSEN); Exh. 6, Goodwin depo., p. 62 (Weeks Marine vessels were anchored on the left descending bank [east bank]); id. at p. 102 (the THOR came at the ELLEFSEN on its shore side, spinning into the east bank and going aground, striking the ELLEFSEN and the M/V SEA CYPRESS (tied alongside the ELLEFSEN)).

[19] Exh. 1, Goodwin depo., pp. 149–50.

[20] Exh. 1, Goodwin depo., pp. 11–12 & depo. exhibit 317.

however, continued further up the bayou, where it eventually ran aground.[21]

### B.     Procedural History.

After the breakaway incident, the THOR Interests and Crosby filed limitation actions.[22] Weeks Marine filed claims against the THOR Interests, Crosby, Martin Energy, and Dawn Services.[23] In response, the defendants have generically asserted defenses based on Weeks' Marine's fault, *i.e.*, that Weeks Marine is responsible to some extent for (i) the THOR's crashing into the ELLEFSEN and accompanying vessels, and (ii) the THOR's pushing those vessels into the STINGRAY vessel grouping.[24]

Weeks Marine moves for summary judgment finding that no fault of Weeks Marine caused any damage in this matter and the dismissal of any claim or defense predicated on the assertion of such fault.

## III.    LAW AND ARGUMENT

### A.     Legal standard.

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the

---

[21] Exh. 8, Charles Grantham depo., p. 110 (the THOR continued up the bayou); Exh. 4, Cloyd depo., p. 545 & depo. exhibit 55 (OII-000093) (the THOR eventually ran aground).

[22] *In the Matter of Modern American Railroad Service*, No. 21-0464 (E.D. La. Mar. 4, 2021); *In Re: the Matter of Crosby Tugs, LLC*, No. 21-0822 (E.D. La. Apr. 26, 2021).

[23] Rec. Docs. 14, 15. Unless noted otherwise, record document cites refer to the consolidated lead case docket (No. 21-258).

[24] *E.g.*, Rec. Doc. 65, p. 5 (THOR answer); Rec. Doc. 145, pp. 21–24 (THOR tendering Weeks Marine to All Coast as owner/operator of the M/V STINGRAY and M/V GROUPER); Rec. Doc. 279, pp. 23–25 (THOR tendering Weeks Marine to Coastal Towing as owner/operator of the M/V TRENT JOSEPH); Rec. Doc. 291, pp. 10–12 (THOR tendering Weeks Marine to Garber Bothers as owner/operator of the M/V SEA CYPRESS); *see also* Rec. Doc. 116, p. 10 (Crosby answer); Rec. Doc. 190, p. 6 (Martin answer); Rec. Docs. 51 & 52, p. 5 (Dawn Services answers).

moving party is entitled to judgment as a matter of law. The movant bears the initial burden to show no genuine issue of material fact. If met, the burden shifts to the non-movant to produce evidence showing the existence of a genuine issue for trial.[25]

Factual controversies are resolved in favor of the non-moving party, but only when there is an actual controversy and both parties have submitted evidence of contradictory facts.[26] As the Supreme Court has held, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[27] Courts may not assume, in the absence of proof, that the nonmoving party could prove the necessary facts.[28]

### B. No party can show that Weeks Marine breached any duty.

The Court should grant this motion first because no party can show that the E.W. ELLEFSEN's anchoring in Bayou Lafourche was in breach of any duty.

#### 1. Weeks Marine did not violate Rule 9 (the "narrow-channel rule").

Captain Daley, the THOR's liability expert, is the only expert to assert that Weeks Marine did anything wrong.[29] He opined that Weeks Marine violated Inland Navigation Rule 9 (33 CFR § 83.09) at subpart (g).[30] That rule provides that "[a]ny vessel shall, if the circumstances of the case admit, avoid anchoring in a narrow channel."[31]

---

[25] *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

[26] *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013).

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[28] *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 391 (5th Cir. 2009).

[29] No other party to this consolidated action has disclosed any expert providing an opinion on the subject, and discovery is closed.

