



December 12, 2023

EXHIBIT

H

Kathleen P. Rice
FRILOT L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA 70163

           Re: *All Coast, LLC v. Shore Offshore Services, LLC, et al.*
              U.S. District Court
              Eastern District of Louisiana
              Civil Action No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
              EXPERT REPORT
              Project No. 20-096

Ms. Rice:

We are hereby presenting to you this Expert Report regarding the above referenced case, pertaining to damages to Greater Lafourche Port Commission ("GLPC") facilities that occurred during Hurricane Zeta in October 2020 involving the offshore drilling rig, "D/B THOR" and other vessels located in Bayou Lafourche at the time of the hurricane.

This report is being submitted in accordance with the Federal Rules of Civil Procedure.   Facts, findings and opinions are presented herein.  Information intended to address the additional declarations required by Federal Rule 26(a)(2)(B) is attached, and includes the following:

- (iv)  the witness's qualifications, including a list of all publications authored in the previous 10 years;
  - Refer to the attached Curriculum Vitae.  I have not been published in the previous 10 years.
- (v)  a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
  - A list of all testimony provided is attached.
- (vi)  a statement of the compensation to be paid for the study and testimony in the case.
  - Compensation was provided on an hourly basis for the services rendered in conjunction with this case, including supporting staff, and is per the attached Rate Schedule.

Kathleen P. Rice*All Coast, LLC*
FRILOT L.L.C.*v. Shore Offshore Services, LLC, et al.*
U.S. District Court
Eastern District of Louisiana
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
EXPERT REPORT
Project No. 20-096
Page 2 of 17

The commentary and opinions offered herein is offered based upon my experience as a Professional Engineer registered in the State of Louisiana, familiar with public engineering and construction contracts that are subject to Louisiana Public Bid Law, with unique and special knowledge of waterfront/marine infrastructure.

This report and any opinions rendered herein are based on the information that I reviewed and is being offered without prejudice or bias to any party that may be involved in the claim.

**Information Considered**

The information and documents reviewed in rendering the opinions offered in this report include:

- GLPC's response to written discovery and attachments thereto, including but not limited to:
    - Receipt for Hazard Buoys
    - Direct Employee Labor Costs
    - Survey Expenses
    - Engineering Removal Expenses
    - Clerk Costs of Recording Removal
    - Removal Costs
    - Removal Costs for Pilings Below the Surface
    - Replacement Costs
    - Engineering Fee Contract
    - Short Term Lease
- GLPC's Responses to Thor Interests, Crosby Endeavor Interests and Martin Interests' Omnibus Discovery Requests
- "Construction Cost Estimates" prepared by Angelette-Picciola, dated January 5, 2021
- Hydrographic survey drawing and images prepared by T. Baker Smith, dated December 4, 2020
- Hydrographic survey drawing prepared by Angellette-Picciola, LLC, dated December 29, 2020
- National Hurricane Center Tropical Cyclone Report, "Hurricane Zeta (AL282020)," dated May 10, 2021
- Code of Federal Regulations, Title 33, Parts 64 and 245, accessed via www.ecfr.gov, June 2023.
- Louisiana Revised Statutes particular to "Public Bid Law" as accessed via www.legis.la.gov, July 2023.
- Vessel data obtained from Crosby Tugs, LLC website www.crosbytugs.com
- Historic records of Google Earth images accessed via the internet
- Photographs obtained by my office during a site inspection on February 9, 2021

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 3 of 17

- Pertinent deposition testimony, including the testimony of DB THOR Captain Joe Douglas pages 549-552, wherein Mr. Douglas concedes that the D/B Thor "had knocked several" of GLPC's mooring dolphins, but he did not know how many.

**Background**

The GLPC facilities are located on Bayou Lafourche near the southern Louisiana coast of the Gulf of Mexico at Port Fourchon. According to the National Hurricane Center report, Hurricane Zeta landed at Cocodrie, Louisiana, approximately 27 miles to the west of Port Fourchon, at around 2100 UTC (2:00 pm CDST) on October 28, 2020. At the time of landfall, Zeta had an estimated wind intensity of 100 knots (115 mph) and a minimum central pressure of 970 mb. An accompanying storm surge inundation of 3 to 6 ft AGL occurred along the coast of southeastern Louisiana from Terrebonne Bay to the Mississippi border.

