UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST, LLC | CIVIL ACTION |
| VERSUS | NO. 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982, 21-2075 & 21-2227 |
| SHORE OFFSHORE SERVICES, LLC; MODERN AMERICAN RAILROAD SERVICES, L.L.C.; and MARTIN ENERGY SERVICES, LLC | SECTION "A" MAG. DIV. (4) |
| | JUDGE: JAY C. ZAINEY |
| | CHIEF MAGISTRATE JUDGE: KAREN WELLS ROBY |
| *Pertains to All Cases* | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

**Introduction**

This motion filed by Defendants, Martin Operating Partnership, L.P. and Martin Energy Services, L.L.C. (collectively "Martin"), involves the duties of a wharfinger (Martin) under general maritime law, and presents the issue of whether Martin can be held liable for the D/B THOR breaking free from its moorings at Martin's dock during Hurricane Zeta when Martin satisfied its duty of reasonable diligence to provide a safe berth and had no involvement whatsoever in the mooring of the THOR to the dock. As discussed more fully below, summary judgment with respect to the claims filed against Martin in these consolidated actions is properly granted in Martin's favor as a matter of law.

**Basic Facts**

It is undisputed that on October 28, 2020, the D/B THOR was moored starboard side to Martin Dock No. 16 in Port Fourchon, Louisiana, when Hurricane Zeta made landfall. At

approximately 4:04 p.m. that day, see Deposition of Terry Joe Douglas at p. 254, ln. 18-20 (hereinafter "Douglas Depo.") (attached as Exhibit A) ("Ex. __"), the THOR broke free from her moorings and set about a calamitous sequence of events that resulted in property damage and personal injuries.

The THOR is a derrick or crane barge that is 138 feet wide, 370 feet long, and has a draft of 26 feet. See Douglas Depo. at p. 306, ln. 11-13 (Ex. A). On October 25, 2020, prior to her arrival at Martin Dock No. 16, the THOR was working a job in the Fieldwood area of the Gulf of Mexico. See Douglas Depo. at p. 98, ln. 18-21 (Ex. A). Around that same timeframe, it became known through weather reports that a tropical system that ultimately became Hurricane Zeta was forecast to enter the Gulf of Mexico with a projected landfall just east of New Orleans, and that there was a 90% chance that Zeta would become a hurricane. See Douglas Depo. at p. 98, ln. 17-25; p. 99 ln. 1-19 (Ex. A). Ultimately, the decision was made by Shore interests that the THOR would depart the Fieldwood job on October 26, 2020, and ride out the storm at Martin Dock No. 16 in Port Fourchon, Louisiana. See Douglas Depo. at p. 101, ln. 14-24; p. 119, ln. 15-18 (Ex. A). The THOR arrived at Martin Dock No. 16 in Port Fourchon, Louisiana, around 11:00 p.m. on October 26, 2020. See Douglas Depo. at p. 136, ln. 14-17 (Ex. A). Approximately, one hour later at midnight on October 27, 2020, the process of securing the THOR to Martin Dock No. 16 began. See Douglas Depo. at p. 136, ln. 18-21 (Ex. A). Terry Douglas, who was the Superintendent or highest ranking person onboard the THOR during this timeframe, see Douglas Depo. at p. 26, ln. 12-16 (Ex. A), testified that it was as much his decision as it was the decision of shoreside management to go to Port Fourchon because it was the closest location with a good dock and a good safe harbor, see Douglas Depo. at p. 141, ln. 23-25; p. 142, ln. 1 (Ex. A). According to

Terry Douglas, Port Fourchon was a good safe harbor and a good spot even if Zeta ultimately became a category 1 hurricane.  See Douglas Depo. at p. 164, ln. 19-21 (Ex. A).

