1             UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

4    ALL COAST, LLC          CIVIL ACTION NO.

                           2:21-CV-00258-JCZ-KWR

5                       (lead case) c/w 21-337,

    VERSUS              21-464, 21-822, 21-1968,

6                       21-1969, 21-1981,

                       21-1982, 21-2075, 21-2227

7    SHORE OFFSHORE

    SERVICES, LLC          SECTION "A"

8

9

10

11    * * * * * * * * * * * * * * * * * * * * * * * *

12        TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

13             TERRY JOE DOUGLAS,

14    TAKEN ON BEHALF OF CLAIMANTS, REPORTED IN THE ABOVE

15    ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

16    CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

17    * * * * * * * * * * * * * * * * * * * * * * * *

18

19

20        REPORTED AT THE LAW OFFICES OF:

21        PUSATERI, JOHNSTON, GUILLOT & GREENBAUM, LLC

22        1100 POYDRAS STREET, SUITE 2250

23        NEW ORLEANS, LOUISIANA  70163

24

25        COMMENCING AT 10:00 A.M., ON MARCH 7, 2023.

Page 1

**EXHIBIT A**

```
 1                        A P P E A R A N C E S
 2
 3          FOR THE CLAIMANTS:
 4              ARNOLD & ITKIN LLP
                   (BY:  ADAM LEWIS, ESQ.)
 5              6009 MEMORIAL DRIVE
                HOUSTON, TEXAS  70802
 6              (713) 222-3800
                alewis@arnolditkin.com
 7
 8          FOR RANDY RIALS AND MONTRELL SMITH:
 9              SPAGNOLETTI LAW FIRM
                   (BY:  MARC KUTNER, ESQ.)
10              401 LOUISIANA STREET, 8TH FLOOR
                HOUSTON, TEXAS  77002
11              (713) 804-9306
                mkutner@spaglaw.com
12
13          FOR DAWN SERVICES, LLC:
14              LISKOW & LEWIS, APLC
                   (BY:  DAVID L. REISMAN, ESQ.)
15              701 POYDRAS STREET, SUITE 5000
                NEW ORLEANS, LOUISIANA  70139
16              (504) 581-7979
                dreisman@liskow.com
17
18          FOR HARVEY GULF INTERNATIONAL MARINE, LLC:
19              ADAMS & REESE, L.L.P.
                   (BY:  CHARLES A. CERISE, JR., ESQ.)
20              (BY:  JOHNNY DOMIANO, JR., ESQ.)
                701 POYDRAS STREET, SUITE 4500
21              NEW ORLEANS, LOUISIANA  70139
                (504) 581-3234
22              charlie.cerise@arlaw.com
                johnny.domiano@arlaw.com
23
24
25
```

Page 2

**EXHIBIT A**

```
1              A P P E A R A N C E S  (Continued)
2
3       FOR CROSBY TUGS, LLC:
4           JONES WALKER L.L.P.
            (BY:  SARA B. KUEBEL, ESQ.)
5           (BY:  ALFRED J. RUFTY III, ESQ.)
              [VIA VIDEOCONFERENCE]
6           210 ST. CHARLES AVENUE, 48TH FLOOR
            NEW ORLEANS, LOUISIANA  70170
7           (504) 582-8547
            skuebel@joneswalker.com
8           arufty@joneswalker.com
9
        FOR MARTIN ENERGY SERVICES, LLC:
10
            DAIGLE FISSE & KESSENICH
11          (BY:  MICHAEL W. MCMAHON, ESQ.)
            227 HIGHWAY 21
12          MADISONVILLE, LOUISIANA  70447
            (985) 871-0800
13          mmcmahon@daiglefisse.com
14
        FOR TERRY LYONS:
15
            PALMINTIER LAW GROUP
16          (BY:  MICHAEL C. PALMINTIER, ESQ.)
            618 MAIN STREET
17          BATON ROUGE, LOUISIANA  70801
            (225) 344-0522
18          mcp@plgroupla.com
19
        FOR OCEANEERING INTERNATIONAL, INC.:
20
            MEYER ORLANDO LLC
21          (BY:  CAMERON HATZEL, ESQ.)
            13201 NORTHWEST FREEWAY, SUITE 119
22          HOUSTON, TEXAS  77040
            (713) 460-9800
23          chatzel@meyerorlando.com
24
25
                                            Page 3
```

**EXHIBIT A**

```
 1              A P P E A R A N C E S (Continued)
 2
 3       FOR CHUBB UNDERWRITING:
 4           CHAFFE MCCALL, L.L.P.
             (BY:  ALEX J. DEGIULIO, ESQ.)
 5             [VIA VIDEOCONFERENCE]
             1100 POYDRAS STREET, SUITE 2300
 6           NEW ORLEANS, LOUISIANA  70163
             (504) 585-7000
 7           alex.degiulio@chaffe.com
 8
         FOR MODERN AMERICAN RAILROAD SERVICES, L.L.C., AND
 9       SHORE OFFSHORE Services, LLC:
10           PUSATERI, JOHNSTON, GUILLOT & GREENBAUM, LLC
             (BY:  GAVIN GUILLOT, ESQ.)
11           (BY:  MEREDITH BLANQUE, ESQ.)
             (BY:  JACOB ALTMYER, ESQ.)
12             [VIA VIDEOCONFERENCE]
             (BY:  JONATHAN PARKER, ESQ.)
13             [VIA VIDEOCONFERENCE]
             1100 POYDRAS STREET, SUITE 2250
14           NEW ORLEANS, LOUISIANA  70163
             (504) 620-2500
15           gavin.guillot@pbgglaw.com
             meredith.blanque@pjgglaw.com
16           jacob.altmyer@pjgglaw.com
             jonathan.parker@pjgglaw.com
17
18       FOR C&G BOATS, INC., AND GULF LOGISTICS, LLC:
19           ALLEN & GOOCH, ALC
             (BY:  ALAN J. MECHE, ESQ.)
20             [VIA VIDEOCONFERENCE]
             2000 KALISTE SALOOM ROAD, SUITE 400
21           LAFAYETTE, LOUISIANA  70508
             (337) 291-1000
22           alanmeche@allengooch.com
23
24
25

                                            Page 4
```

**EXHIBIT A**

```
 1              A P P E A R A N C E S  (Continued)
 2
 3       FOR COASTAL TOWING, LLC:
 4           GALLOWAY JOHNSON TOMPKINS BURR & SMITH, APLC
             (BY:  TIMOTHY W. HASSINGER, ESQ.)
 5             [VIA VIDEOCONFERENCE]
             #3 SANCTUARY BOULEVARD, SUITE 301
 6           MANDEVILLE, LOUISIANA  70471
             (985) 674-6680
 7           thassinger@gallowaylawfirm.com
 8
         FOR WEEKS MARINE, LLC:
 9
             FLANAGAN PARTNERS LLP
10           (BY:  LAURENT J. DEMOSTHENIDY, ESQ.)
               [VIA VIDEOCONFERENCE]
11           (BY:  SEAN P. BRADY, ESQ.)
               [VIA VIDEOCONFERENCE]
12           201 ST. CHARLES AVENUE, SUITE 3300
             NEW ORLEANS, LOUISIANA  70170
13           (504) 569-0235
             ljd@flanaganpartners.com
14           sbrady@flanaganpartners.com
15
         FOR COMPLETE LOGISTICAL SERVICES:
16
             PHELPS DUNBAR LLP
17           (BY:  CLAIRE ZERINGUE, ESQ.)
               [VIA VIDEOCONFERENCE]
18           365 CANAL BOULEVARD, SUITE 2000
             NEW ORLEANS, LOUISIANA  70130
19           (504) 566-1311
             claire.zeringue@phelps.com
20
21       FOR ALL COAST, LLC, AND GULF COAST MARINE, LLC:
22           THE MOELLER FIRM
             (BY:  DAVID K. SMITH, ESQ.)
23             [VIA VIDEOCONFERENCE]
             650 POYDRAS STREET, SUITE 1207
24           NEW ORLEANS, LOUISIANA  70130
             (504) 308-1363
25           david@moellerfirm.com
```

