UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST, LLC<br><br>VERSUS<br><br>SHORE OFFSHORE SERVICES, LLC | CIVIL ACTION NO.: 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075<br><br>SECTION: A (3)<br><br>JUDGE JAY C. ZAINEY<br><br>MAG. JUDGE DOSSIER<br><br>ADMIRALTY - Rule 9(h)<br>Applies to: All Cases |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND ACT OF GOD DEFENSE**

**MAY IT PLEASE THE COURT:**

Limitation Petitioner, Crosby Tugs, LLC ("Crosby"), in accordance with Federal Rule of Civil Procedure 56, moves this Honorable Court for summary judgment on all claims filed against Crosby on the basis that there is no evidence to establish that the breakaway was proximately caused by negligence on the part of Crosby or by any unseaworthy condition in its towing vessel the M/V CROSBY ENDEAVOR ("ENDEAVOR"). Because the undisputed evidence also establishes that Crosby acted reasonably under the circumstances, it may properly invoke and succeed on its Act of God defense.[1]

**SUMMARY OF THE ARGUMENT**

This case arises out of the breakaway of the D/B THOR, a heavy lift construction support vessel, on October 28, 2020 in Port Fourchon as Hurricane Zeta passed through the area. At the

---

[1] *See, e.g.*, Crosby's Affirmative Defenses in R. Docs. 114-140.

time of the breakaway, the ENDEAVOR, an anchor handling tug operated by Crosby, was moored alongside the THOR for the purpose of towing it back to its offshore work site post-storm. Prior to Hurricane Zeta, Shore Offshore Services, LLC ("Shore") and Modern American Railroad Services, LLC ("MARS") (collectively "the THOR Interests"), the respective operator and owner of the THOR were responsible for safely and properly mooring the THOR to withstand hurricane force conditions. The THOR Interests moored the THOR to Dock No. 16 of Martin Energy Services, LLC ("Martin") on or around October 26, 2020. It is undisputed that no Crosby personnel participated in or were involved with the mooring of the THOR to the Martin dock.

On the afternoon of October 28, 2020, at approximately 4:00 p.m., as Hurricane Zeta moved through Bayou Lafourche, the THOR broke free of its moorings and allided with various vessels taking shelter from the storm in the port. The THOR Interests and other claimants have filed claims against Crosby on the basis that the ENDEAVOR was an "assist tug" for the THOR and that the ENDEAVOR should have somehow prevented THOR from breaking away from the Martin dock.

In the upcoming bench trial, this Court will determine fault and causation. Under well-established principles of general maritime law, the THOR Interests are presumed to be at fault for this breakaway. Regardless, even setting aside legal presumptions, the undisputed evidence establishes that Crosby ***did not breach any duty and did not cause the breakaway of the THOR***. The evidence establishes that THOR broke away from the dock because of improper mooring coupled with the sheer strength of Hurricane Zeta. When the mooring cables and lines attaching THOR to the Martin dock parted, THOR was set adrift. Crosby indisputably played no role in securing THOR to the Martin dock. The ENDEAVOR's mission was to "work as directed" by THOR and it was on standby throughout the day, awaiting instructions. Not until THOR was

breaking away did the first instruction come — an impossible charge to overcome the failed mooring lines and to push THOR back into the dock in churning seas and 100 m.p.h. winds. Because it is clear that Crosby could not have prevented the breakaway, Crosby breached no duty, was not negligent and did not cause the breakaway. *Accord Paragon Asset Co. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 99 F.4th 736, 743 (5th Cir. 2024) (affirming trial court's finding that assist tugs did not cause breakaway of drillship during a hurricane and that drillship owner was solely liable for improper mooring of its vessel); *see also Archer Daniels Midland v. M/T Am. Liberty*, 545 F. Supp. 3d 390, 410 (E.D. La. 2021) (exonerating assist tugs who obeyed all orders and were not guilty of negligence). Furthermore, even assuming Crosby owed some duty to attempt to assist the THOR or "hold" the THOR at the dock, no action of Crosby could have prevented the THOR from breaking away during Hurricane Zeta. As such, Crosby is likewise entitled to invoke the Act of God defense to liability.

In short, the fundamental cause or catalyst of the breakaway was the THOR Interests' failure to properly moor the THOR for anticipated hurricane strength conditions; because Crosby exercised reasonable care and did not cause or contribute to the breakaway of the THOR, it cannot be held liable and all claims filed by all claimants against Crosby should be dismissed with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    <u>The THOR and its Work in the Gulf</u>**

The D/B THOR is a 12,667 gross ton heavy lift construction support vessel that measures approximately 370 feet in length and 137 feet in breadth.[2] Solely for the Court's visual reference, below is a photograph of the THOR taken from its specification sheet:



The THOR is equipped with a derrick crane, deck crane, and utility crane. It also has eight mooring winches and eight 16,000-pound anchors.

