Transcript of the Testimony of

# CODY D. SIMS

November 8, 2023

ALL COAST, LLC v. SHORE OFFSHORE SERVICES, LLC, ET ALL




P.O. Box 1554 • Hammond • Louisiana 70404
**(Toll Free) 866.870.7233 • 985.542.8685 • (Fax) 985.419.0799**
office@amersonwhite.com • www.amersonwhite.com

EXHIBIT
3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST LLC | CIVIL ACTION NO. 21-258 Lead Case, c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982 and 21-2075 |
| VERSUS | |
| SHORE OFFSHORE SERVICES, LLC; MODERN AMERICAN RAILROAD SERVICES, LLC; AND MARTIN ENERGY SERVICE LLC | JUDGE JAY C. ZAINEY |
| | MAGISTRATE JUDGE KAREN WELLS ROBY |
| | APPLIES TO ALL CASES |

VIDEOTAPED AND VIDEOCONFERENCE DEPOSITION OF CODY D. SIMS, 32503 Tamina Road, Building B-1, Magnolia, Texas 77354, taken at PUSATERI, JOHNSON, GUILLOT & GREENBAUM, 1100 POYDRAS STREET, SUITE 2250, NEW ORLEANS, LOUISIANA 70163, in the above-entitled cause on the 8th of November, 2023, commencing at 9:35 a.m.

REPORTED BY: CHÉRIE E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER



APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFF, DARREN WALKER:

ARNOLD & ITKIN, LLC
6009 Memorial Drive
Houston, Texas 77007
Phone: 713.222.3800

(BY: John Grinnan, Esquire)
Email: jgrinnan@arnolditkin.com
(Via Zoom)

ATTORNEYS REPRESENTING PLAINTIFFS, MONTRELL SMITH AND RANDY RIALS:

SPAGNOLETTI LAW FIRM
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Phone: 713.653.5630

(BY: Charles Mills, Esquire)
Email: cmills@spaglaw.com
(Via Zoom)



APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, HARVEY SEAS LLC AND HARVEY GULF INTERNATIONAL MARINE, LLC (COLLECTIVELY "HARVEY GULF"):

ADAMS AND REESE LLP
Hancock Whitney Center
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Phone: 504.585.0192
(BY: Charlie Cerise, Esquire)
E-mail: charlie.cerise@arlaw.com
(BY: Johnny L. Domiano, Esquire)
Email: johnny.domiano@arlaw.com

ATTORNEYS REPRESENTING THE DEFENDANT, WEEKS MARINE:

FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 2405
New Orleans, Louisiana 70170
Phone: 504.569.0075 |Fax: 504.592.0251
(BY: Laurent J. Demosthenidy, Esquire)
E-mail: ljd@flanaganpartners.com

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, MODERN AMERICAN RAILROAD SERVICES AND SHORE OFFSHORE SERVICES, LLC:

PUSATERI, JOHNSTON, GUILLOT & GREENBAUM
1100 Poydras Street, Suite 2250
New Orleans, Louisiana 70163
Phone: 504.620.2504 |Fax: 504.620.2510
(BY: Gavin Guillot, Esquire)
E-mail: Gavin.guillot@pjgglaw.com
(BY: Meredith Blanque, Esquire)
Email: meredith.blanque@pjgglaw.com

ATTORNEYS REPRESENTING THE DEFENDANT, DAWN SERVICES, L.L.C.:

LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Phone: 504.556.4042 |Fax: 504.556.4108
(BY: David Reisman, Esquire)
Email: dreisman@liskow.com

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, ALL COAST LLC AND GULF COAST MARINE, LLC:

THE MOELLER FIRM
650 Poydras Street, Suite 2516
New Orleans, Louisiana 70130
Phone: 504.313.1328 |Fax: 504.702.6783
(BY: David Smith, Esquire)
Email: David@moellerfirm.com
(BY: Kassie Richbourg, Esquire)
Email: kassie@moellerfirm.com
(Via Zoom)

