UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST, LLC | CIVIL ACTION NO. 2:21-CV-00258-JCZ-KWR (lead case) c/w 21-337, |
| VERSUS | 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982, 21-2075, 21-2227 |
| SHORE OFFSHORE SERVICES, LLC | SECTION "A" |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

TERRY JOE DOUGLAS,

TAKEN ON BEHALF OF CLAIMANTS, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *


REPORTED AT THE LAW OFFICES OF:

PUSATERI, JOHNSTON, GUILLOT & GREENBAUM, LLC

1100 POYDRAS STREET, SUITE 2250

NEW ORLEANS, LOUISIANA  70163


COMMENCING AT 10:00 A.M., ON MARCH 7, 2023.

EXHIBIT
5

```
 1                A P P E A R A N C E S

 2

 3   FOR THE CLAIMANTS:

 4        ARNOLD & ITKIN LLP
          (BY:  ADAM LEWIS, ESQ.)
 5        6009 MEMORIAL DRIVE
          HOUSTON, TEXAS  70802
 6        (713) 222-3800
          alewis@arnolditkin.com
 7

 8   FOR RANDY RIALS AND MONTRELL SMITH:

 9        SPAGNOLETTI LAW FIRM
          (BY:  MARC KUTNER, ESQ.)
10        401 LOUISIANA STREET, 8TH FLOOR
          HOUSTON, TEXAS  77002
11        (713) 804-9306
          mkutner@spaglaw.com
12

13   FOR DAWN SERVICES, LLC:

14        LISKOW & LEWIS, APLC
          (BY:  DAVID L. REISMAN, ESQ.)
15        701 POYDRAS STREET, SUITE 5000
          NEW ORLEANS, LOUISIANA  70139
16        (504) 581-7979
          dreisman@liskow.com
17

18   FOR HARVEY GULF INTERNATIONAL MARINE, LLC:

19        ADAMS & REESE, L.L.P.
          (BY:  CHARLES A. CERISE, JR., ESQ.)
20        (BY:  JOHNNY DOMIANO, JR., ESQ.)
          701 POYDRAS STREET, SUITE 4500
21        NEW ORLEANS, LOUISIANA  70139
          (504) 581-3234
22        charlie.cerise@arlaw.com
          johnny.domiano@arlaw.com
23

24

25
```

```
 1              A P P E A R A N C E S (Continued)

 2

 3   FOR CROSBY TUGS, LLC:

 4        JONES WALKER L.L.P.
          (BY:  SARA B. KUEBEL, ESQ.)
 5        (BY:  ALFRED J. RUFTY III, ESQ.)
            [VIA VIDEOCONFERENCE]
 6        210 ST. CHARLES AVENUE, 48TH FLOOR
          NEW ORLEANS, LOUISIANA  70170
 7        (504) 582-8547
          skuebel@joneswalker.com
 8        arufty@joneswalker.com

 9

10   FOR MARTIN ENERGY SERVICES, LLC:

11        DAIGLE FISSE & KESSENICH
          (BY:  MICHAEL W. MCMAHON, ESQ.)
12        227 HIGHWAY 21
          MADISONVILLE, LOUISIANA  70447
13        (985) 871-0800
          mmcmahon@daiglefisse.com

14

15   FOR TERRY LYONS:

16        PALMINTIER LAW GROUP
          (BY:  MICHAEL C. PALMINTIER, ESQ.)
17        618 MAIN STREET
          BATON ROUGE, LOUISIANA  70801
18        (225) 344-0522
          mcp@plgroupla.com

19

20   FOR OCEANEERING INTERNATIONAL, INC.:

21        MEYER ORLANDO LLC
          (BY:  CAMERON HATZEL, ESQ.)
22        13201 NORTHWEST FREEWAY, SUITE 119
          HOUSTON, TEXAS  77040
23        (713) 460-9800
          chatzel@meyerorlando.com

24

25
```

```
 1              A P P E A R A N C E S (Continued)

 2

 3   FOR CHUBB UNDERWRITING:

 4        CHAFFE MCCALL, L.L.P.
          (BY:  ALEX J. DEGIULIO, ESQ.)
 5         [VIA VIDEOCONFERENCE]
          1100 POYDRAS STREET, SUITE 2300
 6        NEW ORLEANS, LOUISIANA  70163
          (504) 585-7000
 7        alex.degiulio@chaffe.com

 8

 9   FOR MODERN AMERICAN RAILROAD SERVICES, L.L.C., AND
     SHORE OFFSHORE Services, LLC:

10        PUSATERI, JOHNSTON, GUILLOT & GREENBAUM, LLC
          (BY:  GAVIN GUILLOT, ESQ.)
11        (BY:  MEREDITH BLANQUE, ESQ.)
          (BY:  JACOB ALTMYER, ESQ.)
12         [VIA VIDEOCONFERENCE]
          (BY:  JONATHAN PARKER, ESQ.)
13         [VIA VIDEOCONFERENCE]
          1100 POYDRAS STREET, SUITE 2250
14        NEW ORLEANS, LOUISIANA  70163
          (504) 620-2500
15        gavin.guillot@pbgglaw.com
          meredith.blanque@pjgglaw.com
16        jacob.altmyer@pjgglaw.com
          jonathan.parker@pjgglaw.com

17

18   FOR C&G BOATS, INC., AND GULF LOGISTICS, LLC:

19        ALLEN & GOOCH, ALC
          (BY:  ALAN J. MECHE, ESQ.)
20         [VIA VIDEOCONFERENCE]
          2000 KALISTE SALOOM ROAD, SUITE 400
21        LAFAYETTE, LOUISIANA  70508
          (337) 291-1000
22        alanmeche@allengooch.com

23

24

25
```

```
 1                A P P E A R A N C E S (Continued)

 2

 3    FOR COASTAL TOWING, LLC:

 4        GALLOWAY JOHNSON TOMPKINS BURR & SMITH, APLC
          (BY:  TIMOTHY W. HASSINGER, ESQ.)
 5         [VIA VIDEOCONFERENCE]
          #3 SANCTUARY BOULEVARD, SUITE 301
 6        MANDEVILLE, LOUISIANA  70471
          (985) 674-6680
 7        thassinger@gallowaylawfirm.com

 8

 9    FOR WEEKS MARINE, LLC:

          FLANAGAN PARTNERS LLP
10        (BY:  LAURENT J. DEMOSTHENIDY, ESQ.)
           [VIA VIDEOCONFERENCE]
11        (BY:  SEAN P. BRADY, ESQ.)
           [VIA VIDEOCONFERENCE]
12        201 ST. CHARLES AVENUE, SUITE 3300
          NEW ORLEANS, LOUISIANA  70170
13        (504) 569-0235
          ljd@flanaganpartners.com
14        sbrady@flanaganpartners.com

15

16    FOR COMPLETE LOGISTICAL SERVICES:

          PHELPS DUNBAR LLP
17        (BY:  CLAIRE ZERINGUE, ESQ.)
           [VIA VIDEOCONFERENCE]
18        365 CANAL BOULEVARD, SUITE 2000
          NEW ORLEANS, LOUISIANA  70130
19        (504) 566-1311
          claire.zeringue@phelps.com

20

21    FOR ALL COAST, LLC, AND GULF COAST MARINE, LLC:

22        THE MOELLER FIRM
          (BY:  DAVID K. SMITH, ESQ.)
23         [VIA VIDEOCONFERENCE]
          650 POYDRAS STREET, SUITE 1207
24        NEW ORLEANS, LOUISIANA  70130
          (504) 308-1363
25        david@moellerfirm.com
```

```
 1              A P P E A R A N C E S (Continued)

 2

 3    FOR GARBER BROS., LLC:

 4         ALLEN & GOOCH, ALC
           (BY:  JOHN H. HUGHES, ESQ.)
 5          [VIA VIDEOCONFERENCE]
           2000 KALISTE SALOOM ROAD, SUITE 400
 6         LAFAYETTE, LOUISIANA  70508
           (337) 291-1000
 7         johnhughes@allengooch.com

 8

 9    FOR C&G WELDING, INC.:

           REICH, ALBUM & PLUNKETT, L.L.C
10         (BY:  J. CALVIN BOX, ESQ.)
            [VIA VIDEOCONFERENCE]
11         1206 PARK DRIVE, SUITE 200
           MANDEVILLE, LOUISIANA  70471
12         (504) 830-3999
           cbox@rapllclaw.com

13

14    FOR GREATER LAFOURCHE PORT COMMISSION:

15         FRILOT L.L.C.
           (BY:  BLAKE C. DONEWAR, ESQ.)
16          [VIA VIDEOCONFERENCE]
           (BY:  KATHLEEN P. RICE, ESQ.)
17          [VIA VIDEOCONFERENCE]
           1100 POYDRAS STREET, SUITE 3700
18         NEW ORLEANS, LOUISIANA  70163
           (504) 599-8000
19         bdonewar@frilot.com
           kpontier@frilot.com

20

21    FOR PREMIER OFFSHORE CATERING, INC.:

22         CHAFFE MCCALL, L.L.P.
           (BY:  JOHN M. RIBARITS, ESQ.)
23         801 TRAVIS STREET, SUITE 1910
           HOUSTON, TEXAS  77002
24         (713) 546-9800
           john.ribarits@chaffe.com

25
```

