UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST, LLC<br><br><br>VERSUS<br><br>SHORE OFFSHORE SERVICES, LLC | CIVIL ACTION NO.: 21-258 c/w 21-337, 21-464, 21-822<br><br>SECTION: A (4)<br><br>JUDGE JAY C. ZAINEY<br><br>MAG. JUDGE ROBY<br><br>ADMIRALTY - Rule 9(h)<br><br>Applies to: 21-464 |

**DECLARATION OF MARC FAZIOLI UNDER 28 U.S.C. § 1746**

1.      My name is Marc Fazioli.  I am over the age of 21, and I am competent and capable of making this Declaration. I have personal knowledge of the facts and statements contained herein, and each of them is true and correct to the best of my knowledge, information, and belief.

2.      I am currently employed by Charted Marine Consulting, LLC as a Marine Consultant. At the time I issued my report in this matter, I was employed by 3D Marine USA, Inc. (Brookes Bell), as a Marine Surveyor/Consultant.

3.      I have been employed in the maritime industry since 1985. I also hold a Bachelor of Science degree in Marine Transportation from Texas A&M University and a U.S. Coast Guard-issued Master's License. I have served as Master, Officer, and Deckhand on board vessels similar in size to the M/V CROSBY ENDEAVOR operating worldwide. I have frequently served as a Master and Officer on vessels transiting the United States Gulf Coast areas during Hurricane season and have personally directed, and assisted with, the

EXHIBIT
9

securing of self-propelled vessels, and barges, in preparation for forecast storm conditions.

4.  In total, I have over 40 years of experience in the maritime industry including experience regarding customary practices and expected mooring procedures for vessels operating within the inland waters of the United States. A true and correct copy of my *curriculum vitae* with all of my relevant experience is attached hereto as **Exhibit A**.

5.  At the request of Jones Walker, LLP, I prepared an expert report dated June 20, 2024, in connection with Civil Action No. 21-258, *All Coast, LLC v. Shore Offshore Services, LLC.*, currently pending in the U.S. District Court for the Eastern District of Louisiana.

6.  Attached as **Exhibit B** is a true and complete copy of the expert report that I prepared as part of my work in the above-captioned matter. I am prepared to and intend to testify regarding the facts and opinions contained within my expert report.

7.  As set forth in my expert report, based upon my training, education, knowledge, and experience, it is my opinion that the actions and omissions of Modern American Recycling Services, Inc. and/or Shore Offshore Services, LLC (collectively the "THOR Interests") employees caused the breakaway incident of D/B THOR at the Martin Energy Dock within Port Fourchon, Louisiana. Specifically, the crew and personnel aboard the THOR failed to properly moor the THOR and the THOR's mooring arrangement had several deficiencies. These deficiencies include: utilizing worn/damaged synthetic mooring lines when new ropes were onboard and available, utilizing different mooring materials within same service (wire and nylon rope on same axis), utilizing short leads for breast lines, failing to utilize long "crossing" leads for spring lines, failing to "double-up" synthetic lines, failing to utilize all available winch wires and shore bollards, and

failing to drop the stern anchor on approach to dock, or at a minimum, failing to walk out at anchor to water's edge for immediate release and anchor deployment upon breakaway. The basis and full synopsis of my opinions is set forth in my attached expert report.

8.  Based upon my training, education, knowledge, and experience, I am further of the opinion that no decision, action or inaction of Crosby Tugs, LLC, the M/V CROSBY ENDEAVOR or its Master and other crewmembers, caused or contributed to the breakaway of the THOR from the Martin Energy Dock on October 28, 2020.

9.  I am aware that this Declaration will be used in the above-captioned litigation.

10.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

**THUS DONE, EXECUTED,** and **SIGNED** this 24th day of October, 2025.

Marc A. Fazioli
Marine Surveyor/Consultant

# charted

EXHIBIT

A

## CURRICULUM VITAE

### Captain Marc A. Fazioli

Citizenship:        United States of America
Office Address:    536 Fairfax Ave., Norfolk, VA, U.S.A.

## Qualifications

USCG issued Master's License w/ Radar Observer
STCW Certificate endorsed Tankerman (PIC)
FCC License - Marine Radio Operator / GMDSS Operator
OSHA Certification as Shipyard Competent Person

## Professional Experience

| | |
|---|---|
| 2025 - Present | Charted Marine Consulting, LLC, Norfolk, Virginia<br>Marine Consultant |
| 2007 - 2025 | 3D Marine USA, Inc. (Brookes Bell), Houston, Texas<br>Marine Surveyor (Principal Master Mariner) |
| 2005 - 2007 | Chugach Development Corporation, Anchorage, Alaska<br>Master / Harbor Pilot |
| 2001 - 2005 | 3D Marine USA, Inc., Brownsville, Texas<br>Marine Surveyor / Consultant |
| 2001 - 2005 | Martech Unlimited, Inc. (Noble Denton Group), Beaumont, Texas<br>Pollution and Safety Advisor / Consultant |
| 1996 - 2001 | Maritime Overseas Corporation (OSG), New York, New York<br>Merchant Marine Officer |
| 1999 | Casino Padre Investment Company, South Padre Island, Texas<br>Master |
| 1995 - 1996 | Texas A&M University, Galveston, Texas<br>Lecturer, Department of Marine Transportation |
| 1994 - 1995 | Marine Transport Lines, Inc., Weehawken, New Jersey<br>Merchant Marine Officer |

Capt. Marc Fazioli's forty years of continuous experience in the maritime industry commenced in 1985 working as a sailing instructor at his family-owned recreational boat rental business in South Padre Island, Texas.  Marc also worked as a Deckhand on Passenger/Fishing Vessels sailing from Port Isabel, Texas before pursuing a college degree and United States Coast Guard Merchant Marine Officer License from the Texas Maritime Academy at Texas A&M University.

Following Ordinary Seaman and Cadet experience on Product Tankers and Container Ships, Capt. Fazioli graduated from Texas A&M University and commenced sailing worldwide as a Merchant Marine Officer on a wide variety of vessels including Tankers, Geared Bulk Carriers, Ro/Ro, Towing Vessels and Passenger Ferries.  During 1999, Capt. Fazioli achieved his first command as Master of a coastwise-service Passenger Vessel, which was followed by Master's assignments on board oceangoing Cargo and Research Vessels.  In addition, Capt. Fazioli was appointed to serve as the Harbor Pilot for the Port of Kwajalein, RMI within the Republic of the Marshall Islands.

Capt. Fazioli's shoreside career included serving as a Lecturer (Instructor) at Texas A&M University where he was responsible for instructing Merchant Marine Cadets in Safety, Lifesaving, Shiphandling and Seamanship.  Subsequently, Capt. Fazioli worked as a Pollution & Safety Advisor / Port Captain for Tanker and Tank Barge operations throughout the Gulf Coast.

Since 2007, Capt. Fazioli has been employed as a Marine Surveyor & Consultant, performing a wide range of surveys including Tank Vessel compliance, safety and cargo contamination surveys; dry cargo and containerization damage surveys; personal injury investigations; vessel damage surveys; on/off hire surveys; and P&I condition surveys. In addition, Capt. Fazioli is regularly retained by attorneys as a consultant and as a testifying Expert Witness in support of litigation proceedings.

charted

## Education

BSc, Marine Transportation - Texas A&M University

## Continuing Education / Professional Coursework & Certification

| Course / Certification | Certified / Approved Training Provider |
| --- | --- |
| Advanced Cargo Operations | Maritime Institute of Technology and Graduate Studies |
| Advanced Meteorology | Maritime Institute of Technology and Graduate Studies |
| Advanced Stability | Maritime Institute of Technology and Graduate Studies |
| Advanced Watchkeeping | Maritime Institute of Technology and Graduate Studies |
| Basic Firefighting | Two Rivers Marine Training & Consulting, Inc. |
| Basic & Advanced Marine Firefighting | Delgado Community College |
| Basic & Advanced Marine Firefighting | Texas A&M – Texas Fire Training School |
| Bridge Resource Management | Marine Safety International |
| Celestial Navigation – Management Level | STAR Center |
| Electronic Chart Display and Information Systems | Maritime Institute of Technology and Graduate Studies |
| First Aid & CPR | Two Rivers Marine Training & Consulting, Inc. |
| Global Maritime Distress & Safety System (GMDSS) | Sea-Technology |
| GMDSS & Radio Operator | Texas A&M – Center for Marine Training & Safety |
| Hatch Covers & Ultrasonic Tightness Testing | SDT International |
| Hazardous Materials | STAR Center |
| Marine Confined Space Safety | Atlantic Environmental & Marine Services, Inc. |
| Marine Operations of Self-Elevating MODU | Diamond Offshore Drilling, Inc. Training Center |
| Marine Propulsion Plants | Maritime Institute of Technology and Graduate Studies |
| Maritime Arbitrator | Houston Maritime Arbitrators Association |
| Medical Care at Sea | Emergency and Safety Programs, Inc. |
| Medical First Aid Provider | San Jacinto College |
| Navigation Decision-Making using RADAR & ARPA | Marine Safety International |
| Personal Safety & Social Responsibilities | Two Rivers Marine Training & Consulting, Inc. |
| Personal Survival Training Course | Two Rivers Marine Training & Consulting, Inc. |
| Radar Observer – Unlimited | Texas A&M – Center for Marine Training and Safety |
| Radar Observer Recertification – Unlimited | Houston Marine Training Services |
| Radar Observer Recertification – Unlimited | Texas A&M – Center for Marine Training and Safety |
| Shipboard Management | STAR Center |
| Shiphandling at the Management Level | STAR Center |
| Stability and Ballast Control for MODU | Diamond Offshore Drilling, Inc. Training Center |
| Tankerman – (PIC) Dangerous Liquids | Texas A&M – Center for Marine Training and Safety |
| Voyage Planning & Electronic Navigation | Maritime Institute of Technology & Graduate Studies |



**Expert Witness Testimony by Capt. Marc Fazioli during Previous Four Years**

1.  C. A. No. 3:20-cv-00012
    *In the Matter of the Complaint of Odfjell Chemical Tankers AS, Goldex Fortune Ltd., Odfjell Management AS and Odfjell Tankers AS, as Owners and Operators of the M/T BOW FORTUNE*
    and,
    C. A. No. 3:20-cv-00016
    *In Re Master Jimbo, Inc. As Owner and/or Owner Pro Hac Vice of the F/V PAPPY'S PRIDE Praying for Exoneration from or Limitation of Liability*
    In the United States District Court for the Southern District of Texas, Galveston Division
    Trial Testimony:      October 2021 - Judge Brown
    Case Description:     Collision
    Attorneys:            Eastham, Watson, Dale & Forney

2.  Case No. 65-471
    *Lance Lacrosse vs. Captain Morgan Gaudet, Albert Daigle, Frank Daigle and Daigle Towing Service, LLC*
    In the 25th Judicial District Court for the Parish of Plaquemines, Louisiana
    Deposition:           February 2022
    Case Description:     Personal Injury – Collision
    Attorneys:            Pusateri, Johnston, Guillot and Greenbaum

3.  C. A. No. 2:21-cv-65
    *Signet Maritime Corporation vs. RLB Contracting, Inc.*
    In the United States District Court for the Southern District of Texas, Corpus Christi Division
    Deposition:           March 2022
    Trial Testimony:      December 2022 – Judge Ramos
    Case Description:     Vessel Damage – Alleged Dredge Pipeline Allision
    Attorneys:            Schouest, Bamdas, Soshea, BenMaier & Eastham

4   Case No. RG19016964
    *Richard Patrick Gleason vs. Shell Oil Company, Sause Bros., Inc., Equilon Enterprises, LLC, and Does 1-20, inclusive*
    In the Superior Court of the State of California, in and for the County of Alameda
    Deposition:           April 2022
    Case Description:     Personal Injury – Gangway
    Attorneys:            Gordon Rees Scully Mansukhani / Lafayette & Kumagai

5.  C.A. No. 2:20-cv-686
    *In the Matter of the Complaint of B&J, Inc., as Owner and Operator of the Motor Vessel ZOIE, for Exoneration from or Limitation of Liability*
    In the United States District Court for the Western District of Louisiana, Lake Charles Division
    Deposition:           May 2022
    Trial Testimony:      April 2023 – Judge Cain
    Case Description:     Vessel/Cargo Damage
    Attorneys:            Jones Walker

Contd/…

Charted Marine Consulting, LLC                                                CONTINUATION

- 2 -

6.      Case No. 1:20-cv-3549
        *Jean Yenkelun vs. Sero Services, LLC*
        In the United States District Court for the District of Maryland
        Deposition:              July 2022
        Case Description:        Personal Injury – Fall from Passenger Vessel
        Attorneys:               Semmes, Bowen & Semmes

7.      Docket No. 133766 "G"
        *Philip Thibodeaux vs. DLS, L.L.C. and JD Marine Logistics, LLC*
        In the 16th Judicial District Court for the Parish of St. Mary, Louisiana
        Deposition:              August 2022
        Case Description:        Personal Injury – Equipment Handling
        Attorneys:               Galloway Johnson Tompkins Burr & Smith

8.      C.A. No. 20-02179
        *The Board of Commissioners of the Port of New Orleans vs. M/V CMA CGM BIANCA*
        *along with its engines, tackle, apparel, boilers, furniture, equipment, appurtenances, etc., in rem,*
        *and Teucarrier No. 3 Corp., in personam*
        In the United States District Court for the Eastern District of Louisiana
        Deposition:              September 2022
        Case Description:        Vessel Breakaway
        Attorneys:               Jones Walker

9.      Cause No. 2020-17900
        *Jose Maldonado vs. Callan Marine, Ltd.*
        In the 157th Judicial District Court of Harris County, Texas
        Trial Testimony:         October 2022 – Judge Garrison
        Case Description:        Personal Injury – Slip and Fall
        Attorneys:               Rusty Hardin & Associates / Frost Brown Todd

10.     Cause No. 202051471
        *Wesley Grizzle and Karen Grizzle vs. John Schoellkopf*
        In the 129th Judicial District Court of Harris County, Texas
        Deposition:              November 2022
        Case Description:        Collision
        Attorneys:               Brown Sims

11.     C.A. No. 20-03012
        *Turn Services, LLC vs. Gulf South Marine Transportation, Inc.*
        In the United States District Court for the Eastern District of Louisiana
        Trial Testimony:         December 2022 – Judge Vitter
        Case Description:        Allision – Barge Breakaway
        Attorneys:               Staines, Eppling & Kenney

Contd/...

- 3 -

12.    C. A. No. 2:20-cv-02845 c/w 2:20-cv-02871
       *Cox Operating, LLC vs. M/V ATINA, IMO No. 959300, along with its engines, tackle, apparel, boilers, furniture,
       equipment, appurtenances, etc., in rem, and Hanzhou 1 Ltd and Ciner Ship Management, in personam*
       In the United States District Court for the Eastern District of Louisiana
       Deposition:              January 2023
       Case Description:        Allision
       Attorneys:               Jones Walker

13.    Cause No. 2020-cv-0760
       *Adam Paul Guidry vs. Callan Marine, Ltd.*
       In the 10th Judicial District Court of Galveston County, Texas
       Deposition:              March 2023
       Case Description:        Personal Injury – Boarding Vessel
       Attorneys:               Frost Brown Todd

14.    Cause No. 2021-38803
       *Anthony Torres vs. Great Lakes Dredge & Dock Company, LLC*
       In the 270th Judicial District Court of Harris County, Texas
       Deposition:              April 2023
       Case Description:        Personal Injury – Vessel Transfer
       Attorneys:               Schouest, Bamdas, Soshea, BenMaier & Eastham

15.    C. A. No. 3:20-cv-00092
       *McArthur Griffin vs. REC Marine Logistics, LLC, American Steamship Owners Mutual Protection and Indemnity
       Association, QBE Insurance (Europe) Limited, Offshore Transport Services, LLC, GOL, LLC and
       Gulf Offshore Logistics, LLC*
       In the United States District Court for the Middle District of Louisiana
       Trial Testimony:         April 2023 – Judge Jackson
       Case Description:        Personal Injury - Material Handling
       Attorneys:               Pusateri, Johnston, Guillot and Greenbaum

16.    Cause No. CV52907
       *Kevin Bass vs. Offshore Oil Services, Inc.*
       In the 23rd Judicial District Court of Wharton County, Texas
       Trial Testimony:         May 2023 – Judge Hardin
       Case Description:        Personal Injury – Parted Line
       Attorneys:               Pusateri, Johnston, Guillot and Greenbaum

17.    C.A. No. 2:19-cv-00094
       *Adriana Morales as Next Friend of a Minor, D.J.M., Lavon Beth Meyer and Lee Allen Meyer Individually and as
       Representative of the Estate of Lyndon Dean Meyer vs. OK Trans Inc. dba OK Transport and Satnam Singh Lehal*
       In the United States District Court for the Southern District of Texas, Corpus Christi Division
       Deposition:              June 2023
       Case Description:        Road Accident – GPS Data
       Attorneys:               Schouest Bamdas Soshea BenMaier & Eastham

Contd/...

18.    C. A. No. 2:21-cv-00495
       *Joseph Berthelot vs. Weeks Marine, Inc.*
       In the United States District Court for the Eastern District of Louisiana
       Deposition:                 August 2023
       Case Description:           Personal Injury/Vessel Damage - Collision
       Attorneys:                  Jones Walker

19.    C.A. No. 2:23-cv-00123
       *Channing Miller, Sr. vs. REC Marine Logistics, LLC and GOL, LLC*
       In the United States District Court for the Eastern District of Louisiana
       Deposition:                 November 2023
       Case Description:           Personal Injury – Collision
       Attorneys:                  Spagnoletti Law Firm

20.    Civil Action No. 18-4678
       *In the Matter of the Complaint of Grand Famous Shipping Ltd and Beikun Shipping Tianjin Co., Ltd. as Owner
       and Owner Pro Hac Vice of the M/V YOCHOW for Exoneration from and/or Limitation of Liability*
       In the United States District Court for the Southern District of Texas, Houston Division
       Trial Testimony:            November 2023 – Judge Ellison
       Case Description:           Allision
       Attorneys:                  Brown Sims

21.    C.A. No. 2:22-cv-04987
       *In Re: The Matter of LA Carriers, LLC as Owner and Operator of the M/V KAREN KOBY, Petitioning for
       Exoneration from or Limitation of Liability*
       In the United States District Court for the Eastern District of Louisiana
       Trial Testimony:            December 2023 – Judge Papillion
       Case Description:           Barge Capsize
       Attorneys:                  Jones Walker

22.    C.A. No. 3:22-cv-325
       *In the Matter of Stanco Boat Rental Ltd., as Owner, and Freeport Launch LP, as Owner Pro Hac Vice, of the
       BRENDA S*
       In the United States District Court for the Southern District of Texas, Galveston Division
       Deposition:                 March 2024
       Case Description:           Personal Injury – Crane Operations
       Attorneys:                  Abraham, Watkins, Nichols, Agosto, Aziz & Stogner

23.    C. A. No. 2:22-cv-00235
       *Edmond Tausch, IV vs. Derrick Construction Company, Inc. and Port of Corpus Christi Authority*
       In the United States District Court for the Southern District of Texas, Corpus Christi Division
       Deposition:                 July 2024
       Trial Testimony:            September 2024 – Judge Ramos
       Case Description:           Allision
       Attorneys:                  McKibben, Martinez, Jarvis & Wood

Contd/...

