Transcript of the Testimony of
# 30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.

**Date taken: May 24, 2023**

> **EXHIBIT**
>
> **G**

**All Coast, LLC v. Shore Offshore Services, LLC**

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Page 39

1          A      Shore had asked us if we knew of

2     any boats out there that could work with the

3     THOR, so we found Louisiana International and

4     Crosby.

5          Q      Okay.  And then what happened after

6     that?

7          A      We put the vessels -- well, when we

8     were contacted by Shore, we contacted the

9     vessel owners, explained to them what Shore

10    was looking for, and when all parties agreed,

11    they went to work for Shore.

12         Q      Okay.  And was Dawn a part of that

13    agreement?  You said, "All parties agreed."

14         A      The vessel owner, as well as Shore.

15         Q      Okay.  And what were they agreeing

16    to?

17         A      The work to be provided.

18         Q      Okay.  And I'm not trying to ask a

19    trick question --

20         A      Right.

21         Q      -- here or anything like that.  I

22    just want to know, Dawn helped facilitate the

23    use of these vessels with Shore in

24    October 2020?

25         A      Yes.

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 42

1        A     Yes.

2        Q     Okay.  So irrespective of what

3    Dawn's position is in this case, as to whether

4    or not this Master Vessel Time Charter applies

5    to the claims against Dawn, in connection with

6    this incident, this contract was in existence

7    on October 28th, 2020, correct?

8        A     Yes.

9        Q     Okay.  Irrespective of Dawn's

10    position in this case as to whether or not the

11    contract applies to the claims against Dawn,

12    in connection with the incident, this contract

13    was in effect between Shore and Dawn on

14    October 28th, 2020?

15        A     Yes.

16        Q     On Page 398, so Dawn 398, under

17    "Charterer, Shore Offshore Services."  For

18    "Print Name" you see where it says "Cody

19    Sims"?

20        A     Yes.

21        Q     Project director?

22        A     Yes.

23        Q     Okay.  And it appears to be signed

24    by Mr. Sims, right?

25        A     Yes.

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 55

```
 1              What was the time period you

 2       asked about?

 3          MR. ALTMYER:

 4              For October 28, 2020.

 5  EXAMINATION BY MR. ALTMYER:

 6       Q     Is that percentage roughly the same

 7  today?

 8       A     No.

 9       Q     Okay.  What's the percentage now?

10       A     Five percent.

11       Q     You're familiar with Dawn's

12  website?

13       A     Yes.

14       Q     Okay.  You've seen it before,

15  correct?

16       A     Yes.

17       Q     Dawn does not market, on its

18  website, that it brokers third-party vessels,

19  correct?

20       A     No.

21       Q     As of June 2017, so at the time

22  that the Master Vessel Time Charter was

23  executed, just to give you a reference of time

24  frame, how many vessels did Dawn have in its

25  fleet?
```

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 57

1       Q      We'll get into Dawn's

2    communications with Shore in October 2020

3    later on, but in October of 20, you

4    understood, in connection with THOR's offshore

5    work, that THOR needed a tug to tow it from

6    platform to platform and to handle anchors,

7    correct?

8       A      Yes.

9       Q      In October 2020, how many vessels

10   that were part of Dawn's fleet were available

11   to provide that type of service, that the THOR

12   needed, that it was performing offshore?

13      A      None.

14      Q      I want to flip to Page 388 of the

15   Master Vessel Time Charter.  I just want to

16   confirm a few things in here with you.  The

17   term "OWNER" and it's capitalized, every

18   single letter in the word "OWNER" is

19   capitalized here, is defined as Dawn Services,

20   LLC, correct?

21      A      Yes.

22      Q      Okay.  And the term "charterer" is

23   defined Shore Offshore Services, LLC, correct?

24      A      Yes.

25      Q      And "CHARTERER" is in all capitals,

Page 61

1    may include any actions taken by charterer,

2    under any provision of this charter,

3    establishes conclusively that all of the terms

4    and conditions of this agreement are in

5    effect, notwithstanding whether or not

6    charterer has returned a signed charter order

7    to charterer."  All right.  Did I read that

8    correctly?

9         A    Yes.

10        Q    All right.  So that's supposed to

11   cover a situation where work starts by a

12   vessel covered under this agreement, but there

13   hasn't been a written confirmation of the

14   charter order yet, right?

15        A    Yes.

16        Q    And sometimes on-hire letters are

17   issued after work commences, right?

18        A    Yes.

19        Q    I believe that was done in a few

20   instances with Shore here, correct?

21        A    I guess.

22        Q    We'll look at them.  Yeah, we'll

23   look at them later.  Let's turn to Dawn 400 to

24   401.  That's going to be Exhibit A of the

25   Master Vessel Time Charter.  All right.  And

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 62

1    this is the confirmation of charter order,

2    Exhibit A, and that's the document that we

3    have just referred to when we were reading

4    Section 1-B, correct?

5         A    Yes.

6         Q    Okay.  I have not seen any

7    documents produced by Dawn in this case, to

8    this effect, but are you aware, testifying as

9    Dawn's corporate representative here today, of

10   any charter orders by Dawn to Shore where this

11   form was actually used?

