**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ALL COAST, LLC** | **CIVIL ACTION NO. 21-258 LEAD CASE, c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982, 21-2075, 21-2227, and 23-3220** |
| **VERSUS** | **JUDGE JAY C. ZAINEY** |
| **SHORE OFFSHORE SERVICES, LLC; MODERN AMERICAN RAILROAD SERVICES, L.L.C.; AND MARTIN ENERGY SERVICES, LLC** | **MAGISTRATE JUDGE EVA J. DOSSIER**<br><br>**Applies to: All Cases** |

### DAWN SERVICES, L.L.C.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

In this litigation, Modern American Recycling Services, L.L.C. ("MARS") and Shore Offshore Services, LLC ("Shore") seek to hold Dawn Services, L.L.C. ("Dawn") responsible for damages allegedly caused when the Derrick Barge THOR—which MARS owned and Shore operated—broke free from its dock in Port Fourchon during Hurricane Zeta. Dawn's only alleged fault, however, relates to its role in helping Shore find a replacement tug—one week before Hurricane Zeta even formed—when the tug Shore was using on a decommissioning project with the THOR broke down. Critically, Dawn served as a middleman/broker, connecting Shore with Crosby Tugs, LLC ("Crosby"), who provided Shore with an even more suitable tug for the project than the one Shore had been using. Dawn's status as a middleman between a vessel owner and a charterer simply lacks the role or responsibility to create third party tort liability. This is particularly true here, where it is undisputed that Dawn did all Shore requested of it in finding a capable replacement tug for the project at hand, and the damages allegedly caused when the THOR later broke from its dock during a hurricane were entirely unforeseeable. Dawn's motion for summary judgment should therefore be granted, and all tort claims against it dismissed.

I.        **FACTUAL BACKGROUND**

The Derrick Barge THOR is owned by MARS and operated by Shore.[1]  In October 2020, the THOR was working pursuant to a contract with Fieldwood Energy LLC ("Fieldwood") to decommission the platform JA, located in Block 259, Ship Shoal area, off the coast of Louisiana.[2] The THOR is not self-propelled and relies upon tugboats to tow it to and between job locations and to handle its anchors.[3]  During the Fieldwood project, the anchor handling tug  MARS TITAN was assisting the THOR.[4]  Like the THOR, the TITAN was owned by MARS and operated by Shore.[5]

In October 2020, the TITAN broke down and could no longer assist the THOR.[6]  Shore's shoreside management asked Dawn to find a replacement anchor handling tug with comparable specifications to the TITAN.[7]  Dawn operates a fleet of offshore tugs, but it also brokers tugs owned

---

[1]  *See* the November 8, 2023 deposition of Cody Sims, Director of Projects at Shore, at p. 236, excerpts of which are attached hereto as Exhibit 1. (Q: Who owns the – the TITAN? A: MARS. Q: Okay. And who was operating the TITAN in October 2020? A: Shore Offshore.).

[2]  *See* the October 3, 2023 deposition of Thomas Gibilterra, Director of Operations at Shore, at p. 84, excerpts and exhibits of which are attached hereto as Exhibit 2. (Q: Where was the barge working prior to Hurricane Zeta? A: It was working for Fieldwood. And don't get me to lying. I think the block number was Ship Shoal 259, but I couldn't tell you exactly. JA structure.); Sims, p. 27 (Q: What was the nature of the project? A: Platform moving. Q: How many platforms? A: I believe it was just one.)

[3]  Exhibit 1, Sims deposition at p. 100 (A: [T]he THOR is a non-propelled vessel, so that tug, we rely on that tug to assist the THOR.).

[4]  Exhibit 1, Sims deposition at p. 236 (Q: Okay. And so Shore was using the TITAN to service the D/B THOR, correct? A: At that time, yes.).

[5]  Exhibit 1, Sims deposition at p. 236 (Q: Who owns the – the TITAN? A: MARS. Q: Okay.  And who was operating the TITAN in October of 2020?  A: Shore Offshore.).

[6]  Exhibit 1, Sims deposition at p. 236 (A: Well, it shows that the TITAN was out of service at that time, yes.).

[7]  Exhibit 1, Sims deposition at p. 237 (Q: Okay. And so you told Mike Grace on October 12th that the TITAN is down and you need to get a replacement for it; is that – is that what you said? . . . A: That he needs to get a replacement, yes.); p. 249 (A. I had asked for a comparable replacement tug to the TITAN,).

and operated by third parties.[8]  On October 17, 2020, Shore's Director of Projects, Cody Sims sent

Michael Grace, Dawn's Vice President of Operations, the following text message[9]:



Sat, Oct 17, 10:30 AM

I'm assuming Mauricio told you the Titan is out for the year?  What are you doing to get a bigger tug out to the Thor sooner than later before we get in a bind??

