UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALL COAST LLC                    CIVIL ACTION NO.
                                 21-258 Lead Case, c/w
                                 21-337, 21-464,
                                 21-822, 21-1968,
VERSUS                           21-1969, 21-1981,
                                 21-1982 and 21-2075

SHORE OFFSHORE
                                 JUDGE JAY C. ZAINEY
SERVICES, LLC; MODERN
AMERICAN RAILROAD
                                 MAGISTRATE JUDGE
SERVICES, LLC; AND               KAREN WELLS ROBY
MARTIN ENERGY SERVICE
                                 APPLIES TO ALL CASES
LLC


        VIDEOTAPED AND VIDEOCONFERENCE DEPOSITION
OF CODY D. SIMS, 32503 Tamina Road, Building B-1,
Magnolia, Texas 77354, taken at PUSATERI,
JOHNSON, GUILLOT & GREENBAUM, 1100 POYDRAS
STREET, SUITE 2250, NEW ORLEANS, LOUISIANA 70163,
in the above-entitled cause on the 8th of
November, 2023, commencing at 9:35 a.m.


REPORTED BY:CHÉRIE E. WHITE
            CCR (LA), CSR (TX), CSR (MS), RPR
            CERTIFIED COURT REPORTER



EXHIBIT
1

```
 1              Q.    And Mauricio, what was his position?
 2              A.    Project manager.
 3              Q.    Do you know who the project manager
 4    was for the job the THOR was performing at the
 5    time of Hurricane Delta?
 6              A.    I do not recall.
 7              Q.    Were you the project manager for the
 8    job the THOR was performing for Fieldwood?
 9              A.    Yes, sir.
10              Q.    From start to finish?
11              A.    Yes, sir.
12              Q.    And when did that Fieldwood job
13    start?
14              A.    I don't remember the exact start
15    date honestly.
16              Q.    What was the nature of the project?
17              A.    Platform moving.
18              Q.    How many platforms?
19              A.    I believe it was one.
20              Q.    All right.  And the location was
21    what?
22              A.    Ship Shoal 259 JA.
23              Q.    How long was that project expected
24    to last?
25              A.    Ten to 14 days.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

SIMS, CODY D. 11/8/2023

```
 1          A.    I think it was more expensive than
 2    the Stone one.  I do recall that.
 3          Q.    But the exact rate you don't recall?
 4          A.    I don't remember the exact rate.
 5          Q.    All right.  And you ultimately chose
 6    the Martin dock, right?
 7          MR. GUILLOT:
 8               Object to form.
 9          THE WITNESS:
10               I -- I provided the two options to
11          JD and he preferred the Martin dock, so
12          that's where I lined up for them to go.
13    BY MR. CERISE:
14          Q.    How did you provide those options to
15    JD?  What was the form of that communication?
16          A.    I called JD and said, look, the
17    Stone dock and the Martin dock have space, which
18    one do you prefer.  And he said he wanted -- he
19    preferred the Martin dock, so that's where we
20    went.
21          Q.    When did you make that call to JD?
22          A.    It would have been on the 25th
23    sometime.
24          Q.    And do you know why JD preferred the
25    Martin dock?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

```
 1   do.
 2          Q.    Well, where did you get that
 3   understanding?
 4          A.    Where did I get the understanding
 5   from?
 6          Q.    Yeah.  I mean, you -- your
 7   understanding is it was there to support the
 8   THOR.  How did you get that understanding?
 9          A.    How did I get the understanding that
10   it was there to support the THOR?  Sorry.  I'm
11   thinking out loud.  Yeah.  It's -- it's -- the
12   THOR is a non-propelled vessel, so that tug, we
13   rely on that tug to assist the THOR.
14          Q.    So your understanding is just based
15   on experience in the workforce, discussions with
16   somebody?
17          A.    Yeah.  I mean, it's a non -- it's a
18   non-propelled vessel.  The tug needs to be there
19   to support the THOR.  JD and the tug decide
20   what -- what that is exactly.
21          Q.    All right.  Did you and JD have any
22   discussions about what that support was going to
23   involve?
24          A.    No.
25          Q.    Did you give any consideration to
```

