Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


ALL COAST, LLC          *   CIVIL ACTION
                        *   NO. 21-258, C/W 21-337,
                        *   21-464, 21-822, 21-1968,
                        *   21-1969, 21-1982,
VERSUS                  *   21-1981, 21-2075,
                        *   21-2227
                        *
                        *   SECTION "A"
SHORE OFFSHORE          *   HON. JAY C. ZAINEY
SERVICES, LLC           *   MAGISTRATE: (4)
                        *   HON. KAREN WELLS ROBY
                        *
                        *   APPLIES TO ALL CASES



        Videotaped Deposition of WALTER
EVERETT, JR., 606 South Spruce Street,
Vidalia, Louisiana 71373, taken in person and
via ZOOM Videoconference, in the offices of
Jones Walker, LLP, 201 St. Charles Avenue,
Suite 5100, New Orleans, Louisiana 70170, on
Tuesday, the 4th day of April, 2023.




APPEARANCES: (VIA ZOOM)

        ARNOLD & ITKIN, LLP
        (By:  John G. Grinnan, Esquire)
        6009 Memorial Drive
        Houston, Texas 77007

            (Attorneys for Claimants)

**EXHIBIT**

**6**

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 160

1    other Crosby vessels or worked with them on

2    the ENDEAVOR before?

3         A     On the ENDEAVOR before.

4         Q     Okay.  Do you know if they're all

5    currently still working for Crosby?

6         A     Yeah -- well, Artigos, the

7    engineer, he's not with Crosby any more.

8         Q     Okay.  Do you know where he's

9    working now?

10        A     He's not able to work at all.  He

11   suffers from Meniere's disease.

12        Q     Oh, okay.  I want to ask you about

13   a term that we've talked about before.

14        A     Okay.

15        Q     Working as directed.  What do you

16   understand that term means?

17        A     Working as directed.

18        Q     I understand that.  But what does

19   it mean to you?  Let me give some examples for

20   this and see if we could go from there.  When

21   you're working as directed, does the person

22   that you're working for tell you every

23   specific thing to do?

24             MR. RUFTY:

25                  Object to form.  I think

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 161

1          this -- I think you need to give him a

2          specific scenario.

3    EXAMINATION BY MR. ALTMYER:

4          Q     Okay.  Let's say, for instance,

5    you're towing the THOR, right?

6          A     Okay.

7          Q     Tell me what specifically the THOR

8    directs you to do?

9          A     Okay.  If I'm just towing the THOR,

10   if he -- we're going to a platform, he tells

11   me how close to get.  He will give me some

12   coordinates, where he's going to drop an

13   anchor, and I try to get him as close as that,

14   and he tells me, you know, "Okay, you're close

15   enough, slow down," or whatever.  "I'm going

16   to drop the anchor."

17         Q     Okay.

18         A     Then he tells me my next move.  He

19   decides when I'm -- when or if I'm going to

20   get off the towline.  So he's directing me.

21         Q     Okay.

22         A     Yeah.

23         Q     He's directing you on where to go,

24   right?

25         A     Where to go, what to do, when to do

Page 162

 1   something.

 2        Q     Okay.  When the THOR is on tow, are

 3   they constantly checking in with you to make

 4   sure that they're still on tow?

 5        A     Not necessary -- not to see if

 6   they're still on tow, but to see where we are,

 7   what kind of speed we're making, if we're on

 8   schedule, you know, to make our ETA, and

 9   normally you have to give them a report every

10   so many hours, with all that information.

11        Q     Let me ask you this question.  When

12   you're towing the THOR, they're not asking you

13   repeatedly whether or not you're still doing

14   your job, towing them?

15        A     No, not if I'm towing them.

16        Q     Okay.  Yeah, that's what I was

17   asking.  Let's say, for instance, you were

18   running anchors.

19        A     Okay.

20        Q     What specifically does the THOR

21   tell you to do when your job assigned is

22   running anchors?

23        A     They've got to tell me what anchor

24   to pick up, where to take it, you know, when

25   to drop it, you know.  It's step by step.

