UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST, LLC | CIVIL ACTION NO. 2:21-CV-00258-JCZ-KWR (lead case) c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982, 21-2075, 21-2227 |
| VERSUS | |
| SHORE OFFSHORE SERVICES, LLC | SECTION "A" |

* * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

TERRY JOE DOUGLAS,

TAKEN ON BEHALF OF CLAIMANTS, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * *


REPORTED AT THE LAW OFFICES OF:

PUSATERI, JOHNSTON, GUILLOT & GREENBAUM, LLC

1100 POYDRAS STREET, SUITE 2250

NEW ORLEANS, LOUISIANA  70163

**EXHIBIT 7**

COMMENCING AT 10:00 A.M., ON MARCH 7, 2023.

1       Q.   These are some of the reports that you would
2    receive via email on the D/B Thor, correct?
3       A.   Correct.
4       Q.   And the emails that I saw would show that
5    these emails would be forwarded.  Sometimes they would
6    be sent to shoreside management and sent to the Thor.
7    Sometimes I saw emails where it would be sent to the
8    Thor and then forwarded to shoreside management.  Is it
9    kind of a -- like everyone is kind of getting them and
10   just circulating to make sure everyone gets them?
11      A.   Correct.
12      Q.   Okay.  And so these ones start on
13   October 25th, okay, and then they go from there, even
14   though there are ones that predate that, okay.  But I'm
15   just trying to hone in instead of going through, like,
16   two weeks of weather reports with you.  All right?
17      A.   Right.
18      Q.   And so we have here October 25th.  We know
19   that you have not left the location yet at Fieldwood,
20   correct?
21      A.   Correct.
22      Q.   It shows on here two different kind of
23   tropical events.  But at -- at the bottom here in
24   yellow, you see where it says "Zeta"?
25      A.   Correct.

1    Q.   And it's giving you the projected path of Zeta
2    as it's going to be traveling through north -- kind of
3    north-northeast through the Gulf of Mexico and then
4    ultimately striking a little east of -- of New Orleans,
5    correct?
6    A.   Correct.
7    Q.   Okay.  And so you would have received this, as
8    well as you would have forwarded it on to shoreside
9    management whenever you got this on the 25th, correct?
10   A.   Correct.
11   Q.   And if you flip to 475, at this point in time,
12   they are -- they are projecting what are the chances of
13   this developing into a further storm, correct?
14   A.   Right.
15   Q.   And so here we're -- October 25th, one day
16   before you leave the location, the weather service is
17   projecting that Hurricane Zeta has a 90 percent chance
18   of becoming a category 1 hurricane, correct?
19   A.   Correct.
20   Q.   And so you would have received this on
21   October 25th.  You would have forwarded it to
22   shoreside, and so everyone knows Hurricane Zeta is
23   projected to come into the Gulf.  It's going to be
24   coming to the area we're currently at, at Fieldwood,
25   and then it's going to start to move northeast towards

1  Louisiana and Mississippi, correct?
2     A.   Correct.
3     Q.   And at least at that point in time on the
4  25th, you as well as shoreside, because you forwarded
5  it to them, knew that this had a 90 percent chance of
6  becoming a hurricane, correct?
7          MR. GUILLOT:  Object to form.
8     A.   Correct.
9  BY MR. LEWIS:
10    Q.   Okay.  And at this point in time, the 25th,
11 it's already been determined that the Thor is going to
12 move off location and head inland, correct?
13    A.   Correct.
14    Q.   Okay.  And so you would have already had these
15 discussions that we talked about before with shoreside
16 management forecasting and watching Zeta as it's
17 progressing and being fore- -- and being projected;
18 that the Thor is in a dangerous situation because,
19 sitting at Fieldwood, according to the projections, you
20 were in the path of a serious storm that has a
21 90 percent chance of becoming a hurricane.  Correct?
22         MR. GUILLOT:  Form.
23    A.   Correct.
24 BY MR. LEWIS:
25    Q.   And so then you and shoreside management

```
 1   ultimately decided the Thor needs to come off location
 2   and it needs to get out of the path of the hurricane,
 3   correct?
 4            MR. GUILLOT:  Object to form.
 5       A.   Correct.
 6   BY MR. LEWIS:
 7       Q.   And you would have already, then, informed the
 8   Fieldwood representative, the company representative on
 9   the D/B Thor, of this situation, correct?
10       A.   Correct.
11       Q.   You would have also already informed the
12   Fieldwood safety representative of this plan, correct?
13       A.   Correct.
14       Q.   And then, like you told me before, this is
15   where shoreside management would start looking for
16   locations for you to take the D/B Thor and wait out the
17   storm, correct?
18       A.   Right.
19       Q.   Ultimately, you were told by shoreside
20   management that the D/B Thor is going to go to the port
21   of Fourchon, correct?
22            MR. GUILLOT:  Form.
23       A.   We had discussed it, and I had requested some
24   dock space there.  Yes.
25   BY MR. LEWIS:
```

