## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

---

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

---

## WRITTEN REPORT OF CAPTAIN RONALD L. CAMPANA
(RULE 26(a) (2) (B) FRCivP)

Civil Action NO. 21-258, C/W 21-337, 21-464, 21-822, 21-1968,*21-1969, 21-1982, 21-1981, 21-2075, and 21-2227

August 1, 2024



*Derrick Barge* **THOR**

I, Captain Ronald L. Campana, have been retained by the Adams and Reese Law Firm, as the designated expert for Harvey Gulf International Marine, LLC, and the law firm of Allen and Gooch, for Garber Brothers, L.L.C., Gulf Logistics, LLC and C & G Boats, Inc and herewith provide the written report concerning matters on which I am expected to offer testimony on in accordance with Rule 26(a) (2) (B) of the Federal Rules of Civil Procedure.

### ***CONTENTS***

SUMMARY...........................................................................2-5

BACKGROUND INFORMATION…………………………….6-9

METHODOLOGY……………………………………………….9

SUMMARY OF FACTS…………………………………….10-27

CONCLUSIONS……………………………………………..28-31

**EXHIBIT**

**9**

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

## *SUMMARY*

The undersigned, Captain Ronald L. Campana of Campana Marine Service Inc., has been retained by law firm of Adams and Reese for Harvey Gulf International Marine, LLC and the law firm of Allen and Gooch for Garber Brothers, L.L.C., Gulf Logistics, LLC and C & G Boats, Inc to consider the issues and facts in this case and render opinions regarding a reported incident that occurred on October 28, 2020, during the afternoon hours, due to Hurricane Zeta impacting in Port Fourchon, LA. It was reported that the D/B *THOR* broke loose from her moorings at the Martin Energy dock 16 along Bayou Lafourche during the height of the hurricane and drifted up the bayou striking numerous vessels.  I reviewed the following;

1. Original Complaint
2. Interrogatory Responses
    - Omnibus responses of Harvey Gulf;
    - Omnibus responses of the THOR Interests;
    - Omnibus responses of Crosby Interests;
    - Omnibus responses of Dawn Interests.
    - Omnibus responses of Martin Interests; and
    - Martin's Answers to HGIM's First set of Interrogatories.
3. USCG Investigation Report related to this matter
4. Harvey Seas Vessel Particulars
5. Request for Production Responses
    - THOR (Bates 1-1185, 1201-5251)
    - Crosby (Bates 2494, 2277-2489, 82-445, 002495-96, 002060-2161, 001517-1605, 001606-77, 001678-1845, 001846-2059)
    - Martin (Bates 1-29, 716, 759, 717-19)
6. Supplemental Responses
    - Dawn Services
    - Crosby
    - Martin
7. DB THOR Mooring Lines Pre-breakaway photos
8. DB THOR List of persons managing the unit, including their professional certification and resumes
9. Persons with duties related to THOR: Tommy Gibilterra PE – Director of Operations; Cody Sims – Director of Projects; Mauricio Arana – Project Manager; Yesenia Hernandez – Project Assistant; Kristi Caton – President and CEO of SOS; Brandon Gill – Fleet Manager (THOR 0004989); Zoe DeLaRosa – Logistics and Project Coordinator MARS (THOR 0004991); Dustin Lowe, Sr. – Barge Administrator

10. EXPERT REPORTS
    - Expert report of McSwain Engineer and Captain Jay Riveria issued at the request of certain personal injury claimants.
    - Expert Report of Wrisk Consulting, LLC
11. The Greater Lafourche Port Commission (GLPC) (FOIA Documents – Port Authority)
    - AIS Data
        - Vessel coordinates for each vessel in the Port
        - 1400-1816 hours overview of vessel positions
        - 1600-1200 hours overview of upper Bayou Lafourche
        - 2000-0800 hours Overview of vessel positions

---

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

---

- o C2023-Bay Laf Mooring Dolphin Replacements
- o Contains dolphin plans and contract documents
- o MSIB (Marine Safety Information Bulletin)
  - ▪ From Oct. 26, 2020 to Oct. 31, 2020 (however, there is no Oct. 28, 2020)
12. FOIA Response for the United States Coast Guard (FOIA Documents – USCG)
    - o 2021-11-09 Patterson to LJD fwd FOIA response
    - o 2021-CGFO-02410_Redacted.pdf
13. Deposition Transcripts: and exhibits of the following persons or entities:
    - o Walter Everett
    - o Joe Douglas
    - o Thomas Gibilterra,
    - o Cody Sims
    - o Martin Corp. Deposition of Terry Damon King
    - o Robbie Plaisance deposition
    - o Crosby Corp. Depo (Wade Savoy)
    - o Martin Cummins
    - o Lewis Andrews
    - o Rene Artigos
    - o Teddy Collins
    - o Michael Melancon
    - o Darren Walker
    - o Brian Cloyd (Exhibit 51 - RFP 46 - Cloyd Video - THOR 0006083.MOV)
    - o Bradley Aro
    - o Charles Goodwin
    - o Montrel Smith
    - o Ernest Plasance
    - o Ivy Danos
14. DB THOR Mooring Lines Pre-breakaway photos
15. SEAS Specs
16. THOR Vessel Particulars
17. Crosby HPP
18. Coastal Safety 80-85 (Shore HPP)
19. Martin's Supplemental Answers to Omnibus Interrogatories, Supplemental Responses to Omnibus Requests for Production, and Supplemental Responses to THOR Interests' Requests for Production (sent 5-30-24)
20. MARTIN 938-977 (INSP. NO HARM)
21. THOR 1199-1275; 1375-1380;1392-1409
22. Garber Bros., LLC Objections and 1st Supplemental Responses to Omnibus Discovery Requests and the corresponding Bates numbered production of documents:
23. GB00001-4 - USCG 2692 Report of Marine Casualty, Commercial Diving Casualty
24. GB00005 - 20210119 - GBI Demand Ltr (DB THOR)
25. GB00006 - Vessel Log
26. GB00007-29 Stansbury & Associates Survey of Sea Cypress Damage - Final Report 11 - 2 & 9 – 2B00030-32 - Inv_308325_from_Stansbury__Associates_LLC_12492
27. GB00033 - NOITR - MV SEA CYPRESS
28. GB00034-38 - Electra Shipyard invoice
29. GB00039 - IMG_5555.mov
30. GB00040-41 Coral - Invoice No. 1114 & 1128
31. GB00042 Schuyler - Invoice No. SM-7828
32. GB00043-66 Vessel Documents - MV Sea Cypress
33. GB00067-69 Vessel General Arrangement - MV Sea Cypress

