UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ALL COAST, LLC | * | CIVIL ACTION NO. 21-258 Lead Case, |
| | * | c/w 21-337, 21-464, 21-822, 21-1968, |
| | * | 21-1969, 21-1981, 21-1982, 21-2075 |
| | * | and 21-2227 |
| | * | |
| VERSUS | * | JUDGE JAY C. ZAINEY |
| | * | |
| SHORE OFFSHORE SERVICES, LLC; | * | MAGISTRATE JUDGE KAREN |
| MODERN AMERICAN RAILROAD | * | WELLS ROBY |
| SERVICES, L.L.C.; and MARTIN | * | |
| ENERGY SERVICES, LLC | * | Applies to: All Cases |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**DAWN SERVICES, L.L.C.'S MEMORANDUM IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON
BREACH OF CONTRACT AND CONTRACTUAL INDEMNITY CLAIMS**

Dawn Services, L.L.C. ("Dawn") moves for partial summary judgment dismissing with prejudice the breach of contract and contractual indemnity claims asserted against it by Modern American Railroad Services, L.L.C. ("MARS") and Shore Offshore Services, LLC ("Shore").[1] *See* 21-cv-1969, R. Doc. 1. The contractual claims are based on the mistaken premise that a Master Vessel Time Charter (hereafter the "Charter") entered into by and between Dawn and Shore on June 9, 2017 (R. Doc. 1, p. 4) governed the anchor handling tug ("AHT") CROSBY ENDEAVOR's replacement of MARS' AHT TITAN on the derrick barge THOR's platform decommissioning work prior to Hurricane Zeta. However, the work at issue was not performed under the Charter, and Dawn did not breach any contract with Shore. As such, this motion should be granted, and Shore's breach of contract and indemnity claims against Dawn should be dismissed.

---

[1] Dawn has filed a separate motion for summary judgment in the consolidated cases regarding its tort liability and adopts and incorporates that motion here by reference. As such, this motion focuses solely on the breach of contract and contractual indemnity claims asserted against Dawn.

## I.     Legal Standard.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits show that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Partial summary judgment dismissing only certain claims is appropriate under the same standards. *Foster Wheeler Energy Corp. v. M/V An Ning Jiang*, No. 00-3677, 2002 WL 31207362, at *2 (E.D. La. Sept. 30, 2002) (citing Fed.R.Civ.P. 56(d)). Further, questions of law are amenable to resolution on summary judgment. *Id*. The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

If the non-moving party has the burden of proof at trial on the dispositive issue, the moving party can succeed if they simply point out "that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim." *Adriatic Marine, LLC v. Harrington*, 446 F. Supp. 3d 126, 135 (5th Cir. 2020). The burden then shifts to the non-moving party, who must go beyond the pleadings to designate "specific facts" showing a genuine issue for trial. *Id.* The non-moving party's burden is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations

omitted). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.*

While courts generally refrain from making credibility determinations or weighing evidence when considering a summary judgment motion, the Fifth Circuit has specifically recognized: "When deciding a motion for summary judgment prior to a bench trial, the district court has limited discretion to decide that the same evidence presented to him or her as a trier of fact in a plenary trial could not possibly lead to a different result." *Adriatic Marine*, 446 F. Supp. 3d at 135 (quoting *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991)).

## II.     The Charter.

Dawn operates a fleet of vessels which are owned by Dawn affiliates, operated by Dawn, and crewed by Dawn employees that it charters out to customers. Separately, Dawn acts as a middleman and broker for vessels which it neither owns, operates, nor crews. When acting as a broker, Dawn charges a fee to connect other vessel owners/operators with customers who want to charter their vessels. On June 9, 2017, Dawn and Shore entered into the Charter to govern Dawn's provision of its operated vessels to Shore.[2] The Charter expressly limits its application to the "operator" side of Dawn's business. The preambles of the Charter begin by stating "CHARTERER has (a) vessel(s) which, from time to time, it commits to the service of others in exchange for a fee (the 'Vessel')". Dawn's Mike Grace was asked about this "CHARTERER has a vessel" language during Dawn's corporate deposition, and he explained it meant the contract only applied to vessels operated by Dawn:

---

[2] The Charter is attached hereto as Exhibit 1.

