UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALL COAST LLC | CIVIL ACTION NO. 21-258 Lead Case, c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982 and 21-2075 |
| VERSUS | |
| SHORE OFFSHORE SERVICES, LLC; MODERN AMERICAN RAILROAD SERVICES, LLC; AND MARTIN ENERGY SERVICE LLC | JUDGE JAY C. ZAINEY |
| | MAGISTRATE JUDGE KAREN WELLS ROBY |
| | APPLIES TO ALL CASES |

    VIDEOTAPED AND VIDEOCONFERENCE DEPOSITION OF CODY D. SIMS, 32503 Tamina Road, Building B-1, Magnolia, Texas 77354, taken at PUSATERI, JOHNSON, GUILLOT & GREENBAUM, 1100 POYDRAS STREET, SUITE 2250, NEW ORLEANS, LOUISIANA 70163, in the above-entitled cause on the 8th of November, 2023, commencing at 9:35 a.m.

REPORTED BY: CHÉRIE E. WHITE
            CCR (LA), CSR (TX), CSR (MS), RPR
            CERTIFIED COURT REPORTER

**EXHIBIT 5**



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1          Q.    Okay.  And what did you see?
 2          A.    That Dawn sent out a tug as a
 3    temporary tug during that time.
 4          Q.    Was that the LA MADONNA and the
 5    LA ELITE?
 6          A.    I believe that was the names, yes,
 7    sir.
 8          Q.    And -- and what did you say when --
 9    when Mike Grace told you that those were the tugs
10    that were going to be out there?
11          A.    Well, I think in the text, off the
12    top of my head, he said the tugs aren't suitable
13    for running the anchors and he -- and I asked him
14    why would he send us a tug that's not suitable to
15    work with the THOR.
16          Q.    So you were expressing concern about
17    the tugs that had been selected?
18          A.    Yeah.  Because he told me it wasn't
19    suitable to run anchors.
20          Q.    And so when you expressed concern,
21    what happened?
22          A.    He said it's temporary.
23          Q.    Okay.  And then was another tug sent
24    out there?
25          A.    The ENDEAVOR was eventually sent out
```



```
 1   there.  I don't know the time lag between that
 2   text message and when it came out.
 3         Q.    And did you express any concerns
 4   about the ENDEAVOR?
 5         A.    No, because he said that this is a
 6   suitable tug and is capable of supporting the
 7   THOR.
 8         Q.    He told you that?  Those are the
 9   words he used?
10         A.    Along those lines, yes.
11         Q.    Well, I'm not asking along the
12   lines.  I'd like to know what the words were that
13   he used.
14         A.    I mean, I can't tell you verbatim,
15   but he said it was a suitable tug for the THOR.
16         Q.    And what did you do, as the director
17   of operations for Shore, to investigate the
18   Crosby ENDEAVOR's specifications?
19         A.    Nothing.  I relied on Dawn to
20   provide the tug.
21         Q.    Okay. Did you get on the Crosby
22   website and look up the specs on the -- on the
23   Crosby ENDEAVOR?
24         MR. GUILLOT:
25              Objection.  Asked and answered.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1   many brake horsepower was it?
 2          A.    7,200.
 3          Q.    And what was the horsepower?
 4          A.    It's a 15,000 HP class tug.
 5          Q.    All right.  Now, let's take a look
 6   at the TITAN.  You see the TITAN spec sheet in
 7   front of you now?
 8          A.    Not yet.  There it goes.  Okay.
 9          Q.    Does it show the bollard pull?
10          A.    Yes, sir.
11          Q.    What is it?
12          A.    77.5.
13          Q.    Is that more or less than the
14   ENDEAVOR?
15          A.    That would be less than 102.
16          Q.    And does it show the brake
17   horsepower?
18          A.    Yes, sir.
19          Q.    How many?
20          A.    6,000.
21          Q.    Is that more or less than the
22   ENDEAVOR?
23          A.    Less.
24          Q.    Would you agree that the ENDEAVOR
25   was a bigger and more powerful tug than the
```



