**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ALL COAST, LLC** | **CIVIL ACTION NO: 21-258** |
| | **c/w 21-337, 21-464, 21-822, 21-1968, 21-1969,** |
| **VERSUS** | **21-1982, 21-1981, 21-2075, 21-2227, 23-3220** |
| | |
| **SHORE OFFSHORE SERVICES, LLC** | **SECTION "A"** |
| | **HON. JAY C. ZAINEY** |
| | |
| | **MAGISTRATE: (3)** |
| | **HON. EVA J. DOSSIER** |
| | |
| | **APPLIES TO ALL CASES** |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT REGARDING CROSBY'S**
**ENTITLEMENT TO EXONERATION FROM OR LIMITATION OF LIABILITY**

**MAY IT PLEASE THE COURT:**

The uncontested material facts of this case establish as a matter of law that Limitation Petitioner, Crosby Tugs, LLC (hereinafter "Crosby"), as alleged owner[1] and operator of the tugboat, M/V CROSBY ENDEAVOR (hereinafter the "ENDEAVOR"), is not entitled to exoneration from or limitation of liability. Crosby's managing officers and the ENDEAVOR's crew knew that the tugboat was serving as a required lifeline for the non-self-propelled derrick barge THOR during Hurricane Zeta in October 2020. Wholly unknown to everyone except Crosby's managing officers and the ENDEAVOR's crew, however, the ENDEAVOR was underpowered and not designed or fit to assist the THOR as directed through the forecasted conditions of Hurricane Zeta or to push the derrick barge back into the dock in the event of a breakaway. Moreover, due to incompetent management, inadequate training practices, and a complete disregard for safe navigation practices, the ENDEAVOR's crew failed to even have her

---

[1] Crosby Marine Transportation LLC is the actual, registered owner of the M/V CROSBY ENDEAVOR, but is not a party to this litigation. *See* Exhibit "A", ENDEAVOR Certificate of Inspection, Bates Nos. CROSBY 002490-002491.

engines turned on and ready for immediate maneuvering during this critical time, thus thwarting any very limited assistance the ENDEAVOR could have provided as configured on the hip of the THOR.

As detailed below, the evidence on record establishes that no genuine triable issue of fact exists establishing a lack of privity or knowledge of the unseaworthy conditions or negligent acts as required by the Limitation of Liability Act, 46 U.S.C. §30505, *et seq.* (hereinafter the "Limitation Act"), such that Modern American Railroad Services, LLC, Shore Offshore Services, LLC, Harvey Gulf International Marine, LLC, Harvey Seas, LLC, and Weeks Marine, LLC (collectively "Movants") respectfully suggest that Crosby must be responsible for the full amount of damages attributable to it under general maritime law.

## 1. SUMMARY OF THE ARGUMENT

Crosby's claims for exoneration from and limitation of liability are ripe to be summarily dismissed with prejudice,[2] because the record evidence shows that Crosby has not and will not be able to meet its burden of proof under the Limitation Act.[3] To the contrary, the record evidence shows that the ENDEAVOR was unseaworthy because neither she nor her crew were fit for her intended purposes—to assist the THOR as directed through the forecasted conditions of Hurricane Zeta.[4] Her unseaworthy conditions were causes of the Breakaway Incident, and those conditions were within the privity or knowledge of Crosby because management has admitted that the vessel could have provided no meaningful assistance under the forecasted weather conditions hours before the incident and this was never communicated to anyone else.[5] In addition to the ENDEAVOR's being unfit for duty and thus unseaworthy, the record evidence establishes that

---

[2] See §3.a. of this supporting memorandum.
[3] See §3.b.
[4] See §3.c.
[5] See §3.d.

Crosby shoreside management personally participated in certain of the negligent conduct, that the ENDEAVOR crew were negligent, that these numerous acts of negligence were causes of the Breakaway Incident,[6] and that these acts of negligence were perpetrated by Crosby directly or were within its privity or knowledge,[7] such that Crosby cannot, as a matter of law, seek to avail itself of the protections afforded by the Limitation Act or hide behind a breached limitation fund of $3.75 million when it caused and faces claims for tens of millions of dollars of damages.

## 2. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

These consolidated cases arise from an incident involving the derrick barge THOR and her assist tug ENDEAVOR that occurred when the THOR broke free from her moorings at Martin Energy Dock No. 16 in Port Fourchon during Hurricane Zeta on 28 October 2020 and, with the ENDEAVOR coupled to her, came into contact with certain vessels and other property in and along the Bayou Lafourche channel (hereinafter the "<u>Breakaway Incident</u>").[8]

The THOR is a non-self-propelled derrick barge[9] owned by Modern American Railroad Services, LLC and was at the time bareboat chartered by Shore Offshore Services, LLC ("<u>Shore</u>").[10] In late October 2020, the THOR was working for Fieldwood Energy LLC ("<u>Fieldwood</u>") south of Port Fourchon[11] with the support of her assist tug, the ENDEAVOR, a vessel owned by Crosby Marine Transportation, LLC[12] and operated by Crosby.[13] Shore procured

---

[6] See §3.e.
[7] See §3.f.
[8] Civil Action No. 21-464, Rec. Doc. 1, ¶8.
[9] Exhibit "B", THOR Spec Sheet and Vessel Particulars, THOR 000002 – THOR 000005; Exhibit "C", Douglas Deposition Transcript, 198:11-18.
[10] Civil Action No. 21-464, Rec. Doc. 1.
[11] Exhibit "D", THOR Daily Progress Report, 25 Oct. 2020, THOR 001234 – THOR 001239.
[12] Crosby Marine Transportation, LLC is not a party to this litigation.
[13] Exhibit "A", ENDEAVOR Certificate of Inspection, CROSBY 002490 – CROSBY 002491.

the ENDEAVOR through Dawn Services LLC,[14] and "relied on Dawn Services to provide tugs sufficient enough to operate with the THOR."[15]

As the weather system that would become Hurricane Zeta developed in the Caribbean Sea, the ENDEAVOR towed the THOR to Port Fourchon[16] so the derrick barge could seek safe harbor from the developing weather event.[17] The THOR arrived at Martin Energy Dock No. 16 on the night of 26 October 2020,[18] roughly two days before Zeta made landfall, which was at the time classified as a Category 1 Hurricane with maximum winds "near 75 mph to 80 mph."[19]

The ENDEAVOR remained alongside the THOR as she was made up to the dock overnight on 26 October, but at approximately 0745 hours on 27 October, the ENDEAVOR requested[20] to leave the THOR before the arrival of the storm to resupply and take on groceries at Crosby's dock[21] located just down the bayou and less than a 15 minute run from the Martin dock.[22] It was later discovered in this litigation that the ENDEAVOR would also be conducting engine repairs, including replacement of "bad" fuel injectors, while at Crosby's dock during this critical time[23] – all unannounced to the THOR. In fact, after the tug had been gone for most of that day the THOR's superintendent and his shoreside management discussed when the ENDEAVOR would be back, and a THOR shoreside representative reached out to their point of contact—Dawn Services—and

---

[14] Exhibit "E", ENDEAVOR On-Hire Letter, DAWN 000379.
[15] Exhibit "F", Sims Deposition Transcript, 30:15-16.
[16] Exhibit "G", ENDEAVOR Deck Logs, 26 Oct. 2020, CROSBY 000452.
[17] Civil Action No. 21-464, Rec. Doc. 1, ¶7; *see also* Exhibit "H", Martin Energy Dock No. 16 Space Dispatch, MARTIN 00803.
[18] Exhibit "I", THOR Daily Progress Report, 26 Oct. 2020, THOR 001036 – THOR 001041; *see also* Exhibit "G", ENDEAVOR Deck Logs, 26 Oct. 2020, CROSBY 000452.
[19] Exhibit "J", TropicsWatch Hurricane Zeta Advisory 11, CROSBY 000153.
[20] Exhibit "C", Douglas Deposition Transcript, 328:15-329:2.
[21] Exhibit "G", ENDEAVOR Deck Logs, 27 Oct. 2020, CROSBY 000453.
[22] Exhibit "K", Port Fourchon Map, available at https://www.portfourchon.com/about-glpc/port-facts#map; Exhibit "G", ENDEAVOR Deck Logs, 27 Oct. 2020, CROSBY 000453; Exhibit "L", Everett Deposition Transcript, 212:16-213:1.
[23] Exhibit "M", Crosby Daily Work Tickets, 27 Oct. 2020, CROSBY 002607 – CROSBY 002613. The only time the newly installed fuel injectors were "tested" were in transit from the Crosby dock to the THOR on the morning of 28 October 2020. *See* Exhibit "N", Plaisance Deposition Transcript, 232:1-233:12.

