UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**EXHIBIT C**

| | |
|---|---|
| ALL COAST, LLC | CIVIL ACTION NO.<br>2:21-CV-00258-JCZ-KWR<br>(lead case) c/w 21-337,<br>21-464, 21-822, 21-1968,<br>21-1969, 21-1981,<br>21-1982, 21-2075, 21-2227 |
| VERSUS | |
| SHORE OFFSHORE<br>SERVICES, LLC | SECTION "A" |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

TERRY JOE DOUGLAS,

TAKEN ON BEHALF OF CLAIMANTS, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORTED AT THE LAW OFFICES OF:

PUSATERI, JOHNSTON, GUILLOT & GREENBAUM, LLC

1100 POYDRAS STREET, SUITE 2250

NEW ORLEANS, LOUISIANA  70163

COMMENCING AT 10:00 A.M., ON MARCH 7, 2023.

1   business and there's a wrong way to do business,
2   especially offshore in the Gulf of Mexico.  He was
3   based in Houma and he was based in New Orleans.  He was
4   based in all kind of different locations.
5               Do you agree with that statement, that there's
6   a right way to do business and there's a wrong way to
7   do business?
8                    MR. GUILLOT:  Form.
9        A.   Yes.
10  BY MR. LEWIS:
11       Q.   Okay.  And at no point in time, you'd agree --
12  you're someone who, I can just tell, has been in this
13  industry and lived this industry for -- for your whole
14  career, many years, right?
15       A.   (Witness nods head.)
16       Q.   At no point in time would it ever be
17  acceptable in your eyes for people to be making
18  decisions to save money versus -- at the cost of
19  safety, right?
20       A.   Correct.
21       Q.   It -- it would be wholly unacceptable in your
22  eyes as a superintendent of the D/B Thor to learn if
23  people -- certain people at the company were making
24  decisions thinking about profits and losses versus
25  safety, correct?

```
1       A.   Yes.
2       Q.   And in your experience -- in your personal
3  experience of 12 years being a superintendent of a
4  barge, interacting with tug captains, do you understand
5  those tugs to be the barge's lifeline?
6            MS. KUEBEL:  Objection; form.
7       A.   Yes, I do.
8  BY MR. LEWIS:
9       Q.   And so just in case this ends up with -- with
10 a jury, okay, they may not understand a barge versus a
11 tug versus a seagoing vessel.  Okay?  Does the D/B Thor
12 have its own propulsion system where it can just
13 navigate around the Gulf of Mexico on its own?
14      A.   No, it does not.
15      Q.   Does it utilize assist tugs or tractor tugs,
16 like, for example, the Crosby Endeavor, to navigate
17 from place to place?
18      A.   Yes.
19      Q.   And so when you're saying it's your lifeline,
20 explain to me and the ladies and gentlemen of the jury,
21 what does that mean?
22      A.   It means without their propulsion, I can't do
23 nothing.  I can't get anywhere.  I can't do nothing.
24      Q.   Without their propulsion, if you're in the
25 water, the D/B Thor basically just becomes a sitting
```

```
 1   up a run -- how many miles and a run time that we was
 2   going to Martin -- Martin dock 16.
 3        Q.   All right.  And did the captain have any
 4   response?
 5        A.   They -- they worked me up a run time and let
 6   me know.
 7        Q.   All right.  Did he give you any other
 8   information?
 9        A.   Sir?
10        Q.   Did he give you any other information?
11        A.   No, other than that he knew right where it was
12   at and right down from their -- their dock.
13        Q.   Did you ask him for any other information?
14        A.   No.
15        Q.   When you got to the dock at Martin, did the
16   Crosby Endeavor stay with the barge the whole time?
17        A.   No, it didn't.
18        Q.   So it left at some point?
19        A.   Yes.
20        Q.   When did it leave?
21        A.   He had called me after we got tied up and we
22   called barge secure on the morning of the 27th.  He had
23   requested could he go to his dock and pick up groceries
24   and supplies.
25        Q.   And how long was the tug gone?
```

```
 1        A.   That day.  He returned back early morning of
 2   the 28th.
 3        Q.   Did he return on his own, or did you call him
 4   back?
 5        A.   No.  It was understood when he requested to go
 6   to his dock that he would be back that morning.
 7        Q.   And he was?
 8        A.   And he was.
 9        Q.   When the decision was made to go to the Martin
10   dock in Fourchon, was there any discussion between you
11   and the office about how far the Fourchon dock was from
12   the jobsite?
13        A.   I don't recall exactly what the conversation
14   was.  I called my project manager, Cody Sims, and told
15   him it looked like I was going to start picking up
16   anchors later that night and I needed some dock space
17   in Fourchon.
18        Q.   And so Cody is the one who told you where to
19   take the barge?
20             MR. GUILLOT:  Object to form.
21        A.   No.  I had asked to go to the closest dock,
22   which was Fourchon.
23   BY MR. CERISE:
24        Q.   You asked for the closest dock?
25        A.   Yes.
```

1   work, right?
2               MR. GUILLOT: Objection; form.
3       A.   This is not work. We're not running anchors
4   in the field. We're talking about I am dependent on
5   his propulsion. I am required, when at the dock, to
6   have an assist tug with me because I have no
7   propulsion. He -- he knows that. Everybody knows
8   that.
9   BY MR. RUFTY:
10      Q.   Did you ask the Crosby Endeavor to tie up next
11  to you?
12      A.   No. He requested to tie up to me because he
13  knows he has to be there with me during the impact of
14  the storm.
15      Q.   If he was part of your mooring plan, wouldn't
16  you have asked him to tie up next to you?
17      A.   Didn't have to ask him. He knew that he had
18  to be there as my protection during the storm. I
19  didn't have to ask him. He knew. He asked me because
20  he --
21      Q.   How many conversations did you have -- how
22  many conversations did you have with Crosby Endeavor on
23  the afternoon of October 28th before the hurricane came
24  through?
25      A.   Just communication from when the wind started

1  have had to hire a boat to come in to help you do that
2  after his hurricane had passed, right?
3       A.   These boats are hired to help me out.
4       Q.   Yeah.  And you had three boats with you --
5  with you next to the Thor, and that allowed you, once
6  the hurricane had passed, to direct the three boats to
7  assist Thor in leaving the port, right?
8       A.   Correct.
9       Q.   And the fact that the three boats -- the three
10 tugboats were near you facilitated that process of
11 leaving the port quickly once the hurricane had passed;
12 isn't that true?
13      A.   Yes.
14      Q.   As opposed to hire a boat to come from
15 somewhere else?
16      A.   Yes.
17      Q.   And the Crosby Endeavor was on standby while
18 the hurricane was coming through, wasn't it?
19           MR. GUILLOT:  Object to form.
20      A.   No, the Crosby was not on standby.  He was --
21 I am required to have a vessel with propulsion beside
22 me, because I'm a dead ship, in all ports at all times
23 by the port authority.
24 BY MR. RUFTY:
25      Q.   When do you believe the Crosby Endeavor should

```
                    REPORTER'S CERTIFICATE
```

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that TERRY JOE DOUGLAS, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in the foregoing 593 pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript, accompanied by my original signature and original raised seal on this page.

Prairieville, Louisiana, this 21st day of March, 2023.

_____
YOLANDA J. PENA, CCR, RPR
CCR NO. 2017002, RPR NO. 907346