**EXHIBIT**

**L**

Transcript of the Testimony of
# Videotaped Deposition of Walter Everett, Jr.

### Date taken: April 4, 2023

### All Coast, LLC v. Shore Offshore Services, LLC

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Page 43

1      A    Yeah.

2      Q    -- one way or the other whether you

3  were drug tested or not?

4      A    Yeah, I don't remember.  There was

5  so much going on that day.  But to be honest,

6  I don't remember.

7      Q    After an incident, is it Crosby's

8  general practice to do, administer drug and

9  alcohol tests?

10     A    They would in the event of, if we

11  had a -- if I ran into someone or, you know,

12  something like that.  But in a situation like

13  this, it's nothing mandatory.

14     Q    Okay.

15     A    Yeah.

16     Q    Here in connection with this

17  incident, did the CROSBY ENDEAVOR actually run

18  into any vessels or any objects?

19     A    No.  We hit one of those dolphins,

20  I think, over on the west bank, and as far as

21  anything else, I'm busy trying to maneuver the

22  boat.  I didn't personally see us hit any

23  vessel or anything, but I know that we touched

24  the dolphin, because it had -- the wind had me

25  pinned on there for a minute.

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 137

1              Object to form.

2         THE WITNESS:

3              Man, I -- like I say, I don't

4    remember the incident.  I have no idea

5    what incident it's talking about?

6  EXAMINATION BY MR. ALTMYER:

7    Q    So irrespective of the incident, do

8  you remember doing additional training hours

9  to get your safety bonus back, in any year

10 that you were working for Crosby?

11   A    No.  I don't remember anything like

12 that.

13   Q    Okay.  So you just don't remember

14 anything at all about --

15   A    No, I have idea.  I have no idea

16 what's going on there.

17   Q    Okay.

18   A    Yeah.

19   Q    Was any action taken against your

20 license by the Coast Guard after the October

21 28, 2020 incident?

22   A    No.  No.

23   Q    Okay.  Are you aware of any changes

24 in Crosby's safety policy or training

25 practices after the October 28, 2020 incident?

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 138

1          A     No.

2          Q     Did you have any post-incident

3     meetings with Crosby shoreside management

4     about the incident, after the fact?

5          A     Yeah, we discussed it, and lessons

6     learned, and I don't remember everything about

7     it, but that's standard.

8          Q     Okay.  What were some of the

9     lessons learned that were discussed?

10         A     I -- I'm going to tell you what I

11    remember is -- my response was, when they --

12    for the lessons learned, was don't bring a

13    barge into Fourchon when there's a hurricane

14    coming.  I had to write up a thing, and that's

15    what I wrote.

16         Q     Okay, so --

17         A     I'm pretty sure.

18         Q     So there should be Crosby

19    documentation about this post-incident

20    meeting?  A form that you would have filled

21    out?

22         A     I'm not 100 percent sure.  That's

23    all I can say on that.  I'm not a hundred

24    percent sure.

25         Q     Were there any memos circulated by

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 212

1    you were going back to the Crosby dock?

2        A    Of course.  Yes, sir.

3        Q    Okay.  Did you ask permission from

4    the THOR to go back to the Crosby dock?

5        A    Yeah.  You can never -- you never

6    leave a customer without their permission and

7    their knowledge.

8        Q    Okay.  Were you still -- was Crosby

9    still charging standby time to the THOR when

10   you all left to go back to the Crosby dock?

11       A    I have no idea.

12       Q    Okay.  Were you still getting paid

13   the same when you were going back to the

14   Crosby dock?

15       A    I'm getting paid the same.

16       Q    Okay.  It looks like, from 7:45 to

17   8:00 is when you departed and then when you

18   arrived at the Crosby dock, so it's about a

19   15-minute trip?

20       A    Yeah.

21       Q    Maybe a little shorter?

22       A    It's about -- yeah, it's shorter

23   than that.  But by the time you get tied up,

24   you know, 15.

25       Q    Okay.  So it's close?

Page 213

1    A    Yeah.

2    Q    Okay.  And looking at the entries

3  from 800, on October 27th -- and let's just

4  confirm real quick, you were working noon to

5  midnight that day, correct?

6    A    Correct.

7    Q    All right.  So looking at the

8  entries from 800, on October 27th, to the next

9  day, which is Crosby 454, to 800, on

10  October 28th, y'all had left the Crosby dock

11  at 7:45, the morning of October 28th, right?

12    A    Right.

13    Q    Okay.  So you were at the Crosby

14  dock for about 24 hours, right?

15    A    Yeah, somewhere, approximately.

16    Q    Okay.  And at that time are you on

17  standby for the THOR?

