

EXHIBIT

N

Transcript of the Testimony of
**Videotaped Deposition of Ernest Plaisance**

**Date taken: July 13, 2023**

**All Coast, LLC v. Shore Offshore Services, LLC**

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 27

1          Exhibit 147?

2              THE COURT REPORTER:

3                  Yes.

4              MR. GUILLOT:

5                  All right.  Well, then we will

6          make this "Exhibit 147," which is Crosby

7          2098.

8     EXAMINATION BY MR. GUILLOT:

9          Q    It is a true statement that you've

10    received no training from Crosby Tugs in how

11    to deal with breakaway scenarios, correct?

12         A    Correct.

13         Q    Is that also a true statement from

14    the date of the incident through today?

15         A    Yes.

16         Q    In your time working for Crosby,

17    have you ever been part of a crew during any

18    collisions or personal injuries that occurred

19    involving the boat that you were on?

20         A    Collisions, no.  Personal injuries,

21    people get hurt.

22         Q    So it's a "yes" as to personal

23    injuries?

24         A    Yeah.

25         Q    "No" as to collisions?

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 73

1              I objected to form and said,

2         "Asked and answered."

3            MR. GUILLOT:

4                 Just form.  Okay.

5            MR. RUFTY:

6                 And then responded to your --

7            MR. GUILLOT:

8                 All right.  All right.  Let's

9         not respond any more.

10           MR. RUFTY:

11                Okay.  That's all I was doing.

12           MR. GUILLOT:

13                That's it.

14   EXAMINATION BY MR. GUILLOT:

15      Q    Now that that's over, do you

16   understand the question?

17      A    Could you repeat it?

18      Q    I'm talking about when you were on

19   watch, from 8:00 a.m. to noon, on the 28th.

20   Those are the parameters that we're talking

21   about, okay.  Are you with me?

22      A    Yes.

23      Q    All right.  You agree that one

24   purpose of the ENDEAVOR, during that time,

25   being coupled to the THOR on October 28th,

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 74

1   would be to push the THOR back into the dock

2   in the event it broke away during that time?

3           MR. RUFTY:

4                 Object to form.  Asked and

5       answered.

6           THE WITNESS:

7                 If directed to.

8   EXAMINATION BY MR. GUILLOT:

9       Q     If directed to.  Do you have any

10  knowledge if the ENDEAVOR was directed to push

11  the THOR back into the dock after the

12  breakaway?

13      A     No.

14      Q     No knowledge whatsoever?

15      A     I don't -- I don't remember hearing

16  none of that.

17      Q     You would agree that another

18  purpose -- or you would agree that a purpose

19  of the ENDEAVOR, in assisting the THOR on

20  October 28th, would be if the THOR broke away

21  from the dock, for the ENDEAVOR to maneuver

22  the THOR to avoid hitting any objects?

23          MR. RUFTY:

24                Object to form.

25          THE WITNESS:

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 75

1              Yes.

2    EXAMINATION BY MR. GUILLOT:

3        Q    And part of that has to do with

4    attempting to take control of the THOR

5    potentially to push it into the bank or the

6    mud, correct?

7              MR. RUFTY:

8                   Object.  Would you read that

9         question back, please?

10             THE WITNESS:

11                  Could you repeat the question?

12             MR. GUILLOT:

13                  He's asked for the court

14        reporter to read it back.

15             THE COURT REPORTER:

16                  Question:  And part of that has

17        to do with --

18             MR. RUFTY:

19                  If he's asked to repeat it

20        anyway, you might as well just skip this

21        part and go ahead and repeat it.  Thank

22        you.

23             MR. GUILLOT:

24                  She was halfway through it.

25             MR. RUFTY:

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 76

1              Well, no, she was just

2         starting.  He doesn't understand it, you

3         know, if you want to try again, go

4         ahead.

5    EXAMINATION BY MR. GUILLOT:

6         Q    The reason you said "correct" to my

7    last question that was answered was because

8    you're trying to take control of the THOR to,

9    for example, push it into the bank or the mud

10   to stop it from being adrift, correct?

