

**EXHIBIT**

**O**

# Transcript of the Testimony of
# **Videotaped Deposition of Ivy Danos**

**Date: July 11, 2024**

**All Coast, LLC v. Shore Offshore Services, LLC, et al**

All electronic deposition & exhibit files
are available at **www.psrdocs.com**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**

# **Professional Shorthand Reporters, Inc.**
**Phone: 504-529-5255**
**Fax: 504-529-5257**
**Email: reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 8

```
 1              MR. SARAVIA:
 2                  Carlos Saravia and Ashley
 3         Bossier, on behalf of C-Port, LLC.
 4              THE VIDEOGRAPHER:
 5                  On Zoom?
 6              MR. FINDLEY:
 7                  Kyle Findley --
 8              MR. McMAHON:
 9                  Mike McMahon, on behalf of
10         Martin.
11              MR. FINDLEY:
12                  Kyle Findley, on behalf of
13         certain personal injury plaintiffs.
14              MR. REISMAN:
15                  David Reisman and Lance
16         Bullock, for Dawn Services.
17              MR. DEMOSTHENIDY:
18                  Laurent Demosthenidy, for Weeks
19         Marine.
20              MR. DeGIULIO:
21                  Alex DeGiulio, for Chubb
22         Underwriting.
23              MS. COLOMB:
24                  Allyson Colomb --
25              MR. HUGHES:
```

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 54

1      Q      When's the last time you referred
2   to it?
3      A      It's been a while.  I don't
4   remember.
5      Q      Over five years?
6      A      Probably -- I don't remember.
7      Q      As we sit here today, in July of
8   2024, can you remember the last time you
9   referred to the Crosby safety manual for any
10  reason?
11     A      I don't remember.
12     Q      So you can't remember the last
13  time --
14     A      No.
15     Q      -- you referred to it for any
16  reason?
17     A      No.
18     Q      Can you think of an example of why
19  you would need to refer to it?
20     A      I don't remember.  I don't know.
21     Q      Did you have any training on the
22  Crosby safety manual, such as like an
23  introduction to it or any type of course or
24  explanation of what the manual is to be used
25  for and how it's used?

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 55

1      A     Yes.

2      Q     When?

3      A     I don't remember.

4      Q     More than ten years ago?

5      A     Probably.

6      Q     What is your understanding of the

7   purpose of the safety manual?

8      A     The safety.

9      Q     And how is the safety manual

10   supposed to be used, in your understanding?

11      A     For safety.

12      Q     Right.  And that's the purpose of

13   it?

14      A     Yes.

15      Q     But how does somebody at Crosby use

16   it to achieve that purpose?  How does somebody

17   use the safety manual to try to be safer?

18      A     Not sure.

19      Q     "Don't know," is that what you

20   said?

21      A     Not sure.

22      Q     Okay.  "Not sure" is what you said,

23   right?

24      A     Yes.

25      Q     Have you had any input in the

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 62

1    to say a tug is needed to work with the THOR

2    offshore.  Then what?  You speak to Kurt?

3          A     Yeah.  I talk to Kurt.

4          Q     You talked to Kurt and said, "What

5    tug do we use"?

6          A     I told him that Mike Grace called

7    for a tug, and then he decided on which tug we

8    would send out to work with the THOR.

9          Q     What information, if any, did you

10   give to Mr. Crosby, to Kurt Crosby, about the

11   work that the tug was going to be doing

12   offshore?

13         A     I just -- Mike had said that they

14   needed a tug to work with the THOR, to run

15   anchors and tow it.

16         Q     To run anchors and to tow it is

17   what you knew?

18         A     Yeah.

19         Q     Did you know what kind of vessel

20   the THOR was at the time?

21         A     Well, I knew the THOR, you know.

22         Q     You knew of the THOR?

23         A     Yes.

24         Q     Did you know what kind of vessel it

25   was?

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 63

1        A     It was a derrick barge.

2        Q     Did you know the size of it, its

3    displacement, its tonnage?  Did you know any

4    of that when the ENDEAVOR was selected to be

5    the tug to go offshore to work with the THOR?

6        A     When I talked to Mr. Crosby, he --

7    we looked at it.

