EXHIBIT

**P** _____

Transcript of the Testimony of
# Video Deposition of Crosby Tugs, LLC through Wade Savoy

**Date: November 2, 2023**

**All Coast, LLC v. Shore Offshore Services, LLC**

All electronic deposition & exhibit files
are available at **www.psrdocs.com**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**

# Professional Shorthand Reporters, Inc.
**Phone:  504-529-5255**
**Fax:  504-529-5257**
**Email:  reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

Page 34

1    November 2nd?

2        A     I don't remember.

3        Q     You're aware that the ENDEAVOR ran

4    aground after the breakaway from the dock,

5    right?

6        A     Yes.

7        Q     How did you become aware of that?

8        A     They reported it to our operations

9    department.

10       Q     Right.  And, in fact, it's included

11   in Captain Plaisance's witness statement from

12   the event?

13       A     I believe so.

14       Q     But you had spoken with the crew

15   after the incident, before November 2nd, and

16   you knew that the vessel had run aground?

17       A     Yes.

18       Q     Under Section II of the 2692, Item

19   No. 1 says, "Unintended grounding or an

20   unintended strike of (allision with) a

21   bridge."  Do you see that?

22       A     Yes.

23       Q     Would you agree with me that that

24   box should have been checked because of the

25   unintended grounding of the CROSBY ENDEAVOR

Page 158

1              And object to no foundation

2        about -- because this witness -- there's

3        no basis for this witness to know when

4        the lines started parting.  Was that a

5        process?  What does that mean?  Object

6        to form, and lack of foundation.

7    EXAMINATION BY MR. GUILLOT:

8        Q    You can answer.

9        A    No, our captain said that he was

10   notified once the breakaway was occurring, for

11   help.  What exactly was said right there, I'm

12   not sure.

13       Q    You sat in his deposition, didn't

14   you?

15       A    Yes.

16       Q    And you read the deposition?

17       A    A while back.

18       Q    Okay.  If he said in the deposition

19   that he was instructed by the THOR crew to

20   push the barge back into the dock, would you

21   have any basis to disagree with that

22   instruction?

23       A    No.

24       Q    And would you consider that

25   instruction to fall outside the scope of one

Page 159

1    of the purposes of the ENDEAVOR being tied to

2    the THOR during the storm?

3        A     No, because we did have orders to

4    work as directed, so that would be within

5    working as directed, if they gave them a

6    direction.

7        Q     So if the THOR gave direction to

8    the ENDEAVOR to push the THOR back into the

9    dock, in the event of the breakaway, that

10   would fall within the scope of working as

11   directed?

12          MR. RUFTY:

13              Object to form.

14          THE WITNESS:

15              Yes.

16   EXAMINATION BY MR. GUILLOT:

17       Q     And so that would be one of the

18   tasks that would be anticipated, that you

19   would have to be prepared to engage in when

20   the ENDEAVOR tied to the THOR, on

21   October 28th, 2020?

22          MR. RUFTY:

23              Object to form.

24          THE WITNESS:

25              I mean, I don't know how you

Page 160

```
1        anticipate every task, but --
2   EXAMINATION BY MR. GUILLOT:
3        Q    It's an expected request or an
4   expected instruction from the THOR crew that
5   would be given to the ENDEAVOR crew, in the
6   event of a breakaway?
7             MR. RUFTY:
8                  Object to form.
9             THE WITNESS:
10                 To try to assist?  Yes.
11  EXAMINATION BY MR. GUILLOT:
12       Q    To try to assist.  And that assist
13  taking the form of using the tug's propulsion
14  to keep the vessel at the dock, in the event
15  of a breakaway?
16       A    As best they could.  Once you start
17  breaking away, there's only so much you can
18  do.
19       Q    So that's a "yes"?
20       A    Yes.
21       Q    Is it Crosby's position that the
22  ENDEAVOR and its crew were not directed to
23  hold or otherwise secure the THOR in place
24  during the hurricane?
25       A    Yes.
```

Video Deposition of Crosby Tugs, LLC through Wade Savoy
All Coast, LLC v. Shore Offshore Services, LLC

Page 192

1        A      Yes.

2        Q      Look at T, U, and V.  Actually, T

3   and U.  T says, "Notation of any machinery or

4   equipment not properly working and all repairs

5   undertaken."  The replacement of the fuel

6   injectors on October 27th should have been

7   noted in the vessel master logbook, according

8   to this procedure, correct?

