UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| All Coast, LLC | * | No. 2:21-CV-00258 (lead case) c/w |
| | * | 21-337, 21-464, 21-822, 21-1968, |
| | * | 21-1969, 21-1981, 21-1982, |
| v. | * | 21-2075, 21-2227 |
| | * | (Applies to all cases) |
| | * | |
| | * | Judge Zainey |
| | * | |
| Shore Offshore Services, LLC | * | Magistrate Judge Dossier |

**Opposition to Dawn Services's Motion for Partial Summary Judgment on Tort Liability, By Claimant Lessle Williams**

Dawn Services seeks to escape liability by characterizing itself as a mere "middleman" or "broker" who simply connected Shore with Crosby Tugs. The undisputed evidence tells a different story. Dawn actively participated in selecting vessels, discussed job requirements and vessel suitability with third-party owners, made recommendations based on its maritime expertise, explained project details to Crosby to facilitate vessel selection, maintained ongoing communications throughout the operation, and remained actively involved when the THOR sought hurricane shelter. Dawn's motion should be denied because genuine disputes of material fact exist regarding Dawn's duty, breach, causation, and the foreseeability of harm.

**A. Dawn Actively Assessed Vessel Suitability—Contradicting Its "Passive Broker" Characterization**

Dawn contends it was merely a passive intermediary. Grace's testimony establishes otherwise and creates genuine factual disputes about Dawn's undertaking and resulting duties. Grace admitted that when Shore provided a job description, Dawn would "go out to the vessel owner and discuss it with them" regarding whether the vessel owner agreed their vessel could

1

handle the job. (Grace Depo. at 194). Dawn specifically discussed with third-party vessel owners "whether the owner believes that the vessel that it's going to provide is sufficient to perform that job." (Grace Depo. at 195). This is not passive connection-making—this is active engagement in assessing vessel suitability.

Most significantly, when Shore requested an anchor-handling tug for the THOR, Grace did not merely relay specifications. Grace testified: "So when I went to Crosby, I explained to them, the derrick barge that they were going to be working for and the job details." (Grace Depo. at 196). Kurt Crosby then called Tommy Gibilterra to discuss the proposed CROSBY ENDEAVOR. (*Id.*). Grace actively explained the project and the specific vessel (the THOR derrick barge) to Crosby, using Dawn's knowledge of both the project and maritime operations to facilitate Crosby's vessel recommendation.

Grace further admitted that Dawn would broker vessels when Dawn determined it "didn't have the vessel that was adequate to do the job, the size of the vessel that they needed." (Grace Depo. at 477-78). This demonstrates Dawn made assessments about whether its own vessels were "adequate" for specific jobs—meaning Dawn possessed and exercised judgment about vessel capabilities relative to job requirements. When Shore contacted Dawn, Shore would "provide parameters" and "Dawn goes out and tries to find vessels that meet those parameters." (Grace Depo. at 480). Dawn evaluated vessels against Shore's requirements.

Grace repeatedly characterized Dawn as "just a broker" and "the middle man." (Grace Depo. at 251-52). But Grace's self-serving labels do not control the legal analysis when his own testimony establishes Dawn did far more than passively connect parties. Whether Dawn's active involvement in assessing suitability, explaining project requirements, and facilitating vessel

2

selection created duties beyond those of a pure charter broker presents genuine factual disputes inappropriate for summary judgment.

## B. Dawn Remained Actively Involved During Hurricane Operations—Establishing Foreseeability and Ongoing Duty

Dawn argues the THOR's hurricane breakaway was "entirely unforeseeable" and that Dawn had no involvement. Grace's testimony contradicts both assertions.

The CROSBY ENDEAVOR arrived on assignment October 20, 2020—the height of Gulf hurricane season. Tropical Storm Zeta formed just four days later on October 24, 2020. Grace admitted he understood at the time that the THOR was coming to Port Fourchon to seek safe harbor from Hurricane Zeta. (Grace Depo. at 135). Dawn knew about the hurricane situation.

Far from being uninvolved, Dawn remained actively engaged in the hurricane response. On October 26, 2020—just two days before the incident—Grace sent an email to Shore stating: "Cody, I spoke with the CROSBY ENDEAVOR and right now they are comfortable only using the LA MADONNA and the LA ELITE... I have the LA COMMANDER available if we need on stand-by. The two tugs plan on meeting up with the THOR around 2100 tonight at the sea buoy." (Grace Depo. at 266-67).

Dawn cannot claim harbor operations during a hurricane were "entirely unforeseeable" when Grace's own testimony shows Dawn knew the THOR was seeking hurricane safe harbor and Dawn was actively coordinating the hurricane demobilization. "The determination of the existence and scope of a duty involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010). Whether harm is foreseeable "is generally a question for the jury." *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987).

Reasonable minds could differ on whether Dawn should have foreseen that a derrick barge it knew was seeking hurricane shelter might need adequate tug assistance for harbor operations. Grace's October 26 email proves Dawn knew about the hurricane situation and remained involved in coordinating the response.

**Conclusion**

Dawn seeks summary judgment based on a characterization of its role—"just a broker" and "middleman"—that is contradicted by its own corporate representative's sworn testimony. Michael Grace, Jr., testifying on behalf of Dawn Services, admitted three categories of facts that create genuine disputes precluding summary judgment:

**First**, Grace admitted Dawn actively assessed vessel suitability by discussing with vessel owners whether vessels were "sufficient to perform that job," explaining the THOR project details to Crosby to facilitate vessel selection, and making assessments about whether vessels were "adequate to do the job." These admissions contradict Dawn's passive broker characterization and create disputed issues about the nature and scope of Dawn's undertaking.

**Second**, Grace admitted Dawn remained actively involved during Hurricane Zeta operations, including sending an email just two days before the incident coordinating tail tug arrangements, communicating with the CROSBY ENDEAVOR, and offering standby vessel support. These admissions establish Dawn's knowledge of the hurricane situation and ongoing operational involvement, creating disputed issues about foreseeability and the scope of Dawn's duties.

Whether Dawn's voluntary undertaking created duties, whether Dawn breached those duties, whether harm was foreseeable given Dawn's hurricane involvement, and whether Dawn's conduct contributed to the incident are factual disputes that must be resolved by the trier of fact.

For these reasons, the Court should deny Dawn's motion in its entirety.

Lessle Williams explicitly adopts and incorporates all arguments made in opposition by the other claimants in this matter.

Respectfully submitted:

*/s/John Love Norris, IV*
Brian King, La. Bar No. 24817
John Love Norris, IV, La. Bar No. 35269
Michael J. Simonson, La. Bar No. 34091
The King Firm, LLC
2912 Canal Street
New Orleans, LA 70119
Phone 504-909-5464
Fax 800-901-6470
E-mail: jnorris@kinginjuryfirm.com