[30] Exh. 9, Cpt. Daley report (Jan. 2025), p. 69.

[31] 33 C.F.R. § 83.09(g).

Weeks Marine did not violate this rule because it does not apply. In the Fifth Circuit, courts have held that the term "narrow channel" generally may include bodies of water less than 1,000 feet in width.[32] Nevertheless, Fifth Circuit law is also clear that the width of the water body alone is not dispositive. Courts must also consider the character of navigational use at the relevant location as well as the specific conditions at relevant times.[33]

Here, regardless of width, Bayou Lafourche cannot be deemed a narrow channel considering the character of navigational use and the specific conditions at relevant times. When the collision occurred, the area of Bayou Lafourche around Port Fourchon was closed to vessel navigation.[34] To the extent the "narrow channel" rule seeks to impose a duty of special care on vessels navigating in certain bodies of water, the rule is inapplicable here. No vessels were navigating the bayou at relevant times. The only vessel traveling up the bayou from Port Fourchon during the passage of the hurricane was the non-self-propelled and non-navigating THOR, which had broken free from its moorings. Having lost all contact with assist tugs, it was a "dead barge" that was not navigating in any sense of the word. Because the channel was closed to navigation, the character of navigational use and specific conditions at relevant times dictate that area of Bayou Lafourche does

---

[32] *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, 892 (5th Cir. 2013).

[33] *Canal Barge Co. v. China Ocean Shipping Co.*, 770 F.2d 1357, 1362 (5th Cir. 1985) ("[T]he determination of what is a "narrow channel" is a mixed question of law and fact. The application of the rule is not based solely on the physical dimensions of the water, but also on the character of navigational use."); *Skibs A/S Siljestad v. S/S Mathew Luckenbach*, 215 F. Supp. 667, 681 (S.D.N.Y.) ("All authorities seem to agree that you do not look to the mere physical dimensions of the area in order to determine whether it is a Narrow Channel but rather the character of navigating use to which the water is put."), *aff'd*, 324 F.2d 563 (2d Cir. 1963); *see also SCF Waxler Marine LLC*, 427 F. Supp. 3d at 763–64 (making a narrow-channel determination based on "the specific circumstances prevailing in this area on the night of January 31, 2016").

[34] Exh. 7, Everett depo., pp. 242–43 & depo. exhibit 69 ("The COTP [Captain Of The Port] has closed the Louisiana Offshore Oil Port (LOOP), Port Fourchon, and Port of Terrebonne."); *see also*, *e.g.*, Exh. 6, Goodwin depo., pp. 31–32 & deposition exhibit 320, WM00020 (note on 10/29/20: "Port still closed to river traffic").

not qualify as a narrow channel for purposed of Rule 9.

Moreover, even where applicable, Inland Navigation Rule 9 sets out an exception: "Any vessel shall, *if the circumstances of the case admit*, avoid anchoring in a narrow channel."[35] The narrow-channel rule thus permits deviation from its mandate in "special" or "exceptional" circumstances.[36] Here, even if that rule applied, the Weeks Marine vessels faced special and exceptional circumstances that justified their choice of anchoring location. Again, the allision occurred during a hurricane, during which no vessels were allowed to or were navigating this part of the bayou at relevant times. A channel having been closed to navigation for a dangerous hurricane is a special circumstance. Anchoring there under these circumstances does not increase the risk of collision and is not a violation of this rule.

## 2. Weeks did not obstruct navigation; its vessels were off to the side, and no navigation was allowed.

In his report, Captain Daley also opined that the Weeks Marine vessels were moored in the middle of the bayou and blocked navigation for all but the smallest of vessels.[37] But the evidence shows that vessels were moored as close to the left descending bank as possible.[38] And that location enabled other vessels to pass by the Weeks Marine vessels' moored location without problem in the days leading up to the hurricane. In fact, at least 20 vessels safely transited the bayou past the E.W. ELLEFSEN in the days between the dredge anchoring and the closure of the port.[39] The

---

[35] 33 C.F.R. § 83.09(g).

[36] *Mike Hooks Dredging Co.*, 716 F.3d at 891–92.