In advance of Hurricane Zeta, the derrick barge D/B THOR was moored alongside a facility on the east bank of Bayou Lafourche, along with its assist tug, the M/V CROSBY ENDEAVOR. It is my understanding that the GLPC owned and maintained fourteen (14) mooring/breasting dolphins that were located in Fourchon on the west bank of Bayou Lafourche. During Hurricane Zeta, the D/B THOR broke free of its moorings, drifted upstream, and then subsequently allided with the GLPC's breasting dolphins. During this breakaway, it has been reported that the breakaway of the D/B THOR caused other vessels, including the M/V CROSBY ENDEAVOR, to break free and possibly allide with the GLPC's breasting dolphins causing catastrophic damage.

The GLPC has filed claims in the resulting consolidated Limitation of Liability Action filed by the owner and/or operator of the D/B THOR, Modern American Railroad Services, LLC and Shore Offshore Services, LLC, as well as the Limitation of Liability Action filed by Crosby Tugs, LLC (captioned above), wherein the GLPC asserts claims against Modern American Railroad Services, LLC, and Shore Offshore Services, LLC, Crosby Tugs, LLC, Dawn Services, LLC, Martin Operating Partnership, L.P., and Martin Energy Services, L.L.C, either directly or through Federal Rule of Civil Procedure 14(c) tenders. Various other entities and individuals have also claimed property damage and personal injuries caused by the breakaway of the D/B THOR. FRILOT, LLC has been retained as legal counsel for the GLPC, and has engaged the undersigned, William J. Thomassie, P.E., as an Expert Witness in this matter. My engagement is technical in focus and pertains to the damages claimed at the GLPC facility described above. This report is intended to present my research, methods, findings and opinions in this matter.

**GLPC Mooring Dolphin Facility**

The GLPC mooring dolphin facility was located on the west bank of Bayou Lafourche, approximately one mile upstream of the Martin Gas facility where the D/B THOR was initially moored.

Kathleen P. Rice
FRILOT L.L.C.

*All Coast, LLC*
*v. Shore Offshore Services, LLC, et al.*
U.S. District Court
Eastern District of Louisiana
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
EXPERT REPORT
Project No. 20-096
Page 4 of 17

There were originally fourteen (14) mooring dolphins that were oriented in a straight line parallel with the shore. They were constructed in pairs that were spaced 100 feet apart, with 400 feet between pairs, creating seven mooring positions that encompassed 2,500 linear feet of waterfront from end to end.

The original construction drawings were not available for review. However, it is understood that Angellette-Picciola was the original Engineer of Record and was engaged to prepare construction drawings for the replacement of the destroyed dolphins per the original specs, which were presented for my review. According to the current construction drawings, each was a multi-pile "tripod" dolphin, consisting of three steel pipe piles, one vertical at the fenderline with two "battered" (driven on an angle) at the rear.

Each dolphin consisted of a 22" diameter by 0.500" thick vertical pipe pile at the front with two (2) 16" diameter by 0.500" thick battered pipe piles behind. These three piles were gusseted together at their top with ¾" steel plate at approximately Elevation (+)10 feet. The two batter piles were braced together with a single 12" diameter pipe at Elevation (+)2.5 feet. A 14" diameter steel pipe bollard above the vertical pile provided a fixed mooring point.

Based on my observations at the site (discussed further below), the details and sizes of the proposed structures match the remains at the site at the time of my inspection on February 9, 2021

According to the GLPC's responses to discovery requests, the eight (8) upstream (furthermost north) dolphins (numbered BL-1 through BL-8) were substantially complete by March 2013, and the six (6) downstream (furthermost south) dolphins (numbered BL-9 through BL-14) were substantially complete by January 2016. Thus, eight (8) of the structures were in service for approximately six (6) years and six (6) of the structures were in service for approximately four (4) years prior to their destruction due to the breakaway of the D/B THOR and/or other vessels.