By 1:00 a.m. on October 27, 2020, the THOR was initially secured to Martin Dock No. 16 with eight mooring lines.  See Douglas Depo. at p. 146, ln. 19-25; p. 147, ln. 1 (Ex. A).  At approximately 7:30 a.m. on October 27, 2020, Terry Douglas made the decision to put out two additional mooring wires (described as anchor cables) to secure the THOR to the dock, one from the vessel's bow and one from the stern.  See Douglas Depo. at p. 157, ln. 6-25 (Ex. A).  He did not have any discussions with Shore's management regarding whether additional wires should be put out.  See Douglas Depo. at p. 383, ln. 22-25 (Ex. A).  According to Terry Douglas, he was not required to use any mooring wires, but that "two were more than plenty."  See Douglas Depo. at p. 159, ln. 8-9 (Ex. A).  Terry Douglas as the THOR's superintendent, was the person responsible for making sure that the mooring lines and wires were being put out properly and that they were in the proper position.  See Douglas Depo. at p. 179, ln. 21-25; p. 180, ln. 1-4 (Ex. A).  Also, while the mooring wires were being placed, Terry Douglas went onto Martin Dock No. 16 and inspected the entire length of the dock.  See Douglas Depo. at p. 309, ln. 3-25 (Ex. A).  In this respect, Terry Douglas testified that he saw no conditions on the dock that gave him concern in relation to mooring the THOR there for the hurricane, and further that had there been any such conditions, he would have told somebody and done things differently.  See Douglas Depo. at p. 413, ln. 19-25; p. 414, ln. 1-11 (Ex. A).

Terry Douglas, as the THOR's superintendent, was the person responsible for making sure that the mooring lines and wires were being put out properly and that they were in the proper position.  See Douglas Depo. at p. 179, ln. 21-25; p. 180, ln. 1-4 (Ex. A).  The mooring plan he used was one that he had used for over ten years, through some very bad storms, and it had never

failed him.  See Douglas Depo. at p. 497, ln. 4-7; p.  (Ex. A).  Terry Douglas further testified that the mooring of the THOR was done by the THOR's rigging crew and skeleton crew, that he did not request any equipment from Martin for purposes of securing the THOR to the dock, that he did not ask anyone from Martin about the best way to moor the THOR, and that no Martin personnel ever boarded the THOR for the purposes of discussing mooring or how to moor, where to moor, or what mooring devices to use.  See Douglas Depo. at p. 414, ln. 12-25; p. 415, ln. 1-4 (Ex. A).

There were ten mooring bitts or bollards on Martin Dock No. 16.  See Douglas Depo. at p. 188, ln. 10-18 (Ex. A).  According to Terry Douglas, eight of the ten mooring bitts or bollards on Martin Dock No. 16 were used to moor the THOR of which mooring lines were secured to six of those bitts or bollards, and an anchor wire or cable was secured to each of the two remaining bitts or bollards.  See Douglas Depo. at p. 188, ln. 10-25; p. 189, ln. 1-2 (Ex. A).  The third bitt or bollard from the stern of the THOR moving forward was not used; nor was the tenth bitt or bollard located at the very end of the dock past the THOR's bow.  See Douglas Depo. at p. 189, ln. 3-7 (Ex. A).  Four photographs bearing date-time stamps of October 28, 2020, at 10:38 a.m. and 10:39 a.m. show how the THOR was moored to Martin Dock No. 16 in the hours leading up to the breakaway that took place later that day.  See Douglas Depo. at p. 312, ln. 8-25; p. 313, ln. 1-11 & Depo. Exhibit 16 in globo (bearing Bates Nos. 1083 to 1086) (Ex. A).  The first photo (1083) shows the starboard stern anchor cable which is affixed to a soft line and a shackle to bitt number 1.  See Douglas Depo. at p. 313, ln. 22-25; p. 314, ln. 1-14; p. 316 ln. 1-5 & Depo. Exhibit 16 (1083) (Ex. A).  The second photo (1084) shows the second line from the barge to the dock that is immediately forward of the cable shown in the first photo.  See Douglas Depo. at p. 315, ln. 16-25 & Depo. Exhibit 16 (1084) (Ex. A).  The third photo (1085) shows bitts number 4 through 8

with number 4 at the bottom and the lines attached. See Douglas Depo. at p. 317, ln. 1-18 & Depo. Exhibit 16 (1085) (Ex. A). The fourth photo (1086) shows bitts number 4 through 9 with bitt 9 having the second anchor cable secured to it in the same manner as the anchor cable secured to bitt 1. See Douglas Depo. at p. 318, ln. 20-25; p. 319, ln. 1-21 & Depo. Exhibit 16 (1086) (Ex. A). Bitt number 10 is also depicted in the fourth photo (1086), but it was not utilized because it was located too far away from the barge and because Terry Douglas did not think that he needed that bitt. See Douglas Depo. at p. 319, ln. 25; p. 320, ln. 1-19 & Depo. Exhibit 16 (1084) (Ex. A). Finally, in addition to the mooring lines and cables that had been deployed, the Tug Crosby ENDEAVOR was connected to the THOR with lines and situated alongside the THOR's port side in order to assist the THOR in remaining alongside the dock if necessary. See Douglas Depo. at p. 175, ln. 10-25; p. 176, ln. 1-19 (Ex. A).