Page 5

**EXHIBIT A**

```
 1                A P P E A R A N C E S  (Continued)
 2
 3        FOR GARBER BROS., LLC:
 4            ALLEN & GOOCH, ALC
             (BY:  JOHN H. HUGHES, ESQ.)
 5              [VIA VIDEOCONFERENCE]
             2000 KALISTE SALOOM ROAD, SUITE 400
 6           LAFAYETTE, LOUISIANA  70508
             (337) 291-1000
 7           johnhughes@allengooch.com
 8
         FOR C&G WELDING, INC.:
 9
             REICH, ALBUM & PLUNKETT, L.L.C
10           (BY:  J. CALVIN BOX, ESQ.)
                [VIA VIDEOCONFERENCE]
11           1206 PARK DRIVE, SUITE 200
             MANDEVILLE, LOUISIANA  70471
12           (504) 830-3999
             cbox@rapllclaw.com
13
14        FOR GREATER LAFOURCHE PORT COMMISSION:
15            FRILOT L.L.C.
             (BY:  BLAKE C. DONEWAR, ESQ.)
16              [VIA VIDEOCONFERENCE]
             (BY:  KATHLEEN P. RICE, ESQ.)
17              [VIA VIDEOCONFERENCE]
             1100 POYDRAS STREET, SUITE 3700
18           NEW ORLEANS, LOUISIANA  70163
             (504) 599-8000
19           bdonewar@frilot.com
             kpontier@frilot.com
20
21        FOR PREMIER OFFSHORE CATERING, INC.:
22            CHAFFE MCCALL, L.L.P.
             (BY:  JOHN M. RIBARITS, ESQ.)
23           801 TRAVIS STREET, SUITE 1910
             HOUSTON, TEXAS  77002
24           (713) 546-9800
             john.ribarits@chaffe.com
25
```

Veritext Legal Solutions
346-293-7000

**EXHIBIT A**

```
1                    A P P E A R A N C E S  (Continued)

2

3         ALSO PRESENT:

4              JOSEPH PENA, VIDEOGRAPHER

5

          REPORTED BY:

6

               YOLANDA J. PENA

7              CCR NO. 2017002, RPR

               STATE OF LOUISIANA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 7
```

**EXHIBIT A**

```
1                           I N D E X

2
                                                      PAGE
3
     LIST OF EXHIBITS..................................9
4
     STIPULATION......................................12
5
     EXAMINATION BY:
6
          MR. LEWIS........................13, 508, 588
7
          MR. PALMINTIER...............................276
8
          MR. KUTNER...................................287
9
          MR. CERISE...................................294
10
          MR. REISMAN.............................342, 523
11
          MR. MCMAHON.............................410, 540
12
          MR. SMITH....................................436
13
          MR. BOX......................................439
14
          MR. DEMOSTHENIDY.............................439
15
          MR. HUGHES...................................447
16
          MR. MECHE....................................451
17
          MR. RUFTY....................................455
18
          MR. DONEWAR..................................549
19
          MR. GUILLOT..................................552
20
     CERTIFICATE......................................594
21

22

23

24

25
                                            Page 8
```

Veritext Legal Solutions
346-293-7000

**EXHIBIT A**

1                       LIST OF EXHIBITS
2
3      Exhibit No. 1......................................45
            (THOR 0005320, Shore Offshore,
4          HSE manual, Mission Statement)
5      Exhibit No. 2......................................49
            (THOR 0005362, Shore Offshore,
6          HSE manual, TQM Policy
           Statement)
7
       Exhibit No. 3......................................54
8          (THOR 0005325, Shore Offshore,
           HSE Manual, Responsibilities)
9
       Exhibit No. 4......................................68
10         (THOR 0005353, Shore Offshore,
           HSE manual, Safety Meetings)
11
       Exhibit No. 5......................................77
12         (THOR 0005363, Shore Offshore,
           HSE manual, Training
13         Requirements)
14     Exhibit No. 6......................................89
            (THOR 0006342, Email chain,
15         Top email from Mr. Mauricio,
           10/6/20, Subject: Re: Marine
16         Forecast)
17     Exhibit No. 7......................................97
            (THOR 0000472, WeatherOps
18         Atlantic Tropical Planner)
19     Exhibit No. 8.....................................102
            (THOR 0003478, EMail chain,
20         Top email from Mr. Grace,
           10/26/20, Subject: RE:
21         On/Off Hire Agreement)
22     Exhibit No. 9.....................................111
            (THOR 0001553, Platform
23         Removal Contract)
24
25

Veritext Legal Solutions
346-293-7000

**EXHIBIT A**

```
1                     LIST OF EXHIBITS (Continued)
2
3       Exhibit No. 10...................................122
            (THOR 0001036, Shore Offshore,
4           Daily Progress Report,
            10/26/20)
5
        Exhibit No. 11...................................160
6           (COASTAL SAFETY 00080, Shore
            Offshore, HSE manual, Hurricane
7           & Tornado Preparedness)
8       Exhibit No. 12...................................207
            (COASTAL 000028, Photographs,
9           Derrick barge "Thor" & Mooring
            Bitts at Martin Energy Dock)
10
        Exhibit No. 13...................................223
11          (THOR 0001092, Report of Marine
            Casualty, Commercial Diving
12          Casualty, or OCS-Related
            Casualty)
13
        Exhibit No. 14...................................251
14          (THOR 0001240, Shore Offshore,
            Daily Progress Report,
15          10/28/20)
16      Exhibit No. 15...................................269
            (THOR 0005307, Shore Offshore,
17          HSE Manual, Incident
            Investigating & Reporting)
18
        Exhibit No. 16...................................312
19          (THOR 0001083, Photographs)
20      Exhibit No. 17...................................320
            (THOR 0001208, Handwritten
21          rough logs)
22      Exhibit No. 18...................................336
            (THOR 0004955, D/B Thor Water
23          Ballast Chart)
24
25
```

                                            Page 10

**EXHIBIT A**

```
1                 LIST OF EXHIBITS (Continued)
2
```

```
3       Exhibit No. 19....................................371
             (THOR 0001392, Mitsubishi
4            Heavy Industries, Ltd.,
             Hiroshima Machinery Works)
5
        Exhibit No. 20....................................398
6            (WM001118, U.S. Coast Guard
             Witness/Investigator Statement
7            Form)
8       Exhibit No. 21....................................411
             (THOR 0001323, Safety
9            Meeting Roster)
10      Exhibit No. 22....................................413
             (THOR 0001276, Shore Offshore,
11           JSA Hazard
             Checklist/Worksheet)
12
        Exhibit No. 23....................................417
13           (THOR 0001390, Schematic)
14      Exhibit No. 24....................................419
             (THOR 0001425, Handwritten
15           logbook)
16      Exhibit No. 25
             (NOT INTRODUCED)
17
        Exhibit No. 26....................................431
18           (THOR 0001381, DB Kallop
             Anchor Winches Overview)
19
        Exhibit No. 27....................................435
20           (MP4 video file,
             RAF Incident 002)
21
        Exhibit No. 28....................................542
22           (THOR 0001085, Photograph
             with labeling)
```

```
23
24
25
```

Veritext Legal Solutions
346-293-7000

**EXHIBIT A**

```
 1                    S T I P U L A T I O N

 2

 3              IT IS STIPULATED AND AGREED by and among the

 4       parties that this deposition is hereby being taken

 5       pursuant to the Federal Rules of Civil Procedure.

 6              All formalities, excluding the reading and

 7       signing of the transcript by the witness, are hereby

 8       waived.

 9              All objections, except as to the form of the

10       question and responsiveness of the answer, are

11       considered reserved until trial or other use of the

12       deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 12
```

**EXHIBIT A**

```
 1              THE VIDEOGRAPHER:  We are on the record
 2         at 10:00 a.m. on March 7, 2023.
 3              This is Media Unit 1 of the
 4         video-recorded deposition of Joe Douglas in
 5         the matter of All Coast, LLC, versus Shore
 6         Offshore Services, LLC, filed in the
 7         United States District Court, Eastern
 8         District of Louisiana, Case Number
 9         221-cv-00258-JCZ-KWR.
10              The location of the deposition is at
11         New Orleans, Louisiana.  My name is Joseph
12         Pena, representing Veritext; I'm the
13         videographer.  The court reporter is Yolanda
14         Pena from Veritext.  All appearances will be
15         noted on the stenographic record.
16              Will the court reporter please swear in
17         the witness, and then counsel may proceed.
18                            * * *
19              TERRY JOE DOUGLAS,
20    having been first duly sworn, was examined and
21    testified as follows:
22                       EXAMINATION
23    BY MR. LEWIS:
24         Q.  Will you please state your full name for the
25    record.
```

Page 13

**EXHIBIT A**

```
1        stay with the D/B William Kallop, and it's later

2        changed to the D/B Thor, correct?

3            A.    Correct.

4            Q.    And at that point in time, then you were hired

5        on at Shore to be acting superintendent on the new

6        piece of equipment they just purchased, right?

7            A.    That's correct.

8            Q.    Okay.  How long had you been on the

9        D/B William Kallop before that kind of sale and change

10       of name?

11           A.    Oh, since 2010.

12           Q.    Okay.  So is it a fair statement to say that

13       from 2010 to 2022, you were the acting superintendent

14       of the D/B Thor, which was also during that time frame

15       called the D/B William Kallop?

16           A.    That's correct.

17           Q.    Okay.  Was Brendan DuPont also the acting

18       relief superintendent during that same time frame?

19           A.    No.

20           Q.    Okay.  Did Brendan DuPont also work at

21       Offshore Specialties, to your knowledge, during the

22       time frames that you did?

23           A.    No.

24           Q.    Okay.  Let's talk about what a superintendent

25       does.  Okay?  Educate me, please, on what does a
```

Veritext Legal Solutions
346-293-7000

**EXHIBIT A**

1      Q.   These are some of the reports that you would

2   receive via email on the D/B Thor, correct?