In and around October 2020, the THOR was working in the Gulf of Mexico on a platform decommissioning project.[3] While performing this work, the THOR Interests contacted Dawn Services, LLC ("Dawn"), as a vessel broker, to procure a tug capable of assisting the THOR on the project and with anchor handling operations.[4] Shore had been working with its own anchor-

---

[2] R. Doc. 1, C.A. No. 21-464, at p. 2, ¶ 3.
[3] Exhibit 1, Deposition of Gibilterra, at pp. 84:4-15.
[4] R. Doc. 1, C.A. No. 21-258, at p. 3. *See also*, Exhibit 2, Corporate Deposition of Dawn Services, at pp. 195:6-197:9.

handling tug, the MARS TITAN, which was out of service for a period.[5] Shore asked Dawn for a comparable tug to replace it. Dawn initially provided Shore with two harbor tugs, the LA MADONNA and the LA ELITE.[6] When Shore expressed dissatisfaction with the capabilities of these tugs, Dawn contacted Crosby and provided the M/V CROSBY ENDEAVOR ("ENDEAVOR"), an anchor-handling tug similar to the MARS TITAN, but with greater power.[7] Shore had no complaints about the ENDEAVOR.[8]

The ENDEAVOR performed towing and anchor handling services as directed by the THOR from October 20, 2020 until 9:50 a.m. October 26, 2020.[9] Due to the development of Hurricane Zeta and impending weather, at or around 9:50 a.m. on October 26, 2020, the THOR directed the ENDEAVOR to tow THOR from the offshore work site to Port Fourchon for safe harbor.[10]

By approximately 10:00 p.m. on the night of October 26, 2020, the ENDEAVOR had towed THOR to Port Fourchon.[11] Once there, ENDEAVOR released THOR from its tow line, and the harbor tugs, LA MADONNA and LA ELITE, took over to push THOR to the Martin dock and to hold her in place as THOR personnel secured her to Martin Dock No. 16.[12] It is undisputed that only the crew aboard the THOR[13] moored the THOR to the Martin dock and that the THOR

---

[5] Exhibit 3, Deposition of Sims, at pp. 241:7-249:11.
[6] Exhibit 3, Deposition of Sims, at pp. 241:7-249:11.
[7] Compared to the tug (MARS TITAN) it was replacing, ENDEAVOR had superior horsepower (15,000), superior brake horsepower (7,200 v. 6,000) and superior bollard pull (102 vs. 77.5). *See* Exhibit 3, Deposition of Sims, at pp. 241:7-249:11.
[8] Exhibit 3, Deposition of Sims, at pp. 241:7-249:11.
[9] Exhibit 4, Deposition of Everett, at pp. 175:2-203:16, Exhibit 68, ENDEAVOR's Vessel Logs.
[10] Exhibit 4, Deposition of Everett, at pp. 203:2-16, Exhibit 68, ENDEAVOR's Vessel Logs.
[11] Exhibit 4, Deposition of Everett, at pp. 175:2-206:11.
[12] *Id*.
[13] Exhibit 5, Deposition of Douglas, at pp. 414:12-415:4.

determined its mooring arrangement to the dock.[14] No Crosby personnel were involved in any way with the mooring of the THOR to the Martin dock.[15] Indeed, since their view was blocked by the massive THOR, ENDEAVOR's crew could not even see the Martin dock or how THOR was secured to it.[16]

## II.    The October 28, 2020 Breakaway

After temporarily going to the nearby Crosby dock to grab groceries and supplies,[17] on the morning of October 28, 2020, the ENDEAVOR secured itself along the outboard side of THOR (opposite the dock) to wait out Hurricane Zeta.[18] ENDEAVOR was on standby, awaiting instructions. ENDEAVOR was "working as directed."[19] This meant that ENDEAVOR was to perform only the work activities that it was instructed to perform by THOR.[20] Shore planned to use ENDEAVOR to tow THOR back to the offshore work site once the hurricane had passed.[21] Under its contract with its customer, Fieldwood Energy, Shore was paid only for three days when adverse weather prevented operations[22] and those three days were used up before the hurricane struck. Shore was therefore incentivized to return THOR offshore as soon as possible and keeping the ENDEAVOR present on standby would facilitate this.

---

[14] Exhibit 5, Deposition of Douglas, at p. 378:7-16.
[15] Exhibit 4, Deposition of Everrett, at pp. 204:24 -208:1; at pp. 623:25-625:2. *See also* Exhibit 6, Deposition of Plaisance, at pp. 326:3-327:11.
[16] Exhibit 5, Deposition of Douglas, at pp. 464:3-14.
[17] Exhibit 4, Deposition of Everett, at pp. 211:2-215:25; Exhibit 5, Deposition of Douglas, at pp. 328:15-329:6.
[18] Exhibit 4, Deposition of Everett, at pp. 279:3-284:4.
[19] Exhibit 4, Deposition of Everett, at pp. 348:1-351:17.
[20] Exhibit 4, Deposition of Everett, at pp. 348:1-351:17.
[21] Exhibit 5, Deposition of Douglas, at p. 472:1-16.
[22] Exhibit 3, Deposition of Sims, at pp. 52:14-53:12.