ATTORNEYS REPRESENTING THE DEFENDANT, CROSBY TUGS, LLC:

JONES WALKER
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170
Phone: 504.582.8547 |Fax: 504.589.8547
(BY: Alfred J. Rufty, III, Esquire)
E-mail: arufty@joneswalker.com
(Via Zoom)

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANT, MARTIN ENERGY SERVICES, LLC:

DAIGLE FISSE & KESSENICH
227 Louisiana Highway 21
Madisonville, Louisiana 70447
Phone: 985.792.8102 |Fax: 985.792.8209
(BY: Michael McMahon, Esquire)
Email: Mmcmahon@daiglefisse.com
(In-person)
(BY: Demi Dantin, Esquire)
Email: ddantin@daiglefisse.com
(Via Zoom)

ATTORNEYS REPRESENTING THE DEFENDANT, CHUBB:

CHAFFE McCALL LLP
1100 Poydras Street, Suite 2300
New Orleans, Louisiana 70163
Phone: 504.585.7056 |Fax: 504.544.6078
(BY: William M. Kelly, Esquire)
E-mail: william.kelly@chaffe.com
(Via Zoom)

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANT, COASTAL TOWING, LLC AND TALISMAN INSURANCE COMPANY:

GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
#3 Sanctuary Boulevard, Suite 301
Mandeville, Louisiana 70448
Phone: 985.674.6680 |Fax: 985.674.6681

(BY: Patrick Schepens, Esquire)
Email: pschepens@gallowayjohnson.com
(Via Zoom)

ATTORNEYS REPRESENTING THE DEFENDANT, GARBER BROTHERS, LLC:

ALLEN & GOOCH
2000 Kaliste Saloom Road, Suite 400
Lafayette, Louisiana 70508
Phone: 337.291.1290 |Fax: 337.291.1295

(BY: John H. Hughes, Esquire)
E-mail: jhughes@allengooch.com
(Via Zoom)

APPEARANCES CONTINUED

ATTORNEYS REPRESENTING TERRYNN TYRELL LYONS:

DEGRAVELLES & PALMINTIER
618 Main Street, #1910
Baton Rouge, Louisiana 70801
Phone: 225.254.7128

(BY: Benjamin Treuting, Esquire)
E-mail: btrueting@plgroupla.com
(Via Zoom)

ATTORNEYS REPRESENTING THE DEFENDANT,
C&G BOATS, INC. AND GULF LOGISTICS, LLC:

ALLEN & GOOCH
2000 Kaliste Saloom Road, Suite 400
Lafayette, Louisiana 70508
Phone: 337.291.1490 |Fax: 337.291.1485

(BY: Alan J. Meche, Esquire)
E-mail: ameche@allengooch.com
(Via Zoom)

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANT, GREATER LAFOURCHE PORT COMMISSION:

FRILOT, LLC
1100 Poydras Street, Suite
New Orleans, Louisiana 70163
Phone: 504.599.8221 |Fax: 504.599.8144

(BY: Blake C. Donewar, Esquire)
E-mail: bdonewar@frilot.com
(Via Zoom)

ALSO PRESENT:
Todd Meaux, Videographer, Depo-Vue

Would the court reporter please swear in the witness?

THE REPORTER:

Please raise your right hand.

CODY D. SIMS,

32503 TAMINA ROAD, BUILDING B-1, MAGNOLIA, TEXAS 77354, after having first been duly sworn by the above-mentioned court reporter, did testify as follows:

EXAMINATION BY MR. CERISE:

Q. Mr. Sims, good morning.

A. Morning.

Q. Would you state your full name for the record, please?

A. Cody Dwayne Sims.

Q. All right. Today, we are going to take your deposition, and I know you are familiar with the process because you sat through Mr. Gibilterra's deposition, right?