1              A P P E A R A N C E S (Continued)

2

3    ALSO PRESENT:

4        JOSEPH PENA, VIDEOGRAPHER

5

6    REPORTED BY:

7        YOLANDA J. PENA
         CCR NO. 2017002, RPR
8        STATE OF LOUISIANA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2
                                                      PAGE
3
LIST OF EXHIBITS......................................9
4
STIPULATION..........................................12
5
EXAMINATION BY:
6
        MR. LEWIS.........................13, 508, 588
7
        MR. PALMINTIER.............................276
8
        MR. KUTNER................................287
9
        MR. CERISE...............................294
10
        MR. REISMAN.........................342, 523
11
        MR. MCMAHON.........................410, 540
12
        MR. SMITH................................436
13
        MR. BOX..................................439
14
        MR. DEMOSTHENIDY.........................439
15
        MR. HUGHES...............................447
16
        MR. MECHE................................451
17
        MR. RUFTY................................455
18
        MR. DONEWAR..............................549
19
        MR. GUILLOT..............................552
20
CERTIFICATE.........................................594
21

22

23

24

25

1                              LIST OF EXHIBITS

2

3    Exhibit No. 1........................................45
          (THOR 0005320, Shore Offshore,
4          HSE manual, Mission Statement)

5    Exhibit No. 2........................................49
          (THOR 0005362, Shore Offshore,
6          HSE manual, TQM Policy
           Statement)
7
     Exhibit No. 3........................................54
8          (THOR 0005325, Shore Offshore,
           HSE Manual, Responsibilities)
9
     Exhibit No. 4........................................68
10         (THOR 0005353, Shore Offshore,
           HSE manual, Safety Meetings)
11
     Exhibit No. 5........................................77
12         (THOR 0005363, Shore Offshore,
           HSE manual, Training
13         Requirements)

14   Exhibit No. 6........................................89
           (THOR 0006342, Email chain,
15         Top email from Mr. Mauricio,
           10/6/20, Subject: Re: Marine
16         Forecast)

17   Exhibit No. 7........................................97
           (THOR 0000472, WeatherOps
18         Atlantic Tropical Planner)

19   Exhibit No. 8.......................................102
           (THOR 0003478, EMail chain,
20         Top email from Mr. Grace,
           10/26/20, Subject: RE:
21         On/Off Hire Agreement)

22   Exhibit No. 9.......................................111
           (THOR 0001553, Platform
23         Removal Contract)

24

25

1          LIST OF EXHIBITS (Continued)

2

3     Exhibit No. 10....................................122
         (THOR 0001036, Shore Offshore,
4         Daily Progress Report,
          10/26/20)

5

      Exhibit No. 11....................................160
6         (COASTAL SAFETY 00080, Shore
          Offshore, HSE manual, Hurricane
7         & Tornado Preparedness)

8     Exhibit No. 12....................................207
         (COASTAL 000028, Photographs,
9         Derrick barge "Thor" & Mooring
          Bitts at Martin Energy Dock)

10
      Exhibit No. 13....................................223
11        (THOR 0001092, Report of Marine
          Casualty, Commercial Diving
12        Casualty, or OCS-Related
          Casualty)

13
      Exhibit No. 14....................................251
14        (THOR 0001240, Shore Offshore,
          Daily Progress Report,
15        10/28/20)

16    Exhibit No. 15....................................269
         (THOR 0005307, Shore Offshore,
17        HSE Manual, Incident
          Investigating & Reporting)

18
      Exhibit No. 16....................................312
19        (THOR 0001083, Photographs)

20    Exhibit No. 17....................................320
         (THOR 0001208, Handwritten
21        rough logs)

22    Exhibit No. 18....................................336
         (THOR 0004955, D/B Thor Water
23        Ballast Chart)

24

25

```
 1                 LIST OF EXHIBITS (Continued)

 2
```

```
 3    Exhibit No. 19.....................................371
          (THOR 0001392, Mitsubishi
 4         Heavy Industries, Ltd.,
           Hiroshima Machinery Works)
 5
      Exhibit No. 20.....................................398
 6         (WM001118, U.S. Coast Guard
           Witness/Investigator Statement
 7         Form)

 8    Exhibit No. 21.....................................411
          (THOR 0001323, Safety
 9         Meeting Roster)

10    Exhibit No. 22.....................................413
          (THOR 0001276, Shore Offshore,
11         JSA Hazard
           Checklist/Worksheet)
12
      Exhibit No. 23.....................................417
13         (THOR 0001390, Schematic)

14    Exhibit No. 24.....................................419
          (THOR 0001425, Handwritten
15         logbook)

16    Exhibit No. 25
          (NOT INTRODUCED)
17
      Exhibit No. 26.....................................431
18         (THOR 0001381, DB Kallop
           Anchor Winches Overview)
19
      Exhibit No. 27.....................................435
20         (MP4 video file,
           RAF Incident 002)
21
      Exhibit No. 28.....................................542
22         (THOR 0001085, Photograph
           with labeling)
23

24

25
```

```
 1                  S T I P U L A T I O N

 2

 3            IT IS STIPULATED AND AGREED by and among the

 4     parties that this deposition is hereby being taken

 5     pursuant to the Federal Rules of Civil Procedure.

 6            All formalities, excluding the reading and

 7     signing of the transcript by the witness, are hereby

 8     waived.

 9            All objections, except as to the form of the

10     question and responsiveness of the answer, are

11     considered reserved until trial or other use of the

12     deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                THE VIDEOGRAPHER:  We are on the record
 2            at 10:00 a.m. on March 7, 2023.
 3                This is Media Unit 1 of the
 4            video-recorded deposition of Joe Douglas in
 5            the matter of All Coast, LLC, versus Shore
 6            Offshore Services, LLC, filed in the
 7            United States District Court, Eastern
 8            District of Louisiana, Case Number
 9            221-cv-00258-JCZ-KWR.
10                The location of the deposition is at
11            New Orleans, Louisiana.  My name is Joseph
12            Pena, representing Veritext; I'm the
13            videographer.  The court reporter is Yolanda
14            Pena from Veritext.  All appearances will be
15            noted on the stenographic record.
16                Will the court reporter please swear in
17            the witness, and then counsel may proceed.
18                              *  *  *
19                TERRY JOE DOUGLAS,
20     having been first duly sworn, was examined and
21     testified as follows:
22                        EXAMINATION
23     BY MR. LEWIS:
24         Q.  Will you please state your full name for the
25     record.
```

1    that's it?

2        A.    It is particular on a barge, probably rigging

3    for an upcoming project, stuff of that nature.

4        Q.    Okay.  So correct me if I'm wrong, it's not

5    like part-time where you work every Tuesday or

6    Wednesday.  It's more of a as certain jobs or specific

7    tasks that maybe you have expertise in need to be done,

8    you come in and help with that process.  Fair?

9        A.    That is fair.

10       Q.    Okay.  And have you been consistently acting

11   as a consultant since early 2022, sitting here today?

12       A.    Yes.

13       Q.    Okay.  I kind of want to go backwards in time

14   now, all right, and just talk about your roles at

15   Shore, from when you kind of went semiretired.  Are you

16   ready?

17       A.    (Witness nods head.)

18       Q.    Right before -- or in 2020 and 2021, it's my

19   understanding you were a superintendent; is that

20   correct?

21       A.    Correct.

22       Q.    Okay.  How long had you been a superintendent

23   at Shore?

24       A.    Since 2018.

25       Q.    Okay.  So from 2018 to early 2022, you were a

1    superintendent.  Fair?

2        A.   Correct.

3        Q.   As a superintendent, were you assigned to

4    certain barges or vessels?

5        A.   Yes.  D/B Thor.

6        Q.   Okay.  So is it a fair statement that you were

7    a superintendent of the D/B Thor from 2018 till early

8    2022?

9        A.   That's correct.

10       Q.   Okay.  Now, we're going to get into a little

11   bit of kind of your roles and your responsibilities.

12   But were there other individuals who would act as a

13   superintendent of the D/B Thor if you were never on the

14   barge?