24.    C.A. No. STCV-00026
*Silvia Williams, as surviving spouse of Jerome Williams (deceased) vs. Maersk A/S and Moller Singapore AP PTE, LTD; and Georgia Ports Authority*
In the State Court of Chatham County, Georgia
Deposition:              July 2024
Case Description:        Gangway Incident (Fatality)
Attorneys:               Bouhan Falligant

25.    C. A. 4:23-cv-00182-WTM-CLR
*Marlon J. Brown vs. MSC Ship Management, Ltd, MSC Mediterranean Shipping Co., and Meridian 7 Ltd.*
In the United States District Court for the Southern District of Georgia, Savannah Division
Deposition:              August 2024
Case Description:        Personal Injury – Gangway
Attorneys:               Bouhan Falligant

26.    Cause No. 2022-77952
*Brandon Darrow vs. Genesis Marine, LLC of Delaware*
In the 40th Judicial District Court for St. John the Baptist Parish, Louisiana
Deposition:              August 2024
Case Description:        Personal Injury – Linehandling
Attorneys:               Phelps Dunbar

27.    Case No. C-15-CV-22-003377
*Joseph Dillard vs. Skanska USA Civil Northeast, Inc.*
In the Circuit Court for Montgomery County, Maryland
Deposition:              November 2024
Case Description:        Personal Injury – Material Handling
Attorneys:               Schouest Bamdas Soshea BenMaier & Eastham

28.    C.A. No. 4:22-cv-00305
*Tim B. Valmont and Linda Valmont vs. HSL Husum Shipping Ltd. and Hammonia Reederei GmbH & Co. KG*
In the United States District Court for the Southern District of Georgia, Savannah Division
Deposition:              December 2024
Case Description:        Personal Injury – Reefer Technician
Attorneys:               Bouhan Falligant

29.    Case No, 00091196 Division "D"
*Zackary D. McNease vs. Maintenance Dredging I, L.L.C.*
In the 29th Judicial District Court for the Parish of St. Charles, Louisiana
Trial Testimony:         January 2025 – Judge Fahrig
Case Description:        Personal Injury – Equipment Handling
Attorneys:               Daigle Fisse & Kessenich

30.    Case No. 833-725
*Shawn Bell vs. Woods Resources, L.L.C. and Wood Dredging, L.L.C.*
In the 24th Judicial District Court for the Parish of Jefferson, Louisiana
Deposition:              February 2025
Case Description:        Personal Injury – Fall from Chair
Attorneys:               Staines Eppling and Kenney

Contd/...

Charted Marine Consulting, LLC                                    CONTINUATION

- 6 -

31.     Cause No. 2023-23171
        *Hunter Porche vs. D & S Marine Services, L.L.C.*
        In the 295th Judicial District Court of Harris County, Texas
        Deposition:              March 2025
        Case Description:        Personal Injury – Equipment Handling
        Attorneys:               Miles Thomas

32.     Cause No. 40752 "A"
        *Michael Bellard and Bryan Giroir vs. Enterprises Marine Services, LLC and Associated Terminals, LLC*
        In the 23rd Judicial District Court for St. James Parish, Louisiana
        Trial Testimony:         March 2025 – Judge Verdigets
        Case Description:        Barge Breakaway – Hurricane
        Attorneys:               Thompson Coe

33.     Case No. 2024-CV-5097-DC
        *John Ayo vs. D&S Marine Service, L.L.C.*
        In the 24th Judicial District Court of Calhoun County, Texas
        Deposition:              June 2025
        Case Description:        Personal Injury – Fall
        Attorneys:               Miles Thomas

34.     Cause No. 851107          Division "E"
        *Christopher Cruise vs. Next Generation Logistics, LLC, ABC Insurance Company, Jean Lafitte Marine, LLC, and Great American Insurance Company*
        In the 24th Judicial District Court for the Parish of Jefferson, Louisiana
        Deposition:              August 2025
        Trial Testimony:         September 2025 – Judge Brindisi
        Description:             Dredge Pipeline Allision
        Attorneys:               Daigle Fisse & Kessenich

35.     Docket No. 24-0927, Inspection No. 1703662
        *Julie A. Su, Acting Secretary of Labor, United States Department of Labor vs. Cooper Consolidated, LLC and its Successors*
        Occupational Safety and Health Review Commission
        Deposition:              August 2025
        Case Description:        OSHA Citation Dispute
        Attorneys:               Jones Walker



20th June 2024                                                                 Our Ref. No. D210141

Jones Walker LLP
201 St. Charles Ave, Ste 5100
New Orleans, LA 70170

<u>Attn:  Mr. Alfred J. Rufty III</u>

C.A. No. 21-258
c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982, 21-2075 and 21-2227
*All Coast, LLC vs. Shore Offshore Services, LLC*
In the United States District Court for the Eastern District of Louisiana

Dear Mr. Rufty,

At the request of Jones Walker LLP, 201 St. Charles Ave, Ste 5100, New Orleans, Louisiana 70170;
3D Marine Consultants have reviewed the following provided depositions and documentation
concerning the above captioned matter:

1)    Deposition Testimony of Mr. Terry Joe Douglas, with Exhibits;
2)    Deposition Testimony of Mr. Lewis Andrews;
3)    Deposition Testimony of Mr. Brian Cloyd, with Exhibits;
4)    Deposition Testimony of Capt. Walter Everett, Jr., with Exhibits;
5)    Deposition Testimony if Mr. Lessel Williams, with Exhibits;
6)    Deposition Testimony of Mr. Jamie Perryman, with Exhibits;
7)    Deposition Testimony of Capt. David Blinn, with Exhibits;
8)    Deposition Testimony of Capt. Bradley Aro, with Exhibits;
9)    Deposition Testimony of Capt. Ernest Plaisance, with Exhibits;
10)   Deposition Testimony of Mr. Harris Solomon, with Exhibits;
11)   Deposition Testimony of Mr. Randy Rials, with Exhibits;
12)   Deposition Testimony of Mr. Rene Artigos, with Exhibits;
13)   Deposition Testimony of Mr. Thomas Gibilterra, with Exhibits;
14)   Deposition Testimony of Mr. Wade Savoy;
15)   Deposition Testimony of Mr. Cody Sims, with Exhibits;
16)   Modern American Railroad Services, L.L.C. and Shore Offshore Services, LLC's Answers to
      Claimants' Interrogatories;
17)   Modern American Railroad Services, L.L.C. and Shore Offshore Services, LLC's Responses to
      Claimants' Request for Admissions;
18)   Modern American Railroad Services, L.L.C. and Shore Offshore Services, LLC's Responses to
      Claimants' Request for Production;
19)   THOR Interests' Answers to Claimants' Omnibus Interrogatories;

Contd/…

3D Marine USA, Inc. is a Brookes Bell company.
Brookes Bell has offices in Liverpool, London, Glasgow, Shanghai, Singapore, Hong Kong, Houston and Mia
Contact details for each office and a full list of our Fee Earners can be obtained from our website
Brookes Bell is the trading name of Brookes Bell LLP, incorporated in England as a limited liability partne

EXHIBIT
B

3D Marine USA, Inc.                                                      CONTINUATION
                                        - 2 -
D210141

20)    THOR Interests' Answers to Claimants' Omnibus Requests for Admissions;
21)    THOR Interests' Responses to Claimants' Omnibus Requests for Production;
22)    THOR Interests' Supplemental Answers to Claimants' Omnibus Interrogatories and Requests for Production;
23)    THOR Interests' Second Supplemental Answers to Claimants' Omnibus Interrogatories and Requests for Production;
24)    THOR Interests' Third Supplemental Answers to Claimants' Omnibus Requests for Production;
25)    THOR Interests' Responses to Personal Injury Claimants' Second Set of Requests for Production;
26)    THOR Interests' Answers to HGIM's First Set of Interrogatories;
27)    THOR Interests' Supplemental Answers to HGIM's First Set of Discovery;
28)    THOR Interests' Second Supplemental Answers to HGIM's First Set of Discovery;
29)    THOR Interests' Responses to HGIM's First Request for Production of Documents;
30)    Harvey Gulf International Marine, LLC's and Harvey Seas, LLC's Responses to Omnibus Interrogatories;
31)    Harvey Gulf International Marine, LLC's and Harvey Seas, LLC's Supplemental Responses to Omnibus Interrogatories;
32)    Harvey Gulf International Marine, LLC's and Harvey Seas, LLC's Responses to Omnibus Requests for Production of Documents;
33)    Harvey Gulf International Marine, LLC's and Harvey Seas, LLC's Supplemental Responses to Omnibus Requests for Production of Documents;
34)    Harvey Gulf International Marine, LLC's and Harvey Seas, LLC's Second Supplemental Responses to Omnibus Requests for Production of Documents No. 31;
35)    Documents, Bates Nos. THOR 1201 to 5369 and 5371 to 6082;
36)    Documents, Bates Nos. HGMI 1 to 7604 and 7995 to 8010;
37)    Documents, Bates Nos. CROSBY 446 to 886, 1419 to 1516, 2162 to 2174, 2277 to 2492, and 2494 to 2646;
38)    Cell Phone Video Recordings;
39)    Rosepoint Data;
40)    Physician Life Care Planning, LLC Reports, dated 27th July, and 8th, 14th, 23rd and 29th November 2022;
41)    Smith Economics Group, Ltd. Reports, dated 11th and 31st January 2023;
42)    Riben Marine, Inc. Report, dated 16th December 2023; and
43)    McSwain Engineering, LLC Report, dated 18th December 2023.

The undersigned, Capt. Marc Fazioli and Mr. M.P. Singh, attended on board Barge DB THOR at the Martin Energy Dock within Port Fourchon, Louisiana on 6th November 2020.[1]

The undersigned also reviewed the PortVision and MSG historical for October 2020; including contemporary weather information forecasts and bulletins referenced herein; as well as United States Coast Guard regulations and maritime industry guidance referenced herein.

---

[1] The undersigned, Capt. Marc Fazioli, also attended on board Barge DB THOR during May 2019 and February 2020 for inspections related to the previous ownership of the vessel.

- 3 -

After review of the above detailed depositions, reports and documentation; our observations on board Barge DB THOR at the Martin Energy facility shortly after the breakaway incident; and our years of professional experience, education and knowledge of the maritime industry; we report as follows:

### A. Description of Incident

During October 2020, Barge DB THOR, was owned by Modern American Recycling Services, Inc. and/or Modern American Railroad Services, LLC (collectively referred to as "MARS"), and operated by an affiliated company, Shore Offshore Services, LLC ("Shore"). Barge DB THOR was working under contract to Fieldwood Energy. LLC, carrying out Oil & Gas industry platform repair and decommissioning projects within the Gulf of Mexico.

On, or about, 19th October 2020, Shore requested Dawn Services, L.L.C. ("Dawn") to arrange a charter for an anchor handling tug to attend Barge DB THOR, on location at the High Island Block 116, approximately 25 nm south of Sabine Pass, Texas. Dawn, in turn, made arrangements with Crosby Tug. LLC ("Crosby") to dispatch the Crosby owned/operated Tug CROSBY ENDEAVOR, an offshore anchor handling towing vessel, to assist Barge DB THOR.

On 20th October, Tug CROSBY ENDEAVOR, under the command of Capt. Walter Everett, Jr., arrived alongside Barge DB THOR, which was under the command of the Barge Superintendent, Mr. Terry Joe Douglas, and took the vessel under tow, bound for the next Fieldwood project location off the Louisiana coast.

On 22nd October, Barge DB THOR arrived on location at Ship Shoal Block 151, approximately 35 nm south of Atchafalaya Bay, Louisiana.

On 23rd October, Barge DB THOR was repositioned to Ship Shoal Block 259, approximately 50 nm southwest of Port Fourchon, Louisiana. All anchors from Barge DB THOR were positioned by Tug CROSBY ENDEAVOR, with the crane barge officially on location and working within Ship Shoal Block 259 during the early morning hours of 24th October.

Later that same day, during the afternoon of 24th October, the tropical depression that would become Hurricane Zeta formed in the central Caribbean. The National Weather Service (NWS) Coastal Waters Forecast issued during the afternoon on 24th October forecast Tropical Storm conditions for Port Fourchon, and the entire Louisiana Coast, on 28th October.

3D Marine USA, Inc.                                              CONTINUATION
                                          - 4 -
D210141



Barge DB THOR continued working on location throughout 24th and 25th October. During this period,
Tropical Storm Zeta continued to strengthen with forecasts indicating landfall as a Hurricane at or near
Port Fourchon, Louisiana on 28th October. [Detailed Forecast Tracks from National Hurricane Center
Tropical Cyclone Report - Hurricane Zeta (AL282020)]

3D Marine USA, Inc.                                                    CONTINUATION

- 5 -

D210141



Figure 11.    NHC official forecast and track guidance through 96 h for 1800 UTC 24 October (a) and 1200 UTC 25 October (b). The white line with the hurricane symbols is the best track of Zeta. The red dots indicate the verifying positions at the end of the forecasts.

Contd/...

During the early morning hours of 26th October, Mr. Douglas ordered Tug CROSBY ENDEAVOR to commence retrieving the barge positioning anchors and take the barge under tow towards Port Fourchon, which was directly on the forecast track of Hurricane Zeta.

All barge anchors were retrieved, with Tug CROSBY ENDEAVOR and Barge DB THOR departing from Ship Shoal Block 259 at approximately 0950 hours, 26th October, bound for the Martin Energy Dock within Port Fourchon, Louisiana.

At approximately 2200 hours, 26th October, Barge DB THOR entered Belle Pass, at the entrance to Port Fourchon, utilizing a shortened stern towline from Tug CROSBY ENDEAVOR. Two Louisiana International Marine, LLC owned/operated towing vessels, Tug LA ELITE and Tug LA MADONNA, were hired by Shore, and or Dawn Services, to assist Barge DB THOR alongside the dock.

At approximately 2300 hours, 26th October, Tug CROSBY ENDEAVOR released her towline, with Tug LA ELITE and Tug LA MADONNA maneuvering Barge DB THOR starboard side to the Martin Energy Dock while mooring operations were carried out by the Barge DB THOR personnel.

At approximately 0040 hours, 27th October, Barge DB THOR was all fast starboard side to the Martin Energy Dock.

At approximately 0745 hours, 27th October, Tug CROSBY ENDEAVOR departed the area and proceeded to the nearby Crosby Docks within Port Fourchon.

According to Mr. Douglas, and other barge personnel, various securing activities were carried out on board Barge DB THOR throughout the day of 27th October, including securing of deck equipment.  Mr. Douglas testified that he personally observed the layout and condition of the dock, and personally directed/approved the eventual mooring arrangements for the barge, which utilized only 2 of the 8 available positioning anchor winches/wires as well as 8 additional synthetic material breast line and spring line leads utilizing relatively short sections of nylon mooring line.

No mooring analysis or professional evaluation was carried out by MARS or Shore with respect to the type, extent, layout or suitability of the Barge DB THOR mooring arrangements.

In addition, Mr. Douglas did not pay out his stern anchor in advance of the storm, nor even make the stern anchor ready for deployment *"on the brake"*, as part of the barge hurricane preparations.

By the afternoon of 27th October, the forecasts called for Hurricane Zeta to impact the Port Fourchon area as a Category 2 storm, with sustained winds greater than 85 knots (98 mph).

At approximately 0800 hours, 28th October, Tug CROSBY ENDEAVOR returned alongside Barge DB THOR and was secured *"on the hip"* along the port side of the barge utilizing head and stern lines.

Throughout the day on 28th October, the crew of Tug CROSBY ENDEAVOR were in communication with the Barge DB THOR crew, as the weather deteriorated.

3D Marine USA, Inc.                                                            CONTINUATION

- 7 -

D210141



According to the testimony of Mr. Douglas, he made no adjustments to his mooring system during the afternoon of 28th October, nor did he make any requests to Tug CROSBY ENDEAVOR to come ahead or astern to lessen the strain on the barge mooring system.

At approximately 1600 hours, near the height of the storm conditions, Barge DB THOR broke away from the Martin Energy Dock in winds estimated to be over 100 mph.

By all accounts, Tug CROSBY ENDEAVOR immediately attempted to gain control of the barge within the waterway but was unable to do so due to the strength of the winds acting upon the sail area of Barge DB THOR.  Soon after the breakaway incident, the head and stern lines connecting Tug CROSBY ENDEAVOR to Barge DB THOR parted as well.

Barge DB THOR was blown in a northerly direction, reportedly impacting multiple vessels secured along the waterway, before grounding 2 to 3 miles upriver from her mooring location.

Contd/...

3D Marine USA, Inc.                                                    CONTINUATION
                                        - 8 -
D210141

**B.  Vessel Particulars**

Name:                  **DB THOR**
Former Name:           YAMASHIRO, DB WILLIAM KALLOP
Flag:                  Panama
Port of Registry:      Panama
IMO No.:               8639455
Call Sign:             HO9316
Year Built:            1997
Builders:              Mitsubishi Heavy Industries, Nagasaki, Japan
Class:                 Isthmus Bureau of Shipping (IBS)
Gross Tonnage:         13260
Net Tonnage:           3770
Length (LOA):          370.7 ft
Breadth (Moulded):     137.8 ft.
Depth:                 26.25 ft.
Operating Draft:       12.14
Design Deadweight:     31,984 MT
Personnel Capacity:    114

Barge DB THOR is a steel-hull, oceangoing, non-self-propelled Crane Barge, fitted with a rotating AmClyde Heavylift Crane forward (Capacity 1,760 ST) and accommodations/machinery spaces aft.

Barge DB THOR is also arranged with eight separate 80-ton anchor winches, fitted with steel cable and Delta Flipper anchors, utilized for offshore mooring/spread anchor patterns.

Barge DB THOR is further arranged with one standard maritime windlass at the stern, fitted with anchor chain and a Baldt Stockless anchor.[2] [3]

---

[2] Barge DB THOR is double-ended, with no discernible differences between the bow and stern underwater hull form.
[3] The stern Baldt Stockless anchor and chain is also referred to by the barge personnel as the *"Storm Anchor"*.

3D Marine USA, Inc.                                                    CONTINUATION
                                    - 9 -
D210141


| | |
|---|---|
| Name: | **CROSBY ENDEAVOR** |
| Former Name: | GULF BRENT |
| Flag: | United States of America |
| Port of Registry: | New Orleans, Louisiana |
| Official No.: | 571494 |
| IMO No.: | 7501118 |
| Year Built: | 1976 |
| Builders: | Halter Marine Services, New Orleans, Louisiana |
| Class: | American Bureau of Shipping (ABS) |
| Gross Tonnage: | 191 |
| Net Tonnage: | 132 |
| Length: | 136.0 ft |
| Breadth: | 40.1 ft. |
| Depth: | 15.6 ft. |
| Bowthruster: | (1) |
| Propulsion: | (2) 7,200 HP |

Tug CROSBY ENDEAVOR is a twin screw, model bow, steel-hull, offshore-service, United States
Coast Guard – inspected (46 CFR Subchapter M compliant), anchor-handling towing vessel of the
standard design, fitted with an INTERcon towing winch and open deck aft.


### C.  Methods and Analysis/Comments

From review of the above detailed depositions, statements and documentation; and from many years as
a Ship's Officer and Captain; and subsequently as a Maritime Instructor, Marine Surveyor and
Consultant; we have analyzed the facts of this case, compared them to standards within the industry
and comment as follows:

The undersigned, Capt. Marc Fazioli, has served as Master, Officer, and Deckhand on board vessels
similar in size to Tug CROSBY ENDEAVOR operating worldwide. In addition, the undersigned also
worked as the Harbor Pilot for the Port of Kwajalein, RMI, and was responsible for piloting and
navigating U. S. government ships, tugs and other commercial vessels.

The undersigned has frequently served a Master and Officer on vessels transiting the United States
Gulf Coast areas during Hurricane season, and has personally directed, and assisted with, the securing
of self-propelled vessels, and barges, in preparation for forecast storm conditions.

As a Maritime Instructor, the undersigned was responsible for training Merchant Marine Cadets
regarding various topics, including vessel mooring, lifesaving (Lifeboatman training), and vessel
emergency procedures.

The undersigned also worked for several years as a Charterer's Representative and Safety Advisor (Port Captain) for towing vessels and barges. Currently, as a Marine Consultant and Surveyor, the undersigned regularly carries out inspections and audits of various type vessels, for compliance with regulations and industry standards, including regular attendance on board various types of Crane Barges operating along the United States Gulf Coast.

The undersigned, Mr. M.P. Singh, has served as Chief Engineer of oceangoing vessels, responsible for maintaining the Engine spaces, machinery and equipment in accordance with required domestic and international standards.

In addition, the undersigned worked for several years as a Project Manager and Shipyard Superintendent for repair, conversion and newbuild construction projects at shipyards in Dubai, Singapore and the United States, including repair and construction of crane barges similar to Barge DB THOR. Currently, as a Marine Consultant and Surveyor, the undersigned regularly carries out vessel inspections and analysis for determining cause, nature and extent of vessel damage and repair issues.