12        A    Never used.  It was never used.

13        Q    Never used.  So is it Dawn's

14   position that all of the charter orders

15   entered into between Shore and Dawn, under the

16   Master Vessel Time Charter, were made orally?

17             MR. REISMAN:

18                  Object to the form.

19             THE WITNESS:

20                  We used the on/off hire

21        letters.

22   EXAMINATION BY MR. ALTMYER:

23        Q    Okay.  And that's the -- so what

24   I'm going to get at here is let's look back at

25   Section 1-B.

Page 63

1      A      Okay.

2      Q      So it says, on the second sentence,

3    "Charter orders may be in written form, in the

4    form of Exhibit A, or perfected on an oral

5    basis, which shall be confirmed in writing by

6    the owner, directly to charterer, as soon as

7    practical, under the circumstances."

8            So what I'm getting at is, so every

9    single situation of where a charter was

10   entered into under this Master Vessel Time

11   Charter with Shore, it was done orally and

12   then confirmed via an on/off hire letter?

13     A      Yes.

14     Q      Okay.  And again, those are sent to

15   Shore via email, right?

16     A      Yes.

17     Q      And you're traditionally the person

18   that sends that email, right?  You, as Mike

19   Grace, not as Dawn?

20     A      Yes.

21     Q      Okay.  All right.  Let's go to

22   Page 389 real quick.  Actually, I want to read

23   one part on 388 first real quick.  It's in the

24   second section.  It's under "Witnesseth," and

25   it's the second point.  I'm just going to read

Page 67

1    its rights or obligations hereunder, and owner

2    shall not, without prior consent, charter, let

3    or hire to permit the use of the vessel by

4    others unless a substitute vessel is provided,

5    in accordance with the provisions of this

6    charter."

7         Q     Okay.  Reading that Section 13, and

8    where it says "substitute vessel," the word

9    "vessel" used after the word "substitute" is

10   not capitalized, right?

11        A     Correct.

12        Q     All right.  Very quickly, again,

13   that's your initials at the bottom of Dawn

14   396?

15        A     Yes.

16        Q     All right.  So looking at this,

17   we've seen -- and there's other places

18   throughout this contract, if you'd like to

19   review for it -- but there's instances of

20   where the term "vessel" is capitalized and

21   there's instances of where the word "vessel"

22   is not capitalized, right?

23        A     Yes.

24        Q     Irrespective of the applicability

25   of the 2017 Master Vessel Time Charter to the

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 68

1    claims against Dawn in this case, from June 9,

2    2017, the date that the Master Vessel Time

3    Charter was executed, to the present, Dawn has

4    provided vessels to Shore from Dawn's own

5    fleet, which it owns and operates, correct?

6         A    Yes.

7         Q    Irrespective of the applicability

8    of the 2017 Master Vessel Time Charter to the

9    claims against Dawn in this case, from the

10   date of the 2017 Master Vessel Time Charter,

11   on June 9, 2017 to the present, Dawn has

12   facilitated the use of vessels owned by third

13   parties to Shore, correct?

14            MR. REISMAN:

15                Object to the form.

16            THE WITNESS:

17                We have brokered vessels to

18        Shore, but the contract didn't apply.

19            MR. ALTMYER:

20                Okay.  I'm going to object as

21        nonresponsive.

22   EXAMINATION BY MR. ALTMYER:

23        Q    You testified earlier that, when I

24   asked you the question of whether or not it

25   was a fair representation, when we were

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 69

1   talking about brokering, that you're

2   facilitating the use of a third-party vessel

3   to one of Dawn's customers, correct?

4        A    Yes.

5        Q    Okay.  So what I'm asking is,

6   irrespective of the applicability of this

7   contract, the 2017 Master Vessel Time Charter,

8   from the time that it was executed on June 9,

9   2017, to the present, Dawn has facilitated the

10  use of third-party vessels to its customer,

11  Shore?

12       A    Yes.

13       Q    What is Dawn's position as to when

14  or under what circumstances a vessel provided

15  to Shore is governed by this 2017 Master

16  Vessel Time Charter?

17            MR. REISMAN:

18                 Object to the form.

19            THE WITNESS:

20                 Could you repeat the question

21       one more time.

22  EXAMINATION BY MR. ALTMYER:

23       Q    Yeah.  What is Dawn's position on

24  when the Master Vessel Time Charter, from

25  June 9, 2017, applies to Dawn providing a

Page 70

```
 1   vessel to Shore?
 2          MR. REISMAN:
 3                Object to the form.
 4          THE WITNESS:
 5                Dawn -- this applies when Dawn
 6        provides a Dawn vessel, where we can
 7        control it, crew it, insure it.
 8          MR. REISMAN:
 9                Jacob, we've been going an
10        hour.  Can we take a break?
11          MR. ALTMYER:
12                Yeah, absolutely.  Yeah.
13                (Whereupon, a break was taken;
14        11:06 a.m. - 11:23 a.m.)
15          MR. ALTMYER:
16                All right.  Let's go back on.
17   EXAMINATION BY MR. ALTMYER:
18      Q    All right, Mr. Grace.  Before we
19   had taken that break, we were talking about
20   when the Master Vessel Time Charter between
21   Shore and Dawn applies and when it does not
22   apply.  So I'm going to ask, just to kind of
23   recap the first question that I was getting
24   into on that topic.
25                Irrespective of the applicability
```

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 71

1    of the 2017 Master Vessel Time Charter to the

2    claims against Dawn in this case, from the

3    date the 2017 Master Vessel Time Charter was

4    executed, on June 9, 2017 -- scratch that

5    question.  I've already asked you that.