None of Dawn's own available boats were suitable to tow the THOR and to run its anchors, so

Dawn started looking for available third-party tugs to broker to Shore.[10]  Dawn initially suggested

two tugs owned and operated by Louisiana International Marine, but Shore expressed concern

because they were not comparable to the TITAN.[11]

After Shore rejected the first replacement option, Grace connected personnel from Shore

and Crosby directly so that Shore could decide which available Crosby tug would be acceptable.[12]

---

[8]  Shore will certainly argue that as it pertains to vessels Dawn lined up for Shore's use in October 2020, Dawn was not a broker.  But it cannot be ignored that in a January 2021 email to a boat operator that was interested in working for Shore, Tommy Gibilterra responded: "Thanks for reaching out.  In an effort to minimize our vendor numbers, we broker most of our tugs through Dawn Services. Mike Grace is cc'ed on the email.  We regularly use tugs to bring material barges in and out of Gibson.  Please reach out to them and get on the call list.  Thanks." *See* Exhibit 240 to Gibilterra's deposition, Exhibit 2.

[9]  *See* excerpt of text messages between Cody Sims and Michael Grace, Dawn 000211, attached hereto as Exhibit 3.

[10]  *See* the May 24, 2023 deposition of Michael Grace, Vice President of Operations at Dawn, at p. 249, excerpts of which are attached hereto as Exhibit 4. (A: And at that time, we didn't have a boat big enough to run anchors and tow the THOR, so that's why we would go broker.).

[11]  Exhibit 1, Sims deposition at p. 242-43. (Q: Was that the LA MADONNA and the LA ELITE? A: I believe that was the names, yes, sir. Q: And – and what did you say when – when Mike Grace told you that those were the tugs that were going to be out there? A: Well, I think in the text, off the top of my head, he said the tugs aren't suitable for running anchors and he – and I asked him why would he send us a tug that's not suitable to work with the THOR. Q: So you were expressing concern about the tugs that had been selected? A: Yeah. Because he told me it wasn't suitable to run anchors. Q: And so when you expressed concern, what happened? A: He said it's temporary. Q: Okay. And then was another tug sent out there? A: The ENDEAVOR was eventually sent out there. I don't know the time lag between that text message and when it came out.).

[12]  Exhibit 4, Grace deposition at p. 272. (A: Shore – Shore's vessel, the MARS TITAN, wasn't coming back to work, and Shore wanted a vessel similar in size to the Titan, so I had reached out to Crosby about Shore's request, about using – of they had a vessel available, would they be interested in going to work for Shore. And so, at some point,

Curt Crosby, the Chief Operating Officer of Crosby, in conjunction with Ivy Danos, Crosby's Offshore Operations Manager, reviewed the vessel particulars of the THOR and offered the CROSBY ENDEAVOR to assist the THOR on the Fieldwood project.[13]   Shore accepted the CROSBY ENDEAVOR because it was comparable to the TITAN.[14]

While Dawn connected Crosby and Shore management to facilitate the transaction, Dawn was not involved in selecting a vessel from Crosby's fleet to replace the TITAN, nor did Dawn exercise any judgment or discretion in determining whether the CROSBY ENDEAVOR would satisfy the needs or requirements of Shore.  Just as Shore rejected the first two vessels Dawn had suggested, Shore used its own judgment and discretion in deciding to accept the CROSBY ENDEAVOR to assist the THOR on the Fieldwood project. That said, Shore's decision to accept Crosby's offer of CROSBY ENDEAVOR made sense.  The Crosby vessel was not just comparable to the TITAN, it was bigger and more powerful than the TITAN.[15]

---

Kurt Crosby, reached out to Tommy Gibilterra to discuss everything, and Tommy called me and said Crosby is going to send out the ENDEAVOR, and so that's how it all got started.).

[13] *See* the July 11, 2024 deposition of Ivy Danos, Offshore Operations Manager at Crosby, at pp. 60-61, excerpts of which are attached hereto as Exhibit 5. (Q: . . . I want to talk to you about, in October 2020, what your understanding is of how the ENDEAVOR was called out to the field to work with the THOR offshore. What is your understanding of how that came about? A: Mr. Mike Grace called looking for a tug to go to work with the THOR. . . Q: Did he ask for the ENDEAVOR specifically, by name, or just for a tug? A: For a tug. Q: How did it come that the ENDEAVOR was chosen for the job? A: Mr. Kurt. Q: Kurt Crosby, the CEO? A: Yes, sir. Q: He picked the ENDEAVOR for the job? A: Yes.); *Id.* at 61-64. (Q: Did you know the size of it, its displacement, its tonnage? Did you know any of that when the ENDEAVOR was selected to be the tug to go offshore to work with the THOR? A: When I talked to Mr. Crosby, he – we looked at it. Q: You went online and looked at it? A: Yeah. . . . Q: Okay. Someone at Crosby – you're saying, the CEO went and verified that that was a suitable tug for the THOR? . . . A: Yes.).

[14] Exhibit 1, Sims deposition at p. 249. (A: I had asked for a comparable replacement tug to the TITAN. Q: And would you agree that the Crosby ENDEAVOR is a comparable tug for – to the TITAN? A: Yes.).

[15] *Id.* at pp. 248-249. (Q: Would you agree that the ENDEAVOR was a bigger and more powerful tug that the TITAN? A: Yes.).