SIMS, CODY D. 11/8/2023

```
 1              Q.    Does Dawn have expertise on barges?
 2              A.    Dawn has expertise on tugs.
 3         MR. REISMAN:
 4              I'm asking you a very different
 5         question and I'm going to object as
 6         nonresponsive and I ask you just to answer
 7         the questions I'm asking you.
 8    BY MR. REISMAN:
 9              Q.    Is it your understanding that Dawn
10    Services has expertise with respect to derrick
11    barges?
12         MR. GUILLOT:
13              Object to form.
14         THE WITNESS:
15              It's my understanding that Dawn
16         Services' expertise in relation to derrick
17         barges are they are going to provide the
18         tugs suitable to support the derrick
19         barges.
20    BY MR. REISMAN:
21              Q.    So you -- your -- your testimony is
22    that you defer to Dawn Services with respect to
23    where the -- your barge, the D/B THOR, should
24    ride out a hurricane?
25         MR. GUILLOT:
```

```
 1                    Objection.  Misstates prior
 2         testimony.
 3    BY MR. REISMAN:
 4         Q.    Is that --
 5         MR. REISMAN:
 6              I'm asking him a question.  You can
 7         answer it.
 8         MR. GUILLOT:
 9              And I'm objecting to the question
10         and you can answer it.
11         THE WITNESS:
12              Yeah.  No.  JD decides where that
13         barge goes.
14    BY MR. REISMAN:
15         Q.    So Dawn didn't decide where the
16    barge was going, correct?
17         A.    Dawn would provide input.
18         Q.    Did Dawn make the decision where to
19    send that barge?
20         A.    Not the final decision, no.
21         Q.    Who made the final decision?
22         MR. GUILLOT:
23              Objection.
24         THE WITNESS:
25              JD.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   said?
 2          Q.    Yes, please.
 3          A.    "I'm assuming Mauricio told you the
 4   TITAN is out for the year.  What are you doing to
 5   get a bigger tug out to the THOR sooner than
 6   later before we get in a bind."
 7          Q.    Does that refresh your recollection
 8   of which tug was working with the D/B THOR prior
 9   to October of 2020, excuse me, October 20th,
10   2020?
11          A.    Well, it shows that the TITAN was
12   out of service at that time, yes.
13          Q.    Who owns the -- the TITAN?
14          A.    MARS.
15          Q.    Okay.  And who was operating the
16   TITAN in October of 2020?
17          A.    Shore Offshore.
18          Q.    Okay.  And so Shore was using the
19   TITAN to service the D/B THOR, correct?
20          A.    At that time, yes.
21          Q.    What kind of tug is the -- is the
22   TITAN?
23          A.    Anchor handling tug.
24          Q.    What kind of tug is the ENDEAVOR?
25          A.    Anchor handling tug.
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1          Q.    Okay.  And so you told Mike Grace on
2    October 17th that the TITAN is down and you need
3    to get a replacement for it; is that -- is that
4    what you said?
5          MR. GUILLOT:
6               Object to form.
7          THE WITNESS:
8               That he needs to get a replacement,
9          yes.
10   BY MR. REISMAN:
11         Q.    And the ENDEAVOR was the replacement
12   that was ultimately provided for that job,
13   correct?
14         A.    That's what they decided to send out
15   there, yes, to replace it.
16         Q.    I didn't ask you who decided.  I'm
17   asking you was --
18         MR. GUILLOT:
19               Hang on.  Hang on.
20         THE WITNESS:
21               Well, you cut me off again.
22         MR. GUILLOT:
23               You're cutting him off.
24         MR. REISMAN:
25               Just raise your hand and tell me.
```



1          Q.     Okay.  And what did you see?

2          A.     That Dawn sent out a tug as a

3    temporary tug during that time.

4          Q.     Was that the LA MADONNA and the

5    LA ELITE?

6          A.     I believe that was the names, yes,

7    sir.

8          Q.     And -- and what did you say when --

9    when Mike Grace told you that those were the tugs

10   that were going to be out there?

11         A.     Well, I think in the text, off the

12   top of my head, he said the tugs aren't suitable

13   for running the anchors and he -- and I asked him

14   why would he send us a tug that's not suitable to

15   work with the THOR.

16         Q.     So you were expressing concern about

17   the tugs that had been selected?

18         A.     Yeah.  Because he told me it wasn't

19   suitable to run anchors.

20         Q.     And so when you expressed concern,

21   what happened?

22         A.     He said it's temporary.

23         Q.     Okay.  And then was another tug sent

24   out there?