Page 163

```
 1      Q     So would you say that -- is it
 2   outcome based?  They're saying, "Go run this
 3   anchor here and do this," but they're not
 4   telling you, you need to go this certain speed
 5   to get there?
 6      A     Oh, yeah, if necessary.  If I'm
 7   going too fast, they're going to say, "Slow
 8   down; you're going too far."  In other words,
 9   they're directing me, you know.
10      Q     Okay.
11      A     "Come into port more," or "slow
12   down, you're going too fast," so --
13      Q     So for navigation, when you're
14   towing them, are they telling you how to
15   navigate the tug?
16            MR. RUFTY:
17                 Object to form.
18            THE WITNESS:
19                 They're not telling me how.
20        They're telling me where they need to
21        go.
22   EXAMINATION BY MR. ALTMYER:
23      Q     Okay.  So they tell you where you
24   need to go?
25      A     Yeah.
```

Page 164

1      Q     Where they need to go?

2      A     Yeah.

3      Q     And then -- but they're not giving

4   you input on how to navigate the tug?

5          MR. RUFTY:

6              Object to the form.  I mean, he

7        just answered the situations where they

8        would be, so I think you need to be more

9        specific if you want to dig deeper.

10         THE WITNESS:

11             Yeah.

12   EXAMINATION BY MR. ALTMYER:

13      Q     If the THOR asks you to tow them

14   from one platform to another?

15      A     Okay.

16      Q     And you begin that tow?

17      A     Right.

18      Q     Are they specifically instructing

19   you on how to navigate the tug, from the first

20   platform to the second platform?

21      A     They're not giving me specific

22   directions until I get close.  Or if it's one

23   platform is close to another, then I'm going

24   to be constantly getting updates as to what I

25   need to do.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge                1-800-536-5255
                                                      www.psrdocs.com

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 165

```
 1        Q      Okay.  So would you say that, in
 2   certain circumstances, that you were given
 3   general directions by the THOR?
 4        A      Uh-huh (affirmative response).
 5        Q      But then in other -- "yes"?
 6             MR. RUFTY:
 7                  Object to form.
 8   EXAMINATION BY MR. ALTMYER:
 9        Q      For working as directed, would you
10   say --
11        A      Okay.  If you start the whole
12   question, give me your question, and I'll give
13   you the answer.
14        Q      Okay.  Working as directed, that's
15   the topic that we're talking about, okay.
16        A      Okay.
17        Q      Would you say that, in certain
18   instances, you are just told generally what
19   the THOR wants you to do?
20             MR. RUFTY:
21                  Object to form.  Once again, I
22          mean, I just think that's too vague and
23          unfair to the witness.  Because he's
24          already given situations where he's --
25             MR. ALTMYER:
```

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 166

```
 1              You can make a form objection,
 2        but I think he can answer.
 3            MR. RUFTY:
 4              I think you need to ask him
 5        specific situations if you want to
 6        get --
 7            MR. ALTMYER:
 8              Are you instructing him not to
 9        answer the question?
10            MR. RUFTY:
11              Not yet, but if I have to, I
12        will.  So give him questions that are
13        fair and you can proceed.
14            MR. ALTMYER:
15              I think that is a fair
16        question, so I'm going to ask you to ask
17        the question.
18            MR. RUFTY:
19              Object to form.
20            THE WITNESS:
21              Okay.  I'm going to ask you to
22        ask the question over again, okay.
23     EXAMINATION BY MR. ALTMYER:
24        Q    Okay.  Working as directed.
25        A    Okay.
```

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 167

1      Q      General topic.  And let's go

2   specifically as to the work that you were

3   performing for the THOR.

4      A      Okay.

5      Q      Are there certain instances of

6   where the THOR gave you just the general

7   directions on what to do, and then after that,

8   they do not give you specific instructions?

9            MR. RUFTY:

10               Object to form.  You can answer

11        it, if understand the question, you can.