1  management about coming off location, did they happen
2  the day before you come off of location?  Did they
3  come -- did they happen two or three days before coming
4  off location?
5       A.   I'm sorry, could you repeat the question,
6  please?
7       Q.   We all know that you came off location on the
8  26th.  You've already told us that that was an open
9  discussion between you and shoreside management.  When
10 did the decision to come off location occur?  Did it
11 happen on the 25th?  Or did it happen before that?
12      A.   I believe the morning of the 25th.
13      Q.   The morning of the 25th.  Okay.
14           So we have here a report on the 25th at
15 2:00 p.m. in the afternoon, right?  The decision to
16 come off location has already occurred, but you had not
17 come off location yet, correct?
18      A.   Correct.
19      Q.   According to the emails we have, shoreside
20 management is contacting the port of Fourchon at about
21 10:30 in the morning on the 26th, right?  Do you see
22 that?
23      A.   Yes.
24      Q.   Okay.  So we have here is the 25th.  According
25 to the emails we have, shoreside management has not

```
1    contacted the port of Fourchon yet.  That happens the
2    next day according to these emails.
3              MR. GUILLOT:  Object to form.
4    BY MR. LEWIS:
5         Q.   And what we do know is that the Zeta has a
6    90 percent chance of becoming a hurricane, and its
7    go -- its projected path goes right towards the port of
8    Fourchon, correct?
9              MR. GUILLOT:  Object to form.
10        A.   I believe we started looking for dock space on
11   the 25th.
12   BY MR. LEWIS:
13        Q.   Okay.  Well, then let's stick with --
14        A.   Because we had a discussion that morning, and
15   I told them I was probably going to start picking up
16   anchors late that night or early morning time and to
17   find me some dock space.
18        Q.   Okay. And that's fair.  But on the 25th --
19   you told us this -- this -- this report is at 2:00 p.m.
20   You've already told us the decision to come off and to
21   get out of the path of the hurricane has already been
22   made.  Remember that?
23        A.   Yes.
24        Q.   Okay.  So at the time -- the same day that
25   you -- you as a group, with shoreside management, have
```

1    decided we've got to come off location, we got to get
2    out of the path of the hurricane, the projection put
3    Zeta, with a 90 percent chance of becoming a hurricane,
4    going right towards the port of Fourchon, correct?
5              MR. GUILLOT:  Form.
6         A.   Correct.
7    BY MR. LEWIS:
8         Q.   And ultimately, shoreside management sent you
9    to the port of Fourchon, right to where the weather
10   reports are saying the hurricane is going to go, right?
11        A.   Correct.
12        Q.   At no point in time did they ever tell you to
13   go to western Louisiana and find a dock space there,
14   did they?
15        A.   No.
16        Q.   At no point in time did they tell you to head
17   towards east Texas, like Beaumont, and look for a dock
18   there, did they?
19        A.   No.
20        Q.   At no point in time did they tell you to go
21   towards Houston, one of the biggest ports in the entire
22   country, and look for dock space there, did they?
23        A.   No.
24        Q.   At no point in time did they say, Go back to
25   Galveston; you were just there.  Did they?