## ALL COAST, LLC
### Versus
## SHORE OFFSHORE SERVICES, LLC

34. GB00070-108 Harold Ganaway III
35. GB00109-138 Joshua Danos
36. GB00139-190 Lonnie Veillion
37. GB00191-233 Norman Barelare
38. GB00234-250 GBI Sea Cypress invoice 1
39. GB00251-268 GBI Sea Cypress invoice 2
40. GB00269-273 GBI Sea Cypress invoice 3
41. GB00274-286 GBI Sea Cypress invoice 4
42. GB00287-300 GBI Sea Cypress invoice 5
43. GB00301-315 GBI Sea Oak invoice
44. GB00316-330 GBI Sea Oak invoice
45. GB00331-346 GBI Sea Oak invoice 3
46. GB00347-361 GBI Sea Oak invoice 4
47. GB00362-376 GBI Sea Oak invoice 5
48. GB00377-392 GBI Sea Oak invoice 6
49. GB0393-411 GBI Sea Cypress Observation -Near Miss - Non Conformity
50. The Bates numbered production of documents by Gulf Logistics:
51. GLO-00001-00717
52. Martin Energy's responses to discovery and corresponding Bates numbered production of documents:
53. 22.11.22 Martin Responses to THOR  [01031-01033].pdf
54. MARTIN [0103402036]
55. Martin's 2nd Suppl Resp to THOR's 1st RFPD.pdf
56. Martin's Resp to THOR's 4th RFPD.pdf
57. Martin's Suppl Resp to Omnibus INT.pdf
58. Martin's Suppl Resp to Omnibus RFPD.pdf
59. Martin's Suppl Resp to THOR's 1st RFPD.pdf
60. Martin's Suppl Resp to THOR's 4th RFPD
61. RFP #1 MARTIN [1-29].pdf
62. RFP #2 FCH16-InspNoHarm-COMBINED - Martin [00938 - 977]
63. RFP #2 MARTIN [30-278].pdf
64. RFP #3 Photos-COMBINED.pdf [Martin [00978 - 1030]
65. RFP #4 MARTIN [279-643].pdf
66. RFP #7 MARTIN [644-715].pdf
67. RFP #9 MARTIN [716].pdf
68. RFP #11 MARTIN [717-719].pdf
69. RFP #12 MARTIN [720-757].pdf
70. RFP #13 ERA SS CBT - M. Cummins & D. Turnage.xls
71. RFP #13 MARTIN [758].pdf
72. RFP #14 MARTIN [759].pdf
73. RFP #15 MARTIN [760-821].pdf
74. RFP #18 MARTIN [822-852].pdf
75. RFP #19 MARTIN [853-886].pdf
76. RFP #22 MARTIN [887].pdf
77. RFP #23 MARTIN [888-912].pdf
78. RFP #27 MARTIN [913-930].pdf
79. RFP #44 MARTIN [931-937].pdf
80. Safety Minutes from October 2020.pdf (not bates stamped)
81. The Greater Lafourche Port Commission's responses to discovery:
82. GLPC's Supp Responses to THOR's Discovery
83. GLPC 000001 – 000974

---

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

---

84. GLPC-000937-001004
85. Wisenet WAVE video - 2130 hrs 10-27-20 - 0230 hrs 10-28-20.exe
86. Wisenet WAVE video - 1730 hrs = 1900 hrs 10-28-20.exe
87. Wisenet WAVE video - 1230 hrs - 1730 hrs 10-28-20.exe
88. Wisenet WAVE video - 0730 hrs - 1230 hrs 10-28-20.exe
89. Wisenet WAVE video - 0230 hrs  - 0730 hrs 10-28-20.exe
90. Martin Video Footage (MARTIN 887)
91. USCG FOIA Responses
92. Crosby Complaint for Exoneration from and/or Limitation of Liability
93. CG Labure, Inc. SDT Response (CG Labure, Inc. 000001-000066).pdf
94. CPORT 000003-000026 - 20-12-16 Incident Investigation Letter - Lanier Job 11593
95. Engineering Investigative Report dated 12/18/2023
96. Harvey Gulf International Marine's Hurricane Plan
97. Martin Energy Hurricane Preparedness Plan 2020
98. Martin Energy's Opposition to THOR's Motion to Compel
99. MHCPP (2022)
100.    MMT DATA
101.    Marine Safety Information Bulletins (10/26/20, 10/27/20, 10/29/20, 10/30/20, & 10/31/20)
102.    Ordinance 71
103.    SURVEY REPORT of Kyle J. Smith (12/21/23)
104.    THOR 001083-1087 - RFP 23 - Photos - 28 Oct. 2020
105.    USCG-MSIB-20-04-Hurricane-Season-Reporting-Requirements-2020_05
106.    USCG PSIX website data for **THOR;**
107.    C&G Boats, Inc. and Gulf Logistics, LLC's Answer and Claims To Consolidated Complaints for Exoneration from and/or Limitation of Liability;
108.    Rule 26(a) Second Amended Initial Disclosures of C&G Boats, Inc. and Gulf Logistics, LLC;
109.    C&G Boats, Inc. and Gulf Logistics, LLC's Objections and Responses to Omnibus Discovery Requests

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

## BACKGROUND INFORMATION

On October 24, 2020, Tropical Storm ZETA formed in the Caribbean southeast of the Yucatan peninsula moving in a northwest direction. On August 26, 2020, ZETA became a hurricane and crossed the Yucatan peninsula downgrading to a tropical storm. On the 28th ZETA became a hurricane again with its actual path depicted in the graphics below.



With an approaching upper-level low over Texas, Zeta began turning to the north and regained hurricane strength during the early morning hours of October 28th. Zeta continued to intensify as it moved north and then northeast towards the Southeast Louisiana Coast. Zeta made landfall at 4 PM CDT October 28th near Cocodrie, Louisiana which is approximately thirty miles west of Port Fourchon, LA.

On October 26, 2020, the **THOR** was under the towage of the M/V ***Crosby Endeavor*** and departed Ship Shoal Block 259 for Port Fourchon due to approaching hurricane ZETA. Shore Offshore Services, LLC (Shore) management inquired to two docks in Port Fourchon for space. John W. Stone and Martin Energy and ultimately decided on Martin Energy along Bayou Lafourche. The **THOR** was towed to the Martin Fuel Dock #16, along Bayou Lafourche.

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

Martin fuel dock 16 is located on Bayou Lafourche in Port Fourchon.



John W. Stone Fuel Oil Dock

As per the regulations of Port Fourchon, a non-self-propelled vessel could not moor to any facility in the port area without a self-propelled vessel assisting for a storm.

-page7-

## ALL COAST, LLC
### Versus
## SHORE OFFSHORE SERVICES, LLC

**Greater Port Lafourche Port Commission Ordinance 71**

**BE IT ORDAINED, by the Board of Commissioners of the Greater Lafourche Port Commission that**:

*When Hurricane Force Winds are expected to occur at Port Fourchon within twenty-four (24) hours, no person shall a. allow a Vessel, which is self-propelled by a motor or engine and of which s/he is either an owner or captain, to remain Unattended in Port Fourchon or moored to Port Pilings.*

*b. allow a Vessel which is not self-propelled by a motor or engine and of which s/he is an owner, to remain in Port Fourchon or moored to Port Pilings without being under the control of a Vessel(s), which is self-propelled by a motor or engine and which is occupied by sufficiently skilled, experienced marine personnel capable of stabilizing and controlling all such Vessel(s) in seas subject to Hurricane Force Winds.*

The operators of the **THOR**, Shore Offshore Services, LLC, contracted with Dawn Services for tugs to work with and assist the **THOR** both while in the Gulf of Mexico and in Port Fourchon in October 2020. The M/V ***Crosby Endeavor*** was contracted to perform anchor handling and towage work as well as standby, work as directed work, with the derrick barge.