3

> Q. And what I'll do is I'll follow up on the testimony that you just said about the owner having the vessel. Tell me what you meant by that. What does it mean when Dawn Services, LLC, has a vessel?
>
> A. When we have a vessel, we control it. We operate it. We employ the crews. We provide the insurance.

Grace Depo. 186:13-20.[3] Consistent with this interpretation, Paragraph 3.a. of the Charter (mis-numbered "1.a.") states "OWNER has the right to possess and charter the Vessel to CHARTERER…". While vessels operated by Dawn plainly fall within this description, brokered vessels do not because Dawn neither "possesses" them nor does Dawn have a right to charter them out.

If the foregoing language were not clear enough, Paragraph 4(c) expressly requires Dawn to be the actual operator of a "Vessel" subject to the Charter:

> …the entire operation, navigation, management, control, performance and use of the Vessel shall be under the sole and exclusive command of, and be actually accomplished by, [Dawn]…the master and crew of the Vessel, as employees of [Dawn], shall be and shall remain in full charge and control of such Vessel at all times.

Paragraph 12 contains similar requirements: "The operation, navigation and management of the Vessel shall be under the exclusive control and command of [Dawn] and its employees." Finally, Paragraph 13 expressly prohibits Dawn from "subchartering" other company's vessels to work under the Charter.[4]

---

[3] *See* the May 24, 2023 deposition of Michael Grace, Vice President of Operations at Dawn, at p. 186, excerpts of which are attached hereto as Exhibit 2.

[4] Consistent with this prohibition, "contractors and subcontractors" of Dawn are not members of "Owner [Dawn's] Group," while Shore's "contractors and subcontractors" are members of "Charterer [Shore] Group" because while Shore is permitted to have contractors and subcontractors, Dawn is not. *See* Charter, Paragraph 11.

These express contractual requirements are completely inconsistent with the MARS and Shore theory that the Charter applied to CROSBY ENDEAVOR's work for Shore. As explained in Dawn's motion for summary judgment on tort theories of liability, after MARS' AHT TITAN broke down, Crosby[5] identified the CROSBY ENDEAVOR as being a comparable tug to the TITAN and therefore considered it would be acceptable to Shore.[6] Then, Shore considered the issue and accepted the CROSBY ENDEAVOR.[7] It is undisputed that the CROSBY ENDEAVOR was not owned, operated, controlled or crewed by Dawn.[8] Comparing these facts with the plain language of the Charter, the Charter could not possibly apply to Shore's use of CROSBY ENDEAVOR.

Crosby's 30(b)(6) representative testified loudly and clearly – and against Crosby's own interest – that Dawn was merely a broker with respect to the CROSBY ENDEAVOR:

---

[5] The CROSBY ENDEAVOR was owned by Crosby Marine Transportation, LLC and operated by Crosby. *See* November 2, 2023, 30(b)(6) deposition of Crosby, excerpts of which are attached hereto as Exhibit 3, at pp. 19-20.

[6] *See* the July 11, 2024 deposition of Ivy Danos, Offshore Operations Manager at Crosby, excerpts of which are attached hereto as Exhibit 4, at pp. 60-61. (Q: I want to talk to you about, in October 2020, what your understanding is of how the ENDEAVOR was called out to the field to work with the THOR offshore. What is your understanding of how that came about? A: Mr. Mike Grace called looking for a tug to go to work with the THOR. . . Q: Did he ask for the ENDEAVOR specifically, by name, or just for a tug? A: For a tug. Q: How did it come that the ENDEAVOR was chosen for the job? A: Mr. Kurt. Q: Kurt Crosby, the CEO? A: Yes, sir. Q: He picked the ENDEAVOR for the job? A: Yes.); *Id.* at 61-64. (Q: Did you know the size of it, its displacement, its tonnage? Did you know any of that when the ENDEAVOR was selected to be the tug to go offshore to work with the THOR? A: When I talked to Mr. Crosby, he – we looked at it. Q: You went online and looked at it? A: Yeah. . . . Q: Okay. Someone at Crosby – you're saying, the CEO went and verified that that was a suitable tug for the THOR? A: Yes.).