```
 1   TITAN?
 2          A.   Yes.
 3          Q.   And you would ask for something
 4   bigger to come out there and work with the THOR,
 5   didn't you?
 6          A.   I had asked for a comparable
 7   replacement tug to the TITAN.
 8          Q.   And would you agree that the Crosby
 9   ENDEAVOR is a comparable replacement tug for --
10   to the TITAN?
11          A.   Yes.
12          Q.   We saw earlier some e-mails that
13   included your DPRs.  You recall seeing those?
14          A.   Yes, sir.
15          Q.   The DPRs are what tell you what's
16   going on on your offshore vessels on any given
17   day, correct?
18          A.   The narrative section does, yes.
19          Q.   Was Dawn Services included on your
20   DPRs; did they receive copies of your DPRs?
21          A.   What do you mean "included"?  Did
22   they receive copies; is that what you're asking?
23          Q.   Did they receive copies of your --
24   of your DPRs?
25          A.   I don't believe so, no.
```

```
 1        Q.   And there were assist tugs involved
 2   in helping to get it in, correct?
 3        A.   Correct.
 4        Q.   You generally refer to those as tail
 5   tugs?
 6        A.   Correct.
 7        Q.   Okay.  Do you know which vessels
 8   those were?
 9        A.   I do not.
10        Q.   Do you know that those were the
11   LA MADONNA and the LA ELITE?
12        A.   If that's what the record shows,
13   then yeah.  I don't recall what they were, their
14   names.
15        Q.   But in any event, you were aware
16   that there were two assist tugs or tail tugs that
17   were made up to the stern of the THOR as it came
18   into Fourchon?
19        A.   I couldn't tell you how they were
20   made up, but I could tell you there were two
21   assist tugs to help.
22        Q.   Fair enough.  Are you aware that
23   Mr. Gibilterra testified that he released one of
24   those tugs after the barge -- the THOR reached
25   the dock and that the other of those tail tugs
```

```
 1   went to stand by the materials barge?
 2            MR. GUILLOT:
 3                  Objection.  Misstates facts in
 4            evidence.
 5            THE WITNESS:
 6                  Yes, I'm aware.
 7   BY MR. REISMAN:
 8       Q.     Do you know whether Mr. Gibilterra
 9   consulted with Dawn Services about that?
10       A.     I do not know.
11       Q.     Are you aware of any communications
12   that Mr. Gibilterra had with any Dawn employee
13   between October 25th and October 28th, 2020,
14   prior to the barge breaking away?
15       A.     I'm not aware.
16       Q.     Now, Shore has a hurricane
17   preparedness plan, correct?
18       A.     Correct.  At one -- it was in place
19   prior, yes.
20       Q.     Does it provide any direction to
21   Shore employees on how to secure a barge to a
22   dock?
23       A.     I'd have to go back and reread it,
24   but I don't believe so.
25       Q.     Does that Shore hurricane
```



1        REPORTER'S CERTIFICATE
2
3        This certification is valid only for a
4   transcript accompanied by my original signature
5   and original seal on this page.
6        I, CHÉRIE E. WHITE, Certified Court
7   Reporter, in and for the State of Louisiana, do
8   hereby certify that Cody D. Sims, to whom the
9   oath was administered, after having been duly
10  sworn by me upon authority of R.S. 37:2554, did
11  testify as hereinbefore set forth in the
12  foregoing 556 pages; that this testimony was
13  reported by me in the stenotype reporting method,
14  was prepared and transcribed by me or under my
15  personal direction and supervision, and is a true
16  and correct transcript to the best of my ability
17  and understanding; that I am not related to
18  counsel or the parties herein, nor am I otherwise
19  interested in the outcome of this matter.
20
21
22        CHÉRIE E. WHITE, CCR (LA NO. 96002)
23        CSR (TX NO. 10720)
24        CSR (MS NO. 1514)
25        RPR (NATIONAL NO. 839452)