4

was told only that "they are doing something at their dock and then they will be back…before the storm."[24] Accordingly, no one on the THOR side knew or had reason to suspect that the ENDEAVOR, now known to be underpowered for the forecasted weather conditions, would also be undergoing engine repairs during this critical time.

The following morning, 28 October, the ENDEAVOR returned to the Martin dock to stand by alongside the THOR and assist the THOR through the forecasted storm[25]—for the acknowledged and anticipated purposes of minimizing the chance of a breakaway of the non-self-propelled vessel,[26] holding[27] or pushing the THOR back into the dock,[28] and ultimately, attempting to maneuver and render aid to the derrick barge in the event of a breakaway.[29]

Indeed, the ENDEAVOR's presence alongside the THOR was required for these purposes by Greater Lafourche Port Commission (the "GLPC") Ordinance No. 71—a regulation established by the GLPC pursuant to its authority under La. R.S. 34:1652 and La. R.S. 34:1652.2,[30] which provides in pertinent part as follows:

> SECTION 2. When Hurricane Force Winds are expected to occur at Port Fourchon within twenty-four (24) hours, no person shall…allow a Vessel which is not self-propelled by a motor or engine and of which s/he is an owner, to remain in Port Fourchon or moored to Port Pilings without being under the control of a Vessel(s), which is self-propelled by a motor or engine and which is occupied by sufficiently skilled, experienced marine personnel capable of stabilizing and controlling all such Vessel(s) in seas subject to Hurricane Force Winds.[31]

---

[24] Exhibit "F", Sims Deposition Transcript, 96:18-98:1.

[25] Exhibit "N", Plaisance Deposition Transcript, 273:6-274:14; Exhibit "O", Danos Deposition Transcript, 147:23-148:22, 150:4-9; Exhibit "L", Everett Deposition Transcript, 444:19-22.

[26] Exhibit "L", Everett Deposition Transcript, 259:3-9. Captain Walter Everett, Jr., testified further, "I'm there to – as the propelled vessel, because they are non-propelled, to attempt to render aid in case they break away." Exhibit "L", Everett Deposition Transcript, 277:19-278:2.

[27] Exhibit "P", Crosby Corporate Deposition Transcript, 490:1-491:10.

[28] Exhibit "P", Crosby Corporate Deposition Transcript, 158:24-160:20; Exhibit "N", Plaisance Deposition Transcript, 73:23-74:7, 77:5-15.

[29] Exhibit "N", Plaisance Deposition Transcript, 74:17-75:1, 76:6-14.

[30] See Greater Lafourche Port Commission, Governing Documents, available at https://www.portfourchon.com/about-glpc/governing-documents

[31] Exhibit "Q", Greater Lafourche Port Commission Ordinance No. 71, § 2.b., CPORT 000160-000161.

In other words, when a non-self-propelled derrick barge, like the THOR, is expected to be subject to hurricane force winds and is located in Port Fourchon, Ordinance No. 71 requires that derrick barge to have a capable assist tug remain with her throughout the duration of such conditions because she has no independent means of propulsion.[32]

Crosby was aware of the requirements of Local Ordinance No. 71 in advance of the Breakaway Incident;[33] the THOR's superintendent knew he was required to have an assist tug alongside[34] and trusted that the ENDEAVOR would be returning for these purposes;[35] and the ENDEAVOR's captain testified that because his tug was the only self-propelled vessel with the non-self-propelled THOR[36] he knew that the ENDEAVOR had to be moored alongside the THOR in advance of and during the forecasted storm.[37] Despite this, and as a critical basis for this Motion, Crosby shoreside management was also aware that the ENDEAVOR was not fit to serve as a qualified, capable vessel for the non-self-propelled derrick barge under this ordinance.[38]

While the ENDEAVOR was resupplying, taking on groceries, and conducting repairs at her home dock, shoreside management for Crosby were monitoring Port Fourchon and the weather forecasts[39] and relaying the forecasts to the ENDEAVOR's crew.[40] In the intervening hours, Hurricane Zeta had strengthened further, and by 0509 hours on 28 October 2020, Crosby was aware that the weather system was expected to continue strengthening and that Hurricane Zeta

---

[32] Exhibit "C", Douglas Deposition Transcript, 469:4-19, 480:17-23.
[33] Exhibit "P", Crosby Corporate Deposition Transcript, 277:15-18; Exhibit "N", Plaisance Deposition Transcript, 78:2-10.
[34] Exhibit "C", Douglas Deposition Transcript, 480:17-23.
[35] *Id*. at 329:3-6.
[36] Exhibit "L", Everett Deposition Transcript, 273:17-275:15.
[37] *Id*. at 279:3-17.
[38] "Q. It's Crosby's position that the ENDEAVOR was not a vessel that was qualified to control the THOR, under Port Ordinance 71, because it applies to situations involving hurricane force winds? A. Yes, we were there to stand by, correct. Q. What I just said is correct? A. Yes." Exhibit "P", Crosby Corporate Deposition Transcript, 315:23-316:6 ; see also generally Exhibit "P", Crosby Corporate Deposition Transcript, 281:6-17; 282:5-12.
[39] Exhibit "P", Crosby Corporate Deposition Transcript, 260:14-262:3; 278:6-11.
[40] *Id*. at 274:12-22; Exhibit "L", Everett Deposition Transcript, 229:15-23; 137:24-138:10.

would likely make "landfall on the southeast Louisiana coast" later that afternoon as a Category 2 Hurricane, with predicted winds of "85 mph gusting to 105 mph" and "[m]aximum winds at landfall [ ] likely [to] be near 100 mph," with the possibility that Hurricane Zeta would "strengthen slightly more than indicated."[41] It cannot be reasonably disputed that both Crosby shoreside management and the ENDEAVOR's crew knew the anticipated weather conditions that the THOR and ENDEAVOR would face *before* the ENDEAVOR returned to the THOR at 0800 hours on 28 October to assist the THOR.

Crosby shoreside management was also aware that the ENDEAVOR was not designed to hold the THOR in place at Martin Energy Dock No. 16 or to push the THOR back into the dock in the event of a breakaway,[42] and that the ENDEAVOR did not have the thrust capacity to hold or push the THOR back into the Martin dock under the conditions being forecasted.[43] Indeed, Crosby's Corporate Representative and Corporate Director of Quality, Health, Safety (Wade Savoy) testified that "at 75 miles an hour, from this wind direction" any assistance the ENDEAVOR would have been able to provide the THOR "would be marginal,"[44] and the ENDEAVOR's relief captain confirmed it would be "iffy" whether the ENDEAVOR could keep the THOR against the dock in 75mph winds and that winds in excess of 100mph would prohibit

---

[41] Exhibit "R", TropicsWatch Hurricane Zeta Intermediate Advisory 16a, CROSBY 000119. While the ENDEAVOR remained at Crosby's dock on the morning of 28 October 2020, TropicsWatch forecasted: "Conditions will begin to deteriorate quickly later this morning into early this afternoon across the Louisiana, Mississippi, and Alabama coasts as Zeta quickly approaches. Surge impacts will begin along the northern Gulf coast by early this afternoon as any tidal surge will move into the coastal areas more quickly, which may result in some damage to coastal structures near the immediate coast. There is also a chance of severe thunderstorms, including tornadoes, as the heavy rain bands move into the coastal areas later this morning and into this afternoon. The greatest threat of tornadoes will occur east of the center."
[42] Exhibit "P", Crosby Corporate Deposition Transcript, 285:2-6; 384:5-9.
[43] Exhibit "P", Crosby Corporate Deposition Transcript, 294:8-17; Exhibit "L", Everett Deposition Transcript, 286:9-15.
[44] Exhibit "P", Crosby Corporate Deposition Transcript, 249:13-16.

the tug from pushing the derrick barge back into the dock.[45] The forecasted winds about which Crosby shoreside management was fully aware exceeded these figures.

Indeed, for at least three hours before the ENDEAVOR would return to the THOR on the day of the breakaway, her managing officers knew or should have known that the ENDEAVOR would not be fit to provide any assistance to the THOR given the conditions forecasted. No one from Crosby ever relayed to any THOR representative or crewmember aboard the THOR that the ENDEAVOR was not designed to hold vessels in place,[46] that there were any limitations to the assistance the ENDEAVOR would be able to provide during the forecasted conditions,[47] or that the ENDEAVOR would not be able to push the THOR back into the dock in the event of a breakaway.[48] Likewise, no one from Crosby dispatched additional or alternative tugs to the THOR, despite the fact that Crosby had available tugs in its fleet just minutes away that were designed to hold barges in place during inclement weather.[49] Crosby shoreside management knowingly created a situation where it sent an unfit tug that, rather than helping, actually just added deadweight to the mooring lines of a derrick barge with no independent means of propulsion.