18    A    While I'm at the Crosby dock?

19    Q    Yes.

20    A    I guess you could say we're on

21  standby, I mean, but it's -- you would have to

22  talk with someone that handles the billing.  I

23  don't know if we were being paid during that

24  time or what.  That's out of my league.

25    Q    For 800, where it says, "Arrive,

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 229

1       A       Okay, yeah.

2       Q       In between those two times, are you

3    aware of whether or not the CROSBY ENDEAVOR

4    was surveyed for any damage?

5       A       Yeah, some -- the office, I

6    remember, asking me about if there was any

7    damage from that dolphin, so at the Crosby

8    dock, the port captains checked it out and

9    determined that it was just surface -- you

10   know, a surface scratch.

11      Q       Okay.

12      A       Yeah.

13      Q       And did you feel like it was safe

14   to go back offshore and keep working?

15      A       Oh, yeah.  Once I got out and

16   looked at it, you know, yeah.

17      Q       Okay.  How do you receive weather

18   data while you're on the CROSBY ENDEAVOR?

19      A       If I'm in port, I can -- I just

20   pull it up on my phone.  If not, I have an

21   office.  They have a weather company that they

22   use, called WeatherOps, and they email it to

23   me.

24      Q       Okay.  So while you're in port, you

25   use your phone.  Offshore, you use WeatherOps?

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 249

1    alerts?

2        A      The Coast Guard would, from time to

3    time, would give bulletins, you know.  But I'm

4    more or less looking at the realtime stuff on

5    my phone at that time, you know.

6        Q      Okay.

7        A      Because the weather radar, I'm

8    looking at the weather radar.

9        Q      Okay.  And specific to when you

10   were offshore working for the THOR, in

11   October 2020, do you recall looking at any

12   weather data, other than what would have been

13   on your cell phone or on the Weather Channel?

14       A      No.

15       Q      Okay.  Do you remember specifically

16   what website you were going to, on your phone,

17   to look at the weather data?

18       A      I was going to NOAA, you know, the

19   NOAA weather site, and then the Weather

20   Channel has an app, and this one called Storm

21   Tracker or something, that I was monitoring

22   how the prediction of the storm was.

23       Q      Okay.  Have you ever heard of

24   Navigational Telex?  Have you ever heard of

25   that before, NAVTEX?

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 259

1      Q      Are the uncrewed vessels, do they

2  have crewed vessels attached to them?

3      A      Yeah, most of the time during the

4  storm, you know, to minimize the chance of

5  them breaking away.

6      Q      Okay.  And that's why you would put

7  a propelled barge next to an unmanned barge,

8  right?

9      A      Right.

10      Q      Okay.  And that's what you were

11  doing for the THOR, right?  You were the means

12  of propulsion, where the THOR had no

13  propulsion at the dock, right?

14          MR. RUFTY:

15              Object to form.

16          THE WITNESS:

17              Well, at the dock, we're not --

18      we're not -- we're supposed to be moored

19      to where propulsion isn't necessary,

20      unless he -- the barge deems it, then I

21      would use propulsion.

22  EXAMINATION BY MR. ALTMYER:

23      Q      Okay.  I'm going to show you a

24  document real quick, okay.  I am going to show

25  you a document, Mr. Everett, and I'm going to

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 273

```
 1            MR. RUFTY:
 2                 Same objection.
 3            THE WITNESS:
 4                 I can only state that I was the
 5       only self-propelled vessel there, to a
 6        barge that was moored.
 7  EXAMINATION BY MR. ALTMYER:
 8     Q    The barge that was moored that
 9  you're talking about is the D/B THOR, right?
10     A    Correct.
11     Q    Which is non-self-propelled?
12            MR. REISMAN:
13                 Object to the form.
14            THE WITNESS:
15                 Correct.
16  EXAMINATION BY MR. ALTMYER:
17     Q    Okay.  Why would you want a
18  propelled vessel with a non-self-propelled
19  vessel at a dock during a hurricane?
20            MR. RUFTY:
21                 Same objection.  Asked and
22        answered.
23            MR. REISMAN:
24                 Object to the form.
25            THE WITNESS:
```

Page 274

1              Repeat your question one more

2       time.

3   EXAMINATION BY MR. ALTMYER:

4       Q    Why would you want a propelled

5   vessel with or moored alongside a

6   non-self-propelled vessel at a dock during a

7   hurricane?

8           MR. RUFTY:

9              Object to form, and asked and

10      answered.

11          THE WITNESS:

12             Because it's

13      non-self-propelled.