11             MR. RUFTY:

12                  Object to form.

13             THE WITNESS:

14                  Yes.

15   EXAMINATION BY MR. GUILLOT:

16        Q    If the ENDEAVOR had been directed,

17   when coupled to the THOR on October 28th, to

18   push the THOR back into the dock after it

19   broke away, you would agree that that would

20   trigger the ENDEAVOR's responsibilities to the

21   THOR to push the vessel back into the dock?

22             MR. RUFTY:

23                  Object to form.

24             THE WITNESS:

25                  I don't know.

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 77

1    EXAMINATION BY MR. GUILLOT:

2        Q    Well, you just testified earlier

3    that you were working as directed, right?

4        A    Yes.

5        Q    And if directed to push the vessel

6    back into the dock, then that would make it

7    very clear that part of the ENDEAVOR's

8    responsibility, on October 28th, 2020, would

9    be to indeed push the THOR back into the dock,

10   in the event of a breakaway, correct?

11            MR. RUFTY:

12                Object to form.  That's a

13        very --

14            THE WITNESS:

15                Yes.

16            MR. RUFTY:

17                Object to form.  Unfair

18        question.

19            MR. GUILLOT:

20                What did you say?  What did the

21        witness say?

22            THE COURT REPORTER:

23                Yes.

24            MR. GUILLOT:

25                Thank you.

Page 78

1    EXAMINATION BY MR. GUILLOT:

2        Q    Do you have knowledge of any

3    ordinance for Port Fourchon governing when

4    hurricane force winds are expected in the

5    port?

6        A    Yes.

7        Q    What is your understanding of any

8    ordinances that speak to that?

9        A    That any vessel that's not

10   self-propelled needs a vessel with them.

11       Q    How long have you had a knowledge

12   of the existence of an ordinance to this

13   effect?

14       A    I don't know.

15       Q    When's the last -- have you ever

16   seen the text of that ordinance?

17       A    Yes.

18       Q    When did you see, last, the text of

19   that ordinance?

20       A    Yesterday.

21       Q    When I asked you earlier what you

22   had reviewed, you told me incident reports,

23   the master log, and the safety manual, right?

24       A    Yes.

25       Q    You didn't mention that you had

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

```
                                              Page 89
 1   barge was positioned, as it was, when the

 2   barge started breaking away from the dock, as

 3   it did, was the tug tied to the barge in a way

 4   that would allow it to push the barge back

 5   into the dock?

 6             MR. RUFTY:

 7                  Object to form.

 8             THE WITNESS:

 9                  I don't know.

10   EXAMINATION BY MR. GUILLOT:

11        Q     You don't know because you lack the

12   experience and expertise to know?

13        A     No.

14        Q     Why is it that you don't know?

15        A     I can't remember exactly what was

16   going on.

17        Q     All right.  Well, let's take it

18   this way.  Let's say, in ordinary weather

19   conditions, winds no more than 20 knots, from

20   the east -- east is the direction of the dock,

21   okay -- and the THOR is tied to the dock, as

22   it was, and the ENDEAVOR is tied to the THOR,

23   as it was, all on October 28th, 2020, okay.

24        A     Yes.

25        Q     All right.  If somehow the THOR
```

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 90

1    starts breaking away from the dock, in those

2    conditions, stern first, is the CROSBY

3    ENDEAVOR tied in a way to the THOR that would

4    allow it to push it back into the dock?

5         A    Yes, it should, yes.

6         Q    At what point would the conditions

7    be such that you are no longer able to answer

8    that question?

9         A    The high winds.

10        Q    High winds of what magnitude?

11        A    From what I remember, it was over a

12   hundred miles an hour winds.

13        Q    So is it your testimony that high

14   winds of over a hundred miles an hour would

15   prohibit the tug from pushing the THOR back

16   into the dock, in the situation that existed

17   on October 28th, 2020?