8        Q     You went online and looked at it?

9        A     Yeah.

10       Q     Okay.  You and Mr. Crosby sat

11   down --

12       A     Well -- yeah.  He asked what was

13   the size of the THOR, so we looked at it and

14   gave him the size of it.

15       Q     Okay.  So you and Kurt Crosby went

16   online and looked at --

17       A     No, I went online and looked at it,

18   got the dimensions.

19       Q     That's what I'm asking.

20       A     Yeah.

21       Q     You went online and researched the

22   THOR to verify that the ENDEAVOR was a

23   suitable tug for it?

24            MR. RUFTY:

25                 Object to form.

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 64

1              THE WITNESS:

2                   Mr. Crosby.

3    EXAMINATION BY MR. GUILLOT:

4         Q    Mr. Crosby did that?

5         A    (Nods head affirmatively).

6         Q    Is that "yes"?

7         A    Yes.

8         Q    Okay.  Someone at Crosby -- you're

9    saying, the CEO went and verified that that

10   was a suitable tug for the THOR?

11             MR. RUFTY:

12                  Object to form.

13             THE WITNESS:

14                  Yes.

15   EXAMINATION BY MR. GUILLOT:

16        Q    In October 2020, did you know of

17   the company called Shore Offshore Services?

18        A    Well, we was working through Mike

19   Grace, for Shore Offshore.

20        Q    What's your understanding of the

21   relationship between Crosby Tugs, Dawn

22   Services and Shore Offshore?

23        A    I don't know.

24        Q    Well, you just said you were

25   working through Mike Grace for Shore Offshore?

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 69

1          A     Don't remember.

2          Q     Were any other tugs besides the

3    ENDEAVOR considered for this job?

4          A     No.

5          Q     Do you know why?

6          A     No.

7          Q     Did you ever talk with Mr. Crosby

8    about whether other tugs were available

9    instead of the ENDEAVOR?

10         A     No, I didn't.  We talked about it

11   and he picked the ENDEAVOR.

12         Q     Was this a face-to-face meeting or

13   was it over the phone?

14         A     I can't remember.

15         Q     Was it a conversation you had with

16   him where he told you, the ENDEAVOR is the tug

17   that will be used?

18         A     Yes.

19         Q     And you accepted that as the

20   answer?

21         A     Yes.

22         Q     And you communicated that to Mike

23   Grace?

24         A     Yes.

25         Q     Okay.  I'm going to show you what

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 70

1    has been produced as Crosby 446 through 456.

2    I've marked it as "Exhibit 460."  Take a

3    moment to look at that, and my question is

4    going to be, have you ever seen this document

5    before, that's marked as Exhibit 460.

6        A    No.

7        Q    As the operations manager -- well,

8    strike that.  These were produced by Crosby in

9    this case, given to the other parties, as the

10   logs for the ENDEAVOR for the dates that are

11   shown on the top, okay.

12       A    (Nods head affirmatively).

13       Q    Do you have any basis to dispute

14   that?

15       A    What was the question?

16       Q    Do you have any basis to dispute

17   that these are the logs for the ENDEAVOR, on

18   the days in October 2020 that are noted?

19       A    Well, I never seen them.

20       Q    As the operations manager, do you

21   ever review the logs on any of the vessels?

22       A    No.

23       Q    Does anybody shoreside review the

24   logs for any of the tugs?

25       A    Don't know.

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 71

1      Q      Who would know the answer to that

2   question?

3      A      I don't know.

4      Q      Well, if it's not the operations

5   department and you're the head of the

6   operations department, who else would be in a

7   position to review the logs to see if they're

8   accurate or if there are any issues with them?

9      A      I'm not sure.

10     Q      So as we sit here today, Exhibit

11   460, the logs from October 20th through

12   October 30th, you've never seen them before?

13     A      No, I haven't seen them.

14     Q      Well, look at the first page, which

15   is 446, the log for October 20th.  Do you know

16   how to read a log?

17     A      I can read it, yes.

18     Q      Have you had any experience reading

19   vessel logs at Crosby?

20     A      No.

21     Q      So is this the first time, sitting

22   here today, that you've seen a vessel log for

23   a Crosby tug?

24     A      Well, I've seen them, but I've

25   never -- I didn't -- I don't look at them.