9        A      Yeah, they should have notated the

10  repairs on the ticket -- on this, Part T.

11       Q      And if they didn't, then that was a

12  deviation from the required practices in the

13  safety manual, correct?

14       A      Yes.

15       Q      All right.  The safety manual is

16  pretty specific on this.  The crew of the

17  ENDEAVOR had told the crew on the THOR that

18  they were returning to the Crosby base to get

19  groceries.  Do you have any knowledge of that,

20  one way or the other?

21       A      No.

22       Q      Do you have any knowledge, one way

23  or the other, of whether the crew on the

24  ENDEAVOR ever told the crew on the THOR that

25  they were going to have to undergo engine

Page 201

1      Q      Not properly trained enough to be

2  able to speak to that issue?

3      A      No.

4      Q      Correct?

5      A      Correct.

6      Q      I think you said that Crosby has a

7  policy of keeping its engines turned on during

8  hurricane conditions; is that right?

9      A      Not written, but yes.

10     Q      Is there ever any exception to that

11  policy?

12     A      No.

13     Q      How is that policy communicated to

14  the crew if it's not written?

15     A      By our operations, and it's the

16  industry best practice.

17     Q      So that's Ivy and Jason would be

18  the ones communicating to the Crosby crew that

19  they should never turn their engines off in

20  hurricane conditions?

21     A      They don't always communicate it.

22  Like I said, it's the industry practice, so

23  typically, whenever they're calling, once they

24  get secured, the boats will call them and say,

25  "Everything's running; we're all secure."

Page 202

1        Q      How do we know, sitting here today,

2    that Ivy, Jason or someone at Crosby

3    communicated this industry practice to the

4    crew that was aboard the ENDEAVOR in

5    October 2020?

6             MR. RUFTY:

7                  Object to form.

8             THE WITNESS:

9                  Other than verbal

10        communication, there's nothing written.

11    EXAMINATION BY MR. GUILLOT:

12        Q      How do we know that they verbally

13    communicated this to the crew of the ENDEAVOR

14    in October 2020?

15        A      They stated that the ENDEAVOR told

16    them that everything was running, when they

17    got all secured before the storm.

18        Q      My question specifically, though,

19    is not what the crew told Ivy or Jason.  My

20    question is regarding what Ivy and Jason told

21    the crew, and since Crosby doesn't have a

22    written policy that requires its tug crews to

23    keep their vessel engines on during

24    hurricanes, but it's an unwritten policy, how

25    do we know that unwritten policy was

Page 249

```
 1                  Object.  That's beyond the

 2          scope of the Notice.

 3      EXAMINATION BY MR. GUILLOT:

 4          Q     Go ahead.

 5              MR. RUFTY:

 6                  And this witness lacks the

 7          expertise.

 8              THE WITNESS:

 9                  I can answer?

10              MR. RUFTY:

11                  Go ahead.

12              THE WITNESS:

13                  At 75 miles an hour, from this

14          wind direction, it would be marginal.

15      EXAMINATION BY MR. GUILLOT:

16          Q     Marginal?

17          A     Yes.

18          Q     Could you elaborate on what that

19      means?

20          A     It really would depend at the time

21      of the operation, on what kind of direction

22      they're giving us on which way they're trying

23      to get us to pivot.

24          Q     So at 75 miles an hour, you're at

25      or very near the threshold of what the maximum
```

Page 256

```
 1      A     I'm sorry, can you say that one
 2  more time?
 3           THE COURT REPORTER:
 4               Question:  Did anyone from
 5           Crosby ever tell anyone at Shore that
 6           the ENDEAVOR would or would not be able
 7           to push the THOR back into the dock, in
 8           the event of a breakaway?
 9           THE WITNESS:
10               No.
11  EXAMINATION BY MR. GUILLOT:
12      Q     What is Crosby's policy on
13  disclosing to companies like Shore that a tug
14  like the ENDEAVOR can or cannot perform
15  certain functions, like pushing a vessel back
16  into the dock, in the event of a breakaway?
17           MR. RUFTY:
18               Object to form.
19           THE WITNESS:
20               Typically whenever you ask what
21           type of vessel that you want and the
22           services that you're asking for, we'll
23           tell you if we can do it or not.  In
24           this instance, we were asked for a
25           vessel that was anchor handling and
```

Page 260

1    what the limitations of the ENDEAVOR were,

2    when the ENDEAVOR tied up to the THOR on

3    October 28th, 2020?

4         A    No.  No one ever asked for

5    limitations.