[37] Exh. 9, Cpt. Daley report (Jan. 2025), pp. 64, 66–68.

[38] *E.g.*, Exh. 6, Goodwin depo., pp. 134–35.

[39] Exh. 10, Cpt. Gupta report (Apr. 2025), pp. 11-20 & Enclosure 2 to Cpt. Gupta's report.

difference between those vessels and the THOR, of course, is that the THOR was drifting out of control and therefore incapable of charting a safe path through the open channel.

Further, the Weeks Marine vessels did not obstruct navigation because, again, the area of Bayou Lafourche in and around Port Fourchon was completely closed to navigation. The only vessel supposedly impeded by the location of the moored Weeks Marine vessels was the THOR. And that vessel was not navigating at all. Accordingly, Weeks Marine did not obstruct navigation.

### 3. Weeks Marine did not violate its own mooring policies.

Captain Daley additionally opined that Weeks Marine violated its hurricane plan by mooring on the left descending (east) bank of Bayou Lafourche instead of the right descending (west) bank.[40] But the policy that Captain Daley referenced gave Weeks Marine's captain discretion to depart from any general rule where deemed appropriate under the circumstances:

> The following contingency plan for moving the dredge is to be implemented in advance of a hurricane or severe storm influencing the project operating area. **It is intended as a guide and can be modified as needed to suit specific situations each evacuation may present**.[41]

Here, the captain of the ELLEFSEN, Captain Goodwin, explained in his deposition that the Weeks Marine vessels anchored on the left (east) descending bank to be near equipment already staged along the bank there.[42] And he testified that he discussed this decision with project management, who approved his decision to anchor on that bank.[43]

---

[40] Exh. 9, Cpt. Daley report (Jan. 2025), pp. 64–65, 71; *see also* Exh. 6, Goodwin depo., p. 39 & depo. exhibit 321, WM00022–23.

[41] *E.g.*, Exh. 6, Goodwin depo., p. 39 & depo. exhibit 321, WM00020 (bold in original).

[42] Exh. 6, Goodwin depo., p. 62.

[43] Exh. 6, Goodwin depo., pp. 62–63.

Captain Daley did not acknowledge either the policy's allowance of discretionary or the express authorization given to the ELLEFSEN to anchor where it did. Nor did he explain why one bank would be safer than the other, unless a derelict vessel happens to randomly drift into one side or the other. Instead, he simply relied on the default language in the plan. But nothing in the Weeks Marine plan requires anchoring in a specific location. Accordingly, the Court should enter summary judgment finding that Weeks Marine breached no duty.

### C. No party can show that any supposed breach by Weeks Marine caused damages.

Causation is an independent and necessary requirement to impose liability. Absent causation, any supposed breach is irrelevant.[44] Causation has two parts: factual causation and legal or proximate causation.[45]

Here, even if any party could show a breach by Weeks Marine, they could not prove that any breach caused damages. The undisputed testimony shows that, prior to the initial impact, the ELLEFSEN was securely moored and did nothing to cause or contribute to the allision.[46] Neither factual *nor* proximate/legal causation is present here.

### 1. Factual causation is absent.

Cause-in-fact is evaluated under the "but for" and "substantial-factor" tests.[47] The Fifth

---

[44] *In re Mid-S. Towing Co.*, 418 F.3d 526, 533–34 (5th Cir. 2005) ("[F]ault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract. . . . [F]ault in the abstract does not give rise to liability.").

[45] Thomas J. Schoenbaum, Admiralty and Maritime Law, § 3-3 (5th ed.); *see also In Re MidSouth*, 418 F.3d 526, 532 (5th Cir 2005).

[46] Exh. 1, Douglas depo., p. 443 ("Q. Is there anything that you saw the . . . E.W. Ellison do to contribute to the Thor making contact with Ellison? A. Not—not that I could tell, no.") (form objection omitted); Exh. 8, Grantham depo., pp. 107–08 ("Q. Okay. Did the dredge do anything to cause the contact with the THOR that happened? A. No, sir, not that I know of.").