The expected service life for a steel structure in a marine environment varies and is dependent upon several variables, including function and use, water salinity levels, character and quality of a protective coating system, the use of sacrificial anodes, and maintenance. For a freshwater environment such as the Mississippi River, which is fresh water that is absent of salinity, the industry accepted typical service life for a steel structure is between 40 and 60 years, or 50 years on average. Salt water environments, such as the offshore Gulf of Mexico, are generally less than this. At Fourchon, the water is considered to be brackish (between fresh and salt), so the service life expectancy for steel dolphins such as those that are the subject of this case (BL-1 through BL-14) is approximately 40 years.

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 5 of 17



*Figure 1: Bayou Lafourche, January 2020 (prior to Hurricane Zeta), showing location of D/B THOR and GLPC mooring dolphins.*



*Figure 2: Enlarged area of Figure 1 above showing (14) mooring dolphins in use at the GLPC site.*

Kathleen P. Rice
FRILOT L.L.C.

*All Coast, LLC*
*v. Shore Offshore Services, LLC, et al.*
U.S. District Court
Eastern District of Louisiana
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
EXPERT REPORT
Project No. 20-096
Page 6 of 17

**D/B THOR**

The D/B THOR is an offshore derrick crane barge measuring 370.7 feet by 137.8 feet with a depth of 26.25 feet and operating draft of approximately 12 feet. Built in 1997, its gross weight is 12,667 tonnes supporting an American-Clyde M-66-E lattice boom crane that has a 1,600 tonne lift capacity.



*Figure 3: D/B THOR (image from Shore Offshore Services, LLC spec sheet).*

**M/V CROSBY ENDEAVOR**

The Crosby Endeavor is a 15,000 horsepower offshore tug measuring 136 feet by 40 feet with an operating draft of approximately 16 feet. Built in 1976, its gross weight is 191 tonnes.

Kathleen P. Rice  *All Coast, LLC*
FRILOT L.L.C.  *v. Shore Offshore Services, LLC, et al.*
U.S. District Court
Eastern District of Louisiana
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
EXPERT REPORT
Project No. 20-096
Page 7 of 17



*Figure 4:  M/V CROSBY ENDEAVOR (image from www.crosbytugs.com)*

**Video Evidence**

I reviewed security video footage of the incident as recorded by the GLPC, where the D/B THOR can be seen moving upstream and into the breasting dolphins.  I have also reviewed still photographs taken from these videos which show the dolphins in place before landfall on the day of Hurricane Zeta and the D/B THOR as it passed through the site.  Subsequent inspection confirms damage to and/or destruction of the dolphins as most are no longer visible above the waterline.

| | |
|---|---|
| Kathleen P. Rice | *All Coast, LLC* |
| FRILOT L.L.C. | *v. Shore Offshore Services, LLC, et al.* |
| | U.S. District Court |
| | Eastern District of Louisiana |
| Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227 | |
| | EXPERT REPORT |
| | Project No. 20-096 |
| | Page 8 of 17 |



*Figure 5: GLPC mooring dolphin site on the day of Hurricane Zeta, approximately 6 hours prior to the eye making landfall.*



*Figure 6: Video capture showing D/B THOR crossing over the GLPC mooring dolphin site at 4:08 PM, approximately 2 hours after the eye made landfall.*

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 9 of 17



*Figure 7: Video capture post-Hurricane Zeta, after the D/B THOR crossed the GLPC mooring dolphin site.*

**Site Inspection**

I personally visited the site on February 9, 2021, approximately 13 weeks following Hurricane Zeta. At that time, I observed conditions at the Martin Gas facility where the D/B THOR was originally moored in advance of the storm. From there, I boarded a GLPC vessel that travelled upstream along Bayou Lafourche, passing the location where the GLPC mooring dolphins were, observing from a distance of approximately 50 to 75 feet from each structure.

During my visit, I took photographs of the waterfront of the Martin Gas facility and the GLPC breasting dolphins. At that time, ten dolphins were not visible above water, evidently destroyed, and three of the remaining four, while visible, were catastrophically damaged beyond repair.

The structures were marked with large white letters, evidently numbered BL-1 through BL-14. I was able to identify and observe the remains of BL-2, BL-3, and BL-4. Upstream of BL-2, there was a single pile, which had no visible markings but was likely the remains of BL-1. BL-5-BL-13 were not visible above water at the time of my inspection.