   The foregoing was how the THOR was situated just hours prior to the hurricane making landfall. At approximately 4:04 p.m. on October 28, 2020, the THOR broke loose from her moorings. See Douglas Depo. at p. 254, ln. 18-20 (Ex. A). Terry Douglas, who was aboard the THOR throughout, does not know what line was the first one to break, see Douglas Depo. at p. 233, ln. 13-16 (Ex. A), but he testified that the vessel began to come away from the dock stern first, see Douglas Depo. at p. 235, ln. 3-14 (Ex. A). Ultimately, as the THOR started drifting away from the dock, the last mooring connection between the THOR and the dock was the starboard bow breast wire. See Douglas Depo. at p. 389, ln. 16-20 (Ex. A). According to Terry Douglas, the starboard bow breast wire did not immediately break; instead, the wire payed out approximately 2500 feet before ultimately breaking after he believed the wire got caught underneath the THOR. See Douglas Depo. at p. 389, ln. 16-25; p. 189, ln. 1-5 (Ex. A). According to Terry Douglas, a dog on the starboard bow winch to which the starboard bow breast wire was

attached on the THOR had been set in order to prevent the wire from paying out as it did, but that somehow the dog had become disengaged. See Douglas Depo. at p. 428, ln. 12-24 (Ex. A). Terry Douglas did not know, however, who may have set the dog in question. See Douglas Depo. at p. 428, ln. 25; p. 429, ln. 1 (Ex. A).

Ultimately, photographs taken on the Martin dock a few days after the hurricane made landfall showed that the THOR's starboard stern anchor cable which was led to bitt number 1 parted with the choked off line remaining on the bitt, that the mooring lines led to bitts 2, 3, 4, 5, and 7 parted with the eyes of those lines still secured to the bitts, and bitt number 6 on the dock broke and it is unknown where the mooring line attached to bitt 6 may have ended up. See Douglas Depo. at p. 422, ln. 21-25; p. 423, ln. 1-25; p. 424, ln. 1-8; p. 426 ln. 7-11; p. 548 ln. 11-25 (Ex. A). All in all, Terry Douglas testified that he would not have expected that a single mooring bitt would be able to hold the THOR in a hurricane of Zeta's magnitude and that is why he put out all of the wires that he did. See Douglas Depo. at p. 431, ln. 21-25 (Ex. A).

1. **A wharfinger is not an insurer of a vessel's safety, but rather is bound to exercise reasonable diligence in furnishing a safe berth.**

Well over a century ago, the U.S. Supreme Court set forth the general duties of a wharfinger:

> Although a wharfinger does not guaranty the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction, to remove it, or to give due notice of its existence to vessels about to use the berths.

Smith v. Burnett, 173 U.S. 430, 433, 19 S.Ct. 442, 443, 43 L.Ed. 756 (1899). The U.S. Fifth Circuit, in expounding upon this general statement of the wharfinger's duties, stated:

> It is well settled that a wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden

> hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner.

Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A., 521 F.2d 229, 230 (5th Cir. 1975); see In re Frescati Shipping Co., Ltd., 718 F.3d 184, 207 (3d Cir. 2013) ("In the tort context, … a wharfinger is not a guarantor of a visiting ship's safety, but is bound to use reasonable diligence in ascertaining whether the berth themselves and the approaches to them are in an ordinary condition of safety for vessels coming to and lying at the wharf.") (quotation marks and citation omitted), cert. denied, 571 U.S. 1197 (2014). As can be seen, the wharfinger's duty to furnish a safe berth is one of reasonable diligence. In summary, "[i]n being invited to dock at a particular port, a vessel should be able to enter, use and exit a wharfinger's dock facilities without being exposed to dangers that cannot be avoided by reasonably prudent navigation and seamanship." In re Frescati Shipping Co., Ltd,, 718 F.3d at 207 (citations and quotation marks omitted). "Reasonably prudent seamanship" in the foregoing sentence necessarily includes the proper use of mooring lines and wire cables to secure the vessel to a dock or wharf so as to avoid being exposed to dangers.