3      A.   Correct.

4      Q.   And the emails that I saw would show that

5   these emails would be forwarded.  Sometimes they would

6   be sent to shoreside management and sent to the Thor.

7   Sometimes I saw emails where it would be sent to the

8   Thor and then forwarded to shoreside management.  Is it

9   kind of a -- like everyone is kind of getting them and

10   just circulating to make sure everyone gets them?

11      A.   Correct.

12      Q.   Okay.  And so these ones start on

13   October 25th, okay, and then they go from there, even

14   though there are ones that predate that, okay.  But I'm

15   just trying to hone in instead of going through, like,

16   two weeks of weather reports with you.  All right?

17      A.   Right.

18      Q.   And so we have here October 25th.  We know

19   that you have not left the location yet at Fieldwood,

20   correct?

21      A.   Correct.

22      Q.   It shows on here two different kind of

23   tropical events.  But at -- at the bottom here in

24   yellow, you see where it says "Zeta"?

25      A.   Correct.

Page 98

**EXHIBIT A**

1      Q.    And it's giving you the projected path of Zeta

2    as it's going to be traveling through north -- kind of

3    north-northeast through the Gulf of Mexico and then

4    ultimately striking a little east of -- of New Orleans,

5    correct?

6      A.    Correct.

7      Q.    Okay.  And so you would have received this, as

8    well as you would have forwarded it on to shoreside

9    management whenever you got this on the 25th, correct?

10     A.    Correct.

11     Q.    And if you flip to 475, at this point in time,

12   they are -- they are projecting what are the chances of

13   this developing into a further storm, correct?

14     A.    Right.

15     Q.    And so here we're -- October 25th, one day

16   before you leave the location, the weather service is

17   projecting that Hurricane Zeta has a 90 percent chance

18   of becoming a category 1 hurricane, correct?

19     A.    Correct.

20     Q.    And so you would have received this on

21   October 25th.  You would have forwarded it to

22   shoreside, and so everyone knows Hurricane Zeta is

23   projected to come into the Gulf.  It's going to be

24   coming to the area we're currently at, at Fieldwood,

25   and then it's going to start to move northeast towards

Page 99

**EXHIBIT A**

```
1        ultimately decided the Thor needs to come off location

2        and it needs to get out of the path of the hurricane,

3        correct?

4                        MR. GUILLOT:  Object to form.

5            A.    Correct.

6    BY MR. LEWIS:

7            Q.    And you would have already, then, informed the

8    Fieldwood representative, the company representative on

9    the D/B Thor, of this situation, correct?

10           A.    Correct.

11           Q.    You would have also already informed the

12   Fieldwood safety representative of this plan, correct?

13           A.    Correct.

14           Q.    And then, like you told me before, this is

15   where shoreside management would start looking for

16   locations for you to take the D/B Thor and wait out the

17   storm, correct?

18           A.    Right.

19           Q.    Ultimately, you were told by shoreside

20   management that the D/B Thor is going to go to the port

21   of Fourchon, correct?

22                        MR. GUILLOT:  Form.

23           A.    We had discussed it, and I had requested some

24   dock space there.  Yes.

25   BY MR. LEWIS:
```

Veritext Legal Solutions
346-293-7000

**EXHIBIT A**

1    Fieldwood representatives leave the vessel with those

2    explosives?  Or did they stay on vessel with you to go

3    into the port of Fourchon?

4        A.  Well, they stayed on the vessel.

5        Q.  They stayed with you all the way up until the

6    point you got to the dock.  Fair?

7        A.  Correct.

8        Q.  Okay.  Do you remember if any crew members got

9    off with the vessel that was picking up the explosives?

10   Or was it just simply they were picking up those

11   materials and everyone -- all the craw members that

12   were on the vessel stayed on the vessel until getting

13   to the dock?

14       A.  Correct.

15       Q.  Okay.  Do you remember the name of -- do you

16   remember the dock you were directed to go to and ride

17   out Hurricane Zeta?

18       A.  Yeah.  Martin dock 16.

19       Q.  Okay.  Do you remember when you were in

20   Galveston?  Wasn't that also a Martin dock you were at?

21       A.  I don't recall.

22       Q.  Okay.  To your knowledge, does the company

23   have specific contracts with certain docks that they

24   have access to?

25       A.  I don't know.

                                          Page 119

**EXHIBIT A**

1    purpose is you got to load those explosives off --

2    explosives off the D/B Thor so you can get into the

3    port of Fourchon, right?

4         A.   Correct.

5         Q.   At 7:27 a.m. the next morning, it's showing

6    that explosives had been loaded off.  The Jessica is

7    departing, and they're taking the explosives to a

8    different location somewhere else, correct?

9         A.   Correct.

10        Q.   And then there's other activities, but

11   ultimately at 9:27 in the morning, we're talking about

12   how tow lines are starting to be attached, right?

13        A.   Right.

14        Q.   Ultimately, at 11:00 p.m. on October 26, 2020,

15   you've now arrived at the Martin dock in Port Fourchon,

16   correct?

17        A.   Correct.

18        Q.   And around midnight, you're starting the

19   process of securing the D/B Thor to the Martin dock,

20   correct?

21        A.   That's correct.

22        Q.   Okay.  During this day, we've got all the

23   different individuals listed, correct?

24        A.   Correct.

25        Q.   It's talking about personnel movements.  And

                                        Page 136

**EXHIBIT A**

```
 1           A.    At the time, I do believe that we done what

 2      was -- was right.

 3      BY MR. LEWIS:

 4           Q.    And I -- I get that.  I'm not trying to fault

 5      you for that.  Okay?  But we're sitting here knowing

 6      what happened, right?  Sitting here knowing what

 7      happened, do you agree choosing or going to the port of

 8      Fourchon was probably not the best decision?  Fair?

 9                      MR. GUILLOT:  Form.

10           A.    I mean, there's always hindsight.  Like I

11      said, at the time, I thought I was doing what was

12      right.

13      BY MR. LEWIS:

14           Q.    Are you happy with what happened?

15                      MR. GUILLOT:  Form.

16           A.    No, I'm absolutely not happy with what

17      happened.

18      BY MR. LEWIS:

19           Q.    That's what I'm trying to get at, is -- and

20      I'm not questioning you at the time, when you were

21      following orders.  I'm not questioning that at all.

22      Okay?

23           A.    I wasn't following.  It was as much my

24      decision as it was management's.  We agreed on this.

25      Closest place and good -- good -- good dock, good, safe
```

                                                Page 141

**EXHIBIT A**

```
1         harbor, and it was multiple mutual agreements.

2              Q.   What I'm trying to get at is we can all agree

3         sitting here, just logically speaking, selecting the

4         port of Fourchon, in hindsight, was not a good choice,

5         correct?

6                        MR. GUILLOT:  Form.

7              A.   Yeah, hindsight.

8         BY MR. LEWIS:

9              Q.   Okay.

10             A.   I mean, it was late in the season.  The -- the

11        chance it would even become a category 1 storm was slim

12        to none.

13             Q.   It was 90 percent.

14                       MR. GUILLOT:  Form.

15             A.   Well...

16        BY MR. LEWIS:

17             Q.   Do you consider 90 percent slim to none, sir?

18                       MR. GUILLOT:  Form.

19             A.   I can show you more wrong weather reports than

20        right ones.

21        BY MR. LEWIS:

22             Q.   Do you disregard weather reports when they're

23        given to you?

24             A.   No, I do not disregard weather reports.

25             Q.   You, in fact, rely on them, right?
```

Page 142

**EXHIBIT A**

1     Q.   Does that coincide with your own personal

2     memory of being on the barge, that you were coming in

3     close to -- a little bit before, but kind of close to

4     midnight?

5     A.   Right.

6     Q.   Okay.  And so then in the early morning hours

7     of October 27, 2020, would be the time where you're

8     coming into the dock.  And at some point, you're going

9     to have to start securing the barge, correct?