On the afternoon of October 28, 2020, Hurricane Zeta made landfall and moved through Bayou Lafourche with sustained winds of approximately 115 miles per hour.[23] At approximately 4:00 p.m.,[24] the THOR's mooring lines failed and the THOR broke away from the Martin dock[25] with the ENDEAVOR tied to her outboard side.  When directed to do so, ENDEAVOR attempted push THOR back into the dock, but could not due to the strength of the storm coupled with the size of the THOR.[26] THOR was then blown up the bayou in the hurricane winds, alliding along the way with various vessels and other marine assets.

Crosby's tug ENDEAVOR was "working as directed" for the THOR.[27]  What this means, explains Joe Douglas (THOR's superintendent) is that "the customer dictates what they want you to do" and "you do what they tell you to do."[28]  Douglas confirmed that, in the events of this case, the ENDEAVOR was working as directed by the THOR.[29]  In other words, "the crew of the THOR was telling the CROSBY ENDEAVOR what to do and when to do it…."[30]

It is also undisputed that *prior* to the THOR's breakaway from the Martin dock, THOR never instructed the ENDEAVOR to push THOR into the Martin dock or to do anything else for that matter.[31] It is likewise undisputed that the Captain of the ENDEAVOR could not see the THOR's mooring lines as Hurricane Zeta passed through the area and for that reason, the

---

[23] This Court may take judicial notice of weather conditions and reports in accordance with Federal Rule of Evidence 201. *See* Exhibit 7, National Hurricane Center, Tropical Cyclone Report, Hurricane Zeta, AL282020.
[24] Exhibit 4, Deposition of Everrett, at pp. 22:15-29:19, Exhibit 60, Vessel Incident Report.
[25] Exhibit 5, Deposition of Douglas, at pp. 233:13-234:12.
[26] Exhibit 4, Deposition of Everett, at pp. 34:3-39:14.
[27] Exhibit 5, Deposition of Douglas, at pp 350:8-351:17.
[28] *Id*., at 350:8-15.
[29] *Id*., at 350:19-21.
[30] *Id*., at 351:13-17.
[31] Exhibit 4, Deposition of Everett, at pp. 610:12-621:25.

ENDEAVOR could not safely apply any force to the barge.[32] As ENDEAVOR's Capt. Everett has

testified:

> Q.    Without being able to see those mooring lines and know which ones
>       were experiencing the most tension and starting to break, for
>       example, was there any way for you to know which direction you
>       should move, in an effort to try and secure the barge to the dock?
>
> [Capt. Everett] No.
>
> Q.    You needed somebody on the THOR to give you that information,
>       didn't you?
>
> [Capt. Everett] Yes. I needed help with that.[33]
>
> *      *      *      *      *
>
> Q.    Did anybody on the THOR ever instruct you or any member of your
>       crew to assist them in holding the barge to the dock during the
>       storm?
>
> [Capt. Everett] No.
>
> Q.    If they had, would you have used your abilities, in an effort to try
>       and keep the barge on the dock?
>
> [Capt. Everett] Yes, if they – if I had been given the information as to what was
>       needed to assist, without making the situation worse, yes.[34]
>
> *      *      *      *      *
>
> Q.    You were waiting for instructions from the THOR?
>
> [Capt. Everett] Correct.
>
> Q.    Would you ever just come alongside a barge and just start pushing
>       on it?
>
> [Capt. Everett] No.

---

[32] Exhibit 4, Deposition of Everett, at pp. 34:3-39:14.
[33] Exhibit 4, Deposition of Everett, at p. 614:4-14.
[34] Exhibit 5, Deposition of Everett, at p. 615:24-616:10.

Q.          You'd want to know from the crew of that barge, where do you want me to push, how do you want me to push, how hard; is that right?

[Capt. Everett] Yes.

Q.          Are those important pieces of information that the captain of a tug would need before he would come alongside and actually push into a barge?

[Capt. Everett] Yes.

Q.          Did you ever receive that information from the crew of the THOR on October 28th, 2020?

[Capt. Everett] At the point that the barge broke away.

Q.          Before the barge broke away, did you ever receive that information –

[Capt. Everett] No.

Q.          -- from the crew of the THOR?

[Capt. Everett] No.[35]

This account from Captain Everett is confirmed in all material respects by THOR's own witnesses, who have testified that:

- No one from Shore ever communicated to Crosby before the hurricane arrived that the ENDEAVOR was expected to push THOR into the dock during the hurricane;[36]

- Having ENDEAVOR push THOR into the dock was not part of Shore's hurricane plan— if it had been, Crosby should have been told this in advance;[37]

- Even on the day of the hurricane, Shore had no expectation that ENDEAVOR would assist THOR in anyway as the hurricane came through;[38]

---

[35] Exhibit 4, Deposition of Everett, at p. 618:25-619:25.
[36] Exhibit 3, Deposition of Sims, at 472:8-14.
[37] *Id*., at 472:25-473:12
[38] Exhibit 1, Deposition of Gilberterra (Shore operations manager), at 424:6-25-425:1-3.