A. Yes, sir.

Q. And you sat through his deposition from beginning to the end, correct?

A. Yes, sir.

Q. If you need a break at any time, please tell me you need a break and we'll take

Q. Yes.
A. If I needed it, yes.
Q. You could find it on your computer?
A. Yes, sir.
Q. Did you know the essence of the terms of the contract without looking at it?
MR. GUILLOT:
Object to form.
THE WITNESS:
Particulars, certain particulars if it was brought up, I could say a yeah or nay.
BY MR. CERISE:
Q. Well, what about weather downtime, did you know the particulars of weather downtime without looking at the contract?
A. To an extent, yes, sir.
Q. And what were the particulars related to weather downtime?
A. That Fieldwood was paying for the weather downtime.
Q. Indefinitely?
A. For a certain duration.
Q. What was the duration?
A. I believe it was 72 hours once we



got to safe harbor.

Q. And was the payment at the regular barge rate?

A. I don't recall if there's a change in the rate.

MR. GUILLOT:

Object to form of the last question.

BY MR. CERISE:

Q. And after 72 hours, if the barge was still on weather downtime, then it was on Shore's nickel?

A. Yes, sir.

Q. And weather downtime started when it arrived in port you said, right?

A. I believe so, yes, sir.

Q. And when would it end?

A. Once we left port.

Q. It wouldn't end when you got back to the job site?

A. I don't remember if that one is set up that way or not. I'd have to look at it.

Q. Well, when you were looking for dock space in Fourchon, did you review the contract?

A. No, sir.

Q. So the contract played no part in

THE VIDEOGRAPHER:
We are going off the record at 2:11.
(A short recess was taken.)
THE VIDEOGRAPHER:
We are back on the record at 2:24.
BY MR. REISMAN:
Q. Mr. Sims, when we took the break, I was asking you about a replacement of the TITAN, so we will go back a little bit, make sure you're on the same page with me.
What we saw was a text message where you indicated that the MARS TITAN had broken down, was out of service and you needed a replacement tug for the D/B THOR, correct?
A. Correct.
Q. And that replacement tug that actually came out and worked with the D/B THOR after that in October of 2020 was the Crosby ENDEAVOR, correct?
A. I -- I think we have to look at the rest of the text message. The Crosby ENDEAVOR didn't come out right away.
Q. Did you look at the text message in the break?
A. Yes, I did.



Q. Okay. And what did you see?

A. That Dawn sent out a tug as a temporary tug during that time.

Q. Was that the LA MADONNA and the LA ELITE?

A. I believe that was the names, yes, sir.

Q. And -- and what did you say when -- when Mike Grace told you that those were the tugs that were going to be out there?

A. Well, I think in the text, off the top of my head, he said the tugs aren't suitable for running the anchors and he -- and I asked him why would he send us a tug that's not suitable to work with the THOR.

Q. So you were expressing concern about the tugs that had been selected?

A. Yeah. Because he told me it wasn't suitable to run anchors.

Q. And so when you expressed concern, what happened?

A. He said it's temporary.

Q. Okay. And then was another tug sent out there?

A. The ENDEAVOR was eventually sent out

there. I don't know the time lag between that text message and when it came out.

Q. And did you express any concerns about the ENDEAVOR?

A. No, because he said that this is a suitable tug and is capable of supporting the THOR.

Q. He told you that? Those are the words he used?

A. Along those lines, yes.

Q. Well, I'm not asking along the lines. I'd like to know what the words were that he used.

A. I mean, I can't tell you verbatim, but he said it was a suitable tug for the THOR.

Q. And what did you do, as the director of operations for Shore, to investigate the Crosby ENDEAVOR's specifications?

A. Nothing. I relied on Dawn to provide the tug.

Q. Okay. Did you get on the Crosby website and look up the specs on the -- on the Crosby ENDEAVOR?

MR. GUILLOT:

Objection. Asked and answered.