15       A.   Yes.  I had a relief --

16       Q.   Okay.

17       A.   -- that relieve me out there.

18            MR. PALMINTIER:  Could you say that

19            again, please?

20            THE WITNESS:  I had a relief.  There was

21            a relief superintendent.  We switched out.

22   BY MR. LEWIS:

23       Q.   Okay.  And can you -- was it the same relief

24   superintendent from 2018 till early 2022?  Or did

25   that -- that -- okay.

1   stay with the D/B William Kallop, and it's later

2   changed to the D/B Thor, correct?

3       A.   Correct.

4       Q.   And at that point in time, then you were hired

5   on at Shore to be acting superintendent on the new

6   piece of equipment they just purchased, right?

7       A.   That's correct.

8       Q.   Okay.  How long had you been on the

9   D/B William Kallop before that kind of sale and change

10  of name?

11      A.   Oh, since 2010.

12      Q.   Okay.  So is it a fair statement to say that

13  from 2010 to 2022, you were the acting superintendent

14  of the D/B Thor, which was also during that time frame

15  called the D/B William Kallop?

16      A.   That's correct.

17      Q.   Okay.  Was Brendan DuPont also the acting

18  relief superintendent during that same time frame?

19      A.   No.

20      Q.   Okay.  Did Brendan DuPont also work at

21  Offshore Specialties, to your knowledge, during the

22  time frames that you did?

23      A.   No.

24      Q.   Okay.  Let's talk about what a superintendent

25  does.  Okay?  Educate me, please, on what does a

1    superintendent do when acting as a superintendent of a

2    piece of equipment like the D/B Thor?

3         A.    He's in charge of the derrick barge and all

4    activities.

5         Q.    Okay.  All right.

6         A.    Tell -- tells the foremans what need to be

7    done, what task.

8         Q.    So it sounds like you're the highest-ranking

9    official of the D/B Thor, correct?

10        A.    Correct.

11        Q.    You oversee all activities that are occurring

12   on the actual D/B Thor, correct?

13        A.    Correct.

14        Q.    You would delegate tasks or authority to other

15   supervisors that are subordinate to you on the

16   D/B Thor, correct?

17        A.    That's correct.

18        Q.    Are you responsible for entering into

19   contracts on behalf of Shore?

20        A.    Can you repeat that, please?

21        Q.    Were you responsible on, like, signing

22   contracts, like MSAs, on behalf of Shore, or would that

23   be somebody else?

24        A.    No.  Somebody else.

25        Q.    Okay.  Would you be responsible for developing

1   the same day, that you're going to be coming off

2   location, correct?

3         A.   Correct.

4         Q.   It also copies Cody Sims.  Who's that, again?

5         A.   Project manager.

6         Q.   Okay.  And D/B Thor, right?

7         A.   Right.

8         Q.   That would be -- that would be your -- your

9   barge?

10        A.   Correct.

11        Q.   And Tommy, the director of operations, is

12  emailing the port of Fourchon.  Do you see that?  It

13  says scottb@portfourchon.com?

14        A.   Yes.

15        Q.   And he says, "The barge will be D/B Thor."  It

16  gives some information.  Superintendent is you, Joe

17  Douglas, right?  Correct?

18        A.   Correct.

19        Q.   The tug you're going to be using is the Crosby

20  Endeavor as the main tug, correct?

21        A.   Correct.

22        Q.   You also have the Lama -- La Madonna on hire.

23  That will be an assist tug, right?

24        A.   Correct.

25        Q.   And it says, "Cody Sims will be taking over

1    all logistics from here on."  Do you see that?

2       A.   Yes.

3       Q.   So you had -- this is before you leave the

4    location.  The director of operations for shore is

5    emailing the port of Fourchon, saying that I've got the

6    D/B Thor coming in, correct?

7       A.   Correct.

8       Q.   And that he's a representative of shoreside

9    management, right?

10       A.   Correct.

11       Q.   And he's actually expressly -- the director of

12    operations is saying, My project manager, Cody Sims, a

13    representative we both know at shoreside management, is

14    handling all logistics involving the movement of the

15    D/B Thor, correct?

16       A.   Correct.

17       Q.   And that coincides with what you told me

18    before, which is you would have an open discussion with

19    shoreside management about whether do we stay on

20    location or do we get off location in the event of a

21    hurricane, correct?

22       A.   Correct.

23       Q.   And then ultimately, shoreside management

24    would find the dock or location you need to go to,

25    correct?

```
 1          A.   Right.

 2          Q.   And what we have here is evidence that

 3     shoreside management, between Tommy, the director of

 4     operations, and Cody Sims, the director of projects,

 5     both being involved in the movement of the D/B Thor to

 6     the port of Fourchon, correct?

 7          A.   Correct.

 8          Q.   And does that refresh your memory, now that

 9     we're seeing words directly from shoreside management,

10     that after you both agreed we got to get off location,

11     it was the representatives of shoreside management who

12     found you a location at the port of Fourchon, and they

13     helped facilitate getting the D/B Thor from location to

14     the port of Fourchon, correct?

15          A.   Correct.

16          Q.   Okay.  Now, going back --

17               MR. LEWIS:  You don't have a stapler, do

18          you?

19               (Discussion off the record.)

20     BY MR. LEWIS:

21          Q.   Now, if we go back to Exhibit 7, sir -- I'm

22     sorry.  If we go back to Exhibit 7, we're going back to

23     the hurricane projections, right?  What we have here is

24     the day before you-guys come off location, I imagine --

25     did the discussions between you and shoreside
```

TERRY DOUGLAS

1    management about coming off location, did they happen

2    the day before you come off of location?  Did they

3    come -- did they happen two or three days before coming

4    off location?

5        A.   I'm sorry, could you repeat the question,

6    please?

7        Q.   We all know that you came off location on the

8    26th.  You've already told us that that was an open

9    discussion between you and shoreside management.  When

10   did the decision to come off location occur?  Did it

11   happen on the 25th?  Or did it happen before that?

12       A.   I believe the morning of the 25th.

13       Q.   The morning of the 25th.  Okay.

14            So we have here a report on the 25th at

15   2:00 p.m. in the afternoon, right?  The decision to

16   come off location has already occurred, but you had not

17   come off location yet, correct?

18       A.   Correct.

19       Q.   According to the emails we have, shoreside

20   management is contacting the port of Fourchon at about

21   10:30 in the morning on the 26th, right?  Do you see

22   that?

23       A.   Yes.

24       Q.   Okay.  So we have here is the 25th.  According

25   to the emails we have, shoreside management has not

1   contacted the port of Fourchon yet.  That happens the

2   next day according to these emails.

3                    MR. GUILLOT:  Object to form.

4   BY MR. LEWIS:

5      Q.   And what we do know is that the Zeta has a

6   90 percent chance of becoming a hurricane, and its

7   go -- its projected path goes right towards the port of

8   Fourchon, correct?

9                    MR. GUILLOT:  Object to form.

10     A.   I believe we started looking for dock space on

11  the 25th.

12  BY MR. LEWIS:

13     Q.   Okay.  Well, then let's stick with --

14     A.   Because we had a discussion that morning, and

15  I told them I was probably going to start picking up

16  anchors late that night or early morning time and to

17  find me some dock space.

18     Q.   Okay.  And that's fair.  But on the 25th --

19  you told us this -- this -- this report is at 2:00 p.m.

20  You've already told us the decision to come off and to

21  get out of the path of the hurricane has already been

22  made.  Remember that?

23     A.   Yes.

24     Q.   Okay.  So at the time -- the same day that

25  you -- you as a group, with shoreside management, have

1    decided we've got to come off location, we got to get

2    out of the path of the hurricane, the projection put

3    Zeta, with a 90 percent chance of becoming a hurricane,

4    going right towards the port of Fourchon, correct?

5                    MR. GUILLOT:  Form.

6        A.  Correct.

7    BY MR. LEWIS:

8        Q.  And ultimately, shoreside management sent you

9    to the port of Fourchon, right to where the weather

10   reports are saying the hurricane is going to go, right?

11       A.  Correct.

12       Q.  At no point in time did they ever tell you to

13   go to western Louisiana and find a dock space there,

14   did they?

15       A.  No.

16       Q.  At no point in time did they tell you to head

17   towards east Texas, like Beaumont, and look for a dock

18   there, did they?

19       A.  No.

20       Q.  At no point in time did they tell you to go

21   towards Houston, one of the biggest ports in the entire

22   country, and look for dock space there, did they?