Consequently, the undersigned are well aware of the customary practices and expected mooring procedures for vessels, including towing vessels such as Tug CROSBY ENDEAVOR, operating within the inland waters of the United States. The undersigned are also well aware of the industry standards and expectations for securing vessels, including compliance with Hurricane Contingency Plans such as at issue in this matter.

## I.  Hurricane Contingency Plans

All commercial vessel owners and operators working along the United States Gulf Coast must have comprehensive and appropriate Hurricane Contingency Plans, for reference by both management and vessel personnel, which provide company policies and guidance in preparation for tropical cyclone conditions.

From review of the Shore Offshore Services, LLC Health Safety & Environmental Manual - Hurricane and Tornado Preparedness Safety policies, it is apparent that the guidance is inadequate, and almost entirely inapplicable to the maritime operations of Barge DB THOR. (THOR 1375 – 1380)

The undersigned are aware that MARS operates various shipyards and facilities in coastal Louisiana, Alabama and Mississippi. The undersigned are also aware that MARS and Shore are affiliated companies that apparently share certain Health and Safety policies.

The hurricane policies detailed within the Shore manual are clearly detailed for a land-based facility and provide no practical or appropriate guidance for safely securing a large oceangoing vessel such as Barge DB THOR in accordance with standard maritime guidance or domestic United States Coast Guard requirements.

Indeed, the first entry within the Shore policy is a reference to 29 U.S.C. 654, which is a basis for the Occupational Safety & Health Administration general duty clause and associated regulations.

3D Marine USA, Inc.                                                    CONTINUATION

D210141

***29 U.S.C. 654 - Duties of employers and employees***
*(a)Each employer—*
*(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;*
*(2) shall comply with occupational safety and health standards promulgated under this chapter.*
> *(b) Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this chapter which are applicable to his own actions and conduct.*

However, while OSHA policies and procedures most certainly apply to the work carried out at the various MARS/Shore land-based facilities, OSHA does not regulate or enforce policies on board foreign commercial vessels operating within U.S. ports [See OSHA Directive No. CPL 02-01-047 - *OSHA Authority Over Vessels and Facilities on or Adjacent to U.S. Navigable Waters and the Outer Continental Shelf (OCS)].*

The operations carried out on board Barge DB THOR, including any hurricane contingency plans, must be carried out in accordance with the policies and procedures of the United States Coast Guard, as well as the vessel's Flag State (Panama). However, nothing within the Shore policies even references United Staters Coast Guard or Panamanian policies.

> ### a.    Mooring Plans

Indeed, the limited maritime vessel details within the Shore policies are inaccurate with respect to the mooring operations of large oceangoing vessels such as Barge DB THOR.

For example, the only hurricane mooring instructions contained within the Shore policies detail that, with the storm at 400 miles distance (26 hours away), *"Barges are to be secured leaving enough slack in lines and hoses to provide for rising water."*

Such guidance may be appropriate for small, unmanned, deck barges at a shipyard facility. However, for large oceangoing crane barges that will remain manned throughout the storm, it is not appropriate to leave slack within the mooring lines upon the approach of a storm.

Indeed, Barge DB THOR was fitted with 8 winches, each of which reportedly had brake settings of 80 MT. While it may not have been possible to deploy all 8 winch wires to the Martin Energy Dock facility, it most certainly would have been possible to deploy the four winch wires on the starboard side of the barge, and most likely an additional 2 or 3 winch wires from the barge port side, deployed as head/stern lines.[4]

---

[4] We particularly note that Mr. Douglas failed to deploy appropriate head lines to available bollards, and failed to take advantage of the offset dock to deploy multiple stern wires to multiple dock fixtures.

There were several deficiencies within Mr. Douglas' mooring arrangements for Barge DB THOR on 28th October 2020, including the following:

1)    Utilizing worn/damaged synthetic mooring lines when new ropes were onboard and available
2)    Utilizing different mooring materials within same service (wire and nylon rope on same axis)
3)    Utilizing short leads for breast lines
4)    Failing to utilize long *"crossing"* leads for spring lines
5)    Failing to *"double-up"* synthetic lines
6)    Failing to utilize all available winch wires and shore bollards
7)    Failing to drop the stern anchor on approach to dock or, at a minimum, failing to walk out at anchor to water's edge for immediate release and anchor deployment upon breakaway

However, we consider one of the worst decisions made by Mr. Douglas was following the advice from the Shore Manual to insert slack into the mooring lines prior to the arrival of the storm.  As can be noticed from the contemporary photographs, Mr. Douglas' decisions regarding moorings left Barge DB THOR essentially unsecured and adrift during the approach of Hurricane Zeta. (THOR 4830 – 4831)

A mooring system relies on balanced tension between the various components sharing the overall load, so that no one particular mooring line, or set of mooring lines, is placed under undue strain.

When slack is inserted to a mooring system, it is not possible to determine when, or even if, the various lines will come under anything approaching equal tension.

Of course, concerns regarding overstressing the mooring lines during hurricane surge (high water) conditions are valid.  However, the appropriate countermeasures to avoid parting lines due to surge induced strain, is to utilize long leads, crossing if necessary, regularly tended when safe to do so, that increase the holding capability of the mooring system as the strain increases.

This added strain during high water surge conditions has the added benefit of increasing friction between the vessel side shell plating and the dock fendering, thereby lessening the possibility of acceleration forces and shock loads from strong wind gusts.

In addition to the above, we noted various testimony regarding setting the *"dog"* on the winch wires. However, as detailed within the Barge DB THOR winch procedures for offshore mooring, it is not a generally good practice to engage the winch dogs with the wires deployed. (THOR 1381 – 1385)

It is a basic principal of vessel mooring operations that winch brakes are purposefully set to render (pay out) at a tension below the breaking strength of the wire.  If a winch brake is set appropriately, and the mooring system is arranged to minimize shock loads, then it would be highly unlikely to part any wires when utilizing a multi-wire mooring arrangement, due to the brakes rendering and paying out below the breaking strength, eventually equalizing tension to provide maximum system holding power.

3D Marine USA, Inc.                                                              CONTINUATION

- 13 -

D210141

If a restraining winch *"dog"* is set, the strain on a mooring wire can potentially exceed the breaking strength resulting in a wire failure, followed by cascading mooring line failures due to the resulting shock loads.

Note:   From review of the various depositions and reports, the undersigned noted numerous references to Tug CROSBY ENDEAVOR somehow failing to *"hold Barge DB THOR alongside the dock"* during the passage of Hurricane Zeta.  We consider such a premise to be inconsistent with normal and customary maritime practice.  There is no maritime principle of safe mooring that includes a tug *"holding"* a vessel such as Barge DB THOR alongside a dock during hurricane force conditions.

It is an appropriate mooring system that keeps a vessel alongside during a hurricane, not the actions of a tug alongside.  While a tug can certainly be utilized to lessen the strain on a mooring system, such actions by a towing vessel when assisting a manned vessel must be carried out in accordance with instruction from the personnel on board the moored vessel.  Otherwise, the force imparted by the tug could easily overstress an already strained mooring system, directly resulting in a breakaway event.

Barge DB THOR was arranged with high visibility 360-degree windows at the upper *"bridge"* location that would have been suitable for Mr. Douglas and the other members of the barge crew to monitor the strain on the mooring lines, as well as any potential actions of Tug CROSBY ENDEAVOR, throughout the passage of Hurricane Zeta.

From review of the testimony of Mr. Gibilterra, we note that he was well aware of 3rd Party mooring plans created by Naval Architects and Professional Engineers that assess the necessary mooring line deployment, angles, etc. based on vessel location available dock fixtures, etc.  Enclosure i) is an example of a mooring plan utilized by a vessel similar in size and displacement to Barge DB THOR.  As can be noted from review of the mooring plan, the Professional Engineer required usage of appropriate mooring line leads, based on the actual location of the shore fixtures and vessel fairleads.

Shore failed to arrange for any professional mooring assessment to be carried out with respect to Barge DB THOR at Port Fourchon and did not even provide Mr. Douglas with useful advice concerning best industry practices he could have utilized to minimize the possibility of a breakaway event.

With respect the use of the anchor, we note that Mr. Douglas did not appropriately consider the use of the anchor as a proactive means of mooring Barge DB THOR.  If the anchor had been dropped while transiting towards the dock, Barge DB THOR would have swung out in the channel following the breakaway but would most likely have been able to maintain position within the channel utilizing the assistance of Tug CROSBY ENDEAVOR secured alongside.

Mr. Douglas' alleged concerns regarding underwater pipelines are unfounded.  From review of the NOAA Chart 11346, which was readily available online, and in electronic form on board Barge DB THOR, it is apparent that there are no pipeline crossings in the vicinity of the Martin Energy Dock, and indeed, the nearest upriver pipeline crossing was nearly 3 nm north at the junction with Bayou Cochon.

Regardless, it is always advisable to utilize an anchor when drifting uncontrolled.  If drifting over a pipeline crossing with an anchor deployed, the correct course of action would be to slack additional chain or wire in order to allow a dragging anchor to *"set"* before potentially coming into contact with submerged pipelines.

Lastly, from review of the ballasting plan, it appears that Mr. Douglas made no attempt to maximize the vessel ballast, thereby decreasing the freeboard, during the approach of Hurricane Zeta (THOR 4955).  It is generally advisable to fill all available tanks in order to reduce the overall wind profile of a vessel during hurricane force conditions.  Winds increase in speed and intensity at higher altitude.  Even a small decrease in the overall height and exposed wind area of a vessel can have an effect on the overall load being placed mooring, again assuming appropriate measures have been taken to avoid shock loads from slack line conditions.

### b.    Safe Harbor (Safe Refuge)

The concept of a *"Safe Harbor"* or *"Safe Refuge"* during the passage of a storm is a basic principle of vessel operation that is highly situational dependent upon the type of vessel, capabilities of vessel and location of vessel.  Of course, the concept of *"Safe Harbor"* is also highly dependent upon the nature of the forecast weather, as well as the force, direction and anticipated duration of the storm.

Port Fourchon is an exposed port, built directly on a low-lying barrier island off the coast of Lousiaina.  In addition, there are very few manmade or natural features within Port Fourchon which provide shelter or wind blocks.  Consequently, Port Fourchon would not generally be considered a *"Safe Harbor"* or *"Safe Refuge"* for anything other than relatively small oilfield support vessels, offshore towing vessels and recreational vessels.

Port Fourchon could certainly have been a *"Safe Harbor"* option, if necessary, for Barge DB THOR, assuming of course that Shore Offshore Services, LLC had properly evaluated the available mooring arrangements ahead of time and appropriately determined that the barge could be safely moored given the anticipated force of the storm.

Port Fourchon was certainly an appropriate *"Safe Harbor"* option for Tug CROSBY ENDEAVOR, as well as dozens of other oil & gas industry vessels, to ride out the storm.  Indeed, Crosby maintains a fleet of multiple vessels (under 500 GRT), in various states of operational readiness, at the inner slip areas of Port Fourchon.

There was no reason whatsoever for Tug CROSBY ENDEAVOR to have refused Shore's instructions to tow Barge DB THOR to Port Fourchon on 26th October.  It was the responsibility of the owners/operators of Barge DB THOR to ensure that they maintained an appropriate mooring plan for use at Port Fourchon, not the command of Tug CROSBY ENDEAVOR, which did not even participate in the securing of Barge DB THOR to the Martin Energy Dock.

Regardless, based on our review of the information available to Barge DB THOR regarding the forecast track of Hurricane Zeta, it is apparent that the Ship Shoal Block 259 location was at the western edge of the projected track, with no indication that the storm would make landfall in far western Louisiana or anywhere along the Texas coast.

Consequently, even at 5 knots speed, Tug CROSBY ENDEAVOR could easily have travelled more than 100 miles per day and reached the Galveston anchorage before Hurricane Zeta made landfall at Port Fourchon.  If Shore had been more proactive and required Barge DB THOR to depart Ship Shoal Block No. 259 soon after the first forecasts were predicting Louisiana landfall occurred on 24th October, the barge could most likely have reached Corpus Christi, if necessary, which was experiencing fair weather throughout the time period at issue in this matter.

In addition, Port Fourchon is located within the wider United States Coast Guard – Sector New Orleans Captain of the Port zone. The New Orleans Maritime Hurricane Contingency Port Plan is clear that the first option for all large oceangoing vessels is to use appropriate weather routing principles to remain at sea instead of remaining in port:

*From June 1st to November 30th each year the communities and ports of the Gulf Coast face the threat of hurricanes. Gulf Coast hurricanes routinely make landfall and adversely impact shoreline communities.*

*The New Orleans area is particularly vulnerable to the hazards associated with hurricanes. Flooding and hurricane force winds can combine to cause substantial damage and disruption in our port, including:*

> *Bridge damage;*
> *Vessel damage;*
> *Waterfront facility damage;*
> *Cargo handling equipment damage;*
> *Critical waterways clogged with debris;*
> *Aid to Navigation disruptions;*
> *Containers and petroleum and chemical storage tanks damaged;*
> *Piers and wharfs sustaining structural damage; and*
> *Vessels grounded.*

*Threatened as we are by these hazards, it is important that the entire port community share a common understanding of the measures required to increase our hurricane readiness.* (Page 1)

*This part of the plan contains general recommended precautionary measures that vessels and waterfront facilities can take to reduce the potential for loss of life, injury, or property damage from a hurricane. The safety precautions contained in this part are not the only precautions that may be necessary to fully prepare a vessel or facility. The unique characteristics of the vessel or facility, and the unique attributes of the storm, may dictate the need for additional measures and/or modifications to the measures contained in these recommendations.* (Page 3)

- 16 -

***When the port is threatened by hurricane force winds and severe storm surge, the recommended course of action for all seaworthy vessels is evasion at sea.*** (Page 4)

*All vessels that intend to remain in port should consider the appropriateness of taking on additional ballast or cargo to improve their stability. Vessels in a fully loaded condition normally fare better than light vessels in hurricanes.* (Page 4)

The Shore Offshore Services, LLC Hurricane policies contained none of the above detailed guidance, nor any references to the various Port Conditions detailed within the United States Coast Guard plans.

Indeed, one of the requirements for oceangoing barges (and vessels over 500 GT), was to submit a *"Remaining in Port Checklist"* (RIPC) to the Captain of the Port including the exact reasons as to why the vessel was remaining in port, as well as providing the full details of the barge mooring plans/ arrangements.

Neither Mr. Douglas, nor apparently anyone else within the Barge DB THOR management, had appropriate knowledge of these required United Coast Guard procedures, which were not carried out by MARS or Shore prior to the 28th October 2020 breakaway incident.

## II.     *Additional Comments*

From review of the various deposition testimonies, including in particular the testimony of Mr. Gibilterra, we noted various comments and insinuations that Shore Offshore Services, LLC functions as a barge operator with only limited knowledge of towing vessels, or other self-propelled vessel operations.

However, from review of historical website searches, as well as other publicly available information, it is apparent that currently, and as of October 2020, Shore Offshore Services, LLC operated an extensive fleet of vessels including not just offshore crane barges, but also multiple towing vessels, and at least one self-propelled Offshore Supply Vessel (OSV).

Indeed, the undersigned utilized the *"wayback"* service to review the contents of the Shore website at the time of the October 2020 incident.

Contrary to the provided Shore Offshore Services, LLC Organizational Chart (THOR 1502), the Shore website details that company was operating the following crane barges and self-propelled vessels during the October 2020 time period.

Crane Barges
DB THOR
DB PACIFIC
DB PERFORMANCE

Offshore Supply Vessel
M.A.R.S. FREEDOM
Towing Vessel
M.A.R.S. TITAN[5]

In addition to the vessels detailed within their Fleet List, the United States Coast Guard Port State Information Exchange (PSIX) details indicate that MARS owned at least two additional towing vessels which were apparently operated by Shore during 2020:

Towing Vessels
M.A.R.S. WAR MACHINE
M.A.R.S. LIBERTY

Mr. Gibilterra testified that he did not recall the reasons why the MARS-owned Tug M.A.R.S. TITAN was not being utilized to tow Barge DB THOR during October 2020.

However, from review of the Tug M.A.R.S. TITAN, Tug M.A.R.S. WAR MACHINE and Tug M.A.R.S. LIBERTY United States Coast Guard inspection records, it is apparent that, during 2020, MARS, and/or Shore, failed to comply with the 46 Subchapter M towing vessel inspection requirements.

The available records indicate that Shore was utilizing Tug M.A.R.S. TITAN for Barge DB THOR operations as recently as 10th October 2020, which would have been contrary to the requirements of 46 CFR 136.202. (THOR 7487)

***46 CFR 136.202 Certificate of Inspection phase-in period.***

*(a) All owners or managing operators of more than one existing towing vessel required to have a COI by this subchapter must ensure that each existing towing vessel under their ownership or control is issued a valid COI according to the following schedule:*
    *(1) By July 22, 2019, at least 25 percent of the towing vessels must have valid COIs on board;*
    *(2) By July 20, 2020, at least 50 percent of the towing vessels must have valid COIs on board;*
    *(3) By July 19, 2021, at least 75 percent of the towing vessels must have valid COIs on board; and*
    *(4) By July 19, 2022, 100 percent of the towing vessels must have valid COIs on board.*

*(b) All owners or managing operators of only one existing towing vessel required to have a COI by this subchapter must ensure the vessel has an onboard, valid COI by July 20, 2020.*

---

[5] Tug M.A.R.S. TITAN is the former Tug OFFSHORE KING, which apparently was assigned to work with Barge DB THOR (ex DB WILLIAM KALLOP) for several years under previous ownership.

3D Marine USA, Inc.                                                        CONTINUATION
                                    - 18 -
D210141

It is unknown if MARS, and/or Shore, continued to utilize Tug M.A.R.S. TITAN after October 2020, contrary to the requirements of 46 CFR 136.202.  However, we note that, during February 2021, Tug M.A.R.S. TITAN received a non-compliance notice from the United States Coast Guard and did not complete her 46 CFR Subchapter M inspection process until October of 2021, nearly a year after the Barge DB THOR incident during the passage of Hurricane Zeta.

Lastly, from review of the posted Barge DB THOR General Arrangement Drawings, we note that the vessel was apparently designed with forward and aft positioned azimuthing thrusters.

Vessel General Arrangement Drawings/Plans are intended to accurately reflect the construction features of a barge.  However, we are uncertain if these thrusters remained onboard Barge DB THOR, and/or were maintained in an operable condition by MARS/Shore, during October 2020.

Regardless, it is apparent that the original design of Barge DB THOR included thrust capabilities that would have most likely been highly effective for directly relieving the tension on the barge mooring system during the passage of Hurricane Zeta.



  **D.**  <u>**Opinions**</u>

Including the above analysis of the case in question, we are of the following additional opinions:

1) Firstly, we are of the opinion that Hurricane Zeta was reasonably and accurately forecast, with the National Weather Service and United States Coast Guard warnings and information broadcasts delivered in a timely manner.

2) We are of the opinion that, during 19th to 29th October 2020, Tug CROSBY ENDEAVOR was working as directed by the command of Barge DB THOR.

   The undersigned is not aware of any failure of Tug CROSBY ENDEAVOR to follow the directions and instructions provided by the command of Barge DB THOR.

3) We are also of the opinion that Modern American Recycling Service, Inc. and/or Shore Offshore Services, LLC failed to provide appropriate, or even reasonably applicable, Hurricane Contingency Plans for use by vessel management and Barge DB THOR personnel during October 2020.

   Indeed, we believe the Hurricane Preparedness procedures that were apparently provided by Shore Offshore Services, LLC to Barge DB THOR were actually shoreside facility (shipyard) Hurricane Preparedness procedures that provided inaccurate, and or misleading, information and guidance regarding the mooring/securing of Barge DB THOR during the passage of Hurricane Zeta.

4) We are further of the opinion that the command of Barge DB THOR should have directed Tug CROSBY ENDEAVOR to remain at sea, carrying out reasonable weather routing procedures, i.e. heading west towards Texas or Mexico, to avoid the passage of Hurricane Zeta.