6              Just generally speaking, what is

7    Dawn's position on when the 2017 Master Vessel

8    Time Charter --

9         MR. REISMAN:

10             I'm just telling him to wait

11        because I'm going to object, but --

12   EXAMINATION BY MR. ALTMYER:

13        Q    Generally speaking, what is Dawn's

14   position as to when or under what

15   circumstances a vessel provided to Shore is

16   governed, under the 2017 Master Vessel Time

17   Charter?

18        MR. REISMAN:

19             Object to the form of the

20        question.  You can answer it, if you

21        can.

22        THE WITNESS:

23             It applies when Dawn provides a

24        Dawn vessel and does not apply when we

25        broker a third-party vessel.

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 80

 1    vessel that's owned by Dawn?

 2        A    Yes.

 3        Q    Okay.  Prior to October 28, 2020,

 4    did Dawn have any broker forms or agreements

 5    that it provided to Shore to distinguish a

 6    scenario between when it was offering to

 7    broker a vessel to Shore versus when it was

 8    chartering a vessel to Shore?

 9        A    The on or on/off hire forms.

10        Q    Okay.  Is that the only form,

11    speaking here today on behalf of Dawn

12    Services, that Dawn had that would distinguish

13    between when Dawn was brokering a vessel to

14    Shore versus when it was chartering a vessel

15    to Shore?

16        A    Yes.

17        Q    And that form would be provided to

18    Shore via email, correct?

19        A    Yes.

20        Q    And you would generally send those

21    emails, correct?

22        A    Yes.

23        Q    We'll look at some of the on-hire

24    and on/off hire letters later on, but that

25    same form is generally used whether or not

Page 81

1    Dawn is brokering a vessel to Shore or

2    chartering a vessel to Shore, correct?

3         A     Yes.

4         Q     So I guess the question then goes

5    to, if it's the same form, then what is

6    distinguishing about it, from the scenario of

7    when Dawn is brokering a vessel to Shore

8    versus when Dawn is chartering a vessel to

9    Shore?

10             MR. REISMAN:

11                  Do you want to see it?

12             THE WITNESS:

13                  Yes.

14   EXAMINATION BY MR. ALTMYER:

15        Q     Okay, yeah.  I'll show you just one

16   example.  I'm not going to offer it yet

17   because we'll --

18             MR. REISMAN:

19                  That's fine.

20             MR. ALTMYER:

21                  We'll ask it later on.  This is

22        the packet that was produced by Dawn --

23             THE WITNESS:

24                  Okay.

25             MR. ALTMYER:

Page 84

1    about it, from the circumstance of when you're

2    brokering a vessel to Shore versus when you're

3    chartering a vessel to Shore?

4         A     Well, because it says "vessel" on

5    here, and we'll name the vessel.

6         Q     Okay.  So you're saying simply --

7    it's Dawn's position that simply the name of

8    the vessel and the fact that a third party may

9    own it, even if it's not stated on the form,

10   that is the distinguishing factor between when

11   it's brokered versus when it's chartered to

12   Shore?

13        A     That, and the mutual agreement

14   between the vessel owner.

15        Q     Okay.  And just to confirm, that

16   mutual agreement language is contained in the

17   on-hire letter or the on/off hire letter that

18   you issued to Shore, irrespective of whether

19   you're brokering the vessel to Shore or

20   chartering the vessel to Shore?

21        A     Yes.

22        Q     So the distinction between an

23   on-hire letter, when you're brokering to Shore

24   versus when you're chartering a vessel to

25   Shore, is simply the name of the vessel that's

Page 85

1    stated on the on/off hire letter?

2        A    Yes.

3        Q    And that's the only difference?

4        A    Yes.

5        Q    Okay.  And prior to October 28,

6    2020, is it Dawn's position here today that

7    that is the on/off hire letter or the on-hire

8    letter?  That's generally the same form,

9    right?  It's just, one says "on hire" and one

10   says "on/off hire"?

11       A    Yeah, when it goes on hire, it

12   lists it.  When it goes off hire, it lists the

13   off hire.

14       Q    Gotcha.  But it's the same form

15   that you use for both letters?

16       A    Correct.

17       Q    Prior to October 28, 2020, is it

18   Dawn's position that the on/off hire letters

19   are the only forms that are used for brokering

20   a boat to Shore?

21       A    Could you repeat the question one

22   more time?

23       Q    Yeah.  Before October 28, 2020, was

24   the on/off hire letter the only form or

25   written document that was used for brokering a

Page 86

1    vessel to Shore?