The CROSBY ENDEAVOR arrived on assignment to the THOR at Block 116, High Island, on October 20, 2020.[16]  The CROSBY ENDEAVOR was crewed by Crosby employees.[17]  There were no Dawn employees on the CROSBY ENDEAVOR and Dawn had no operational control over it.[18]  Once the CROSBY ENDEAVOR arrived offshore to begin working with the THOR, it began taking orders directly from the THOR's crew.[19]  The CROSBY ENDEAVOR worked this way with the THOR without issue for several days.[20]

On October 24, 2020, "Tropical Depression Twenty-eight" formed across the Eastern Caribbean just after daybreak and strengthened into Tropical Storm Zeta by that evening.[21]  The next day, Shore decided to demobilize the THOR due to Tropical Storm Zeta.[22]  At that time, Tropical Storm Zeta was predicted to intensify to Category 1 status by October 27, 2020 and Port Fourchon was directly in the predicted path.[23]  Both Shore's shoreside management and the superintendent of the THOR were receiving weather reports regarding Zeta and were in

---

[16] *See* the April 4, 2023 deposition of Captain Walter Everett, Jr., captain of the CROSBY ENDEAVOR, at p. 188, excerpts of which are attached hereto as Exhibit 6. (Captain Everett reviews the CROSBY ENDEAVOR log from October 20, 2020 and confirmed that it indicated arrival at the THOR at Block High Island 116.).

[17] *See* November 2, 2023, 30(b)(6) deposition of Crosby at pp. 461-462, excerpts of which are attached hereto as Exhibit 12.

[18] *Id.*

[19] *Id.* at pp. 160-69. (Captain Everett explaining what "working as directed" means.)

[20] *Id.* at pp. 189-203. (Captain Everett going through the vessel logs from October 20 through October 26, when the ENDEAVOR began to tow the THOR to Port Fourchon.).

[21] https://www.weather.gov/lch/2020Zeta

[22] *See* the March 7, 2023 deposition of Terry Joe Douglas, superintendent of the THOR, at p. 107, excerpts of which are attached hereto as Exhibit 7. (Q: We all know that you came off location on the 26th. You've already told us that was an open discussion between you and shoreside management. When did the decision to come off location occur? Did it happen on the 25th? Or did it happen before that? A: I believe the morning of the 25th.).

[23] *Id.* at pp. 108-109. (Q: Okay. So at the time – the same day that you – you as a group, with shoreside management, have decided we've got to come off location, we got to get out of the path of the hurricane, the projection put Zeta, with a 90 percent chance of becoming a hurricane, going right towards the port of Fourchon, correct? . . . A: Correct.).

communication with each other leading up to Hurricane Zeta making landfall.[24]  Shore did not look to Dawn for the determination of whether or where to demobilize.[25]

At Shore's request, Dawn arranged two tail tugs to assist the THOR to the dock once she arrived in Fourchon.[26]  Shore readily admits that Dawn did all that Shore requested of it with regard to these two tail tugs.[27]  Dawn played no role in selecting a dock for the THOR.[28]  Dawn also was not involved in the decisions as to how to secure the THOR to the dock.[29]  After the THOR was secured to the dock, Shore released one of the tail tugs and asked the other to standby with the materials barge.[30]

While moored in Port Fourchon, the THOR's seniormost crewmember, superintendent Joe Douglas, and the rest of the THOR crew were in direct communication with the captain and crew of the CROSBY ENDEAVOR.[31]  The CROSBY ENDEAVOR was not taking orders or instructions

---

[24] *Id.* at pp. 98-101. (Joe Douglas explaining that he received weather reports and forwarded them to Shore's shoreside management and how the decision was made to come off location based on the weather reports.).

[25] Exhibit 1, Sims deposition at pp. 231-32. (Q: So you – your – your testimony is that you defer to Dawn Services with respect to where the – your barge, the D/B THOR, should ride out a hurricane? . . . A: Yeah. No. JD [Joe Douglas] decides where that barge goes.).

[26] Exhibit 4, Grace deposition at p. 266 (Q: Okay. This is referring to the LA MADONNA and the LA ELITE meeting THOR at the sea bayou, so they could serve as the tail tugs to bring the THOR into Port Fourchon to seek safe harbor . . . during Hurricane Zeta, right?).

[27] Exhibit 1, Sims deposition at p. 251. (A: I asked Dawn to provide tugs to bring the THOR into Fourchon. Q: Okay. Was that all you asked them? A: Yeah. Q: Did – did the THOR arrive safely into Fourchon in October of 2020? A: Yes.).

[28] *Id.* at p. 63. (Q: All right. And you ultimately chose the Martin dock, right? . . . A: I – I provided the two options to JD [Joe Douglas] and he preferred the Martin dock, so that's where I lined up for them to go.).

[29] Exhibit 7, Douglas deposition at p. 384. (Q: Was Dawn Services involved in any away in the decision as to how to secure the barge to the dock? . . . A: No.).

[30] Exhibit 2, Gibilterra deposition at pp. 381-382. (Q: You testified earlier, I think it was with Mr. Cerise, that when the Endeavor and the Thor came in, there was also another assist tug. There were actually two assist tugs that were helping. They were both from Louisiana International, correct? A: Correct. Q: The La Madonna and the La Elite? A: Correct. Q: You testified that one of those tugs remained with the materials barge that was working with the Thor correct? A: That's what I understand. Q: So one tug stood by the materials barge, but the other was released, correct? A: That's what I understand. Q: Why did Shore release that second assist tug? A: Because we had one tug with each barge. And with the weather forecast, that decision was made that we didn't need it.