25         A.     The ENDEAVOR was eventually sent out



SIMS, CODY D. 11/8/2023

```
1    there.  I don't know the time lag between that
2    text message and when it came out.
3         Q.    And did you express any concerns
4    about the ENDEAVOR?
5         A.    No, because he said that this is a
6    suitable tug and is capable of supporting the
7    THOR.
8         Q.    He told you that?  Those are the
9    words he used?
10        A.    Along those lines, yes.
11        Q.    Well, I'm not asking along the
12   lines.  I'd like to know what the words were that
13   he used.
14        A.    I mean, I can't tell you verbatim,
15   but he said it was a suitable tug for the THOR.
16        Q.    And what did you do, as the director
17   of operations for Shore, to investigate the
18   Crosby ENDEAVOR's specifications?
19        A.    Nothing.  I relied on Dawn to
20   provide the tug.
21        Q.    Okay.  Did you get on the Crosby
22   website and look up the specs on the -- on the
23   Crosby ENDEAVOR?
24        MR. GUILLOT:
25             Objection.  Asked and answered.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1    many brake horsepower was it?
 2            A.    7,200.
 3            Q.    And what was the horsepower?
 4            A.    It's a 15,000 HP class tug.
 5            Q.    All right.  Now, let's take a look
 6    at the TITAN.  You see the TITAN spec sheet in
 7    front of you now?
 8            A.    Not yet.  There it goes.  Okay.
 9            Q.    Does it show the bollard pull?
10            A.    Yes, sir.
11            Q.    What is it?
12            A.    77.5.
13            Q.    Is that more or less than the
14    ENDEAVOR?
15            A.    That would be less than 102.
16            Q.    And does it show the brake
17    horsepower?
18            A.    Yes, sir.
19            Q.    How many?
20            A.    6,000.
21            Q.    Is that more or less than the
22    ENDEAVOR?
23            A.    Less.
24            Q.    Would you agree that the ENDEAVOR
25    was a bigger and more powerful tug than the
```



SIMS, CODY D. 11/8/2023

1    TITAN?

2         A.    Yes.

3         Q.    And you would ask for something

4    bigger to come out there and work with the THOR,

5    didn't you?

6         A.    I had asked for a comparable

7    replacement tug to the TITAN.

8         Q.    And would you agree that the Crosby

9    ENDEAVOR is a comparable replacement tug for --

10   to the TITAN?

11        A.    Yes.

12        Q.    We saw earlier some e-mails that

13   included your DPRs.  You recall seeing those?

14        A.    Yes, sir.

15        Q.    The DPRs are what tell you what's

16   going on on your offshore vessels on any given

17   day, correct?

18        A.    The narrative section does, yes.

19        Q.    Was Dawn Services included on your

20   DPRs; did they receive copies of your DPRs?

21        A.    What do you mean "included"?  Did

22   they receive copies; is that what you're asking?

23        Q.    Did they receive copies of your --

24   of your DPRs?

25        A.    I don't believe so, no.

SIMS, CODY D. 11/8/2023

```
 1                    I asked Dawn to provide tugs to
 2          bring the THOR into Fourchon.
 3   BY MR. REISMAN:
 4          Q.     Okay.  Was that all you asked them?
 5          A.     Yeah.
 6          Q.     Did -- did the THOR arrive safely
 7   into Fourchon in October of 2020?
 8          A.     Yes.
 9          Q.     How long have you known Mike Grace?
10          A.     Since I started Bisso probably.
11          Q.     You've been to Pebble Beach with
12   him, correct?
13          A.     I'm not sure if that relates, but
14   yeah.
15          Q.     You've been to Whistling Straights
16   up in Wisconsin with Mike Grace, haven't you?
17          A.     Okay.
18          Q.     Did you?
19          A.     Yeah.
20          Q.     Did you invite him to your wedding?
21          A.     I don't recall if I did or not.
22          Q.     Then you don't remember if he was
23   there, do you?
24          A.     I don't know.
25          Q.     You would have to look at pictures?
```