12            THE WITNESS:

13               See, the question, to me, is in

14        two parts, because there can -- I can

15        start on the first part and then, at the

16        end, I've got to have specific.  I know

17        where you're going with everything, so

18        I'll meet you there.

19   EXAMINATION BY MR. ALTMYER:

20      Q      Okay.

21      A      All right.

22      Q      Yeah, so generally speaking, for

23   example, when you're towing the THOR, they

24   give you a general direction of tow us from

25   Point A to Point B, correct?

Page 168

1       A     Right, correct.

2       Q     During that time, they are not

3    giving you specific instructions on how to

4    navigate the vessel, how to navigate the tug?

5       A     No, they're not giving me step by

6    step.

7       Q     Exactly.

8       A     Okay.

9       Q     Okay.  Now, please, can you give me

10   an example of working as directed, where you

11   would expect step-by-step instructions from

12   the THOR?

13      A     Okay.  If I'm taking a -- if I'm

14   taking an anchor into an area where there's a

15   lot of pipelines, you know, they've got to --

16   you know, I've got to maneuver, and they've

17   got to be sure that that's exactly where it's

18   got to be at, or we could be on top of a

19   pipeline.

20            When I'm moored to a dock, okay, in

21   a situation like with the hurricane, okay, the

22   wind is coming up.  If you need -- see that

23   there is stress, more stress on one line,

24   then, "Hey, I need you to come ahead, use

25   power," or "Go astern," you know.  So because

Page 169

1    I'm on the side, I can't see the mooring

2    lines; I'm blind to the fact, you know.

3        Q    I do want to ask you real quick

4    about that, because we were talking about that

5    the HEDRON and we had taken the break on that.

6    You had said, for the HEDRON, that you weren't

7    able to go actually on the deck and inspect

8    the mooring lines for Hurricane Ida, correct?

9        A    Right.

10       Q    Okay.  Where the ENDEAVOR was

11   situated alongside the THOR, would you have

12   been able to go onto the deck of the THOR?

13           MR. RUFTY:

14               Objection.  Asked and answered.

15           MR. ALTMYER:

16               I never asked that question.

17           THE WITNESS:

18               I can't remember exactly.  I'm

19       probably the -- it's possible that there

20       was some way to get up there.

21   EXAMINATION BY MR. ALTMYER:

22       Q    Okay.

23       A    Yeah.

24       Q    What was the deck levels, as far as

25   between the ENDEAVOR and the THOR?

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 188

1      Q      All right.  Let's go to the next

2   day.  This is going to be October 20th, 2020,

3   and this is going to be Crosby 000446.  Are

4   you on that page?

5      A      Uh-huh (affirmative response).

6      Q      All right.  So the first minute of

7   the day, "Under way, lifeboat to BLK 116 High

8   Island."  Do you see that?

9      A      Uh-huh (affirmative response).

10      Q      All right.  0600 and 1200.  Once

11   again, it looks like it's just updates of

12   where you're at, correct?

13      A      Correct.

14      Q      Enroute to the THOR, right?

15      A      Yes.  Yes, that's correct.

16      Q      Gotcha.  At 1600, it says, "Arrived

17   at D/B THOR in Bulk" --

18      A      "Block."

19      Q      -- "High Island 116; stand by to

20   get survey"?

21      A      Yeah.

22      Q      Okay.  What kind of survey?  What

23   does that mean?

24      A      The survey equipment that they

25   would put on the vessel to keep track of

Page 189

1    exactly where I am --

2         Q    Okay.

3         A    -- whenever I have to drop an

4    anchor.

5         Q    Understood.  1800, "Going alongside

6    THOR to get survey equipment."  That explains

7    that?

8         A    Yeah.

9         Q    And then 1900, "Towline on THOR."

10   Do you see that there?

11        A    Yes.

12        Q    Okay.  And then, "Under way, full

13   power to Block 21 South" --

14        A    Pelto.

15        Q    "Pelto," okay.  So you now have the

16   THOR in tow?

17        A    Correct.

18        Q    All right.  And you all are heading

19   to a different block on the OCS?

20        A    Yes.

21        Q    I see that there's a marking on

22   this entry for -- you all had a JSA for

23   putting a towline on the barge, correct?