1    we're going to get into the lines breaking kind of in
2    more detail, okay.  At any point in time when you
3    realized that the D/B Thor was kind of in peril, lines
4    were either about to break or had started breaking, did
5    you ever hear the Crosby Endeavor actually fire up its
6    engines?
7                MS. KUEBEL:  Objection; form.
8         A.   No, I did not.
9    BY MR. LEWIS:
10        Q.   Okay.  At any point in time when these lines
11   started breaking or when you anticipated that they
12   might start breaking, were there any communications
13   between the D/B Thor and the Crosby Endeavor about what
14   was going on?
15        A.   When the lines started breaking?
16        Q.   Yeah.  Either -- either when you knew they
17   were going to break or if you didn't know, once they
18   started breaking.
19        A.   Yes.  Once we started breaking away from the
20   dock, I got on the radio and called the Endeavor and
21   told him we was breaking away from the dock, push me
22   in.
23        Q.   Okay.  So you're still at this point in
24   time -- and from my understanding is all lines didn't
25   just instantly break.  They started breaking one at a

```
 1      A.   That's where we get some of our tugs from.
 2      Q.   Okay.  Have you ever had any direct
 3 communication with Dawn Services?
 4      A.   No, I have not.
 5      Q.   I'll ask you specifically, then.  Have you
 6 ever spoken with any Dawn Services employee on the
 7 telephone?
 8      A.   Possibly.  I don't recall.
 9      Q.   So you -- you -- do you have any recollection
10 of ever speaking to any Dawn Services employee either
11 on the telephone or face to face?
12      A.   No.
13      Q.   Do you have any recollection of ever
14 communicating with any Dawn Services employee by
15 telephone -- excuse me, by text message or email?
16      A.   Not me personally, no.
17      Q.   You're familiar with the Crosby Endeavor,
18 correct?
19      A.   Correct.
20      Q.   Were you familiar with the Crosby Endeavor
21 before it came out to tow the Thor in October of 2020?
22      A.   I do believe we had used it before.
23      Q.   When you say "we," is that Shore or was
24 that --
25      A.   Shore.
```

```
 1   with respect to demobing the Thor from its location at
 2   Ship Shoal, I think it was 259, to Fourchon?
 3       A.   No.
 4       Q.   Did you have any discussions with Butch Caton
 5   regarding Hurricane Zeta or the tropical storm that
 6   ultimately became Hurricane Zeta?
 7       A.   No.
 8       Q.   How did you find out that the Crosby Endeavor
 9   was going to be the tug that was going to be providing
10   towing services for the Thor in October of 2020?
11       A.   I don't recall if it was email or phone call.
12   I don't recall.
13       Q.   Were you involved in -- in the decision to
14   hire that tug?
15       A.   No.
16       Q.   Do you know who was?
17       A.   No, I don't.
18       Q.   When the tug arrived, did you have
19   communications with the -- with the captain on board?
20       A.   Yeah.
21       Q.   What -- what did those communications consist
22   of?
23       A.   He just let us know that he's in the field, be
24   over there, and then we'd tell him to come -- come
25   alongside and so we'd put serving gear on it.
```

```
 1        Q.   You told the captain of the Endeavor to come
 2   alongside the Thor so you could put survey gear on --
 3   on the tug?
 4        A.   Yes, sir.
 5        Q.   And the survey gear is so that you can -- you
 6   can see in real time where the tug is as it places its
 7   anchor; is that correct?
 8        A.   Correct.
 9        Q.   You have a surveyor on board the Thor, and
10   he's monitoring that position so that the anchors can
11   be placed in the precise location?
12        A.   Correct.
13        Q.   So you direct the -- the Crosby Endeavor to
14   come to you so he could get the -- the survey gear,
15   correct?
16        A.   My foremans do, yes.
17        Q.   Okay.  And after that, did you have any other
18   communication with the Crosby Endeavor?
19        A.   While he was working with us?
20        Q.   Yes.
21        A.   Just regular conversation, yeah.
22        Q.   You'd tell him when you needed to pick up or
23   set an anchor, correct?
24        A.   My foremans do that, and the tower operator.
25        Q.   Okay.  So the Shore tower operator and the
```