### M/*V Crosby Endeavor*



| ALL COAST, LLC |
| :---: |
| **Versus** |
| **SHORE OFFSHORE SERVICES, LLC** |

The **THOR** was all fast at the Martin Fuel dock at 2338 hours of October 26th, 2020. She was assisted into the dock by the M/V *La Madonna* as the M/V Crosby Endeavor still had her towline on the barge.

## METHODOLOGY:

I reviewed the available case documents and testimony regarding the breakaway of the **THOR** from Martin 16 dock, Port Fourchon, LA that occurred on October 28, 2020, during Hurricane Zeta.

In evaluating the marine aspects of the incident, I reviewed the pertinent CFR's, US Laws, the local ordinance for Port Fourchon as well as all the Hurricane Plans for Martin Entergy, Shore Offshore Services, LLC, Crosby Towing, Harvey Gulf International Marine, Shore's Safety Manual, all the depositions listed above as well as all the exhibits listed and USCG Sector New Orleans Maritime Hurricane Contingency Port Plan. I also reviewed Wrisk Consulting, LLC Weather Expert Report for Hurricane Zeta. I have been the mate and master of US Flagged vessels, a marine surveyor for forty-three (43) years along the Mississippi River and Gulf Coast including Port Fourchon and worked in the pertinent area of operation in my career. I am a graduate of the United States Merchant Marine Academy, Kings Point, NY. I held numerous marine licenses including Master, as detailed in my CV.

The below findings are based upon the above, as well as my knowledge of vessels and the proper procedures for maintaining marine safety and security, determining the risk factors for jobs, and common sense for protecting life, limb, and property while at sea. Additionally, the below findings are made based on my experience on ships, oil field vessels, experience in the field of marine safety and operations, mooring operations, investigation, and audit (as per my enclosed resume), and consultation with appropriate publications and governmental agencies.

These findings are based upon a reasonable degree of professional certainty.

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

### SHORE OFFSHORE SERVICES, LLC (Shore)

1)  The **THOR** was owned by MARS and operated by Shore on October 28, 2020.Mr. Cody Sims was the Director of the Project for Shore at this time.

2)  The **THOR** is Panamanian Registry and has dimensions of:

   Registered Length 355.90
   Beam 137.80
   Depth 26.20
   IMO number 8639455
   built in 1997
   Gross Tons 13260.
   She is a manned, non-self-propelled crane barge used in the decommissioning of abandoned oil platforms.

3)  Shore, via Mr. Sims, contracted with Dawn Services (Dawn) for tugs to assist the **THOR** in her job requirements. The tugs had to be anchor handling tugs and be able to tow the **THOR** where needed. Dawn contracted with Crosby Tugs for the M/V *Crosby Endeavor* to assist the **THOR** after the M/V *Mars Titan* had to be replaced. There is a disagreement between Dawn and Shore whether Dawn was a broker (middleman) or charterer of the M/V Crosby Endeavor.

4)  On October 26, 2020, the **THOR** was working in Block Ship Shoal 259 when owing to Hurricane Zeta's forecasted path and timing, all operations were shut down and the DB THOR towed back to Port Fourchon and secured to the Martin Energy dock 16 along Bayou Lafourche. The decision to head to Port Fourchon was made by the superintendent and management of Shore. Shore management called to find a berth suitable and both Stone Oil and Martine Energy were available with Shore choosing Martin Energy. There was no specific reason given for their choice of dock, however, a quick look at the photo above clearly shows Stone Oil dock to be surrounded by land and a much safer berth for the **THOR**. Stone's dock is on the west side of the inlet and with a hurricane approaching from the south heading north, the prevailing winds would be from the east pushing the barge against the dock. There is contradictory testimony on what Shore told Martin Energy and vice versa about their plans to ride out the hurricane at that dock and Martin's instructions to Shore. Martin has maintained that it thought the barge was coming in for fuel, water, and supplies, which is the normal function of Martin. The Martin Hurricane plan does not permit any vessel to remain at their facilities in a hurricane because their facility is evacuated. Martin contends the **THOR** never officially told Martin they were intending to ride out the storm. Rather they took on water and fuel on the 27th, completing around late afternoon and

| **ALL COAST, LLC** |
| :---: |
| **Versus** |
| **SHORE OFFSHORE SERVICES, LLC** |

informed Martin personnel on the dock they were staying. As per the testimony of Martin, they had to make an exception to their policy as the hurricane would make landfall the next day. **THOR** disputes Martin's claim and maintains that at all times it was made clear that the **THOR** intended to ride out the storm at Martin's dock.

5) The superintendent had his crew put out their mooring lines in anticipation of the hurricane and testified he did not believe it would be very bad. Allegedly, he had up to date weather forecasts, and he should have known Martin employees would be evacuating. The mooring lines that were placed out, under his supervision, were old mixed mooring lines, that is, some nylon and some poly lines based on the testimony of witnesses and the photos produced. Their age is not known. He also rigged two 2" wires from the starboard bow and stern winches to the mooring bitts ashore further mixing the mooring line configuration. The holding capability of the mooring arrangements was varied. Mixing of different lines (nylon, polypropylene, and polyester) should be avoided. Two lines were of 2" wire and the rest polyester and/or nylon. All parted except the bow wire which ran off the winch. The Superintendent seemed to know about elongation of certain mooring lines and the importance of same. Nylon stretches 20-30% of its length. Mixing different types of lines results in uneven strain on the lines. This results in putting maximum shock strain on just a few lines which can lead to a parting of a line. Once that first line parts you have a short window before momentum builds, and the vessel starts moving, resulting in many lines parting. It is very hard to stop that momentum. In this case all the moorings failed resulting in the barge breaking free from the dock. Photos of the mooring arrangement before the breakaway show a complete lack of proper mooring techniques by the Superintendent, who had no formal training in mooring either from his experience or from the company. A recurring theme from Shore is that they relied on Mr. Douglas because of all his experience yet they never verified his experience or bothered to ensure that he was properly trained, especially in the face of an approaching hurricane. Joe Douglas was the company senior company man on the THOR.

## 1. DOUGLAS' BACKGROUND:

Douglas retired from offshore work at the beginning of 2022. He currently works as a consultant for Shore Offshore ("Shore") in a part-time role. He consults for Shore and is paid his day rate of $500 per day in his role as a consultant, which is only related to the breakaway at this time.

Douglas was Superintendent of the **THOR** from 2018-2022. He started working for Shore in 2018. Prior to that he worked for Offshore Specialty Fabricators ("OSF") from 2004-2017 in the positions of Superintendent, Barge Foreman and Leaderman. While there he worked on 3 pieces of equipment, which included theTHOR (it was called DB **William Kallop** at that time), DB **Swing Thompson**

| ALL COAST, LLC |
| :---: |
| **Versus** |
| **SHORE OFFSHORE SERVICES, LLC** |

and DB **Raefore.**   The company eventually shut down and the **THOR** was auctioned off. Shore purchased the **THOR** and Douglas stayed with it. Douglas was essentially an acting superintendent on the **THOR** from 2010-2022.