[7] *See* the November 8, 2023 deposition of Cody Sims, Director of Projects at Shore, excerpts of which are attached hereto as Exhibit 5, at p. 249. (A: I had asked for a comparable replacement tug to the TITAN. Q: And would you agree that the Crosby ENDEAVOR is a comparable tug for – to the TITAN? A: Yes.).

[8] *See* 30(b)(6) deposition of Crosby, at pp. 461-462, 473.

```
 4           Who was Crosby's customer in
 5   connection with the work that was being done
 6   by the ENDEAVOR and for the THOR, in October
 7   of 2020?
 8       A   Like I said, I stated earlier, we
 9   thought of Shore as our customer.
10       Q   And what was Dawn's relationship
11   with Crosby in connection with the ENDEAVOR
12   and the THOR?
13       A   The broker.
14       Q   Did Crosby ever charter the
15   ENDEAVOR to Dawn?
16           MR. RUFTY:
17               Object to form.
18           THE WITNESS:
19               Did we ever charter it?  No.
```

Simply stated, Dawn did not—and could not—charter a vessel to Shore which it neither owned, controlled, nor chartered itself.

Dawn anticipates Shore will argue that the Charter applied to the CROSBY ENDEAVOR because of the manner in which Dawn collected its brokerage fee. Dawn invoiced Shore for hire, collected hire, deducted Dawn's brokerage fee, and then paid Crosby.[9] While Shore may argue this payment chain is evidence Dawn chartered the vessel in and then chartered it out to Shore, the documents again undermine Shore's arguments. Dawn's "On / Off Hire" letters, which were sent to Shore in connection with the CROSBY ENDEAVOR,

---

[9] As explained in the discussion below, this payment structure is consistent with brokerage, and does not convert Dawn's role into that of a time charterer. *See Oceaneering Int'l, Inc. v. Black Towing Inc.*, 491 So. 2d 1, 5 (La. 1986) ("Black billed Oceaneering for the MISS SHELLY at a price higher than it billed for its own vessels. The difference in prices was the brokerage fee charged by Black. The fact that Black received the payments for itself and Cheramie is not material to the issue of whether the time charter written by Oceaneering can be stretched to include a vessel not owned by Black Towing.").

6

state the relevant commercial and operational details for the vessel and contain an express disclaimer that Shore must have its own agreement with the "vessel owner":

> Subject: 3.25 fuel, availability, and a mutual agreement between vessel owner and Shore Offshore Services, LLC. Prices quoted do not include agent / custom fees; pilot fees; port / harbor fees; canal fees; assist tugs; taxes; dues; duties; permits; safe berths; watchman; on or off charter surveys; subsistence for customer representative; barge ballasting; weather report during trip; trip and tow survey; line handlers; special tow gear; special fendering including installations, emergency tow wires; weather deviation; or any other charges incurred by the tug or barge.

*See* Dawn 000379 & 000383, attached hereto as Exhibit 6. Moreover, Shore's anticipated argument that Dawn was chartering in the Crosby vessel and then chartering it out to Shore would violate the express prohibition on Dawn subchartering contained in Paragraph 13 of the Charter.

The plain language of the Charter limits its application to vessels operated by Dawn and crewed by Dawn employees. The CROSBY ENDEAVOR was neither operated by Dawn[10] or crewed with Dawn employees.[11] The Charter simply does not apply.