The ENDEAVOR arrived back at the Martin dock at approximately 0800 hours on 28 October 2020 and secured herself "on the hip" of the THOR (i.e., with her port side to the port side of the derrick barge with multiple mooring lines).[50] Port Fourchon began experiencing significant tropical storm force effects associated with Hurricane Zeta by around 1200 hours on 28

---

[45] Exhibit "N", Plaisance Deposition Transcript, 89:25-90:25.
[46] Exhibit "P", Crosby Corporate Deposition Transcript, 285:7-13; Exhibit "N", Plaisance Deposition Transcript, 100:12-20, 193:7-23.
[47] Exhibit "P", Crosby Corporate Deposition Transcript, 260:6-13; Exhibit "N", Plaisance Deposition Transcript, 94:23-95:4 ; 98:17-99:2.
[48] Exhibit "P", Crosby Corporate Deposition Transcript, 256:4-10.
[49] Exhibit "P", Crosby Corporate Deposition Transcript, 287:20-23, 192:2-7; Exhibit "N", Plaisance Deposition Transcript, 451:19-453:9.
[50] Exhibit "G", ENDEAVOR Deck Log, 28 October 2020, CROSBY 454.

October 2020, with the breakaway occurring as the eastern eyewall passed over the area at approximately 1600 hours that afternoon – eight hours after the ENDEAVOR tied to the THOR.[51]

      The ENDEAVOR's captain testified that he had been in regular radio communication with the THOR's superintendent, and that as the derrick barge began breaking away from the dock, the superintendent radioed to alert him to the breakaway and to request that the tug push the derrick barge back into the dock.[52]

      Unfortunately for the THOR and all claimants in these consolidated cases, Crosby does not provide its tug crews with any training on how to deal with potential breakaway situations,[53] and it has since been established by the ENDEAVOR's own logs that the tug's engines were operational for only three hours on the day of the breakaway.[54] In other words, during the entire eight hours that the ENDEAVOR was tied to the THOR awaiting possible instructions to push the THOR back into the dock in the event of a breakaway, the ENDEAVOR's engines were off. It is not a simple procedure to start the engines and takes approximately ten minutes.[55] How we know the engines were off is confirmed by the engine room logs, the wheelhouse logs, and the relief captain's testimony. The engine room logs show that the engines were on for only three hours on 28 October, and the wheelhouse logs showing the activity of the ENDEAVOR detail that there was a total of three hours of run time with the engines on – none of which were between 0800 and 1600 on 28 October. Specifically, the engines were running earlier on the morning of 28 October 2020 when the ENDEAVOR made the approximately 15-minute run from Crosby's dock to Martin Energy Dock No. 16 and then later during the approximately two and half hours that passed after

---

[51] Exhibit "G", ENDEAVOR Deck Log, 28 October 2020, CROSBY 454.
[52] Exhibit "L", Everett Deposition Transcript, 294:20-295:13.
[53] Exhibit "N", Plaisance Deposition Transcript, 27:9-15.
[54] Exhibit "S", ENDEAVOR Engine Log, 28 October 2020, CROSBY 000470; *see also* Exhibit "T", Artigos Deposition Transcript, 150:24-151:4; Exhibit "N", Plaisance Deposition Transcript, 464:24-465:7.
[55] Exhibit "T", Artigos Deposition Transcript, 95:12-102:7.

the breakaway when the ENDEAVOR was operating.[56] After the breakaway, the ENDEAVOR eventually broke free from the THOR and subsequently grounded, providing no assistance to its tow, then eventually returning to Crosby's dock.[57]

In other words, these records show the amount of time the tug's engines were running that day[58]—three hours—such that it would have been "impossible" for those engines to have been running for the entire eight intervening hours the ENDEAVOR was standing by and coupled to the THOR to protect and provide the derrick barge with propulsion in compliance with local ordinance before the Breakaway Incident.[59] At his deposition, the ENDEAVOR's relief captain recognized this. He remarked that the engineer "log[s] down how many hours the engines ran that day," and on this day that was three hours.[60]

Crosby has no written policy requiring crews to keep engines on during hurricane conditions.[61] Rather, Crosby has "Engine Shut Down Procedures" in its Towing Safety & Environmental Management System Manual, which guide its tug crews to "shut down at least one engine (two, if safety conditions allow), in an effort to conserve fuel and reduce cost" during vessel delays.[62] Accordingly, over the course of these eight hours when the ENDEAVOR could have been instructed at any moment to provide assistance to the THOR, the ENDEAVOR had been adding stress to the THOR's mooring arrangement, and worse, as it takes several minutes for the tug's engines to engage, the ENDEAVOR could ultimately do nothing to even try to hold or push

---

[56] Exhibit "G", ENDEAVOR Deck Log, 28 October 2020, CROSBY 000454.
[57] Exhibit "G", ENDEAVOR Deck Log, 28 October 2020, CROSBY 000454.
[58] Artigos explained that the ENDEAVOR's engine room logs are the only documents that explain when the ENDEAVOR's engines were running for a particular day, and as the QMED on board, Artigos agreed it was his responsibility to complete those logs. Exhibit "T", Artigos Deposition Transcript, 140:4-10, 32:23-33:9.
[59] Exhibit "T", Artigos Deposition Transcript, 155:11-22.
[60] Exhibit "N", Plaisance Deposition Transcript, 442:7-12, 464:24-465:7.
[61] Exhibit "P", Crosby Corporate Deposition Transcript, 201:6-202:10; Exhibit "O", Danos Deposition Transcript, 257:18-258:2.
[62] Exhibit "U", Crosby Towing Safety & Environmental Management System Manual, Engine Shut Down Procedures, CROSBY 000656.

the THOR back into the dock or provide any "marginal"[63] or even "iffy"[64] assistance once the mooring arrangement began to fail.

As noted above, it is not a simple procedure to start the engines and takes approximately ten minutes.[65] Once the ENDEAVOR's engines were engaged after the THOR was already broken free from the Martin dock, the tug was attempting to direct and maneuver the derrick barge;[66] but as indicated above she did not have the capacity to do so. The THOR with the ENDEAVOR tied to her made contact with other vessels who are claimants here, first the HARVEY SEAS and then the MR. COLBY, where both vessels were moored to dolphins owned by C-Port, LLC across the bayou from the Martin dock.[67] Eventually, the ENDEAVOR parted from the THOR, and the THOR continued up bayou with the storm surge. The ENDEAVOR was not fast enough to catch up with the THOR in the hurricane surge conditions,[68] and ENDEAVOR ultimately grounded about three and half miles north of the Martin dock.[69]

Numerous claims for personal injuries and property damage ensued and Crosby filed a Complaint for Exoneration from or Limitation of Liability seeking to preclude or limit recovery to $3.75 million—the declared value of the ENDEAVOR immediately following the Breakaway Incident.[70]

---

[63] Exhibit "P", Crosby Corporate Deposition Transcript, 249:13-16.
[64] Exhibit "N", Plaisance Deposition Transcript, 89:25-90:25.
[65] Exhibit "T", Artigos Deposition Transcript, 95:12-102:7.
[66] Exhibit "L", Everett Deposition Transcript, 294:20-295:13.
[67] Captains Everett and Plaisance claimed not to see contact between the ENDEAVOR and any vessels, but both confirmed seeing ENDEAVOR make contact with certain mooring dolphins after ENDEAVOR uncoupled from THOR. *See* Exhibit "L", Everett Deposition Transcript, 43:16-25; Exhibit "N", Plaisance Deposition Transcript, 132:10-24, 334:23-337:2. In addition, video evidence shows the ENDEAVOR coupled to THOR at the point of contact with the HARVEY SEAS and shows direct contact by the ENDEAVOR with the MR. COLBY.
[68] Exhibit "N", Plaisance Deposition Transcript, 202:10-203:9.
[69] Exhibit "P", Crosby Corporate Deposition Transcript, 34:3-6; Exhibit "N", Plaisance Deposition Transcript, 182:16-19; *see also* Exhibit "K", Port Fourchon Map, available at https://www.portfourchon.com/about-glpc/port-facts#map.
[70] E.D. La. Civil Action No. 21-822, Rec. Doc. 1. Crosby Marine Transportation did not join in this filing, has not appeared in this case, or asserted limitation defenses as owner of the ENDEAVOR.