14  EXAMINATION BY MR. ALTMYER:

15      Q    Okay.  Explain that a little bit

16  further to me.  Why would you want the

17  self-propelled vessel with the

18  non-self-propelled vessel, because it's

19  non-self-propelled?

20          MR. REISMAN:

21             Object to the form.

22          MR. RUFTY:

23             Object to form.

24          THE WITNESS:

25             Because it's

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 275

1        non-self-propelled.

2    EXAMINATION BY MR. ALTMYER:

3        Q    Because it has no means of --

4        A    Because it's non-self-propelled.

5        Q    So you want a propelled vessel with

6    a non-self-propelled vessel, so that it can

7    assist in keeping the non-self-propelled

8    vessel back at the dock, correct?

9            MR. RUFTY:

10               Object to form.

11           THE WITNESS:

12               As I said, the

13       non-self-propelled vessel is moored.

14       You have the propelled vessel there to

15       assist.

16    EXAMINATION BY MR. ALTMYER:

17       Q    Okay.  And so you were assisting

18    the D/B THOR on October 28, 2020?

19           MR. RUFTY:

20               Object to form.

21           THE WITNESS:

22               Right.

23    EXAMINATION BY MR. ALTMYER:

24       Q    Okay.  As the only means of

25    propulsion between the THOR and the channel,

Page 277

```
 1       Q      Attempt to.  Attempt to, okay.

 2              MR. REISMAN:

 3                   Object to form.

 4    EXAMINATION BY MR. ALTMYER:

 5       Q     So you were the THOR's lifeline?

 6              MR. RUFTY:

 7                   Object to form.

 8              MR. REISMAN:

 9                   Object to form.

10              THE WITNESS:

11                   I don't call myself a lifeline.

12    EXAMINATION BY MR. ALTMYER:

13       Q      In the event of a break-away?

14              MR. RUFTY:

15                   Object to form.

16              MR. REISMAN:

17                   Same objection.

18    EXAMINATION BY MR. ALTMYER:

19       Q     Let me ask you this.  Why else

20    would you have been tied to the THOR?

21              MR. RUFTY:

22                   Object to form.

23    EXAMINATION BY MR. ALTMYER:

24       Q      During the hurricane?

25       A      I'm there to -- as the propelled
```

Page 278

```
 1   vessel, because they are non-propelled, to

 2   attempt to render aid in case they break away.

 3        Q     Okay.

 4        A     But I am -- I cannot call myself a

 5   lifeline.

 6        Q     Okay.  So you were there to aid the

 7   THOR in case they broke away?

 8             MR. RUFTY:

 9                  Object to form.

10             THE WITNESS:

11                  Correct.

12   EXAMINATION BY MR. ALTMYER:

13        Q     Okay.  And that's what you were

14   doing on October 28th, while you were moored

15   to the THOR?

16             MR. RUFTY:

17                  Object to the form.

18             MR. REISMAN:

19                  Object to the form.

20             THE WITNESS:

21                  Correct.

22   EXAMINATION BY MR. ALTMYER:

23        Q     Okay, thank you.  Why didn't the

24   CROSBY ENDEAVOR stay at the Crosby dock, on

25   October 27th, to ride out the hurricane?
```

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 279

1          A      We did stay there on October the

2     27th.

3          Q      I mean, why didn't they stay

4     there -- why didn't the CROSBY ENDEAVOR stay

5     there on the 28th?

6          A      Because the THOR requested that we

7     return.

8          Q      Did the THOR -- do you have

9     personal knowledge that the THOR specifically

10    requested that you return?

11         A      No, I don't have the -- in other

12    words, they don't call me and say, "Hey,

13    Captain Walt, we need you to come over by our

14    barge."  My office gives me the information.

15         Q      As master of the CROSBY ENDEAVOR,

16    you knew that you had to be moored alongside

17    the THOR during the hurricane, right?

18              MR. RUFTY:

19                  Object to form.

20              THE WITNESS:

21                  Yes.

22    EXAMINATION BY MR. ALTMYER:

23         Q      Okay.  Let's talk about specific

24    communications that you would have had with

25    the THOR superintendent on October 28th, 2020.

Page 286

1           not directed to do so.

2                THE WITNESS:

3                    Okay.  As I was made up, it

4           would be impossible for me to push the

5           barge directly into the dock.  I'm made

6           up alongside.  I can drive ahead or I

7           can drive astern.

8    EXAMINATION BY MR. ALTMYER:

9        Q     Can you position the bow thruster

10   in a way that would be able to --

11       A     The bow thruster is not strong

12   enough to do that.  It's for small maneuvers,

13   light boat maneuvering.  As I was made up,

14   it's impossible for me to push directly into

15   the dock.