18        A    Yes.  Yes.

19        Q    What about 50 mile-an-hour winds,

20   would that prohibit it?

21        A    No, it shouldn't have.

22        Q    How about 75 mile-per-hour winds?

23        A    I don't know.

24        Q    It's iffy at 75?

25        A    Yes.

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 94

1    THOR in those seas, though, if you were tied

2    up in that manner?

3        A    We wouldn't be tied up.

4        Q    And I'm asking you a hypothetical.

5    If you were tied up in that manner, would you

6    be able to maneuver the THOR in those

7    conditions?

8        A    I don't know, because we wouldn't

9    be tied up to it.

10        Q    What would be the maximum strength

11    of the wind and height of the sea conditions,

12    where you would say, "No, can't be tied up to

13    the THOR like this to maneuver it"?

14        A    Sea conditions, no more than

15    six feet.  Anything above six feet, I wouldn't

16    get alongside of it.

17        Q    And then for the wind, do you have

18    a cutoff for that as well?

19        A    I wouldn't know.  I don't know.

20        Q    Yet, this is the way that you were

21    tied to the THOR during Hurricane Zeta, right?

22        A    Yes.

23        Q    At any time, did you explain to

24    anybody on the THOR that if there was a

25    breakaway, the ENDEAVOR's ability to maneuver

Page 95

1    the THOR would be hampered by the hurricane

2    conditions that were expected to be

3    experienced?

4         A    No.

5         Q    Is it fair to say that, under the

6    hurricane conditions that were expected to be

7    experienced, the ENDEAVOR could not maneuver

8    the THOR after the THOR had completely broken

9    free from the dock, as the ENDEAVOR was

10   coupled to the THOR?

11            MR. RUFTY:

12                Object to form.  If you can

13         understand it, you can answer it.

14            THE WITNESS:

15                The prediction, it wasn't

16         supposed to be as bad as it got.

17            MR. GUILLOT:

18                I agree with you.

19            MR. GRINNAN:

20                Objection, nonresponsive.

21            MR. GUILLOT:

22                I don't agree with him.

23   EXAMINATION BY MR. GUILLOT:

24        Q    But let's talk about what they

25   actually were, though.  Is it your

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 98

1          dock, in the event of a breakaway; is

2          that correct?

3              MR. RUFTY:

4                  I just -- that's

5          incomprehensible.  I object to form.

6              MR. GUILLOT:

7                  All right.  Well, it may be

8          incomprehensible to you.  Let's see if

9          it's incomprehensible to the witness.

10             THE WITNESS:

11                 Could you rephrase the

12         question?

13             MR. GUILLOT:

14                 Yes.  Yeah, I'm happy to

15         rephrase the question.

16     EXAMINATION BY MR. GUILLOT:

17         Q    The way that you were tied to the

18     THOR, on October 28th, 2020, did you ever

19     communicate to anyone aboard the THOR that the

20     way in which you were tied to the THOR on that

21     date might limit your ability to push the THOR

22     back into the dock, in the event of a

23     breakaway?

24             MR. RUFTY:

25                 Object to the form.

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 99

 1              THE WITNESS:

 2                  No.

 3    EXAMINATION BY MR. GUILLOT:

 4         Q      After the THOR broke away from the

 5    dock, the ENDEAVOR remained coupled to her for

 6    a period of time and then eventually broke

 7    away from the THOR, correct?

 8         A      Yes.

 9         Q      The ENDEAVOR ran aground at some

10    point following decoupling from the THOR,

11    correct?

12         A      Yes.

13         Q      And the ENDEAVOR was rescued by the

14    CROSBY INTEGRITY at some point, on the 28th,

15    right?

16         A      Yes.

17         Q      Do you agree with the statement

18    that the CROSBY ENDEAVOR is not designed to

19    hold vessels in place?