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 72

1      Q      Okay.  Well, is this the first
2  time, sitting here today, that you're being
3  asked to read a vessel log for a Crosby tug?
4      A      Yes.
5      Q      I'm sorry?
6      A      Yes.
7      Q      Just a moment.  Take us through how
8  you would communicate with -- take us through
9  how Crosby would communicate with the ENDEAVOR
10  crew to give them the orders, that they were
11  going to be working with the THOR?
12     A      Well, we'd -- when we got the
13  orders from Mike to go, we gave them the
14  orders to go meet the THOR at the block they
15  were at, to work as directed with them.
16     Q      Take us through that step by step.
17  How do you communicate those orders to the tug
18  crew?
19     A      We would have called -- we could
20  have called the captain and gave him the
21  orders.
22     Q      Who would have called the captain?
23     A      Well, it would have been either me
24  or one of my coordinators.
25     Q      So someone in the operations

Page 78

1          Q      You don't remember?

2          A      Don't remember.

3          Q      Is it standard practice to tell

4    them what the weather conditions were like at

5    the location where they're ordered to go?

6          A      We look at it, at times.

7          Q      Is it standard practice to tell the

8    vessel crew what the conditions are like at

9    the location where they are ordered to go?

10         A      We look at it.

11         Q      I understand that.  But is it then,

12   just sometimes we do and sometimes we don't,

13   there's not a general practice?  Is that fair?

14         A      No, we do.

15         Q      So there is a general practice that

16   whenever you give a tug orders to go out into

17   the field, you communicate, you tell the

18   vessel crew what the weather is like at the

19   destination where they're headed?

20         A      Not sure.

21         Q      You're not sure, okay.  So let's

22   sum it all up.  You're not sure if there is a

23   practice or not to tell the vessel crew what

24   the weather conditions are like at the

25   destination where the vessel is ordered to go?

Page 79

1    Is that right?

2        A      I'm not sure.

3        Q      You're not sure if you're not sure,

4    okay.  For starting work out there in the

5    field, when you conveyed the orders that you

6    conveyed to the ENDEAVOR, to go out and meet

7    with the THOR, did Crosby Tugs have any type

8    of procedure to establish a standard for

9    operating the tug and to improve planning for

10   vessel movement safely?

11            MR. RUFTY:

12                Object to form.

13            THE WITNESS:

14                I don't know.

15   EXAMINATION BY MR. GUILLOT:

16       Q      Do you know when --

17            MR. RUFTY:

18                I'm sorry, I just missed that

19       question.  Would you mind reading that

20       question back?

21                (Whereupon, the Court Reporter

22       read back the requested testimony as

23       follows:)

24            THE COURT REPORTER:

25                Question:  For starting work

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 82

1      Q     Do you understand the question?

2      A     No.

3      Q     Okay.  So is the question I asked

4   too confusing to understand?

5      A     Yes.

6      Q     Would you agree that the operations

7   department is responsible for implementing a

8   voyage assessment procedure to ensure that

9   vessel personnel are aware of the requirements

10   of the voyage assessment?

11         MR. RUFTY:

12             Object to form.

13         THE WITNESS:

14             The tug makes the assessment.

15   EXAMINATION BY MR. GUILLOT:

16      Q     So it's not the operations

17   department, it's the tug?

18      A     The tug.

19      Q     Okay.  So you disagree that the

20   operations department is responsible for that?

21      A     Yeah, it's the tug.

22      Q     Okay.  Do you agree that voyage

23   planning will be performed on a trip, voyage

24   and watch basis, as appropriate to the

25   vessel's operational assignment, crewing level

Page 94

1           THE WITNESS:

2               Mr. Crosby.

3    EXAMINATION BY MR. GUILLOT:

4        Q    Okay.  The CEO --

5        A    Yeah.

6        Q    -- assigned it to work offshore,

7    right?

8        A    Right.

9        Q    Okay.  You would agree that, when

10   assigning a vessel to work offshore, every

11   effort should be made to maximize the

12   horsepower-to-tow ratio in order to utilize

13   the horsepower most efficiently?

14           MR. RUFTY:

15               Object to form.

16           THE WITNESS:

17               That's Mr. Crosby that decided

18       it.

19   EXAMINATION BY MR. GUILLOT:

20       Q    He decided it for that specific

21   vessel?