6         Q    That's not my question.  Did anyone

7    from Crosby ever express to Shore any of the

8    limitations of the ENDEAVOR, when the ENDEAVOR

9    tied up to the THOR on October 28th, 2020?

10        A    No.

11        Q    Did anybody ever do it before

12   October 28th, 2020?

13        A    Not that I know.

14        Q    Management at Crosby was monitoring

15   in Port Fourchon, correct?

16        A    Yes.

17        Q    You personally, as the Director of

18   QHSE, were monitoring the weather, correct?

19        A    Yes.

20        Q    Also monitoring the weather were

21   Buddy Cantrell and Ivy Danos?

22        A    I don't know if Buddy was.  I know

23   Ivy was.  Like I said, at that time, Buddy was

24   on the east coast.

25        Q    Who would have been responsible, at

Page 261

1    Crosby, to monitor the weather?

2        A    Operations and QHSE.

3        Q    Operations consists, in this

4    context, of whom?

5        A    It would have been Ivy Danos or

6    Jason -- I believe his last name is Eymard.

7    But the people, with the actual subscription

8    services, were myself and Ivy.

9        Q    Let's make this straight so we can

10   figure out who's going to give depositions

11   later.  Interrogatory No. 13, on Crosby's

12   Answers to Omnibus Interrogatories.  I have

13   one copy.  We'll have to read along together.

14           No. 13, on Crosby's Answers to the

15   Omnibus Interrogatories, dated July 11th,

16   2022.  No. 13, "Please list the name and

17   contact information of each person who was

18   monitoring Tropical Depression No. 28,

19   Tropical Storm Zeta, and/or Hurricane Zeta, on

20   your behalf."  There's an objection.  It says,

21   subject to this objection, A.J. Buddy Cantrell

22   and Ivy Danos, Crosby's offshore operations

23   managers, would have been monitoring the storm

24   on behalf of Crosby, as well as Wade Savoy,

25   Director of QHSE.

Page 262

1          What is an accurate answer to that

2     question?

3          A      Myself and Ivy.

4          Q      So not Buddy Cantrell?

5          A      No.

6          Q      How do you know that?

7          A      Buddy may have been looking at it,

8     but he is the ops guy and actually lives in

9     Florida, on the east coast.

10         Q      How is it that you come to receive

11    the weather reports to monitor?

12         A      They come in from -- well, several

13    sources, but are you asking for the

14    subscription services or --

15         Q      Well, let me ask it better.  What

16    type of weather sources are you monitoring?

17         A      So, of course, we have news,

18    National Hurricane Center.  Then we also

19    subscribe to -- what is it?  Is it WeatherGeo?

20    GeoWeather?  I never get it correct.

21         Q      StormGeo?

22         A      Yeah, StormGeo, where they put

23    together forecast projections, things of that

24    nature.

25         Q      StormGeo is emailed to you at

Page 274

1    issued?

2        A    I think it was Captain Plaisance at

3    that time and Walt came on at noon, if I

4    recall.

5        Q    That's what the -- what the work

6    and rest time records show.

7        A    Yes.

8        Q    So Captain Plaisance was on duty at

9    the time Crosby received this weather report,

10   correct?

11       A    Yes.

12       Q    Do you know who would have been the

13   specific person to communicate the substance

14   of this weather report by radio to Captain

15   Plaisance?

16       A    It would have been Ivy Danos.

17       Q    So Ivy Danos would have been the

18   one to tell Captain Plaisance, around the time

19   of the receipt of this form, or within an hour

20   of it, that max winds were 85 miles an hour,

21   gusting to 105 miles an hour?

22       A    Yes.

23       Q    Do you know for certain whether

24   that was relayed to Captain Plaisance?

25       A    I don't know for certain, no.

Page 277

1     Q     I'm handing you what's been marked

2    as Exhibit 269.