[47] Thomas J. Schoenbaum, Admiralty and Maritime Law, § 3-3 (5th ed.).

Circuit determines factual causation by evaluating whether the particular event would have occurred even without the conduct at issue:

> [A]n act or an omission is not regarded as a cause of an event if the particular event would have occurred without it. . . . . A failure to have a lifeboat ready is not a cause of the death of a man who sinks without trace immediately upon falling into the ocean. The failure to install a proper fire escape on a hotel is no cause of the death of a man suffocated in his bed by smoke. The omission of a traffic signal to an automobile driver who could not have seen it if it had been given is not a cause of the ensuing collision. . . . The presence of a railroad embankment may be no cause of the inundation of the plaintiff's land by a cloud burst which would have flooded it in any case.[48]

Thus, "ascertaining the existence of but-for causation requires a court to create 'a mental picture of a situation identical to the actual facts of the case in all respects save one: the defendant's wrongful conduct is now 'corrected' to the minimal extent necessary to make it conform to the law's requirements.' Then, the court asks 'whether the injuries that the plaintiff suffered would probably still have occurred had the defendant behaved correctly in the sense indicated.' Only if the answer to that question is 'No' is the defendant's conduct a but-for-cause of the plaintiff's injuries."[49]

Applying this rule in admiralty cases, the Fifth Circuit has repeatedly found that a given party's (allegedly) negligent conduct did not cause an event that would have occurred regardless:

- *Atkins v. Lorentzen*, 328 F.2d 66, 71-72 (5th Cir. 1964) (vessel's failure to post a lookout, drop anchor, increase speed, or adjust steering could not have been a cause of the collision where it would have occurred regardless).

---

[48] *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1012–13 (5th Cir. 1980) (admiralty jurisdiction; applying maritime law; quoting W. Prosser, The Law of Torts, § 41, at 238 (4th ed. 1971)); *see also* Thomas J. Schoenbaum, Admiralty and Maritime Law, § 3-3 (5th ed.) ("Certainly, the defendant's act cannot be a 'substantial factor' if the plaintiff's harm would have occurred without it.").

[49] *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011) (citing, *e.g.*, *Moser*).

- *Bd. of Comm'rs of Port of New Orleans v. M/V Farmsum*, 574 F.2d 289, 295-98 (5th Cir. 1978) (had the third-party defendant abided a certain navigational custom, sounded a bend signal, and posted a lookout, that still would not have prevented the collision at issue, so its failures with respect to those things "could not possibly have any real causal connection with the collision").

- *Maya Special Mar. Enter. v. Crochet*, No. 4:13-CV-1871, 2016 WL 4190153, at *13 (S.D. Tex. Aug. 9, 2016) (violation of lookout rule did not support liability where it was "mere conjecture that Mr. Castillo would have been able to spot the M.L. CROCHET, given the prevailing conditions, in time for the MINERVA MAYA to take an adequate evasive maneuver").

- *Seacarriers Maritime Co. v. M/T Stolt Jade*, 823 F. Supp. 1311, 1319-20 (E.D. La. 1993) (vessel's unsafe speed did not cause or contribute to other vessel's collision with an offshore platform, where the collision would have happened regardless).[50]

- *Chotin Transp., Inc. v. Motor Vessel Hugh C. Blaske*, 356 F. Supp. 388, 393-95 (E.D. La. 1972) (failure to post lookout was not a cause of collision with drifting-out-of-control barges; the presence of a lookout would not have changed the outcome), *aff'd*, 475 F.2d 1370 (5th Cir. 1973).

- *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 825 (4th Cir. 1992) (affirming that one vessel in collision was not liable, even though it failed to display navigational light in fog, where it "would not have made 'one iota of difference one way or the other whether the [TMI–96's] navigation lights were or were not on,' and that 'the lack of navigation lights on the barge . . . would [not] have served to prevent any amount of damage,'" because "the fog was so dense immediately preceding the crash that the crew of the USS MOUNT BAKER would have been unable to see the TMI–96's navigational lights even had they been illuminated.") (citations omitted).