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 10 of 17

Prior to my inspection, the GLPC performed its own inspections, including a side-scan sonar survey performed by T. Baker Smith on November 13, 2020 and documented on its drawing "Hyrdrographic Survey of Dolphin Piles in Bayou Lafourche Located Near Port Fourchon," dated December 4, 2020. The drawing confirms that the dolphins were damaged, including nine (9) that were indicated as either "missing" or "below water" and three (3) others that were either "damaged" or "destroyed."

**Summary of Damages**

Based on my observations at the site and a review of the documents that were presented to me, it is my opinion that the GLPC's mooring dolphins were destroyed beyond repair due to the breakaway of the D/B THOR.

**Emergency Markings & Removal**

In order to protect navigation interests, the Code of Federal Regulations (CFRs) requires that the remains of damaged and abandoned structures that present a "hazard to navigation" be a) marked, and b) removed. These CFRs assign authority in this matter to the U.S. Coast Guard and to the U.S. Army Corps of Engineers.

Specifically, under PART 64—MARKING OF STRUCTURES, SUNKEN VESSELS AND OTHER OBSTRUCTIONS:

> 33 CFR 64.11(a):  *The owner and/or operator of a vessel, raft, or other craft wrecked and sunk in a navigable channel must mark it immediately with a buoy or beacon during the day and with a light at night. The requirement to mark the vessel, raft, or other craft with a light at night may be waived by the District Commander pursuant to § 64.13 of this subpart.*

And, under PART 245—REMOVAL OF WRECKS AND OTHER OBSTRUCTIONS:

> 33 CFR 245.10(b):  **Owner responsibility**. *Primary responsibility for removal of wrecks or other obstructions lies with the owner, lessee, or operator. Where an obstruction presents a hazard to navigation which warrants removal, the District Engineer will attempt to identify the owner or other responsible party and vigorously pursue removal by that party before undertaking Corps removal.*

Accordingly, the GLPC, as the owner of the mooring dolphin facility, was obligated to remove the damaged dolphins and to establish hazard markings as soon as possible following the incident.

Kathleen P. Rice *All Coast, LLC*
FRILOT L.L.C. *v. Shore Offshore Services, LLC, et al.*
U.S. District Court
Eastern District of Louisiana
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
EXPERT REPORT
Project No. 20-096
Page 11 of 17

**Required Repairs**

Because the dolphins were essentially destroyed, there is no means of repairing and/or restoring the original dolphins BL-1 through BL-14. These must be replaced and can be done so in-kind, based on the drawings prepared by Angelette-Picciolla.

**Louisiana Public Bid Law, Demolition & Replacement Costs**

As a Louisiana public entity, the GLPC is bound by Louisiana Revised Statutes regarding procurement and contracts for construction. This is covered under Louisiana R.S. Title 38, which is generally known as the "Public Bid Law."

Therein:

> *§2212. Advertisement and letting to lowest responsible and responsive bidder; public work; electronic bidding; participation in mentor-protégé program; exemptions; subpoena:*
>
> *A.(1)(a) All public work exceeding the contract limit as defined in this Section, including labor and materials, to be done by a public entity shall be advertised and let by contract to the lowest responsible and responsive bidder who bid according to the bidding documents as advertised, and no such public work shall be done except as provided in this Part.*
>
> *C.(1) Except as provided in Paragraphs (2), (3), and (4) of this Subsection, the term "contract limit" as used in this Section shall be equal to the sum of two hundred fifty thousand dollars per project, including labor, materials, and equipment…*
>
> *H. Every public entity intending to advertise a public work for bids shall estimate the probable construction costs of such public work or obtain such estimate from the project designer prior to advertising such public work for bids. No public entity shall advertise a public work for bids unless funds that meet or exceed the estimate of the probable construction costs have been budgeted by the public entity for the project.*
>
> *§2241.  Written contract and bond*
>
> *A.(2)  For each contract in excess of twenty-five thousand dollars per project, the public entity shall require of the contractor a bond with good, solvent, and sufficient surety in a sum of not less than*

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 12 of 17

> *fifty percent of the contract price for the payment by the contractor or subcontractor to claimants as defined in R.S. 38:2242. The bond furnished shall be a statutory bond and no modification, omissions, additions in or to the terms of the contract, in the plans or specifications, or in the manner and mode of payment shall in any manner diminish, enlarge, or otherwise modify the obligations of the bond. The bond shall be executed by the contractor with surety or sureties approved by the public entity and shall be recorded with the contract in the office of the recorder of mortgages in the parish where the work is to be done not later than thirty days after the work has begun.*

In summary, for projects that are estimated to be greater than $250,000, Louisiana Public Bid Law requires a public entity to 1) solicit (advertise) for public bids, 2) have funds in place ("budgeted") before doing so, and 3) record the resultant contract with the parish's recorder of mortgages.