Having stated the wharfinger's general duties, it is also important to briefly note what those duties do not include. For example, a wharfinger "has no duty to warn of open and obvious conditions that can be reasonably ascertained by a vessel." West v. City of St. Paul, 936 P.2d 136, 138–39 (Ak. 1997). Along these lines, a wharfinger also has no duty to warn a vessel of impending weather conditions. See City of St. Paul, 936 P.2d at 139 ("Because most weather conditions are open and obvious, and can be discovered with reasonable diligence, a wharfinger does not have a duty to warn of such dangers."). Nor does a wharfinger have a duty to obtain a weather forecast and disseminate it to vessel owners. See In re Aramark Sports and Entertainment Services, LLC, 831 F.3d 1264, 1282 (10th Cir. 2016) (holding based upon "notions of personal responsibility" that

"Aramark had no duty to obtain a weather forecast and provide it to the boaters … when the plaintiff could take the same protective steps at least equally easily and well").

2. **Regular inspections of Martin's dock to identify potential defects are conducted by governmental entities and by Martin.**

As discussed above, Martin's duty as a wharfinger "includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner." Trade Banner Line, Inc., 521 F.2d at 230. Moreover, this duty is one of "reasonable diligence." Burnett, 173 U.S. at 433, 19 S.Ct. at 443. Here, the evidence in this case shows that the Greater Lafourche Port Commission, from whom Martin leases the dock, inspected the dock on an annual basis, see Deposition of Terry Damon King ("King Depo.") at p. 78, ln. 10-13 (Ex. B), the U.S. Coast Guard inspected Martin's dock several times a year on an unannounced basis, see Deposition of Robbie Plaisance ("Plaisance Depo.") at p. 106, ln. 13-16 (Ex. C), and Martin itself conducted monthly inspections of the dock, see King Depo. at p. 76, ln. 17-25 (Ex. B).  The Martin inspections look for any visual defects in the condition of the bollards or mooring bitts, and Martin rectifies any defects that are found through the process of blasting and painting. See Plaisance Depo. at p. 88, ln. 15-21; p. 91, ln. 3-5 (Ex. C).  In fact, just prior to the breakaway in question, the Greater Lafourche Port Commission inspected the dock on October 20, 2020, see King Depo. at p. 90, ln. 5-10 (Ex. B), and the U.S. Coast Guard inspected the dock on October 26, 2020, see King Depo. at p. 90, ln. 17-25; p. 91 ln. 1-4 (Ex. B).  See also Plaisance Depo. at p. 97, ln. 1-9 (Ex. C).  Following these inspections, according to Robbie Plaisance, who is Martin's Area Manager, see King Depo. at p. 99 ln. 2-4 (Ex. B), there were no known defects at Martin's dock and thus no defects were relayed to anybody

at Shore or to the personnel on the THOR, <u>see</u> Plaisance Depo. at p. 85, ln. 17-25; p. 86 ln. 1-9 (Ex. C).

**3.      Martin had no involvement whatsoever in mooring the THOR to the dock.**

An analogous case is <u>Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A.</u>, 521 F.2d 229 (5th Cir. 1975) (per curiam) ("<u>Trade Banner Line</u>"), which arose out of Hurricane Celia in 1970. In <u>Trade Banner Line</u>, the M/V TRADE CARRIER broke free from her berth at a dock owned by Reynolds Metal Company during Hurricane Celia and ran aground causing damage to the vessel. As in our action, the vessel owner attempted to place blame on the wharfinger for the damage suffered by the vessel after it became adrift, and the district court so found.  In this respect, the district court found that because both the vessel owner and the wharfinger were at fault, "the loss should be divided equally between them."  <u>Trade & Transport, Inc. v. Caribbean S.S. Co., S.A.</u>, 384 F.Supp. 782, 787 (S.D. Tex. 1974), <u>aff'd in part and rev'd in part</u>, <u>Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A.</u>, 521 F.2d 229 (5th Cir. 1975) (per curiam). As summarized by the U.S. Fifth Circuit:

> As we understand the ruling of the district court, Reynolds Metals Company's liability as wharfinger is grounded on one or more of three possible bases.  The first is that Reynolds breached its duty to supply the M/V TRADE CARRIER with a safe berth by failing to warn her captain of the shallow water which lay to the west of the bauxite dock where she was moored.  The second is that the same duty was breached when Reynolds recommended to the captain that TRADE CARRIER be moved from the Alumina dock to the bauxite pier because "… the fittings on the bauxite pier were not entirely adequate to hold the vessel in the storm." 384 F.Supp. at 787.  The third is that Reynolds "… had some fault with regard to the securing of the vessel to the bauxite pier." 384 F.Supp. at 787.