10    A.   Right.

11    Q.   And so if you flip to 1043, right, which is

12    the second page of the October 27, 2021, report, we

13    start having the same activity chart of what's going

14    on, correct?

15    A.   Right.

16    Q.   Same in the sense of it's not the same as the

17    day before but the same kind of process, right?

18    A.   Right.

19    Q.   And it shows at 1:00 o'clock, you-guys were

20    secured at the Martin dock, correct?

21    A.   Right.

22    Q.   Being secured at the Martin dock doesn't mean

23    you have your, like, anchor cables or anchor lines out,

24    right?

25    A.   No.  We're just secured with eight mooring

Page 146

**EXHIBIT A**

1    lines at this point.

2        Q.    Okay.

3        A.    We're not completely through mooring.

4        Q.    And so -- because if we look down, it -- it

5    shows that you're actually starting to put out some of

6    the cables to moor, right?

7        A.    Right.

8        Q.    And so you -- you get kind of a preliminary

9    securement to the Martin dock; you're not anchored or

10   moored yet?

11       A.    Right.

12       Q.    And you start offloading all of the

13   third-party personnel from the vessel, correct?

14       A.    Correct.

15       Q.    And so at 1:15 in the morning, you're

16   offloading third-party personnel that we'll talk about

17   in a minute.  And at 3:00 o'clock in the morning, a bus

18   came and -- and actually physically took that

19   third-party personnel away from the dock, correct?

20       A.    Correct.

21       Q.    And -- but there were some individuals on the

22   crew that remained on the D/B Thor, correct?

23       A.    Correct.

24       Q.    And so I might do this as a side-by-side,

25   okay, just to try and make it a little easier for

                                              Page 147

**EXHIBIT A**

```
 1              you.

 2                   THE WITNESS:  I'm sorry.

 3    BY MR. LEWIS:

 4         Q.   And then -- one second.  Let me try and put

 5    this back together real quick.  Sorry.

 6              All right.  And then if we go back to the

 7    activity portion of October 27th, okay, we've got -- at

 8    7:30 in the morning, we're starting the process of

 9    mooring the D/B Thor to the dock, correct?

10         A.   The anchor cables, correct.

11         Q.   Yeah, putting out the anchor cables to kind of

12    moor it to the dock, right?

13         A.   Correct.

14         Q.   Whose decision was it to put out two anchor

15    cables?

16         A.   Mine.

17         Q.   Did you consult anybody at Shore Offshore

18    about how many anchor cables should be put out?

19         A.   No.

20         Q.   Ultimately, you decided to put out the

21    starboard stern anchor cable, correct, at 7:30?

22         A.   Correct.

23         Q.   And then later in the day, you put out the

24    starboard bow breast anchor cable, correct?

25         A.   (Coughs.)  Excuse me.  That is correct.
```

Page 157

**EXHIBIT A**

```
 1                    MR. GUILLOT:  Form.

 2          A.   As far as I know, that's correct.

 3   BY MR. LEWIS:

 4          Q.   Okay.  You could have put out -- in addition

 5   to the two you did, you could have put out the

 6   starboard bow anchor line as well as the starboard

 7   stern breast anchor lines, if you wanted, correct?

 8          A.   I'm not even required to put out any anchor

 9   cables.  I mean, two were more than plenty.

10          Q.   Okay.  And so I understand you're saying, I

11   don't think I needed to.  All right?  I'm not disputing

12   that.  But you could have put out the starboard bow and

13   the starboard stern breast in addition to the two you

14   put out, if you wanted to, correct?

15          A.   Correct.

16          Q.   Okay.  Had you ever been trained at Shore

17   Offshore about, in the event that you are having to be

18   secured at a dock in the direct path of a hurricane,

19   how many anchor cables need to be placed?

20          A.   No.  That's just something that I picked up

21   through the years, different companies.

22          Q.   Had you ever -- had Shore Offshore ever

23   trained you on how to place the anchor cables to

24   account for projected storm surges?

25          A.   No.
```

**EXHIBIT A**

```
1          Q.   Have you ever heard of a game -- I don't know

2     if it's called a game.   Have you ever heard of Russia

3     roulette?

4          A.   Yep.

5          Q.   Let's imagine you have a 10 -- you have a

6     revolver that is a 10-shooter.   Okay?   You got ten --

7     you got ten chambers, and nine on the ten chambers are

8     loaded.   Would you ever play that game?

9          A.   No.

10          Q.   And why?   Because the percentages are so high

11     and the consequences are so deadly, no logical person

12     would ever do that, right?

13          A.   Right.

14          Q.   But what we have here is Shore Offshore

15     shoreside management and you making decisions under the

16     same percentages and dealing with -- and dealing with

17     situations that you know are deadly, right?

18               MR. GUILLOT:   Object to form.

19          A.   Not necessarily.   Even -- even in a cat 1, I

20     was -- I was in a good spot, good, safe harbor, even at

21     cat 1.

22     BY MR. LEWIS:

23          Q.   Okay.   Let's talk about the different phases.

24     Okay?   So now I'm moving over one more page, which is

25     now Coastal Safety 82.   It's page 3 of this policy.
```

Page 164

**EXHIBIT A**

1    A.    Correct.

2    Q.    Going back to Exhibit 10, do you remember how

3    much slack you provided, if any, in the anchor cables,

4    either the starboard stern anchor cable or the

5    starboard bow anchor cable?

6    A.    I was probably seven -- seven to nine feet

7    away from the dock.

8    Q.    Okay.

9    A.    Somewhere in that area.

10    Q.    And at this point in time, there was a tug.  I

11    think it was the Crosby Endeavor; is that right?

12    A.    That's right.

13    Q.    And obviously, one side of the -- it's the

14    starboard side of the D/B Thor is facing the dock,

15    right?

16    A.    That's correct.

17    Q.    Because that's where -- that's where you're

18    throwing your lines out?

19    A.    Correct.

20    Q.    On the -- on the port side, is that where the

21    Crosby Endeavor is alongside you?

22    A.    Correct.

23    Q.    Okay.  And is the Crosby Endeavor connected to

24    you with lines?

25    A.    Yes.

Page 175

**EXHIBIT A**

1      Q.   Okay.  Is the Crosby Endeavor during this time

2   just sitting there on standby, or are they helping in

3   the process at any point in time?  So this might have

4   changed.  I just want to ask a general statement.

5          From the time you have your anchor lines

6   attached to the time it breaks free, okay, is the

7   Crosby Endeavor just sitting there, or is it actively

8   helping push the D/B Thor up against the dock?

9              MS. KUEBEL:  Objection; form, asked and

10             answered.

11     A.   Just sitting there.

12   BY MR. LEWIS:

13     Q.   Okay.  As the superintendent, was it your

14   expectation of the Crosby tug to actually be assisting

15   the D/B Thor in remaining secured to the dock?

16             MS. KUEBEL:  Objection; form.

17     A.   Absolutely.

18             MS. KUEBEL:  You can answer.

19     A.   That's why he was there.

20   BY MR. LEWIS:

21     Q.   Okay.  And so there's going to be questions

22   asked about this.  Okay?  This is why -- you're the

23   head guy there.  I want to -- I want to hear from you

24   about this.  They were an assist tug for the D/B Thor

25   during this process of coming in as well as being at

Page 176

**EXHIBIT A**

```
 1              we can stop now, just because we're totally

 2              going to pivot now.  Be back around 1:55.

 3                   THE VIDEOGRAPHER:  We are off the record

 4              at 1:26 p.m.

 5                        (Recess taken.)

 6                   THE VIDEOGRAPHER:  We are on the record

 7              at 2:03 p.m.

 8    BY MR. LEWIS:

 9         Q.   Sir, we took a short break for lunch.  You

10    ready to go?

11         A.   Yes.

12         Q.   Okay.  I want to go back to a couple of

13    things.  Then we're going to jump back into where we

14    left off.  Okay?

15         A.   Uh-huh.

16         Q.   Going back to Exhibit 10, which is the daily

17    progress reports, okay, you and I had gone through

18    this.  And on Exhibit 10, it's going to be Bates

19    labeled 1043.

20         A.   Okay.

21         Q.   And so here what we -- we were talking about,

22    how the anchor cables or anchor lines are being put out

23    on this day, correct?

24         A.   Correct.

25         Q.   And I think you told me that you were the one
```

                                        Page 179

**EXHIBIT A**

1    overseeing that process of making sure that anchor

2    cables and anchor lines were being put out properly and

3    that they were in the proper position, correct?