- ENDEAVOR's captain and crew could not see the mooring lines and cables connecting THOR to the Martin dock;[39]

- Shore wouldn't have expected ENDEAVOR to start pushing THOR into the dock without being instructed to do so by the THOR;[40] and

- It would have been *"reckless"* for ENDEAVOR to act without direction from THOR, as pushing blindly without knowing what effect this was having on the mooring lines might have actually caused a breakaway;[41]

- As the weather deteriorated, ENDEAVOR's Capt. Everett kept up a running dialogue on the radio with THOR's superintendent Douglas.  Capt. Everett repeatedly asked Douglas how things were going on the THOR, and Douglas replied each time that everything was going fine;[42] and

- Douglas didn't ask for assistance until THOR was already breaking away.[43]

It is thus undisputed that the THOR never requested any assistance from the ENDEAVOR until ***after*** the THOR had already broken away. And at that point, it was entirely too late for the ENDEAVOR to do anything to keep the THOR from free floating in Bayou Lafourche considering the size of the THOR, the size of the ENDEAVOR, and the hurricane conditions.

In support of its defenses, Crosby has retained several expert witnesses, including Capt. Marc Fazioli and Scott McClure. Capt. Fazioli is a licensed master and has been employed in the maritime industry for over 40 years. Scott McClure is a naval architect with over 30 years of experience.

Based upon Capt. Fazioli's training, education, knowledge, and experience, it is his opinion that the breakaway of the THOR was caused by the THOR Interests' failure to properly moor the

---

[39] Exhibit 3, Deposition of Sims, at 477:9-16.
[40] Exhibit 1, Deposition of Gilberterra, at 428:14-429:14.
[41] *Id*., at 428:14-429:14.
[42] Exhibit 5, Deposition of Douglas, at 465:13-466:7.
[43] *Id*., at 201:19-22 ("Yes. Once we started breaking away from the dock, I got on the radio and called the ENDEAVOR and told him we was breaking away from the dock, push me in.").

THOR in accordance with regulations and standards in the maritime industry and in accordance with safe practices customary to the industry.[44] Capt. Fazioli is further of the opinion that no decision, action or inaction of Crosby Tugs, LLC, the M/V CROSBY ENDEAVOR or its Master and other crewmembers, caused or contributed to the breakaway of the THOR from the Martin Energy Dock on October 28, 2020.[45]

Similarly, based upon Mr. McClure's training, education, knowledge, and experience, it is his opinion that the M/V CROSBY ENDEAVOR could not have prevented the D/B THOR from moving away from the Martin dock during the passage of Hurricane Zeta on October 28, 2020.[46] Mr. McClure has opined that the wind forces acting on the D/B THOR vastly exceeded the bollard pull capacity of the M/V CROSBY ENDEAVOR.[47]  As McClure confirms, there was simply nothing that ENDEAVOR could do to stop the breakaway.[48]

In sum, the undisputed evidence in this case establishes that Crosby acted reasonably under the circumstances and that neither the ENDEAVOR and her crew, nor Crosby were the ***legal cause*** of the breakaway of the THOR. For that reason, any and all claims against Crosby should be dismissed with prejudice.

## III.    <u>Procedural Background</u>

Following the breakaway, on February 8, 2021, All Coast, LLC ("All Coast") filed a Complaint against Shore Offshore Services, LLC ("Shore"), Modern American Railroad Services, LLC ("MARS"), and Martin Energy Services, LLC ("Martin") for various damages arising from

---

[44] Exhibit 9-B, Declaration of Capt. Fazioli, at pp. 2-3, ¶ 7, Expert Report.
[45] Exhibit 9, Declaration of Capt. Fazioli, at p. 3, ¶ 8.
[46] Exhibit 10, Declaration of McClure, at pp. 2-3, ¶ 8.
[47] Exhibit 10, Declaration of McClure, at p. 3, ¶ 9.
[48] Exhibit 10, Declaration of McClure, at p. 3, ¶ 10.

the breakaway.[49] Thereafter, on March 4, 2021, MARS and Shore, as owner and bareboat charterer/owner *pro hac vice*, respectively, of the THOR (collectively "the THOR Interests"), initiated a limitation action in this Court pursuant to the Limitation of Liability Act and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims ("THOR Limitation Action"). Various other previously filed suits were then consolidated into the THOR Limitation Action. On April 26, 2021, Crosby initiated its limitation action as the operator of the M/V CROSBY ENDEAVOR ("Crosby Limitation Action"). This Court then consolidated the Crosby Limitation action into the THOR Limitation Action.

Various parties and individuals have filed various claims into this matter against the THOR Interests and Crosby for alleged personal injuries, property damages, contribution, indemnity, etc. all arising from the breakaway.[50] The THOR Interests have settled with all personal injury claimants[51] and some property damage claimants.[52] Crosby has settled with two personal injury claimants[53] and some property damage claimants.[54] Nevertheless, claims still exist against Crosby for its alleged role in causing or contributing to the breakaway of the THOR.