THE WITNESS:
Not that I recall.
BY MR. REISMAN:
Q. Have you ever done that?
A. Since the --
MR. GUILLOT:
Asked and answered.
THE WITNESS:
Since the incident, yes.
BY MR. REISMAN:
Q. Okay. And what did you find?
A. That it was a bigger tug than the TITAN is.
Q. It had more horsepower, correct?
A. Yes.
Q. It had more brake horsepower, correct?
A. It has more bollard pull. I don't know the -- if it has more brake horsepower. I just know the bollard pull was bigger than the TITAN.
Q. Okay. Did -- when you looked, did you see that the ENDEAVOR had 7,200 brake horsepower?
A. I don't recall what it was.

Q. Do you know what the TITAN's brake horsepower was?

A. I do not.

Q. If we looked at the spec sheets on both of those vessels, would that help you remember?

A. Yeah. If it's listed on there.

Q. Okay. Well, let's take a look. What I've put on your screen for you to look at is the spec sheet on the Crosby ENDEAVOR. Do you see that?

A. Yes, sir.

Q. Now you got a notice of that to be reminded of something. And how many horsepower is it listed as?

A. That says 15,000 horsepower.

Q. Okay. And then let's scroll down. If you have a notepaper over there, you might even jot these down so you'll remember when we look at the other one. Do you see BHP listed?

A. Yes, sir.

Q. How many BHP?

A. 7,200.

Q. And you know from your years in the entry that BHP means brake horsepower, correct?

A. Yes, sir.

Q. And, in fact, when you worked at Bisso Marine, you were responsible for a fleet of offshore tugs, weren't you?

A. No.

Q. Never?

A. No. They had vessel managers for that.

Q. What year did you start at Bisso Marine?

A. I think shortly after you. 2009 possibly.

Q. And did Bisso Marine own and operate its own anchor handling tugs when you worked at Bisso Marine?

A. At the pipeline barges, they did.

Q. Did you have any involvement with any of the Bisso Marine offshore anchor handling tugs?

A. Not that I recall it, no.

Q. You would defer to your -- your employment records on that, though, wouldn't you?

MR. GUILLOT:

Object to form.

THE WITNESS:

I don't think the employment records show --

BY MR. REISMAN:

Q. You don't think you sat in on meetings where the offshore anchor handling tugs were discussed?

A. Not that I recall.

Q. But you would defer to the -- to the meeting minutes of those, wouldn't you?

MR. GUILLOT:

Object to form.

THE WITNESS:

Yeah. You could look at the meeting minutes.

BY MR. REISMAN:

Q. And I want you to take a look here and you'll see bollard pull listed for the Crosby ENDEAVOR. What was the bollard pull?

A. It says 102.

Q. A hundred two straight tons, correct?

A. Short tons.

Q. Short tons. I'm sorry.

A. That's okay.

Q. So 102 short tons. How many -- how

many brake horsepower was it?

A. 7,200.

Q. And what was the horsepower?

A. It's a 15,000 HP class tug.

Q. All right. Now, let's take a look at the TITAN. You see the TITAN spec sheet in front of you now?

A. Not yet. There it goes. Okay.

Q. Does it show the bollard pull?

A. Yes, sir.

Q. What is it?

A. 77.5.

Q. Is that more or less than the ENDEAVOR?

A. That would be less than 102.

Q. And does it show the brake horsepower?

A. Yes, sir.

Q. How many?

A. 6,000.

Q. Is that more or less than the ENDEAVOR?

A. Less.

Q. Would you agree that the ENDEAVOR was a bigger and more powerful tug than the

TITAN?
A. Yes.
Q. And you would ask for something bigger to come out there and work with the THOR, didn't you?
A. I had asked for a comparable replacement tug to the TITAN.
Q. And would you agree that the Crosby ENDEAVOR is a comparable replacement tug for -- to the TITAN?
A. Yes.
Q. We saw earlier some e-mails that included your DPRs. You recall seeing those?
A. Yes, sir.
Q. The DPRs are what tell you what's going on on your offshore vessels on any given day, correct?
A. The narrative section does, yes.
Q. Was Dawn Services included on your DPRs; did they receive copies of your DPRs?
A. What do you mean "included"? Did they receive copies; is that what you're asking?
Q. Did they receive copies of your -- of your DPRs?
A. I don't believe so, no.