23       A.  No.

24       Q.  At no point in time did they say, Go back to

25   Galveston; you were just there.  Did they?

```
 1      A.   No.
 2      Q.   And from your location to go to Galveston,
 3   that would be a longer trip than from your location to
 4   the port of Fourchon, correct?
 5      A.   Correct.
 6      Q.   Which would -- if you had gone to Galveston
 7   where you were just at, you would be getting out of the
 8   path of the hurricane.  You would agree with me on
 9   that?
10           MR. GUILLOT:  Form.
11      A.   Correct.
12   BY MR. LEWIS:
13      Q.   It would also require, once you get to
14   Galveston and once it's clear, it would take you
15   longer, it would take you more days, to get back to the
16   location again, correct?
17      A.   Correct.
18      Q.   And so you went off location.  How long does
19   it take, generally speaking -- because you did the trip
20   at least from Galveston to the Fieldwood location --
21   how long would it take to go from the Fieldwood
22   location to Galveston or vice versa?
23      A.   I wouldn't know.  I don't recall.
24      Q.   Would it be more than two days?
25      A.   I -- I just don't know.  I don't remember the
```

TERRY DOUGLAS

```
 1   mileage.
 2        Q.   Okay.  It took you about -- all right.  We --
 3   we'll get that -- we'll get that from other
 4   information.  Okay.
 5             But we can agree, if you were to take -- if it
 6   was decided by shoreside management to take the
 7   D/B Thor to Texas, out of the path of the hurricane, it
 8   would take longer to get to Texas and it would take
 9   longer to go from Texas back to location versus the
10   port of Fourchon, correct?
11             MR. GUILLOT:  Objection; asked and
12        answered.
13        A.   Correct.
14   BY MR. LEWIS:
15        Q.   Were you aware of the contract that was in
16   place for Shore and Fieldwood for this job?
17             MR. GUILLOT:  Objection; asked and
18        answered.
19        A.   No.
20             MR. LEWIS:  Okay.  I'm going to mark as
21        Exhibit 9 -- it's a copy of the MSA between
22        Fieldwood and Shore -- Shore Offshore
23        Services.
24        (Exhibit No. 9 was marked for identification.)
25   BY MR. LEWIS:
```

1    purpose is you got to load those explosives off --

2    explosives off the D/B Thor so you can get into the

3    port of Fourchon, right?

4        A.    Correct.

5        Q.    At 7:27 a.m. the next morning, it's showing

6    that explosives had been loaded off.  The Jessica is

7    departing, and they're taking the explosives to a

8    different location somewhere else, correct?

9        A.    Correct.

10        Q.    And then there's other activities, but

11    ultimately at 9:27 in the morning, we're talking about

12    how tow lines are starting to be attached, right?

13        A.    Right.

14        Q.    Ultimately, at 11:00 p.m. on October 26, 2020,

15    you've now arrived at the Martin dock in Port Fourchon,

16    correct?

17        A.    Correct.

18        Q.    And around midnight, you're starting the

19    process of securing the D/B Thor to the Martin dock,

20    correct?

21        A.    That's correct.

22        Q.    Okay.  During this day, we've got all the

23    different individuals listed, correct?

24        A.    Correct.

25        Q.    It's talking about personnel movements.  And

1      Q.    Does that coincide with your own personal

2   memory of being on the barge, that you were coming in

3   close to -- a little bit before, but kind of close to

4   midnight?

5      A.    Right.

6      Q.    Okay.  And so then in the early morning hours

7   of October 27, 2020, would be the time where you're

8   coming into the dock.  And at some point, you're going

9   to have to start securing the barge, correct?

10      A.    Right.

11      Q.    And so if you flip to 1043, right, which is

12   the second page of the October 27, 2021, report, we

13   start having the same activity chart of what's going

14   on, correct?

15      A.    Right.

16      Q.    Same in the sense of it's not the same as the

17   day before but the same kind of process, right?

18      A.    Right.

19      Q.    And it shows at 1:00 o'clock, you-guys were

20   secured at the Martin dock, correct?

21      A.    Right.

22      Q.    Being secured at the Martin dock doesn't mean

23   you have your, like, anchor cables or anchor lines out,

24   right?

25      A.    No.  We're just secured with eight mooring

TERRY DOUGLAS

1  lines at this point.

2        Q.   Okay.

3        A.   We're not completely through mooring.

4        Q.   And so -- because if we look down, it -- it

5  shows that you're actually starting to put out some of

6  the cables to moor, right?

7        A.   Right.

8        Q.   And so you -- you get kind of a preliminary

9  securement to the Martin dock; you're not anchored or

10 moored yet?

11       A.   Right.

12       Q.   And you start offloading all of the

13 third-party personnel from the vessel, correct?

14       A.   Correct.

15       Q.   And so at 1:15 in the morning, you're

16 offloading third-party personnel that we'll talk about

17 in a minute.  And at 3:00 o'clock in the morning, a bus

18 came and -- and actually physically took that

19 third-party personnel away from the dock, correct?

20       A.   Correct.

21       Q.   And -- but there were some individuals on the

22 crew that remained on the D/B Thor, correct?

23       A.   Correct.

24       Q.   And so I might do this as a side-by-side,

25 okay, just to try and make it a little easier for

```
 1                 you.
 2                     THE WITNESS:  I'm sorry.
 3  BY MR. LEWIS:
 4       Q.   And then -- one second.  Let me try and put
 5  this back together real quick.  Sorry.
 6            All right.  And then if we go back to the
 7  activity portion of October 27th, okay, we've got -- at
 8  7:30 in the morning, we're starting the process of
 9  mooring the D/B Thor to the dock, correct?
10       A.   The anchor cables, correct.
11       Q.   Yeah, putting out the anchor cables to kind of
12  moor it to the dock, right?
13       A.   Correct.
14       Q.   Whose decision was it to put out two anchor
15  cables?
16       A.   Mine.
17       Q.   Did you consult anybody at Shore Offshore
18  about how many anchor cables should be put out?
19       A.   No.
20       Q.   Ultimately, you decided to put out the
21  starboard stern anchor cable, correct, at 7:30?
22       A.   Correct.
23       Q.   And then later in the day, you put out the
24  starboard bow breast anchor cable, correct?
25       A.   (Coughs.)  Excuse me.  That is correct.
```

1    Q.   Okay.  And if we go back, according to --

2    according to the daily progress note, the starboard bow

3    breast cable that you utilized had not been changed in

4    over 52 months, correct?

5                MR. GUILLOT:  Form; asked and answered.

6    A.   And which cable are you --

7    BY MR. LEWIS:

8    Q.   Starboard bow breast that we just talked

9    about --

10    A.   Correct.

11    Q.   -- had not been changed, according to the

12    daily progress report for that day, in over 52 months,

13    correct?

14                MR. GUILLOT:  Form.

15    A.   That's what it says, but that's -- that's an

16    error.

17    BY MR. LEWIS:

18    Q.   Okay.

19    A.   That cable had been changed earlier that year.

20                MR. LEWIS:  I'll object as nonresponsive

21                after "That's what it says."

22    BY MR. LEWIS:

23    Q.   The starboard stern cable that you decided to

24    put out, according to the daily progress report, had

25    not been replaced in over 61 months, correct?

```
 1              MR. GUILLOT:  Form.
 2         A.   As far as I know, that's correct.
 3  BY MR. LEWIS:
 4         Q.   Okay.  You could have put out -- in addition
 5  to the two you did, you could have put out the
 6  starboard bow anchor line as well as the starboard
 7  stern breast anchor lines, if you wanted, correct?
 8         A.   I'm not even required to put out any anchor
 9  cables.  I mean, two were more than plenty.
10         Q.   Okay.  And so I understand you're saying, I
11  don't think I needed to.  All right?  I'm not disputing
12  that.  But you could have put out the starboard bow and
13  the starboard stern breast in addition to the two you
14  put out, if you wanted to, correct?
15         A.   Correct.
16         Q.   Okay.  Had you ever been trained at Shore
17  Offshore about, in the event that you are having to be
18  secured at a dock in the direct path of a hurricane,
19  how many anchor cables need to be placed?
20         A.   No.  That's just something that I picked up
21  through the years, different companies.
22         Q.   Had you ever -- had Shore Offshore ever
23  trained you on how to place the anchor cables to
24  account for projected storm surges?
25         A.   No.
```

1    overseeing that process of making sure that anchor

2    cables and anchor lines were being put out properly and

3    that they were in the proper position, correct?

4         A.   Correct.

5         Q.   Do you have an independent memory of this --

6    because there was a skeleton crew on there, right?  Do

7    you have an independent memory of what specific crew

8    members helped in that process, or do you just remember

9    there were people helping?

10        A.   Just people helping.

11        Q.   Okay.

12        A.   I don't recall exactly.

13        Q.   And -- and that's fair.  And that's why --

14   just sitting here today, based off your memory, because

15   it's obviously not documented here of who did what, you

16   don't remember, of the crew members on the vessel, who

17   specifically was helping you in setting those two

18   anchor lines, correct?