   However, once the decision was made by the management and command of Barge DB THOR to proceed towards Port Fourchon, and into the path of Hurricane Zeta, the barge crew should have secured the barge alongside the dock facility in accordance with accepted good maritime practice and should have complied with the guidance and requirements of the United States Coast Guard – Sector New Orleans Hurricane Contingency Port Plan.

   We believe the command of Barge DB THOR failed to reasonably secure the crane barge alongside the Martin Energy Dock; failed to utilize all available resources to prevent and/or reduce the possibility of a breakaway event during the passage of Hurricane Zeta; and failed to respond the breakaway event in a reasonable or seamanlike manner in order to prevent, and/or reduce, the alleged occurrence of injuries as well as physical damages to Barge DB THOR and additional vessels secured within the surrounding waterways.

### E.    Conclusions

In conclusion, we do not believe that any decisions, actions or inactions of Crosby Tugs, LLC, Tug CROSBY ENDEAVOR, nor her Master and other crewmembers, caused, or contributed to, the breakaway incident of Barge DB THOR at the Martin Energy Dock within Port Fourchon, Louisiana on 28th October 2020.

We reserve the right to amend or supplement this opinion should further information be made available.

Without prejudice,


Marc A. Fazioli                                          M. P. Singh
3D Marine USA, Inc.                                      3D Marine USA, Inc.

The opinions expressed in this report are based upon a review of the documentation provided. This report, including the opinions and analyses contained within, is the product of an application of the preparer's experience and knowledge in the context of the material provided in this matter and cannot be applied to other situations or incidents, no matter how similar they may be. Furthermore, this report does not attempt to resolve conflicts, nor is it intended to discredit witnesses or experts, and is produced bearing in mind that it is normal for conflicts to exist between the accounts of witnesses.


Attachments:          i)      Genesis Engineering Mooring Plan
                      ii)     Chart 11346
                      iii)    Maritime Hurricane Contingency Port Plan
                      iv)     Shore Offshore Services, LLC Historical Website & Tug Details
                      v)      Tug M.A.R.S. TITAN PSIX Data
                      vi)     CV and Details for M.P. Singh
                      vii)    CV and Details for Marc A. Fazioli

i)      Genesis Engineering Mooring Plan

| Project Number | Booking Code | Sequence Number |
|---|---|---|
| 14-531 | MEM | 002 |
| Client Reference Number: | | |



# PARAGON

O F F S H O R E

# PARAGON DPDS1
# Operation Support

**Document Number:**
**14-531-MEM-002**

# Mooring at Dock
# Aransas Pass, Texas

**August 2017**

**Prepared for**
**Paragon Offshore**
**Houston, Texas**

**Prepared by**



SCHENKEL
26
April 26, 2019
Court Reporter:
Stephanie M. Harper, RPR, CSR

| Rev. | Date | Reason for Issue | Written By | Checked By | Approved By | Client Approval |
|---|---|---|---|---|---|---|
| 0 | 05/26/17 | Issued for review | TL/DC | DC | DC | |
| 1 | 06/26/17 | Issued for review | TL/DC | DC | DC | |
| 2 | 07/03/17 | Issued for review | TL/DC | DC | DC | |
| 3 | 08/24/17 | Issued for review | TL/DC | DC | DC | |
| | | | | | | |

| PARAGON DPDS1 Operation Support | Rev. 3 |
|---|---|
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 2 of 10 |

### Mooring at Dock, Aransas Pass, Texas

We have performed mooring analyses for the revised mooring layout of **PARAGON DPDS1** at a dock in Aransas Pass, Texas.

The mooring line components are listed in Table 1. The mooring arrangement was developed by Paragon Offshore, as depicted in Figure 1. The mooring lines were assumed tensioned to the level listed in Table 2.

It was assumed the drillship was tied to the dock at 7.194 m draft with 1.260 m aft trim and the dock deck elevation is 3.0 m above water surface.

The mooring was analyzed to wind only conditions with wind speeds between 15 to 35 m/sec (29.2 to 68.0 knots). The wind was considered coming from the dock side and the shielding effect from the dock was not considered. In addition, it was also considered a 2 knots current coming in and out of the channel. The wave loads were ignored in this static analysis.

Orcaflex was used for this analysis. Its model is demonstrated in Figure 2. The analysis results are summarized in Figures 3 through 12. Please note that the wind speed in the charts is 1-minute average speed at 10 m elevation.

From the results, we can conclude:

1. With an FOS of 2.0 for the intact mooring condition, the mooring lines with Dyneema ropes can withstand wind speed up to about 70 knots without or with the 2 knots current. Line #6 is the most critical line, followed by lines #1 and #14.

2. The lines with the wire + chain + wire configuration are used to reduce the dynamic movement of the drillship. They are very loose and are not expected to have any significant tension at any time.

3. The ultimate capacity of the bollards on the dock is assumed at 200 MT. With an FOS of 2.0, the results show the bollards can sustain the mooring loads from wind speed up to 68 knots without the current and up to 67 knots with the 2 knots current. Bollards #4 and #1 are the most critical bollards.

4. The ultimate capacity of the whole tripod on the dock is 600 MT. With an FOS of 2.0, the results show the tripod legs can sustain the mooring loads from wind speed up to about 78 knots without or with the 2 knots current. Tripods #2 and #3 are the most critical ones.

5. The load on the mooring system is dominated by the wind load. The minimum load from the 2 knots current coming in and out of the channel is less than 6 MT. The analysis results have shown little differences with and without the current.

| PARAGON DPDS1 Operation Support | Rev. 3 |
|---|---|
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 3 of 10 |

### Table 1 Mooring Components

| Component | 3" Proton-8 Dyneema Rope | 3" ORQ Studlink Chain | 2" EIPS Wire Rope |
|---|---|---|---|
| Length (m) | - | 60.96 | $12.19^1 + 24.38^2$ |
| Diameter (mm) | 76.2 | 76.2 | 50.8 |
| EA (MT) | $19,688^1$ | 59,800 | 12,542 |
| MBS (MT) | 246 | 474 | 179 |

*Note:* 1. *On the ship end.*
2. *On the dock end.*
3. *80 times of breaking strength.*

### Table 2 Mooring Line Tensions, From Bow to Stern

| Line No. | Anchor Point[1] | Drillship Fairlead | Components | Line Tension (MT) |
|---|---|---|---|---|
| 1 | Bollard 4 | FE | 3" Dyneema Rope | 2.5 |
| 2 | Bollard 4'[2] | FE | 3" Dyneema Rope | 2.5 |
| 3 | Tripod 4-3 | Fr.187p | 3" Dyneema Rope | 3 |
| 4 | Bollard 3'[2] | Fr.175p | 3" Dyneema Rope | 2 |
| 5 | Tripod 3-2 | Fr.168p | 3" Dyneema Rope | 4 |
| 6 | Tripod 3-3 | Fr.145p | 3" Dyneema Rope | 1.5 |
| 7 | Tripod 2-1 | Fr.145p | Wire + Chain +Wire | 0 |
| 8 | Tripod 3-1 | Fr.28p | Wire + Chain +Wire | 0 |
| 9 | Tripod 2-2 | Fr.28p | 3" Dyneema Rope | 1.5 |
| 10 | Tripod 2-1 | Fr.8p | 3" Dyneema Rope | 1.5 |
| 11 | Tripod 2-2 | Fr.3p | 3" Dyneema Rope | 1.5 |
| 12 | Tripod 1-2 | AE out p | 3" Dyneema Rope | 2 |
| 13 | Tripod 1-2 | AE out p | 3" Dyneema Rope | 2 |
| 14 | Bollard 1 | AE in p | 3" Dyneema Rope | 4.5 |
| 15 | Bollard 2 | AE in s | 3" Dyneema Rope | 4.5 |

*Note:* 1. *The bollards, tripods and mooring cleats are counted from southeast end of the dock. The legs of the tripods are counted clockwise from the leg closest to the drillship.*
2. *Bollards on the other side of the dock.*

| PARAGON DPDS1 Operation Support | Rev. 3 |
|---|---|
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 4 of 10 |



Figure 1  Revised Mooring Arrangement

Paragon (DPDS1)  210

| PARAGON DPDS1 Operation Support | Rev. 3 |
|---|---|
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 5 of 10 |



Figure 2  Orcaflex Model



| PARAGON DPDS1 Operation Support | Rev. 3 |
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 6 of 10 |



Figure 3  Mooring Line FOS vs Wind Direction, 3" Dyneema Rope Lines, without Current



Figure 4  FOS of Bollards vs Wind Direction, without Current

| PARAGON DPDS1 Operation Support | Rev. 3 |
|---|---|
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 7 of 10 |



Figure 5  FOS of the Tripod Legs vs Wind Direction, without Current



Figure 6  FOS of the Mooring Lines vs Wind Speed, without Current

| PARAGON DPDS1 Operation Support | Rev. 3 |
|---|---|
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 8 of 10 |



Figure 7 FOS of the Anchor Points vs Wind Speed, without Current



Figure 8 Mooring Line FOS vs Wind Direction, 3" Dyneema Rope Lines, with 2 kts Current

| PARAGON DPDS1 Operation Support | Rev. 3 |
| --- | --- |
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 9 of 10 |



Figure 9  FOS of Bollards vs Wind Direction, with 2 kts Current



Figure 10  FOS of the Tripod Legs vs Wind Direction, with 2 kts Current

| PARAGON DPDS1 Operation Support | Rev. 3 |
|---|---|
| Document Number: 14-531-MEM-002 | August 2017 |
| Mooring at Dock, Aransas Pass, Texas | Page 10 of 10 |



Figure 11  FOS of the Mooring Lines vs Wind Speed, with 2 kts Current



Figure 12  FOS of the Anchor Points vs Wind Speed, with 2 kts Current

Paragon (DPDS1)  216

ii)     Chart 11346



iii)    Maritime Hurricane Contingency Port Plan

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

**Sector New Orleans**



**Maritime Hurricane Contingency Port Plan**

**Annex (A) to Sector New Orleans Hurricane Plan**

**A Guide to Port Planning and Preparation**

**Date Published:  06 AUG 2015**
**Date Revised: 22 May 2017**

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

TABLE OF CONTENTS

**TOPIC**          **Page**

Table of Contents ii
Record of Changes iii

**INTRODUCTION**
Background 1
Assumptions 1
Authority 2
Applicability and Purpose 2
Amendments 3
Distribution 3

**RECOMMENDED STORM PREPARATIONS**

General 3
Vessels 4
Facilities 4

**COTP ACTIONS AND DECISIONS**

General 5
Port Conditions 6
Information Sources 6
Specific Pre-Storm Actions 7
Specific Post-Storm Actions 13

Enclosure (1) - Remaining in Port Checklists (RIPC) for Oceangoing Vessels 14
Enclosure (2) - Remaining in Port Checklist Reporting Tool 18
Enclosure (3) - Storm Preparation Checklists for Vessels 19
         Recommended Precautionary Measures for Ships 23
         Recommended Precautionary Measures for Barges 24
Enclosure (4) - Storm Preparation Checklists for Waterfront Facilities 25
Enclosure (5) - Cargo of Particular Hazard and Certain Dangerous Cargo 29
Enclosure (6) – Annual Hurricane Operations Plan (AHOP) Guidance 30
Enclosure (7) - Options for Port Conditions 43
Enclosure (8) - Post Storm Deep Draft Vessel Movement Guidance 45
Enclosure (9) - Port Coordination Team Agenda 46

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

## RECORD OF CHANGES

| CHANGE NO. | DATE OF CHANGE |
|---|---|
| 1 | April 16, 2009, updated Maritime Hurricane Contingency Port Plan |
| 2 | April 21, 2009 included updated Sector's IMT ICS-203 form |
| 3 | April 23, 2009, updated departmental hurricane condition check lists |
| 4 | May 1, 2009, updated plan format |
| 5 | May 4, 2009, included MSU Morgan City and MSU Baton Rouge Hurricane Plans |
| 6 | May 4, 2009, included RNA and Severe Weather Mooring and Anchoring Policy |
| 7 | May 6, 2009, included CD of ICS forms |
| 8 | May 7, 2009, updated List of acronyms |
| 9 | May 15, 2009, updated Port Condition information |
| 10 | May 27, 2009, updated Sector's ICP organizational chart |
| 11 | June 9, 2010, updated Port of New Orleans waterways; updated Hurricane Port Conditions Pre- and Post-storm specific activities; updated Port Conditions to include Hurricane RNA requirements; updated Information Sources; and, added Enclosure 5 – RNA and Enclosure 6 – Barge Fleet MOU Mile 71. |
| 12 | April 17, 2012, updated Port of New Orleans waterways, updated "Remain In Port Checklist", updated maritime associations. |
| 13 | May 23, 2012, Inserted Enclosures 8, 9 and 10; clarified role of the Port Coordination Team; removed reference to commercial port area boundaries in the discussion of waterway restrictions to maximize flexibility; added assumptions; updated facilities section addressing need to press up or empty storage tanks in flood prone locations. |
| 14 | August 5, 2013, clarified language regarding closure times to mirror consistency and current operations. Pg's 6, 8, 11. |
| 15 | August 7, 2013, clarified language in the Port Condition Zulu and Shallow Draft stakeholders' portions. Pg's 9, 20, 36. |
| 16 | May 30th, 2014, inserted Hurricane RNA Final Rule into Enclosure 6, removed redundant language and updated structure terms in Port Conditions Yankee and Zulu, updated contact information in MM 71 MOU, updated PCT Agenda. |
| 17 | June 4, 2014, inserted maps of RNA area into Enclosure 6. |

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

| | |
|---|---|
| 18 | August 06, 2015, made several syntax and grammar corrections throughout document.  Added reference for COTP zone under applicability and purpose on page 2. Added WWM e-mail address under amendments on page 3. Added homeport and MSIB subscription management instructions as footnote on page 3. Moved Recommended Storm Preparations section before COTP Actions and Decisions.  Changed all instances of "Mile Marker 71 MOU" to "Mile Marker 73 MOA." |
| 19 | May 23, 2017, added Annual Hurricane Operations Plan (AHOP) Guidance. |

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

## INTRODUCTION

Background

From June 1st to November 30th each year the communities and ports of the Gulf Coast face the threat of hurricanes. Gulf Coast hurricanes routinely make landfall and adversely impact shoreline communities.

The New Orleans area is particularly vulnerable to the hazards associated with hurricanes. Flooding and hurricane force winds can combine to cause substantial damage and disruption in our port, including:

- Bridge damage;
- Vessel damage;
- Waterfront facility damage;
- Cargo handling equipment damage;
- Critical waterways clogged with debris;
- Aid to Navigation disruptions;
- Containers and petroleum and chemical storage tanks damaged;
- Piers and wharfs sustaining structural damage; and
- Vessels grounded.

Threatened as we are by these hazards, it is important that the entire port community share a common understanding of the measures required to increase our hurricane readiness.

Assumptions:

The following planning assumptions facilitate pre-storm planning and will be considered until superseded by real world conditions for a particular storm. These planning assumptions will ensure the most likely and worst case scenario is taken into account and subsequently planned for from the onset of each tropical weather event.

Each tropical weather event is different and will pose its own unique threats and concerns due to variations in storm track, wind intensity, storm surge, port congestion, river stage, etc.

Storm impacts will vary across the Sector New Orleans area of responsibility due to storm size, track and the geographic expanse of the Sector.

A significant storm may require the Sector Commander to enact Sector New Orleans Continuity of Operations Plan (COOP) requiring the Sector to evacuate which will greatly complicate pre- and post-storm coordination and communication. Port and Waterway stakeholders may also evacuate compounding coordination, communication, and logistical challenges.

1

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

Commercial waterways will require assessment prior to being reopened to unrestricted commercial navigation. The scope and extent of these assessments will be predicated on a storm's impact on the waterway in question.

A large portion of the critical aids to navigation throughout the Sector may be damaged and/or out of service post-storm.

Competing demands for limited port and navigation resources, including but not limited to pilots, harbor tugs, and berth space will require prioritization of vessel movement post-storm.

Coast Guard forces will balance multiple competing demands post-storm, including search and rescue, marine environmental pollution response and salvage operations in addition to port reopening and waterways management.

The Regulated Navigation Areas on both the East and West Bank of the Mississippi River will likely be enforced pre-storm to protect the Hurricane Storm Damage Risk Reduction System (HSDRRS).

<u>Authority</u>

The provisions of Title 33, Code of Federal Regulations (CFR), Parts 160 and 165, describe the authority that Coast Guard Captains of the Port (COTPs) may use to ensure port safety. Specifically, COTPs are authorized to:

- Establish safety zones;

- Direct the handling, loading, unloading, storage and movement of dangerous cargoes aboard waterfront facilities; and

- Order vessels to operate or anchor, in whatever manner is necessary to protect life, property, and the environment.

<u>Applicability and Purpose</u>

This plan is applicable to all waterfront facilities and vessels within the COTP, New Orleans, Louisiana Zone defined in Title 33, CFR, Part 3.40-15

Purpose:

- To advise the maritime community of the sequence and timing of COTP decisions and actions during periods when the port is threatened by a hurricane; and,

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

- To recommend and direct actions that should be taken by vessels and waterfront facilities to minimize storm related deaths, injuries, property damage and threats to the environment.

Amendments

Amendments will be incorporated into this plan by U.S. Coast Guard Sector New Orleans following a formal annual review.  However, suggestions and changes may be offered at any time, especially following the implementation of the plan during exercises or actual hurricane emergencies. Suggestions and changes may be submitted to U.S. Coast Guard Sector New Orleans by email at SECNOLA-WPM@USCG.MIL.

Distribution

This plan is available on the USCG SECTOR NEW ORLEANS web site - **http://homeport.uscg.mil/nola**[1].  Due to the geographic size of the COTP zone, the electronic version of this plan is best way to ensure widest dissemination with port partners.  Paper copy distribution will be limited, but copies may be requested under extenuating circumstances.

**RECOMMENDED STORM PREPARATIONS**

**General:**

This part of the plan contains general recommended precautionary measures that vessels and waterfront facilities can take to reduce the potential for loss of life, injury, or property damage from a hurricane.  The safety precautions contained in this part are not the only precautions that may be necessary to fully prepare a vessel or facility.  The unique characteristics of the vessel or facility, and the unique attributes of the storm, may dictate the need for additional measures and/or modifications to the measures contained in these recommendations.

The COTP will continuously review the status of all hurricane preparations (vessel and facility) and direct the correction of dangerous conditions.  The COTP will issue orders only to those vessels or facilities that fail to initiate appropriate action.

Nothing in these recommendations shall be construed as relieving the masters, owners, operators, and agents of vessels or the owners, operators, and persons-in-charge of waterfront facilities from their primary responsibility for the safety of such vessels or waterfront facilities during a hurricane.  Similarly, in no way should any of these recommendations be understood as the COTP advocating personnel being placed in life threatening situations to secure property.

---

[1] On http://homeport.uscg.mil/nola, the link to the plan is located in the right-hand column, in the "Safety and Security" box, under "Local Contingency Plans"

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

**Vessels:**

When the port is threatened by hurricane force winds and severe storm surge, the recommended course of action for all seaworthy vessels is evasion at sea.  Departure to sea should commence well before the expected arrival of hurricane force winds because weather conditions at Southwest Pass deteriorate far before other areas of the waterway and make it unsafe for pilots to disembark from outbound vessels long before hurricane landfall.  Port Conditions, once set, cover the entire Sector New Orleans AOR. Marine Safety Information Bulletins (MSIBs) and Broadcast Notice to Mariners (BNMs) will be used to communicate any waterway restrictions or vessel movement control actions associated with a particular Port Condition.  The MSIBs and BNMs will specify which portions of the Sector New Orleans AOR are covered/impacted by these actions (i.e. will clearly state which waterways are open, which waterways are closed, etc.).