2            MR. REISMAN:

3                 Object to the form.

4            THE WITNESS:

5                 Yes.

6    EXAMINATION BY MR. ALTMYER:

7        Q    Okay.  Prior to October 28, 2020,

8    did Dawn have any written policies in effect

9    regarding explaining to its customers when

10   Dawn was offering to broker a vessel versus

11   when it was chartering a vessel?

12       A    No.  Other than Tommy and Cody knew

13   what vessels were brokered --

14       Q    Okay.

15       A    -- and what were chartered.

16           MR. ALTMYER:

17                Okay.  Object as nonresponsive.

18   EXAMINATION BY MR. ALTMYER:

19       Q    I'm talking about just, did Dawn

20   have any written policies about distinguishing

21   to a customer, what you should explain to a

22   customer when Dawn is offering to broker a

23   vessel versus when it is chartering a vessel?

24       A    No.

25       Q    Were there any non-written or

Page 87

1    informal policies implemented by Dawn prior to

2    October 28, 2020, as to what you should do to

3    distinguish to a customer when Dawn is

4    offering to broker a vessel versus when it is

5    chartering a vessel?

6        A    No, other than send this letter to

7    them.

8        Q    Prior to October 28, 2020, did Dawn

9    have any written policies in effect regarding

10   explaining to its customers that Dawn would be

11   taking the position that certain Master Vessel

12   Time Charters it had between it and its

13   customers would not apply, when it would

14   provide its customers with third-party

15   vessels?

16       A    Could you repeat the question?

17       Q    Yeah.  Prior to October 28, 2020,

18   did Dawn have any written policies in place

19   regarding explaining to its customers that

20   Dawn would be taking the position that any

21   Master Vessel Time Charter that it had in

22   place between it and its customer, would not

23   apply in a scenario of where it was brokering

24   a vessel to a customer?

25       A    No, other than the on/off hire,

Page 88

```
 1   where it states "vessel owner" and "Shore
 2   Offshore."  You'd have a mutual agreement.
 3       Q     And I'm just talking about -- not
 4   documents.  I'm talking about, there was no
 5   written policy to that effect.
 6       A     No.
 7             MR. PALMINTIER:
 8                 I'm having trouble hearing the
 9         witness.
10             MR. REISMAN:
11                 That's okay.  Are you able to
12         read it back for them?
13             THE COURT REPORTER:
14                 The answer was --
15             MR. REISMAN:
16                 Mike, are you able to hear her?
17             MR. PALMINTIER:
18                 Yes, thanks.
19             MR. REISMAN:
20                 Okay.  Yeah, she's going to
21         read it back for you.
22             THE COURT REPORTER:
23                 The question was:  And I'm just
24         talking about -- not documents.  I'm
25         talking about, there was no written
```

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 93

```
 1              MR. REISMAN:

 2                  Object to the form.

 3          THE WITNESS:

 4                  I mean, I read -- I had an

 5          understanding of what our Time Charter

 6          covered.  I would expect Tommy and Cody

 7          to have an understanding, too, of what

 8          the Time Charter covered, the Master

 9          Vessel Time Charter.

10              MR. ALTMYER:

11                  Okay.  I'm going to strike --

12          object to the answer as nonresponsive.

13              MR. REISMAN:

14                  I disagree.

15      EXAMINATION BY MR. ALTMYER:

16          Q    My question is, did you ever convey

17      to Shore, in writing, -- well, let's exclude

18      the contract then also from that.  So not

19      talking about the contract, not talking about

20      the on/off hire letter, and not talking about

21      the Certificate of Insurance.  Prior to

22      October 28, 2020, did Dawn ever convey to

23      Shore, in writing, that it would be taking the

24      position that the 2017 Master Vessel Time

25      Charter would not apply in scenarios where
```

Page 94

1    Dawn was brokering a vessel to Shore?

2         A    No.

3         Q    Same question and same

4    qualifications on it.  I'm not talking about

5    the Master Vessel Time Charter, I'm not

6    talking about the on/off hire letter, I'm not

7    talking about a Certificate of Insurance.

8    Prior to October 28, 2020, did Dawn ever

9    convey to Shore verbally that, specifically,

10   that it would be taking the position that the

11   2017 Master Vessel Time Charter would not

12   apply to vessels that it was brokering to

13   Shore?

14             MR. REISMAN:

15                  Object to the form.

16             THE WITNESS:

17                  Could you repeat it again?

18   EXAMINATION BY MR. ALTMYER:

19        Q    Yes.  Same qualifications.  So

20   we're not talking about the Master Vessel Time

21   Charter, the on/off hire letters, or the

22   Certificate of Insurance.  Prior to October

23   28, 2020, did Dawn ever convey to Shore,

24   verbally, that it would be taking the position

25   that the 2017 Master Vessel Time Charter would

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 106

1   on-hire or on/off hire letter is employed by

2   Dawn, irrespective of whether or not Dawn is

3   taking the position that it's brokering a boat

4   or chartering a boat?

5       A    Wait.  Could you repeat the

6   question one more time?