[31] Exhibit 7, Douglas deposition at pp. 347-351. (Q: When the tug arrived, did you have communications with the – with the captain on board? A: Yeah.).

from anyone other than the THOR crew.[32]  However, at no point did Douglas contact Shore's shoreside management to report that the CROSBY ENDEAVOR was not doing what he thought it should be doing or to request additional tugs to support the THOR during the hurricane.[33]  During this period, Douglas did not have any direct communication with Dawn and thus did not complain to Dawn either.[34]  This makes sense because Dawn was not involved in Shore or Crosby's operations.  Indeed, no one advised Dawn that the CROSBY ENDEAVOR was tied up to the THOR for the duration of the storm,[35] nor should they have done so—Dawn had no role in the operation.

The THOR ultimately broke free from the Martin Dock No. 16 during the passing of Hurricane Zeta.  In the heat of the moment, *after* the THOR began parting its lines and breaking away from the dock, Douglas asked CROSBY ENDEAVOR's crew to help hold the THOR

---

[32] Exhibit 6, Everett deposition at p. 289. (Q: Working as directed, you said that's what you were there doing, right? A: Correct. Q: Were you getting any instructions from anyone other than the THOR crew? A: No.).

[33] Exhibit 1, Sims deposition at pp. 372-73. (Q: Did Mr. Douglas ever contact you at any time and tell you that he thought that the Crosby ENDEAVOR was not doing what he thought it should be doing? A: Not that I recall, no. Q: Did Mr. Douglas ever contact you at any time and tell you that he thought there should be additional tugs supporting the THOR at the dock for the hurricane? A: Not that I recall. . . Q: Would you have expected Mr. Douglas, who you've described as Shore's in-house expert on securing barges to docks during hurricanes, to have told you that he believed that more or different tugs were needed for the THOR to ride out the hurricane safely? A: He would have express that concern, yes. Q: And to be clear, he never expressed that concern to you, correct? No. Q: Are you aware of – well, was I correct? A: Yes. Correct.).

[34] Exhibit 7, Douglas deposition at p. 344. (Q: Okay. Have you ever had any direct communication with Dawn Services? A: No, I have not.).

[35] Exhibit 4, Grace deposition at p. 286. (Q: So just to confirm, while Hurricane Zeta is going on, on October 28th, 2020, and this incident occurs, at that time Dawn had no idea that the CROSBY ENDEAVOR was tied to the THOR as the Martin dock? A: Correct.).

alongside the dock.[36]  However, the anchor handling tug was unable to do so.[37]  This litigation arises from the resulting damage caused by the THOR's breakaway.  While Shore has attempted to shift blame from itself by asserting a Rule 14(c) tender of Dawn to the various claimants, nearly five years of litigation has confirmed Dawn is free from fault and has no tort liability under general maritime law.  As such, this motion for partial summary judgment should be granted.[38]

## II.    LAW AND ARGUMENT

### A.  Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits show that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Partial summary judgment dismissing only certain claims is appropriate under the same standards.  *Foster Wheeler Energy Corp. v. M/V*

---

[36] Exhibit 7, Douglas deposition at p. 201. (Q: Okay. At any point in time when these lines started breaking or when you anticipated that they might start breaking, were there any communications between the D/B Thor and the Crosby Endeavor about what was going on? A: When the lines started breaking? Q: Yeah Either – either when you know they were going to break or if you didn't know, once they started breaking. A: Yes. Once we started breaking away from the dock, I got on the radio and called the Endeavor and told him we was breaking away from the dock, push me in.); Exhibit 6, Everett deposition at pp. 300-01. (A: At the time that he made the request is the first time that I engaged the engines, you know, in an attempt to hold them to the dock. . . . Q: What request? You said the first time he made the request was the first time. A: When he notified me that we had – that the barge was aloose, that it had broken aloose. Q: Did he make a request at that time? A: Yeah. He said – I think he said, "Start pushing" or "Try to push me back in." I'm not a hundred percent sure.)

[37] *Id.* at p. 521. (A: As I stated, the way I was made up, I would be unable to push them into the dock, to pin them against the dock.); *see also* Exhibit 5, Danos deposition at p. 168, (Q: Is the ENDEAVOR a type of tug that could have pushed the THOR into the dock in the event of a breakaway? A: No.). *See also* Exhibit 6, Everett deposition at pp. 286-87. (Q: Okay. I'm going to read you an answer from discovery responses that Crosby had given us, and I'm quoting, it says, "The ENDEAVOR is an offshore towing and anchor handling tug and is not designed to hold vessels in place." . . . Q: Do you agree with that statement? A: Pretty much. I mean, we're – I'm not able to – it's not like I'm a dynamic positioning or Z-drive vessel, you know.). *See also* the July 13, 2023 deposition of Captain Ernest Plaisance (Relief Captain of the ENDEAVOR) at pp. 102-103, excerpts of which are attached hereto as Exhibit 8. (Q: . . . I'm quoting from a November 28th, 2022 discovery response from Crosby, Supplemental Interrogatory No. 18, Pages 11 and 12 of 42. Supplemental Answer to Interrogatory No. 18 reads, quote, "The ENDEAVOR is an offshore towing and anchor-handling tug. It is not designed to, quote, "hold" closed quote, "vessels in place during a hurricane." . . . So do you agree with what I just read? A: Yes.).

[38] Shore filed breach of contract and contractual indemnity claims against Dawn (21-1969, R.Doc. 1), which are the subject of a separate motion for partial summary judgment.