SIMS, CODY D. 11/8/2023

```
 1            Q.    Okay.  Is that (indicated) what you
 2    want to see?
 3            A.    Yeah.
 4            Q.    Okay.
 5            A.    So leading up to this, Mike says
 6    he's sending out a tug next week to be the tow.
 7    "MADONNA will run anchors.  COMMANDER is the size
 8    of ENDEAVOR, just isn't a good anchor handling
 9    tug."  That's from Mike Grace.  I replied with
10    "Why would we send a tug out that isn't a good
11    anchor handling tug to work with the THOR."
12            Q.    Okay.  That's --
13            A.    And then you'll see --
14            Q.    That's the communication you are
15    referring to?
16            A.    And then you'll see later, "Call me
17    back shortly."  I think he tried to call me to
18    explain to me that he's working on getting a
19    comparable tug to work with the THOR.
20            Q.    What kind of tug is the Crosby
21    ENDEAVOR?
22            MR. GUILLOT:
23                  Asked and answered.
24            THE WITNESS:
25                  Anchor handling tug.
```

SIMS, CODY D. 11/8/2023

```
 1   had that text exchange with Mr. Grace --
 2           A.    Uh-huh (affirmatively).
 3           Q.    -- did you know that Hurricane Zeta
 4   was forming and would be reaching the Gulf of
 5   Mexico?
 6           MR. GUILLOT:
 7                 Form.  Assumes facts not in
 8           evidence.
 9           THE WITNESS:
10                 On October 17th?
11           MR. REISMAN:
12                 Yes.
13           THE WITNESS:
14                 I'd have to look at the weather
15           forecast.
16   BY MR. REISMAN:
17           Q.    Okay.  Well, when you were
18   communicating with Mr. Grace and you said to him
19   that you wanted an anchor handling tug, were you
20   anticipating that that barge, the THOR, was going
21   to be caught in a hurricane?
22           MR. GUILLOT:
23                 Form.
24           THE WITNESS:
25                 No.  He needed to provide a tug that
```



SIMS, CODY D. 11/8/2023

```
 1              could pick up the anchors.
 2    BY MR. REISMAN:
 3         Q.    Okay.  And that's what he provided,
 4    correct?
 5         A.    No.  Not on this, no.
 6         Q.    Okay.  So your testimony is that the
 7    Crosby ENDEAVOR could not pick up the THOR'S
 8    anchors?
 9         A.    No.  You're talking about on
10    October 17th when he provided the COMMANDER.
11         Q.    And you rejected those vessels,
12    correct?
13         A.    No.  He sent them out there.
14         Q.    I understand that, and you rejected
15    them.  You said no, I don't want those, send me
16    something else?
17         A.    Yeah.  I need a vessel that could
18    support the THOR.  That's what I told him.
19         Q.    So you felt that you were not
20    satisfied with the COMMANDER?  What was it, the
21    COMMANDER or the MADONNA, correct?
22         A.    Correct.
23         Q.    And you wanted an anchor handling
24    tug bigger than those?
25         A.    I felt that because he told me that
```



SIMS, CODY D. 11/8/2023

```
 1    they weren't sufficient to support the THOR.
 2            Q.    And, again, my question to you is
 3    did you ever ask Mr. Grace in writing to provide
 4    a tug that could hold the ENDEAVOR (sic) on the
 5    dock during a hurricane?
 6            A.    Not that I recall.
 7            MR. GUILLOT:
 8                  Form.
 9            THE WITNESS:
10                  Not that I recall, no.
11    BY MR. REISMAN:
12            Q.    Are you aware of anybody from Shore
13    ever asking anybody from Dawn to provide a tug
14    that could hold the THOR on the dock during a
15    hurricane?
16            MR. GUILLOT:
17                  Form.
18            THE WITNESS:
19                  Not that I recall.
20    BY MR. REISMAN:
21            Q.    Now, you're aware that when the THOR
22    came into Fourchon that it was being towed,
23    meaning the ENDEAVOR was out ahead of it with a
24    tow line running back to the THOR, correct?
25            A.    I believe so, yes.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

SIMS, CODY D. 11/8/2023

```
 1    2020, did you think it was important for Dawn to
 2    have Shore's safety policies and procedures?
 3          A.    No.
 4          Q.    You -- you've testified that
 5    Mr. Douglas was a Shore expert on how to secure a
 6    barge for a dock and how to ride out a hurricane,
 7    correct?
 8          A.    Yeah.  I think I testified that he
 9    had experience to tie a vessel during a
10    hurricane.
11          Q.    Did Mr. Douglas ever contact you at
12    any time and tell you that he thought that the
13    Crosby ENDEAVOR was not doing what he thought it
14    should be doing?
15          A.    Not that I recall, no.
16          Q.    Did Mr. Douglas ever contact you at
17    any time and tell you that he thought there
18    should be additional tugs supporting the THOR at
19    the dock for the hurricane?
20          A.    Not that I recall.
21          Q.    Would you have expected Mr. Douglas,
22    whom you've described as your in-house expert on
23    securing dock -- the barges to docks, to let you
24    know if he felt there were inadequate tugs
25    available to assist him for the hurricane?
```

SIMS, CODY D. 11/8/2023