24        A    Correct.

25        Q    When you to do, do JSAs, do you

Page 190

 1    mark them on the vessel log or do you indicate

 2    that on the vessel log?

 3         A    Most of the time it's -- you're

 4    supposed to do it.  Sometimes it's, you know,

 5    you do the JSA and you've got to do the job

 6    immediately and it gets left off, so it

 7    doesn't always --

 8         Q    Okay.  Let's see.  And then you

 9    worked from noon to midnight that day,

10    correct?

11         A    Yes.

12         Q    Okay.  And that's indicated at

13    the -- well, there's two spots where it looks

14    like it's indicated.  It looks like it's

15    indicated under the fire watch section?

16         A    Uh-huh (affirmative response).

17         Q    And then it's also indicated just

18    where all the crew hours are, right?

19         A    Right.

20         Q    All right.  Let's go to the next

21    day, October 21st, 2020.  If we look at -- and

22    so this is going to be Crosby 000447 for

23    everybody on ZOOM.  Let's go to 0830 in the

24    morning.  "D/B THOR change destination to

25    Block 129 Ship Shoal."

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 191

1     A     Uh-huh (affirmative response).

2     Q     Okay.  So explain to me the

3    conversation that you would have had with the

4    THOR while you're initially towing them to one

5    block, but then they instruct you to go to a

6    different block?

7     A     Yes.  Basically they would call on

8    the radio and say, "Hey, Cap, we're not going

9    to that 21 South Pelto; you need to go to"

10   whatever the block is, and I would make my

11   route to there.  Of course, it's going to

12   change the mileage.  And then I would probably

13   at some point say, "Okay, it's going to be X

14   number of miles and we should arrive there at

15   a certain hour."

16    Q     Okay.  So when they give you a --

17   when the THOR gives you a destination, you do

18   a calculation of mileage and time, and then

19   convey that back to the THOR?

20    A     Yes.

21    Q     Okay.  So if we look at the rest of

22   the entries on October 21st, 2020, it looks

23   like those are just updates on where you are,

24   enroute to Block 129 Ship Shoal?

25    A     Correct.

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 192

1      Q      All right.  You work noon to

2    midnight that day, correct?

3      A      Uh-huh (affirmative response).

4      Q      Okay.  As for all of the logs that

5    we've looked at so far, from October 15 to

6    October 21, you personally filled out these

7    forms, correct?

8      A      Not all of it because whenever

9    Plaisance is on watch, he's putting in.

10     Q      He's the one that does from --

11     A      Yeah.

12     Q      Midnight to noon?

13     A      Right.

14     Q      And then you're doing the entries

15    from noon to midnight?

16     A      Right.

17     Q      Okay.  Let's go to the next day,

18    October 22nd.  It looks like -- let's make

19    sure real quick.  You are at 129 Ship Shoal,

20    but on October 22nd, at 7:40 a.m., it says,

21    "D/B THOR; change destination, Block 151 Ship

22    Shoal"?

23     A      Yeah.

24     Q      So you had another change in

25    destination, right?

Page 193

1      A      Right.

2      Q      Y'all get there at 11:00 a.m., on

3   the morning of October 22nd, correct?

4      A      Correct.

5      Q      All right.  So I see the term,

6   "W.O.W."

7      A      Waiting on weather.

8      Q      Waiting on weather?

9      A      Uh-huh (affirmative response).

10     Q      Okay.  So you were waiting on

11  weather until, it looks like, the next

12  morning, on October 23rd, and that would be on

13  Crosby 000449, right?

14     A      Yeah.

15     Q      Okay.  And it looks like it was

16  probably about 12:30, 30 minutes past

17  midnight, 12:30 a.m., on the morning of

18  October 23rd?

19     A      Right.

20     Q      Okay.  Let's go back to Crosby

21  000448, which is the entry for October 22nd.

22  What type of work are you doing when you're

23  waiting on weather?

24     A      We're just hanging on the towline.

25  Looks like they had dropped the stern anchor,

Page 194

1    so they would have the seas off the stern.