1   Shore foreman or you would be the ones communicating to
2   the Crosby Endeavor telling them where you need to pick
3   up or set anchors, correct?
4        A.   Correct.
5        Q.   What other things would you tell the Crosby
6   Endeavor?  And when I say "you," I mean you or your
7   crew on the -- on the shore -- the Thor.
8        A.   Pretty much where -- like I said, where to run
9   anchors, where to set them, where to pick them up, if
10  any's got to be moved.
11       Q.   When to put -- put the barge on tow?
12       A.   When to put the barge on town.
13       Q.   Where to take the barge?
14       A.   Correct.
15       Q.   In other words, the tug it out there to work
16  as directed by the Shore crew on board the Thor; is
17  that correct?
18       A.   That's correct.
19       Q.   And you understand that concept of working as
20  directed, right?
21       A.   Correct.
22       Q.   There's some jobs where the Thor works as
23  directed by its customer?
24       A.   Correct.
25       Q.   In those cases, you follow the directions that

```
 1   your customer provides to you, correct?
 2        A.   That's correct.
 3        Q.   Do you do things they tell you not to do?  Or
 4   do you only do what they tell you to do?
 5        A.   My customers?
 6        Q.   Correct.
 7        A.   We come to an agreement on what to do.
 8        Q.   Okay.  But the customer dictates what they
 9   want you to do, correct?
10        A.   Yes.
11        Q.   And you do what they tell you to do?
12        A.   Correct.
13        Q.   That's -- that's what's "working as directed"
14   means?
15        A.   Correct.
16        Q.   Following the instructions you receive from
17   your customer, correct?
18        A.   Correct.
19        Q.   In this case, the Crosby Endeavor was working
20   as directed by the Thor, correct?
21        A.   Correct.
22        Q.   And that means that the customer for them was
23   the crew -- the crew of the Thor, correct?
24             MR. GUILLOT:  Form.
25   BY MR. REISMAN:
```

1      Q.   Is that correct?
2                MR. GUILLOT:  Form.
3      A.   Repeat the question.
4  BY MR. REISMAN:
5      Q.   The crew of the Thor was -- I'm going to
6  strike the question.  I'll ask you a different one.
7           The crew of the Thor was directing the
8  activities of the Endeavor, correct?
9                MR. GUILLOT:  Form.
10     A.   As far as anchor running and -- and -- and
11 bringing -- helping bring it to the barge, correct.
12 BY MR. REISMAN:
13     Q.   You, the crew of the Thor, was telling the
14 Crosby Endeavor what to do and when to do it; is that
15 correct?
16               MR. GUILLOT:  Form.
17     A.   Correct.
18 BY MR. REISMAN:
19     Q.   There was some discussion earlier today -- I'm
20 not going to try and pull out every document, but if
21 you need it, ask me.  I don't want to hide it from you.
22 It's going to be in that stack.  We can get it out.
23 But you remember seeing the WeatherOps reports that
24 would come in to the barge by email?
25     A.   Yes.

```
 1   BY MR. REISMAN:
 2        Q.   Did the crew of the Crosby Endeavor make any
 3   of the connections between the barge and the dock when
 4   you arrived at the dock in Fourchon?
 5        A.   No.
 6        Q.   Did the crew of the Endeavor participate in
 7   determining how the barge should be secured to the
 8   dock?
 9        A.   No.
10        Q.   Was Dawn Services involved in any way in the
11   decisions as to how to secure the barge to the dock?
12                MR. GUILLOT:  Object to form.
13        A.   No.
14   BY MR. REISMAN:
15        Q.   Did Dawn Services participate in securing the
16   barge to the dock?
17        A.   No.
18        Q.   We know you had the starboard stern anchor
19   wire running to the dock, correct?
20        A.   Correct.
21        Q.   Can you tell me how that -- that wire ran and
22   came off of a winch --
23        A.   Correct.
24        Q.   -- running aft.
25             And then where did it go in order to get to
```

|   |   |
|---|---|
| 1 | REPORTER'S CERTIFICATE |

2      I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered

3  Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that TERRY

4  JOE DOUGLAS, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in

5  the foregoing 593 pages.
       I further certify that said testimony was reported

6  by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and

7  supervision, and is a true and correct transcript to the best of my ability and understanding.

8      I further certify that the transcript has been prepared in compliance with transcript format

9  guidelines required by statute or by rules of the board and that I have been informed about the complete

10  arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

11     I further certify that I have acted in compliance with the prohibition on contractual relationships, as

12  defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

13     I further certify that I am not an attorney or counsel for any of the parties, that I am neither

14  related to nor employed by any attorney or counsel connected with this action, and that I have no

15  financial interest in the outcome of this matter.
       This certificate is valid only for this

16  transcript, accompanied by my original signature and original raised seal on this page.

17
       Prairieville, Louisiana, this 21st day of March,

18  2023.

19

20

21

22  _____
    YOLANDA J. PENA, CCR, RPR
23  CCR NO. 2017002, RPR NO. 907346

24

25