In his role as Superintendent Douglas was in charge of the **THOR** and its day to day activities.  He was the highest-ranking official on the barge. Douglas had no responsibility for entering into contracts, developing HSE manuals, company policies or procedures.    All contracting, auditing, and training was the responsibility of shore side management. Prior to working for OSF, Douglas worked for J. Ray McDermott from 1997-2004 as a Leaderman. Prior to that he was self- employed as a carpenter. Douglas is a high school graduate who has no training in engineering, meteorology, or naval architecture.

 Brandon Dupont ("Dupont") was Douglas' relief superintendent from 2018-2022. Dupont still works for Shore as acting superintendent of the **THOR**. Dupont took over Douglas' role when Douglas retired.

## 2.  SHORE'S SHORE SIDE MANAGEMENT

At the time of this incident on October 28, 2020, the **THOR** was working for Fieldwood. Douglas had active daily communications with Shore's shore side management. He submitted daily reports laying out activities of the THOR to shore side management. Shore side management reviewed those reports and directed corrections to them at times. If the **THOR** or another asset needed to be moved, the company and its shore side management team would ultimately tell Douglas where to take it.

Shoreside management also provided Douglas information on a daily basis via email, including weather reports and forecasts.   If weather was an issue to the THOR's operations shore side management would be involved in how to respond to the weather event.   If the weather presented a safety risk, Douglas would contact shore side management.   If the **THOR** had to be moved off of its working location, Douglas would communicate with shore side management to discuss the situation and a decision would be made as to what to do with the barge.  Most often it would be a joint decision between Douglas as superintendent and Shore's shore side management. Shore's shore side management team would contact ports, docks, or locations to see where the **THOR** would be moved to and would facilitate tug(s) necessary to move it. That process was followed in October. 2020 in response to Hurricane Zeta.

Shores' shore side management officials were as follows:
- Tommy Gibilterra-  Director of Operations
- Cody Sims- Project Mgr.
- Mauricio Arana- Project Mgr.

> **ALL COAST, LLC**
> **Versus**
> **SHORE OFFSHORE SERVICES, LLC**

Cody Simms was the Project Manager for the Fieldwood project. Mauricio Arana was the Project Manager for other jobs including a job earlier in October 2020 when the **THOR** was moved to Galveston for Hurricane Delta. Tommy Gibilterra was involved in every project.

Douglas admitted to following:

- All injuries are preventable. Ex. 1- **THOR** 5320-5321:  Shore Offshore HSE Manual.
- Decisions should not be made thinking of profits and losses rather than safety.
- The THOR does decommission work to remove assets after construction. It must be on site to fulfill the terms of its contract.
- Shore side management has total responsibility for Shore's safety program.
- According to Douglas, Shore's Safety Director was a shore side guy named Mike Melancon ("Melancon"), who worked for Coastal Safety as an HSE consultant.
- THOR and Shore relied on advice from Coastal Safety and Melancon.
- Fieldwood had a company representative on board the **THOR** but he does not recall his name.  Douglas and Shore's shore side management team would decide where the **THOR** was going to be moved to and advise the Fieldwood representatives when they proposed to leave the location and where they would be relocating.
- He believes the barge and the crew should not ride out a hurricane offshore.
- Douglas never wants to be in the hurricane's path.


### 3.  SHORE SAFETY PROGRAM:

Safety meetings are essential to the success of a safety program. Shore's shore side/corporate management has a responsibility to make sure safety meetings are occurring throughout the company.

Written records of meetings/minutes are supposed to be kept detailing the people involved and topics discussed. If a safety meeting occurred, there would be a document showing who was there and what was discussed. Those documents are kept in a file on the barge and periodically transmitted to shore side management.

It is the responsibility of shore side management to ensure these meetings are occurring. The **THOR** crew did not perform hurricane drills where they would rehearse bringing the barge ashore and/or mooring it for weather events. According to Douglas, any rehearsal bringing the vessel ashore in a drill type

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

scenario would be useless because the THOR would not remain offshore in the path of a hurricane. Therefore, it is all the more reason to drill on how to bring it into the dock and moor it properly.

Shore's policy says that all training must be documented. If training were done would have been documented.

## 4.   WEATHER REPORTS:

Weather reports were always received on board the **THOR** and by shore side management. Sometimes the reports were sent to the **THOR** and then to management and sometimes the reports were sent to management and then forwarded to the **THOR**. **THOR** pp. 472-495 Weather Ops Atlantic Tropical Planner (Ex. 7).

On Oct. 25, 2020, the **THOR** was on location working on the Fieldwood job. Weather reports were received by Douglas showing Hurricane Zeta's projected path. The report received by **THOR** projected that the storm had a 90% chance of developing into a Cat. 1 hurricane. **THOR**, p. 475. This report would have been forwarded to Shore's shore side management. On Oct. 25th, a decision was made that THOR was going to be moved off of the Fieldwood work site and towed inland.   Douglas testified that if the**THOR** had remained at the Fieldwood work site it would have been in Zeta's path so Douglas and shore side management decided they would move the barge inland. Shore side management looked for locations to take the **THOR** for the storm. Douglas believed they started looking for dock space on October 25th. They came off location and started heading to Port Fourchon on October 26th.

On October 26, 2020, at 10:25 a.m. Tommy Gibilterra, Director of Operations at Shore, cc Cody Sims (project mgr.) and **THOR** emailed the Port of Fourchon telling the Port that the **THOR** was coming in and Project Manager, Cody Sims, will be handling all operations of the THOR.   Shoreside Management directed the relocation of the **THOR** to Port Fourchon.

Douglas admitted that at this time the weather reports showed Zeta heading towards Port of Fourchon. He was never told to take the **THOR** to Western LA or Eastern TX or to look for dock space elsewhere. In fact, there was never any discussion of going anywhere other than Port Fourchon. There was no Plan B. Douglas said the **THOR** was taken to the closest dock because that's "normally" what we do.   Douglas admitted he would have gone elsewhere if he'd known Zeta was going to be a CAT 3 storm**.**

| ALL COAST, LLC |
| Versus |
| SHORE OFFSHORE SERVICES, LLC |

Douglas did not have any communications with the USCG or the Greater Lafourche Port Commission about bringing **THOR** into Fourchon nor did anyone with Shore tell him to do so. Douglas was not aware of any regulations at issue nor did Shore tell him of any that were applicable.  However, he did seem to be aware that he needed to have a tug with the **THOR** at all times while in port during a hurricane because the **THOR** lacks its own means of self-propulsion.

Neither Douglas nor Shore identified any safe harbors prior to hurricane season where the **THOR** could be brought during a storm. Douglas claims he knew where all of the safe harbors were located and thus did not need any such list.