Confirming the obvious, Shore's Chief Operating Officer (Tommy Gibilterra, who previously served as Shore's Director of Projects in 2020) testified that the Charter "does not come into play" when Dawn brokers, as opposed to charters, a vessel.[12] It is therefore understandable why Shore so desperately wants to frame Dawn as a charterer rather than a broker in this litigation. Shore's litigation position, however, is belied by Gibilterra's contemporaneous correspondence. Gibilterra testified that he sent an email on January 18, 2021, less than three months after the CROSBY ENDEAVOR went to work with the THOR,

---

[10] *See* Crosby 30(b)(6) deposition at p. 462.

[11] *See* Crosby 30(b)(6) deposition at pp. 461-462.

[12] *See* the October 3, 2023 deposition of Thomas Gibilterra, Director of Operations at Shore, excerpts of which are attached hereto as Exhibit 7 at p. 290.

saying "we [Shore] broker most of our tugs through Dawn Services."[13] Gibilterra went on to provide further color to his email:

```
 2      Q.   So in this situation, Tristen Plaisance
 3   wanted to provide the same service to you that
 4   Crosby was providing, an anchor-handling tug,
 5   correct?
 6      A.   He said, yes, we have experience with
 7   that. That's what he wanted to provide.
 8      Q.   And you said, "hey, we broker vessels
 9   through Dawn, talk to them?"
10           MR. GUILLOT:  Asked and answered.
11           THE WITNESS:  That's what it says, yes.
12   EXAMINATION BY MR. REISMAN:
13      Q.   And you wrote that?
14           MR. GUILLOT:  Asked and answered.
15           THE WITNESS:  Yes.
```
[14]

Dawn's position with respect to its status as a broker and the inapplicability of the Charter is based on (i) the plain language of the Charter, (ii) the acknowledgement – against its interest – by Crosby that Dawn was merely a broker, and (iii) the admissions of Shore's Chief Operating Officer.

The Louisiana Supreme Court dealt with an almost identical situation in *Oceaneering Int'l, Inc. v. Black Towing Inc.*, 491 So. 2d 1, 1 (La. 1986). In that case, Oceaneering International, Inc. ("Oceaneering") had a standing time charter with Black Towing, Inc. ("Black"). *Id*. at 1-2. Like Dawn, Black operated and crewed its own fleet of vessels. *Id*. Also like Dawn, "Black was also a broker of vessels it did not own." *Id*.

Black provided two of its own vessels to Oceaneering under the time charter and then Oceaneering asked for a third vessel, a shallow water tug. *Id*. at 2.

---

[13] *See* deposition of Thomas Gibilterra at p. 326.

[14] *See* deposition of Thomas Gibilterra at p. 328.

> Black did not have one of its owned and operated vessels which fit Oceaneering's specifications available at that time, and accordingly advised Oceaneering it could not fill the request from its own fleet. Oceaneering nevertheless requested Black obtain a tug. Representatives of Oceaneering [similar to Shore's Chief Operating Officer Tommy Gibilterra] testified the firm was aware that Black was both a broker for boats it did not own as well as a supplier of boats it owned and operated.

*Id*. Like Dawn, to meet its customer's needs:

> Black contacted Cheramie Towing Corporation which chartered and operated a shallow-water tugboat, the M/V MISS SHELLY, which fit Oceaneering's specifications for the Transco work. Cheramie agreed to send the MISS SHELLY to the Transco construction site. There is no dispute that the MISS SHELLY worked under Oceaneering's directions, but with a captain and crew provided by Cheramie. At no time did the MISS SHELLY operate with a crew or captain provided by Black, nor did Black supervise the work performed by the MISS SHELLY.

*Id*. Cheramie Towing's vessel MISS SHELLY allided with a pipeline while working at the construction site. Oceaneering paid for the damage and then sued Cheramie Towing and Black.