**3. LAW & ARGUMENT**

    a. Summary Judgment Standard

Challenges to an invocation of the Limitation Act are properly brought through motions for summary judgment,[71] and Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[72]

The parties moving for summary judgment bear the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.[73] When the moving parties have carried this burden under Rule 56(c), the opponent must do more than simply show that there is some "scintilla of evidence"[74] or metaphysical doubt as to the material facts; the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial."[75] Thus, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."[76] Where the only issue before the Court is a pure question of law, summary judgment is also proper.[77]

---

[71] *Foret v. Transocean Offshore (USA), Inc.*, No. 09-4567, 2011 WL 3818635, at *7 (E.D. La. Aug. 29, 2011) (Lemelle, J.) (where the court found that summary adjudication of Limitation Act defenses was proper at this stage of litigation as it was "deeply relevant" and "would significantly impact" the trial and the parties' attempts to settle); see also *In re Lasala*, No. 18-11057, 2021 WL 2002503, at *5 (E.D. La. May 19, 2021) (Vitter, J.).

[72] Fed. R. Civ. P. 56; see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[73] *Stults v. Conoco*, 76 F.3d 651 (5th Cir. 1996).

[74] *In re Lasala*, 2021 WL 2002503, at *2 (quoting *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008)).

[75] *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

[76] *Id.*

[77] *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

Moreover, and as the Court knows well, "summary judgment is favored in federal courts,"[78] and the summary judgment procedure should be construed to accomplish these ends.[79] In this case, Your Honor "will act as the trier of fact,"[80] and it is therefore within the Court's discretion to "draw[] inferences from the evidence submitted on summary judgment,"[81] and to decide that the same evidence, "presented [ ] in a plenary trial, could not possibly lead to a different result,"[82] such that Crosby's claims for exoneration from and limitation of liability are ripe to be summarily dismissed with prejudice.

  b. <u>Burden of Proof Under the Limitation Act</u>

The Limitation Act creates a procedure whereby "the liability of the owner of a vessel for any claim, debt, or liability…shall not exceed the value of the vessel and pending freight" provided the loss or damage claimed was "done, occasioned, or incurred, without the privity or knowledge of the owner."[83]

Determining whether a vessel owner is entitled to the protections afforded by the Limitation Act is a two-step analysis that divides the burden of proof between the parties.[84] Here, the burden of proof rests first with the Movants to prove that the destruction or loss was caused in whole or in part by the unseaworthiness of the ENDEAVOR, the  negligent acts of the ENDEAVOR's crew, or by some neglect of duty by Crosby itself.[85] Once this initial step is

---

[78] *Maister Assocs. v. State Farm Fire & Cas. Co.*, No. 06-0589, 2009 WL 926981, at *2 (E.D. La. Mar. 31, 2009) (Chasez, M.J.), aff'd, 350 F. App'x 978 (5th Cir. 2009) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075–76 (5th Cir.1994)).

[79] "Summary judgment reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir.1986).

[80] *In re Lasala*, 2021 WL 2002503, at *3 (quoting *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991)).

[81] *Id*.

[82] *Id*.

[83] 46 U.S.C. Ann. § 30523.

[84] *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1062, 1997 AMC 457 (11th Cir. 1996).

[85] *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 1976 AMC 1639 (5th Cir. 1976), *rehearing denied* 532 F.2d 1375 (5th Cir. 1976); *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465 (5th Cir. 1991).

satisfied, the burden then shifts to Crosby to demonstrate that it comes within the statutory limitation conditions and that there was no privity or knowledge on its part of those same acts of negligence or conditions of unseaworthiness.[86] If, as will be shown, Crosby shoreside management personally participated in negligent conduct or if any one of the causes set forth below was within the privity or knowledge of Crosby, a denial of limitation is triggered.[87]

Crosby will undoubtedly argue that the injuries and damage sustained were caused by the THOR, by Martin Dock No. 16, by Hurricane Zeta, or by some other factors at play on the afternoon of the Breakaway Incident. However, allegations as to other causes of the Breakaway Incident are irrelevant for the purposes of this motion. This is because a casualty "may have multiple causes. If any one of the causes was [an unseaworthy condition or] act of negligence within the privity or knowledge of [Crosby, it] is not entitled to limitation."[88]

In other words, a ruling on this Motion does not require the Court to find that Crosby is solely liable for the Breakaway Incident. Rather, a determination of the unseaworthiness of the ENDEAVOR and Crosby's negligence, and whether those conditions or negligence occurred within its privity and knowledge, is all that is required under the U.S. Fifth Circuit's test for determining whether a vessel owner is entitled to protection under the Limitation Act.

Accordingly, if in responding to this Motion, Crosby fails to establish a lack of privity or knowledge of the unseaworthy conditions or negligent acts established herein, Crosby is not

---

[86] *Farrell Lines*, 530 F.2d at 10; *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991); *In re Omega Protein*, 548 F.3d at 371 (*citing Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779, 789 (5th Cir. 2003); 46 U.S.C. §30505 (b)).
[87] *Farrell Lines*, 530 F.2d at 10.
[88] *In re Lasala*, 2021 WL 2002503, at *3 (citing *Omega Protein*, 548 F.3d 361; *In re TT Boat Corp.*, No. 98-494, 1999 WL 223165, at *8-10 (E.D. La. Apr. 14, 1999) (Duval, J.)).

entitled to limit its liability and is responsible for the full amount of damages attributable to it under general maritime law.[89]

      c.   <u>The ENDEAVOR was Unseaworthy and her Unseaworthiness was a Cause of the Breakaway Incident</u>

Part of the Court's two-step process in determining Crosby's right to limit is determining whether any condition of unseaworthiness caused the Breakaway Incident.[90] Here, Crosby's assignment of the ENDEAVOR to assist the THOR during Hurricane Zeta constituted the deployment of an unseaworthy vessel, and this unseaworthiness was within the privity and knowledge of Crosby's shoreside management.

As the United States Supreme Court has explained,

> A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service.[91]

Here, vessel and crew were unfit for the ENDEAVOR's intended service.

      i.   *The ENDEAVOR was not fit to assist the THOR as directed through the forecasted conditions of Hurricane Zeta*

The U.S. Fifth Circuit has "defined that to be seaworthy, a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended."[92] According to the appellate court:

> The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or

---

[89] *In re Settoon Towing, LLC*, No. 14-499, 2016 WL 9447753, at *7 (E.D. La. March 21, 2016) (Milazzo, J.) (citing *Farrell Lines*, 530 F.2d at 10.

[90] *Id.*

[91] *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499, 91 S. Ct. 514, 517–18, 27 L. Ed. 2d 562 (1971)

[92] *In re Signal Int'l, LLC*, 579 F.3d 478, 498 (5th Cir. 2009) (citing *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir.1988)).

its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful, or prudent the owner might have been."[93]

*First, what was the ENDEAVOR to do?* Here, the undisputed evidence shows that Crosby was aware of Ordinance No. 71, which requires a non-self-propelled derrick barge to have an assist tug remain with her through a hurricane because she has no independent means of propulsion,[94] and that the ENDEAVOR was standing by the THOR to assist the derrick barge as directed through Hurricane Zeta, and that such directions could have included holding or pushing the THOR back into the dock and attempting to maneuver and render aid to the derrick barge in the event of a breakaway.[95]

*Second, what were the hazards, the perils, the forces likely to be incurred by the ENDEAVOR?* Here, Crosby shoreside management, including its CEO, knew the ENDEAVOR was intended to assist the 370 foot long, non-self-propelled derrick barge[96] through Hurricane Zeta for the acknowledged and anticipated purposes of minimizing the chance of a breakaway of the non-self-propelled vessel,[97] holding[98] or pushing the THOR back into the dock,[99] and ultimately, attempting to maneuver and render aid to the derrick barge in the event of a breakaway[100] during a storm that was already being forecasted to make "landfall on the southeast Louisiana coast" as a

---

[93] *Walker v. Harris*, 335 F.2d 185, 191 (5th Cir. 1964) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960)).
[94] Exhibit "C", Douglas Deposition Transcript, 469:4-8, 48:17-23.
[95] Exhibit "P", Crosby Corporate Deposition Transcript, 158:24-160:20, 490:1-491:10; Exhibit "N", Plaisance Deposition Transcript, 73:23-74:7, 74:17-75:1, 76:6-14, 77:5-15.
[96] Exhibit "O", Danos Deposition Transcript, 62:19-64:14.
[97] Exhibit "L", Everett Deposition Transcript, 259:3-9. Captain Walter Everett, Jr., testified further, "I'm there to – as the propelled vessel, because they are non-propelled, to attempt to render aid in case they break away." Exhibit "L", Everett Deposition Transcript, 277:19-278:2.
[98] Exhibit "P", Crosby Corporate Deposition Transcript, 490:1-491:10.
[99] Exhibit "P", Crosby Corporate Deposition Transcript, 158:24-160:20; Exhibit "N", Plaisance Deposition Transcript, 73:23-74:7, 77:5-15.
[100] Exhibit "N", Plaisance Deposition Transcript, 74:17-75:1, 76:6-14.