16       Q     Okay.  I'm going to read you an

17   answer from discovery responses that Crosby --

18       A     Okay.

19       Q     -- had given us, and I'm quoting,

20   it says, "The ENDEAVOR is an offshore towing

21   and anchor handling tug and is not designed to

22   hold vessels in place."

23       A     Yeah.

24       Q     Do you agree with that statement?

25       A     Pretty much.  I mean, we're -- I'm

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 294

```
 1          MR. RUFTY:

 2               Object to form.

 3          THE WITNESS:

 4               No.  I was holding against it,

 5          and like, as I said, constantly

 6          conversing with the barge to see if

 7          they -- you know, how they were doing,

 8          if they needed something, because if he

 9          needed -- if it looked like he was

10          getting a lot of tension on his stern

11          line or his bow line, I would either --

12          and I would hold myself -- try to hold

13          the vessel as straight as possible and

14          either come ahead or astern.

15   EXAMINATION BY MR. ALTMYER:

16        Q     Did you engage the bow thruster at

17   any point prior to the time the THOR began to

18   break away?

19        A     Not prior to it breaking away.

20        Q     And what did you first do -- well,

21   how did you learn that the vessel was breaking

22   away?

23        A     Well, when J.D. -- I was asking him

24   how he was doing, and I heard him say -- he

25   came on the radio and said, "We're breaking
```

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 295

1    away from the dock."  So at that time I could

2    feel the swinging out a little bit, so I

3    started to drive ahead on my lines, you know,

4    on the lines, to try to get him back in to the

5    dock.  I didn't know how many lines, if all

6    his lines had broken or what, so -- with very

7    little effect, and as it started to swing me

8    to the west side of the bayou, I tried

9    twin-screwing by using my starboard engine

10   ahead and my port engine slightly astern, and

11   the bow thruster full force to try to hold us

12   up, you know, and at that point, lines started

13   parting, you know.

14   EXAMINATION BY MR. ALTMYER:

15        Q    There's been some testimony

16   previously in this case -- I think you

17   testified earlier that you reviewed parts of

18   the --

19        A    Yeah.

20        Q    -- deposition of Mr. Douglas, Joe

21   Douglas.

22        A    Yeah.

23        Q    There was some testimony about

24   black smoke coming from the CROSBY ENDEAVOR

25   moments after the THOR began to break away

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 444

1              MR. ALTMYER:

2                   Objection to form.

3              THE WITNESS:

4                   In most cases.

5    EXAMINATION BY MR. GRINNAN:

6        Q    Okay, in most cases.  In this case,

7    the THOR defendants or the owners of the THOR,

8    they hired Crosby to provide some tug services

9    with the ENDEAVOR, fair?

10             MR. ALTMYER:

11                  Objection to form.

12             THE WITNESS:

13                  I don't know who hired them.

14   EXAMINATION BY MR. GRINNAN:

15       Q    Okay.  Well, sir, did you have

16   permission to be there on the day of the

17   incident?

18       A    Yes.

19       Q    Who told you that you needed to go

20   out and be alongside the THOR on the day of

21   the incident?

22       A    Operations, Crosby.

23       Q    Okay.  What's that person's name?

24       A    Ivy Danos was one of them.  I don't

25   know --

Videotaped Deposition of Walter Everett, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 667

1                  REPORTER'S CERTIFICATE

2

3        This certification is valid only for a
transcript accompanied by my original
4   signature and original required seal on this
page.

5

6              I, Linda G. Griffin, RPR,
Certified Court Reporter in and for the
7   State of Louisiana, as the officer before
whom this testimony was taken, do hereby
8   certify that WALTER EVERETT, JR., after
having been duly sworn by me upon authority
9   of R.S. 37:2554, did testify as hereinbefore
set forth in the foregoing 666 pages; that
10  this testimony was reported by me in the
stenotype reporting method, was prepared and
11  transcribed by me or under my personal
direction and supervision, and is a true and
12  correct transcript to the best of my ability
and understanding; that the transcript has
13  been prepared in compliance with transcript
format guidelines required by statute or by
14  rules of the board, that I have acted in
compliance with the prohibition on
15  contractual relationships, as defined by
Louisiana Code of Civil Procedure Article
16  1434 and in rules and advisory opinions of
the board; that I am not related to counsel
17  or the parties herein, nor am I otherwise
interested in the outcome of this matter.

18

19

20

21         _____
           LINDA G. GRIFFIN, RPR
           CERTIFIED COURT REPORTER
22

23

24

25