20              MR. RUFTY:

21                  Object to form.

22              THE WITNESS:

23                  I'm not -- I don't know.

24    EXAMINATION BY MR. GUILLOT:

25         Q      Can't offer an opinion on that, --

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 100

1      A      No.

2      Q      -- one way or the other?

3      A      No.

4      Q      Just a moment.  Mr. Everett

5   testified some weeks ago, and in some

6   documents that came from Crosby to us, it was

7   represented that, quote, "The ENDEAVOR is an

8   offshore towing and anchor-handling tug and is

9   not designed to hold vessels in place," closed

10  quote.  Do you agree with that statement?

11     A      Yes.

12     Q      Did you ever tell the THOR, any

13  personnel on the THOR, that the CROSBY

14  ENDEAVOR is not designed to hold vessels in

15  place?

16     A      No.

17     Q      Did you ever tell anyone at Shore

18  Offshore Services or Modern American Railroad

19  Services that that was the case?

20     A      No.

21     Q      Because you agree with the

22  statement that the ENDEAVOR is not designed to

23  hold vessels in place, you would agree that it

24  cannot and could not, on October 28th, 2020,

25  stabilize and control the THOR at the Martin

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 132

1       A     Oh, yeah.

2       Q     I'm going to play that again, from

3    1:30 to 1:36, and I want you to tell me if you

4    see any smoke coming out of the smoke stacks

5    of the ENDEAVOR, okay.   (Video playing).

6             Did you see any smoke coming out of

7    the smoke stacks?

8       A     No.

9       Q     I asked you about the MR. COLBY.

10   Do you have any knowledge of whether the

11   ENDEAVOR struck any other vessels or property?

12      A     The only thing I witnessed that we

13   hit was a piling.  I didn't -- I didn't see no

14   other boat -- I caught glimpses of boats, but

15   I didn't see no running into it, collision or

16   anything.

17      Q     Now, are we talking about just the

18   CROSBY ENDEAVOR or the CROSBY ENDEAVOR and the

19   THOR together?

20      A     Just the ENDEAVOR.

21      Q     So you just saw the ENDEAVOR hit

22   one piling and you have no knowledge of

23   hitting anything else?

24      A     That's correct.

25      Q     I'm going to play where we left

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 182

1    here?

2         A     That's right.

3         Q     Okay.  It asks, in the main block

4    in the center, "If you are witness or if you

5    are the injured employee, please provide a

6    statement of how and where the incident

7    occurred."

8               It says, "D/B THOR broke loose at

9    1600 in about 100-plus mile-per-hour wind

10   gusts.  While trying to maneuver, our deck

11   line broke and the wind pushed the D/B THOR up

12   the Bayou Lafourche.  We followed until we ran

13   aground north of the Flotation Canal."  Did I

14   read that correctly?

15        A     Yes.

16        Q     Where exactly did you run aground?

17        A     We ran aground in Bayou Lafourche,

18   three and a half miles north of Flotation

19   Canal, my best recollection.

20        Q     That part of the canal, does it

21   have channel markers?

22        A     The bayou?

23        Q     The area where you ran aground,

24   does that area of the canal have channel

25   markers?

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 193

1      A      We have a bow bumper, but it's a
2    good ways off the water line.  It's high.
3      Q      Is it your understanding that the
4    freeboard of the THOR is not as great as the
5    bumper on the bow of the ENDEAVOR?
6      A      Yes.
7      Q      So is it fair to say that, when you
8    coupled yourself to the THOR, you knew that
9    you would not be able to be in a position to
10   face up against the THOR, in any circumstance,
11   to manipulate the movement of the THOR?
12     A      Yes, we couldn't push up on it at
13   all.
14     Q      Was that ever communicated to
15   anybody on the THOR, on October 28th, 2020?
16          MR. RUFTY:
17              Object to form.
18          THE WITNESS:
19              I don't remember, no.
20   EXAMINATION BY MR. GUILLOT:
21     Q      You have no knowledge of whether
22   that was communicated, right?
23     A      No.
24     Q      Correct?
25     A      Yeah, I don't -- I don't remember.