22       A    Yes.

23       Q    And I'm asking you more generally

24   that, when assigning a vessel to work

25   offshore, every effort should be made to

Page 95

1    maximize the horsepower-to-tow ratio in order

2    to utilize the horsepower most efficiently?

3              MR. RUFTY:

4                   Same objection.

5              THE WITNESS:

6                   Well, he -- he made the

7        decision.

8    EXAMINATION BY MR. GUILLOT:

9         Q    Okay.  Let's take him out of it for

10   a second and let's say we're talking about

11   sending a tug off to go work offshore for

12   somebody else, like the HEDRON, okay.  Are you

13   with me?

14        A    Yes.

15        Q    So we're not talking about

16   specifically with the ENDEAVOR here.  Are you

17   with me?

18        A    Yes.

19        Q    Okay.  You would agree that, when

20   assigning a tug to go work offshore, in this

21   example with the HEDRON, every effort should

22   be made to maximize the horsepower-to-tow

23   ratio in order to utilize the horsepower most

24   efficiently?

25              MR. RUFTY:

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 96

1              Object to form.

2          THE WITNESS:

3              Well, I didn't make the -- I

4      didn't -- he makes that decision.

5  EXAMINATION BY MR. GUILLOT:

6      Q    As a general practice, is that

7  something that Crosby is concerned about,

8  which is maximizing the horsepower-to-tow

9  ratio so that the horsepower is used most

10 efficiently?

11         MR. RUFTY:

12             Object to form.

13 EXAMINATION BY MR. GUILLOT:

14     Q    Do you know, one way or the other?

15     A    Well, I guess that's how they do

16 it.  I mean, he's the one that decides it.

17     Q    Okay.  Do you know what

18 horsepower-to-tow ratio is?

19     A    No.

20     Q    Do you know of anybody in the

21 operations department who understands what

22 horsepower-to-tow ratio is?

23     A    No.

24     Q    Do you know if Mr. Crosby

25 understands what horsepower-to-tow ratio is?

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 139

1              What was that?  What was that?

2    EXAMINATION BY MR. GUILLOT:

3        Q     Should a voyage assessment have

4    been completed for the ENDEAVOR, when the

5    ENDEAVOR took the THOR to Port Fourchon, in

6    advance of Hurricane Zeta?

7              MR. RUFTY:

8                   Asked and answered.

9              THE WITNESS:

10                  Yes.

11   EXAMINATION BY MR. GUILLOT:

12       Q     You said earlier that the ENDEAVOR

13   left the THOR, after the THOR was docked at

14   the Martin dock, to return to the Crosby base

15   to get supplies and groceries, right?

16       A     Yes.

17       Q     And you have no knowledge of any

18   maintenance being performed on the engines on

19   the ENDEAVOR, right?

20       A     Not at the time, no.

21       Q     As the manager of operations,

22   should you have been advised if there was

23   going to be any maintenance on the engines of

24   the ENDEAVOR on October 27th, the day before

25   hurricane landfall?

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 147

1    because you don't have an opinion?  Why are

2    you not sure?

3         A    Don't know.  Don't know.

4         Q    Okay.  Well, the ENDEAVOR

5    eventually returned to the THOR from the

6    Crosby base on the morning of October 28th,

7    2020.  Do you know that much?

8         A    They called me, that they were

9    headed back to the THOR.

10        Q    The ENDEAVOR crew called you and

11   told you that they were headed back to the

12   THOR?

13        A    Walt called me and told me, yeah,

14   they were headed back to the THOR.

15        Q    You said Walt, so that's Captain

16   Walter Everett?

17        A    Captain Walter Everett, yes, sir.

18        Q    Okay.  The logs showed that the

19   ENDEAVOR got to the THOR at around 8:00 a.m.

20   on the 28th.  Does that sound about right to

21   you?

22        A    Something like that.

23        Q    What conversation did you have with

24   anyone aboard the CROSBY ENDEAVOR about what

25   the ENDEAVOR was going to do when it returned

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 148

1    to the THOR?

2            MR. RUFTY:

3                Object to form.

4            THE WITNESS:

5                To work as directed with the

6        THOR.

7    EXAMINATION BY MR. GUILLOT:

8        Q    So the same information that you

9    told the ENDEAVOR, when it went offshore about

10   October 20th, is what you told the ENDEAVOR on

11   October 28th, to work as directed?

12       A    That's what they were there for, to

13   work as directed with the THOR.