3     A     Are we finished with this?

4     Q     For now.

5     A     For now?

6     Q     Which is the two-page Lafourche

7    Parish Ordinance No. 71.

8     A     Okay.

9     Q     Have you seen that before?

10     A     Yes.

11     Q     When did you first see this?

12     A     Several years ago.

13     Q     Before or after the incident?

14     A     Before.

15     Q     So it's your testimony that Crosby

16    tugs was aware of this ordinance before the

17    October 28th, 2020 breakaway?

18     A     Yes.

19     Q     Let's look at Section 2 of the

20    ordinance.  Actually, I'm sorry, Section 1,

21    A and B, so we can get our foundation straight

22    here.  Unattended is defined.  It says, "Not

23    occupied by sufficiently skilled, experienced

24    maritime personnel capable of stabilizing and

25    controlling the vessel in seas subject to

Page 278

1    hurricane force winds," and then hurricane

2    force winds are "sustained winds or frequent

3    gusts equal to or greater than 74 miles per

4    hour," right?

5        A    Yes.

6        Q    And just at 5:00 am on

7    October 28th, Crosby had actual notice that

8    the sustained winds were to be in excess of

9    85 miles an hour, per the weather reports that

10   we just reviewed, correct?

11       A    Yes.

12       Q    Section 2.  "When hurricane force

13   winds, which were sustained winds greater than

14   74 miles per hour, as defined in this

15   ordinance, are expected to occur at Port

16   Fourchon, within 24 hours, no person shall,"

17   and then there are two indented points.  Do

18   you see that?

19       A    Yes.

20       Q    Point A, "Allow a vessel, which is

21   self-propelled by a motor or engine, and of

22   which s/he is either an owner or captain, to

23   remain unattended in Port Fourchon or moored

24   to port pilings," right?

25       A    Yes.

Page 281

1   non-self-propelled vessel shall remain in Port

2   Fourchon, quote, "without being under the

3   control of a vessel which is self-propelled."

4   Do you see that?

5       A    Yes.

6       Q    Is it Crosby's position that the

7   ENDEAVOR does not meet the requirement of

8   being that vessel, which is exercising control

9   over the non-self-propelled vessel?

10          MR. RUFTY:

11              Object to form.

12          THE WITNESS:

13              That's correct.  Like I said,

14      when you look at this and it says, "Seas

15      subject to hurricane force winds," and

16      what our captain has testified, after

17      about 75 miles an hour is marginal.

18          MR. GUILLOT:

19              Wait, I'm sorry, can you repeat

20      that?

21          THE WITNESS:

22              I said, and our captain had

23      testified that, after 75 miles an hour

24      is marginal.  So what we're saying is,

25      is that Crosby's stance is that we were

Page 282

1           standing by, waiting for it to pass.  No

2           one asked us to be this type of vessel

3           for the THOR.

4   EXAMINATION BY MR. GUILLOT:

5        Q    Because the ENDEAVOR couldn't serve

6   as that type of vessel for the THOR, for

7   hurricane force winds, right?

8           MR. RUFTY:

9                Object to form.

10          THE WITNESS:

11               It could, with additional

12          vessels.  By itself, no.

13          MR. GRINNAN:

14               Based on the opinion testimony

15          of the witness.

16   EXAMINATION BY MR. GUILLOT:

17        Q    So, to be clear, Section 2, Part B,

18   where it says, "Without being under the

19   control of a vessel which is self-propelled,"

20   and equipped by various personnel, it is

21   Crosby's position that the ENDEAVOR was not

22   that vessel?

23          MR. RUFTY:

24               Object to form.

25          THE WITNESS:

Page 285

1    per manned boat we will do.

2        Q     All right.  Do you agree with the

3    statement that the ENDEAVOR is an offshore

4    towing and anchor handling tug and is not

5    designed to hold vessels in place?

6        A     Yes.

7        Q     Did you ever communicate -- did

8    Crosby ever communicate to the THOR, before

9    October 28th, 2020, at 1600 hours, that the

10   ENDEAVOR is not designed to hold vessels in

11   place?

12       A     No, because no one asked us to hold

13   them in place.