Here, any alleged breach by Weeks Marine regarding the specific positioning of the ELLEFSEN was not a cause of any allision. If the Weeks Marine vessel group had been anchored closer to shore, that would not have prevented the allision but instead would have made it only more certain to occur. The THOR struck the Weeks Marine vessel group on the side closest to

---

[50] *See also* Thomas J. Schoenbaum, Admiralty and Maritime Law, § 11-3 (5th ed.) (citing *Seacarriers* for the proposition that supposed negligence is not a cause if "the casualty would have occurred anyway").

east bank.[51] Being closer to shore on that side would have simply ensured a more direct hit.

Likewise, if the Weeks Marine vessels had moored at a designated mooring spot, such as alongside dolphins, it would not have made a difference. Numerous vessels moored to designated dolphins were struck by the THOR.[52]

Further, even if the Weeks Marine vessels were anchored along the west bank, it would not have made any difference. The THOR's out-of-control path was random and unforeseeable. It bounced back and forth as it drifted out of control up the bayou, striking and damaging property and vessels on both sides.[53] Vessels on the west bank were no more protected from the rampaging barge than vessels on the east. The Fifth Circuit has held that even an improperly moored or anchored vessel is not the cause of an allision just because it happens to be where a drifting barge fortuitously strikes it.[54]

As the record in this case shows—and as the sheer number of claimants confirms—no vessel or property in Bayou Lafourche could predict a mooring or anchorage location that would be safe from the THOR once it broke away. Under these circumstances, it would not have made "one iota of difference" where the Weeks Marine vessels anchored. The ELLEFSEN's choice to anchor on the east bank played no role in an allision caused by a randomly drifting barge.[55] Because this

---

[51] *E.g.*, Exh. 6, Goodwin depo., p. 102.

[52] Exh. 1, Douglas depo., pp. 239–40; Exh. 4, Cloyd depo., pp. 505–08, 513 & depo. exhibit 51.

[53] *E.g.*, Exh. 1, Douglas depo., pp. 239–40; Exh. 6, Goodwin depo., pp. 62, 102.

[54] *Am. River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450–51 (5th Cir. 1998) (the presence of the barges moored on the river without a permit was not a substantial and material factor in causing the accident with a drifting vessel that had lost power) ("Specifically, Arosita points to testimony that, if one less barge had been moored at the fleeting facility, the M/V Kavo Kaliakra would not have allided with it. At bottom, however, this argument is no more than a restatement of the position that the unpermitted barges caused the accident by 'being there.'").

[55] *See U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 825 (4th Cir. 1992).

allision would "still have occurred had [Weeks Marine] behaved correctly" in the sense that defendants might envision, the supposed deviation is not a factual cause of any allision or damages.[56]

### 2.     Proximate/legal causation is also absent.

In addition, any alleged fault on the part of Weeks Marine for anchoring the ELLEFSEN where it did was not the proximate or legal cause of any allision. Legal cause implicates policy considerations.[57] It incorporates concepts such as foreseeability and superseding cause.[58] The legal cause element ensures that an "actor will [not] always be held [liable] for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity."[59]

In evaluating the policy considerations implicated by this element, the Supreme Court has clarified that courts may look to state law. "In ruling upon whether a defendant's blameworthy act was sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant, courts sitting in admiralty may draw guidance from . . . the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources."[60]

Louisiana has a well-developed body of law on legal causation, which can assist the Court in evaluating this element. Under Louisiana law, proximate/legal causation is absent where the specific risk encountered by the plaintiff is attenuated and unforeseeable.[61] It is also absent where

---

[56]   *See In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011) (citing, *e.g.*, *Moser*).

[57]   *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1012 (5th Cir. 1980).

[58]   Thomas J. Schoenbaum, Admiralty and Maritime Law, § 3-3 (5th ed.).

[59]   *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838–39 (1996) (quoting *Petition of Kinsman Transit Co.*, 338 F.2d 708, 725 (2d Cir. 1964)).

[60]   *Exxon Co.*, 517 U.S. at 839.