**Demolition & Replacement Costs**

With the overarching urgency to remove the structures as navigation hazards per the CFRs, the GLPC advertised the project to remove the damaged dolphins and received competitive bids on June 21, 2021. Seven (7) contractors submitted bid proposals. Bo-Mac Contractors provided the lowest responsive Base Bid at a cost of $203,000 for dolphin removal plus an Additive Alternate of $207,000 for two (2) replacement dolphins. The engineer's estimate for the project was $398,000, triggering the requirement that the project be advertised for public bids. While the low bid of $203,000 was less than the threshold, all of the other bids that were received were above, ranging from $381,000 to $484,982. Given this, it is reasonable that the GLPC proceeded with a public bid solicitation for demolition.

Through the obligated public solicitation process and the receipt of competitive bids, the GLPC expended $203,000 towards the removal of the damaged dolphins through its contract with Bo-Mac. The contract was awarded without the Additive Alternate. This was the lowest cost proposed by seven (7) potential contractors through public advertisement. Thus, the $203,000 is considered to be reasonable.

The engineer's estimate to replace fourteen (14) dolphins was $985,000, which is significantly more than the $250,000 threshold that would compel the GLPC to advertise and solicit public bids. However, in order to comply with Public Bid Law, it would be necessary for the GLPC to have the funds in place ("budgeted") before doing so.

The GLPC was able to identify a potential cost for the replacement of the mooring dolphins through the use of an "Alternate" bid item that was included as an option on the bid proposals for demolition. The unit cost for Item A1-1 "Steel Mooring Dolphin" ranged from $103,500 to $164,972 when included as an

Kathleen P. Rice *All Coast, LLC*
FRILOT L.L.C. *v. Shore Offshore Services, LLC, et al.*
U.S. District Court
Eastern District of Louisiana
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
EXPERT REPORT
Project No. 20-096
Page 13 of 17

additive alternate on the demolition contract. Further, mobilization ranged from $45,000 to $206,766. Using these bid proposal figures to extrapolate an estimated cost of construction for replacing 14 dolphins yield the following:

|  | Low | | | | High | | | |
|---|---|---|---|---|---|---|---|---|
| Mobilization |  |  |  |  | 1 | ea | $ 206,766 | $ 206,766 |
|  | 1 | ea | $ 45,000 | $ 45,000 |  |  |  |  |
| Mooring Dolphins |  |  |  |  | 14 | ea | $ 164,972 | $ 2,309,608 |
|  | 14 | ea | $ 103,500 | $ 1,449,000 |  |  |  |  |
|  |  |  |  | **$ 1,494,000** |  |  |  | **$ 2,309,608** |

Accordingly, though the engineer's estimate as prepared on January 5, 2021 indicated a cost of $985,000 for the replacement of 14 dolphins, as predicted by the bid solicitation for demolition, the actual replacement cost will likely be significantly higher, ranging from $1,494,000 to $2,309,608.

**Additional Costs**

In addition to the primary costs for removal and replacement of the dolphins as discussed above, related costs that the GLPC attributes to the D/B THOR incident are itemized and discussed below.

Receipt for Hazard Buoys

Navigation is subject to Federal Regulations and is under the jurisdictional authority of the U.S. Coast Guard. 33 CFR § PART 64 - MARKING OF STRUCTURES, SUNKEN VESSELS AND OTHER OBSTRUCTIONS sets for the requirements and obligations of the GLPC to provide "aids to navigation" markers that mark the underwater obstructions that are a potential hazard to navigation. The U.S. Coast Guard prescribes the requirements for such markers on a case-by-case basis. The costs identified in Exhibit A in the amount of $2,477 is for the markers only, without installation, and is reasonable and necessary.