<u>Trade Banner Line</u>, 521 F.2d at 230.  On appeal, however, the Fifth Circuit held that liability on the wharfinger under any of the grounds asserted by the district court was "unfounded." <u>Trade Banner Line</u>, 521 F.2d at 230.  With respect to the fittings located on the wharf, the Fifth Circuit found that there was no evidence to support a finding that the fittings were inadequate, and further

found that the wharfinger could not, in any event, be liable for the parting of the vessel's mooring lines which were solely furnished by the vessel:

> Although the trial court, as factfinder, concluded that the fittings of the bauxite pier were not entirely adequate, there was no evidence to support this finding. Each fitting utilized held throughout the storm. TRADE CARRIER was cast adrift either because her lines parted or because they slipped loose. The parting of the lines, which were provided by TRADE CARRIER, *231 certainly cannot be blamed upon the wharfinger. Although there is authority that a wharfinger is bound to provide fittings which will not fail, *e. g., City Compress & Warehouse Co. v. United States*, 190 F.2d 699, 701 (4th Cir. 1951), even in a severe storm, *See Medomsley Steam Shipping Co. v. Elizabeth River Terminals, supra*, there is none which holds that he must provide fittings from which ropes will not slip loose in a 138-mile per hour hurricane, especially when, as the court found, ". . . the lines could have been, at least some of them, more securely fastened than they were, (and) (t)here is no way to be sure that, had the lines been more securely fastened to the fittings by the . . . (ship's) crew, the vessel would not have been torn from its moorings anyway."

Trade Banner Line, 521 F.2d at 230–31. The Fifth Circuit also held that the fact that the fittings on the wharf could have been more adequate if they had been set at a better angle was essentially of no moment as the vessel controlled all aspects of the mooring and the vessel had full knowledge of the fittings available and chose to moor where he did:

> The fact that the fittings at the bauxite pier might have been more nearly adequate had the uprights of the double bitts been at an angle or had the double bitts on its east side been unobstructed does not alter the situation. All details of the mooring of TRADE CARRIER were controlled by the ship's crew under the supervision of her master. Under the circumstances, responsibility for the mooring of the vessel lay with him. City Compress & Warehouse Co. v. United States, supra, 190 F.2d at 700. The number, types and locations of the fittings were apparent. No fitting was less sound than it appeared to be. It was with full knowledge of the fittings available and the impending hurricane that the master chose to moor where and how he did. Reynolds Metals, as wharfinger, cannot be made to bear responsibility for his decision.

Trade Baner Line, 521 F.2d at 231. All in all, the Fifth Circuit found that "[s]ince it [wa]s the master, when present and supervising, and not a wharfinger absent some type of contractual commitment not present here who is responsible for the mooring of a ship, it was error to hold that Reynolds [the wharfinger] had some fault with regard to the securing of the TRADE CARRIER

prior to her misadventure." Trade Banner Line, 521 F.2d at 231. Consequently, the Fifth Circuit reversed that portion of the district court's judgment that had found the wharfinger jointly at fault with the vessel owner. See Trade Banner Line, 521 F.2d at 231.

One finding by the district court that was upheld by the Fifth Circuit was that the "failure of the [wharfinger] to warn the captain of the change of the course of the storm in time for him to take the vessel into the Gulf did not constitute a lack of reasonable diligence [on the part of the wharfinger]." Trade & Transport, Inc., 384 F.Supp. at 787. As further explained by the district court:

> When the captain of the TRADE CARRIER secured his radio shack and thereafter failed to keep track of the course and fury of the storm, he was negligent and he breached his duty to the ship. He was not entitled to rely solely on others to keep him posted as to the course and strength of the storm. *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84 (5th Cir. 1960).