4        A.    Correct.

5        Q.    Do you have an independent memory of this --

6    because there was a skeleton crew on there, right?  Do

7    you have an independent memory of what specific crew

8    members helped in that process, or do you just remember

9    there were people helping?

10       A.    Just people helping.

11       Q.    Okay.

12       A.    I don't recall exactly.

13       Q.    And -- and that's fair.  And that's why --

14   just sitting here today, based off your memory, because

15   it's obviously not documented here of who did what, you

16   don't remember, of the crew members on the vessel, who

17   specifically was helping you in setting those two

18   anchor lines, correct?

19       A.    Correct.

20       Q.    But you would have been overseeing that.  And

21   you were the superintendent; you would have been

22   verifying, at least in your opinion, everything was

23   done properly.  Correct?

24       A.    Correct.

25       Q.    Were you consulting anybody, not on the

Page 180

**EXHIBIT A**

```
1                    MR. GUILLOT:  Form.

2          A.   Correct.

3     BY MR. LEWIS:

4          Q.   But when it comes to coming here and giving a

5     deposition, you're willing to meet with people for 30

6     to 40 hours to prepare to answer questions, right?

7                    MR. GUILLOT:  Form.

8          A.   Correct.

9     BY MR. LEWIS:

10         Q.   Now, at the dock, right, there are various

11    kind of mooring bitts in place, correct?

12         A.   (Witness nods head.)

13         Q.   Right?

14         A.   Right.

15         Q.   And do you remember -- do you have any

16    independent memory of how many mooring bitts were along

17    that dock there?

18         A.   Ten.

19         Q.   Ten.  And did you have lines -- at least some

20    sort of a line on all ten bitts, or was it only certain

21    bitts?

22         A.   (Coughs.)  Excuse me.  Eight bitts.

23         Q.   Okay.  So eight out of the ten bitts you had

24    some sort of a line on.  We know we had the two anchor

25    lines, and then there would have been lines on the
```

Page 188

**EXHIBIT A**

1     other six, correct?

2          A.   Correct.

3          Q.   When we say only eight, is it -- was it the --

4     the two furthest ones weren't used?  Or is it, like,

5     the two middle ones weren't used?

6          A.   I believe the third from the stern and the

7     tenth, the very last one at the end of dock.

8          Q.   Okay.  Did you have an anchor cable, to your

9     knowledge, that was long enough, if you wanted to put

10    it out, to go to that tenth mooring bitt?

11         A.   No.  No, I couldn't reach it.

12         Q.   Okay.  Did you have an anchor cable that was

13    long enough, if you wanted to, to go to that -- that

14    third one you were talking about?

15         A.   It wouldn't have done no good.  It'd been in

16    the wrong direction.

17         Q.   And I'm not -- I'm just trying to get the

18    distance, right.

19         A.   Okay.

20         Q.   We can talk about the effect had you done it

21    or not later.

22          Was it -- was it close enough to your vessel

23    that you had anchor cable long enough to reach it if

24    you had decided to put one out?

25         A.   Yes.

Page 189

**EXHIBIT A**

```
1    during this incident, you wouldn't have any personal
2    knowledge on how they were injured, correct?
3              MR. GUILLOT:  Form.
4        A.    (Coughs.)  Excuse me.  No.
5    BY MR. LEWIS:
6        Q.    Okay.  "No" meaning you don't have -- "no"
7    meaning you don't have any personal knowledge?
8        A.    Of how they got injured, no.
9        Q.    Sitting here today, you have no personal
10   knowledge to -- assuming those people were injured, to
11   the extent of their injuries, correct?
12       A.    No.
13       Q.    Okay.  Do you know -- when it comes to the
14   various lines to the vessel, do you know which was the
15   first line to break?
16       A.    No, I do not.
17       Q.    Where were you at on the barge when you first
18   realized lines were starting to break?
19       A.    I was on the bridge, in my office.
20       Q.    Was there anybody on the bridge in the office
21   with you at this exact time when you realized lines
22   were starting to break?
23       A.    Yes.
24       Q.    Who?
25       A.    My clerk.  My clerk, Dustin Lowe.
```

Page 233

**EXHIBIT A**

1    understanding, the D/B Thor hit?

2         A.    I don't recall the name of it.

3         Q.    When the D/B Thor started to come off of the

4    dock, do you remember how it came off of the dock?

5    Meaning, did it just come straight off the dock?  Did

6    it start spinning off the dock?

7         A.    It kind of started coming slightly from the

8    stern out a little more and then out, and then it

9    eventually turned all the way around.

10        Q.    So whenever it starts to break away and it's

11   starting, you can see and feel it moving away from the

12   dock.  You're saying the stern was the one that kind of

13   moved away first?

14        A.    Correct.

15        Q.    And then ultimately, both anchor cables

16   disengaged and it was completely off the dock?

17             MR. MCMAHON:  Objection.

18        A.    No.  At that time, the bow anchor cable did

19   not break.

20             MR. MCMAHON:  Say it again?

21             THE WITNESS:  The starboard bow breast

22        anchor cable didn't break at that time.

23   BY MR. LEWIS:

24        Q.    Okay.  So we know, as these cable are starting

25   to break or break free, you're telling me that the

                                        Page 235

**EXHIBIT A**

1     A.    Excel.

2     Q.    So we'd be able to go back and find -- you do

3     it via email, right?  You'd submit it via email?

4     A.    Yes.

5     Q.    So we'd be able to go back and find the actual

6     native formats of every time you submitted one of these

7     back to shoreside, right?

8     A.    Yes.

9     Q.    Can you explain to us why there's two

10    different versions that have been submitted?

11    A.    No, I cannot.

12    Q.    On this one, on the second page, it does have

13    some activity logged on it, right?

14    A.    Yes.

15    Q.    It says at 4:04, the barge broke loose.  Do

16    you see that?

17    A.    Excuse me?

18    Q.    At 1604, or 4:04 in the afternoon, barge broke

19    loose, correct?

20    A.    Correct.

21    Q.    2030, or 8:30, dropped anchor to stop barge,

22    correct?

23    A.    Correct.

24    Q.    So this barge was free-floating for over four

25    hours according to your daily progress report, correct?

Page 254

**EXHIBIT A**

```
1              A.    Yes.

2              Q.    Did it have electronic charts?

3              A.    I don't know.

4              Q.    Did you consult any of those charts at any

5    time after the Thor docked at the Martin dock?

6              A.    No.

7              Q.    Did anybody from the company management

8    shoreside ask you to take a look at any of the charts

9    after the Thor docked at Martin?

10             A.    No.

11             Q.    What are the dimensions of the Thor?

12             A.    138 feet wide, 370 feet long, and 26 feet

13   deep.

14             Q.    The Thor also had a material barge with it on

15   its job for Fieldwood; is that right?

16             A.    Yes.

17             Q.    And where did the material barge put into

18   port?

19             A.    It was to the stern of us, tied up there.

20             Q.    And who made the determination to put the

21   material barge there?

22             A.    The -- the tugboats that was -- my tail tug

23   brought it in and tied it up there.

24             Q.    Did the material barge break loose?

25             A.    Not that I know of.
```

                                                    Page 306

**EXHIBIT A**

1          before Hurricane Zeta?

2               A.   Not that I'm aware of.

3               Q.   And when the Thor got to the Martin dock, did

4          you actually get off the Thor and walk the dock to

5          inspect it?

6               A.   The following morning, not that night.

7               Q.   So the 27th?

8               A.   Correct.

9               Q.   And how long did your inspection take?

10              A.   Sir?

11              Q.   How long did your inspection take?

12              A.   Just inspected it while we was down there

13         hooking up the anchor cables.

14                   MR. GUILLOT:  Listen to his question.

15         BY MR. CERISE:

16              Q.   I asked -- I asked how long -- and I

17         appreciate you're anticipating some of my questions.

18         How long were you on the dock inspecting it?

19              A.   Oh, just a short period of time inspecting it.

20              Q.   But you got a look at -- at the entire length

21         of dock?

22              A.   Sir?

23              Q.   You got a look at the entire length of the

24         dock?