The bench trial of this matter is currently set to begin on Tuesday, January 20, 2026 at 10:00 a.m.[55] Notwithstanding the foregoing, the undisputed evidence establishes that the THOR should be held solely at fault for the breakaway and its aftermath. No action or inaction of Crosby

---

[49] R. Doc. 1, C.A. No. 21-258.
[50] *See* R. Docs. 11, 12, 13, 14, 15,16, 17, 18, 21,22, 27, 28, 29, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41,42, 43, 44, 45, 46, 47, 48, 49, 50, 51,52, 53, 54, 55, 57, 58, 59, 60, 61, 63, 64, 67, 68, 69, 70, 72, 73, 75, 76, 77, 78, 79, 80, 81, 82.
[51] *See* R. Docs. 530 (dismissing claim of Terrynn Lyons), 567 (dismissing claim of Brian Cloyd), 568 (dismissing claim of Wallace McCray), 569 (dismissing claim of Lessle Williams), 570 (dismissing claim of Lewis Andrews), 571 (dismissing claim of Patrick Burnett), 581 (dismissing claim of Randy Rials), 582 (dismissing claim of Montrell Smith).
[52] *See* R. Docs. 703.
[53] R. Docs. 663.
[54] R. Docs. 707.
[55] R. Doc. 678, at p. 2.

caused or contributed to the breakaway. Rather, it is undisputed that the breakaway was ultimately caused by the THOR's faulty moorings and no action or inaction of Crosby or the ENDEAVOR could have caused or prevented the breakaway.

## LAW AND ARGUMENT

### I.    Rule 56 Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-399 (5th Cir. 2008). The Court must draw reasonable inferences in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2738 (2d ed. 1983)).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.* 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quotation marks removed). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict

in favor of the moving party." *Id*. at 1265. To the contrary, if the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Id*. at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *Id*.; *see also Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting *Celotex*, 477 U.S. at 322).

Furthermore, in bench trial cases, as is the case here, a district court "has greater discretion to grant summary judgment" as the court may "decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Johnson v. Diversicare Afton Oaks LLC*, 597 F.3d 673, 676 (5th Cir. 2010). As explained by the Fifth Circuit:

> [T]he court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved. Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably . . . even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.' A trial on the merits would reveal no additional data.

*Nunez v. Superior Oil Co*., 572 F.2d 1119, 1123-24 (5th Cir. 1978). Accordingly, the judge, as trier of fact, is "in a position to and ought to draw his inferences without resort to the expense of trial." *Id*.

## II.   <u>Maritime Law Presumption of Fault</u>

"Liability for collisions on the navigable waters is [often] governed by a series of presumptions and burden-shifting principles." *Illinois Constructors Corp. v. Logan Transp*., 715 F. Supp. 872, 879 (N.D. Ill. 1989). Here, Crosby contends that *The Louisiana* Rule applies and that the THOR Interests are presumptively at fault for the breakaway.

Pursuant to *The Louisiana* Rule, when a drifting vessel allides with a fixed vessel or structure, the moving vessel is presumptively at fault and ***bears the burden*** of exonerating herself. *The Louisiana*, 70 U.S. 164, 173 (1865). This Court has consistently applied *The Louisiana* Rule in cases such as this as well.  *See e.g. In re Mid-South Towing Co*., 418 F.3d 526 (5th Cir. 2005); *James v. River Parish Co., Inc*., 686 F.2d 1129 (5th Cir. 1982). A vessel "adrift on the river bears the burden of proof that it is nomadic without fault on [her] part." *James*, 686 F.2d at 1130.  "The presumption 'suffices to make a prima facie case of negligence against the moving vessel.'"  *Id*. at 1132 (quoting *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co*., 377 F.2d 724, 726 (5th Cir. 1967)). In *James*, this Court laid out a specific "rubric" for applying this rule:

> When a drifting vessel causes damage, an inference arises as a matter of law that the vessel was adrift through negligence.  Such an inference is called a presumption. The custodian of the drifting vessel bears the burden of disproving fault by a preponderance of the evidence.  In other words, he bears the risk of non-persuasion. This inference or presumption of negligence is a rule of law based on the logical deduction that a vessel found floating loose was improperly moored.

*Id*. at 1132-33. Accordingly, the presumption shifts the burden onto the drifting vessel. *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 449 (5th Cir. 1987). That burden rests heavily upon the defendant who must disprove their fault by a preponderance of the evidence. *James*, 686 F.2d at 1132. The defendant can satisfy their burden by showing that the accident could not have been prevented by "human skill and precaution and a proper display of nautical skills."

*Id.* The defendant "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (quoting *Brown & Root*, 377 F.2d at 726).

As the owner and operator of a drifting vessel, the law presumes that the THOR Interests are at fault for this breakaway. Nevertheless, even setting aside this legal presumption of fault – which the THOR Interests cannot overcome – the undisputed evidence firmly establishes that Crosby did not cause the breakaway of the THOR and that Crosby did not breach any duty owed.