Q. Do you defer to that from this point?

A. What's that?

Q. You defer to -- to Mr. Douglas's testimony on this point to expect what he believed?

A. Yes, sir.

Q. No one from Shore ever communicated to Crosby before the hurricane arrived that the Crosby ENDEAVOR was expected to push THOR into the dock during the hurricane; isn't that true?

A. Before the hurricane arrived?

Q. Yes.

A. Not that I recall, no.

Q. If Shore had wanted for the Crosby ENDEAVOR to push THOR into the dock during the hurricane as part of its hurricane plan, that should have been communicated to Crosby in advance, right?

MR. GUILLOT:

Form.

THE WITNESS:

Ask that again. Sorry.

BY MR. RUFTY:

Q. Okay. To your knowledge, having the

ENDEAVOR push THOR into the dock was not part of Shore Offshore's hurricane plan, correct?

MR. GUILLOT:

Form.

THE WITNESS:

No. That's not part of the plan.

BY MR. RUFTY:

Q. Okay. And if it had been part of the plan, it would have been appropriate to tell Crosby about that before the hurricane arrived, right?

A. Yeah. I think -- yeah, I think they would have told them, but his expectations were that they would.

Q. So tell me what you think the Crosby ENDEAVOR did wrong.

A. Oh, geez.

MR. GUILLOT:

Alfred, I'm going to give the same objection that you gave at the corporate deposition of Crosby; and that is, that we reserve rights on providing expert reports per the court's scheduling order.

Subject to that, you can answer, Mr. Sims.

Q. The people on the Crosby ENDEAVOR could not see the mooring lines attaching THOR to the Martin dock, correct?

MR. GUILLOT:

Objection, foundation.

THE WITNESS:

From what I understand, no.

BY MR. RUFTY:

Q. So that's correct, the Crosby ENDEAVOR crew, to your understanding, could not see the mooring lines connecting the THOR to the Martin dock, correct?

MR. GUILLOT:

Asked and answered.

THE WITNESS:

Correct.

MR. GUILLOT:

Fifteen minutes.

BY MR. RUFTY:

Q. And, therefore, if the Crosby ENDEAVOR hadn't been pushing the THOR into the dock, the Crosby crew could not have seen what effect that was having on the mooring lines connecting THOR to the dock, correct?

MR. GUILLOT:

Objection. Calls for speculation.

THE WITNESS:

Yeah.

BY MR. RUFTY:

Q. Prior to the time Joe Douglas asked the Crosby ENDEAVOR to assist, the ENDEAVOR was standing by waiting for instructions working as directed, correct?

MR. GUILLOT:

Form.

THE WITNESS:

From the time period they are at the dock?

MR. RUFTY:

Yes.

THE WITNESS:

I think a part of that time period they had to go back to Crosby's dock.

BY MR. RUFTY:

Q. Okay. Once -- once the ENDEAVOR was back on the day of the hurricane and was moored up again alongside the THOR, from that time until Joe Douglas requested assistance as the breakaway was occurring, up until that moment, the ENDEAVOR was standing by awaiting instructions working as



directed, correct?

MR. GUILLOT:

Form.

MR. GRINNAN:

Form.

THE WITNESS:

Yeah. From what I understand, correct.

BY MR. RUFTY:

Q. Did you ever consult Melancon about the hurricane before it struck?

A. Prior to it striking you said?

Q. Yes.

A. Not that I recall, no.

Q. To your knowledge, did anyone else at Shore?

A. Not that I know of.

Q. The LA MADONNA and the LA ELITE are harbor tugs, correct?

A. I don't -- I don't think so. I think they are offshore tugs.

Q. Okay. And you've called them assist tugs; is that right?

A. At the time of coming into the dock, they are used as assist tugs.