19        A.   Correct.

20        Q.   But you would have been overseeing that.  And

21   you were the superintendent; you would have been

22   verifying, at least in your opinion, everything was

23   done properly.  Correct?

24        A.   Correct.

25        Q.   Were you consulting anybody, not on the

1    D/B Thor, about how those lines need to be placed,

2    knowing that a hurricane and storm surge was coming?

3        A.   No.

4        Q.   Did you speak at all to any representatives of

5    shoreside management when this process was going out to

6    talk about how many anchor cables should be placed?

7        A.   No.

8        Q.   Did you talk to any representatives of

9    shoreside management about -- of the two anchor cables

10   that you placed, how they need to be placed, knowing

11   that the storm surge is coming?

12       A.   No.

13       Q.   Did you consult anybody, other than just

14   yourself and based off of your independent experience,

15   of how those two cables were supposed to be placed to

16   ensure that they were properly placed?

17       A.   No.

18       Q.   Okay.  Did you -- after they were placed,

19   okay, did you go down and visually inspect them, check

20   them to make sure you were comfortable with how they

21   were laid out and how they were angled at any point in

22   time?

23       A.   Yes.

24       Q.   And when you went out and visibly looked at

25   it, seeing about how they were laid out, what angles

1    they had going, were you, in your own opinion,

2    comfortable with the way they were laid out, obviously

3    before the storm surge came?

4        A.   Yes.  I was actually involved in securing

5    them.

6        Q.   Okay.  And did you -- after they were secured,

7    okay, and you'd gone down and you visually inspected

8    them, at any point in time did you, like, take pictures

9    of them and maybe send them to somebody at shoreside

10   management, either in a text message or an email, to

11   say, Look, we're set up.  I'm just going to tell

12   you-guys specifically what it looks like?

13       A.   I had my clerk take pictures after the

14   mooring, but I didn't send them to nobody, no.

15                 MR. MCMAHON:  Excuse me, sir.  I didn't

16            hear you.  You had your what?

17                 THE WITNESS:  I had my barge

18            administrator, my clerk, take pictures of the

19            mooring, but I did not send them to nobody.

20   BY MR. LEWIS:

21       Q.   Okay.  And just so we're clear, this is after

22   the lines have been placed but before the storm surge

23   is -- actually has arrived, correct?

24       A.   Right.

25       Q.   Why did you have pictures taken if you weren't

1   going to send them to anybody?

2       A.   I was going to use them for an example to show

3   my barge foremen to -- how much distance to leave

4   between the barge and the dock, and just for kind of

5   training purposes.

6       Q.   Okay.  Because we've already gone over that

7   this process isn't expressly part of the shore

8   training, correct?

9            MR. GUILLOT:  Object to form.

10  BY MR. LEWIS:

11      Q.   The company has never come out and done that

12  with you, have they?

13      A.   No.  The company -- not the company.  I

14  usually do the training on the barge in my --

15      Q.   And I -- I get that.  But I'm -- that was

16  probably a bad question.  Okay.  Obviously, you're

17  telling me that you do that, because you took a picture

18  to do it, right?

19      A.   (Witness nods head.)

20      Q.   Has anyone from shoreside management -- the

21  HSE department, your -- the director of operations, or

22  anyone from the company, not on the -- not on the

23  barge -- ever come out and had kind of a session where

24  they show you how to actually moor up or rig up anchor

25  lines in anticipation of storm surge?

1    we're going to get into the lines breaking kind of in

2    more detail, okay.  At any point in time when you

3    realized that the D/B Thor was kind of in peril, lines

4    were either about to break or had started breaking, did

5    you ever hear the Crosby Endeavor actually fire up its

6    engines?

7                    MS. KUEBEL:  Objection; form.

8        A.    No, I did not.

9    BY MR. LEWIS:

10       Q.    Okay.  At any point in time when these lines

11   started breaking or when you anticipated that they

12   might start breaking, were there any communications

13   between the D/B Thor and the Crosby Endeavor about what

14   was going on?

15       A.    When the lines started breaking?

16       Q.    Yeah.  Either -- either when you knew they

17   were going to break or if you didn't know, once they

18   started breaking.

19       A.    Yes.  Once we started breaking away from the

20   dock, I got on the radio and called the Endeavor and

21   told him we was breaking away from the dock, push me

22   in.

23       Q.    Okay.  So you're still at this point in

24   time -- and from my understanding is all lines didn't

25   just instantly break.  They started breaking one at a

1    time.  Right?

2         A.   Don't really know.

3         Q.   **And that's -- that's fine.  Okay.**

4         A.   Assuming.

5         Q.   **Whenever you realized lines were starting to**

6    **break and you call the Crosby Endeavor and you say, You**

7    **need to push us in.  We're starting to break away, what**

8    **did the captain or whoever was on the radio say back to**

9    **you?**

10        A.   There was a brief pause.  He asked me to

11   repeat myself.  I told him, I'm breaking away from the

12   dock.  I need to be pushed back in.  Push me in the

13   dock.

14        Q.   **So there was a pause.  You basically then**

15   **repeated yourself.  What did the Crosby Endeavor**

16   **respond to you then when you had repeated yourself a**

17   **second time?**

18        A.   Another pause.  And then approximately a

19   minute after that, I'd seen black smoke come out of the

20   stacks.

21        Q.   **So we have the D/B Thor starting to break away**

22   **from the dock.  You notify them that you're starting to**

23   **break away.  There's pauses.  They ask you to repeat.**

24   **There's more pauses.  And then you visibly see the**

25   **stacks the -- smokestack come up.  To your knowledge,**

1  was that -- was that them initially firing up all their

2  engines?

3           MS. KUEBEL:  Objection; form.

4      A.   I don't believe so.  I believe it was probably

5  coming out of neutral and getting into throttle.

6  Because it takes longer than a minute to fire your

7  engines up.

8  BY MR. LEWIS:

9      Q.   Okay.  When you first reported it, you told me

10  there was some pauses in, you know, conversations,

11  right.  About how -- about how long of a time frame was

12  that from when you first said, We're breaking away,

13  till when you saw the black smoke?

14     A.   Approximately a minute.

15     Q.   Okay.  And so we'll talk to the captain of the

16  tug and we'll talk to the crew.  All right?  You're the

17  first depo.

18          If at the time you reported to them -- to the

19  Crosby Endeavor that you're starting to break away and

20  at that point in time they start the process of firing

21  up their engines, because the engines weren't on at

22  that point -- it's a hypothetical, okay?  I'm not

23  telling you this is what it is.  What would you say to

24  learn that the Crosby Endeavor was sitting alongside

25  you with the engines off and it wasn't until after the

1  during this incident, you wouldn't have any personal

2  knowledge on how they were injured, correct?

3          MR. GUILLOT:  Form.

4      A.  (Coughs.)  Excuse me.  No.

5  BY MR. LEWIS:

6      Q.  Okay.  "No" meaning you don't have -- "no"

7  meaning you don't have any personal knowledge?

8      A.  Of how they got injured, no.

9      Q.  Sitting here today, you have no personal

10 knowledge to -- assuming those people were injured, to

11 the extent of their injuries, correct?

12     A.  No.

13     Q.  Okay.  Do you know -- when it comes to the

14 various lines to the vessel, do you know which was the

15 first line to break?

16     A.  No, I do not.

17     Q.  Where were you at on the barge when you first

18 realized lines were starting to break?

19     A.  I was on the bridge, in my office.

20     Q.  Was there anybody on the bridge in the office

21 with you at this exact time when you realized lines

22 were starting to break?

23     A.  Yes.

24     Q.  Who?

25     A.  My clerk.  My clerk, Dustin Lowe.

1      Q.   Okay.  Anybody else?

2      A.   And the other -- the surveyor, Brian Cloyd,

3  which was actually my clerk before, and he was training

4  Dustin.

5      Q.   Okay.  And so once you realized it's starting

6  to break away, you told us how you were on the radio

7  starting to talk to the Crosby Endeavor.  Do you

8  remember that?

9      A.   Correct.

10      Q.   Ultimately, you understand that you fully

11  broke away, right?

12      A.   Right.

13      Q.   Do you remember at any point in time, when the

14  Crosby Endeavor disengaged its lines, whether they

15  broke away or they were -- were untied, where they were

16  no longer actually even connected to the D/B Thor?

17      A.   Shortly after we got across the bayou on the

18  west bank.

19      Q.   Okay.

20           MS. KUEBEL:  Did you say "on the west

21           bank"?

22           THE WITNESS:  Yes, after we went across

23           the bayou.

24  BY MR. LEWIS:

25      Q.   What is the first vessel or object, to your

1    understanding, the D/B Thor hit?