The Coast Guard has established a regulated navigation area (RNA) for the canals adjoining the Mississippi River. The provisions of the RNA will be enforced 24 hours in advance of the closure of the Lake Borgne Surge Barrier or West Closure Complex navigation gates. Vessels will not be permitted to stay in the RNA past 24 hours in advance of and through the storm passage if the RNA is activated, except those vessels moored in accordance with mooring plans verified by the Captain of the Port. Alternate routes exist for vessels to transit around or depart from the RNA. This RNA is needed to protect the floodwalls, levees, and adjacent communities within the IHNC, Harvey, and Algiers Canals from potential hazards associated with vessels being in this area during a hurricane.

Those ships unable to evade the storm at sea should anchor within established anchorages.

All barge fleets within the COTP zone should review the Greater New Orleans Barge Fleeting Association's publication entitled Barge Fleeting: Standard of Care & Streamlined Inspection Program Section (m), High Water. All fleets will be required to meet the mooring standards set in 33 CFR 165. 803(m)(2)(i-iii).

All vessels that intend to remain in port should consider the appropriateness of taking on additional ballast or cargo to improve their stability. Vessels in a fully loaded condition normally fare better than light vessels in hurricanes.

**Facilities:**

If a hurricane or a severe weather event threatens the Sector New Orleans COTP zone, all waterfront facilities, shipyards and marinas should immediately assess the current condition of the property.  The assessment should include identifying loose items or equipment that could become missile hazards or become potential pollution sources in high winds (i.e., fuel oil barrels, drums, tanks, welding equipment, etc.).

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

Bulk liquid facilities in areas prone to flooding should take actions to secure their tanks to prevent them from being displaced by pressing up or emptying their tanks and removing access plates to prevent buoyancy. They should also remove hazards such as tank cars (highway and rail) and portable tanks that may also float free and create a hazard.

Facility owners and operators should alert personnel to commence heavy weather preparations in order to ensure compliance with all Waterfront Facility storm preparation action requirements found in Enclosure (4).

Additional References:

- **Gulf Intracoastal Canal Association's (GICA) Joint Hurricane Response Protocol**: This document the product of the Gulf Coast Inland Waterways Joint Hurricane Team, whose membership includes representatives from USCG District Eight and Gulf Coast Sectors, USACE, NOAA, the State of Louisiana, and industry representatives. The Joint Hurricane Response Protocol is an excellent resource for severe weather preparations and post-storm recovery efforts. The full document can be found at the following link: http://www.gicaonline.com/Images/Interior/resources/gica%20joint%20hurricane%20protocol%201%20june%202014.pdf

- **"Mile Marker 73 MOA"**: This document provides barge fleet owners and operators below Mile Marker (MM) 73 Above Head of Passes, Lower Mississippi River (LMR) with policy and guidance for the fleeting of barges in this area during hurricane season. The full name of the document is "Memorandum of Agreement between the United States Coast Guard and the American Waterways Operators, Gulf Intracoastal Canal Association, Greater New Orleans Barge Fleeting Association, Ingram Barge Company, Teco Barge Line, AEP Memco Barge Line, American Commercial Barge Line, Turn Services fleeting, International Marine Terminals Regarding Fleet Operations During Hurricane Season."

**COTP ACTIONS AND DECISIONS**

General

Port Conditions are set by COTP New Orleans in advance of an arriving hurricane. They are based on a prediction of gale force winds at Southwest Pass. Gale force winds are defined as sustained winds of 34 knots (39 mph). These predictions are based on information obtained from the National Weather Service. The intent of setting Port Conditions is to provide the marine community with sufficient time to make preparations in order to minimize damage from heavy weather. Port Conditions, once set, cover the

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

entire Sector New Orleans AOR. Marine Safety Information Bulletins (MSIBs)[2] and Broadcast Notice to Mariners (BNMs) will be used to communicate any waterway restrictions or vessel movement control actions associated with a particular Port Condition.  The MSIBs and BNMs will specify which portions of the Sector New Orleans AOR are covered/impacted by these actions (i.e. will clearly state which waterways are open, which waterways are closed, etc.). Subscription status for the MSIB may be managed at http://cgls.uscg.mil, then under hosted groups you will find Sector New Orleans MSIB.  All published MSIB's may also be found on Sector New Orleans Homeport Page: https://homeport.uscg.mil, then choose New Orleans under Port Directory.

**Port Conditions**

The four (4) port conditions are:

- **WHISKEY:**  Gale force winds are predicted at Southwest Pass in **72 hours**.
- **X-RAY:**  Gale force winds are predicted at Southwest Pass in **48 hours**.
- **YANKEE:**  Gale force winds are predicted at Southwest Pass in **24 hours**. This condition is also used after the storm passes, because vessel traffic control measures may still be in effect.
- **ZULU:**  Gale force winds are predicted at Southwest Pass in **12 hours**.

Information Sources

The COTP will communicate changes in Port Conditions in the following ways:

- The Maritime community will be notified each time there is a change in Port Condition via Marine Safety Information Bulletin (MSIB).  The MSIB is released via email and will be posted on Homeport at http://homeport.uscg.mil/nola.
- Vessels will be notified via a Broadcast Notice to Mariners (BNM). Hurricane BNMs will be broadcast on VHF-Channels 16 and 67.
- Questions concerning Port Conditions may be directed to the Sector Command Duty Officer, who can be reached 7 days a week, 24 hours a day, at (504) 365-2200 or 1-800-874-2153.
- For continuity of operations during a tropical event, contact information for Sector New Orleans will be provided via MSIBs should the need arise for the Sector to evacuate and shift operations to a safe haven.

Prior to hurricane season or predicted tropical activity, general inquiries regarding port status and conditions can be directed to Sector New Orleans Waterways Management via email at SECNOLA-WPM@uscg.mil .

---

[2] To subscribe to the MSIB mailing list, please visit http://cgls.uscg.mil/mailman/listinfo/secnola-msib and complete the subscription form. Copies of MSIBs are also posted at http://homeport.uscg.mil/nola, in the right-hand column, in the "Safety and Security" box, under "MSIB".

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

**Specific Pre-Storm Actions**

The COTP will coordinate with the Port Coordination Team (PCT) and establish Port Conditions in advance of the storm.  The PCT consists of public (federal and state) and private key port stake holders including the Coast Guard , Army Corps of Engineers, state flood protection authorities, along with marine industry representatives from deep draft and shallow draft stakeholders, commercial barge fleet operators, and various port authorities.  The PCT will assist the COTP in assessing the potential impact of each storm and help guide decision making regarding possible control measures pre- and post-storm to ensure maritime safety and security.

1.  **WHISKEY** (gale force winds within **72 hours**):

    Port Status:  Open to all commercial traffic.

    - Initiate Port Coordination Team (PCT) conference calls to identify and address concerns over port status, activities, and emergency preparations. **[Note: The COTP and PCT should review Enclosure 7 prior to concluding the PCT teleconference call and, based on the predicted storm track, intensity, and surge coupled with projected river stage and port congestion, determine which, if any, of the possible control measures noted in Enclosure 7 may need to be enacted with the establishment of the Port Condition.]**

    - Issue MSIB requiring all self-propelled oceangoing vessels over 500 Gross Tons (GT) and all oceangoing barges and their supporting tugs to report their intention to depart or remain in port to Vessel Traffic Service Lower Mississippi River (VTS):

        a.  Vessels remaining in port will:
            1.  Complete a Remaining in Port Checklist (RIPC) (Enclosure 1) within 24 hours and have it readily available for review upon request.
            2.  Submit the Remaining in Port Checklist Reporting Tool (Enclosure 2) to the COTP, via the VTS, within 24 hours for approval. This can be done by fax, email, hand delivery, etc.
        b.  Vessels intending to depart prior to the storm's arrival shall report their name, vessel type, cargo, current location, next port of call, departure time, and expected time to clear South West Pass.

    - The Coast Guard Port Assessment Teams (PATs) will increase harbor patrols and advise vessel and facility operators of any conditions that require immediate action or correction.

    - Advise port stakeholders of intentions for setting next condition.

7

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

2. **X-RAY** (gale force winds within **<u>48 hours</u>**):

Port Status:  Open to all commercial traffic.

- Conduct a Port Coordination Team (PCT) conference call to identify any concerns regarding implementation of X-Ray and identify any industry concerns regarding current activities, contingencies, and emergency preparations. **[Note: The COTP and PCT should review Enclosure 7 prior to concluding the PCT teleconference call and, based on the predicted storm track, intensity, and surge coupled with projected river stage and port congestion, determine which, if any, of the possible control measures noted in Enclosure 7 may need to be enacted with the establishment of the Port Condition.]**

- The Coast Guard will continue to contact waterfront facilities to determine the intentions of the facility and any vessels (which have not submitted a RIPC Reporting Tool) moored thereto. Individually assess vessels desiring to remain in port, and issue COTP Orders as appropriate.

- Contact deep draft vessels at anchor and determine their intentions, if they have not submitted a RIPC Reporting Tool.

- PATs will inspect wharf and pier areas and will contact facility representative with any concerns or violations of the port condition.

- Spot-check marinas and waterways to determine the status of hurricane preparations.

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

3.  **YANKEE** (gale force winds expected within **24 hours**):

   Port Status:  Vessel traffic control measures in effect:

   - Conduct a Port Coordination Team (PCT) conference call to identify any concerns regarding implementation of Yankee and identify any industry concerns regarding current activities, contingencies, and emergency preparations. **[Note: The COTP and PCT should review Enclosure 7 prior to concluding the PCT teleconference call and, based on the predicted storm track, intensity, and surge coupled with projected river stage and port congestion, determine which, if any, of the possible control measures noted in Enclosure 7 may need to be enacted with the establishment of the Port Condition.]**

   - The COTP may close portions of the port in response to forecasted weather and actual damage, impact, or threat in different geographic areas within the port.  Establish a Safety Zone controlling vessel movements and activities as appropriate, including:

      Close ports, where necessary, to all inbound commercial vessel traffic. Port closure will not apply to vessels that are capable of completing the cargo load/discharge cycle in less than 12 hours.  The area affected by this order includes all Navigable Waters of the United States within 12 nautical miles of shoreline.

   - Issue COTP Orders as appropriate.

   - The Coast Guard has established a Regulated Navigation Area (RNA) for the canals adjoining the Mississippi River. The provisions of the RNA will be enforced 24 hours in advance of the closure of the Lake Borgne Surge Barrier or West Closure Complex navigation gates. Vessels will not be permitted to stay in the RNA past 24 hours in advance of and through the storm passage if the RNA is activated, except those vessels moored in accordance with mooring plans verified by the Captain of the Port. Alternate routes exist for vessels to transit around or depart from the RNA. This RNA is needed to protect the floodwalls, levees, and adjacent communities within the IHNC, Harvey, and Algiers Canals from potential hazards associated with vessels being in this area during a hurricane.

   - The RNA canals shall not be used for safe haven.  Outside of the indicated areas above, the mooring location of a floating vessel during a storm will be at the discretion of the vessel owners.  Vessel owners must use good judgment in determining a floating vessel's mooring location during a storm.

9

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

- The COTP will require barge fleets on the Lower Mississippi River to comply with the <u>Mile Marker 73 Memorandum of Agreement</u> (henceforth referred to as the "MM 73 MOA"), as described on pg. 5 of this document.

- All barge fleets within the COTP zone should review the Greater New Orleans Barge Fleeting Association's publication entitled <u>"Barge Fleeting: Standard of Care & Streamlined Inspection Program"</u> Section (m), High Water. All fleets will be required to meet the mooring standards set in 33 CFR 165. 803(m)(2)(i-iii).

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

4.  **ZULU** (gale force winds expected within **12 hours**):

    Port Status:  Vessel traffic control measures in effect:

    - Conduct a Port Coordination Team conference call to identify any concerns regarding implementation of Zulu and identify any industry concerns regarding current activities, contingencies, and emergency preparations. **[Note: The COTP and PCT should review Enclosure 7 prior to concluding the PCT teleconference call and, based on the predicted storm track, intensity, and surge coupled with projected river stage and port congestion, determine which, if any, of the possible control measures noted in Enclosure 7 may need to be enacted with the establishment of the Port Condition.]**

    - The COTP may close portions of the port in response to forecasted weather and actual damage, impact, or threat in different geographic areas within the port.  Establish a Safety Zone controlling vessel movements and activities as appropriate, including:

      a.  Close ports, where necessary, to all commercial vessel traffic (including vessel transits within the port).  This prohibition will not apply to vessels that have requested and received approval from the COTP to transit the port.  The approval of the COTP will only be granted if the transit can be made safely and mooring or anchorage space has been identified; or if the vessel is departing to sea, only if the vessel can reach safe water prior to encountering hurricane conditions.

    - Suspend cargo operations involving bulk liquid dangerous cargoes (including bunkering and lightering operations), unless permission is requested and an approval granted.  Approval will be given on a case-by-case basis.  This approval provision does not apply to operations involving Cargo of Particular Hazard or Certain Dangerous Cargoes, which in, every case, must be suspended.  Definitions for these specified cargoes are found in Annex D of this plan.

    - The Coast Guard has established a Regulated Navigation Area (RNA) for the canals adjoining the Mississippi River. The provisions of the RNA will be enforced 24 hours in advance of the closure of the Lake Borgne Surge Barrier or West Closure Complex navigation gates. Vessels will not be permitted to stay in the RNA past 24 hours in advance of and through the storm passage if the RNA is activated, except those vessels moored in accordance with mooring plans verified by the Captain of the Port. Alternate routes exist for vessels to transit around or depart from the RNA. This RNA is needed to protect the floodwalls, levees, and adjacent

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

communities within the IHNC, Harvey, and Algiers Canals from potential hazards associated with vessels being in this area during a hurricane.

- The RNA canals shall not be used for safe haven. Outside of the indicated areas above, the mooring location of a floating vessel during a storm will be at the discretion of the vessel owners. Vessel owners must use good judgment in determining a floating vessel's mooring location during a storm.

- All barge fleets within the COTP zone should review the Greater New Orleans Barge Fleeting Association's publication entitled "Barge Fleeting: Standard of Care & Streamlined Inspection Program" Section (m) High Water. All fleets will be required to meet the mooring standards set in 33 CFR 165. 803(m)(2)(i-iii).

Annex (A) to CGSECTORNOLAINST 3006.1G

MARITIME HURRICANE CONTINGENCY PORT PLAN

**Specific Post Storm Actions (**As Soon as practical following the storm)

Port Status: Condition **Yankee:**

1. Assess the Port

   1. Port Assessment Teams (PAT) will be sent to their assigned zones to assess damage to the waterways infrastructure.

   2. Aerial assessment flights will be conducted to report any possible damage to the waterways infrastructure.

   3. Coast Guard units with small boats will be assigned zones to assess damage.

   4. Coast Guard Cutters will be assigned zones to assess damage.

   5. PAT conference calls will be conducted to report information coming in from the field and recommend prioritization for restoration of the port.

2. Restoration

   1. The COTP, PAT, local and state authorities and other pertinent Federal agencies will prioritize available assets to restore the Marine Transportation System based on information gathered from the field.

   2. Aids to Navigation will be re-established based on the Critical Aid List.

   3. Channels will be opened as they are assessed and deemed safe.

   4. The COTP will partner with the Army Corps of Engineers to open locks and resume normal operations.

   5. The COTP will partner with bridge operators to open bridges.

   6. The COTP will partner with Southeastern Louisiana Flood Protection Authority East and West to re-open the East and West sides of the Hurricane Storm Damage Risk Reduction System (floodgates).

Safety Zones will be maintained or established as needed by port conditions. As the port is reconstituted, information will be disseminated via Marine Safety Information Bulletins and Safety Broadcast Notice to Mariners.

ENCLOSURE 1

## REMAINING IN PORT CHECKLIST (RIPC)

## OCEANGOING VESSELS
## (SELF-PROPELLED VESSELS OVER 500 GROSS TONS)

The person in charge of the vessel must have a written mooring plan for review upon request. Vessels remaining in port must have their decks clear of missile hazards, potential pollution hazards, and flammable materials. All persons in charge must ensure that hatches are secured for heavy weather. These conditions are subject to verification by Coast Guard personnel.

Submit the SECTOR NEW ORLEANS REMAINING IN PORT CHECKLIST REPORTING TOOL (Enclosure 2) to the Vessel Traffic Service via **fax 504-365-2519 or e-mail D08—PF-VTSNEWORLEANS-LMR@USCG.MIL**

**NOTE:** Submission of the SECTOR NEW ORLEANS HURRICANE REMAINING IN PORT CHECKLIST REPORTING TOOL (Enclosure 2) signifies completion of this checklist (this page); however, submission does not guarantee approval. Keep this completed checklist onboard with other required records and logs.

The following information must be included in the mooring plan.

1. Name, call sign, official number, and nationality of vessel.

2. Vessel particulars, as applicable (length, breadth, draft, air draft, gross tonnage, hull type, horsepower, single or twin screw).

3. Name of the master.

4. Name, address and phone number of the agent, charterer or operator, and owner.

5. Reason why the vessel is not leaving port.

6. Full vessel characteristics that would be needed to affect salvage.

7. A full stowage plan and manifest to determine particular cargo and pollution hazards.

8. 24-hour contact information for qualified individuals (QI) who have been empowered in writing by the owners to make on-site decisions and authorize expenditures for any required pollution response or salvage.

9. A full insurance disclosure to the Captain of the Port. If the vessel is moored to a facility, provide the insurance information to the facility.

10. Number of personnel to remain on the vessel and their qualifications.

11. Amount of ballast the vessel may hold.

12. Amount of bunkers, lube oil and diesel oil on board. Estimated draft with the vessel in ballast.

ENCLOSURE 1

13. Name of the berth and location.

14. Depth of water in the vessel's berth at mean low water.

15. Availability of the vessel's main propulsion.

16. A description of how the vessel will be secured to the berth. A diagram showing the mooring arrangements with the size, length and lead of mooring lines or wire.

17. Operational status of machinery on board (i.e., engines, generators, fire fighting pumps, bilge pumps, anchors, mooring machinery, etc.).

18. Any unusual conditions affecting the vessel's seaworthiness.

ENCLOSURE 1

## REMAINING IN PORT CHECKLIST (RIPC)

### OCEANGOING VESSELS
### (OCEAN GOING BARGES AND SUPPORTING TUGS)

The person in charge of the barge(s) and assist tug(s) must have a written mooring plan for review upon request. Tugs and barges remaining in port must have their decks clear of missile hazards, potential pollution hazards and flammable materials. All persons in charge must ensure that hatches are secured for heavy weather. These conditions are subject to verification by Coast Guard personnel.

Submit the  SECTOR NEW ORLEANS REMAINING IN PORT CHECKLIST REPORTING TOOL (Enclosure 2) to the Vessel Traffic Service via **fax 504-365-2519 or e-mail D08—PF-VTSNEWORLEANS-LMR@USCG.MIL**

**NOTE:**  Submission of the SECTOR NEW ORLEANS HURRICANE REMAINING IN PORT CHECKLIST REPORTING TOOL (Enclosure 2) signifies completion of this checklist (this page); however, submission does not guarantee approval.  Keep this completed checklist onboard with other required records and logs.

The following information must be included in the mooring plan.

1. Name, call sign and official number of tug and barge.

2. Nationality of the tug and barge.

3. Name of the master of the tug.

4. Name, address and phone number of the owner/operator, charterer, and/or agent.

5. Reason why the tug and barge is remaining in port.

6. Full barge characteristics that would be needed to affect salvage.

7. A full stowage plan and manifest to determine particular cargo and pollution hazards.

8. 24-hour contact information for qualified individuals (QI) who have been empowered in writing by the owners to make on-site decisions and authorize expenditures for any required pollution response or salvage.

9. A full insurance disclosure to the Captain of the Port. If the barge is moored to a facility, provide the insurance information to the facility.

10. Tug and barge particulars for each vessel, as applicable (length, breadth, draft, air draft, gross tonnage, hull type, horsepower, single or twin screw).

ENCLOSURE 1

11. Ballast capabilities.

12. Will the tug be tending the barge(s) while in port?

13. Name and rating of personnel to remain on the tug.

14. Amount of lube oil and diesel oil on board the tug and barge(s).

15. Name of the berth and location. Describe how the vessel will be secured to the berth. Submit a diagram showing the mooring arrangements with the size, length and lead of mooring lines or wire.

16. Operational status of machinery on board the tug and barge(s) (i.e., engines, generators, fire fighting pumps, bilge pumps, anchors, mooring machinery, etc.)