7       Q    Yeah.  The same process of issuing

8   an on-hire or on/off hire letter and emailing

9   it to a customer, that same process is

10  employed by Dawn, irrespective of whether or

11  not Dawn is taking the position that it

12  brokers a boat or charters a boat?

13      A    Yes.

14      Q    I think we'll go through them and

15  ask some general questions about just the form

16  itself, and then we'll go through some of

17  these specifically.  But on-hire letters are

18  not always sent prior to a job commencing,

19  correct?

20      A    Correct.

21      Q    Okay.  I think we can see from

22  Dawn 373, reading it, at the Start Time

23  section, it says 1300, on October 7th, 2020,

24  right?

25      A    Correct.

Page 108

```
 1        Q     Is there a particular rhyme or
 2   reason as to why just an on/off hire would be
 3   issued and not an on-hire letter for a
 4   particular job?
 5        A     If it's an hourly rate job, it's
 6   generally just however many hours, and you
 7   just put it all on one rather than a day rate
 8   vessel.
 9        Q     Okay.  So hourly rates, that might
10   be some of the instances of where we just see
11   an on/off hire letter instead of an on-hire
12   letter and an on/off hire letter?
13        A     Yes.
14        Q     Understood.  How long has Dawn been
15   using this form for?
16        A     Probably -- I'm guessing, but
17   probably 12 years.  Ten to 12 years.
18        Q     So you testified earlier you've
19   been with Dawn for around ten years, right?
20        A     No.  I've been with Dawn longer.  I
21   didn't testify that I was with Dawn for ten
22   years.
23             MR. REISMAN:
24                  He was the VP for ten years.
25             THE WITNESS:
```

Page 175

1    Exhibit 128, which is the website screenshot

2    of the vessels.  So Gulf Dawn, LLC, is the

3    owner of the M/V GULF DAWN, correct?

4         A    Yes.

5         Q    Okay.  Break of Dawn, Inc., is the

6    owner of the M/V BREAK OF DAWN, correct?

7         A    Yes.

8         Q    And that's under the

9    3600-horsepower class?

10        A    Yes.

11        Q    On Exhibit 128?

12        A    Yes.

13        Q    All right.  My apologies.  I'm

14   going to flip to my copy real quick.  All

15   right.  And then we've got the M/V ATLANTIC

16   DAWN listed under 4200-horsepower class.  That

17   is owned pilot Atlantic Dawn, LLC, correct?

18        A    Yes.

19        Q    Then we've got Pacific Dawn, LLC.

20   The PACIFIC DAWN is also shown on Exhibit 128,

21   under the 4200-horsepower class, correct?

22        A    Yes.

23        Q    All right.  And Pacific Dawn, LLC,

24   is the owner of that vessel?

25        A    Yes.

Page 189

1    Dawn's position that the Master Vessel Time

2    Charter applies?

3         A     Yes.

4         Q     Okay.  So let's put it this way.

5    If the M/V BREAK OF DAWN -- I used that one

6    because I think it's a good name --

7         A     Yeah.

8         Q     If the M/V BREAK OF DAWN is owned

9    by Break of Dawn, Incorporated, directly, and

10   it is not owned directly by Dawn Services,

11   LLC, it's Dawn's position that the Master

12   Vessel Time Charter from 2017 would apply

13   still, to providing the M/V BREAK OF DAWN to

14   Shore?

15            MR. REISMAN:

16                Object to the form.  There are

17         other criteria, but I mean, if you're

18         just limiting it to --

19            THE WITNESS:

20                Dawn controlled, Dawn operated,

21         Dawn employed, Dawn insured the BREAK OF

22         DAWN, so it would apply to the Master

23         Vessel Time Charter.

24   EXAMINATION BY MR. ALTMYER:

25         Q     Okay.  And just to clarify, that's

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 204

```
 1        A      Operationally, Shore, in this
 2   instance, would tell us where, what type of
 3   job they're looking -- what they're looking
 4   for.
 5                MR. REISMAN:
 6                     Hang on a second.  I object to
 7           the form, because I really didn't
 8           understand the question.  You said
 9           something about, from some point on, but
10           I don't think it was clear and I don't
11           know that -- he's going backwards.  I
12           think you meant forwards.
13                MR. ALTMYER:
14                     Yeah.
15   EXAMINATION BY MR. ALTMYER:
16        Q      I'm talking about when Dawn's
17   brokering a boat.
18        A      Right.
19        Q      And let's say, after an on-hire is
20   issued, what is Dawn's level of involvement
21   after that, between the third-party vessel
22   owner and Dawn's customer?
23                MR. REISMAN:
24                     After -- after the on-hire
25           letter is sent out?
```

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 205

1    EXAMINATION BY MR. ALTMYER:

2         Q     After the on-hire, yeah.

3         A     Very minimal, because once the

4    vessel gets to the location and its working

5    with the D/B THOR, they're working as

6    directed.  The barge is -- the barge is

7    directing the tug what to do.

8         Q     Okay.  And then, so let's say --

9    let's take it back and specifically to an

10   instance to where the work would commence

11   before an on-hire is issued.  What is Dawn's

12   level of involvement in that scenario?

13        A     It would just really only tell the

14   vessel owner where the vessel needed to go to

15   report to.