*An Ning Jiang*, No. 00-3677, 2002 WL 31207362, at *2 (E.D. La. Sept. 30, 2002) (citing Fed. R. Civ. P. 56(d)). Further, questions of law are amenable to resolution on summary judgment. *Id*. The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

If the non-moving party has the burden of proof at trial on the dispositive issue, the moving party can succeed if they simply point out "that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim." *Adriatic Marine, LLC v. Harrington*, 446 F. Supp. 3d 126, 135 (5th Cir. 2020). The burden then shifts to the non-moving party, who must go beyond the pleadings to designate "specific facts" showing a genuine issue for trial. *Id.* The non-moving party's burden is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.*

While courts generally refrain from making credibility determinations or weighing evidence when considering a summary judgment motion, the Fifth Circuit has specifically recognized: "When deciding a motion for summary judgment prior to a bench trial, the district court has limited discretion to decide that the same evidence presented to him or her as a trier of

fact in a plenary trial could not possibly lead to a different result." *Adriatic Marine*, 446 F. Supp. 3d at 135 (quoting *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991)).

Dawn is not a limitation petitioner in this consolidated limitation action because it did not have any vessels it owned or operated involved in the incident. However, Dawn is a third-party defendant for claims that have been tendered to Dawn by way of Shore's Rule 14(c) tenders. The claimants bear the initial burden of proof against Dawn, just as they bear the initial burden of proof against the limitation petitioners. The claimants are required to show not only that Dawn owed them a duty and that Dawn was somehow negligent and breached that duty, but also that Dawn's negligence caused their alleged injuries. For this motion to be granted, Dawn may simply highlight the absence of evidence presented by the claimants to support its motion. *Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 323–24 (5th Cir. 2002)). This motion should be granted because none of the claimants can set forth a triable fact establishing tort liability under general maritime law against Dawn.

### B. Dawn has no tort liability to the claimants under the general maritime law.

"Because the events at issue occurred on navigable waters of the United States and involve traditional maritime activity that had a substantial impact on maritime commerce, the maritime law of the United States governs the parties' dispute." *SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 758 (E.D. La. 2019), *aff'd sub nom.*, 24 F.4th 458 (5th Cir. 2022) (citing *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972); 46 U.S.C. § 30101). To recover under the general maritime law for negligence, the plaintiff must prove (1) there was a duty owed by the defendant to the plaintiff, (2) there was a breach of duty, (3) the plaintiff sustained an injury, (4) there is a causal connection between the breach of duty and the injury, and (5) the plaintiff suffered damages. *In re Cooper/ T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).

**1. Aside from Shore, Dawn did not owe a duty to the claimants.**

"Determination of the tortfeasor's duty is a question of law." *Miss. Dep't of Transp. v. Signal Int'l LLC* (*In re Signal Int'l LLC*), 579 F.3d 478, 490 (5th Cir. 2009). "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)). "The determination of the existence and scope of a duty involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." *Id.* (quoting *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987) (internal quotations omitted). Harm is foreseeable "if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission." *Consol. Aluminum Corp.*, 833 F.2d at 68. However, if the causal connection between the negligent act and the resulting harm is too attenuated, it falls outside the scope of risk created by that act and is unforeseeable as a matter of law. *In re Great Lakes*, 624 F.3d at 212. "Duty . . . is measured by the scope of the risk that negligent conduct foreseeably entails." *Chiasson v. Brand Energy Solutions*, 439 F. Supp. 3d 816 (W.D. La. 2020) (citing various Fifth Circuit maritime cases) (internal quotation marks and citations omitted).

No vessel owned or operated by Dawn was involved in this incident. The allegations of fault against Dawn arise solely from it acting as a middleman or broker in assisting Shore with finding a replacement anchor handling tug for TITAN. While Dawn owed a duty to its customer, Shore, to perform its services in accordance with the applicable standard of care,[39] Dawn did not

---

[39] As set forth below, Dawn discharged its responsibilities to Shore in accordance with the standard of care. It did nothing wrong.

owe a duty to anyone else. A vessel broker is not liable for tort damages when it simply acts as a middleman between the vessel owner and the vessel operator.

It is well-settled that a vessel broker owes no tort duty under the general maritime law to third parties outside of the contractual relationship with its customer. A broker's role is purely transactional: identifying vessels, arranging charters, and facilitating agreements. Courts consistently hold that a broker who does not exercise operational control over a vessel cannot be held liable for the negligence of the vessel or its crew. *See Wood v. Mariner Energy, Inc.*, 2010 WL 4286327 (W.D. La. Oct. 24, 2010) (granting summary judgment to vessel broker where the broker exercised no operational control over the vessel, noting that "[a] broker relationship ... does not make [the broker] vicariously liable for the negligence of other parties"); *see also Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470, 473 (2d Cir. 1974) (upholding dismissal of seaman's wrongful death action against chartering broker, since broker neither owned the vessel nor employed the deceased seaman).