```
 1          A.    You know, just like you mentioned,
 2   JD's the expert on tying up the barge, we rely on
 3   the tugs to tell us if they can't hold the barge
 4   during a storm.
 5          MR. REISMAN:
 6               I'm going to object as nonresponsive
 7          and ask you again to answer my question.
 8   BY MR. REISMAN:
 9          Q.    Would you have expected Mr. Douglas,
10   who you've described as Shore's in-house expert
11   on securing barges to docks during hurricanes, to
12   have told you that he believed that more or
13   different tugs were needed for the THOR to ride
14   out the hurricane safely?
15          A.    He would have expressed that
16   concern, yes.
17          Q.    And to be clear, he never expressed
18   that concern to you, correct?
19          A.    No.
20          Q.    Are you aware of -- well, was I
21   correct?
22          A.    Yes.  Correct.
23          Q.    Are you aware of Mr. Douglas
24   expressing a concern about the tug or lack of
25   tugs or nature of the tugs for the hurricane to
```

SIMS, CODY D. 11/8/2023

```
 1              THE WITNESS:
 2                   Yeah.  I think JD's line of
 3              communication was with the -- with the
 4              tug.  JD represented the THOR.  My line of
 5              communication was Dawn Services, being
 6              Shore Offshore management and -- yeah.
 7              He -- he could communicate with the tug,
 8              and from what I could read of his
 9              testimony, he communicated with them to an
10              extent I don't know.
11              MR. REISMAN:
12                   I'm going to object to the
13              nonresponsive portions of that.
14         BY MR. RUFTY:
15              Q.   So if JD -- if JD had wanted the
16         Crosby ENDEAVOR to do something before the call
17         he made, he could have and presumably would have
18         called the ENDEAVOR early, correct?
19              A.   Yeah.  I'd have to refer to JD to --
20         to that question.
21              Q.   If JD had wanted for the ENDEAVOR to
22         do something earlier, he could have made a call
23         and made that request, right?
24              A.   I think JD's expectations were for
25         the ENDEAVOR to support him by keeping him in the
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

SIMS, CODY D. 11/8/2023

```
 1   dock during the hurricane.
 2        MR. RUFTY:
 3             Okay.  Move to strike as
 4        nonresponsive.
 5   BY MR. RUFTY:
 6        Q.   Please listen to my -- my specific
 7   question and answer it.
 8             If JD had wanted the Crosby ENDEAVOR
 9   to do something earlier, he could have requested
10   that, right?
11        MR. GUILLOT:
12             Asked and answered.
13        THE WITNESS:
14             Yeah.  JD could have asked for
15        certain things.
16   BY MR. RUFTY:
17        Q.   And if JD had wanted the Crosby
18   ENDEAVOR to do something earlier, don't you
19   expect that he would have asked?
20        MR. GUILLOT:
21             Form.
22        THE WITNESS:
23             I think --
24        MR. GRINNAN:
25             Form.
```



```
 1                REPORTER'S CERTIFICATE
 2
 3        This certification is valid only for a
 4   transcript accompanied by my original signature
 5   and original seal on this page.
 6        I, CHÉRIE E. WHITE, Certified Court
 7   Reporter, in and for the State of Louisiana, do
 8   hereby certify that Cody D. Sims, to whom the
 9   oath was administered, after having been duly
10   sworn by me upon authority of R.S. 37:2554, did
11   testify as hereinbefore set forth in the
12   foregoing 556 pages; that this testimony was
13   reported by me in the stenotype reporting method,
14   was prepared and transcribed by me or under my
15   personal direction and supervision, and is a true
16   and correct transcript to the best of my ability
17   and understanding; that I am not related to
18   counsel or the parties herein, nor am I otherwise
19   interested in the outcome of this matter.
20
21
22        CHÉRIE E. WHITE, CCR (LA NO. 96002)
23        CSR (TX NO. 10720)
24        CSR (MS NO. 1514)
25        RPR (NATIONAL NO. 839452)
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799