2    I'm still on my towline, so I'm just hanging

3    there.

4         Q    Okay.  "On bottom, 151 Ship Shoal."

5    That was at 11:00 o'clock, right?

6         A    Yeah.

7         Q    Okay.  And that was the destination

8    that you all were going to, right?

9         A    Change destination -- yeah, it

10   looks like it.

11        Q    Okay.  Let's go to the next entry

12   real quick, which is -- I mean, the next page,

13   which is the October 23rd vessel log.  At 0130

14   in the morning, so 1:30 a.m., on October 23rd,

15   it says, "Anchor up."  It's likes "EP" is

16   circled there.  That would have been Ernest

17   Plaisance for the next entry, right?

18        A    Yeah.

19        Q    Okay.  "Under tow, slow for

20   Block 259 Ship Shoal"?

21        A    Yeah.

22        Q    Okay.  So this is a new

23   destination --

24        A    Yeah.

25        Q    -- that you're going to.  Again,

Page 195

1    what kind of instructions would you have

2    gotten from the THOR to change your

3    destination to this new block?

4         A    I mean, I wasn't up, but he would

5    have called Captain Ernest and told him that

6    "We're going to this block," and probably

7    asked how many miles it was and how long he

8    think it will take to get there.

9         Q    Would the THOR be giving any other

10   instructions to the CROSBY ENDEAVOR while it's

11   on tow, heading to Block 259?

12        A    It's possible.  He could tell him

13   the heading he wanted him on, when to shorten

14   up, probably give him a safe drop location,

15   because he has to drop an anchor, for us to

16   get off tow, so they have to figure all that

17   out.  We can't just tell them, because he's

18   got all the survey equipment.

19        Q    But as far as navigating to

20   Block 259, is the THOR giving any kind of

21   specific instructions to the CROSBY ENDEAVOR

22   on how to navigate the vessel and how to get

23   there?

24        A    Unless there's an area that he

25   doesn't want to go across, you know.  And like

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 196

1    I said, at that particular time, it looks like

2    it was just a straight shot probably, so we

3    would have just been navigating to that

4    position.  Yeah.

5         Q    So unless he didn't want to go

6    somewhere specifically, the THOR is not giving

7    any kind of navigation instructions, in that

8    specific instance?

9         A    No, not in the open sea out there,

10   yeah.

11        Q    Okay.  All right, gotcha.  Let's

12   see.  If we look at the log, it will tell us

13   here.  Let's see, we've got "1800 WAD."

14   That's working as directed, correct?

15        A    Uh-huh (affirmative response).

16        Q    "On location, 259 Ship Shoal."  Do

17   you see that?

18        A    Uh-huh (affirmative response).

19        Q    Okay.  Where is the entry where it

20   says -- so is it 1400, where you all had

21   actually gotten there?

22        A    Yeah.  He dropped the stern anchor,

23   so I'm still just hanging on the towline.

24        Q    Hanging on the towline.  And then,

25   "Working as directed."  "1937, towline off and

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 197

1    running anchors"?

2        A    Yes.

3        Q    Okay.  So, "Towline off and running

4    anchors."  Tell me about the specific

5    instruction -- and let's see, 1937, you would

6    have been on duty at that point, right?

7        A    Correct.

8        Q    Okay.  So tell me about the

9    specific instruction that you would have

10   gotten to run anchors at that point?

11       A    He would call -- the deck foreman

12   would call and say which anchor he wanted to

13   run first.  The surveyor would put up on the

14   screen exactly where that anchor has to be

15   dropped, and because of pipelines, you have to

16   pretty much put it on spot.  You can't

17   deviate.  And they will instruct you if

18   something changes or they see you're not close

19   enough to the drop site.

20       Q    Okay.  Let's go to the next entry,

21   2245.  "Shut operations down until WX passes."

22       A    Weather.

23       Q    Weather?

24       A    Uh-huh (affirmative response).

25       Q    Okay.  Did you shut down the

Page 198

1    operations or was it someone on the THOR that

2    told you that they were going to shut it down?