### 5 MOORING:

The decision as to which lines/cables were used to moor the **THOR** was abdicated by Shoreside management and was made by Joe Douglas. No one else in management or shore side inquired about or was involved in decisions about how the vessel was moored.   On the morning of October 27, 2020, two anchor cables were put out (starboard stern and starboard bow breast anchor cables). According to the Daily Progress Report the starboard bow breast anchor cable had not been changed in over 52 months and the starboard stern wire had not been changed in 61 months. Proper marine practice has the wires being end for ended (reversed) every five years with normal use that is, removing the wires from the drum and putting the used end on the drum first which then has the unused end as the working end. This extends the working life of the wire.

Douglas had never been trained by Shore or anyone else on how many anchor cables needed to be put out to account for hurricane winds or storm surge**.** His ability to tie up the barge was "Just something I picked up along the way." No checklist exists for mooring the barge. Shore's policy says barges are to be secured but does not say how many cables or lines need to be used or whether they can be mixed. Douglas did not speak to or consult with anyone else about how many anchor cables to use or the location of the cables.

There was no inspection of the Martin dock prior to the incident other than a brief visual inspection by Douglas after arrival on the day before the storm. No one with Shore or otherwise inspected the Martin dock ahead of **THOR**'s arrival to assess its suitability as a safe haven for the storm.  Douglas claims he "inspected" the cables after they were put in place. He was involved in securing the lines but does not recall which other crew members were involved.

 Shore's HS&E Manual on Hurricane and Tornado Preparedness Safety  defines "storm surge" as the most deadly part of a hurricane.  Douglas admitted that he knew the location they were bringing the THOR would be impacted by storm surge

| **ALL COAST, LLC** |
| **Versus** |
| **SHORE OFFSHORE SERVICES, LLC** |

but despite the weather forecasts did not expect it to reach even CAT 1 strength that late in the hurricane season. (Ex. 11. Coastal Safety pp. 50-85. **THOR** pp. 1375-80). Shore has no documented policy on how much slack should be given in cables to account for rising water other than to say to "leave enough slack."

Douglas did not recall how much slack was provided in the anchor cables, but he claims THOR was 7-9 feet from the dock with the starboard side of THOR facing the dock.  The Crosby Endeavor was on the **THOR**'s port side.

Douglas had his barge administrator take pictures of the **THOR**'s mooring arrangement but claims he did not send the photos to anyone before the incident. He had the photos taken because he planned to use them to demonstrate this mooring arrangement to the barge foreman for training purposes.  (Douglas pages 184 and 187)

Q:  To your knowledge, has shore side management ever trained any of your crew? A:  No.

Q:  You thought it was important to train them on mooring, which is why you took pictures? A:  Yes.

Q:  How much time did you spend with shore side management discussing preparation of storm surge? A:  None.

Q:  How much time spent discussing putting out the anchor cables? A:  None.

Q:  How much time did you spend preparing for this deposition? A:  40-50 hours.

Q:  When it comes to making sure the barge was secured you spent no time. But to prepare for this depo, you spent 40 plus hours?  A:  Correct.

Ten mooring bits were along the Martin dock. Douglas decided what lines to put out on his own. The **THOR** had lines on 8 of the 10 available bits**.**  The third bit from the stern and the 10th/last bit were unused. Douglas did not use the 10th bit because he believed it was too far away and thought what he had was sufficient. He did not participate in physically putting out the 8 lines, but he observed the mooring process and had no issue with it.

Q:  Were the lines to the Martin bitts doubled up? A:  Not all of them. Some were spring lines (at an angle to keep the barge from going forward and aft).

Q:  Who made that decision? A:  The barge foreman made that decision.  Douglas saw where and how the lines were tied and approved it. Shore did not provide training on spring lines or doubling lines. The USCG port condition warnings noted mooring lines should be doubled up. (USCG MSIB June 5, 2020 1500 hours Set Port Condition XRAY.)

| ALL COAST, LLC |
| :---: |
| Versus |
| SHORE OFFSHORE SERVICES, LLC |

Douglas did not do any mooring calculations at any time. Shore never trained him how to perform mooring calculations for the **THOR**. (Douglas page 299) According to Douglas that was unnecessary as he had "on the job" training how to tie up the lines**.**

Neither the Crosby Endeavor ("Endeavor") crew nor Dawn Services participated in securing the barge or developing plans to secure barge. There were eight (8) anchor wires on the THOR and Douglas used two of them. An anchor wire was made up to the winch and ran through the snatch block and at over a 90 degree angle, onto the shore bitt.  The diameter of the anchor wires on the barge were 2 inches.   The diameter of the eye of the snatch block was also 2 inches which is too small for this arrangement.

The starboard bow breast line was run to bitt 9 and came from the winch drum off of the bow, around the button and to a bitt on the dock.   That wire failed about 2500 feet up the bayou. It was the last mooring connection- the starboard breast connection.

Martin personnel did not participate in mooring the **THOR**. Douglas did not request any equipment from Martin to secure the **THOR**. Douglas did not ask Martin for information on the best way to moor the **THOR** there. No Martin personnel were involved in any discussion about how and where to moor.

During the breakaway, the starboard anchor cable broke at the block. (Ex. 16 in globo- pre-incident pictures). Photos shows horns on every Martin bitt other than bits #1-2, which is where **THOR** had a snatch block and mooring line, respectively. (Ex. 12- after the fact pictures). The line on bitt #2 parted but the eye stayed on the bitt. The line on Bitt #4 also parted with the eye remaining on the bitt. Coastal p. 42- the THOR line parted at Bitt #4. Coastal p. 46- the **THOR** line parted with the eye remaining on Bitt #5. There was also a beam that was sawed nearly all the way through.

Douglas did not have anyone monitoring the lines during the storm. He received a phone call in the clerk's office (the clerk was named Dustin Lowe) from someone advising that the stern line broke. Douglas does not know which line broke first.

**THOR**'s line to bitt #7 parted.  The eye remained on bitt #7.
(Ex. 26--**THOR** 1381-1385).  On p. 1382- it says the winch peeled out 2000+ feet.

Q:  The **THOR** did not have the dog set on the starboard side winch—did it? A:  The dog was set. Somehow it disengaged. Q:  Who set the dog-? A:  Don't recall.  The dog has a notch/teeth that sets down on gear and locks in.   Q:  Did the brakes fail? A:  It didn't fail it just wasn't strong enough to hold that barge when the other

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

lines broke.  Q:  After this incident, the dog was still a component of the winch? A:  Yes. Q:  No explanation as to why the dog didn't work/disengaged?  A:  No. Q:  Any work done on it after incident? A:  Nothing wrong with the dog.

The **THOR** has eight (8) anchor winches. All had certificates and were up to date as far as Douglas was aware. The certificates were kept aboard **THOR**. Douglas testified that all of the THOR's equipment was operational prior to Zeta and nothing required repairs. (Douglas page 304-305)

Q:  You did not do a root cause analysis as to the condition of Martin's bits, did you? A:  No.