In litigation, Oceaneering claimed Black provided the MISS SHELLY under the time charter, and therefore its terms and conditions should apply. *Id*. at 2. However, in a detailed opinion, the Louisiana Supreme Court rejected this argument and held that Black arranged the MISS SHELLY as a broker, and the work was not performed under the time charter. The Supreme Court based its decision on many facts identical to the undisputed facts which exist between Dawn and Shore. For instance:

> All the provisions of the charter presume the vessels will be owned by Black; Black will insure the vessels, verify it has insurance on its vessels, and then man the vessels with its own personnel who will provide the services of the boat to the charterer while maintaining possession and management of the vessel. The charter clearly identifies Black as "Owner" in all references. That is, all the vessels which Black is to provide under

9

> the charter are to be owned by Black. Oceaneering is clearly identified as the charterer. The only way to read the contract to make sense of its own definitions is to presume Black owns the vessels covered by the charter which are to be hired by Oceaneering for the Transco pipeline job. There are no references to boats not owned by Black, or to boats simply chartered by Black, or to Black's role as a broker of non-owned vessels.
>
> A reading of the time charter's other provisions reinforces the position that the only vessel or vessels contemplated by the contract are those which Black owned and operated. The contract requires Black to provide the vessel's captain and crew at its sole cost and expense. Cheramie provided the captain and crew for the MISS SHELLY. The charter required Black, the owner, to operate, navigate, victual and supply "each vessel." The MISS SHELLY was not manned by Black or under Black's control. The charter further required: "The entire operation, navigation, management, control, performance and use of the vessel shall be under the sole and exclusive command of, and be actually accomplished by Owner." (Emphasis ours.) Sole command of the MISS SHELLY rested with the captain provided by Cheramie. These facts surrounding the ownership, operation and management of the MISS SHELLY are not in serious dispute.

*Id*. at 3-4.

Faced with the unambiguous contract terms regarding the time charter's scope, and the facts regarding MISS SHELLY, the Louisiana Supreme Court determined the time charter did not apply to Black's work relating to the MISS SHELLY. In doing so, the court expressly rejected Oceaneering's argument that Black time-chartered MISS SHELLY from Cheramie Towing and then subchartered it to Oceaneering:

> Oceaneering maintains the MISS SHELLY was obtained by Black, and therefore it is covered by the time charter. Plaintiff-respondent characterizes the Cheramie vessel as a sub-charter to Black's charter with Oceaneering. … A time charter does not cover non-owned and non-operated vessels. The MISS SHELLY was neither owned, operated or manned by Black, therefore it does not fall within the Time Charter Party which Oceaneering wrote and entered.

*Id*. at 4.

10

In this case, the Dawn-Shore contract is titled a "Master Vessel Time Charter," like the time charter in *Oceaneering*. And like the *Oceaneering* time charter, Paragraphs 4(c) and 12 of the Dawn-Shore Charter expressly require Dawn to assume "sole and exclusive command" of the vessel at issue, including its "operation, navigation and management". These paragraphs also require Dawn to employ the crew. Additionally, Paragraph 13 of the Dawn-Shore Charter includes an express prohibition on subchartering. The CROSBY ENDEAVOR (like the MISS SHELLY in *Oceaneering*) was <u>not</u> under the "sole and exclusive command" of Dawn, nor did Dawn employ its crew. As held by the Louisiana Supreme Court, under these facts, the Charter does not apply.

This case and *Oceaneering* are distinguishable from cases rejecting a "broker" defense to application of a charter such as *Ray v. Glob. Indus., Ltd.*, No. 04 CV 0816, 2006 WL 305964, at *1 (W.D. La. Feb. 8, 2006) and *Poole v. Elevating Boats, L.L.C.*, 2006-0890 (La. App. 4 Cir. 4/4/07), 956 So. 2d 675, 676, writ denied, 2007-0899 (La. 6/1/07), 957 So. 2d 183, where the "broker" chartered the vessel from the actual owner under a time charter. Such cases are the opposite of this case and *Oceaneering*. In both *Ray* and *Poole*, the purported broker had time charters with vessel owners which were the only way the vessel owners would provide the broker/charterer with access to their vessels.[15] *Ray* at *2 ("However, Mr. Gros admits in his deposition testimony that in order for the company to have access to Global vessels, it had to have the Charter Agreement in place."); *Poole*, 956 So. 2d at 678 ("Furthermore, without the execution of this charter agreement, neither Gulf Tran nor Dynamic would have access to the vessels belonging to Elevating Boats."). And as such, the brokers/charterers arguments

---

[15] While the court noted the parties in *Poole* had also executed a brokerage agreement, the court determined the brokerage agreement was superseded and "nullified" by the express terms of the later-executed time charter. *Poole*, 956 So. 2d at 678.