Category 2 Hurricane, with predicted winds of "85 mph gusting to 105 mph" and "[m]aximum winds at landfall [ ] likely [to] be near 100 mph."[101]

*Third, was the ENDEAVOR sufficient to withstand those anticipated forces?* Here, the answer is unequivocally "no," the ENDEAVOR was not sufficient to withstand the anticipated forces. Crosby has admitted that she was not designed to hold the THOR in place at Martin Energy Dock No. 16[102] or to push the THOR back into the dock in the event of a breakaway. Moreover, the ENDEAVOR was underpowered and did not have the thrust capacity to hold or push the THOR back into the Martin dock under the conditions being forecasted and actually known to Crosby before the ENDEAVOR tied to the THOR eight hours before the breakaway.[103] Indeed, Crosby's corporate representative testified that "at 75 miles an hour, from this wind direction" any assistance the ENDEAVOR would have been able to provide the THOR "would be marginal,"[104] and the ENDEAVOR's relief captain confirmed it would be "iffy" whether the ENDEAVOR could keep the THOR against the dock in 75mph winds and that winds in excess of 100mph would prohibit the tug from pushing the derrick barge back into the dock.[105]

In sum, the ENDEAVOR was not fit to assist the THOR as directed through the forecasted conditions of Hurricane Zeta, which conditions were wholly known to Crosby before the ENDEAVOR returned to the THOR on the morning of 28 October. Given that the answer to this final point of inquiry "is in the negative, then [the ENDEAVOR was] unseaworthy no matter how diligent, careful, or prudent [Crosby] might have been,"[106] and courts within and outside this

---

[101] Exhibit "R", TropicsWatch Hurricane Zeta Intermediate Advisory 16a, CROSBY 000119.
[102] Exhibit "P", Crosby Corporate Deposition Transcript, 285:2-6; 384:5-9.
[103] Exhibit "P", Crosby Corporate Deposition Transcript, 294:8-17; Exhibit "L", Everett Deposition Transcript, 286:9-15.
[104] Exhibit "P", Crosby Corporate Deposition Transcript, 249:13-16.
[105] Exhibit "N", Plaisance Deposition Transcript, 89:25-90:25.
[106] *Walker*, 335 F.2d at 191 (5th Cir. 1964) (citing *Mitchell*, 362 U.S. 539).

district support such a finding when a tug, like the ENDEAVOR, lacks the design or horsepower for the task at hand and conditions forecasted.[107]

> ## ii. The ENDEAVOR's crew was not fit to assist the THOR as directed through the forecasted conditions of Hurricane Zeta

In addition, and as indicated above, a failure of a vessel owner, like Crosby, to implement adequate training and policies or a "finding that the [] crew was inadequate or ill-trained for the task they were assigned [also] represents a classic example of unseaworthiness."[108] This finding is not necessary to breach Crosby's limitation because part i. above achieves that, but it *a fortiori* shows another independent basis to do so.

Here, the record makes clear that Crosby does not provide its tug crews with any training on how to deal with potential breakaway situations,[109] much less any written policy requiring crews to keep engines on during hurricane conditions.[110] Instead, the only policy on point guides tug crews to "shut down at least one engine (two, if safety conditions allow), in an effort to conserve fuel and reduce cost" during vessel delays.[111] Taken together, these failings created circumstances in which a crew unfit to assist the THOR through the forecasted conditions of Hurricane Zeta was nevertheless assigned to do so by Crosby shoreside management.

---

[107] *See Eagle Marine Indus., Inc. v. Valley Line Co.*, 541 F. Supp. 297 (E.D. Mo. 1982), *aff'd in part, rev'd in part sub nom. Consol. Grain & Barge Co. v. Archway Fleeting & Harbor Serv., Inc.*, 712 F.2d 1287 (8th Cir. 1983) (Placement of harbor boat, which was unseaworthy because it lacked lower tow knees, at stern of center string of barges improperly and adversely affected its ability to add necessary horsepower with which to push tow, so that when defective timberhead on barge fractured, collision and breakaway were inevitable, fleeter and barge owner were equally liable for damage caused by breakaway and fleeter was liable to barge owner for one-half of its damages.); *Alamo Barge Lines, Inc. v. Rim Mar. Co.*, 596 F. Supp. 1026, 1032 (E.D. La. 1984) (PHILIP ARTHUR's insufficient horsepower for the task at hand in the high water and current conditions that existed on the day of the accident constituted unseaworthiness and was a cause of the allision and resulting damage. Given those conditions, and the vessel's inadequate power, the court found that PHILIP ARTHUR's captain and/or pilot should have requested and utilized helper boats to enter the river from the Port Allen Lock.).

[108] *Bonefont v. Valdez Tankships*, No. 95-21021, 1998 WL 30028, *5 (5th Cir. Jan. 9, 1998) (citing *Comeaux v. T. L. James & Co.*, 666 F.2d 294, 298 (5th Cir. 1982), supplemented by 702 F.2d 1023 (5th Cir. 1983)).

[109] Exhibit "N", Plaisance Deposition Transcript, 27:9-15.

[110] Exhibit "P", Crosby Corporate Deposition Transcript, 201:6-202:10; Exhibit "O", Danos Deposition Transcript, 257:18-258 :2.

[111] Exhibit "U", Crosby Towing Safety & Environmental Management System Manual, Engine Shut Down Procedures, CROSBY 000656.

    d.  <u>The ENDEAVOR's Unseaworthy Conditions Were Within the Privity and Knowledge of Crosby</u>

Given that the record fairly establishes beyond any reasonable dispute that the ENDEAVOR was unseaworthy, to avoid summary judgment, Crosby must present the Court with material record evidence that establishes it had no privity or knowledge of the ENDEAVOR's unseaworthy conditions.[112] There is no such evidence.

"Privity or knowledge is not tantamount to actual knowledge or direct causation. All that is needed to deny limitation is that [Crosby], by prior action or inaction set into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause" of the Breakaway Incident.[113] However, here actual knowledge exists.

As detailed above, it has been established through the testimony of Crosby's Corporate Director of QHSE and Corporate Representative (Wade Savoy) and Operations Manager (Ivy Danos) that Crosby knew that Ordinance No. 71 required a non-self-propelled barge to have an assist tug remaining with her in a hurricane,[114] that the ENDEAVOR could be directed to hold[115] or push the THOR back into the dock during Hurricane Zeta,[116] and that the ENDEAVOR was not actually designed to hold the THOR in place at the Martin dock[117] or to push the THOR back into the dock in the event of a breakaway, and that the ENDEAVOR did not have the thrust capacity to do so under the forecasted conditions.[118] It has also been established that Crosby shoreside

---

[112] §15:8. Privity or knowledge, 2 Admiralty & Mar. Law § 15:8 (6th ed.)(citing T*rico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779 (5th Cir. 2003).

[113] *In re Amoco Cadiz*, 954 F.2d 1279, 1303 (7th Cir. 1992) (internal citations omitted) (cited with approval by *Gabarick v. Laurin Mar. (Am.), Inc.*, 900 F. Supp. 2d 669, 677 (E.D. La. 2012), *aff'd*, 551 F. App'x 228 (5th Cir. 2014)).

[114] Exhibit "C", Douglas Deposition Transcript, 469:4-8, 48:17-23.

[115] Exhibit "P", Crosby Corporate Deposition Transcript, 490:1-491:10.

[116] Exhibit "P", Crosby Corporate Deposition Transcript, 158:24-160:20.

[117] Exhibit "P", Crosby Corporate Deposition Transcript, 285:2-6; 384:5-9.

[118] Exhibit "P", Crosby Corporate Deposition Transcript, 294:8-17; Exhibit "L", Everett Deposition Transcript, 286:9-15.

management were aware that no one from Crosby ever relayed these limitations to Shore or anyone on board the THOR or dispatched additional or alternative tug assistance to the THOR.[119] This evidence from Crosby's own shoreside management establishes actual knowledge of the ENDEAVOR's unseaworthiness and is fatal to Crosby's limitation defense.[120]

Crosby was necessarily aware of its own training practices and lack thereof. Crosby's failure to develop and implement adequate hurricane preparedness, breakaway response, and engine readiness policies constitutes independent and compounding bases of negligence under general maritime law, each of which directly contributed to the Breakaway Incident (as will be addressed in §3.e. and §3.f. below). These operational failures also fall squarely within the privity and knowledge of Crosby's shoreside management. And courts have consistently held that such omissions preclude limitation of liability.