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 202

```
 1            MR. RUFTY:

 2                 Object to form.  And there's a

 3         lot of circumstances not included in

 4         that question, as well.  Object to form.

 5         I think it's an unfair question.  You

 6         can answer it, if you can.

 7            THE WITNESS:

 8                 I don't know.

 9   EXAMINATION BY MR. GUILLOT:

10      Q    All right.  The ENDEAVOR was fast

11   enough to catch the THOR in the bayou

12   following the breakaway.  Do you agree with

13   that statement?

14            MR. RUFTY:

15                 Object to form.

16            THE WITNESS:

17                 No.

18   EXAMINATION BY MR. GUILLOT:

19      Q    It was not fast enough?

20            MR. RUFTY:

21                 You're referring to in the

22         hurricane conditions, after the

23         hurricane?

24            MR. GUILLOT:

25                 Well, I'm saying after the
```

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 203

1          breakaway.  So, yeah.  I mean, there's

2          only one breakaway we're here talking

3          about.

4                MR. RUFTY:

5                     These questions -- the same

6          question was asked several times, half

7          an hour ago, so --

8                THE WITNESS:

9                     In the conditions, no.

10    EXAMINATION BY MR. GUILLOT:

11         Q    So it's your testimony that the

12    THOR was a faster vessel than the ENDEAVOR

13    following the breakaway?

14                MR. GRINNAN:

15                     Object to form.

16                MR. RUFTY:

17                     Object to form.  He's given you

18          the answer.  That's just -- that's

19          simply a deceptive question, for the

20          sake of deception.

21    EXAMINATION BY MR. GUILLOT:

22         Q    Can you answer that?

23         A    No, I don't know.

24         Q    All right.  Now, let's talk a

25    little bit more about when the CROSBY ENDEAVOR

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 232

1      Q      Did you go straight from the Crosby

2    dock to the THOR?

3      A      Yes.  Once we got the order to go

4    back to the THOR, we went straight to the

5    THOR, yes.

6      Q      So the only opportunity to have the

7    vessel tested was in that -- tested, in terms

8    of the vessel moving, is in that transit from

9    the Crosby dock to the THOR, on the morning of

10    October 28th, correct?

11      A      No.

12      Q      All right.  When was the sea trial

13    of the newly-installed injectors conducted,

14    after they were replaced?

15      A      I don't remember offhand.  We'd

16    have to look at the rough log.

17      Q      So go ahead and look at the rough

18    log.

19      A      Because I don't remember that,

20    okay.  What was the date of the storm?

21      Q      October 28th.

22      A      Okay.  We don't have it logged down

23    that we did a test drive.

24      Q      And if you did a test drive, it

25    would be logged, right?

Page 233

1      A      Yeah.  It should have been, yes.

2      Q      Okay.  And if it's not on the logs,

3   it didn't happen, right?

4      A      I don't remember.

5      Q      Well, it would have to be on the

6   logs, right?

7      A      Yes.

8      Q      Okay.  And so the only time that it

9   was tested, if you can call it a test, was in

10  the transit from the Crosby dock to the THOR,

11  right?

12     A      Yes.

13     Q      And it should have been tested in

14  some type of sea trial, correct?

15          MR. RUFTY:

16              Object to form.

17          THE WITNESS:

18              Like I say, I don't remember.

19       I don't remember.

20  EXAMINATION BY MR. GUILLOT:

21     Q      Right, I understand you don't

22  remember, but --

23     A      And it's not written down, I

24  mean --

25     Q      What did you say?

Page 273

1     Q     You testified earlier that you

2  didn't know that the ENDEAVOR was going back

3  to the THOR, when you tied up at the Crosby

4  dock on the 27th, right?

5     A     Yeah, I didn't know.

6     Q     How did you learn that you were

7  going from the Crosby dock to the THOR, to be

8  with the THOR to ride out the storm?