14       Q    So that's a "yes"?  That's the same

15   thing you told them?

16           MR. RUFTY:

17               He's asking you if you told

18       them that on this day.

19           THE WITNESS:

20               No, I didn't tell them on that

21       day.  They went back because they were

22       working with the THOR.

23   EXAMINATION BY MR. GUILLOT:

24       Q    So on October 28th, 2020, when

25   Walter Everett called you -- was it on the

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 150

1    they, the crew of the ENDEAVOR, were going to

2    work as directed, is that what you're saying?

3        A    Yes.

4        Q    Now, working as directed, to be

5    tied to a vessel like the THOR during a

6    hurricane in Port Fourchon, what does that

7    mean to you?

8        A    Work as directed, whatever the

9    barge wanted them to do.

10       Q    As the manager of operations for

11   Crosby Tugs, does the tug have any

12   responsibilities to the THOR in that

13   situation, on October 28th, 2020?

14           MR. RUFTY:

15               Object to form.

16           THE WITNESS:

17               Just to work as directed.

18   EXAMINATION BY MR. GUILLOT:

19       Q    And aside from direction, does the

20   tug have any job?  Is that like inherent in

21   working as directed?

22           MR. RUFTY:

23               Object to form.

24           THE WITNESS:

25               No.  They're there to work as

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

```
                                              Page 257
  1              MR. PALMINTIER:
  2                   No questions.
  3              MR. GUILLOT:
  4                   Okay.  Well, I have a few
  5         followups.  Mr. Danos, thanks for your
  6         time.
  7    EXAMINATION BY MR. GUILLOT:
  8         Q     Do you have any knowledge, one way
  9    or the other, of whether the CROSBY ENDEAVOR
 10    had turned its engines off after it had tied
 11    to the THOR, on the morning of October 28th?
 12         A     Not that I know of.
 13         Q     Do you have any knowledge of
 14    inaccurate recordkeeping of the engine room
 15    logs aboard the ENDEAVOR for the month of
 16    October, 2020?
 17         A     Not that I'm aware of.
 18         Q     Would it have been against any
 19    Crosby policy for the ENDEAVOR to have turned
 20    its engines off, on October 28th, 2020, after
 21    having tied to the THOR, in anticipation of
 22    Hurricane Zeta?
 23         A     Not that I'm aware of.
 24         Q     Don't know, one way or the other,
 25    whether it would be against a policy to turn
```

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 258

1    the engines off?

2         A     Not sure.

3             MR. GUILLOT:

4                  Okay.  That's all I have.

5         Thank you.

6             THE WITNESS:

7                  All right.

8             MR. RUFTY:

9                  We're done.

10            THE VIDEOGRAPHER:

11                 This concludes today's

12        deposition.  We're off the record.

13                 (Whereupon, the deposition

14        concluded at 3:33 p.m.)

15                    *     *     *

16

17

18

19

20

21

22

23

24

25

Videotaped Deposition of Ivy Danos
All Coast, LLC v. Shore Offshore Services, LLC, et al

Page 260

1                REPORTER'S CERTIFICATE

2

3        This certification is valid only for a
transcript accompanied by my original
4    signature and original required seal on this
page.

5

6            I, Linda G. Griffin, Certified
Court Reporter in and for the State of
7    Louisiana, as the officer before whom this
testimony was taken, do hereby certify that
8    IVY DANOS, after having been duly sworn by
me upon authority of R.S. 37:2554, did
9    testify as hereinbefore set forth in the
foregoing 259 pages; that this testimony was
10   reported by me in the stenotype reporting
method, was prepared and transcribed by me
11   or under my personal direction and
supervision, and is a true and correct
12   transcript to the best of my ability and
understanding; that the transcript has been
13   prepared in compliance with transcript
format guidelines required by statute or by
14   rules of the board, that I have acted in
compliance with the prohibition on
15   contractual relationships, as defined by
Louisiana Code of Civil Procedure Article
16   1434 and in rules and advisory opinions of
the board; that I am not related to counsel
17   or the parties herein, nor am I otherwise
interested in the outcome of this matter.

18

19

20

21   _____
     LINDA G. GRIFFIN, RPR
22   CERTIFIED COURT REPORTER

23

24

25