14       Q     Do you agree that Shore should have

15   been advised of that information by Crosby

16   when the ENDEAVOR tied up to the THOR, in

17   advance of the hurricane?

18       A     No.

19       Q     Why?

20       A     Because when Shore hired us and

21   asked us to do, we told them the capabilities

22   of.

23       Q     And what do you mean when you say,

24   you told them the capabilities of?

25       A     When Shore asked for a vessel, they

Page 287

1      Q      What type of efforts would be

2  undertaken to get the THOR prepared to go back

3  offshore after the hurricane, and how long it

4  would take?

5      A      No.

6      Q      Is it Crosby's understanding that

7  as soon as the hurricane passed, the THOR was

8  just going to go offshore, as soon as the port

9  opened?

10     A      Yes.  They were told, we would

11  stand by from there, and as soon as it was

12  passed, we were going back offshore.

13     Q      Did Crosby ever tell Dawn Services

14  that the ENDEAVOR was not designed to hold

15  vessels in place?

16     A      No.  They never asked.

17          MR. REISMAN:

18               Object to the form.

19  EXAMINATION BY MR. GUILLOT:

20     Q      Does Crosby have any tugs in its

21  fleet that are designed to hold barges in

22  place during bad weather?

23     A      Yes, we have vessels that have

24  lower draft, where the bow bumpers go closer

25  to the water line.  I think we actually

Page 294

1    the big ships, they ask for three or four

2    tugs.

3        Q    Did Crosby ever disclose to the

4    THOR that the bow bumper would exceed or the

5    bottom of the bow bumper on the ENDEAVOR would

6    be above the gunwale on the THOR?

7        A    No.  No one ever asked.

8        Q    Do you agree with the statement

9    that the bow thruster, according to Crosby's

10   various paperwork here, is not capable of

11   being used to assist in pushing the THOR into

12   the dock?

13       A    No, it's very small horsepower.

14   This is on for heading changes, when itself is

15   coming to the dock, not to move anything else.

16   I believe it's only like six to

17   800-horsepower.

18       Q    All right, just a minute.  Who gave

19   the instruction to the ENDEAVOR to return to

20   the THOR on the 28th?

21       A    I wasn't privy to that

22   communication.

23       Q    Did that come from anyone at Crosby

24   shoreside?

25       A    Talking to operations, it didn't

Page 315

```
 1        Q      The only ordinance that we were
 2   talking about.
 3        A      Oh, the Port Fourchon ordinance?
 4        Q      Yes, sir.
 5        A      Wait.  I'm getting there.
 6        Q      I want to confirm that it's
 7   Crosby's position that the ENDEAVOR was not a
 8   vessel qualified to control the THOR, under
 9   Port Ordinance 71, because it applies to
10   situations involving hurricane force winds.
11   Is that correct?
12            MR. RUFTY:
13                 Object to form.
14            THE WITNESS:
15                 What -- like I said earlier, we
16         didn't know we were here to comply with
17          this, is our position.
18   EXAMINATION BY MR. GUILLOT:
19        Q      That's different.  You're claiming
20   you didn't know that you were there to comply
21   with this.  Mine's more fundamental.  My
22   question is much more fundamental.  It's that
23   it's Crosby's position that the ENDEAVOR was
24   not a vessel that was qualified to control the
25   THOR, under Port Ordinance 71, because it
```

Page 316

1   applies to situations involving hurricane

2   force winds?

3        A     Yes, we were there to stand by,

4   correct.

5        Q     What I just said is correct?

6        A     Yes.

7        Q     What are Crosby's insurance limits

8   applicable to the claims brought against it in

9   these cases?

10       A     As far as, like a first level, our

11  excess, everything?

12       Q     Total.

13       A     I may have to look at our COI.  For

14  P & I, for the club, with the excess, our

15  excess limits are 1 billion, I believe.  I'd

16  have to look at the COI.

17            Why do you laugh?

18            MR. GUILLOT:

19                 Who?

20            MR. GRINNAN:

21                 I've just never heard somebody

22         say 1 billion is the limit, that's why.

23            THE WITNESS:

24                 Okay.

25  EXAMINATION BY MR. GUILLOT:

Page 384

1    of the bow that wraps around.  What we don't

2    have is where it comes to a 45.  If I put a

3    tire on a sharp edge and I make contact with

4    something, I'm going to cut through the tire.