[61]   *Lahare v. Valentine Mech. Servs., LLC*, 2017-289 (La. App. 5 Cir. 6/29/17), 223 So. 3d 773, 778–79 (no legal causation link existed between (1) duties associated with installing a generator in the correct location at a home

intervening events sever the connection between the conduct and the harm. "Whether phrased in terms of scope of duty or legal cause or proximate cause, it can be useful to consider whether 'too much else has intervened—time, space, people, and bizarreness.'"[62]

Further, legal cause is missing where the rule allegedly violated by was not designed to protect against the sort of harm encountered:

- *Lazard v. Foti*, 2002-2888 (La. 10/21/03), 859 So. 2d 656, 660–61 (requirement that sheriff keep juveniles out of adult jail was designed to protect against risk of harm inside an adult jail, not to protect against risk of a juvenile being released on bail and thereafter being injured outside by a third party).

- *Dupre & Son Floor Covering, Inc. v. City of Iota*, 2009-1183 (La. App. 3 Cir. 5/5/10), 36 So. 3d 1117, 1119–22 (duty to impound car driven by driver without insurance was designed to encourage compliance with insurance requirements, not to protect against the risk that an uninsured driver who was allowed to remain in his vehicle would later crash into someone else).

- *Stephenson v. Com. Travelers Mut. Ins. Co.*, 2004-1237 (La. App. 3 Cir. 2/2/05), 893 So. 2d 180, 184, 186–87 (tort duty imposed on high school soccer coach to keep student athlete on the sidelines due to an injury to her *left* ankle was designed to protect against harm to others or further harm to her left ankle; it was not to protect against the risk that while playing she might get kicked in the *right* leg and suffer a new and different injury).

- *Martinez v. Modenbach*, 396 So. 2d 471, 474 (La. App. 4 Cir. 1981) (duty to keep pets leashed was designed to avoid risk of animals injuring others, not the risk of a person

---

residence and (2) the "attenuated risk" that the homeowner might trip on a sidewalk while canvasing her neighborhood to seek support for a zoning variance that was needed because of the improperly located generator); *Trosclair v. Halliburton Co.*, 158 F.3d 584 (5th Cir. 1998) (unpublished; applying Louisiana law in a diversity case) (a workers' negligence in allowing a cement mixture to spill onto a drilling platform because the mixing tank was not connected to a discharge line was not the legal cause of an injury suffered by another who was hurt—not from slipping on spilled substances—but instead while helping to lift and reattach the discharge line).

[62] *Paul v. La. State Employees' Grp. Ben. Program*, 1999-0897 (La. App. 1 Cir. 5/12/00), 762 So. 2d 136, 143–44 (quoting *Roberts v. Benoit*, 605 So. 2d 1032, 1058 (La. 1991)); *Brow v. Allstate Indem. Co.*, 1999-2319 (La. App. 1 Cir. 11/3/00), 771 So. 2d 268, 273–74 (any negligence of the DOTD in failing to install "wrong way" signage at a highway intersection was not the legal cause of an accident in which a motorist entered the highway going the wrong way at that intersection, proceeded to drive four miles in the wrong direction while failing to notice other signs that were present as well as efforts by other motorists to alert him to his mistake, and then collided with the plaintiff; the collision "was the result of the events that intervened between [the wrong-way driver's] entrance to Highway 61 and the scene of the accident and was not legally caused by DOTD").

slipping on wet grass while chasing an unleased dog from his yard).

Here any alleged negligence by Weeks Marine as to its mooring was not the proximate or legal cause of any allision or damages. It was not foreseeable that any vessel would be traveling up the bayou while it was closed for a hurricane, especially not an out-of-control vessel unable to navigate around the ELLEFSEN.[63] Any foreseeable harm would concern impediments to *navigation*. Foreseeable harm does not include the risk of a massive barge escaping its moorings, randomly careening through closed channels, and happening to strike the Weeks Marine vessels where they were anchored.[64]

Further, the Weeks Marine vessels had been anchored safely for several days before the THOR hit them.[65] In that time, several vessels, including the GROUPER and STINGRAY, freely navigated around and past the ELLEFSEN anchorage without incident.[66] It was only after some combination of fault from the *defendants* that a massive, non-self-propelled barge broke free from its moorings and proceeded to randomly hit vessels and property throughout the channel. Intervening events sever any legal connection between Weeks Marine's alleged fault and the claimed

---

[63] Exh. 7, Everett depo., pp. 242–43 & depo. exhibit 69; *see also*, *e.g.*, Exh. 6, Goodwin depo., pp. 31–32 & depo. exhibit 320, WM00020 (note on 10/29/20).