Direct Employee Labor Costs

The GLPC has provided time-entry records documenting $291.36 in labor costs to deploy the hazard buoys identified in Exhibit A. No vessel or equipment costs are claimed. Had the GLPC contracted with a marine contractor to deploy the buoys, this cost would have been many times the amount claimed in Exhibit B. Thus, this cost is both necessary and reasonable.

Survey Expenses

The GLPC performed a hydrographic survey of the water bottoms at the site through T. Baker Smith at a cost of $8,252.70. I routinely subcontract hydrographic surveys for marine engineering projects undertaken by Infinity Engineering and would typically expect a cost of approximately $10,000 for a hydrographic survey of a site of the size involved. Therefore, the cost as presented in Exhibit C is on par with what is expected and is considered reasonable.

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 14 of 17

Engineering Removal Expenses

To date, the GLPC has paid $35,946.90 for engineering services provided by Angelette-Picciola (see the discussion of Exhibit I below). Angelette-Picciola invoiced for Basic Services and for Special Services beginning in January 2021 and through April 2022, per the documents reviewed. This covers through 50% of the construction cost based on the lowest responsive bid of $410,000 as submitted by Bo-Mac Constructors. The GLPC has paid Angelette-Picciola a total of $35,946 through this agreement, which appears to be in-line with what was agreed upon.

Clerk Costs of Recording Removal

For each contract in excess of twenty-five thousand dollars per project, La. R.S. 38:2241 requires public entities to record the construction contract and its associated bond in the office of the recorder of mortgages in the parish where the work is to be done. The GLPC recorded with the Lafourche Parish Clerk of Court the construction contract between the GLPC and Bo-Mac for the removal of the damaged mooring/breasting dolphins (see Exhibit F below). The recording cost of $415 was a necessary cost.

Removal Costs for Pilings Below the Surface

Structures in a navigable waterway are subject to the jurisdictional permitting authority of the U.S. Army Corps of Engineers, and would be covered under Section 10 (permit) of the Rivers and Harbors Act of 1899. Typically, the U.S. Army Corps of Engineers requires that the demolition of any structures be removed to at least three feet below the mudline.

Though the GLPC entered into a contract agreement with BoMac Construction for the demolition of the damaged mooring dolphins, at the conclusion of that contract, the portion of the dolphins that was underground remained. Understanding that the pilings were found to have been sheared under water during the event, it would be reasonable to believe that the contractor did not anticipate this given the information that was provided (known) at the time of bid solicitation. As such, this is considered an unforeseen condition in which case it would be the subject of either 1) a change order needing to be granted to the contractor for additional compensation, or 2) a task that was significantly out of scope such that it would represent a cardinal change to the project and would require a new solicitation. Thus, the cost to remove the pilings that remain beneath the mudline will still be required.

The GLCP's engineer, Angelette-Picciola, prepared a cost estimate for this removal. The estimate accounted for (4) 24" diameter vertical piles and (9) 16" diameter batter piles that remain underground, along with mobilization and engineering. This estimate, dated February 28, 2022, amounted to $536,000 in total removal costs.

Engineering Fee Contract

The GLPC has disclosed its contract with Angelette-Picciola that was executed on December 1, 2020. This contract is an agreement for engineering services that are required for the removal and replacement of the damaged mooring/breasting dolphins. It is understood that eight (8) of the structures were in service

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 15 of 17

for approximately six (6) years and six of the structures were in service for approximately four (4) years prior to the D/B THOR incident and were installed per designs and construction documents originally developed by Angelette-Picciola. Accordingly, as the original engineer of record, Angelette-Picciola is in the best position to understand the original design requirements, site parameters, and other elements that lend to an expedient design for the reconstruction of the site.

The fee structure identified in the contract is divided into two parts, one for Basic Services and a second for Special Services, the scope for both is defined within the contract. The fee for Basic Services is a sliding scale that is calculated based upon a percentage of construction, ranging from 10% to 6.4% of construction cost, from $200,000 to $5,000,000+. This methodology closely follows that prescribed by the Louisiana Office of Facility Planning, which is commonly used to establish fees for professional design services on public projects in Louisiana. As such, the engineering fees for Basic Services as outlined in the contract are typical of that in the industry. The fee for Special Services is essentially 2% of construction cost, regardless of its value.