Trade & Transport, Inc., 384 F.Supp. at 787. In Boudoin, cited by the district court, the Fifth Circuit stated the following regarding the responsibilities of a shipmaster:

> First, it is the nature of the calling of the shipmaster to know of the tempestuous forces of wind and tide and seas. He has to make assessments often from confusing or inadequate facts and then translate them into effective decisions. He cannot, therefore, trust to some providential intuition. He must be informed and experienced in the critical evaluation of data. Hence, he may not justify an erroneous judgment merely because others not similarly trained or charged with responsibility ***85** reached a like conclusion. Second, he has under his command a thing which may be the instrument of further damage— here a large cumbersome, unmanned, unwieldy craft which, once loosed before these forces, would smash all in her path. He has, therefore, a special duty to take all reasonable steps consistent with safety to this ship and her crew, to avoid or minimize the chance of harm to others.

Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 84–85 (5th Cir. 1960).

Returning to our action, here, as shown above, the THOR controlled all aspects of mooring the vessel to Martin's dock, including devising the mooring plan to be implemented, providing the mooring lines and wires that were to be used, directing the placement of those lines and wires, and

providing the personnel who actually handled the lines and wires in securing the vessel to the dock. As in Trade Banner Line, Martin simply had no involvement whatsoever in the actual mooring of the THOR. Any claims of culpability on Martin's part are simply "unfounded."

**4. The failure of bitt number 6 on Martin's dock played no role in the THOR's breakaway.**

Finally, it is expected that the parties asserting claims against Martin will attempt to rely on the fact that bitt number 6 on Martin's Dock No. 16 failed during Hurricane Zeta to support their contention that Martin breached its duty as a wharfinger and is somehow liable to them. In this respect, Martin has retained Robert D. Bartlett, P.E., of Bartlett Engineering LLC as an expert witness to render opinions in this matter, and, in accordance with his written report, and through the use of 3D Model Reconstruction as more fully described therein, he will testify at the trial of this matter that the failure of bitt number 6 on Martin Dock No. 16 and the loss of the mooring line attached thereto, by itself, would not have contributed to the breakaway of the THOR. See Declaration of Robert D. Bartlett, P.E. (Ex. D) and accompanying Expert Report at p. 25, ¶ 22 (Ex. 1 to Ex. D). Moreover, Mr. Bartlett is prepared to testify at trial that the 3D Model Reconstruction he performed was able to determine that the following mooring lines parted prior to the failure of bitt number 6: lines M1, M2, M4A, M4B, M5B, and further that line M5A may have preceded the bitt failure. See Expert Report of Robert D. Bartlett, P.E., at p. 26, ¶ 24 (Ex. 1 to Ex. D). The fact that bitt number 6 ultimately failed during Hurricane Zeta is nothing more than a red herring.

**5. Summary judgment is properly granted in favor of Martin because there are no genuine issues of material fact and the claimants who have asserted claims against Martin cannot prove that Martin breached its duties as a wharfinger.**

Under federal law, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). As the U.S. Fifth Circuit has recognized, "where the non-

movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." Lindsey v. Sears Roebuck & Co., 16 F.3d 616, 618 (5th Cir. 1994); see Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986) (finding that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"); Celotex Corp., 477 U.S. at 322, 106 S. Ct. at 2552 (finding that summary judgment is properly granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Here, as discussed above, Martin has come forward and demonstrated that the claimants cannot prove an essential element of their cases against Martin—namely, that Martin breached its duties as a wharfinger. Being unable to prove that Martin breached its duties as a wharfinger, the claims asserted against Martin necessarily fail as a matter of law, and are properly dismissed, with prejudice, on summary judgment.

## **Conclusion**

Based on the foregoing reasons, Martin respectfully requests that its Motion for Summary Judgment be granted, and that all claims asserted against Martin in these consolidated actions be dismissed in their entirely, and with prejudice, at the claimants' sole cost.

- 14 -

Respectfully submitted:

**DAIGLE FISSE & KESSENICH, PLC**

/s/ Kirk N. Aurandt
MICHAEL W. MCMAHON (#23987)
KIRK N. AURANDT (#25336)
ETHAN M. GARNER (#40368)
P. O. Box 5350
Covington, Louisiana 70434-5350
Telephone: (985) 871-0800
Facsimile: (985) 871-0899
Email: mmcmahon@daiglefisse.com
        kaurandt@daiglefisse.com
        egarner@daiglefisse.com
*Attorneys for Martin Energy Services, L.L.C. and Martin Operating Partnership, L.P.*