25              A.   Yes, sir.

                                             Page 309

**EXHIBIT A**

```
 1    the 27th, were those soft lines ever adjusted again
 2    before the storm?
 3         A.   No.
 4         Q.   And what about the anchor cables, the two
 5    cables that were out?  Were they ever adjusted again
 6    before the storm?
 7         A.   No.
 8         Q.   Did you take -- you said you had your clerk
 9    take pictures, right?
10         A.   Correct.
11         Q.   Let me show you what is identified as
12    Thor 1083 to 1086, and if you would just flip through,
13    should be four photos.  If you'd flip through those
14    really quickly for me, please.
15         A.   Okay.
16                   MR. KUTNER:  Did you mark that?
17                   MR. CERISE:  That will be Exhibit 16.
18              Is that right?
19                   MR. KUTNER:  Yeah.
20         (Exhibit No. 16 was marked for identification.)
21                   THE WITNESS:  Okay.
22    BY MR. CERISE:
23         Q.   All right.  Are those the photos the clerk
24    took?
25         A.   Yes.
```

Page 312

**EXHIBIT A**

1      Q.   And these all have a stamped date on them of

2      October 28; is that right?

3      A.   Correct.

4      Q.   And it said 10:38 and 10:39; is that correct?

5      A.   Correct.

6      Q.   Why did you want the clerk to take the photos

7      at that time?

8      A.   Like I'd said before, just for a -- show my

9      foremen and everything examples of how much space to

10     leave between the dock and the barge and how to tie the

11     barge.

12     Q.   From the -- let's say the morning of the 28th

13     until the time the storm hit, was the weather just

14     steadily increasing?

15     A.   After lunch, yes.

16     Q.   After lunch, it steadily increased until the

17     storm hit?

18     A.   Yes.

19     Q.   And then did it steadily decrease?  Did it

20     steadily decrease after passing?

21     A.   Yes.

22     Q.   All right.  So let's look at this first photo,

23     1083.  Do you know what line that is that's shown in

24     that photos?

25     A.   Yes.  That is the starboard stern anchor

Page 313

**EXHIBIT A**

1    cable.

2        Q.   All right.  So the anchor cable is actually

3    affixed to some soft line; is that right?

4        A.   That's correct.

5        Q.   All right.  And who -- who rigged this up?

6        A.   Myself and the riggers.

7        Q.   And were you taught this is how you should rig

8    it up to connect it to a bitt?

9        A.   Yes.

10       Q.   All right.  What is the -- that eye or that

11   ring around the bitt?  What is that?

12       A.   That is a shackle.

13       Q.   And -- and what pound shackle was that?

14       A.   That's called a Crosby 125 wide body.

15       Q.   All right.  And this bitt that the anchor

16   cable was connected to, that bitt doesn't have any

17   horns, or crucifix as you called it, right?

18       A.   That's correct.

19       Q.   Were you concerned at all that this cable, the

20   soft line, could slip off of that bitt if the barge

21   rose in the seas?

22       A.   No, I was not.

23       Q.   Why not?

24       A.   Because that's choked around it.

25       Q.   All right.  And if the barge was pushed

                                        Page 314

**EXHIBIT A**

```
 1          against the dock, then what would happen?  Would it
 2          still be choked around it?
 3               A.   Yes.
 4               Q.   And why is that?
 5               A.   Because it's set in place.
 6               Q.   Set with what?
 7               A.   It set itself.  When it choked, then they're
 8          in place.
 9                         THE REPORTER:  Can you repeat that?
10                         THE WITNESS:  Once you go around --
11                         MR. GUILLOT:  Just repeat what you said,
12                    is what the lady is asking.
13                         THE WITNESS:  Oh.  Once it chokes
14                    itself, it's set in place.
15          BY MR. CERISE:
16               Q.   Let's go to the next photo, please.  Do you
17          know what line that is?
18               A.   That is the second line from the barge to the
19          dock.
20               Q.   Second line from the barge.  So second from
21          the bow or the stern?
22               A.   From the stern.
23               Q.   All right.  So that would be the line
24          immediately after the one we just talked about in 1083?
25               A.   Correct.
```

Page 315

**EXHIBIT A**

1          Q.   Okay.  And you gave us a number of bitts

2     earlier, and you numbered them -- and I'm not going to

3     hold you to it -- but 1 through 10.  Would the bitt in

4     1083 be bitt number 1?

5          A.   Yes.  This would be considered bitt number 1.

6          Q.   All right.  So this line that is in 1084, is

7     that line doubled?

8          A.   No, it's not.  That's a spring line.

9          Q.   When was the last time these soft lines had

10    been inspected on the barge?

11         A.   They was -- they was made new at the beginning

12    of the season.

13         Q.   What's the beginning of the season?  What

14    starts the season?

15         A.   Whenever we -- whenever we go offshore, we

16    make all new lines.  And they inspect them every time

17    we use them.

18         Q.   So I -- I'm not familiar with -- with that.

19    Tell me what month that would have been in either 2020

20    or 2019.

21         A.   Well, we had a late season, so three or four

22    months prior, three months.

23         Q.   All right.  And this line in 1084, that's --

24    that's three months of wear on it?

25         A.   Yes.

                                              Page 316

**EXHIBIT A**

1           Q.   All right.  Let's go to the next photo,

2     please, 1085.

3           A.   Okay.

4           Q.   So this -- this boom for the derrick, is that

5     on the stern?

6           A.   That's on the stern, yes.

7           Q.   All right.  So we're looking at the stern

8     going --

9           A.   Toward the bow.

10          Q.   -- toward the bow?

11          A.   Correct.

12          Q.   So these bitts that are in this photo, what

13    numbers would they be?

14          A.   I believe that's number 4 at the bottom of the

15    page, and 5, 6, 7, 8, I believe.

16          Q.   Okay.  And looking at the bottom of the page,

17    number 4, it has two lines on it; is that right?

18          A.   Correct.

19          Q.   Are those lines doubled?

20          A.   No.

21          Q.   Are those both spring lines?

22          A.   No.

23          Q.   Okay.  Let's go to bitt 5.  Are those lines

24    doubled?

25          A.   No.

                                              Page 317

**EXHIBIT A**

```
1              Q.    And are those two lines spring lines?

2              A.    One is.  I'm not sure if the other one is or

3         not.

4              Q.    And then let's go to bitt 6.  Is that line

5         doubled?

6              A.    Yes.

7              Q.    And bitt 7, is that line doubled?

8              A.    Yes.

9              Q.    All right.  It looks like there might be two

10        lines there.  Is that what we have there?

11             A.    Yes, looks like.

12             Q.    Well, they're not both doubled, are they?

13             A.    No.

14             Q.    Are those spring lines?

15             A.    Yes, I believe.  Number 7 and number 5 are

16        spring lines.

17             Q.    All right.  And then number 8, is that line

18        doubled?

19             A.    Yes.

20             Q.    Okay.  Let's go to the next photo, if you

21        would, please.  And so we're starting four at the

22        bottom again; is that right?

23             A.    I believe that's five.  That's number 5.

24             Q.    All right.  Number 5 at the bottom.

25                   All right.  So we've got number 8 going to the
```

Page 318

**EXHIBIT A**

```
1      top?
2              A.   Sir?
3              Q.   Count -- would you count with me, please,
4      five, six, seven, eight.  Go to number 8.
5              A.   Correct.
6              Q.   That line's doubled?
7              A.   Yes.
8              Q.   Okay.  And nine -- bitt 9, is that line
9      doubled?
10             A.   That's the starboard bow breast anchor cable,
11     I believe.  No.  I can't tell.  One, two, three, four
12     five -- five, six, seven, eight.  One -- see.  Five,
13     six, seven, eight, nine.  It looks like eight is.  And
14     I believe bitt 9 is the anchor cable.
15             Q.   So was the starboard bow anchor cable made up
16     to the bitt in the same manner as the stern anchor
17     cable was?
18             A.   Yes.
19             Q.   Same thing, shackled --
20             A.   Well, it had a shackle with a -- a 4-inch
21     endless rope on it, shackled in and put over the bitt.
22             Q.   All right.  And that bitt actually has the
23     horns on it, a crucifix on it?
24             A.   Yes, I believe it does.
25             Q.   All right.  And then the next bitt, was there
```

Page 319

**EXHIBIT A**

1        a line on that?

2                A.    The number 10?

3                Q.    Yes, sir.

4                A.    No, sir.

5                Q.    All right.  And is that another bitt after

6        number 10?

7                A.    Yes, sir.  That's on -- but that's on the

8        other side of Martin.

9                Q.    So did you consider connecting a cable to bitt

10       number 10?

11               A.    No.  It was too far away.

12               Q.    Too far away from what?

13               A.    From the barge.

14               Q.    Well, did you actually go out there and assess

15       it and decide it was too far away?

16               A.    That, and I didn't think I needed it.

17               Q.    Why didn't you think you needed it?

18               A.    I thought ten mooring lines and two anchor

19       cables was more than sufficient.

20               Q.    Let me ask you about what I'm going to mark

21       as -- it's going to be Exhibit 17.

22            (Exhibit No. 17 was marked for identification.)

23                    MR. REISMAN:  What exhibit number was

24            the photos?