## III.   No action or inaction of Crosby was the legal cause of the breakaway.

Under general maritime law, a plaintiff must prove that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff sustained an injury. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010). Generally speaking, a vessel owner, like Crosby, has a "special duty to take all reasonable steps consistent with safety to [a] ship and her crew, to avoid or minimize the chance of harm to others." *Boudoin v. J. Ray McDermott & Co*., 281 F.2d 81, 85 (5th Cir. 1960). Specifically, with respect to "assist tugs," assist tugs have a duty to "promptly execute the orders of the tow's commander" or the person in charge of the vessel. *Bisso v. Waterways Transp. Co*., 235 F.2d 741, 746 (5th Cir. 1956). In other words, assist tugs have a duty to "to follow the orders of others rather than taking action on their own." *Archer Daniels Midland v. M/T Am. Liberty*, 545 F. Supp. 3d 390, 409 (E.D. La. 2021) (other internal citations omitted). "***Chaos would indeed prevail*** if a helper tug either did, or felt under compulsion to determine, what that tug from its limited point of view thought ought to be done." *Bisso*, 235 F.2d at 746 (citing *Moran Towing & Transportation Co. v. Empresa, Hondurena de Vapores*, 31 F.2d 963 (5th Cir. 1929)) (emphasis added). An assist tug may be exonerated from liability provided the tug

obeyed all orders and was not guilty of negligence, either in the manner of executing the orders or by participating in an obviously dangerous maneuver. *Archer Daniels Midland*, 545 F. Supp. 3d at 410 (citing *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 527 F. Supp. 824, 834 (E.D. La. 1981), aff'd, 699 F.2d 240 (5th Cir. 1983)).

Moreover, pursuant to general maritime law, a party's negligence is actionably only if it is a "legal cause" of the plaintiff's injuries. *Donaghey v. Ocean Drilling & Explor. Co*., 974 F.2d 646, 649 (5th Cir. 1992). Legal cause is something more than "but for" causation and the alleged negligence must be a "substantial factor" in the injury. *SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458, 477 (5th Cir. 2022). Substantial factor "means more than 'but for' the negligence, the harm would not have resulted, and more than merely negligible negligence.'" *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975). Furthermore, "legal cause" has been defined as "any cause which, in a natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred." *Evans v. McKinney Marine*, 1997 U.S. App. LEXIS 42425, at *4 (5th Cir. Sep. 10, 1997). When an accident results from two negligent acts, "one more remote and one an intervening cause, the presence of the intervening cause prevents a finding of liability on the one responsible for the more remote cause." *Id*. (quoting *Graham v. Amoco Oil Co*., 21 F.3d 643, 648 (5th Cir. 1994)) (other citations omitted).

While maritime law may employ the principle of comparative fault, the U.S. Fifth Circuit has consistently held that if a party's alleged negligence was not the legal cause of an injury, the party cannot be held liable:

> This does not mean that a somewhat blameworthy respondent must always be liable for his part of divided damages. Each case stands on its own. **Call it anything: a condition, a remote cause, a non-contributing fault**, the last clear chance; if, in

the circumstances of the particular case, the respondent's fault is slight in comparison with the libellant's or if there was a clear cleavage between respondent's fault and the collision, an admiralty court will evaluate the respective degrees of fault **and exonerate the respondent**. That is just about what we said in *The Suwanee*, *The Cherokee*. We reiterate it, here:

Whether this be called an application of the doctrine of last clear chance or the rule of causation, makes little difference. **Where, as here, an act is negligent, but is not the proximate cause of the injury it is merely a condition. As such it is not a basis of liability**. The damage to the Cherokee is attributable entirely to this gross fault on the part of her navigator.

*Cenac Towing Co. v. Richmond*, 265 F.2d 466, 471 (5th Cir. 1959) (internal quotations and citations omitted); *see also Manning v. M/V Sea Rd.*, 358 F.2d 615, 618-19 (5th Cir. 1965).

As set forth herein, Crosby contends that the undisputed evidence establishes that it acted reasonably under the circumstances and that any alleged action or inaction of Crosby was not the legal cause of the breakaway of the THOR. To the contrary, the sole and proximate cause of the breakaway of the THOR was its improper mooring. Any failure by Crosby to "hold" the THOR in during the storm was merely a "remote cause" that is entirely too attenuated from the proximate cause of the breakaway to hold Crosby liable. **Indeed, this Court has already noted itself that "the ENDEAVOR's effort had no effect given the looming size of the THOR and the hurricane conditions**."[56]

In that regard, this case can be analogized to *Paragon Asset Co. v. American Steamship Owners Mutual Protection & Indemnity Association*, 99 F.4th 736 (5th Cir. 2024). In *Paragon*, a drillship broke away from a dock in Port Aransas, Texas during and after Hurricane Harvey. Prior to the hurricane, the owners of the drillship moored the vessel to the dock. The owners also hired Signet Maritime Corporation ("Signet") to provide two harbor tugs specifically hired to assist with

---

[56] R.Doc. 722, at p. 3.

keeping the drillship at the dock during the storm by applying power to the drillship. *Id.*, at 739. At the height of the hurricane, the drillship broke free of its moorings, alliding with both Signet tugs and sinking one. The drillship then ran aground in the Corpus Christi ship channel. *Id.* Three days later, the drillship refloated and allided with a nearby pier owned by the University of Texas ("UT"). After a five-day bench trial, the district court found, *inter alia*, that Paragon alone was liable for the initial breakaway of the drillship during the hurricane. *Id.* at 740. The owner of the drillship appealed.