2        A.    I don't recall the name of it.

3        Q.    When the D/B Thor started to come off of the

4    dock, do you remember how it came off of the dock?

5    Meaning, did it just come straight off the dock?  Did

6    it start spinning off the dock?

7        A.    It kind of started coming slightly from the

8    stern out a little more and then out, and then it

9    eventually turned all the way around.

10        Q.    So whenever it starts to break away and it's

11    starting, you can see and feel it moving away from the

12    dock.  You're saying the stern was the one that kind of

13    moved away first?

14        A.    Correct.

15        Q.    And then ultimately, both anchor cables

16    disengaged and it was completely off the dock?

17                MR. MCMAHON:  Objection.

18        A.    No.  At that time, the bow anchor cable did

19    not break.

20                MR. MCMAHON:  Say it again?

21                THE WITNESS:  The starboard bow breast

22            anchor cable didn't break at that time.

23    BY MR. LEWIS:

24        Q.    Okay.  So we know, as these cable are starting

25    to break or break free, you're telling me that the

1  up a run -- how many miles and a run time that we was

2  going to Martin -- Martin dock 16.

3      Q.   All right.  And did the captain have any

4  response?

5      A.   They -- they worked me up a run time and let

6  me know.

7      Q.   All right.  Did he give you any other

8  information?

9      A.   Sir?

10     Q.   Did he give you any other information?

11     A.   No, other than that he knew right where it was

12  at and right down from their -- their dock.

13     Q.   Did you ask him for any other information?

14     A.   No.

15     Q.   When you got to the dock at Martin, did the

16  Crosby Endeavor stay with the barge the whole time?

17     A.   No, it didn't.

18     Q.   So it left at some point?

19     A.   Yes.

20     Q.   When did it leave?

21     A.   He had called me after we got tied up and we

22  called barge secure on the morning of the 27th.  He had

23  requested could he go to his dock and pick up groceries

24  and supplies.

25     Q.   And how long was the tug gone?

1       A.    That day.  He returned back early morning of

2    the 28th.

3       **Q.    Did he return on his own, or did you call him**

4    **back?**

5       A.    No.  It was understood when he requested to go

6    to his dock that he would be back that morning.

7       **Q.    And he was?**

8       A.    And he was.

9       **Q.    When the decision was made to go to the Martin**

10   **dock in Fourchon, was there any discussion between you**

11   **and the office about how far the Fourchon dock was from**

12   **the jobsite?**

13      A.    I don't recall exactly what the conversation

14   was.  I called my project manager, Cody Sims, and told

15   him it looked like I was going to start picking up

16   anchors later that night and I needed some dock space

17   in Fourchon.

18      **Q.    And so Cody is the one who told you where to**

19   **take the barge?**

20              MR. GUILLOT:  Object to form.

21      A.    No.  I had asked to go to the closest dock,

22   which was Fourchon.

23   BY MR. CERISE:

24      **Q.    You asked for the closest dock?**

25      A.    Yes.

1   Shore foreman or you would be the ones communicating to

2   the Crosby Endeavor telling them where you need to pick

3   up or set anchors, correct?

4       A.   Correct.

5       Q.   What other things would you tell the Crosby

6   Endeavor?  And when I say "you," I mean you or your

7   crew on the -- on the shore -- the Thor.

8       A.   Pretty much where -- like I said, where to run

9   anchors, where to set them, where to pick them up, if

10  any's got to be moved.

11      Q.   When to put -- put the barge on tow?

12      A.   When to put the barge on town.

13      Q.   Where to take the barge?

14      A.   Correct.

15      Q.   In other words, the tug it out there to work

16  as directed by the Shore crew on board the Thor; is

17  that correct?

18      A.   That's correct.

19      Q.   And you understand that concept of working as

20  directed, right?

21      A.   Correct.

22      Q.   There's some jobs where the Thor works as

23  directed by its customer?

24      A.   Correct.

25      Q.   In those cases, you follow the directions that

1  your customer provides to you, correct?

2      A.   That's correct.

3      Q.   **Do you do things they tell you not to do?  Or**

4  **do you only do what they tell you to do?**

5      A.   My customers?

6      Q.   **Correct.**

7      A.   We come to an agreement on what to do.

8      Q.   **Okay.  But the customer dictates what they**

9  **want you to do, correct?**

10     A.   Yes.

11     Q.   **And you do what they tell you to do?**

12     A.   Correct.

13     Q.   **That's -- that's what's "working as directed"**

14  **means?**

15     A.   Correct.

16     Q.   **Following the instructions you receive from**

17  **your customer, correct?**

18     A.   Correct.

19     Q.   **In this case, the Crosby Endeavor was working**

20  **as directed by the Thor, correct?**

21     A.   Correct.

22     Q.   **And that means that the customer for them was**

23  **the crew -- the crew of the Thor, correct?**

24            MR. GUILLOT:  Form.

25  BY MR. REISMAN:

TERRY DOUGLAS

1      Q.   Is that correct?

2           MR. GUILLOT:   Form.

3      A.   Repeat the question.

4  BY MR. REISMAN:

5      Q.   The crew of the Thor was -- I'm going to

6  strike the question.  I'll ask you a different one.

7           The crew of the Thor was directing the

8  activities of the Endeavor, correct?

9           MR. GUILLOT:   Form.

10     A.   As far as anchor running and -- and -- and

11 bringing -- helping bring it to the barge, correct.

12 BY MR. REISMAN:

13     Q.   You, the crew of the Thor, was telling the

14 Crosby Endeavor what to do and when to do it; is that

15 correct?

16          MR. GUILLOT:   Form.

17     A.   Correct.

18 BY MR. REISMAN:

19     Q.   There was some discussion earlier today -- I'm

20 not going to try and pull out every document, but if

21 you need it, ask me.  I don't want to hide it from you.

22 It's going to be in that stack.  We can get it out.

23 But you remember seeing the WeatherOps reports that

24 would come in to the barge by email?

25     A.   Yes.

1    October 28, 2020?

2        A.    Not to my knowledge, no.

3        Q.    **To your knowledge, have their job**

4    **responsibilities changed since that time?**

5        A.    I don't know.

6        Q.    **You said you made the decision to go to**

7    **Fourchon.  Did you consider any other locations to**

8    **demob the barge?**

9        A.    No, I didn't.

10        Q.    **When you communicated with Tommy and Cody and**

11    **Mauricio about demobing the barge to Fourchon, did they**

12    **ever suggest any alternate locations to you?**

13        A.    I thought I done answered that.  No.

14        Q.    **Have you ever seen any materials provided to**

15    **you by Shore that instruct you on how to moor a barge**

16    **in hurricane conditions?**

17        A.    No.

18        Q.    **Have you ever seen any instructions provided**

19    **to you by Shore that instruct you how to moor a barge**

20    **in tropical storm conditions?**

21        A.    No.

22        Q.    **Did anybody from Shore ever give you advice on**

23    **how to moor a barge in hurricane conditions?**

24        A.    No, they have not.  They trust me to know how

25    to do it after 30 years-plus being in the field.

1      Q.   All right.  Did anybody at Shore ever give you

2  any advice or instructions on how to moor a barge in

3  advance of a tropical storm?

4      A.   No.

5      Q.   Okay.  Same answer, because they trust you

6  based on your experience?

7      A.   Correct.

8      Q.   You said you started working for Shore, I

9  think, in 2018; is that correct?

10     A.   Correct.

11     Q.   Do you remember when in 2018?

12     A.   March, April.

13     Q.   Prior to that, had you ever worked with Tommy

14  Gibilterra before?

15     A.   No.

16     Q.   Prior to coming to work for Shore, had you

17  ever worked for Cody Sims before?

18     A.   No.

19     Q.   Prior to coming to work for Shore, had you

20  ever worked with Mauricio Arana before?

21     A.   Briefly.

22     Q.   How -- how briefly?

23     A.   A few months.

24     Q.   When was that?

25     A.   Before I started with Shore, I worked for

```
 1                    THE WITNESS:  I need a break.

 2                    MR. REISMAN:  Okay.  That's fine.

 3             How -- how long you think you -- you need?

 4                    THE WITNESS:  Five minutes.

 5                    THE VIDEOGRAPHER:  We are off the record

 6        at 6:21 p.m.

 7                        (Recess taken.)

 8                    THE VIDEOGRAPHER:  We are on the record

 9        at 6:33 p.m.

10   BY MR. REISMAN:

11        Q.   All right, Mr. Douglas, we'll pick it up.

12             If there was a document that told you how to

13   moor the Thor in specific wind and sea conditions, you

14   would have liked to have seen that, correct?

15        A.   Correct.

16        Q.   And you would have consulted that and -- and

17   relied on it, correct?

18                    MR. GUILLOT:  Form.

19        A.   I would have reviewed it, yes.

20   BY MR. REISMAN:

21        Q.   From the time the Thor arrived in Fourchon on

22   October -- I think it was midnight on the 26th -- until

23   the -- the barge broke free on the 28th, did any

24   members of Shore's management team come to visit the

25   barge?
```

1     A.   No.

2     Q.   Did any members of Shore's management team

3  inspect the mooring configuration of the barge?