17. Any unusual conditions affecting either the tug's or barges(s)' seaworthiness.

ENCLOSURE 2



### Coast Guard Sector New Orleans

### REMAINING IN PORT CHECKLIST REPORTING TOOL

> ### Fax to VTS Lower Mississippi River 504-365-2519 or
> ### Email to D08—PF-VTSNEWORLEANS-LMR@USCG.MIL

**Date**: _____    **Vessel Has Completed Checklist in Enclosure 1: ___ Yes ____ No**

**Vessel Name**: _____**Call Sign**: _____    **Official Number**: _____

**Nationality**: _____

(**Length**: _____, **Daft**: _____,**Gross Tonnage**: _____. **Horsepower**: _____)

**Master**: _____    **Agent**: _____

**Phone Number/ Fax**: _____

**Email Address** _____, (24-Hour Contact) _____

**Departure Date**: _____

**Persons Onboard  Vessel (#)**: _____
**Reason(s) for staying in port**:
_____
**Anchorage/Berth/Location**: _____
**Ballasted**:    YES/NO
**Cargo type/Amount** _____
**Number of Tugs** _____
**Name of Tugs**: _____

**Mooring or Anchoring Plan (Explain general plans and arrangements:)**

_____
_____
_____
_____
_____
_____

> ### Vessels shall maintain a radio watch on VHF Channel 67 and Channel 16 at ALL TIMES

**You may e-mail or fax this form to D08-PF-VTSNEWORLEANS-LMR@USCG.MIL or (504) 365-2519.**

18

ENCLOSURE 3

## STORM PREPARATION CHECKLIST FOR <u>VESSELS</u>

This Enclosure contains detailed precautionary measures appropriate to ships and barges, respectively, which intend to shelter in port either at anchor or moored.

**I.    PORT CONDITION WHISKEY**
**(72 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Review vessel's operational schedule. |
| | (b) Review vessel heavy weather plans and take appropriate action. |
| | (c) If unable to get underway, evaluate the safety of the present berth. If necessary, develop plans to shift to an alternate location or berth. The plans should include the number and source of tugs, the permits required, and the agency responsible for approving them, and safety/security arrangements appropriate to the new mooring/berth.<br><br>NOTE:  This recommendation primarily applies to vessels at local repair facilities, or vessels in lay berths (moored or at anchor) |
| | (d) Set a continuous Channel 16 VHF-FM radio watch. |

ENCLOSURE 3

## STORM PREPARATION CHECKLIST FOR <u>VESSELS</u>

**II.  PORT CONDITION X-RAY**
**(48 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Vessels intending to remain at their moorings during the hurricane should obtain the permission of the owner, operator, or person-in-charge of the waterfront facility and determine the conditions the facility will require. |
| | (b) Ships intending to remain in port at anchor during the hurricane should contact the appropriate Pilot's Association to obtain an anchorage assignment.  The Pilot Associations will report the identity and location of vessels anchored to the COTP. |
| | NOTE 1:  Vessels desiring to remain at an anchorage other than an anchorage assigned by a Lower Mississippi River Pilot Association must request the permission from the COTP.<br><br>NOTE 2:  Barges shall not anchor during a hurricane unless approved by the COTP. |

20

ENCLOSURE 3

## STORM PREPARATION CHECKLIST FOR <u>VESSELS</u>

**III.  PORT CONDITION YANKEE**
      **(24 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Vessels intending to anchor in port during the hurricane should prepare to proceed to anchorage prior to port closure. |
| | (b) Vessels intending to weather the hurricane at sea should prepare to depart the port prior to port closure. |
| | (c) Vessels intending to remain moored at a waterfront facility during the hurricane should prepare to proceed to the facility (if not already there) or shift berths as needed prior to port closure.  Prior to this action, in the case of self-propelled oceangoing vessels over 500 GT or oceangoing barges, the waterfront facility must request permission from the COTP. |

ENCLOSURE 3

## STORM PREPARATION CHECKLIST FOR <u>VESSELS</u>

**IV.  PORT CONDITION ZULU**
**(12 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Ensure the vessel is securely moored or anchored and prepared for hurricane conditions. |
| | (b) Suspend cargo transfer operations as required by weather conditions or the COTP as stated on page 7 of this plan. |
| | (c) Discontinue all transits of the port as required by the COTP. |
| | (d) Report any hazardous conditions or breakaways of vessels directly to the COTP as soon as possible. |

ENCLOSURE 3

## RECOMMENDED PRECAUTIONARY MEASURES FOR SHIPS

**Applies to vessels:**

| Moored | Anchored | | |
|--------|----------|-----|---|
| X | | 1. | Mooring lines doubled up with due consideration given to the effects of predicted storm surge. |
| X | | 2. | Outboard anchor rigged at short stay. |
| X | X | 3. | Sufficient number of officers and crew onboard to tend mooring lines, and/or get underway. |
| X | X | 4. | Vessel ballasted to ensure maximum safety. |
| X | X | 5. | All side ports, hatches, portholes, and other openings are closed and secured. |
| X | X | 6. | Bilge pumps and manifolds are ready for immediate use. |
| X | X | 7. | All firefighting equipment is ready for immediate use. |
| X | X | 8. | At least one (1) pilot ladder is rigged on each side of the vessel. |
| X | | 9. | A gangway, or other suitable means of accessing the vessel from the pier, is rigged. |
| X | X | 10. | At least one (1) fire warp is rigged on the bow and another on the stern.  In order to expedite the establishment of an emergency tow, a portion of each fire warp should be draped overboard and allowed to hang no more than six (6) feet above the waterline. |
| X | X | 11. | Spare mooring lines and/or wires should be readily available. |
| X | X | 12. | A continuous radio watch should be maintained on Channel 16 VHF-FM (156.8 MHZ), Channel 13, and Channel 67 by a person who speaks English fluently. |
| | X | 13. | At least two anchors should be set. |
| | X | 14. | Vessel should remain ready to get underway in 15 minutes. |

ENCLOSURE 3

## RECOMMENDED PRECAUTIONARY <u>MEASURES FOR BARGES</u>

**Applies to barges:**

| Moored | Anchored | | |
|--------|----------|----|----|
| | X | 1. | All available anchors are deployed. |
| X | | 2. | Mooring lines doubled up with due consideration given to the effects of predicted storm surge. Special attention should be paid to barges moored in the proximity of bridges. |
| X | | 3. | Sufficient personnel are available ashore to respond to emergencies. |
| X | X | 4. | All hatches, portholes and other openings are closed and secured. |
| X | | 5. | Firefighting equipment is available and ready for immediate use. |
| | X | 6. | At least one (1) fire warp is rigged on the bow and another on the stern. In order to expedite the establishment of an emergency tow, a portion of each fire warp should be draped overboard and allowed to hang no more than six (6) feet above the waterline. |
| X | X | 7. | Spare mooring lines and/or wires should be readily available. |

ENCLOSURE 4

**STORM PREPARATION CHECKLIST FOR WATERFRONT <u>FACILITIES</u>**

**I.   PORT CONDITION WHISKEY**
**(72 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Review facility contingency plans.  The contingency plans for barge fleeting facilities should contain procedures for recovering breakaway barges and specifically include the location or availability of tugs/towboats.  Barge fleeting facilities should also evaluate measures to reduce the size of their fleets<br><br>NOTE:  Plans to nest barges with other vessels or to anchor barges must be approved by the COTP. |
| | (b) Review vessel arrival schedules. |
| | (c) Review operational schedules to identify and reduce shipments of Cargoes of Particular Hazard, Hazardous Material, and/or Dangerous Cargoes arriving via highway or rail vehicles. |
| | (d) Evaluate the extent that a 96-hour interruption of cargo operations, during and after storm passage, will interrupt strategic public safety, energy, or transportation needs. If a significant interruption is expected, report it to the COTP New Orleans. |
| | (e) Facilities utilizing permanently moored tank barges for oil storage shall inventory contents/amounts in each storage tank, locate and review data on age/structural integrity of all storage tanks.  Inspect moorings and double up as necessary to ensure the tank barge is capable of withstanding projected tidal surge and wind for the area. |
| | (f) Account for and document all *pre/post storm facility checklists*. |

25

ENCLOSURE 4

## STORM PREPARATION CHECKLIST FOR WATERFRONT <u>FACILITIES</u>

**II.    PORT CONDITION X-RAY**
**         (48 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Determine the special needs and intentions of vessels moored at the facility. |
| | (b) Determine whether vessels desiring to remain moored to the facility during the hurricane will be allowed to do so.  Notify the vessel master, vessel agent, and the COTP of the facility's decision.  Ensure vessels in "lay-up" status are prepared for hurricane condition.<br><br>NOTE:  The COTP may direct the vessel or facility to take certain precautions to correct conditions that threaten the port or the environment, one of which may be to direct the vessels to proceed to sea or anchor. |
| | (c) Set a time for the voluntary suspension of cargo handling operations.  In doing so, ensure that vessels have ample time to hire and schedule labor, arrange pilots, contract tugs/towboats, and safely complete the transit to sea or a hurricane anchorage prior to the setting of Port Condition ZULU.  Notify the COTP of the time established. |
| | (d) Advise the COTP New Orleans Facility Duty Stander at (504) 329-0726, of status of storage tank barge inventory, data available on structural integrity, and intentions for ballasting of empty storage tanks. |

ENCLOSURE 4

**STORM PREPARATION CHECKLIST FOR WATERFRONT <u>FACILITIES</u>**

**III.    PORT CONDITION YANKEE**
**(24 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Secure missile hazards and clear nonessential equipment and loose gear from all wharves and piers. |
| | (b) Secure or move hazardous material and dangerous cargo to a safe location. Individual drums of hazardous material should be palletized and banded. When palletized drums are stowed inside, they should be elevated off the floor in a well-ventilated warehouse.  When stowed outside, palletized drums should be sheltered from the weather as much as possible, and in no case stacked more than two high.  Stacked pallets of drums should also be braced and dunnaged to prevent shifting and/or toppling.  (NOTE:  Title 49 of the Code of Federal Regulations Parts 171-178 should be used as a stowage and segregation guide, if the drums to be consolidated contain hazardous materials from different Hazard Classes/Divisions.)  Grounded containers should be stacked no more than 3 high.  Empty containers should be moved to less flood prone areas if possible. |
| | (c) Advise the COTP of any dangerous cargo that cannot be secured or moved to a safe location. |
| | (d) Prepare to secure cargo operations involving liquid bulk dangerous cargoes in advance of the COTP setting Port Condition ZULU, unless permission is requested and approval is received from the COTP. Operations involving Cargoes of Particular Hazard or Certain Dangerous Cargoes will be secured, without exception, at Port Condition ZULU. |
| | (e) Ensure all self-propelled oceangoing vessels over 500 GT and all oceangoing barges have departed moorings (unless permission has been granted by the COTP or such vessels will remain in port at the facility moorings). |

ENCLOSURE 4

**STORM PREPARATION CHECKLIST FOR WATERFRONT <u>FACILITIES</u>**

**IV.    PORT CONDITION ZULU**
**       (12 HOURS BEFORE ANTICIPATED LANDFALL)**

| DATE/INITIALS | TASK REQUIREMENT |
|---|---|
| | (a) Secure cargo operations involving liquid bulk dangerous cargoes, unless permission is granted from the COTP.  Operations with Cargoes of Particular Hazard or Certain Dangerous Cargoes will be secured in all cases. |
| | (b) Oil transfer terminals should drain all loading arms and transfer hoses of product, blank off hoses, empty and clean small discharge containment. |
| | (c) All small craft owned by the facility that can be hauled out or trailered should be removed from the water and secured well away from the effects of possible storm surge and high winds. |

ENCLOSURE 5

## CARGO OF PARTICULAR HAZARD

"Cargo of Particular Hazard" is defined in section 126.3 of Title 33 of the Code of Federal Regulations (33 CFR 126.3). Cargoes of Particular Hazard are:

1.  Division 1.1 or 1.2 explosives,
     2.  Ammonium nitrate products, division 5.1 (oxidizing),
     3.  Division 4.3 dangerous when wet products in excess of 60 metric tons,
     4.  Division 2.3 and 6.1 poison inhalation hazard products,
     5.  Class 7 highway route controlled quantity radioactive material of fissile material.

## CERTAIN DANGEROUS CARGO

"Certain Dangerous Cargo" is defined in section 160.204 of Title 33 of the Code of Federal Regulations (33 CFR 160.204). Certain Dangerous Cargoes are:

1.  Division 1.1 or 1.2 explosives,

2.  Division 1.5D blasting agents for which a permit is required,

3.  Division 2.3 poisonous gas that is also a material poisonous by inhalation, and that is in a quantity in excess of 1 metric ton per vessel,

4.  Division 5.1 oxidizing materials for which a permit is required,

5.  A liquid material that has a primary or subsidiary classification of Division 6.1 poisonous material that is also a material poisonous by inhalation, and that is in a bulk packaging, or that is in a quantity in excess of 20 metric tons per vessel,

1.  Class 7 highway route controlled quantity radioactive material or fissile material,

2.  Bulk liquefied chlorine gas and bulk liquefied gas cargo that is flammable and/or toxic.

3.  The following bulk liquids: acetone cyanohydrin, allyl alcohol, chlorosulfonic acid, crotonaldehyde, ethylene chlorohydrin, ethylene dibromide, methacrylonitrile, and oleum (fuming sulfuric acid).

ENCLOSURE 6

# Annual Hurricane Operations Plan (AHOP) Guidance



ENCLOSURE 6

# Table of Contents

Overview………………………………………………………………...……………………28

Background……………………………………………………………………………………28

Authority………………………………………………………………………………………28

Applicability and Purpose………………………………………………………………...…29

RNA Boundaries……………………………………………………………………………29

Enforcement Periods...………………………………………………………………………30

Pre-Storm Season Action…………………………………………………………………...31

Storm Season Actions………………………………………………………………………31

Initial Annual Hurricane Operations Plan………………………………………………………32

Renewing an Annual Hurricane Operations Plan………………………………………………33

72 Hour Verification Report…………………………………………………………………...33

Appendix A – 72 Hour Verification Report Checklist........................................................34

Appendix B - Annual Hurricane Operations Plan Template………………………...…………………35-38

ENCLOSURE 6

# Overview

This Annual Hurricane Operations Plan (AHOP) guidance explains in further detail the enforcement of the Regulated Navigation Area (RNA) defined in 33 CFR 165.838. This will expand on triggers for Hurricane and Storm Damage Risk Reduction Systems (HSDRRS) structures established in the operating procedures. It will further explain what is required in the AHOP, and what is expected for consecutive filing.

# Background

The Coast Guard partnered with the U. S. Army Corps of Engineers (USACE) to reduce the risk posed to the flood control infrastructure in the New Orleans area. With the completion of the HSDRRS fully operational, the Coast Guard, through collaborative efforts with Federal, State, and local port partners, determined that a RNA was the most effective and efficient authority to mitigate the risk. The number one goal of the RNA will always be to protect the citizens of the greater New Orleans area while ensuring the safety of mariners and waterway infrastructure.

Although no plan can guarantee absolute results, it is important that the entire port community share a common understanding of the goal and the measures required to increase our hurricane readiness and protection within the RNA.

# Authority

The provisions of Title 33, Code of Federal Regulations (CFR), Part 165, describe the authority that the Coast Guard Captain of the Port (COTP) can use to ensure the safety of their ports. Specifically, District Commanders are authorized to:

- Establish Regulated Navigation Areas in a water area within a defined boundary for which regulations for vessels navigating within the area have been established;

- Control vessel traffic in an area which is determined to have hazardous conditions by issuing regulations;

- Specify times of vessel entry, movement, or departure to, from, within, or through ports, harbors, or other waters;

- Establish vessel size, speed, draft limitations, and operating conditions; and,

- Restrict vessel operations in a hazardous area, or under hazardous conditions, to vessels which have particular operating characteristics or capabilities that are considered necessary for safe operation under the circumstances.

ENCLOSURE 6

# Applicability and Purpose

This enclosure is applicable to all floating vessels within the RNA as defined within the COTP New Orleans, Louisiana zone in Title 33, CFR, Part 165.838.
Its purpose is to:

- Protect the citizens of the greater New Orleans area while ensuring the safety of mariners and waterway infrastructure;

- To advise the maritime community of the sequence and timing of COTP decisions and actions during periods when the port is threatened by a tropical event; and,

- To recommend and direct actions that should be taken by vessels and waterfront facilities to minimize storm related deaths, injuries, property damage, and threats to the environment.

# RNA Boundaries

The following is a Regulated Navigation Area (RNA):

(1) The Gulf Intracoastal Waterway (GIWW) from Mile Marker (MM) 22 East of Harvey Locks (EHL), west on the GIWW, including the Michoud Canal and the Inner Harbor Navigation Canal (IHNC), extending North 1⁄2 mile from the Seabrook Flood Gate Complex out into Lake Pontchartrain, and South to the IHNC Lock;
(2) The Harvey Canal, between the LAPALCO Boulevard Bridge, and the confluence of the Harvey Canal and the Algiers Canal;
(3) The Algiers Canal, from the Algiers Lock to the confluence of the Algiers Canal and the Harvey Canal;
(4) The GIWW, from the confluence of Harvey Canal and Algiers Canal to MM 7.5 West of Harvey Locks (WHL).



ENCLOSURE 6

# **Enforcement Periods**

This RNA will be enforced during a tropical event beginning 24 hours in advance of the predicted closure of the IHNC Lake Borgne Surge Barrier structure within the HSDRRS (IHNC & GIWW) or the West Closure Complex within the HSDRRS (Harvey & Algiers Canals). If the Coast Guard receives notice of a closure from the Army Corps of Engineers less than 24 hours before the predicted closure, the RNA will be enforced upon the COTP receiving the notice. It is important to stress that the enforcement of the RNA is not necessarily always in conjunction with the COTP Port Conditions (Whiskey, X-Ray, Yankee, Zulu) as outlined in the Maritime Hurricane Contingency Port Plan (MHCPP). These port conditions are predicated on gale force winds at Southwest Pass. The enforcement of the RNA could occur well before the implementation of the COTP port conditions.  In addition to the MHCPP, all requirements located within 33 CFR 165.838, and this AHOP, are required.

In the event that a particularly dangerous storm is predicted, the COTP, in consultation with local agencies and port stakeholders via a Port Coordination Team, may require all floating vessels to evacuate the RNA beginning as early as 72 hours before the predicted closure of any navigational structure; or upon notice that particularly dangerous storm conditions are approaching, whichever is less.

During enforcement periods, all floating vessels are prohibited from entering or remaining within the RNA unless a current AHOP is on file with Coast Guard Sector New Orleans, meeting all provisions and requirements as outlined in 33 CFR 165.838.

ENCLOSURE 6

# Pre-Storm Season Actions

(1) By May 1st of each calendar year those facilities desiring to maintain vessels moored within the RNA are required to develop an AHOP to Coast Guard Sector New Orleans Waterways Management Division for review.  For those facilities that already have an AHOP on file, only a renewal is required.

(2) Prior to June 1st of each calendar year, the USCG, USACE, the Coastal Protection Restoration Authorities (CPRA), and South Louisiana Flood Protection Authority (SLFPA) will conduct a joint survey of the RNA to develop a hurricane pre-season port status overview. Additionally, this survey will acquire the total number of vessels within the RNA, and subsequent throughput analysis to evacuate. The results of this throughput analysis will be shared with CPRA and SLFPA.

# Storm Season Actions

(1) During hurricane season from June 1st until November 30th, joint monthly verification checks of all vessels will be conducted.

(2) When a tropical event is expected to impact the COTP New Orleans area of responsibility, the Coast Guard will organize a joint patrol of the RNA.  Vessel counts will be compared with current AHOPs', and two numbers will be calculated:
(1) Throughput analysis for all vessels;
(2) Throughput analysis for those vessels not moored in accordance with an AHOP.

(3) When a tropical event is expected to impact the COTP New Orleans area of responsibility, there will be daily Port Coordination Team conference calls conducted to identify any concerns regarding current activities, contingencies, and emergency preparations.