16        Q     Okay.  So would that type of

17   information include ETAs?

18        A     Sometimes.

19        Q     If there are logistical delays with

20   a third-party vessel, is that something that

21   you would convey to one of your customers?

22        A     Sometimes.

23        Q     Okay.  If there was additional

24   costs associated with logistical delays, is

25   that something that you would communicate with

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 206

1    one of your customers?

2         A     What do you mean by additional

3    costs?

4         Q     So let's say it's going to take

5    longer for a vessel to get to a certain

6    position and they're on an hourly rate.  Is

7    that something that you would communicate to

8    your customer?

9         A     I mean, is there something specific

10   that you're looking for?  Like, as far as like

11   a specific time?

12        Q     No, I'm just wondering -- all

13   right.  So, look, we just discussed about, if

14   there's delays, then that's something that

15   you're going to communicate to your customer,

16   right?

17        A     Sometimes.  The boat might be able

18   to communicate with our customer, as well, or

19   the boat owner, vessel owner.

20        Q     Absolutely.  I'm just talking about

21   generally.  I'm not talking about any specific

22   instance.  Is that something that is a

23   communication that has happened before?

24             MR. REISMAN:

25                  Object to the form.  Asked and

Page 207

1         answered.

2              THE WITNESS:

3                   Yeah.  It's -- it's --

4         sometimes.

5    EXAMINATION BY MR. ALTMYER:

6         Q     Okay.

7         A     I mean, --

8         Q     When Dawn provides a brokered

9    vessel to a customer, Dawn coordinates the

10   third-party vessel's need for fuel or lube

11   replacement, correct?

12        A     Sometimes.

13        Q     Okay.  Going back to the ETAs, if

14   there is ETA information that's conveyed to

15   one of Dawn's customers, that information is

16   received by Dawn from the third-party vessel

17   owner, right?

18        A     We're just merely the middle man in

19   all this.

20        Q     Right.  So is it fair to say that

21   it's -- in your role as a broker, you're a

22   pass-through of communication between the

23   vessel owner and your customer?

24              MR. REISMAN:

25                   Object to the form.

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 208

1              THE WITNESS:

2                  Can you repeat the question,

3         please?

4              MR. ALTMYER:

5                  Yeah.

6              MR. REISMAN:

7                  Are you talking about, that

8         they serve as the pass-through or that

9         there can be times when information is

10        relayed through them?

11             MR. ALTMYER:

12                 Yeah, there could be times

13        when -- I'll do it this way.

14             MR. REISMAN:

15                 Or are they the source of all

16        information?  And to that, I think

17        that's --

18   EXAMINATION BY MR. ALTMYER:

19        Q    Primarily speaking, does Dawn serve

20   as the pass-through of information between the

21   third-party vessel owner and Dawn's customer?

22             MR. REISMAN:

23                 Object to the form.

24             THE WITNESS:

25                 Not always.  Sometimes.

Page 209

```
 1   EXAMINATION BY MR. ALTMYER:

 2        Q    So it's sometimes.  So all I want

 3   to do is just talk about specific instances of

 4   when that might happen.  So ETAs, is that one

 5   of the topics that sometimes is conveyed to

 6   Dawn from the third-party vessel owner, and

 7   then is later conveyed to Dawn's customer?

 8        A    Sometimes.

 9        Q    Okay.  Logistical delays, is that

10   information that Dawn sometimes, as a broker,

11   receives from a third-party vessel owner and

12   then communicates to Dawn's customer?

13        A    Vessel delays?

14        Q    Yes.

15        A    I mean, it's different all the

16   time, but sometimes.

17        Q    Okay.  Same question for fuel or

18   lube replacement, the need for fuel or lube

19   replacement.  Is that information that you

20   would receive from the third-party vessel

21   owner if they're on a day rate job, and then

22   convey that information to Dawn's customer?

23        A    As a broker, --

24             MR. REISMAN:

25                  Object to the form, but you can
```

Page 210

```
1          answer.
2              THE WITNESS:
3                  As a broker, at the end of the
4          job, yeah, that would be sometimes.
5          Sometimes I would do that.
6      EXAMINATION BY MR. ALTMYER:
7          Q     Okay.  Over the course of a job, if
8      one of the vessels that Dawn has brokered to
9      one of Dawn's customers requires a crew
10     change, is that something that sometimes will
11     be conveyed to Dawn's customer?
12         A     Sometimes.
13         Q     Okay.  And that's information that
14     Dawn would receive from the third-party vessel
15     owner?
16         A     Yes.
17         Q     Okay.  For these communications
18     that we talked about sometimes happening, is
19     that generally done via email?
20         A     Not always.
21         Q     Okay.  So sometimes by phone call?
22         A     Yes.
23         Q     Sometimes by text message?
24         A     Yes.
25         Q     Okay.  Is it fair to say that when
```

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 222

1              So now answer the question he's

2       asking.

3  EXAMINATION BY MR. ALTMYER:

4       Q     So is the answer to the question

5  "no"?