The same principles have been applied by state courts exercising concurrent jurisdiction and applying substantive maritime law. In *Oceaneering Int'l, Inc. v. Black Towing, Inc.*, 491 So. 2d 1 (La. 1986), the Louisiana Supreme Court held that a vessel broker had no tort duty to third parties when it merely arranged for a vessel that it did not own, operate, or control. The court emphasized that responsibility for the vessel rested entirely with the operator in possession. Likewise, in *Rojas v. Robin*, 90 So. 2d 58 (La. 1958), the court held a vessel broker who merely arranged a charter and never took possession or control of the vessel was not liable for its loss. *See also Selaz Integrated Servs. Ltd. v. T&M Boat Rentals LLC*, 2025 WL 2976919 (W.D. La. Oct. 21, 2025) (following "Louisiana jurisprudence," holding vessel broker not liable

for damage occurring to a vessel in transport when the broker had no operational control of the vessel and instead merely facilitated the transaction).[40]

Accordingly, because Dawn acted strictly as a broker and exercised no operational control over the replacement tug, it owed no tort duty to the claimants. Dawn simply brought two parties together, Shore and Crosby, to select a tug to replace the TITAN. Dawn was not asked to, and did not, analyze whether CROSBY ENDEAVOR was a good fit for the project. Crosby proposed its tug based on its similarity to the TITAN, the vessel it was replacing. Shore then considered the tug and found it to be acceptable, a conclusion that comes as no surprise, because CROSBY ENDEAVOR is a more capable anchor handling tug than the TITAN. The claims against Dawn should be dismissed because Dawn did not owe a duty to the claimants for its work as a middleman/ broker for Shore.

### 2. Dawn did not breach the standard of care.

As explained above, Dawn did exactly what was asked of it by finding a vessel owner like Crosby with an anchor handling tug which was comparable to the TITAN to work on the platform decommissioning project. As evidence: Shore determined the CROSBY ENDEAVOR would fit its needs before it accepted the vessel. Then, during the period when the CROSBY ENDEAVOR was performing its anticipated duties on the decommissioning job, Shore had no complaints about the vessel or its crew. While Shore later (after the commencement of litigation following the breakaway) complained the CROSBY ENDEAVOR was not fit to hold it alongside a dock in the middle of a hurricane, no one at Shore included such a performance requirement in their

---

[40] To the extent the *Selaz* Court relied on Louisiana state law, it is noted that federal courts sitting in admiralty may look to state law when federal maritime law is incomplete and where the state law is not inconsistent. *See generally Global Towing, LLC v. Marine Tech. Servs.*, 2000 WL 235247 (E.D. La. Feb. 29, 2000). Here, the federal and state courts consistently hold that a vessel broker owes no tort duty to third parties, and it is respectfully submitted that this well-established principle should be applied in this matter.

discussions with Dawn or Crosby when selecting a replacement for TITAN.  These after-the-fact criticisms do not change the analysis of whether Dawn complied with the applicable standard of care when faced with the job of assisting to find a replacement for TITAN.  Shore's acceptance of the CROSBY ENDEAVOR and failure to complain about the vessel's abilities, crew, or performance while it was working on the decommissioning project for which it was hired are all contemporaneous evidence that the selection of the vessel was proper.

In this case, there are eight liability experts not specifically retained by Dawn.  Of those eight experts, only three even offer any opinions regarding Dawn's supposed fault in causing or contributing to the incident.  However, as explained below, the three opinions are insufficient as a matter of law to resist an entry of summary judgment because they offer unsupported, conclusory opinions without reference to evidence and which are contradicted by admissible evidence. In *Smiley Team II, Inc. v. Gen. Star Ins. Co.*, No. 23-40129, 2024 WL 2796652 (5th Cir. May 31, 2024), the Fifth Circuit affirmed a trial court's grant of summary judgment in favor of defendants and rejected arguments that the trial court erred by disregarding plaintiff's expert opinions:

> Plaintiff's expert's affidavit makes conclusory statements and naked assertions that the roof damage was caused by the vehicle collision. He provides no supporting factual evidence or methodology for how he arrived at the conclusion that the roof damage was caused by the vehicle collision. Such a self-serving affidavit is not sufficient to defeat summary judgment. "We have held that the district court may inquire into the reliability and foundation of any expert's opinion to determine its admissibility." *Orthopedic & Sports Inj. Clinic v. Wang Lab'ys, Inc.*, 922 F.2d 220, 224-25 (5th Cir. 1991). However, when such an affidavit is conclusory in fashion, "[w]e have recognized that there is a [certain level] below which [it] must not sink if it is to provide the basis for a genuine issue of material fact." *Id*. "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Id*. at 225 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987)).

*Id.* at \*1. *See also Jones v. United States*, 936 F.3d 318, 323 (5th Cir. 2019) (affirming maritime defendant's summary judgment and holding that "conclusory" and "unsubstantiated assertions" in expert reports cannot defeat summary judgment); *Stagliano v. Cincinnati Ins. Co.*, 633 F. App'x 217 (5th Cir. 2015) (accord). Thus, it is well-established that the Court should disregard the unsupported expert opinions offered in opposition to this motion for summary judgment.