3        A    I don't remember exactly if it was

4    the visibility was bad or the seas had picked

5    up; I would have shut it down, because I

6    wouldn't put my guys out there and risk

7    injury, you know.

8        Q    Okay.  And you have stop-work

9    authority to be able to do that, right?

10       A    Right.

11       Q    Okay.

12       A    And my crew.

13       Q    And your crew, as well, okay.  And

14   then it looks like, at 2400, you were on

15   standby for weather time, right?

16       A    Correct.

17       Q    Okay.  Do you know if Crosby is

18   being paid the same, whether or not they're on

19   weather down time or whether or not they're

20   running?

21       A    No idea.

22       Q    No idea?  Does it change anything

23   about how you're getting paid?

24       A    Never.

25       Q    Okay.  Let's go to October 24th,

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 199

1    which is the next vessel log, 450, Crosby 450.

2    It looks like you all were still waiting on

3    weather until 12:30 a.m. on October 24th,

4    right?

5         A    Correct.

6         Q    All right.  And it says, "Working

7    as directed, running anchors," correct?

8         A    Correct.

9         Q    Okay.  And it looks here that you

10   all are still working at the 259 Ship Shoal

11   block, right?

12        A    That's correct.

13        Q    Okay.  Working as directed from

14   12:00 to midnight while you were on shift,

15   right, on October 24th?

16        A    On October 24th -- yes, yes.

17        Q    Okay.  Is there anything that --

18   any documentation that you keep or that Crosby

19   keeps that goes into more specific detail

20   about what you were doing while working as

21   directed?

22        A    No.

23        Q    Okay.  So this is the main document

24   that's kept contemporaneously while you're

25   doing work?

Page 200

1        A       Correct.

2        Q       And then there would be another

3    document that you would type up later on, the

4    billing log, right?

5        A       Correct.

6        Q       Okay.  But that's more of a --

7    would you say a more synthesized version of

8    the vessel log?

9        A       Yeah, you -- you could say that.

10       Q       Okay.  So this is where I'm going

11   to get the most information written down about

12   what you all were doing out there?

13       A       Correct.

14       Q       Okay, gotcha.  Once again, it looks

15   like you were working noon to midnight,

16   correct?

17       A       Correct.

18       Q       All right.  Let's go to

19   October 25th, and you were continuously -- I

20   mean, the CROSBY ENDEAVOR is continuously

21   working as directed on the entirety of

22   October 25th, right?

23       A       Correct.

24       Q       And this is all in the same block,

25   259 Ship Shoal?

Page 201

1    A    Correct.

2    Q    Do you remember at this time, on

3 October 25th, whether or not you had had any

4 discussions with the THOR about coming into

5 Port Fourchon for Hurricane Zeta?

6    A    I don't remember.

7    Q    Okay.  Do you remember at all when

8 the first conversation was that you would have

9 had with someone on the THOR about coming in

10 for Hurricane Zeta?

11    A    I don't remember when the first

12 conversation was had, no.

13    Q    Okay.  For working as directed, is

14 there anything else that you would have been

15 doing offshore besides running anchors?

16    A    No.  Well, once we set them up, I'm

17 just hanging on the buoy, so I'm not doing

18 anything.

19    Q    Okay.  So when it says, "Working as

20 directed," unless it says "Running anchors,"

21 in the log --

22    A    Yeah, when they get --

23    Q    -- you're just hanging out?

24    A    When I'm working as directed, once

25 I've set the barge up, I'm just hanging on an

Page 202

1    anchor until I'm instructed to do something

2    else.  We still call it working as directed.

3        Q    Okay.

4        A    Because that's all I'm doing.

5        Q    Okay.  So you're just hanging out

6    until the THOR says, "We're going to do

7    something else"?

8        A    Right.

9        Q    Okay.  October 26, 2020, and this

10   is going to be Crosby 452.  It looks like,

11   continuously running, working as directed,

12   until 3:00 a.m. that morning, correct?