Q:  Were you aware that the D/B **HEDRON** was nearby and did not breakaway? A: Yes. (Douglas page 432- 433)

Douglas admitted he did not consider putting an anchor on land to secure the barge. He does not believe he could have dropped anchor in the water on the bayou side because they were essentially at a fuel dock and signs in the area warned about existing pipelines and forbid dropping anchor or dredging.  Douglas never asked anyone about dropping anchor as he was comfortable with the mooring system he had, which he said he had used for 10 years without any issues.

Q:  Ever instructed by Shore what to do if the barge broke free? A:  No. (Douglas page 393)

Q: You or anyone there have a Coast Guard license? A:  No. (Douglas page 393)

The lines used to tie up----- nine were nylon and 1 was polypropylene.

Q:  Did any of **THOR**'s winches have repairs done in 2020? A: Yes, all 4 starboard side winches had been refurbished earlier that year.   (Douglas page 446)

Douglas did not know the depth of water at the dock or in the channel. He did not consider ballasting down and getting into the mud because the draft of the THOR was 13 feet and freeboard was 13 feet.  Douglas has filled the ballast tanks before and it still didn't sit down in the mud.  If he had deployed the storm anchor at the dock the anchor would have just sat in the mud— but it would not have grabbed.

Q:  Where did you learn to moor this barge? A:  Training to moor a vessel this size during a hurricane came from previous superintendents, foremen, etc. – hands on training. (Douglas page 494)

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

(Douglas pages 499-501)

Q: How much wind and surge can your mooring plan take and how do you know? A: I don't know.

Q: Don't you think it would have been useful to confer with Cody Simms or someone else – two heads are better than one. A: No. For the predicted weather we were supposed to get (CAT 1) my mooring was more than adequate.

Q: In hindsight what would you have done differently? A: I would have gotten a different tug- one that was competent. Would not have went to Martin's dock.

Q: Would you consider having gone West? A: Yes if I had known it was going to be a CAT 3.

Q: Hurricanes can be unpredictable? A: Rare but yes.

Q: You did not have any training to tell how strong the storm surge was going to be? A: I don't know of any such training.

Q: Would you expect the line to break before the bitt itself? A: Yes.

Q: Would you expect the bitt to break in that storm? A: No.

Q: Did that tell you as Superintendent of **THOR** that the bitt was not functioning as you would expect it to b/c it broke? A: Yes.

Q: If the Crosby tug wasn't going to help you, why would it come back to you after going refuel and restock at its dock? A: No reason.

Inspections of lines on the THOR take place every time they are used. This is done by the barge foreman and leadermen.

Q: Anyone at Shore ever ask you about your mooring plan? A: No.

Q: Your responsibility to make sure JSAs got done? A: Yes. Q: Did you do one to tell crew how to handle hurricane? Or know if anyone else did? A: No I did not.

Q: You are not equipped to perform mooring calculations—force, fuel, cargo, water on barge are all variables? A: Correct.

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

Q: And you're not equipped to do those calculations?  A: Correct. Q: Did you do anything to account for fuel and water taken on? A: No. Q: Was the THOR moored when it took on water and fuel? A: Yes- we made no corrections.

Q: Did not make any mooring changes based on direction of wind?  A: No.

Q: Saw hurricane strength increased dramatically? A: Yes.

Q: Did you make any adjustments once you saw the storm was going to be stronger than you expected? A: No. At a certain point you could no longer modify the mooring arrangement.



Stern wire configuration with improper shackle at bollard creating a pressure point. And shackle on gunnel too small and allowing line to rub on the gunnel. Additionally, the center of lines looks really worn and frayed.

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**



Improper mooring configuration. No spring lines, lines not doubled up as per USCG instructions for approaching hurricane. New lines, stowed below deck, not used.

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

Proper mooring arrangements under normal conditions.



## 6 MV CROSBY ENDEAVOR

It was Douglas' expectation and assumption that the Endeavor was out there pushing against the **THOR.** Douglas did not tell Endeavor's crew to push the **THOR** against the dock because he thought that's what they were there to do. He did not personally hire the Endeavor-- that was done by Shore's shore side management. No one ever expressly told Douglas what the tug was going to do. The authority to hire and release tugs rested with the project manager, Cody Sims.

Q: If they had told you to instruct the Tug you would have? A: Yes. That tug is "my lifeline." Without their propulsion I cannot do anything. I believed the purpose of having him there was to provide assistance. 9Douglas page 198, 538-539)

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

Q:  Do you believe the captain was acting incompetent by letting you sit there without assistance. A:  Yes. Douglas page (200)

Douglas' first conversation with Endeavor after getting into Port:  the **THOR**'s barge foreman talked with Endeavor about when they were to disconnect the tow wire.  While doing so the M/V **LA MADONNA** pushed the **THOR** against the dock. There was no conversation about a mooring plan or asking the Endeavor to be part of the mooring plan. The Endeavor could not see what lines were used to secure **THOR** to the dock. After **THOR** was moored and the M/V **LA MADONNA** pulled away and went to stern, Endeavor requested to go to its dock and pick up supplies and groceries. Douglas told them that was fine. The following morning of 10/28 Endeavor called on the radio and said he was on his way back and asked if there was someone there to catch his line. Douglas told him, yes. Then after lunch when the wind started picking up Douglas and Endeavor discussed the gusts they were getting. As the wind increased Endeavor asked on several occasions "how we were doing/looking" and Douglas replied we looked good.

Q:  Ever asked the Endeavor to assist in any way? A:  No- didn't think I had to was under impression that when he asked how I was doing that he was pushing on me.   I didn't think he was there being dead weight.   ( Douglas page 466)

Q:  Endeavor working "as directed"—true? Had to give instructions for them to do work. A:  Never had to tell a licensed seasoned captain what to do and how to do his job to take some tension off my lines in a CAT 3 hurricane. Never had to tell a tug to push on me. I am required to have an assist tug with me because I have no propulsion—everyone knows that. ( Douglas page 466)

Q:  Never asked him to push or if he was pushing on you? A:  Didn't think I had to ask him as when he asked how I was doing I didn't think he was asking about my lunch.  ( Douglas page 466)

Q:  You were anticipating Endeavor to bring THOR back after storm passed? A:  Yes. I was required to have a tug with me because I have no propulsion.

Q:  Endeavor couldn't see if the **THOR**'s lines were slack or taught?  A:  No.

Q:  Did it occur to you to tell them they need to push harder? A: No. I thought when he asked how we're doing I thought he was pushing against me.   ( Douglas page 468)

Q: The Endeavor had to come back on 10/28 because it had to take THOR back offshore after the storm, correct? A:  Yes. But it also had to be there because I'm

<table>
<tr><td><strong>ALL COAST, LLC</strong><br><strong>Versus</strong><br><strong>SHORE OFFSHORE SERVICES, LLC</strong></td></tr>
</table>

required to have an assist tug during a hurricane because I have no propulsion. Q:  Did you convey that to Endeavor? A:  No. ( Douglas page 470)

Q:  If you learned that the engines were off on the Endeavor, what would you say? A:  I would be lost for words that it would be there without engines running in the storm, for self-preservation if for no other reason. (Douglas page 204)

Douglas never heard Endeavor fire up the engines. Once **THOR** started breaking away from the dock, he called the M/V **Crosby Endeavor** and told him that the **THOR** was breaking away from dock to push him back in. There was a pause. Douglas repeated himself and there was another pause and about a minute after that he saw black smoke come out of the Endeavor's stack. Douglas does not believe the Endeavor was just starting its engines at that time because that would have taken longer than a minute. Rather, he believes the Endeavor was coming out of neutral at that time. However, the M/V Endeavor's Engine Room log only show the main engines running a total of only three (3) hours on October 28, 2020.