11

that the charters did not apply would result in the charters having no effect at all—a conclusion disfavored by canons of contractual interpretation. *Ray* at *2 ("To accept Kevin Gros Consulting'[s] argument, would cause the Charter Agreement to have no effect at all.").

Similarly, there is no indication in *Ray* that the vessel owner knew the charterer at issue also acted as a broker in addition to chartering-in vessels, and in *Poole*, the parties had expressly superseded and nullified a prior brokerage agreement when they executed the time charter. *Poole*, 956 So. 2d at 678. Conversely in this case and *Oceaneering*, the customer at issue (Shore and Oceaneering, respectively) knew its counterparty (Dawn and Black, respectively) operated two lines of business—(i) chartering-out vessels it crewed and operated, and (ii) brokering. As such, in this case, concluding that brokering vessels operated and crewed by other companies is not covered by the time charter does not render the time charter without effect. In both the instant case and *Oceaneering*, the time charter is still effective for those instances where (as specifically required by the charters' terms) the vessel at issue is crewed and under the sole and exclusive command of Dawn and Black, respectively.

Finally, the courts' decisions in *Ray* and *Poole* turned heavily on the fact that the brokers/charterers only had access to the vessels pursuant to a charter from their respective owners. In the instant case, however, it undisputed that the CROSBY ENDEAVOR was *not* chartered to Dawn[16] and there was no prohibition against the CROSBY ENDEAVOR being brokered to Shore.

There is no legal basis to deviate from the Louisiana Supreme Court's precedent in this remarkably factually similar case. This motion should be granted.

---

[16] Crosby 30(b)(6) deposition at p. 461.

### III. Dawn did not breach any contractual obligations, express or implied.

At Shore's request, Dawn agreed to help find an anchor handling tug to replace the TITAN. However, Dawn did not retain any decision-making control over which vessel would be assigned for the work. For instance, Dawn initially suggested two tugs owned and operated by Louisiana International Marine, but Shore's Director of Projects, Cody Sims, expressed concern because they were not comparable to the TITAN.[17] After Shore rejected the first replacement option, Sims instructed Dawn that he wanted "a comparable replacement tug to the TITAN."[18] Dawn's Mike Grace connected personnel from Shore and Crosby directly so that Shore could decide which available Crosby tug would be acceptable.[19] At no point did either company ask Dawn's thoughts on the CROSBY ENDEAVOR, nor did Dawn make any representations about the vessel's capabilities or "fit" for the decommissioning project or any other services. Shore's Director of Projects confirmed that the CROSBY ENDEAVOR fulfilled his request:

---

[17] Exhibit 5, Sims deposition at p. 242-43. (Q: Was that the LA MADONNA and the LA ELITE? A: I believe that was the names, yes, sir. Q: And – and what did you say when – when Mike Grace told you that those were the tugs that were going to be out there? A: Well, I think in the text, off the top of my head, he said the tugs aren't suitable for running anchors and he – and I asked him why would he send us a tug that's not suitable to work with the THOR. Q: So you were expressing concern about the tugs that had been selected? A: Yeah. Because he told me it wasn't suitable to run anchors. Q: And so when you expressed concern, what happened? A: He said it's temporary. Q: Okay. And then was another tug sent out there? A: The ENDEAVOR was eventually sent out there. I don't know the time lag between that text message and when it came out.).

[18] Exhibit 5, Sims deposition at p. 249.

[19] Exhibit 2, Grace deposition at p. 272. (A: Shore – Shore's vessel, the MARS TITAN, wasn't coming back to work, and Shore wanted a vessel similar in size to the Titan, so I had reached out to Crosby about Shore's request, about using – of they had a vessel available, would they be interested in going to work for Shore. And so, at some point, Kurt Crosby, reached out to Tommy Gibilterra to discuss everything, and Tommy called me and said Crosby is going to send out the ENDEAVOR, and so that's how it all got started.).