In *In re Moran Towing Corp.*,[121] a deckhand was entrapped in a tug capstan by a towline put under great pressure during an improper swing maneuver. The court found that "unseaworthiness for lack of training and procedures" was established and that the deckhand's death was "not the result of navigational errors or one time negligence, as Moran posit[ed], but a consequence of Moran's failure to ensure adequate procedures for handling a line under strain" for the following reasons:

> Moran failed to adequately implement any procedures or guidelines that would provide its crew with the requisite training, skill and knowledge to safely perform a swing maneuver, operate the capstan or handle towlines. In fact, Moran issued no policies as to line-handling whatsoever, including ongoing training or standards for handling a line under strain.
> …

---

[119] Exhibit "O", Danos Deposition Transcript, 69:2-11. ("Q. Were any other tugs besides the ENDEAVOR considered for this job? A. No. Q. Do you know why? A. No. Q. Did you ever talk with Mr. Crosby about whether other tugs were available instead of the ENDEAVOR? A. No, I didn't. We talked about it and he picked the ENDEAVOR."

[120] *In re Complaint of Leo, LLC*, No. 09-1768RAJ, 2011 WL 5335288, at *7 (W.D. Wash. Nov. 7, 2011)( "A vessel manager's actual knowledge of the causative unseaworthy condition required denial of limitation.").

[121] *In re Moran Towing Corp.*, 984 F. Supp. 2d 150 (S.D.N.Y. 2013).

> Moran did not have any written guidelines, instructions or procedures whatsoever for line handling during swing maneuvers or capstan operations. Moran did not have a risk assessment for a swing maneuver or handling lines under pressure, or safety procedures for capstan operations in any of its Port Advisories or safety meetings, or require its captains and crews to dedicate time during the safety meetings to discuss or practice the swing maneuver or capstan operations for lines under strain.
> …
> In addition, because Moran had no guidelines or established procedures regarding the swing maneuver, Moran failed to instruct its crew as to the importance of communicating the "all-fast" before placing load on the line with the right rudder.[122]

The court found that these failings were sufficient to establish privity or knowledge, and concluded that Moran's failure "to adequately train or supervise its crew or create a safe environment with respect to line handling and swing maneuvers…render[ed] limitation of liability inappropriate."[123]

Here, limitation is likewise inappropriate because Crosby "failed to adequately implement any procedures or guidelines that would provide its crew with the requisite training, skill and knowledge"[124] on how to deal with potential breakaway situations, and did not have "any written guidelines, instructions or procedures whatsoever…instruct[ing] its crews as to the importance"[125] of keeping engines on to ensure operational readiness during hurricane conditions, instead of encouraging crews to shut down engines "in an effort to conserve fuel and reduce cost" during vessel delays.[126]

In sum, the record shows that Crosby had actual knowledge that its vessel and crew were unfit, such that there is no possible way for Crosby to demonstrate that there was no privity or knowledge on its part.[127] Crosby shoreside management had privity and knowledge of the

---

[122] *In re Moran Towing Corp.*, 984 F. Supp. 2d 150, 176-77 (S.D.N.Y. 2013).
[123] *Id.* at 181.
[124] *Id.* at 176-77.
[125] *Id*.
[126] Exhibit "U", Crosby Towing Safety & Environmental Management System Manual, Engine Shut Down Procedures, CROSBY 000656.
[127] *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1474 (5th Cir. 1991).

ENDEAVOR's unseaworthy conditions. As only one cause is necessary to trigger a denial of limitation, the foregoing alone are sufficient for the Court to grant summary judgment.

e.   Crosby Was Negligent and This Negligence was a Cause of the Breakaway Incident

In addition to the ENDEAVOR's unseaworthiness, the evidence establishes that Crosby shoreside management personally participated in certain of the negligent conduct, that the ENDEAVOR crew were negligent, and that these numerous acts of negligence were causes of the Breakaway Incident.

i.   *Crosby shoreside management participated in negligent conduct that caused the Breakaway Incident*

The elements of an action for negligence under general maritime law are "essentially the same as land-based negligence under the common law…a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury."[128] "The test and standard for a finding of negligence is reasonable care under the circumstances, or whether judged against the standard of good and prudent seamanship, the [Breakaway Incident] could have been prevented by the exercise of due care."[129] While "[t]his standard necessarily can be applied only on a case by case basis considering the circumstances under which the casualty took place,"[130] it is worth noting at the outset that Crosby has been criticized previously by the same section of this Court for violating the standards of good and prudent seamanship.

In 2005, the matter of *In re Crosby Tugs, L.L.C.*[131] came before the Court following an incident wherein a Crosby tug allided with a submerged pipeline causing a pollution incident. To

---

[128] *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (*quoting Withhart v. Otto Candies, LLC*, 431 F.3d 840, 842 (5th Cir. 2005), *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

[129] § 14:3. The basis of liability, 2 Admiralty & Mar. Law § 14:3 (6th ed.).

[130] *Id.*

[131] *In re Crosby Tugs, L.L.C.*, No. 02-1125, 2005 WL 7873785, at *18 (E.D. La. July 5, 2005) (Zainey, J.), *amended sub nom. In re Crosby Tugs, L.L.C.*, No. 02-1125, 2005 WL 7873858 (E.D. La. Aug. 4, 2005), and *motion for relief*

recap briefly, Crosby had ordered the tug to tow a barge to an offshore storage facility. The captain and mate generally discussed the route but did not use nautical charts to formally plan the trip. The mate was not familiar with the area and looked for a navigation chart of the area but was unable to find one before the captain turned over the wheel to him and went to sleep. The mate entered the wrong canal and was attempting to use pickets to navigate resulting in numerous groundings, and the eventual allision and resulting oil spill.

Crosby waived its limitation defenses during the trial, such that the Court noted that "its negligent actions d[id] not warrant substantial discussion."[132] With that said, even Crosby's "briefly addressed" negligent actions were found by the Court to be "plentiful and systemic,"[133] and may be illuminating in the Court's consideration of this Motion.

Twenty years ago, this Court found that "[i]t was clear from the testimony of the Crosby personnel that they gave no thought to weather or tide conditions,"[134] and that the casualty was the result of "incompetent management, inadequate training practices," "complete disregard for safe navigation practices, and the unseaworthiness" of the Crosby tug,[135] which was assigned "to this job without know[ledge] of the real draft of the vessel or the depth of the water."[136]

The Court heard testimony that "established that Crosby had no corporate policy or training program concerning: (a) shallow water operations, despite the fact that a large portion of its fleet worked solely in shallow water areas; (b) pre-voyage planning and watch change procedures; and (c) assigning vessels that were adequate for planned voyages."[137] And, "[a]lthough the evidence

---

*from judgment granted sub nom. In re Crosby Tugs, L.L.C.*, No. CIV.A. 02-1125, 2006 WL 8091886 (E.D. La. June 6, 2006), and *aff'd sub nom. BP Oil Pipeline Co. v. Webb Crosby Tug*, 302 F. App'x 315 (5th Cir. 2008).
[132] *Id*. at *18.
[133] *Id*. at *34.
[134] *Id*. at *5.
[135] *Id*. at *18.
[136] *Id*. at *22.
[137] *Crosby Tugs,* 2005 WL 7873785, at *20.

indicated that Crosby made efforts to implement safe practices, the company fell short of its goals repeatedly."[138] Ultimately, the comments at trial of Crosby's now Operations Manager Ivy Danos, indicated to the Court "that safety was not a top priority at Crosby."[139]

As indicated above, since the *In re Crosby Tugs, L.L.C.* case, Ivy Danos has been promoted from personnel manager to "operations manager," and when he was deposed related to Crosby and the ENDEAVOR's involvement in the Breakaway Incident, his "comments indicate[d] that safety [still is] not a top priority at Crosby."[140]

In this litigation, Danos was deposed as the "operations manager" and was involved directly in the use of the ENDEAVOR. Much like the case 20 years ago, he was not sure how crewmembers would use the Crosby Towing Safety & Environmental Management System Manual to work more safely,[141] and testified that he probably had not personally referred to Crosby's safety manual in over five years.[142] He continued that the Crosby Operations Department is not involved in or responsible for implementing voyage assessment procedures[143] or for assigning vessels to jobs that maximize the horsepower to tow ratio,[144] despite the fact that the manual specifically delineates these as Operations Department responsibilities.[145] Danos ultimately conceded that a voyage assessment should have been done for the ENDEAVOR when she took the THOR to Port Fourchon in advance of Hurricane Zeta.[146] In addition, Danos'