9     A     We -- we got orders from the office

10 to head that way.

11     Q     Who?

12     A     I don't remember.

13     Q     How does that come through?

14     A     Either on the company sat radio or

15 they would call us on our personal cell phone.

16     Q     And so through either one of those

17 mechanisms, company, management would tell

18 you, go be with the THOR to ride out the

19 hurricane?

20     A     Yes.

21     Q     Did they tell -- was that a

22 conversation had with you or with someone

23 else?

24     A     I don't remember.

25     Q     Do you remember any other details

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 274

1    of that conversation?

2        A    No, I don't remember.

3        Q    Do you remember any of the details

4    about, not the conversation that you can't

5    remember having, but discussion with the crew

6    aboard the ENDEAVOR about what the job was,

7    for the ENDEAVOR, when it went to the THOR?

8        A    No, I don't remember.

9        Q    What is your understanding of what

10   the job was for the ENDEAVOR, when it went to

11   the THOR on the morning of the 28th, and tied

12   up at 8:00 a.m.?

13       A    We was to go with the THOR and

14   stand by with them and work as directed.

15       Q    Aside from the instruction from

16   management to go to the THOR, and

17   conversations that you weren't privy to

18   between the THOR and Captain Everett, do you

19   have any understanding of any other forms of

20   communication regarding what the ENDEAVOR was

21   or was not supposed to do, when tied up to the

22   THOR on the 28th?

23       A    No.  No.

24       Q    When the THOR and the ENDEAVOR were

25   offshore, they started making way on the 26th

Page 334

1    discussed the EW ELLEFSON with you before?

2         A    No.

3              MR. DEMOSTHENIDY:

4                   Okay.  I don't have any more

5         questions.

6                   John, do you mind if we go real

7         quick?  I've got like ten questions.

8              MR. GRINNAN:

9                   Yeah.  Are we okay on time?

10             THE VIDEOGRAPHER:

11                  Five hours, 21 minutes.

12             MR. GRINNAN:

13                  Okay, go ahead.

14   EXAMINATION BY MR. DONEWAR:

15        Q    All right.  Hey, Mr. Plaisance,

16   this is Blake Donewar, for the Greater

17   Lafourche Port Commission.  I've just got a

18   couple of questions.  Earlier, I think I heard

19   you testify that you recall the ENDEAVOR

20   striking at least one piling during the

21   breakaway; is that correct?

22        A    Yes.

23        Q    Okay.  How many pilings did you

24   strike?

25        A    I don't know.

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 335

1        Q      When did you strike that piling?
2    Was it when you were still tied up to the D/B
3    THOR or was it after you had separated from
4    the D/B THOR?
5        A      After.
6        Q      After, okay.  Do you remember any
7    pilings being hit while you were still tied
8    up?
9        A      I don't know.
10       Q      Okay.  Do you know who owned the
11   piling you hit?
12       A      No.
13       Q      Was it documented that you hit the
14   piling?
15       A      I don't know.  I don't remember.
16       Q      Okay.  Do you know what type of
17   structure that piling was?  Was it a mooring
18   dolphin?  Do you know what it was at all?
19       A       It was one of those pilings, the
20   mooring pilings across from C-Port, I believe.
21       Q      Okay.  Are you familiar with the
22   Greater Lafourche Port Commission's mooring
23   dolphins in Bayou Lafourche?
24       A      Yes.  There's no more.
25       Q      Are you aware of whether they were

Page 336

1   destroyed during the breakaway that we're

2   talking about today?

3        A     Yes.

4        Q     Okay.  Do you know who destroyed

5   them?

6        A     No.

7        Q     Do you know if the THOR hit them at

8   all?

9             MR. GUILLOT:

10                 Objection, form.

11            THE WITNESS:

12                 No, I don't know.

13  EXAMINATION BY MR. DONEWAR:

14       Q     Then you're not certain that the

15  ENDEAVOR is the one that hit -- do you know if

16  the ENDEAVOR hit them at all, or no?