5         Q    Okay.  So is it your testimony that

6    the CROSBY ENDEAVOR was not fit for use, to

7    use to push the THOR into the dock from the

8    bow?

9         A    Correct.

10        Q    Did anybody warn anybody at THOR or

11   Martin's dock that the tugboat would not be

12   able to push the THOR against the dock during

13   the hurricane, from the bow?

14             MR. RUFTY:

15                  Asked and answered.

16             THE WITNESS:

17                  No.  I was asked this earlier.

18        No one gave us instructions that that's

19        what they wanted us to do.  We were

20        hired to do anchor handling and towing

21        service.

22   EXAMINATION BY MR. GRINNAN:

23        Q    I think you said earlier -- let me

24   see if I can -- the most productive way to

25   push when you're using a tugboat is from the

Video Deposition of Crosby Tugs, LLC through Wade Savoy
All Coast, LLC v. Shore Offshore Services, LLC

```
                                               Page 490
  1        Q      What services could they have
  2   performed from that position?
  3             MR. RUFTY:
  4                   Asked and answered.
  5             THE WITNESS:
  6                   They could push in and out, as
  7         I explained several times, the way that
  8         they were configured, to relieve tension
  9         off of lines.
 10   EXAMINATION BY MR. GRINNAN:
 11        Q      And that would be -- that would be
 12   dock-holding assistance?
 13             MR. RUFTY:
 14                   Object to form.
 15             THE WITNESS:
 16                   If that's what you want to call
 17         it.
 18   EXAMINATION BY MR. GRINNAN:
 19        Q      Okay.  Is there any other service
 20   that they could have provided at the
 21   configuration the ENDEAVOR was in, to the
 22   THOR?
 23             MR. RUFTY:
 24                   Object to form.
 25             THE WITNESS:
```

Video Deposition of Crosby Tugs, LLC through Wade Savoy
All Coast, LLC v. Shore Offshore Services, LLC

Page 491

1              No.

2    EXAMINATION BY MR. GRINNAN:

3        Q    Okay.  So the only service they

4    could possibly have provided, if directed to

5    do anything, is dock-holding --

6            MR. RUFTY:

7                  Object to form.

8    EXAMINATION BY MR. GRINNAN:

9        Q    -- assistance?

10       A    Dock-holding?  Yes.

11           MR. GRINNAN:

12                 Okay.  I'll pass the witness.

13           MR. McMAHON:

14                 Going once.  Anybody on Zoom?

15           MR. GUILLOT:

16                 Done.

17           THE VIDEOGRAPHER:

18                 This concludes today's

19       deposition.  We're off the record.

20           MR. GUILLOT:

21                 For clarity on this exhibit,

22       Crosby 2162 is marked as Exhibit 274.

23                 (The deposition concluded at

24       6:55 p.m.)

25                      *    *    *

Video Deposition of Crosby Tugs, LLC through Wade Savoy
All Coast, LLC v. Shore Offshore Services, LLC

Page 493

1                    REPORTER'S CERTIFICATE

2

3          This certification is valid only for a
    transcript accompanied by my original
4    signature and original required seal on this
    page.

5

6               I, Linda G. Griffin, Certified
    Court Reporter in and for the State of
7    Louisiana, as the officer before whom this
    testimony was taken, do hereby certify that
8    WADE SAVOY, after having been duly sworn by
    me upon authority of R.S. 37:2554, did
9    testify as hereinbefore set forth in the
    foregoing 492 pages; that this testimony was
10   reported by me in the stenotype reporting
    method, was prepared and transcribed by me
11   or under my personal direction and
    supervision, and is a true and correct
12   transcript to the best of my ability and
    understanding; that the transcript has been
13   prepared in compliance with transcript
    format guidelines required by statute or by
14   rules of the board, that I have acted in
    compliance with the prohibition on
15   contractual relationships, as defined by
    Louisiana Code of Civil Procedure Article
16   1434 and in rules and advisory opinions of
    the board; that I am not related to counsel
17   or the parties herein, nor am I otherwise
    interested in the outcome of this matter.

18

19

20

21    _____
    LINDA G. GRIFFIN, RPR
22   CERTIFIED COURT REPORTER

23

24

25