[64] *See Union Pac. R. Co. v. Heartland Barge Mgmt., L.L.C.*, No. H-02-0438, 2006 WL 2850064, at *14 (S.D. Tex. Oct. 3, 2006) (barges broke free in Tropical Storm Allison and drifted into a vessel; any fault of the vessel—in not posting a lookout and under-manning the vessel—was not a proximate cause of the allision or the vessel's being knocked out of its mooring and into other vessels) ("The barges' allision with the MOUNT WASHINGTON's rudder was an extraordinary event not reasonably foreseeable to the crew of the MOUNT WASHINGTON. It so changed the MOUNT WASHINGTON's circumstance that it proximately caused the MOUNT WASHINGTON's subsequent breakaway and allision with the downstream ships. The barges' allision is a superseding cause of the MOUNT WASHINGTON's breakaway, regardless of any shortcomings in the MOUNT WASHINGTON's storm preparations. More men aboard the ship could not have prevented the subsequent breakaway and no causative fault can be assigned to the MOUNT WASHINGTON.").

[65] *E.g.*, Exh. 6, Goodwin depo. pp. 31–32 & depo. exhibit 320, WM00014.

[66] Exh. 10, Cpt. Gupta report, pp. 11-20 & Enclosure 2 to Cpt. Gupta report.

damages.[67]

Moreover, the standard of conduct that supposedly was violated is not designed to prevent this sort of incident. The rule about not mooring in a narrow channel (even if that is what occurred here) is designed to avoid posing obstacles to *vessels in navigation*. That rule is part of the Inland *Navigation* Rules. The THOR was not navigating; the bayou in this area was closed to navigation. Further, the THOR could never navigate. It is a non-self-propelled barge that must be moved by a tug, without which it is a "dead ship."[68] After the breakaway, no tug was moving or in control of the THOR. No rule about anchoring in a navigable waterway (or, for that matter, Weeks Marine's hurricane plan) was designed to ensure unimpeded passage to an out-of-control, randomly drifting barge.[69] Accordingly, legal causation is absent.

## IV. Conclusion

Because no party can show that Weeks Marine breached any duty or that any breach caused damages, the Court should enter partial summary judgment for Weeks Marine, finding it free of fault for any allision or collision that occurred in this incident and dismissing any claims and defenses asserted against it (including tenders) with prejudice.

Respectfully submitted,

s/ Anders F. Holmgren
Harold J. Flanagan (#24091)
Laurent J. Demosthenidy (#30473)

---

[67] *See Union Pac. R. Co. v. Heartland Barge Mgmt., L.L.C.*, No. 02-0438, 2006 WL 2850064, at *14 (S.D. Tex. Oct. 3, 2006) (barges broke free in Tropical Storm Allison and drifted into a moored vessel; any fault of moored vessel was not a proximate cause; barges breaking free of moorings and later striking a moored vessel "was an unforeseeable intervening event").

[68] Exh. 1, Douglas depo., p. 480.

[69] *See Union Pac. R. Co.*, 2006 WL 2850064, at *14 (poorly secured barges broke free in Tropical Storm Allison and drifted into a vessel; any fault of the vessel was not a proximate cause; the requirement that the vessel have sufficient personnel available was not designed to protect "against the possibility of negligently moored barges").

Anders F. Holmgren (#34597)
Dennis O. Durocher, Jr. (#36441)
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Suite 3300
New Orleans, LA 70170
Telephone: (504) 569-0235
Facsimile: (504) 592-0251

*Attorneys for Weeks Marine, Inc.*