As discussed previously, the anticipated construction cost for the replacement of the destroyed dolphins is estimated to be between $1,494,000 and $2,309,608. Based on the contract between the GLPC and Angelette-Piciola, the corresponding engineering fee would be 7.5% of this amount. Therefore, it is anticipated that the GLPC will be required to pay Angelette-Picciola an additional fee of between $112,050 and $161,673 which is considered reasonable.

Additional Costs – Summary

The additional costs as reviewed are believed to be necessary and reasonable amount to $745,055.26 and are summarized as follows:

- Receipt for Hazard Buoys .............................................. $ 2,477.00
- Direct Employee Labor Costs........................................... $ 291.36
- Survey Expenses ........................................................... $ 8,252.70
- Engineering Removal Expenses .................................. $ 35,946.90
- Clerk Costs of Recording Removal................................... $ 415.00
- Removal Costs for Pilings Below the Surface ............ $ 536,000.00
- Engineering Fee Contract ......................................... $ 161,673.00

Kathleen P. Rice  *All Coast, LLC*
FRILOT L.L.C.  *v. Shore Offshore Services, LLC, et al.*
U.S. District Court
Eastern District of Louisiana
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227
EXPERT REPORT
Project No. 20-096
Page 16 of 17

**Opinions and Conclusions**

In conclusion, I render the following opinions:

1. It is my opinion that the fourteen (14) mooring dolphins at the Greater Lafourche Port Commission's mooring facility were damaged by the breakaway of the D/B THOR during Hurricane Zeta on August 29, 2020 and were a total loss.

2. It is my opinion that the Greater Lafourche Port Commission was bound by the Code of Federal Regulations to both mark the damaged structures as "hazards to navigation" and to subsequently remove them.

3. It is my opinion that the Greater Lafourche Port Commission is bound by Louisiana Revised Statutes, specifically the "Public Bid Law" which obligates the GLPC to publicly solicit bid proposals both the removal and replacement of the damaged mooring dolphins.

4. It is my opinion that the costs expended by the Greater Lafourche Port Commission to remove the damaged mooring dolphins through its contract with BoMac Contractors in the amount of $203,000 was reasonable, considering the fact that this was the lowest responsive bid received through its public solicitation.

5. It is my opinion that the estimated cost to install fourteen (14) in-kind replacement mooring dolphins will be between $1,493,000 to $2,309,608 as indicated by the unit costs proposed as part of the bids that were received for demolition and these costs are reasonable.

6. It is my opinion that the additional costs of $745,055.26 identified by the Greater Lafourche Port Commission for items that are necessary based on the damages that I observed and documents that I have reviewed:

    a. The cost of $2,477 for obtaining hazard buoys markers is both necessary and reasonable.
    b. The cost of $291.36 in labor costs to deploy the hazard buoys is both necessary and reasonable.
    c. The cost of $8,252.70 paid to T. Baker Smith to perform a survey of the water bottoms is reasonable.
    d. The cost of $35,946.90 paid to Angelette-Picciola for engineering services provided between January 2021 and April 2021 is reasonable.

Kathleen P. Rice  
FRILOT L.L.C.

*All Coast, LLC*  
*v. Shore Offshore Services, LLC, et al.*  
U.S. District Court  
Eastern District of Louisiana  
Civil Case No. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075, 21-2227  
EXPERT REPORT  
Project No. 20-096  
Page 17 of 17

e. The cost of $415 for recording the demolition contract was a necessary cost and is reasonable.
f. The estimated cost of $536,000 provided by the project engineer, Angelette-Picciola, to remove the underground portions of the damaged structures is necessary and reasonable.
g. The estimated engineering fee that will be paid by the GLPC of $161,673 is necessary and is considered reasonable.

\*\*\*

This report and any opinions rendered herein is based on the information that has been presented thus far and is subject to being updated and revised based on any new information that may be brought forth. I reserve the right to modify my opinions in light of any additional evidence hereafter. Should you have any questions related to this matter, please do not hesitate to call.

Sincerely,

Infinity Engineering Consultants, LLC



William J. Thomassie, P.E.  
Principal Partner