25                    MR. GUILLOT:  Sixteen.

**EXHIBIT A**

```
1              A.   I could have put three more out, but I seen
2      no -- no need.
3              Q.   Okay.  Did you have any discussions with
4      Shore's management about whether to put out those
5      additional wires?
6                        MR. GUILLOT:  Do you have any questions
7                   that haven't been asked like ten times?
8                        MR. REISMAN:  You can object to the form
9                   if you'd like; otherwise, I don't need the
10                  commentary.  We can just keep moving.
11                       MR. GUILLOT:  It's almost 7:00 o'clock,
12                  David.
13                       MR. REISMAN:  I understand that.  I'm
14                  entitled to ask my questions, Gavin.
15                       MR. GUILLOT:  What?  They're all asked
16                  and answered.
17     BY MR. REISMAN:
18             Q.   Sir, do you need it repeated?
19             A.   Please.
20                       MR. REISMAN:  Madam, would you repeat
21                  that for us, please?
22                       THE REPORTER:  "Did you have any
23                  discussions with Shore's management about
24                  whether to put out those additional wires?"
25             A.   No.
```

Page 383

**EXHIBIT A**

```
1        BY MR. REISMAN:
2             Q.   Do you know when that steel beam was cut into
3        by a wire?
4             A.   When we broke away.
5             Q.   Can -- can you explain that to me?  What --
6        what caused it to -- to chafe into that -- that beam?
7             A.   As the wire moves across the drum and gets
8        closer to the edge, then it closed the distance on that
9        pipe on the walkway and started cutting.
10            Q.   Did that wire fail?
11            A.   No -- well, yes.
12            Q.   Where did it fail?
13            A.   Twenty-five, 600 feet up the bayou.
14            Q.   2500 -- say that number again.
15            A.   About 2500 feet up the bayou.
16            Q.   Okay.  So as the barge start drifting, the
17       last mooring connection between the barge and the dock
18       was the starboard stern breast wire.  Is that -- is
19       that accurate?
20            A.   Starboard bow breast, correct.
21            Q.   And the barge got about 2500 feet upriver?
22            A.   Correct.
23            Q.   And then it failed?
24            A.   It broke.  Yes.
25            Q.   The wire parted, or the wire ran off of the
```

                                              Page 389

**EXHIBIT A**

1     previously produced as Thor 1276 through 1322.

2   (Exhibit No. 22 was marked for identification.)

3 BY MR. MCMAHON:

4   Q. You do agree the purpose of the JSA is to

5 evaluate risk and minimize those risks.  That's why you

6 do it, correct?

7   A. Correct.

8   Q. And you do agree that there was a risk of the

9 Thor breaking away from Martin's dock, which is why you

10 used the ten different lines we've talked about

11 throughout this entire deposition, correct?

12   A. I mean, there's always a potential.

13   Q. And there were no JSAs done with regard to

14 what to do in the event of a breakaway, was there?

15   A. No.

16     MR. MCMAHON:  I'll attach that as

17   Exhibit No. 22.

18 BY MR. MCMAHON:

19   Q. Now, in your testimony throughout the day

20 here, you've previously referred to Martin's dock as a

21 good -- a good dock.  Do you remember that?

22   A. Yes.

23   Q. When you arrived at Martin's dock and when

24 Mr. Cerise asked you questions about getting out on the

25 dock and walking around, you saw absolutely no

**EXHIBIT A**

```
 1        conditions that gave you concern about the dock itself
 2        in relation to mooring the Thor for the hurricane,
 3        correct?
 4             A.   Correct.
 5             Q.   Had you, you would have told somebody?
 6             A.   Correct.
 7             Q.   Had you, you would have called the office?
 8             A.   Correct.
 9             Q.   Had you, you would have done something
10        differently?
11             A.   Correct.
12             Q.   Now, moor -- Martin personnel did not provide
13        any assistance in mooring the Thor.  That was all done
14        by your skeleton crew.  Correct?
15                      MR. GUILLOT:  Object to form.
16             A.   That was done by both shifts, the rigging crew
17        and the skeleton crew.
18        BY MR. MCMAHON:
19             Q.   Okay.  You did not request any equipment from
20        Martin for purposes of securing the Thor to its
21        dock 16, did you?
22             A.   No, I did not.
23             Q.   You did not ask them any information as to the
24        best way to moor the Thor to the dock, did you?
25             A.   No, I did not.
```

Page 414

**EXHIBIT A**

1      Q.   No Martin personnel ever boarded the Thor for
2   purposes of discussing mooring and/or how to moor,
3   where to moor, what devices to use, correct?
4      A.   That's correct.
5      Q.   All right.  Now, Mr. Reisman asked you some
6   questions, and he did it just by getting a verbal
7   response.  I want to be a little more specific, in
8   utilizing a drawing here.  It's part of Thor previous
9   production, and it's -- a document that I have
10  misplaced.  One minute, please.
11                  MR. KUTNER:  While he's looking for
12              that, can we stop for just a minute?
13                  MR. MCMAHON:  Sure.
14                  THE VIDEOGRAPHER:  We are off the record
15              at 7:20.
16                      (Recess taken.)
17                  THE VIDEOGRAPHER:  We are on the record
18              at 7:27 p.m.
19  BY MR. MCMAHON:
20      Q.   Mr. Douglas, I handed you Thor 0001390.  Do
21  you recognize that as the D/B Thor?
22      A.   Yes, I do.
23      Q.   All right.  Can you please put a "B" and an
24  "S" at the very top and the bottom of the pages so
25  everybody knows what's the bow and what's the stern?

                                        Page 415

**EXHIBIT A**

```
 1          Q.   Now let's go to the after-the-fact pictures on

 2    Exhibit No. 12.  You can -- you might need 16 to

 3    reference that.  Give me -- give me that 10 out of your

 4    way, please.

 5               Okay.  Let's look at No. 12 together.

 6                    MR. RUFTY:  Hi, this is Alfred Rufty.

 7               Gavin, we're getting really late here.

 8                    MR. MCMAHON:  I'm almost finished,

 9               Alfred.

10                    MR. RUFTY:  We have questions after

11               that, and then people are going to want to

12               have follow-up.  It's already 7:40.  I think

13               it's about time for us to call it.

14                    MR. GUILLOT:  No.

15                    MR. MCMAHON:  We already talked about

16               that.

17                    MR. GUILLOT:  Let's keep going.

18                    MR. MCMAHON:  I don't have much more,

19               Alfred.

20    BY MR. MCMAHON:

21          Q.   All right.  Mr. Douglas, I want you to look at

22    Coastal -- Exhibit 12, Coastal No. 29.  We already

23    talked about where the line parted on the number 1

24    bitt.  That was aboard the D/B Thor, and the remaining

25    line with the choked off line remained on Martin's bitt
```

                                              Page 422

**EXHIBIT A**

```
1        number 1, correct?

2              A.   Correct.

3              Q.   All right.  We looked at Exhibit No. 16, bitt

4        number 2.  And if you go to Coastal 32, the line that

5        the Thor utilized to secure to bitt number 2 in fact

6        parted, and the eye of it remained on bitt number 2,

7        correct?

8              A.   Correct.

9              Q.   You said earlier in your testimony bitt

10       number 3 wasn't utilized.  Keep going, please.  The

11       line on bitt number 4 also parted, with the eye

12       remaining on Martin's bitt number 4, correct?

13                       MR. GUILLOT:  What -- what are you

14                  identifying?

15                       THE WITNESS:  What number are you at?

16       BY MR. MCMAHON:

17             Q.   You can use whatever picture you like.  Do you

18       have an independent knowledge?  Do you remember that

19       the line on 4 parted also?

20             A.   Correct.

21             Q.   With the eye staying on Martin's bitt?

22             A.   Yes.

23             Q.   Okay.  And since you'd like a number, let's go

24       to Coastal 42.  That's the one that's leaned over a

25       little bit, right?
```

**EXHIBIT A**

1        A.   Correct.

2        Q.   The Thor's line parted at number 4, correct?

3        A.   Correct.

4        Q.   Let's go to number 5.  You're welcome to look

5    at any of the picture, but you have an independent

6    recollection that Thor's line parted on number 5 with

7    the eye remaining around number 5, correct?

8        A.   Correct.

9        Q.   Yes?

10       A.   Correct.

11       Q.   That's Coastal 46, isn't it?

12            Now, let's go get to -- to mooring bitt

13   number 6.  You're in the bridge.  Were you in fact

14   awake at 4:00 o'clock p.m. when the Thor broke away?