At the district court level, the evidence at trial established that the drillship broke away at approximately 10:45 p.m. on the night of August 25 with sustained winds of 92 m.p.h. and gusts of 115 m.p.h.[57] According to the captains of the assist tugs, both tugs were running their engines and applying force to the drillship at the highest capacity they could without overheating the vessels.[58] Despite these efforts, the drill ship broke away due to the many deficiencies in its mooring system. At the bench trial, considering the evidence and testimony, the district court ultimately held that the breakaway of the drillship was caused by hurricane strength winds exceeding the mooring system's capacity. In addition, the district court noted, "[a]t the time of the breakaway, the wind speed coupled with its direction (perpendicular to the port side) overwhelmed the mooring system, even with the Signet tugs attempting to push the [drillship] toward the dock."[59]

At trial, the owner of the drillship contended that the drill ship broke away because Signet failed to fulfill their contractual obligations with respect to the drillship. In response, Signet

---

[57] *Paragon Asset Co. v. Gulf Copper & Mfg. Corp.*, 622 F. Supp. 3d 360, 390 (S.D. Tex. 2022).
[58] *Id.* at 389.
[59] *Id.* at 391-92.

countered that the drillship owner failed to utilize an adequate mooring system to keep the vessel at the dock during the storm. In evaluating the parties' competing claims, the district court made particular note of the duties of the drillship owner. Specifically, the district court explained:

> One of a shipmaster's primary responsibilities is to restrain a docked vessel adequately, so that the vessel does not break away from the dock and impact nearby property. Vessel owners can use a variety of restraining devices to fulfill this duty. The shipmaster does not have to create a perfect system but must install a reasonable system considering the risks of a breakaway at that location. Fulfilling that duty requires that a vessel owner possess an adequate understanding of the installed system. Absent an accurate understanding of the mooring system actually in place, a vessel owner has no basis on which to conclude whether its mooring system can withstand an incoming storm. In essence, *a shipmaster without an accurate understanding of its own mooring system leaves the results to chance*. In the current matter, Paragon took this chance, and in doing so, fell short of fulfilling its duties under maritime law.[60]

Moreover, with respect to Signet, the district court noted that the evidence at trial demonstrated that Signet's captains operated their tug boats reasonably under the circumstances and did not contribute to the drillship breaking away from the dock.[61] Accordingly, the district court found Paragon solely liable for the initial breakaway as no action of Signet caused or contributed to the drillship's breakaway from the dock. The U.S. Fifth Circuit affirmed this decision on appeal. *Paragon*, 99 F.4th at 742-744.

Just as in *Paragon*, the evidence in this case demonstrates that the THOR Interests improperly moored the THOR to the Martin dock and that they did not even have an adequate understanding of the mooring system in place for the THOR. Indeed, as testified to by Joe Douglas, the barge superintendent of the THOR, no shoreside management of the THOR inspected the mooring configuration on the THOR before Hurricane Zeta nor did they even confirm what

---

[60] *Paragon Asset Co. v. Gulf Copper & Mfg. Corp*., 622 F. Supp. 3d 360, 399 (S.D. Tex. 2022) (other internal citations omitted)
[61] *Id.*, at 403.

mooring arrangement the barge utilized.[62]  Such actions fall woefully short of a ship owner's responsibilities under maritime law.

On the contrary, Crosby played no role in mooring THOR to the Martin dock and received no instructions to assist THOR at the dock in any way until **after** THOR was already breaking away.  This is, again, undisputed.  As Cody Sims, Shore's manager over the project at issue, has testified, ENDEAVOR was "working as directed" and was "standing by awaiting instructions" from THOR throughout the day until the breakaway began, when Douglas finally requested assistance.[63]  Under these undisputed facts, Crosby did not breach any duty and any alleged breach did not cause the breakaway of the THOR. Furthermore, even if ENDEAVOR is considered to have been serving as an "assist tug" during the hurricane (despite never being asked to serve this role), ENDEAVOR was still "working as directed" and was still reliant on instructions to act from the THOR. That instruction did not come until it was too late and the ENDEAVOR complied with that order, but nothing could be done.

In sum, Crosby avers that the undisputed evidence in this case establishes that Crosby did not breach any duty owed under the applicable and controlling law and the legal cause of the breakaway was the THOR Interests' failure to adequately and properly moor the barge to the Martin dock. Any alleged fault on the part of Crosby did not cause or contribute to the breakaway

---

[62] Exhibit 6, Deposition of Douglas, at pp. 372:21-376:10.