4     A.   No.

5     Q.   Did any members of the Shore management team

6  offer any input on how the barge should be secured to

7  the dock?

8     A.   No.

9     Q.   Did any member of the Shore management team

10  request photographs of the mooring configuration?

11     A.   No.

12     Q.   And I think you testified earlier, you -- you

13  had your clerk take the photos, but you didn't send

14  them to anybody.  Is that correct?

15     A.   Till after the breakaway, correct.

16     Q.   Okay.  Did you tell -- prior to the breakaway,

17  did you tell any members of the Shore management team

18  that you had photographs of the mooring configuration?

19     A.   No.

20     Q.   Mr. Cerise asked you some questions about

21  Coast Guard port conditions, Whiskey, Yankee, Zulu,

22  et cetera.  I think you said you were familiar with

23  those concepts; is that correct?

24     A.   Correct.

25     Q.   Do you know if anybody at Shore is assigned to

1   monitor port conditions and locations where Shore

2   barges are -- are located?

3        A.   No, no, I'm not.

4        Q.   I take it, then, that you're not aware of

5   whether Shore has any employees who are assigned to

6   ensure compliance with -- with Coast Guard port

7   conditions.  Is that correct?

8               MR. GUILLOT:  Form.

9        A.   I'm sure they all do.

10  BY MR. REISMAN:

11       Q.   I'm asking you if you're aware of any --

12       A.   I'm not aware, no.

13       Q.   Mr. Cerise also you asked -- asked you a

14  question about the storm anchor, and I think he asked

15  you specifically, "Why didn't you deploy that at the

16  dock before the barge broke away?"  Do you recall that?

17       A.   Yes.

18       Q.   Can you tell me -- because I didn't hear the

19  answer.  I knew he asked it, but I didn't hear what

20  your answers was, so I apologize.

21       A.   (Coughs.)  Excuse me.  Because I'm at a

22  (indiscernible) --

23               THE REPORTER:  I'm sorry?

24       A.   I'm at a fuel dock, and I'm assuming there's

25  pipelines there.

```
 1   BY MR. REISMAN:
 2       Q.   Okay.  Did you ever ask anybody at the dock
 3   whether there were pipelines at that dock?
 4       A.   No.
 5       Q.   When you made the decision to go to Fourchon,
 6   who was it that told you that they found you a space at
 7   the Martin Energy dock?
 8       A.   Cody Sims.
 9       Q.   Did you ask Cody, Are there pipelines at that
10   dock?
11       A.   No, I didn't.
12       Q.   Did Cody you tell you whether there were
13   pipelines at that dock?
14       A.   No, he didn't.
15       Q.   Did you ask Cody any questions to determine,
16   before you made the decision to -- to go to that dock,
17   whether that dock was a safe berth for the Thor given
18   the weather conditions that were expected?
19       A.   No.
20       Q.   At any time before the barge broke away, did
21   you have any discussions with any Shore management
22   members about whether that dock was a safe and adequate
23   berth for the Thor?
24       A.   No.
25       Q.   At any time did any of the Shore management
```

 1   members contact you and ask you whether you thought

 2   that dock was a safe berth for the Thor?

 3       A.   We had spoke on the 27th, and they had asked

 4   if I was secured and everything was good, and I said

 5   yes.

 6       Q.   That was the extent of the conversation?

 7       A.   Pretty much, best I can recall.

 8       Q.   I couldn't hear that.

 9       A.   The best I can recall, yes.  (Coughs.)  Excuse

10   me.

11       Q.   Did you ever give any consideration to

12   deploying one of your starboard -- starboard anchors

13   onto the yard there at the dock where you were located?

14       A.   No.

15       Q.   You could have put an anchor out on that yard

16   to help secure you, like a deadman, correct?

17       A.   I doubt they'd let me do that.

18       Q.   I didn't ask you whether they'd let you.  I

19   said, you could have actually done it, though, right?

20            MR. GUILLOT:  Form.

21       A.   Not on the stern, no.

22   BY MR. REISMAN:

23       Q.   I'm not asking about the stern.  I'm asking

24   about any of your anchors.

25       A.   Could I?

 1        Q.    Did you ask anybody at the dock whether you
 2   could put an anchor out there?
 3        A.    No, I did not.
 4        Q.    Did you ask anybody whether there was a
 5   pipeline in that location?
 6        A.    No, I did not.
 7        Q.    Did you ever give any thought to putting an
 8   anchor out on the port side before the barge broke
 9   away?
10        A.    No, I did not.  I was more comfortable with
11   the mooring system that I had.
12        Q.    Okay.  And the mooring system you had is the
13   one that you came up with yourself, correct?
14        A.    That is correct.  I've tied that barge up like
15   that going on better than ten years.  Never had no
16   issues.
17        Q.    Had you ever been to that Martin Energy dock
18   number 16 before?
19        A.    No, I have not.
20        Q.    Before you got there, did you know how many --
21   I -- I call them bollards -- mooring bitts there were
22   at that dock?
23        A.    Yes.
24        Q.    How did you know?
25        A.    I've seen an overhead picture of it.

1   conditions that gave you concern about the dock itself

2   in relation to mooring the Thor for the hurricane,

3   correct?

4        A.   Correct.

5        Q.   Had you, you would have told somebody?

6        A.   Correct.

7        Q.   Had you, you would have called the office?

8        A.   Correct.

9        Q.   Had you, you would have done something

10  differently?

11       A.   Correct.

12       Q.   Now, moor -- Martin personnel did not provide

13  any assistance in mooring the Thor.  That was all done

14  by your skeleton crew.  Correct?

15            MR. GUILLOT:  Object to form.

16       A.   That was done by both shifts, the rigging crew

17  and the skeleton crew.

18  BY MR. MCMAHON:

19       Q.   Okay.  You did not request any equipment from

20  Martin for purposes of securing the Thor to its

21  dock 16, did you?

22       A.   No, I did not.

23       Q.   You did not ask them any information as to the

24  best way to moor the Thor to the dock, did you?

25       A.   No, I did not.

1      Q.   No Martin personnel ever boarded the Thor for

2   purposes of discussing mooring and/or how to moor,

3   where to moor, what devices to use, correct?

4      A.   That's correct.

5      Q.   All right.  Now, Mr. Reisman asked you some

6   questions, and he did it just by getting a verbal

7   response.  I want to be a little more specific, in

8   utilizing a drawing here.  It's part of Thor previous

9   production, and it's -- a document that I have

10  misplaced.  One minute, please.

11              MR. KUTNER:  While he's looking for

12          that, can we stop for just a minute?

13              MR. MCMAHON:  Sure.

14              THE VIDEOGRAPHER:  We are off the record

15          at 7:20.

16                  (Recess taken.)

17              THE VIDEOGRAPHER:  We are on the record

18          at 7:27 p.m.

19  BY MR. MCMAHON:

20      Q.   Mr. Douglas, I handed you Thor 0001390.  Do

21  you recognize that as the D/B Thor?

22      A.   Yes, I do.

23      Q.   All right.  Can you please put a "B" and an

24  "S" at the very top and the bottom of the pages so

25  everybody knows what's the bow and what's the stern?

```
 1                 MR. GUILLOT:  Form.
 2         A.   Did they have a role in the mooring plan?  No.
 3    BY MR. RUFTY:
 4         Q.   Did you speak to the Crosby Endeavor in Port
 5    Fourchon before the hurricane came through?
 6         A.   Yes.
 7         Q.   When did you speak with the Crosby Endeavor?
 8                 MR. GUILLOT:  Objection; asked and
 9              answered about a dozen times.
10         A.   When we got there, after we was tied up, the
11    following day.
12    BY MR. RUFTY:
13         Q.   All right.  Let's go through each one of these
14    conversations.  When was the first one once the Thor
15    arrived in the port?
16         A.   What was what?
17         Q.   When was your first conversation with the
18    Crosby Endeavor?
19         A.   When?
20         Q.   When the Thor arrived in the port.
21         A.   When we got there, my barge foreman said --
22    when we had got stopped, come to a complete stop, the
23    barge foreman said that if we'd back up, that we'd take
24    the towline off of him.  He backed up.  Picked up his
25    tow wire.  We disconnected his tow wire.  And then
```

TERRY DOUGLAS

1  La Madonna and the Elite pushed us in as he was picking

2  up his tow bridle.