(4) Depending on the storm path, Safety Zones may be created to manage traffic inbound New Orleans and the RNA from the east and west.

ENCLOSURE 6

# <u>Initial Annual Hurricane Operations Plan</u>

Required for all facilities that have vessels intending to seek approval to remain within the RNA.  Every applicant shall submit an AHOP (Appendix B) to the Captain of the Port New Orleans via the Coast Guard Sector New Orleans Waterways Management Division. The AHOP shall include:

(1) A description of the maximum number of vessels the facility intends to have remaining at any one time during hurricane season;

(2) A detailed plan for any vessel(s) that are intended to be sunk/grounded in place when the RNA is enforced if evacuation is not possible;

(3) A diagram of the waterfront facility and fleeting area;

(4) Vessel name, call sign, official number, and operational status of machinery on board (i.e., engines, generators, fire fighting pumps, bilge pumps, anchors, mooring machinery, etc.) each standby towboat.  Or provide a contract for enough tugboats meeting the characteristics.  Additionally, if the facilities tugboats are used for outside contracting they must also include a statement that if enough of their fleet is not available they will contract the appropriate number of tugboats meeting the characteristics required.

(5) Characteristics for each vessel remaining at the fleeting or mooring facility, as applicable (length, breadth, draft, air draft, gross tonnage, hull type, horsepower, single or twin screw);

(6) Details of mooring arrangements in accordance with mooring requirements and conditions set forth in paragraphs (g) and (h) of 33 CFR 165.838 or COTP case-by-case approved deviations;

(7)  Certification by a professional engineer that the mooring arrangements are able to withstand winds of up to 140 mph, a surge water level of eleven feet, a current of four mph and a wave height of three feet within the RNA East, and a surge water level of eight feet, a current of four mph, and a wave height of two and a half feet within the RNA West;

(8)  Emergency contact information for the owner/operator, and/or agent of the facility/property;

(9)  24-hour emergency contact information for qualified individuals empowered in writing by the owners/operators to make on-site decisions and authorize expenditures for any required pollution response or salvage;

(10) To fulfill the insurance disclosure include a copy of the facilities Certificate of Insurance. Full insurance disclosure to the COTP.  Vessels moored to a facility shall provide insurance information to the facility.

ENCLOSURE 6

# **Renewing an Annual Hurricane Operations Plan**

Facilities that have an AHOP in good standing with the COTP New Orleans (has been reviewed by the Coast Guard and found to be in compliance with the rule), need not submit an entirely new AHOP. Instead, you may renew your plan by submitting a letter indicating that no changes to the plan have been made, and/or annotate any minor administrative changes (i.e. telephone number changes, etc.) to the plan. However, if significant operational changes are made, you may be required to resubmit updated portions of the plan, and may be required to obtain recertification by a professional engineer; submitting associated diagrams along with a statement in letter format of the changes from the previous AHOP. Questions regarding recertification should be made to the Coast Guard Sector New Orleans Waterways Management Division for guidance.

# **72 Hour Verification Report**

Those facilities with an AHOP in good standing with the COTP shall, within 72 hrs of a tropical event, submit to the COTP New Orleans a Storm Specific Plan Verification Report Form (Appendix A) in accordance with this plan. The minimum information required for this verification report is contained below (Appendix A):

ENCLOSURE 6

# Appendix A

# 72 HOUR STORM SPECIFIC VERIFICATION REPORT FORM

| **Fax to SECNOLA Waterways Management 504-365-2287 or Email to D08-DG-SECNEWORLEANS-PREVENTION-WATERWAYS@USCG.mil** |
|---|

**Date**: _____

**Total Number of Vessels Currently Moored**: _____    **Mooring Configurations: *PLEASE ATTACH***

**Emergency Contact Person:**_____    **Phone Number/ Fax**: _____

**Email Address** _____    **24 Hour Number** _____

**Standby Tugboat Name**: _____    **Call Sign:** _____    **Official Number**: _____

**Operational status of machinery (i.e engines, generators, fire fighting pumps, bilge pumps, anchors, mooring machinery, etc.):**
_____
_____

**Tugboat Contact Information:**_____

**Standby Tugboat Name**: _____    **Call Sign:** _____    **Official Number**: _____

**Operational status of machinery (i.e engines, generators, fire fighting pumps, bilge pumps, anchors, mooring machinery, etc.):**
_____
_____

**Tugboat Contact Information:**_____

**Process and Timeframe for Evacuating Vessels Exceeding the Amount Listed in the AHOP:**
_____
_____
_____
_____
_____
_____

| Vessels shall maintain a radio watch on VHF Channel 67 and Channel 16 at ALL TIMES |
|---|

**\*\*You may e-mail or fax this form to D08-DG-SECNEWORLEANS-PREVENTION-WATERWAYS@USCG.mil or (504) 365-2287.\*\***

38

ENCLOSURE 6

# Appendix B

# Annual Hurricane Operations Plan Template

I. **Maximum Number of Vessels Moored at Each Type of Waterfront or Barge Fleeting Facility**
*Provide the facility name, facility type, and facility location (physical address, mile marker or latitude and longitude). Then, provide the maximum number of vessels anticipated to be moored at any given time during hurricane season. This shall include the classification, number, and mooring location of each vessel at the facility, and the facility name of where vessel is moored. If there is additional information to be added, or there is not enough space provided for the requested information, attach the additional information to the plan.*

| Facility Name | Facility Type | Facility Location |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

| Classification of Vessel | Number of Vessel | Mooring Location at Facility | Facility Name |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

II. **Plan for Vessel(s) to be Grounded or Sunk in Place**
*Provide a plan for any vessel(s) that will be grounded or sunk in place when the RNA is enforced and evacuation of the vessel(s) is not possible. For each vessel, include at a minimum the following information indicated below. If there is additional information to be added, or there is not enough space provided for the requested information, attach the additional information to the plan.*

| | |
|---|---|
| Vessel Name |  |
| Anticipated Method(s) of Disabling |  |
| Description and Quantities of All Cargo, Cargo Residue, Oil and Hazardous Materials |  |
| Method(s) of Ensuring Vessel Remains Stationary |  |
| Name of Oil Spill Response Organization |  |
| Name of Salvage Company |  |

ENCLOSURE 6

**III.** **A Diagram of Each Type of Waterfront or Barge Fleeting Facility**
*Provide an engineering plot diagram, photographic image(s) or topographical images of each type of waterfront or barge fleeting facility. Provide an attachment, drawing, or file to the plan. At a minimum include the following information:*

A.  A detailed legend or key.

B.  Labeling of waterway(s).

C.  Labeling or road(s).

D.  Depth of waterways(s).

E.  Waterfront facility boundaries and/or barge fleet configurations.

F.  Neighboring natural and/or manmade structures of interest and/or concern.

G.  Facility Critical Infrastructure.

**IV.** **Characteristics of Stand-by Tow Vessel(s)**
*Provide the necessary information in the table. Additionally, if the tow vessel(s) are contracted to outside entities, the facility must include a statement attesting that if the required numbers of tow vessel(s) are not available for the barge fleet(s,) then the facility will contract the appropriate number of tow vessel(s) with the required characteristics to satisfy all requirements.*

| Vessel Name | Call Sign | Official Number | Operational Status of Machinery Onboard | |
|---|---|---|---|---|
| | | | Engines | |
| | | | Generators | |
| | | | Fire Fighting Pumps | |
| | | | Bilge Pumps | |
| | | | Anchors | |
| | | | Mooring Machinery | |
| | | | Other | |

ENCLOSURE 6

| Vessel Name | Call Sign | Official Number | Operational Status of Machinery Onboard | |
|---|---|---|---|---|
| | | | Engines | |
| | | | Generators | |
| | | | Fire Fighting Pumps | |
| | | | Bilge Pumps | |
| | | | Anchors | |
| | | | Mooring Machinery | |
| | | | Other | |

## V.  <u>Characteristics of Vessel(s) Remaining at the Waterfront or Barge Fleeting Facility</u>

*Provide the necessary information of each vessel that is going to remain at the waterfront and/or barge fleeting facility.*

| Vessel Name | Call Sign | Official Number | Characteristics of Vessel | |
|---|---|---|---|---|
| | | | Length | |
| | | | Breadth | |
| | | | Draft | |
| | | | Air Draft | |
| | | | Gross Tonnage | |
| | | | Hull Type | |
| | | | Horsepower | |
| | | | Single or Twin Screw | |
| | | | Other | |

| Vessel Name | Call Sign | Official Number | Characteristics of Vessel | |
|---|---|---|---|---|
| | | | Length | |
| | | | Breadth | |
| | | | Draft | |
| | | | Air Draft | |
| | | | Gross Tonnage | |
| | | | Hull Type | |
| | | | Horsepower | |
| | | | Single or Twin Screw | |
| | | | Other | |

41

ENCLOSURE 6

**VI.**    **Details of Mooring Arrangements**
*Provide a brief description of the mooring arrangements at the waterfront facility or the barge fleet, ensuring that they meet 33 CFR 165.838(f) – "Mooring Requirements" and 33 CFR 165.838(g) – "Towboat Requirements". Provide the description of mooring arrangements at the waterfront facility or the barge fleet as an attachment to the plan.*

**VII.**    **Certification of Mooring Arrangements**
*Provide certification by a professional engineer that the mooring arranges are able to withstand the following conditions indicated below. Provide the engineering certification document as an attachment to the plan.*

| RNA East | RNA West |
|---|---|
| Winds up to **140** miles per hour | Winds up to **140** miles per hour |
| Surge water level of **11** feet | Surge water level of **8** feet |
| Current of **4** miles per hour | Current of **4** mile per hour |
| Wave height of **3** feet | Wave height of **2.5** feet |

**VIII.**    **Emergency Contact Information of the Owner/Operator and/or Agent of the Facility**
*Provide the required information and insert the information into the appropriate fields in the table. Ensure the contact numbers are current and operable.*

| Name of Owner/Operator/Agent | Contact Number (Primary) | Contact Number (Secondary) |
|---|---|---|
|  |  |  |
|  |  |  |

**IX.**    **Twenty-Four Hour Contract Information for Qualified Individuals**
*Provide the required information and insert the information into the appropriate fields in the table. Ensure the contact numbers are current and operable.*

| Name of Qualified Individual | Contact Number (Primary) | Contact Number (Secondary) |
|---|---|---|
|  |  |  |
|  |  |  |

**X.**    **Certificate of Insurance**
*Provide a current and signed copy of the Certificate of Insurance for the facility to the Captain of the Port for New Orleans. Vessel(s) moored at the waterfront facility and/or barge fleeting facility shall provide insurance information to the waterfront facility and/or barge fleet. Provide the Certificate of Insurance as an attachment to the plan.*

ENCLOSURE 7

# OPTIONS FOR PORT CONDITIONS

## The COTP, in consultation with the PCT, will consider these actions at each of the Port Conditions and will direct their implementation as deemed appropriate/necessary:

1. Implement VTS Measures to require all vessels north of the Huey P. Long (HPL) Bridge from coming south once the Bar Pilots cease boardings (i.e. a vessel at a terminal north of the HPL intending to depart and anchor south of the HPL). Exclude vessels able to clear South West Pass and exit the Mississippi River BEFORE the Bar Pilots cease operations.

     a. *"No vessel over 500 gross tons may transit south of the HPL bridge whose intentions are to anchor or moor in a location south of the HPL bridge, without permission from the COTP. This VTS measure does not apply to vessels whose intentions are to get underway and subsequently clear South West Pass ahead of TS Isaac."[Actual verbage from Hurricane ISAAC VTS Measure.]*

2. Move as many vessels south of the HPL bridge to anchorages and berths north of the HPL bridge with priority given to loaded tank ships.

3. Once the Bar Pilots announce a time that they will be cease operations, prohibit any deep draft vessels from entering the Mississippi River to prevent congestion and minimize risks of vessels losing moorings and dragging anchors, and deep draft collisions, allisions and groundings.

4. Implement the Mile Marker 73 MOA to move barges and tows up river.

5. Direct certain anchorages to close (e.g. South West Pass Anchorage up to 9 Mile Anchorage).

6. Prohibit ships from mooring at certain buoy systems. Vessels have historically parted lines and lost moorings while moored at mooring buoy systems during hurricanes. Mooring buoy systems immediately south of the I-310 Bridge (Luling Bridge) present a particular risk.

          CGB at Laplace (3 sets) MM 133-134-135
          Reserve MM 136-137
          ADM MM 120-121, (2 buoys system to anchor two ships)
          Wood Chip at Kenner Bend 8 sets MM 110 up to MM 113 RDB
          Zito Buoys at MM 86

ENCLOSURE 7

7.  Direct deep drafts in layup status to comply with with their approved layup plan. Require tugs to remain on scene and secure all deep draft vessels in layup status. If the vessel cannot comply, the vessel will be directed to move upriver of the Huey P. Long Bridge.

8.  Require ships moored to piers to remain at piers to free up available anchorage space for other vessels.

9.  In consultation with the NOBRA Pilots, allow deep draft vessels to anchor in the upriver crossings to alleviate congestion and move deep draft vessels upriver from more vulnerable anchorages south of the HPL bridge.

10. Once the Army Corps of Engineers announces a time for the closure of the Lake Borgne Surge Barrier, initiate a Safety Zone on the GICWW east of New Orleans to prevent westbound traffic between Mobile and New Orleans from becoming trapped.

ENCLOSURE 8

# **Post Storm Deep Draft Vessel Movement Guidance**

*Note: All storms are not the same and the below guidance may be modified as needed depending on specific post-storm circumstances.*

The inbound and outbound movement of vessels must be accomplished simultaneously to manage port congestion.

The following general principles will guide the reopening of the Lower Mississippi River to commercial deep draft navigation:

1. Outbound and Intra-port Movements:

   A. Priority should be given to clear vessels out of the system which have loaded/completed cargo operations to make way for shifting and inbound vessels.

   B. Vessels at anchor in port prior to the arrival of the tropical storm:

      i. Priority should be given to those vessels which can go straight to a berth/facility/loading terminal from the anchorage.

      ii. Vessels which request to shift between anchorages are secondary to vessels which can shift from an anchorage directly to an open berth.

2. Inbound Movements:  The queue for inbound vessels is developed between the COTP, the Bar Pilots and the Federal Pilots.  Typically, shallower draft vessels such as Articulated Tug and Barge combinations are allowed to transit first to mitigate risk as river traffic resumes.

   A. The typical prioritization for inbound vessels is as follows:

      i.    Cruise ships
      ii.   Tank ships
      iii.  Container ships
      iv.   Break bulk ships
      v.    Bulk cargo ships

ENCLOSURE 9

# Port Coordination Team Agenda

Date:                                                    Time:

- NWS/NOAA – Weather Update

- USACE

    IHNC Surge Barrier status:

    Seabrook status:

    West Closure Complex status:

    Lock Status:

- U.S.C.G.

    o Sector NOLA

        PATS:

        RNA:

        Mile Marker 73 MOA:

    o D08 Bridges:

- Shallow Draft stakeholders (GICA, AWO, GNOBFA, etc.)

- Deep Draft stakeholders (Pilots, LAMA, NOBOT, etc.)

- Port partners

- Closing comments (ensure review of Enclosure 7)

- Future call needs/modifications

iv)     Shore Offshore Services, LLC Historical Website & Tug Details

The Wayback Machine - https://web.archive.org/web/20201031182601/http://shoreoffshore.com/fleet/

# Shore Offshore Services

# Fleet

## D/B THOR



Capacity: 1,760 ST
Dimensions: 370'x137'x26'

**Spec Sheet (https://web.archive.org/web/2020103118 2601/http://shoreoffshore.com/wp 17/wp-content/uploads/2018/03/DB-Thor-spec-sheet.pdf)**

## D/B Pacific



Capacity: 1,000 ST
Dimensions: 350'x100'x25'

**Spec Sheet (https://web.archive.org/web/2020103118 2601/http://shoreoffshore.com/wp 17/wp-content/uploads/2017/11/Pacific-Shore-Specs-and-Brochure_rev-1.pdf)**

**Houston Office**
Phone:
(281)378-1504
Address:
20333 State Hwy 249, Ste. 200 Houston, TX 77070

## D/B Performance

Copyright © 2020 Shore Offshore Services, LLC. All rights reserved.

**Logistics Base**
Phone:
(985)631-2310
Address:
499 Powhatten Court Gibson, LA 70340

## MARS Freedom

Capaci



ty: 880 ST
Dimen
sions:
394'x1
04'x24
'



**Spec Sheet
(https://we
b.archive.o
rg/web/202
010311826
01/http://s
horeoffsho
re.com/wp
17/wp-
content/upl
oads/2017/
11/DB-
Performan
ce-spec-
sheet_rev-
1.pdf)**

**Spec Sheet
(https://we
b.archive.o
rg/web/202
010311826
01/http://s
horeoffsho
re.com/wp
17/wp-
content/upl
oads/2019/
03/MARS-
Freedom-
spec-
sheet.pdf)**

---

**Houston Office**

(281)378-1504

**MARS Titan**

Address:
20333 State Hwy 249, Ste. 200 Houston, TX 77070



Copyright © 2020 Shore Offshore Services, LLC. All
rights reserved.

**Logistics Base**

(985)868-2210

Phone:

Address:
499 Powhatten Court Gibson, LA 70340



**Spec Sheet (https://web.archive.org/web/20201031182601/http://shoreoffshore.com/wp17/wp-content/uploads/2019/03/MARS-Titan-spec-sheet-1.pdf)**



**Houston Office**

Phone:
(281)378-1504

Address:
20333 State Hwy 249, Ste. 200 Houston, TX 77070

Copyright © 2020 Shore Offshore Services, LLC. All rights reserved.

**Logistics Base**

Phone:
(985)868-2210

Address:
499 Powhatten Court Gibson, LA 70340

The Wayback Machine - https://web.archive.org/web/20201031190648/http://shoreoffshore.com/contact/

## Shore Offshore Services

# Contact

## OPERATIONS HEADQUARTERS

20333 State Hwy 249, Ste. #200
Houston, TX 77070
281-378-1504

**Estimating**
estimating@shoreoffshore.com
(https://web.archive.org/web/20201031190648/mailt
o:estimating@shoreoffshore.com)

**Cody Sims**
Director of Projects
Cody@Shoreoffshore.com
(https://web.archive.org/web/20201031190648/mailt
o:Cody@Shoreoffshore.com)

**Tommy Gibilterra, P.E.**
Director of Operations
Tommy@Shoreoffshore.com
(https://web.archive.org/web/20201031190648/mailt
o:Tommy@Shoreoffshore.com)

## LOGISTICS BASE

499 Powhatten Court
Gibson, LA 70340
985-868-2210

---

**Houston Office**

Phone:
(281)378-1504
Address:
20333 State Hwy 249, Ste. 200 Houston, TX 77070



Copyright © 2020 Shore Offshore Services, LLC. All rights reserved.

**Logistics Base**

Phone:
(985)868-2210
Address:
499 Powhatten Court Gibson, LA 70340

Home    Search    Links    About Us    **Updates**    Login

# M.A.R.S. LIBERTY

Built in 1980, by the J. Ray McDermott Company of Morgan City, Louisiana (hull #256) as the *W.D. Haden II* for the Bay Houston Towing Company of Houston, Texas.

Along with the Suderman and Young Towing Company of Houston, Texas. The Bay Houston Towing Company is part of a combined operating company, the G and H Towing Company of Houston, Texas.

In 2011, the G and H Towing Company became part of a joint venture between the Moran Towing Corporation of New Canaan, Connecticut. Serving the Cameron LNG facility near Lake Charles, Louisiana.

In 2020, she was acquired by Modern American Recycling Services Incorporated of Gibson, Louisiana. Where she was renamed as the *M.A.R.S. Liberty*.

Powered by a single, EMD 16-645E7B diesel engine. Outfitted with a flanking rudder, she is a single screw tug, rated at 3,070 horsepower.