6       A     No.

7              MR. REISMAN:

8                  You agree with him?

9  EXAMINATION BY MR. ALTMYER:

10      Q     You agree that --

11      A     Yes.

12      Q     -- there was --

13      A     Yes.

14      Q     -- no contract?

15      A     Yes, yes.

16      Q     Okay, thank you.  Between June 9,

17  2017 and October 28th, 2020, had Dawn ever

18  entered into a Master Services Contract,

19  Master Vessel Time Charter or any other Master

20  Agreement with Crosby?

21      A     No.

22      Q     Between June 9, 2017 and October

23  28th, 2020, had Dawn ever entered into any

24  written or oral charter agreements with

25  Crosby?

Page 223

1        A      No.

2        Q      Between June 9, 2017 and October

3   28th, 2020, did Dawn enter into any contracts

4   with Crosby?

5        A      No.

6        Q      Has Dawn ever sold any vessels to

7   Crosby?

8        A      Sold vessels to Crosby?

9        Q      Yeah.

10       A      To purchase, like for them to --

11       Q      Yeah.

12       A      No.

13       Q      While you've been at Dawn, has Dawn

14   ever purchased a vessel from Crosby?

15       A      No.

16       Q      When did Dawn start providing

17   Crosby vessels to Dawn's customers?

18           MR. REISMAN:

19               Object to the form.  He's

20       testified several times, they don't

21       provide brokered vessels.

22   EXAMINATION BY MR. ALTMYER:

23       Q      As far as Dawn's position, when did

24   Dawn start brokering Crosby vessels?

25       A      I don't know the specific dates.

Page 238

1    "Exhibit 133."

2         All right.  And Mr. Grace, Dawn 402

3    is a Dawn Services Morning Report for

4    October 26, 2020, right?

5    A    It's a Morning Report, yeah.

6    Q    Okay.  403 is for October 27th,

7    2020, correct?

8    A    Yes.

9    Q    And 404 is a Morning Report for

10   October 28, 2020, right?

11   A    Yes.

12   Q    Okay.  So you've seen these

13   documents before, correct?

14   A    Yes.

15   Q    Okay.  Who creates Morning Reports

16   for Dawn?

17   A    I do.

18   Q    And what is the purpose of a

19   Morning Report?

20   A    Just so everybody in the office

21   knows.  Mainly, my father-in-law likes to know

22   what boats are working, where they're working.

23   Q    All right.  You just mentioned your

24   father-in-law.  Is john Charpentier --

25   A    I'm sorry, Kenny.

Page 248

1    all of those vessels were chartered out to

2    different customers at that time, correct?

3         A    All those vessels were working for

4    different customers.

5         Q    Different customers at the time?

6         A    Yeah.

7         Q    I just want to confirm, they

8    weren't available for Shore, to go work for

9    Shore at that time?

10        A    No, but it also -- the reason why

11   we were also -- this goes back a while, but

12   the reason why we were using the LA MADONNA

13   and the CROSBY ENDEAVOR, or why we had

14   brokered those vessels, was earlier I said if

15   we were -- how did you say it?  You said the

16   only time we would go broker something is if

17   we didn't have a boat to do the job or didn't

18   have a boat to -- how did you say it?  I

19   forgot how you said it.  You used a term, and

20   I can't remember.  But part of the reason why

21   we would go broker a vessel is because we

22   might not have had a boat that was capable of

23   doing the job.

24        Q    Of performing a specific task that

25   Shore needed to be done?

Page 249

1      A      Shore needed something done.

2      Q      Okay.

3      A      So it's not necessarily that our

4    boats weren't available.  It's just, our boats

5    maybe weren't available to do that certain

6    task.

7      Q      Okay, gotcha.

8            MR. REISMAN:

9                  Available or capable?

10            THE WITNESS:

11                  Capable.  Capable of doing that

12        task.

13    EXAMINATION BY MR. ALTMYER:

14      Q      For instance, when we're talking

15    about running anchors?

16      A      Running anchors or just the THOR,

17    as you had said earlier, is a big barge.

18      Q      Yeah, yeah, yeah.

19      A      And at the time, we didn't have a

20    boat big enough to go run anchors and tow the

21    THOR, so that's why we would go broker.

22      Q      Understood.  I had asked some

23    general earlier about just what Dawn's role as

24    a broker is and what type of communications it

25    would receive from a third-party vessel owner

Page 266

1    at the sea buoy.  Thanks."  And then your

2    signature block, right?

3        A    Yes.

4        Q    Okay.  This is referring to the

5    LA MADONNA and the LA ELITE meeting THOR at

6    the sea bayou, so they could serve as the tail

7    tugs to bring the THOR into Port Fourchon to

8    seek safe harbor --

9        A    Right.

10       Q    -- during Hurricane Zeta, right?

11       A    Right.

12       Q    Okay.

13       A    And when I said I spoke to the

14   CROSBY ENDEAVOR, it would have been Ivy Danos

15   or somebody shoreside at Crosby.

16       Q    Okay, gotcha.

17       A    And when I say I have the LA

18   COMMANDER available, it would have been

19   Louisiana International has a boat available,

20   if they needed an additional tug.