### a. Jon Abadie

One of Harvey Gulf's liability experts, John Abadie, mentions Dawn in his opinions. In his conclusion paragraph, Abadie states that "[m]iscommunication between Shore/MARS and both Dawn Services/Crosby and Martin, resulted in underutilized resources and ineffective responses."[41] While this might be interpreted as criticism of Dawn, earlier in his report in the section with the heading "Contributing Factors from Tug Providers," Abadie is actually critical of Shore, not Dawn.[42] Abadie notes that "the Thor and Shore/MARS management never requested assistance from either LA Elite or LA Madonna, neither in advance nor during the hurricane, as confirmed by both Walter Everette (pages 626 & 627) and Joe Douglas ( Joe Douglas Deposition page 308)."[43] Additionally, Abadie states "Shore/MARS management did not communicate with either Dawn Services and/or Crosby about what was needed and/or expected regarding assist tugs despite having the particulars of the Crosby Endeavor available."[44] When it came time to opine what actions or inactions caused or contributed to the accident, Abadie squarely placed the blame on Shore, Crosby, and Martin. Thus, Abadie fails to provide sufficient evidence and explanation of Dawn's fault that would prevent entry of summary judgment.

---

[41] *See* the June 3, 2024 expert report of John R. Abadie at p. 20, attached hereto as Exhibit 9.

[42] *Id.* at p. 18.

[43] *Id.*

[44] *Id.*

### b. Ron Campana

Another one of Harvey Gulf's four liability experts, Captain Ronald Campana, offers an opinion that is arguably critical of Dawn.  Campana's opinions begin on page 28 of his report, in a section titled "Conclusions."[45]  Of Campana's 19 bullet-point conclusions, the only one even potentially critical of Dawn is the tenth bullet point which concludes, "[t]he shoreside management of Shore failed to communicate with Crosby shoreside management or Dawn Service management and vice versa, so that there was no agreement or understanding on why the M/V Crosby Endeavor was there and what it was supposed to do nor was there any effort made to make sure the M/V Crosby Endeavor could actually do what the Thor wanted them to do."[46]  Frankly, however, the report is unclear as to whether Campana is actually criticizing Dawn.  Aside from this one reference, his report fails to opine on what Dawn should or should not have done, and how its acts or omissions caused or contributed to the casualty, let alone reference actual evidence in support of any such positions. And of course, any criticism in this regard overlooks the undisputed fact that *all* operational communication between Shore/THOR and the CROSBY ENDEAVOR flowed directly from the THOR to the CROSBY ENDEAVOR – exactly as one would expect.

### c. Gregory Daley.

Only Shore's expert, Captain Gregory Daley, expressed any substantive analysis regarding Dawn's potential liability in causing or contributing to the accident.  However, Daley's opinions regarding Dawn are deeply flawed and the subject of a separate, previously filed *Daubert* motion (R. Doc.782).  Dawn adopts and incorporates the arguments made in its *Daubert* motion here by reference, but the thrust of the motion is that Daley's Opinion #2 is improper.  Daley argues "Dawn

---

[45] *See* the August 1, 2024 expert report of Captain Ronald Campana at p. 20, attached hereto as Exhibit 10.

[46] *Id.* at p. 29.

Failed to Provide an Adequate Tug and Failed to Warn That the Tug Provided Was Inadequate."[47]

This opinion (consisting of three parts) suffers from three flaws: [48]

| Opinion | Objection |
|---|---|
| "In my opinion, Shore believed Dawn chartered the M/V Crosby Endeavor for the purpose of towing, running anchors, and assisting the D/B THOR at the dock." | Shore's belief is not a proper subject for expert testimony. |
| "The M/V Crosby Endeavor was not powerful enough to assist in its side tie configuration at the dock. The tug's bow was not designed to push on the D/B THOR. Dawn failed to notify Shore that the tug was not capable of assisting by keeping the D/B THOR on the dock." | These are not facts in issue. There is no dispute. |
| "Dawn failed to broker a vessel able to perform its required tasks." | This opinion hinges upon Shore's belief about the tasks required and opines on ultimate issues of contract formation and interpretation. |

Even if Daley's Opinion #2 is not rejected under *Daubert* and Rule 702, it fails for the same reason Abadie's and Campana's opinions fail. Daley is critical of Dawn because it "failed to notify Shore that the [CROSBY ENDEAVOR] was not capable of assisting by keeping the D/B THOR on the dock." Daley does not cite any evidence that being held alongside the dock in Port Fourchon, <u>or anywhere else</u>, was one of the requests made of Dawn at the time replacement tugs for the TITAN were being considered by Shore. Similarly, Daley's opinion that the CROSBY ENDEAVOR's "bow was not designed to push on the D/B THOR" actually highlights the flaws in Daley's opinions. The TITAN and CROSBY ENDEAVOR have the exact same hull type, which makes sense when one (unlike Daley) considers Shore was looking for a replacement for TITAN.

---

[47] *See* the July 31, 2024 report of Captain Gregory Daley at p. 82, attached hereto as Exhibit 11.