13       A    Correct.

14       Q    And then it says, "Start running

15   anchors," right?

16       A    Correct.

17       Q    Then it says, at 700 hours, or 7:00

18   a.m., "Stop running anchors, stand by while

19   THOR working crewboat."  Do you see that?

20       A    Yeah.

21       Q    Okay.  Do you remember what that

22   entry was about, "THOR working crewboat"?

23       A    Probably taking people off.  I

24   would have been asleep at that time, but I'm

25   sure he was -- they were demobing the barge at

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 203

```
 1    that time.
 2         Q    Okay.  And then, let's see, at 9:50
 3    in the morning, so 9:50 a.m., and it says,
 4    "Last anchor up and under tow for Port
 5    Fourchon."
 6         A    Uh-huh (affirmative response).
 7         Q    Okay.  So that would have been at
 8    the time when the ENDEAVOR was towing the
 9    THOR --
10         A    Correct.
11         Q    -- back to Port Fourchon for
12    Hurricane Zeta, right?
13         A    Correct.
14         Q    Okay.  And the CROSBY ENDEAVOR was
15    the lead tow, correct?
16         A    The only tow.
17         Q    Only tow, but you had two tail
18    tows, correct?
19         A    But they wouldn't be out there.
20         Q    They weren't out there?
21         A    No.  The tail tug is not out there
22    in the field.
23         Q    Okay.  So when does the tail tug
24    come in?
25         A    When you're coming into the jetties
```

Page 286

1          not directed to do so.

2              THE WITNESS:

3                  Okay.  As I was made up, it

4          would be impossible for me to push the

5          barge directly into the dock.  I'm made

6          up alongside.  I can drive ahead or I

7          can drive astern.

8    EXAMINATION BY MR. ALTMYER:

9        Q      Can you position the bow thruster

10   in a way that would be able to --

11       A      The bow thruster is not strong

12   enough to do that.  It's for small maneuvers,

13   light boat maneuvering.  As I was made up,

14   it's impossible for me to push directly into

15   the dock.

16       Q      Okay.  I'm going to read you an

17   answer from discovery responses that Crosby --

18       A      Okay.

19       Q      -- had given us, and I'm quoting,

20   it says, "The ENDEAVOR is an offshore towing

21   and anchor handling tug and is not designed to

22   hold vessels in place."

23       A      Yeah.

24       Q      Do you agree with that statement?

25       A      Pretty much.  I mean, we're -- I'm

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 287

```
 1   not able to -- it's not like I'm a dynamic

 2   positioning or Z-drive vessel, you know.

 3       Q     So if you agree with that

 4   statement, that you were there to, per your

 5   testimony, work as directed, to hold the THOR

 6   in place, correct?

 7       A     Yeah, to assist.

 8       Q     But do you agree that the CROSBY

 9   ENDEAVOR was not designed to hold a vessel in

10   place?

11       A     Man, I don't -- I'm not going to

12   make an -- I'd be making assumptions on that,

13   so -- I neither agree nor disagree.

14       Q     What's the horsepower of the CROSBY

15   ENDEAVOR?

16       A     7200 brake horsepower.

17       Q     Okay.  Two engines?

18       A     Two engines.

19       Q     Okay.  What's the horsepower of the

20   bow thruster?

21       A     About 350 or 400 horsepower.

22       Q     Okay.  Is there any other means of

23   propulsion on board the CROSBY ENDEAVOR?

24       A     No.

25       Q     As you sit here today, do you think
```

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 289

1    company.   What company was that?

2              MR. REISMAN:

3                   Object to the form.

4              THE WITNESS:

5                   Put that whole question

6         together.

7    EXAMINATION BY MR. ALTMYER:

8         Q     Working as directed, you said

9    that's what you were there doing, right?

10        A     Correct.

11        Q     Were you getting any instructions

12   from anyone other than the THOR crew?

13        A     No.

14        Q     Okay.  So do you believe that the

15   CROSBY ENDEAVOR was a sufficient vessel to

16   hold the THOR into the dock during a hurricane

17   if they asked you to do so?