Douglas had used the M/V **Crosby Endeavor** before and had no complaints. Douglas was not involved in the decision to hire that specific tug. Douglas knew that Dawn Services was "where we get our tugs from" but could not recall any specific conversations with anyone at Dawn Services.

**THOR** 1044- Oct. 27 Progress Report:   References Endeavor- and its purpose is listed as an anchor tug. Q:  Does your progress report ID Endeavor as an assist tug? A:  No. Q:  You approved the progress report, correct? A:  Yes.

Douglas admits his Coast Guard statement does not reference the M/V **Crosby Endeavor** as assist tug either. He claims he didn't think that needed to be put in the Coast Guard statement.

Testimony from Captain Plaisance and Captain Everett of the M/V ***Crosby Endeavor*** is clear that their vessel was not designed to push a vessel with its bow as the bow is ice classed steel construction and the fenders not designed for head on pushing. Joe Douglas, even though he had numerous conversations with the captain, never indicated he expected him to push on the **THOR** at a ninety-degree angle, like the ***MV LA Madonna*** did when it was docked. Captain Plaisance testified he was basically "hipped" up to the THOR and could, if requested move it forward or aft but not towards the dock. Nor did Captain Plaisance discuss with Mr. Douglas what exactly Mr. Douglas wanted other than "work as directed." It wasn't until the **THOR** broke away that Douglas requested help being pushed back into the dock. This is a prime example of the attitude that was exhibited by all parties in this case. Everyone just assumed the other person(s) knew what to do without verification. Proper communication on all sides was lacking.

-page24-

| ALL COAST, LLC |
| :---: |
| Versus |
| SHORE OFFSHORE SERVICES, LLC |

Onboard the **THOR** was a mooring plan, but it was in Japanese.

What is crystal clear is Joe Douglas lacked the necessary skills and education to properly secure a large derrick barge to the dock in anticipation of an approaching hurricane, Secondly, Shore Offshore Services, LLC failed to give Joe Douglas any guidance whatsoever on this task leaving it solely to his years of experience yet he has never been trained in mooring operations or calculations and they never investigated his training in this area. The head of Shore's HSE has no training or education in mooring either and no one in direct employment of management does either. From Cody Sims to Mr. Gibilterra, their standard answer was Mr. Douglas has experience, so we do not need to train him in critical operations such as mooring the Derrick Barge for heavy weather or when and where to drop the storm anchors. Shore used a contractor, Melancon, as head of HSE and his company Coastal Safety creates the necessary paperwork and safety manuals for Shore to bid jobs with the major oil companies. To be able to bid on work from the majors, a company must meet or exceed the safety standards of that major oil company. Instead of hiring an in-house safety management specialist, Shore elected to hire Coastal Safety and give Mr. Melancon the title of corporate HSE.

Shore relied on Weatherops for marine weather guidance and forecasts yet failed to heed the warnings. Martin Energy dock was straight up Bayou Lafourche where the hurricane surges would be directed and based upon NOAA estimates the surge there was between 5-6'. Stone Oil dock would also have a rise in tide but not the strong surge experienced at Martin 16 because it was offset to the east and surrounded by land with only a small waterway into that area of the port.

If the decision had been made to head west toward Galveston, as Shore did in the first October storm, it is approximately 241 nm distance from SS 259 or at least 48 hours towing time. That means the tow would have had to have gotten under way by October 26th before noon. Based on available data, that was extremely possible as they only had to make the decision to stop work twelve hours earlier. Going west would have taken the THOR out of danger. From October 24th, the forecasted cone of uncertainty included Port Fourchon in the center of that cone. Hurricane tracks are well forecasted today however intensity is still a challenge. While they did not anticipate a Cat 2/3 storm in Port Fourchon, they failed to prepare for one as well. If Shore had taken the **THOR** to Stone Oil  even if she broke away, she would not travel up Bayou Lafourche and strike all the vessels that she did which includes, The M/V **Harvey Seas**, M/V **Sea Cypress**, M/V **Mr. Colby**, Dredge **EW Ellefsen**, M/V **Dominic S**, M/V **Roland A. Falgout** and  M/V **Trent Joseph** which as a result of being struck by the **THOR**, allided with the lift boats **Sting Ray** and **Grouper.**

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

### CROSBY TOWING

Ivy Danos was the offshore operational manager. He reported directly to the CEO Kurt Crosby. He had assistants but no other person with the same authority in charge with him for the offshore division.

Mr. Danos's testimony consisted of "I don't know" or I don't remember for a majority of the deposition.

On page 141 Mr. Danos testified he did not know about any maintenance done on October 27, 2020, on the M/V **Crosby Endeavor** but should have been notified. And on page 144 had he known about it he would have informed his customer, which was Mike Grace with Dawn Services.

On pages 167-168 Mr. Danos testified when asked:

*14 If a tug is tied to a barge and the*
*15 barge is tied to the dock, and the barge*
*16 breaks away from the dock during a hurricane,*
*17 isn't it conceivable that one of the jobs of a*
*18 tug, in this example, could be to push the*
*19 barge back into the dock?*

*Page 168- A- It could.*
*Q Okay. So it is conceivable that*
*7 one of the jobs of the tug would be to push*
*8 the barge back into the dock, right?*
*9 A It depends.*
*10 Q What does it depend on?*
*11 A On which tug it is, with the barge.*
*12 Q Okay, it depends on the type of*
*13 tug?*
*14 A Right.*
*15 Q Is the ENDEAVOR a type of tug that*
*16 could have pushed the THOR into the dock in*
*17 the event of a breakaway?*
*18 A No.*

*Page 171*
*5 Q Okay. So if it was directed by the*
*6 THOR crew to push the THOR back into the dock,*
*7 in the event of a breakaway, it was unfit to*
*8 do that job?*
*9 MR. RUFTY:*
*10 Object to form.*
*11 THE WITNESS:*
*12 It was there to work as*
*13 directed. It wasn't asked to push.*

> ### ALL COAST, LLC
> ### Versus
> ### SHORE OFFSHORE SERVICES, LLC

Page 181
*18 Q Okay. So at the noon phone call,*
*19 which was four hours before the breakaway, you*
*20 had no knowledge of how the ENDEAVOR was tied*
*21 up to the THOR?*
*22 A No.*
*23 Q*

Crosby knew the M/V Crosby Endeavor was an ice classed tug and could not push with its bow on another hull. Neither Crosby management nor the Crosby Captain's relayed that information to the THOR or Dawn Services or Shore. Crosby did have four other available tugs in Port Fourchon that could push on the THOR; The **Crosby Trinity, Crosby Reliant, Crosby Integrity** and **Crosby Guardian**. All four were anchor handling tugs but built without an ice class bow. All four were available.