13

```
 3        Q.   And you would ask for something
 4   bigger to come out there and work with the THOR,
 5   didn't you?
 6        A.   I had asked for a comparable
 7   replacement tug to the TITAN.
 8        Q.   And would you agree that the Crosby
 9   ENDEAVOR is a comparable replacement tug for --
10   to the TITAN?
11        A.   Yes.
```
[20]

In fact, Crosby and Shore were correct that CROSBY ENDEAVOR was suitable for the decommissioning project because it is bigger and more powerful than the TITAN that Shore performed the work with prior to hiring the Crosby tug.[21] Indeed, Shore had no complaints about the Crosby tug and her crew while she was performing the work for which she was hired. It was only after the hurricane and the THOR's breakaway that Shore raised an issue with respect to Dawn's involvement with the tug assigned to work with the THOR. However, all that was asked of Dawn was to identify tugs that were available for hire so Shore could determine whether it wanted to hire them to replace the TITAN. Thereafter the decision of which vessel to hire was entirely within Shore's control.

Dawn brokered two harbor assist tugs to Shore to accompany the THOR into Port Fourchon. One of those tugs stood by with another Shore barge during the hurricane. But instead of using the other tug to assist in holding the THOR on the dock during the hurricane, Shore released that tug before the storm arrived. *See* deposition of Shore's Director of Operations, Thomas Gibilterra, excerpts of which are attached hereto as Exhibit 7, at p. 382. *See also* deposition of Cody Sims at pp. 340-341.

---

[20] Exhibit 5, Sims deposition at p. 249.

[21] Exhibit 5, Sims deposition at pp. 248-249. (Q: Would you agree that the ENDEAVOR was a bigger and more powerful tug that the TITAN? A: Yes.).

Therefore, as explained above and in Dawn's Motion for Partial Summary Judgment on tort theories of liability (R. Doc. 784) which is adopted and incorporated herein by reference, Dawn did not breach any contractual obligation owed to Shore in acting as its vessel broker.

## IV.  Conclusion

Dawn's position with respect to the Charter is simple.

- The plain language of the Charter reveals that it did not and could not apply to a situation where the vessel at issue was owned, operated, and crewed by a third party.
- Crosby admitted that Dawn did not own, operate, or crew the CROSBY ENDEAVOR.
- Shore's Chief Operating Officer confirmed that the Charter does not apply when Dawn is acting as a broker.
- Crosby admitted that Dawn was merely serving as a broker for the CROSBY ENDEAVOR.
- Shore's Chief Operating Officer contemporaneously admitted Dawn brokers tugs such as the CROSBY ENDEAVOR to Shore.
- The Charter is therefore inapplicable in this case.

Dawn's position with respect to its obligations as a broker is equally simple.

- Dawn was asked to provide a tug "comparable" to the MARS TITAN.
- Shore's Director of Projects admitted, and it is undisputed that the CROSBY ENDEAVOR was comparable to the MARS TITAN.
- Dawn fulfilled its obligations as a broker.

For the foregoing reasons, and as set forth in *Oceaneering Int'l, Inc. v. Black Towing Inc.*, 491 So. 2d 1, 4 (La. 1986), Dawn's Motion for Partial Summary Judgment should be

15

granted and Shore's breach of contract and contractual indemnity claims should be dismissed with prejudice.

                Respectfully submitted,

                */s/ David L. Reisman*
                David L. Reisman, T.A. (Bar #21833)
                Raymond T. Waid (Bar #31351)
                Lance Bullock (Bar #38519)
                LISKOW & LEWIS
                701 Poydras Street, Suite 5000
                New Orleans, Louisiana 70139-5099
                Telephone: (504) 581-7979
                dreisman@liskow.com
                rwaid@liskow.com
                lbullock@liskow.com

                ***Attorneys for Dawn Services, L.L.C.***