---

[138] *Id.* at *21.
[139] *Id.* at *21.
[140] *Id.* at *21.
[141] Exhibit "O", Danos Deposition Transcript, 55:6-18
[142] Exhibit "O", Danos Deposition Transcript, 54:1-6.
[143] Exhibit "O", Danos Deposition Transcript, 82:6-21.
[144] Exhibit "O", Danos Deposition Transcript, 94:9-95:7. In fact, Danos conceded that he does not know what horsepower-to-tow ratio is know of anybody in the operations department who understands what horsepower-to-tow ratio is. *See* Exhibit "O", Danos Deposition Transcript, 96:17-23
[145] Exhibit "V", Crosby Towing Safety & Environmental Management System Manual, Voyage Planning, CROSBY 000639; Exhibit "W", Crosby Towing Safety & Environmental Management System Manual, Scheduling Horsepower Procedure, CROSBY 000685.
[146] Exhibit "O", Danos Deposition Transcript, 139:3-10.

testimony made clear that even though the ENDEAVOR's crew were reliant on shoreside management for weather updates, Crosby had no standard practice of telling the vessel crews what the weather conditions were like at the destinations they were being ordered for work.[147] This made it more than likely that "[n]either the management nor crew of [the ENDEAVOR] considered the [horsepower or design] of the vessel, nor the prevailing weather conditions when [the ENDEAVOR] was assigned to [the derrick barge]."[148]

Danos testified that despite his role as "head of the operations department," he has no experience reading vessel logs, has never reviewed logs from any of Crosby's vessels before the day of his deposition in this case, and does not know whether anyone from Crosby shoreside management does so or is in a position to do so.[149] These failings were only exacerbated by Crosby's failure to train the ENDEAVOR's crew on how to deal with potential breakaway situations,[150] and failure to have a communicated policy requiring or otherwise ensuring crews kept engines on during hurricane conditions,[151] instead of encouraging crews to shut down engines "in an effort to conserve fuel and reduce cost" during vessel delays.[152] All of these failures were negligent and contributed directly to the Breakaway Incident and the resulting damages.

---

[147] Exhibit "O", Danos Deposition Transcript, 78:3-79:2.
[148] *Crosby Tugs,* 2005 WL 7873785, at *20.
[149] Exhibit "O", Danos Deposition Transcript, 70:16-72:4.
[150] Exhibit "N", Plaisance Deposition Transcript, 27:9-15.
[151] Exhibit "P", Crosby Corporate Deposition Transcript, 201:6-202:10; Exhibit "O", Danos Deposition Transcript, 257:18-258 :2.
[152] Exhibit "U", Crosby Towing Safety & Environmental Management System Manual, Engine Shut Down Procedures, CROSBY 000656.

ii.    The ENDEAVOR's crew was negligent and in violation of the Inland Navigation Rules

The crew of the ENDEAVOR were duty bound to use "such reasonable care and maritime skill as prudent navigators employ for the performance of similar service,"[153] and yet, it has since been proven that the crew knew the ENDEAVOR was not designed to hold vessels in place,[154] and that she was underpowered and not fit to assist the THOR as directed through the forecasted conditions of Hurricane Zeta.[155] Moreover, it is not disputed that the THOR's superintendent radioed the ENDEAVOR's captain to advise the vessel was breaking away to push the THOR back into the dock.[156] However, it has also been established that the ENDEAVOR's engines were off for hours leading up to this critical moment.[157] This failing thwarted any assistance she could have provided as the breakaway was happening because it takes several minutes to engage this tug's engines, so as the THOR slowly began breaking away from the dock, the ENDEAVOR could do nothing other than add deadweight to the THOR.

The ENDEAVOR's crew's failings also amounted to violations of the Inland Navigation Rules, also known as the "Rules of the Road," which are promulgated in Title 33, United States Code of Federal Regulations, Subchapter E, Part 83, *et. seq.* These rules impose affirmative duties on vessel owners and operators to act with prudence, maintain readiness, and take appropriate action to avoid foreseeable risks. The ENDEAVOR crew's failure to comply with these standards—through its utilization of an underpowered vessel, failure to notify the THOR of the

---

[153] *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 782 (5th Cir. 1986) (citing *Stevens v. THE WHITE CITY*, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932); *Agrico Chemical Co. v. M/V BEN MARTIN*, 664 F.2d 85, 90 (5th Cir.1981)).
[154] Exhibit "N", Plaisance Deposition Transcript, 100:12-20, 193:7-23.
[155] Exhibit "N", Plaisance Deposition Transcript, 89:25-90:25.
[156] Exhibit "L", Everett Deposition Transcript, 294:20-295:13.
[157] Exhibit "T", Artigos Deposition Transcript, 155:11-22.

ENDEAVOR's limitations, and failure to have the ENDEAVOR's engines engaged during the storm—violated these regulations and directly contributed to the Breakaway Incident.

Rule 2 (Responsibility) provides that "[n]othing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these rules or of the neglect of any precaution which may be required by the ordinary practice of seamen."[158] Rule 2 has been consistently interpreted as requiring "vessels to observe general standards of good seamanship."[159] Here, the actions of the ENDEAVOR's crew "fell far below the standards of prudent seamanship." Notably, the crew "failed to properly plan"[160] for the acknowledged and anticipated purposes of minimizing the chance of a breakaway of the non-self-propelled vessel,[161] holding[162] or pushing the THOR back into the dock,[163] and ultimately, attempting to maneuver and render aid to the derrick barge in the event of a breakaway[164] under the forecasted weather conditions. Crosby has likewise since acknowledged that a voyage assessment should have been done for the ENDEAVOR, when the ENDEAVOR took the THOR to Port Fourchon, in advance of Hurricane Zeta,[165] and that good seamanship would have required the engines to be on throughout the storm, such that the foregoing actions and inactions by the

---

[158] 33 C.F.R. § 83.02.
[159] *In re Crosby Tugs, L.L.C.*, No. 02-1125, 2005 WL 7873785, at *18 (E.D. La. July 5, 2005), *amended sub nom. In re Crosby Tugs, L.L.C.*, No. 02-1125, 2005 WL 7873858 (E.D. La. Aug. 4, 2005), and *motion for relief from judgment granted sub nom. In re Crosby Tugs, L.L.C.*, No. CIV.A. 02-1125, 2006 WL 8091886 (E.D. La. June 6, 2006), and *aff'd sub nom. BP Oil Pipeline Co. v. Webb Crosby Tug*, 302 F. App'x 315 (5th Cir. 2008) (citing *Crowley American Transportation, Inc. v. Double Eagle Marine, Inc.,* 208 F. Supp. 2d 1250 (S.D. Ala. 2002)).
[160] *Id.*
[161] Exhibit "L", Everett Deposition Transcript, 259:3-9. Captain Walter Everett, Jr., testified further, "I'm there to – as the propelled vessel, because they are non-propelled, to attempt to render aid in case they break away." Exhibit "L", Everett Deposition Transcript, 277:19-278:2.
[162] Exhibit "P", Crosby Corporate Deposition Transcript, 490:1-491:10.
[163] Exhibit "P", Crosby Corporate Deposition Transcript, 158:24-160:20; Exhibit "N", Plaisance Deposition Transcript, 73:23-74:7, 77:5-15.
[164] Exhibit "N", Plaisance Deposition Transcript, 74:17-75:1, 76:6-14.
[165] Exhibit "O", Danos Deposition Transcript, 139:3-10.

ENDEAVOR's crew "were in clear violation of the general standards of good seamanship" in violation of Rule 2.

Rule 5 (Look–Out) requires that "[e]very vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of the collision."[166] A proper lookout aboard the ENDEAVOR would have recognized the vessel's limited capacity to assist the THOR through the forecasted and observably deteriorating weather conditions, and would have ensured engine readiness to avoid the risk of collision. The ENDEAVOR's crew failed to do either, in violation of Rule 5.

The ENDEAVOR's crew also violated Rule 7 (Risk of Collision), which mandates that "[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists."[167] Neither Crosby's management nor the ENDEAVOR's crew considered the vessel's horsepower, design limitations, or the prevailing weather when assigning the ENDEAVOR to the THOR. This amounts to a failure "to use any available means to determine if they were at risk of [breakaway] and, therefore, [a] violat[ion of] Rule 7."[168]

Likewise, Rule 8 (Action to Avoid Collision) requires any action to avoid collision to "be positive, made in ample time and with due regard to the observance of good seamanship."[169] Here, the ENDEAVOR was knowingly underpowered and her engines were off at the time of the breakaway — conditions that thwarted any positive action the ENDEAVOR could have provided

---

[166] 33 C.F.R. § 83.05.
[167] 33 C.F.R. § 83.07.
[168] *Id.*
[169] 33 C.F.R. § 83.08.

and prevented any attempt the ENDEAVOR could have made to avoid collision, in violation of Rule 8.