17       A     Only one, that I know of, that I

18  seen with my eyes.

19       Q     Was it one of the Greater Lafourche

20  Port Commission's?

21       A     I don't know which one it was.

22       Q     Okay.  So you said it was the

23  pilings across from C-Port?

24       A     I believe.  I don't know exactly

25  what area we was in, if we was straight across

Page 337

1    from it or if it was the pilings further

2    north.  I don't -- I don't know.

3         Q    Okay.  And how long were you adrift

4    when you struck that piling?

5         A    Can you repeat that?

6         Q    How long after the breakaway did

7    you strike the piling?  Was it an hour, two

8    hours, how long?

9         A    No, I don't remember.  It wasn't --

10   it wasn't that long.

11        Q    It wasn't long, okay.

12          MR. DONEWAR:

13               That's all my questions.  Thank

14       you.

15          MR. MECHE:

16               John, I've got about maybe four

17       questions if you want us to go before

18       you.

19          MR. GRINNAN:

20               Yeah, that's fine.

21          MR. MECHE:

22               All right.

23   EXAMINATION BY MR. MECHE:

24        Q    Captain Plaisance, my name is Alan

25   Meche and I represent C & G Boats and Gulf

Page 442

1    the engine hours?

2          A      The engine hours?

3          Q      Yes, sir.

4          A      Is the amount of time from the last

5    overhaul -- or oil change.  Excuse me, oil

6    change.

7          Q      How are the engine hours recorded?

8          A      The engineer has got a -- their

9    maintenance book, and in their rough log, they

10   log down how many hours the engines ran that

11   day, and they add it to the hours that was

12   there the day before.

13         Q      It's a written document kept by the

14   engineer?  It's not a digital recording of the

15   amount of time that the engine has been on?

16         A      We have a digital reading, an hour

17   reading now.  I'm not -- I don't remember if

18   we had it then, because the controls was

19   changed, the --

20         Q      You talked about the wind gauge --

21         A      Yes, sir.

22         Q      -- when you were asked, "How did

23   you know what the wind speed was."  You said

24   it was a hundred miles an hour, plus.  Isn't

25   it true that the cups on the wind gauge, on

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 451

1     Q     You said it was the owners of the

2  THOR's decision to go to Port Fourchon, but in

3  truth, you had master's overriding authority

4  if you wanted to veto going to Port Fourchon,

5  correct?

6     A     Yes.

7     Q     You were asked about people being

8  on the THOR.  I think the opportunity to leave

9  on a helicopter may have been brought up,

10  something like that.  Do you have any

11  knowledge of what the minimum crew complement

12  requirements are for a vessel like the THOR,

13  to ride out a storm?

14          MR. GRINNAN:

15               Form.

16          THE WITNESS:

17               No.

18  EXAMINATION BY MR. GUILLOT:

19     Q     The other Crosby Tugs that are at

20  the Crosby base, speaking of the tugs that

21  were there at the base on October 28th, 2020,

22  do you remember how many tugs there were?

23     A     No, I do not.

24     Q     More than two?

25     A     I don't remember, but more than two

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 452

1    would be a good guess, I guess.

2        Q    Okay.  There were some there?

3        A    There were some there.

4        Q    We just don't know how many?

5        A    I don't know.

6        Q    We can figure out how many, but as

7    you sit here today, there were some; we just

8    don't know the number, right?

9        A    Right.

10       Q    All right.  I believe you said

11   earlier, the ENDEAVOR is one of the larger

12   tugs in the Crosby fleet that's based out of

13   Port Fourchon, right?

14       A    Yes.

15       Q    Were there any tugs at the Crosby

16   base that had the bow bumper less out of the

17   water, with less freeboard, than the CROSBY

18   ENDEAVOR?

19            MR. GRINNAN:

20                Form.

21            THE WITNESS:

22                All of them would have been

23        closer to the water than the ENDEAVOR.