15       A.   Yes, I was awake.

16       Q.   All right.  The reason I ask, sir, is I've

17   been on the bridge of the Thor, and when I looked out

18   the window, I couldn't see the number 1 bitt or the

19   anchor line.

20            Isn't it correct you did not have anybody

21   monitoring the number 1 line as the storm approached?

22       A.   You can see that bitt from the TV room.

23       Q.   Did you have anybody monitoring the number --

24   the line leading to the number 1 bitt?

25       A.   No, I did not.

                                            Page 424

**EXHIBIT A**

1   broke?

2       A.   Do not know which one broke first.

3       Q.   You don't know if the number 6 was trying to

4   hold all of the Thor's stern as it swung out after 1,

5   2, 3, 4 and -- excuse me, 1, 2, 4 and 5 broke, do you?

6       A.   I do not know what broke first, no.

7       Q.   Let's keep going.  Number -- the Thor's line

8   to the number 7 also parted, and the eye of the Thor's

9   line was still around number 7 when we all did an

10  investigation on October 30, 2020, correct?

11      A.   Correct.

12              MR. GUILLOT:  Form.

13  BY MR. MCMAHON:

14      Q.   Let's talk about number 9.  Before we do that,

15  you testified earlier that it -- I believe your words

16  were "it peeled out," correct?

17      A.   Correct.

18      Q.   All right.  Explain to me how the number 9

19  winch that you've drawn on -- I believe it was

20  Exhibit 22 or 23 -- how does that winch work?  You made

21  reference to the brakes not holding.  How does that

22  winch work?

23      A.   Off of hydraulics.

24      Q.   I'm going to take a wild guess and suggest to

25  you there's not a lawyer in here that understands what

                                            Page 426

**EXHIBIT A**

1          "The dog is utilized on each drum when the

2     anchors are racked on the barge to prevent slacking off

3     in case of brake or hydraulic failure.  The dog may be

4     utilized in certain weather conditions if the brakes

5     start slipping due to heavy winds and seas."

6          Q.   Would you consider Hurricane Zeta heavy wind

7     and seas?

8          A.   Yes, I do.

9          Q.   And you previously testified that it peeled

10    out some 2,000-plus feet, correct?

11         A.   Yes.

12         Q.   Isn't it a fact that on October 28, 2020, the

13    D/B Thor did not have the dog set on the starboard bow

14    winch that was utilized and secured to the number 9

15    bitt at Martin's dock?

16         A.   The dog was set.

17         Q.   The dog was set --

18         A.   Yes.

19         Q.   -- and it still paid out?

20         A.   Yes.

21         Q.   How can you have a dog that is utilized -- is

22    to be utilized in certain weather conditions if the

23    brake starts slipping due to heavy wind and seas?

24         A.   Somehow or another, the dog had disengaged.

25         Q.   All right.  So who set the dog?

Page 428

**EXHIBIT A**

1          A.    I don't recall.

2          Q.    Tell -- if the jury ever hears any of this,

3     what does the dog do?

4          A.    It sets inside a notch on an anchor drum to

5     keep the drum from backing off.

6          Q.    The drum has a gear on it, correct?

7          A.    Correct.

8          Q.    And the dog has a notch or teeth on it that

9     sets down on that gear and locks in, right?

10         A.    That's correct.

11         Q.    So if I understand you correctly, on the day

12    of this hurricane, the brakes failed.  Would that be

13    hydraulic failure?

14         A.    No.  The brake didn't fail.  It just -- I

15    mean, I done broke ten wires and an anchor wire.

16    There's no way one wire is going to hold that barge.

17    So it drug that cable through the brake.  It's not

18    failure; it just wasn't strong enough to hold that

19    barge in that weather.

20         Q.    That's what it's designed to do, correct, hold

21    the barge?

22               MR. GUILLOT:  Object to form.

23         A.    Not one -- like I said, if ten mooring lines

24    and -- and a broke anchor cable ain't going to hold me,

25    one is not going to hold.

                                              Page 429

**EXHIBIT A**

1          Coastal 101.
2                    What is this wire all the way to the left side
3          of the picture that appears to be parted?
4              A.    That is what was pulled up off the front of
5          the barge after we got back to the dock.
6              Q.    All right.
7                    MR. MCMAHON:  I'm going to mark this as
8                    the next exhibit.  Somebody help me out here,
9                    please.
10                   MS. BLANQUE:  Twenty-six?
11                   UNIDENTIFIED SPEAKER:  The last one I
12                   had was 23.
13                   MS. BLANQUE:  I thought he had the wire
14                   log as 24.
15                   MR. CERISE:  Twenty-six.
16                   MR. MCMAHON:  Twenty-six?  Thank you.
17          (Exhibit No. 26 was marked for identification.)
18      BY MR. MCMAHON:
19              Q.    All right.  When Mr. Adam Lewis was asking you
20          questions, you were critical of Martin's mooring bitts.
21          But as I understand your testimony, although you're
22          trained to do root cause analyses according to your
23          personnel file, you did not in fact do one, correct?
24                   MR. GUILLOT:  Object to form.
25              A.    Repeat the question, please.

                                                        Page 431

**EXHIBIT A**

1    thought process you had as you devised this mooring

2    plan for this hurricane.  I want you to finish that

3    process you started to tell me.

4         A.   I -- I've -- I've done said this.  I've --

5    I've tied this barge up for over ten years.  I've used

6    this -- I've used this mooring plan.  I've been through

7    some really bad storms and never had no issues.

8         Q.   But now, every dock is a little bit different,

9    right?

10         A.   Correct.

11         Q.   You didn't have the same bollard layout in

12    past experiences you've had tying up the Thor for a

13    storm, have you?

14         A.   Have I what?

15         Q.   You haven't had the same layout of bollards on

16    the dock in past experiences, have you?

17         A.   Probably not exact but similar.

18         Q.   So you used the same mooring plan every time?

19         A.   Yes.

20         Q.   Okay.  What are the components of that mooring

21    plan?

22              MR. GUILLOT:  Form.

23         A.   Two anchor cables and ten mooring lines.

24    BY MR. RUFTY:

25         Q.   How many storms have you used that system for?

                                              Page 497

**EXHIBIT A**

```
1              A.   I don't know.
2              Q.   No idea?
3                   MR. GUILLOT:  He's already answered
4              that.
5                   MR. MCMAHON:  That one has not been
6              answered.
7                   MR. GUILLOT:  What?
8                   MR. MCMAHON:  That one has not been
9              answered.
10    BY MR. MCMAHON:
11         Q.   Where are the lines on number 6, on the bitt
12    that broke?
13                   MR. GUILLOT:  Can you clarify that
14              question?
15                   MR. MCMAHON:  Yes.
16                   MR. GUILLOT:  Like where today?
17    BY MR. MCMAHON:
18         Q.   After the storm, where did the line on the
19    bitt break -- the bitt that broke ended up, if you
20    know?
21         A.   The bitt that broke, where did the mooring
22    line end up?
23         Q.   Yes.
24                   MR. GUILLOT:  Do you know?
25                   THE WITNESS:  No, I don't know.
```

Page 548

**EXHIBIT A**

```
 1                    REPORTER'S CERTIFICATE
 2        I, YOLANDA J. PENA, Certified Court Reporter in
       and for the State of Louisiana, Registered
 3     Professional Reporter, and as the officer before whom
       this testimony was taken, do hereby certify that TERRY
 4     JOE DOUGLAS, after having been duly sworn by me upon
       authority of R.S. 37:2554, did testify as set forth in
 5     the foregoing 593 pages.
          I further certify that said testimony was reported
 6     by me in the Stenotype reporting method, was prepared
       and transcribed by me or under my direction and
 7     supervision, and is a true and correct transcript to
       the best of my ability and understanding.
 8        I further certify that the transcript has been
       prepared in compliance with transcript format
 9     guidelines required by statute or by rules of the
       board and that I have been informed about the complete
10     arrangement, financial or otherwise, with the person
       or entity making arrangements for deposition services.
11        I further certify that I have acted in compliance
       with the prohibition on contractual relationships, as
12     defined by Louisiana Code of Civil Procedure Article
       1434, and in rules and advisory opinions of the board.
13        I further certify that I am not an attorney or
       counsel for any of the parties, that I am neither
14     related to nor employed by any attorney or counsel
       connected with this action, and that I have no
15     financial interest in the outcome of this matter.
          This certificate is valid only for this
16     transcript, accompanied by my original signature and
       original raised seal on this page.
17
          Prairieville, Louisiana, this 21st day of March,
18     2023.
19
20
21
22            _____
              YOLANDA J. PENA, CCR, RPR
23            CCR NO. 2017002, RPR NO. 907346
24
25

                                          Page 594
```

**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**