[63]  In the deposition, Sims testified as follows:

> Q: Once the ENDEAVOR was back on the day of the hurricane and was moored up again alongside the THOR, from that time until Joe Douglas requested assistance as the breakaway was occurring, up until that moment, the ***ENDEAVOR was standing by awaiting instructions, working as directed***, correct?"

> A: "Yeah. From what I understand, correct."  *See* Exhibit 3, Sims Dep., at 478:20-479:8.

and any arguments to the contrary amount to nothing more than rank speculation. Accordingly, summary judgment is warranted and all claims against Crosby should be dismissed as no action of Crosby was a *legal cause* of the breakaway incident.

## IV.    Crosby is entitled to the Act of God defense.

Furthermore, even assuming some action or inaction on the part of Crosby was a legal cause of the breakaway, Crosby may invoke the Act of God defense as a complete defense to any liability.

A defendant may raise the defense of "Act of God" or *vis major* when faced with such rebuttable presumptions. "[A]n act of God is defined as any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected, could have been prevented." *Brown v. Sandals Resorts International*, 284 F.3d 949, 954 (8th Cir. 2002) (relying on South Dakota law). *See also Union Pac. R.R., Co. v. Heartland Barge Mgmt., L.L.C.*, No. 02-0438, 2006 U.S. Dist. LEXIS 75797, at *38 (S.D. Tex. Oct. 3, 2006). One invoking Act of God as a defense must prove not only that the weather was heavy but also that "the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills.'" *James v. River Pars. Co.*, 686 F.2d 1129, 1132 (5th Cir. 1982) (quoting *In re United States*, 425 F.2d 991, 995 (5th Cir. 1970)). "[A]n act of God is defined as any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected, could have been prevented." *Brown v. Sandals Resorts International*, 284 F.3d 949, 954 (8th Cir. 2002) (relying on South Dakota law). *See also Union Pac. R.R., Co. v. Heartland Barge Mgmt., L.L.C.*, No. 02-0438, 2006 U.S. Dist. LEXIS 75797, at *38 (S.D. Tex. Oct. 3, 2006).

The U.S. Fifth Circuit and this Court have repeatedly held that hurricanes of Zeta's strength qualify as Acts of God. *See, e.g., Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 82 (5th Cir. 1960) (concerning Category 3 Hurricane Audrey, which made landfall with "[w]inds of over 100 mph, driving rain and a storm tide of over 10 feet above mean sea level"); *In re United States*, 425 F.2d at 993-94, 996 (describing Category 3 Hurricane Betsy's 120-150 mph winds as "vengefully furious" and "of unprecedented force"); *Pioneer Nat. Res. USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 690 (E.D. La. 2009) (describing Category 3 Hurricane Ivan as "a classic 'Act of God'"); *Valley Line Co. v. Musgrove Towing Serv., Inc.*, 654 F. Supp. 1009, 1012 (S.D. Tex. 1987 (involving Category 3 Hurricane Alicia).

Accordingly, the issue becomes whether Crosby took reasonable precautions and exercised a proper display of nautical skills in responding to the breakaway of the THOR. As testified to by Capt. Everett, the ENDEAVOR could do absolutely nothing to stop the THOR once its lines had parted and the barge broke away from the dock, due to the enormous size of the THOR coupled with the hurricane conditions. This is further buttressed by the expert opinion of Mr. McClure who also agrees that the ENDEAVOR could do nothing to stop the breakaway once it occurred. Considering the foregoing, because the undisputed evidence firmly establishes that Crosby was powerless to prevent the breakaway of the THOR (and as already noted by this Court),[64] summary judgment on Crosby's Act of God defense is also warranted and proper.

---

[64] R.Doc. 722, at p. 3.

## CONCLUSION

For the reasons noted herein, Crosby is entitled to summary judgment on all claims filed against Crosby in this limitation action. Under applicable and controlling law, Crosby did not breach any duty owed. Moreover, it is undisputed that any action or inaction of Crosby was not the legal cause of the breakaway. Any alleged fault or negligence of Crosby was clearly remote and too attenuated to hold Crosby liable for the breakaway of the THOR. Furthermore, the undisputed evidence clearly establishes that Crosby exercised reasonable precaution and that the ENDEAVOR was powerless to prevent the breakaway in light of the sheer strength of Hurricane Zeta. As such, Crosby is also entitled to the Act of God defense. Considering these undisputed facts, summary judgment is warranted and Crosby respectfully requests that the Court grant its Motion.

Respectfully submitted,

*/s/ Jefferson R. Tillery*

JEFFERSON R. TILLERY (La. Bar No. 17831)
ALFRED J. RUFTY, III (La. Bar No. 19990)
VALERIE E. FONTENOT (La. Bar. No. 35129)
SARA B. KUEBEL (La. Bar No. 38305)
JONES WALKER, LLP
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:    (504) 582-8616
Facsimile:    (504) 589-8616
E-Mail:        jtillery@joneswalker.com
                arufty@joneswalker.com
                vfontenot@joneswalker.com
                skuebel@joneswalker.com

**Attorneys for Limitation Petitioner, Crosby Tugs, LLC**