3      **Q.  Did you have any conversations with the Crosby**

4  **Endeavor about your mooring plan?**

5              MR. GUILLOT:  Form.

6      A.  No.

7  BY MR. RUFTY:

8      **Q.  Did you ask Crosby Endeavor to be part of your**

9  **mooring plan?**

10      A.  No.

11      **Q.  The Crosby Endeavor was unable to see what**

12  **lines and wires were used to connect the Thor to the**

13  **Martin dock; isn't that true?**

14      A.  Yes, they could not see it.

15              MR. GUILLOT:  You okay?

16              THE WITNESS:  (No audible response.)

17  BY MR. RUFTY:

18      **Q.  So what else did you discuss with the Crosby**

19  **Endeavor after the Thor arrived in Port Fourchon?**

20      A.  After we got to port and got moored, then

21  the -- the two -- La Madonna and Elite pulled away,

22  went to their little dock there to the stern of the

23  derrick barge.  Endeavor requested to go to their dock

24  and pick up supplies and groceries and said they'd be

25  back in the morning, and I told them that was fine.

1      Q.   Okay.  Any conversations with Crosby Endeavor

2  after that?

3      A.   Not till the following morning when he was

4  coming back, and he had called on the radio and said he

5  was leaving his dock and headed that way, was there

6  somebody on the barge that could catch his lines.

7      Q.   That would have been the morning of

8  October 28th, correct?

9      A.   That's correct.

10     Q.   And what did you say?

11     A.   I told him, yes, there would be somebody there

12  to catch his lines, come on in.

13     Q.   Anything else said between you and the Crosby

14  Endeavor in that conversation?

15     A.   No.

16     Q.   Did you have another conversation with Crosby

17  Endeavor before the hurricane came through?

18     A.   Not till after lunch when the wind started

19  picking up.

20     Q.   Tell me about that conversation.

21     A.   (Coughs.)  Excuse me.  It was just once the

22  wind started picking up, we was discussing the gust of

23  winds, what we was getting.  And just back and forth

24  with the -- the La Madonna.  Pretty much just talking

25  about what the wind was doing, what we was all getting

1   on the wind.

2       Q.   Aside from talking about the -- the wind

3   picking up, was there any other topic discussed between

4   you and the Crosby Endeavor at that time?

5       A.   Yes.  As the wind was increasing, the Endeavor

6   asked on several occasions how we was doing, how we

7   looked over there, and I replied fine, we looked good.

8       Q.   And after those conversations, did you ask the

9   Crosby Endeavor to assist you or the Thor in any way?

10      A.   No, I didn't ask him.  I didn't think I had

11  to.  I -- I was under the impression, when he asked how

12  I was doing, he was pushing on me.

13      Q.   What gave you that impression?

14      A.   He knows he's supposed to keep me there at

15  that dock.  I didn't think he was just laying there

16  being dead weight.

17      Q.   I believe you told us before the Crosby

18  Endeavor was working as directs by the Thor.  Isn't

19  that correct?

20      A.   I didn't think I had to tell a seasoned boat

21  captain that he knows how to run his boats or what to

22  do.

23              MR. RUFTY:  Move to strike as

24          nonresponsive.

25  BY MR. RUFTY:

```
 1                THE WITNESS:  Yes, I know what I was
 2          saying.
 3                MR. GUILLOT:  Then say what you know you
 4          were saying.
 5      A.   I didn't think that I had to tell a licensed
 6   boat captain to at least alleviate his weight and try
 7   to take some tension off my lines in a cat 3 hurricane.
 8   BY MR. RUFTY:
 9      Q.   Crosby Endeavor was working as directed; isn't
10   that true?
11                MR. GUILLOT:  Objection; asked and
12          answered, form.
13      A.   I've never had to tell a boat captain before
14   to push on me when we're in severe weather.
15                MR. RUFTY:  Move to strike;
16          nonresponsive.
17   BY MR. RUFTY:
18      Q.   I'll repeat the question.
19           The Crosby Endeavor was working as directed by
20   the Thor; isn't that true?
21                MR. GUILLOT:  Same objection.
22      A.   Yes, they was working as directed.
23   BY MR. RUFTY:
24      Q.   And that means that you were supposed to give
25   directions when you want the Crosby Endeavor to do some
```

1  work, right?

2              MR. GUILLOT:  Objection; form.

3       A.   This is not work.  We're not running anchors

4  in the field.  We're talking about I am dependent on

5  his propulsion.  I am required, when at the dock, to

6  have an assist tug with me because I have no

7  propulsion.  He -- he knows that.  Everybody knows

8  that.

9  BY MR. RUFTY:

10      Q.   **Did you ask the Crosby Endeavor to tie up next**

11 **to you?**

12      A.   No.  He requested to tie up to me because he

13 knows he has to be there with me during the impact of

14 the storm.

15      Q.   **If he was part of your mooring plan, wouldn't**

16 **you have asked him to tie up next to you?**

17      A.   Didn't have to ask him.  He knew that he had

18 to be there as my protection during the storm.  I

19 didn't have to ask him.  He knew.  He asked me because

20 he --

21      Q.   **How many conversations did you have -- how**

22 **many conversations did you have with Crosby Endeavor on**

23 **the afternoon of October 28th before the hurricane came**

24 **through?**

25      A.   Just communication from when the wind started

 1   picking up till the breakaway.

 2       **Q.   How many conversations in that time period?**

 3       A.   It was kind of like an ongoing conversation

 4   with myself, the La Madonna, and the Endeavor.

 5       **Q.   So ongoing conversation on the radio; is that**

 6   **right?**

 7       A.   Correct.

 8       **Q.   And the three -- the three of you were talking**

 9   **about the wind and how it's picking up?**

10       A.   Correct.

11       **Q.   In none of those conversations did you bother**

12   **to ask the Crosby Endeavor, Would you please assist --**

13   **would you please push us into the dock?  You never did**

14   **that, did you?**

15              MR. GUILLOT:  Object to form.

16       A.   I didn't think I needed to.  No, I didn't.

17   BY MR. RUFTY:

18       **Q.   And you never bothered to ask him if he was**

19   **doing that either, did you?**

20              MR. GUILLOT:  Same objection.

21       A.   It was my anticipation he was.  And when he

22   kept asking me how I was doing, I -- I didn't think he

23   was asking me about lunchtime or nothing.  I assumed

24   that he's pushing against me; he wants to know how he's

25   doing.  And I say fine.

 1   BY MR. RUFTY:

 2        Q.   In all of this idle chitchat you were having

 3   with the captain of the Crosby Endeavor and the other

 4   tugboats, you never thought to ask if he was pushing

 5   you into the dock?

 6                  MR. GUILLOT:  Form.

 7   BY MR. RUFTY:

 8        Q.   Did you?

 9        A.   No.  If I thought I was -- if I had thought I

10   would have to ask him or tell him how to do his job, I

11   most certainly would have.

12        Q.   And you've described the Crosby Endeavor as

13   your lifeline.  You said that earlier today, didn't

14   you?

15        A.   Yes.

16        Q.   Don't you think it would have been appropriate

17   to -- to ask your lifeline if it was doing what you

18   needed to help you?

19                  MR. GUILLOT:  Objection; asked and

20             answered.

21        A.   Again, I didn't see the need.  I was -- in my

22   mind, I was completely convinced he knew what he was

23   doing and what he was there for.  Otherwise, why did he

24   come back and even tie up to me?  Might as well stay

25   where he was at.

TERRY DOUGLAS

```
 1    BY MR. RUFTY:
 2         Q.   You were anticipating that the Crosby Endeavor
 3    would help bring the Thor back out -- out of the port
 4    once the hurricane had passed?
 5         A.   That is correct.  That is correct.
 6         Q.   And how many assist -- how many -- how many
 7    other assist boats besides the -- the -- the anchor
 8    tug, that is, the Crosby Endeavor, what other tugboats
 9    did you anticipate using to bring Thor out of Port
10    Fourchon so it could go -- go back to work in the gulf?
11         A.   The same two that were the tail tugs that
12    brought me in, La Madonna and the Elite.
13         Q.   And were those the same three tugboats that
14    you used to bring Thor into Port Fourchon before the
15    storm?
16         A.   That's correct.
17         Q.   So the -- the Crosby Endeavor is not powerful
18    enough to control the Thor by itself even in calm
19    weather, is it?
20              MR. GUILLOT:  Object to form.
21         A.   Repeat the question.
22    BY MR. RUFTY:
23         Q.   Yeah.  To bring the Thor into Port Fourchon
24    before the hurricane, you used three tugboats, right?
25         A.   Correct.
```