Pictured as: the *W.D. Haden II* (Bay Houston Towing Company) Photo by: Trommel

Vessel Name: *M.A.R.S. LIBERTY*
USCG Doc. No.: 6237090
Vessel Service: TOWING VESSEL
IMO Number: 7925338
Trade Indicator: Coastwise, Unrestricted
Call Sign: WYQ6984
Hull Material: STEEL
Hull Number: 256
Ship Builder: J RAY MCDERMOTT & CO INC
Year Built: 1980
Length: 88.6
Hailing Port: GIBSON, LA.

Hull Depth: 16.3
Hull Breadth: 32.1
Gross Tonnage: 178
Net Tonnage: 121
Previous Vessel Names:
*W.D. HADEN II*
Previous Vessel Owners:
BAY HOUSTON MARITIME INDUSTRIES INC



Pictured as: the *W.D. Haden II* (Bay Houston Towing Company) Photo by: Trommel

## MODERN AMERICAN RECYCLING SERVICES INCORPORATED

## Back to Search Results

Copyright 2024 TugboatInformation.com
Website developed by: The TBI Group LLC

Home    Search    Links    About Us    **Updates**    Login

# M.A.R.S. WAR MACHINE

Built in 1975, by Equitable Equipment Incorporated of Madisonville, Louisiana (hull #1652) as the *Eliska Theriot* for Nolty J. Theriot Offshore of Golden Meadow, Louisiana.

In 1984, she was sold. Where she was renamed as the *Eliska*.

In 1988, the tug was acquired by the Exxon Shipping Company of Wilmington, Delaware. Where the tug was renamed as the *Exxon Golden State*.

In 1993, in the wake of the *Exxon Valdez* incident. The Exxon Shipping Company was rebranded as the SeaRiver Maritime Company of Houston, Texas. Where the tug was renamed as the *S/R Golden State*.

In 1998, the tug was acquired by the American Steamship Company of New York, New York. Where she was renamed as the *Ocean Venture*.

In 1998, the American Steamship Company outfitted the tug Bludworth coupler system. And, mated her with a large bulk barge. The tug and the barge worked primarily in the Gulf of Mexico. Although, the unit completed two trips to Russia with loads of grain.

In 2003, she was acquired by the Moran Towing Corporation of New Canaan, Connecticut. Where she was renamed as the *Paul T. Moran*.



Pictured as: the *Paul T. Moran* (Moran Towing) Photo by: Will Van Dorp

However, her bulk barge was scrapped as "unsalvageable." The *Paul T. Moran* was the first articulated tug and barge placed in service for the Moran Towing Corporation

In 2020, the unit was acquired by Modern American Recycling Services Incorporated of Gibson, Louisiana. Where the tug was renamed as the *M.A.R.S. War Machine*.

The tug is powered by two, twenty cylinder, EMD 20-645-E5 diesel engines. Turning two, cast steel, fixed pitch, propellers. She is a twin screw tug, rated 7,200 horsepower.

Her electrical service is provided by two 99kW generator sets. The tug's capacities are 212,394 gallons of fuel.

Her barge was built in 1981, by the General Dynamics Corporation of Quincy Massachusetts (hull #75) as the *Amoco Georgia* for Amoco Shipping Incorporated of Wilmington, Delaware. Although in 1987, it was renamed as the *Georgia Bay*.

In 1997, the barge was acquired by the Moran Towing Corporation of New York, New York. Where it was renamed as the *Massachusetts*. And in 2005, the barge was modified to receive a Bludworth coupler system. The coupling unit required a redesigning of the notch, as well as a new skeg arrangement. A second hull was also added to the the barge. Work was completed by Gulf Marine Repair of Tampa, Florida. She measures 430(ft), with a capacity of 137,000 bbls.
*(Robert Silva, Robert P. Hill)*

Vessel Name: *M.A.R.S. WAR MACHINE*
USCG Doc. No.: 564374
Vessel Service: TOWING VESSEL
IMO Number: 7390777
Trade Indicator: Coastwise Unrestricted, Registry
Call Sign: WDB4930
Hull Material: STEEL
Hull Number: 1652
Ship Builder: EQUITABLE EQUIPMENT COMPANY, INC.
Year Built: 1975
Length: 138
Hailing Port: MOBILE, AL.

Hull Depth: 13.9
Hull Breadth: 40
Gross Tonnage: 173
Net Tonnage: 117
Previous Vessel Names:
*Eliska Theriot, ELISKA, EXXON GOLDEN STATE, S/R GOLDEN STATE, OCEAN VENTURE, PAUL T. MORAN*
Previous Vessel Owners:
Nolty J. Theriot Offshore Inc., Exxon Shipping Co., SEARIVER MARITIME INC., American Steamship Co., MORAN TOWING CORPORATION



Pictured as: the *Paul T. Moran* (Moran Towing Corporation) Photo by: Birk Thomas



Pictured as: the *Paul T. Moran* (Moran Towing Corporation) Photo by: Photo by: Eastriver



Pictured as: the *Eliska Theriot* (Nolty J. Theriot Offshore) Photo by: Gary Markham

## MODERN AMERICAN RECYCLING SERVICES INCORPORATED

### Back to Search Results

Copyright 2024 TugboatInformation.com
Website developed by: The TBI Group LLC

v)    Tug M.A.R.S. TITAN PSIX Data



**USCG Maritime Information Exchange**
# Port State Information Exchange

| SEARCH PSIX | FEATURED LINKS | WEB ACCESSIBILITY POLICY | FOIA REQUESTS | CONTACT US |

Skip Navigation

Results for Vessel: *M.A.R.S. TITAN*

| Vessel Information: | Vessel Particulars: |
|---|---|
| **Vessel Name:** M.A.R.S. TITAN | **Service:** Towing Vessel |
| **Primary Vessel Number:** 513704 *(Official Number (U.S.))* | **Length:** 137.90 ft |
| **Hull Identification Number:** N/A | **Breadth:** 34.50 ft |
| **Manufacturer Hull Number:** 147 | **Depth:** 20.40 ft |
| **IMO Number:** 7742293 | **Build Year:** 1968 |
| **Vessel Flag:** UNITED STATES | **Alternate VINs:** N/A |
| **Vessel Call Sign:** WDJ7144 | |

| Service Information: | Tonnage Information: |
|---|---|
| **Service Status:** Active | **Cargo Authority:** N/A |
| **Out Of Service Date:** N/A | **Tonnage:** |
| **Last Removed From Service By:** N/A | • 574 - Convention (Subpart B), Gross Ton |
| | • 196 - Regulatory (Subpart C or D), Gross Ton |
| | • 172 - Convention (Subpart B), Net Ton |
| | • 133 - Regulatory (Subpart C or D), Net Ton |

### Vessel Documents and Certifications

| Document | Agency | Date Issued | Expiration Date | Status |
|---|---|---|---|---|
| CERTIFICATE OF DOCUMENTATION | USCG | October 14,2023 | October 31,2024 | Valid |
| Certificate of Inspection | USCG | October 25,2021 | October 25,2026 | Issued/Effective |
| ISM - Document Of Compliance | ABS | January 19,2021 | January 18,2022 | DEACTIVATED |
| Tonnage Certificate, International | ABS | January 4,2019 | | VALID |
| Classification Document | ABS | October 4,2017 | August 24,2022 | EXPIRED |
| International Load Line Certificate | ABS | August 25,2017 | August 24,2022 | EXPIRED |
| Stability Letter | N/A | December 6,1972 | | VALID |

### Summary of Coast Guard Contacts

Click Here To View Contact Data **From:** 01/01/1968    **To:** 05/31/2024    *(MM/DD/YYYY)*

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 7439824 | Not Associated with a Case | Houma, Louisiana | Thursday, April 28, 2022 | Vessel Inspection |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 7390013 | 1292156 | WASHINGTON, District of Columbia | Friday, January 28, 2022 | Incident Investigation |

| View Investigation Details | Incident Information | | | |
|---|---|---|---|---|
| | **Role** | | | |
| | Involved in a Marine Casualty | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 7387302 | Not Associated with a Case | Houma, Louisiana | Friday, January 28, 2022 | Vessel Inspection |

| | Deficiency Information | | |
|---|---|---|---|
| Resolved / Pending | **System** | **SubSystem** | **Component** |
| | 02 - Structural Conditions | N/A - No Subsystem | 02123 - Wheelhouse -door -window |
| | **Cause** | **Action** | **Action Code** |
| | Damaged By Earlier | 705 - Other - as specified | c - To the satisfaction of the Coast Guard |

| | Event |
|---|---|
| | **Description of Deficiency** |
| | Broken windows and frame/trim. Repair/Replace windows and trim/frame. Vessel may transit to shipyard for repairs. |

| **Due Date** | **Resolved** | **Resolved Date** |
|---|---|---|
| Sunday, February 27, 2022 | True | Tuesday, June 21, 2022 |

| **Resolution Description** |
|---|
| Attended Vessel and verified repairs |



Resolved
Pending

| *Deficiency Information* |
|---|

| **System** | **SubSystem** | **Component** |
|---|---|---|
| 02 - Structural Conditions | N/A - No Subsystem | 02199 - Other (Structural condition) |

| **Cause** | **Action** | **Action Code** |
|---|---|---|
| Damaged By Earlier Event | 705 - Other - as specified | c - To the satisfaction of the Coast Guard |

| **Description of Deficiency** |
|---|
| Hand rails are damaged around the pilot house. Make repairs IAW 46 CFR 144.800. Vessel may transit to shipyard for repairs. |

| **Due Date** | **Resolved** | **Resolved Date** |
|---|---|---|
| Sunday, February 27, 2022 | True | Tuesday, June 21, 2022 |

| **Resolution Description** |
|---|
| Verified repairs |



Resolved
Pending

| *Deficiency Information* |
|---|

| **System** | **SubSystem** | **Component** |
|---|---|---|
| 01 - Certificates & Documentation | 011 - Ships Certificates | 01199 - Other (certificates) |

| **Cause** | **Action** | **Action Code** |
|---|---|---|
| Invalid | 60 - Rectify deficiencies prior to movement | c - To the satisfaction of the Coast Guard |

| **Description of Deficiency** |
|---|
| No vessel owned by the company has a valid COI. Vessel shall obtain a valid COI prior to operation or bring fleet into compliance with 46 CFR 136.202. All owners and operators of an existing towing vessel must have a valid COI prior to the specified phase-in period listed in 46 CFR 136.202 |

| **Due Date** | **Resolved** | **Resolved Date** |
|---|---|---|
| Sunday, February 27, 2022 | True | Tuesday, June 21, 2022 |

| **Resolution Description** |
|---|
| Issued COI. |

| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
|---|---|---|---|---|
| 7376359 | Not Associated with a Case | Savannah, Georgia | Thursday, January 6, 2022 | Vessel Inspection |
| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
| 7352740 | Not Associated with a Case | Savannah, Georgia | Tuesday, November 16, 2021 | Vessel Inspection |
| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
| 7338889 | Not Associated with a Case | Savannah, Georgia | Monday, October 25, 2021 | Vessel Inspection |
| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
| 7336797 | Not Associated with a Case | Savannah, Georgia | Thursday, October 21, 2021 | Vessel Inspection |
| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
| 7146957 | Not Associated with a Case | Mobile, Alabama | Friday, February 26, 2021 | Vessel Inspection |



Resolved
Pending

| *Deficiency Information* |
|---|

| **System** | **SubSystem** | **Component** |
|---|---|---|
| 01 - Certificates & Documentation | 011 - Ships Certificates | CG001 - Certificate of Inspection (COI) |

| **Cause** | **Action** | **Action Code** |
|---|---|---|

| Not Available | 50 - Rectify deficiencies w/in 30 days | c - To the satisfaction of the Coast Guard |
|---|---|---|
| **Description of Deficiency** | | |
| All owners and operators of existing towing vessels must meet the compliance phase in requirements of 46 CFR 136.202. As of 20JULY2020 companies must have a valid COI for towing vessels within thier fleet. As of 26FEB2021 M.A.R.S. INC. towing vessel fleet has a valid COI for 15% of its vessels. The M.A.R.S. TITAN must obtain an valid COI within 30 days from 26FEB2021. The associated code of this deficiency will change automatically to 17 if the stated requirements are not met. | | |
| **Due Date** | **Resolved** | **Resolved Date** |
| Sunday, March 28, 2021 | True | Thursday, October 21, 2021 |
| **Resolution Description** | | |
| Cleared in accordance with CVC Policy 02-20. | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 5178233 | 734500 | WASHINGTON, District of Columbia | Thursday, July 2, 2015 | Incident Investigation |
| View Investigation Details | Incident Information | | | |
| | Role | | | |
| | Involved in a Marine Casualty | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 3985347 | Not Associated with a Case | Morgan City, Louisiana | Tuesday, April 12, 2011 | Uninspected Towing Vessel Exam |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 3922077 | Not Associated with a Case | Houma, Louisiana | Thursday, January 6, 2011 | Uninspected Towing Vessel Exam |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 3904558 | 531462 | WASHINGTON, District of Columbia | Tuesday, November 23, 2010 | Incident Investigation |
| View Investigation Details | Incident Information | | | |
| | Role | | | |
| | Involved in a Marine Casualty | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 3833376 | 518686 | WASHINGTON, District of Columbia | Friday, August 20, 2010 | Incident Investigation |
| View Investigation Details | Incident Information | | | |
| | Role | | | |
| | Involved in a Marine Casualty | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 3445766 | 446783 | WASHINGTON, District of Columbia | Friday, April 3, 2009 | Incident Investigation |
| View Investigation Details | Incident Information | | | |
| | Role | | | |
| | Acknowledged Pollution Source | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 187881 | 69739 | WASHINGTON, District of Columbia | Friday, December 9, 1994 | Incident Investigation |
| View Investigation Details | Incident Information | | | |
| | Role | | | |
| | Involved in a Marine Casualty | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 172301 | 961601 | WASHINGTON, District of Columbia | Thursday, September 15, 1994 | Incident Investigation |
| View Investigation Details | Incident Information | | | |
| | Role | | | |
| | Involved in a Marine Casualty | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 156140 | 947419 | WASHINGTON, District of Columbia | Saturday, August 24, 1996 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 154969 | 946396 | WASHINGTON, District of Columbia | Monday, May 17, 1999 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 123006 | 918228 | WASHINGTON, District of Columbia | Sunday, December 25, 1994 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 122116 | 917444 | WASHINGTON, District of Columbia | Saturday, May 13, 2000 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 117775 | 913617 | WASHINGTON, District of Columbia | Wednesday, January 20, 1993 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 104990 | 902316 | WASHINGTON, District of Columbia | Monday, April 29, 1996 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 89606 | 888853 | WASHINGTON, District of Columbia | Wednesday, July 14, 1999 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 78489 | 879030 | WASHINGTON, District of Columbia | Friday, June 6, 1997 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 72382 | 873649 | WASHINGTON, District of Columbia | Saturday, December 21, 1991 | Incident Investigation |

View Investigation Details

| Incident Information | | | | |
|---|---|---|---|---|
| Role | | | | |
| Involved in a Marine Casualty | | | | |

| Activity Number | Case Number | Responsible Unit's USCG Zone/Port | Incident Date | Activity Type |
|---|---|---|---|---|
| 70365 | 871876 | WASHINGTON, District of Columbia | Wednesday, May 18, 1994 | Incident Investigation |

| | Incident Information | | | |
|---|---|---|---|---|
| View Investigation Details | **Role** | | | |
| | Involved in a Marine Casualty | | | |

| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
|---|---|---|---|---|
| 66373 | 868334 | WASHINGTON, District of Columbia | Saturday, January 14, 1995 | Incident Investigation |

| | Incident Information | | | |
|---|---|---|---|---|
| View Investigation Details | **Role** | | | |
| | Involved in a Marine Casualty | | | |

| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
|---|---|---|---|---|
| 44913 | 849389 | WASHINGTON, District of Columbia | Monday, June 10, 1996 | Incident Investigation |

| | Incident Information | | | |
|---|---|---|---|---|
| View Investigation Details | **Role** | | | |
| | Involved in a Marine Casualty | | | |

| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
|---|---|---|---|---|
| 42644 | 847387 | WASHINGTON, District of Columbia | Sunday, April 2, 2000 | Incident Investigation |

| | Incident Information | | | |
|---|---|---|---|---|
| View Investigation Details | **Role** | | | |
| | Involved in a Marine Casualty | | | |

| **Activity Number** | **Case Number** | **Responsible Unit's USCG Zone/Port** | **Incident Date** | **Activity Type** |
|---|---|---|---|---|
| 34888 | 840563 | WASHINGTON, District of Columbia | Tuesday, September 13, 1994 | Incident Investigation |

| | Incident Information | | | |
|---|---|---|---|---|
| View Investigation Details | **Role** | | | |
| | Involved in a Marine Casualty | | | |

Back to Top

Printer Friendly Version

**Last Update:**
Monday, May 13, 2024



**USCG Maritime Information Exchange**
**Incident Investigation Reports**

SEARCH IIR    FEATURED LINKS    WEB ACCESSIBILITY POLICY    FOIA REQUESTS    CONTACT US

Skip Navigation

# Investigation Activity Report

Injury - DB William Kallop/Offshore King

Activity Start Date: Thursday, July 2, 2015
MISLE Activity Number: 5178233
MISLE Originating Unit: Marine Safety Unit Morgan City
MISLE Activity Owner: Commandant (CG-INV-3)
MISLE Activity Controller: Marine Safety Unit Morgan City
MISLE Case Number: 734500

---

## I. INCIDENT BRIEF

On July 3, 2015 Marine Safety Unit Morgan City was notified that at approximately 1825 on July 2, 2015,while making towing arrangements between the bow of the Derrick Barge DB WILLIAM KALLOP and the stern of the towing vessel OFFSHORE KING, two crewmembers were injured when one of the towlines snapped under heavy tension. After attaching the two towlines, one on the port bow and one on the starboard bow of the barge, the lines began to take tension and one of the lines became caught on the OFFSHORE KING. Two crewmembers proceeded to investigate the reason for the towline being caught when the line came loose and it whipped through the guard rail and struck both of them leading to some injuries and the medical evacuation of the members for further evaluation. As a result of the investigation, it was identified that the two crewmembers were standing in what is considered a restricted area when the vessel is in tow, but at the time of casualty they did not consider this to be a restricted area since they were still working the lines.

---

## II. INCIDENT SUMMARY

Incident Involved: Marine Casualty, Reportable
Level of Investigation: Informal
IMO Classification: Routine
USCG Classification: Routine

Was This a Serious Marine Incident? No

Was a Marine Board Convened by Commandant? No

| Personal Casualty Summary | Vessel(s) Status Summary | Property Damage Summary |
|---|---|---|
| **Total Missing:** 0 | **Actual Total Loss(es):** 0 | NO RECORDED DATA |
| **Total Dead:** 0 | **Total Constructive Loss, Salvaged:** 0 | |
| **Total Injured:** 2 | **Total Constructive Loss, Unsalvaged:** 0 | |
| **At Risk, Not Injured:** 0 | **Damaged:** 0 | |
| **Total Not at Risk:** 1 | **Undamaged:** 2 | |
| **Total at Risk:** 2 | | |

---

## III. ACTIONS IN REPONSE TO THIS REPORT

***Actions on Recommendations:***

NO RECORDED DATA

***Safety Alerts:***

NO RECORDED DATA

---

## IV. FINDINGS OF FACT

***Subjects of the Investigation***

Involved Vessel(s)        Involved Facilities

**Vessel Name:** OFFSHORE KING
**VIN:** 513704
**Role:** Involved in a Marine Casualty

**Vessel Name:** DB WILLIAM KALLOP
**VIN:** 8639455
**Role:** Involved in a Marine Casualty

NO RECORDED DATA

For additional vessel details, please click here.    For additional facility details, please click here.

Involved Parties                                        Involved Organizations

**Party Name:** Removed for Privacy                     NO RECORDED DATA
**Party Name:** Removed for Privacy
**Party Name:** Removed for Privacy

For additional party details, please click here.    For additional organization details, please click here.

Response Resources                                      Waterway Segment(s)

NO RECORDED DATA                                        **Waterway:** GULF OF MEXICO

For additional response details, please click here.    For additional waterway details, please click here.

---

## V. REFERRAL FOR ENFORCEMENT ACTION

NO RECORDED DATA

Printer Friendly Version

**Last Update:**
Monday, May 13, 2024