21       Q    All right.  What I was going to ask

22   about is "The two tugs plan on meeting up with

23   THOR around 2100 tonight at the sea buoy."

24   That's you just conveying an ETA that you had

25   gotten from Louisiana International Marine to

Page 278

1        Q     Yeah, yeah.  So let's go to

2   October 25th on the text message exchange.

3        A     Okay.

4        Q     And just to confirm, looking at

5   Dawn 282 through Dawn 286, these are screen

6   shots of text messages between you and Ivy

7   Danos, right?

8        A     Correct.

9        Q     Okay.  And these are screenshots

10  that you would have personally taken from your

11  iPhone, right?

12       A     Yes.

13       Q     All right.  So let's go to Page 238

14  of the text messages.

15       A     Okay.

16       Q     You had mentioned earlier that Ivy

17  had contacted you about what the plans were

18  for the CROSBY ENDEAVOR, right?

19       A     Yeah, he had asked me.

20       Q     Okay.  And that would be the text

21  message on 283, that's under Sunday,

22  October 25th, 10:19 a.m.?

23       A     Yes.

24       Q     Okay.  "What or y'all toughs on

25  CROSBY ENDEAVOR and THOR for the storm."  I

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 279

1    think that's supposed to be, "What are y'all's

2    thoughts on CROSBY ENDEAVOR and THOR for the

3    storm."  Is that the way you would read that?

4         A    Yes.

5         Q    Okay.  That was sent at 10:19 a.m.,

6    from Ivy Danos to you, right?

7         A    Correct.

8         Q    Okay.  226, the email exchange at

9    Exhibit 144, that was 8:47 a.m., where Ivy

10   Danos had sent you, "See attached tropical

11   weather" or some sort of tropical weather

12   data, right?

13        A    Yes.

14        Q    Do you remember what the tropical

15   weather data that was sent to you was?

16        A    I don't.

17        Q    Okay.  Was it something that was

18   readily accessible?  If you recall.  Something

19   that was readily accessible to Dawn, or was it

20   from like a subscription service?

21        A    That was -- it looks like it was

22   coming -- Crosby had submitted that to Dawn,

23   so that would have been their weather

24   forecast.

25        Q    Okay.  So it's just a weather

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 287

1              MR. REISMAN:

2                   Don't manufacture a question.

3         You want to answer -- just answer what

4         he's asking.

5              THE WITNESS:

6                   I don't -- I don't know.

7    EXAMINATION BY MR. ALTMYER:

8         Q    Okay.  That leads into my next

9    question anyway.  In reviewing Dawn's

10   discovery responses, I saw a response to the

11   effect that at approximately 5:00 p.m., on

12   October 28th, 2020, Ivy Danos had called you

13   and advised that the THOR had broken free from

14   her moorings?

15        A    Yes.

16        Q    Does that sound accurate?

17        A    Yes.

18        Q    Okay.  Explain that communication

19   to us.

20        A    Ivy had called and said that the

21   THOR had broken free and that the ENDEAVOR

22   wasn't going to be able to stop it, with the

23   high winds.

24        Q    Okay.  Anything else you remember

25   about that conversation?

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 288

```
 1        A     I mean, other -- it actually --
 2   they were floating down the canal.
 3        Q     Was that the first communication
 4   that you had with -- that Dawn had with
 5   anybody at Crosby with respect to the
 6   incident?
 7        A     Yes.
 8        Q     Did Dawn have any other
 9   communications with Crosby about the incident?
10        A     Not -- not that particular -- no,
11   not at that time.
12        Q     No, I'm just talking about anytime
13   after that.
14        A     Yes, about the retrieval and going
15   to get the barge.
16        Q     Okay.  We'll talk about that in a
17   second.
18        A     Okay.
19        Q     But I'm just talking about the
20   incident itself.  Did you ever talk with Ivy
21   Danos after that about what happened?
22        A     I don't remember.  I don't
23   remember.  I can't answer that.  I don't
24   remember.
25        Q     If you did, via email, that should
```

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 495

1              REPORTER'S CERTIFICATE

2

3      This certification is valid only for a
transcript accompanied by my original
4  signature and original required seal on this
page.

5

6        I, Linda G. Griffin, Certified
Court Reporter in and for the State of
7  Louisiana, as the officer before whom this
testimony was taken, do hereby certify that
8  MICHAEL GRACE, after having been duly sworn
by me upon authority of R.S. 37:2554, did
9  testify as hereinbefore set forth in the
foregoing 494 pages; that this testimony was
10  reported by me in the stenotype reporting
method, was prepared and transcribed by me
11  or under my personal direction and
supervision, and is a true and correct
12  transcript to the best of my ability and
understanding; that the transcript has been
13  prepared in compliance with transcript
format guidelines required by statute or by
14  rules of the board, that I have acted in
compliance with the prohibition on
15  contractual relationships, as defined by
Louisiana Code of Civil Procedure Article
16  1434 and in rules and advisory opinions of
the board; that I am not related to counsel
17  or the parties herein, nor am I otherwise
interested in the outcome of this matter.

18

19

20

21    _____

     LINDA G. GRIFFIN, RPR
22    CERTIFIED COURT REPORTER

23

24

25