[48] *Id.*

## MARS TITAN                    ## CROSBY ENDEAVOR

   

Make no mistake, Shore knew exactly what kind of tug it was getting with the CROSBY ENDEAVOR:

> Q. What kind of tug is the Crosby ENDEAVOR?
>
> A. Anchor handling tug.
>
> Q. Okay. And that's the same kind of tug as the Crosby, excuse me, and the MARS TITAN, correct?
>
> A. Yes.
>
> Q. Do you understand that there's a difference between a harbor tug and an anchor handling tug?
>
> A. Yes.[49]

The CROSBY ENDEAVOR worked with the THOR from the time it arrived at the decommissioning project on October 20 until the THOR towed the CROSBY ENDEAVOR into Port Fourchon on the morning of October 26 without any complaints—evidence it was the right vessel for the requested work. Daley's opinion that "Dawn failed to provide a qualified assist vessel during the storm," that opinion completely ignores Shore's Projects Manager Cody Sims'

---

[49] Exhibit 1, Sims deposition at p. 332.

testimony that Dawn was not asked to provide a tug that could hold the THOR on the dock during

a hurricane:

> Q. Okay. Well, when you were communicating with Mr. Grace and
> you said to him that you wanted an anchor handling tug, were you
> anticipating that that barge, the THOR, was going to be caught in a
> hurricane?
>
> A. No. He needed to provide a tug that could pick up the anchors.
> …
>
> Q. Are you aware of anybody from Shore ever asking anybody from
> Dawn to provide a tug that could hold the THOR on the dock during
> a hurricane?
> …
>
> A. Not that I recall.[50]

Indeed, it is uncontested that if the TITAN had never broke down, it would have been alongside

the THOR in Port Fourchon during the hurricane instead of CROSBY ENDEAVOR.  There is no

evidence that the TITAN would have performed any better or that the outcome would have been

different.  Daley's opinions lack supporting evidence and are contradicted by existing evidence.

They are completely insufficient to avoid summary judgment.

> **3.  Even if Dawn owed a duty to claimants and breached the standard of
> care, the damages asserted are not recoverable because it is not
> foreseeable that assisting Shore in obtaining a replacement anchor
> handling tug for an offshore decommissioning project would later
> result in the THOR breaking away from a Port Fourchon dock during
> a hurricane.**

When Shore asked Dawn for assistance in finding an anchor handling tug that was

comparable to the TITAN for use on platform decommissioning projects, Shore did not request a

vessel that could hold the THOR against a dock throughout a hurricane.  Shore's omission was

likely because it, like Dawn and Crosby, had no reason to suspect the THOR would seek shelter in

---

[50] Exhibit 1, Sims deposition at pp. 337-39.

the path of a hurricane.  That the THOR and CROSBY ENDEAVOR would find themselves in this very situation was completely unanticipated at the time the three companies were working to replace the TITAN.  Even more unforeseeable at the time the vessel was selected is that the THOR would break away from its moorings and allegedly allide with various vessels and property in Port Fourchon.

In the *Deepwater Horizon* MDL, Judge Barbier analyzed three cases that illustrate harm that is "unforeseeable." *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2011 WL 4829905, at *4 (E.D. La. Oct. 12, 2011), *aff'd sub nom. In re Deepwater Horizon*, 500 F. App'x 355 (5th Cir. 2012) (Analyzing *Consol. Aluminum Corp.*, 833 F.2d 65; *Loyd's Leasing Ltd. v. Conoco,* 868 F.2d 1447 (5th Cir. 1989) (per curiam); and *In re Great Lakes*, 624 F.3d 201.  Using the analysis from this line of cases, Judge Barbier found that the resultant pollution damage from the sinking of the *Deepwater Horizon* was not a foreseeable harm of salvor vessels that arrived at the *Deepwater Horizon* in the aftermath of the explosion and attempted to extinguish the fires with their water monitors, albeit potentially negligently. *Id.* at *6 (quoting  *In re: Signal International, LLC,* 579 F.3d at 495 n.19) (internal quotations removed) ("Here, however, the harm results from pollution damage, which is conceptually distinct and geographically removed from the physical damage one would expect from the negligent use of a fire monitor. Thus, the alleged harm is not of the type risked by the negligent act.").

Based on the scenario presented to Dawn when it brokered a replacement for the TITAN, Dawn might have anticipated a poor choice would result in Shore and the THOR experiencing operational delays on the offshore decommissioning project if the CROSBY ENDEAVOR could not move the THOR's anchor spread as easily as the TITAN.  Dawn could also likely envision that

such delays may give rise to economic losses.  However, Dawn had no reason to anticipate the THOR would break free of her moorings in port during a hurricane and third parties would allegedly be injured.  There were no storms in the Gulf of Mexico at the time Dawn rendered its assistance in replacing the TITAN with the CROSBY ENDEAVOR, and, as set forth above, no one from Shore raised hurricanes or harbor assistance as a concern with the selection of the tug. Because the harm alleged by the claimants (damage to third party vessels moored on Bayou Lafourche) was not foreseeable, this motion should be granted and the tort claims against Dawn should be dismissed.

## III.    CONCLUSION

For these reasons, Dawn Services, L.L.C. respectfully requests that the Court grant its motion for partial summary judgment and dismiss all tort claims against Dawn with prejudice. The undisputed facts establish that Dawn acted solely as a broker and exercised no operational control over the CROSBY ENDEAVOR's navigation or crew during Hurricane Zeta.  Any alleged harm arises from events which were not anticipated by any party, rendering any causal connection too remote and unforeseeable to support tort liability.  Summary judgment is therefore warranted as a matter of law.

Respectfully submitted,

*/s/   David L. Reisman*
David L. Reisman, T.A. (Bar #21833)
Raymond T. Waid (Bar #31351)
Lance Bullock (Bar #38519)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
dreisman@liskow.com
rwaid@liskow.com
lbullock@liskow.com

**Attorneys for Dawn Services, L.L.C.**