18             MR. RUFTY:

19                  Asked and answered.

20             MR. REISMAN:

21                  Same objection.

22             THE WITNESS:

23                  I don't have any belief on that

24        question.

25   EXAMINATION BY MR. ALTMYER:

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 300

1    EXAMINATION BY MR. ALTMYER:

2        Q     Can you just answer the question?

3    I think there was a little overlap of --

4        A     At the time that he made the

5    request is the first time that I engaged the

6    engines, you know, in an attempt to hold them

7    to the dock.

8             MR. ALTMYER:

9                  Okay.

10            MR. RUFTY:

11                 What request?

12            THE WITNESS:

13                 Yes, sir.

14            MR. RUFTY:

15                 What request?  You said the

16        first time he made the request was the

17        first time.

18            THE WITNESS:

19                 When he notified that we had --

20        that the barge was aloose, that it had

21        broken aloose.

22            MR. RUFTY:

23                 Did he make a request at that

24        time?

25            THE WITNESS:

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 301

1              Yeah.  He said -- I think he
2         said, "Start pushing" or "Try to push me
3         back in."  I'm not a hundred percent
4         sure.
5    EXAMINATION BY MR. ALTMYER:
6         Q    Did you have any communications
7    with Joe Douglas after -- and we're talking
8    about Joe Douglas, right?
9         A    Yes.
10        Q    Okay.  Did you have any
11   communications with Joe Douglas after that
12   point?  And that point, meaning when he had
13   said, "Push me back in" or --
14        A    Yes, we would.  Either myself or
15   Captain Ernest was on the radio with him
16   pretty much until they were anchored, finally
17   got an anchor down, so yes, it was
18   communications throughout.
19        Q    Okay.  I'm going to read you
20   something real quick.
21        A    Okay.
22        Q    This is also an answer that was in
23   Crosby's discovery responses, and I just want
24   to know what you think about it.
25        A    Yeah.

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 521

1    include going to the side of the vessel and

2    providing propulsion to push the THOR up

3    against the dock?

4        A    As I stated, the way I was made up,

5    I would be unable to push them into the dock,

6    to pin them against the dock.

7        Q    Okay.  And so I -- is it your

8    understanding that when you were supposed to

9    be working as directed, that the only two

10   forms of propulsion that you would be

11   applying, or might be asked to apply, would be

12   to either push it or pull it from the head or

13   the stern?

14       A    Yes, because of the way I'm made

15   up, John.  That's the only options I have.

16   I'm not able to --

17       Q    Got you.

18       A    -- push it directly in.

19       Q    So when -- I didn't mean to

20   interrupt you.

21       A    Go ahead.

22       Q    So when you were told to work as

23   directed, you had no idea it might include

24   having to go to the side of the vessel to push

25   the THOR up against the dock, right?

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 667

1                REPORTER'S CERTIFICATE

2

3        This certification is valid only for a
   transcript accompanied by my original
4  signature and original required seal on this
   page.

5

6            I, Linda G. Griffin, RPR,
   Certified Court Reporter in and for the
7  State of Louisiana, as the officer before
   whom this testimony was taken, do hereby
8  certify that WALTER EVERETT, JR., after
   having been duly sworn by me upon authority
9  of R.S. 37:2554, did testify as hereinbefore
   set forth in the foregoing 666 pages; that
10 this testimony was reported by me in the
   stenotype reporting method, was prepared and
11 transcribed by me or under my personal
   direction and supervision, and is a true and
12 correct transcript to the best of my ability
   and understanding; that the transcript has
13 been prepared in compliance with transcript
   format guidelines required by statute or by
14 rules of the board, that I have acted in
   compliance with the prohibition on
15 contractual relationships, as defined by
   Louisiana Code of Civil Procedure Article
16 1434 and in rules and advisory opinions of
   the board; that I am not related to counsel
17 or the parties herein, nor am I otherwise
   interested in the outcome of this matter.

18

19

20

21        _____
          LINDA G. GRIFFIN, RPR
          CERTIFIED COURT REPORTER
22

23

24

25