As is evident in this case, this is another example of people just assuming they know what other parties are expected to do in the face of a hurricane. The fundamental principle of discussing the upcoming tasks, in this case the arrival of Zeta, what is expected of each party and what could/should be done for worst case scenarios, was sorely lacking both from Crosby and Shore.

| ALL COAST, LLC<br>Versus<br>SHORE OFFSHORE SERVICES, LLC |
| :---: |

## <u>CONCLUSIONS</u>

• Shore Offshore Services, LLC failed to properly supervise, train, and guide their superintendent on the **THOR**, Mr. Joe Douglas.

• Shore Offshore Services, LLC should have taken the THOR west towards Galveston to seek refuge from the storm in a timely manner. After deciding on Port Fourchon, Shore picked the wrong dock to go to in Port Fourchon and should have secured the barge at the Stone Oil Dock once they made the decision not to go westward towards Galveston where they did for the hurricane earlier in the month. No one from management even looked to see which was the better dock for the **THOR**.

• Shore made no attempt to investigate, seek guidance or ask for help with Martin dock16 as they had never been there before.

• Shore did not consult their HSE Director for guidance on who to consult with for securing the **THOR** to the mooring bitts at Martin 16 instead chose to rely on Mr. Douglas's experience without really knowing what that was other than he had been a superintendent for many years.

• Mr. Douglas had no concept of what he was doing with the mooring lines configuration. Knowing he was facing a minimum of a Cat one storm, he should have placed out the brand-new mooring lines, all of the same strength and quality, doubled them up as per USCG MSIB 074-20, allowed for slack for the anticipated surge and had proper bow/stern leads, breast lines and spring lines. The wires employed from the bow and stern created mixed moorings which is never recommended. He also testified the dog on the forward winch was engaged which is never recommended for a mooring winch. It might cause the wire to part under strain.

• All operations involving the **THOR** were assigned to Cody Sims when the decision was made to leave offshore and seek a safe port of refuge. Mr. Sims deferred the technical details to Mr. Douglas and testified he was them to support him where and when needed, such as getting a berth, arranging fuel and water, etc. He gave Mr. Douglas no direction on mooring, use of mooring lines and or wires or how to configure the lines as he did not know these things. He did not request and was not sent, prior to the arrival of the storm, any photos of the mooring arrangements as had been produced in this case. Mr. Gibilterra is an engineer, and he did not even try to perform any mooring calculation for the **THOR** at the doc or provide any assistance or advice on mooring the **THOR.**

| ALL COAST, LLC |
| :---: |
| **Versus** |
| **SHORE OFFSHORE SERVICES, LLC** |

- Mr. Douglas just assumed Captains Everett and Plaisance on the M/V Crosby Endeavor knew what they wanted from Mr. Douglas and despite talking with them, never held a formal or informal JSA to discuss what might go wrong and what could be done to plan for it. Had this conversation taken place, Captains Everett and Plaisance would have told him you needed assist tugs if you expected us to push you into the dock because we cannot do that. Then Mr. Sims should have been notified Dawn Services to provide two assist tugs as needed. There were assist tugs available if needed in Port Fourchon.

- Captain Plaisance and Captain Everett also failed to communicate with Mr. Douglas the limitations of the M/V **Crosby Endeavor** regarding bow pushing and in theory, this should have taken place when they held a JSA or informal meeting to discuss the arrival of Zeta.

- Crosby failed to determine if the M/V Crosby Endeavor was capable of holding the **THOR** at the Martin dock in the event of a breakaway. Crosby also failed to direct the assist tugs, which were available at their Fourchon dock, to help with the **THOR**.

- The shoreside management of Shore failed to communicate with Crosby shoreside management or Dawn Services management and vice versa, so that there was no agreement or understanding on why the M/V **Crosby Endeavor** was there and what it was supposed to do nor was there any effort made to make sure the M/V **Crosby Endeavor** could actually do what the Thor wanted them to do.

- Martin Energy did not install the bollards/bitts at their dock. The Greater Port Fourchon Port Commission installed the bollards/bitts years before Martin leased the facility. Martin is responsible for maintenance on those bollards as per the testimony of the Martin Corporate representative, Martine's Hurricane Plan did not allow for any vessel to remain at its docks during a storm. Yet Martin allowed the **THOR** to remain at its dock to ride out Zeta.

- Joe Douglas did not use all the mooring bitts available, and he only used 8 out of 10 with old lines, mixed lines and wires. There is no record that I reviewed that details the age of the mooring lines which should be part of the safety operations manual. The wires were approaching the point where they needed to be end for ended (reversed) which usually is five years with normal usage.

- None of the vessels that sustained damage as a result of the **THOR** breakaway were responsible for their damage. The actions/inactions of the Shore

---

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

---

interests and Crosby interests resulted in, among other things, damage to the identified or listed vessels.

• My review of the USCG 2692 (Bates GLO-222-3) for the M/V **_Mr. Colby_** shows that the vessel was properly located at the dolphins across from C-Port 1 and had adequate mooring lines out for the storm.

• Shore did not believe the damage done by the **THOR** was in excess $75,000, even five days after the incident. Shore did not conduct an incident investigation as they placed all the blame on Martin and Crosby. They ignored their own safety manual in not doing so.

• Shore should have known Mr. Douglas had no training (they didn't train him and never investigated his background properly) in mooring the **THOR** for a storm. All their answers are we relied on Mr Douglas and Mr. Sims, and neither had the experience of qualification to moor a derrick barge for a hurricane. Neither Mr. Sims nor Mr. Gibilterra asked Mr. Melancon for a recommendation for a qualified expert to inspect the mooring arrangements and make recommendations once they knew they were going to Port Fourchon. This should have been done immediately after the decision was made to come to Port Fourchon. Any expert in mooring would have opted for the Stone Oil dock over Martin Energy dock.

• Shore knew or should have known Joe Douglas had no mooring training. They didn't know because they didn't ask. When planning for a hurricane, there always is a "what if" scenario and proper planning accounts for that. In this case, it appears as if Mr. Gibilterra and Mr. Sims left to their senior man on the THOR, Joe Douglas to figure it out by himself and he was not qualified to do so. And their hurricane Plan was lacking in sufficiency regarding the mooring of the THIR for a storm.

• Shore's failure to properly plan for the hurricane, properly moor the THOR, improperly utilization of mooring lines and wires and failure to conduct basic planning with their assigned tug, led to the breakaway during the height of the storm.

• Prior to the storm, Shore should have identified which Gulf coast ports/docks were available for its barges, including the **THOR.**

**ALL COAST, LLC**
**Versus**
**SHORE OFFSHORE SERVICES, LLC**

The undersigned intends to or may use part of, or all the photographs/videos introduced by any party.

The undersigned intends to or may use any part of, or all photographs of the barge displayed on ELMO or overhead projector.

The opinions expressed here are those of Captain Ronald L. Campana. I reserve the right to modify my opinions should additional information be made available to me.

_____
Captain Ronald L. Campana