Finally, Rule 19 (Conduct of Vessels in Restricted Visibility) provides in pertinent part that "[a] power-driven vessel shall have her engines ready for immediate maneuver" in conditions of restricted visibility.[170] It is not disputed that visibility was restricted as Port Fourchon began experiencing significant tropical storm force effects associated with Hurricane Zeta, such that it was a clear violation of Rule 19 for the ENDEAVOR not to "have her engines ready for immediate maneuver."

These violations are not merely technical—they reflect a systemic failure by Crosby to ensure regulatory compliance and operational readiness. As noted by this Court 20 years ago in *In re Crosby Tugs*, the Rules of the Road were designed to prevent accidents, and when violated, as here, the *Pennsylvania* rule presumes that the party violating the rule (Crosby) is at fault and requires it to bear the burden of proving that its violation did not cause the collision or allision.[171]

As a casualty "may have multiple causes,"[172] Crosby cannot reasonably argue that the failings of its crew or its decision to have a knowingly underpowered tug standing by to assist the THOR by minimizing the chance of a breakaway of the non-self-propelled vessel, holding or pushing the THOR back into the dock, or ultimately, attempting to maneuver and render aid to the derrick barge in the event of a breakaway, with her engines off did not, *in any way*, cause or contribute to the Breakaway Incident.

A reasonable inference can also be made that if the ENDEAVOR had disclosed to the THOR the limitations of the vessels capacities or requested alternative or additional tug support,

---

[170] 33 C.F.R. § 83.19(b).
[171] *In re Crosby Tugs, L.L.C.*, No. 02-1125, 2005 WL 7873785, *31 (E.D. La. July 5, 2005) (citing *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir.1994); *Trico Marine*, 332 F.3d at 786).
[172] *In re Lasala*, 2021 WL 2002503, at *3 (citing *Omega Protein,* 548 F.3d 361).

the Breakaway Incident could have been prevented. Likewise, had the ENDEAVOR's crew made the prudent and commonsense decision to "have her engines ready for immediate maneuver,"[173] the Breakaway Incident could have been avoided entirely.

Thus, the only remaining issue on this point is whether these acts of negligence occurred within Crosby's privity and knowledge, as many were their own, they undoubtedly did. As such, Crosby cannot, as a matter of law, seek to avail itself of the protections afforded by the Limitation Act and limit its liability for the tens of millions of dollars in damages for this incident to only $3.75 million.

        f.   Crosby's Negligence was within its Privity or Knowledge

A vessel owner is deemed to have privity or knowledge and a denial of limitation is triggered when, as here, shoreside management personally participated in negligent conduct and made negligent decisions leading directly to the casualty,[174] and the Court should reject any argument by Crosby that the failings of the ENDEAVOR's crew were merely instantaneous errors in navigation, not within its privity or knowledge, because the record makes clear that Crosby shoreside management knew well the negligent conditions within which the ENDEAVOR was operating.[175]

Moreover, the U.S. Fifth Circuit has determined and courts within this circuit have found that that privity and knowledge exist where, the vessel owner has failed to provide adequate training programs[176] or failed to enforce compliance with maritime regulations, contributing to a

---

[173] 33 C.F.R. § 83.19(b).

[174] *In re TT Boat Corp.*, 1999 WL 223165, at *8-10; *In re Hellenic Inc.*, 252 F.3d 391 (5th Cir. 2001); see also generally § 15:8. Privity or knowledge, 2 Admiralty & Mar. Law § 15:8 (6th ed.).

[175] *In re Bowmech Marine, Inc.*, No. 91-1893, 1992 WL 266098, at *6 (E.D. La. Sept. 24, 1992) (McNamara, J.), aff'd sub nom. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500 (5th Cir. 1994) (where undertaking the voyage in question in 35 mph winds with a tow of four empty salt barges despite the presence of gas pipelines crossing the waterway was negligent, but shoreside management knew the tug was being operated in high winds, vessel owners were not entitled to limitation).

[176] *Brister,* 946 F.2d 350; *In re Cameron Boat Rentals, Inc.*, 683 F. Supp. 577 (E.D. La. 1988).

navigational error, and where such an error was the natural consequence of the owner's unwritten policies.[177]

Here, Crosby's failure to train its crew on breakaway procedures, its disregard for engine readiness during hurricane conditions, and its assignment of a vessel known to be underpowered and improperly designed for the intended service are not isolated crew oversights but reflect a broader pattern of operational negligence that falls squarely within the scope of Crosby's corporate-level authority and knowledge. Because these breaches occurred with full knowledge of the ENDEAVOR's limitations and the forecasted storm conditions, and because Crosby failed to take reasonable precautions that a prudent operator would have taken, Crosby cannot meet its burden under the Limitation of Liability Act. Its claims for exoneration or limitation must be denied.

### 4. CONCLUSION

In sum, "incompetent management, inadequate training practices, [the ENDEAVOR's crew's] complete disregard for safe navigation practices, and the unseaworthiness of [the ENDEAVOR] all contributed to the circumstances that resulted" in the Breakaway Incident.[178] Under these circumstances, Crosby cannot, as a matter of law, meet its burden of proving that no negligence on its part and/or unseaworthy condition of the ENDEAVOR were contributing factors in the Breakaway Incident. Further, it cannot establish that these acts of negligence and/or conditions of unseaworthiness were not within its privity and knowledge. For the foregoing reasons, Crosby's claims for exoneration from and limitation of liability should be dismissed with prejudice.

---

[177] *In re Cameron Boat*, 683 F. Supp. 577.
[178] *In re Crosby Tugs, L.L.C.*, 2005 WL 7873785, *18.

Respectfully Submitted:

*/s/ Gavin H. Guillot*
Gavin H. Guillot, T.A. (#31760)
Salvador J. Pusateri (#21036)
Aaron B. Greenbaum (#31752)
Meredith W. Blanque (#32346)
Jacob A. Altmyer (#36352)
Jonathan D. Parker (#35275)
**PUSATERI, JOHNSTON, GUILLOT &
GREENBAUM, LLC**
1100 Poydras Street, Suite 2250
New Orleans, LA 70163
Telephone: 504-620-2500
Facsimile: 504-620-2510
Gavin.Guillot@pjgglaw.com
Salvador.Pusateri@pjgglaw.com
Aaron.Greenbaum@pjgglaw.com
Meredith.Blanque@pjgglaw.com
Jacob.Altmyer@pjgglaw.com
Jonathan.Parker@pjgglaw.com
**ATTORNEYS FOR MODERN AMERICAN
RAILROAD SERVICES, L.L.C., AND
SHORE OFFSHORE SERVICES, LLC**

**AND**


*/s/ Edwin Lazier*
Edwin Christian Laizer
Johnny L. Domiano, Jr.
Matthew C. Guy
Charles A. Cerise, Jr.
Catherine Neal Creed
ADAMS & REESE, LLP
701 Poydras St., Suite 4500
New Orleans, LA 70139
504-581-3234
edwin.laizer@arlaw.com
johnny.domiano@arlaw.com
matthew.guy@arlaw.com
ceriseca@arlaw.com
cate.creed@arlaw.com
**ATTORNEYS FOR HARVEY GULF
INTERNATIONAL MARINE, LLC AND**

32

**HARVEY SEAS, LLC**

**AND**

**STAINES, EPPLING & KENNEY, LLP**
*/s/Jason R. Kenney*
**JASON R. KENNEY (#29933)**
**COREY P. PARENTON (#32918)**
3500 North Causeway Boulevard, Suite 820
Metairie, Louisiana 70002
Telephone: (504) 838-0019
Facsimile: (504) 838-0043
Email: corey@seklaw.com
jason@seklaw.com
*Counsel for Intervenor, Certain Underwriters*
*subscribing to Hull & Machinery Policy # GCP*
*19537*

**AND**

*/s/ Laurent J. Demosthenidy*
Harold J. Flanagan (#24091)
Laurent J. Demosthenidy (#30473)
Anders F. Holmgren (#34597)
Dennis O. Durocher, Jr. (#36441)
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Suite 3300
New Orleans, LA 70170
Telephone: (504) 569-0235
Facsimile: (504) 592-0251
hflanagan@flanaganpartners.com
ljd@flanaganpartners.com
aholmgren@flanaganpartners.com
ddurocher@flanaganpartners.com
**Attorneys for Weeks Marine, Inc.**