24   EXAMINATION BY MR. GUILLOT:

25       Q    The ENDEAVOR has got the largest?

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 453

1      A     It's higher.

2      Q     All right.  And do you know if any

3   of those tugs that were available at the

4   Crosby base, on October 28th, 2020, had the

5   bow bumper such that it would have been low

6   enough to be able to push against the side of

7   the THOR?

8      A     The other tugs' bows would have

9   been able to push against their barge, yes.

10     Q     And that would get rid of the

11  concern that you expressed earlier about metal

12  on metal?

13     A     Right.

14     Q     A lot of questions about working as

15  directed.  If you were ever given an

16  instruction by any customer, by any company,

17  by anyone on the THOR, when you're under, as

18  you say, a "working as directed" scenario, if

19  that instruction was unsafe, in all

20  circumstances, master's overriding authority

21  is an ultimate veto over that instruction,

22  correct?

23          MR. RUFTY:

24               Object to form.

25          THE WITNESS:

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 464

1          going to have an objection if I'm not

2          allowed to ask them and get answers

3          right now.

4              MR. RUFTY:

5                  So, gang, look, sorry, we gave

6          you fair warning about the seven hours.

7              MR. GRINNAN:

8                  And from our perspective, what

9          are we supposed to do if the witness

10         doesn't get passed to us?

11             MR. RUFTY:

12                 Okay.  Look, Gavin, I'm going

13         to let the pending question be answered,

14         the one question that was pending, since

15         we stopped in the middle of a question

16         and answer.  Answer that last question

17         that Mr. Guillot had and then we're

18         done, okay, that's it.

19             MR. GUILLOT:

20                 Okay.

21     EXAMINATION BY MR. GUILLOT:

22         Q    Do you remember my question?

23         A    No.

24         Q    My question is, this column here

25     that shows the hours for the starboard and

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 465

1   port engines, --

2        A     Yes.

3        Q     -- that shows, on October 28th,

4   2020, that those engines ran for a total of

5   three hours on that day, correct?

6        A     That's what it's got written down,

7   yes.

8             MR. GUILLOT:

9                  Thanks.  Thank you, Alfred.

10        So, no further questions.

11             MR. KUTNER:

12                  Are you going to let me ask

13        questions or not?

14             MR. RUFTY:

15                  No.

16             MR. KUTNER:

17                  Okay.  Then I'm going to put an

18        objection on the record, on behalf of

19        Plaintiffs, Rials and Smith, that I

20        haven't been given an adequate

21        opportunity to question the witness.

22        And I'm reserving the right to take it

23        up with the Magistrate, and have him

24        come back and answer the questions on

25        another date.

Videotaped Deposition of Ernest Plaisance
All Coast, LLC v. Shore Offshore Services, LLC

Page 467

1          REPORTER'S CERTIFICATE

2

3        This certification is valid only for a
transcript accompanied by my original
4    signature and original required seal on this
page.

5

6            I, Linda G. Griffin, RPR,
Certified Court Reporter in and for the
7    State of Louisiana, as the officer before
whom this testimony was taken, do hereby
8    certify that ERNEST PLAISANCE, after having
been duly sworn by me upon authority of
9    R.S. 37:2554, did testify as hereinbefore
set forth in the foregoing 466 pages; that
10   this testimony was reported by me in the
stenotype reporting method, was prepared and
11   transcribed by me or under my personal
direction and supervision, and is a true and
12   correct transcript to the best of my ability
and understanding; that the transcript has
13   been prepared in compliance with transcript
format guidelines required by statute or by
14   rules of the board, that I have acted in
compliance with the prohibition on
15   contractual relationships, as defined by
Louisiana Code of Civil Procedure Article
16   1434 and in rules and advisory opinions of
the board; that I am not related to counsel
17   or the parties herein, nor am I otherwise
interested in the outcome of this matter.

18

19

20

21        _____
          LINDA G. GRIFFIN, RPR
          CERTIFIED COURT REPORTER
22

23

24

25