Transcript of the Testimony of
# 30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.

**Date taken: May 24, 2023**

**All Coast, LLC v. Shore Offshore Services, LLC**

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALL COAST, LLC     *  CIVIL ACTION
                   *  NO. 21-258, C/W 21-337,
                   *  21-464, 21-822, 21-1968,
                   *  21-1969, 21-1982,
VERSUS             *  21-1981, 21-2075,
                   *  21-2227
                   *
                   *  SECTION "A"
SHORE OFFSHORE      *  HON. JAY C. ZAINEY
SERVICES, LLC      *  MAGISTRATE: (4)
                   *  HON. KAREN WELLS ROBY
                   *
                   *  APPLIES TO ALL CASES
RULE 30(b)(6)
DEPOSITION OF
DAWN SERVICES, L.L.C

DAWN SERVICES, L.L.C., through its
representative, Michael W. Grace, Jr.,
Vice-President, Dawn Services, L.L.C., 851
MacArthur Avenue, Harvey, Louisiana 70058,
taken in person and via ZOOM Videoconference,
in the offices of Liskow & Lewis, 701 Poydras
Street, Suite 5000, New Orleans, Louisiana
70139, on Wednesday, the 24th day of May,
2023.

APPEARANCES: (VIA ZOOM)
    ARNOLD & ITKIN, LLP
    (By:  John G. Grinnan, Jr., Esquire)
    6009 Memorial Drive
    Houston, Texas 77007

## Page 2

1
2   APPEARANCES: (IN PERSON)
3       PUSATERI, JOHNSTON,
        GUILLOT & GREENBAUM, LLC
4       (By:  Jacob A. Altmyer, Esquire)
        1100 Poydras Street, Suite 2250
        New Orleans, Louisiana 70163
5
6       (Attorneys for Modern American
        Railroad Services, L.L.C., and
7       Shore Offshore Services, LLC)

8       LISKOW & LEWIS, APLC
        (By:  David L. Reisman, Esquire)
        701 Poydras Street, Suite 5000
9       New Orleans, Louisiana 70139
10      (Attorneys for Dawn Services, LLC)
11      ADAMS & REESE, LLP
        (By:  Matthew C. Guy, Esquire)
12      701 Poydras Street, Suite 4500
        New Orleans, Louisiana 70139
13
14      (Attorneys for Harvey Gulf
        International Marine, LLC)
15  APPEARANCES (VIA ZOOM)
16      SPAGNOLETTI LAW FIRM
        (By:  Marc E. Kutner, Esquire)
17      401 Louisiana Street, 8th Floor
        Houston, Texas 77002
18
        (Attorneys for Montrell Smith and
19      Randy Rials)
20  JONES WALKER, LLP
        (By:  Alfred J. Rufty, III, Esquire
21      Sara B. Kuebel, Esquire)
        201 St. Charles Avenue, Suite 5100
22      New Orleans, Louisiana 70170
23      (Attorneys for Crosby Tugs, LLC)
24
25

## Page 3

1   APPEARANCES (VIA ZOOM):
2       DAIGLE, FISSE & KESSENICH
        (By:  Demi M. Dantin, Esquire)
3       227 Highway 21
        Madisonville, Louisiana 70447
4
5       (Attorneys for Martin Interests)
6       GALLOWAY, JOHNSON, TOMPKINS,
        BURR & SMITH, APLC
7       (By:  Kelsey L. Bonnaffons, Esquire)
        #3 Sanctuary Boulevard, Suite 301
8       Mandeville, Louisiana 70471
9       (Attorneys for Coastal Towing, LLC,
        and Talisman Casualty Insurance
10      Company, LLC)
11  FLANAGAN PARTNERS, LLP
        (By:  Laurent J. Demosthenidy, Esquire)
12      201 St. Charles Avenue, Suite 3300
        New Orleans, Louisiana 70170
13      (Attorneys for Weeks Marine, Inc.,
        and GOL, LLC)
14
15  CHAFFE MCCALL, LLP
        (By:  Catherine G. Schroeder, Esquire)
16      1100 Poydras Street, Suite 2300
        New Orleans, Louisiana 70163
17      (Attorneys for Chubb Underwriting
        Agencies, Ltd.)
18
19  CHAFFE McCALL, LLP
        (By:  John M. Ribarits, Esquire)
20      801 Travis Street, Suite 1910
        Houston, Texas 77002
21      (Attorneys for Premier Offshore
        Catering, Inc.)
22
23  PALMINTIER LAW GROUP
        (By:  Michael C. Palmintier, Esquire)
24      618 Main Street
        Baton Rouge, Louisiana 70801
25      (Attorneys for Terrynn Lyons)

## Page 4

1   APPEARANCES (VIA ZOOM):
2       ALLEN & GOOCH
        (By:  John H. Hughes, Esquire
3             Alan J. Meche, Esquire)
        2000 Kaliste Saloom Road, Suite 400
4       Lafayette, Louisiana 70508
5       (Attorneys for Garber Brothers,
        LLC, Gulf Logistics, LLC, C&G
6       Boats, Inc.)
7   FRILOT, LLC
        (By:  Blake C. Donewar, Esquire)
8       1100 Poydras Street, Suite 3700
        New Orleans, Louisiana 70163
9
        (Attorneys for Greater Lafourche
10      Port Commission)
11  THE MOELLER FIRM, LLC
        (By:  Kassie L. Richbourg, Esquire)
12      650 Poydras Street, Suite 2516
        New Orleans, Louisiana 70130
13
14      (Attorneys for All Coast, LLC)
15  REPORTED BY:
16      LINDA G. GRIFFIN, RPR
        CERTIFIED COURT REPORTER
17          ***
18
19
20
21
22
23
24
25

Pages 1 to 4

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 5

I N D E X

EXAMINATION

PAGE

EXAMINATION BY MR. ALTMYER ........ 10

EXAMINATION BY MR. GRINNAN ........ 333

EXAMINATION BY MR. ALTMYER ........ 458

EXAMINATION BY MR. REISMAN ........ 470

EXAMINATION BY MR. GRINNAN ........ 491

***

Page 7

EXHIBIT NO. 136 .................  259
Email; Grace to Arana; 10/19/20
Subj:  Crosby Endeavor Fuel
Dawn 000183

EXHIBIT NO. 137 .................  262
Emails; Grace to Arana; 10/16/20
Subj:  LA ELITE/LA COMMANDER
Dawn 000189 - 000190

EXHIBIT NO. 138 .................  265
Email; Grace to Sims; 10/26/20
Subj: THOR
Dawn 000149

EXHIBIT NO. 139 .................  267
Email; Grace to Danos; 10/26/20
Subj: CROSBY ENDEAVOR
DAWN 000235

EXHIBIT NO. 140 .................  269
Email; Grace to Arana; 10/20/20;
Subj: Manifest Rev1
Dawn 000179

EXHIBIT NO. 141 .................  270
Email; Grace to Arana; 10/22/20
Subj: On-Hire Agreement - M/V
CROSBY ENDEAVOR (REQ#YH1849)
Dawn 000175

EXHIBIT NO. 142 .................  272
Emails; Danos to Grace; 10/22/20
Subj: ENDEAVOR
Dawn 000227 - 000228

EXHIBIT NO. 143 .................  277
Text Messages; Danos
08/07/20 - 11/10/20
Dawn 000282 - 000286

EXHIBIT NO. 144 .................  279
Email; Danos to Grace
10/25/20; Subj: Tropical Storm Zeta
Advisory 5
Dawn 000226

EXHIBIT NO. 145 .................  392
Drawing by John Grinnan

Page 6

EXHIBITS

PAGE

EXHIBIT NO. 126 .................  19
Re-Notice of Fed.R.Civ.P.Rule 30(B)(6)
Deposition of Dawn Services, LLC

EXHIBIT NO. 127...................  40
Master Vessel Time Charter
6/9/17; Dawn 000388 - 000401

EXHIBIT NO. 128 .................  72
Dawn Services, LLC; Website Page
"Our Fleet"

EXHIBIT NO. 129 .................  103
On/Off Hire Letters
10/08/20 - 11/03/20
Dawn 000373 - 000383

EXHIBIT NO. 130.................  147
On-Hire Letter; 06/04/19
To:  Tommy Gibilterra

EXHIBIT NO. 131...................  187
Trident Marine Managers, Inc.
Insurance Policy; 10/30/19 - 04/30/21
Dawn 000405 - 000413

EXHIBIT NO. 132...................  225
Email; Master Service Agreement
Crosby 000030 - 000035

EXHIBIT NO. 133 .................  237
Dawn Services Morning Report
10/26/20 - 10/28/20
Dawn 000402 - 000404

EXHIBIT NO. 134...................  255
Email; Grace to Arana
10/20/20; Subj:  Crew Change
Dawn 000181

EXHIBIT NO. 135 .................  258
Email; Roberts to Grace
10/16/20; Subj:  Crew Change
Dawn 000247

Page 8

EXHIBIT NO. 146 .................  466
Certificate of Liability Insurance
10/28/20
Dawn 000384 - 000387

***

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 9

1       STIPULATION
2
3           It is stipulated and agreed by and
4    between counsel for the parties hereto that
5    the deposition of the aforementioned witness
6    is hereby being taken for all purposes
7    allowed under the Federal Rules of Civil
8    Procedure, in accordance with law, pursuant
9    to notice;
10          That the formalities of reading and
11   signing are specifically not waived;
12          That the formalities of sealing,
13   certification and filing are specifically
14   waived;
15          That all objections, save those as
16   to the form of the question and the
17   responsiveness of the answer, are hereby
18   reserved until such time as this deposition,
19   or any part thereof, may be used or sought
20   to be used in evidence.
21          *     *     *     *
22          LINDA G. GRIFFIN, CCR, Registered
23   Professional Reporter, in and for the State
24   of Louisiana, officiated in administering
25   the oath to the witness.

Page 10

1           DAWN SERVICES, L.L.C., through its
2    Representative, MICHAEL W. GRACE, JR.,
3    VICE-PRESIDENT, DAWN SERVICES, L.L.C.,
4    after having been first duly sworn by the
5    above-mentioned Registered Professional
6    Reporter, did testify as follows:
7           (On the record at 10:06 a.m.)
8    EXAMINATION BY MR. ALTMYER:
9        Q    Mr. Grace, we just met off the
10   record. My name is Jacob Altmyer. I
11   represent Shore Offshore Services and Modern
12   American Railroad Services, LLC. Just sitting
13   here today, have you ever been deposed before?
14       A    Yes.
15       Q    Okay. Just some ground rules, and
16   if you've been deposed before, but some
17   instructions going on here. Please provide
18   audible answers to the court reporter. If I
19   ask a question that requires a "yes" or "no"
20   answer, please audibly say "yes" or "no."
21   Head nods, up and down, the court reporter
22   can't pick that up. This isn't a video
23   deposition, so you're not being videoed here
24   today.
25          If you don't understand a question,

Page 11

1    please let me know and I'll restate it until
2    you do understand it, and if you don't ask me
3    to rephrase the question, I'm going to take it
4    as you do understand what I'm asking you. Is
5    that fair?
6        A    Yes.
7        Q    Okay. As far as breaks go, it's
8    your call. You let me know when you need a
9    break or anything like that, or come to a
10   stopping point, and then if you need to use
11   the restroom, anything like that, get some
12   water, we'll do that. It's all up to you.
13          And then, just as far as -- try not
14   to talk over each other. If I ask a question,
15   I'll try to finish it as much as possible
16   without you speaking over me, and then I'll
17   try not to speak over you when you answer a
18   question that I've asked, okay.
19       A    Okay.
20       Q    All right, sounds good. If you
21   could, please give your full name, for the
22   record?
23       A    Michael Wilcox Grace, Jr.
24       Q    And what is your home address, sir?
25       A    8 Paladin, P-A-L-A-D-I-N, Place,

Page 12

1    Metairie, Louisiana 70005.
2        Q    All right. And what about business
3    address?
4        A    851 MacArthur Avenue, Harvey,
5    Louisiana 70058.
6        Q    All right, thank you. Mr. Grace,
7    have you taken any medications today?
8        A    No.
9        Q    Okay. You understand that you are
10   testifying here today as if you were
11   testifying in court before a judge or a jury,
12   correct?
13       A    Yes.
14       Q    Okay. Are you having any issues
15   hearing today?
16       A    No.
17       Q    Any issues with your vision?
18       A    No.
19       Q    Is there anything impairing you
20   today from truthfully and accurately
21   testifying?
22       A    No.
23       Q    You understand that you're being
24   presented here today for this deposition, as
25   the corporate representative of Dawn Services,

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 13

1   LLC, correct?
2       A    Yes.
3       Q    Okay. Have you ever testified
4   before as a corporate representative of Dawn?
5       A    Yes.
6       Q    Okay. I'm just going to refer to
7   Dawn Services, LLC, as "Dawn," if that's okay.
8       A    Yes.
9       Q    If you need me to clarify anything,
10  just let me know when I ask a question. You
11  are currently employed by Dawn, correct?
12      A    Yes.
13      Q    What is your position at Dawn?
14      A    Vice-president.
15      Q    And you are the commercial lead for
16  Dawn that works with Shore Offshore Services,
17  correct?
18      A    Commercially?
19           MR. REISMAN:
20               Object to the form.
21  EXAMINATION BY MR. ALTMYER:
22      Q    Yes, sir. You are the
23  representative of Dawn that deals commercially
24  with Shore Offshore Services, correct?
25           MR. REISMAN:

Page 14

1                Object to the form.
2            THE WITNESS:
3                I don't understand "commercial
4            lead."
5   EXAMINATION BY MR. ALTMYER:
6       Q    Oh, no, scratch that question. You
7   just deal commercially with Shore Offshore
8   Services, on behalf of Dawn?
9       A    Could you define "commercial" for
10  me?
11      Q    Do you have business dealings that
12  you do for Dawn with Shore Offshore Services?
13      A    I broker vessels to them. We
14  provide our vessels.
15           MR. REISMAN:
16               Answer just the question he's
17           asking you, Mike.
18           THE WITNESS:
19               Okay.
20           MR. REISMAN:
21               Just listen to the question and
22           answer what he's asking you.
23           THE WITNESS:
24               Okay.
25  EXAMINATION BY MR. ALTMYER:

Page 15

1       Q    On behalf of Dawn Services, do you
2   deal commercially with Shore Offshore
3   Services?
4       A    Yes.
5       Q    Okay. No organizational chart was
6   produced by Dawn, in discovery in this case,
7   so if you could, could you please just give us
8   a general breakdown of the organization and
9   where you fit into it?
10      A    We have Kenny Charpentier. He is
11  CEO. Then John Charpentier is president.
12  Then myself as vice-president.
13      Q    Okay. So you, as vice-president,
14  report to the CEO and the president?
15      A    Correct.
16      Q    Okay. And who reports to you?
17      A    We have Karen Gardes, Human
18  Resources. We have Mitch St. Romain, Port
19  Engineer; Doug Plaisance, Health and Safety,
20  and Phillip Bommarito. He is port
21  captain/warehouse.
22      Q    Okay. And aside from assistants,
23  secretaries, anything like that, that's the
24  shoreside personnel, as far as Dawn Services
25  goes?

Page 16

1       A    Yes.
2       Q    How long have you held your current
3   position for?
4       A    Probably ten years.
5       Q    And just to confirm, you held this
6   position on October 28th, 2020?
7       A    Yes.
8       Q    Okay. When were you first hired on
9   to work for Dawn?
10      A    Excuse me?
11      Q    When were you first hired on to
12  work for Dawn?
13      A    May of 2007.
14      Q    2007, okay. So what position did
15  you hire on as?
16      A    Business development operations.
17      Q    And then you were promoted to VP
18  after that or did you have any interim
19  positions?
20      A    Promoted to VP.
21      Q    Okay. And that would have been
22  around 2013?
23      A    Sounds about right.
24      Q    Okay. If you can just please
25  explain to us the general roles and

Professional Shorthand Reporters, Inc.          1-800-536-5255
Offices in New Orleans and Baton Rouge           www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 17

1 responsibilities of your position as
2 vice-president.
3      A    To oversee the day-to-day
4 operations.
5      Q    You were also referenced in Dawn's
6 discovery responses as being Dawn's records
7 custody custodian.  Is that accurate?
8      A    Yes.
9      Q    So you will be familiar with Dawn's
10 business records?
11      A    Yes.
12      Q    As vice-president, you execute
13 contracts on behalf of Dawn?
14      A    Yes.
15      Q    And you've been doing that since --
16 did you do that in your role of business
17 development and operations, too, or just as
18 VP?
19      A    Just as VP.
20      Q    I'm going to not spend too much
21 time on this, but I just want to talk a little
22 bit about your work history prior to Dawn and
23 your educational background.  Did you work
24 anywhere before Dawn Services?
25      A    Yes.

Page 18

1      Q    Okay.  Where did you work?
2      A    TICO Health Care.
3      Q    And when did you start working
4 there?
5      A    After graduation from college.
6      Q    Okay.  What year did you graduate
7 college?
8      A    2000.
9      Q    Gotcha.  So you worked there for
10 about seven years and then hired on with Dawn?
11      A    Yes.
12      Q    Any interim jobs?
13      A    No.
14      Q    Was working for Dawn Services your
15 first marine-related job?
16      A    Yes.
17      Q    And just briefly, what did you do
18 for TICO Health Care?
19      A    Sold medical supplies.
20      Q    All right.  And so where did you
21 graduate from college?
22      A    University of Arizona.
23      Q    And what year did you graduate high
24 school?
25      A    1996.

Page 19

1      Q    Gotcha.  Any grad degrees, anything
2 like that?
3      A    No.
4      MR. ALTMYER:
5          Okay.  I'm going to mark this
6 here as "Exhibit" -- we are on No. 126.
7 This is a rolling number of exhibits
8 that we've had in this case.
9      THE WITNESS:
10          Okay.
11      MR. ALTMYER:
12          So the numbers can seem a bit
13 off.  I'll give you a copy.  It's the
14 Rule 30(b)(6) Deposition Notice.
15      MR. REISMAN:
16          I've got it.  Thanks.
17 EXAMINATION BY MR. ALTMYER:
18      Q    All right, Mr. Grace, this is
19 Re-Notice of Federal Rules of Civil Procedure,
20 Rule 30(b)(6) Deposition of Dawn Services.
21 You've seen this document before, correct?
22      A    Yes.
23      Q    Okay.  You reviewed this document
24 before your deposition, correct?
25      A    Yes.

Page 20

1      Q    All right.  Let's just start out
2 with Exhibit A.  And this is just something
3 that we do for corporate depositions.  We're
4 going to walk through each of the topics, and
5 it's specifically going to be on Page 6.  It's
6 areas of inquiry.  There's 15 of them here.
7      A    Okay.
8      Q    Then we're going to walk through
9 each one of them and talk about whether or not
10 you're prepared to testify on that topic and
11 what you did to prepare to testify on that
12 topic.
13      A    Okay.
14      Q    So let's start with No. 1, area of
15 inquiry No. 1, Dawn's responses to written
16 discovery in these consolidated cases.
17 Sitting here today, are you prepared to
18 testify regarding this Topic 1 on behalf of
19 Dawn?
20      A    Yes.
21      Q    And what did you do to prepare to
22 testify today on this topic?
23      A    Met with our lawyer.
24      Q    Did you review the discovery
25 responses --

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 21

1    A    Yes.
2    Q    -- produced by Dawn in this case?
3    Okay.  Let's go to Topic 2.  Dawn's documents
4    and records produced in discovery in this
5    case.  Are you prepared to testify here today
6    regarding Topic 2, on behalf of Dawn?
7    A    Yes.
8    Q    And did you review the documents
9    that were produced by Dawn in connection with
10   this case --
11   A    Yes.
12   Q    -- in preparation for your
13   deposition?
14   A    Yes.
15       MR. REISMAN:
16          Let him finish his question
17       before you answer.
18       THE WITNESS:
19          Okay.
20   EXAMINATION BY MR. ALTMYER:
21   Q    Topic 3 is the contractual
22   arrangement and commercial relationship
23   between Dawn and Crosby, in place on
24   October 28, 2020, for the M/V CROSBY ENDEAVOR.
25   Are you prepared to testify here today

Page 22

1    regarding Topic 3, on behalf of Dawn?
2    A    Yes.
3    Q    Okay.  And what did you do to
4    prepare to testify today on this topic, as the
5    corporate representative of Dawn?
6        MR. REISMAN:
7           I'm just going to lodge a
8        general objection and an instruction to
9        the witness to not disclose anything
10       that you've discussed with any of your
11       attorneys or any of Dawn's attorneys.
12       THE WITNESS:
13          Okay.  Met with our lawyer.
14   EXAMINATION BY MR. ALTMYER:
15   Q    Did you review any of the contracts
16   produced in this case?
17   A    The Master Vessel Time Charter.
18   Q    Okay.  The contractual arrangement
19   and commercial relationship between Dawn and
20   Louisiana International Marine, in place on
21   October 28th, 2020, for the LA MADONNA and
22   LA ELITE.  That's Topic 4.  Are you prepared
23   to testify here today regarding Topic 4, on
24   behalf of Dawn?
25   A    Yes.

Page 23

1    Q    And what did you do to prepare to
2    testify today on this topic?
3    A    Discussed it with our lawyer.
4    Q    Okay.  Topic 5.  Did you review any
5    of the on-hire/off-hire letters, anything like
6    that, with Louisiana International Marine?
7    A    Excuse me.  Can you repeat the
8    question?
9    Q    Did you review any documents from
10   Louisiana International Marine or anything
11   that you all issued to Louisiana International
12   Marine, in preparing for your deposition
13   today?
14   A    No.
15   Q    Okay.  Topic 5.  June 9, 2017
16   Master Vessel Time Charter between Dawn and
17   Shore.  Are you prepared to testify here today
18   regarding Topic 5, on behalf of Dawn?
19   A    Yes.
20   Q    Okay.  And I believe you stated
21   earlier, you had reviewed the Master Vessel
22   Time Charter prior to your deposition here
23   today, correct?
24   A    Yes.
25   Q    Okay.  Did you review anything else

Page 24

1    to prepare to testify on this topic?
2        MR. REISMAN:
3           Object to the form.
4        THE WITNESS:
5           No.
6    EXAMINATION BY MR. ALTMYER:
7    Q    What did you do to prepare to
8    testify today on this topic?
9    A    Read the contract, reviewed the
10   contract.
11   Q    Okay.  Topic 6.  Dawn's position
12   and the basis for its position as to when the
13   2017 Master Vessel Time Charter applies
14   between Dawn and Shore, and to when it does
15   not apply between Dawn and Shore.  Are you
16   prepared to testify here today regarding
17   Topic 6, on behalf of Dawn?
18   A    Yes.
19   Q    And what did you do to prepare to
20   testify today on this topic?
21   A    Met with our lawyers.
22   Q    Topic 7.  The vessels that Dawn
23   chartered to Shore and that Dawn brokered to
24   Shore, from June 9, 2017 to present,
25   irrespective of Dawn's position regarding

Pages 21 to 24

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 25

1   whether or not the terms of the Master Vessel
2   Time Charter applied.  Are you prepared to
3   testify here today regarding Topic 7, on
4   behalf of Dawn?
5        A    Yes.
6        Q    Same question.  What did you do to
7   prepare to testify on this topic today?
8        A    Met with the lawyers.
9        Q    Dawn's communications, oral or
10  written, with Shore in 2020, regarding or
11  related to the M/V CROSBY ENDEAVOR, the
12  LA MADONNA and the LA ELITE.  Are you prepared
13  to testify here today regarding Topic 8, on
14  behalf of Dawn?
15       A    Yes.
16       Q    And what did you do to prepare to
17  testify on this topic?
18       A    Reviewed with our lawyers.
19       Q    As far as documents go, would you
20  have reviewed any of the emails and text
21  message communications --
22       A    Yes.
23       Q    -- that were produced in the case?
24       A    Yes.
25       Q    Topic 9.  Dawn's communications,

Page 26

1   oral or written, with Crosby in 2020,
2   regarding or related to the M/V CROSBY
3   ENDEAVOR.  Are you prepared to testify here
4   today regarding Topic 9, on behalf of Dawn?
5        A    Yes.
6        Q    And what did you do to prepare to
7   testify today on this topic, as a corporate
8   representative of Dawn?
9        A    Met with our lawyers.
10       Q    Did you also review communications,
11  emails, text messages, produced in connection
12  with this case by Dawn?
13       A    Yes.
14       Q    Dawn's communications, oral or
15  written, with Louisiana International Marine
16  in 2020, regarding or related to the
17  LA MADONNA or the LA ELITE.  Are you prepared
18  to testify here today regarding Topic 10, on
19  behalf of Dawn?
20       A    Yes.
21       Q    And what did you do to prepare to
22  testify today on this topic, as the corporate
23  representative of Dawn?
24       A    Met with the lawyers.
25       Q    Okay.  Also, for this round of

Page 27

1   communication, did you review any text
2   messages or emails that you may have had with
3   Louisiana International Marine?
4        A    Yes.
5        Q    Okay.  What documents and records
6   Dawn has, if any, or is supposed to generate,
7   if any, to differentiate when a vessel is
8   chartered to Shore versus when a vessel is
9   brokered to Shore.  Are you prepared to
10  testify here today regarding Topic 11, on
11  behalf of Dawn?
12       A    Yes.
13       Q    And that's Topic 11, just for
14  clarity.  And what did you do to prepare to
15  testify today on this topic, as the corporate
16  representative of Dawn?
17       A    Met with our lawyers.
18       Q    Topic 12.  What documents and
19  records Dawn has, if any, to differentiate
20  when a vessel is chartered to Dawn's
21  customers, other than Shore, versus when a
22  vessel is brokered to Dawn's customers, other
23  than Shore.  Are you prepared to testify here
24  today regarding Topic 12, on behalf of Dawn?
25       A    Yes.

Page 28

1        Q    And what did you do to prepare to
2   testify on this topic, as the corporate
3   representative of Dawn?
4        A    Met with our lawyers.
5        Q    Topic 13.  Dawn's policies and
6   procedures in place in October 2020, to
7   differentiate circumstances where Dawn is
8   acting as a broker, where Dawn is acting as a
9   charterer versus -- I'm sorry, let me re-read
10  that for you real quick.  Dawn's policies and
11  procedures in place in October 2020, to
12  differentiate circumstances, where Dawn is
13  acting as a broker versus where Dawn is acting
14  as a charterer, when making arrangements to
15  provide a customer, like Shore, with a vessel,
16  as well as any changes to the existing
17  policies and procedures related to the subject
18  and implemented after the October 28, 2020
19  incident at issue in this case.  Are you
20  prepared to testify here today regarding
21  Topic 13, on behalf of Dawn?
22       A    Yes.
23       Q    And what did you do to prepare to
24  testify today on that topic?
25       A    Met with our lawyers.

Pages 25 to 28

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 29

1    Q    Topic 14.  Dawn's on/off hire
2  letters for vessels that Dawn chartered to
3  Shore and brokered to Shore, from June 9, 2017
4  to present, and the differences, if any,
5  between them.  Are you prepared to testify
6  here today regarding Topic 14, on behalf of
7  Dawn?
8    A    Yes.
9    Q    Okay.  What did you do to prepare
10 to testify today on this topic?
11   A    Met with our lawyers.
12   Q    Okay.  And did you review Dawn's
13 on/off hire letters that were produced by Dawn
14 in connection with this case?
15   A    Yes.
16   Q    Okay.  Topic 15, last one.  Dawn's
17 insurance coverage for Shore's claims against
18 Dawn and the Claimants' claims against Dawn.
19 Are you prepared to testify here today
20 regarding Topic 15, on behalf of Dawn?
21   A    Yes.
22   Q    And what did you do to prepare to
23 testify today on this topic?
24   A    Met with our lawyers.
25   Q    Okay.  And did you review any

Page 30

1  documents related to insurance coverage that
2  Dawn may have?
3    A    Yes.
4    Q    What specifically did you review?
5    A    The -- I made some notes of what
6  we -- what I remember, what we talked about.
7        MR. REISMAN:
8            He's asking you specifically
9        what you reviewed in relation to No. 15.
10       THE WITNESS:
11           The letter from Mitsui to
12       Gavin.
13 EXAMINATION BY MR. ALTMYER:
14   Q    Just to specify, that's to Gavin
15 Guillot?
16   A    Correct.
17   Q    Okay.
18       MR. REISMAN:
19           He's also indicated that he
20       reviewed the documents that were
21       produced, which include insurance
22       policies.
23       MR. ALTMYER:
24           Okay.
25 EXAMINATION BY MR. ALTMYER:

Page 31

1    Q    And just to clarify, the letter
2  that we're talking about is the denial of a
3  tender, correct?
4    A    It was dated March 26, 2021.
5    Q    Okay.  So you have a list there.
6  Is that of documents that you reviewed in
7  connection with this case?
8    A    Yes.  I jotted it this morning just
9  so I could remember what we reviewed.
10   Q    What was the list?  Can you read it
11 off for me?
12   A    Yes.  The Master Vessel Time
13 Charter, the March 26th, 2020 letter from
14 Mitsui to Gavin Guillot.
15       MR. REISMAN:
16           You mean 2021?
17       THE WITNESS:
18           2021, I'm sorry, yes.  Dawn's
19       responses to the discovery, all the
20       documents Dawn had produced, and the
21       Notice of the Deposition topics.
22 EXAMINATION BY MR. ALTMYER:
23   Q    Great, thank you.  All right.  What
24 number was that, Exhibit 126, we started with?
25 If you flip to Page 7, in Exhibit B there, did

Page 32

1  you review Exhibit B before your deposition
2  today?
3    A    Yes.
4    Q    Okay.  Just at No. 1, all documents
5  and records in Dawn's possession and custody
6  and control pertaining to the areas of inquiry
7  set forth in Exhibit A, to Notice of Federal
8  Rules of Civil Procedure, Rule 30(b)(6)
9  Deposition of Dawn Services, LLC, above.
10       And then No. 2 says, all documents
11 and records in Dawn's possession, custody and
12 control that are responsive to any record
13 request for production of documents propounded
14 on you, in this case, to the extent any such
15 responsive documents and records have yet to
16 be produced by you.
17       So on the first point we just
18 reviewed, Exhibit A, that lists the areas of
19 inquiry, right?
20   A    Yes.
21   Q    I understand that you assisted, and
22 it's in a discovery response, in responding to
23 discovery requests that were sent to Dawn in
24 this case, correct?
25   A    Could you repeat the question?

Pages 29 to 32

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge                    1-800-536-5255
                                                          www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 33

1    Q    Yeah.  In one of the discovery
2  responses, it names you as a person that
3  assisted in answering some of the discovery
4  requests.  Is that accurate?
5    A    Yes.
6    Q    Aside from assisting in responding
7  to those discovery requests, did you do any
8  further searches of Dawn's business records
9  specific to your preparation for this
10 deposition today?
11   A    No.
12   Q    Okay.  Do you know if anyone else
13 at Dawn did any searches of Dawn's business
14 records, for the purposes of this deposition?
15   A    Not that I'm aware of, no.
16   Q    Were you asked to do so?
17   A    To?
18   Q    To search your business records for
19 anything that might pertain to the topics of
20 inquiry that are stated in Exhibit A?
21   A    Could you repeat the question one
22 more time?
23   Q    Yeah.  Were you asked or do you
24 know if anyone else at Dawn was asked to
25 search Dawn's business records for anything

Page 34

1  that may pertain to the areas of inquiry,
2  1 through 15, that are on Exhibit A of the
3  Deposition Notice?
4      MR. REISMAN:
5         When you say "at Dawn," are you
6      referring only to Dawn employees or are
7      you including Dawn and its lawyers?
8  EXAMINATION BY MR. ALTMYER:
9    Q    Just Dawn's employees.
10   A    No, it was just me.
11   Q    Okay.  So I'm asking, were you
12 requested to look up any documents in Dawn's
13 business records pertaining to this area of
14 inquiry?
15   A    Yes.
16   Q    Specific for this deposition?
17   A    Yes.
18   Q    Okay.  Did you find any other
19 documents that you know of that have not been
20 produced in this case?
21   A    No.
22     MR. REISMAN:
23        And I'm just going to enter a
24     general objection here.  Objections were
25     made to discovery requests, that were

Page 35

1  submitted, both on the omnibus basis, as
2  well as particularly by the Shore
3  interests, Shore and MARS.  Possibly,
4  also Harvey Gulf, I can't remember, or
5  HARVEY SEAS.  We stand on those
6  objections.  They are maintained.  We're
7  not producing documents to which we had
8  previously objected and to which no
9  Motions to Compel or discovery
10 conference was set.
11     MR. ALTMYER:
12        Absolutely, understood.
13 EXAMINATION BY MR. ALTMYER:
14   Q    I'm really just trying to get at
15 whether or not you were asked to look at these
16 areas of inquiry and go see if there was
17 anything else that maybe you didn't catch the
18 first time you were going to look for the
19 records.
20   A    Okay.
21   Q    And I'm just asking whether or not
22 that happened or not.
23   A    No.  No.
24   Q    Okay.  All right.  So not getting
25 into the incident itself, but you are

Page 36

1  generally familiar with the October 28, 2020
2  incident involving the D/B THOR, to which the
3  M/V CROSBY ENDEAVOR was moored alongside the
4  THOR during Hurricane Zeta, in Port Fourchon,
5  correct?
6    A    Yes.
7    Q    And if I refer to "the incident"
8  throughout this deposition, that's what I'm
9  referring to, okay.
10   A    Okay.
11   Q    And if you need clarity on that,
12 just let me know.  You are familiar with the
13 vessel named the M/V CROSBY ENDEAVOR, correct?
14   A    Yes.
15   Q    And that's a vessel that's owned by
16 Crosby Tugs, correct?
17   A    Yes.
18   Q    And you're familiar with the
19 vessels, the LA MADONNA and the LA ELITE?
20   A    Yes.
21   Q    And those are two vessels that are
22 owned by Louisiana International Marine,
23 correct?
24   A    Yes.
25   Q    Irrespective of what Dawn's

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 37

1   position is regarding the applicability of any
2   contracts in this case, Dawn provided all
3   three of those vessels to work for or assist
4   the THOR in October 2020, correct?
5       A    We didn't provide them.  We
6   brokered them.
7       Q    Okay.  You facilitated the use of
8   those vessels to the THOR, in October 2020?
9       MR. REISMAN:
10          Object to the form.
11      THE WITNESS:
12          I was asked by Shore to help
13      locate vessels that could work with the
14      D/B THOR.
15  EXAMINATION BY MR. ALTMYER:
16      Q    Okay.  I'll ask it this way.  You
17  were involved in commercial dealings between
18  Shore, Dawn, and either Crosby or Louisiana
19  International Marine, depending on which
20  vessel we were just talking about, either the
21  CROSBY ENDEAVOR, the LA MADONNA or the
22  LA ELITE, in facilitating the use of those
23  vessels with Shore?
24      MR. REISMAN:
25          Object to the form.

Page 38

1       THE WITNESS:
2           When you say "the use," could
3       you be more specific?
4   EXAMINATION BY MR. ALTMYER:
5       Q    In October of 2020, are you
6   generally aware of the fact that the
7   LA MADONNA, the LA ELITE, and the M/V CROSBY
8   ENDEAVOR were working with and/or assisting
9   the THOR in October 2020?
10      MR. REISMAN:
11          Object to the form.
12      THE WITNESS:
13          October 2020?  Yes.
14  EXAMINATION BY MR. ALTMYER:
15      Q    Okay.  And you were also involved,
16  on behalf of Dawn, in facilitating linking
17  those parties together?
18      MR. REISMAN:
19          Object to the form.
20      THE WITNESS:
21          I was a broker.
22  EXAMINATION BY MR. ALTMYER:
23      Q    You facilitated the use of those
24  vessels -- okay, explain to me exactly what
25  you did for brokering these vessels.

Page 39

1       A    Shore had asked us if we knew of
2   any boats out there that could work with the
3   THOR, so we found Louisiana International and
4   Crosby.
5       Q    Okay.  And then what happened after
6   that?
7       A    We put the vessels -- well, when we
8   were contacted by Shore, we contacted the
9   vessel owners, explained to them what Shore
10  was looking for, and when all parties agreed,
11  they went to work for Shore.
12      Q    Okay.  And was Dawn a part of that
13  agreement?  You said, "All parties agreed."
14      A    The vessel owner, as well as Shore.
15      Q    Okay.  And what were they agreeing
16  to?
17      A    The work to be provided.
18      Q    Okay.  And I'm not trying to ask a
19  trick question --
20      A    Right.
21      Q    -- here or anything like that.  I
22  just want to know, Dawn helped facilitate the
23  use of these vessels with Shore in
24  October 2020?
25      A    Yes.

Page 40

1       Q    Okay.
2       MR. REISMAN:
3           Object to the form.
4   EXAMINATION BY MR. ALTMYER:
5       Q    All right, Mr. Grace, I'm going to
6   show you a document that is Bates labeled as
7   Dawn 388 through Dawn 401.  It's a Master
8   Vessel Time Charter.
9       A    Okay.
10      Q    And we're marking that as "Exhibit
11  127."  You've seen this document before,
12  correct?
13      A    Yes.
14      Q    Okay.  And it's a Master Vessel
15  Time Charter between Dawn and Shore, dated
16  June 9, 2017, correct?
17      A    Yes.
18      Q    Okay.  Let's go to Page 399.  It's
19  Dawn 399.  If it gets confusing as to what I'm
20  referring to, if it's a page number or the
21  Bates labeled number, let me know.
22      A    Okay.
23      Q    So Dawn 399.  If we look there --
24  and I know it doesn't look like it's the best
25  quality of image on there -- but your name is

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 41

1  printed at the top of the page, correct?
2       A    Yes.
3       Q    Michael Grace.  And it lists you as
4  vice-president for the owner, stated in here,
5  Dawn Services, LLC, correct?
6       A    Yes.
7       Q    Okay.  And that's your signature?
8       A    Yes.
9       Q    On Page 399?
10      A    Yes.
11      Q    And looking at the bottom of the
12 page, is that your initials at the bottom?
13      A    Yes.
14      Q    Okay.  And as of June 9, 2017, you
15 had authority, on behalf of Dawn, to execute
16 this contract, correct?
17      A    Yes.
18      Q    Just flipping through Dawn 388
19 through Dawn 399, your initials are on the
20 bottom of -- bottom right-hand corner of each
21 of these pages, correct?
22           I know the quality looks like it
23 isn't the best, but if you can tell whether or
24 not those are your initials or whether you
25 recall initialing this.

Page 42

1       A    Yes.
2       Q    Okay.  So irrespective of what
3  Dawn's position is in this case, as to whether
4  or not this Master Vessel Time Charter applies
5  to the claims against Dawn, in connection with
6  this incident, this contract was in existence
7  on October 28th, 2020, correct?
8       A    Yes.
9       Q    Okay.  Irrespective of Dawn's
10 position in this case as to whether or not the
11 contract applies to the claims against Dawn,
12 in connection with the incident, this contract
13 was in effect between Shore and Dawn on
14 October 28th, 2020?
15      A    Yes.
16      Q    On Page 398, so Dawn 398, under
17 "Charterer, Shore Offshore Services."  For
18 "Print Name" you see where it says "Cody
19 Sims"?
20      A    Yes.
21      Q    Project director?
22      A    Yes.
23      Q    Okay.  And it appears to be signed
24 by Mr. Sims, right?
25      A    Yes.

Page 43

1       Q    Okay.  And you've dealt with Cody
2  Sims in the past before, correct?
3       A    Yes.
4       Q    And you've had communications with
5  Cody Sims in the past before, correct?
6       A    Yes.
7       Q    This contract, and specifically,
8  I'm referring to the Master Vessel Time
9  Charter of June 9, 2017, was never terminated
10 by Dawn after June 9, 2017, correct?
11      A    No.
12      Q    Okay.  And it was never terminated
13 by Shore either, after June 9, 2017, correct?
14      A    No.
15      Q    Okay.  You alluded to this earlier,
16 but I understand that it's Dawn's position in
17 this case that it brokered the M/V CROSBY
18 ENDEAVOR to Shore.  Is that a correct
19 understanding of Dawn's position?
20      A    Yes.
21      Q    And I also understand it's Dawn's
22 position in this case that it brokered the
23 LA MADONNA and the LA ELITE, the two Louisiana
24 International Marine vessels, to Shore as
25 well.  Is that a correct understanding of that

Page 44

1  position?
2       A    Yes.
3       Q    When Dawn provides its customer a
4  vessel that's owned by a third party, Dawn
5  takes a fee for those services, correct?
6       A    Yes.
7       Q    Okay.  And how does Dawn come up
8  with that fee?  What goes behind that?
9       A    It's just a number that we come up
10 with.
11      Q    Okay.  Is it like a percentage
12 mark-up?
13      A    It's not -- it's usually around
14 10 to 15 percent.
15      Q    What are the variables that go into
16 that, of determining whether or not it's going
17 to be -- what the percentage is going to be?
18      A    There's really no rhyme or reason.
19 Sometimes you make 10 percent.  Sometimes we
20 were making less than 10 percent.  Sometimes
21 we were making more than 15 percent.
22      Q    But, I mean, just variable-wise,
23 does it go with the good will of using the
24 customer before, anything like that, or is it
25 just kind of, we're going to throw a

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 45

1    10 percent on them for this one, or 15 percent
2    on, for this next one?
3        A     There's no -- there's -- I'm just
4    trying to think here.  There's no real rhyme
5    or reason on how we come up with the exact
6    percent that we're making.  Sometimes it would
7    actually be more of, we're going to put "X" on
8    it, a day, just to make some money, to
9    handle --
10            MR. REISMAN:
11               Just answer his question.
12            THE WITNESS:
13               No, there's no rhyme or reason.
14   EXAMINATION BY MR. ALTMYER:
15       Q     Okay.  Do you, when you provide a
16   vessel owned by a third party to one of your
17   customers, do you generally tell your customer
18   what the mark-up is going to be ahead of time
19   or is it something that the vessel owner will
20   invoice you, and then you just add your
21   mark-up after that?
22       A     It normally is we just add our
23   mark-up on top of it.
24       Q     So there's no brokerage fee or
25   anything like that that's prenegotiated with

Page 46

1    the customer when you're providing a
2    third-party vessel to a customer?
3            MR. REISMAN:
4               Object to the form.
5            THE WITNESS:
6               Not -- sometimes it's discussed
7            with the customer.
8    EXAMINATION BY MR. ALTMYER:
9        Q     Okay.  Do you recall whether or not
10   it was ever discussed with Shore?
11       A     As it relates to?
12       Q     Before October 28, 2020.
13       A     Shore knew what we were making.
14       Q     Okay.  Did they know what you were
15   making because you had invoiced them?
16       A     It was discussed.
17       Q     It was discussed, okay.  Did you
18   discuss that before you were providing
19   third-party vessels to Shore or after you
20   started doing that?
21       A     It was done on a -- like every
22   transaction, for the most part.
23       Q     Okay.  Can you clarify what that
24   means?
25       A     Well, when we would get a vessel,

Page 47

1    broker a vessel for Shore, there was
2    communication with Tommy and Cody about what
3    the fee would be.
4        Q     Okay.  Were those communications
5    via email, via text message?
6        A     Phone.
7        Q     Phone, okay.  I'm guessing not, but
8    I'm just going to ask the question.  Were any
9    of those conversations ever recorded?
10       A     No.
11       Q     By you, that you know of?
12       A     No.
13       Q     Did you ever have any of those
14   conversations via email or via text message?
15       A     There was text message back with
16   Mauricio, as it relates to the ENDEAVOR, what
17   he had wanted us to ask Crosby to go in at.
18   Crosby then reached out to Tommy and had
19   conversations with Tommy about the ENDEAVOR,
20   and Tommy told me what I should put on top of
21   it.
22            MR. REISMAN:
23               Somebody needs to mute their
24            microphone.  We're getting some feedback
25            from somebody on the Zoom link.  Thank

Page 48

1            you.
2    EXAMINATION BY MR. ALTMYER:
3        Q     Do you recall whether or not that
4    communication by Tommy was over the phone or
5    that was email?
6        A     It was -- I believe it was a phone
7    conversation Tommy had with Kurt Crosby.
8        Q     Okay.  And just for clarity, we'll
9    go more into details later, but was that for
10   the use of the Crosby Tugs after the breakaway
11   incident?
12       A     No.
13       Q     Or that was for the use of the
14   CROSBY ENDEAVOR?
15       A     That was for the ENDEAVOR.
16       Q     Okay, got it.  And that was around
17   like October 19th, 20th, around that date
18   range?
19       A     Yes.
20       Q     Irrespective of the applicability
21   of the Master Vessel Time Charter that we are
22   about to start getting into, to the claims
23   against Dawn in this case, when did Dawn first
24   start providing third-party vessels to its
25   customers?

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 49

1      A    Before I started, back in 2007.
2  Dawn would broker vessels to Bisso Marine.
3      Q    Was Bisso the only customer that
4  Dawn was brokering vessels to at that time?
5      A    Yes.
6      Q    When did Dawn start providing third
7  party vessels to other customers other than
8  Bisso?
9      A    It was primarily just Bisso Marine.
10      Q    Okay.
11      A    From what I remember.
12      Q    So going into the fact that we
13  talked about, it's Dawn's position in this
14  case that it brokered the M/V CROSBY ENDEAVOR
15  to Shore in October 2020, so I'm asking for
16  other customers besides Bisso, when did Dawn
17  start brokering boats to other customers?
18      A    I don't -- I don't remember.
19      Q    Okay.  Was it the first time that
20  you had ever seen Dawn broker a vessel to a
21  customer other than Bisso Marine?  Was that
22  during your employment?
23      A    No.
24      Q    Okay.  I guess that was actually a
25  poor question, on my part.

Page 50

1      A    Yeah.
2      Q    When was the first time, while you
3  were employed with Dawn, that you saw a vessel
4  provided from a third party to one of Dawn's
5  customers, other than Bisso Marine?
6      A    I can't remember a time that we
7  brokered a boat to Bisso Marine that was --
8  like outside.
9      Q    I'm talking about other than Bisso
10  Marine.
11      A    I can't remember a time.
12      MR. REISMAN:
13          You're talking about other than
14      Bisso Marine, other than at Shore?
15  EXAMINATION BY MR. ALTMYER:
16      Q    So, anyone.  So when did you first
17  start brokering boats to Shore?
18      A    Oh, in 2017.
19      Q    2017?
20      A    Yes.
21      Q    Okay.  Other than Shore, has Dawn
22  ever brokered boats to any other customer?
23      A    Cashman Equipment, this year, we
24  brokered a boat to.
25      Q    And generally speaking, when we're

Page 51

1  talking about brokering a boat, we're talking
2  about providing a third-party vessel, a vessel
3  that's owned by a company other than Dawn
4  Services, correct?
5      MR. REISMAN:
6          Object to the form.
7      THE WITNESS:
8          We would hire -- we would
9      charter -- we would broker a vessel from
10      a separate company to our customer.
11  EXAMINATION BY MR. ALTMYER:
12      Q    Okay.  I'm not trying to trick you
13  or anything like that.
14      A    Right.
15      Q    Yeah, we're talking about vessels
16  that are owned by other companies, other than
17  Dawn Services.
18      A    Yes.
19      Q    When you're providing third-party
20  vessels to one of your customers, that's what
21  you're talking about when you're brokering?
22      A    Yes.
23      Q    Okay.  And I think this is an
24  obvious question, but I'm still going to ask
25  it.  When Dawn was providing those third-party

Page 52

1  vessels to its customers, it still maintained
2  its own fleet of vessels, correct?
3      MR. REISMAN:
4          I'm going to object to the
5      form.
6      MR. ALTMYER:
7          Okay.  I'll just re-ask it.
8  EXAMINATION BY MR. ALTMYER:
9      Q    Dawn still maintained its own fleet
10  of vessels at the time it began providing
11  third-party vessels to other customers,
12  correct?
13      MR. REISMAN:
14          I'm going to object to the
15      form.
16      MR. ALTMYER:
17          Okay.  What's the basis for the
18      objection?
19      MR. REISMAN:
20          The word "providing."  I'm not
21      sure what that means.  He's explained
22      that he brokered vessels, which is
23      not -- and he explained earlier that
24      that's not the same as providing the
25      vessels.  They merely brokered them.

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 53

1    They introduced one party to another,
2    and then there would be a separate
3    agreement between the vessel owner, and
4    in this case, Shore.  So I don't know
5    what "providing" means, as you're using
6    it.  It doesn't sound like it's the same
7    thing as what he's described for their
8    brokering situation.
9    EXAMINATION BY MR. ALTMYER:
10       Q    Would you agree with me that, when
11   you talk about brokering a vessel, you're
12   facilitating the use of a third-party vessel
13   to one of your customers?
14       A    Yes.
15       Q    Okay.  So instead of providing, did
16   Dawn still maintain its own fleet of vessels
17   at the time it began facilitating the use of
18   third-party vessels to one of its customers?
19       MR. REISMAN:
20           Object to the form.
21       THE WITNESS:
22           Yes.
23   EXAMINATION BY MR. ALTMYER:
24       Q    At the time that Dawn started
25   facilitating the use of third-party vessels to

Page 54

1    its customers, did the demand for Dawn's
2    vessels surpass the supply of the vessels in
3    Dawn's own fleet?  Is that one of the reasons
4    why you all started brokering boats?
5        MR. REISMAN:
6            Object to the form.
7        THE WITNESS:
8            Yes.
9    EXAMINATION BY MR. ALTMYER:
10       Q    As of October 28, 2020, what was
11   the percentage of third-party vessels that
12   were being facilitated to Dawn's customers
13   versus -- what was the percentage of business
14   that was going on with Dawn, for brokering, on
15   October 28, 2020?
16       A    I would have to go back and check
17   to see what the percentage was.
18       Q    Okay.  That's a number that you
19   would be able to figure out, though?
20       A    I could get a ballpark, yeah.
21       Q    Okay.  Are you comfortable giving a
22   ballpark right now, or no?
23       A    I would think, maybe 20 percent,
24   25 percent.
25       MR. REISMAN:

Page 55

1        What was the time period you
2    asked about?
3        MR. ALTMYER:
4            For October 28, 2020.
5    EXAMINATION BY MR. ALTMYER:
6        Q    Is that percentage roughly the same
7    today?
8        A    No.
9        Q    Okay.  What's the percentage now?
10       A    Five percent.
11       Q    You're familiar with Dawn's
12   website?
13       A    Yes.
14       Q    Okay.  You've seen it before,
15   correct?
16       A    Yes.
17       Q    Dawn does not market, on its
18   website, that it brokers third-party vessels,
19   correct?
20       A    No.
21       Q    As of June 2017, so at the time
22   that the Master Vessel Time Charter was
23   executed, just to give you a reference of time
24   frame, how many vessels did Dawn have in its
25   fleet?

Page 56

1        A    I think nine.
2        Q    As of October 2020, how many
3    vessels did Dawn have in its fleet?
4        A    Nine.
5        Q    Okay.  Do you know how many vessels
6    Dawn has in its fleet right now?
7        A    Fourteen.
8        Q    Okay.  And we'll look at it later.
9    I have the screenshot from the vessel section
10   of the website.  That should probably give me
11   an accurate representation of the vessels that
12   are currently in Dawn's fleet?
13       MR. REISMAN:
14           Object to the form.
15   EXAMINATION BY MR. ALTMYER:
16       Q    The website.
17       A    No.  There's two vessels that we
18   haven't added to that.
19       Q    Okay.  You're familiar with the
20   type of work that the THOR was performing
21   offshore in October of 2020, correct?
22       A    Yes.
23       Q    And that's offshore decommissioning
24   work of platforms?
25       A    Yes.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 57

1      Q    We'll get into Dawn's
2  communications with Shore in October 2020
3  later on, but in October of 20, you
4  understood, in connection with THOR's offshore
5  work, that THOR needed a tug to tow it from
6  platform to platform and to handle anchors,
7  correct?
8      A    Yes.
9      Q    In October 2020, how many vessels
10 that were part of Dawn's fleet were available
11 to provide that type of service, that the THOR
12 needed, that it was performing offshore?
13     A    None.
14     Q    I want to flip to Page 388 of the
15 Master Vessel Time Charter.  I just want to
16 confirm a few things in here with you.  The
17 term "OWNER" and it's capitalized, every
18 single letter in the word "OWNER" is
19 capitalized here, is defined as Dawn Services,
20 LLC, correct?
21     A    Yes.
22     Q    Okay.  And the term "charterer" is
23 defined Shore Offshore Services, LLC, correct?
24     A    Yes.
25     Q    And "CHARTERER" is in all capitals,

Page 58

1  the word, correct?
2      A    Yes.
3      Q    All right.  There's a reference on
4  Dawn 388 at Section 1-B that I want to look
5  at, a Confirmation of Charter Order Form
6  that's attached as Exhibit A.  Do you see
7  that?
8      A    Yes.
9      Q    All right.  Now, I want to look
10 at B, and specifically at the -- and this is
11 Section 1-B of the Master Vessel Time
12 Charter -- and specifically, the second
13 sentence that says that "Charter orders may be
14 written in the form of Exhibit A, or perfected
15 on an oral basis, which shall be confirmed in
16 writing by owner directly to charterer, as
17 soon as practical, under the circumstances."
18 Do you see that?
19     A    Yes.
20     Q    And that's what it says, correct?
21     A    Yes.
22     Q    So we'll look at Exhibit A in a
23 moment, but in the event of an oral charter
24 order, how did Dawn traditionally confirm oral
25 charter orders with Shore?

Page 59

1      A    Could you repeat the question?
2      Q    Yeah.  So if there was an oral
3  charter -- the section that we just read, it
4  contemplates the use of a written charter
5  order or an oral charter order, correct?
6      A    Yes.
7      Q    So in the circumstances of when
8  there was an oral charter order, and it says
9  that it should be confirmed in writing, by the
10 owner, directly to charterer, as soon as
11 practical, under the circumstances, how were
12 oral charter orders confirmed in writing, by
13 Dawn?
14     A    On our on/off hire letter.
15     Q    So issuing the on/off hire is how
16 that would be confirmed?
17     A    Yes.
18     Q    Gotcha.  And those are
19 traditionally sent to a customer, and
20 specifically Shore, in connection with the
21 Master Vessel Time Charter, via email,
22 correct?
23     A    Yes.
24     Q    We'll go into the on/off hire form
25 letters later.  But I've seen some that are

Page 60

1  just on-hire letters and then some that are
2  on/off hire letters, right?
3      A    Yes.
4      Q    Okay.  Traditionally, an on-hire
5  letter is sent either before work commences or
6  after work commences, or shortly after work
7  commences, before a job is complete, right?
8      A    Yes.
9      Q    Okay.  And then is there always a
10 follow-up on/off hire letter that's sent at
11 the end of a job?
12     A    Yes.
13     Q    Okay.  Is it Dawn's policy to
14 always issue an on-hire letter for an oral
15 charter?
16     A    Yes.
17     Q    All right.  I'm going to read the
18 next two sentences real quick of Section 1-B.
19 "In the event owner does not reduce an oral
20 order to writing, the charter order will have
21 been deemed to be executed by owner and
22 charterer, upon the provision of the vessel,
23 by owner to charterer, and the terms and
24 conditions hereof shall apply.  Delivery to
25 and use by the charterer of the vessel, which

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 61

1    may include any actions taken by charterer,
2    under any provision of this charter,
3    establishes conclusively that all of the terms
4    and conditions of this agreement are in
5    effect, notwithstanding whether or not
6    charterer has returned a signed charter order
7    to charterer." All right. Did I read that
8    correctly?
9        A    Yes.
10       Q    All right. So that's supposed to
11   cover a situation where work starts by a
12   vessel covered under this agreement, but there
13   hasn't been a written confirmation of the
14   charter order yet, right?
15       A    Yes.
16       Q    And sometimes on-hire letters are
17   issued after work commences, right?
18       A    Yes.
19       Q    I believe that was done in a few
20   instances with Shore here, correct?
21       A    I guess.
22       Q    We'll look at them. Yeah, we'll
23   look at them later. Let's turn to Dawn 400 to
24   401. That's going to be Exhibit A of the
25   Master Vessel Time Charter. All right. And

Page 62

1    this is the confirmation of charter order,
2    Exhibit A, and that's the document that we
3    have just referred to when we were reading
4    Section 1-B, correct?
5        A    Yes.
6        Q    Okay. I have not seen any
7    documents produced by Dawn in this case, to
8    this effect, but are you aware, testifying as
9    Dawn's corporate representative here today, of
10   any charter orders by Dawn to Shore where this
11   form was actually used?
12       A    Never used. It was never used.
13       Q    Never used. So is it Dawn's
14   position that all of the charter orders
15   entered into between Shore and Dawn, under the
16   Master Vessel Time Charter, were made orally?
17       MR. REISMAN:
18           Object to the form.
19       THE WITNESS:
20           We used the on/off hire
21       letters.
22   EXAMINATION BY MR. ALTMYER:
23       Q    Okay. And that's the -- so what
24   I'm going to get at here is let's look back at
25   Section 1-B.

Page 63

1        A    Okay.
2        Q    So it says, on the second sentence,
3    "Charter orders may be in written form, in the
4    form of Exhibit A, or perfected on an oral
5    basis, which shall be confirmed in writing by
6    the owner, directly to charterer, as soon as
7    practical, under the circumstances."
8           So what I'm getting at is, so every
9    single situation of where a charter was
10   entered into under this Master Vessel Time
11   Charter with Shore, it was done orally and
12   then confirmed via an on/off hire letter?
13       A    Yes.
14       Q    Okay. And again, those are sent to
15   Shore via email, right?
16       A    Yes.
17       Q    And you're traditionally the person
18   that sends that email, right? You, as Mike
19   Grace, not as Dawn?
20       A    Yes.
21       Q    Okay. All right. Let's go to
22   Page 389 real quick. Actually, I want to read
23   one part on 388 real quick. It's in the
24   second section. It's under "Witnesseth," and
25   it's the second point. I'm just going to read

Page 64

1    this real quick, where it says, "Whereas,
2    owner has a vessel," and then it has the "(S)"
3    behind that, so it has a vessel or vessels,
4    "which from time to time it commits to the
5    service of others in exchange for a fee, and
6    then defines that term as vessel capitalized."
7    Do you see that?
8        A    Yes.
9        Q    Now, let's look at Page 389, and
10   specifically, it's Section 2. I want to look
11   at the second sentence of that section, where
12   it starts with the word "owner" and then it
13   ends at the very end of Section 2, with
14   "charter order." Can you read that for me out
15   loud?
16       A    Wait, could you -- where it says
17   "owner"?
18       Q    "Owner shall furnish" is where it
19   starts.
20       A    "Owner shall furnish any vessel or
21   vessels required by charterer at the time and
22   place agreed upon in any charter order, and
23   continue operations diligently and without
24   delay, in a safe, proper and workmanlike
25   manner, in strict conformity with the

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 65

1    specifications and requirements herein and in
2    such charter order."
3        Q    All right.  And just very quickly,
4    that's your initials at the bottom of
5    Page 389, right?
6        A    Yes.
7        Q    Reading that second sentence of
8    Section 2, I just want to confirm very quickly
9    that the words "vessel" or "vessels" are not
10   capitalized in that sentence, correct?
11       A    Correct.
12       Q    All right.  Let's go to Page 390,
13   Section 4, entitled "Employment and Use of
14   Vessel" and then specifically Subpart B.  Can
15   you read Subpart B out loud, for the record,
16   for us?
17       A    "Owner shall have the right from
18   time to time during the term of this charter
19   to substitute a vessel, for the vessel,
20   provided that any such substitution shall
21   require owner to provide a vessel that has the
22   same functionality and horsepower as the
23   vessel."
24       Q    All right.  Reading Section 4,
25   Subpart B, I just want to confirm that there

Page 66

1    are two instances in that sentence where the
2    word "vessel" is not capitalized, correct?
3        A    Yes.
4        Q    And there are two instances in that
5    sentence where the word "vessel" is
6    capitalized, correct?
7        A    Yes.
8        Q    And it's hard to make out on the
9    bottom of Page 390, but that's your initials
10   at the bottom right-hand side, right?
11       A    Yes.
12       Q    Let's go to Page 396.
13           MR. REISMAN:
14               396?
15           MR. ALTMYER:
16               396, yes.
17           MR. REISMAN:
18               Thank you.
19   EXAMINATION BY MR. ALTMYER:
20       Q    And at Section 13, entitled
21   "Assignment and Subcharter," can you please
22   read Section 13 out loud, for the record.
23       A    "Owner shall not, without prior
24   written consent of charterer, sell, assign,
25   subcharter or pledge this charter or any of

Page 67

1    its rights or obligations hereunder, and owner
2    shall not, without prior consent, charter, let
3    or hire to permit the use of the vessel by
4    others unless a substitute vessel is provided,
5    in accordance with the provisions of this
6    charter."
7        Q    Okay.  Reading that Section 13, and
8    where it says "substitute vessel," the word
9    "vessel" used after the word "substitute" is
10   not capitalized, right?
11       A    Correct.
12       Q    All right.  Very quickly, again,
13   that's your initials at the bottom of Dawn
14   396?
15       A    Yes.
16       Q    All right.  So looking at this,
17   we've seen -- and there's other places
18   throughout this contract, if you'd like to
19   review for it -- but there's instances of
20   where the term "vessel" is capitalized and
21   there's instances of where the word "vessel"
22   is not capitalized, right?
23       A    Yes.
24       Q    Irrespective of the applicability
25   of the 2017 Master Vessel Time Charter to the

Page 68

1    claims against Dawn in this case, from June 9,
2    2017, the date that the Master Vessel Time
3    Charter was executed, to the present, Dawn has
4    provided vessels to Shore from Dawn's own
5    fleet, which it owns and operates, correct?
6        A    Yes.
7        Q    Irrespective of the applicability
8    of the 2017 Master Vessel Time Charter to the
9    claims against Dawn in this case, from the
10   date of the 2017 Master Vessel Time Charter,
11   on June 9, 2017 to the present, Dawn has
12   facilitated the use of vessels owned by third
13   parties to Shore, correct?
14           MR. REISMAN:
15               Object to the form.
16           THE WITNESS:
17               We have brokered vessels to
18   Shore, but the contract didn't apply.
19           MR. ALTMYER:
20               Okay.  I'm going to object as
21   nonresponsive.
22   EXAMINATION BY MR. ALTMYER:
23       Q    You testified earlier that, when I
24   asked you the question of whether or not it
25   was a fair representation, when we were

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 69

1  talking about brokering, that you're
2  facilitating the use of a third-party vessel
3  to one of Dawn's customers, correct?
4        A    Yes.
5        Q    Okay.  So what I'm asking is,
6  irrespective of the applicability of this
7  contract, the 2017 Master Vessel Time Charter,
8  from the time that it was executed on June 9,
9  2017, to the present, Dawn has facilitated the
10  use of third-party vessels to its customer,
11  Shore?
12        A    Yes.
13        Q    What is Dawn's position as to when
14  or under what circumstances a vessel provided
15  to Shore is governed by this 2017 Master
16  Vessel Time Charter?
17        MR. REISMAN:
18             Object to the form.
19        THE WITNESS:
20             Could you repeat the question
21        one more time.
22  EXAMINATION BY MR. ALTMYER:
23        Q    Yeah.  What is Dawn's position on
24  when the Master Vessel Time Charter, from
25  June 9, 2017, applies to Dawn providing a

Page 70

1  vessel to Shore?
2        MR. REISMAN:
3             Object to the form.
4        THE WITNESS:
5             Dawn -- this applies when Dawn
6        provides a Dawn vessel, where we can
7        control it, crew it, insure it.
8        MR. REISMAN:
9             Jacob, we've been going an
10        hour.  Can we take a break?
11        MR. ALTMYER:
12             Yeah, absolutely.  Yeah.
13             (Whereupon, a break was taken;
14        11:06 a.m. - 11:23 a.m.)
15        MR. ALTMYER:
16             All right.  Let's go back on.
17  EXAMINATION BY MR. ALTMYER:
18        Q    All right, Mr. Grace.  Before we
19  had taken that break, we were talking about
20  when the Master Vessel Time Charter between
21  Shore and Dawn applies and when it does not
22  apply.  So I'm going to ask, just to kind of
23  recap the first question that I was getting
24  into on that topic.
25             Irrespective of the applicability

Page 71

1  of the 2017 Master Vessel Time Charter to the
2  claims against Dawn in this case, from the
3  date the 2017 Master Vessel Time Charter was
4  executed, on June 9, 2017 -- scratch that
5  question.  I've already asked you that.
6             Just generally speaking, what is
7  Dawn's position on when the 2017 Master Vessel
8  Time Charter --
9        MR. REISMAN:
10             I'm just telling him to wait
11        because I'm going to object, but --
12  EXAMINATION BY MR. ALTMYER:
13        Q    Generally speaking, what is Dawn's
14  position as to when or under what
15  circumstances a vessel provided to Shore is
16  governed, under the 2017 Master Vessel Time
17  Charter?
18        MR. REISMAN:
19             Object to the form of the
20        question.  You can answer it, if you
21        can.
22        THE WITNESS:
23             It applies when Dawn provides a
24        Dawn vessel and does not apply when we
25        broker a third-party vessel.

Page 72

1  EXAMINATION BY MR. ALTMYER:
2        Q    All right.  I had mentioned earlier
3  that we would look at this document.  There's
4  no Bates label.  I'll represent to you, this
5  is a screenshot of the Dawn Services website.
6  I took it on Monday.  Here's a copy for you,
7  David.  And we're going to mark this as
8  "Exhibit 128."
9             All right, Mr. Grace, we talked
10  about the website, Dawn Services website, a
11  little bit earlier, correct?
12        A    Yes.
13        Q    Okay.  Have you seen this page
14  before, the vessels page on the Dawn Services
15  website?
16        A    Yes.
17        Q    Okay.  So currently these are just
18  some of the vessels in Dawn's fleet, correct?
19        MR. REISMAN:
20             Hang on one second.  Which
21        topic are we on?
22        MR. ALTMYER:
23             This would be, when does the
24        Master Vessel Time Charter between Shore
25        and Dawn apply and when does it not

Pages 69 to 72

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 73

1   apply.
2       MR. REISMAN:
3           And their website falls within
4   that?
5       MR. ALTMYER:
6           Yeah.  I mean, he said that it
7   applies to when Dawn provides one of its
8   own boats, so I just want to confirm
9   what Dawn has.
10      MR. REISMAN:
11          Okay.  I was going to tell you
12  that I don't think studying the website
13  falls within that, so I don't know how
14  familiar he is with it.  I know he said
15  he has seen it, but I want to give that
16  caveat.  I think we're borderline here,
17  but go ahead.
18  EXAMINATION BY MR. ALTMYER:
19      Q    Okay.  Well, I'll ask you this.
20  You're familiar with the vessels that are
21  currently in Dawn's fleet, correct?
22      A    Yes.
23      Q    Okay.  You testified earlier that
24  there were around nine vessels in Dawn's
25  fleet, as of October 28, 2020, correct?

Page 74

1       A    Yes.
2       Q    All right.  I just want to look at
3   this website, and we'll talk about whether or
4   not, that these are the current vessels in
5   Dawn's fleet.  I believe you said that there's
6   two additional vessels.  But we'll look at it
7   real quick.
8           All right.  So just looking at
9   this, is this an accurate, this website that's
10  on Exhibit 128, is this an accurate
11  representation of Dawn's fleet currently?
12      A    No.
13      Q    Okay.  There's two additional
14  vessels, you had said, that were added,
15  correct?
16      A    Yes.
17      Q    Okay.  What are the names of those
18  two vessels?
19      A    ARCTIC DAWN and MEDITERRANEAN DAWN.
20      Q    All right.  And here we have the --
21  I'm just going to list them out.  They're
22  identified or segregated by horsepower class.
23  We have the M/V BAYOU DAWN and the M/V COASTAL
24  DAWN, under 2400-horsepower class, right?
25      A    Yes.

Page 75

1       Q    All right.  Under 3600-horsepower
2   class, we have the M/V BREAK OF DAWN and the
3   M/V CASPIAN DAWN, right?
4       A    Yes.
5       Q    Under 4200-horsepower class, we
6   have the M/V GULF DAWN, the M/V BERING DAWN,
7   the M/V PACIFIC DAWN, and M/V ATLANTIC DAWN?
8       A    Yes.
9       Q    Under the 6000-horsepower class, we
10  have the M/V INDIAN DAWN and the M/V AEGEAN
11  DAWN, correct?
12      A    Yes.
13      Q    And under the 9000-horsepower class
14  we have the M/V CARIBBEAN DAWN and the M/V
15  SOUTHERN DAWN, right?
16      A    Yes.
17      Q    What horsepower class would the
18  ARCTIC DAWN fit under?
19      A    9000.
20      Q    What about the M/V MEDITERRANEAN
21  DAWN?
22      A    9000.
23      Q    Were any of the vessels that are
24  here on this website, and then also, I'm
25  talking about the ARCTIC DAWN and the

Page 76

1   MEDITERRANEAN DAWN, added to Dawn's fleet
2   after October 28, 2020?
3       A    After October?
4       Q    Yeah.
5       A    Yes.
6       Q    Which ones?
7       A    The two 9000's, the CARIBBEAN DAWN
8   and SOUTHERN DAWN, as well as CASPIAN DAWN, in
9   the 3600.
10      Q    Gotcha.  And just to confirm, the
11  ARCTIC DAWN and the MEDITERRANEAN DAWN were
12  also acquired by Dawn after October 28, 2020?
13      A    Yes.
14      Q    All right.  So as of October 28,
15  2020, I'm going to list the following vessels,
16  and if any of them were not a part of Dawn's
17  fleet on October 28, 2020, let me know.  The
18  M/V BAYOU DAWN, the M/V COASTAL DAWN, the
19  M/V BREAK OF DAWN, the M/V GULF DAWN, the M/V
20  BERING DAWN, the M/V PACIFIC DAWN, the
21  M/V ATLANTIC DAWN, the M/V INDIAN DAWN, and
22  the M/V AEGEAN DAWN.  All of those vessels
23  that I just named were part of Dawn's fleet on
24  October 28, 2020?
25      A    Yes.

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 77

1    Q    And as the corporate representative
2  of Dawn testifying here today, I just want to
3  confirm with you that it's Dawn's position
4  that if Dawn were to provide Shore with any
5  one of these vessels that we just talked
6  about, after June 9, 2017, the 2017 Master
7  Vessel Time Charter would apply to Dawn
8  providing Shore with that vessel?
9         MR. REISMAN:
10            Object to the form.
11         THE WITNESS:
12            Could you repeat the question.
13  EXAMINATION BY MR. ALTMYER:
14    Q    Yeah.  For all the vessels that we
15  just went through --
16         MR. REISMAN:
17            I'm going to make the same
18         objection, in advance, so I don't
19         interfere with his testimony.
20         MR. ALTMYER:
21            Absolutely.
22  EXAMINATION BY MR. ALTMYER:
23    Q    So in connection with the vessels
24  that we just discussed on the website, I just
25  want to confirm with you, as the corporate

Page 78

1  representative of Dawn testifying here today,
2  that it's Dawn's position that if Dawn were to
3  provide Shore with any one of the vessels that
4  we just talked about on the website, and then
5  also including the ARCTIC DAWN or the
6  MEDITERRANEAN DAWN, if they were to provide
7  one of those vessels to Shore, then the Master
8  Vessel Time Charter from June 9, 2017 would
9  apply?
10    A    Yes.
11    Q    Going back to one of the terms we
12  had talked about on the Master Vessel Time
13  Charter.  We discussed two sections earlier
14  that referred to the term "substitute
15  vessels."  Do you recall that?
16    A    Yes.
17    Q    All right.  As the corporate
18  representative of Dawn, a substitute vessel
19  provided to Shore, under the Master Vessel
20  Time Charter, does not need to be owned by
21  Dawn, correct?
22         MR. REISMAN:
23            Object to the form.
24         THE WITNESS:
25            Can you point out where

Page 79

1  "substitute" is again?
2  EXAMINATION BY MR. ALTMYER:
3    Q    Yeah, absolutely.  So the two
4  sections that we had talked about substitute
5  vessels under were -- I believe it was
6  Section 4-B, and then the term "substitute
7  vessel" that we also looked at was referred to
8  in Section 13.
9         MR. REISMAN:
10            And you're saying those
11         sections, it says that it's a vessel
12         that could be owned by somebody other
13         than Dawn?
14         MR. ALTMYER:
15            Yes.
16  EXAMINATION BY MR. ALTMYER:
17    Q    I'm just asking if, whether or not
18  a substitute vessel that's contemplated
19  thereunder, if that can be owned by a company
20  other than Dawn.
21    A    Not according to this agreement,
22  no.
23    Q    Okay.  So it's Dawn's position that
24  any substitute vessel that's provided, under
25  the Master Vessel Time Charter, has to be a

Page 80

1  vessel that's owned by Dawn?
2    A    Yes.
3    Q    Okay.  Prior to October 28, 2020,
4  did Dawn have any broker forms or agreements
5  that it provided to Shore to distinguish a
6  scenario between when it was offering to
7  broker a vessel to Shore versus when it was
8  chartering a vessel to Shore?
9    A    The on or on/off hire forms.
10    Q    Okay.  Is that the only form,
11  speaking here today on behalf of Dawn
12  Services, that Dawn had that would distinguish
13  between when Dawn was brokering a vessel to
14  Shore versus when it was chartering a vessel
15  to Shore?
16    A    Yes.
17    Q    And that form would be provided to
18  Shore via email, correct?
19    A    Yes.
20    Q    And you would generally send those
21  emails, correct?
22    A    Yes.
23    Q    We'll look at some of the on-hire
24  and on/off hire letters later on, but that
25  same form is generally used whether or not

Pages 77 to 80

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 81

1   Dawn is brokering a vessel to Shore or
2   chartering a vessel to Shore, correct?
3       A    Yes.
4       Q    So I guess the question then goes
5   to, if it's the same form, then what is
6   distinguishing about it, from the scenario of
7   when Dawn is brokering a vessel to Shore
8   versus when Dawn is chartering a vessel to
9   Shore?
10      MR. REISMAN:
11          Do you want to see it?
12      THE WITNESS:
13          Yes.
14  EXAMINATION BY MR. ALTMYER:
15      Q    Okay, yeah. I'll show you just one
16  example. I'm not going to offer it yet
17  because we'll --
18      MR. REISMAN:
19          That's fine.
20      MR. ALTMYER:
21          We'll ask it later on. This is
22      the packet that was produced by Dawn --
23      THE WITNESS:
24          Okay.
25      MR. ALTMYER:

Page 82

1           -- in connection with this.
2       MR. REISMAN:
3           What's the Bates number on the
4   first one?
5       THE WITNESS:
6           373.
7       MR. REISMAN:
8           373?
9       THE WITNESS:
10          Yes.
11      MR. REISMAN:
12          Thank you.
13      THE WITNESS:
14          In the subject, down at the
15      bottom, it talks about a mutual
16      agreement between vessel owner and Shore
17      Offshore Services, LLC.
18  EXAMINATION BY MR. ALTMYER:
19      Q    Okay.
20      A    So if we were chartering one of our
21  vessels, it would be Dawn, or if it was a
22  third-party vessel that we were brokering, it
23  would be between vessel owner and Shore.
24      Q    Okay. The language that you just
25  read that's at the bottom of -- I'm sorry,

Page 83

1   that's Bates label 373?
2       A    373.
3       Q    -- that language is also contained
4   in the on-hire or on/off hire letters that you
5   would provide to Shore when you were
6   chartering a Dawn vessel, though, correct?
7       A    Yes.
8       Q    Okay. So my question is, if the
9   same form is used, what is distinguishing
10  about it, between a scenario when you're
11  brokering a vessel and when you're chartering
12  a vessel to Shore?
13      A    Tommy and Cody know our fleet.
14  They know what vessels we own, what vessels we
15  operate, what vessels we crew. They also
16  know, based off the Certificate of Insurance
17  that we provided, our vessels are listed on
18  there. So they had a very good understanding
19  of what we owned and what we brokered.
20      MR. REISMAN:
21          I'm going to object as
22      nonresponsive.
23  EXAMINATION BY MR. ALTMYER:
24      Q    I'm talking about just from a
25  form point of view, what is distinguishing

Page 84

1   about it, from the circumstance of when you're
2   brokering a vessel to Shore versus when you're
3   chartering a vessel to Shore?
4       A    Well, because it says "vessel" on
5   here, and we'll name the vessel.
6       Q    Okay. So you're saying simply --
7   it's Dawn's position that simply the name of
8   the vessel and the fact that a third party may
9   own it, even if it's not stated on the form,
10  that is the distinguishing factor between when
11  it's brokered versus when it's chartered to
12  Shore?
13      A    That, and the mutual agreement
14  between the vessel owner.
15      Q    Okay. And just to confirm, that
16  mutual agreement language is contained in the
17  on-hire letter or the on/off hire letter that
18  you issued to Shore, irrespective of whether
19  you're brokering the vessel to Shore or
20  chartering the vessel to Shore?
21      A    Yes.
22      Q    So the distinction between an
23  on-hire letter, when you're brokering to Shore
24  versus when you're chartering a vessel to
25  Shore, is simply the name of the vessel that's

Pages 81 to 84

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 85

1  stated on the on/off hire letter?
2      A    Yes.
3      Q    And that's the only difference?
4      A    Yes.
5      Q    Okay.  And prior to October 28,
6  2020, is it Dawn's position here today that
7  that is the on/off hire letter or the on-hire
8  letter?  That's generally the same form,
9  right?  It's just, one says "on hire" and one
10  says "on/off hire"?
11      A    Yeah, when it goes on hire, it
12  lists it.  When it goes off hire, it lists the
13  off hire.
14      Q    Gotcha.  But it's the same form
15  that you use for both letters?
16      A    Correct.
17      Q    Prior to October 28, 2020, is it
18  Dawn's position that the on/off hire letters
19  are the only forms that are used for brokering
20  a boat to Shore?
21      A    Could you repeat the question one
22  more time?
23      Q    Yeah.  Before October 28, 2020, was
24  the on/off hire letter the only form or
25  written document that was used for brokering a

Page 86

1  vessel to Shore?
2          MR. REISMAN:
3          Object to the form.
4          THE WITNESS:
5          Yes.
6  EXAMINATION BY MR. ALTMYER:
7      Q    Okay.  Prior to October 28, 2020,
8  did Dawn have any written policies in effect
9  regarding explaining to its customers when
10  Dawn was offering to broker a vessel versus
11  when it was chartering a vessel?
12      A    No.  Other than Tommy and Cody knew
13  what vessels were brokered --
14      Q    Okay.
15      A    -- and what were chartered.
16          MR. ALTMYER:
17          Okay.  Object as nonresponsive.
18  EXAMINATION BY MR. ALTMYER:
19      Q    I'm talking about just, did Dawn
20  have any written policies about distinguishing
21  to a customer, what you should explain to a
22  customer when Dawn is offering to broker a
23  vessel versus when it is chartering a vessel?
24      A    No.
25      Q    Were there any non-written or

Page 87

1  informal policies implemented by Dawn prior to
2  October 28, 2020, as to what you should do to
3  distinguish to a customer when Dawn is
4  offering to broker a vessel versus when it is
5  chartering a vessel?
6      A    No, other than send this letter to
7  them.
8      Q    Prior to October 28, 2020, did Dawn
9  have any written policies in effect regarding
10  explaining to its customers that Dawn would be
11  taking the position that certain Master Vessel
12  Time Charters it had between it and its
13  customers would not apply, when it would
14  provide its customers with third-party
15  vessels?
16      A    Could you repeat the question?
17      Q    Yeah.  Prior to October 28, 2020,
18  did Dawn have any written policies in place
19  regarding explaining to its customers that
20  Dawn would be taking the position that any
21  Master Vessel Time Charter that it had in
22  place between it and its customer, would not
23  apply in a scenario of where it was brokering
24  a vessel to a customer?
25      A    No, other than the on/off hire,

Page 88

1  where it states "vessel owner" and "Shore
2  Offshore."  You'd have a mutual agreement.
3      Q    And I'm just talking about -- not
4  documents.  I'm talking about, there was no
5  written policy to that effect.
6      A    No.
7          MR. PALMINTIER:
8          I'm having trouble hearing the
9  witness.
10          MR. REISMAN:
11          That's okay.  Are you able to
12  read it back for them?
13          THE COURT REPORTER:
14          The answer was --
15          MR. REISMAN:
16          Mike, are you able to hear her?
17          MR. PALMINTIER:
18          Yes, thanks.
19          MR. REISMAN:
20          Okay.  Yeah, she's going to
21  read it back for you.
22          THE COURT REPORTER:
23          The question was:  And I'm just
24  talking about -- not documents.  I'm
25  talking about, there was no written

Professional Shorthand Reporters, Inc.                1-800-536-5255
Offices in New Orleans and Baton Rouge                www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 89

1    policy to that effect?
2        Answer:  No.
3    EXAMINATION BY MR. ALTMYER:
4        Q    Okay.  What about non-written,
5    informal policies?  There's no non-written or
6    informal policies to that effect either,
7    correct?
8        A    No.
9        Q    So it's Dawn's position here today
10   that the name of the vessel and the on/off
11   hire agreement and the language that is at the
12   bottom of all of the on/off hire forms, is the
13   only form of written notice that is given to a
14   customer like Shore, that a vessel is being
15   brokered versus a vessel being chartered?
16       A    Wait.  Could you repeat the
17   question one more time?
18       Q    Yeah, absolutely.  So sitting here
19   today, testifying as a corporate
20   representative of Dawn, it's Dawn's position
21   that the only form of written notice that was
22   given to Shore, prior to October 28, 2020,
23   that Dawn was brokering a vessel versus Dawn
24   chartering a vessel, is the name of the vessel
25   that is specified on an on/off hire form and

Page 90

1    the language that is contained at the bottom
2    of an on/off hire form, right above "yours
3    truly," where you signed the document?
4        MR. REISMAN:
5            Object to the form.  You've
6        already shown him the website, which
7        lists the Dawn vessels, which they had
8        access to.  So are you excluding that
9        from this now?
10       MR. ALTMYER:
11           Yeah, I'm talking about written
12       notice that you've given.
13       MR. REISMAN:
14           That's in writing, isn't it?
15       MR. ALTMYER:
16           You're testifying for the
17       witness right now.
18       MR. REISMAN:
19           Well, I'm asking you to clarify
20       the question.
21       MR. ALTMYER:
22           And what --
23       MR. REISMAN:
24           Now, you've shown him a
25       document, and now, it's unclear to us --

Page 91

1    I mean, if you want to ask him, I'll
2        just object and you won't get a
3        reasonable answer; that's fine.  But if
4        you want to be able to get an answer you
5        can rely on, we just need a
6        clarification.
7        MR. ALTMYER:
8            Well, then I'll --
9        MR. REISMAN:
10           Are you excluding the website,
11       which lists the Dawn vessels, from the
12       written notice?
13   EXAMINATION BY MR. ALTMYER:
14       Q    I will ask you the open-ended
15   question then, of what is Dawn's position of
16   what the written notice was given to Shore,
17   prior to October 28th, 2020, as to, it was
18   brokering a vessel versus it was chartering a
19   vessel?
20       A    You had this (indicating).
21       Q    Can you specify?
22       A    Oh, I'm sorry, the on/off hire.
23       Q    So just the on/off hire letter
24   itself?
25       A    They also had access to our

Page 92

1    Certificate of Insurance, which lists the
2    vessels that we own and control, and I believe
3    that's it.
4        Q    Okay.  Now, aside from the on/off
5    hire letter and the COI that you just
6    mentioned, prior to October 28th, 2020, did
7    Dawn ever convey to Shore, in writing, that it
8    would be taking the position that the 2017
9    Master Vessel Time Charter would not apply to
10   vessels it was providing to Shore that were
11   owned by third parties?
12       MR. REISMAN:
13           Object to the form.
14       THE WITNESS:
15           Could you ask the question one
16       more time?
17   EXAMINATION BY MR. ALTMYER:
18       Q    Yes.  Notwithstanding the on/off
19   hire letter or the Certificate of Insurance,
20   prior to October 28th, 2020, did Dawn ever
21   convey to Shore, in writing, that it would be
22   taking the position that the 2017 Master
23   Vessel Time Charter would not apply to vessels
24   that it was providing to Shore that were owned
25   by third parties?

Pages  89  to  92

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 93

```
1      MR. REISMAN:
2          Object to the form.
3      THE WITNESS:
4          I mean, I read -- I had an
5    understanding of what our Time Charter
6    covered.  I would expect Tommy and Cody
7    to have an understanding, too, of what
8    the Time Charter covered, the Master
9    Vessel Time Charter.
10     MR. ALTMYER:
11         Okay.  I'm going to strike --
12   object to the answer as nonresponsive.
13     MR. REISMAN:
14         I disagree.
15   EXAMINATION BY MR. ALTMYER:
16     Q    My question is, did you ever convey
17   to Shore, in writing, -- well, let's exclude
18   the contract then also from that.  So not
19   talking about the contract, not talking about
20   the on/off hire letter, not talking about
21   the Certificate of Insurance.  Prior to
22   October 28, 2020, did Dawn ever convey to
23   Shore, in writing, that it would be taking the
24   position that the 2017 Master Vessel Time
25   Charter would not apply in scenarios where
```

Page 94

```
1    Dawn was brokering a vessel to Shore?
2      A    No.
3      Q    Same question and same
4    qualifications on it.  I'm not talking about
5    the Master Vessel Time Charter, I'm not
6    talking about the on/off hire letter, I'm not
7    talking about a Certificate of Insurance.
8    Prior to October 28, 2020, did Dawn ever
9    convey to Shore verbally that, specifically,
10   that it would be taking the position that the
11   2017 Master Vessel Time Charter would not
12   apply to vessels that it was brokering to
13   Shore?
14     MR. REISMAN:
15         Object to the form.
16     THE WITNESS:
17         Could you repeat it again?
18   EXAMINATION BY MR. ALTMYER:
19     Q    Yes.  Same qualifications.  So
20   we're not talking about the Master Vessel Time
21   Charter, the on/off hire letters, or the
22   Certificate of Insurance.  Prior to October
23   28, 2020, did Dawn ever convey to Shore,
24   verbally, that it would be taking the position
25   that the 2017 Master Vessel Time Charter would
```

Page 95

```
1    not apply to vessels it was providing to Shore
2    that were owned by third parties?
3      MR. REISMAN:
4          Object to the form.
5      THE WITNESS:
6          Verbally?  Yeah, we had
7    conversations.  They knew -- again, they
8    knew what vessels we owned and what
9    vessels were going to be third-party
10   vessels.
11   EXAMINATION BY MR. ALTMYER:
12     Q    Okay.  So my question is specific
13   to, did Dawn ever specifically tell anyone at
14   Shore, prior to October 28, 2020, that the
15   2017 Master Vessel Time Charter was not going
16   to apply to situations where Dawn was
17   brokering a vessel to Shore?
18     A    No, but I would expect them to have
19   an understanding.
20     Q    Notwithstanding your expectations,
21   the answer to that question is "No," correct?
22     A    Yes.
23     Q    Specific to the use of the
24   M/V CROSBY ENDEAVOR, in October of 2020, Dawn
25   never conveyed to Shore, in writing, that it
```

Page 96

```
1    would be taking the position that the 2017
2    Master Vessel Time Charter would not apply to
3    Dawn's providing the M/V CROSBY ENDEAVOR to
4    Shore, correct?
5      MR. REISMAN:
6          Object to the form.
7      THE WITNESS:
8          No, but Kurt Crosby and Tommy
9    Gibilterra had a conversation about the
10   vessel, the ENDEAVOR.
11     MR. ALTMYER:
12         I'm going to strike that as
13   nonresponsive.
14   EXAMINATION BY MR. ALTMYER:
15     Q    Did Dawn, specific to the use of
16   the M/V CROSBY ENDEAVOR, in October of 2020,
17   prior to October 28th, 2020, Dawn never had
18   any conversations, any communications with
19   Shore, in writing, that it would be taking the
20   position that the 2017 Master Vessel Time
21   Charter would not apply to Dawn's providing
22   the M/V CROSBY ENDEAVOR to Shore?
23     MR. REISMAN:
24         Object to the form.
25     MR. ALTMYER:
```

Pages 93 to 96

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 97

1    Correct?
2    MR. REISMAN:
3        Object to the form.
4    THE WITNESS:
5        Not in writing.
6    EXAMINATION BY MR. ALTMYER:
7    Q    Verbally, prior to October 28, 2020
8    and specific to the use of the M/V CROSBY
9    ENDEAVOR, in October 2020, Dawn never conveyed
10   to Shore, verbally, that it would be taking
11   the position that the 2017 Master Vessel Time
12   Charter would not apply to Dawn's providing
13   the M/V CROSBY ENDEAVOR to Shore, correct?
14   MR. REISMAN:
15       Object to the form.
16   THE WITNESS:
17       Tommy Gibilterra and Kurt
18   Crosby had a conversation.  What they
19   discussed, I can't -- I can't speak on
20   behalf of that.
21   MR. ALTMYER:
22       I'm going to object as
23   nonresponsive.
24   EXAMINATION BY MR. ALTMYER:
25   Q    I'm talking about, did Dawn ever

Page 98

1    verbally convey that to Shore.
2    MR. REISMAN:
3        Object to the form.
4    THE WITNESS:
5        I understand what you're
6    saying.
7    MR. REISMAN:
8        Asked and answered.
9    THE WITNESS:
10       I understand what you're
11   saying, but when Crosby is having a
12   conversation with Shore, I don't know
13   what they're discussing.  I assume
14   they're discussing the terms of the
15   vessel, the ENDEAVOR.
16   MR. ALTMYER:
17       Okay.  I just want to -- I'm
18   going to also object as nonresponsive.
19   EXAMINATION BY MR. ALTMYER:
20   Q    I'm talking about Dawn's
21   conversations with Shore, not Crosby's
22   conversations with Shore.  All right.  So
23   generally speaking, did anybody else at Dawn
24   have commercial discussions with Shore other
25   than you?

Page 99

1    A    John Charpentier might have, at
2    times.
3    Q    Okay.  Are you aware of whether or
4    not John Charpentier ever conveyed to Shore
5    verbally, prior to October 28th, 2020, that
6    Dawn would be taking the position that the
7    2017 Master Vessel Time Charter would not
8    apply to Dawn's providing the M/V CROSBY
9    ENDEAVOR to Shore, in October of 2020?
10   MR. REISMAN:
11       Object to the form.
12   THE WITNESS:
13       I'm not sure.
14   EXAMINATION BY MR. ALTMYER:
15   Q    Okay.  Other than John Charpentier,
16   you were the only person at Dawn that is
17   generally communicating with Shore, correct?
18   A    Yes.
19   Q    Okay.  Specific to the use of the
20   M/V CROSBY ENDEAVOR, in October of 2020, prior
21   to October 28th, 2020, the date of the
22   incident, did you ever convey to Shore,
23   verbally, specifically that Dawn would be
24   taking the position that the 2017 Master
25   Vessel Time Charter was not going to apply to

Page 100

1    Dawn providing the M/V CROSBY ENDEAVOR to
2    Shore?
3    MR. REISMAN:
4        Object to the form.  Asked and
5    answered.
6    THE WITNESS:
7        No.
8    EXAMINATION BY MR. ALTMYER:
9    Q    I'll ask it this way.  Asking the
10   same questions regarding the LA MADONNA and
11   the LA ELITE, the vessels that were owned by
12   Louisiana International Marine, would you
13   testify to the same answers?
14   MR. REISMAN:
15       Object to the form.
16   THE WITNESS:
17       Yes.
18   EXAMINATION BY MR. ALTMYER:
19   Q    So I'll just ask it then.  Specific
20   to the use of the LA MADONNA and the LA ELITE,
21   in October of 2020, Dawn never conveyed to
22   Shore, in writing, that it would be taking the
23   position that the 2017 Master Vessel Time
24   Charter would not apply to Dawn's providing
25   the LA MADONNA to Shore?

Pages 97 to 100

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 101

1     MR. REISMAN:
2         Object to the form.
3     MR. ALTMYER:
4         Correct?
5     THE WITNESS:
6         Correct.
7  EXAMINATION BY MR. ALTMYER:
8     Q    Okay.  Specific to the use of the
9  LA MADONNA and the LA ELITE, in October 2020,
10 prior to October 28th, 2020, Dawn never
11 verbally conveyed to Shore, in writing, that
12 it would be taking the position that the 2017
13 Master Vessel Time Charter would not apply to
14 Dawn's providing those two vessels to Shore,
15 correct?
16    MR. REISMAN:
17        Object to the form.
18    THE WITNESS:
19        Correct.
20 EXAMINATION BY MR. ALTMYER:
21    Q    So testifying here today, on behalf
22 of Dawn Services, the on/off hire letters,
23 Dawn's Certificate of Insurance, and the
24 Master Vessel Time Charter itself are the only
25 documents that you can cite me to, to where

Page 102

1  Dawn is of the opinion that it conveyed to
2  Shore that the 2017 Master Vessel Time Charter
3  would not apply to Dawn's providing the
4  M/V CROSBY ENDEAVOR to Shore, in October of
5  2020?
6     MR. REISMAN:
7         Object to the form.  Misstates
8     prior testimony.
9     THE WITNESS:
10        Could you repeat the question
11    again?
12    MR. ALTMYER:
13        Yes.
14    MR. REISMAN:
15        Same objection, in advance of
16    the question you'll be saying, so I
17    don't interfere.
18 EXAMINATION BY MR. ALTMYER:
19    Q    Testifying here today, on behalf of
20 Dawn Services, the on/off hire letter, the
21 Master Vessel Time Charter itself, and the
22 Certificate of Insurance, Dawn's Certificate
23 of Insurance, are the only three documents
24 that you can cite me to where Dawn is of the
25 opinion that it conveyed, in writing, to Shore

Page 103

1  that the 2017 Master Vessel Time Charter would
2  not apply to Dawn's providing the M/V CROSBY
3  ENDEAVOR to Shore, in October of 2020?
4     A    If you go to the website, like you
5  pointed out earlier.
6     Q    Okay.  So the website, also?
7     A    Yeah.
8     Q    But those are the only four things
9  you can point me to?
10    A    Yes.
11    Q    Same for the LA MADONNA and the
12 LA ELITE?
13    A    Yes.
14    Q    All right.  We're going to actually
15 use that packet now that's in front of you for
16 the on/off letters.
17    MR. REISMAN:
18        He wants you to keep that.
19    MR. ALTMYER:
20        We're going to mark this as
21    "Exhibit 129," and specifically, it is
22    going to be -- I've got a copy for you.
23    MR. REISMAN:
24        I shouldn't need it.  Give me
25    the Bates range.

Page 104

1     MR. ALTMYER:
2         Yeah.  It's 373 to 383.
3     MR. REISMAN:
4         Okay.  Yeah, I don't need a
5     copy.  What was the exhibit number?
6     MR. ALTMYER:
7         We're on 129.
8     MR. REISMAN:
9         Thank you.
10 EXAMINATION BY MR. ALTMYER:
11    Q    Okay.  So, Mr. Grace, if you could
12 just briefly flip through Dawn 373 through
13 383, and once you've had a chance to just kind
14 of browse through them, let me know.
15    MR. REISMAN:
16        Take your time and look at
17    them, okay.
18    THE WITNESS:
19        Okay.  (Reviewing Documents).
20    Okay.
21 EXAMINATION BY MR. ALTMYER:
22    Q    All right.  Having reviewed these
23 documents now, you've seen these documents
24 before, correct?
25    A    Yes.

Pages 101 to 104

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 105

1    Q    Okay.  These would have been some
2  of the on/off hires you would have reviewed
3  prior to your deposition today, correct?
4    A    Yes.
5    Q    All right.  Flipping through 373
6  through 383, your signature is on all of these
7  documents, correct?
8    A    Yes.
9    Q    And these are on/off hire letters
10 that were provided to Shore Offshore Services,
11 correct?
12   A    Yes.
13   Q    And you would have provided these
14 to Shore personnel via email, correct?
15   A    Yes.
16   Q    And I believe we discussed earlier,
17 Dawn's on-hire and on/off hire emails are
18 traditionally -- letters are traditionally
19 sent to the customer via email, right?
20   A    Yes.
21   Q    Has Dawn ever used any other means
22 of sending its customers these types of
23 letters, other than email?
24   A    No.
25   Q    And the same process for issuing an

Page 106

1  on-hire or on/off hire letter is employed by
2  Dawn, irrespective of whether or not Dawn is
3  taking the position that it's brokering a boat
4  or chartering a boat?
5    A    Wait.  Could you repeat the
6  question one more time?
7    Q    Yeah.  The same process of issuing
8  an on-hire or on/off hire letter and emailing
9  it to a customer, that same process is
10 employed by Dawn, irrespective of whether or
11 not Dawn is taking the position that it
12 brokers a boat or charters a boat?
13   A    Yes.
14   Q    I think we'll go through them and
15 ask some general questions about just the form
16 itself, and then we'll go through some of
17 these specifically.  But on-hire letters are
18 not always sent prior to a job commencing,
19 correct?
20   A    Correct.
21   Q    Okay.  I think we can see from
22 Dawn 373, reading it, at the Start Time
23 section, it says 1300, on October 7th, 2020,
24 right?
25   A    Correct.

Page 107

1    Q    And then the letter is issued on
2  October 8th, 2020?
3    A    Correct.
4    Q    Okay.  You're the person that sends
5  these emails to the customer, right?
6    A    Yes.
7    Q    All right.  And you would have sent
8  these on/off hire letters to Shore, right?
9    A    Yes.
10   Q    Do you send that email the same day
11 that this document is generated?
12   A    Yes.
13   Q    Okay.  And we talked about earlier
14 sometimes there's just an on-hire letter,
15 sometimes there's an on/off hire letter.  Just
16 generally speaking, the distinction on there
17 would be that the stop times are not included
18 on the off-hire letters, right?
19   A    The stop times are included.
20   Q    Are included on the off, yes, okay.
21   A    Yes.
22   Q    They're not included on the on-hire
23 letter.  Gotcha.  Are there some times when
24 just an on/off hire letter is issued?
25   A    Yes.

Page 108

1    Q    Is there a particular rhyme or
2  reason as to why just an on/off hire would be
3  issued and not an on-hire letter for a
4  particular job?
5    A    If it's an hourly rate job, it's
6  generally just however many hours, and you
7  just put it all on one rather than a day rate
8  vessel.
9    Q    Okay.  So hourly rates, that might
10 be some of the instances of where we just see
11 an on/off hire letter instead of an on-hire
12 letter and an on/off hire letter?
13   A    Yes.
14   Q    Understood.  How long has Dawn been
15 using this form for?
16   A    Probably -- I'm guessing, but
17 probably 12 years.  Ten to 12 years.
18   Q    So you testified earlier you've
19 been with Dawn for around ten years, right?
20   A    No.  I've been with Dawn longer.  I
21 didn't testify that I was with Dawn for ten
22 years.
23        MR. REISMAN:
24          He was the VP for ten years.
25        THE WITNESS:

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 109

1        VP, yes.
2    EXAMINATION BY MR. ALTMYER:
3        Q    VP for ten years, I'm sorry.
4        A    Yes.
5        Q    And three years before that, you
6    were --
7        A    I started in 2007, May of 2007.
8        Q    2007, okay, gotcha.  So this
9    document was first used while you were
10   employed with Dawn?
11       A    Yes.
12       Q    Okay, understood.  But before you
13   were VP?
14       A    I don't remember.
15       Q    Okay.  Let's just go through
16   generally just like the substance of the form.
17   Date at the top is obviously the --
18       MR. REISMAN:
19            Is there a particular one
20   you're looking at?
21       MR. ALTMYER:
22            Yeah, let's just use 373 as the
23   form.
24       MR. REISMAN:
25            I just wanted to make sure he

Page 110

1        was looking at the same.
2    EXAMINATION BY MR. ALTMYER:
3        Q    Date at the top, that's the day
4    that you email it out, right?
5        A    Yes.
6        Q    Same day that you generate the
7    form?
8        A    Yes.
9        Q    Underneath that, where it says,
10   "Mr. Mauricio Arana, Shore Offshore Services,"
11   that's the customer that it's being issued to,
12   correct?
13       A    Correct.
14       Q    Where it says, "As per your
15   request, I am pleased to offer the following
16   on/off hire information for the M/V DEACON."
17   The M/V DEACON is the vessel that is being
18   offered to the customer, to Dawn's customer,
19   correct?
20       MR. REISMAN:
21            Object to the form.
22       THE WITNESS:
23            It is the vessel that we are --
24   it is the vessel that is being used on
25   the particular job.

Page 111

1    EXAMINATION BY MR. ALTMYER:
2        Q    Okay.  I'm just using the word
3    "offer" because it says, "Pleased to offer"
4    the information on the following, information
5    for the M/V DEACON.  So this is the vessel --
6    I'm not trying to ask you a trick question
7    about this.
8        A    Right.
9        Q    I'm just trying to say, the vessel
10   that is listed in that sentence is the vessel
11   that is contemplated under this on/off hire
12   agreement?
13       A    Right.
14       Q    Okay.  For job description,
15   "Working as directed, assisting the M/V
16   LA MADONNA with the D/B THOR from Galveston
17   jetties to midstream in Galveston," that's
18   just a general description of the work that's
19   proposed to be performed by the vessel,
20   contemplated under this letter, right?
21       A    Yes.
22       Q    Okay.  "Hour Rate," I see that it's
23   marked out there, but that's the rate that's
24   going to be charged per hour, correct, for the
25   vessel use?

Page 112

1        A    Yes.
2        Q    Is that the hour rate that's being
3    charged by the owner of the vessel or is that
4    the hour rate that's being charged by Dawn to
5    Shore?
6        A    It is the rate that's being charged
7    to Shore.
8        Q    Okay.  "Start Time" is the start
9    time of the job that's being described above,
10   correct?
11       A    Correct.
12       Q    "Stop Time" is when they're going
13   off hire, correct?
14       A    Yes, when the job ends.
15       Q    All right.  Then you have "Start
16   Fuel, Stop Fuel."  Just explain to us how that
17   process -- I know it's not applicable here,
18   but usually if you have a third-party vessel
19   coming in, they'll tell you how much fuel is
20   on board before they start a job, right?
21       A    On an hourly rate job, the rate
22   provided includes fuel and lube.
23       Q    Okay.
24       A    So on an hourly rate job, the start
25   fuels and lubes are irrelevant.

Pages 109 to 112

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 113

1    Q    That's why it's not applicable
2  here.  What about on a day-rate job?
3    A    They are important, because they're
4  not part of the day rate.
5    Q    Okay.  And then so the start fuel
6  will be indicated in that section there, where
7  it says "Start Fuel"?
8    A    Yes.
9    Q    All right.  "Start Lube," the same
10 answer?  That will be indicated where it says
11 "N/A" on this document?
12   A    Yes.
13   Q    And then at the end of the job, you
14 will get those figures from the owner of the
15 third-party vessel, they tell you how much
16 fuel is on the boat, and you indicate that
17 there, right?
18   A    Yes.
19   Q    For "Stop Fuel" and "Stop Lube,"
20 right?
21   A    Yes.
22   Q    And then "Fuel Owed" and "Lube
23 Owed," that is Shore's charge for the
24 difference, right, between the start and the
25 stop fuel and lube?

Page 114

1    A    Well, sometimes Shore is owed and
2  sometimes the vessel owner is owed.
3    Q    Right.  So if there's an excess,
4  then --
5    A    Yes.
6    Q    Okay, understood.  "Mobilization,"
7  that's just saying what port its coming out
8  of, the vessel?
9    A    Yes.
10   Q    Okay.  And then "Request Number,"
11 where it says "YH1809," that is a number that
12 you are provided from your customer, correct?
13       MR. REISMAN:
14           Object to the form.
15       THE WITNESS:
16           It's a number provided by
17       Shore, yes.
18 EXAMINATION BY MR. ALTMYER:
19   Q    By Shore, yeah.  Okay.  We talked
20 about this a little bit earlier.  There's
21 "Yours truly," your signature is on this
22 document, correct?
23   A    Yes.
24   Q    You sign every on/off hire
25 letter --

Page 115

1    A    Yes.
2    Q    -- that's issued by Dawn?  And then
3  the language --
4        MR. REISMAN:
5            Mike, slow down and let him
6        finish his question.  You knew what he
7        was asking, but you clipped him.  She
8        can only get what one person says at a
9        time, so just let him finish.
10 EXAMINATION BY MR. ALTMYER:
11   Q    And then we talked about this a
12 little bit earlier, but the language above
13 "Yours truly," starting with "Subject" and
14 ending with "Barge," that language is included
15 in every on/off hire letter that Dawn provides
16 to its customers, correct?
17   A    Yes.
18   Q    Okay.  And it was included in every
19 on/off hire that was provided from Dawn to
20 Shore, correct?
21   A    Wait, could you repeat?
22   Q    It's provided in every on/off hire
23 letter that was provided to Shore?
24   A    Yes.
25   Q    Okay.  Flipping through, I'm not

Page 116

1  going to ask you the specifics about each and
2  every single one of these on/off hire letters.
3  I just want to know, so on 373, this covers,
4  this on/off hire letter covers the M/V DEACON,
5  correct?
6    A    Yes.
7    Q    All right.  Who's the owner of the
8  M/V DEACON?
9    A    It's a company out of Houston.  I
10 believe it's G & -- G & B -- G & -- they're a
11 harbor assist tug company out of Houston.  I
12 just can't remember the name of them.
13   Q    Okay.  Do you remember who your
14 contact is there?
15   A    No.
16   Q    But this was for work in
17 October 2020 for Shore?
18   A    Yes.
19   Q    If one of the on/off hire letters
20 is issued -- you see where it says "Subject to
21 Availability" next to the vessel for
22 M/V DEACON?
23   A    Yes.
24   Q    At that point, at the time that
25 this document was generated on October 8,

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 117

1  2020, the M/V DEACON had already started
2  commencing mobilization towards wherever the
3  THOR was, correct?
4      A    Yes.
5      Q    So I guess what I'm trying to get
6  at is once an on/off hire letter is generated,
7  work either has been commenced or is going to
8  be commenced shortly thereafter, correct?
9      A    Yes.
10     Q    All right.
11         THE WITNESS:
12             Could we take a break?
13         MR. ALTMYER:
14             Yeah, absolutely.
15         (Whereupon, a break was taken;
16     12:10 p.m. - 12:30 p.m.)
17  EXAMINATION BY MR. ALTMYER:
18     Q    All right, Mr. Grace, back from the
19  break.  We are looking at the group of
20  documents that's attached as Exhibit 129, and
21  that's Dawn 373 through Dawn 383.  We left off
22  on questions, on Dawn 373, and that's the
23  on/off hire letter for the M/V DEACON, right?
24     A    Correct.
25     Q    Okay.  I think the last thing that

Page 118

1  I wanted to ask on that particular document,
2  you couldn't recall exactly who the owner of
3  that vessel was, right?
4      A    No.
5      Q    Okay.  Dawn Services is not the
6  owner of that vessel, though, right?
7      A    Correct.
8      Q    Okay.  Sitting here, as the
9  corporate representative of Dawn, what is
10  Dawn's position as to whether or not the 2017
11  Master Vessel Time Charter between Dawn and
12  Shore applies to this on/off hire letter?
13     A    Could you answer it one more
14  time -- or ask the question again?
15     Q    Yeah, of course.  As a corporate
16  representative of Dawn, testifying here today,
17  specifically we're looking at Dawn 373, the
18  on/off hire letter for the M/V DEACON.  What
19  is Dawn's position as to whether the 2017
20  Master Vessel Time Charter applies to Dawn's
21  providing this vessel to work with Shore?
22     A    It does not apply.  It was
23  brokered.
24     Q    And I'll ask it and you can answer
25  it at that point.  What is the basis for

Page 119

1  Dawn's position that the 2017 Master Vessel
2  Time Charter does not apply?
3      A    Because it's not a vessel that we
4  own.
5      Q    Okay.  Is there any other reason?
6      A    No.
7      Q    Okay.  And when you say "we," we're
8  talking about Dawn Services, right?
9      A    Dawn Services.  When it's a vessel
10  that we own, we control it, we operate it.
11  That vessel, we don't own, we don't operate
12  it.  It does not apply to the Time Charter.
13     Q    Okay.  We're going to just kind of
14  do a similar thing, going through these on/off
15  hire letters.  Let's go to 374.  This is an
16  on/off hire letter from October 12th, 2020,
17  for the M/V LA INVADER, correct?
18     A    Yes.
19     Q    And it was to be working as
20  directed with the D/B THOR, and it looks like
21  the start time was September 28th, 2020, at
22  1500 hours; is that correct?
23     A    Yes.
24     Q    And stop time was September 30th,
25  2020, at 2400 hours, correct?

Page 120

1      A    Correct.
2      Q    All right.  So distinguishing this
3  document, this form document, at 374, from the
4  document provided at 373, on 374, we're
5  looking at a day rate job, correct?
6      A    Correct.
7      Q    And on 373, we're looking at an
8  hourly rate job, right?
9      A    Correct.
10     Q    Who's the owner of the
11  M/V LA INVADER?
12     A    Louisiana International.
13     Q    Okay.  And that is the same owner
14  as the LA MADONNA and the LA ELITE, right?
15     A    Yes.
16     Q    And going back to when we were just
17  talking generally about the form itself, we
18  were talking about 373 and the description and
19  all that stuff, I should be able to read all
20  of the forms the same way, correct?
21     A    Yes.
22     Q    All right.  And that should go for
23  any on/off hire letter that is issued by Dawn
24  to Shore, right?
25     A    Yes.

Pages 117 to 120

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 121

1    Q    Okay.  And just for clarity, that
2  would also apply to on-hire letters as well,
3  right?
4    A    Yes.
5    Q    Okay.  Testifying here today as the
6  corporate representative of Dawn, what is
7  Dawn's position as to whether or not the 2017
8  Master Vessel Time Charter applies to Dawn's
9  providing the M/V LA INVADER to Shore, under
10  this on-hire, off-hire letter?
11    A    Same.
12    Q    Same as before, for your testimony
13  for 373, right?
14    A    Yes.
15    Q    Okay.  So it's Dawn's position that
16  the Master Vessel Time Charter does not apply
17  because Dawn is not the owner of the
18  M/V LA INVADER, right?
19    A    Yes.
20    Q    Okay.  Let's go to 375.  This is an
21  on/off hire letter for the M/V H. DOUGLAS
22  MASTERSON from October 12th, 2020, correct?
23    A    Yes.
24    Q    Okay.  And this is an hourly rate
25  job, right?

Page 122

1    A    Yes.
2    Q    "Working as directed, assisting the
3  M/V LA MADONNA with the D/B THOR, off the dock
4  at midstream in Galveston and to the Galveston
5  Ship Channel."  That's the job description,
6  right?
7    A    Yes.
8    Q    Okay.  And the start time was
9  October 11th, 2020, at 0600 hours, and the end
10  time was October 11, 2020, at 0900 hours,
11  right?
12    A    Yes.
13    Q    Okay.  Who's the owner of the
14  M/V H. DOUGLAS MASTERSON?
15    A    It's the same company that owns the
16  DEACON.
17    Q    Okay.  You don't have to flip back
18  to 374, but I just want to ask one more
19  question about that.  Who's your contact at
20  Louisiana International Marine?
21    A    Anthony Roberts.
22    Q    Do you know what his job title is
23  at Louisiana International Marine?
24    A    I don't.
25    Q    Is he the only person that you deal

Page 123

1  with at Louisiana International Marine?
2    A    Yes.
3    MR. PALMINTIER:
4        I'm sorry to interrupt, Jacob.
5    Can you move closer to your mic or
6    whatever you did earlier?
7    MR. ALTMYER:
8        Yeah, I will not lean back when
9    I'm asking questions.
10    MR. PALMINTIER:
11        I know how it is, and I
12    apologize for even asking, but we really
13    can't hear.
14  EXAMINATION BY MR. ALTMYER:
15    Q    For the company that -- so you
16  don't recall who that company is that provided
17  the M/V H. DOUGLAS MASTERSON?
18    MR. REISMAN:
19        Object to the form.
20    THE WITNESS:
21        No.
22  EXAMINATION BY MR. ALTMYER:
23    Q    Okay.  You just don't remember the
24  name of the company?
25    A    I don't remember the name, no.

Page 124

1    Q    Okay.  Do you recall whether or not
2  you had any contracts in place with that
3  company for brokering their vessels?
4    A    No, but it didn't matter because
5  they were working for Shore.
6    MR. ALTMYER:
7        I'm going to strike as
8    nonresponsive.
9  EXAMINATION BY MR. ALTMYER:
10    Q    I just want to know whether or not
11  you had any contracts in place --
12    A    No.
13    Q    -- with that company.
14    A    No.
15    Q    Did you have any contracts in place
16  with Louisiana International Marine for the
17  brokering of their vessels?
18    A    Yes.
19    Q    Okay.  And which contracts would
20  those be?
21    MR. REISMAN:
22        For brokering or just any
23    service?  I'm sorry.
24    MR. ALTMYER:
25        For brokering.

Pages 121 to 124

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 125

1    MR. REISMAN:
2        Okay.
3    THE WITNESS:
4        No, we did not have one for
5    brokering.
6    EXAMINATION BY MR. ALTMYER:
7    Q    Okay. Did you have a Time Charter
8    in place with them?
9    A    I believe so.
10   Q    Okay. It's a Master Vessel Time
11   Charter?
12   A    It's a Time Charter.
13   Q    A Master Agreement, though?
14   A    Yes.
15   Q    In October 2020, did Dawn ever
16   enter into any charter orders with Louisiana
17   International Marine?
18   A    No.
19   Q    How about just in 2020, in general?
20   A    No.
21   Q    And just to clarify, are you aware
22   of whether or not the Master Agreement, the
23   Time Charter Agreement that Dawn has in place
24   with Louisiana International Marine was in
25   effect, as of October 28th, 2020?

Page 126

1    A    It was in effect, but it didn't
2    apply.
3    Q    Okay. And I'm just asking whether
4    or not it was executed before October 28,
5    2020.
6    A    Yes.
7    Q    Okay. All right. Let's go to 376.
8    This is from October 12, 2020. Also an hourly
9    rate job, right?
10   A    Yes.
11   Q    And this is for the M/V DEACON
12   again, right?
13   A    Yes.
14   Q    Okay. Job description is "Working
15   as directed, assisting the M/V LA MADONNA with
16   the D/B THOR from midstream Galveston to
17   Galveston jetties, and assist the M/V LA ELITE
18   with the M/V CBR801 off the dock at midstream
19   Galveston," right?
20   A    Yes.
21   Q    Generally speaking, where do you
22   get the information of what to plug in for the
23   job description?
24   A    From Shore.
25   Q    Okay. Directly from Shore. Who

Page 127

1    conveys that to you?
2    A    One of their project managers.
3    Q    Okay. Is that generally going to
4    be the project manager that's listed at the
5    top of an on/off hire letter?
6    A    Yes.
7    Q    Okay. I want to ask, back on 375,
8    is your testimony the same for the
9    M/V H. DOUGLAS MASTERSON with respect to
10   Dawn's position that the 2017 Master Vessel
11   Time Charter would not apply to this on/off
12   hire letter?
13   A    Yes.
14   Q    Okay. And that position is based
15   on Dawn not owning the M/V H. DOUGLAS
16   MASTERSON, correct?
17   MR. REISMAN:
18       Object to the form.
19   THE WITNESS:
20       Yes.
21   EXAMINATION BY MR. ALTMYER:
22   Q    Okay. And that's the only basis,
23   correct?
24   MR. REISMAN:
25       Object to the form.

Page 128

1    THE WITNESS:
2        Well, yeah. They didn't
3    know we -- they know we didn't own this
4    vessel.
5    EXAMINATION BY MR. ALTMYER:
6    Q    Okay. And I'm just talking about
7    what Dawn's position is, as to why the Master
8    Vessel Time Charter doesn't apply.
9    A    Yes.
10   Q    It's based upon the fact that Dawn
11   does not own the M/V H. DOUGLAS MASTERSON,
12   correct?
13   MR. REISMAN:
14       Object to the form.
15   THE WITNESS:
16       Yes.
17   EXAMINATION BY MR. ALTMYER:
18   Q    Okay. 377. This is from
19   October 13th, 2020, correct? This is an
20   on-hire letter for the M/V LA ELITE?
21   A    Yes.
22   Q    All right. The start time was
23   September 30th, 2020, right?
24   A    Yes.
25   Q    Okay. Day rate job?

Pages 125 to 128

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 129

1      A    Yes.
2      Q    And this is to be working as
3  directed with a materials barge, right,
4  CBR801?
5      A    Yes.
6      Q    All right.  This was issued, it
7  looks like, 13, 14 days after the start time
8  for the work; is that correct?
9      A    Yes.
10     Q    Okay.  Just generally speaking,
11 what would cause the lapse in time from when a
12 vessel commences work to the time that you
13 issue an on/off hire letter?
14     A    Probably collecting some of the
15 information from the vessel owner or waiting
16 on a requisition number from Shore.
17     Q    Okay.  But before the on/off hire
18 letter is issued and the vessel has already
19 commenced work, what terms is Dawn expecting
20 to apply between the time period that the
21 vessel commences work and the time that an
22 on/off hire letter is issued?
23     A    The same terms that have always
24 applied.  I mean, you can see that we've been
25 issuing on/off hire letters with the same

Page 130

1  verbiage this entire time.  Shore knows what
2  vessels we own and what vessels are
3  third-party.  They know all this language in
4  here.  It's the same terms.  It's whatever
5  terms they work out with the vessel owner.
6      Q    Okay.  So would you agree that you
7  have a course of dealing with Shore?
8          MR. REISMAN:
9              Object to the form.
10         THE WITNESS:
11             Could you repeat the --
12         MR. REISMAN:
13             Calls for a legal conclusion.
14         THE WITNESS:
15             Would you repeat the --
16         MR. REISMAN:
17             He's not going to answer about
18        a legal conclusion.
19 EXAMINATION BY MR. ALTMYER:
20     Q    Would you agree that, in connection
21 with these on/off hire letters, for a
22 substantial amount of time, you've been
23 operating under the same method or procedure
24 of issuing these on/off hire letters to Shore?
25     A    Yes.

Page 131

1      Q    Okay.  So I want to ask the
2  question again, though.  What is Dawn's
3  position as to what terms apply, in a
4  situation of where -- and I'm talking strictly
5  about third-party vessels right now -- in the
6  situation of where a vessel has commenced work
7  for Shore, but an on/off hire letter has not
8  yet been issued?
9          MR. REISMAN:
10             Object to the form.  I also
11        object on the grounds that it's been
12        asked and answered.
13         THE WITNESS:
14             The terms between the vessel
15        owner and Shore, that's what we would
16        expect.
17 EXAMINATION BY MR. ALTMYER:
18     Q    Okay.  So it's Dawn's position that
19 no terms between Dawn and Shore are applicable
20 at that point?
21     A    Other than we are their broker.
22     Q    And just to confirm, you have no
23 brokerage agreement -- you had no brokerage
24 agreement in place with Shore, as of October
25 28, 2020, correct?

Page 132

1      A    No.
2      Q    On 377, that's one of the vessels
3  we talked about pretty early in the
4  deposition, the LA ELITE.  That's a Louisiana
5  International Marine boat, right?
6      A    Yes.
7      Q    Okay.  And Dawn's position is that
8  the Master Vessel Time Charter from 2017 does
9  not apply to this on/off hire letter, correct?
10     A    Correct.
11     Q    Or to the providing of the LA ELITE
12 to Shore in October of 2020?
13     A    We didn't provide it to them.  We
14 brokered it to them.
15     Q    Or facilitating the use of that
16 vessel to Shore in October 2020?
17     A    Yes.
18     Q    And just to confirm, yes, it is
19 Dawn's position that the 2017 Master Vessel
20 Time Charter does not apply?
21     A    Yes.
22     Q    Okay.  And the basis for that is
23 that Dawn does not own the LA ELITE, correct?
24     A    Yes.
25     Q    378, that's another on/off hire

Pages 129 to 132

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 133

1   letter for the LA ELITE, right?
2        A    Yes.  This is on/off, yes.
3        Q    All right.  So looking at 377, we
4   have the on-hire letter.  378, this is the
5   off-hire letter, right?
6        A    Yes.
7        Q    Okay.  So this has now, as we
8   talked about earlier, the stop time, the stop
9   lube, that kind of information, right?
10       A    Yes.
11       Q    Okay.  Same testimony?  Is it
12  Dawn's position that the 2017 Master Vessel
13  Time Charter does not apply to the job
14  description that's described on Dawn 378, for
15  the M/V LA ELITE?
16       A    Yes.
17       Q    Let's go to 379, October 22nd,
18  2020, and this is an on-hire letter for the
19  M/V CROSBY ENDEAVOR, right?
20       A    Yes.
21       Q    All right.  Job description,
22  "Working as directed with the D/B THOR,"
23  right?
24       A    Yes.
25       Q    All right.  So we have start time

Page 134

1   is October 19th, 2020, correct?
2        A    Yes.
3        Q    So this letter was issued about
4   three days after?
5        A    Yes.
6        Q    All right.  Now, being familiar
7   with the incident that's the subject of the
8   litigation in this case, this is the on/off
9   hire letter that was in effect at the time of
10  the incident, correct?
11       A    Yes.
12       Q    All right.  Or I'm going to clarify
13  that.  This is the on-hire letter?
14       A    Yes.
15       Q    All right.
16       A    But I do want to say something
17  about this.  I actually tried to go to Crosby
18  and have them adjust their start time for this
19  job, because Shore put fuel on the vessel.  I
20  was acting in -- I was acting as a broker, for
21  Shore, to try and get their time -- tried to
22  save them money.
23       Q    Well, I think I have an email to
24  that effect?
25       A    Yes.

Page 135

1        Q    And we'll look at that in a little
2   while.
3        A    Okay.
4        Q    Again, your signature is on this
5   document, it's on all of the on/off hire
6   letters, right?
7        A    Yes.
8        Q    Here today, it's Dawn's position,
9   testifying as the corporate representative of
10  Dawn, that the 2017 Master Vessel Time Charter
11  does not apply to this on/off hire letter or
12  the work that is described in the job
13  description on it, correct?
14       A    Yes.
15       Q    And the basis of that is that Dawn
16  Services does not own the CROSBY ENDEAVOR,
17  correct?
18       A    Correct.
19       Q    Any other basis?
20       MR. REISMAN:
21            Object to the form.
22       THE WITNESS:
23            No.  Well, they do know that
24       Crosby -- who owns Crosby.  I mean, it's
25       pretty obvious.

Page 136

1   EXAMINATION BY MR. ALTMYER:
2        Q    October 26, 2020, we're on Dawn
3   380.  This is an on/off hire for the LA ELITE.
4   This is a different one than we looked at
5   before, right, --
6        A    Yes.
7        Q    -- for the LA ELITE.  This is
8   "Working as directed, assisting the
9   M/V LA MADONNA with Materials Barge CBR793
10  from Belle Pass jetties to Stone Oil No. 2."
11  That's what the job description says, right?
12       A    Yes.
13       Q    Okay.  The Vessel LA ELITE, we
14  talked about earlier, that's Louisiana
15  International Marine owns that boat, right?
16       A    Yes.
17       Q    Okay.  Start time, we have
18  October 26, 2020, at 0700, right?
19       A    Yes.
20       Q    Stop time is 1100 on October 26,
21  2020, right?
22       A    Yes.
23       Q    Okay.  Generally speaking, just so
24  I understand the job description on this, this
25  is for the LA ELITE to go assist at the Belle

Pages 133 to 136

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 137

1  Pass jetties to bring a material barge into
2  Port Fourchon, right?
3       A    Yes.
4       Q    Okay.  And then, same as before,
5  it's Dawn's position that the 2017 Master
6  Vessel Time Charter does not apply, correct?
7       A    Yes.
8       Q    Specific to this on/off hire letter
9  and the job description in it?
10      A    Yes.
11      Q    381, we have another one for the
12  LA ELITE.  It's dated October 28th, 2020.  The
13  start time was October 26, 2020, at 1900
14  hours, right?
15      A    Yes.
16      Q    All right.  Stop time is 0100 on
17  October 27th, 2020, correct?
18      A    Yes.
19      Q    Job description, "Working as
20  directed, assisting M/V CROSBY ENDEAVOR with
21  D/B THOR from Belle Pass sea buoy to midstream
22  in Fourchon, Louisiana," correct?
23      A    Yes.
24      Q    So, just general job description
25  here, this is sending out the M/V LA ELITE to

Page 138

1  meet the THOR and the CROSBY ENDEAVOR at the
2  Belle Pass jetty to bring the THOR into Port
3  Fourchon, correct?
4       A    Yes.
5       Q    And at the time, you understood
6  that the THOR was coming in to Port Fourchon
7  to seek safe harbor from Hurricane Zeta,
8  correct?
9       A    Yes.
10      Q    Okay.  And as the corporate
11  representative of Dawn, testifying here today,
12  is it Dawn's position that the Master Vessel
13  Time Charter from June 9, 2017, does not apply
14  to the work that's the subject of this on/off
15  hire letter?
16      A    Yes.
17      Q    And the basis for that is that Dawn
18  does not own the M/V LA ELITE, correct?
19      A    Yes.
20      MR. RUFTY:
21          We're having an issue again
22  with the volume of the questions.
23      MR. ALTMYER:
24          I think I'm leaning back too
25  much.  I'll try to keep my posture

Page 139

1  forward.  Or I'll just try to yell at
2  the witness a little bit.  Sorry if it's
3  coming off like that, but I'm just going
4  to try to speak up for them.
5       MR. REISMAN:
6           Y'all on the Zoom, if it
7  becomes a problem, yeah, just let us
8  know and Jacob is obviously working hard
9  to -- It's not an ideal situation, but
10  he's working hard to make sure you can
11  hear him.  So just let us know if it's a
12  problem.
13      MR. PALMINTIER:
14          Will do.
15  EXAMINATION BY MR. ALTMYER:
16      Q    And is that the only basis for
17  Dawn's position that the Master Vessel Time
18  Charter does not apply to the work subject of
19  this on/off hire letter?
20      MR. RUFTY:
21          Can't hear.
22      MR. REISMAN:
23          Don't answer.  They said they
24  couldn't hear.  Hang on a second.
25      MR. ALTMYER:

Page 140

1           We're going to take a break,
2  guys.  We're going to see if we can get
3  an external microphone for us to plug
4  in.
5           (Whereupon, a discussion was
6  held off the record to address the Zoom
7  issue).
8  EXAMINATION BY MR. ALTMYER:
9       Q    Mr. Grace, back on the record.  We
10  were talking about Dawn 381.  That's the
11  October 28th, 2020 on/off hire letter for the
12  M/V LA ELITE, correct?
13      A    Yes.
14      Q    Which one actually do you have in
15  front of you right now?
16      A    381, that's the LA ELITE.
17      Q    The LA ELITE, that's the one we're
18  talking about, okay.  Working as directed.
19  Dawn's position in this case is that the
20  Master Vessel Time Charter of 2017 from,
21  June 9, 2017, does not apply to the work
22  subject of this on/off hire letter, correct?
23      A    Correct.
24      Q    Okay.  The basis for that is that
25  Dawn does not own the M/V LA ELITE, correct?

Pages 137 to 140

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 141

1    MR. REISMAN:
2        Object to the form.
3    THE WITNESS:
4        Correct.
5  EXAMINATION BY MR. ALTMYER:
6    Q    Okay.  And that's the sole basis
7  for that, correct?
8    MR. REISMAN:
9        Object to the form.
10   THE WITNESS:
11       Correct.
12 EXAMINATION BY MR. ALTMYER:
13   Q    All right.  Let's go to 382.  We've
14 got November 3rd, 2020, for the LA MADONNA,
15 the M/V LA MADONNA.  That's a Louisiana
16 International Marine vessel that we talked
17 about earlier, correct?
18   A    Yes.
19   Q    Okay.  I think we had actually
20 looked at an on-hire letter -- no, we did
21 not -- for this boat.  But this here is an
22 on/off hire letter for the LA MADONNA,
23 correct?
24   A    Yes.
25   Q    All right.  November 3rd, 2020.

Page 142

1  And the start time is September 14th, 2020,
2  and the stop time is October 19th, 2020,
3  correct?
4    A    October 29th -- or, yes,
5  October 29th, 2020.
6    Q    Gotcha.  And then that's after the
7  date of the incident that's the subject of
8  this litigation, correct?
9    A    Yes.
10   Q    November 3rd, 2020, so it's issued,
11 we're looking four or five days after the --
12 after the stop time that's stated here,
13 correct?
14   A    Yes.
15   Q    Okay.  Job description is "Working
16 as directed with D/B THOR and materials
17 barges."  That's an accurate description of
18 the work?
19   A    Yes.
20   Q    Okay.
21   A    Well, it was more of the material
22 barge tug.
23   Q    Okay.  Is there any like reason why
24 there wouldn't have been an on-hire letter
25 issued for this?

Page 143

1    A    I'm not sure.
2    Q    Okay.  There could be one out
3  there, though?
4    A    There could be.
5    Q    Okay.  Testifying here as Dawn's
6  corporate representative, it's Dawn's position
7  that the 2017 Master Vessel Time Charter does
8  not apply to the work subject of this on/off
9  hire letter, correct?
10   A    Correct.
11   Q    And just so we're clear, for the
12 record, we're talking about 382.  And the
13 basis for that is that Dawn does not own the
14 M/V LA MADONNA, correct?
15   A    Correct.
16   Q    Okay.  Is there any other basis for
17 that?
18   MR. REISMAN:
19       Object to the form.
20   THE WITNESS:
21       No.
22 EXAMINATION BY MR. ALTMYER:
23   Q    Let's go to 383.  This is the
24 on/off hire information for the M/V CROSBY
25 ENDEAVOR.  It's dated November 3rd, 2020,

Page 144

1  right?
2    A    Correct.
3    Q    All right.  So this was issued to
4  Mr. Mauricio Arana at Shore Offshore Services?
5    A    Correct.
6    Q    The vessel M/V CROSBY ENDEAVOR,
7  that is not a vessel that is owned by Dawn
8  Services, correct?
9    A    Correct.
10   Q    Start time, I see, October 19th,
11 2020, at 1100 hours, and stop time is 1400, on
12 October 29th, 2020, right?
13   A    Correct.
14   Q    So the stop time is after the date
15 of the incident that's the subject of this
16 litigation, correct?
17   A    Correct.
18   Q    Job description is "Working as
19 directed with D/B THOR," correct?
20   A    Correct.
21   Q    Testifying here today, on behalf of
22 Dawn Services, it's Dawn's position that the
23 2017 Master Vessel Time Charter does not apply
24 to the work subject of this on/off hire
25 letter, correct?

Pages 141 to 144

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 145

1      A    Correct.
2      Q    All right.  We're talking about
3  Dawn 383, right?
4      A    Correct.
5      Q    Okay.  During this time frame, were
6  you aware that, on October 28th, 2020, that
7  the CROSBY ENDEAVOR was moored alongside the
8  D/B THOR during Hurricane Zeta at the Martin
9  Dock No. 16?
10      A    I was not.
11      Q    And just to confirm, as earlier, is
12  that Dawn's position is that the Master Vessel
13  Time Charter does not apply to this work,
14  right?
15      A    Correct.
16      Q    And the basis for that is that Dawn
17  does not own the M/V CROSBY ENDEAVOR, correct?
18      MR. REISMAN:
19          Object to the form.
20      THE WITNESS:
21          Correct.
22  EXAMINATION BY MR. ALTMYER:
23      Q    Okay.  Is there any other reason
24  that you can think of or cite to me, as far as
25  a document goes, as to why the Master Vessel

Page 146

1  Time Charter does not apply to the work
2  subject of this on/off hire letter?
3      MR. REISMAN:
4          Object to the form.  Asked and
5      answered.
6      THE WITNESS:
7          Yeah.  I mean, we've been
8      through it.  Shore knows what vessels we
9      own, you know, based off of
10      conversations with Tommy and Cody, based
11      off of our website, based off our COI,
12      based off those.
13  EXAMINATION BY MR. ALTMYER:
14      Q    Okay.  I just want to confirm,
15  looking back at 373 through 383, all of these
16  on-hire or off-hire, or on-hire letters,
17  whichever they may be, contained the same
18  language above, your signature and "Yours
19  truly," the "subject" through "barge"
20  language, correct?
21      A    Yes.
22      Q    Okay.  And just for the record, can
23  you just read that out for us real quick, just
24  so it's clear?
25      A    "Subject:  3.25 fuel, availability,

Page 147

1  and a mutual agreement between vessel owner
2  and Shore Offshore Services, LLC.  Prices
3  quoted do not include agent/custom fees; pilot
4  fees; port/harbor fees; canal fees; assist
5  tugs; taxes; dues; duties; permits; safe
6  berths, watchman, on or off charter surveys,
7  subsistence for customer representative; barge
8  ballasting, weather report during trip; trip
9  and tow survey; line handlers; special tow
10  gear; special fendering including
11  installations, emergency tow wires; weather
12  deviation; or any other charges incurred by
13  the tug or barge."
14      Q    All right, thank you.  I'm going to
15  show you this document.  This is not a
16  document that's Bates labeled, but I'm going
17  to show it to you.  I'm going to premark it as
18  "Exhibit 130" and ask you to review it real
19  quick, Mr. Grace.
20          Okay.  Mr. Grace, have you seen
21  that document before?
22      A    Yes.
23      Q    Okay.  And that is your signature
24  at the bottom of the document, right?
25      A    Yes.

Page 148

1      Q    Bottom left-hand side?
2      A    Yes.
3          (Whereupon, a discussion was
4      held off the record).
5  EXAMINATION BY MR. ALTMYER:
6      Q    This is an on/off hire letter dated
7  June 4th, 2019, for the M/V BREAK OF DAWN,
8  correct?
9      A    Yes.
10      Q    Okay.  And that is a vessel that is
11  part of Dawn's fleet, correct?
12      A    Yes.
13      Q    All right.  And that's one of the
14  vessels that was listed on the website that we
15  looked at earlier, right?
16      A    Yes.
17      Q    And that was at Exhibit -- if you
18  have it in front you, I just want to clarify.
19      A    128.
20      Q    128?  Okay.
21      MR. REISMAN:
22          While you're looking at that,
23      and following up on Matt's point, since
24      I don't know that this document has been
25      produced, but I know you've produced

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 149

1  other documents that were unredacted.
2  Would you agree to redact the rate from
3  this, as commercially sensitive?
4      MR. ALTMYER:
5          That's fine, yeah.
6      MR. REISMAN:
7          Okay, thank you.  So the
8  document that will get attached will
9  have that redacted.
10     MR. ALTMYER:
11         Yeah, that's fine.
12     MR. REISMAN:
13         Thank you, Matt.
14 EXAMINATION BY MR. ALTMYER:
15     Q    So for job description, it says,
16 "Working as directed with material barge for
17 D/B THOR," right?
18     A    Yes.
19     Q    Okay.  This is an on-hire letter
20 that was issued to Mr. Tommy Gibilterra at
21 Shore Offshore Services, right?
22     A    Yes.
23     Q    Okay.  It's the same form for a day
24 rate on-hire letter that we've looked at
25 previously in the documents we reviewed from

Page 150

1  Dawn 373 to 383, right?
2      A    Yes.
3      Q    Okay.  It has the same language in
4  it, at the bottom, above "Yours truly" and
5  above your signature, starting with "Subject:
6  3.25 fuel," through the last sentence,
7  "Charges incurred by the tug or barge," right?
8      A    Yes.
9      Q    What is Dawn's position, testifying
10 here on behalf as a corporate representative
11 of Dawn, as to whether or not the 2017 Master
12 Vessel Time Charter would apply to the
13 M/V BREAK OF DAWN being provided to Shore,
14 subject to the work of this job description in
15 the on-hire letter of June 4th, 2019?
16     A    It would apply.
17     Q    It would apply, okay.  And why
18 would it apply?
19     A    Because it's a vessel we own.
20     Q    And just to confirm, this is the
21 same form that's used, irrespective of whether
22 or not Dawn is brokering a vessel or
23 chartering a vessel to Shore, correct?
24     MR. REISMAN:
25         Object to the form, and it's

Page 151

1  also been asked and answered several
2  times.
3      THE WITNESS:
4          Yes.
5  EXAMINATION BY MR. ALTMYER:
6      Q    Prior to October 28, 2020, are you
7  aware of any situation in which Dawn either
8  brokered or chartered a vessel to Shore and
9  used a form other than the on/off hire form?
10     A    No.
11     MR. REISMAN:
12         What was the date range on
13 that?
14     MR. ALTMYER:
15         Before October 28, 2020.
16     MR. REISMAN:
17         Okay, thank you.
18     MR. ALTMYER:
19         And just specific to Shore.
20     THE WITNESS:
21         Yes, correct.
22 EXAMINATION BY MR. ALTMYER:
23     Q    All right.  I want to go back to
24 the screenshot of the website.  Just to
25 confirm, if Shore was provided any of the

Page 152

1  vessels that are shown on the printout of
2  Dawn's website, at Exhibit 128, it's Dawn's
3  position that the 2017 Master Vessel Time
4  Charter would apply, correct?
5      A    Yes.
6      Q    Okay.  I'm going to look at a
7  document -- and the basis of that is because
8  Dawn owns those vessels, right?
9      MR. REISMAN:
10         Object to the form.
11     THE WITNESS:
12         Yes, we own and operate.
13 EXAMINATION BY MR. ALTMYER:
14     Q    Okay.  I'm going to show you a
15 document that's labeled Dawn 405 through 413.
16 This is a document that was produced by Dawn
17 in discovery.  It's one of its insurance
18 policies.  Have you seen this document before?
19     A    Yes.
20     Q    Okay.  I'm not going to ask you
21 about the policy itself.  I just want you to
22 turn to Page 407, Dawn 407, on the policy.
23 Okay.  And if you can, can you grab the
24 website, 128, and just keep it alongside,
25 because I kind of want to walk through some

Pages 149 to 152

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 153

1  stuff on here.
2       All right.  So we're looking at
3  Dawn 407, about mid-page, under the line, "The
4  attached clauses form part of this policy,"
5  there's a "To:" section, and there's a list of
6  entities there.  Do you see that?
7     A    Yes.
8     Q    Okay.  It says, "Dawn Services;
9  Aegean Dawn, LLC" -- strike that.  It says,
10  "Dawn Services, LLC; Aegean Dawn, LLC; Gulf
11  Dawn, LLC; Break of Dawn, Inc.; Atlantic Dawn,
12  LLC; Pacific Dawn, LLC; Arctic Dawn, LLC;
13  Bayou Dawn, LLC; Coastal Dawn, LLC; Dawn
14  Barges, LLC; Baltic Dawn, LLC; Bering Dawn,
15  LLC; Indian Dawn, LLC; Charpentier
16  Investments, LLC, 851 Macarthur, LLC; Southern
17  Dawn; Dawn PR, LLC," correct?
18     A    Yes.
19     Q    Okay.  And it has the word "owner"
20  behind all of them except the first two
21  entities that are listed, right?
22     A    Yes.
23     Q    For Dawn Services, it's the first
24  one listed, it says, "Owner/assured," correct?
25     A    Yes.

Page 154

1     Q    And then Aegean Dawn, it says,
2  "Assured in Respect of Vessel REED DANOS,"
3  right?
4     A    Yes.
5     Q    Okay.  So I want to compare the
6  list of entities that's on here, for 407, to
7  the website printout that we were looking at,
8  at 128.  When I see the entity listed as the
9  Aegean Dawn, LLC, --
10     A    Okay.
11     Q    -- it says, "Assured in Respect of
12  Vessel REED DANOS," was the REED DANOS a
13  former name of that boat?
14     A    Yes.
15     Q    Okay.  And it was renamed, the
16  AEGEAN DAWN, right?
17     A    Yes.
18     Q    Okay.  Do you know when that was,
19  when it was renamed?
20     A    I don't know exactly when.
21     Q    Okay.  Was that vessel acquired
22  from a different company?
23     A    Yes.
24     Q    Okay.  Who was it acquired from?
25     A    Cashman Equipment.

Page 155

1     Q    Is Aegean Dawn, LLC, the owner of
2  the M/V AEGEAN DAWN?
3     A    The AEGEAN DAWN is owned by
4  the Aegean -- yes.
5     Q    Okay.  So Dawn Services, LLC, is a
6  distinct entity from Aegean Dawn, LLC, right?
7     A    Well, the owners of Dawn Services
8  own Aegean Dawn.
9         MR. ALTMYER:
10           I'm going to strike it as
11  nonresponsive.
12  EXAMINATION BY MR. ALTMYER:
13     Q    Dawn Services, LLC, is a different
14  company than Aegean Dawn, LLC, correct?
15     A    Aegean Dawn is an affiliate company
16  of Dawn Services.
17         MR. ALTMYER:
18           Strike as nonresponsive.
19         MR. REISMAN:
20           It's not nonresponsive.
21  EXAMINATION BY MR. ALTMYER:
22     Q    Dawn Services, LLC, is a different
23  company than Aegean Dawn, LLC, correct?
24         MR. REISMAN:
25           I'm going to object to your

Page 156

1  commentary.  He's answered the question.
2  You didn't like it.  You made a
3  statement.  His answer is his answer.
4  EXAMINATION BY MR. ALTMYER:
5     Q    Are you aware, one way or another,
6  if Dawn Services, LLC, is a member of Aegean
7  Dawn, LLC?
8     A    I'm not sure.
9     Q    Okay.  But just to confirm, Aegean
10  Dawn, LLC, is the owner of the M/G -- of the
11  M/V AEGEAN DAWN, correct?
12     A    The M/G?
13     Q    The M/V.
14     A    M/V, yeah.
15     Q    Yeah.  M/V AEGEAN DAWN, correct?
16     A    Yes.
17     Q    Okay.  So with that, Dawn Services,
18  LLC, is not the owner of the M/V AEGEAN DAWN,
19  correct?
20         MR. REISMAN:
21           Object to the form.  Asked and
22  answered.
23         THE WITNESS:
24           It's a Dawn vessel.
25         MR. ALTMYER:

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 157

1    I'm going to strike as
2    nonresponsive.
3    EXAMINATION BY MR. ALTMYER:
4        Q    Dawn Services, LLC, as the entity
5    itself, is not the entity that owns the
6    M/V AEGEAN DAWN, correct?
7        A    Yes.
8        Q    Okay.  Next one, we have Gulf Dawn,
9    LLC.  If we look to Exhibit 128, under
10   4200-horsepower class, we have the M/V GULF
11   DAWN shown there, correct?
12       A    Yes.
13       Q    Okay.  Is the M/V GULF DAWN owned
14   by Gulf Dawn, LLC?
15       A    It -- the owners of Dawn Services
16   own the Gulf Dawn.
17       Q    Does Gulf Dawn, LLC, --
18           MR. ALTMYER:
19           I'm going to strike it as not
20   responsive.
21   EXAMINATION BY MR. ALTMYER:
22       Q    Does Gulf Dawn, LLC, own the M/V
23   GULF DAWN?
24           MR. REISMAN:
25           Hang on a second.  You don't

Page 158

1    have the right to strike his answers, so
2    don't tell him that you're striking his
3    answers.
4            MR. ALTMYER:
5            I'm just saying --
6            MR. REISMAN:
7            Now, hang on.  Hang on a
8    second.  I'm speaking.  You have told
9    him now a couple of times that you're
10   striking his responses.  You're not
11   entitled to do that.  His responses are
12   his responses, whether you like them or
13   you don't like them.  So I'm going to
14   ask you, please, refrain from telling
15   him that, because you're misleading the
16   witness if you are suggesting to him
17   that his answer is being stricken from
18   the record.  Because it most assuredly
19   is not.  And I think that's very
20   misleading, and I would ask you to
21   please stop doing that.
22           MR. ALTMYER:
23           Okay.  Are you objecting to me
24   objecting to a question that's
25   nonresponsive?

Page 159

1            MR. REISMAN:
2            I'm objecting to the statements
3    you've made.  They're inappropriate.
4    They're invalid, and they're not
5    enforceable, and all they do is mislead
6    the witness.
7            MR. ALTMYER:
8            I think it's fair for me to
9    object to a response as nonresponsive.
10   I'm not trying to mislead you, in any
11   which way, I can assure you of that.
12   I'm just reserving my right to reask the
13   question.
14           MR. REISMAN:
15           You can reask the question, but
16   you can't strike his answer.
17           MR. ALTMYER:
18           I don't think that I have
19   grounds to strike his answer.  I think
20   that's for a court to rule on.
21           MR. REISMAN:
22           We've reached some common
23   ground then, but that's not --
24           MR. ALTMYER:
25           When I say, "Strike a

Page 160

1    question," I'm simply asserting my own
2    objection to it.  So my apologies if you
3    think that I am striking your response
4    on that.  I'm simply reserving my right
5    to reask the question, sir.
6    EXAMINATION BY MR. ALTMYER:
7        Q    Anyways, where we left off, the
8    M/V GULF DAWN is owned by Gulf Dawn, LLC,
9    correct?
10       A    Yes.
11       Q    And Dawn Services, LLC, as an
12   entity, does not own the M/V GULF DAWN?
13       A    It's an affiliate.
14       Q    I'll ask it this way.  The M/V GULF
15   DAWN is not owned directly by Dawn Services,
16   LLC?
17       A    Well, the owners that own Dawn
18   Services own Gulf Dawn, LLC.
19       Q    Is that the only basis that you
20   have to say that Dawn Services -- well, strike
21   the question.  I'm going to ask it again.
22   Dawn Services, LLC, separately, as an entity,
23   does not specifically own the M/V GULF DAWN?
24           MR. REISMAN:
25           Object to the form.  It's been

Pages 157 to 160

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 161

1    asked and answered.
2        THE WITNESS:
3            It is a vessel that we operate,
4    own and operate.  The owners of Dawn
5    Services own Gulf Dawn.  We operate the
6    GULF DAWN as a Dawn vessel.
7    EXAMINATION BY MR. ALTMYER:
8        Q    Are you aware, one way or the
9    other, of whether or not Dawn Services, LLC,
10   is a member of Gulf Dawn, LLC?
11       A    I'm not sure.
12       Q    And just to clarify your testimony,
13   is it Dawn's position that any ownership
14   interest that it may have in the M/V GULF DAWN
15   is based upon the fact that the owners of Dawn
16   Services are the same owners as Gulf Dawn,
17   LLC?
18       MR. REISMAN:
19           Hold on a second.  Which topic
20   are we on here?
21       MR. ALTMYER:
22           I think this goes out to a lot
23   of topics.
24       MR. REISMAN:
25           Okay.

Page 162

1        MR. ALTMYER:
2            I think it goes to when the
3    Master Vessel --
4        MR. REISMAN:
5            I'm just looking for something
6    that says what the ownership structure
7    of these vessels is.  If you can show me
8    that, I have no problem.  Where is that
9    on here?
10       MR. ALTMYER:
11           Well, he's testifying on behalf
12   of Dawn.
13       MR. REISMAN:
14           Just show me where that is on
15   here.
16       MR. ALTMYER:
17           It's not -- it's -- well, I'll
18   go over every single topic that I think
19   that it's on, David.
20       MR. REISMAN:
21           Okay.  I mean, anything that
22   says the ownership structure.  Because
23   you're asking him something that I think
24   is outside the bounds of this, that he's
25   not prepared for.

Page 163

1        MR. ALTMYER:
2            Well, I'm --
3        MR. REISMAN:
4            So, I mean, if it's on here,
5    fair game.  But if it's not, then it's
6    not.  So just show me where it says
7    ownership structure of the vessels.
8        MR. ALTMYER:
9            On here, Topic 5, the June 9,
10   2017 Master Vessel Time Charter between
11   Dawn and Shore, okay.
12       MR. REISMAN:
13           Yeah.
14       MR. ALTMYER:
15           No. 6, Dawn's position as to
16   the basis for its position as to when
17   the 2017 Master Vessel Time Charter
18   applies between Dawn and Shore, and as
19   to when it does not apply between Dawn
20   and Shore.
21       MR. REISMAN:
22           You can ask him those
23   questions, but that's not -- now you're
24   asking him about the ownership structure
25   of entities, and I don't think that

Page 164

1    fairly, or unfairly, falls within either
2    of those topics.
3        MR. ALTMYER:
4            The witness testified earlier
5    that the Master Vessel Time Charter
6    applies when Dawn owns the boat.
7        MR. REISMAN:
8            That's not what he said.  See,
9    when you ask him a question seven times,
10   and I object each time, after the first,
11   you know, you might get something
12   different.  But he gave you a much more
13   articulated answer the first time.
14       MR. ALTMYER:
15           Well, I'll say this, too.  On
16   15, insurance coverage for Shore's
17   claims against Dawn, this is a document
18   that was produced and I may be leading
19   into questions about whether or not it's
20   covered.
21       MR. REISMAN:
22           Well, then ask that, but don't
23   ask about who owns what, because that
24   doesn't bear on --
25       MR. ALTMYER:

Pages 161 to 164

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 165

```
 1          That leads into foundation,
 2  though.
 3          MR. REISMAN:
 4          It doesn't bear on ownership of
 5  it.  No, it doesn't.
 6          MR. ALTMYER:
 7          I disagree.
 8          MR. REISMAN:
 9          You're asking him for something
10  that's completely outside the bounds of
11  this, and's not prepared for it.  And
12  I'm sorry, but I mean, he's not going to
13  be able to answer your questions about
14  the ownership structure because you
15  didn't tell him that was something he
16  was expected to know.
17          MR. ALTMYER:
18          He's expected to know when the
19  Master Vessel Time Charter applies --
20          MR. REISMAN:
21          And he's told you.
22          MR. ALTMYER:
23          -- and when it doesn't.
24          MR. REISMAN:
25          And he's told you that.  And
```

Page 166

```
 1  you asked him several more times, and
 2  you may have gotten six additional
 3  answers.  But he gave you the first
 4  answer.  He told you; it applies when
 5  the charter, on its face, says it
 6  applies, period.
 7          MR. ALTMYER:
 8          All right.  I'm going to pose
 9  it like this.  Are you going to instruct
10  him not to answer further questions on
11  that?
12          MR. REISMAN:
13          Well, I don't think he's
14  capable of answering the questions on
15  that.  And I'm just going to ask you
16  again, show me anything on here that
17  says, "You be prepared to discuss the
18  ownership structure of these entities."
19          If it's on here -- listen,
20  Jacob I don't have this memorized; you
21  might.  If it's on here, I have no
22  problem.  He's going to answer the
23  questions.  He might say, "I don't
24  know," but he'll answer it.  But if it's
25  not on the topics, then I'm going to say
```

Page 167

```
 1  you need to move on.
 2          MR. ALTMYER:
 3          Areas of inquiry.  I'll start
 4  with No. 1.  Documents and records
 5  produced in discovery in this case.
 6          MR. REISMAN:
 7          Yeah.
 8          MR. ALTMYER:
 9          This is a document that was
10  produced in discovery in this case.
11          MR. REISMAN:
12          That's fine, but that doesn't
13  discuss the ownership interests of these
14  companies.
15          And as you just put it, who's a
16  member of what, that's not on here.  You
17  didn't ask him that in discovery.  If
18  you had asked him that in discovery and
19  that was your topic, then I think that
20  would be fair game.
21          But show me that interrogatory
22  or request for production that says the
23  ownership structure or membership
24  interests of each of these entities.
25  I'm not trying to be difficult.  I'm
```

Page 168

```
 1  just telling you that he's not prepared
 2  for this, and you can tell from his
 3  answers, he's not sure.  He's told you
 4  that.
 5          So you're trying to get him to
 6  say things that he doesn't know, and I
 7  don't think he should know this, based
 8  on these topics.
 9          MR. ALTMYER:
10          As the corporate representative
11  of Dawn, I think he should know whether
12  or not Dawn owns the boat or a different
13  company owns the boat.
14          MR. REISMAN:
15          He can tell you that.  You're
16  asking about who's a member of what
17  entities, and that's not on here.
18  That's not on here.
19          MR. ALTMYER:
20          I'll ask it that way then.
21          MR. REISMAN:
22          Well, I mean, I don't know what
23  it is you're going to ask.
24          MR. ALTMYER:
25          Because his testimony so far
```

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 169

1  has been -- well, it's actually led into
2  questions on that, because the witness
3  is the one that testified that they have
4  the same owners.
5      MR. REISMAN:
6          Just because you've asked that
7  doesn't mean that he's going to know
8  what the ownership structure of all
9  these entities is, and he's told you he
10  doesn't know.
11      MR. ALTMYER:
12          Well, then he can just tell me
13  that he doesn't know it.
14      MR. REISMAN:
15          I'm not going to let you sit
16  and ask him a bunch of questions that
17  aren't on the topics.
18      MR. ALTMYER:
19          Okay.  I think that they are
20  within the topics, and if we need to get
21  Judge Roby on the phone, --
22      MR. REISMAN:
23          Well, then get her on the
24  phone, because, I mean, I just don't see
25  that this is relevant.

Page 170

1          Let me see what he knows about
2  this, all right.  If he knows and he's
3  comfortable testifying -- but I can tell
4  you, he wasn't prepared, because I don't
5  think this is in the bounds, so --
6      MR. ALTMYER:
7          We can go off the record for a
8  second.
9          (Whereupon, a break was taken;
10  1:30 p.m. - 1:45 p.m.)
11  EXAMINATION BY MR. ALTMYER:
12      Q    All right, Mr. Grace, I'm going to
13  ask you a quick question real quick about an
14  answer that was provided in discovery.  It was
15  subject to an objection, but I'm going to read
16  the part after that.
17          "Subject to without waiving the
18  foregoing objections, vessels that are owned
19  and operated by Dawn and provided to Shore,
20  after June 9, 2017, were chartered to Shore
21  and are governed by the 2017 Master Vessel
22  Time Charter," okay.  Sitting here, as the
23  corporate representative of Dawn today, what
24  does the term "owned and operated by Dawn"
25  mean?

Page 171

1      MR. REISMAN:
2          You're asking him, in the way
3  that he's been using it and the way it
4  was used in the responses, not from a
5  legal standpoint, correct?
6  EXAMINATION BY MR. ALTMYER:
7      Q    From the way that you've been using
8  it.
9      A    Owned and operated, "operated"
10  means that we provide the crews, we control
11  the vessel, we possess the vessel, we insured
12  the vessel.  We had complete control of the
13  vessel, what that vessel did.
14      Q    Okay.  Specific to the word
15  "owned," as it's been used so far from your
16  testimony today, can you clarify what you mean
17  by the word "owned"?
18      A    When I talk about the word "owned,"
19  I'm referring to it in the contract as -- but
20  it clearly states that we operated the vessel,
21  we controlled the vessel.  We provided
22  insurance on the vessel.
23      MR. REISMAN:
24          Can I help you?
25      MR. ALTMYER:

Page 172

1          Yes.
2      MR. REISMAN:
3          He heard that.  So he's asked
4  you a question with two parts.
5      THE WITNESS:
6          Okay.
7      MR. REISMAN:
8          Owned and operated.  You've
9  addressed "operate."
10      THE WITNESS:
11          Right.
12      MR. REISMAN:
13          What he wants to know now is
14  when you referred to vessels that were
15  owned by Dawn, are you referring to
16  vessels that are owned 100 percent by
17  Dawn Services, LLC, or by Dawn's
18  affiliates or something else?
19      MR. ALTMYER:
20          By Dawn's affiliates.
21      THE WITNESS:
22          By Dawn or its affiliates.
23      MR. ALTMYER:
24          By Dawn's affiliates, yeah.
25      THE WITNESS:

Pages 169 to 172

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 173

1      Okay.
2  EXAMINATION BY MR. ALTMYER:
3      Q    So just for clarity, it's Dawn's
4  position that Dawn Services, LLC, does not
5  have to be the direct owner of a vessel in
6  order for the 2017 Master Vessel Time Charter
7  to apply?
8      A    We operated Dawn vessels, so we
9  controlled them. We possessed them. We
10 insured them. We hired the crews. We
11 provided insurance for the crews. They were
12 part of Dawn Services.
13     Q    Okay. I'm talking about just
14 actual ownership of the vessel, though. I'll
15 include that part as part of operations. I
16 just want to know, actual ownership by Dawn
17 Services, LLC. That is not a requirement in
18 order for the 2017 Master Vessel Time Charter
19 to apply?
20     A    No, because it talks about
21 controlling the vessel, possessing the vessel.
22 We had all that.
23     Q    Okay. So just generally speaking,
24 and then we'll go through the list of
25 entities, because I just want to line them up

Page 174

1  with the website photo. But it's Dawn's
2  position today that, in the entities that we
3  looked at earlier, the list, that one of those
4  entities could be the actual owner of a vessel
5  that's shown as part of Dawn's fleet, on
6  Dawn's website, but the Master Vessel Time
7  Charter still applies to providing that vessel
8  to Shore?
9      A    Could you repeat the question,
10 please?
11     Q    Yeah, yeah. In the list of
12 entities that we looked at earlier on Dawn
13 407, --
14     A    Okay.
15     Q    -- aside from Dawn Services -- I'm
16 not talking about Dawn Services, LLC -- any of
17 those other entities listed there, is it
18 Dawn's position that any of those entities
19 could be the actual owner of a vessel that's
20 provided, under the 2017 Master Vessel Time
21 Charter?
22     A    Yes. Those vessels were under the
23 Master Vessel Time Charter.
24     Q    Okay. And that's all I want to do
25 is just line up with the document on 407, to

Page 175

1  Exhibit 128, which is the website screenshot
2  of the vessels. So Gulf Dawn, LLC, is the
3  owner of the M/V GULF DAWN, correct?
4      A    Yes.
5      Q    Okay. Break of Dawn, Inc., is the
6  owner of the M/V BREAK OF DAWN, correct?
7      A    Yes.
8      Q    And that's under the
9  3600-horsepower class?
10     A    Yes.
11     Q    On Exhibit 128?
12     A    Yes.
13     Q    All right. My apologies. I'm
14 going to flip to my copy real quick. All
15 right. And then we've got the M/V ATLANTIC
16 DAWN listed under 4200-horsepower class. That
17 is owned pilot Atlantic Dawn, LLC, correct?
18     A    Yes.
19     Q    Then we've got Pacific Dawn, LLC.
20 The PACIFIC DAWN is also shown on Exhibit 128,
21 under the 4200-horsepower class, correct?
22     A    Yes.
23     Q    All right. And Pacific Dawn, LLC,
24 is the owner of that vessel?
25     A    Yes.

Page 176

1      Q    Okay. Now I see Arctic Dawn, LLC,
2  is listed in the group of entities. That was
3  one of the boats that we talked about earlier
4  that wasn't shown on the website, right?
5      A    That would have been -- we had a
6  vessel called the ARCTIC DAWN at one point,
7  but we had sold that a long time ago.
8      Q    Oh, okay. So that's a new vessel
9  called the ARCTIC DAWN?
10     A    Correct.
11     Q    That's been acquired after October
12 28, 2020?
13     A    Correct.
14     Q    Gotcha. So I'm going to stick with
15 just the ones that are shown on the website
16 then. For Bayou Dawn, LLC, they are the owner
17 of the M/V BAYOU DAWN that's shown under the
18 2400-horsepower class, correct, on Exhibit
19 128?
20     A    Yes.
21     Q    The M/V COASTAL DAWN that's shown
22 next to it, under 2400-horsepower class,
23 that's owned by Coastal Dawn, LLC, correct?
24     A    Yes.
25     Q    All right. Let's go down to the

Pages 173 to 176

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 177

1    BERING DAWN, which is under the
2    4200-horsepower class.  That's owned by Bering
3    Dawn, LLC, right?
4        A    Yes.
5        Q    Under 6000-horsepower class, you've
6    got the M/V INDIAN DAWN, which is owned by
7    Indian Dawn, LLC, right?
8        A    Yes.
9        Q    And then, let's look at the
10   SOUTHERN DAWN, which is under the
11   9000-horsepower class.  That's owned by
12   Southern Dawn, LLC, right?
13       A    Yes.
14       Q    Are you aware of which entity owns
15   the M/V CARIBBEAN DAWN?
16       A    Southern Dawn.
17       Q    Are you aware of which entity owns
18   the M/V CASPIAN DAWN?
19       A    Southern Dawn.
20       Q    Are you aware of which entity owns
21   the newly named ARCTIC DAWN?
22       A    Mediterranean Dawn.
23       Q    And that's Mediterranean Dawn, LLC?
24       A    Yes.
25       Q    This probably goes without

Page 178

1    question, but does Mediterranean Dawn, LLC,
2    also own the M/V MEDITERRANEAN DAWN?
3        A    Yes.
4        Q    So irrespective of the vessels that
5    we just discussed ownership, it's Dawn's
6    position here today that the 2017 Master
7    Vessel Time Charter applies to Dawn providing
8    those vessels to Shore?
9        MR. REISMAN:
10           Which vessels?
11       MR. ALTMYER:
12           I'll repeat, yeah.
13       MR. REISMAN:
14           No problem.  Don't answer.
15       There's not a question yet.
16       THE WITNESS:
17           I understand.
18   EXAMINATION BY MR. ALTMYER:
19       Q    Irrespective of the ownership of
20   the vessels that we just discussed, and that's
21   the vessels that are shown on, that are listed
22   on Exhibit 128, screenshot from the website,
23   irrespective of the ownership of those
24   vessels, it's Dawn's position that the 2017
25   Master Vessel Time Charter would apply after

Page 179

1    June 9, 2017, if any of those vessels were
2    provided to Shore?
3        A    Correct, because we control them.
4    We operated them.  We crewed them.  We insured
5    them.  We had complete control of those
6    vessels.  We possessed them.
7        Q    Even if Dawn Services, LLC, did not
8    specifically own those vessels?
9        A    We operated those vessels, yes.
10       MR. PALMINTIER:
11           Can't hear the witness.
12       MR. REISMAN:
13           What was that?
14       MR. PALMINTIER:
15           Can't hear the witness.
16       MR. REISMAN:
17           Okay.  Yeah, maybe move that
18       back towards the middle.  Just say your
19       name.  And tell us if you can hear him
20       now.
21       THE WITNESS:
22           Mike Grace.
23       MR. REISMAN:
24           Were you all able to hear that?
25       MS. DANTIN:

Page 180

1            Yes.
2        MR. REISMAN:
3            Okay, thank you.  Again, let us
4        know if there's an issue.
5        MR. ALTMYER:
6            Madam court reporter, can you
7        please repeat the question.
8        THE COURT REPORTER:
9            Question:  Even if Dawn
10       Services, LLC, did not specifically own
11       those vessels?
12           Answer:  We operated those
13       vessels, yes.
14   EXAMINATION BY MR. ALTMYER:
15       Q    Okay.  So if Dawn Services operated
16   the vessel, then irrespective of ownership,
17   irrespective of Dawn Services, LLC's ownership
18   of those vessels, it's Dawn's position that
19   the Master Vessel Time Charter would apply?
20       MR. REISMAN:
21           Object to the form.
22       THE WITNESS:
23           Could you ask it again, please?
24   EXAMINATION BY MR. ALTMYER:
25       Q    Yeah, yeah.  So irrespective of

Pages 177 to 180

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 181

1    whether Dawn Services, LLC, was the direct
2    owner of any of the vessels that we just
3    discussed, as shown on Exhibit 128, it's
4    Dawn's position that because Dawn operated
5    those vessels, that the Master Vessel Time
6    Charter applies, correct?
7        MR. REISMAN:
8            Object to the form.
9        THE WITNESS:
10           We operated those vessels. We
11       controlled those vessels. We possessed
12       those vessels. We insured the vessels.
13       The vessels were on the Certificate of
14       Insurance. We employed the crews, the
15       wheelhouse. Everything that we did, we
16       operated those vessels, we controlled
17       them.
18   EXAMINATION BY MR. ALTMYER:
19       Q    Okay.
20       A    The other vessels were all brokered
21   vessels.
22       Q    I'll ask it this way. After
23   June 9, 2017, if Dawn Services provided Shore
24   any of the vessels that are shown on Exhibit
25   128, and also including the M/V ARCTIC DAWN

Page 182

1    and the M/V MEDITERRANEAN DAWN, if any of
2    those vessels were provided to Shore after
3    June 9, 2017, it's Dawn's position that the
4    Master Vessel Time Charter would apply,
5    correct?
6        A    Yes, because of all the things that
7    I've listed out beforehand.
8        Q    Okay. And following up on that
9    question, that is irrespective of whether or
10   not Dawn Services, LLC, is the direct owner of
11   any of the vessels that are shown on Exhibit
12   128?
13       MR. REISMAN:
14           Object to the form. The use of
15       "direct owner." He's told you that it
16       was affiliates of Dawn that were the
17       owners. I don't know whether that's
18       direct or indirect. I don't know what
19       that means.
20   EXAMINATION BY MR. ALTMYER:
21       Q    Are you aware of, one way or the
22   other, of whether or not Dawn Services
23   directly owned -- and when I say directly
24   owned, I mean, is the entity within which the
25   asset is held. Are you aware, one way or

Page 183

1    another, of whether or not Dawn Services
2    directly owned any of the vessels that are
3    shown on Exhibit 128?
4        MR. REISMAN:
5            Object to the form.
6        THE WITNESS:
7            Again, it goes back to the
8        contract. We operated them.
9        MR. REISMAN:
10           Answer the question he's
11       asking. Subject to my objection, answer
12       what he's asking you.
13       THE WITNESS:
14           Could you repeat the question,
15       please?
16       MR. ALTMYER:
17           Yeah.
18       MR. REISMAN:
19           Same objection, in advance, so
20       I won't interfere with the question.
21   EXAMINATION BY MR. ALTMYER:
22       Q    Are you aware, one way or the
23   other, of whether or not Dawn Services, LLC,
24   directly owned -- and I don't mean is an
25   affiliate of or anything like that -- Dawn

Page 184

1    Services, LLC, is the company that holds the
2    asset for any of the vessels that are shown on
3    Exhibit 128?
4        A    I'm not 100 percent sure.
5        Q    Okay. What is your understanding,
6    here today?
7        A    My understanding is that John
8    Charpentier and Kenny Charpentier own the
9    vessels.
10       Q    And whether or not that's through
11   Dawn Services or through a different company,
12   that's not something that you know?
13       A    They're all affiliated.
14       Q    Okay. They're all affiliated
15   companies?
16       A    Yes.
17       Q    Okay. I want to look back to -- I
18   think it's the Master Vessel Time Charter.
19   I'm not sure exactly what exhibit that was.
20       A    127.
21       Q    127, okay. I do want to just
22   confirm something real quick. On the first
23   page, 388, Master Vessel Time Charter, it
24   says, "This Master Vessel Time Charter,"
25   defined, the agreement or charter, "is made

Pages 181 to 184

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 185

1    and entered into on this" -- I believe that's
2    supposed to be a 9 -- "9 day of June, 2017,"
3    definition, effective date, "by and between
4    Dawn Services, LLC," hereinafter referred to
5    as OWNER, all caps, "and Shore Offshore
6    Services, LLC," hereinafter referred to as
7    CHARTERER, all caps, right?
8        A    Yes.
9        Q    Okay.  There's a blank, right, and
10   "Dawn Services, LLC," is written in, correct?
11       A    Yes.
12       Q    Okay.  That says, "Dawn Services,
13   LLC," right?
14       A    Yes.
15       Q    It does not say, "Dawn Services,
16   LLC, and its affiliates," correct?
17       A    No, but it also says down here,
18   "Whereas, owner has vessel."  We had those
19   vessels.  We controlled those vessels.
20       Q    But let's ask you about that real
21   quick.  So it's Dawn's position that having a
22   vessel does not necessarily mean that that
23   vessel is an asset that is directly owned by
24   Dawn Services, LLC?
25           MR. REISMAN:

Page 186

1           I'm going to object to the
2       form, to the extent that you're asking
3       him to provide a legal interpretation of
4       this contract.  He's told you what his
5       understanding of it is.  He can't give
6       you more than that.  And I'm going to
7       instruct him to not try and give
8       legal -- you're asking him to rule and
9       take the court's position on what the
10      contract means.  He's told you what he
11      thinks.  He can do no more than that.
12   EXAMINATION BY MR. ALTMYER:
13       Q    And what I'll do is I'll follow up
14   on the testimony that you just said about the
15   owner having the vessel.  Tell me what you
16   meant by that.  What does it mean when Dawn
17   Services, LLC, has a vessel?
18       A    When we have a vessel, we control
19   it.  We operate it.  We employ the crews.  We
20   provide the insurance.
21       Q    And when you say, "have a vessel,"
22   does --
23           MR. RUFTY:
24           I'm sorry to interrupt, but
25       this is Alfred Rufty.  We're still

Page 187

1    having a volume problem.
2           MR. REISMAN:
3           Is it just Mike that you can't
4       hear, Alfred?
5           MR. RUFTY:
6           No, it's -- everybody is low
7       volume.
8           (Whereupon, a break was taken
9       to address the issue with the Zoom
10      volume; 2:03 p.m. - 2:28 p.m.)
11          MR. ALTMYER:
12          Back on the record.  There's
13      one document we've looked at that I
14      didn't formally mark as an exhibit, so I
15      just want to do that now.  That's Dawn
16      405 through Dawn 414, and that was the
17      insurance policy that we were looking at
18      earlier.  So that's going to be
19      "Exhibit 131."
20   EXAMINATION BY MR. ALTMYER:
21       Q    Okay.  Mr. Grace, when we left off,
22   we were talking about the 2017 Master Vessel
23   Time Charter and specifically the sentence on
24   it, "Whereas, owner has a vessel or vessels
25   which from time to time it commits to the

Page 188

1    service of others in exchange for a fee," and
2    then it says, defined as VESSEL, capitalized.
3    We were talking about the phrase, "Owner has a
4    vessel."  So I just want to clarify real quick
5    that Dawn's interpretation of this sentence is
6    that Dawn Services, LLC, does not have to be
7    the actual legal entity that owns a vessel in
8    order for the Master Vessel Time Charter to
9    apply?
10          MR. REISMAN:
11          Object to the form.  Asked and
12      answered, and to the extent you're
13      calling for a legal conclusion.  He's
14      not qualified to do that.  The contract
15      speaks for itself and will be
16      interpreted by the court, not by the
17      parties.
18          THE WITNESS:
19          Dawn and its affiliates have
20      the vessel.
21   EXAMINATION BY MR. ALTMYER:
22       Q    So whether or not it's Dawn
23   Services, LLC, the entity, or an affiliate of
24   Dawn Services, LLC, that owns one of the
25   vessels that we looked at in Exhibit 128, it's

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 189

1  Dawn's position that the Master Vessel Time
2  Charter applies?
3      A    Yes.
4      Q    Okay.  So let's put it this way.
5  If the M/V BREAK OF DAWN -- I used that one
6  because I think it's a good name --
7      A    Yeah.
8      Q    If the M/V BREAK OF DAWN is owned
9  by Break of Dawn, Incorporated, directly, and
10 it is not owned directly by Dawn Services,
11 LLC, it's Dawn's position that the Master
12 Vessel Time Charter from 2017 would apply
13 still, to providing the M/V BREAK OF DAWN to
14 Shore?
15     MR. REISMAN:
16         Object to the form.  There are
17     other criteria, but I mean, if you're
18     just limiting it to --
19     THE WITNESS:
20         Dawn controlled, Dawn operated,
21     Dawn employed, Dawn insured the BREAK OF
22     DAWN, so it would apply to the Master
23     Vessel Time Charter.
24 EXAMINATION BY MR. ALTMYER:
25     Q    Okay.  And just to clarify, that's

Page 190

1  even if the Break of Dawn, Incorporated, was
2  the actual owner of the M/V BREAK OF DAWN?
3      MR. REISMAN:
4          Object to form.
5      THE WITNESS:
6          Well, it's an affiliate.  It's
7      an affiliate.
8  EXAMINATION BY MR. ALTMYER:
9      Q    Yeah, yeah.  So it's an affiliated
10 company of Dawn Services, LLC?
11     MR. REISMAN:
12         Object to the form.
13 EXAMINATION BY MR. ALTMYER:
14     Q    The Break of Dawn, Inc., is an
15 affiliated company of Dawn Services, LLC?
16     MR. REISMAN:
17         It's an affiliate.
18     MR. ALTMYER:
19         An affiliate.
20     THE WITNESS:
21         Yes, it's an affiliate of Dawn
22     Services.
23 EXAMINATION BY MR. ALTMYER:
24     Q    Okay.  So if Break of Dawn, Inc.,
25 is the company that actually owns the

Page 191

1  M/V BREAK OF DAWN, but as you said, Dawn
2  Services, LLC, is the company that's operating
3  the vessel, it's Dawn's position that if that
4  boat was provided to Shore after June 9, 2017,
5  that the Master Vessel Time Charter would
6  apply?
7      A    Yes.
8      Q    Okay.  So simply what I'm getting
9  at is, if one of Dawn's vessels that's shown
10 on Exhibit 128 is owned by one of its
11 affiliates, not directly by Dawn Services,
12 LLC, but if it's operated by Dawn Services,
13 LLC, and it's provided to Shore after the date
14 of this Master Vessel Time Charter, the Master
15 Vessel Time Charter applies?
16     A    Wait.  Could you repeat that
17 question one more time?
18     Q    Yeah.  So if one of the affiliated
19 companies that we looked at earlier on the
20 insurance policy, it was on Page Dawn 407, if
21 one of those companies actually owns the
22 vessel, but Dawn is the one operating the
23 vessel, if one of those boats is provided to
24 Shore after June 9, 2017, it's Dawn's position
25 that the Master Vessel Time Charter would

Page 192

1  apply to the furnishing of that vessel to
2  Shore?
3      A    Yes, because we operated the
4  vessel.
5      Q    Okay.  And that's all I'm trying to
6  get at.  If it's one of the affiliated
7  companies that owns it, that's fine.  That
8  goes -- the Master Vessel Time Charter still
9  applies?
10     A    Yes.
11     Q    Okay.  Dawn Services, LLC, does not
12 have to be the entity that directly owns the
13 vessel?
14     A    No, because we controlled.
15     Q    Okay.  So control is the --
16     A    Control, possessed, employed,
17 insured.
18     Q    Okay.  Understood, got it.  I'm
19 going to move topics.  I just want to talk
20 about brokering, in general.  When Dawn is
21 brokering any vessel, does Dawn do any
22 inspection of the vessel that it's providing
23 to a customer?
24     A    Could you clarify that question?
25     Q    Yeah.  Does Dawn do any inspection

Pages 189 to 192

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 193

1  of the vessel that it's providing to a
2  customer, when Dawn's brokering a vessel?
3      A    No.  We just merely put our
4  customer, Shore, in contact with the vessel
5  owner.
6      Q    Okay.  So just to clarify, no
7  inspection is done?
8      A    No inspection is done.
9      Q    By Dawn?
10     A    By Dawn.
11     Q    To preview a little bit, I'm going
12 to ask like similar questions like that so I
13 understand what your answer is.  And if you
14 want to just do "yes" or "no," that's up to
15 you.  Does Dawn discuss with the vessel's
16 owner about the job to be performed and
17 whether the owner believes that the vessel to
18 be provided to a customer would be fit to
19 perform that job?  And I'm talking about when
20 you're brokering a boat.
21     A    Could you repeat the question.
22     Q    Yeah.  Does Dawn discuss with the
23 vessel's owner about the job that's going to
24 be performed and whether the owner believes
25 that the vessel to be provided would be fit to

Page 194

1  perform that job?
2      A    Shore would come to us and give a
3  job description.  I would go out to the vessel
4  owner and discuss it with them.  And the
5  vessel owner would agree or disagree with the
6  job.
7      Q    Okay.  So it was up to the vessel
8  owner to decide whether or not their vessel
9  could handle the job?
10         MR. REISMAN:
11             Object to the form.  In the
12     first instance or overall?
13         MR. ALTMYER:
14             Overall.  I'm just talking
15     about just generally, the situation of
16     when Dawn is brokering a boat.
17         THE WITNESS:
18             Dawn would -- I'm getting
19     confused.  Could you go back to the
20     original question?
21 EXAMINATION BY MR. ALTMYER:
22     Q    Yeah.  When Dawn is brokering a
23 boat?
24     A    Right.
25     Q    So I'm going to ask a series of

Page 195

1  questions.  I'm talking about when Dawn
2  brokering the boat.  Does Dawn discuss with
3  the third-party owner of the vessel, No. 1,
4  the job to be performed?
5      A    Yes.
6      Q    Okay.  Does Dawn discuss with the
7  third-party vessel owner whether or not that
8  owner believes that the vessel that it's going
9  to provide is sufficient to perform that job?
10     A    Yes.
11     Q    Okay.
12     A    When you say "sufficient," what are
13 you trying to --
14     Q    I'll throw an example out there.
15     A    Okay.
16     Q    If Shore requested an anchor
17 handling tug, --
18     A    Okay.
19     Q    -- and then you go to a third party
20 and say, "Do you have any anchor handling tugs
21 available," do you then discuss with them
22 whether or not the tugs that they offer are
23 going to be able to perform that work?
24     A    I would go -- in this particular
25 instance, Shore requested an anchor handling

Page 196

1  tug to handle the THOR.  They wanted a big
2  tug.  So when I went to Crosby, I explained to
3  them, the derrick barge that they were going
4  to be working for and the job details.  Kurt
5  Crosby then called Tommy Gibilterra to discuss
6  it, and what was proposed, the CROSBY
7  ENDEAVOR.
8      Q    Okay.  So I guess what I'm getting
9  at is just even generally, in the just general
10 terms of brokering, the customer tells you
11 what the job's going to be, right?
12     A    Correct.
13     Q    And then what I'm trying to get at
14 is do you then convey to a third-party vessel
15 owner -- for instance, you're going to be
16 working for the D/B THOR; it's a big derrick
17 barge.  They need a big tug.  "We're going to
18 need a tug of a certain size"?
19         MR. REISMAN:
20             Object to the form.
21         THE WITNESS:
22             I never say, this is the size
23     tug we need.
24 EXAMINATION BY MR. ALTMYER:
25     Q    Okay.  That's something that you

Pages  193 to 196

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 197

1    just describe whatever is conveyed to you from
2    your customer --
3        A    Customer.
4        Q    -- to whoever the third-party
5    vessel owner is, and then you leave it to them
6    to decide what vessel that they're going to
7    provide for that work?
8        A    Right.  They make the decision on
9    what vessel they're going to provide.
10       Q    Okay.  And "they" is the --
11       A    The third party.
12       Q    -- third-party vessel owner.
13   That's all I'm trying to get at.  When
14   brokering a vessel, does Dawn discuss with the
15   vessel's owners about the vessel's crew and
16   their experience?
17       A    No.  The vessel owner makes that.
18       Q    When brokering a vessel, does Dawn
19   confirm with the vessel's owner whether all
20   wheelhouse personnel possess valid and current
21   U.S. Coast Guard licenses.
22       A    Could you repeat the question?
23       Q    Yeah.  When Dawn is brokering a
24   vessel, from a third-party vessel owner, does
25   Dawn confirm with the vessel's owner whether

Page 198

1    or not all wheelhouse personnel possess valid
2    and current Coast Guard licenses?
3        A    Dawn just tells them the
4    description of the job that was relayed to
5    them by the customer.  The vessel owner makes
6    the determination, because they're the ones
7    going to be working for -- they're the ones
8    that are going to have the mutual agreement
9    between themselves and Shore.
10       Q    So I'm just trying to ask whether
11   or not -- is that a conversation that you
12   have?  Do you ask the third party, "Look, do
13   all the guys that are going to be in the
14   wheelhouse on this vessel, have their valid
15   and current Coast Guard license"?
16       A    I don't think the third-party
17   company would put a vessel out there if they
18   didn't think they had the capability of doing
19   it.
20       Q    Okay.  I'm just asking you whether
21   or not you asked that question.
22       A    I understand.  I understand, but I
23   would -- I would believe that they had valid
24   Coast Guard licenses to do the job.
25       Q    Okay.  Notwithstanding your belief,

Page 199

1    is that something that you generally ask of a
2    third-party vessel owner?
3        MR. REISMAN:
4            Object to the form.
5        THE WITNESS:
6            Could you repeat the question,
7        please?
8    EXAMINATION BY MR. ALTMYER:
9        Q    Yeah.  Is that a topic or an
10   inquiry that you generally ask a third-party
11   vessel owner, when Dawn is brokering a boat,
12   specifically, if whether or not all wheelhouse
13   personnel possess valid and current Coast
14   Guard licenses.
15       MR. REISMAN:
16           Object to the form.  You can
17       answer it if you can.
18       THE WITNESS:
19           When I call a vessel owner for
20       a specific job, it is the vessel owner's
21       responsibility to make sure that they
22       have valid Coast Guard licenses.
23   EXAMINATION BY MR. ALTMYER:
24       Q    Okay.  I'll ask it this way.
25   Discussing whether or not the crew or

Page 200

1    personnel that are going to be in the
2    wheelhouse of a vessel that's provided when
3    Dawn is brokering a vessel, asking about
4    whether or not those personnel have valid and
5    current U.S. Coast Guard licenses is not
6    something that you generally do?
7        A    I'm a broker.  I'm a broker when
8    we're going after third-party, working with a
9    third-party company.
10       Q    I'm just asking you whether or not
11   you ask them the question or not.  I'm not
12   trying to pin you down on anything.  I'm just
13   asking if that's a question that you generally
14   ask.
15       A    No.
16       Q    Okay.  This whole line of
17   questioning is going to be very similar to
18   that, and I'm talking strictly about when
19   Dawn's brokering a boat.  Does Dawn provide
20   its safety management system manual to vessel
21   owners to whom it's brokering their boats?
22       A    No, because they have their own
23   vessel safety management system.
24       Q    Okay.  Does Dawn discuss its safety
25   policies with vessel owners for whom it is

Pages 197 to 200

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 201

1   brokering its boats?
2       A    Wait, repeat that again.
3       Q    Yeah.  Does Dawn discuss Dawn's
4   safety policies with the third-party vessel
5   owner when it's brokering a third-party vessel
6   owner's boat?
7            MR. REISMAN:
8                Which topic are we on now?
9            MR. ALTMYER:
10               Discussions -- Dawn's policies
11           and procedures in place in October 2020
12           to differentiate circumstances where
13           Dawn is acting as a broker versus where
14           Dawn is acting as a charterer, and when
15           making arrangements to provide a
16           customer like Shore with a vessel.
17           MR. REISMAN:
18               This isn't differentiation.
19           You're asking, what does he do, and not
20           to his policies and procedures.  You're
21           asking him if he does it.
22           MR. ALTMYER:
23               Well, I haven't gotten to how,
24           what he does differently when he
25           charters a boat.

Page 202

1            MR. REISMAN:
2                All right.
3   EXAMINATION BY MR. ALTMYER:
4       Q    Does Dawn discuss Dawn's safety
5   policies with vessel owners, third-party
6   vessel owners, when it provides one of those
7   third-party vessel owners to one of Dawn's
8   customers?
9       A    Wait.  You're confusing me here.
10  So if you can shorten it up or --
11      Q    Yes.  Does Dawn, when it's
12  brokering a vessel, discuss Dawn's safety
13  policies with the third-party vessel owner
14  that Dawn is brokering a boat for?
15           MR. REISMAN:
16               Object to the form.
17           THE WITNESS:
18               Dawn -- Dawn's safety
19           management policy or policies wouldn't
20           apply with brokered vessels.
21           MR. REISMAN:
22               Did you say would or would not?
23           THE WITNESS:
24               Would not.  We're not -- we're
25           not controlling these vessels.  So we're

Page 203

1   not possessing these vessels.  We're not
2   doing anything -- we're not operating
3   these vessels.  We're just merely a
4   broker.
5   EXAMINATION BY MR. ALTMYER:
6       Q    And all I'm asking is whether or
7   not you had the communication with them or not
8   about that.
9            MR. REISMAN:
10               Just answer his question.
11           THE WITNESS:
12               No.
13  EXAMINATION BY MR. ALTMYER:
14      Q    Okay.  When Dawn provides one of
15  its customers with a third-party vessel, when
16  it brokers a boat, what is Dawn's level of
17  involvement from that point forward between
18  the vessel owner and Dawn's customer?
19           MR. REISMAN:
20               Object to the form.
21           THE WITNESS:
22               When -- wait, just repeat --
23           now we're talking operationally?
24  EXAMINATION BY MR. ALTMYER:
25      Q    Yeah, yeah.

Page 204

1       A    Operationally, Shore, in this
2   instance, would tell us where, what type of
3   job they're looking -- what they're looking
4   for.
5            MR. REISMAN:
6                Hang on a second.  I object to
7            the form, because I really didn't
8            understand the question.  You said
9            something about, from some point on, but
10           I don't think it was clear and I don't
11           know that -- he's going backwards.  I
12           think you meant forwards.
13           MR. ALTMYER:
14               Yeah.
15  EXAMINATION BY MR. ALTMYER:
16      Q    I'm talking about when Dawn's
17  brokering a boat.
18      A    Right.
19      Q    And let's say, after an on-hire is
20  issued, what is Dawn's level of involvement
21  after that, between the third-party vessel
22  owner and Dawn's customer?
23           MR. REISMAN:
24               After -- after the on-hire
25           letter is sent out?

Pages 201 to 204

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 205

1  EXAMINATION BY MR. ALTMYER:
2      Q    After the on-hire, yeah.
3      A    Very minimal, because once the
4  vessel gets to the location and its working
5  with the D/B THOR, they're working as
6  directed.  The barge is -- the barge is
7  directing the tug what to do.
8      Q    Okay.  And then, so let's say --
9  let's take it back and specifically to an
10  instance to where the work would commence
11  before an on-hire is issued.  What is Dawn's
12  level of involvement in that scenario?
13      A    It would just really only tell the
14  vessel owner where the vessel needed to go to
15  report to.
16      Q    Okay.  So would that type of
17  information include ETAs?
18      A    Sometimes.
19      Q    If there are logistical delays with
20  a third-party vessel, is that something that
21  you would convey to one of your customers?
22      A    Sometimes.
23      Q    Okay.  If there was additional
24  costs associated with logistical delays, is
25  that something that you would communicate with

Page 206

1  one of your customers?
2      A    What do you mean by additional
3  costs?
4      Q    So let's say it's going to take
5  longer for a vessel to get to a certain
6  position and they're on an hourly rate.  Is
7  that something that you would communicate to
8  your customer?
9      A    I mean, is there something specific
10  that you're looking for?  Like, as far as like
11  a specific time?
12      Q    No, I'm just wondering -- all
13  right.  So, look, we just discussed about, if
14  there's delays, then that's something that
15  you're going to communicate to your customer,
16  right?
17      A    Sometimes.  The boat might be able
18  to communicate with our customer, as well, or
19  the boat owner, vessel owner.
20      Q    Absolutely.  I'm just talking about
21  generally.  I'm not talking about any specific
22  instance.  Is that something that is a
23  communication that has happened before?
24      MR. REISMAN:
25          Object to the form.  Asked and

Page 207

1  answered.
2      THE WITNESS:
3          Yeah.  It's -- it's --
4  sometimes.
5  EXAMINATION BY MR. ALTMYER:
6      Q    Okay.
7      A    I mean, --
8      Q    When Dawn provides a brokered
9  vessel to a customer, Dawn coordinates the
10  third-party vessel's need for fuel or lube
11  replacement, correct?
12      A    Sometimes.
13      Q    Okay.  Going back to the ETAs, if
14  there is ETA information that's conveyed to
15  one of Dawn's customers, that information is
16  received by Dawn from the third-party vessel
17  owner, right?
18      A    We're just merely the middle man in
19  all this.
20      Q    Right.  So is it fair to say that
21  it's -- in your role as a broker, you're a
22  pass-through of communication between the
23  vessel owner and your customer?
24      MR. REISMAN:
25          Object to the form.

Page 208

1      THE WITNESS:
2          Can you repeat the question,
3  please?
4      MR. ALTMYER:
5          Yeah.
6      MR. REISMAN:
7          Are you talking about, that
8  they serve as the pass-through or that
9  there can be times when information is
10  relayed through them?
11      MR. ALTMYER:
12          Yeah, there could be times
13  when -- I'll do it this way.
14      MR. REISMAN:
15          Or are they the source of all
16  information?  And to that, I think
17  that's --
18  EXAMINATION BY MR. ALTMYER:
19      Q    Primarily speaking, does Dawn serve
20  as the pass-through of information between the
21  third-party vessel owner and Dawn's customer?
22      MR. REISMAN:
23          Object to the form.
24      THE WITNESS:
25          Not always.  Sometimes.

Pages 205 to 208

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 209

1    EXAMINATION BY MR. ALTMYER:
2        Q    So it's sometimes.  So all I want
3    to do is just talk about specific instances of
4    when that might happen.  So ETAs, is that one
5    of the topics that sometimes is conveyed to
6    Dawn from the third-party vessel owner, and
7    then is later conveyed to Dawn's customer?
8        A    Sometimes.
9        Q    Okay.  Logistical delays, is that
10   information that Dawn sometimes, as a broker,
11   receives from a third-party vessel owner and
12   then communicates to Dawn's customer?
13       A    Vessel delays?
14       Q    Yes.
15       A    I mean, it's different all the
16   time, but sometimes.
17       Q    Okay.  Same question for fuel or
18   lube replacement, the need for fuel or lube
19   replacement.  Is that information that you
20   would receive from the third-party vessel
21   owner if they're on a day rate job, and then
22   convey that information to Dawn's customer?
23       A    As a broker, --
24            MR. REISMAN:
25                Object to the form, but you can

Page 210

1        answer.
2            THE WITNESS:
3                As a broker, at the end of the
4        job, yeah, that would be sometimes.
5        Sometimes I would do that.
6    EXAMINATION BY MR. ALTMYER:
7        Q    Okay.  Over the course of a job, if
8    one of the vessels that Dawn has brokered to
9    one of Dawn's customers requires a crew
10   change, is that something that sometimes will
11   be conveyed to Dawn's customer?
12       A    Sometimes.
13       Q    Okay.  And that's information that
14   Dawn would receive from the third-party vessel
15   owner?
16       A    Yes.
17       Q    Okay.  For these communications
18   that we talked about sometimes happening, is
19   that generally done via email?
20       A    Not always.
21       Q    Okay.  So sometimes by phone call?
22       A    Yes.
23       Q    Sometimes by text message?
24       A    Yes.
25       Q    Okay.  Is it fair to say that when

Page 211

1    Dawn brokers a vessel, it acts as a
2    pass-through for billing between the
3    third-party vessel owner and Dawn's customer?
4            MR. REISMAN:
5                Object to the form.
6            THE WITNESS:
7                We do that so we can collect
8        our fee.
9    EXAMINATION BY MR. ALTMYER:
10       Q    Gotcha.  And just general process,
11   is Dawn -- and we'll talk specifically about
12   the CROSBY ENDEAVOR and the LA MADONNA and the
13   LA ELITE later on.  But just generally
14   speaking, Dawn receives billing logs or vessel
15   logs from the third-party vessel owner,
16   correct?
17       A    Yes.
18       Q    Okay.  And then Dawn invoices,
19   creates its own invoice, marks it up, and then
20   issues that invoice to its customer, right?
21           MR. REISMAN:
22               Object to the form.
23           THE WITNESS:
24               Ask it again, please?
25   EXAMINATION BY MR. ALTMYER:

Page 212

1        Q    Yeah.  So just the general process
2    is Dawn receives -- when we're talking about
3    just a brokered boat, on an on-hire letter,
4    Dawn receives the vessel logs from the
5    third-party vessel owner, then creates an
6    invoice, attaches those vessel logs and
7    submits it to its customer, correct?
8            MR. REISMAN:
9                Object to the form.
10   EXAMINATION BY MR. ALTMYER:
11       Q    To Dawn's customer?
12           MR. REISMAN:
13               Object to the form.
14           THE WITNESS:
15               The vessel owner would send
16       vessel logs with their invoice, and then
17       we would, in turn, send our invoice to
18       our customer to collect our fee.
19   EXAMINATION BY MR. ALTMYER:
20       Q    Gotcha.  Understood.  And that
21   happened in the instances in October of 2020,
22   in connection with the M/V CROSBY ENDEAVOR,
23   correct?
24       A    Yes.
25       Q    Okay.  And same for the LA MADONNA

Pages 209 to 212

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 213

1 and the LA ELITE, their use with Shore
2 Offshore Services in October 2020?
3    A    Yes.
4    Q    Does Dawn ever make direct contact
5 with a third-party vessel that it brokers?  Or
6 are your communications strictly limited to
7 shoreside personnel, for whoever the company
8 is that you're brokering the boat for?
9    A    Shoreside personnel.  You know,
10 again, we don't control those boats, so I
11 would have no need to contact those vessels.
12    Q    Okay.  And I'm just going to ask
13 you specific questions on that.  So were any
14 communications had between Dawn and the crew
15 of the M/V CROSBY ENDEAVOR, in October of
16 2020?
17    A    No.
18    Q    Were any communications had between
19 Dawn and the crew of the LA MADONNA in
20 October 2020?
21    A    No.
22    Q    Were any communications had between
23 Dawn and the crew of the LA ELITE in
24 October 2020?
25    A    No.

Page 214

1    Q    Who do you generally communicate
2 with at Crosby when Dawn provides a Crosby
3 boat to a customer?
4    A    Mostly it would be Ivy Danos.
5    Q    Okay.  Anybody else?
6    A    No.  No.
7    Q    So it's always Ivy Danos?
8    A    Yeah, it would be Ivy.
9    Q    Who would you generally communicate
10 with at Shore when Dawn provides a vessel for
11 Shoreline?
12    MR. REISMAN:
13         Object to the form.
14 EXAMINATION BY MR. ALTMYER:
15    Q    And I'll condition that on,
16 irrespective of whether or not it's being
17 brokered or whether or not it's being
18 chartered.
19    MR. REISMAN:
20         Object to the form.  They don't
21    provide vessels when they broker them,
22    so -- if you want to ask him, who does
23    he communicate with when they broker a
24    vessel or charter a vessel, I think
25    that's --

Page 215

1    MR. ALTMYER:
2         I'll ask it that way.
3 EXAMINATION BY MR. ALTMYER:
4    Q    Who do you communicate with -- who
5 does Dawn communicate with when it brokers a
6 vessel to Shore?
7    A    The project management team, Tommy
8 and Cody, Mauricio.
9    Q    Okay.  Who does Dawn communicate
10 with when it charters a vessel to Shore?
11    A    Tommy, Cody and Mauricio.
12    Q    Okay.  When Dawn charters a vessel
13 to Shore and it's governed under the Master
14 Vessel Time Charter, what differences are
15 there in that scenario, if any, regarding your
16 involvement in operations?
17    MR. REISMAN:
18         As opposed to what?
19    MR. ALTMYER:
20         As opposed to when Dawn brokers
21    a boat.
22    THE WITNESS:
23         The difference is, is I would
24    be involved -- if I was chartering a
25    vessel, I would be involved in

Page 216

1 everything, from making sure the vessel
2 has got the proper people on board, that
3 it's ready to go to work, that it's
4 manned, it's got the -- it's full of
5 fuel, it's got all the equipment it
6 needs to do the services that we're
7 going to provide for our customer.
8 EXAMINATION BY MR. ALTMYER:
9    Q    When Dawn brokers a boat, does Dawn
10 make communication with the brokered vessel
11 offshore regarding any of the work being
12 performed?
13    A    No.
14    Q    Does Dawn have communication with
15 its customer offshore regarding the work being
16 performed when Dawn brokers a boat?
17    A    Wait, say that again.
18    Q    Yeah.  So when Dawn brokers a boat
19 to a customer, does Dawn make any
20 communications with its customer about what
21 type of work it's performing on a particular
22 day?
23    A    No.
24    Q    How about when Dawn charters a boat
25 to a customer?

Pages 213 to 216

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 217

1     A    When we charter a vessel, I get
2  vessel logs daily. I'm talking to the
3  captains daily. I'm making sure that they
4  have everything that they need to execute the
5  job.
6     Q    So I'll kind of skip ahead real
7  quick on this then. So let's say, for
8  instance, for the M/V CROSBY ENDEAVOR, in
9  October of 2020, it's Dawn's position that
10  that vessel was brokered to Shore, right?
11     A    That vessel was brokered to Shore.
12     Q    Okay. When Dawn invoiced Shore for
13  those services, it invoiced Shore and attached
14  billing logs provided by Crosby, correct?
15     A    Yes.
16     Q    Okay. When Dawn brokers a boat,
17  how often does it get billing logs sent to it
18  from the third-party vessel owner?
19     A    When they send the invoice.
20     Q    Okay, gotcha. I just wanted to
21  know whether or not it was a daily frequency
22  of you getting a vessel log from a brokered
23  boat, weekly, monthly. It's just whenever
24  Dawn gets invoiced for it?
25     A    It's whenever Dawn gets an invoice.

Page 218

1  The third-party company would send the invoice
2  with the vessel logs.
3     Q    Okay. And that's what would have
4  happened in October 2020 with the CROSBY
5  ENDEAVOR?
6     A    Yes.
7     Q    Okay. Same for the LA MADONNA and
8  the LA ELITE, with Louisiana International
9  Marine?
10     A    Yes, correct. When they invoiced
11  us, they send the vessel logs.
12     Q    Okay. All right. In reviewing
13  Dawn's discovery responses, I understand that
14  there were no written contracts between Crosby
15  and Dawn related to the CROSBY ENDEAVOR's
16  operations in October of 2020; is that
17  correct?
18     A    Wait, can you say that again?
19     Q    Yeah. There were no written
20  contracts for the M/V CROSBY ENDEAVOR's
21  operation in October 2020 between Crosby and
22  Dawn?
23     A    It was between Crosby and Shore.
24     Q    Okay. So, but between Crosby and
25  Dawn, there were no written contracts?

Page 219

1     A    No, we didn't need one. It was
2  between Crosby and Shore, as the on-hire
3  states, mutually agreed upon, the vessel owner
4  and Shore.
5     Q    All dealings between Dawn and
6  Crosby related to the use of the CROSBY
7  ENDEAVOR in October 2020 were made either via
8  email, text or phone call, correct?
9     A    Yes.
10     Q    And that would have been with
11  Crosby shoreside personnel?
12     A    Yes.
13     Q    Ivy Danos, specifically?
14     A    Specifically, yes.
15     Q    What is Dawn's understanding of
16  what the terms of any contract between it and
17  Crosby were, in connection with the CROSBY
18  ENDEAVOR's operations in October of 2020.
19     MR. REISMAN:
20     Object to the form. You can
21  answer it if you know.
22     THE WITNESS:
23     Between who?
24  EXAMINATION BY MR. ALTMYER:
25     Q    Between Dawn and Crosby.

Page 220

1     A    It didn't matter.
2     MR. REISMAN:
3     Did you mean Dawn?
4     MR. ALTMYER:
5     Yeah, between Dawn and Crosby.
6     MR. REISMAN:
7     Okay.
8     THE WITNESS:
9     Crosby had a mutual agreement
10  with Shore.
11  EXAMINATION BY MR. ALTMYER:
12     Q    I understand that position. I just
13  want to know what your position is on what
14  were the terms governing a contract, if you
15  think that you had any, between Dawn and
16  Crosby?
17     A    Crosby knew we were a broker.
18     Q    So is it Dawn's position that it
19  had no contract with Crosby?
20     A    Right. We were a broker.
21     Q    And it had no contract with Crosby,
22  written or oral?
23     A    What do you mean by "written or
24  oral"?
25     Q    Whether or not it was a verbal

Pages 217 to 220

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 221

1  contract or whether or not it was a written
2  contract.
3        MR. REISMAN:
4           Are you talking about for the
5     ENDEAVOR or --
6  EXAMINATION BY MR. ALTMYER:
7     Q    For the ENDEAVOR.  Yeah, specific
8  to the ENDEAVOR.
9     A    What are you looking for,
10  specifically?
11    Q    Whether or not there was a
12  contract -- what Dawn's position is and
13  whether or not it had a contract between it
14  and Crosby for the use of the Crosby ENDEAVOR,
15  in October 2020.
16        MR. REISMAN:
17           I'm going to object to the
18     form.  It's been asked and answered.  He
19     said that -- well, --
20        THE WITNESS:
21           It's between Shore and Crosby.
22     It's their contract.  We were just
23     merely the broker.  We were the middle
24     man.
25        MR. REISMAN:

Page 222

1           So now answer the question he's
2     asking.
3  EXAMINATION BY MR. ALTMYER:
4     Q    So is the answer to the question
5  "no"?
6     A    No.
7        MR. REISMAN:
8           You agree with him?
9  EXAMINATION BY MR. ALTMYER:
10    Q    You agree that --
11    A    Yes.
12    Q    -- there was --
13    A    Yes.
14    Q    -- no contract?
15    A    Yes, yes.
16    Q    Okay, thank you.  Between June 9,
17  2017 and October 28th, 2020, had Dawn ever
18  entered into a Master Services Contract,
19  Master Vessel Time Charter or any other Master
20  Agreement with Crosby?
21    A    No.
22    Q    Between June 9, 2017 and October
23  28th, 2020, had Dawn ever entered into any
24  written or oral charter agreements with
25  Crosby?

Page 223

1     A    No.
2     Q    Between June 9, 2017 and October
3  28th, 2020, did Dawn enter into any contracts
4  with Crosby?
5     A    No.
6     Q    Has Dawn ever sold any vessels to
7  Crosby?
8     A    Sold vessels to Crosby?
9     Q    Yeah.
10    Q    To purchase, like for them to --
11    Q    Yeah.
12    A    No.
13    Q    While you've been at Dawn, has Dawn
14  ever purchased a vessel from Crosby?
15    A    No.
16    Q    When did Dawn start providing
17  Crosby vessels to Dawn's customers?
18        MR. REISMAN:
19           Object to the form.  He's
20     testified several times, they don't
21     provide brokered vessels.
22  EXAMINATION BY MR. ALTMYER:
23    Q    As far as Dawn's position, when did
24  Dawn start brokering Crosby vessels?
25    A    I don't know the specific dates.

Page 224

1     Q    Okay.  Did it first start while you
2  were --
3        MR. RUFTY:
4           Jacob, is there any way you can
5     get closer to the microphone again?
6        MR. REISMAN:
7           He's moving back up.
8        MR. ALTMYER:
9           I'm moving back up.  Sorry,
10     Alfred.
11        MR. RUFTY:
12           Thank you.
13        MR. ALTMYER:
14           You got it, man.
15  EXAMINATION BY MR. ALTMYER:
16    Q    When did Dawn start brokering
17  Crosby boats?
18        MR. REISMAN:
19           I'm going to object to the
20     form.  Are you asking -- well, I object
21     to the form.  I'm happy to explain if
22     you'd like.
23        MR. ALTMYER:
24           Yeah, that would be great.
25        MR. REISMAN:

Pages 221 to 224

Professional Shorthand Reporters, Inc.         1-800-536-5255
Offices in New Orleans and Baton Rouge         www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 225

1          Are you asking whether he
2   brokers vessels for Crosby to customers,
3   or brokers vessels for customers that
4   came from Crosby?
5   EXAMINATION BY MR. ALTMYER:
6       Q     Brokering Crosby vessels to
7   customers.  When did that start?
8          MR. REISMAN:
9             On behalf of Crosby?
10  EXAMINATION BY MR. ALTMYER:
11      Q     On behalf of Crosby.
12      A     I didn't broker on behalf of
13  Crosby.  I brokered on behalf of Shore.
14      Q     Okay.  So on behalf of a customer
15  then, when did you start brokering Crosby
16  vessels to customers?
17      A     I don't know the exact dates.
18      Q     Okay.  And then just the follow-up
19  question on that is, did that start while you
20  were working for Dawn?
21      A     I -- I don't know.  I don't know if
22  they did that before my time at Dawn or not.
23  I can't answer that question.
24      Q     Understood.  I'm going to show you,
25  this is a Crosby email.  We're on "Exhibit

Page 226

1   132."  I'm going to premark this.  This is a
2   Bates labeled document, Crosby 30 through
3   Crosby 35.
4          MR. REISMAN:
5             What was the exhibit number?
6          MR. ALTMYER:
7             132.
8          THE WITNESS:
9             Could they make the writing any
10  smaller?
11         MR. ALTMYER:
12            Yeah, that's pretty small.  I
13  think you can take that up with
14  Mr. Rufty.
15  EXAMINATION BY MR. ALTMYER:
16      Q     So just very quickly, Mr. Grace, I
17  want to start at the bottom email on Page
18  Crosby 30.
19      A     Okay.
20      Q     And it looks to be an email from
21  Mike Grace, that's you, right?
22      A     Correct.
23      Q     MikeG@DawnOffshore.com.  Is that
24  your email address?
25      A     Yes.

Page 227

1       Q     And it looks like it was sent on
2   Friday, October 18th, 2019, at 10:31 a.m., to
3   Ivy Danos, right?
4       A     10:31, yes.
5       Q     Okay.  You've sent emails to
6   Mr. Danos in the past before, correct?
7       A     Yes.
8       Q     Okay.  Are you familiar with
9   whether or not that's his email address,
10  IDanos@CrosbyTugs.com?
11      A     It appears to be.
12      Q     Okay.  Subject is, it says, "Dawn
13  Services, LLC - MSA," right?
14      A     Yes.
15      Q     Now, the body of the email says,
16  "Ivy, please see the attached MSA for your
17  review.  Once it's executed, send it back and
18  I will countersign.  Let me know if you have
19  any questions, thanks," and then it has your
20  signature block there after that, right?
21      A     Yes.
22      Q     Okay.  Above that, it appears to
23  have an email from Ivy Danos, Friday,
24  October 18, 2019, at 10:37 a.m., to Myles
25  Cheramie and Ferrel Trosclair.  It doesn't

Page 228

1   look like you were cc'd on that email, right?
2       A     Yeah, correct.
3       Q     But the email below it, at 10:31,
4   do you recall sending that email to Mr. Danos?
5       A     I -- I mean, I sent so many emails,
6   I don't know, but I mean it appears that I
7   did.
8       Q     Okay.  Do you have any reason to
9   dispute that you did not send that email?
10      A     No.
11      Q     Okay.  That was a poor question.
12  Do you have any reason to dispute that you did
13  send that email?
14      A     No.
15      Q     Okay.  All right.  Let's flip to
16  the next page.  It's Crosby 31 and it goes to
17  Crosby 35.
18      A     Okay.
19      Q     Looking at this, this looks like
20  it's an unexecuted or unsigned Master Service
21  Agreement, right?
22      A     It looks like it's a broker
23  agreement.
24      Q     Okay.  So essentially what I'm
25  getting at is, is this a broker agreement that

Pages  225 to 228

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 229

1  Dawn had sent to Crosby, it looks like, in
2  October of 2019?
3      A    I must have sent it, but it's a
4  broker agreement that shows that we were a
5  broker.
6      Q    Okay.  Let's look at the email
7  again, Crosby 30, and there's an attachment.
8  It says, "Attached," at the top, "Dawn
9  Services - Crosby Tugs (10.08.19)pdf."  Just
10  looking at that, looking at the subject of the
11  email, does this appear to be the Master
12  Service Agreement that was the subject of the
13  email on October 18, 2019 that you had sent to
14  Ivy Danos?
15      A    I would assume.
16      Q    Okay.
17      A    But again, it says it's a
18  brokerage, for brokerage services.
19      Q    Okay.  Yeah, yeah.  I'm just asking
20  some questions about this.
21      A    All right.  I just want to go on
22  the record for saying that.
23      Q    Yeah.  So essentially this is what
24  I'm getting at.  Looking at it here today,
25  Crosby 31 to Crosby 35, this is the MSA or

Page 230

1  Master Service Agreement that you sent to Ivy
2  Danos on October 18, 2019?
3      A    It's a brokerage agreement, but
4  it's labeled "Master Service Agreement"?
5      Q    It's a document entitled "Master
6  Service Agreement" that you sent?
7      A    Okay.
8      Q    Correct?
9      A    Yes.
10      Q    Okay.  Did you ever get a signed
11  copy of this agreement back from Crosby?
12      A    No.
13      Q    Okay.  Did you ever get a response
14  from Crosby that they did not agree to the
15  terms of this MSA?
16      A    No.  I don't believe so.
17      Q    Okay.  And I'm going to rephrase
18  the question real quick.  I'm going to say, as
19  the corporate representative of Dawn, did Dawn
20  ever get a signed copy of this agreement back
21  from Crosby?
22      A    Not that I'm aware.  But it says,
23  broker on -- for or on behalf of.
24          MR. REISMAN:
25              Just answer his question.

Page 231

1          THE WITNESS:
2              Okay.
3  EXAMINATION BY MR. ALTMYER:
4      Q    Did Dawn ever get a response from
5  Crosby that they did not agree to the terms of
6  this MSA?
7      A    No.
8      Q    Did Crosby ever send revisions of
9  this MSA back to Dawn?
10      A    Not that I'm aware.
11      Q    Do you have a signed copy of this
12  agreement that you signed, in your file?
13      A    No.
14      Q    I'll rephrase the question, too,
15  because I said "you."  Does Dawn have a signed
16  copy of this MSA in its filed, signed on
17  behalf of Dawn?
18      A    No.
19      Q    And just to confirm, Dawn does not
20  have a copy of this MSA, signed on behalf of
21  Crosby, in its file either?
22      A    No.
23      Q    Did you ever follow up with anyone
24  else at Crosby regarding the status of the
25  execution of this MSA?

Page 232

1      A    I don't remember.
2      Q    Did anyone at Crosby ever object to
3  Dawn regarding the terms of this MSA, whether
4  verbally or in writing?
5      A    Not that I'm aware.
6          MR. RUFTY:
7              Object to form.
8  EXAMINATION BY MR. ALTMYER:
9      Q    Did you ever discuss this MSA with
10  anyone at Crosby, aside from this email
11  communication?
12      A    I don't believe so.
13      Q    Was it your understanding that
14  after you had sent this document to Crosby,
15  that Crosby and Dawn were operating under the
16  terms of this agreement, when Crosby was
17  brokering -- when Dawn was brokering Crosby's
18  boats?
19      A    Wait.  Can you repeat that
20  question?
21      Q    Yeah.  After you had sent this
22  Master Service Agreement to Ivy Danos, on
23  October 18, 2019, at 10:31 a.m., was it Dawn's
24  understanding that Dawn and Crosby were
25  operating under the terms of this Master

Pages  229 to 232

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 233

1   Service Agreement when Dawn was brokering
2   Crosby's tugs?
3            MR. REISMAN:
4                Object to the form.
5            THE WITNESS:
6                I mean, it was never signed.
7   EXAMINATION BY MR. ALTMYER:
8        Q    Okay.  Did you ever send a
9   different Master Service Agreement to Crosby?
10       A    Not that I'm aware.
11       Q    Did you ever send a signed copy of
12  the MSA, on Dawn's behalf, to Crosby?
13       A    No.
14       Q    So here today, as a corporate
15  representative of Dawn, where did the
16  conversations leave off between Dawn and
17  Crosby regarding this Master Service
18  Agreement?
19       A    It must have stopped once I sent
20  the email, and then he forwarded it on,
21  because I don't remember ever getting anything
22  back.
23       Q    Okay.  Did Dawn tender the claims
24  asserted against Dawn in this case to Crosby,
25  under this MSA?

Page 234

1        A    Wait, say that again.
2        Q    Did Dawn tender the claims asserted
3   against it in this case to Crosby, under the
4   terms of this MSA?
5            MR. REISMAN:
6                Do you understand what he's
7            asking?
8            THE WITNESS:
9                No, I don't understand.  I'm
10           sorry, I don't want to answer it if I
11           don't --
12  EXAMINATION BY MR. ALTMYER:
13       Q    Okay.  Did Dawn request defense and
14  indemnity or additional insured coverage from
15  Crosby Tugs in connection with the claims that
16  are asserted against Dawn in this litigation,
17  under the terms of this MSA?
18       A    I don't believe so, but I'm not --
19  I don't believe so.
20       Q    Specific to -- I'm going to move on
21  to the contractual relationship and commercial
22  relationship with Louisiana International
23  Marine.
24       A    Okay.  Mind if I go to the restroom
25  real quick, though?

Page 235

1            MR. ALTMYER:
2                Yeah, go for it, man.
3                (Whereupon, a break was taken;
4            3:16 p.m. - 3:24 p.m.)
5   EXAMINATION BY MR. ALTMYER:
6        Q    We were switching gears, over to
7   the contractual arrangement and commercial
8   relationship between Dawn and Louisiana
9   International Marine, in place on October
10  28th, 2020, for the LA MADONNA and the
11  LA ELITE.  That's one the topics, subjects
12  today.
13       A    Okay.
14       Q    So Dawn has taken the position in
15  this case that it brokered the LA MADONNA and
16  the LA ELITE to Shore in October 2020,
17  correct?
18       A    Correct.
19       Q    I understand that there were no
20  written contracts in place between Louisiana
21  International Marine and Dawn related to
22  either of those vessel's operations in
23  October 202, correct?
24       A    Wait, say that question one more
25  time.

Page 236

1        Q    Yeah.  There were no written
2   contracts between Louisiana International
3   Marine and Dawn related to either of those
4   vessel's operations in October 02020?
5            MR. REISMAN:
6                The vessels, meaning the
7            LA MADONNA and the LA ELITE?
8   EXAMINATION BY MR. ALTMYER:
9        Q    Yeah, the LA MADONNA and the
10  LA ELITE.
11       A    Right, they were brokered.
12       Q    All dealings between Dawn and
13  Louisiana International Marine related to the
14  use of the LA MADONNA or the LA ELITE would
15  have been through email, text messages or
16  phone calls, right?
17       A    Yes.
18       Q    And talking specifically about it
19  in October of 202?
20       A    And we're talking shoreside.
21       Q    Yeah.  Shoreside personnel yeah.
22       A    Right.
23       Q    Between June 9, 2017 and October
24  28, 2020, had Dawn ever entered into a Master
25  Service Contract, Master Time Charter

Pages  233 to 236

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 237

1   Agreement, or any other similar Master
2   Agreement with Louisiana International Marine?
3       A    I'm not a hundred percent sure.
4   There might have been a Time Charter.
5       Q    Okay.  When you say there might
6   have been a Time Charter, is it a Master Time
7   Charter?
8       A    I don't -- I can't remember.
9       Q    Got it.  Do you remember if Dawn
10  had sent, in that specific instance, if Dawn
11  would have sent the Time Charter Agreement or
12  if Louisiana International Marine would have
13  sent the Time Charter Agreement to Dawn?
14      A    I don't remember.
15      Q    Is that the only instance you can
16  think of, between Dawn and Louisiana
17  International Marine from June 9, 2017 and
18  October 28, 2020?
19      A    As far as --
20      Q    As far as contracts.
21      A    Contracts?  Yeah, I don't know.
22      Q    All right.  I want to look at a
23  group of documents.  This is the Morning
24  Reports.  They were produced by Dawn, as Dawn
25  402 through 404, and I'm going to mark them as

Page 238

1   "Exhibit 133."
2       All right.  And Mr. Grace, Dawn 402
3   is a Dawn Services Morning Report for
4   October 26, 2020, right?
5       A    It's a Morning Report, yeah.
6       Q    Okay.  403 is for October 27th,
7   2020, correct?
8       A    Yes.
9       Q    And 404 is a Morning Report for
10  October 28, 2020, right?
11      A    Yes.
12      Q    Okay.  So you've seen these
13  documents before, correct?
14      A    Yes.
15      Q    Okay.  Who creates Morning Reports
16  for Dawn?
17      A    I do.
18      Q    And what is the purpose of a
19  Morning Report?
20      A    Just so everybody in the office
21  knows.  Mainly, my father-in-law likes to know
22  what boats are working, where they're working.
23      Q    All right.  You just mentioned your
24  father-in-law.  Is john Charpentier --
25      A    I'm sorry, Kenny.

Page 239

1       Q    Kenny Charpentier is your
2   father-in-law?
3       A    Yeah.
4       Q    Okay.  Tough boss to please.  You
5   don't have to answer that on the record.
6   Okay.  So you create it and then do you just
7   send it to Kenny Charpentier?
8       A    No.
9       Q    Okay.  Who is this document sent
10  to?
11      A    Everyone in the office.
12      Q    And when I say this document, I'm
13  talk I'm not talking about this specific one.
14  I'm just talking about generally speaking.
15      A    Right.
16      Q    Okay.  So it's sent to everybody in
17  the office?
18      A    Just Dawn office personnel.
19      Q    Would that be the shoreside
20  personnel that we discussed earlier, or, I
21  mean, secretaries, everybody gets it?
22      A    Shoreside.
23      Q    Okay.  So it says "Morning Report."
24  It's created in the morning, right?
25      A    Yes.

Page 240

1       Q    Generally what time do you create
2   these?
3       A    Whenever I get to the office.
4       Q    Okay.  And then so just kind of
5   going through it, there's a breakdown of it.
6   I see that there's a list of Dawn vessels on
7   there, correct?
8       A    Correct.
9       Q    Okay.  And that's going to be from
10  BREAK OF DAWN through the AEGEAN DAWN and I'm
11  talking about Dawn 402, specifically, right
12  now.
13      A    Yes.
14      This is the Morning Report for the
15  26th.
16      A    And BATTLESHIP.
17      Q    And BATTLESHIP is also a Dawn boat,
18  right?
19      A    Correct.  It's a barge.
20      Q    A barge, gotcha.  Then you also
21  have the LA MADONNA, which is a Louisiana
22  International Marine vessel, right?
23      A    Right.
24      Q    And then the CROSBY ENDEAVOR, which
25  is a Crosby Tugs vessel?

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 241

1     A    Right.
2     Q    Each one of those vessels has an
3  entry next to it, right?
4     A    Yes.
5     Q    Okay.  If you can, explain to us
6  where you get the information from to create
7  an entry for a particular vessel.
8     A    Well, I mean, in that particular
9  instance, I knew that the LA MADONNA -- this
10  was the 26th.  So they were back in Fourchon.
11  So Anthony might have called.  Anthony Roberts
12  might have called me and told me that we were
13  there.
14     Q    Gotcha.  What about for the CROSBY
15  ENDEAVOR?
16     A    Well, I know that they were heading
17  into Fourchon because the storm was coming.
18     Q    Okay.
19     A    So either Ivy called me and told me
20  that they were heading in or one of the
21  shoreside personnel from Shore.
22     Q    Understood.  And so whether or not
23  it's for a Dawn vessel on here or whether or
24  not it's for a third-party vessel that's on
25  here, this is just at the time that you create

Page 242

1  the document, on the morning of a particular
2  day, with the most up-to-date information that
3  you have on what the vessel is doing for that
4  day?
5     A    That I have, yes.
6     Q    Yes, that you have.
7     A    The most up-to-date information
8  that I know of.
9     Q    Yeah.  And that information can
10  come from either a phone call, text message,
11  email, vessel log that may be sent to you, if
12  it's a Dawn boat, right?
13     A    Right.  If it's a Dawn boat,
14  they're sending a vessel log.  If it's a
15  brokered boat, like the LA MADONNA and the
16  ENDEAVOR, you know, it would be a call from a
17  shoreside person.  And that's not necessarily
18  happening every single morning either, so --
19     Q    Okay.  But if you're off of work
20  one day, nobody fills in for you to fill out a
21  Morning Report?
22     A    No.
23     Q    And then some days, when you are at
24  work, and you might just not do one?
25     A    Wait, say that again.

Page 243

1     Q    There's some days when you're
2  working where you might be too busy to do one?
3     A    No, I'll -- I'll do them in the
4  morning.
5     Q    Okay.  I thought you had said that
6  there's some days where you might not have it.
7     A    Oh, I'm talking about the updates,
8  like the updates.
9     Q    The updates, gotcha.  Okay,
10  understood.  Yeah.  So, I mean, you're
11  religious with this?  This is something that's
12  an everyday thing for you, if you're in the
13  office?
14     A    If I'm in the office.
15     Q    Gotcha.  Okay.  Let's flip specific
16  to 403.  That's for October 27th, the Dawn
17  Services Morning Report.  Same testimony?
18  It's the same way that this would have been
19  created?
20     A    Yes.
21     Q    Okay.  Same thing for Dawn 404, for
22  October 28, 2020?
23     A    Yes.
24     Q    I want to ask about the vessels
25  that are on this report.

Page 244

1     A    Okay.
2          MR. REISMAN:
3          Which one?  404?
4          MR. ALTMYER:
5          It will be, I think, 402, 403
6  and 404.  If I could just look for me
7  real quick.  They all have the same
8  vessels on there.
9          THE WITNESS:
10          Yes.
11  EXAMINATION BY MR. ALTMYER:
12     Q    And then I just want to talk,
13  generally speaking, about the Morning Report,
14  as a whole.
15     A    Okay.
16     Q    So irrespective of whether or not
17  it's Dawn's position that it brokered a
18  particular vessel or it has chartered out a
19  particular vessel, is this list that's
20  included on the Dawn Services Morning Report
21  inclusive of all Dawn boats and all brokered
22  boats for a particular day, in which Dawn has
23  either brokered a boat to a customer or has
24  chartered a boat to a customer?
25     A    This is inclusive of Dawn's vessels

Pages 241 to 244

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 245

1    and brokered vessels.
2        Q    Okay.  What I'm trying to get at is
3    whether or not you brokered a vessel or
4    whether or not you chartered a vessel, as
5    Dawn, all the boats for that day, of which
6    Dawn has either brokered or chartered, are
7    included on a Dawn Services Morning Report?
8        A    When you say -- can you rephrase
9    it?  Can you ask that question again?
10       Q    I'll give you a specific example of
11   it.  So we're looking at Dawn 402.  I don't
12   see any reference to the M/V CASPIAN DAWN?
13       A    She -- we didn't own her at that
14   time.
15       Q    Didn't own her at that time, okay.
16   Were all of the vessels that were owned by
17   Dawn in October of -- let's do it specific to
18   October 26, 2020.
19       A    Okay.
20       Q    Were all the vessels that are part
21   of Dawn's fleet chartered out on October 2020,
22   October 26, 2020?
23       A    When you mean chartered out, were
24   they working?
25       Q    Yeah, were they working.

Page 246

1        A    It appears that the GULF DAWN was
2    at Main Iron Works, standing by, so she must
3    have been getting shipyard work done.
4        Q    Did you all own the -- you said
5    BAYOU DAWN would have been working.  COASTAL
6    DAWN would have been working.  BREAK OF DAWN,
7    looks like they were working, right?
8        A    Yeah.
9        Q    CASPIAN DAWN, you said you did not
10   own the CASPIAN DAWN as of October 26, 2020?
11       A    Correct.
12       Q    The GULF DAWN, looks like they
13   would have been working, correct?
14       A    Yeah, the GULF DAWN was at the
15   shipyard.
16       Q    Okay.  There's a status for it.  So
17   even if it's not working, there's just a
18   status --
19       A    Right.
20       Q    -- for all Dawn boats every single
21   day?
22       A    Yes.
23       Q    Okay.  And then what I'm trying to
24   get at is, for the LA MADONNA and the CROSBY
25   ENDEAVOR, those are both boats that Dawn has

Page 247

1    taken the position that were brokered, in
2    October 2020, does this list include all boats
3    that Dawn would have brokered to a customer on
4    October 26, 2020?
5        A    Just those two boats.  Yeah, those
6    are the only two boats we would have been
7    brokering that day.
8        Q    Only two, okay, got it.  And then
9    the same goes for October 27th, and the same
10   goes for October 28th?
11       A    Yes.
12       Q    Gotcha.  The BATTLESHIP was the
13   barge that you mentioned earlier?
14       A    Yes.
15       Q    Okay.  And it looks like the GULF
16   DAWN, you had said, was getting worked on at
17   that time, it was on stand-by?
18       A    No, that's stand -- it's just
19   stand-by Main Iron Works.
20       Q    On stand-by for Dawn?
21       A    Yeah.  It just means that that's --
22   they're hanging out there.
23       Q    Gotcha.  So for the vessels that
24   are listed as the BREAK OF DAWN through the
25   AEGEAN DAWN, on all of the Morning Reports,

Page 248

1    all of those vessels were chartered out to
2    different customers at that time, correct?
3        A    All those vessels were working for
4    different customers.
5        Q    Different customers at the time?
6        A    Yeah.
7        Q    I just want to confirm, they
8    weren't available for Shore, to go work for
9    Shore at that time?
10       A    No, but it also -- the reason why
11   we were also -- this goes back a while, but
12   the reason why we were using the LA MADONNA
13   and the CROSBY ENDEAVOR, or why we had
14   brokered those vessels, was earlier I said if
15   we were -- how did you say it?  You said the
16   only time we would go broker something is if
17   we didn't have a boat to do the job or didn't
18   have a boat to -- how did you say it?  I
19   forgot how you said it.  You used a term, and
20   I can't remember.  But part of the reason why
21   we would go broker a vessel is because we
22   might not have had a boat that was capable of
23   doing the job.
24       Q    Of performing a specific task that
25   Shore needed to be done?

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 249

1    A    Shore needed something done.
2    Q    Okay.
3    A    So it's not necessarily that our
4 boats weren't available.  It's just, our boats
5 maybe weren't available to do that certain
6 task.
7    Q    Okay, gotcha.
8         MR. REISMAN:
9              Available or capable?
10        THE WITNESS:
11             Capable.  Capable of doing that
12 task.
13 EXAMINATION BY MR. ALTMYER:
14    Q    For instance, when we're talking
15 about running anchors?
16    A    Running anchors or just the THOR,
17 as you had said earlier, is a big barge.
18    Q    Yeah, yeah, yeah.
19    A    And at the time, we didn't have a
20 boat big enough to go run anchors and tow the
21 THOR, so that's why we would go broker.
22    Q    Understood.  I had asked some
23 general earlier about just what Dawn's role as
24 a broker is and what type of communications it
25 would receive from a third-party vessel owner

Page 250

1 and then communicate to a customer.  These
2 questions that I'm going to have right now are
3 going to be specific to communications that
4 you may or may not have had between Dawn
5 Services and Crosby, okay.
6    A    Okay.
7    Q    So specific to -- and this also
8 includes the Louisiana International Marine.
9    A    Okay.
10    Q    Dawn provided ETAs of Crosby
11 vessels to Shore in October of 2020?
12        MS. BONNAFFONS:
13             I'm sorry, we can't hear the
14 question.
15        MR. ALTMYER:
16             Yeah, yeah, yeah.  All right.
17 Can you hear me right now?
18        MS. BONNAFFONS:
19             Yes.  Thank you.
20        MR. ALTMYER:
21             All right, you got it.  I think
22 I've got to be kind in front of this mic
23 and I keep pushing back.
24 EXAMINATION BY MR. ALTMYER:
25    Q    Dawn provided ETAs of Crosby

Page 251

1 vessels to Shore, in October 2020, correct?
2    A    I believe so.
3    Q    Dawn would have received -- and
4 believing so, to relay that ETA information to
5 Shore, Dawn would have received the
6 information from Crosby, right?
7    A    Yeah, we would have just passed it
8 along to Shore.
9    Q    Okay.  In that respect, and I've
10 asked the question earlier, in that respect,
11 you are a pass-through -- Dawn is a
12 pass-through of communication from --
13        MR. REISMAN:
14             Object to the form.
15 EXAMINATION BY MR. ALTMYER:
16    Q    -- the third-party vessel owner to
17 the customer?
18        MR. REISMAN:
19             Object to the form.
20        THE WITNESS:
21             We were just a broker.  We were
22 the middle man.
23 EXAMINATION BY MR. ALTMYER:
24    Q    Okay.  Dawn provided ETAs of
25 Louisiana International Marine vessels to

Page 252

1 Shore, in October of 2020, also, correct?
2    A    I believe so.  I'd have to go back
3 and check, but --
4    Q    I'll go back in a little bit.  But
5 for all those communications, that would have
6 generally been done by email or text, right?
7    A    Or phone.
8    Q    Or phone, okay.  And in order to
9 receive that ETA information, Dawn would have
10 received it from Louisiana International
11 Marine, right?
12    A    From shoreside.
13    Q    From shoreside, yeah.  And I'm
14 using the terms right now, I'm just going to
15 be talking about shoreside personnel?
16    A    Okay.  I just want to make sure
17 the --
18    Q    I know, you said earlier that you
19 never had communications directly with the
20 crew that was on board the vessel, right?
21    A    Correct.
22    Q    All right.  Dawn received Crosby's
23 invoices directly from Crosby for the
24 ENDEAVOR's work in October 2020, correct?
25    A    Wait, say that again one more time.

Pages 249 to 252

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 253

1    Q    Yeah, I'm talking about for the
2  services provided by the CROSBY ENDEAVOR.
3  Dawn received Crosby's invoices directly from
4  Crosby, for the ENDEAVOR's work, in
5  October 2020?
6    A    Yes.
7    Q    And that would have included the
8  billings logs for that time period that Crosby
9  had generated, correct?
10   A    Yes.
11   Q    Specific to Crosby, Dawn would then
12 create its own invoice for that work, correct?
13   A    Yes.
14   Q    Okay.  And then Dawn would send
15 Shore that invoice via email, right?
16   A    With our mark-up on it.
17   Q    With your mark-up.
18   A    Right.  For our brokerage services.
19   Q    Okay.  And the invoice that you
20 would send would also attach Crosby's billing
21 logs?
22   A    Yes.
23   Q    How often would -- and this is just
24 foundational about what you testified
25 earlier -- you said that you had received

Page 254

1  Crosby's billing logs when they would invoice
2  you, right?
3    A    Yeah, we'd get the vessel logs when
4  they would invoice us.
5    Q    Gotcha.  How often would Crosby
6  generally invoice you?
7    A    I don't remember when we got the
8  invoice.  So I think it was only one time --
9    Q    Okay.
10   A    -- that they sent us an invoice for
11 that particular job.
12   Q    Gotcha.  Sending invoices to Shore,
13 you, Mike Grace, would be the person that
14 would generally do that, right?
15   A    Yes.
16   Q    And you did so in October and
17 November of 2020, in connection with the
18 services provided by Crosby and Louisiana
19 International Marine, right?
20   A    I don't remember when I sent the
21 invoices.
22   Q    And I'm just talking about the
23 services provided for those two months.
24   A    Yes.
25   Q    You would have been the person that

Page 255

1  sent those invoice?
2    A    Yes.
3    Q    Do you remember invoicing for that?
4    A    Yes.
5    Q    Okay.  For invoices for providing
6  Shore with, for brokering the Louisiana
7  International Marine vessels, the LA MADONNA
8  and the LA ELITE, the same exact process would
9  have been employed, right?
10   A    Wait, repeat that question again.
11   Q    The same process for receiving
12 invoices from Louisiana International Marine,
13 Dawn creating an invoice with a mark-up,
14 sending it to Shore via email, directly from
15 you?
16   A    Yes.
17   Q    Same process?
18   A    Whenever we would get the invoice
19 from the vessel owner, we would send it to --
20 we would send an invoice to our customer,
21 Shore, with our mark-up.
22   Q    Gotcha.  Okay.  I have a group of
23 emails that I want to go through.  I'll give
24 you a copy, me a copy, and him a copy.  What
25 I'm going to do is just give you the whole

Page 256

1  packet, because I'm going to ask about
2  everything and you can just flip through it.
3    Okay.  Mr. Grace, I'm going to show
4  you a document labeled Dawn 181, and I'm going
5  to mark that as "Exhibit 134."
6    A    Okay.
7    Q    I'll represent to you that this is
8  a document that was produced by Dawn.  It's
9  got the Dawn Bates label under there.  It
10 doesn't have your email address next to it,
11 but it says it's from Mike Grace, right?
12   A    Yes.
13   Q    And then, generally speaking, do
14 you see "Mike Grace" at the very top?
15   A    Yes.
16   Q    And does that indicate that you had
17 printed this email out or created a pdf of
18 this email?
19   A    Printed it out.
20   Q    Printed it out, gotcha.  Okay.  So
21 you're familiar with this document?
22   A    Yes.
23   Q    Okay.  This would have been an
24 email from you to Mauricio Arana.  He works
25 for Shore, right?

Pages 253 to 256

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 257

1    A    Yes.
2    Q    Shore Offshore Services?
3    A    Yes.
4    Q    Sent on October 2020, at 10:11
5    a.m., and it states, "Mauricio, the LA MADONNA
6    has two guys needing off this week and two
7    guys coming on, plus groceries.  What day do
8    you plan on running a crew boat?"  And then it
9    says, "Thanks," and has your signature block,
10   right?
11   A    Yes.
12   Q    Okay.  LA MADONNA, that's the
13   Louisiana International March vessel we talked
14   about earlier, right?
15   A    Yes.
16   Q    Okay.  With respect to two guys
17   needing off this week, that's information that
18   you would have received from Louisiana
19   International Marine, right?
20   A    They would have called me and told
21   me.
22   Q    Yeah.  Called you and said that,
23   "We need two guys; we need to do a crew
24   change"?
25   A    Right.

Page 258

1    Q    And then you relay that information
2    to Mauricio, at Shore?
3    A    Yes.
4    Q    Gotcha.  I'm going to show you the
5    next document and mark this as "Exhibit 135,"
6    and that is Bates labeled Dawn 247, right?
7    A    Yes.
8    Q    Okay.  I'm going to keep mine
9    clipped together.  So I'm going to start at
10   the bottom email.  It says -- it's on
11   October 16, 2020, at 10:59 a.m., Mike Grace,
12   and that's your email address, correct?
13   A    Yes.
14   Q    Okay.  It says, "Anthony, see my
15   customer response to crew change next week,"
16   and then it has in quotes, "The boat run will
17   depend on how the deck lift goes.  It could be
18   Sunday night, out of McCall Dock, Cameron,
19   M/V Genesis, thanks," and then it has your
20   signature block, right?
21   A    Yes.
22   Q    Okay.  Anthony is Tony Roberts,
23   right?
24   A    Yes.
25   Q    And he's your contact at Louisiana

Page 259

1    International Marine?
2    A    Yes.
3    Q    Okay.  Anthony had responded above,
4    at 11:40 a.m., "No problem," in response to
5    that email, right?
6    A    Yes.
7    Q    Okay.  So I just want to ask, the
8    customer response to crew change next week,
9    that's information that you would have
10   received from Shore, right?
11   A    Yes.
12   Q    Okay.  And then this email is an
13   example of you communicating the information
14   that you received from Shore to a third-party
15   vessel owner?
16   A    I was passing on the information.
17   Q    Passing on the information to the
18   third-party vessel owner, right?
19   A    Yes.
20   Q    Okay.  And that's just about a crew
21   change?
22   A    Right.
23   Q    All right.  I'm going to show you
24   Dawn 183 and mark this as "Exhibit 136."
25   Okay.  So this is an email from Mauricio Arana

Page 260

1    from Shore Offshore Services, right?
2    A    Yes.
3    Q    October 19, 2020.  I'm looking at
4    the bottom email, I'm sorry.
5    A    Yes.
6    Q    And it's on October 19, 2020, at
7    10:32 a.m., right?
8    A    Right.
9    Q    And your email address is contained
10   within the "to" column of that, right?
11   A    Yes.
12   Q    This is an email that you would
13   have printed out?
14   A    Yes.
15   Q    The email that we looked at before
16   was that also an email that you printed out?
17   A    I don't know.
18   Q    Okay.
19   A    It doesn't have my name up at the
20   top.  I don't know.
21   Q    You recognize the emailing that we
22   were looking at, at Exhibit 135, though,
23   right?
24   A    Yes.
25   Q    All right.  So let's look at 183

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 261

1  again, which is Exhibit 136. It's from
2  Mauricio to Yesenia Hernandez and Mike Grace,
3  and then it has CC to Cody Sims, Tommy
4  Gibilterra, Melodi Gonzalez, and then D/B THOR
5  Superintendent.
6       Mauricio says, "Yesenia, please
7  send Melodi a request number for
8  40,000 gallons of fuel for the CROSBY
9  ENDEAVOR. Mike, please let the ENDEAVOR know
10  that as soon as fueling is complete, they need
11  to head out to High Island 116-A to meet up
12  with the D/B THOR. Thanks." And then you had
13  responded, at 10:49, "CROSBY ENDEAVOR will be
14  heading to the fuel dock shortly," right?
15       A    Yes.
16       Q    Okay. So explain to me the
17  circumstances of this email. Is this Shore
18  letting you know where the CROSBY ENDEAVOR
19  needs to head out to?
20       A    That's the location that the CROSBY
21  ENDEAVOR would need to go to, yes.
22       Q    Okay. And when I said "this," I'm
23  talking about the 10:32 a.m. email.
24       A    The bottom email, yes.
25       Q    The bottom email, gotcha. And then

Page 262

1  the email above, that's a response by you to
2  Mauricio's email. "CROSBY ENDEAVOR will be
3  heading to the fuel dock shortly," right?
4       A    Yes. So I would have told -- what
5  I would have done, as a broker, I would have
6  let Crosby, presumably, Ivy know that the fuel
7  had been arranged, because Crosby had
8  requested fuel, and I was letting Ivy know
9  that. Presumably, he would have let me know
10  that they were heading to the fuel dock
11  shortly, and I was responding to Mauricio,
12  letting him know.
13       Q    Okay. So you were relaying
14  information between --
15       A    Just passing on information.
16       Q    -- between Shore and Crosby?
17       A    Yes.
18       Q    Gotcha. All right. Let me mark
19  this as "Exhibit 137." It's going to be Dawn
20  189 to Dawn 190. Dawn 190 just has the tail
21  end of your signature block, right?
22       A    Yes.
23       Q    Looking at this document here, this
24  is one of the emails that you would have
25  printed out, right?

Page 263

1       A    Yes.
2       Q    Okay. Below, you have an email.
3  I'm looking at the bottom email from
4  October 16, 2020. That's an email from you to
5  Mauricio, at Shore, right?
6       A    Yes.
7       Q    It says, "Mauricio, the LA
8  COMMANDER is going to dry dock on Sunday and
9  should be back in the water by Sunday evening.
10  Monday morning, heading to location to replace
11  the LA ELITE. Also, what day do you plan on
12  doing crew change next week and where do you
13  plan on running the crewboat," right?
14       A    Yes.
15       Q    Okay. And your signature block
16  below that. Mauricio responds, "Mike, Roger
17  that on the LA COMMANDER. The boat will run
18  depending on how the deck lift goes. It could
19  be Sunday night out of McCall Dock, Cameron,
20  M/V GENESIS. Thanks, Mauricio," right?
21       A    Yes.
22       Q    And this is the exact quoted
23  language that you had relayed to, in the prior
24  email that we looked at, that's going to be
25  136, Exhibit 136.

Page 264

1       A    135.
2       Q    135, right?
3       A    Yes.
4       MR. REISMAN:
5            Object to the form.
6  EXAMINATION BY MR. ALTMYER:
7       Q    And then you had responded on --
8  and specifically, the information quoted that
9  we're talking about, "The boat will run
10  depending on how the deck lift goes. It could
11  be Sunday night out of McCall Dock, Cameron,
12  M/V GENESIS," right?
13       A    Yes.
14       Q    Okay. That was the information
15  that was relayed to the representative at
16  Louisiana International Marine?
17       A    Yeah. Mauricio had told me that
18  so, I was just, again, passing it on.
19       Q    Passing it along, gotcha. You
20  responded, 10:58 a.m. "Thanks; please keep me
21  posted on the boat run, as we need to swap out
22  a captain."
23       A    Yes.
24       Q    Okay.
25       A    Louisiana International Marine

Pages 261 to 264

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 265

1  needed to swap out a captain.
2      Q    So you're saying that "we" is
3  referring to Louisiana International?
4      A    Yeah.
5      Q    It does say "we," though, right?
6      A    It does say "we," but we would not
7  have put a captain, again, because we didn't
8  control, operate, crew, anything of that, so
9  this is strictly just me relaying a message
10  on, as a broker.
11      Q    This is going to be Dawn 149,
12  "Exhibit 138."  This is another email that you
13  had printed out, right, Mr. Grace?
14      A    Yes.
15      Q    Okay.  It's an email from you to
16  Cody and Tommy, at Shore, October 26th, 2020,
17  at 3:41 p.m., right?
18      A    Yes.
19      Q    Okay.  It says, "Cody, I spoke with
20  the CROSBY ENDEAVOR and right now they are
21  comfortable only using the LA MADONNA and the
22  LA ELITE" -- or just "the LA MADONNA and
23  LA ELITE.  I have the LA COMMANDER available
24  if we need on stand-by.  The two tugs plan on
25  meeting up with the THOR around 2100 tonight

Page 266

1  at the sea buoy.  Thanks."  And then your
2  signature block, right?
3      A    Yes.
4      Q    Okay.  This is referring to the
5  LA MADONNA and the LA ELITE meeting THOR at
6  the sea bayou, so they could serve as the tail
7  tugs to bring the THOR into Port Fourchon to
8  seek safe harbor --
9      A    Right.
10      Q    -- during Hurricane Zeta, right?
11      A    Right.
12      Q    Okay.
13      A    And when I said I spoke to the
14  CROSBY ENDEAVOR, it would have been Ivy Danos
15  or somebody shoreside at Crosby.
16      Q    Okay, gotcha.
17      A    And when I say I have the LA
18  COMMANDER available, it would have been
19  Louisiana International has a boat available,
20  if they needed an additional tug.
21      Q    All right.  What I was going to ask
22  about is "The two tugs plan on meeting up with
23  THOR around 2100 tonight at the sea buoy."
24  That's you just conveying an ETA that you had
25  gotten from Louisiana International Marine to

Page 267

1  Shore, the customer, right?
2      A    I think it would have been -- the
3  ETA would have probably been coming from
4  Crosby about being at the sea buoy at 2100.
5      Q    Okay.
6      A    And the two tugs were going to be
7  there at the sea buoy to meet them.
8      Q    They're just going to be there
9  already, waiting for them?
10      A    Yes.
11      Q    Okay.  Just looking to see.  This
12  is an example of passing through information
13  between either Louisiana International Marine
14  and Shore, you're acting as the middle man for
15  Crosby and Shore, and you acting as the middle
16  man?
17      A    Yes, passing on information.
18      Q    All right.  Let's look at 235, Dawn
19  235.  All right.  The bottom email is an email
20  from Ivy Danos at Crosby Tugs, October 26,
21  2020, at 10:09 a.m., to you, correct?
22      A    Yes.
23      Q    All right.  This document, as a
24  whole, this is one of the documents that you
25  would have printed out, right?

Page 268

1      A    Yes.
2      Q    Okay.  And aside from the one that
3  didn't have your name up top, which you said
4  you had recognized before, all the ones that
5  have your name, Mike Grace, that we've looked
6  at so far, at the top, have been email
7  exchanges that you personally printed out,
8  right?
9      A    Yes.
10      Q    Okay.  So let's see.  Let's start
11  with October 26, 2020 at 10:07 a.m.  You had
12  written to Ivy Danos, "Ivy, what is the ETA to
13  Belle Pass jetties?  I just want to make sure
14  the LA MADONNA and LA ELITE are there for you.
15  Thanks," and your signature block, right?
16      A    Yes.
17      Q    Ivy responds, at 10:09 a.m., on the
18  26th, "They just got on the way.  Should have
19  an ETA by noon."  And then you responded at
20  10:16 a.m., "Okay," right?
21      A    Yes.
22      Q    Okay.  And so that's an example of
23  you receiving ETA information from someone at
24  Crosby, or requesting ETA information from
25  someone at Crosby, so that you can relay that

Pages 265 to 268

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 269

1  to Shore?
2      A    I was -- yes, I was requesting
3  information from Crosby so I could pass it on.
4  Just doing what a broker would do.
5      Q    Let's look at Dawn 179.  That's
6  going to be "Exhibit 140."  The email at the
7  bottom is from D/B THOR's email account to
8  Mauricio, Zoe Brunet, Cody Sims, Tommy
9  Gibilterra, you, and the THOR superintendent.
10  It's October 20 at 10:59 a.m., right?
11      A    Yes.
12      Q    Okay.  It just says, "Sorry all, I
13  left off the deck manifest.  Attached
14  revision.  Thanks."  You had replied to that
15  email and said, "ETA for CROSBY ENDEAVOR is
16  1600 to High Island 116," right?
17      A    Right.
18      Q    It says, HI-116, but that's
19  referring to High Island 116 Block offshore,
20  right?
21      A    Yes.
22      Q    This is you explaining to Shore
23  when the CROSBY ENDEAVOR is expected to meet
24  the THOR offshore at High Island 116, right?
25      A    Mauricio would have been asking for

Page 270

1  that.  I remember Mauricio asking for that
2  information, so I was just relaying the
3  information on.
4      Q    Gotcha.  And you would have gotten
5  the ETA information, that Crosby was going to
6  be there at 1600 from Ivy Danos?
7      A    Yeah, Ivy would have --
8      Q    I'm just going to do this one just
9  to kind of go through everything.  This is
10  Dawn 175, "Exhibit 141," an email from you to
11  Mauricio, Cody, Tommy and Yesenia Hernandez,
12  with a CC to John C at Dawn Offshore, and
13  yourself, on October 22nd, 2020, at 8:38 a.m.,
14  right?
15      A    Yes.
16      Q    Okay.  It says, "Mauricio, please
17  see the attached on-hire agreement for the M/V
18  CROSBY ENDEAVOR.  Thanks for the work, Mike
19  Grace."  Right?
20      A    Right.
21      Q    Okay.  Looking back, it was labeled
22  as Dawn 379, and if you can, can you just let
23  me know what exhibit number that was?  It's
24  the packet of on-hire agreement forms.
25      A    129.

Page 271

1      Q    If you just look at 129, at
2  Dawn 379, I just want to confirm that this was
3  the on-hire agreement that was sent via this
4  email, at Dawn 175.
5      A    Repeat the question.
6      Q    Yeah.  I just want to confirm that
7  Dawn 379, the on-hire letter that we looked at
8  earlier, dated October 22nd, 2020, is the
9  on-hire agreement for the M/V CROSBY ENDEAVOR
10  that's mentioned on Dawn 00175.
11      A    Yeah, it was the on-hire
12  information, so that would have been --
13      Q    That would have been the
14  attachment?
15      A    Yeah.
16      Q    That attachment line, the "Mauricio
17  Arana - CROSBY ENDEAVOR WAD with THOR - ON
18  (10.22.20).pdf"
19      A    Yes.  The on-hire information.
20      Q    If you can, and if you remember,
21  can you explain to us just the initial
22  conversations between Dawn and Shore in
23  October 2020 about the ENDEAVOR going
24  to work for Shore, in October 2020?
25      A    For the ENDEAVOR?

Page 272

1      Q    Yeah.
2      A    Shore -- Shore's vessel, the MARS
3  TITAN, wasn't coming back to work, and Shore
4  wanted a vessel similar in size to the Titan,
5  so I had reached out to Crosby about Shore's
6  request, about using -- if they had a vessel
7  available, would they be interested in going
8  to work for Shore.  And so, at some point,
9  Kurt Crosby reached out to Tommy Gibilterra to
10  discuss everything, and Tommy called me and
11  said Crosby is going to send out the ENDEAVOR,
12  and so that's how that all got started.
13      Q    Okay.  I'll show you and mark it as
14  "Exhibit 145."
15          MR. REISMAN:
16          142, right?  Did I miss one?
17  EXAMINATION BY MR. ALTMYER:
18      Q    Oh, 142.  I jumped ahead on the
19  exhibit list.  "Exhibit 142," and it's going
20  to be Dawn 227 to 228.  If you could review
21  that real quick.  Your name's at the top of
22  that, right?  This would have been an email
23  exchange that you would have printed out?
24      A    Yes.
25      Q    Okay.  Looking at this, is this the

Pages 269 to 272

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 273

1   group of email communications that you would
2   have had between yourself and Ivy Danos
3   related to the work that the CROSBY ENDEAVOR
4   was going to work with Shore for, in
5   October 2020?
6       A    So this email started off with Ivy
7   sending me all the on-hire information.
8       Q    And that's the 1:42 p.m. email,
9   October 2020?
10      A    1:24 p.m., yes.
11      Q    Okay.
12      A    And so I responded back, because I
13  was acting as a broker, on Shore's behalf,
14  that I didn't think they were going to want to
15  pay from 11:00 o'clock, especially since we
16  didn't put the -- especially since the boat
17  didn't leave until 2200, and Shore had also
18  put the fuel on the vessel.  So I had asked
19  them if they would be willing to adjust the
20  time, and then Ivy followed up, on
21  October 22nd at 8:21, that he talked to Kurt,
22  and that they declined the request to adjust
23  the start time on the vessel.
24      Q    Okay.  Looking back at these
25  communications, is that why the on-hire letter

Page 274

1   for the CROSBY ENDEAVOR was issued on
2   October 22nd and the work that the -- well,
3   let's say the mobilization from Port Fourchon
4   to High Island 116, to go work with Shore,
5   started on October 19th?
6       A    Wait, say that one more time.  I
7   just want to make sure I understand it.
8       Q    Is this the explanation as to why
9   the on-hire letter is dated October 22nd, but
10  then it says that the work started October
11  19th?
12      A    Yeah, I would think that's probably
13  the reason for the delay, because I was
14  waiting on confirmation from Crosby to confirm
15  their start time.
16      Q    Okay.  Do you recall having any
17  verbal communications or any further email
18  communications with Ivy Danos about switching
19  the start time back?
20      A    Verbal communications?
21      Q    Yes.
22      A    I don't remember.  I don't recall.
23      Q    Okay.  And if we can, could we just
24  look at the on/off hire and see what the
25  ultimate determination was?  I think it was

Page 275

1   379.
2       A    11:00 o'clock.
3       Q    Okay.  All right.  I'm going to ask
4   you about this email real quick.  This is
5   Bates labeled Dawn 226.  I've marked it as
6   "Exhibit 144."
7       A    Okay.
8       Q    Okay.  You've seen that email
9   before, right?
10      A    Yes.
11      Q    Okay.  This is an email that you
12  printed out?
13          MR. REISMAN:
14              What was the Bates number?
15          MR. ALTMYER:
16              226.  It's one of the last ones
17      in the packet.
18          MR. REISMAN:
19              Thanks.
20  EXAMINATION BY MR. ALTMYER:
21      Q    It's dated Sunday, October 25th,
22  2020, at 8:47 a.m., right?
23      A    Yes.
24      Q    And it's from Ivy Danos to you?
25      A    Yes.

Page 276

1       Q    It says, "See attached tropical
2   weather."  Looks like the attachments, it
3   says, "sc_c.pdf."  Do you see that?
4       A    Yes.
5       Q    Okay.  Do you remember what Ivy
6   Danos had sent to you, where it says, "See
7   attached tropical weather"?
8       A    I remember -- he sent me a text
9   message at some point, I don't know if it was
10  before or after this, asking if we had
11  heard -- because they hadn't heard what the
12  plan was for the THOR, what Shore had planned
13  for the THOR.
14      Q    Okay.  We'll look at that text
15  message in a second.
16      A    Okay.  So he sent this to me.
17      Q    Okay, gotcha.  I'll get that right
18  now so we can go back and forth with those.
19          THE WITNESS:
20              While you're doing that, do you
21      mind if I go get something to eat real
22      quick?  I'm starving.
23          MR. ALTMYER:
24              Yeah, sure.
25          THE WITNESS:

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 277

1    I'm just going to grab
2  something real quick.  Take a
3  five-minute break?
4      MR. ALTMYER:
5      Yeah.
6      (Whereupon, a break was taken;
7  4:12 p.m. - 4:23 p.m.)
8      MR. REISMAN:
9      Can you go ahead and redact, on
10  Exhibit 130, that rate?
11      MR. ALTMYER:
12      Yeah, absolutely.
13  EXAMINATION BY MR. ALTMYER:
14      Q    All right, Mr. Grace, we are back
15  on.  We left off talking about Dawn 226,
16  right?
17      A    Yes.
18      Q    And that was "Exhibit 144"?
19      A    Yes.
20      Q    I'm now going to show you and offer
21  as "Exhibit 143" Dawn 282 through Dawn 286.
22      A    Okay.
23      Q    Okay.  So the email on Dawn 226 is
24  October 25th, 2020, right?
25      A    Oh, we're back to that?  Yes.

Page 278

1      Q    Yeah, yeah.  So let's go to
2  October 25th on the text message exchange.
3      A    Okay.
4      Q    And just to confirm, looking at
5  Dawn 282 through Dawn 286, these are screen
6  shots of text messages between you and Ivy
7  Danos, right?
8      A    Correct.
9      Q    Okay.  And these are screenshots
10  that you would have personally taken from your
11  iPhone, right?
12      A    Yes.
13      Q    All right.  So let's go to Page 238
14  of the text messages.
15      A    Okay.
16      Q    You had mentioned earlier that Ivy
17  had contacted you about what the plans were
18  for the CROSBY ENDEAVOR, right?
19      A    Yeah, he had asked me.
20      Q    Okay.  And that would be the text
21  message on 283, that's under Sunday,
22  October 25th, 10:19 a.m.?
23      A    Yes.
24      Q    Okay.  "What or y'all toughs on
25  CROSBY ENDEAVOR and THOR for the storm."  I

Page 279

1  think that's supposed to be, "What are y'all's
2  thoughts on CROSBY ENDEAVOR and THOR for the
3  storm."  Is that the way you would read that?
4      A    Yes.
5      Q    Okay.  That was sent at 10:19 a.m.,
6  from Ivy Danos to you, right?
7      A    Correct.
8      Q    Okay.  226, the email exchange at
9  Exhibit 144, that was 8:47 a.m., where Ivy
10  Danos had sent you, "See attached tropical
11  weather" or some sort of tropical weather
12  data, right?
13      A    Yes.
14      Q    Do you remember what the tropical
15  weather data that was sent to you was?
16      A    I don't.
17      Q    Okay.  Was it something that was
18  readily accessible?  If you recall.  Something
19  that was readily accessible to Dawn, or was it
20  from like a subscription service?
21      A    That was -- it looks like it was
22  coming -- Crosby had submitted that to Dawn,
23  so that would have been their weather
24  forecast.
25      Q    Okay.  So it's just a weather

Page 280

1  forecast document that Crosby had and sent
2  over to you?
3      A    Yes.
4      Q    Okay.  Aside from these two email
5  communications at 8:47 a.m., or this one email
6  communication, 8:47 a.m., on October 25th,
7  2020, and the text message from Ivy Danos to
8  you, "What are y'all's thoughts on CROSBY
9  ENDEAVOR and THOR for the storm," did you have
10  any other conversations or communications with
11  Ivy Danos?
12      A    Well, yeah, because two and a half
13  hours later, two hours and 20 minutes later, I
14  asked them what it would be for a three-hour
15  minimum for, I guess -- it would be for an
16  assist tug to help the CROSBY ENDEAVOR.
17      Q    Or did he respond?  He says, "Mike,
18  it would be (blank) per hour"?
19      A    I'm sorry, you're right.  It did
20  say -- he did say, "Mike, it would be (blank)
21  per hour, for a three-hour minimum."  So I
22  must have reached out to him via phone and had
23  a conversation with them, because Shore would
24  have let me know that we were heading to
25  Fourchon.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 281

1      Q     Okay, gotcha.  So sometime between
2   10:19 a.m., on October 25th, 2020 -- and just
3   to confirm, these text message exchanges are
4   all in 2020, right?
5      A     Yes.
6      Q     Okay.
7         MR. PALMINTIER:
8            I can't hear you, Jacob.
9         MR. ALTMYER:
10           I'm moving.  I'm moving over.
11  EXAMINATION BY MR. ALTMYER:
12     Q     Just to confirm, the text messages
13  that are included within Dawn 282 to 286 are
14  all from 2020, right?
15     A     Yes.
16     Q     Okay, gotcha.  All right.  Let's go
17  back to Dawn 283.  So what I was asking was
18  sometime between 10:19 a.m., on October 25th,
19  2020, and 12:34 p.m., on October 25th, 2020,
20  you would have had a phone call with Ivy Danos
21  to discuss what your thoughts were on the
22  CROSBY ENDEAVOR and THOR for the storm?
23        MR. REISMAN:
24           Object to the form.
25        THE WITNESS:

Page 282

1            No, I wouldn't have had a
2   conversation with Ivy Danos.  I would
3   have had a conversation with somebody
4   from Shore about what they wanted to do.
5   They told me that they were heading to
6   Fourchon.  So I must have called Ivy and
7   asked him what he would charge for us to
8   broker the vessel, another vessel, to
9   Shore to help them in.  And that's when
10  he responded, on Sunday, October 25th,
11  at 12:34 p.m., saying, "Mike, it would
12  be (blank) per hour, three-hour
13  minimum."
14  EXAMINATION BY MR. ALTMYER:
15     Q     Okay.  Did you ever discuss on the
16  phone after -- No. 1, did you respond via text
17  message to Ivy Danos to the text message that
18  he sent you, on 10:19 a.m., "What were y'all's
19  thoughts on CROSBY ENDEAVOR and THOR for the
20  storm"?
21     A     He was asking what Shore's thoughts
22  were and what they were planning to do.
23     Q     Okay.  But he was trying to get
24  that information through you?
25     A     Right.  He had reached out to me.

Page 283

1   I don't know if he had reached out to Shore,
2   as well, but I then contacted Shore.
3      Q     Okay.  Then contacted Shore.  I
4   just wanted to know whether or not you had a
5   conversation with anyone at Crosby on this
6   topic, a phone call.
7      A     About?
8      Q     About what your thoughts on the
9   storm were.
10     A     I wouldn't have given my thoughts.
11  I mean, it's not my barge, it's not my tug.
12  It would have been up to Shore, what they
13  wanted to do.
14     Q     Did you ever discuss with Ivy Danos
15  on the phone, on October 25th, 2020, the
16  tropical weather data that he had sent to you?
17     A     No.  I don't -- I don't believe so.
18  I don't remember.  But I think he was looking
19  for direction from Shore on what their plans
20  were.
21     Q     Just to put some context in this,
22  when it says "Mike, it would be" and it's
23  redacted, "per hour, three-hour minimum," what
24  is that referring to?
25     A     That would have been a price that

Page 284

1   Crosby would have given for one of their
2   vessels to be the assist tug, coming in with
3   the THOR.
4      Q     Okay, gotcha.  And then you
5   respond, saying, we're just going to use the
6   LA MADONNA and the LA ELITE, from
7   International Marine?
8      A     Right.  They were cheaper.
9      Q     Understood.
10        MR. REISMAN:
11           I'm going to object to the
12        mischaracterization on the text.  He
13        didn't say that Dawn would be using it.
14        MR. ALTMYER:
15           Oh, he said -- okay, yeah.
16        MR. REISMAN:
17           You made a statement that
18        mischaracterized the text.  I just want
19        to make sure we clear that up.
20        MR. ALTMYER:
21           My apologies.  I'm just trying
22        to read this.
23  EXAMINATION BY MR. ALTMYER:
24     Q     All right.  "They will use
25  LA MADONNA and LA ELITE.  When will they be

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 285

1  departing?"  That's talking about the THOR
2  will use the LA MADONNA and the LA ELITE,
3  Shore Offshore Services?
4      A    Shore, yes.
5      Q    Okay, gotcha.  Did you ever have
6  any discussions with Ivy Danos regarding
7  Hurricane Zeta and how the CROSBY ENDEAVOR was
8  going to be moored to the THOR at the Martin
9  dock?
10     A    No, absolutely not.
11     Q    Okay.  I understand that Dawn does
12 not subscribe to any weather services; is that
13 correct?
14     A    Correct.  We use NOAA.
15     Q    Just free data?
16     A    Yeah.
17     Q    Did you ever -- did Dawn ever
18 communicate with Crosby about how the THOR was
19 going to moor to the dock?
20     A    No.
21     Q    Did you have any -- did Dawn have
22 any communication with Crosby about mooring
23 arrangements in connection with Hurricane
24 Zeta?
25     A    No.  I wasn't -- I mean, I'm just a

Page 286

1  broker, I mean, --
2      Q    Did Dawn ever communicate with
3  Crosby about a docking plan regarding the D/B
4  THOR, in connection with Hurricane Zeta?
5      A    No, that would be on Shore.  It's
6  their barge.  They tie it up.
7      Q    Did Ivy Danos ever tell you that
8  the CROSBY ENDEAVOR was going to tie up to the
9  THOR to ride out Hurricane Zeta?
10     A    No.
11     Q    So just to confirm, while Hurricane
12 Zeta is going on, on October 28th, 2020, and
13 this incident occurs, at that time Dawn had no
14 idea that the CROSBY ENDEAVOR was tied to the
15 THOR at the Martin dock?
16     A    Correct.
17     Q    When did Dawn first learn that it
18 was?
19     A    I don't remember when we first
20 learned that it was tied, but Ivy called me.
21         MR. REISMAN:
22            Just answer the question.
23         Don't --
24         THE WITNESS:
25            Okay.  Yes.

Page 287

1          MR. REISMAN:
2              Don't manufacture a question.
3          You want to answer -- just answer what
4          he's asking.
5          THE WITNESS:
6              I don't -- I don't know.
7  EXAMINATION BY MR. ALTMYER:
8      Q    Okay.  That leads into my next
9  question anyway.  In reviewing Dawn's
10 discovery responses, I saw a response to the
11 effect that at approximately 5:00 p.m., on
12 October 28th, 2020, Ivy Danos had called you
13 and advised that the THOR had broken free from
14 her moorings?
15     A    Yes.
16     Q    Does that sound accurate?
17     A    Yes.
18     Q    Okay.  Explain that communication
19 to us.
20     A    Ivy had called and said that the
21 THOR had broken free and that the ENDEAVOR
22 wasn't going to be able to stop it, with the
23 high winds.
24     Q    Okay.  Anything else you remember
25 about that conversation?

Page 288

1      A    I mean, other -- it actually --
2  they were floating down the canal.
3      Q    Was that the first communication
4  that you had with -- that Dawn had with
5  anybody at Crosby with respect to the
6  incident?
7      A    Yes.
8      Q    Did Dawn have any other
9  communications with Crosby about the incident?
10     A    Not -- not that particular -- no,
11 not at that time.
12     Q    No, I'm just talking about anytime
13 after that.
14     A    Yes, about the retrieval and going
15 to get the barge.
16     Q    Okay.  We'll talk about that in a
17 second.
18     A    Okay.
19     Q    But I'm just talking about the
20 incident itself.  Did you ever talk with Ivy
21 Danos after that about what happened?
22     A    I don't remember.  I don't
23 remember.  I can't answer that.  I don't
24 remember.
25     Q    If you did, via email, that should

Pages 285 to 288

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 289

1   be --
2        A    That would be all --
3        Q    All in your emails?
4        A    Yeah.
5        Q    Okay.  But it could have been by
6   phone, not recorded?
7        A    Right.
8        Q    Okay.  You just don't remember, one
9   way or the other, whether you did or not?
10       A    I mean, the moments afterwards, I
11  had -- we were trying to figure out what was
12  going on, so I had made some phone calls to
13  Cody.  He didn't answer.  I tried calling
14  Tommy.  I don't remember if Tommy answered or
15  not.  Tommy called me back.  He was aware of
16  the situation, and then said, "We need to get
17  the barge."
18            So I had actually reached out to
19  Louisiana International to see if they had
20  anything.  But their vessels were too deep to
21  get to the barge, as it was floating down the
22  canal.  I guess it got to a spot where it was
23  getting shallow.  So I called Ivy, and Ivy
24  had -- they had the boats, Crosby had the
25  boats.

Page 290

1        Q    Okay.
2            MR. REISMAN:
3            Just answer the question he's
4   asking.
5            THE WITNESS:
6            All right.
7   EXAMINATION BY MR. ALTMYER:
8        Q    So that kind of goes into the next
9   line of text messages, right --
10       A    Okay.
11       Q    -- only 283.  Let's look at
12  Wednesday, October 28th, at 5:49 p.m.
13       A    Right.
14       Q    You had texted to Ivy, "Let me know
15  when they get going."  That's referring to the
16  tugs that Crosby was going to send out?
17       A    Yes.
18       Q    Okay.  Let's go to the next page,
19  284.  I know that there's not like the time
20  stamps that are next to it when you move your
21  phone, but it looks like sometime after that,
22  and if we turn to the next page, you could see
23  that it's sometime between 5:49 and 10:16
24  p.m., on October 28th, right?
25       A    Yes.

Page 291

1        Q    Okay.  You had responded -- I mean,
2   you had texted Mr. Danos again, "Have they
3   left yet?"  That's referring to the tugs that
4   went out to get the THOR and bring it back to
5   the Martin dock, right?
6        A    Yes.
7        Q    Okay.  He responds, "Wind still too
8   strong," right?
9        A    Yes.
10       Q    Okay.  You responded, "Whatever
11  they can do to get going would be much
12  appreciated," and then there's a photograph
13  of, it looks like, an Amazon Basics legal pad
14  with some coordinates on there, right?
15       A    Yes.
16       Q    Okay.  That's a photograph that you
17  had received from Tommy Gibilterra, right?
18       A    Correct.
19       Q    Okay.  You sent that, the
20  coordinates, that was where the THOR was
21  located, right?
22       A    Correct.
23       Q    Ivy Danos responds, "Thanks"?
24       A    Yes.
25       Q    Let's go to the next page.  The

Page 292

1   next four text messages are from you to Ivy,
2   right?
3        A    Right.
4        Q    "Have they left?  What four boats
5   are you sending?  Updates?  Wind finally died
6   here in the city.  Sorry to be a pain, but my
7   customer called again looking for another
8   update"?
9        A    Yes.
10       Q    And so that's just looking to see
11  what the status of the Crosby boats were that
12  were going out to retrieve the THOR, what the
13  ETA was for that?
14       A    Yes.
15       Q    Okay.  10:16 p.m., he texted you?
16  "They at THOR," right?
17       A    Right.
18       Q    All right.  We're just going to say
19  read, this the correct way, that you had
20  corrected it.  It just says, "F they underway
21  to the dock?"
22       A    It should be, "Are they underway to
23  the dock?"
24       Q    Yeah.  I'm not going to read the
25  other one.

Pages 289 to 292

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 293

1     A    Yeah.
2     Q    And then, "Waiting the barge to be
3   ready," Ivy had sent that, and also said,
4   "They departed with THOR." So that's sometime
5   between 10:16 p.m. and 3:59 a.m., on Thursday,
6   October 29th, right? Well, let me clarify
7   that. Sometime between 10:16 p.m., on
8   October 28th, and Thursday, October 29th, at
9   3:59 a.m., right?
10    A    Yes.
11    Q    All right. And then. Around 4:00
12  a.m., 3:59, you get a text from Ivy, saying
13  that they are back at the dock with the THOR,
14  right?
15    A    Yes.
16    Q    Okay. And just to note, for the
17  next part of correspondence, on October 29th,
18  it's like 11:23 a.m., "Checking on ENDEAVOR
19  and THOR." That's -- the ENDEAVOR got sent
20  offshore again, correct, October 29th? Are
21  you familiar with that?
22    A    I'm not familiar with that.
23    Q    Okay. Did Dawn facilitate any work
24  between -- I guess it would have been TOPS,
25  the D/B Swing Thompson and the CROSBY

Page 294

1   ENDEAVOR, on October 29th?
2     A    I don't know. I don't even know
3   what you're talking about.
4     Q    Okay. Then you don't know what I'm
5   talking about.
6     A    Yeah.
7     Q    Okay. In reviewing Dawn's
8   discovery responses, I saw a response in there
9   that was to the effect that you had advised
10  Shore that it was Dawn's position, this is
11  after the incident, that the Master Vessel
12  Time Charter was not going to apply to Dawn
13  providing the ENDEAVOR to Shore. Do you
14  recall that?
15    A    Yes.
16    Q    Okay. Do you remember if that was
17  done via phone, via email?
18    A    It was actually -- I think our
19  lawyers had written those responses. That's
20  the discovery, right?
21    Q    Yeah, yeah, yeah.
22    A    Yeah, yeah.
23    Q    Do you recall, after the incident,
24  ever talking with anyone at Shore about
25  whether or not the Master Vessel Time Charter

Page 295

1   was going to apply?
2     A    I don't remember.
3     Q    Okay.
4         MR. REISMAN:
5           Apply to what?
6         MR. ALTMYER:
7           To the -- let's say just the
8     on-hire of the CROSBY ENDEAVOR, in
9     October of 2020.
10        THE WITNESS:
11          Well, I mean, I always -- I
12    always knew that it didn't apply. I
13    mean, it wasn't our vessel, it wasn't
14    something that we controlled.
15        MR. REISMAN:
16          He's asking if you ever had any
17    conversations with anybody at Shore,
18    where it was discussed that the Master
19    Vessel Time Charter does not apply to
20    brokerage situations.
21  EXAMINATION BY MR. ALTMYER:
22    Q    After the incident.
23        MR. REISMAN:
24          Even afterwards, for anything
25    else.

Page 296

1         THE WITNESS:
2           Oh, the -- so there was a -- so
3     they had contacted us afterwards to move
4     the THOR to the shipyard to get fixed,
5     and Cody had actually reached out to me
6     and said, "We need to get a contract in
7     place, because his legal team had
8     advised them that the contract didn't
9     apply to brokered vessels," and so, on
10    that occasion and one other occasion,
11    when the D/B PERFORMANCE went down to
12    Brazil, for Shore, we had signed two, on
13    separate occasions, back-to-back
14    agreements with the vessel owners, Dawn,
15    and then Dawn to Shore.
16  EXAMINATION BY MR. ALTMYER:
17    Q    Okay. Do you recall specifically
18  that Cody had told you that his legal team had
19  told him that the Master Vessel Time
20  Charter --
21    A    Yes.
22    Q    -- did not apply --
23    A    Yes.
24        MR. REISMAN:
25          Let him finish his question.

Pages 293 to 296

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 297

1    THE WITNESS:
2        Okay, I'm sorry.
3    EXAMINATION BY MR. ALTMYER:
4        Q    Okay.  You remember that
5    specifically --
6        A    Yes.
7        Q    -- that Cody Sims told you that?
8        A    Yes.
9        Q    Okay.
10       MS. BONNAFFONS:
11           I'm sorry, I can't hear the
12       question again.
13       MR. ALTMYER:
14           I was asking the witness if he
15       remembered specifically Cody Sims
16       telling him that.
17       MS. RICHBOURG:
18           We just need you to speak up a
19       little bit more, please.
20       MR. ALTMYER:
21           We're trying here, we're
22       trying.
23           (Whereupon, a discussion was
24       held off the record).
25       MR. ALTMYER:

Page 298

1        All right.  We can go back on.
2    EXAMINATION BY MR. ALTMYER:
3        Q    Did Dawn have any communications
4    with the Coast Guard with respect to the
5    incident?
6        A    No.
7        Q    Are you aware of anyone from Dawn
8    ever giving a witness statement to the Coast
9    Guard --
10       A    No.
11       Q    -- with respect to the incident?
12       A    No.
13       Q    Okay.  In reviewing Dawn's
14   discovery responses, I had seen mention of an
15   investigation by Dawn of the incident.  Do you
16   recall that?
17       MR. REISMAN:
18           Can you show him that?
19       MR. ALTMYER:
20           Yeah, yeah.  In fact, let me
21       search for it real quick so I know
22       exactly where it's at.
23   EXAMINATION BY MR. ALTMYER:
24       Q    And I'll ask you this, while it's
25   loading.  Did Dawn perform any root cause

Page 299

1    analyses or incident investigations in
2    connection with the incident?
3        A    Not that I'm aware of.
4        Q    Okay.  There could be one, you just
5    were not a part of it?
6        A    Yeah, I'm not -- there could be
7    one, but I'm not sure.  I don't think so.
8        Q    Okay.
9        A    You know, it wasn't our barge or
10   our tug.  We were just a broker.
11       Q    Looking back at it, if counsel for
12   Dawn had an investigation, I'm not going to
13   ask you about that.  But as far as you know,
14   there were no incident reports or root cause
15   analyses that were performed by Dawn in
16   connection with this incident?
17       A    Yes.
18       Q    Okay.  I'll ask you this.  Were you
19   contacted by Crosby or anyone at Crosby in
20   connection with any incident investigation
21   that they were undertaking?
22       A    No.
23       Q    I understand that Dawn had no
24   employees in Port Fourchon during Hurricane
25   Zeta, is that accurate?

Page 300

1        A    Yes.
2        Q    Did Dawn have any vessels located
3    in Port Fourchon during Hurricane Zeta?
4        A    No.
5        Q    Did Dawn discipline any of its
6    employees in connection with the incident?
7        A    No.
8        Q    Did Dawn change any of its policies
9    and procedures as a result of the incident?
10       A    No.  It wasn't -- again, it wasn't
11   our vessels, so --
12       Q    I'm going to go through -- this is
13   just some of the vessel names that I had seen
14   in some of the correspondence, back and forth.
15   We're not going to go over the correspondence.
16   I'm just going to ask you, vessel names, if
17   you're familiar with it, and if you know who
18   owns it, owns the boat.
19       A    Okay.
20       Q    I had seen some mention of the
21   M/V KAREN KOBY.  Do you recall that vessel
22   name?
23       A    Yes.
24       Q    Okay.  That was a vessel that was
25   provided to Shore in 2020, correct?

Pages 297 to 300

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 301

1      A    Yes.
2      Q    Okay.  Do you know who owns that
3  vessel?
4      A    LA Carriers.
5      Q    And just generally speaking, do you
6  recall what that vessel was being used for?
7      A    I believe it was used to move the
8  material barge from -- I don't know if it was
9  from Fourchon or Cat Island sea buoy back to
10 it's demobe port.
11     Q    Gotcha.  And I should be able to
12 find an on-hire letter for that, right?
13     A    Yes.
14     Q    Okay.  Did you have any written
15 contracts in place with LA Carriers?
16         MR. REISMAN:
17             Object to the form.
18 EXAMINATION BY MR. ALTMYER:
19     Q    In October 2020?
20     A    No, I don't believe so.
21     Q    Okay.  So no MSAs, Master Vessel
22 Time Charters, anything like that?
23     A    Not to my knowledge.
24     Q    Let me ask you this.  Do you
25 recall, it was the email, the Crosby email to

Page 302

1  Ivy Danos, the Master Service Agreement
2  regarding the brokerage of the vessel that you
3  testified about earlier?
4      A    Yes.
5      Q    Okay.  Do you recall sending that
6  to any other company and getting a signed copy
7  back?
8      A    I don't -- I don't know.  I don't
9  believe so.
10     Q    Okay.
11     A    I don't believe so.
12         MR. REISMAN:
13             You don't believe you sent it
14         to anybody or you don't believe you got
15         a signed copy back?  I'm going to object
16         to the form of the question.
17         MR. ALTMYER:
18             Yeah, I appreciate that,
19         though, yeah.
20         THE WITNESS:
21             Yeah, we might have sent it to
22         some other people, but I don't think we
23         got anything back.
24 EXAMINATION BY MR. ALTMYER:
25     Q    Okay.  As far as you know, and

Page 303

1  speaking on behalf of Dawn, there are no
2  Master Service Brokerage Agreements that were
3  in place for October 28th, 2020?
4         MR. REISMAN:
5             I'm not trying to be overly
6         narrow, but are you talking about on
7         that form or something similar to that
8         form?
9         MR. ALTMYER:
10             On that form or something
11         substantially similar.
12         THE WITNESS:
13             I don't believe there is.
14 EXAMINATION BY MR. ALTMYER:
15     Q    Okay.  For the KAREN KOBY being
16 owned by a different company, it's Dawn's
17 position that the 2017 Master Vessel Time
18 Charter did not apply to that, correct?
19         MR. REISMAN:
20             Object to the form.
21         Mischaracterizes his prior testimony.
22         He gave a litany of factors besides just
23         ownership, on which the determination is
24         made as to whether it's subject to the
25         charter or not.

Page 304

1  EXAMINATION BY MR. ALTMYER:
2      Q    We'll just talk about the vessel,
3  just as a whole.  It's Dawn's position that
4  the 2017 Master Vessel Time Charter doesn't
5  apply to the work that was being performed by
6  the KAREN KOBY in 2020, right?
7      A    Correct.  We didn't operate it.  We
8  didn't control it.  We didn't provide the
9  vessel.
10     Q    Understood.  I think it's probably
11 said the ELSBETH, but it's the ELSBETH I and
12 the ELSBETH II.  Are you familiar with those
13 named vessels?
14     A    Yes.
15     Q    Okay.  Those were vessels that were
16 provided to Shore in 2020, right?
17         MR. REISMAN:
18             Object to the form.
19         THE WITNESS:
20             We didn't provide them.
21 EXAMINATION BY MR. ALTMYER:
22     Q    Or facilitated, brokered?
23         MR. REISMAN:
24             Object to the form.
25         THE WITNESS:

Pages 301 to 304

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 305

1       Yeah.
2    EXAMINATION BY MR. ALTMYER:
3       Q    Okay.  Who owns those vessels?
4       A    Smith Maritime.
5       Q    Are you aware of any contracts that
6    Dawn had with Smith Maritime in effect on
7    October 28, 2020?
8       A    Not October 28, 2020.
9       Q    All right, I'm sorry, just -- let's
10   say in 2020.  Any contracts they would have
11   had in effect at that time?
12      A    Not at that time, with them, but we
13   did have a contract with them.  They were one
14   of the companies that we used to move the THOR
15   to the shipyard, that we got a contract with.
16      Q    So after the incident?
17      A    After the incident, yes.
18      Q    Okay.  Dawn's position is that the
19   2017 Master Vessel Time Charter does not apply
20   to the work that was being performed by those
21   two vessels, the ELSBETH I and the ELSBETH II?
22      A    It's "ELSBETH."
23      Q    ELSBETH?
24      A    ELSBETH, yeah.
25      Q    Okay.  The M/V TRENT JOSEPH, you're

Page 306

1    familiar with that vessel?
2       A    Yes.
3       Q    Okay.  That's a Coastal Towing
4    vessel, right?
5       A    Correct.
6       Q    And that was a vessel that was
7    brokered, facilitated or provided to Shore in
8    2020, right?
9            MR. REISMAN:
10               Object to the form.
11           THE WITNESS:
12               Not provided.
13   EXAMINATION BY MR. ALTMYER:
14      Q    Okay.  Brokered?
15      A    Brokered, yes.
16      Q    Okay.  I'll just start using the
17   word "brokered" when I do this for you.  For
18   the ELSBETH I and II, I should be able to go
19   back and find on-hire or on-hire and off-hire
20   letters for those vessels, right?
21           MR. REISMAN:
22               Object to the form.
23           THE WITNESS:
24               Wait, say that again.
25   EXAMINATION BY MR. ALTMYER:

Page 307

1       Q    For the ELSBETH I and the
2    ELSBETH II, I should be able to find, in email
3    correspondence, on-hire letters for those
4    vessels, right?
5            MR. REISMAN:
6                Object to the form.
7            THE WITNESS:
8                On-hire letters?
9    EXAMINATION BY MR. ALTMYER:
10      Q    On-hire letters issued to Shore?
11           MR. REISMAN:
12               Object to the form.
13           THE WITNESS:
14               Wait, say it one more time.
15   EXAMINATION BY MR. ALTMYER:
16      Q    Yeah, yeah, yeah.  So for the
17   ELSBETH I and the ELSBETH II, --
18           MR. REISMAN:
19               I'll make the objection in
20   advance because I don't want to distract
21   him.
22           MR. ALTMYER:
23               Okay.
24   EXAMINATION BY MR. ALTMYER:
25      Q    For the ELSBETH I and ELSBETH II, I

Page 308

1    just wanted to know, if I was to look in
2    Dawn's emails, I should be able to find an
3    on-hire letter that was issued for the work
4    that was being performed for Shore by those
5    two vessels?  I should be able to find an
6    on-hire letter?
7       A    We didn't perform.  We were just
8    brokering.
9       Q    No, that those vessels were
10   performing.  I just should be able to find an
11   on-hire letter from Dawn --
12      A    That they were brokered?
13      Q    Yeah, they were brokered.
14      A    If they were brokered, yes.
15      Q    Okay.  Yeah, I just wanted to know
16   if I should be able to see an on-hire letter
17   that says ELSBETH I and ELSBETH II, that Dawn
18   had issued to Shore.
19      A    To broker, yes.
20      Q    Okay.  Using the same on-hire form
21   that we talked about many times earlier today
22   in the deposition?
23      A    Yes.  Subject, vessel owner,
24   mutually agreed upon vessel owner, with Shore.
25      Q    I do want to follow up at this

Pages  305 to 308

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 309

1    point with the language that you just
2    mentioned.  If you can, just pull one of the
3    on-hire letters, and just read the exact
4    language that you were just discussing just
5    now, the subject --
6        A    Subject, 3.25 availability in a
7    mutual agreement between vessel owner and
8    Shore Offshore, LLC.
9        Q    Okay.  Do you know if there were
10   any agreements in place between Shore and
11   Break of Dawn, Inc., in 2019.
12       MR. REISMAN:
13           Object to the form.
14       THE WITNESS:
15           I think we've already
16       established that they're Dawn
17       affiliates, and so the contract would
18       apply for Dawn and its affiliates,
19       because we controlled, operated, manned,
20       provided insurance.
21   EXAMINATION BY MR. ALTMYER:
22       Q    Okay.  So it's Dawn's position that
23   the Master Vessel Time Charter, as a whole,
24   just applies to Dawn and all of its
25   affiliates?

Page 310

1        A    Dawn and all of its affiliates.
2        Q    Okay.  So it's Dawn's position and
3    testimony here today that all of the entities
4    that we had looked at on Dawn 407 that are
5    affiliates of Dawn Services, LLC, are parties
6    to the contract or the Master Vessel Service
7    Agreement?
8        MR. REISMAN:
9            Object to the form.  And this
10       has all been asked and answered
11       previously.  But separate and apart from
12       that, I object to the form.
13       THE WITNESS:
14           Can you ask the question again,
15       because I feel like I've already
16       answered it before, so --
17   EXAMINATION BY MR. ALTMYER:
18       Q    Okay.  No, no, I just want to know,
19   it's Dawn's position that the 2017 Master
20   Vessel Service Agreement is entered into
21   between Shore Offshore Services and Dawn
22   Services, LLC, and all of Dawn Services, LLC's
23   affiliates?
24       MR. REISMAN:
25           Object to the form.

Page 311

1        THE WITNESS:
2            It is entered into, agreement
3        with Dawn, and all of the companies that
4        we control, operate, --
5    EXAMINATION BY MR. ALTMYER:
6        Q    Okay.
7        A    -- man.
8        Q    So for -- and we'll go back to, if
9    you can look for me real quick, it's the
10   exhibit with -- it's from June 2019, the
11   M/V BREAK OF DAWN on-hire letter.
12       A    Yeah.
13       Q    I just want to confirm.  So it's
14   Dawn's position that the subject to mutual
15   agreement between vessel owner and Shore
16   Offshore Services, that is fulfilled on that
17   on-hire letter?
18       A    Yeah.  Vessel owner, Dawn and
19   Dawn's affiliates, vessel owners.
20       Q    Okay.  So that's how you're reading
21   that?
22       A    Yes.
23       Q    Okay.  The M/V MISS BETH, do you
24   know who owns that vessel?
25       A    T & D Towing.

Page 312

1        Q    That was a vessel that was provided
2    to Shore in 2020, or brokered to Shore in
3    2020?
4        A    Yes.
5        Q    Okay.  You just looked at a
6    document.  What is that that you're looking
7    at?
8        A    It is a list of vessels that had --
9    that were -- a list of vessels that we -- I
10   was asked to put together this list, in that
11   document request.  It's all the vessels that
12   were used.
13       Q    Okay.  All the vessels that were
14   used?
15       A    By Shore.
16       Q    Okay, gotcha.  So specifically in
17   which request are we talking about?  We're
18   talking about for the subpoena request?
19       A    Yeah.
20       MR. REISMAN:
21           You guys asked him to note all
22       of the vessels that were brokered or
23       chartered, and so he wrote down all the
24       vessels.
25   EXAMINATION BY MR. ALTMYER:

Pages  309 to 312

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 313

1      Q     Okay.  So this is all of the
2  vessels that were either brokered or chartered
3  to Shore Offshore Services from June 9, 2017
4  to the present?
5      A     Yes.
6      Q     Okay.  That was done in your own
7  handwriting?  You personally wrote that list?
8      A     Yes.
9          MR. ALTMYER:
10          Is it okay if I attach that?
11         MR. REISMAN:
12          No.  He did that at my specific
13      request, so no, we're not going to
14      attach that.  If you have a question
15      about a vessel, he can refer to it and
16      answer your questions.
17         MR. ALTMYER:
18          Okay.  I'm going to ask you to
19      now tell me, since it's a topic, what
20      are all the vessels that Dawn chartered
21      or brokered to Shore from June 9, 2017,
22      to the present.
23         MR. REISMAN:
24          You have access to that.  I
25      mean, look, this deposition's gone on a

Page 314

1  long time and there are other people
2  that have to ask questions, and that's
3  information you have.  If you haven't
4  gotten it yet, send me a discovery
5  request.  We'll send you every vessel.
6  We're happy to -- we're not trying to
7  hide behind that at all.  We're happy to
8  give it to you.  But that's information
9  that Shore has.  You're asking us to
10 tell you which vessels did Shore use.
11 Shore knows that.
12         MR. ALTMYER:
13          I think we did ask that
14      question already in the response that --
15         MR. REISMAN:
16          Shore knows it and has it.
17      We're happy to give you the information.
18      But, come on, I mean, it's 5:00 o'clock.
19      Do we really need to go through every
20      vessel?
21         MR. ALTMYER:
22          To my defense, David, there's
23      been a lot of --
24         MR. REISMAN:
25          You can defend yourself.

Page 315

1          MR. ALTMYER:
2          There's a lot of delays that
3      happened for stuff on this.
4          MR. REISMAN:
5          I agree.
6          MR. ALTMYER:
7          I do think that I'm entitled to
8      ask that question.  It is a specific
9      topic that's listed on here.
10         MR. REISMAN:
11          And we're going to give it to
12      you.  That's what I'm saying.  You're
13      going to get the list.  Just send me a
14      request.  We'll give you the list.  But
15      are we going to be here for an hour
16      while he reads boat names?
17         MR. ALTMYER:
18          All I'm asking is that we just
19      attach the list instead.  I think that's
20      easier, but --
21         MR. REISMAN:
22          Let me see the list.  Why don't
23      you keep going.  Let me look at this.
24         MR. ALTMYER:
25          Okay.

Page 316

1  EXAMINATION BY MR. ALTMYER:
2      Q     You may have to refer back to that
3  for these next couple of questions, but -- so
4  you said it's T & D Towing that owned the MISS
5  BETH?
6      A     Yes.
7      Q     Okay.  Dawn's position is the 2017
8  Master Vessel Time Charter did not apply to
9  the operations conducted by the MISS BETH in
10 2020, right?
11     A     Yes.
12         MR. ALTMYER:
13          What do you think?
14         MR. REISMAN:
15          I mean, are you going to ask 20
16      questions about every vessel on the
17      list?
18         MR. ALTMYER:
19          I'm not going to ask every
20      single one on that, no.  That was just
21      the ones that I had seen in the emails.
22      And to be completely honest, like, I
23      think that that's completely fair,
24      because what I can tell and what Dawn
25      produced --

Pages 313 to 316

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 317

1    MR. REISMAN:
2        If the question is which
3    vessels were chartered, I think that's
4    what you want to know --
5    MR. ALTMYER:
6        I want to know which vessels
7    were chartered and which ones are
8    brokered.
9    MR. REISMAN:
10       If you want to know that -- it
11   you want to know which vessels are
12   chartered, what he's going to tell you
13   is what he already told you, that if it
14   was in the Dawn fleet of vessels, owned
15   by Dawn or one of its affiliates, and
16   otherwise, satisfy the requirements of
17   the charter, to be chartered, then it
18   was chartered.
19       If it was a third-party vessel,
20   not owned or operated, controlled,
21   manned by Dawn, then it's not.
22       I mean, he's been very clear
23   about that.  He's said it several times
24   repeatedly, even when you didn't ask him
25   a few times, he's said it.

Page 318

1        So, I mean, he can provide you
2    the list, and if you want to know who
3    owns the vessels, they can tell you
4    that.  But, I mean, to take time in a
5    deposition to establish that, that seems
6    like a waste of time, and I know there
7    are other people that have questions
8    they want to ask.
9        And I'll be honest with you.
10   Most of the delays today have been
11   associated with the fact that you didn't
12   have an audio setup for this.  That's
13   not our obligation.  We didn't notice
14   this deposition.  We didn't provide the
15   court reporter.  We were not responsible
16   for this, but yet, I've had my people --
17   I'm not.  How am I responsible for that?
18   MR. ALTMYER:
19       I know, just -- that's not --
20   MR. REISMAN:
21       But I'm just saying, that's
22   been -- most of the delays have been
23   associated with that.  I don't want to
24   waste any more time.  I want to get
25   going.

Page 319

1        As I told you, he's got some
2    place he would like to be for his family
3    this evening.  You know, he's going to
4    do what he needs two do here today, but
5    I just would like to move on.
6        So going through a hundred
7    questions about a hundred vessels, or
8    whatever it is, is not, to me, doesn't
9    seem very necessary or productive.
10   We'll give you the information.
11   MR. ALTMYER:
12       All right, I appreciate what
13   you're saying, David, but also, at the
14   same time, too, like -- to throw that on
15   me, to like -- I learned this morning
16   that you have something to do after
17   this, and this is also a date that's
18   been selected.  That's not --
19   MR. REISMAN:
20       Look, I'm not -- I'm not saying
21   you have an obligation to let him out,
22   I'm not saying that.  I'm just saying,
23   in the interest of getting this thing
24   going and getting it over with, I mean,
25   if that's all you want to know about

Page 320

1    that, we're going to tell you that.  You
2    know, if that's the questions, those are
3    the questions you have and the
4    information you want from that, we'll
5    give it to you.
6    MR. ALTMYER:
7        Well, I want other information,
8    as well, and -- I'm just going to ask
9    some questions, sir.
10   EXAMINATION BY MR. ALTMYER:
11   Q    Did you have any Master Time
12   Charters or Master Service Agreements in
13   effect with T & D Towing?
14   MR. REISMAN:
15       You've already asked him if
16   they had those with anybody.  You aske4d
17   him that.  So, I mean, if we're going to
18   be repetitive, then I'm going to put my
19   foot down, so you're not going to ask
20   the same question over and over.
21   EXAMINATION BY MR. ALTMYER:
22   Q    Did you have any contracts between
23   June 9, 2017, in effect, and the present, in
24   effect between Dawn and T & D Towing?
25   A    I don't believe so.

Pages 317 to 320

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 321

1      Q    Okay.  With any of the vessels that
2  are brokered, on the list that you brought
3  here with you today, do you have any contracts
4  in effect with those parties from June 9,
5  2017, to the present?
6      A    No, I don't believe so.
7          MR. REISMAN:
8              Are you talking about for
9          brokerage?  He's told you that there
10         were two special occasions that he's
11         mentioned.  So I don't know if, if you
12         were clear, if he's clear what you're
13         asking him there.
14  EXAMINATION BY MR. ALTMYER:
15     Q    I want to know, before
16  October 28th, 2020, --
17         MR. REISMAN:
18             Before October 28th?
19         MR. ALTMYER:
20             Yeah.
21  EXAMINATION BY MR. ALTMYER:
22     Q    I just want to know if you had any
23  contracts in place with any --
24     A    I don't believe so.
25     Q    -- vessels that you contend that

Page 322

1  were brokered?
2      A    I don't believe so.
3      Q    Okay.  And that list that you're
4  talking about, I should be able, in reading
5  that, to tell what Dawn's position is on
6  whether or not they brokered a vessel or
7  whether or not they chartered a vessel?
8      A    I would think so.
9          MR. ALTMYER:
10             Okay.  I'm just going to ask
11         him some questions about it.
12  EXAMINATION BY MR. ALTMYER:
13     Q    The list has vessel names on there?
14     A    Vessel names.
15     Q    Does it also have the owner's
16  names?
17     A    No.
18     Q    Okay.
19         MR. REISMAN:
20             He can tell you every Dawn
21         vessel.
22         MR. ALTMYER:
23             Okay.
24         MR. REISMAN:
25             We've already discussed them,

Page 323

1  but --
2          MR. ALTMYER:
3              Okay.  Yeah, yeah.
4          MR. REISMAN:
5              -- he can tell you those.
6          Again, we're not trying to hide any of
7  this from you.  We're just trying to be
8  expedient.
9          MR. ALTMYER:
10             I respect that, okay.
11         Admittedly, at the same time, if he's
12         got the list, it was part of the areas
13         of inquiry.  There was a request for
14         production along with that, that might
15         have been a little helpful to just have
16         ahead of time, if that's fair.
17  EXAMINATION BY MR. ALTMYER:
18     Q    The HENRY T, is that on that list?
19     A    Yes.
20     Q    Okay.  Who owns the HENRY T?
21     A    I believe it's T & T Marine.
22     Q    Do you recall if Dawn had any
23  contracts in place with T & T Marine between
24  June 9, 2017, and October 28, 2020?
25     A    We did not.

Page 324

1      Q    There were some photos that were
2  produced in Dawn's discovery request.  Do you
3  recall ever receiving photos from anyone, of
4  the Martin dock, after the incident?
5      A    I don't.
6      Q    Okay.
7      A    I don't remember seeing photos
8  produced, no.
9      Q    Do you recall ever receiving any
10 videos?
11     A    No.
12     Q    Okay.  Do you know if anyone at
13 Dawn had received any photos or videos?
14     A    I'm not sure.
15     Q    I'm not talking about your lawyers,
16 just anyone at Dawn.
17     A    I'm not sure.
18         MR. ALTMYER:
19             I have one more topic that I'm
20         not going to spend much time on, but --
21         MR. REISMAN:
22             We'll provide you that list and
23         we'll list the owner and whether we
24         think it was chartered or brokered.
25         MR. ALTMYER:

Pages 321 to 324

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 325

1    With that, I am happy to accept
2  it.
3        MR. REISMAN:
4            We'll do that.
5        MR. ALTMYER:
6            Thank you.  You got that on the
7  record, huh?
8        MR. REISMAN:
9            It's on the record.  It's going
10  to take him a little bit of time to do
11  it, but we'll get that to you in due
12  course, within a week or so.  Can you do
13  that within a week?
14        THE WITNESS:
15            Yes.
16        MR. REISMAN:
17            Okay.
18  EXAMINATION BY MR. ALTMYER:
19        Q    I'll just ask you a general
20  question while I'm flipping through my notes.
21  In any of the documents that you reviewed
22  today that we attached as exhibits here, did
23  you have any issue with the authenticity of
24  those documents?
25        A    No.

Page 326

1        Q    Just a few questions on a final
2  topic.  I may have a few questions later on
3  after, I think, Mr. Grinnan has some
4  questions, but I'm going to pass you after
5  this little topic here.
6            It's the last topic on the areas of
7  inquiry.  Dawn's insurance coverage for
8  Shore's claims against Dawn and the claimants'
9  claims against Dawn.  Was it your
10  understanding that Dawn had insurance coverage
11  for boat brokering, as of October 28, 2020?
12        A    Yes.
13        Q    Okay.  Was coverage sought from --
14  well, was coverage sought from Dawn's
15  insurance carrier for the claims brought
16  against Dawn in this case?
17        A    Wait, say that again.
18        Q    Did you seek insurance coverage
19  from your insurer?
20        A    We've notified our insurance.
21        Q    Notified insurer, okay.  Was
22  coverage accepted or denied?
23        A    I'm not a hundred percent -- I
24  don't know.  I know it was submitted.
25        Q    Okay.  Are you aware of whether or

Page 327

1  not -- so insurer, in that respect, is that
2  Mitsui?
3        A    Yes.
4        Q    Okay.  Are you aware of whether or
5  not Mitsui had issued a Reservation of Rights
6  letter to Dawn?
7        A    I believe they have issued a
8  Reservation of Rights letter.
9        MR. REISMAN:
10            They have or have not?
11        THE WITNESS:
12            Have.  Have.
13  EXAMINATION BY MR. ALTMYER:
14        Q    Okay.  Have you seen that letter
15  before?
16        A    Just briefly.
17        Q    Okay.  To your knowledge, was that
18  document produced by Dawn, in discovery in
19  this case?
20        A    I don't know.
21        Q    As the records custodian of Dawn,
22  which we talked about earlier as being one of
23  your roles, were you asked to provide a copy
24  of that document to be produced in connection
25  with this litigation?

Page 328

1        A    I don't -- it was a lot of
2  documents.  I don't remember.
3        MR. REISMAN:
4            Jacob, I will tell you, on the
5        record, we have it.  There is a
6        Reservation of Rights letter that has
7        been issued.  We have it.  We have not
8        produced it because we don't think it's
9        necessarily discoverable, and I'm not
10        sure whether it was asked for, if there
11        would be an issue, but not only do we
12        have it, we've disclosed that we have
13        it, so --
14        MR. ALTMYER:
15            Okay.
16  EXAMINATION BY MR. ALTMYER:
17        Q    Do you recall any of the contents
18  of the Reservation of Rights letter?
19        A    No.
20        Q    Do you know if Mitsui is paying for
21  the defense of Dawn's claim?
22        A    Yes.
23        Q    Of the claims asserted against Dawn
24  in connection with this litigation?
25        A    Yes.

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 329

1      Q     Okay.  Who's Dawn's insurance
2  broker?
3      A     USI.
4      Q     Specific, who's the contact that
5  you use at USI?
6      A     Chris Casbarian.
7      Q     And I should be able to look at
8  the -- to know it was in effect, October 28,
9  2020, look at the COI, that you testified
10  earlier was provided to Shore, right?
11      A     Yes.
12      Q     Are you aware, one way or the
13  other, whether or not Shore is listed as an
14  additional insured on any of Dawn's insurance
15  policies that were in effect on October 28,
16  2020?
17      A     Wait.  Say that again.
18      Q     Do you know, one way or the other,
19  if Shore was listed as an additional assured
20  on any of Dawn's policies in effect on October
21  28, 2020?
22      A     Would it not say that on the COI?
23      MR. REISMAN:
24          Listen to what he's asking.
25      THE WITNESS:

Page 330

1          Okay.
2  EXAMINATION BY MR. ALTMYER:
3      Q     I'm just asking whether or not, if
4  you know, one way or the other.
5      A     I don't know.
6      Q     Okay, do not know.
7      MR. REISMAN:
8          I don't think you heard the
9  question.
10      THE WITNESS:
11          Okay.
12      MR. REISMAN:
13          Mike, you've got to concentrate
14  on the question.
15      THE WITNESS:
16          Okay.
17  EXAMINATION BY MR. ALTMYER:
18      Q     If whether or not Shore Offshore
19  Services was listed as an additional insured
20  on any of Dawn's policies, in effect on
21  October 28, 2020?
22      A     On any of Dawn's policies?
23      Q     Yeah.
24      A     I think so.
25      Q     Okay.  Do you know which ones?

Page 331

1      A     I don't know.  I'm not -- I'm
2  not -- I don't know.  I don't really
3  understand -- fully understand the question,
4  to be honest with you.  It's been a long day.
5      Q     Okay.  I understand.  Are you
6  generally familiar with the insurance policies
7  that Dawn has?
8      A     Somewhat.
9      Q     Okay.  Is there someone in the
10  company that is more knowledgeable on Dawn's
11  insurance than you are?
12      A     Maybe John, John Charpentier.
13      Q     Okay.
14      MR. ALTMYER:
15          All right.  I may have some
16  follow-up questions later.  It won't be
17  long.  But right now, I'm fine with
18  passing it on to somebody else.  Thank
19  you very much for your time today.
20      THE WITNESS:
21          All right.  You're welcome.
22      MR. REISMAN:
23          You need a break?
24      THE WITNESS:
25          Can we take a ten-minute break?

Page 332

1      MR. ALTMYER:
2          Yeah.
3          (Whereupon, a break was taken;
4  5:16 p.m. - 5:20 p.m.)
5      MR. REISMAN:
6          Who's up next?
7      MR. GRINNAN:
8          I can go next.
9      MR. REISMAN:
10          All right, John.  Before you
11  start, who else is expecting to have
12  questions for him just so we have some
13  planning, on our end here?
14      MR. PALMINTIER:
15          This is Palmintier.  No
16  questions.
17      MR. DEMOSTHENIDY:
18          This is Laurent.  I'm not going
19  to have any questions.
20      MR. KUTNER:
21          Marc Kutner, no questions.
22      MR. RUFTY:
23          None anticipated for Crosby.
24      MS. DANTIN:
25          None for Martin.

Pages 329 to 332

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 333

1      MS. RICHBOURG:
2          None.
3      MR. REISMAN:
4          Okay.  So it sounds like it's
5    just John, and then if Jacob has some
6    follow-ups.  All right.  Go ahead, John.
7    Sorry about that.  John, are you there?
8      MR. GRINNAN:
9          Yes, I am.
10     MR. REISMAN:
11         Okay, go ahead.
12     MR. GRINNAN:
13         Are we on the record?
14     MR. ALTMYER:
15         Yes.
16   EXAMINATION BY MR. GRINNAN:
17     Q    Okay.  Good afternoon, sir.  Good
18   evening, sir.  We've been here all day.
19   You've had to listen to a lot of questions
20   about things that don't really pertain to this
21   case, so I apologize for that.  I represent
22   some of the crewmembers who were hurt on the
23   THOR.  My name is John Grinnan.  We have never
24   met before, have we?
25     A    No, sir.

Page 334

1      Q    Okay.  What I want to ask you first
2    is some questions about people who worked at
3    Shore, or I think they worked at Shore.  Who
4    is Tommy Gibilterra?
5      A    Tommy Gibilterra is a project
6    manager or vice-president of operations.
7      THE WITNESS:
8          He just froze.  Oh, he's back
9    now.
10     MR. REISMAN:
11         John, now we're having wifi
12   issues, so apparently the signal is
13   fading in and out.  So did you hear his
14   answer about who Tommy Gibilterra is?
15     MR. GRINNAN:
16         VP of Operations.
17     THE WITNESS:
18         Yes.
19   EXAMINATION BY MR. GRINNAN:
20     Q    And who did he work for?
21     A    Shore Offshore Services.
22     Q    Does he still work for them?
23     A    Yes, sir.
24     Q    Okay.  And who is Cody Sims?
25     A    He's a project manager.

Page 335

1      Q    And who did he work for at the time
2    of the incident?
3      A    Shore Offshore Services.
4      Q    It's my understanding he still
5    works for Shore, true?
6      A    True.
7      Q    Both Mr. Gibilterra and Mr. Sims
8    worked at shoreside management for Shore
9    Offshore, true?
10     MR. ALTMYER:
11         Objection to form.
12     THE WITNESS:
13         True.
14   EXAMINATION BY MR. GRINNAN:
15     Q    And their roles -- well, let's back
16   up.  Tommy Gibilterra, did he have an
17   engineering background, as far as you know?
18     A    I'm not sure.
19     Q    And what about Cody Sims, does he
20   have any engineering background?
21     A    I'm not sure.
22     Q    Okay.  How long have you known
23   Tommy Gibilterra?
24     A    Since I started with Dawn, back in
25   2007.

Page 336

1      Q    And how long have you known Cody
2    Sims?
3      A    Cody started working with Tommy
4    shortly after I started with Dawn, maybe '08,
5    '09.
6      Q    It's fair to say you know both
7    Tommy Gibilterra and Cody Sims through your
8    work at Dawn?
9      A    Yes.
10     Q    Okay.  You didn't meet them outside
11   of the workplace, right?
12     A    No, sir.
13     MR. REISMAN:
14         John, object to the form.
15   John, are you asking if he's ever met
16   them outside?  Or if he first met them
17   in the workplace?
18     MR. GRINNAN:
19         I'm asking about the genesis of
20   their relationship.
21     MR. REISMAN:
22         Okay.
23   EXAMINATION BY MR. GRINNAN:
24     Q    And how you all know each other
25   really.

Pages  333  to  336

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 337

1    A    I met them through --
2    Q    You all met through work, right?
3    A    Yes, I met through work.  I met
4    them through work.
5    Q    Okay.  Now, at that time Tommy and
6    Cody both worked for a different company that
7    was not Shore, right?
8    A    Yes.
9    Q    And what company was that?
10    A    Bisso Marine Company.
11    Q    Okay.  And how long did Tommy and
12    Cody work at Bisso Marine?
13    A    I'm not sure for how long they
14    worked at Bisso Marine.
15    Q    Okay.  And then how did they come
16    about working at Shore, do you know?
17    A    I don't know the particulars of how
18    they ended up working at Shore.  I do know
19    that Bisso Marine is no longer in business, or
20    no longer working.
21    Q    And when did -- to your
22    recollection, when did Bisso go out of
23    business?
24    A    I didn't -- I don't know if they
25    went out of business.  We stopped working with

Page 338

1    Bisso back in, probably around '16, '17.
2    Q    Okay.  And is it about at that time
3    that both Tommy Gibilterra and Cody Sims went
4    over to Shore?
5    A    Yes, sir.
6    Q    Okay.  Now, you first met Tommy
7    Gibilterra and Cody Sims when they were Bisso
8    Marine employees.  Did Dawn ever get tugs from
9    Bisso Marine?
10    A    Did we ever get tugs from Bisso?
11    Q    Or provide them?
12    A    Did we ever provide tugs?
13    Q    Or did you ever provide tugs, yes,
14    sir.
15    A    We did provide -- we did give them
16    tugboats, yes.
17    Q    Okay.  And did you work with Tommy
18    and Cody in connection with providing Bisso
19    Marine tugs?
20    A    Yes.  They would call and ask for
21    tugboats and we would get them the vessels
22    they were asking for.
23    Q    And what sorts of vessels were Cody
24    and Tommy procuring Dawn Services for at that
25    time?

Page 339

1    A    Tugboats.
2    Q    Okay.  And what sorts of vessels?
3    Were they barges that they needed tugboats
4    for?
5    A    Yes.  They had -- they had derrick
6    barges, as well, so they needed tugboats to
7    work with their derrick and they had pipe lay
8    barges, as well.
9    Q    Okay.  And is a derrick barge,
10    that's the same sort of barge that the THOR
11    was, true?
12    A    True.
13    Q    Okay.  And so since you started
14    working with Tommy Gibilterra and Cody Sims,
15    it was in connection with Dawn providing
16    tugboats for use in vessels like the THOR,
17    which were derrick barges, right?
18    A    Yes, we -- yes, we did get them
19    tugboats.
20    Q    Okay.  Is Bisso Marine a similar
21    company to Shore, as far as you understand it?
22    MR. ALTMYER:
23        Objection to form.
24    THE WITNESS:
25        Yes.

Page 340

1    EXAMINATION BY MR. GRINNAN:
2    Q    All right.  And so Tommy and Cody,
3    they regularly would go about getting tugboats
4    from companies like Dawn for use on derrick
5    barges, back, going all the way back to 2007,
6    right?
7    MR. REISMAN:
8        Object to the form.
9    MR. ALTMYER:
10        Objection to form.
11    MR. REISMAN:
12        John, are you asking about tugs
13    that Dawn owned or brokered tugs, that
14    Dawn brokered?
15    MR. GRINNAN:
16        I guess either/or.
17    THE WITNESS:
18        Could you ask the question,
19    please, again.
20    EXAMINATION BY MR. GRINNAN:
21    Q    Sure.  You are somebody who has
22    personal knowledge that both Tommy Gibilterra
23    and Cody Sims have been involved in procuring
24    services from Dawn to get tugboat services for
25    use in derrick barges, right?

Pages  337 to 340

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 341

1    A    Yes.
2    Q    Okay.  This is something that Tommy
3  Gibilterra and Cody Sims do on a regular
4  basis, as part of their jobs, and have been
5  doing that for over 15 years, true?
6        MR. ALTMYER:
7            Objection to form.
8        THE WITNESS:
9            I believe so, yes, true.
10  EXAMINATION BY MR. GRINNAN:
11    Q    Okay.  And you know so, since you
12  have worked for Dawn and worked with Tommy and
13  Cody, and have, I guess, been the middle man
14  in going about providing these tugboats for
15  them to use, either at Bisso Marine or at
16  Shore Offshore, fair?
17        MR. ALTMYER:
18            Objection to form.
19        MR. REISMAN:
20            I'm going to object to the use
21  of the word "provide" unless you're only
22  limiting it to the context of vessels
23  that were chartered by Dawn, meaning
24  Dawn vessels.  But if you mean brokered
25  or chartered, then I think you could

Page 342

1  probably ask the question without an
2  objection from me.
3        MR. GRINNAN:
4            Okay.  And I can reask it.
5  Madam court reporter, can you read back
6  my question so I can reask it the way --
7  reask the exact question with the
8  non-objectionable language in there?
9        THE COURT REPORTER:
10            Question:  And since you have
11  worked for Dawn and worked with Tommy
12  and Cody, you have, I guess, been the
13  middle man in going about providing
14  these tugboats for them to use, either
15  at Bisso Marine or at Shore Offshore,
16  fair?
17        MR. GRINNAN:
18            All right.
19  EXAMINATION BY MR. GRINNAN:
20    Q    So since you began working with
21  Tommy Gibilterra and Cody Sims, you have been
22  involved with brokering tugboats for them to
23  use either at Bisso Marine or at Shore
24  Offshore Services, for derrick barges, fair?
25    A    True, fair.

Page 343

1    Q    Okay.  Long before Dawn ever
2  brokered any tugboats for use at Shore, Dawn
3  had an established relationship with both
4  Tommy and Cody, in the provision of tugs
5  and/or the brokering of tugs, is that fair?
6        MR. ALTMYER:
7            Objection to form.
8        THE WITNESS:
9            Are you talking about when they
10  were at Bisso?
11  EXAMINATION BY MR. GRINNAN:
12    Q    Yes.
13    A    Yes.
14    Q    You have a long, established
15  relationship with these men and you know -- or
16  you're somebody who can testify about how they
17  do business, what they know and how they run
18  their business, is that fair?
19        MR. ALTMYER:
20            Objection to form.
21        THE WITNESS:
22            Fair.
23  EXAMINATION BY MR. GRINNAN:
24    Q    Okay.  And did Tommy Gibilterra
25  have a similar position at Bisso Marine that

Page 344

1  he does now at Shore?
2    A    I believe so, yes.
3    Q    Okay.  And did Cody Sims have a
4  similar position at Bisso Marine that he does
5  now at Shore?
6    A    Yes.
7    Q    Okay.  And can you just kind of
8  walk me through generally what they would do
9  for Shore and how that would interact with you
10  in your job?
11    A    Could you ask the question again?
12    Q    If they're going to go about
13  getting -- sure.  If Tommy and Cody wanted to
14  go about getting Dawn to broker a tug for them
15  to use for a derrick barge, like the THOR, can
16  you walk me through that process?
17    A    They would call and say that they
18  would need a tugboat, describe the job, and I
19  would go and try and broker a vessel, based
20  off of their requirements, try and locate a
21  vessel based off their requirements.
22    Q    Would Tommy and Cody be primarily
23  responsible for making that phone call to you?
24        MR. ALTMYER:
25            Objection to form.

Professional Shorthand Reporters, Inc.                                    1-800-536-5255
Offices in New Orleans and Baton Rouge                                   www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 345

1    THE WITNESS:
2         Tommy and Cody, yes, and
3    sometimes Mauricio.
4    EXAMINATION BY MR. GRINNAN:
5    Q    And who's Mauricio?
6    A    He's another, I guess, project
7    manager over there.
8    Q    Same position as Cody?
9    A    I don't -- I don't know where they
10   stand in the hierarchy over there at Shore.  I
11   think Cody is higher.
12   Q    Fair enough.
13   A    I think Cody would be higher.
14   Q    Okay.  And since you met Tommy and
15   Cody, going back to 2007, has it kind of
16   worked that way, where they would call you,
17   for you to go broker a tug for them to use?
18   MR. ALTMYER:
19        Objection to form.
20   THE WITNESS:
21        Yes.  Yes.
22   EXAMINATION BY MR. GRINNAN:
23   Q    And I take it that Cody and Tommy
24   have called you in the past to get a tug for
25   them to use during a hurricane, is that fair?

Page 346

1    A    We have had vessels working for
2    them during hurricanes, I'm pretty sure of
3    that, yes.
4    Q    Okay.  And so Cody and Tommy have
5    specifically called you in the past for Dawn
6    to broker a tug for them to use for a derrick
7    barge, is that fair?
8    A    Yes.  For a derrick barge, yes.
9    Q    Okay.  And on each of those
10   occasions, both Tommy and Cody, from Shore,
11   would specify exactly what the job would
12   require for that hurricane, fair?
13   MR. ALTMYER:
14        Objection to form.
15   THE WITNESS:
16        Are we talking about for a
17        hurricane or are we talking about for
18        work, in general?
19   EXAMINATION BY MR. GRINNAN:
20   Q    Well, for work in general and then
21   hurricanes, too.  So let's -- just so the
22   record's clear, each time Tommy Gibilterra and
23   Cody Sims would call you in connection with
24   brokering a tug, they would specify the exact
25   terms that were required to be met for the tug

Page 347

1    services, fair?
2    MR. ALTMYER:
3         Objection to form.
4    THE WITNESS:
5         Yes, they would have -- yes.
6    EXAMINATION BY MR. GRINNAN:
7    Q    They would have knowledge of the
8    conditions that the tug would be in, fair?
9    MR. ALTMYER:
10        Objection to form.
11   THE WITNESS:
12        Yes.
13   EXAMINATION BY MR. GRINNAN:
14   Q    They would have knowledge of what
15   requirements the tug would have to meet in
16   order to provide the tug services that Shore
17   needed, fair?
18   A    Yes.
19   Q    Tommy Gibilterra and Cody Sims
20   would have knowledge of and actually give
21   assignments to the tugboat, through you, is
22   that fair?
23   A    No.  For the job initially, they
24   would get with me about what they would
25   require, but when the vessel was offshore

Page 348

1    working, the vessel was working as directed
2    from the barge.  The barge was directing them.
3    Q    All right.  And then, same thing
4    goes for hurricanes.  Cody Sims and Tommy
5    Gibilterra, they would to be the ones that
6    would call you and say, "Hey, we need a tug
7    for use for a derrick barge that's going to be
8    used for services in a hurricane," fair?
9    A    They hired -- they called and asked
10   for a tug to tow and run anchors on the -- for
11   the THOR.  That same tug was the tug that
12   brought the derrick, the derrick barge to the
13   dock.  And if they wanted --
14   Q    The first time --
15   A    What's that?
16   Q    I didn't mean to interrupt you,
17   sir.  Go ahead.
18   A    I was going to say, if they wanted
19   additional tugboats, they could have made
20   arrangements.
21   Q    They are the experts that know
22   exactly what they need --
23   MR. ALTMYER:
24        Objection to form.
25   EXAMINATION BY MR. GRINNAN:

Pages  345 to 348

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 349

1      Q    -- in order to meet the
2  requirements of the barge, fair?
3      A    They know what they need for the
4  barge, yes.
5      Q    All right.  Cody Sims and Tommy
6  Gibilterra, they have called you in the past,
7  before the THOR incident, for you to broker a
8  tug for them to use on a derrick barge during
9  a hurricane, fair?
10     A    I'm sorry, could you repeat the
11  question one more time?
12     Q    Sure.  Before October 28, 2020,
13  Cody Sims or Tommy Gibilterra had called you,
14  for you to broker a tugboat for them to use on
15  a derrick barge for another hurricane, right?
16     A    Yes, I would -- back in the days of
17  Bisso, we worked a lot together.
18     Q    Okay.  This wasn't -- I guess, what
19  I'm saying is, Cody Sims, Tommy Gibilterra,
20  this wasn't their first time getting a
21  tugboat, through you, for them to use on a
22  derrick barge to go through a hurricane, fair?
23     A    I think that -- I mean, I think
24  that's a fair statement.
25     Q    Okay.  Both Tommy Gibilterra and

Page 350

1  Cody Sims, they know the right way to go about
2  mooring a vessel like the THOR, during a
3  hurricane, and they would know the wrong way,
4  too, fair?
5          MR. ALTMYER:
6              Objection to form.
7          THE WITNESS:
8              They would know how to moor the
9          vessel to the dock.
10  EXAMINATION BY MR. GRINNAN:
11     Q    Okay.  Cody Sims and Tommy
12  Gibilterra would also know exactly what
13  requirements the tugboat would have to fulfill
14  in order to help the THOR stay moored during
15  the hurricane, fair?
16          MR. ALTMYER:
17              Objection to form.
18          THE WITNESS:
19              They would know -- they
20          would -- the barge would direct the tug
21          on what they should be doing during the
22          storm, if anything.
23  EXAMINATION BY MR. GRINNAN:
24     Q    You said something earlier about
25  having different types of tugs or different --

Page 351

1  tugs with different, I guess, that provide
2  different types of services.  Do you remember
3  that?
4      A    I'm sorry, no.  When did I say --
5      Q    Different capabilities.  I think
6  that's the word you used, right?
7      A    Different capabilities as to?
8      Q    As to the services they can
9  provide, right, because -- let me be more
10  specific.  When you are providing a tug for
11  use in a hurricane, it needs to be capable of
12  actually providing that assistance to a vessel
13  like the THOR, fair?
14     A    I think it comes down to a lot of
15  the direction on what you want to have the
16  vessel do.
17     Q    Okay.  And that would be the
18  responsibility of both Cody Sims or Tommy
19  Gibilterra, at Shore, who would be the
20  responsibility to tell you, at Dawn, what they
21  require, or the tugboat would need to require,
22  and what it needs to be capable of in order to
23  help them during the hurricane, fair?
24          MR. ALTMYER:
25              Objection to form.

Page 352

1          THE WITNESS:
2              I think it would be up to the
3          decision of Shore on what they would
4          want the vessel to be doing.
5  EXAMINATION BY MR. GRINNAN:
6      Q    All right.  And when it comes to
7  who makes the decision on which type of
8  tugboat to use, to help for mooring during a
9  hurricane, that would be Shore's decision,
10  right?
11          MR. ALTMYER:
12              Objection to form.
13          THE WITNESS:
14              Yes.
15  EXAMINATION BY MR. GRINNAN:
16     Q    Every time that you have -- well,
17  let me ask you this.  Would it be fair to say
18  that when you work with Tommy Gibilterra and
19  Cody Sims, you're really coordinating or
20  acting as the middle man to provide a tugboat
21  for them to use on a derrick barge?
22     A    Yes.  I'm just --
23     Q    All right.  Every time you -- go
24  ahead.
25          MR. REISMAN:

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 353

1    Objection.  Go ahead and finish
2  your answer.
3        MR. ALTMYER:
4        Objection, form.
5        THE WITNESS:
6        I mean, when it's a brokered
7  vessel, I'm very limited on what I can
8  do, because I don't control the tugboat,
9  I don't control the crew.  I don't have
10  any say-so on the vessel.  But when it's
11  a Dawn provided tug, I'm much more
12  involved.
13  EXAMINATION BY MR. GRINNAN:
14        Q    Okay.  Every time you coordinated
15  with Tommy Gibilterra or Cody Sims in the
16  past, in brokering a tug, Tommy and Cody would
17  be the ones who would provide the instructions
18  and directions related to what the tugboat
19  would be doing, fair?
20        A    They would be the ones calling,
21  asking for a vessel to do this type of job.
22        Q    Okay.  And would that include
23  instructions and directions?
24        A    Instructions and directions were
25  coming from -- are we talking about mobilizing

Page 354

1  the tug or are we talking about while we're
2  offshore working, or other applications?
3        Q    Well, first let's talk about
4  mobilizing the tug.
5        A    Okay.  They would call and say, "We
6  need this boat at such-and-such location."
7  The boat would get its orders and go.  While
8  the vessel is offshore --
9        Q    Okay.
10        A    While the vessel is offshore, the
11  barge is -- the barge is giving the orders to
12  the tugboat.
13        Q    Okay.  Now, when it comes to an
14  assignment like the ENDEAVOR was given on the
15  day of the incident, that sort of direction
16  would come from somebody at shoreside
17  management at THOR, right?
18        MR. ALTMYER:
19        Objection to form.
20        THE WITNESS:
21        I would think so.
22  EXAMINATION BY MR. GRINNAN:
23        Q    Okay.  Well, it didn't come from
24  anybody else, did it?
25        MR. ALTMYER:

Page 355

1        Objection to form.
2        THE WITNESS:
3        No.  Not from Dawn.
4  EXAMINATION BY MR. GRINNAN:
5        Q    Well, it didn't come from Crosby
6  because Crosby was, like you all say, working
7  as directed, right?
8        A    Correct.
9        Q    Okay.  And so that means that
10  somebody at THOR was the one who was giving
11  instructions in the assignment to the CROSBY
12  ENDEAVOR on the day of the incident, fair?
13        A    Fair.
14        Q    Okay.  And more general than that,
15  the assignment that day for the ENDEAVOR to be
16  at Port Fourchon to provide assistance to the
17  THOR would have come from Shore shoreside
18  management, fair?
19        MR. ALTMYER:
20        Objection to form.
21        THE WITNESS:
22        Shoreside management made the
23  decision on where the THOR would be
24  going for the storm.
25  EXAMINATION BY MR. GRINNAN:

Page 356

1        Q    The Shore shoreside management also
2  made the decision on where the CROSBY ENDEAVOR
3  would be going for Hurricane Zeta, too, true?
4        MR. ALTMYER:
5        Objection to form.
6        THE WITNESS:
7        Well, they were towing the
8  barge, yes, so they would be the ones
9  bringing it to Fourchon.
10  EXAMINATION BY MR. GRINNAN:
11        Q    Okay.  Based on what you know, is
12  it fair to say that both Tommy Gibilterra and
13  Cody Sims, at Shore, knew that the THOR was
14  going to be docked at Port Fourchon during
15  Hurricane Zeta?
16        A    Yes, they knew.
17        Q    Okay.  Based on what you know, is
18  it fair to say that Tommy Gibilterra and Cody
19  Sims, at Shore, knew that the CROSBY ENDEAVOR
20  was the tug that was assigned to assist the
21  THOR during Hurricane Zeta?
22        A    They were there to work as
23  directed.  Now, whether that was assisting in
24  the storm or not, I'm not aware of anything.
25        Q    Well, both Tommy Gibilterra and

Pages  353 to 356

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 357

1   Cody Sims, they knew the CROSBY ENDEAVOR was
2   there to do work as directed for the THOR
3   during Hurricane Zeta, fair?
4        MR. ALTMYER:
5            Objection to form.
6        THE WITNESS:
7            Fair.
8   EXAMINATION BY MR. GRINNAN:
9        Q    All right.  Tommy Gibilterra and
10  Cody Sims, at Shore, both knew that the THOR
11  was going to be in the path of Hurricane Zeta
12  while docked at Port Fourchon, true?
13       MR. ALTMYER:
14           Objection to form.
15       THE WITNESS:
16           I would think so.
17  EXAMINATION BY MR. GRINNAN:
18       Q    All right.  And you would think so
19  because you know that they were directly
20  involved with procuring a tugboat, the CROSBY
21  ENDEAVOR, for use by the THOR, right?
22       A    Wait, could you repeat that
23  question one more time?
24       Q    Sure.  Either Tommy Gibilterra or
25  Cody Sims, or both of them, were involved with

Page 358

1   going through Dawn Services to get the CROSBY
2   ENDEAVOR, to provide tug assistance to the
3   THOR during the hurricane, fair?
4        MR. ALTMYER:
5            Objection to form.
6        THE WITNESS:
7            Well, the tug was there to work
8        as directed.
9   EXAMINATION BY MR. GRINNAN:
10       Q    Sure.  And all I'm saying is that
11  Tommy Gibilterra and Cody Sims, they knew that
12  the THOR was going to be in the path of
13  Hurricane Zeta, while it was at Port Fourchon,
14  right?
15       MR. ALTMYER:
16           Objection to form.
17       THE WITNESS:
18           I would think so, yes.
19  EXAMINATION BY MR. GRINNAN:
20       Q    And that means that Tommy
21  Gibilterra and Cody Sims also knew that the
22  CROSBY ENDEAVOR was going to be in the path of
23  Hurricane Zeta while docked at Port Fourchon,
24  true?
25       MR. ALTMYER:

Page 359

1            Objection to form.
2        THE WITNESS:
3            Yes.
4   EXAMINATION BY MR. GRINNAN:
5        Q    Okay.  Shore had a responsibility
6   to ensure that the CROSBY ENDEAVOR was
7   operated in a safe way for anything that it
8   did for the THOR on the day of the incident,
9   true?
10       MR. ALTMYER:
11           Objection to form?
12       THE WITNESS:
13           Could you repeat that question
14       one more time?
15       MR. ALTMYER:
16           Same objection.
17  EXAMINATION BY MR. GRINNAN:
18       Q    Shore had a responsibility to
19  ensure that the CROSBY ENDEAVOR was operated
20  in a safe way on the day of the incident,
21  true?
22       A    Well, they knew the CROSBY ENDEAVOR
23  was going to be right there in Fourchon with
24  the THOR, so --
25       Q    Okay.  All right.  Let me ask that

Page 360

1   a different way.
2        A    Okay.
3        Q    Shore was responsible for ensuring
4   that whatever directions and instructions were
5   provided to the ENDEAVOR were adequate to keep
6   the THOR safe during the Hurricane Zeta, true?
7        MR. ALTMYER:
8            Objection to form.
9        THE WITNESS:
10           They were -- they were giving
11       the instructions for what the ENDEAVOR
12       would or would not be doing.
13       MR. REISMAN:
14           Listen to his question and
15       answer his question.
16       THE WITNESS:
17           Okay.  Could you repeat it one
18       more time?  I'm sorry.
19  EXAMINATION BY MR. GRINNAN:
20       Q    Sure.  Shore was responsible for
21  ensuring that the directions and instructions
22  that were provided to the ENDEAVOR were
23  adequate to keep the THOR safe during
24  Hurricane Zeta, true?
25       MR. ALTMYER:

Pages 357 to 360

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 361

1          Objection to form.
2     THE WITNESS:
3          I believe so, yes, because they
4     were working as directed.
5     EXAMINATION BY MR. GRINNAN:
6     Q    Okay.  Shore was responsible for
7     ensuring that the directions and instructions
8     provided to the ENDEAVOR were adequate to keep
9     the THOR crew safe during Hurricane Zeta,
10    true?
11         MR. ALTMYER:
12             Objection to form.
13         THE WITNESS:
14             Yeah, they were there to work
15         as directed, so whatever instructions
16         they were given.
17    EXAMINATION BY MR. GRINNAN:
18    Q    Okay.  But would you say that that
19    would be a Shore responsibility, to provide
20    instructions and directions that are necessary
21    to keep the crew on board the THOR safe, or
22    would that be something that would be Dawn's
23    responsibility or Crosby's?
24    A    No, it would be --
25         MR. ALTMYER:

Page 362

1          Objection to form.
2     THE WITNESS:
3          It would be Shore's
4     responsibility.
5     EXAMINATION BY MR. GRINNAN:
6     Q    All right.  Shore was responsible
7     for ensuring that the directions and
8     instructions provided to the ENDEAVOR were
9     adequate to keep the THOR safely moored to the
10    dock during Hurricane Zeta, true?
11         MR. ALTMYER:
12             Objection to form.
13         THE WITNESS:
14             Yeah, they were the ones -- the
15         Shore personnel were the ones who tied
16         up the vessel.
17    EXAMINATION BY MR. GRINNAN:
18    Q    Okay.  And then whatever pushing
19    assistance that the THOR needed to stay moored
20    during the hurricane, that was the
21    responsibility of Shore, and Shore shoreside
22    management to give directions and instructions
23    to the CROSBY ENDEAVOR, as needed, true?
24         MR. ALTMYER:
25             Objection to form.

Page 363

1     THE WITNESS:
2          Yes.
3     EXAMINATION BY MR. GRINNAN:
4     Q    All right.  If 0the THOR needed
5     assistance from the CROSBY ENDEAVOR to help
6     stay moored up to the Martin dock during the
7     hurricane, that was the responsibility of
8     Shore shoreside management to make sure that
9     those instructions and directions got to the
10    ENDEAVOR, true?
11         MR. ALTMYER:
12             Objection to form.
13         THE WITNESS:
14             True.
15    EXAMINATION BY MR. GRINNAN:
16    Q    Okay.  Shore was responsible for
17    ensuring that the mooring lines were adequate
18    to keep the THOR safely moored to the dock
19    during Hurricane Zeta, true?
20         MR. ALTMYER:
21             Objection to form.
22         THE WITNESS:
23             True.
24    EXAMINATION BY MR. GRINNAN:
25    Q    THOR was responsible for ensuring

Page 364

1     that the mooring lines were properly secured
2     to the dock during Hurricane Zeta, true?
3         MR. ALTMYER:
4             Objection to form.
5         THE WITNESS:
6             I'm sorry, could you say that
7         one more time?
8     EXAMINATION BY MR. GRINNAN:
9     Q    Yes, sir.  Shore was responsible
10    for ensuring that the mooring lines were
11    properly secured to the Martin dock during
12    Hurricane Zeta, true?
13    A    Shore did tie the barge up.
14        MR. ALTMYER:
15            Objection to form.  I'm also
16        going to object on the basis that all of
17        these questions are outside the scope of
18        the areas of inquiry that were noticed
19        on the deposition.
20        MR. GRINNAN:
21            It's directly with the
22        incident.  I'm sorry that I'm asking
23        something about the incident.  I know
24        you didn't.
25        MR. REISMAN:

Pages  361  to  364

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 365

1     Try and answer his question,
2  okay.  He's asking a very specific
3  question.  Don't change the question.
4     THE WITNESS:
5        Okay.
6     MR. REISMAN:
7        Just like I told you with
8  Jacob, answer the question that's being
9  asked of you.
10     THE WITNESS:
11        Yeah, okay.  Fair enough.
12  Okay.
13     MR. ALTMYER:
14        So I'm just going to have a
15  rolling objection on that basis.
16     MR. GRINNAN:
17        I'll just reask the question so
18  it's clear.
19  EXAMINATION BY MR. GRINNAN:
20     Q    Shore was responsible for ensuring
21  that the mooring lines were properly secured
22  to Martin's dock during Hurricane Zeta, true?
23     MR. ALTMYER:
24        Objection to form.
25     THE WITNESS:

Page 366

1        True.
2  EXAMINATION BY MR. GRINNAN:
3     Q    Okay.  Shore shared a
4  responsibility with the Martin's dock for
5  ensuring that that dock was adequate to hold
6  the THOR during the hurricane, true?
7     MR. ALTMYER:
8        Objection to form.
9     THE WITNESS:
10        Yes.  That was between Shore
11  and Midstream.
12  EXAMINATION BY MR. GRINNAN:
13     Q    And Martin?
14     A    And Martin, I'm sorry.
15     Q    You're fine.  It's been a long day.
16  Shore was well aware that properly qualified
17  individuals needed to be involved with mooring
18  a derrick barge like the THOR during Hurricane
19  Zeta, true?
20     MR. ALTMYER:
21        Objection to form.
22     THE WITNESS:
23        Sure, yes.  True.
24  EXAMINATION BY MR. GRINNAN:
25     Q    And Tommy Gibilterra and Cody Sims

Page 367

1  were well aware that properly qualified
2  individuals needed to be involved with mooring
3  a derrick barge like the THOR during Hurricane
4  Zeta, true?
5     MR. ALTMYER:
6        Objection to form.
7     THE WITNESS:
8        True.
9  EXAMINATION BY MR. GRINNAN:
10     Q    Okay.  Anytime you moor a large
11  vessel like the THOR during a Category 3
12  hurricane, like Hurricane Zeta, there are
13  some -- there is some analysis that goes into
14  that decision, isn't there?
15     MR. ALTMYER:
16        Objection to form.
17     THE WITNESS:
18        I would think so.
19  EXAMINATION BY MR. GRINNAN:
20     Q    I mean, the THOR is not a small
21  vessel at all, is it?
22     A    No.
23     Q    Okay.  And when it is in a
24  hurricane, it's going to be exerting some
25  force against whatever dock it's tied up to,

Page 368

1  is that fair?
2     MR. ALTMYER:
3        Objection to form.
4     THE WITNESS:
5        Yes.
6  EXAMINATION BY MR. GRINNAN:
7     Q    Shore shoreside management needs to
8  have somebody who is qualified to calculate
9  exactly how strong its mooring lines need to
10  be in order to stay tied up to that dock
11  during the hurricane, true?
12     MR. ALTMYER:
13        Objection to form.
14     THE WITNESS:
15        You broke up a little bit, I'm
16  sorry.  Could you repeat that question
17  one more time?
18  EXAMINATION BY MR. GRINNAN:
19     Q    Shoreside management had a
20  responsibility to make sure that there were
21  qualified people on board who could actually
22  analyze and do the calculations necessary to
23  figure out the strength of the lines that they
24  needed to stay tied up during the hurricane,
25  true?

Pages 365 to 368

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 369

```
1          MR. ALTMYER:
2          Form.
3          THE WITNESS:
4          True.
5    EXAMINATION BY MR. GRINNAN:
6      Q    And Shore shoreside management was
7    also responsible for determining and having a
8    person qualified to make the determination of
9    how much assistance it needed to keep the THOR
10   tied up during the hurricane, from a tugboat
11   like the CROSBY ENDEAVOR, true?
12         MR. ALTMYER:
13         Form.
14         THE WITNESS:
15         True.
16   EXAMINATION BY MR. GRINNAN:
17     Q    Okay.  And based on what you know
18   about Tommy Gibilterra and Cody Sims, they are
19   two individuals at Shore who know the right
20   way to do this and the wrong way to do this,
21   right?
22         MR. ALTMYER:
23         Objection to form.
24         THE WITNESS:
25         Yes.
```

Page 370

```
1    EXAMINATION BY MR. GRINNAN:
2      Q    Okay.  Now, you found out about the
3    THOR coming -- well, strike that.  We know
4    that Shore completely failed in their
5    obligations to make sure that the THOR was
6    properly moored during the hurricane, true?
7          MR. ALTMYER:
8          Objection to form.
9          THE WITNESS:
10         Yes.
11   EXAMINATION BY MR. GRINNAN:
12     Q    Okay.  And that was a failure on
13   the part of Shore shoreside management, true?
14         MR. ALTMYER:
15         Objection to form.
16         THE WITNESS:
17         Yes.
18   EXAMINATION BY MR. GRINNAN:
19     Q    Okay.  And then at some point, you
20   learned about this failure on the day of the
21   incident, didn't you?
22         MR. ALTMYER:
23         Objection to form.
24         THE WITNESS:
25         Yes.
```

Page 371

```
1    EXAMINATION BY MR. GRINNAN:
2      Q    Okay.  And you learned about it, I
3    think you said, about 5:30 p.m.?
4      A    I think it was around 5:00 p.m.
5      Q    Okay.  Tommy Gibilterra and Cody
6    Sims, they must have been the ones that called
7    you, because it was their failure and they
8    were responsible for making sure this didn't
9    happen?  I'm sure they called you up and said,
10   "Hey, we made a big mistake," didn't they?
11         MR. ALTMYER:
12         Objection to form.
13         THE WITNESS:
14         It came from Crosby Tugs, the
15   phone call.
16   EXAMINATION BY MR. GRINNAN:
17     Q    So Shore didn't even call you to
18   let you know that they had failed?
19         MR. ALTMYER:
20         Objection to form.
21         THE WITNESS:
22         No.  I got the call from
23   Crosby.
24   EXAMINATION BY MR. GRINNAN:
25     Q    Did you pick up the phone and call
```

Page 372

```
1    Tommy Gibilterra and say, "Hey, what's going
2    on?  You all completely failed to keep your
3    boat tied up during the hurricane"?
4          MR. ALTMYER:
5          Objection to form.
6          THE WITNESS:
7          I called -- I called them and
8    was trying to figure out what was going
9    on.
10   EXAMINATION BY MR. GRINNAN:
11     Q    What did Tommy say?
12     A    Wanted to go get his barge,
13   retrieve his barge.
14     Q    Where was Tommy?
15     A    I believe he was in Houston, at
16   home.
17     Q    He was in Houston.  Well, what
18   Tommy should have done before this ever
19   happened is he should have sent the D/B THOR
20   to Houston, and then this whole incident would
21   have been prevented, in the first place, true?
22         MR. ALTMYER:
23         Objection to form.
24         THE WITNESS:
25         It would have brought it out of
```

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 373

1    harm's way.
2    EXAMINATION BY MR. GRINNAN:
3        Q    Okay.  And if Tommy had sent the
4    THOR to Houston, out of harm's way, that would
5    have prevented the incident on the bayou on
6    the day of the incident, true?
7        MR. ALTMYER:
8            Objection to form.
9        THE WITNESS:
10           True.
11   EXAMINATION BY MR. GRINNAN:
12       Q    If Cody Sims had sent the D/B THOR
13   to Houston, where Tommy was, that also would
14   have gotten the THOR out of harm's way and
15   that would have prevented the incident, true?
16       MR. ALTMYER:
17           Form.
18       THE WITNESS:
19           True.
20   EXAMINATION BY MR. GRINNAN:
21       Q    If anyone at Shore shoreside
22   management had directed the THOR and the
23   CROSBY ENDEAVOR to go to Houston instead of
24   Port Fourchon, that would have prevented this
25   incident, true?

Page 374

1        MR. ALTMYER:
2            Form.
3        THE WITNESS:
4            True.
5    EXAMINATION BY MR. GRINNAN:
6        Q    But Shore shoreside management
7    failed to do that, and that caused this
8    incident, true?
9        MR. ALTMYER:
10           Form.
11       THE WITNESS:
12           To move it to Houston?
13       MR. GRINNAN:
14           Yeah.
15       THE WITNESS:
16           True.
17       MR. ALTMYER:
18           Form.
19   EXAMINATION BY MR. GRINNAN:
20       Q    Tommy Gibilterra and Cody Sims,
21   they also caused this incident by failing to
22   send the THOR and the CROSBY ENDEAVOR to
23   Houston, true?
24       MR. ALTMYER:
25           Form.

Page 375

1        THE WITNESS:
2            Yes.  Yes.
3    EXAMINATION BY MR. GRINNAN:
4        Q    Tommy Gibilterra and Cody Sims,
5    they certainly know that that's the safest
6    course of action, true?
7        MR. ALTMYER:
8            Form.
9        THE WITNESS:
10           I guess, yes.
11   EXAMINATION BY MR. GRINNAN:
12       Q    The safest thing to do is to get
13   the vessel out of harm's way, right?
14       MR. ALTMYER:
15           Form.
16       THE WITNESS:
17           Yes.
18   EXAMINATION BY MR. GRINNAN:
19       Q    Okay.  But when Tommy Gibilterra,
20   Cody Sims and Shore shoreside management
21   decided to go dock the THOR at Port Fourchon,
22   in the path of Hurricane Zeta, they failed to
23   do the safest thing that you could do in this
24   situation, true?
25       MR. ALTMYER:

Page 376

1            Form.
2        THE WITNESS:
3            True.
4    EXAMINATION BY MR. GRINNAN:
5        Q    Okay.  Now, so Tommy was in
6    Houston.  What was he doing, was he watching
7    the Weather Channel?
8        MR. ALTMYER:
9            Form.
10       THE WITNESS:
11           I don't know.  I don't have the
12   answer for that.
13   EXAMINATION BY MR. GRINNAN:
14       Q    All right.  Did he have air
15   conditioning?
16       MR. ALTMYER:
17           Form.
18       THE WITNESS:
19           I don't know.  I don't know.
20   EXAMINATION BY MR. GRINNAN:
21       Q    He had power, didn't he?
22       MR. ALTMYER:
23           Form.
24       THE WITNESS:
25           I would assume he had power.

Professional Shorthand Reporters, Inc.        1-800-536-5255
Offices in New Orleans and Baton Rouge        www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 377

1    EXAMINATION BY MR. GRINNAN:
2        Q    Well, his phone was working, wasn't
3    it?
4        MR. ALTMYER:
5            Form.
6        THE WITNESS:
7            Yes.
8    EXAMINATION BY MR. GRINNAN:
9        Q    I can tell you, I'm in Houston
10   right now and we didn't see any effects from
11   Hurricane Zeta.  You're someone who can
12   testify that Tommy Gibilterra was free from
13   all of the effects from Hurricane Zeta here in
14   Houston, right?
15       MR. ALTMYER:
16           Form.
17       THE WITNESS:
18           Yes, he was far away from the
19       storm.
20   EXAMINATION BY MR. GRINNAN:
21       Q    Okay.  And you said he was
22   concerned about getting his barge.  But when
23   did he leave Houston?
24       MR. ALTMYER:
25           Form.

Page 378

1        THE WITNESS:
2            I'm not sure.
3    EXAMINATION BY MR. GRINNAN:
4        Q    Okay.  Did he tell you that he was
5    going to Port Fourchon right away to make sure
6    that no one got hurt?
7        A    He did ask if the -- he did ask if
8    the roads were open.
9        Q    He asked you if the roads were
10   open?
11       A    Yeah.  He wanted to know if the
12   roads were open.
13       Q    Why would he ask you?
14       A    I don't know.
15       Q    It seems like he should maybe ask
16   somebody on the THOR or somebody at Port
17   Fourchon, right?
18       A    Well, --
19       MR. ALTMYER:
20           Objection to form.
21       THE WITNESS:
22           Port Fourchon had just gone
23       through a hurricane, so I don't know if
24       there was anything to contact down
25       there.

Page 379

1    EXAMINATION BY MR. GRINNAN:
2        Q    Where were you during the
3    hurricane?
4        A    New Orleans.
5        Q    Okay.  And so Tommy Gibilterra,
6    he's in Texas during Hurricane Zeta, while his
7    barge is floating down the bayou, right?
8        A    Yes.
9        MR. ALTMYER:
10           Objection to form.
11   EXAMINATION BY MR. GRINNAN:
12       Q    And where was Cody Sims?
13       A    I don't know.  I had heard Cody was
14   at his hunting camp, but I don't know if
15   that's --
16       Q    Where is that?
17       A    I don't know if that's true or not.
18   That's just what I heard.
19       Q    Where's Cody's hunting camp?
20       A    I have no idea.  Never been.
21       Q    Is it in -- certainly it's not in
22   Louisiana.  You couldn't do much hunting
23   during Hurricane Zeta, right?
24       A    No, it's not in Louisiana.
25       Q    And was it in Texas?

Page 380

1        MR. ALTMYER:
2            Objection to form.
3        THE WITNESS:
4            I believe so.
5    EXAMINATION BY MR. GRINNAN:
6        Q    So Cody is in Texas, on a hunting
7    trip, while we got men who have their life in
8    danger because Cody and Tommy failed to tie up
9    their barge the right way, fair?
10       MR. ALTMYER:
11           Form.
12       THE WITNESS:
13           Could you repeat the question
14       one more time.
15   EXAMINATION BY MR. GRINNAN:
16       Q    Sure.  Cody and Tommy, they're both
17   in Texas, safe, while the D/B THOR is floating
18   down the bayou because they failed to make
19   sure that they tied up the barge in a safe and
20   proper way prior to the storm, true?
21       MR. ALTMYER:
22           Form.
23       THE WITNESS:
24           Yes, they were in Texas.
25   EXAMINATION BY MR. GRINNAN:

Pages 377 to 380

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 381

1    Q    And while my clients were on board
2   the THOR, trying to get it to stop, trying to
3   do everything they could, getting hurt, Cody
4   Sims was at a hunting trip in Texas, true?
5        MR. ALTMYER:
6            Objection to form.
7        THE WITNESS:
8            It's what I've heard, yes.
9   EXAMINATION BY MR. GRINNAN:
10   Q    Okay.  And who did you hear that
11  from?
12   A    I don't remember.  Honestly, I
13  don't remember.
14   Q    Okay.  Was it somebody who worked
15  at Shore?
16   A    I would think it's -- yes, I would
17  think it's coming from Shore, yeah.
18   Q    Okay.  So somebody at Shore told
19  you Cody Sims is on a hunting trip in Texas,
20  true?
21   A    Yes.
22   Q    Okay.  Did Cody Sims have cell
23  service?
24   A    He did call me that night.
25   Q    Okay.  So Cody Sims had cell

Page 382

1   service the night of the incident and he
2   called you, true?
3    A    Yes.
4    Q    Okay.  And what did you all talk
5   about?
6    A    He had sent -- I believe he had
7   sent the coordinates that the barge had given
8   him, just like Tommy had.
9    Q    And why were they giving that to
10  you?
11   A    Because they had asked for our
12  help, to broker vessels, to go get the THOR.
13   Q    Okay.  So they weren't even going
14  to go get it themselves, they were going to
15  hire you all to go do that, too?
16       MR. REISMAN:
17           Object to form.
18       MR. ALTMYER:
19           Objection to form.
20       THE WITNESS:
21           They don't have tugboats, so
22  they --
23  EXAMINATION BY MR. GRINNAN:
24   Q    Fair enough.  Go ahead.
25   A    So they came to us, asked for

Page 383

1   assistance in helping retrieve the barge, with
2   tugboats.
3    Q    Okay.  When something like this
4   happens, it is a massive failure on the part
5   of shoreside management, from Shore, right?
6        MR. ALTMYER:
7            Form.
8        THE WITNESS:
9            Yes.
10  EXAMINATION BY MR. GRINNAN:
11   Q    Okay.  And there's multiple
12  failures here?  You've got a huge safety
13  failure in putting it in the path of a
14  hurricane, you've got a huge safety failure in
15  letting an unqualified person tie it up at the
16  dock, and additional safety failures on top of
17  that, right?
18       MR. ALTMYER:
19           Form.
20       THE WITNESS:
21           Additional?
22  EXAMINATION BY MR. GRINNAN:
23   Q    Well, sure.  We know that the dock
24  failed as well, didn't it?
25       MR. ALTMYER:

Page 384

1            Form.
2        THE WITNESS:
3            I'm not -- I'm not a hundred
4   percent sure what exactly happened.
5   EXAMINATION BY MR. GRINNAN:
6    Q    Okay, that's fair enough.  Surely,
7   Tommy Gibilterra took responsibility for his
8   failures, when you talked to him on the day of
9   the incident, fair?
10       MR. ALTMYER:
11           Form.
12       THE WITNESS:
13           Not to my knowledge.  He wanted
14  to go get -- he wanted us to help get
15  the barge.
16  EXAMINATION BY MR. GRINNAN:
17   Q    Okay.  He was interested in trying
18  to clean up the mess, right?
19       MR. ALTMYER:
20           Form.
21       THE WITNESS:
22           Yes.
23  EXAMINATION BY MR. GRINNAN:
24   Q    Okay.  Well, maybe Cody Sims was
25  more honorable.  Cody Sims, he certainly took

Pages 381 to 384

Page 385

1    responsibility for his failures, didn't he?
2        MR. ALTMYER:
3            Form.
4        THE WITNESS:
5            I don't -- I don't remember.
6    EXAMINATION BY MR. GRINNAN:
7        Q    Neither one of them said, like, "We
8    messed up; this was our fault," anything like
9    that?
10       A    No, not to me.
11       Q    Did that shock you?
12       A    I mean, they were probably dealing
13   with a lot at that time, so getting the barge
14   back and getting everybody back was probably
15   their priority.
16       Q    They didn't have any guilt on their
17   conscience, that you could tell?
18       MR. ALTMYER:
19           Form.
20       THE WITNESS:
21           I don't -- I can't answer that.
22   EXAMINATION BY MR. GRINNAN:
23       Q    Okay.  We do know that they were
24   trying to clean up the mess that they made,
25   right?

Page 386

1        MR. ALTMYER:
2            Form.
3        THE WITNESS:
4            They were trying to get the --
5        they were trying to get the barge back
6        to the dock.
7    EXAMINATION BY MR. GRINNAN:
8        Q    Okay.  And that's why they called
9    you, to get another tug other than the
10   ENDEAVOR, to try to tow it back to Martin's
11   dock?
12       A    Well, the ENDEAVOR was too deep.
13   It couldn't get to where the barge was.  It
14   shallowed up.
15       Q    The ENDEAVOR was too deep?
16       A    It was drafting too much, so --
17       Q    Okay.  Go ahead.
18       A    So we had talked to Crosby, and
19   Crosby had some vessels that were able to --
20   that were shallow enough that could go get the
21   vessel.
22       Q    Okay.  And so you got that
23   information from Tommy Gibilterra or Cody
24   Sims, right?
25       A    What information?

Page 387

1        Q    Well, the depth that the THOR
2    was -- the depth of water that the THOR was in
3    when it came to a rest, right?
4        A    No, they just -- they provided the
5    coordinates to where the barge was.
6        Q    Okay.  And from there, you were
7    able to determine that the CROSBY ENDEAVOR
8    was, I guess, was not capable of getting the
9    THOR, I guess, unstuck?
10       A    Yes.  The CROSBY ENDEAVOR was
11   drawing too much water.
12       Q    Okay.  And so did you -- so did you
13   arrange or broker another tugboat to go help
14   the THOR?
15       A    We brokered more Crosby Tugs to go
16   get the THOR.
17       Q    How many tugs?
18       A    Four.
19       Q    Four.  And then did those four tugs
20   then tow the THOR back to Martin's dock?
21       A    Those four tugs towed the THOR back
22   to Martin's dock, yes.
23       Q    Okay.  And then what did they tie
24   up to?  Or strike that.  What did they tie up
25   to when they got back to Martin's dock?

Page 388

1        A    I don't know.  I wasn't there.
2        Q    Okay.  It didn't tie up to the
3    dock, did it?
4        A    It tied up to, I believe, the dock
5    that it was at.
6        MR. ALTMYER:
7            Objection to form on that.
8    EXAMINATION BY MR. GRINNAN:
9        Q    Okay.  Now, in the past when Tommy
10   and Cody had brokered a tug for assistance
11   during a hurricane, had any other barge come
12   unmoored like the THOR had?
13       A    No.
14       Q    Okay.  In the past, Tommy and Cody
15   knew the correct way to make -- to moor the
16   vessel so that it didn't come unmoored during
17   a hurricane, right?
18       MR. ALTMYER:
19           Form.
20       THE WITNESS:
21           They had done it before.
22   EXAMINATION BY MR. GRINNAN:
23       Q    And in the past, when Tommy and
24   Cody had brokered a tug for use during a
25   hurricane, was it for the specific purpose of

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 389

1  providing pushing services?
2      A    The tugs were always there to work
3  as directed.
4      Q    Yeah, and so, like, and just for
5  people in the jury that doesn't really know
6  what that means -- I understand that's one of
7  the talking points -- but if they were
8  directed to do anything during a hurricane,
9  what would they be doing?
10     A    Taking orders from the barge.
11     Q    Fair enough.  But how would a
12  tugboat assist a vessel like the THOR during a
13  hurricane?
14     A    It would be up to the discretion of
15  the barge on what they felt they needed from
16  the tugboat.
17     Q    Yeah, and I got that.  My question
18  is different.  How in the world would a
19  tugboat ever provide any help to a vessel like
20  the THOR during a hurricane?
21         MR. ALTMYER:
22             Form.
23         THE WITNESS:
24             I don't -- again, it's, I
25  think, a unique situation.  I don't have

Page 390

1             any knowledge on how the THOR wanted the
2  CROSBY ENDEAVOR to help out.
3  EXAMINATION BY MR. GRINNAN:
4      Q    And that's I guess not what I'm
5  asking.  Is the purpose of having a tugboat
6  there, for a derrick barge during a hurricane,
7  in order to have its engines on and to push
8  the vessel up against the dock, in the event
9  that the tugboat is directed to do so?
10         MR. ALTMYER:
11             Form.
12         THE WITNESS:
13             Yes, if the tugboat was
14  directed to do so.
15         MR. REISMAN:
16             Did you say "if" the tugboat?
17         THE WITNESS:
18             Yes, if the tugboat was
19  instructed to do so.
20  EXAMINATION BY MR. GRINNAN:
21     Q    And just so the jury understands,
22  if the tugboat was directed to do so, the
23  tugboat would be aligned perpendicular to the
24  orientation, that the derrick barge is moored
25  up against the dock, and they could turn their

Page 391

1  engines on and push perpendicularly up against
2  the barge to push it up against the dock, to
3  help, right?
4         MR. ALTMYER:
5             Form.
6         THE WITNESS:
7             I'm not sure how the tug was
8  moored alongside the THOR and what was
9  told -- what was told to the tug.
10  EXAMINATION BY MR. GRINNAN:
11     Q    And that's fine.  I'm saying, if
12  they got directed, the purpose then would be
13  to push them up against the dock, right?
14     A    To hold them in, yes.
15     Q    And just so the jury could
16  understand what the purpose of them being out
17  there -- strike that.  For the jury's benefit
18  of understanding what the ENDEAVOR's purpose
19  of being out there would be, if they were
20  directed to help, it would be to push the D/B
21  THOR up against Martin's dock to help it stay
22  moored during the hurricane, if they were
23  directed to do so, right?
24     A    Yes.
25     Q    And it would be -- strike that.  In

Page 392

1  the event that the ENDEAVOR was directed to
2  help the THOR while it was tied up to the THOR
3  during the hurricane, the ENDEAVOR would have
4  been aligned directly perpendicular to the
5  THOR, up along its side, right?
6         MR. ALTMYER:
7             Form.
8         THE WITNESS:
9             If that's what they were
10  instructed to do.
11  EXAMINATION BY MR. GRINNAN:
12     Q    Is that a "yes"?
13         MR. ALTMYER:
14             Form.
15         THE WITNESS:
16             Yes.  If they were instructed
17  to do so, yes.
18  EXAMINATION BY MR. GRINNAN:
19     Q    And I guess, just so it's clear,
20  I'm going to mark as --
21         MR. GRINNAN:
22             What exhibit number are we on?
23         THE COURT REPORTER:
24             145.
25         MR. GRINNAN:

Pages  389 to 392

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 393

```
1           145?
2      MR. REISMAN:
3           Yes.
4   EXAMINATION BY MR. GRINNAN:
5      Q    I'm going to mark as "Exhibit 145,"
6   this little Word document we're going to make
7   real quick, and just so the jury understands.
8   Can you see my screen, sir?
9      A    Yes.
10     Q    All right.  This is a blank Word
11  document.  It's just for illustration.  All
12  right.  I want you to -- bear with me.  I'm
13  going to draw this, just so the jury can get
14  an idea of what we're talking about, and this
15  is going to be very rudimentary.  Are you with
16  me so far?
17     A    Yes.
18     Q    All right.  So let's pretend this
19  first little rectangle I'm drawing is a dock.
20  We'll put a "D" for it.  Are you with me?
21     A    Yes.
22     Q    Okay.  And let's pretend this next
23  little rectangle I'm going to draw is a
24  vessel, like the D/B THOR, and we'll put a "T"
25  for the Vessel THOR.  Are you with me so far?
```

Page 394

```
1      A    Yes.
2      Q    Okay.  And the CROSBY ENDEAVOR, if
3   it was directed to provide pushing services,
4   it would be aligned perpendicular to the THOR,
5   like this rectangle I'm drawing, and putting
6   an "E" inside of, true?
7      MR. ALTMYER:
8           Form.
9      THE WITNESS:
10          True.
11  EXAMINATION BY MR. GRINNAN:
12     Q    And if directed, the ENDEAVOR would
13  turn its engines on and push against the THOR
14  in the direction of this arrow that I just
15  drew, true?
16     MR. ALTMYER:
17          Form.
18     THE WITNESS:
19          True, if they were instructed
20      to do so.
21  EXAMINATION BY MR. GRINNAN:
22     Q    And this helps make it a lot more
23  simple, doesn't it?
24     MR. ALTMYER:
25          Form.
```

Page 395

```
1      THE WITNESS:
2           Yes.
3   EXAMINATION BY MR. GRINNAN:
4      Q    All right.  I'm going to put
5   Exhibit 145 -- I'm going to put "X145" on this
6   document.  And this is an illustration that
7   very basically demonstrates what the ENDEAVOR
8   would be doing for the THOR on the day of the
9   incident, if they were directed to turn on
10  their engines and help, fair?
11     MR. ALTMYER:
12          Form.
13     THE WITNESS:
14          If they were instructed to do
15      so.
16  EXAMINATION BY MR. GRINNAN:
17     Q    If they were instructed, is that a
18  "yes"?
19     MR. ALTMYER:
20          Same objection.
21     THE WITNESS:
22          Yes.
23  EXAMINATION BY MR. GRINNAN:
24     Q    So we can take that down for now.
25  Now, Shore Offshore had direct knowledge that
```

Page 396

```
1   tug assistance, like I just illustrated on
2   Exhibit 145, was necessary to keep a vessel
3   like the THOR moored during a hurricane, true?
4      MR. ALTMYER:
5           Form.
6      THE WITNESS:
7           I would -- I would think they
8       would have instructed the barge to tell
9       the tug to do something.
10  EXAMINATION BY MR. GRINNAN:
11     Q    And I'm saying, even more generally
12  than that, Shore shoreside management had
13  direct knowledge that, when you have a vessel
14  like the THOR that's docked at Port Fourchon
15  during Hurricane Zeta, that it's a situation
16  that very well could call for the use of a
17  tugboat to help push them up against the dock,
18  right?
19     MR. ALTMYER:
20          Form.
21     THE WITNESS:
22          They could have used the
23      tugboat to assist.
24  EXAMINATION BY MR. GRINNAN:
25     Q    Okay.  Shore shoreside management
```

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 397

1    had actual knowledge that the mooring lines
2    alone might not be strong enough to keep the
3    THOR tied up during Hurricane Zeta, true?
4        MR. ALTMYER:
5            Form.
6        THE WITNESS:
7            I don't know. I don't know.
8    EXAMINATION BY MR. GRINNAN:
9        Q    Well, you know that Tommy
10   Gibilterra and Cody Sims, they both know that,
11   since they've actually gone through you in the
12   past to get tugboats to provide these pushing
13   services, if they're directed to do so, true?
14       MR. ALTMYER:
15           Form.
16       THE WITNESS:
17           Wait, could you repeat that
18       question one more time and maybe go
19       back? Because I thought you were
20       talking about the mooring lines.
21   EXAMINATION BY MR. GRINNAN:
22       Q    Well, I'm kind of talking about
23   them both right now. You know that Tommy
24   Gibilterra and Cody Sims both had actual
25   knowledge that mooring lines alone are not

Page 398

1    going to be adequate precautions to take
2    during a hurricane, like Hurricane Zeta, and
3    that's why they get a tugboat like the
4    ENDEAVOR to come help them during it, right?
5        MR. ALTMYER:
6            Form.
7        THE WITNESS:
8            The ENDEAVOR was there to work
9        with them offshore and to go back
10       offshore.
11   EXAMINATION BY MR. GRINNAN:
12       Q    It wasn't there to work as
13   directed?
14       A    It was there to work as directed,
15   yes, but it was --
16       Q    And the only thing it would be
17   directed to do on the day of the hurricane
18   would be to provide pushing assistance, right?
19       MR. ALTMYER:
20           Form.
21       THE WITNESS:
22           It would be there to help.
23   EXAMINATION BY MR. GRINNAN:
24       Q    Yeah, help, but it wasn't -- the
25   ENDEAVOR was not towing the THOR anywhere that

Page 399

1    day, was it?
2        A    No. They were at the dock with the
3    THOR.
4        Q    And they were only there to help
5    during the hurricane, true?
6        A    I believe so.
7        Q    Okay. And THOR has actual
8    knowledge that it needs assistance from
9    tugboats like the ENDEAVOR, because mooring
10   lines alone are not going to be adequate to
11   ensure that the THOR stays moored during a
12   hurricane, true?
13       MR. ALTMYER:
14           Form.
15       THE WITNESS:
16           Wait, I'm sorry, you broke up
17       on me. I apologize.
18   EXAMINATION BY MR. GRINNAN:
19       Q    No, you're fine. And THOR has
20   actual knowledge that the mooring lines alone
21   are not an adequate precaution to keep the
22   THOR moored during a hurricane, and that's why
23   they keep a vessel like the ENDEAVOR, in the
24   event that it's needed, and they direct the
25   ENDEAVOR to turn on its engines and help,

Page 400

1    right?
2        MR. ALTMYER:
3            Form.
4        THE WITNESS:
5            Right.
6    EXAMINATION BY MR. GRINNAN:
7        Q    Okay. And so you know that Shore
8    had actual knowledge that the mooring lines
9    alone were not an adequate precaution to keep
10   the THOR moored during Hurricane Zeta, true?
11       MR. ALTMYER:
12           Form.
13       THE WITNESS:
14           I don't know. Again, I wasn't
15       there. I wasn't aware of what mooring
16       lines were used. I can't -- I don't
17       feel like I can comment on that, what
18       was adequate or not.
19   EXAMINATION BY MR. GRINNAN:
20       Q    Cody Sims and Tommy Gibilterra,
21   they certainly have actual knowledge of what
22   precautions need to be taken to keep a vessel
23   like the THOR moored during a hurricane, true?
24       MR. ALTMYER:
25           Form.

Pages 397 to 400

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 401

1      THE WITNESS:
2      True.
3  EXAMINATION BY MR. GRINNAN:
4      Q    Okay.  Tommy Gibilterra and Cody
5  Sims, they have actual knowledge of the
6  manning requirements that are necessary to
7  keep a vessel like the THOR safely moored
8  during a hurricane, like Hurricane Zeta, true?
9      MR. ALTMYER:
10      Form.
11      THE WITNESS:
12      Manning requirements?
13  EXAMINATION BY MR. GRINNAN:
14      Q    Yeah.
15      A    Could you explain what you mean on
16  that?
17      Q    Sure.  Well, in the maritime
18  industry, vessels have manning requirements.
19  You're aware of that, right?
20      A    Yes.
21      Q    Okay.  And if you have a skeleton
22  crew, that means you're running on less than
23  the normal manning requirements for the
24  vessel, right?
25      A    I guess, yes.

Page 402

1      Q    And that's all I'm getting at is
2  that Tommy Gibilterra and Cody Sims, they have
3  actual knowledge about the manning
4  requirements on their vessel, the THOR, right?
5      A    Yes.
6      Q    Okay.  And they have actual
7  knowledge of the minimum manning requirements
8  to keep a vessel like the THOR safely moored
9  during a hurricane, true?
10      MR. ALTMYER:
11      Form.
12      THE WITNESS:
13      True.
14  EXAMINATION BY MR. GRINNAN:
15      Q    Okay.  Shore shoreside management
16  was responsible for providing or manning the
17  THOR with an adequate crew in order for the
18  THOR to stay safely moored up during the
19  hurricane, true?
20      MR. ALTMYER:
21      Form.
22      THE WITNESS:
23      Wait, repeat that one more
24  time.
25  EXAMINATION BY MR. GRINNAN:

Page 403

1      Q    Sure.  Shore shoreside management
2  was responsible for providing enough crew
3  members on the THOR to safely keep it moored
4  during the hurricane, true?
5      MR. ALTMYER:
6      Form.
7      THE WITNESS:
8      Right.  I just don't know what
9  they -- I don't know what crew was on
10  board.
11  EXAMINATION BY MR. GRINNAN:
12      Q    No, that's fine.  You do know that
13  a skeleton crew would not be the safest
14  option, whenever you're talking about manning
15  requirements for a vessel like the THOR during
16  a hurricane, true?
17      MR. ALTMYER:
18      Form.
19      THE WITNESS:
20      Correct.
21  EXAMINATION BY MR. GRINNAN:
22      Q    Did Tommy Gibilterra or Cody Sims
23  or anybody at Shore ever tell you that their
24  mooring equipment was deteriorating or
25  defective or damaged in any way?

Page 404

1      MR. ALTMYER:
2      Form.
3      THE WITNESS:
4      No, sir, we never talked about
5  mooring equipment.
6  EXAMINATION BY MR. GRINNAN:
7      Q    Okay.  They concealed that from
8  you?
9      MR. ALTMYER:
10      Form.
11      THE WITNESS:
12      They never told me.
13  EXAMINATION BY MR. GRINNAN:
14      Q    Okay.  If the mooring equipment on
15  the THOR was defective or inadequate, that's
16  something that you had no knowledge of prior
17  to this incident, true?
18      A    True.
19      Q    Would you have liked to have known
20  that when you were brokering tug services for
21  the THOR?
22      MR. ALTMYER:
23      Form.
24      THE WITNESS:
25      Yes.

Pages 401 to 404

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 405

1    EXAMINATION BY MR. GRINNAN:
2        Q    Why?
3            MR. ALTMYER:
4                Same objection.
5            THE WITNESS:
6                Because obviously we don't want
7        the THOR to break away from the dock.
8    EXAMINATION BY MR. GRINNAN:
9        Q    Okay.  And if the THOR does have
10   defective mooring equipment, you would expect
11   someone like Tommy Gibilterra, Cody Sims, or
12   somebody from Shore shoreside management to
13   share that with yourself or someone at Dawn or
14   someone at Crosby, true?
15       A    I would think they would say
16   something.
17       Q    Okay.  And it would be essential to
18   share that information with somebody at Dawn
19   or Crosby because that can affect the safety
20   of every person on the THOR and every person
21   on the ENDEAVOR, true?
22           MR. ALTMYER:
23               Form.
24           THE WITNESS:
25               Yes.

Page 406

1    EXAMINATION BY MR. GRINNAN:
2        Q    Okay.  If the mooring equipment on
3    the THOR is defective or deteriorating, that's
4    something that the ENDEAVOR would need to know
5    because they're there to help assist or help
6    provide assistance in the event that the THOR
7    needs it, to stay moored up during the
8    hurricane, true?
9        A    Yeah, they would have told the
10   ENDEAVOR that the mooring equipment was
11   inadequate.
12       Q    Okay.  And why would they have done
13   that?
14       A    Well, I'm just saying they should
15   have done that.
16           MR. ALTMYER:
17               Form.
18   EXAMINATION BY MR. GRINNAN:
19       Q    Okay.  Shore shoreside management
20   and the superintendent had an obligation to
21   share with Crosby and Dawn the condition of
22   the mooring equipment for the THOR prior to
23   the storm, true?
24           MR. ALTMYER:
25               Form.

Page 407

1            THE WITNESS:
2                They had an obligation?
3    EXAMINATION BY MR. GRINNAN:
4        Q    Yes.
5        A    Yes.
6        Q    Okay.  To your knowledge, did they
7    share any information about the condition of
8    the mooring equipment on the THOR?
9        A    No.  No.
10       Q    Okay.  The superintendent and Shore
11   shoreside management failed to share any
12   information about the condition of the THOR
13   mooring equipment with anybody from Dawn or
14   Crosby, to your knowledge, true?
15           MR. ALTMYER:
16               Form.
17           THE WITNESS:
18               To my knowledge.
19   EXAMINATION BY MR. GRINNAN:
20       Q    That's true?
21           MR. ALTMYER:
22               Form again.
23           THE WITNESS:
24               True.
25   EXAMINATION BY MR. GRINNAN:

Page 408

1        Q    And had you known that or had
2    anybody at Dawn or Crosby had known that, that
3    certainly would have affected the preparations
4    that the ENDEAVOR would have taken on the day
5    of the incident, true?
6            MR. ALTMYER:
7                Form.
8            THE WITNESS:
9                Wait, I'm sorry, could you say
10       that one more time?
11   EXAMINATION BY MR. GRINNAN:
12       Q    Sure.  If Shore shoreside
13   management had shared information with you or
14   anybody at Dawn or Crosby about the defective
15   or deteriorating nature of their mooring
16   equipment, that would have impacted the way
17   Crosby prepared for the storm, true?
18           MR. ALTMYER:
19               Form.
20           MR. REISMAN:
21               Object to the form.
22           THE WITNESS:
23               Yeah, I can't answer that for
24       Crosby.  I don't --
25   EXAMINATION BY MR. GRINNAN:

Pages 405 to 408

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 409

1    Q    Well, that certainly would have
2  impacted the way the ENDEAVOR would have
3  prepared for the storm and what it might be
4  doing on the day of the incident, right?
5        MR. ALTMYER:
6            Form.
7        THE WITNESS:
8            Yes, it would have -- the barge
9        should have notified -- the barge should
10       have notified the ENDEAVOR.
11 EXAMINATION BY MR. GRINNAN:
12   Q    Okay.  And had the superintendent
13 of the THOR or somebody from Shore shoreside
14 management had told somebody at Dawn or Crosby
15 that it did not have the necessary and safe
16 mooring equipment that was needed to keep the
17 THOR tied up during the hurricane, the
18 ENDEAVOR would have aligned itself so that it
19 could provide those pushing services on the
20 day of the incident, true?
21       MR. ALTMYER:
22           Form.
23       THE WITNESS:
24           Well, yeah, if they instructed
25       them to push, yes.

Page 410

1  EXAMINATION BY MR. GRINNAN:
2    Q    Okay.  The failure to inform
3  anybody at Crosby or Dawn about the inadequate
4  nature of the mooring equipment that was on
5  board the THOR was a cause of this incident,
6  true?
7        MR. ALTMYER:
8            Form.
9        THE WITNESS:
10           I can't -- I can't answer that.
11       I mean, I wasn't there.  I didn't -- I
12       didn't see how everything was moored up.
13       I mean, I think it has a lot to do with
14       it, yes.
15 EXAMINATION BY MR. GRINNAN:
16   Q    Okay.  And it has a lot to do with
17 it, because if you had known, or if somebody
18 at Crosby had known that the mooring equipment
19 was not going to hold that day, then the
20 CROSBY ENDEAVOR could have turned on its
21 engines and started pushing right from the
22 get-go, right?
23       MR. ALTMYER:
24           Form.
25       THE WITNESS:

Page 411

1            Yeah, they could have had a
2        conversation on what could have been
3        done to help keep the barge --
4  EXAMINATION BY MR. GRINNAN:
5    Q    And if that had been -- if
6  information about the inadequate mooring had
7  been provided to the ENDEAVOR or somebody at
8  Dawn, then that could have prevented this
9  incident, because the ENDEAVOR could have had
10 its engines running and it could have been
11 pushing right at the beginning of the storm,
12 true?
13       MR. ALTMYER:
14           Form.
15       THE WITNESS:
16           They could have been pushing.
17 EXAMINATION BY MR. GRINNAN:
18   Q    And that could have prevented the
19 THOR from ever coming loose, in the first
20 place, true?
21       MR. ALTMYER:
22           Form.
23       THE WITNESS:
24           I don't know -- I don't know if
25       it would have prevented it.  It would

Page 412

1        have helped.
2  EXAMINATION BY MR. GRINNAN:
3    Q    It certainly would have, at least,
4  mitigated or lessened the likelihood of the
5  THOR coming completely unmoored, true?
6        MR. ALTMYER:
7            Form.
8        THE WITNESS:
9            Yes.
10 EXAMINATION BY MR. GRINNAN:
11   Q    And just so the record's clean, if
12 somebody from Shore shoreside management had
13 told somebody at Dawn or Crosby that the
14 mooring equipment was defective or inadequate,
15 that could have prevented this incident or
16 lessened the likelihood of this incident
17 occurring, true?
18       MR. ALTMYER:
19           Form.
20       THE WITNESS:
21           Could have had a conversation
22       about it, yes.
23 EXAMINATION BY MR. GRINNAN:
24   Q    And that's because -- well, we've
25 already gone through that.  Shore shoreside

Pages  409 to 412

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 413

1    management was responsible for approving the
2    mooring configuration for the THOR, true?
3            MR. ALTMYER:
4                Form.
5            THE WITNESS:
6                I believe so.
7    EXAMINATION BY MR. GRINNAN:
8        Q    Okay.  And Shore shoreside
9    management, they actually had knowledge about
10   how the THOR was being moored prior to the
11   storm, didn't they?
12           MR. ALTMYER:
13               Form.
14           THE WITNESS:
15               I think so.
16   EXAMINATION BY MR. GRINNAN:
17       Q    Okay.  And the reason you think
18   that is because you know that Shore shoreside
19   management got pictures of the mooring
20   configuration before the incident, true?
21           MR. ALTMYER:
22               Form.
23           THE WITNESS:
24               I don't know if they got
25        pictures.

Page 414

1    EXAMINATION BY MR. GRINNAN:
2        Q    Okay.  But you do know that they
3    got information about how the THOR was
4    configured up to the dock before the
5    hurricane, true?
6            MR. ALTMYER:
7                Form.
8            THE WITNESS:
9                I don't know how they -- I
10       don't know.
11   EXAMINATION BY MR. GRINNAN:
12       Q    Okay.  Well, the superintendent for
13   the THOR certainly shared that information
14   with somebody at Crosby or Dawn, right?
15       A    I never talked to the
16   superintendent from the barge.
17       Q    Okay.  Tommy Gibilterra and Cody
18   Sims, they would have known how the THOR was
19   configured or moored up for the hurricane,
20   right?
21           MR. ALTMYER:
22               Form.
23           THE WITNESS:
24               I would think so.
25   EXAMINATION BY MR. GRINNAN:

Page 415

1        Q    And why?
2        A    Because it's their barge.
3        Q    It's their responsibility, isn't
4    it?
5            MR. ALTMYER:
6                Form.
7            THE WITNESS:
8                Yes.  It's their barge, their
9        responsibility.
10   EXAMINATION BY MR. GRINNAN:
11       Q    Yeah.  In the past, Tommy
12   Gibilterra and Cody Sims, they actually get
13   information about how their barge is moored up
14   during a hurricane because they're the ones
15   who need to know, right?
16           MR. ALTMYER:
17               Form.
18           THE WITNESS:
19               Yes.
20   EXAMINATION BY MR. GRINNAN:
21       Q    Okay.  This incident or this
22   instance was no different, right?
23           MR. ALTMYER:
24               Form.
25           THE WITNESS:

Page 416

1                Not to my knowledge, no.
2    EXAMINATION BY MR. GRINNAN:
3        Q    Okay.  To your knowledge, Shore
4    shoreside management or Cody Sims or Tommy
5    Gibilterra, they actually had knowledge about
6    how the THOR mooring lines were configured
7    prior to the hurricane, true?
8            MR. ALTMYER:
9                Form.
10           THE WITNESS:
11               I don't know.
12   EXAMINATION BY MR. GRINNAN:
13       Q    Okay, fair enough.  Let me ask you
14   this.  Are you aware of the policies and
15   procedures that go into effect during
16   hurricanes, for vessels like the THOR?
17       A    No, I'm not.
18           MR. ALTMYER:
19               Form.
20   EXAMINATION BY MR. GRINNAN:
21       Q    Okay.  What about at Dawn, are
22   there any special policies and procedures that
23   go into place whenever y'all have a vessel
24   that's either brokered or it's your own that's
25   going to be going through a hurricane?

Pages  413 to 416

Page 417

1      A    Yes, we do.
2      Q    Don't you all have a meeting every
3  six hours?
4      A    We definitely have meetings, yes,
5  sir.
6      Q    Okay.  And during this hurricane,
7  Hurricane Zeta, did you all have any meetings
8  with anybody at Crosby management office or
9  the THOR management office?
10     A    No, because we didn't have anything
11 to do with tying up the barge.
12     Q    All right.  When Cody and Tommy
13 talked to you on the night of the incident,
14 did they tell you how the barge was tied up
15 before it came loose?
16     A    No.  I didn't talk to them before
17 the incident, the night of the incident.
18     Q    Yeah, I'm saying afterwards.
19     A    Oh, afterwards?  No.
20     Q    Did they tell you how the boat come
21 loose?
22     A    No.
23     Q    Did they tell you -- did they tell
24 you if any of the lines broke?
25     A    Not to my knowledge.  I mean, the

Page 418

1  barge broke free, so --
2      Q    Sure.  And then vessel logs from
3  the day of the incident, Dawn would have been
4  getting vessel logs from the Crosby, right,
5  the ENDEAVOR?
6      A    We only got vessel logs when they
7  send us an invoice.
8      Q    Okay.  Those vessel logs that the
9  ENDEAVOR was keeping, they went to the THOR,
10 right?
11     A    I'm not sure.  Again, we were just
12 a broker.
13     Q    And --
14     A    We were just a broker.  I don't
15 know what the THOR and ENDEAVOR had worked
16 out.
17     Q    Okay.  Shore was responsible for
18 making sure that there was enough slack in the
19 mooring lines to withstand any storm surge
20 from Hurricane Zeta, true?
21         MR. ALTMYER:
22              Form.
23         THE WITNESS:
24              Again, I don't have any
25         knowledge of how they tied everything up

Page 419

1  or what their -- yeah, I don't have any
2  knowledge of how they tied anything up
3  in regards to slack or anything.
4  EXAMINATION BY MR. GRINNAN:
5      Q    Fair enough.  Okay.  But Shore
6  would have been responsible for making sure
7  that there was enough slack in the lines,
8  right?
9          MR. ALTMYER:
10              Form.
11         THE WITNESS:
12              Shore was responsible for tying
13         the barge up.
14 EXAMINATION BY MR. GRINNAN:
15     Q    Right.  Now, training.  I want to
16 ask you about that.  Whenever Dawn brokered a
17 tug for use by Shore, did Dawn provide any
18 training to the tug crew?
19     A    No, because we were just a broker.
20 We didn't have any control of the vessel at
21 all.
22     Q    Okay.  Who would have been
23 responsible for providing training to the tug
24 crew on the sort of assistance that might be
25 needed in order to go through a hurricane?

Page 420

1      A    Who would have provided assistance
2  or who would have provided training?
3      Q    Who was responsible for providing
4  that training?
5          MR. ALTMYER:
6              Form.
7          THE WITNESS:
8              The vessel owner, the vessel
9          owners.
10 EXAMINATION BY MR. GRINNAN:
11     Q    Okay.  So that would have been
12 Crosby or Shore?
13     A    Right, but --
14         MR. ALTMYER:
15              Form.
16         THE WITNESS:
17              But when it comes to tying up
18         the barge, it's Shore's responsibility.
19 EXAMINATION BY MR. GRINNAN:
20     Q    Okay.  And when it comes to
21 providing tug services during a hurricane,
22 that would be Crosby's responsibility to train
23 its crew on how to provide those services, if
24 it's directed, true?
25     A    Crosby would have -- I would

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 421

1  imagine Crosby -- well, let me back up.  They
2  were instructed to work as directed, so they
3  were relying on Shore.
4      Q    Yeah, and I'm not --
5      A    They were relying on Shore to tell
6  them what they needed to do.
7      Q    And who was responsible for
8  training the Crosby crew on how to work during
9  a hurricane?
10     A    I'm not sure.
11     Q    Okay.  Was it Shore's
12  responsibility or Crosby's?
13         MR. ALTMYER:
14             Form.
15         THE WITNESS:
16             I can't -- I can't answer that.
17     I think Crosby probably told the vessel
18     to -- they were instructed to work as
19     directed.
20  EXAMINATION BY MR. GRINNAN:
21     Q    And when Shore came to you to
22  broker tug services, one of your obligations
23  was to provide competent tugboat services,
24  right?
25         MR. REISMAN:

Page 422

1             Object to the form.
2         THE WITNESS:
3             When we were instructed -- when
4     we were hired to broker?  We were hired
5     to provide -- we were just merely there
6     to put vessel owner with our customer,
7     as a broker.
8  EXAMINATION BY MR. GRINNAN:
9     Q    Okay.  My question was different,
10  so I'll ask it again.  I'm talking about when
11  you did do that, when you brokered vessel
12  owner with tug owner, one of your obligations
13  would have been to provide a competent tugboat
14  service, right?
15         MR. REISMAN:
16             Object to the form.
17         THE WITNESS:
18             We were asked to get vessels
19     from Shore.  They were the ones who gave
20     us the requirements for the type of tugs
21     they wanted.
22  EXAMINATION BY MR. GRINNAN:
23     Q    You went and found the tugs for
24  Shore, right?
25     A    We were the ones that went and

Page 423

1  looked for the tugboats, yes.
2      Q    Okay.  And Shore didn't want just
3  any tugboat and any tug crew?  They needed the
4  tugboat and a tug crew that could provide the
5  services that they had asked for, right?
6      A    Yeah, they wanted a big tugboat.
7      Q    Okay.  You needed to find the right
8  type of tugboat and make sure that it was from
9  a company that was going to provide it with an
10  adequate and competent tug crew, right?
11     A    Yes.
12     Q    Okay.  And that means you need to
13  make sure that the tugboat's adequate and that
14  the training that would be provided to the
15  crew would be adequate so that they could
16  provide competent services that Shore had
17  requested, true?
18         MR. REISMAN:
19             Object to the form.
20         THE WITNESS:
21             Could you ask the question one
22     more time?
23  EXAMINATION BY MR. GRINNAN:
24     Q    Sure.  You had to make sure you got
25  an adequate sized tugboat for Shore, as part

Page 424

1  of that brokerage agreement, right?
2         MR. REISMAN:
3             Object to the form.
4         THE WITNESS:
5             We had to -- Shore came to us
6     and said, this is the size -- this is
7     what we're looking for in a tugboat.  So
8     we went and we brokered vessels based
9     off of their requirements.
10  EXAMINATION BY MR. GRINNAN:
11     Q    Okay.  And that also required you
12  to get a crew, too, right?  Because the vessel
13  can't -- the tug can't just operate on its
14  own, can it?
15         MR. REISMAN:
16             Object to the form.
17         THE WITNESS:
18             Well, we never -- we never put
19     Dawn crews on these vessels.  These
20     vessels came crewed.
21  EXAMINATION BY MR. GRINNAN:
22     Q    Exactly.  You had to procure the
23  tugboat, and then you also had to make sure
24  that there was a tug crew to operate the
25  tugboat, right?

Pages  421 to 424

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 425

1     MR. REISMAN:
2          Object to the form.
3     THE WITNESS:
4          The tug crew came with the
5     tugboat.  We had nothing to do with the
6     crew -- we had nothing to do with the
7     crewing of that vessel or any vessel
8     that we brokered.
9  EXAMINATION BY MR. GRINNAN:
10     Q     You got hired by Shore to go broker
11  a tugboat.  You couldn't just provide a
12  tugboat, because that wouldn't provide
13  everything that Shore had asked for, right?
14     MR. REISMAN:
15          Object to the form.  They
16     didn't provide anything, John.  There's
17     been a lot of testimony about that.
18     Dawn didn't provide tugs.
19     MR. GRINNAN:
20          I got it.
21  EXAMINATION BY MR. GRINNAN:
22     Q     If you got a tugboat with no tug
23  crew, that tugboat's not going to do any good,
24  is it?
25     MR. REISMAN:

Page 426

1          Object to the form.
2     THE WITNESS:
3          Well, the tug couldn't work.  I
4     mean, you need a crew to go with the
5     vessel and that's --
6  EXAMINATION BY MR. GRINNAN:
7     Q     That's what I'm getting at, is that
8  when you're brokering a tugboat, you've got to
9  make sure that whoever you're brokering or
10  whoever you're getting the tugboat from,
11  they're also going to be able to provide a
12  crew, right?
13     MR. REISMAN:
14          Object to the form.
15     THE WITNESS:
16          Well, they wouldn't be able to
17     work the boat if they didn't have a
18     crew.
19  EXAMINATION BY MR. GRINNAN:
20     Q     That's why you've got to make sure,
21  when you're brokering the tugboat, you've got
22  to make sure that they're going to provide the
23  crew, right?
24     MR. REISMAN:
25          Object to the form.

Page 427

1     THE WITNESS:
2          Well, when you're brokering a
3     boat, the boat comes with a tugboat
4     crew.
5  EXAMINATION BY MR. GRINNAN:
6     Q     Okay.  That's all I was getting at.
7     A     Okay.
8     Q     Is that this brokering agreement,
9  it required you to find a tugboat with a tug
10  crew, right?
11     A     Yes.  The tugboat comes with a
12  crew.
13     Q     Okay.  And that tug crew had to be
14  competent to perform the services that Shore
15  had asked you to get a tugboat for, right?
16     MR. REISMAN:
17          Object to the form.
18     THE WITNESS:
19          Yeah.  Could you ask that one
20     more time?  Because I feel like --
21  EXAMINATION BY MR. GRINNAN:
22     Q     Yeah.  The tug crew had to be
23  competent to perform the services that Shore
24  wanted the tug to perform, true?
25     MR. REISMAN:

Page 428

1          Object to the form.
2     THE WITNESS:
3          The tug crew knew -- the tug
4     crew knew what job they were being hired
5     to do, which was go work with the THOR
6     offshore, as an anchor handling tug
7     crew.
8  EXAMINATION BY MR. GRINNAN:
9     Q     Yeah.  But what I'm getting at is
10  you can't just have a tug crew full of
11  five-year-olds that don't know what they're
12  doing.  You've got to make sure the tug crew
13  is competent to perform the services that
14  Shore wants performed, right?
15     MR. REISMAN:
16          Object to the form.  Dawn
17     doesn't have to do that.  Shore has to
18     do that.  He's told you that.  It's not
19     up to Dawn.  They were simply a broker.
20  EXAMINATION BY MR. GRINNAN:
21     Q     You can answer.
22     A     Yeah, we were just a broker in the
23  situation.
24     Q     Okay.  And so, well, is it your
25  testimony that you just had to provide a

Pages  425 to 428

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 429

1    tugboat and no tug crew?
2         MR. REISMAN:
3             Object to the form.
4         THE WITNESS:
5             No, that's not -- no.
6    EXAMINATION BY MR. GRINNAN:
7         Q    Okay.  The tug crew had to come
8    with the tugboat, and the tug crew had to know
9    what they were doing, right?
10        MR. REISMAN:
11            Object to the form.  Dawn
12            didn't provide anything.  He's made that
13            clear and you're just trying to get him
14            to change that testimony, I guess, but
15            he's not going to, and you really need
16            to move on.
17    EXAMINATION BY MR. GRINNAN:
18        Q    You can answer, sir.
19        A    We didn't provide the tugboat or
20   tug crew.
21        Q    I'm not saying you did.  I'm really
22   not.  I'm not trying to say that you
23   provided -- I know that Crosby provided the
24   tugboat and Crosby provided the crew, right?
25        A    Yes.

Page 430

1         Q    And it was necessary for you, in
2    your service, when you were finding a tugboat
3    and tug crew, to find an adequate tugboat and
4    a crew that could do the job that Shore needed
5    done, right?
6         MR. REISMAN:
7             Object to the form.
8         THE WITNESS:
9             Crosby knew the crew could do
10            the job.
11    EXAMINATION BY MR. GRINNAN:
12        Q    And that's all I'm getting at, is
13   you had to make sure this crew knew what they
14   were doing and could provide services to a
15   derrick barge like the THOR, right?
16        MR. REISMAN:
17            Object to the form.
18        THE WITNESS:
19            When I'm calling a company,
20            asking to see if they have any boats
21            available, for broker, and I explain the
22            job that has been explained to me,
23            they're the ones that make sure that the
24            crew is adequate to do the job.
25    EXAMINATION BY MR. GRINNAN:

Page 431

1         Q    Okay.  So that would be Crosby's
2    responsibility?
3         A    It's Crosby's boat.  It's Crosby.
4         Q    Okay.  And Crosby's crew, right?
5         A    Yes, it's Crosby's crew.
6         Q    All right.  So Crosby then would
7    have the responsibility to provide a competent
8    crew to perform the services that Shore was
9    requiring, true?
10        A    True.
11        Q    Okay.  And it goes back to the
12   whole brokerage agreement thing is that like
13   if you just provided a tugboat -- well, strike
14   that.  I won't use the word "provide."  It
15   goes back to the whole brokerage agreement is
16   that if you brokered a tugboat without a crew
17   who could do what Shore needed the tugboat
18   for, then you wouldn't be doing what you were
19   supposed to do, as your part of the agreement,
20   right?
21        MR. REISMAN:
22            Object to the form.  What kind
23        of charter?  Are you talking about a
24        bareboat charter?  Are you talking about
25        a time charter?  Because on a bareboat

Page 432

1    charter, there is no crew.
2    EXAMINATION BY MR. GRINNAN:
3         Q    You can answer, sir.
4         A    Could you ask the question one more
5    time?
6         Q    Sure.
7         MR. GRINNAN:
8             Well, madam court reporter, can
9        you just read back my question?
10        THE COURT REPORTER:
11            Question:  It goes back to the
12        whole brokerage agreement is that if you
13        brokered a tugboat without a crew who
14        could do what Shore needed the tugboat
15        for, then you wouldn't be doing what you
16        were supposed to do, as your part of the
17        agreement, right?
18        MR. GRINNAN:
19            You can answer.
20        MR. REISMAN:
21            Same objection.  Object to the
22        form.
23        THE WITNESS:
24            When we broker a vessel, the
25        tug will come with a crew.

Pages 429 to 432

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 433

1    EXAMINATION BY MR. GRINNAN:
2        Q    And the crew needs to be able to do
3    the job that Shore has asked that the tug do,
4    right?
5            MR. REISMAN:
6                Object to the form.
7            THE WITNESS:
8                The tug would -- the tug -- the
9            tug -- we were given parameters by Shore
10           on what kind of tug that they want and
11           it was for an anchor handling tugboat,
12           and so the crew that would come with the
13           vessel would be a crew that could do the
14           anchor handling job that they were hired
15           to do.
16   EXAMINATION BY MR. GRINNAN:
17       Q    Okay.  And that's -- you kind of
18   just answered the question.  The tug needed to
19   come with a crew who could do the anchor
20   handling job, right?
21       A    Yes.
22       Q    And the responsibility to provide
23   training necessary to do that sort of job
24   would be on Crosby, right?
25       A    To do the anchor handling?

Page 434

1        Q    Yeah.
2        A    Crosby has been doing it for a long
3    time.
4        Q    It was their responsibility to
5    train their crew, right?
6        A    Yes.  I mean, anchor handling is --
7    it's --
8            MR. REISMAN:
9                Answer his question.
10           THE WITNESS:
11               Yes.
12           MR. REISMAN:
13               If you want to go home, just
14           answer his question.
15           THE WITNESS:
16               Yes.
17   EXAMINATION BY MR. GRINNAN:
18       Q    And it was Crosby's responsibility
19   to train its crew on proper precautions to
20   take when you are providing assistance during
21   a hurricane, even when you're working as
22   directed, true?
23           MR. GLASCOE:
24               Object to form.
25           THE WITNESS:

Page 435

1                Could you repeat the question?
2    EXAMINATION BY MR. GRINNAN:
3        Q    It was Crosby's responsibility to
4    train its crew on the proper and safe
5    precautions to take when providing tug
6    services during a hurricane, true?
7            MR. GLASCOE:
8                Form.
9            THE WITNESS:
10               True.
11   EXAMINATION BY MR. GRINNAN:
12       Q    And if there were certain
13   situations where working as directed was
14   dangerous, then it was Crosby's responsibility
15   to train its crew on the actions it should
16   take to avoid that danger, true?
17           MR. REISMAN:
18               Object to the form.
19           THE WITNESS:
20               It was Crosby -- it was Crosby
21           that -- that -- yes.
22   EXAMINATION BY MR. GRINNAN:
23       Q    All right.  Because you can't just
24   blindly work as directed if it would endanger
25   either the CROSBY ENDEAVOR crew or the crew on

Page 436

1    board the THOR, fair?
2            MR. REISMAN:
3                Object to the form.
4            THE WITNESS:
5                Well, yeah.  You would,
6            obviously you want to keep -- yes,
7            obviously the vessel needs to be safe,
8            as well as the THOR, so those --
9    EXAMINATION BY MR. GRINNAN:
10       Q    And so in some situations, the
11   ENDEAVOR should not work as directed if it
12   would endanger somebody on the THOR or
13   somebody on the ENDEAVOR, fair?
14           MR. REISMAN:
15               Object to the form.
16           MR. GLASCOE:
17               Form.
18           THE WITNESS:
19               I would think that they
20           needed -- did you say something?
21   EXAMINATION BY MR. GRINNAN:
22       Q    I thought you answered the
23   question, "correct."
24       A    Okay.
25           MR. REISMAN:

Pages 433 to 436

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 437

1      No, he didn't.
2   EXAMINATION BY MR. GRINNAN:
3      Q    I'm sorry, I misheard you.  Okay.
4   If working as directed would endanger the
5   ENDEAVOR crew or the THOR crew, then the
6   CROSBY ENDEAVOR crew should not work as
7   directed, fair?
8      MR. REISMAN:
9          Object to the form.
10   THE WITNESS:
11          The CROSBY ENDEAVOR crew, yes,
12      should not work as directed if it was
13      going to endanger people.
14   EXAMINATION BY MR. GRINNAN:
15      Q    That would mean that Crosby would
16   be responsible for training its crew on
17   situations where they should not work as
18   directed, because it might endanger
19   crewmembers on board the ENDEAVOR or the THOR,
20   fair?
21      A    They're -- they were there to work
22   as directed.
23      Q    Sure.  And Crosby would be
24   responsible for training the crew on
25   exceptions to that rule, where they shouldn't

Page 438

1   work as directed, or only as directed, because
2   in certain situations, it might be dangerous
3   to do so, fair?
4      MR. GLASCOE:
5          Form.
6   THE WITNESS:
7          I would think Crosby would tell
8      their boat that if it was endangering
9      their boat, that they wouldn't work as
10      directed, but --
11   EXAMINATION BY MR. GRINNAN:
12      Q    And Crosby would be responsible for
13   training its crew that you work as directed
14   unless it would endanger a crewmember on the
15   ENDEAVOR or the THOR, fair?
16      A    I don't know what Crosby training
17   entails.
18      Q    That's fine.  I'm not asking you --
19   I'm just saying -- I'm asking you about who
20   would have the responsibility to provide the
21   training to the Crosby crew?  Are you with me?
22      A    It would be Crosby.
23      Q    So Crosby would have a
24   responsibility to train the Crosby crew on
25   certain situations that are exceptions to the

Page 439

1   work as directed rule, because in certain
2   situations, it might be dangerous to work as
3   directed, fair?
4      A    Fair.
5      Q    Crosby would have the
6   responsibility to train the Crosby crew on the
7   situations where it should not work as
8   directed, because it would be more dangerous
9   to work as directed, fair?
10      MR. GLASCOE:
11          Form.
12   THE WITNESS:
13          Fair.
14   EXAMINATION BY MR. GRINNAN:
15      Q    Shore was responsible for making
16   sure that there was somebody qualified on
17   board that could safely and properly moor the
18   THOR during the hurricane, true?
19      MR. ALTMYER:
20          Form.
21   THE WITNESS:
22          True.
23   EXAMINATION BY MR. GRINNAN:
24      Q    Okay.  The last thing I want to
25   talk to you about -- well, strike that.  Based

Page 440

1   on everything you know, do you agree with me
2   that Shore failed, at multiple different
3   junctures, and that those failures were the
4   cause of this incident, true?
5      MR. ALTMYER:
6          Form.
7   THE WITNESS:
8          I would think Shore failed in
9      tying the barge up.  But again, I wasn't
10      there.
11   MR. GRINNAN:
12          Object as nonresponsive.
13   THE WITNESS:
14          I wasn't there.  I didn't
15      witness how it was tied up.  It would
16      never be something that I would -- it's
17      not on -- it wouldn't be on the tugboat
18      to tie that up.
19   EXAMINATION BY MR. GRINNAN:
20      Q    Have you talked to Tommy and Cody
21   since the night of the incident?
22      A    Yes.
23      Q    Okay.  Have they taken
24   responsibility for their actions since the
25   night of the incident?

Pages  437 to 440

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 441

1      A    I thought I had -- I thought that
2  we had already talked about that.  No.  No.
3      Q    We talked about the night of the
4  incident.  They didn't to it on the night of
5  the incident?
6      A    No.
7      Q    But since then, they still haven't
8  come clean and taken responsibility for their
9  actions?
10     MR. ALTMYER:
11         Form.
12     THE WITNESS:
13         No.
14  EXAMINATION BY MR. GRINNAN:
15     Q    Has anybody from Shore, that you've
16  talked to, come clean and taken responsibility
17  for their actions?
18     MR. ALTMYER:
19         Form.
20     THE WITNESS:
21         No.
22  EXAMINATION BY MR. GRINNAN:
23     Q    There's not a single honest person
24  that works there?
25     MR. ALTMYER:

Page 442

1         Form.
2      THE WITNESS:
3         I don't -- I don't know.  They
4      don't talk to me about that.
5  EXAMINATION BY MR. GRINNAN:
6      Q    There's not a single good person
7  that will actually just fess up and say, "You
8  know what?  We did a lot of things wrong that
9  day; we were the cause of this, and we're
10  responsible for this?"  There's not a single
11  person who's ever said anything --
12     A    Not to me, no.
13     MR. REISMAN:
14         Form.
15  EXAMINATION BY MR. GRINNAN:
16     Q    Anything like that, from Shore to
17  you?
18     THE WITNESS:
19         Not to me, no.
20     MR. ALTMYER:
21         Form.
22  EXAMINATION BY MR. GRINNAN:
23     Q    I mean, doesn't that kind of
24  surprise you?  There's this huge lawsuit going
25  on?  I mean, there are a bunch of boats that

Page 443

1  got rammed into, there's a bunch of people
2  that got hurt, and not a single person from
3  Shore has even ever like mentioned to you,
4  even vaguely, that, like, "Yeah it was our
5  fault; we messed up.  We should take
6  responsibility"?
7      MR. ALTMYER:
8         Form.
9      THE WITNESS:
10         No.  Nobody's ever mentioned
11     that to me.
12  EXAMINATION BY MR. GRINNAN:
13     Q    Does that surprise you?
14     MR. ALTMYER:
15         Form.
16     THE WITNESS:
17         Not really.
18  EXAMINATION BY MR. GRINNAN:
19     Q    I mean, you all might be liable in
20  this case for paying money because of their
21  failures.  You all aren't mad at them for
22  that?
23     MR. REISMAN:
24         Object to form.
25     MR. ALTMYER:

Page 444

1         Form.
2      THE WITNESS:
3         I mean, we were a boat broker
4      in this deal.
5  EXAMINATION BY MR. GRINNAN:
6      Q    I know, and you know that Shore,
7  they're the ones who brought you into this
8  case, don't you?
9      MR. ALTMYER:
10         Form.
11     THE WITNESS:
12         Yes.
13  EXAMINATION BY MR. GRINNAN:
14     Q    Okay.  You're not mad at them for
15  that?
16     MR. REISMAN:
17         Object to the form.
18     THE WITNESS:
19         Of course, I don't want to be
20     involved in this.
21  EXAMINATION BY MR. GRINNAN:
22     Q    So why -- you all didn't call them
23  up and say, "Hey, what the hell is going on?"
24  Like, "This was y'all's fault and now we're
25  getting dragged into this lawsuit?  You all

Pages 441 to 444

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 445

1   need to take responsibility for your actions?"
2        MR. ALTMYER:
3            Form.
4        THE WITNESS:
5            I've never had that
6   conversation.
7   EXAMINATION BY MR. GRINNAN:
8        Q    The right thing to do would be from
9   somebody from Shore to pick up the phone and
10  call every single person who got hurt from
11  this incident and take responsibility for the
12  damages they caused, fair?
13       MR. ALTMYER:
14           Form.  This is -- I'm going to
15  object to this whole line of
16  questioning.  I think that's completely
17  out of bounds of what the scope of this
18  deposition is for.
19       THE WITNESS:
20           Could you repeat that?
21  EXAMINATION BY MR. GRINNAN:
22       Q    You can answer.
23       A    Could you repeat the question?
24       Q    Sure.  The right thing to do would
25  be from somebody from Shore to pick up the

Page 446

1   phone and call every person who got hurt from
2   this incident, everybody who had property
3   damage from this incident, to apologize, take
4   responsibility, and pay for the damages that
5   they caused, true?
6        MR. ALTMYER:
7            Form.
8        THE WITNESS:
9            That's up to the individual
10   that caused all this.
11  EXAMINATION BY MR. GRINNAN:
12       Q    That would be the decent thing to
13  do, wouldn't it be?
14       MR. ALTMYER:
15           Form.
16       THE WITNESS:
17           Yes.
18  EXAMINATION BY MR. GRINNAN:
19       Q    Okay.  Those people over there at
20  Shore, they're not decent people, are they?
21       MR. ALTMYER:
22           Form.
23       THE WITNESS:
24           I can't -- I can't -- the
25   people at Shore are -- it's up to them

Page 447

1   what they want to do.
2   EXAMINATION BY MR. GRINNAN:
3        Q    Did you know that Shore trapped
4   injured people on board that THOR vessel for a
5   few days before they let them get off and get
6   medical care?
7        MR. ALTMYER:
8            Form.
9        THE WITNESS:
10           I have no wherewithal or any
11  idea of the people that got hurt on the
12  THOR.
13  EXAMINATION BY MR. GRINNAN:
14       Q    Do you know that they cornered
15  these hurt people in rooms and made them give
16  statements without lawyers present?
17       MR. ALTMYER:
18           Form.
19       THE WITNESS:
20           I'm unaware of that.  Again, I
21  don't know who got hurt or how they got
22  hurt or anything like that, and what
23  happened afterwards.
24  EXAMINATION BY MR. GRINNAN:
25       Q    Do you know that Shore lawyers got

Page 448

1   on board the vessel and started taking
2   statements of hurt people and wouldn't let
3   them off the boat until they gave them the
4   statement that they wanted?
5        MR. ALTMYER:
6            Form.
7        MR. REISMAN:
8            John, I think we are getting
9   outside of the scope of the deposition
10  now.
11       MR. GRINNAN:
12           I'm just seeing if he heard
13  anything like that.
14       MR. REISMAN:
15           I mean, are you just about
16  done?
17       MR. GRINNAN:
18           That's the last question I was
19  going to ask about that.
20       MR. REISMAN:
21           All right.  Go ahead and
22  answer, subject to the objection.
23       THE WITNESS:
24           I am not aware of any of that.
25  EXAMINATION BY MR. GRINNAN:

Pages  445 to 448

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 449

1    Q    All right. The last thing I wanted
2  to ask you about is indemnification. Have you
3  heard that word?
4    A    Yes.
5    Q    Okay. Does Dawn have to pay any
6  indemnification to Crosby for this case?
7    A    I'm not aware of the contract as
8  far as how it reads.
9    Q    Has Crosby requested
10 indemnification from Dawn?
11   A    I think they have.
12   Q    Okay. Has --
13     MR. REISMAN:
14         Hang on, hang on. Either you
15     know or you don't know.
16     THE WITNESS:
17         Yes, they have.
18     MR. REISMAN:
19         Wait. Hang on a second. Are
20     you hearing the questions? Are you
21     hearing who he's asking about?
22     THE WITNESS:
23         Wait, say that again. Can you
24     ask the question again?
25 EXAMINATION BY MR. GRINNAN:

Page 450

1    Q    Well, I want to ask about Shore
2  now. Has Shore requested indemnification from
3  anybody at Dawn?
4      MR. REISMAN:
5          John, he's tried to tell you
6      that he didn't understand the last
7      series of questions. I think he
8      misunderstood it. So if you want to let
9      it sit, with him saying he didn't
10     understand, you can. But otherwise you
11     might want to go back and reask him.
12 EXAMINATION BY MR. GRINNAN:
13   Q    Okay. Has Dawn requested
14 indemnification or indemnity from Crosby?
15   A    Oh, I'm sorry. From Crosby?
16   Q    Yeah.
17   A    Not that I'm aware of.
18   Q    Okay. And has Shore requested
19 indemnification from anybody at Crosby or
20 Dawn?
21   A    Not from -- not that I'm aware of.
22   Q    Okay. What about from Dawn?
23   A    From Dawn?
24     MR. REISMAN:
25         Has Shore requested indemnity

Page 451

1  from Dawn?
2      THE WITNESS:
3          I believe so.
4  EXAMINATION BY MR. GRINNAN:
5    Q    What did you all tell them, "This
6  is your fault; you should have to pay for it"?
7      MR. ALTMYER:
8          Form.
9      THE WITNESS:
10         I believe we told them that it
11     had nothing to do with the Master Vessel
12     Time Charter.
13 EXAMINATION BY MR. GRINNAN:
14   Q    That thing you all talked about for
15 like eight hours earlier today?
16     MR. REISMAN:
17         That's the one.
18     THE WITNESS:
19         Yes.
20 EXAMINATION BY MR. GRINNAN:
21   Q    Okay. Did you all give your answer
22 to them in writing?
23   A    I believe our -- I believe our
24 insurance underwriter provided them.
25   Q    Okay. With an answer on their

Page 452

1  request for indemnity?
2    A    Yes.
3    Q    Okay. And have you seen that
4  letter?
5      MR. REISMAN:
6          Just answer his question, Mike.
7      THE WITNESS:
8          Yes.
9  EXAMINATION BY MR. GRINNAN:
10   Q    And has it been produced in this
11 case?
12   A    Yes.
13   Q    And let me ask you this. Has
14 anybody else requested indemnification from
15 you?
16   A    No, not that I'm aware of.
17   Q    Have you requested indemnification
18 from anybody?
19   A    Not that I'm aware of.
20   Q    No one?
21     MR. REISMAN:
22         He doesn't know.
23     THE WITNESS:
24         I don't know.
25     MR. REISMAN:

Pages 449 to 452

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 453

1        John, he doesn't know.
2    THE WITNESS:
3        I don't know.
4    EXAMINATION BY MR. GRINNAN:
5        Q    Okay, you don't know.  All right,
6    that's fine.  I just want to ask you one more
7    question.  Do you think it would be fair for
8    Dawn to have to pay indemnification to Shore?
9        MR. ALTMYER:
10            Form.
11    EXAMINATION BY MR. GRINNAN:
12        Q    In this case?
13        A    No.
14        Q    Why not?
15        MR. ALTMYER:
16            Form.
17        THE WITNESS:
18            Because we didn't have anything
19    to do with it.  We were just merely a
20    broker.
21    EXAMINATION BY MR. GRINNAN:
22        Q    And who did?
23        A    What's that?
24        Q    It was Shore who did, right?
25        MR. ALTMYER:

Page 454

1            Form.
2        THE WITNESS:
3            Shore.
4    EXAMINATION BY MR. GRINNAN:
5        Q    Okay.  And Dawn, as a corporate
6    representative for Dawn, you can testify that
7    it's Dawn's position that this was Shore's
8    fault, true?
9        MR. ALTMYER:
10            Form.
11        THE WITNESS:
12            True.
13    EXAMINATION BY MR. GRINNAN:
14        Q    And you, as a corporate
15    representative for Dawn, have no personal
16    knowledge or no Dawn knowledge about anything
17    that any of the mechanics or the cooks or the
18    surveyors on board the THOR did wrong, true?
19        MR. ALTMYER:
20            Form.
21        THE WITNESS:
22            I don't know anything about any
23    of the crew on board the THOR.
24    EXAMINATION BY MR. GRINNAN:
25        Q    And so, as a corporate

Page 455

1    representative for Dawn, it is Dawn's position
2    that none of the cooks, mechanics, or
3    surveyors did anything wrong or anything to
4    cause or contribute to this incident, true?
5        MR. ALTMYER:
6            Form.
7        MR. REISMAN:
8            John, I'm going to object,
9    first, that it's outside the scope.  I'm
10    going to also object that those are
11    matters that are not for Dawn to decide,
12    but instead, for Dawn's lawyers and
13    experts.  So he's not in a position to
14    respond, but it's outside the scope of
15    the deposition notice, and so I'm going
16    to instruct him to not answer that.
17        MR. GRINNAN:
18            David, it's on the incident.
19        MR. REISMAN:
20            I don't -- I don't think -- I
21    didn't see anything that asked about the
22    crew and whether they were at fault.
23    But he doesn't know, John.  He's told
24    you that he doesn't know.
25        MR. GRINNAN:

Page 456

1            That's not --
2        MR. REISMAN:
3            And Dawn's not taking a
4    position.  Its lawyers and its experts
5    will decide that.
6        MR. GRINNAN:
7            I mean, let me ask it again.
8    I'm just about done, David.  I'm about
9    to pass the witness.
10    EXAMINATION BY MR. GRINNAN:
11        Q    As the corporate representative for
12    Dawn, do you have any knowledge of any
13    wrongdoing on the part of any of the
14    mechanics, surveyors or cooks on board the
15    THOR?
16        MR. ALTMYER:
17            Form.
18        MR. REISMAN:
19            Subject to the same objection,
20    go ahead and answer.
21        THE WITNESS:
22            I don't know anybody that was
23    on the vessel.
24    EXAMINATION BY MR. GRINNAN:
25        Q    All right.  And so that means you

Pages  453 to 456

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 457

1  have no knowledge of anything that the cooks,
2  mechanics or surveyors did wrong, right.
3          MR. ALTMYER:
4              Form.
5          MR. REISMAN:
6              Object to form.  You can
7  answer.
8          THE WITNESS:
9              Correct.
10  EXAMINATION BY MR. GRINNAN:
11      Q    Last question.  As the corporate
12  representative for Dawn, you have no personal
13  knowledge of anything that any of the cooks,
14  mechanics or surveyors did to cause or
15  contribute to this incident, true?
16          MR. ALTMYER:
17              Form.
18          MR. REISMAN:
19              Same objection.  Subject to
20  that, you can answer.
21          THE WITNESS:
22              Could you repeat the question?
23  EXAMINATION BY MR. GRINNAN:
24      Q    Sure.  As the corporate
25  representative for Dawn, you have no knowledge

Page 458

1  of anything that the cooks, mechanics or
2  surveyors on board the THOR did to cause or
3  contribute to this incident, true?
4          MR. ALTMYER:
5              Form.
6          THE WITNESS:
7              None.  Not to my knowledge.
8          MR. GRINNAN:
9              Okay.  I'll pass the witness.
10  Thank you for your time, sir.
11          THE WITNESS:
12              You're welcome.
13          MR. REISMAN:
14              Anybody else have questions?  I
15  think Jacob may have a couple.  Anybody
16  else?
17          MR. PALMINTIER:
18              No questions.
19          MR. REISMAN:
20              Why don't we just take a quick
21  break.
22          MR. ALTMYER:
23              Perfect.
24              (Whereupon, a break was taken;
25  7:02 p.m. - 7:14 p.m.)

Page 459

1  EXAMINATION BY MR. ALTMYER:
2      Q    All right, Mr. Grace.  I just have
3  a few follow-up questions.  I don't think I'm
4  going to be very long.
5      A    Okay.
6      Q    You were asked a lot of questions
7  just now by Mr. Grinnan about the
8  responsibilities of Shore Offshore Services
9  and any causes of the incident.  Do you
10  remember that?
11      A    Yes.
12      Q    Okay.  Just to clarify, as of
13  October 28, 2020, you had no personal
14  knowledge of how the THOR was actually moored
15  to the Martin dock, correct?
16      A    Yes, correct.
17          MR. GRINNAN:
18              Form.
19  EXAMINATION BY MR. ALTMYER:
20      Q    You have no personal knowledge of
21  how the THOR, of what lines the THOR used to
22  moor itself to the dock?
23      A    Correct.
24      Q    Okay.  You have no personal
25  knowledge, as of October 28, 2020, of how

Page 460

1  Crosby was moored to the THOR, correct?
2      A    Correct.
3      Q    You have no personal knowledge, as
4  of October 28, 2020, of who participated in
5  mooring the ENDEAVOR to the THOR, correct?
6          MR. GRINNAN:
7              Object to the form.
8          THE WITNESS:
9              Correct.
10  EXAMINATION BY MR. ALTMYER:
11      Q    As of October 28, 2020, you had no
12  personal knowledge of what lines were used to
13  moor the CROSBY ENDEAVOR to the THOR, correct?
14          MR. GRINNAN:
15              Form.
16          THE WITNESS:
17              Correct.
18  EXAMINATION BY MR. ALTMYER:
19      Q    As of October 28, 2020, you have no
20  idea what the sufficiency of the lines that
21  were used to moor the D/B THOR to the Martin
22  dock were, correct?
23          MR. REISMAN:
24              Object to the form.
25          MR. GRINNAN:

Pages 457 to 460

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 461

1          Form.
2          THE WITNESS:
3               Could you say that again?
4     EXAMINATION BY MR. ALTMYER:
5          Q     You have no personal knowledge, as
6     of October 28, 2020, of what the sufficiency
7     or condition of the lines that were used to
8     moor the THOR to the Martin dock were?
9          MR. REISMAN:
10              Object to the form.
11         MR. GRINNAN:
12              Form.
13         THE WITNESS:
14              Correct.
15    EXAMINATION BY MR. ALTMYER:
16         Q     As of October 28, 2020, you had no
17    personal knowledge of the sufficiency or the
18    work condition of any of the THOR's mooring
19    equipment, correct?
20         MR. GRINNAN:
21              Form.
22         THE WITNESS:
23              Correct.
24    EXAMINATION BY MR. ALTMYER:
25         Q     As of October 28, 2020, you had no

Page 462

1     personal knowledge of what any communications
2     were or were not between the crew of the THOR
3     and the crew of the CROSBY ENDEAVOR, correct?
4          MR. GRINNAN:
5               Form.
6          THE WITNESS:
7               Correct.
8     EXAMINATION BY MR. ALTMYER:
9          Q     Dawn was never a party to any of
10    those communications, correct?
11         A     Correct.
12         Q     Directly between the crew of the
13    THOR and the crew of the CROSBY ENDEAVOR,
14    right?
15         A     The crew of the THOR and the CROSBY
16    ENDEAVOR, correct.
17         Q     Okay.  Overall, as of October 28,
18    2020, you have no personal knowledge of what
19    the conditions present at the Martin Dock
20    No. 16 were on the date of the incident,
21    correct?
22         MR. GRINNAN:
23              Object to the form.
24         THE WITNESS:
25              Correct.

Page 463

1     EXAMINATION BY MR. ALTMYER:
2          Q     As of October 28, 2020, you have no
3     personal knowledge of what lines used from the
4     D/B THOR were tied to which bitts that were
5     present at the Martin Dock No. 16, correct?
6          MR. GRINNAN:
7               Form.
8          THE WITNESS:
9               Correct.
10    EXAMINATION BY MR. ALTMYER:
11         Q     As of October 28, 2020, you have no
12    personal knowledge of what any of the
13    communications between the crew of the D/B
14    THOR were and anyone that works in Shore
15    Offshore Services shoreside management,
16    correct?
17         MR. GRINNAN:
18              Object to the form.
19         THE WITNESS:
20              Correct.
21    EXAMINATION BY MR. ALTMYER:
22         Q     So any testimony that you just
23    testified to, from the questions of
24    Mr. Grinnan, regarding any causes of the
25    incident or any responsibilities that any

Page 464

1     party may or may not have is not based on any
2     personal knowledge of what the conditions
3     were, present at the Martin Dock No. 16, on
4     October 28, 2020?
5          MR. GRINNAN:
6               Objection.
7          MR. REISMAN:
8               Object to the form.
9          MR. GRINNAN:
10              Object to the form.  He is a
11    corporate representative and every
12    single question you just asked him was a
13    trick question, because you're asking
14    him specifically, as of October 28,
15    2020.  So I just want to make sure my
16    objection is clear.
17         MR. REISMAN:
18              Subject to the objection, go
19    ahead and answer the question.
20         THE WITNESS:
21              Could you repeat the question?
22    Because everybody --
23    EXAMINATION BY MR. ALTMYER:
24         Q     Yeah, absolutely.  I'm just saying
25    that, you have no personal knowledge of what

Pages 461 to 464

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 465

1  the scene of the Martin dock was, on October
2  28, 2020, correct?
3          MR. REISMAN:
4              Object to the form.
5          MR. GRINNAN:
6              Object to the form.
7          THE WITNESS:
8              I did not know the condition.
9  EXAMINATION BY MR. ALTMYER:
10     Q   Okay. And just, you have no
11  personal knowledge at all about what it looked
12  like from where the THOR was tied to the
13  Martin dock, right?
14         MR. GRINNAN:
15             Form.
16         THE WITNESS:
17             Correct.
18  EXAMINATION BY MR. ALTMYER:
19     Q   And you have no personal knowledge
20  whatsoever of what it looked like, from where
21  the CROSBY ENDEAVOR was tied to the D/B THOR,
22  correct?
23         MR. REISMAN:
24             Object to the form.
25         MR. GRINNAN:

Page 466

1              Form.
2          THE WITNESS:
3              To where the CROSBY ENDEAVOR
4          was tied to the THOR?
5  EXAMINATION BY MR. ALTMYER:
6      Q   Yes.
7      A   Yes, I had no personal knowledge of
8  where they were tied.
9      Q   Okay. I do want to ask you just a
10  few basic questions about this document here.
11  It's labeled Dawn 384 to Dawn 387, and I've
12  marked that as "Exhibit 146." We had talked
13  about the COI earlier, correct?
14     A   Correct.
15     Q   This is a Certificate of Liability
16  Insurance that was produced in this case.
17  Have you seen this document before?
18     A   Yes.
19     Q   Okay. I just want to clarify
20  whether or not this was an accurate
21  representation of the COI that you talked
22  about, testified to earlier in your
23  deposition.
24         MR. GRINNAN:
25             David, will you stipulate that

Page 467

1  it's authentic so we don't have to ask
2  these questions?
3          MR. REISMAN:
4              I can't, because I don't know.
5          MR. GRINNAN:
6              Okay.
7          MR. REISMAN:
8              If he knows, he can answer. I
9  don't know if he can.
10         THE WITNESS:
11             I can't with 100 percent
12  certainty say this is.
13  EXAMINATION BY MR. ALTMYER:
14     Q   It does appear to be a Dawn
15  document, correct, with the Dawn Bates label?
16     A   It is a Dawn document, yes.
17     Q   Okay. You testified earlier that
18  you're the records custodian of Dawn Services,
19  correct?
20     A   Yes.
21     Q   Okay. If this is a document that
22  was produced by Dawn in discovery, it would
23  have been something that you would have pulled
24  from Dawn's business records, correct?
25         MR. GRINNAN:

Page 468

1              Form.
2          MR. REISMAN:
3              Object to the form.
4          THE WITNESS:
5              Yeah, I don't know -- I don't
6  know how --
7          MR. REISMAN:
8              He's already told you, he
9  wasn't the only person who worked on the
10  discovery responses, and that's actually
11  stated in the discovery responses
12  themselves, so --
13         THE WITNESS:
14             Correct.
15  EXAMINATION BY MR. ALTMYER:
16     Q   Do you remember pulling this COI?
17     A   I don't remember pulling this COI.
18     Q   Okay. So you can't testify, one
19  way or the other, as to if this is the COI
20  that you had testified to earlier with respect
21  to Shore being on notice of Dawn brokering
22  third-party vessels?
23     A   I cannot.
24         MR. REISMAN:
25             I think that misstates his

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 469

1      prior testimony, so I'm going to object.
2   EXAMINATION BY MR. ALTMYER:
3      Q    Your testimony earlier, and just
4   correct me if I'm wrong in this, a Certificate
5   of Insurance that was provided to Shore was
6   one of the documents that you had cited to me
7   that put Shore on notice that the Master
8   Vessel Time Charter would not apply to
9   third-party vessels that were provided to
10  Shore.  Do you remember that?
11     A    Yes.
12     Q    Okay.  I'm just trying to see if
13  this is an accurate representation of the COI
14  that you were talking about.
15     A    Well, it lists the Dawn vessels on
16  here, so that's why it would not apply to the
17  Master Vessel Time Charter, because it lists
18  our vessels on there.
19     Q    Okay.  And I'm just trying to see
20  if this was the COI that you were talking
21  about.
22     A    Yes.  It -- well, yes, it appears
23  to be, because it has the vessels on there,
24  listed on there.
25          MR. REISMAN:

Page 470

1          What exhibit, please?
2          MR. ALTMYER:
3          Yeah, it was Exhibit 146.
4   EXAMINATION BY MR. ALTMYER:
5      Q    I want to ask one more thing.  You
6   have no personal knowledge of what training
7   Shore provided to its employees, correct.
8      A    Correct.
9      Q    You have no personal knowledge of
10  what training Crosby gave to its employees,
11  correct?
12     A    Correct.
13         MR. ALTMYER:
14         I think that's all I've got.
15         Thank you very much for your time, by
16     the way.  I pass the witness.
17  EXAMINATION BY MR. REISMAN:
18     Q    Good evening, Mr. Grace.  I want to
19  ask you a few questions, and I'll try and move
20  quickly through this.  Most of this will be in
21  response to some of the questions you've
22  already received.
23         Mr. Altmyer just asked you some
24  questions about what you did or didn't know
25  about whose fault the barge breakaway of the

Page 471

1   D/B THOR was, on October 28, 2020.  Do you
2   recall that?
3      A    Yes.
4      Q    If the barge had been properly
5   secured to the dock, and the dock was
6   sufficient to withstand the forces and hold
7   the barge, should the barge have remained at
8   the dock?
9          MR. ALTMYER:
10         Form.
11         THE WITNESS:
12         Yes.
13  EXAMINATION BY MR. REISMAN:
14     Q    If Shore had properly moored their
15  barge, in the face of Hurricane Zeta, would
16  this barge have broken away?
17         MR. ALTMYER:
18         Form.
19         THE WITNESS:
20         No.
21  EXAMINATION BY MR. REISMAN:
22     Q    Are you able to say, on that basis,
23  that Shore was at all the fault for allowing
24  the barge to break away?
25         MR. ALTMYER:

Page 472

1          Form.
2          THE WITNESS:
3          Yes.
4   EXAMINATION BY MR. REISMAN:
5      Q    I'm going to first ask you about
6   the CROSBY ENDEAVOR.  You testified earlier
7   about what Dawn's involvement was.  Was Dawn a
8   broker or a charterer of the CROSBY ENDEAVOR
9   in October of 2020?
10     A    A broker.
11     Q    Did Dawn have any contracts with
12  Crosby with respect or that applied to the use
13  of the CROSBY ENDEAVOR, in October of 2020?
14     A    No.
15     Q    Did Dawn have any contracts in
16  place with Shore that applied or governed the
17  use of the CROSBY ENDEAVOR, in October of
18  2020?
19         MR. ALTMYER:
20         Form.
21         THE WITNESS:
22         No.
23  EXAMINATION BY MR. REISMAN:
24     Q    Did Dawn have any contracts in
25  place with Louisiana International that

Pages 469 to 472

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 473

1  governed the use of the LA MADONNA or the
2  LA ELITE, in October of 2020?
3      A    No.
4      Q    Did Dawn have any contracts in
5  place with Shore that governed the use of the
6  LA MADONNA or the LA ELITE, in October of
7  2020?
8          MR. ALTMYER:
9              Form.
10         THE WITNESS:
11             No.
12  EXAMINATION BY MR. REISMAN:
13      Q    There was some testimony earlier
14  about Shore's knowledge and awareness of the
15  Dawn fleet of vessels.  Do you remember that
16  testimony?
17      A    Yes.
18      Q    Let's first ask about Tommy
19  Gibilterra.  To your knowledge, in October of
20  2020, was Tommy Gibilterra familiar with the
21  fleet of vessels that's been identified, both
22  on your website and then the two additional
23  vessels that were -- well, not the two
24  additional -- the vessels that were on your
25  website?

Page 474

1      A    Yes.
2      Q    What do you base that statement on?
3      A    Years of working together,
4  communication, conversations we have.
5      Q    You talked earlier about, there was
6  a time in your career with Dawn where you were
7  responsible for business development?
8      A    Correct.
9      Q    That's a fancy word for sales?
10     A    Correct.
11     Q    Part of your job, as a salesman for
12  Dawn, was making sure that potential customers
13  and actual customers were familiar with the
14  fleet of vessels that Dawn actually operated,
15  correct?
16     A    Correct.
17     Q    And the fleet of vessels that Dawn
18  operated are the ones that have the word,
19  "Dawn," in their name, correct?
20     A    Correct.
21     Q    Did you have discussions with Tommy
22  Gibilterra with the fleet of vessels, the Dawn
23  fleet of vessels, that had the word "Dawn" in
24  their names?
25         MR. ALTMYER:

Page 475

1              Form.
2          THE WITNESS:
3              Yes.
4  EXAMINATION BY MR. REISMAN:
5      Q    What about Cody Sims, did you ever
6  have any conversation with Cody, where you
7  talked about the fleet of Dawn vessels that
8  had the word "Dawn" in their names?
9          MR. ALTMYER:
10             Form.
11         THE WITNESS:
12             Yes.
13  EXAMINATION BY MR. REISMAN:
14      Q    To your knowledge, was Cody with
15  the Dawn fleet of vessels?
16     A    Yes.
17     Q    And when I say the Dawn fleet of
18  vessels, again, I'm talking about the vessels
19  that were listed on your website, the vessels
20  that had the word "Dawn" in their name, that
21  Dawn Services operates, correct?
22     A    Correct.
23     Q    And that would also include the
24  additional vessels that had been picked up
25  since October of 2020, correct?

Page 476

1          MR. ALTMYER:
2              Form.
3          THE WITNESS:
4              Correct.
5  EXAMINATION BY MR. REISMAN:
6      Q    When Dawn acquired or began
7  operating those two additional vessels, I
8  think it was the -- well, you tell me -- the
9  ARCTIC DAWN and the MEDITERRANEAN DAWN?
10     A    Correct.
11     Q    Did you talk to Tommy and Cody to
12  tell them about those vessels?
13     A    Yes.
14     Q    Why would you do that?
15     A    Because they're Dawn vessels.
16     Q    You wanted them to use them?
17     A    Correct.
18     Q    There was some testimony earlier,
19  and I'm not sure if it was clear, in my head,
20  so I want to try and see if I can understand
21  it, about when Shore would charter a Dawn
22  vessel versus when Shore would ask you to help
23  them broker in a vessel.  Do you remember that
24  testimony?
25     A    Yes.

Professional Shorthand Reporters, Inc.              1-800-536-5255
Offices in New Orleans and Baton Rouge              www.psrdocs.com

  
30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 477

```
1         Q    Was the only time that Dawn would
2   broker a vessel, on behalf of Shore, when
3   Dawn -- all of Dawn's vessels were in use?
4         A    No.
5         Q    What other circumstances would
6   prompt Dawn to broker a vessel for Shore?
7         A    When we didn't have the vessel that
8   was adequate to do the job, the size of the
9   vessel that they needed.
10        Q    And how would you know what size
11  vessel was needed for a particular job?
12        A    From Shore.
13        Q    Shore would specify, for example,
14  the horsepower class of vessel they would
15  need?
16        A    Yes.
17        Q    And so it was pretty easy for you
18  to determine whether Dawn had a vessel that
19  could satisfy that, correct?
20        MR. PALMINTIER:
21            Form, leading.
22        THE WITNESS:
23            Correct.
24  EXAMINATION BY MR. REISMAN:
25        Q    How were you able to determine
```

Page 478

```
1   whether Dawn had a vessel that was sufficient
2   for Shore's use?
3         A    Shore would tell me.
4         Q    During the years that you've worked
5   with Tommy and Cody, whether it was with Shore
6   or while they were with Bisso Marine, do you
7   know whether they were familiar with Crosby's
8   fleet of tugs?
9         A    Yes.
10        Q    Did you have conversations with
11  Tommy and Cody about Crosby's tugs?
12        MR. ALTMYER:
13            Form.
14        THE WITNESS:
15            Yes.
16  EXAMINATION BY MR. REISMAN:
17        Q    And when it came to the work that
18  was done for the THOR, in October of 2020, and
19  specifically with the ENDEAVOR, did Shore know
20  that the vessel was coming from Crosby?
21        A    Yes.
22        Q    Do you know whether Shore had any
23  direct communications with Crosby about the
24  use of the ENDEAVOR?
25        A    Yes.  Kurt Crosby and Tommy
```

Page 479

```
1   Gibilterra spoke about it.
2         Q    Who was responsible for determining
3   whether the CROSBY ENDEAVOR was sufficient for
4   the intended uses that Shore had for the tug?
5         A    Shore.
6         Q    Okay.  Did Dawn exercise any
7   judgment or discretion in determining whether
8   the CROSBY ENDEAVOR would satisfy the needs or
9   requirements of Shore, as respects the D/B
10  THOR?
11        MR. ALTMYER:
12            Form.
13        THE WITNESS:
14            No.
15  EXAMINATION BY MR. REISMAN:
16        Q    Who made those decisions?
17        A    Shore.
18        Q    Do you know particularly what
19  individual or individuals made that decision?
20        A    Tommy and Cody.
21        Q    When Shore contacts Dawn and says,
22  "Hey, we'd like you to help us broker a
23  vessel," you said they provide parameters --
24        A    Correct.
25        Q    -- of what they're looking for?
```

Page 480

```
1   And then Dawn goes out and tries to find
2   vessels that meet those parameters; is that
3   correct?
4         A    Correct.
5         Q    Who has the final say over whether
6   Shore is going to accept any particular vessel
7   that Dawn is brokering?
8         A    Shore.
9         Q    And is that true with respect to
10  the CROSBY ENDEAVOR, in October of 2020?
11        A    Yes.
12        Q    Who had the final decision as to
13  whether the CROSBY ENDEAVOR was sufficient for
14  the needs that Shore had, in October of 2020?
15        A    Shore.
16        MR. ALTMYER:
17            Form.
18        THE WITNESS:
19            Shore.
20  EXAMINATION BY MR. REISMAN:
21        Q    There were a lot of questions
22  throughout the day today about the Master
23  Vessel Time Charter that's been attached as an
24  exhibit, if I can find in it your pile of
25  documents here.  It was attached as Exhibit
```

Pages 477 to 480

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 481

1    127.  Do you recall that?
2        A    Yes.
3        Q    If you can take just a quick look.
4    Are you generally familiar with that contract?
5        A    Yes.
6        Q    Do you know who wrote that
7    contract?
8        A    Shore's lawyers.
9        Q    Did Dawn write that contract?
10       A    No.
11       Q    Okay.  Does Dawn believe that that
12   contract applies to brokerage situations?
13       A    No.
14       Q    Did Dawn charter the CROSBY
15   ENDEAVOR from Crosby at any time?
16           MR. ALTMYER:
17               Objection to form.
18           THE WITNESS:
19               No.
20   EXAMINATION BY MR. REISMAN:
21       Q    Has Dawn ever chartered the CROSBY
22   ENDEAVOR to Shore at any time?
23           MR. ALTMYER:
24               Objection to form.
25           THE WITNESS:

Page 482

1               No.
2    EXAMINATION BY MR. REISMAN:
3        Q    Specifically, in October of 2020,
4    did Dawn charter the CROSBY ENDEAVOR from
5    Crosby?
6            MR. ALTMYER:
7                Form.
8            THE WITNESS:
9                No.
10   EXAMINATION BY MR. REISMAN:
11       Q    In October of 2020, did Dawn
12   charter the CROSBY ENDEAVOR to Shore?
13           MR. ALTMYER:
14               Form.
15           THE WITNESS:
16               No.
17   EXAMINATION BY MR. REISMAN:
18       Q    What was Dawn's relationship with
19   respect to the CROSBY ENDEAVOR and Shore and
20   Crosby, in October of 2020?
21       A    We were a broker.
22       Q    Did Dawn provide the ENDEAVOR to
23   Shore, in October of 2020?
24           MR. ALTMYER:
25               Form.

Page 483

1            THE WITNESS:
2                No.
3    EXAMINATION BY MR. REISMAN:
4        Q    Did Dawn provide the LA ELITE to
5    Shore, in October of 2020?
6            MR. ALTMYER:
7                Form.
8            THE WITNESS:
9                No.
10   EXAMINATION BY MR. REISMAN:
11       Q    Did Shore provide the LA MADONNA to
12   Shore, in October of 2020?
13           MR. ALTMYER:
14               Form.
15           THE WITNESS:
16               Could you repeat that?
17   EXAMINATION BY MR. REISMAN:
18       Q    Sure.  Did Dawn provide the
19   LA MADONNA to Shore, in October of 2020?
20           MR. ALTMYER:
21               Form.
22           THE WITNESS:
23               No.
24   EXAMINATION BY MR. REISMAN:
25       Q    Did you ever request permission

Page 484

1    from THOR to subcharter a vessel in, under the
2    Master Vessel Time Charter that we've referred
3    to today?
4        A    No.
5        Q    Do you recall Shore ever telling
6    you, you were authorized, you had their
7    written consent to subcharter a vessel in,
8    under that Master Vessel Time Charter?
9        A    No.
10       Q    I think I may have asked you this
11   and I can't remember, and it's late.  When
12   Shore approached you, in October of 2020,
13   about brokering a tug to be used with the D/B
14   THOR, do you know why Shore didn't ask you
15   about one of the Dawn vessels?
16       A    Because they knew our vessels
17   weren't big enough.
18       Q    There was some discussion about a
19   Master Time Charter with Louisiana
20   International.  Do you recall that?
21       A    Yes.
22       Q    Does that contract apply to
23   brokering of vessels?
24           MR. ALTMYER:
25               Form.

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

| Page 485 | Page 487 |
|---|---|
| 1       THE WITNESS: | 1       No. |
| 2       No. | 2  EXAMINATION BY MR. REISMAN: |

THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did Mr. Altmyer show you any
documents today indicating that Dawn had
possession at any time, of the CROSBY
ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did Mr. Altmyer show you any
documents today that showed that Dawn had the
right to charter the CROSBY ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did Mr. Altmyer show you any
documents today that established that Dawn had
the right to man the CROSBY ENDEAVOR?
MR. ALTMYER:
Form.

THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did he show you any documents today
that established that Dawn actually manned the
CROSBY ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did Mr. Altmyer show you any
documents today that established that Dawn
navigated the CROSBY ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did Mr. Altmyer show you any
documents today that established that Dawn
employed the crew on the CROSBY ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:

No.
EXAMINATION BY MR. REISMAN:
Q   Did Mr. Altmyer show you any
documents today that established that Dawn
controlled the CROSBY ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did Dawn ever possess the CROSBY
ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Did Dawn have the CROSBY ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   If I had asked you, on
October 20th, 2020, if the Dawn has the CROSBY

ENDEAVOR, what would your answer have been?
MR. ALTMYER:
Form.
THE WITNESS:
We don't have it.
EXAMINATION BY MR. REISMAN:
Q   Has Dawn ever had the right to
charter the CROSBY ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
EXAMINATION BY MR. REISMAN:
Q   Has Dawn ever manned the CROSBY
ENDEAVOR?
MR. ALTMYER:
Form.
THE WITNESS:
No.
MR. REISMAN:
What's the basis of that one,
"Has Dawn ever manned the CROSBY
ENDEAVOR?"  What's the objection there?
MR. ALTMYER:
It's whether or not it's

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 489

1    manned, under the terms of the contract.
2        MR. REISMAN:
3            I asked him if it's manned.
4    EXAMINATION BY MR. REISMAN:
5        Q    Did Dawn ever employ the crew on
6    board the CROSBY ENDEAVOR?
7        A    No.
8        Q    Did Dawn ever navigate the CROSBY
9    ENDEAVOR?
10       MR. ALTMYER:
11           Form.
12       THE WITNESS:
13           No.
14   EXAMINATION BY MR. REISMAN:
15       Q    Did Dawn ever control the CROSBY
16   ENDEAVOR?
17       MR. ALTMYER:
18           Form.
19       THE WITNESS:
20           No.
21   EXAMINATION BY MR. REISMAN:
22       Q    Did Dawn perform any of the CROSBY
23   ENDEAVOR's work, in connection with the D/B
24   THOR, in October of 2020?
25       A    No.

Page 490

1        Q    Did Dawn perform any work for the
2    D/B THOR, in October of 2020?
3        MR. ALTMYER:
4            Form.
5        THE WITNESS:
6            No.
7    EXAMINATION BY MR. REISMAN:
8        Q    In October of 2020, did Dawn
9    believe it was working under the Shore Master
10   Vessel Time Charter that's been attached as an
11   exhibit here today?
12       A    No.
13       Q    Did you ever have a discussion with
14   anybody from Shore, where they blamed Dawn in
15   any way for the breakaway of the D/B THOR and
16   any resulting injuries or damages?
17       A    No.
18       Q    Did Shore continue using Dawn after
19   the breakaway of the D/B THOR, in October of
20   2020?
21       A    Yes.
22       Q    Did Shore continue brokering
23   vessels through Dawn after the breakaway of
24   the D/B THOR, in October of 2020?
25       A    Yes.

Page 491

1        Q    Did Shore ever ask you, following
2    the breakaway of the D/B THOR, in October of
3    2020, to change any of your policies or
4    procedures?
5        A    No.
6        Q    Did anybody from Shore, after the
7    breakaway of the D/B THOR, ever tell you that
8    Dawn was doing a good job, and that Shore was
9    happy with the work it was performing?
10       A    Yes.
11       Q    Who told you that?
12       A    Tommy and Cody.
13       MR. REISMAN:
14           Those are all the questions I
15   have for you.  Thank you very much.
16       THE WITNESS:
17           No problem.
18       MR. REISMAN:
19           If you want to pack up, you
20   might get to see some of your game.
21       MR. GRINNAN:
22           Sir, I've got just two or three
23   quick questions for you.
24       MR. REISMAN:
25           We can't hear you; you're

Page 492

1    breaking up.
2    EXAMINATION BY MR. GRINNAN:
3        Q    You are the Dawn corporate
4    representative, right?
5        A    Wait, could you say that one more
6    time?
7        Q    Can you hear me now?
8        A    Yes.
9        Q    Sir, you are the Dawn corporate
10   representative, right?
11       A    Yes.
12       Q    And your testimony today has been
13   as the Dawn corporate representative, right?
14       A    Yes.
15       Q    And your testimony today is based
16   on what Dawn has knowledge of, right?
17       A    Yes.
18       Q    Okay.  It's based off much more
19   than just what you know, on October 28, 2020,
20   right?
21       A    Wait, ask again.
22       Q    Yeah.  It's based off -- your
23   testimony, as the Dawn corporate
24   representative, is based off of much more than
25   what you just personally knew, on October 28,

Pages 489 to 492

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 493

```
1      2020, fair?
2          A    Yes.
3              MR. GRINNAN:
4                  That's all I've got.
5              MR. REISMAN:
6                  All right.  Thank you,
7      everybody.
8              MR. ALTMYER:
9                  All right.  Thanks, everyone.
10                 (Whereupon, the deposition
11     concluded at 7:39 p.m.)
12                 *    *    *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 495

```
1
2
3              REPORTER'S CERTIFICATE

     This certification is valid only for a
transcript accompanied by my original
signature and original required seal on this
page.

     I, Linda G. Griffin, Certified
Court Reporter in and for the State of
Louisiana, as the officer before whom this
testimony was taken, do hereby certify that
MICHAEL GRACE, after having been duly sworn
by me upon authority of R.S. 37:2554, did
testify as hereinbefore set forth in the
foregoing 494 pages; that this testimony was
reported by me in the stenotype reporting
method, was prepared and transcribed by me
or under my personal direction and
supervision, and is a true and correct
transcript to the best of my ability and
understanding; that the transcript has been
prepared in compliance with transcript
format guidelines required by statute or by
rules of the board, that I have acted in
compliance with the prohibition on
contractual relationships, as defined by
Louisiana Code of Civil Procedure Article
1434 and in rules and advisory opinions of
the board; that I am not related to counsel
or the parties herein, nor am I otherwise
interested in the outcome of this matter.


     _____
     LINDA G. GRIFFIN, RPR
     CERTIFIED COURT REPORTER
```

Page 494

```
1
2
3
4      WITNESS' CERTIFICATE
5
6
7          I have read or have had the foregoing
8      testimony read to me and hereby certify that
9      it is a true and correct transcription of my
10     testimony with the exception of any attached
11     corrections or changes.
12
13
14
15
16
17     _____
18         (Witness Signature)
19
20     PLEASE INDICATE
21     ( ) NO CORRECTIONS
22     ( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
23
24
25
```

Pages 493 to 495

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 496

**A**

**a.m** 10:7 70:14
70:14 227:2,24
232:23 257:5
258:11 259:4
260:7 261:23
264:20 267:21
268:11,17,20
269:10 270:13
275:22 278:22
279:5,9 280:5
280:6 281:2,18
282:18 293:5,9
293:12,18
**ability** 495:12
**able** 54:19 88:11
88:16 91:4
120:19 165:13
179:24 195:23
206:17 287:22
301:11 306:18
307:2 308:2,5
308:10,16
322:4 329:7
386:19 387:7
426:11,16
433:2 471:22
477:25
**above-mentio...**
10:5
**absolutely** 35:12
70:12 77:21
79:3 89:18
117:14 206:20
277:12 285:10
464:24
**accept** 325:1
480:6
**accepted** 326:22
**access** 90:8
91:25 313:24
**accessible**
279:18,19
**accompanied**
495:3

**account** 269:7
**accurate** 17:7
33:4 56:11
74:9,10 142:17
287:16 299:25
466:20 469:13
**accurately**
12:20
**acquired** 76:12
154:21,24
176:11 476:6
**acted** 495:14
**acting** 28:8,8,13
28:13 134:20
134:20 201:13
201:14 267:14
267:15 273:13
352:20
**action** 1:4 375:6
**actions** 61:1
435:15 440:24
441:9,17 445:1
**acts** 211:1
**actual** 173:14,16
174:4,19 188:7
190:2 397:1,24
399:7,20 400:8
400:21 401:5
402:3,6 474:13
**ADAMS** 2:11
**add** 45:20,22
**added** 56:18
74:14 76:1
**additional** 74:6
74:13 166:2
205:23 206:2
234:14 266:20
329:14,19
330:19 348:19
383:16,21
473:22,24
475:24 476:7
**address** 11:24
12:3 140:6
187:9 226:24

227:9 256:10
258:12 260:9
**addressed** 172:9
**adequate** 360:5
360:23 361:8
362:9 363:17
366:5 398:1
399:10,21
400:9,18
402:17 423:10
423:13,15,25
430:3,24 477:8
**adjust** 134:18
273:19,22
**administering**
9:24
**Admittedly**
323:11
**advance** 77:18
102:15 183:19
307:20
**advised** 287:13
294:9 296:8
**advisory** 7:23
495:16
**Aegean** 75:10
76:22 153:9,10
154:1,9,16
155:1,2,3,4,6,8
155:14,15,23
156:6,9,11,15
156:18 157:6
240:10 247:25
**affect** 405:19
**affiliate** 155:15
160:13 183:25
188:23 190:6,7
190:17,19,21
**affiliated** 184:13
184:14 190:9
190:15 191:18
192:6
**affiliates** 172:18
172:20,22,24
182:16 185:16

188:19 191:11
309:17,18,25
310:1,5,23
311:19 317:15
**aforementioned**
9:5
**afternoon**
333:17
**Agencies** 3:17
**agent/custom**
147:3
**ago** 176:7
**agree** 53:10
130:6,20 149:2
194:5 222:8,10
230:14 231:5
315:5 440:1
**agreed** 9:3 39:10
39:13 64:22
219:3 308:24
**agreeing** 39:15
**agreement** 6:16
7:14 39:13
53:3 61:4,12
79:21 82:16
84:13,16 88:2
89:11 111:12
125:13,22,23
131:23,24
147:1 184:25
198:8 220:9
222:20 228:21
228:23,25
229:4,12 230:1
230:3,4,6,11
230:20 231:12
232:16,22
233:1,9,18
237:1,2,11,13
270:17,24
271:3,9 302:1
309:7 310:7,20
311:2,15 424:1
427:8 431:12
431:15,19

432:12,17
**agreements** 80:4
222:24 296:14
303:2 309:10
320:12
**ahead** 45:18
73:17 217:6
272:18 277:9
323:16 333:6
333:11 348:17
352:24 353:1
382:24 386:17
448:21 456:20
464:19
**air** 376:14
**Alan** 4:3
**Alfred** 2:20
186:25 187:4
224:10
**aligned** 390:23
392:4 394:4
409:18
**ALLEN** 4:2
**allowed** 9:7
**allowing** 471:23
**alluded** 43:15
**alongside** 36:3
145:7 152:24
391:8
**Altmyer** 2:3 5:6
5:8 10:8,10
13:21 14:5,25
19:4,11,17
21:20 22:14
24:6 30:13,23
30:25 31:22
34:8 35:11,13
37:15 38:4,14
38:22 40:4
45:14 46:8
48:2 50:15
51:11 52:6,8
52:16 53:9,23
54:9 55:3,5
56:15 62:22

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 497

| | | | | |
|---|---|---|---|---|
| 66:15,19 68:19 | 163:1,8,14 | 276:23 277:4 | 358:15,25 | 411:21 412:6 |
| 68:22 69:22 | 164:3,14,25 | 277:11,13 | 359:10,15 | 412:18 413:3 |
| 70:11,15,17 | 165:6,17,22 | 281:9,11 | 360:7,25 | 413:12,21 |
| 71:12 72:1,22 | 166:7 167:2,8 | 282:14 284:14 | 361:11,25 | 414:6,21 415:5 |
| 73:5,18 77:13 | 168:9,19,24 | 284:20,23 | 362:11,24 | 415:16,23 |
| 77:20,22 79:2 | 169:11,18 | 287:7 290:7 | 363:11,20 | 416:8,18 |
| 79:14,16 81:14 | 170:6,11 171:6 | 295:6,21 | 364:3,14 | 418:21 419:9 |
| 81:20,25 82:18 | 171:25 172:19 | 296:16 297:3 | 365:13,23 | 420:5,14 |
| 83:20,23 86:6 | 172:23 173:2 | 297:13,20,25 | 366:7,20 367:5 | 421:13 439:19 |
| 86:16,18 89:3 | 178:11,18 | 298:2,19,23 | 367:15 368:2 | 440:5 441:10 |
| 90:10,15,21 | 180:5,14,24 | 301:18 302:17 | 368:12 369:1 | 441:18,25 |
| 91:7,13 92:17 | 181:18 182:20 | 302:24 303:9 | 369:12,22 | 442:20 443:7 |
| 93:10,15 94:18 | 183:16,21 | 303:14 304:1 | 370:7,14,22 | 443:14,25 |
| 95:11 96:11,14 | 186:12 187:11 | 304:21 305:2 | 371:11,19 | 444:9 445:2,13 |
| 96:25 97:6,21 | 187:20 188:21 | 306:13,25 | 372:4,22 373:7 | 446:6,14,21 |
| 97:24 98:16,19 | 189:24 190:8 | 307:9,15,22,24 | 373:16 374:1,9 | 447:7,17 448:5 |
| 99:14 100:8,18 | 190:13,18,23 | 309:21 310:17 | 374:17,24 | 451:7 453:9,15 |
| 101:3,7,20 | 194:13,21 | 311:5 312:25 | 375:7,14,25 | 453:25 454:9 |
| 102:12,18 | 196:24 199:8 | 313:9,17 | 376:8,16,22 | 454:19 455:5 |
| 103:19 104:1,6 | 199:23 201:9 | 314:12,21 | 377:4,15,24 | 456:16 457:3 |
| 104:10,21 | 201:22 202:3 | 315:1,6,17,24 | 378:19 379:9 | 457:16 458:4 |
| 109:2,21 110:2 | 203:5,13,24 | 316:1,12,18 | 380:1,10,21 | 458:22 459:1 |
| 111:1 114:18 | 204:13,15 | 317:5 318:18 | 381:5 382:18 | 459:19 460:10 |
| 115:10 117:13 | 205:1 207:5 | 319:11 320:6 | 383:6,18,25 | 460:18 461:4 |
| 117:17 123:7 | 208:4,11,18 | 320:10,21 | 384:10,19 | 461:15,24 |
| 123:14,22 | 209:1 210:6 | 321:14,19,21 | 385:2,18 386:1 | 462:8 463:1,10 |
| 124:6,9,24 | 211:9,25 | 322:9,12,22 | 388:6,18 | 463:21 464:23 |
| 125:6 127:21 | 212:10,19 | 323:2,9,17 | 389:21 390:10 | 465:9,18 466:5 |
| 128:5,17 | 214:14 215:1,3 | 324:18,25 | 391:4 392:6,13 | 467:13 468:15 |
| 130:19 131:17 | 215:19 216:8 | 325:5,18 | 394:7,16,24 | 469:2 470:2,4 |
| 136:1 138:23 | 219:24 220:4 | 327:13 328:14 | 395:11,19 | 470:13,23 |
| 139:15,25 | 220:11 221:6 | 328:16 330:2 | 396:4,19 397:4 | 471:9,17,25 |
| 140:8 141:5,12 | 222:3,9 223:22 | 330:17 331:14 | 397:14 398:5 | 472:19 473:8 |
| 143:22 145:22 | 224:8,13,15,23 | 332:1 333:14 | 398:19 399:13 | 474:25 475:9 |
| 146:13 148:5 | 225:5,10 226:6 | 335:10 339:22 | 400:2,11,24 | 476:1 478:12 |
| 149:4,10,14 | 226:11,15 | 340:9 341:6,17 | 401:9 402:10 | 479:11 480:16 |
| 151:5,14,18,22 | 231:3 232:8 | 343:6,19 | 402:20 403:5 | 481:16,23 |
| 152:13 155:9 | 233:7 234:12 | 344:24 345:18 | 403:17 404:1,9 | 482:6,13,24 |
| 155:12,17,21 | 235:1,5 236:8 | 346:13 347:2,9 | 404:22 405:3 | 483:6,13,20 |
| 156:4,25 157:3 | 244:4,11 | 348:23 350:5 | 405:22 406:16 | 484:24 485:4,8 |
| 157:18,21 | 249:13 250:15 | 350:16 351:24 | 406:24 407:15 | 485:13,16,21 |
| 158:4,22 159:7 | 250:20,24 | 352:11 353:3 | 407:21 408:6 | 485:24 486:7 |
| 159:17,24 | 251:15,23 | 354:18,25 | 408:18 409:5 | 486:12,15,20 |
| 160:6 161:7,21 | 264:6 272:17 | 355:19 356:4 | 409:21 410:7 | 486:23 487:3,6 |
| 162:1,10,16 | 275:15,20 | 357:4,13 358:4 | 410:23 411:13 | 487:13,19 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 498

488:2,9,16,24
489:10,17
490:3 493:8
**Amazon** 291:13
**American** 2:5
  10:12
**amount** 130:22
**analyses** 299:1
  299:15
**analysis** 367:13
**analyze** 368:22
**anchor** 195:16
  195:20,25
  428:6 433:11
  433:14,19,25
  434:6
**anchors** 57:6
  249:15,16,20
  348:10
**and's** 165:11
**and/or** 38:8
  343:5
**answer** 9:17
  10:20 11:17
  14:16,22 21:17
  45:11 71:20
  88:14 89:2
  91:3,4 93:12
  95:21 113:10
  118:13,24
  130:17 139:23
  156:3,3 158:17
  159:16,19
  164:13 165:13
  166:4,10,22,24
  170:14 178:14
  180:12 183:10
  183:11 193:13
  199:17 203:10
  210:1 219:21
  222:1,4 225:23
  230:25 234:10
  239:5 286:22
  287:3,3 288:23
  289:13 290:3

313:16 334:14
353:2 360:15
365:1,8 376:12
385:21 408:23
410:10 421:16
428:21 429:18
432:3,19 434:9
434:14 445:22
448:22 451:21
451:25 452:6
455:16 456:20
457:7,20
464:19 467:8
488:1
**answered** 98:8
  100:5 131:12
  146:5 151:1
  156:1,22 161:1
  188:12 207:1
  221:18 289:14
  310:10,16
  433:18 436:22
**answering** 33:3
  166:14
**answers** 10:18
  100:13 158:1,3
  166:3 168:3
**Anthony** 122:21
  241:11,11
  258:14,22
  259:3
**anticipated**
  332:23
**anybody** 98:23
  214:5 288:5
  295:17 302:14
  320:16 354:24
  403:23 407:13
  408:2,14 410:3
  417:8 441:15
  450:3,19
  452:14,18
  456:22 458:14
  458:15 490:14
  491:6

**anytime** 288:12
  367:10
**anyway** 287:9
**Anyways** 160:7
**apart** 310:11
**APLC** 2:7 3:6
**apologies** 160:2
  175:13 284:21
**apologize**
  123:12 333:21
  399:17 446:3
**apparently**
  334:12
**appear** 229:11
  467:14
**APPEARAN...**
  1:22 2:1,15 3:1
  4:1
**appears** 42:23
  227:11,22
  228:6 246:1
  469:22
**applicability**
  37:1 48:20
  67:24 68:7
  69:6 70:25
**applicable**
  112:17 113:1
  131:19
**applications**
  354:2
**applied** 25:2
  129:24 472:12
  472:16
**applies** 1:10
  24:13 42:4,11
  69:25 70:5,21
  71:23 73:7
  118:12,20
  121:8 163:18
  164:6 165:19
  166:4,6 174:7
  178:7 181:6
  189:2 191:15
  192:9 309:24

481:12
**apply** 24:15
  60:24 68:18
  70:22 71:24
  72:25 73:1
  77:7 78:9
  87:13,23 92:9
  92:23 93:25
  94:12 95:1,16
  96:2,21 97:12
  99:8,25 100:24
  101:13 102:3
  103:2 118:22
  119:2,12 121:2
  121:16 126:2
  127:11 128:8
  129:20 131:3
  132:9,20
  133:13 135:11
  137:6 138:13
  139:18 140:21
  143:8 144:23
  145:13 146:1
  150:12,16,17
  150:18 152:4
  163:19 173:7
  173:19 178:25
  180:19 182:4
  188:9 189:12
  189:22 191:6
  192:1 202:20
  294:12 295:1,5
  295:12,19
  296:9,22
  303:18 304:5
  305:19 309:18
  316:8 469:8,16
  484:22
**appreciate**
  302:18 319:12
**appreciated**
  291:12
**approached**
  484:12
**approving** 413:1

**approximately**
  287:11
**Arana** 6:21 7:1
  7:4,11,14
  110:10 144:4
  256:24 259:25
  271:17
**Arctic** 74:19
  75:18,25 76:11
  78:5 153:12
  176:1,6,9
  177:21 181:25
  476:9
**area** 20:14 34:13
**areas** 20:6 32:6
  32:18 34:1
  35:16 167:3
  323:12 326:6
  364:18
**Arizona** 18:22
**ARNOLD** 1:23
**arrange** 387:13
**arranged** 262:7
**arrangement**
  21:22 22:18
  235:7
**arrangements**
  28:14 201:15
  285:23 348:20
**arrow** 394:14
**Article** 495:15
**articulated**
  164:13
**aside** 15:22 33:6
  92:4 174:15
  232:10 268:2
  280:4
**aske4d** 320:16
**asked** 11:18
  33:16,23,24
  35:15 37:12
  39:1 55:2
  68:24 71:5
  98:8 100:4
  131:12 146:4

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 499

151:1 156:21
161:1 166:1
167:18 169:6
172:3 188:11
198:21 206:25
221:18 249:22
251:10 273:18
278:19 280:14
282:7 310:10
312:10,21
320:15 327:23
328:10 348:9
365:9 378:9
382:11,25
422:18 423:5
425:13 427:15
433:3 455:21
459:6 464:12
470:23 484:10
487:24 489:3
**asking** 11:4
  14:17,22 30:8
  34:11 35:21
  49:15 69:5
  79:17 90:19
  100:9 115:7
  123:9,12 126:3
  162:23 163:24
  165:9 168:16
  171:2 183:11
  183:12 186:2,8
  198:20 200:3
  200:10,13
  201:19,21
  203:6 222:2
  224:20 225:1
  229:19 234:7
  269:25 270:1
  276:10 281:17
  282:21 287:4
  290:4 295:16
  297:14 314:9
  315:18 321:13
  329:24 330:3
  336:15,19

338:22 340:12
353:21 364:22
365:2 390:5
430:20 438:18
438:19 449:21
464:13
**asserted** 233:24
  234:2,16
  328:23
**asserting** 160:1
**asset** 182:25
  184:2 185:23
**assign** 66:24
**assigned** 356:20
**assignment**
  66:21 354:14
  355:11,15
**assignments**
  347:21
**assist** 37:3
  116:11 126:17
  136:25 147:4
  280:16 284:2
  356:20 389:12
  396:23 406:5
**assistance**
  351:12 355:16
  358:2 362:19
  363:5 369:9
  383:1 388:10
  396:1 398:18
  399:8 406:6
  419:24 420:1
  434:20
**assistants** 15:22
**assisted** 32:21
  33:3
**assisting** 33:6
  38:8 111:15
  122:2 126:15
  136:8 137:20
  356:23
**associated**
  205:24 318:11
  318:23

**assume** 98:13
  229:15 376:25
**assure** 159:11
**assured** 154:2
  154:11 329:19
**assuredly**
  158:18
**Atlantic** 75:7
  76:21 153:11
  175:15,17
**attach** 253:20
  313:10,14
  315:19
**attached** 58:6
  117:20 149:8
  153:4 217:13
  227:16 229:8
  269:13 270:17
  276:1,7 279:10
  325:22 480:23
  480:25 490:10
  494:10
**attaches** 212:6
**attachment**
  229:7 271:14
  271:16
**attachments**
  276:2
**attorneys** 2:5,10
  2:13,18,23 3:4
  3:8,13,17,21
  3:25 4:5,9,13
  22:11,11
**audible** 10:18
**audibly** 10:20
**audio** 318:12
**authentic** 467:1
**authenticity**
  325:23
**authority** 41:15
  495:8
**authorized**
  484:6
**availability**
  116:21 146:25

309:6
**available** 57:10
  195:21 248:8
  249:4,5,9
  265:23 266:18
  266:19 272:7
  430:21
**Avenue** 1:15
  2:21 3:11 12:4
**avoid** 435:16
**aware** 33:15
  38:6 62:8 99:3
  125:21 145:6
  151:7 156:5
  161:8 177:14
  177:17,20
  182:21,25
  183:22 230:22
  231:10 232:5
  233:10 289:15
  298:7 299:3
  305:5 326:25
  327:4 329:12
  356:24 366:16
  367:1 400:15
  401:19 416:14
  448:24 449:7
  450:17,21
  452:16,19
**awareness**
  473:14

---
**B**
**B** 2:21 31:25
  32:1 58:10
  65:14,15,25
  116:10
**back** 47:15 49:1
  54:16 62:24
  70:16 78:11
  88:12,21
  117:18 120:16
  122:17 123:8
  127:7 138:24
  140:9 146:15

151:23 179:18
183:7 184:17
187:12 194:19
205:9 207:13
224:7,9 227:17
230:11,20
231:9 233:22
241:10 248:11
250:23 252:2,4
263:9 270:21
272:3 273:12
273:24 274:19
276:18 277:14
277:25 281:17
289:15 291:4
293:13 298:1
299:11 300:14
301:9 302:7,15
302:23 306:19
311:8 316:2
334:8 335:15
335:24 338:1
340:5,5 342:5
345:15 349:16
385:14,14
386:5,10
387:20,21,25
397:19 398:9
421:1 431:11
431:15 432:9
432:11 450:11
**back-to-back**
  296:13
**background**
  17:23 335:17
  335:20
**backwards**
  204:11
**ballasting** 147:8
**ballpark** 54:20
  54:22
**Baltic** 153:14
**bareboat** 431:24
  431:25
**barge** 115:14

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

| | | | | |
|---|---|---|---|---|
| 129:3 136:9 | 161:15 168:7 | 411:11 | 268:13 | 266:2 268:15 |
| 137:1 142:22 | 344:19,21 | **behalf** 14:8 15:1 | **benefit** 391:17 | 269:19 |
| 146:19 147:7 | 356:11,17 | 17:13 20:18 | **Bering** 75:6 | **board** 112:20 |
| 147:13 149:16 | 369:17 424:8 | 21:6 22:1,24 | 76:20 153:14 | 216:2 252:20 |
| 150:7 196:3,17 | 439:25 464:1 | 23:18 24:17 | 177:1,2 | 361:21 368:21 |
| 205:6,6 240:19 | 492:15,18,22 | 25:4,14 26:4 | **berths** 147:6 | 381:1 403:10 |
| 240:20 247:13 | 492:24 | 26:19 27:11,24 | **best** 40:24 41:23 | 410:5 436:1 |
| 249:17 283:11 | **basic** 466:10 | 28:21 29:6,20 | 495:12 | 437:19 439:17 |
| 286:6 288:15 | **basically** 395:7 | 38:16 41:15 | **BETH** 311:23 | 447:4 448:1 |
| 289:17,21 | **Basics** 291:13 | 80:11 97:20 | 316:5,9 | 454:18,23 |
| 293:2 299:9 | **basis** 24:12 35:1 | 101:21 102:19 | **big** 196:1,16,17 | 456:14 458:2 |
| 301:8 339:9,10 | 52:17 58:15 | 144:21 150:10 | 249:17,20 | 489:6 495:14 |
| 344:15 346:7,8 | 63:5 118:25 | 162:11 225:9 | 371:10 423:6 | 495:16 |
| 348:2,2,7,12 | 127:22 132:22 | 225:11,12,13 | 484:17 | **boat** 50:7,24 |
| 349:2,4,8,15 | 135:15,19 | 225:14 230:23 | **billing** 211:2,14 | 51:1 85:20 |
| 349:22 350:20 | 138:17 139:16 | 231:17,20 | 217:14,17 | 106:3,4,12,12 |
| 352:21 354:11 | 140:24 141:6 | 233:12 273:13 | 253:20 254:1 | 113:16 132:5 |
| 354:11 356:8 | 143:13,16 | 303:1 477:2 | **billings** 253:8 | 136:15 141:21 |
| 364:13 366:18 | 145:16 152:7 | **belief** 198:25 | **Bisso** 49:2,3,8,9 | 154:13 164:6 |
| 367:3 372:12 | 160:19 163:16 | **believe** 23:20 | 49:16,21 50:5 | 168:12,13 |
| 372:13 377:22 | 341:4 364:16 | 48:6 61:19 | 50:7,9,14 | 191:4 193:20 |
| 379:7 380:9,19 | 365:15 471:22 | 74:5 79:5 92:2 | 337:10,12,14 | 194:16,23 |
| 382:7 383:1 | 488:21 | 105:16 116:10 | 337:19,22 | 195:2 199:11 |
| 384:15 385:13 | **Bates** 40:6,21 | 125:9 185:1 | 338:1,7,9,10 | 200:19 201:6 |
| 386:5,13 387:5 | 72:4 82:3 83:1 | 198:23 230:16 | 338:18 339:20 | 201:25 202:14 |
| 388:11 389:10 | 103:25 147:16 | 232:12 234:18 | 341:15 342:15 | 203:16 204:17 |
| 389:15 390:6 | 226:2 256:9 | 234:19 251:2 | 342:23 343:10 | 206:17,19 |
| 390:24 391:2 | 258:6 275:5,14 | 252:2 283:17 | 343:25 344:4 | 212:3 213:8 |
| 396:8 409:8,9 | 467:15 | 301:7,20 302:9 | 349:17 478:6 | 214:3 215:21 |
| 411:3 414:16 | **Baton** 3:24 | 302:11,13,14 | **bit** 17:22 19:12 | 216:9,16,18,24 |
| 415:2,8,13 | **BATTLESHIP** | 303:13 320:25 | 72:11 114:20 | 217:16,23 |
| 417:11,14 | 240:16,17 | 321:6,24 322:2 | 115:12 139:2 | 240:17 242:12 |
| 418:1 419:13 | 247:12 | 323:21 327:7 | 193:11 252:4 | 242:13,15 |
| 420:18 430:15 | **bayou** 74:23 | 341:9 344:2 | 297:19 325:10 | 244:23,24 |
| 440:9 470:25 | 76:18 153:13 | 361:3 372:15 | 368:15 | 248:17,18,22 |
| 471:4,7,7,15 | 176:16,17 | 380:4 382:6 | **bitts** 463:4 | 249:20 257:8 |
| 471:16,24 | 246:5 266:6 | 388:4 399:6 | **Blake** 4:7 | 258:16 263:17 |
| **barges** 142:17 | 373:5 379:7 | 413:6 451:3,10 | **blamed** 490:14 | 264:9,21 |
| 153:14 339:3,6 | 380:18 | 451:23,23 | **blank** 185:9 | 266:19 273:16 |
| 339:8,17 340:5 | **bear** 164:24 | 481:11 490:9 | 280:18,20 | 300:18 315:16 |
| 340:25 342:24 | 165:4 393:12 | **believes** 193:17 | 282:12 393:10 | 326:11 354:6,7 |
| **base** 474:2 | **began** 52:10 | 193:24 195:8 | **blindly** 435:24 | 372:3 417:20 |
| **based** 83:16 | 53:17 342:20 | **believing** 251:4 | **block** 227:20 | 426:17 427:3,3 |
| 127:14 128:10 | 476:6 | **Belle** 136:10,25 | 257:9 258:20 | 431:3 438:8,9 |
| 146:9,10,11,12 | **beginning** | 137:21 138:2 | 262:21 263:15 | 444:3 448:3 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 501

**boats** 4:6 39:2
49:17 50:17,22
54:4 73:8,9
176:3 191:23
200:21 201:1
213:10 224:17
232:18 238:22
244:21,22
245:5 246:20
246:25 247:2,5
247:6 249:4,4
289:24,25
292:4,11
430:20 442:25
**body** 227:15
**Bommarito**
15:20
**Bonnaffons** 3:6
250:12,18
297:10
**borderline**
73:16
**boss** 239:4
**bottom** 41:11,12
41:20,20 65:4
66:9,10 67:13
82:15,25 89:12
90:1 147:24
148:1 150:4
226:17 258:10
260:4 261:24
261:25 263:3
267:19 269:7
**Boulevard** 3:7
**bounds** 162:24
165:10 170:5
445:17
**Brazil** 296:12
**break** 11:9
70:10,13,19
75:2 76:19
117:12,15,19
140:1 148:7
150:13 153:11
170:9 175:5,6

187:8 189:5,8
189:9,13,21
190:1,2,14,24
191:1 235:3
240:10 246:6
247:24 277:3,6
309:11 311:11
331:23,25
332:3 405:7
458:21,24
471:24
**breakaway**
48:10 470:25
490:15,19,23
491:2,7
**breakdown** 15:8
240:5
**breaking** 492:1
**breaks** 11:7
**briefly** 18:17
104:12 327:16
**bring** 137:1
138:2 266:7
291:4
**bringing** 356:9
**broke** 368:15
399:16 417:24
418:1
**broken** 287:13
287:21 471:16
**broker** 14:13
28:8,13 38:21
47:1 49:2,20
51:9 71:25
80:4,7 86:10
86:22 87:4
131:21 134:20
200:7,7 201:13
203:4 207:21
209:10,23
210:3 214:21
214:23 220:17
220:20 221:23
225:12 228:22
228:25 229:4,5

230:23 248:16
248:21 249:21
249:24 251:21
262:5 265:10
269:4 273:13
282:8 286:1
299:10 308:19
329:2 344:14
344:19 345:17
346:6 349:7,14
382:12 387:13
418:12,14
419:19 421:22
422:4,7 425:10
428:19,22
430:21 432:24
444:3 453:20
472:8,10
476:23 477:2,6
479:22 482:21
**brokerage** 45:24
131:23,23
229:18,18
230:3 253:18
295:20 302:2
303:2 321:9
424:1 431:12
431:15 432:12
481:12
**brokered** 24:23
27:9,22 29:3
37:6 43:17,22
49:14 50:7,22
50:24 52:22,25
68:17 83:19
84:11 86:13
89:15 118:23
132:14 151:8
181:20 202:20
207:8 210:8
212:3 214:17
216:10 217:10
217:11,22
223:21 225:13
235:15 236:11

242:15 244:17
244:21,23
245:1,3,6
247:1,3 248:14
296:9 304:22
306:7,14,15,17
308:12,13,14
312:2,22 313:2
313:21 317:8
321:2 322:1,6
324:24 340:13
340:14 341:24
343:2 353:6
387:15 388:10
388:24 416:24
419:16 422:11
424:8 425:8
431:16 432:13
**brokering** 38:25
49:4,17 50:17
51:1,21 53:8
53:11 54:4,14
69:1 80:13
81:1,7 82:22
83:11 84:2,19
84:23 85:19,25
87:23 89:23
91:18 94:1,12
95:17 106:3
124:3,17,22,25
125:5 150:22
192:20,21
193:2,20
194:16,22
195:2 196:10
197:14,18,23
199:11 200:3
200:19,21
201:1,5 202:12
202:14 204:17
213:8 223:24
224:16 225:6
225:15 232:17
232:17 233:1
247:7 255:6

308:8 326:11
342:22 343:5
346:24 353:16
404:20 426:8,9
426:21 427:2,8
468:21 480:7
484:13,23
490:22
**brokers** 55:18
106:12 203:16
211:1 213:5
215:5,20 216:9
216:16,18
217:16 225:2,3
**Brothers** 4:5
**brought** 321:2
326:15 348:12
372:25 444:7
**browse** 104:14
**Brunet** 269:8
**bunch** 169:16
442:25 443:1
**buoy** 137:21
266:1,23 267:4
267:7 301:9
**BURR** 3:6
**business** 12:2
14:11 16:16
17:10,16 33:8
33:13,18,25
34:13 54:13
337:19,23,25
343:17,18
467:24 474:7
**busy** 243:2

---
**C**
---
**C** 1:8 2:11 3:23
4:7 270:12
**C&G** 4:5
**C/W** 1:4
**calculate** 368:8
**calculations**
368:22
**call** 11:8 199:19

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 502

210:21 219:8
242:10,16
281:20 283:6
338:20 344:17
344:23 345:16
346:23 348:6
354:5 371:15
371:17,22,25
381:24 396:16
444:22 445:10
446:1
**called** 176:6,9
196:5 241:11
241:12,19
257:20,22
272:10 282:6
286:20 287:12
287:20 289:15
289:23 292:7
345:24 346:5
348:9 349:6,13
371:6,9 372:7
372:7 382:2
386:8
**calling** 188:13
289:13 353:20
430:19
**calls** 130:13
236:16 289:12
**Cameron**
258:18 263:19
264:11
**camp** 379:14,19
**canal** 147:4
288:2 289:22
**capabilities**
351:5,7
**capability**
198:18
**capable** 166:14
248:22 249:9
249:11,11
351:11,22
387:8
**capitalized**

57:17,19 64:6
65:10 66:2,6
67:10,20,22
188:2
**capitals** 57:25
**caps** 185:5,7
**captain** 264:22
265:1,7
**captain/wareh...**
15:21
**captains** 217:3
**care** 18:2,18
447:6
**career** 474:6
**CARIBBEAN**
75:14 76:7
177:15
**carrier** 326:15
**Carriers** 301:4
301:15
**Casbarian**
329:6
**case** 15:6 19:8
21:2,5,10
22:16 25:23
26:12 28:19
29:14 31:7
32:14,24 34:20
37:2 42:3,10
43:17,22 48:23
49:14 53:4
62:7 68:1,9
71:2 134:8
140:19 167:5
167:10 233:24
234:3 235:15
326:16 327:19
333:21 443:20
444:8 449:6
452:11 453:12
466:16
**cases** 1:10 20:16
**Cashman** 50:23
154:25
**CASPIAN** 75:3

76:8 177:18
245:12 246:9
246:10
**Casualty** 3:9
**Cat** 301:9
**catch** 35:17
**Category**
367:11
**Catering** 3:21
**Catherine** 3:15
**cause** 129:11
298:25 299:14
410:5 440:4
442:9 455:4
457:14 458:2
**caused** 374:7,21
445:12 446:5
446:10
**causes** 459:9
463:24
**caveat** 73:16
**CBR793** 136:9
**CBR801** 126:18
129:4
**CC** 261:3
270:12
**cc'd** 228:1
**CCR** 9:22
**cell** 381:22,25
**CEO** 15:11,14
**certain** 87:11
196:18 206:5
249:5 435:12
438:2,25 439:1
**certainly** 375:5
379:21 384:25
400:21 408:3
409:1 412:3
414:13
**certainty** 467:12
**Certificate** 8:1
83:16 92:1,19
93:21 94:7,22
101:23 102:22
102:22 181:13

466:15 469:4
494:4 495:1
**certification**
9:13 495:3
**Certified** 4:16
495:6,22
**certify** 494:8
495:7
**CHAFFE** 3:14
3:18
**chance** 104:13
**change** 6:21,24
210:10 257:24
258:15 259:8
259:21 263:12
300:8 365:3
429:14 491:3
**changes** 28:16
494:11
**Channel** 122:5
376:7
**charge** 113:23
282:7
**charged** 111:24
112:3,4,6
**charges** 147:12
150:7
**Charles** 2:21
3:11
**Charpentier**
15:10,11 99:1
99:4,15 153:15
184:8,8 238:24
239:1,7 331:12
**chart** 15:5
**charter** 6:5
22:17 23:16,22
24:13 25:2
31:13 40:8,15
42:4 43:9
48:21 51:9
55:22 57:15
58:5,12,13,23
58:25 59:3,4,5
59:8,12,21

60:15,20 61:2
61:6,14,25
62:1,10,14,16
63:3,9,11
64:14,22 65:2
65:18 66:25
67:2,6,25 68:3
68:8,10 69:7
69:16,24 70:20
71:1,3,8,17
72:24 77:7
78:8,13,20
79:25 87:21
92:9,23 93:5,8
93:9,25 94:5
94:11,21,25
95:15 96:2,21
97:12 99:7,25
100:24 101:13
101:24 102:2
102:21 103:1
118:11,20
119:2,12 121:8
121:16 125:7
125:11,12,16
125:23 127:11
128:8 132:8,20
133:13 135:10
137:6 138:13
139:18 140:20
143:7 144:23
145:13 146:1
147:6 150:12
152:4 163:10
163:17 164:5
165:19 166:5
170:22 173:6
173:18 174:7
174:21,23
178:7,25
180:19 181:6
182:4 184:18
184:23,24,25
187:23 188:8
189:2,12,23

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 503

191:5,14,15,25
192:8 214:24
215:14 217:1
222:19,24
236:25 237:4,6
237:7,11,13
294:12,25
295:19 296:20
303:18,25
304:4 305:19
309:23 316:8
317:17 431:23
431:24,25
432:1 451:12
469:8,17
476:21 480:23
481:14 482:4
482:12 484:2,8
484:19 485:15
488:8 490:10
**chartered** 24:23
27:8,20 29:2
84:11 86:15
89:15 151:8
170:20 214:18
244:18,24
245:4,6,21,23
248:1 312:23
313:2,20 317:3
317:7,12,17,18
322:7 324:24
341:23,25
481:21
**charterer** 28:9
28:14 42:17
57:22,25 58:16
59:10 60:22,23
60:25 61:1,6,7
63:6 64:21
66:24 185:7
201:14 472:8
**chartering** 80:8
80:14 81:2,8
82:20 83:6,11
84:3,20,24

86:11,23 87:5
89:24 91:18
106:4 150:23
215:24
**charters** 87:12
106:12 201:25
215:10,12
216:24 301:22
320:12
**cheaper** 284:8
**check** 54:16
252:3
**Checking**
293:18
**Cheramie**
227:25
**Chris** 329:6
**Chubb** 3:17
**circumstance**
84:1
**circumstances**
28:7,12 58:17
59:7,11 63:7
69:14 71:15
201:12 261:17
477:5
**cite** 101:25
102:24 145:24
**cited** 469:6
**city** 292:6
**Civil** 1:4 9:7
19:19 32:8
495:15
**claim** 328:21
**claimants'** 29:18
326:8
**claims** 29:17,18
42:5,11 48:22
68:1,9 71:2
164:17 233:23
234:2,15 326:8
326:9,15
328:23
**clarification**
91:6

**clarify** 13:9 31:1
46:23 90:19
125:21 134:12
148:18 161:12
171:16 188:4
189:25 192:24
193:6 293:6
459:12 466:19
**clarity** 27:14
36:11 48:8
121:1 173:3
**class** 74:22,24
75:2,5,9,13,17
157:10 175:9
175:16,21
176:18,22
177:2,5,11
477:14
**clauses** 153:4
**clean** 384:18
385:24 412:11
441:8,16
**clear** 143:11
146:24 204:10
284:19 317:22
321:12,12
346:22 365:18
392:19 429:13
464:16 476:19
**clearly** 171:20
**clients** 381:1
**clipped** 115:7
258:9
**closer** 123:5
224:5
**Coast** 1:4 4:13
197:21 198:2
198:15,24
199:13,22
200:5 298:4,8
**Coastal** 3:8
74:23 76:18
153:13 176:21
176:23 246:5
306:3

**Code** 495:15
**Cody** 42:18 43:1
43:5 47:2
83:13 86:12
93:6 146:10
215:8,11 261:3
265:16,19
269:8 270:11
289:13 296:5
296:18 297:7
297:15 334:24
335:19 336:1,3
336:7 337:6,12
338:3,7,18,23
339:14 340:2
340:23 341:3
341:13 342:12
342:21 343:4
344:3,13,22
345:2,8,11,13
345:15,23
346:4,10,23
347:19 348:4
349:5,13,19
350:1,11
351:18 352:19
353:15,16
356:13,18
357:1,10,25
358:11,21
366:25 369:18
371:5 373:12
374:20 375:4
375:20 379:12
379:13 380:6,8
380:16 381:3
381:19,22,25
384:24,25
386:23 388:10
388:14,24
397:10,24
400:20 401:4
402:2 403:22
405:11 414:17
415:12 416:4

417:12 440:20
475:5,6,14
476:11 478:5
478:11 479:20
491:12
**Cody's** 379:19
**COI** 92:5 146:11
329:9,22
466:13,21
468:16,17,19
469:13,20
**collect** 211:7
212:18
**collecting**
129:14
**college** 18:5,7,21
**column** 260:10
**come** 11:9 44:7
44:9 45:5
194:2 242:10
314:18 337:15
354:16,23
355:5,17
388:11,16
398:4 417:20
429:7 432:25
433:12,19
441:8,16
**comes** 351:14
352:6 354:13
420:17,20
427:3,11
**comfortable**
54:21 170:3
265:21
**coming** 112:19
114:7 138:6
139:3 241:17
257:7 267:3
272:3 279:22
284:2 353:25
370:3 381:17
411:19 412:5
478:20
**COMMAND...**

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 504

7:4 263:8,17
265:23 266:18
**commence**
205:10
**commenced**
117:7,8 129:19
131:6
**commences** 60:5
60:6,7 61:17
129:12,21
**commencing**
106:18 117:2
**comment**
400:17
**commentary**
156:1
**commercial**
13:15 14:3,9
21:22 22:19
37:17 98:24
234:21 235:7
**commercially**
13:18,23 14:7
15:2 149:3
**Commission**
4:10
**commits** 64:4
187:25
**common** 159:22
**communicate**
205:25 206:7
206:15,18
214:1,9,23
215:4,5,9
250:1 285:18
286:2
**communicates**
209:12
**communicating**
99:17 259:13
**communication**
27:1 47:2 48:4
203:7 206:23
207:22 216:10
216:14 232:11

251:12 280:6
285:22 287:18
288:3 474:4
**communicatio...**
25:9,21,25
26:10,14 43:4
47:4 57:2
96:18 210:17
213:6,14,18,22
216:20 249:24
250:3 252:5,19
273:1,25
274:17,18,20
280:5,10 288:9
298:3 462:1,10
463:13 478:23
**companies**
51:16 167:14
184:15 191:19
191:21 192:7
305:14 311:3
340:4
**company** 3:9
51:3,10 79:19
116:9,11
122:15 123:15
123:16,24
124:3,13
154:22 155:14
155:15,23
168:13 184:1
184:11 190:10
190:15,25
191:2 198:17
200:9 213:7
218:1 302:6
303:16 331:10
337:6,9,10
339:21 423:9
430:19
**compare** 154:5
**Compel** 35:9
**competent**
421:23 422:13
423:10,16

427:14,23
428:13 431:7
**complete** 60:7
171:12 179:5
261:10
**completely**
165:10 316:22
316:23 370:4
372:2 412:5
445:16
**compliance**
495:13,14
**concealed** 404:7
**concentrate**
330:13
**concerned**
377:22
**concluded**
493:11
**conclusion**
130:13,18
188:13
**conclusively**
61:3
**condition**
214:15 406:21
407:7,12 461:7
461:18 465:8
**conditioning**
376:15
**conditions** 60:24
61:4 347:8
462:19 464:2
**conducted** 316:9
**conference**
35:10
**configuration**
413:2,20
**configured**
414:4,19 416:6
**confirm** 16:5
57:16 58:24
65:8,25 73:8
76:10 77:3,25
84:15 131:22

132:18 145:11
146:14 150:20
151:25 156:9
184:22 197:19
197:25 231:19
248:7 271:2,6
274:14 278:4
281:3,12
286:11 311:13
**confirmation**
58:5 61:13
62:1 274:14
**confirmed** 58:15
59:9,12,16
63:5,12
**conformity**
64:25
**confused** 194:19
**confusing** 40:19
202:9
**connection** 21:9
26:11 29:14
31:7 42:5,12
57:4 59:20
77:23 82:1
130:20 212:22
219:17 234:15
254:17 285:23
286:4 299:2,16
299:20 300:6
327:24 328:24
338:18 339:15
346:23 489:23
**conscience**
385:17
**consent** 66:24
67:2 484:7
**consolidated**
20:16
**contact** 116:14
122:19 193:4
213:4,11
258:25 329:4
378:24
**contacted** 39:8,8

278:17 283:2,3
296:3 299:19
**contacts** 479:21
**contained** 83:3
84:16 90:1
146:17 260:9
**contemplated**
79:18 111:11
111:20
**contemplates**
59:4
**contend** 321:25
**contents** 328:17
**context** 283:21
341:22
**continue** 64:23
490:18,22
**contract** 24:9,10
41:16 42:6,11
42:12 43:7
67:18 68:18
69:7 93:18,19
171:19 183:8
186:4,10
188:14 219:16
220:14,19,21
221:1,2,12,13
221:22 222:14
222:18 236:25
296:6,8 305:13
305:15 309:17
310:6 449:7
481:4,7,9,12
484:22 489:1
**contracts** 17:13
22:15 37:2
124:2,11,15,19
218:14,20,25
223:3 235:20
236:2 237:20
237:21 301:15
305:5,10
320:22 321:3
321:23 323:23
472:11,15,24

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 505

**contractual**
21:21 22:18
234:21 235:7
495:15
**contribute**
455:4 457:15
458:3
**control** 32:6,12
70:7 92:2
119:10 171:10
171:12 179:3,5
186:18 192:15
192:16 213:10
265:8 304:8
311:4 353:8,9
419:20 489:15
**controlled**
171:21 173:9
181:11,16
185:19 189:20
192:14 295:14
309:19 317:20
487:5
**controlling**
173:21 202:25
**conversation**
48:7 96:9
97:18 98:12
198:11 280:23
282:2,3 283:5
287:25 411:2
412:21 445:6
475:6
**conversations**
47:9,14,19
95:7 96:18
98:21,22
146:10 233:16
271:22 280:10
295:17 474:4
478:10
**convey** 92:7,21
93:16,22 94:9
94:23 98:1
99:22 196:14

205:21 209:22
**conveyed** 95:25
97:9 99:4
100:21 101:11
102:1,25 197:1
207:14 209:5,7
210:11
**conveying**
266:24
**conveys** 127:1
**cooks** 454:17
455:2 456:14
457:1,13 458:1
**coordinated**
353:14
**coordinates**
207:9 291:14
291:20 382:7
387:5
**coordinating**
352:19
**copy** 19:13 72:6
103:22 104:5
175:14 230:11
230:20 231:11
231:16,20
233:11 255:24
255:24,24
302:6,15
327:23
**corner** 41:20
**cornered** 447:14
**corporate** 12:25
13:4 20:3 22:5
26:7,22 27:15
28:2 62:9 77:1
77:25 78:17
89:19 118:9,15
121:6 135:9
138:10 143:6
150:10 168:10
170:23 230:19
233:14 454:5
454:14,25
456:11 457:11

457:24 464:11
492:3,9,13,23
**correct** 12:12
13:1,11,17,24
15:15 19:21,24
23:23 30:16
31:3 32:24
36:5,13,16,23
37:4 40:12,16
41:1,5,16,21
42:7 43:2,5,10
43:13,18,25
44:5 51:4 52:2
52:12 55:15,19
56:21 57:7,20
57:23 58:1,20
59:5,22 61:20
62:4 65:10,11
66:2,6 67:11
68:5,13 69:3
72:11,18 73:21
73:25 74:15
75:11 78:21
80:18,21 81:2
83:6 85:16
89:7 95:21
96:4 97:1,13
99:17 101:4,6
101:15,19
104:24 105:3,7
105:11,14
106:19,20,25
107:3 110:12
110:13,19
111:24 112:10
112:11,13
114:12,22
115:16,20
116:5 117:3,8
117:24 118:7
119:17,22,25
120:1,5,6,9,20
121:22 127:16
127:23 128:12
128:19 129:8

131:25 132:9
132:10,23
134:1,10
135:13,17,18
137:6,17,22
138:3,8,18
140:12,22,23
140:25 141:4,7
141:11,17,23
142:3,8,13
143:9,10,14,15
144:2,5,8,9,13
144:16,17,19
144:20,25
145:1,4,15,17
145:21 146:20
148:8,11
150:23 151:21
152:4 153:17
153:24 155:14
155:23 156:11
156:15,19
157:6,11 160:9
171:5 175:3,6
175:17,21
176:10,13,18
176:23 179:3
181:6 182:5
185:10,16
196:12 207:11
211:16 212:7
212:23 217:14
218:10,17
219:8 226:22
227:6 228:2
230:8 235:17
235:18,23
238:7,13 240:7
240:8,19
246:11,13
248:2 251:1
252:1,21,24
253:9,12
258:12 267:21
278:8 279:7

285:13,14
286:16 291:18
291:22 292:19
293:20 300:25
303:18 304:7
306:5 355:8
388:15 403:20
436:23 457:9
459:15,16,23
460:1,2,5,9,13
460:17,22
461:14,19,23
462:3,7,10,11
462:16,21,25
463:5,9,16,20
465:2,17,22
466:13,14
467:15,19,24
468:14 469:4
470:7,8,11,12
474:8,10,15,16
474:19,20
475:21,22,25
476:4,10,17
477:19,23
479:24 480:3,4
494:9 495:11
**corrected**
292:20
**corrections**
494:11,21,22
**correctly** 61:8
**correspondence**
293:17 300:14
300:15 307:3
**costs** 205:24
206:3
**counsel** 9:4
299:11 495:16
**countersign**
227:18
**couple** 158:9
316:3 458:15
**course** 118:15
130:7 210:7

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 506

| | | | | |
|---|---|---|---|---|
| 325:12 375:6 | 426:4,12,18,23 | 98:11 99:8,20 | 266:15 267:4 | 437:6,11,15,23 |
| 444:19 | 427:4,10,12,13 | 100:1 102:4 | 267:15,20 | 438:7,12,16,21 |
| **court** 1:1 4:16 | 427:22 428:3,4 | 103:2 133:19 | 268:24,25 | 438:22,23,24 |
| 10:18,21 12:11 | 428:7,10,12 | 134:17 135:16 | 269:3,15,23 | 439:5,6 449:6 |
| 88:13,22 | 429:1,7,8,20 | 135:24,24 | 270:5,18 271:9 | 449:9 450:14 |
| 159:20 180:6,8 | 429:24 430:3,4 | 137:20 138:1 | 271:17 272:5,9 | 450:15,19 |
| 188:16 318:15 | 430:9,13,24 | 143:24 144:6 | 272:11 273:3 | 460:1,13 462:3 |
| 342:5,9 392:23 | 431:4,5,8,16 | 145:7,17 196:2 | 274:1,14 | 462:13,15 |
| 432:8,10 495:6 | 432:1,13,25 | 196:5,6 211:12 | 278:18,25 | 465:21 466:3 |
| 495:22 | 433:2,12,13,19 | 212:22 213:15 | 279:2,22 280:1 | 470:10 472:6,8 |
| **court's** 186:9 | 434:5,19 435:4 | 214:2,2 217:8 | 280:8,16 | 472:12,13,17 |
| **cover** 61:11 | 435:15,25,25 | 217:14 218:4 | 281:22 282:19 | 478:20,23,25 |
| **coverage** 29:17 | 437:5,5,6,11 | 218:14,15,20 | 283:5 284:1 | 479:3,8 480:10 |
| 30:1 164:16 | 437:16,24 | 218:21,23,24 | 285:7,18,22 | 480:13 481:14 |
| 234:14 326:7 | 438:13,21,24 | 219:2,6,6,11 | 286:3,8,14 | 481:15,21 |
| 326:10,13,14 | 439:6 454:23 | 219:17,17,25 | 288:5,9 289:24 | 482:4,5,12,19 |
| 326:18,22 | 455:22 462:2,3 | 220:5,9,16,17 | 290:16 292:11 | 482:20 485:6 |
| **covered** 61:12 | 462:12,13,15 | 220:19,21 | 293:25 295:8 | 485:15,23 |
| 93:6,8 164:20 | 463:13 486:22 | 221:14,14,21 | 299:19,19 | 486:6,14,22 |
| **covers** 116:3,4 | 489:5 | 222:20,25 | 301:25 332:23 | 487:5,11,18,25 |
| **create** 239:6 | **crewboat** | 223:4,7,8,14 | 355:5,6,11 | 488:8,14,22 |
| 240:1 241:6,25 | 263:13 | 223:17,24 | 356:2,19 357:1 | 489:6,8,15,22 |
| 253:12 | **crewed** 179:4 | 224:17 225:2,4 | 357:20 358:1 | **Crosby's** 98:21 |
| **created** 239:24 | 424:20 | 225:6,9,11,13 | 358:22 359:6 | 232:17 233:2 |
| 243:19 256:17 | **crewing** 425:7 | 225:15,25 | 359:19,22 | 252:22 253:3 |
| **creates** 211:19 | **crewmember** | 226:2,3,18 | 362:23 363:5 | 253:20 254:1 |
| 212:5 238:15 | 438:14 | 228:16,17 | 369:11 371:14 | 361:23 420:22 |
| **creating** 255:13 | **crewmembers** | 229:1,7,9,25 | 371:23 373:23 | 421:12 431:1,3 |
| **crew** 6:21,24 | 333:22 437:19 | 229:25 230:11 | 374:22 386:18 | 431:4,5 434:18 |
| 70:7 83:15 | **crews** 171:10 | 230:14,21 | 386:19 387:7 | 435:3,14 478:7 |
| 197:15 199:25 | 173:10,11 | 231:5,8,21,24 | 387:10,15 | 478:11 |
| 210:9 213:14 | 181:14 186:19 | 232:2,10,14,15 | 390:2 394:2 | **current** 16:2 |
| 213:19,23 | 424:19 | 232:16,24 | 405:14,19 | 74:4 197:20 |
| 252:20 257:8 | **criteria** 189:17 | 233:9,12,17,24 | 406:21 407:14 | 198:2,15 |
| 257:23 258:15 | **Crosby** 2:23 | 234:3,15 | 408:2,14,17,24 | 199:13 200:5 |
| 259:8,20 | 6:17 7:2,9,15 | 240:24,25 | 409:14 410:3 | **currently** 13:11 |
| 263:12 265:8 | 21:23,24 25:11 | 241:14 246:24 | 410:18,20 | 56:12 72:17 |
| 353:9 361:9,21 | 26:1,2 36:3,13 | 248:13 250:5 | 412:13 414:14 | 73:21 74:11 |
| 401:22 402:17 | 36:16 37:18,21 | 250:10,25 | 417:8 418:4 | **custodian** 17:7 |
| 403:2,9,13 | 38:7 39:4 | 251:6 252:23 | 420:12,25 | 327:21 467:18 |
| 419:18,24 | 43:17 47:17,18 | 253:2,4,8,11 | 421:1,8,17 | **custody** 17:7 |
| 420:23 421:8 | 48:7,10,14 | 254:5,18 261:8 | 429:23,24 | 32:5,11 |
| 423:3,4,10,15 | 49:14 95:24 | 261:13,18,20 | 430:9 431:3,6 | **customer** 28:15 |
| 424:12,24 | 96:3,8,16,22 | 262:2,6,7,16 | 433:24 434:2 | 44:3,24 45:17 |
| 425:4,6,23 | 97:8,13,18 | 265:20 266:14 | 435:20,20,25 | 46:1,2,7 49:3 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 507

49:21 50:22
51:10 59:19
69:10 86:21,22
87:3,22,24
89:14 105:19
106:9 107:5
110:11,18,18
114:12 147:7
192:23 193:2,4
193:18 196:10
197:2,3 198:5
201:16 203:18
204:22 206:8
206:15,18
207:9,23
208:21 209:7
209:12,22
210:11 211:3
211:20 212:7
212:11,18
214:3 216:7,15
216:19,20,25
225:14 244:23
244:24 247:3
250:1 251:17
255:20 258:15
259:8 267:1
292:7 422:6
**customers** 27:21
27:22 45:17
48:25 49:7,16
49:17 50:5
51:20 52:1,11
53:13,18 54:1
54:12 69:3
86:9 87:10,13
87:14,19
105:22 115:16
202:8 203:15
205:21 206:1
207:15 210:9
223:17 225:2,3
225:7,16 248:2
248:4,5 474:12
474:13

**D**

**D** 5:1 311:25
316:4 320:13
320:24 393:20
**D/B** 36:2 37:14
111:16 119:20
122:3 126:16
133:22 137:21
142:16 144:19
145:8 149:17
196:16 205:5
261:4,12 269:7
286:3 293:25
296:11 372:19
373:12 380:17
391:20 393:24
460:21 463:4
463:13 465:21
471:1 479:9
484:13 489:23
490:2,15,19,24
491:2,7
**DAIGLE** 3:2
**daily** 217:2,3,21
**damage** 446:3
**damaged** 403:25
**damages** 445:12
446:4 490:16
**danger** 380:8
435:16
**dangerous**
435:14 438:2
439:2,8
**Danos** 7:9,17,19
7:22 154:2,12
154:12 214:4,7
219:13 227:3,6
227:23 228:4
229:14 230:2
232:22 266:14
267:20 268:12
270:6 273:2
274:18 275:24
276:6 278:7
279:6,10 280:7

280:11 281:20
282:2,17
283:14 285:6
286:7 287:12
288:21 291:2
291:23 302:1
**Dantin** 3:2
179:25 332:24
**data** 279:12,15
283:16 285:15
**date** 48:17 68:2
68:10 71:3
99:21 109:17
110:3 142:7
144:14 151:12
185:3 191:13
319:17 462:20
**dated** 31:4 40:15
137:12 143:25
148:6 271:8
274:9 275:21
**dates** 223:25
225:17
**David** 2:8 72:7
162:19 314:22
319:13 455:18
456:8 466:25
**Dawn** 1:12,13
1:14 2:10 6:4,6
6:7,10,15,18
6:19,22,24 7:2
7:5,7,10,12,15
7:18,20,23 8:2
10:1,3 12:25
13:4,7,7,11,13
13:16,23 14:8
14:12 15:1,6
15:24 16:9,12
17:13,22,24
18:10,14 19:20
20:19 21:2,6,9
21:23 22:1,5
22:19,24 23:16
23:18 24:14,15
24:17,22,23

25:4,14 26:4,8
26:12,19,23
27:6,11,16,19
27:24 28:3,7,8
28:12,13,21
29:2,7,13,18
29:18,20 30:2
31:20 32:9,23
33:13,24 34:5
34:6,7 37:2,18
38:16 39:12,22
40:7,7,15,19
40:23 41:5,15
41:18,19 42:5
42:11,13,16
43:10 44:3,4,7
48:23,23 49:2
49:4,6,16,20
50:3,21 51:3
51:17,25 52:9
53:16,24 54:14
55:17,24 56:3
56:6 57:19
58:4,24 59:13
61:23 62:7,10
62:15 63:19
67:13 68:1,3,9
68:11 69:9,25
70:5,5,6,21
71:2,23,24
72:5,10,14,25
73:7,9 74:19
74:19,23,24
75:2,3,6,6,7,7
75:10,11,14,15
75:18,21,25
76:1,7,8,8,11
76:11,12,18,18
76:19,19,20,20
76:21,21,22
77:2,4,7 78:1,2
78:5,6,18,21
79:13,20 80:1
80:4,11,12,13
81:1,7,8,22

82:21 83:6
86:8,10,19,22
87:1,3,8,10,18
87:20 89:20,23
89:23 90:7
91:11 92:7,20
93:22 94:1,8
94:23 95:13,16
95:24 96:15,17
97:9,25 98:23
99:6,16,23
100:1,21
101:10,22
102:1,20,24
104:12 105:21
106:2,2,10,11
106:22 108:14
108:19,20,21
109:10 112:4
115:2,15,19
117:21,21,22
118:5,9,11,16
118:17 119:8,9
120:23 121:6
121:17 125:15
125:23 127:15
128:10 129:19
131:19 132:23
133:14 135:10
135:15 136:2
138:11,17
140:10,25
143:13 144:7
144:22 145:3
145:16 148:7
150:1,11,13,22
151:7 152:8,15
152:16,22
153:3,8,9,10
153:10,11,11
153:11,12,12
153:13,13,13
153:14,14,15
153:17,17,23
154:1,9,16

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 508

| | | | | |
|---|---|---|---|---|
| 155:1,2,3,5,6,7 | 190:1,2,10,14 | 237:9,10,13,16 | 309:24 310:1,4 | 474:19,22,23 |
| 155:8,13,14,15 | 190:15,21,24 | 237:24,24 | 310:5,21,22 | 475:7,8,15,17 |
| 155:16,22,23 | 191:1,1,11,12 | 238:2,3,16 | 311:3,11,18 | 475:20,21 |
| 156:6,7,10,11 | 191:20,22 | 239:18 240:6 | 313:20 316:24 | 476:6,9,9,15 |
| 156:15,17,18 | 192:11,20,21 | 240:10,10,11 | 317:14,15,21 | 476:21 477:1,3 |
| 156:24 157:4,6 | 192:25 193:9 | 240:17 241:23 | 320:24 322:20 | 477:6,18 478:1 |
| 157:8,11,13,14 | 193:10,15,22 | 242:12,13 | 323:22 324:13 | 479:6,21 480:1 |
| 157:15,16,17 | 194:16,18,22 | 243:16,21 | 324:16 326:8,9 | 480:7 481:9,11 |
| 157:22,23 | 195:1,2,6 | 244:20,21,22 | 326:10,16 | 481:14,21 |
| 160:8,8,11,12 | 197:14,18,23 | 245:5,6,7,11 | 327:6,18,21 | 482:4,11,22 |
| 160:15,15,17 | 197:25 198:3 | 245:12,17 | 328:23 331:7 | 483:4,18 |
| 160:18,20,22 | 199:11 200:3 | 246:1,5,6,6,9 | 335:24 336:4,8 | 484:15 485:5 |
| 160:23 161:4,5 | 200:19,24 | 246:10,12,14 | 338:8,24 | 485:14,22 |
| 161:6,6,9,10 | 201:3,13,14 | 246:20,25 | 339:15 340:4 | 486:5,13,21 |
| 161:14,15,16 | 202:4,11,14,18 | 247:3,16,20,24 | 340:13,14,24 | 487:4,11,18,25 |
| 162:12 163:11 | 203:14 207:8,9 | 247:25 250:4 | 341:12,23,24 | 488:7,14,22 |
| 163:18,19 | 207:16 208:19 | 250:10,25 | 342:11 343:1,2 | 489:5,8,15,22 |
| 164:6,17 | 209:6,10 210:8 | 251:3,5,11,24 | 344:14 346:5 | 490:1,8,14,18 |
| 168:11,12 | 210:14 211:1 | 252:9,22 253:3 | 351:20 353:11 | 490:23 491:8 |
| 170:19,23,24 | 211:11,14,18 | 253:11,14 | 355:3 358:1 | 492:3,9,13,16 |
| 172:15,17,22 | 212:2,4 213:4 | 255:13 256:4,8 | 405:13,18 | 492:23 |
| 173:4,8,12,16 | 213:14,19,23 | 256:9 258:6 | 406:21 407:13 | **Dawn's** 17:5,6,9 |
| 174:12,15,16 | 214:2,10 215:5 | 259:24 262:19 | 408:2,14 | 20:15 21:3 |
| 175:2,3,5,6,16 | 215:9,12,20 | 262:20,20 | 409:14 410:3 | 22:11 24:11,25 |
| 175:17,19,20 | 216:9,9,14,16 | 265:11 267:18 | 411:8 412:13 | 25:9,25 26:14 |
| 175:23 176:1,6 | 216:18,19,24 | 269:5 270:10 | 414:14 416:21 | 27:20,22 28:5 |
| 176:9,16,17,21 | 217:12,16,24 | 270:12,22 | 418:3 419:16 | 28:10 29:1,12 |
| 176:23 177:1,3 | 217:25 218:15 | 271:2,4,7,10 | 419:17 424:19 | 29:16 31:18 |
| 177:6,7,10,12 | 218:22,25 | 271:22 272:20 | 425:18 428:16 | 32:5,11 33:8 |
| 177:15,16,18 | 219:5,25 220:3 | 275:5 277:15 | 428:19 429:11 | 33:13,25 34:9 |
| 177:19,21,22 | 220:5,15 | 277:21,21,23 | 449:5,10 450:3 | 34:12 36:25 |
| 177:23 178:1,2 | 222:17,23 | 278:5,5 279:19 | 450:13,20,22 | 42:3,9 43:16 |
| 178:7 179:7 | 223:3,6,13,13 | 279:22 281:13 | 450:23 451:1 | 43:19,21 49:13 |
| 180:9,15,17 | 223:16,24 | 281:17 284:13 | 453:8 454:5,6 | 50:4 54:1,3,12 |
| 181:1,4,23,25 | 224:16 225:20 | 285:11,17,21 | 454:15,16 | 55:11 56:12 |
| 182:1,10,16,22 | 225:22 227:12 | 286:2,13,17 | 455:1,11 | 57:1,10 60:13 |
| 183:1,23,25 | 229:1,8 230:19 | 288:4,8 293:23 | 456:12 457:12 | 62:9,13 68:4 |
| 184:11 185:4 | 230:19 231:4,9 | 294:12 296:14 | 457:25 462:9 | 69:3,13,23 |
| 185:10,12,15 | 231:15,17,19 | 296:15 298:3,7 | 466:11,11 | 71:7,13 72:18 |
| 185:24 186:16 | 232:3,15,17,24 | 298:15,25 | 467:14,15,16 | 73:21,24 74:5 |
| 187:15,16 | 233:1,15,16,23 | 299:12,15,23 | 467:18,22 | 74:11 76:1,16 |
| 188:6,19,22,24 | 233:24 234:2 | 300:2,5,8 | 468:21 469:15 | 76:23 77:3 |
| 189:5,8,9,10 | 234:13,16 | 303:1 305:6 | 472:7,11,15,24 | 78:2 79:23 |
| 189:13,20,20 | 235:8,14,21 | 308:11,17 | 473:4,15 474:6 | 84:7 85:6,18 |
| 189:21,21,22 | 236:3,12,24 | 309:11,16,18 | 474:12,14,17 | 89:9,20 91:15 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 509

96:3,21 97:12
98:20 99:8
100:24 101:14
101:23 102:3
102:22 103:2
105:17 110:18
118:10,19,20
119:1 121:7,8
121:15 127:10
128:7 131:2,18
132:7,19
133:12 135:8
137:5 138:12
139:17 140:19
143:5,6 144:22
145:12 148:11
150:9 152:2,2
161:13 163:15
172:17,20,24
173:3 174:1,5
174:6,18 178:5
178:24 180:18
181:4 182:3
185:21 188:5
189:1,11 191:3
191:9,24 193:2
200:19 201:3
201:10 202:4,7
202:12,18
203:16,18
204:16,20,22
205:11 207:15
208:21 209:7
209:12,22
210:9,11 211:3
212:11 217:9
218:13 219:15
220:18 221:12
223:17,23
232:23 233:12
244:17,25
245:21 249:23
287:9 294:7,10
298:13 303:16
304:3 305:18

308:2 309:22
310:2,19
311:14,19
316:7 322:5
324:2 326:7,14
328:21 329:1
329:14,20
330:20,22
331:10 361:22
454:7 455:1,12
456:3 467:24
472:7 477:3
482:18
**day** 1:17 45:8
107:10 108:7
110:3,6 113:4
120:5 128:25
149:23 185:2
209:21 216:22
242:2,4,20
244:22 245:5
246:21 247:7
257:7 263:11
331:4 333:18
354:15 355:12
355:15 359:8
359:20 366:15
370:20 373:6
384:8 395:8
398:17 399:1
408:4 409:4,20
410:19 418:3
442:9 480:22
**day-rate** 113:2
**day-to-day** 17:3
**days** 129:7
134:4 142:11
242:23 243:1,6
349:16 447:5
**DEACON**
110:16,17
111:5 116:4,8
116:22 117:1
117:23 118:18
122:16 126:11

**deal** 14:7 15:2
122:25 444:4
**dealing** 130:7
385:12
**dealings** 14:11
37:17 219:5
236:12
**deals** 13:23
**dealt** 43:1
**decent** 446:12
446:20
**decide** 194:8
197:6 455:11
456:5
**decided** 375:21
**decision** 197:8
352:3,7,9
355:23 356:2
367:14 479:19
480:12
**decisions** 479:16
**deck** 258:17
263:18 264:10
269:13
**declined** 273:22
**decommission...**
56:23
**deemed** 60:21
**deep** 289:20
386:12,15
**defective** 403:25
404:15 405:10
406:3 408:14
412:14
**defend** 314:25
**defense** 234:13
314:22 328:21
**define** 14:9
**defined** 57:19,23
184:25 188:2
495:15
**defines** 64:6
**definitely** 417:4
**definition** 185:3
**degrees** 19:1

**delay** 64:24
274:13
**delays** 205:19,24
206:14 209:9
209:13 315:2
318:10,22
**Delivery** 60:24
**demand** 54:1
**Demi** 3:2
**demobe** 301:10
**demonstrates**
395:7
**Demosthenidy**
3:11 332:17
**denial** 31:2
**denied** 326:22
**departed** 293:4
**departing** 285:1
**depend** 258:17
**depending**
37:19 263:18
264:10
**deposed** 10:13
10:16
**deposition** 1:11
6:4 9:5,18
10:23 12:24
19:14,20,24
21:13 23:12,22
31:21 32:1,9
33:10,14 34:3
34:16 36:8
105:3 132:4
308:22 318:5
318:14 364:19
445:18 448:9
455:15 466:23
493:10
**deposition's**
313:25
**depositions** 20:3
**depth** 387:1,2
**derrick** 196:3,16
339:5,7,9,17
340:4,25

342:24 344:15
346:6,8 348:7
348:12,12
349:8,15,22
352:21 366:18
367:3 390:6,24
430:15
**describe** 197:1
344:18
**described** 53:7
112:9 133:14
135:12
**description**
111:14,18
120:18 122:5
126:14,23
133:14,21
135:13 136:11
136:24 137:9
137:19,24
142:15,17
144:18 149:15
150:14 194:3
198:4
**details** 48:9
196:4
**deteriorating**
403:24 406:3
408:15
**determination**
198:6 274:25
303:23 369:8
**determine** 387:7
477:18,25
**determining**
44:16 369:7
479:2,7
**development**
16:16 17:17
474:7
**deviation**
147:12
**died** 292:5
**difference** 85:3
113:24 215:23

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 510

**differences** 29:4
215:14
**different** 136:4
154:22 155:13
155:22 164:12
168:12 184:11
209:15 233:9
248:2,4,5
303:16 337:6
350:25,25
351:1,2,5,7
360:1 389:18
415:22 422:9
440:2
**differentiate**
27:7,19 28:7
28:12 201:12
**differentiation**
201:18
**differently**
201:24
**difficult** 167:25
**diligently** 64:23
**direct** 173:5
181:1 182:10
182:15,18
213:4 350:20
395:25 396:13
399:24 478:23
**directed** 111:15
119:20 122:2
126:15 129:3
133:22 136:8
137:20 140:18
142:16 144:19
149:16 205:6
348:1 355:7
356:23 357:2
358:8 361:4,15
373:22 389:3,8
390:9,14,22
391:12,20,23
392:1 394:3,12
395:9 397:13
398:13,14,17

420:24 421:2
421:19 434:22
435:13,24
436:11 437:4,7
437:12,18,22
438:1,1,10,13
439:1,3,8,9
**directing** 205:7
348:2
**direction** 283:19
351:15 354:15
394:14 495:11
**directions**
353:18,23,24
360:4,21 361:7
361:20 362:7
362:22 363:9
**directly** 58:16
59:10 63:6
126:25 160:15
182:23,23
183:2,24
185:23 189:9
189:10 191:11
192:12 252:19
252:23 253:3
255:14 357:19
364:21 392:4
462:12
**director** 42:21
**disagree** 93:14
165:7 194:5
**discipline** 300:5
**disclose** 22:9
**disclosed** 328:12
**discoverable**
328:9
**discovery** 15:6
17:6 20:16,24
21:4 31:19
32:22,23 33:1
33:3,7 34:25
35:9 152:17
167:5,10,17,18
170:14 218:13

287:10 294:8
294:20 298:14
314:4 324:2
327:18 467:22
468:10,11
**discretion**
389:14 479:7
**discuss** 46:18
166:17 167:13
193:15,22
194:4 195:2,6
195:21 196:5
197:14 200:24
201:3 202:4,12
232:9 272:10
281:21 282:15
283:14
**discussed** 22:10
23:3 46:6,10
46:16,17 77:24
78:13 97:19
105:16 178:5
178:20 181:3
206:13 239:20
295:18 322:25
**discussing** 98:13
98:14 199:25
309:4
**discussion** 140:5
148:3 297:23
484:18 490:13
**discussions**
98:24 201:10
285:6 474:21
**dispute** 228:9,12
**distinct** 155:6
**distinction**
84:22 107:16
**distinguish** 80:5
80:12 87:3
**distinguishing**
81:6 83:9,25
84:10 86:20
120:2
**distract** 307:20

**DISTRICT** 1:1
1:2
**dock** 122:3
126:18 145:9
258:18 261:14
262:3,10 263:8
263:19 264:11
285:9,19
286:15 291:5
292:21,23
293:13 324:4
348:13 350:9
362:10 363:6
363:18 364:2
364:11 365:22
366:4,5 367:25
368:10 375:21
383:16,23
386:6,11
387:20,22,25
388:3,4 390:8
390:25 391:2
391:13,21
393:19 396:17
399:2 405:7
414:4 459:15
459:22 460:22
461:8 462:19
463:5 464:3
465:1,13 471:5
471:5,8
**docked** 356:14
357:12 358:23
396:14
**docking** 286:3
**document** 19:21
19:23 40:6,11
62:2 72:3
85:25 90:3,25
107:11 109:9
113:11 114:22
116:25 118:1
120:3,3,4
135:5 145:25
147:15,16,21

147:24 148:24
149:8 152:7,15
152:16,18
164:17 167:9
174:25 187:13
226:2 230:5
232:14 239:9
239:12 242:1
256:4,8,21
258:5 262:23
267:23 280:1
312:6,11
327:18,24
393:6,11 395:6
466:10,17
467:15,16,21
**documents** 21:3
21:8 23:9
25:19 27:5,18
30:1,20 31:6
31:20 32:4,10
32:13,15 34:12
34:19 35:7
62:7 88:4,24
101:25 102:23
104:19,23,23
105:7 117:20
149:1,25 167:4
237:23 238:13
267:24 325:21
325:24 328:2
469:6 480:25
485:5,14,22
486:4,13,21
487:4
**doing** 17:15
46:20 158:21
198:18 203:2
242:3 248:23
249:11 263:12
269:4 276:20
341:5 350:21
352:4 353:19
360:12 376:6
389:9 395:8

Case 2:21-cv-00258-JCZ-EJD   Document 817-2   Filed 11/18/25   Page 141 of 187

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 511

409:4 428:12
429:9 430:14
431:18 432:15
434:2 491:8
**Donewar** 4:7
**Doug** 15:19
**DOUGLAS**
  121:21 122:14
  123:17 127:9
  127:15 128:11
**drafting** 386:16
**dragged** 444:25
**draw** 393:13,23
**drawing** 7:25
  387:11 393:19
  394:5
**drew** 394:15
**Drive** 1:24
**dry** 263:8
**due** 325:11
**dues** 147:5
**duly** 10:4 495:8
**duties** 147:5

---

**E**

**E** 2:16 5:1 394:6
**earlier** 23:21
  43:15 52:23
  68:23 72:2,11
  73:23 78:13
  103:5 105:16
  107:13 108:18
  114:20 115:12
  123:6 133:8
  136:14 141:17
  145:11 148:15
  164:4 174:3,12
  176:3 187:18
  191:19 239:20
  247:13 248:14
  249:17,23
  251:10 252:18
  253:25 257:14
  271:8 278:16
  302:3 308:21

327:22 329:10
350:24 451:15
466:13,22
467:17 468:20
469:3 472:6
473:13 474:5
476:18
**early** 132:3
**easier** 315:20
**EASTERN** 1:2
**easy** 477:17
**eat** 276:21
**educational**
  17:23
**effect** 42:13 61:5
  62:8 86:8 87:9
  88:5 89:1,6
  125:25 126:1
  134:9,24
  287:11 294:9
  305:6,11
  320:13,23,24
  321:4 329:8,15
  329:20 330:20
  416:15
**effective** 185:3
**effects** 377:10
  377:13
**eight** 451:15
**either** 37:18,20
  43:13 60:5
  89:6 117:7
  151:7 164:1
  219:7 231:21
  235:22 236:3
  241:19 242:10
  242:18 244:23
  245:6 267:13
  313:2 341:15
  342:14,23
  357:24 416:24
  435:25 449:14
**either/or** 340:16
**ELITE** 22:22
  25:12 26:17

36:19 37:22
38:7 43:23
100:11,20
101:9 103:12
120:14 126:17
128:20 132:4
132:11,23
133:1,15 136:3
136:7,13,25
137:12,25
138:18 140:12
140:16,17,25
211:13 213:1
213:23 218:8
235:11,16
236:7,10,14
255:8 263:11
265:22,23
266:5 268:14
284:6,25 285:2
473:2,6 483:4
**ELITE/LA** 7:4
**ELSBETH**
304:11,11,12
305:21,21,22
305:23,24
306:18 307:1,2
307:17,17,25
307:25 308:17
308:17
**email** 6:16,21,23
7:1,6,9,11,14
7:22 47:5,14
48:5 59:21
63:15,18 80:18
105:14,19,23
107:10 110:4
134:23 210:19
219:8 225:25
226:17,20,24
227:9,15,23
228:1,3,4,9,13
229:6,11,13
232:10 233:20
236:15 242:11

252:6 253:15
255:14 256:10
256:17,18,24
258:10,12
259:5,12,25
260:4,9,12,15
260:16 261:17
261:23,24,25
262:1,2 263:2
263:3,4,24
265:12,15
267:19,19
268:6 269:6,7
269:15 270:10
271:4 272:22
273:1,6,8
274:17 275:4,8
275:11 277:23
279:8 280:4,5
288:25 294:17
301:25,25
307:2
**emailing** 106:8
260:21
**emails** 7:4,17
25:20 26:11
27:2 80:21
105:17 107:5
227:5 228:5
255:23 262:24
289:3 308:2
316:21
**emergency**
147:11
**employ** 186:19
489:5
**employed** 13:11
50:3 106:1,10
109:10 181:14
189:21 192:16
255:9 486:22
**employees** 34:6
34:9 299:24
300:6 338:8
470:7,10

**employment**
49:22 65:13
**ENCLOSED**
494:22
**endanger**
435:24 436:12
437:4,13,18
438:14
**endangering**
438:8
**Endeavor** 7:2,9
7:15,17 21:24
25:11 26:3
36:3,13 37:21
38:8 43:18
47:16,19 48:14
48:15 49:14
95:24 96:3,10
96:16,22 97:9
97:13 98:15
99:9,20 100:1
102:4 103:3
133:19 135:16
137:20 138:1
143:25 144:6
145:7,17 196:7
211:12 212:22
213:15 217:8
218:5 219:7
221:5,7,8,14
240:24 241:15
242:16 246:25
248:13 253:2
261:9,9,13,18
261:21 262:2
265:20 266:14
269:15,23
270:18 271:9
271:17,23,25
272:11 273:3
274:1 278:18
278:25 279:2
280:9,16
281:22 282:19
285:7 286:8,14

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 512

| | | | | |
|---|---|---|---|---|
| 287:21 293:18 | 219:18 252:24 | 182:24 188:7 | **event** 58:23 | 95:11 96:14 |
| 293:19 294:1 | 253:4 391:18 | 188:23 192:12 | 60:19 390:8 | 97:6,24 98:19 |
| 294:13 295:8 | 489:23 | **entry** 241:3,7 | 392:1 399:24 | 99:14 100:8,18 |
| 354:14 355:12 | **ended** 337:18 | **equipment** | 406:6 | 101:7,20 |
| 355:15 356:2 | **ends** 64:13 | 50:23 154:25 | **everybody** | 102:18 104:10 |
| 356:19 357:1 | 112:14 | 216:5 403:24 | 187:6 238:20 | 104:21 109:2 |
| 357:21 358:2 | **enforceable** | 404:5,14 | 239:16,21 | 110:2 111:1 |
| 358:22 359:6 | 159:5 | 405:10 406:2 | 385:14 446:2 | 114:18 115:10 |
| 359:19,22 | **Engineer** 15:19 | 406:10,22 | 464:22 493:7 | 117:17 123:14 |
| 360:5,11,22 | **engineering** | 407:8,13 | **everyday** 243:12 | 123:22 124:9 |
| 361:8 362:8,23 | 335:17,20 | 408:16 409:16 | **evidence** 9:20 | 125:6 127:21 |
| 363:5,10 | **engines** 390:7 | 410:4,18 | **exact** 45:5 | 128:5,17 |
| 369:11 373:23 | 391:1 394:13 | 412:14 461:19 | 225:17 255:8 | 130:19 131:17 |
| 374:22 386:10 | 395:10 399:25 | **ERRATA** | 263:22 309:3 | 136:1 139:15 |
| 386:12,15 | 410:21 411:10 | 494:22 | 342:7 346:24 | 140:8 141:5,12 |
| 387:7,10 390:2 | **ensure** 359:6,19 | **especially** | **exactly** 38:24 | 143:22 145:22 |
| 392:1,3 394:2 | 399:11 | 273:15,16 | 118:2 154:20 | 146:13 148:5 |
| 394:12 395:7 | **ensuring** 360:3 | **Esquire** 1:23 2:3 | 184:19 298:22 | 149:14 151:5 |
| 398:4,8,25 | 360:21 361:7 | 2:8,11,16,20 | 346:11 348:22 | 151:22 152:13 |
| 399:9,23,25 | 362:7 363:17 | 2:21 3:2,6,11 | 350:12 368:9 | 155:12,21 |
| 405:21 406:4 | 363:25 364:10 | 3:15,19,23 4:2 | 384:4 424:22 | 156:4 157:3,21 |
| 406:10 408:4 | 365:20 366:5 | 4:3,7,11 | **EXAMINATI...** | 160:6 161:7 |
| 409:2,10,18 | **entails** 438:17 | **essential** 405:17 | 5:3,6,7,8,9,10 | 170:11 171:6 |
| 410:20 411:7,9 | **enter** 34:23 | **essentially** | 10:8 13:21 | 173:2 178:18 |
| 418:5,9,15 | 125:16 223:3 | 228:24 229:23 | 14:5,25 19:17 | 180:14,24 |
| 435:25 436:11 | **entered** 62:15 | **establish** 318:5 | 21:20 22:14 | 181:18 182:20 |
| 436:13 437:5,6 | 63:10 185:1 | **established** | 24:6 30:13,25 | 183:21 186:12 |
| 437:11,19 | 222:18,23 | 309:16 343:3 | 31:22 34:8 | 187:20 188:21 |
| 438:15 460:5 | 236:24 310:20 | 343:14 485:22 | 35:13 37:15 | 189:24 190:8 |
| 460:13 462:3 | 311:2 | 486:5,13,21 | 38:4,14,22 | 190:13,23 |
| 462:13,16 | **entire** 130:1 | 487:4 | 40:4 45:14 | 194:21 196:24 |
| 465:21 466:3 | **entities** 153:6,21 | **establishes** 61:3 | 46:8 48:2 | 199:8,23 202:3 |
| 472:6,8,13,17 | 154:6 163:25 | **ETA** 207:14 | 50:15 51:11 | 203:5,13,24 |
| 478:19,24 | 166:18 167:24 | 251:4 252:9 | 52:8 53:9,23 | 204:15 205:1 |
| 479:3,8 480:10 | 168:17 169:9 | 266:24 267:3 | 54:9 55:5 | 207:5 208:18 |
| 480:13 481:15 | 173:25 174:2,4 | 268:12,19,23 | 56:15 62:22 | 209:1 210:6 |
| 481:22 482:4 | 174:12,17,18 | 268:24 269:15 | 66:19 68:22 | 211:9,25 |
| 482:12,19,22 | 176:2 310:3 | 270:5 292:13 | 69:22 70:17 | 212:10,19 |
| 485:7,15,23 | **entitled** 65:13 | **ETAs** 205:17 | 71:12 72:1 | 214:14 215:3 |
| 486:6,14,22 | 66:20 158:11 | 207:13 209:4 | 73:18 77:13,22 | 216:8 219:24 |
| 487:5,12,18 | 230:5 315:7 | 250:10,25 | 79:2,16 81:14 | 220:11 221:6 |
| 488:1,8,15,23 | **entity** 154:8 | 251:24 | 82:18 83:23 | 222:3,9 223:22 |
| 489:6,9,16 | 155:6 157:4,5 | **evening** 263:9 | 86:6,18 89:3 | 224:15 225:5 |
| **ENDEAVOR's** | 160:12,22 | 319:3 333:18 | 91:13 92:17 | 225:10 226:15 |
| 218:15,20 | 177:14,17,20 | 470:18 | 93:15 94:18 | 231:3 232:8 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 513

| | | | | |
|---|---|---|---|---|
| 233:7 234:12 | 367:9,19 368:6 | 421:20 422:8 | 481:20 482:2 | 32:7,18 33:20 |
| 235:5 236:8 | 368:18 369:5 | 422:22 423:23 | 482:10,17 | 34:2 40:10 |
| 244:11 249:13 | 369:16 370:1 | 424:10,21 | 483:3,10,17,24 | 58:6,14,22 |
| 250:24 251:15 | 370:11,18 | 425:9,21 426:6 | 485:3,12,20 | 61:24 62:2 |
| 251:23 264:6 | 371:1,16,24 | 426:19 427:5 | 486:3,11,19 | 63:4 72:8 |
| 272:17 275:20 | 372:10 373:2 | 427:21 428:8 | 487:2,10,17,23 | 74:10 103:21 |
| 277:13 281:11 | 373:11,20 | 428:20 429:6 | 488:6,13 489:4 | 104:5 117:20 |
| 282:14 284:23 | 374:5,19 375:3 | 429:17 430:11 | 489:14,21 | 147:18 148:17 |
| 287:7 290:7 | 375:11,18 | 430:25 432:2 | 490:7 492:2 | 152:2 157:9 |
| 295:21 296:16 | 376:4,13,20 | 433:1,16 | **example** 81:16 | 175:1,11,20 |
| 297:3 298:2,23 | 377:1,8,20 | 434:17 435:2 | 195:14 245:10 | 176:18 178:22 |
| 301:18 302:24 | 378:3 379:1,11 | 435:11,22 | 259:13 267:12 | 181:3,24 |
| 303:14 304:1 | 380:5,15,25 | 436:9,21 437:2 | 268:22 477:13 | 182:11 183:3 |
| 304:21 305:2 | 381:9 382:23 | 437:14 438:11 | **exception** | 184:3,19 |
| 306:13,25 | 383:10,22 | 439:14,23 | 494:10 | 187:14,19 |
| 307:9,15,24 | 384:5,16,23 | 440:19 441:14 | **exceptions** | 188:25 191:10 |
| 309:21 310:17 | 385:6,22 386:7 | 441:22 442:5 | 437:25 438:25 | 225:25 226:5 |
| 311:5 312:25 | 388:8,22 390:3 | 442:15,22 | **excess** 114:3 | 238:1 256:5 |
| 316:1 320:10 | 390:20 391:10 | 443:12,18 | **exchange** 64:5 | 258:5 259:24 |
| 320:21 321:14 | 392:11,18 | 444:5,13,21 | 188:1 272:23 | 260:22 261:1 |
| 321:21 322:12 | 393:4 394:11 | 445:7,21 | 278:2 279:8 | 262:19 263:25 |
| 323:17 325:18 | 394:21 395:3 | 446:11,18 | **exchanges** 268:7 | 265:12 269:6 |
| 327:13 328:16 | 395:16,23 | 447:2,13,24 | 281:3 | 270:10,23 |
| 330:2,17 | 396:10,24 | 448:25 449:25 | **exclude** 93:17 | 272:14,19,19 |
| 333:16 334:19 | 397:8,21 | 450:12 451:4 | **excluding** 90:8 | 275:6 277:10 |
| 335:14 336:23 | 398:11,23 | 451:13,20 | 91:10 | 277:18,21 |
| 340:1,20 | 399:18 400:6 | 452:9 453:4,11 | **Excuse** 16:10 | 279:9 311:10 |
| 341:10 342:19 | 400:19 401:3 | 453:21 454:4 | 23:7 | 392:22 393:5 |
| 343:11,23 | 401:13 402:14 | 454:13,24 | **execute** 17:12 | 395:5 396:2 |
| 345:4,22 | 402:25 403:11 | 456:10,24 | 41:15 217:4 | 466:12 470:1,3 |
| 346:19 347:6 | 403:21 404:6 | 457:10,23 | **executed** 55:23 | 480:24,25 |
| 347:13 348:25 | 404:13 405:1,8 | 459:1,19 | 60:21 68:3 | 490:11 |
| 350:10,23 | 406:1,18 407:3 | 460:10,18 | 69:8 71:4 | **exhibits** 6:1 19:7 |
| 352:5,15 | 407:19,25 | 461:4,15,24 | 126:4 227:17 | 325:22 |
| 353:13 354:22 | 408:11,25 | 462:8 463:1,10 | **execution** | **existence** 42:6 |
| 355:4,25 | 409:11 410:1 | 463:21 464:23 | 231:25 | **existing** 28:16 |
| 356:10 357:8 | 410:15 411:4 | 465:9,18 466:5 | **exercise** 479:6 | **expect** 93:6 |
| 357:17 358:9 | 411:17 412:2 | 467:13 468:15 | **exerting** 367:24 | 95:18 131:16 |
| 358:19 359:4 | 412:10,23 | 469:2 470:4,17 | **exhibit** 6:3,5,7,9 | 405:10 |
| 359:17 360:19 | 413:7,16 414:1 | 471:13,21 | 6:11,13,16,18 | **expectations** |
| 361:5,17 362:5 | 414:11,25 | 472:4,23 | 6:20,23 7:1,3,6 | 95:20 |
| 362:17 363:3 | 415:10,20 | 473:12 475:4 | 7:8,11,13,16 | **expected** 165:16 |
| 363:15,24 | 416:2,12,20 | 475:13 476:5 | 7:19,21,24 8:1 | 165:18 269:23 |
| 364:8 365:19 | 419:4,14 | 477:24 478:16 | 19:6 20:2 | **expecting** |
| 366:2,12,24 | 420:10,19 | 479:15 480:20 | 31:24,25 32:1 | 129:19 332:11 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 514

| | | | | |
|---|---|---|---|---|
| **expedient** 323:8 | 371:18 372:2 | 164:1 | 147:10 | 334:1 336:16 |
| **experience** | 374:7 375:22 | **familiar** 17:9 | **Ferrel** 227:25 | 338:6 348:14 |
| 197:16 | 380:8,18 | 36:1,12,18 | **fess** 442:7 | 349:20 354:3 |
| **experts** 348:21 | 383:24 407:11 | 55:11 56:19 | **figure** 54:19 | 372:21 393:19 |
| 455:13 456:4 | 440:2,8 | 73:14,20 134:6 | 289:11 368:23 | 411:19 455:9 |
| **explain** 16:25 | **failing** 374:21 | 227:8 256:21 | 372:8 | 472:5 473:18 |
| 38:24 86:21 | **failure** 370:12 | 293:21,22 | **figures** 113:14 | **FISSE** 3:2 |
| 112:16 224:21 | 370:20 371:7 | 300:17 304:12 | **file** 231:12,21 | **fit** 15:9 75:18 |
| 241:5 261:16 | 383:4,13,14 | 306:1 331:6 | **filed** 231:16 | 193:18,25 |
| 271:21 287:18 | 410:2 | 473:20 474:13 | **filing** 9:13 | **five** 55:10 |
| 401:15 430:21 | **failures** 383:12 | 478:7 481:4 | **fill** 242:20 | 142:11 |
| **explained** 39:9 | 383:16 384:8 | **family** 319:2 | **fills** 242:20 | **five-minute** |
| 52:21,23 196:2 | 385:1 440:3 | **fancy** 474:9 | **final** 326:1 | 277:3 |
| 430:22 | 443:21 | **far** 11:7,13 | 480:5,12 | **five-year-olds** |
| **explaining** 86:9 | **fair** 11:5 68:25 | 15:24 25:19 | **finally** 292:5 | 428:11 |
| 87:10,19 | 159:8 163:5 | 145:24 168:25 | **find** 34:18 | **fixed** 296:4 |
| 269:22 | 167:20 207:20 | 171:15 206:10 | 301:12 306:19 | **FLANAGAN** |
| **explanation** | 210:25 316:23 | 223:23 237:19 | 307:2 308:2,5 | 3:10 |
| 274:8 | 323:16 336:6 | 237:20 268:6 | 308:10 423:7 | **fleet** 6:8 52:2,9 |
| **extent** 32:14 | 341:16 342:16 | 299:13 302:25 | 427:9 430:3 | 53:16 54:3 |
| 186:2 188:12 | 342:24,25 | 335:17 339:21 | 480:1,24 | 55:25 56:3,6 |
| **external** 140:3 | 343:5,18,22 | 377:18 393:16 | **finding** 430:2 | 56:12 57:10 |
| | 345:12,25 | 393:25 449:8 | **fine** 81:19 91:3 | 68:5 72:18 |
| **F** | 346:7,12 347:1 | **father-in-law** | 149:5,11 | 73:21,25 74:5 |
| **F** 292:20 | 347:8,17,22 | 238:21,24 | 167:12 192:7 | 74:11 76:1,17 |
| **face** 166:5 | 348:8 349:2,9 | 239:2 | 331:17 366:15 | 76:23 83:13 |
| 471:15 | 349:22,24 | **fault** 385:8 | 391:11 399:19 | 148:11 174:5 |
| **facilitate** 39:22 | 350:4,15 | 443:5 444:24 | 403:12 438:18 | 245:21 317:14 |
| 293:23 | 351:13,23 | 451:6 454:8 | 453:6 | 473:15,21 |
| **facilitated** 37:7 | 352:17 353:19 | 455:22 470:25 | **finish** 11:15 | 474:14,17,22 |
| 38:23 54:12 | 355:12,13,18 | 471:23 | 21:16 115:6,9 | 474:23 475:7 |
| 68:12 69:9 | 356:12,18 | **Fed.R.Civ.P....** | 296:25 353:1 | 475:15,17 |
| 304:22 306:7 | 357:3,7 358:3 | 6:3 | **FIRM** 2:16 4:11 | 478:8 |
| **facilitating** | 365:11 368:1 | **Federal** 9:7 | **first** 10:4 16:8 | **flip** 31:25 57:14 |
| 37:22 38:16 | 380:9 382:24 | 19:19 32:7 | 16:11 18:15 | 104:12 122:17 |
| 53:12,17,25 | 384:6,9 389:11 | **fee** 44:5,8 45:24 | 32:17 35:18 | 175:14 228:15 |
| 69:2 132:15 | 395:10 416:13 | 47:3 64:5 | 48:23 49:19 | 243:15 256:2 |
| **fact** 38:6 49:12 | 419:5 436:1,13 | 188:1 211:8 | 50:2,16 63:23 | **flipping** 41:18 |
| 84:8 128:10 | 437:7,20 438:3 | 212:18 | 70:23 82:4 | 105:5 115:25 |
| 161:15 298:20 | 438:15 439:3,4 | **feedback** 47:24 | 109:9 153:20 | 325:20 |
| 318:11 | 439:9,13 | **feel** 310:15 | 153:23 164:10 | **floating** 288:2 |
| **factor** 84:10 | 445:12 453:7 | 400:17 427:20 | 164:13 166:3 | 289:21 379:7 |
| **factors** 303:22 | 493:1 | **fees** 147:3,4,4,4 | 184:22 194:12 | 380:17 |
| **fading** 334:13 | **fairly** 164:1 | **felt** 389:15 | 224:1 286:17 | **Floor** 2:17 |
| **failed** 370:4 | **falls** 73:3,13 | **fendering** | 286:19 288:3 | **follow** 186:13 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 515

| | | | | |
|---|---|---|---|---|
| 231:23 308:25 | 106:15 108:15 | 347:3,10 | 404:10,23 | 461:1,10,12,21 |
| **follow-up** 60:10 | 109:16,23 | 348:24 350:6 | 405:23 406:17 | 462:5,23 463:7 |
| 225:18 331:16 | 110:7,21 | 350:17 351:25 | 406:25 407:16 | 463:18 464:8 |
| 459:3 | 114:14 120:3 | 352:12 353:4 | 407:22 408:7 | 464:10 465:4,6 |
| **follow-ups** | 120:17 123:19 | 354:19 355:1 | 408:19,21 | 465:15,24 |
| 333:6 | 127:18,25 | 355:20 356:5 | 409:6,22 410:8 | 466:1 468:1,3 |
| **followed** 273:20 | 128:14 130:9 | 357:5,14 358:5 | 410:24 411:14 | 471:10,18 |
| **following** 76:15 | 131:10 135:21 | 358:16 359:1 | 411:22 412:7 | 472:1,20 473:9 |
| 110:15 111:4 | 141:2,9 143:19 | 359:11 360:8 | 412:19 413:4 | 475:1,10 476:2 |
| 148:23 182:8 | 145:19 146:4 | 361:1,12 362:1 | 413:13,22 | 477:21 478:13 |
| 491:1 | 149:23 150:21 | 362:12,25 | 414:7,22 415:6 | 479:12 480:17 |
| **follows** 10:6 | 150:25 151:9,9 | 363:12,21 | 415:17,24 | 481:17,24 |
| **foot** 320:19 | 152:10 153:4 | 364:4,15 | 416:9,19 | 482:7,14,25 |
| **force** 367:25 | 156:21 160:25 | 365:24 366:8 | 418:22 419:10 | 483:7,14,21 |
| **forces** 471:6 | 180:21 181:8 | 366:21 367:6 | 420:6,15 | 484:25 485:9 |
| **forecast** 279:24 | 182:14 183:5 | 367:16 368:3 | 421:14 422:1 | 485:17,25 |
| 280:1 | 186:2 188:11 | 368:13 369:2 | 422:16 423:19 | 486:8,16,24 |
| **foregoing** | 189:16 190:4 | 369:13,23 | 424:3,16 425:2 | 487:7,14,20 |
| 170:18 494:7 | 190:12 194:11 | 370:8,15,23 | 425:15 426:1 | 488:3,10,17 |
| 495:9 | 196:20 199:4 | 371:12,20 | 426:14,25 | 489:11,18 |
| **forgot** 248:19 | 199:16 202:16 | 372:5,23 373:8 | 427:17 428:1 | 490:4 |
| **form** 9:16 13:20 | 203:20 204:7 | 373:17 374:2 | 428:16 429:3 | **formalities** 9:10 |
| 14:1 24:3 | 206:25 207:25 | 374:10,18,25 | 429:11 430:7 | 9:12 |
| 37:10,25 38:11 | 208:23 209:25 | 375:8,15 376:1 | 430:17 431:22 | **formally** 187:14 |
| 38:19 40:3 | 211:5,22 212:9 | 376:9,17,23 | 432:22 433:6 | **format** 495:13 |
| 46:4 51:6 52:5 | 212:13 214:13 | 377:5,16,25 | 434:24 435:8 | **former** 154:13 |
| 52:15 53:20 | 214:20 219:20 | 378:20 379:10 | 435:18 436:3 | **forms** 80:4,9 |
| 54:6 56:14 | 221:18 223:19 | 380:2,11,22 | 436:15,17 | 85:19 89:12 |
| 58:5,14 59:24 | 224:20,21 | 381:6 382:17 | 437:9 438:5 | 120:20 270:24 |
| 62:11,18 63:3 | 232:7 233:4 | 382:19 383:7 | 439:11,20 | **forth** 32:7 |
| 63:4 68:15 | 251:14,19 | 383:19 384:1 | 440:6 441:11 | 276:18 300:14 |
| 69:18 70:3 | 264:5 281:24 | 384:11,20 | 441:19 442:1 | 495:9 |
| 71:19 77:10 | 301:17 302:16 | 385:3,19 386:2 | 442:14,21 | **forward** 139:1 |
| 78:23 80:10,17 | 303:7,8,10,20 | 388:7,19 | 443:8,15,24 | 203:17 |
| 80:25 81:5 | 304:18,24 | 389:22 390:11 | 444:1,10,17 | **forwarded** |
| 83:9,25 84:9 | 306:10,22 | 391:5 392:7,14 | 445:3,14 446:7 | 233:20 |
| 85:8,14,24 | 307:6,12 | 394:8,17,25 | 446:15,22 | **forwards** 204:12 |
| 86:3 89:13,21 | 308:20 309:13 | 395:12 396:5 | 447:8,18 448:6 | **found** 39:3 |
| 89:25 90:2,5 | 310:9,12,25 | 396:20 397:5 | 451:8 453:10 | 370:2 422:23 |
| 92:13 93:2 | 335:11 336:14 | 397:15 398:6 | 453:16 454:1 | **foundation** |
| 94:15 95:4 | 339:23 340:8 | 398:20 399:14 | 454:10,20 | 165:1 |
| 96:6,24 97:3 | 340:10 341:7 | 400:3,12,25 | 455:6 456:17 | **foundational** |
| 97:15 98:3 | 341:18 343:7 | 401:10 402:11 | 457:4,6,17 | 253:24 |
| 99:11 100:4,15 | 343:20 344:25 | 402:21 403:6 | 458:5 459:18 | **four** 103:8 |
| 101:2,17 102:7 | 345:19 346:14 | 403:18 404:2 | 460:7,15,24 | 142:11 292:1,4 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 516

387:18,19,19
387:21
**Fourchon** 36:4
137:2,22 138:3
138:6 241:10
241:17 266:7
274:3 280:25
282:6 299:24
300:3 301:9
355:16 356:9
356:14 357:12
358:13,23
359:23 373:24
375:21 378:5
378:17,22
396:14
**Fourteen** 56:7
**frame** 55:24
145:5
**free** 285:15
287:13,21
377:12 418:1
**frequency**
217:21
**Friday** 227:2,23
**FRILOT** 4:7
**front** 103:15
140:15 148:18
250:22
**froze** 334:8
**fuel** 7:2 112:16
112:16,19,22
113:5,7,16,19
113:22,25
134:19 146:25
150:6 207:10
209:17,18
216:5 261:8,14
262:3,6,8,10
273:18
**fueling** 261:10
**fuels** 112:25
**fulfill** 350:13
**fulfilled** 311:16
**full** 11:21 216:4

428:10
**fully** 331:3
**functionality**
65:22
**furnish** 64:18,20
**furnishing**
192:1
**further** 33:8
166:10 274:17

─────── **G** ───────

**G** 1:23 3:15 4:15
9:22 116:10,10
116:10 495:6
495:21
**gallons** 261:8
**GALLOWAY**
3:5
**Galveston**
111:16,17
122:4,4 126:16
126:17,19
**game** 163:5
167:20 491:20
**Garber** 4:5
**Gardes** 15:17
**Gavin** 30:12,14
31:14
**gear** 147:10
**gears** 235:6
**general** 15:8
16:25 22:8
34:24 106:15
111:18 125:19
137:24 192:20
196:9 211:10
212:1 249:23
325:19 346:18
346:20 355:14
**generally** 36:1
38:6 45:17
50:25 71:6,13
80:20,25 85:8
98:23 99:17
107:16 108:6

109:16 120:17
126:21 127:3
129:10 136:23
173:23 194:15
196:9 199:1,10
200:6,13
206:21 210:19
211:13 214:1,9
239:14 240:1
244:13 252:6
254:6,14
256:13 301:5
331:6 344:8
396:11 481:4
**generate** 27:6
110:6
**generated**
107:11 116:25
117:6 253:9
**genesis** 258:19
263:20 264:12
336:19
**get-go** 410:22
**getting** 35:24
47:24 48:22
63:8 70:23
191:8 194:18
196:8 217:22
228:25 229:24
233:21 246:3
247:16 289:23
302:6 319:23
319:24 340:3
344:13,14
349:20 377:22
381:3 385:13
385:14 387:8
402:1 418:4
426:7,10 427:6
428:9 430:12
444:25 448:8
**Gibilterra** 6:12
96:9 97:17
149:20 196:5
261:4 269:9

272:9 291:17
334:4,5,14
335:7,16,23
336:7 338:3,7
339:14 340:22
341:3 342:21
343:24 346:22
347:19 348:5
349:6,13,19,25
350:12 351:19
352:18 353:15
356:12,18,25
357:9,24
358:11,21
366:25 369:18
371:5 372:1
374:20 375:4
375:19 377:12
379:5 384:7
386:23 397:10
397:24 400:20
401:4 402:2
403:22 405:11
414:17 415:12
416:5 473:19
473:20 474:22
479:1
**give** 11:21 15:7
19:13 55:23
56:10 73:15
103:24 186:5,7
194:2 245:10
255:23,25
314:8,17
315:11,14
319:10 320:5
338:15 347:20
362:22 447:15
451:21
**given** 89:13,22
90:12 91:16
283:10 284:1
354:14 361:16
382:7 433:9
**giving** 54:21

298:8 354:11
355:10 360:10
382:9
**GLASCOE**
434:23 435:7
436:16 438:4
439:10
**go** 11:7 21:3
25:19 35:16
40:18 44:15,23
47:17 48:9
54:16 59:24
63:21 65:12
66:12 70:16
73:17 103:4
106:14,16
109:15 119:15
120:22 121:20
126:7 133:17
134:17 136:25
141:13 143:23
151:23 162:18
170:7 173:24
176:25 194:3
194:19 195:19
195:24 205:14
216:3 229:21
234:24 235:2
248:8,16,21
249:20,21
252:2,4 255:23
261:21 270:9
274:4 276:18
276:21 277:9
278:1,13
281:16 290:18
291:25 298:1
300:12,15
306:18 311:8
314:19 332:8
333:6,11
337:22 340:3
344:12,14,19
345:17 348:17
349:22 350:1

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 517

352:23 353:1
354:7 372:12
373:23 375:21
382:12,14,15
382:24 384:14
386:17,20
387:13,15
397:18 398:9
416:15,23
419:25 425:10
426:4 428:5
434:13 448:21
450:11 456:20
464:18
**goes** 15:25 44:8
81:4 85:11,12
145:25 161:22
162:2 177:25
183:7 192:8
228:16 247:9
247:10 248:11
258:17 263:18
264:10 290:8
348:4 367:13
431:11,15
432:11 480:1
**going** 10:17 11:3
13:6 17:20
19:5 20:4,5,8
22:7 34:23
35:18 40:5
44:16,17,25
45:7,18 47:8
49:12 51:24
52:4,14 54:14
60:17 61:24
62:24 63:25
68:20 70:9,22
71:11 72:7
73:11 74:21
76:15 77:17
78:11 81:16
83:21 88:20
93:11 95:9,15
96:12 97:22

98:18 99:25
103:14,20,22
111:24 112:12
116:1 117:7
119:13,14
120:16 124:7
127:3 130:17
134:12 139:3
140:1,2 147:14
147:16,17
152:6,14,20
155:10,25
157:1,19
158:13 160:21
165:12 166:8,9
166:15,22,25
168:23 169:7
169:15 170:12
170:15 175:14
176:14 186:1,6
187:18 192:19
193:11,23
194:25 195:8
195:23 196:3
196:11,15,17
197:6,9 198:7
198:8,13 200:1
200:8,17
204:11 206:4
206:15 207:13
213:12 216:7
221:17 224:19
225:24 226:1
230:17,18
234:20 237:25
240:5,9 250:2
250:3 252:14
255:25 256:1,3
256:4 258:4,8
258:9 259:23
262:19 263:8
263:24 265:11
266:21 267:6,8
269:6 270:5,8
271:23 272:7

272:11,19
273:4,14 275:3
277:1,20 284:5
284:11 285:8
285:19 286:8
286:12 287:22
288:14 289:12
290:15,16
291:11 292:12
292:18,24
294:12 295:1
299:12 300:12
300:15,16
302:15 313:13
313:18 315:11
315:13,15,23
316:15,19
317:12 318:25
319:3,6,24
320:1,8,17,18
320:19 322:10
324:20 325:9
326:4 332:18
340:5 341:14
341:20 342:13
344:12 345:15
348:7,18
355:24 356:3
356:14 357:11
358:1,12,22
359:23 364:16
365:14 367:24
372:1,8 378:5
382:13,14
392:20 393:5,6
393:13,15,23
395:4,5 398:1
399:10 410:19
416:25,25
423:9 425:23
426:11,22
429:15 437:13
442:24 444:23
445:14 448:19
455:8,10,15

459:4 469:1
472:5 480:6
**GOL** 3:13
**Gonzalez** 261:4
**GOOCH** 4:2
**good** 11:20
44:23 83:18
189:6 333:17
333:17 425:23
442:6 470:18
491:8
**gotcha** 18:9 19:1
59:18 76:10
85:14 107:23
109:8 142:6
176:14 211:10
212:20 217:20
240:20 241:14
243:9,15
247:12,23
249:7 254:5,12
255:22 256:20
258:4 261:25
262:18 264:19
266:16 270:4
276:17 281:1
281:16 284:4
285:5 301:11
312:16
**gotten** 166:2
201:23 266:25
270:4 314:4
373:14
**governed** 69:15
71:16 170:21
215:13 472:16
473:1,5
**governing**
220:14
**grab** 152:23
277:1
**Grace** 1:14 6:21
6:23 7:1,4,6,9
7:11,14,17,22
10:2,9 11:23

12:6 19:18
40:5 41:3
63:19 70:18
72:9 104:11
117:18 140:9
147:19,20
170:12 179:22
187:21 226:16
226:21 238:2
254:13 256:3
256:11,14
258:11 261:2
265:13 268:5
270:19 277:14
459:2 470:18
495:8
**grad** 19:1
**graduate** 18:6
18:21,23
**graduation** 18:5
**great** 31:23
224:24
**Greater** 4:9
**GREENBAUM**
2:3
**Griffin** 4:15
9:22 495:6,21
**Grinnan** 1:23
5:7,10 7:25
326:3 332:7
333:8,12,16,23
334:15,19
335:14 336:18
336:23 340:1
340:15,20
341:10 342:3
342:17,19
343:11,23
345:4,22
346:19 347:6
347:13 348:25
350:10,23
352:5,15
353:13 354:22
355:4,25

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 518

| | | | | |
|---|---|---|---|---|
| 356:10 357:8 | 409:11 410:1 | 462:4,22 463:6 | 160:23 161:5,6 | 325:1 491:9 |
| 357:17 358:9 | 410:15 411:4 | 463:17,24 | 161:10,14,16 | **harbor** 116:11 |
| 358:19 359:4 | 411:17 412:2 | 464:5,9 465:5 | 175:2,3 246:1 | 138:7 266:8 |
| 359:17 360:19 | 412:10,23 | 465:14,25 | 246:12,14 | **hard** 66:8 139:8 |
| 361:5,17 362:5 | 413:7,16 414:1 | 466:24 467:5 | 247:15 | 139:10 |
| 362:17 363:3 | 414:11,25 | 467:25 491:21 | **Guy** 2:11 | **harm's** 373:1,4 |
| 363:15,24 | 415:10,20 | 492:2 493:3 | **guys** 140:2 | 373:14 375:13 |
| 364:8,20 | 416:2,12,20 | **groceries** 257:7 | 198:13 257:6,7 | **Harvey** 1:15 |
| 365:16,19 | 419:4,14 | **ground** 10:15 | 257:16,23 | 2:13 12:4 35:4 |
| 366:2,12,24 | 420:10,19 | 159:23 | 312:21 | 35:5 |
| 367:9,19 368:6 | 421:20 422:8 | **grounds** 131:11 | | **he'll** 166:24 |
| 368:18 369:5 | 422:22 423:23 | 159:19 | **H** | **head** 10:21 |
| 369:16 370:1 | 424:10,21 | **group** 3:22 | **H** 4:2 121:21 | 261:11,19 |
| 370:11,18 | 425:9,19,21 | 117:19 176:2 | 122:14 123:17 | 476:19 |
| 371:1,16,24 | 426:6,19 427:5 | 237:23 255:22 | 127:9,15 | **heading** 241:16 |
| 372:10 373:2 | 427:21 428:8 | 273:1 | 128:11 | 241:20 261:14 |
| 373:11,20 | 428:20 429:6 | **Guard** 197:21 | **half** 280:12 | 262:3,10 |
| 374:5,13,19 | 429:17 430:11 | 198:2,15,24 | **handle** 45:9 57:6 | 263:10 280:24 |
| 375:3,11,18 | 430:25 432:2,7 | 199:14,22 | 194:9 196:1 | 282:5 |
| 376:4,13,20 | 432:18 433:1 | 200:5 298:4,9 | **handlers** 147:9 | **Health** 15:19 |
| 377:1,8,20 | 433:16 434:17 | **guess** 49:24 | **handling** 195:17 | 18:2,18 |
| 378:3 379:1,11 | 435:2,11,22 | 61:21 81:4 | 195:20,25 | **hear** 88:16 |
| 380:5,15,25 | 436:9,21 437:2 | 117:5 196:8 | 428:6 433:11 | 123:13 139:11 |
| 381:9 382:23 | 437:14 438:11 | 280:15 289:22 | 433:14,20,25 | 139:21,24 |
| 383:10,22 | 439:14,23 | 293:24 340:16 | 434:6 | 179:11,15,19 |
| 384:5,16,23 | 440:11,19 | 341:13 342:12 | **handwriting** | 179:24 187:4 |
| 385:6,22 386:7 | 441:14,22 | 345:6 349:18 | 313:7 | 250:13,17 |
| 388:8,22 390:3 | 442:5,15,22 | 351:1 375:10 | **hang** 72:20 | 281:8 297:11 |
| 390:20 391:10 | 443:12,18 | 387:8,9 390:4 | 139:24 157:25 | 334:13 381:10 |
| 392:11,18,21 | 444:5,13,21 | 392:19 401:25 | 158:7,7 204:6 | 491:25 492:7 |
| 392:25 393:4 | 445:7,21 | 429:14 | 449:14,14,19 | **heard** 172:3 |
| 394:11,21 | 446:11,18 | **guessing** 47:7 | **hanging** 247:22 | 276:11,11 |
| 395:3,16,23 | 447:2,13,24 | 108:16 | **happen** 209:4 | 330:8 379:13 |
| 396:10,24 | 448:11,17,25 | **guidelines** | 371:9 | 379:18 381:8 |
| 397:8,21 | 449:25 450:12 | 495:13 | **happened** 35:22 | 448:12 449:3 |
| 398:11,23 | 451:4,13,20 | **Guillot** 2:3 | 39:5 206:23 | **hearing** 12:15 |
| 399:18 400:6 | 452:9 453:4,11 | 30:15 31:14 | 212:21 218:4 | 88:8 449:20,21 |
| 400:19 401:3 | 453:21 454:4 | **guilt** 385:16 | 288:21 315:3 | **held** 16:2,5 |
| 401:13 402:14 | 454:13,24 | **Gulf** 2:13 4:5 | 372:19 384:4 | 140:6 148:4 |
| 402:25 403:11 | 455:17,25 | 35:4 75:6 | 447:23 | 182:25 297:24 |
| 403:21 404:6 | 456:6,10,24 | 76:19 153:10 | **happening** | **hell** 444:23 |
| 404:13 405:1,8 | 457:10,23 | 157:8,10,13,14 | 210:18 242:18 | **help** 37:12 |
| 406:1,18 407:3 | 458:8 459:7,17 | 157:16,17,22 | **happens** 383:4 | 171:24 280:16 |
| 407:19,25 | 460:6,14,25 | 157:23 160:8,8 | **happy** 224:21 | 282:9 350:14 |
| 408:11,25 | 461:11,20 | 160:12,14,18 | 314:6,7,17 | 351:23 352:8 |

Case 2:21-cv-00258-JCZ-EJD    Document 817-2    Filed 11/18/25    Page 149 of 187

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 519

363:5 382:12
384:14 387:13
389:19 390:2
391:3,20,21
392:2 395:10
396:17 398:4
398:22,24
399:4,25 406:5
406:5 411:3
476:22 479:22
**helped** 39:22
412:1
**helpful** 323:15
**helping** 383:1
**helps** 394:22
**HENRY** 323:18
323:20
**hereinafter**
185:4,6
**hereinbefore**
495:9
**hereof** 60:24
**hereto** 9:4
**hereunder** 67:1
**Hernandez**
261:2 270:11
**Hey** 348:6
371:10 372:1
444:23 479:22
**HI-116** 269:18
**hide** 314:7 323:6
**hierarchy**
345:10
**high** 18:23
261:11 269:16
269:19,24
274:4 287:23
**higher** 345:11
345:13
**Highway** 3:3
**hire** 6:9 16:15
29:1,13 51:8
59:14,15,24
60:2,10 62:20
63:12 67:3

80:9,24 83:4
84:17 85:1,7,9
85:10,11,12,13
85:18,24 87:25
89:11,12,25
90:2 91:22,23
92:5,19 93:20
94:6,21 101:22
102:20 105:9
105:17 106:1,8
107:8,15,24
108:2,11,12
110:16 111:11
112:13 114:24
115:15,19,22
116:2,4,19
117:6,23
118:12,18
119:15,16
120:23 121:21
127:5,12
129:13,17,22
129:25 130:21
130:24 131:7
132:9,25 134:9
135:5,11 136:3
137:8 138:15
139:19 140:11
140:22 141:22
143:9,24
144:24 146:2
148:6 151:9
274:24 382:15
**hired** 16:8,11
18:10 173:10
348:9 422:4,4
425:10 428:4
433:14
**hires** 105:2
**history** 17:22
**hold** 161:19
366:5 391:14
410:19 471:6
**holds** 184:1
**home** 11:24

372:16 434:13
**HON** 1:8,9
**honest** 316:22
318:9 331:4
441:23
**Honestly** 381:12
**honorable**
384:25
**horsepower**
65:22 74:22
75:17 477:14
**hour** 70:10
111:22,24
112:2,4 280:18
280:21 282:12
283:23 315:15
**hourly** 108:5,9
112:21,24
120:8 121:24
126:8 206:6
**hours** 108:6
119:22,25
122:9,10
137:14 144:11
280:13,13
417:3 451:15
**Houston** 1:24
2:17 3:20
116:9,11
372:15,17,20
373:4,13,23
374:12,23
376:6 377:9,14
377:23
**huge** 383:12,14
442:24
**Hughes** 4:2
**huh** 325:7
**Human** 15:17
**hundred** 237:3
319:6,7 326:23
384:3
**hunting** 379:14
379:19,22
380:6 381:4,19

**hurricane** 36:4
138:7 145:8
266:10 285:7
285:23 286:4,9
286:11 299:24
300:3 345:25
346:12,17
348:8 349:9,15
349:22 350:3
350:15 351:11
351:23 352:9
356:3,15,21
357:3,11 358:3
358:13,23
360:6,24 361:9
362:10,20
363:7,19 364:2
364:12 365:22
366:6,18 367:3
367:12,12,24
368:11,24
369:10 370:6
372:3 375:22
377:11,13
378:23 379:3,6
379:23 383:14
388:11,17,25
389:8,13,20
390:6 391:22
392:3 396:3,15
397:3 398:2,2
398:17 399:5
399:12,22
400:10,23
401:8,8 402:9
402:19 403:4
403:16 406:8
409:17 414:5
414:19 415:14
416:7,25 417:6
417:7 418:20
419:25 420:21
421:9 434:21
435:6 439:18
471:15

**hurricanes**
346:2,21 348:4
416:16
**hurt** 333:22
378:6 381:3
443:2 445:10
446:1 447:11
447:15,21,22
448:2

**I**

**IDanos@Cros...**
227:10
**idea** 286:14
379:20 393:14
447:11 460:20
**ideal** 139:9
**identified** 74:22
473:21
**II** 304:12 305:21
306:18 307:2
307:17,25
308:17
**III** 2:20
**illustrated** 396:1
**illustration**
393:11 395:6
**image** 40:25
**imagine** 421:1
**impacted**
408:16 409:2
**impairing** 12:19
**implemented**
28:18 87:1
**important** 113:3
**inadequate**
404:15 406:11
410:3 411:6
412:14
**inappropriate**
159:3
**incident** 28:19
35:25 36:2,7
42:6,12 48:11
99:22 134:7,10

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

142:7 144:15
286:13 288:6,9
288:20 294:11
294:23 295:22
298:5,11,15
299:1,2,14,16
299:20 300:6,9
305:16,17
324:4 335:2
349:7 354:15
355:12 359:8
359:20 364:22
364:23 370:21
372:20 373:5,6
373:15,25
374:8,21 382:1
384:9 395:9
404:17 408:5
409:4,20 410:5
411:9 412:15
412:16 413:20
415:21 417:13
417:17,17
418:3 440:4,21
440:25 441:4,5
445:11 446:2,3
455:4,18
457:15 458:3
459:9 462:20
463:25
**include** 30:21
61:1 147:3
173:15 205:17
247:2 353:22
475:23
**included** 107:17
107:19,20,22
115:14,18
244:20 245:7
253:7 281:13
**includes** 112:22
250:8
**including** 34:7
78:5 147:10
181:25

**inclusive** 244:21
244:25
**Incorporated**
189:9 190:1
**incurred** 147:12
150:7
**indemnification**
449:2,6,10
450:2,14,19
452:14,17
453:8
**indemnity**
234:14 450:14
450:25 452:1
**Indian** 75:10
76:21 153:15
177:6,7
**indicate** 113:16
256:16 494:20
**indicated** 30:19
113:6,10
**indicating** 91:20
485:5
**indirect** 182:18
**individual** 446:9
479:19
**individuals**
366:17 367:2
369:19 479:19
**industry** 401:18
**inform** 410:2
**informal** 87:1
89:5,6
**information**
110:16 111:4,4
126:22 129:15
133:9 143:24
205:17 207:14
207:15 208:9
208:16,20
209:10,19,22
210:13 241:6
242:2,7,9
251:4,6 252:9
257:17 258:1

259:9,13,16,17
262:14,15
264:8,14
267:12,17
268:23,24
269:3 270:2,3
270:5 271:12
271:19 273:7
282:24 314:3,8
314:17 319:10
320:4,7 386:23
386:25 405:18
407:7,12
408:13 411:6
414:3,13
415:13
**initial** 271:21
**initialing** 41:25
**initially** 347:23
**initials** 41:12,19
41:24 65:4
66:9 67:13
**injured** 447:4
**injuries** 490:16
**inquiry** 20:6,15
32:6,19 33:20
34:1,14 35:16
167:3 199:10
323:13 326:7
364:18
**inside** 394:6
**inspection**
192:22,25
193:7,8
**installations**
147:11
**instance** 194:12
195:25 196:15
204:2 205:10
206:22 217:8
237:10,15
241:9 249:14
415:22
**instances** 61:20
66:1,4 67:19

67:21 108:10
209:3 212:21
**instruct** 166:9
186:7 455:16
**instructed**
390:19 392:10
392:16 394:19
395:14,17
396:8 409:24
421:2,18 422:3
**instruction** 22:8
**instructions**
10:17 353:17
353:23,24
355:11 360:4
360:11,21
361:7,15,20
362:8,22 363:9
**insurance** 3:9
6:14 8:1 29:17
30:1,21 83:16
92:1,19 93:21
94:7,22 101:23
102:22,23
152:17 164:16
171:22 173:11
181:14 186:20
187:17 191:20
309:20 326:7
326:10,15,18
326:20 329:1
329:14 331:6
331:11 451:24
466:16 469:5
**insure** 70:7
**insured** 171:11
173:10 179:4
181:12 189:21
192:17 234:14
329:14 330:19
**insurer** 326:19
326:21 327:1
**intended** 479:4
**interact** 344:9
**interest** 161:14

319:23
**interested** 272:7
384:17 495:17
**interests** 3:4
35:3 167:13,24
**interfere** 77:19
102:17 183:20
**interim** 16:18
18:12
**International**
2:14 22:20
23:6,10,11
26:15 27:3
36:22 37:19
39:3 43:24
100:12 120:12
122:20,23
123:1 124:16
125:17,24
132:5 136:15
141:16 218:8
234:22 235:9
235:21 236:2
236:13 237:2
237:12,17
240:22 250:8
251:25 252:10
254:19 255:7
255:12 257:13
257:19 259:1
264:16,25
265:3 266:19
266:25 267:13
284:7 289:19
472:25 484:20
**interpretation**
186:3 188:5
**interpreted**
188:16
**interrogatory**
167:21
**interrupt** 123:4
186:24 348:16
**introduced** 53:1
**INVADER**

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 521

| | | | | |
|---|---|---|---|---|
| 119:17 120:11 | 24:25 36:25 | 270:6,7 273:2 | 193:16,19,23 | 43:9,10,13 |
| 121:9,18 | 42:2,9 48:20 | 273:6,20 | 194:1,3,6,9 | 55:21 68:1,11 |
| **invalid** 159:4 | 67:24 68:7 | 274:18 275:24 | 195:4,9 196:4 | 69:8,25 71:4 |
| **investigation** | 69:6 70:25 | 276:5 278:6,16 | 198:4,24 | 77:6 78:8 |
| 298:15 299:12 | 84:18 106:2,10 | 279:6,9 280:7 | 199:20 204:3 | 138:13 140:21 |
| 299:20 | 150:21 178:4 | 280:11 281:20 | 209:21 210:4,7 | 148:7 150:15 |
| **investigations** | 178:19,23 | 282:2,6,17 | 217:5 248:17 | 163:9 170:20 |
| 299:1 | 180:16,17,25 | 283:14 285:6 | 248:23 254:11 | 179:1 181:23 |
| **Investments** | 182:9 214:16 | 286:7,20 | 344:10,18 | 182:3 185:2 |
| 153:16 | 244:16 | 287:12,20 | 346:11 347:23 | 191:4,24 |
| **invoice** 45:20 | **Island** 261:11 | 288:20 289:23 | 353:21 428:4 | 222:16,22 |
| 211:19,20 | 269:16,19,24 | 289:23 290:14 | 430:4,10,22,24 | 223:2 236:23 |
| 212:6,16,17 | 274:4 301:9 | 291:23 292:1 | 433:3,14,20,23 | 237:17 311:10 |
| 217:19,25 | **issue** 28:19 | 293:3,12 302:1 | 474:11 477:8 | 313:3,21 |
| 218:1 253:12 | 60:14 129:13 | | 477:11 491:8 | 320:23 321:4 |
| 253:15,19 | 138:21 140:7 | **J** | **job's** 196:11 | 323:24 |
| 254:1,4,6,8,10 | 180:4 187:9 | **J** 2:20 3:11 4:3 | **jobs** 18:12 341:4 | **jury** 12:11 389:5 |
| 255:1,13,18,20 | 325:23 328:11 | **Jacob** 2:3 10:10 | **john** 1:23 3:19 | 390:21 391:15 |
| 418:7 | **issued** 23:11 | 70:9 123:4 | 4:2 7:25 15:11 | 393:7,13 |
| **invoiced** 46:15 | 61:17 84:18 | 139:8 166:20 | 99:1,4,15 | **jury's** 391:17 |
| 217:12,13,24 | 107:1,24 108:3 | 224:4 281:8 | 184:7 238:24 | |
| 218:10 | 110:11 115:2 | 328:4 333:5 | 270:12 331:12 | **K** |
| **invoices** 211:18 | 116:20 120:23 | 365:8 458:15 | 331:12 332:10 | **Kaliste** 4:3 |
| 252:23 253:3 | 129:6,18,22 | **JAY** 1:8 | 333:5,6,7,23 | **Karen** 1:9 15:17 |
| 254:12,21 | 131:8 134:3 | **jetties** 111:17 | 334:11 336:14 | 300:21 303:15 |
| 255:5,12 | 142:10,25 | 126:17 136:10 | 336:15 340:12 | 304:6 |
| **invoicing** 255:3 | 144:3 149:20 | 137:1 268:13 | 425:16 448:8 | **Kassie** 4:11 |
| **involved** 37:17 | 204:20 205:11 | **jetty** 138:2 | 450:5 453:1 | **keep** 103:18 |
| 38:15 215:24 | 274:1 307:10 | **job** 18:15 60:7 | 455:8,23 | 138:25 152:24 |
| 215:25 340:23 | 308:3,18 327:5 | 60:11 106:18 | **JOHNSON** 3:5 | 250:23 258:8 |
| 342:22 353:12 | 327:7 328:7 | 108:4,5 110:25 | **JOHNSTON** | 264:20 315:23 |
| 357:20,25 | **issues** 12:14,17 | 111:14 112:9 | 2:2 | 360:5,23 361:8 |
| 366:17 367:2 | 211:20 334:12 | 112:14,20,21 | **JONES** 2:20 | 361:21 362:9 |
| 444:20 | **issuing** 59:15 | 112:24 113:2 | **JOSEPH** 305:25 | 363:18 369:9 |
| **involvement** | 105:25 106:7 | 113:13 120:5,8 | **jotted** 31:8 | 372:2 396:2 |
| 203:17 204:20 | 129:25 130:24 | 121:25 122:5 | **Jr** 1:14,23 10:2 | 397:2 399:21 |
| 205:12 215:16 | **ITKIN** 1:23 | 122:22 126:9 | 11:23 | 399:23 400:9 |
| 472:7 | **Ivy** 214:4,7,8 | 126:14,23 | **judge** 12:11 | 400:22 401:7 |
| **involving** 36:2 | 219:13 227:3 | 128:25 133:13 | 169:21 | 402:8 403:3 |
| **iPhone** 278:11 | 227:16,23 | 133:21 134:19 | **judgment** 479:7 | 409:16 411:3 |
| **Iron** 246:2 | 229:14 230:1 | 135:12 136:11 | **jumped** 272:18 | 436:6 |
| 247:19 | 232:22 241:19 | 136:24 137:9 | **junctures** 440:3 | **keeping** 418:9 |
| **irrelevant** | 262:6,8 266:14 | 137:19,24 | **June** 23:15 | **Kelsey** 3:6 |
| 112:25 | 267:20 268:12 | 142:15 144:18 | 24:24 29:3 | **Kenny** 15:10 |
| **irrespective** | 268:12,17 | 149:15 150:14 | 40:16 41:14 | 184:8 238:25 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 522

| | | | | |
|---|---|---|---|---|
| 239:1,7 | 172:13 173:16 | 375:5 376:11 | 454:16,16 | 100:20,25 |
| **KESSENICH** | 180:4 182:17 | 376:19,19 | 456:12 457:1 | 101:9,9 103:11 |
| 3:2 | 182:18 184:12 | 378:11,14,23 | 457:13,25 | 103:12 111:16 |
| **kind** 44:25 | 204:11 213:9 | 379:13,14,17 | 458:7 459:14 | 119:17 120:11 |
| 70:22 104:13 | 217:21 219:21 | 383:23 385:23 | 459:20,25 | 120:14,14 |
| 119:13 133:9 | 220:13 223:25 | 388:1 389:5 | 460:3,12 461:5 | 121:9,18 122:3 |
| 152:25 217:6 | 225:17,21,21 | 397:7,7,9,10 | 461:17 462:1 | 126:15,17 |
| 240:4 250:22 | 227:18 228:6 | 397:23 400:7 | 462:18 463:3 | 128:20 132:4 |
| 270:9 290:8 | 237:21 238:21 | 400:14 403:8,9 | 463:12 464:2 | 132:11,23 |
| 344:7 345:15 | 241:16 242:8 | 403:12 406:4 | 464:25 465:11 | 133:1,15 136:3 |
| 397:22 431:22 | 242:16 252:18 | 411:24,24 | 465:19 466:7 | 136:7,9,13,25 |
| 433:10,17 | 260:17,20 | 413:18,24 | 470:6,9 473:14 | 137:12,25 |
| 442:23 | 261:9,18 262:6 | 414:2,9,10 | 473:19 475:14 | 138:18 140:12 |
| **knew** 39:1 46:13 | 262:8,9,12 | 415:15 416:11 | 492:16 | 140:16,17,25 |
| 86:12 95:7,8 | 270:23 276:9 | 418:15 428:11 | **knowledgeable** | 141:14,15,22 |
| 115:6 220:17 | 280:24 283:1,4 | 429:8,23 | 331:10 | 143:14 211:12 |
| 241:9 295:12 | 287:6 290:14 | 438:16 440:1 | **known** 335:22 | 211:13 212:25 |
| 356:13,16,19 | 290:19 294:2,2 | 442:3,8 444:6 | 336:1 404:19 | 213:1,19,23 |
| 357:1,10 | 294:4 298:21 | 444:6 447:3,14 | 408:1,2 410:17 | 218:7,8 235:10 |
| 358:11,21 | 299:9,13 | 447:21,25 | 410:18 414:18 | 235:11,15,16 |
| 359:22 388:15 | 300:17 301:2,8 | 449:15,15 | **knows** 130:1 | 236:7,7,9,10 |
| 428:3,4 430:9 | 302:8,25 308:1 | 452:22,24 | 146:8 170:1,2 | 236:14,14 |
| 430:13 484:16 | 308:15 309:9 | 453:1,3,5 | 238:21 314:11 | 240:21 241:9 |
| 492:25 | 310:18 311:24 | 454:22 455:23 | 314:16 467:8 | 242:15 246:24 |
| **know** 11:1,8 | 317:4,6,10,11 | 455:24 456:22 | **KOBY** 300:21 | 248:12 255:7,8 |
| 13:10 33:12,24 | 318:2,6,19 | 465:8 467:4,9 | 303:15 304:6 | 257:5,12 263:7 |
| 34:19 36:12 | 319:3,25 320:2 | 468:5,6 470:24 | **Kuebel** 2:21 | 263:11,17 |
| 39:22 40:21,24 | 321:11,15,22 | 477:10 478:7 | **Kurt** 48:7 96:8 | 265:21,22,22 |
| 41:22 46:14 | 324:12 326:24 | 478:19,22 | 97:17 196:4 | 265:23,23 |
| 47:11 53:4 | 326:24 327:20 | 479:18 481:6 | 272:9 273:21 | 266:5,5,17 |
| 56:5 73:13,14 | 328:20 329:8 | 484:14 492:19 | 478:25 | 268:14,14 |
| 76:17 83:13,14 | 329:18 330:4,5 | **knowledge** | **Kutner** 2:16 | 284:6,6,25,25 |
| 83:16 98:12 | 330:6,25 331:1 | 301:23 327:17 | 332:20,21 | 285:2,2 301:4 |
| 104:14 112:17 | 331:2 335:17 | 340:22 347:7 | | 301:15 473:1,2 |
| 116:3 122:22 | 336:6,24 | 347:14,20 | **L** | 473:6,6 483:4 |
| 123:11 124:10 | 337:16,17,18 | 384:13 390:1 | **L** 2:8 3:6 4:11 | 483:11,19 |
| 128:3,3 130:3 | 337:24 341:11 | 395:25 396:13 | 9:1 | **label** 72:4 83:1 |
| 135:23 139:8 | 343:15,17 | 397:1,25 399:8 | **L.L.C** 1:12,13 | 256:9 467:15 |
| 139:11 146:9 | 345:9 348:21 | 399:20 400:8 | 1:14 2:6 10:1,3 | **labeled** 40:6,21 |
| 148:24,25 | 349:3 350:1,3 | 400:21 401:5 | **LA** 7:4 22:21,22 | 147:16 152:15 |
| 154:18,20 | 350:8,12,19 | 402:3,7 404:16 | 25:12,12 26:17 | 226:2 230:4 |
| 164:11 165:16 | 356:11,17 | 407:6,14,18 | 26:17 36:19,19 | 256:4 258:6 |
| 165:18 166:24 | 357:19 364:23 | 413:9 416:1,3 | 37:21,22 38:7 | 270:21 275:5 |
| 168:6,7,11,22 | 369:17,19 | 416:5 417:25 | 38:7 43:23,23 | 466:11 |
| 169:7,10,13 | 370:3 371:18 | 418:25 419:2 | 100:10,11,20 | **Lafayette** 4:4 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 523

**Lafourche** 4:9
**language** 82:24
83:3 84:16
89:11 90:1
115:3,12,14
130:3 146:18
146:20 150:3
263:23 309:1,4
342:8
**lapse** 129:11
**large** 367:10
**late** 484:11
**Laurent** 3:11
332:18
**law** 2:16 3:22
9:8
**lawsuit** 442:24
444:25
**lawyer** 20:23
22:13 23:3
**lawyers** 24:21
25:8,18 26:9
26:24 27:17
28:4,25 29:11
29:24 34:7
294:19 324:15
447:16,25
455:12 456:4
481:8
**lay** 339:7
**lead** 13:15 14:4
**leading** 164:18
271:23 477:21
**leads** 165:1
287:8
**lean** 123:8
**leaning** 138:24
**learn** 286:17
**learned** 286:20
319:15 370:20
371:2
**leave** 197:5
233:16 273:17
377:23
**led** 169:1

**left** 117:21 160:7
187:21 269:13
277:15 291:3
292:4
**left-hand** 148:1
**legal** 130:13,18
171:5 186:3,8
188:7,13
291:13 296:7
296:18
**lessened** 412:4
412:16
**let's** 20:1,14
21:3 40:18
61:23 62:24
63:21 64:9
65:12 66:12
70:16 93:17
109:15,22
119:15 121:20
126:7 133:17
141:13 143:23
176:25 177:9
185:20 189:4
204:19 205:8,9
206:4 217:7
228:15 229:6
243:15 245:17
260:25 267:18
268:10,10
269:5 274:3
278:1,13
281:16 290:11
290:18 291:25
295:7 305:9
335:15 346:21
354:3 393:18
393:22 473:18
**letter** 6:12 30:11
31:1,13 57:18
59:14 60:5,10
60:14 63:12
84:17,17,23
85:1,7,8,24
87:6 91:23

92:5,19 93:20
94:6 102:20
106:1,8 107:1
107:14,15,23
107:24 108:3
108:11,12,12
111:20 114:25
115:15,23
116:4 117:6,23
118:12,18
119:16 120:23
121:10,21
127:5,12
128:20 129:13
129:18,22
131:7 132:9
133:1,4,5,18
134:3,9,13
135:11 137:8
138:15 139:19
140:11,22
141:20,22
142:24 143:9
144:25 146:2
148:6 149:19
149:24 150:15
204:25 212:3
271:7 273:25
274:9 301:12
308:3,6,11,16
311:11,17
327:6,8,14
328:6,18 452:4
**letters** 6:9 23:5
29:2,13 59:25
60:1,2 61:16
62:21 80:24
83:4 85:15,18
94:21 101:22
103:16 105:9
105:18,23
106:17 107:8
107:18 116:2
116:19 119:15
121:2 129:25

130:21,24
135:6 146:16
306:20 307:3,8
307:10 309:3
**letting** 261:18
262:8,12
383:15
**level** 203:16
204:20 205:12
**Lewis** 1:16 2:7
**Liability** 8:1
466:15
**liable** 443:19
**license** 198:15
**licenses** 197:21
198:2,24
199:14,22
200:5
**life** 380:7
**lift** 258:17
263:18 264:10
**liked** 404:19
**likelihood** 412:4
412:16
**likes** 238:21
**limited** 213:6
353:7
**limiting** 189:18
341:22
**Linda** 4:15 9:22
495:6,21
**line** 147:9 153:3
173:25 174:25
200:16 271:16
290:9 445:15
**lines** 363:17
364:1,10
365:21 368:9
368:23 397:1
397:20,25
399:10,20
400:8,16 416:6
417:24 418:19
419:7 459:21
460:12,20

461:7 463:3
**link** 47:25
**linking** 38:16
**Liskow** 1:16 2:7
**list** 31:5,10
74:21 76:15
153:5 154:6
173:24 174:3
174:11 240:6
244:19 247:2
272:19 312:8,9
312:10 313:7
315:13,14,19
315:22 316:17
318:2 321:2
322:3,13
323:12,18
324:22,23
**listed** 83:17
111:10 127:4
148:14 153:21
153:24 154:8
174:17 175:16
176:2 178:21
182:7 247:24
315:9 329:13
329:19 330:19
469:24 475:19
**listen** 14:21
166:19 329:24
333:19 360:14
**lists** 32:18 41:3
85:12,12 90:7
91:11 92:1
469:15,17
**litany** 303:22
**litigation** 134:8
142:8 144:16
234:16 327:25
328:24
**little** 17:21
72:11 114:20
115:12 135:1
139:2 193:11
252:4 297:19

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 524

323:15 325:10
326:5 368:15
393:6,19,23
**LLC** 1:4,8 2:3,6
2:10,14,23 3:8
3:9,13 4:5,5,7
4:11,13 6:4,7
10:12 13:1,7
32:9 41:5
57:20,23 82:17
147:2 153:9,10
153:10,11,12
153:12,12,13
153:13,14,14
153:15,15,16
153:16,17,17
154:9 155:1,5
155:6,13,14,22
155:23 156:6,7
156:10,18
157:4,9,14,17
157:22 160:8
160:11,16,18
160:22 161:9
161:10,17
172:17 173:4
173:17 174:16
175:2,17,19,23
176:1,16,23
177:3,7,12,23
178:1 179:7
180:10 181:1
182:10 183:23
184:1 185:4,6
185:10,13,16
185:24 186:17
188:6,23,24
189:11 190:10
190:15 191:2
191:12,13
192:11 227:13
309:3 310:5,22
**LLC's** 180:17
310:22
**LLP** 1:23 2:11

2:20 3:10,14
3:18
**loading** 298:25
**locate** 37:13
344:20
**located** 291:21
300:2
**location** 205:4
261:20 263:10
354:6
**lodge** 22:7
**log** 217:22
242:11,14
**logistical** 205:19
205:24 209:9
**Logistics** 4:5
**logs** 211:14,15
212:4,6,16
217:2,14,17
218:2,11 253:8
253:21 254:1,3
418:2,4,6,8
**long** 16:2 108:14
176:7 314:1
331:4,17
335:22 336:1
337:11,13
343:1,14
366:15 434:2
459:4
**longer** 108:20
206:5 337:19
337:20
**look** 34:12 35:15
35:18 40:23,24
56:8 58:4,9,22
61:22,23 62:24
64:9,10 72:3
74:2,6 80:23
104:16 135:1
152:6 157:9
177:9 184:17
198:12 206:13
228:1 229:6
237:22 244:6

260:25 267:18
269:5 271:1
274:24 276:14
290:11 308:1
311:9 313:25
315:23 319:20
329:7,9 481:3
**looked** 79:7
136:4 141:20
148:15 149:24
174:3,12
187:13 188:25
191:19 260:15
263:24 268:5
271:7 310:4
312:5 423:1
465:11,20
**looking** 39:10
41:11 67:16
74:8 109:20
110:1 117:19
118:17 120:5,7
133:3 142:11
146:15 148:22
153:2 154:7
162:5 187:17
204:3,3 206:10
221:9 228:19
229:10,10,24
245:11 260:3
260:22 262:23
263:3 267:11
270:21 272:25
273:24 278:4
283:18 292:7
292:10 299:11
312:6 424:7
479:25
**looks** 41:22
119:20 129:7
226:20 227:1
228:19,22
229:1 246:7,12
247:15 276:2
279:21 290:21

291:13
**loose** 411:19
417:15,21
**lot** 161:22
314:23 315:2
328:1 333:19
349:17 351:14
385:13 394:22
410:13,16
425:17 442:8
459:6 480:21
**loud** 64:15 65:15
66:22
**Louisiana** 1:2
1:15,16 2:4,9
2:12,17,22 3:3
3:7,12,16,24
4:4,8,12 9:24
12:1,5 22:20
23:6,10,11
26:15 27:3
36:22 37:18
39:3 43:23
100:12 120:12
122:20,23
123:1 124:16
125:16,24
132:4 136:14
137:22 141:15
218:8 234:22
235:8,20 236:2
236:13 237:2
237:12,16
240:21 250:8
251:25 252:10
254:18 255:6
255:12 257:13
257:18 258:25
264:16,25
265:3 266:19
266:25 267:13
289:19 379:22
379:24 472:25
484:19 495:7
495:15

**low** 187:6
**lube** 112:22
113:9,19,22,25
133:9 207:10
209:18,18
**lubes** 112:25
**Lyons** 3:25

---

**M**

**M** 3:2,19
**M/G** 156:10,12
**M/V** 7:14 21:24
25:11 26:2
36:3,13 38:7
43:17 49:14
74:23,23 75:2
75:3,6,6,7,7,10
75:10,14,14,20
76:18,18,19,19
76:19,20,21,21
76:22 95:24
96:3,16,22
97:8,13 99:8
99:20 100:1
102:4 103:2
110:16,17
111:5,15 116:4
116:8,22 117:1
117:23 118:18
119:17 120:11
121:9,18,21
122:3,14
123:17 126:11
126:15,17,18
127:9,15
128:11,20
133:15,19
136:9 137:20
137:25 138:12
140:12,25
141:15 143:14
143:24 144:6
145:17 148:7
150:13 155:2
156:11,13,14

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

156:15,18
157:6,10,13,22
160:8,12,14,23
161:14 175:3,6
175:15 176:17
176:21 177:6
177:15,18
178:2 181:25
182:1 189:5,8
189:13 190:2
191:1 212:22
213:15 217:8
218:20 245:12
258:19 263:20
264:12 270:17
271:9 300:21
305:25 311:11
311:23
**MacArthur**
1:15 12:4
153:16
**mad** 443:21
444:14
**madam** 180:6
342:5 432:8
**Madisonville**
3:3
**MADONNA**
22:21 25:12
26:17 36:19
37:21 38:7
43:23 100:10
100:20,25
101:9 103:11
111:16 120:14
122:3 126:15
136:9 141:14
141:15,22
143:14 211:12
212:25 213:19
218:7 235:10
235:15 236:7,9
236:14 240:21
241:9 242:15
246:24 248:12

255:7 257:5,12
265:21,22
266:5 268:14
284:6,25 285:2
473:1,6 483:11
483:19
**MAGISTRATE**
1:8
**Main** 3:23 246:2
247:19
**maintain** 53:16
**maintained** 35:6
52:1,9
**making** 28:14
44:20,21 45:6
46:13,15
201:15 216:1
217:3 344:23
371:8 418:18
419:6 439:15
474:12
**man** 207:18
221:24 224:14
235:2 251:22
267:14,16
311:7 341:13
342:13 352:20
485:23
**management**
200:20,23
202:19 215:7
335:8 354:17
355:18,22
356:1 362:22
363:8 368:7,19
369:6 370:13
373:22 374:6
375:20 383:5
396:12,25
402:15 403:1
405:12 406:19
407:11 408:13
409:14 412:12
413:1,9,19
416:4 417:8,9

463:15
**manager** 127:4
334:6,25 345:7
**managers** 6:14
127:2
**Mandeville** 3:7
**manifest** 7:12
269:13
**manned** 216:4
309:19 317:21
486:5 488:14
488:22 489:1,3
**manner** 64:25
**manning** 401:6
401:12,18,23
402:3,7,16
403:14
**manual** 200:20
**manufacture**
287:2
**Marc** 2:16
332:21
**March** 31:4,13
257:13
**Marine** 2:14
3:13 6:14
22:20 23:6,10
23:12 26:15
27:3 36:22
37:19 43:24
49:2,9,21 50:5
50:7,10,14
100:12 122:20
122:23 123:1
124:16 125:17
125:24 132:5
136:15 141:16
218:9 234:23
235:9,21 236:3
236:13 237:2
237:12,17
240:22 250:8
251:25 252:11
254:19 255:7
255:12 257:19

259:1 264:16
264:25 266:25
267:13 284:7
323:21,23
337:10,12,14
337:19 338:8,9
338:19 339:20
341:15 342:15
342:23 343:25
344:4 478:6
**marine-related**
18:15
**maritime** 305:4
305:6 401:17
**mark** 19:5 72:7
103:20 187:14
237:25 256:5
258:5 259:24
262:18 272:13
392:20 393:5
**mark-up** 44:12
45:18,21,23
253:16,17
255:13,21
**marked** 111:23
275:5 466:12
**market** 55:17
**marking** 40:10
**marks** 211:19
**MARS** 35:3
272:2
**Martin** 3:4
145:8 285:8
286:15 291:5
324:4 332:25
363:6 364:11
366:13,14
459:15 460:21
461:8 462:19
463:5 464:3
465:1,13
**Martin's** 365:22
366:4 386:10
387:20,22,25
391:21

**massive** 383:4
**Master** 6:5,16
22:17 23:16,21
24:13 25:1
31:12 40:7,14
42:4 43:8
48:21 55:22
57:15 58:11
59:21 61:25
62:16 63:10
67:25 68:2,8
68:10 69:7,15
69:24 70:20
71:1,3,7,16
72:24 77:6
78:7,12,19
79:25 87:11,21
92:9,22 93:8
93:24 94:5,11
94:20,25 95:15
96:2,20 97:11
99:7,24 100:23
101:13,24
102:2,21 103:1
118:11,20
119:1 121:8,16
125:10,13,22
127:10 128:7
132:8,19
133:12 135:10
137:5 138:12
139:17 140:20
143:7 144:23
145:12,25
150:11 152:3
162:3 163:10
163:17 164:5
165:19 170:21
173:6,18 174:6
174:20,23
178:6,25
180:19 181:5
182:4 184:18
184:23,24
187:22 188:8

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 526

189:1,11,22
191:5,14,14,25
192:8 215:13
222:18,19,19
228:20 229:11
230:1,4,5
232:22,25
233:9,17
236:24,25
237:1,6 294:11
294:25 295:18
296:19 301:21
302:1 303:2,17
304:4 305:19
309:23 310:6
310:19 316:8
320:11,12
451:11 469:7
469:17 480:22
484:2,8,19
490:9
**MASTERSON**
121:22 122:14
123:17 127:9
127:16 128:11
**material** 137:1
142:21 149:16
301:8
**materials** 129:3
136:9 142:16
**Matt** 149:13
**Matt's** 148:23
**matter** 124:4
220:1 495:17
**matters** 455:11
**Matthew** 2:11
**Mauricio** 47:16
110:10 144:4
215:8,11
256:24 257:5
258:2 259:25
261:2,6 262:11
263:5,7,16,20
264:17 269:8
269:25 270:1

270:11,16
271:16 345:3,5
**Mauricio's**
262:2
**McCALL** 3:14
3:18 258:18
263:19 264:11
**mean** 31:16
44:22 73:6
91:1 93:4
129:24 135:24
146:7 162:21
163:4 165:12
168:22 169:7
169:24 170:25
171:16 182:24
183:24 185:22
186:16 189:17
206:2,9 207:7
209:15 220:3
220:23 228:5,6
233:6 239:21
241:8 243:10
245:23 283:11
285:25 286:1
288:1 289:10
291:1 295:11
295:13 313:25
314:18 316:15
317:22 318:1,4
319:24 320:17
341:24 348:16
349:23 353:6
367:20 385:12
401:15 410:11
410:13 417:25
426:4 434:6
437:15 442:23
442:25 443:19
444:3 448:15
456:7
**meaning** 236:6
341:23
**means** 46:24
52:21 53:5

105:21 171:10
182:19 186:10
247:21 355:9
358:20 389:6
401:22 423:12
456:25
**meant** 186:16
204:12
**mechanics**
454:17 455:2
456:14 457:2
457:14 458:1
**Meche** 4:3
**medical** 18:19
447:6
**medications**
12:7
**Mediterranean**
74:19 75:20
76:1,11 78:6
177:22,23
178:1,2 182:1
476:9
**meet** 138:1
261:11 267:7
269:23 336:10
347:15 349:1
480:2
**meeting** 265:25
266:5,22 417:2
**meetings** 417:4
417:7
**Melodi** 261:4,7
**member** 156:6
161:10 167:16
168:16
**members** 403:3
**membership**
167:23
**Memorial** 1:24
**memorized**
166:20
**men** 343:15
380:7
**mention** 298:14

300:20
**mentioned** 72:2
92:6 238:23
247:13 271:10
278:16 309:2
321:11 443:3
443:10
**merely** 52:25
193:3 203:3
207:18 221:23
422:5 453:19
**mess** 384:18
385:24
**message** 25:21
47:5,14,15
210:23 242:10
265:9 276:9,15
278:2,21 280:7
281:3 282:17
282:17
**messages** 7:19
26:11 27:2
236:15 278:6
278:14 281:12
290:9 292:1
**messed** 385:8
443:5
**met** 10:9 20:23
22:13 24:21
25:8 26:9,24
27:17 28:4,25
29:11,24
333:24 336:15
336:16 337:1,2
337:3,3 338:6
345:14 346:25
**Metairie** 12:1
**method** 130:23
495:10
**mic** 123:5
250:22
**Michael** 1:14
3:23 10:2
11:23 41:3
495:8

**microphone**
47:24 140:3
224:5
**mid-page** 153:3
**middle** 179:18
207:18 221:23
251:22 267:14
267:15 341:13
342:13 352:20
**midstream**
111:17 122:4
126:16,18
137:21 366:11
**Mike** 14:17
63:18 88:16
115:5 179:22
187:3 226:21
254:13 256:11
256:14 258:11
261:2,9 263:16
268:5 270:18
280:17,20
282:11 283:22
330:13 452:6
**MikeG@Daw...**
226:23
**mind** 234:24
276:21
**mine** 258:8
**minimal** 205:3
**minimum**
280:15,21
282:13 283:23
402:7
**minutes** 280:13
**mischaracteri...**
284:12
**mischaracteri...**
284:18
**Mischaracteri...**
303:21
**misheard** 437:3
**mislead** 159:5
159:10
**misleading**

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 527

158:15,20
misstates 102:7
  468:25
mistake 371:10
misunderstood
  450:8
Mitch 15:18
mitigated 412:4
Mitsui 30:11
  31:14 327:2,5
  328:20
mobilization
  114:6 117:2
  274:3
mobilizing
  353:25 354:4
Modern 2:5
  10:11
MOELLER
  4:11
moment 58:23
moments 289:10
Monday 72:6
  263:10
money 45:8
  134:22 443:20
monthly 217:23
months 254:23
Montrell 2:18
moor 285:19
  350:8 367:10
  388:15 439:17
  459:22 460:13
  460:21 461:8
moored 36:3
  145:7 285:8
  350:14 362:9
  362:19 363:6
  363:18 370:6
  390:24 391:8
  391:22 396:3
  399:11,22
  400:10,23
  401:7 402:8,18
  403:3 406:7

410:12 413:10
414:19 415:13
459:14 460:1
471:14
mooring 285:22
  350:2 352:8
  363:17 364:1
  364:10 365:21
  366:17 367:2
  368:9 397:1,20
  397:25 399:9
  399:20 400:8
  400:15 403:24
  404:5,14
  405:10 406:2
  406:10,22
  407:8,13
  408:15 409:16
  410:4,18 411:6
  412:14 413:2
  413:19 416:6
  418:19 460:5
  461:18
moorings
  287:14
morning 6:18
  31:8 237:23
  238:3,5,9,15
  238:19 239:23
  239:24 240:14
  242:1,18,21
  243:4,17
  244:13,20
  245:7 247:25
  263:10 319:15
Motions 35:9
move 123:5
  167:1 179:17
  192:19 234:20
  290:20 296:3
  301:7 305:14
  319:5 374:12
  429:16 470:19
moving 224:7,9
  281:10,10

MSA 227:13,16
  229:25 230:15
  231:6,9,16,20
  231:25 232:3,9
  233:12,25
  234:4,17
MSAs 301:21
multiple 383:11
  440:2
mute 47:23
mutual 82:15
  84:13,16 88:2
  147:1 198:8
  220:9 309:7
  311:14
mutually 219:3
  308:24
Myles 227:24

_____
N

N 5:1 9:1
N/A 113:11
name 10:10
  11:21 40:25
  42:18 84:5,7
  84:25 89:10,24
  116:12 123:24
  123:25 154:13
  179:19 189:6
  260:19 268:3,5
  300:22 333:23
  474:19 475:20
name's 272:21
named 36:13
  76:23 177:21
  304:13
names 33:2
  74:17 300:13
  300:16 315:16
  322:13,14,16
  474:24 475:8
narrow 303:6
nature 408:15
  410:4
navigate 489:8

navigated
  486:14
necessarily
  185:22 242:17
  249:3 328:9
necessary 319:9
  361:20 368:22
  396:2 401:6
  409:15 430:1
  433:23
need 11:8,10
  13:9 36:11
  78:20 91:5
  103:24 104:4
  167:1 169:20
  196:17,18,23
  207:10 209:18
  213:11 217:4
  219:1 257:23
  257:23 261:10
  261:21 264:21
  265:24 289:16
  296:6 297:18
  314:19 331:23
  344:18 348:6
  348:22 349:3
  351:21 354:6
  368:9 400:22
  406:4 415:15
  423:12 426:4
  429:15 445:1
  477:15
needed 57:5,12
  205:14 248:25
  249:1 265:1
  266:20 339:3,6
  347:17 362:19
  362:23 363:4
  366:17 367:2
  368:24 369:9
  389:15 399:24
  409:16 419:25
  421:6 423:3,7
  430:4 431:17
  432:14 433:18

436:20 477:9
  477:11
needing 257:6
  257:17
needs 47:23
  216:6 261:19
  319:4 351:11
  351:22 368:7
  399:8 406:7
  433:2 436:7
  479:8 480:14
Neither 385:7
never 43:9,12
  62:12,12,13
  95:25 96:17
  97:9 100:21
  101:10 196:22
  233:6 252:19
  333:23 379:20
  404:4,12
  414:15 424:18
  424:18 440:16
  445:5 462:9
new 1:16 2:4,9
  2:12,22 3:12
  3:16 4:8,12
  176:8 379:4
newly 177:21
night 258:18
  263:19 264:11
  381:24 382:1
  417:13,17
  440:21,25
  441:3,4
nine 56:1,4
  73:24
NOAA 285:14
Nobody's
  443:10
nods 10:21
non-objection...
  342:8
non-written
  86:25 89:4,5
nonresponsive

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 528

86:17 93:12
96:13 97:23
98:18 124:8
155:11,18,20
157:2 158:25
159:9 440:12
**noon** 268:19
**normal** 401:23
**normally** 45:22
**note** 293:16
312:21
**notes** 30:5
325:20
**notice** 9:9 19:14
31:21 32:7
34:3 89:13,21
90:12 91:12,16
318:13 455:15
468:21 469:7
**noticed** 364:18
**notified** 326:20
326:21 409:9
409:10
**notwithstandi...**
61:5 92:18
95:20 198:25
**November**
141:14,25
142:10 143:25
254:17
**number** 19:7
31:24 40:20,21
44:9 54:18
82:3 104:5
114:10,11,16
129:16 226:5
261:7 270:23
275:14 392:22
**numbers** 19:12

**O**

**O** 9:1
**o'clock** 273:15
275:2 314:18
**oath** 9:25

**object** 13:20
14:1 24:3
37:10,25 38:11
38:19 40:3
46:4 51:6 52:4
52:14 53:20
54:6 56:14
62:18 68:15,20
69:18 70:3
71:11,19 77:10
78:23 83:21
86:3,17 90:5
91:2 92:13
93:2,12 94:15
95:4 96:6,24
97:3,15,22
98:3,18 99:11
100:4,15 101:2
101:17 102:7
110:21 114:14
123:19 127:18
127:25 128:14
130:9 131:10
131:11 135:21
141:2,9 143:19
145:19 146:4
150:25 152:10
155:25 156:21
159:9 160:25
164:10 180:21
181:8 182:14
183:5 186:1
188:11 189:16
190:4,12
194:11 196:20
199:4,16
202:16 203:20
204:6 206:25
207:25 208:23
209:25 211:5
211:22 212:9
212:13 214:13
214:20 219:20
221:17 223:19
224:19,20

232:2,7 233:4
251:14,19
264:5 281:24
284:11 301:17
302:15 303:20
304:18,24
306:10,22
307:6,12
309:13 310:9
310:12,25
336:14 340:8
341:20 364:16
382:17 408:21
422:1,16
423:19 424:3
424:16 425:2
425:15 426:1
426:14,25
427:17 428:1
428:16 429:3
429:11 430:7
430:17 431:22
432:21 433:6
434:24 435:18
436:3,15 437:9
440:12 443:24
444:17 445:15
455:8,10 457:6
460:7,24
461:10 462:23
463:18 464:8
464:10 465:4,6
465:24 468:3
469:1
**objected** 35:8
**objecting**
158:23,24
159:2
**objection** 22:8
34:24 52:18
77:18 102:15
160:2 170:15
183:11,19
307:19 335:11
339:23 340:10

341:7,18 342:2
343:7,20
344:25 345:19
346:14 347:3
347:10 348:24
350:6,17
351:25 352:12
353:1,4 354:19
355:1,20 356:5
357:5,14 358:5
358:16 359:1
359:11,16
360:8 361:1,12
362:1,12,25
363:12,21
364:4,15
365:15,24
366:8,21 367:6
367:16 368:3
368:13 369:23
370:8,15,23
371:12,20
372:5,23 373:8
378:20 379:10
380:2 381:6
382:19 388:7
395:20 405:4
432:21 448:22
456:19 457:19
464:6,16,18
481:17,24
488:23
**objections** 9:15
34:24 35:6
170:18
**obligation**
318:13 319:21
406:20 407:2
**obligations** 67:1
370:5 421:22
422:12
**obvious** 51:24
135:25
**obviously**
109:17 139:8

405:6 436:6,7
**occasion** 296:10
296:10
**occasions**
296:13 321:10
346:10
**occurring**
412:17
**occurs** 286:13
**October** 16:6
21:24 22:21
28:6,11,18
36:1 37:4,8
38:5,9,13
39:24 42:7,14
46:12 48:17
49:15 54:10,15
55:4 56:2,21
57:2,3,9 73:25
76:2,3,12,14
76:17,24 80:3
85:5,17,23
86:7 87:2,8,17
89:22 91:17
92:6,20 93:22
94:8,22 95:14
95:24 96:16,17
97:7,9 99:5,9
99:20,21
100:21 101:9
101:10 102:4
103:3 106:23
107:2 116:17
116:25 119:16
121:22 122:9
122:10 125:15
125:25 126:4,8
128:19 131:24
132:12,16
133:17 134:1
136:2,18,20
137:12,13,17
140:11 142:2,4
142:5 144:10
144:12 145:6

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 529

| | | | | |
|---|---|---|---|---|
| 151:6,15 | 461:6,16,25 | 269:24 270:12 | 47:7 48:8,16 | 129:10,17 |
| 176:11 201:11 | 462:17 463:2 | 285:3 293:20 | 49:10,19,24 | 130:6 131:1,18 |
| 212:21 213:2 | 463:11 464:4 | 309:8 310:21 | 50:21 51:12,23 | 132:7,22 133:7 |
| 213:15,20,24 | 464:14 465:1 | 311:16 313:3 | 52:7,17 53:15 | 133:11 135:3 |
| 217:9 218:4,16 | 471:1 472:9,13 | 330:18 334:21 | 54:18,21 55:9 | 136:13,17,23 |
| 218:21 219:7 | 472:17 473:2,6 | 335:3,9 341:16 | 55:14 56:5,8 | 137:4 138:10 |
| 219:18 221:15 | 473:19 475:25 | 342:15,24 | 56:19 57:22 | 140:18,24 |
| 222:17,22 | 478:18 480:10 | 347:25 354:2,8 | 60:4,9,13 62:6 | 141:6,19 |
| 223:2 227:2,24 | 480:14 482:3 | 354:10 395:25 | 62:23 63:1,14 | 142:15,20,23 |
| 229:2,13 230:2 | 482:11,20,23 | 398:9,10 428:6 | 63:21 67:7 | 143:2,5,16 |
| 232:23 235:9 | 483:5,12,19 | 459:8 463:15 | 68:20 69:5 | 145:5,23 |
| 235:16,23 | 484:12 487:25 | **Oh** 14:6 50:18 | 72:13,17 73:11 | 146:14,22 |
| 236:4,19,23 | 489:24 490:2,8 | 91:22 176:8 | 73:19,23 74:13 | 147:20,23 |
| 237:18 238:4,6 | 490:19,24 | 243:7 272:18 | 74:17 79:23 | 148:10,20 |
| 238:10 243:16 | 491:2 492:19 | 277:25 284:15 | 80:3,10 81:15 | 149:7,19,23 |
| 243:22 245:17 | 492:25 | 296:2 334:8 | 81:24 82:19,24 | 150:3,17 |
| 245:18,21,22 | **off-hire** 107:18 | 417:19 450:15 | 83:8 84:6,15 | 151:17 152:6 |
| 246:10 247:2,4 | 121:10 133:5 | **Oil** 136:10 | 85:5 86:7,14 | 152:14,20,23 |
| 247:9,10 | 146:16 306:19 | **okay** 10:15 11:7 | 86:17 88:11,20 | 153:8,19 154:5 |
| 250:11 251:1 | **offer** 81:16 | 11:18,19 12:9 | 89:4 92:4 | 154:10,15,18 |
| 252:1,24 253:5 | 110:15 111:3,3 | 12:14 13:3,6,7 | 93:11 95:12 | 154:21,24 |
| 254:16 257:4 | 195:22 277:20 | 14:19,24 15:5 | 98:17 99:3,15 | 155:5 156:9,17 |
| 258:11 260:3,6 | **offered** 110:18 | 15:13,16,22 | 99:19 101:8 | 157:8,13 |
| 263:4 265:16 | **offering** 80:6 | 16:8,14,21,24 | 103:6 104:4,11 | 158:23 161:25 |
| 267:20 268:11 | 86:10,22 87:4 | 18:1,6 19:5,10 | 104:17,19,20 | 162:21 163:11 |
| 269:10 270:13 | **office** 238:20 | 19:23 20:7,13 | 105:1 106:21 | 169:19 170:22 |
| 271:8,23,24 | 239:11,17,18 | 21:3,19 22:3 | 107:4,13,20 | 171:14 172:6 |
| 273:5,9,21 | 240:3 243:13 | 22:13,18 23:4 | 108:9 109:8,12 | 173:1,13,23 |
| 274:2,5,9,10 | 243:14 417:8,9 | 23:15,20,25 | 109:15 111:2 | 174:14,24 |
| 275:21 277:24 | **officer** 495:7 | 24:11 26:25 | 111:14,22 | 175:5 176:1,8 |
| 278:2,22 280:6 | **offices** 1:16 | 27:5 29:9,12 | 112:8,23 113:5 | 179:17 180:3 |
| 281:2,18,19 | **officiated** 9:24 | 29:16,25 30:17 | 114:6,10,19 | 180:15 181:19 |
| 282:10 283:15 | **offshore** 1:8 2:6 | 30:24 31:5 | 115:18,25 | 182:8 184:5,14 |
| 286:12 287:12 | 3:21 10:11 | 32:4 33:12 | 116:13 117:25 | 184:17,21 |
| 290:12,24 | 13:16,24 14:7 | 34:11,18 35:20 | 118:5,8 119:5 | 185:9,12 |
| 293:6,8,8,17 | 14:12 15:2 | 35:24 36:9,10 | 119:7,13 | 187:21 189:4 |
| 293:20 294:1 | 42:17 56:21,23 | 37:7,16 38:15 | 120:13 121:1,5 | 189:25 190:24 |
| 295:9 301:19 | 57:4,12,23 | 38:24 39:5,12 | 121:15,20,24 | 191:8 192:5,11 |
| 303:3 305:7,8 | 82:17 88:2 | 39:15,18 40:1 | 122:8,13,17 | 192:15,18 |
| 321:16,18 | 105:10 110:10 | 40:9,14,18,22 | 123:23 124:1 | 193:6 194:7 |
| 323:24 326:11 | 144:4 147:2 | 41:7,14 42:2,9 | 124:19 125:2,7 | 195:6,11,15,18 |
| 329:8,15,20 | 149:21 185:5 | 42:23 43:1,12 | 125:10 126:3,7 | 196:8,25 |
| 330:21 349:12 | 213:2 216:11 | 43:15 44:7,11 | 126:14,25 | 197:10 198:20 |
| 459:13,25 | 216:15 257:2 | 45:15 46:9,14 | 127:3,7,14,22 | 198:25 199:24 |
| 460:4,11,19 | 260:1 269:19 | 46:17,23 47:4 | 128:6,18,25 | 200:16,24 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 530

203:14 205:8
205:16,23
207:6,13 209:9
209:17 210:7
210:13,17,21
210:25 211:18
212:25 213:12
214:5 215:9,12
217:12,16,20
218:3,7,12,24
220:7 222:16
224:1 225:14
225:18 226:19
227:5,8,12,22
228:8,11,15,18
228:24 229:6
229:16,19
230:7,10,13,17
231:2 233:8,23
234:13,24
235:13 237:5
238:6,12,15
239:4,6,9,16
239:23 240:4,9
241:5,18
242:19 243:5,9
243:15,21
244:1,15 245:2
245:15,19
246:16,23
247:8,15 249:2
249:7 250:5,6
250:9 251:9,24
252:8,16
253:14,19
254:9 255:5,22
256:3,6,20,23
257:12,16
258:8,14,22
259:3,7,12,20
259:25 260:18
261:16,22
262:13 263:2
263:15 264:14
264:24 265:15

265:19 266:4
266:12,16
267:5,11 268:2
268:10,20,22
269:12 270:16
270:21 272:13
272:25 273:11
273:24 274:16
274:23 275:3,7
275:8,11 276:5
276:14,16,17
277:22,23
278:3,9,15,20
278:24 279:5,8
279:17,25
280:4 281:1,6
281:16 282:15
282:23 283:3
284:4,15 285:5
285:11 286:25
287:8,18,24
288:16,18
289:5,8 290:1
290:10,18
291:1,7,10,16
291:19 292:15
293:16,23
294:4,7,16
295:3 296:17
297:2,4,9
298:13 299:4,8
299:18 300:19
300:24 301:2
301:14,21
302:5,10,25
303:15 304:15
305:3,18,25
306:3,14,16
307:23 308:15
308:20 309:9
309:22 310:2
310:18 311:6
311:20,23
312:5,13,16
313:1,6,10,18

315:25 316:7
321:1 322:3,10
322:18,23
323:3,10,20
324:6,12
325:17 326:13
326:21,25
327:4,14,17
328:15 329:1
330:1,6,11,16
330:25 331:5,9
331:13 333:4
333:11,17
334:1,24
335:22 336:10
336:22 337:5
337:11,15
338:2,6,17
339:2,9,13,20
341:2,11 342:4
343:1,24 344:3
344:7 345:14
346:4,9 349:18
349:25 350:11
351:17 353:14
353:22 354:5,9
354:13,23
355:9,14
356:11,17
359:5,25 360:2
360:17 361:6
361:18 362:18
363:16 365:2,5
365:11,12
366:3 367:10
367:23 369:17
370:2,12,19
371:2,5 373:3
375:19 376:5
377:21 378:4
379:5 381:10
381:14,18,22
381:25 382:4
382:13 383:3
383:11 384:6

384:17,24
385:23 386:8
386:17,22
387:6,12,23
388:2,9,14
393:22 394:2
396:25 399:7
400:7 401:4,21
402:6,15 404:7
404:14 405:9
405:17 406:2
406:12,19
407:6,10
409:12 410:2
410:16 413:8
413:17 414:2
414:12,17
415:21 416:3
416:13,21
417:6 418:8,17
419:5,22
420:11,20
421:11 422:9
423:2,7,12
424:11 427:6,7
427:13 428:24
429:7 431:1,4
431:11 433:17
436:24 437:3
439:24 440:23
444:14 446:19
449:5,12
450:13,18,22
451:21,25
452:3 453:5
454:5 458:9
459:5,12,24
462:17 465:10
466:9,19 467:6
467:17,21
468:18 469:12
469:19 479:6
481:11 492:18
**omnibus** 35:1
**on-hire** 6:12

7:14 60:1,4,14
61:16 80:23
83:4 84:17,23
85:7 105:17
106:1,8,17
107:14,22
108:3,11 121:2
121:10 128:20
133:4,18
134:13 141:20
142:24 146:16
146:16 149:19
149:24 150:15
204:19,24
205:2,11 212:3
219:2 270:17
270:24 271:3,7
271:9,11,19
273:7,25 274:9
295:8 301:12
306:19,19
307:3,8,10
308:3,6,11,16
308:20 309:3
311:11,17
**on-hire/off-hire**
23:5
**on/off** 6:9 29:1
29:13 59:14,15
59:24 60:2,10
62:20 63:12
80:9,24 83:4
84:17 85:1,7
85:10,18,24
87:25 89:10,12
89:25 90:2
91:22,23 92:4
92:18 93:20
94:6,21 101:22
102:20 103:16
105:2,9,17
106:1,8 107:8
107:15,24
108:2,11,12
110:16 111:11

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 531

114:24 115:15
115:19,22
116:2,4,19
117:6,23
118:12,18
119:14,16
120:23 121:21
127:5,11
129:13,17,22
129:25 130:21
130:24 131:7
132:9,25 133:2
134:8 135:5,11
136:3 137:8
138:14 139:19
140:11,22
141:22 143:8
143:24 144:24
146:2 148:6
151:9 274:24
**once** 104:13
117:6 205:3
227:17 233:19
**ones** 76:6 176:15
198:6,7 268:4
275:16 316:21
317:7 330:25
348:5 353:17
353:20 356:8
362:14,15
371:6 415:14
422:19,25
430:23 444:7
474:18
**open** 378:8,10
378:12
**open-ended**
91:14
**operate** 83:15
119:10,11
152:12 161:3,4
161:5 172:9
186:19 265:8
304:7 311:4
424:13,24

**operated** 170:19
170:24 171:9,9
171:20 172:8
173:8 179:4,9
180:12,15
181:4,10,16
183:8 189:20
191:12 192:3
309:19 317:20
359:7,19
474:14,18
**operates** 68:5
475:21
**operating**
130:23 191:2
191:22 203:2
232:15,25
476:7
**operation**
218:21
**operationally**
203:23 204:1
**operations**
16:16 17:4,17
64:23 173:15
215:16 218:16
219:18 235:22
236:4 316:9
334:6,16
**opinion** 102:1
102:25
**opinions** 495:16
**opposed** 215:18
215:20
**option** 403:14
**oral** 25:9 26:1
26:14 58:15,23
58:24 59:2,5,8
59:12 60:14,19
63:4 220:22,24
222:24
**orally** 62:16
63:11
**order** 58:5,24
59:5,5,8 60:20

60:20 61:6,14
62:1 64:14,22
65:2 173:6,18
188:8 252:8
347:16 349:1
350:14 351:22
368:10 390:7
402:17 419:25
**orders** 58:13,25
59:12 62:10,14
63:3 125:16
354:7,11
389:10
**organization**
15:8
**organizational**
15:5
**orientation**
390:24
**original** 194:20
495:3,4
**Orleans** 1:16 2:4
2:9,12,22 3:12
3:16 4:8,12
379:4
**outcome** 495:17
**outside** 50:8
162:24 165:10
336:10,16
364:17 448:9
455:9,14
**overall** 194:12
194:14 462:17
**overly** 303:5
**oversee** 17:3
**owed** 113:22,23
114:1,2
**owned** 36:15,22
44:4 45:16
51:3,16 68:12
78:20 79:12,19
80:1 83:19
92:11,24 95:2
95:8 100:11
144:7 155:3

157:13 160:8
160:15 170:18
170:24 171:9
171:15,17,18
172:8,15,16
175:17 176:23
177:2,6,11
182:23,24
183:2,24
185:23 189:8
189:10 191:10
245:16 303:16
316:4 317:14
317:20 340:13
**owner** 39:14
41:4 45:19
53:3 57:17,18
58:16 59:10
60:19,21,23
63:6 64:2,12
64:17,18,20
65:17,21 66:23
67:1 82:16,23
84:14 88:1
112:3 113:14
114:2 116:7
118:2,6 120:10
120:13 121:17
122:13 129:15
130:5 131:15
147:1 153:19
155:1 156:10
156:18 173:5
174:4,19 175:3
175:6,24
176:16 181:2
182:10,15
185:5,18
186:15 187:24
188:3 190:2
193:5,16,17,23
193:24 194:4,5
194:8 195:3,7
195:8 196:15
197:5,12,17,19

197:24,25
198:5 199:2,11
199:19 201:5
202:13 203:18
204:22 205:14
206:19,19
207:17,23
208:21 209:6
209:11,21
210:15 211:3
211:15 212:5
212:15 217:18
219:3 249:25
251:16 255:19
259:15,18
308:23,24
309:7 311:15
311:18 324:23
420:8 422:6,12
422:12
**owner's** 199:20
201:6 322:15
**Owner/assured**
153:24
**owners** 39:9
155:7 157:15
160:17 161:4
161:15,16
169:4 182:17
197:15 200:21
200:25 202:5,6
202:7 296:14
311:19 420:9
**ownership**
161:13 162:6
162:22 163:7
163:24 165:4
165:14 166:18
167:13,23
169:8 173:14
173:16 178:5
178:19,23
180:16,17
303:23
**owning** 127:15

Case 2:21-cv-00258-JCZ-EJD    Document 817-2    Filed 11/18/25    Page 162 of 187

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 532

**owns** 68:5
  122:15 135:24
  136:15 152:8
  157:5 164:6,23
  168:12,13
  177:14,17,20
  188:7,24
  190:25 191:21
  192:7,12
  300:18,18
  301:2 305:3
  311:24 318:3
  323:20

**P**
**P** 9:1
**P-A-L-A-D-I-N**
  11:25
**p.m** 117:16,16
  170:10,10
  187:10,10
  235:4,4 265:17
  273:8,10 277:7
  277:7 281:19
  282:11 287:11
  290:12,24
  292:15 293:5,7
  332:4,4 371:3
  371:4 458:25
  458:25 493:11
**Pacific** 75:7
  76:20 153:12
  175:19,20,23
**pack** 491:19
**packet** 81:22
  103:15 256:1
  270:24 275:17
**pad** 291:13
**page** 5:5 6:2,7
  20:5 31:25
  40:18,20 41:1
  41:9,12 42:16
  57:14 63:22
  64:9 65:5,12
  66:9,12 72:13

72:14 152:22
184:23 191:20
226:17 228:16
278:13 290:18
290:22 291:25
495:4
**pages** 41:21
495:9
**pain** 292:6
**Paladin** 11:25
**Palmintier** 3:22
3:23 88:7,17
123:3,10
139:13 179:10
179:14 281:7
332:14,15
458:17 477:20
**parameters**
433:9 479:23
480:2
**part** 9:19 39:12
46:22 49:25
57:10 63:23
76:16,23 113:4
148:11 153:4
170:16 173:12
173:15,15
174:5 245:20
248:20 293:17
299:5 323:12
341:4 370:13
383:4 423:25
431:19 432:16
456:13 474:11
**participated**
460:4
**particular** 108:1
108:4 109:19
110:25 118:1
195:24 216:21
241:7,8 242:1
244:18,19,22
254:11 288:10
477:11 480:6
**particularly**

35:2 479:18
**particulars**
337:17
**parties** 9:4
38:17 39:10,13
68:13 92:11,25
95:2 188:17
310:5 321:4
495:17
**PARTNERS**
3:10
**parts** 172:4
**party** 44:4 45:16
49:7 50:4 53:1
84:8 195:19
197:11 198:12
462:9 464:1
**pass** 136:10
137:1,21 138:2
268:13 269:3
326:4 456:9
458:9 470:16
**pass-through**
207:22 208:8
208:20 211:2
251:11,12
**passed** 251:7
**passing** 259:16
259:17 262:15
264:18,19
267:12,17
331:18
**path** 357:11
358:12,22
375:22 383:13
**pay** 273:15
446:4 449:5
451:6 453:8
**paying** 328:20
443:20
**pdf** 256:17
271:18
**people** 216:2
302:22 314:1
318:7,16 334:2

368:21 389:5
437:13 443:1
446:19,20,25
447:4,11,15
448:2
**percent** 44:14
44:19,20,21
45:1,1,6 54:23
54:24 55:10
172:16 184:4
237:3 326:23
384:4 467:11
**percentage**
44:11,17 54:11
54:13,17 55:6
55:9
**Perfect** 458:23
**perfected** 58:14
63:4
**perform** 193:19
194:1 195:9,23
298:25 308:7
427:14,23,24
428:13 431:8
489:22 490:1
**PERFORMA...**
296:11
**performed**
111:19 193:16
193:24 195:4
216:12,16
299:15 304:5
305:20 308:4
428:14
**performing**
56:20 57:12
216:21 248:24
308:10 491:9
**period** 55:1
129:20 166:6
253:8
**permission**
483:25
**permit** 67:3
**permits** 147:5

**perpendicular**
390:23 392:4
394:4
**perpendicularly**
391:1
**person** 1:15 2:1
33:2 63:17
99:16 107:4
115:8 122:25
242:17 254:13
254:25 369:8
383:15 405:20
405:20 441:23
442:6,11 443:2
445:10 446:1
468:9
**personal** 340:22
454:15 457:12
459:13,20,24
460:3,12 461:5
461:17 462:1
462:18 463:3
463:12 464:2
464:25 465:11
465:19 466:7
470:6,9 495:11
**personally**
268:7 278:10
313:7 492:25
**personnel** 15:24
105:14 197:20
198:1 199:13
200:1,4 213:7
213:9 219:11
236:21 239:18
239:20 241:21
252:15 362:15
**pertain** 33:19
34:1 333:20
**pertaining** 32:6
34:13
**Phillip** 15:20
**phone** 47:6,7
48:4,6 169:21
169:24 210:21

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 533

219:8 236:16
242:10 252:7,8
280:22 281:20
282:16 283:6
283:15 289:6
289:12 290:21
294:17 344:23
371:15,25
377:2 445:9
446:1
photo 174:1
photograph
291:12,16
photos 324:1,3,7
324:13
phrase 188:3
pick 10:22
371:25 445:9
445:25
picked 475:24
pictures 413:19
413:25
pile 480:24
pilot 147:3
175:17
pin 200:12
pipe 339:7
place 11:25
21:23 22:20
28:6,11 64:22
87:18,22 124:2
124:11,15
125:8,23
131:24 201:11
235:9,20 296:7
301:15 303:3
309:10 319:2
321:23 323:23
372:21 411:20
416:23 472:16
472:25 473:5
places 67:17
Plaisance 15:19
plan 257:8
263:11,13

265:24 266:22
276:12 286:3
planned 276:12
planning 282:22
332:13
plans 278:17
283:19
platform 57:6,6
platforms 56:24
please 10:17,20
11:1,21 15:7
16:24 66:21
158:14,21
174:10 180:7
180:23 183:15
199:7 208:3
211:24 227:16
239:4 261:6,9
264:20 270:16
297:19 340:19
470:1 494:20
pleased 110:15
111:3
pledge 66:25
plug 126:22
140:3
plus 257:7
point 11:10
32:17 63:25
78:25 83:25
103:9 116:24
118:25 131:20
148:23 176:6
203:17 204:9
272:8 276:9
309:1 370:19
pointed 103:5
points 389:7
policies 28:5,10
28:17 30:22
86:8,20 87:1,9
87:18 89:5,6
152:18 200:25
201:4,10,20
202:5,13,19

300:8 329:15
329:20 330:20
330:22 331:6
416:14,22
491:3
policy 6:14
60:13 88:5
89:1 152:21,22
153:4 187:17
191:20 202:19
poor 49:25
228:11
port 4:10 15:18
15:20 36:4
114:7 137:2
138:2,6 266:7
274:3 299:24
300:3 301:10
355:16 356:14
357:12 358:13
358:23 373:24
375:21 378:5
378:16,22
396:14
port/harbor
147:4
pose 166:8
position 13:13
16:3,6,14 17:1
24:11,12,25
37:1 42:3,10
43:16,19,22
44:1 49:13
62:14 69:13,23
71:7,14 77:3
78:2 79:23
84:7 85:6,18
87:11,20 89:9
89:20 91:15
92:8,22 93:24
94:10,24 96:1
96:20 97:11
99:6,24 100:23
101:12 106:3
106:11 118:10

118:19 119:1
121:7,15
127:10,14
128:7 131:3,18
132:7,19
133:12 135:8
137:5 138:12
139:17 140:19
143:6 144:22
145:12 150:9
152:3 161:13
163:15,16
173:4 174:2,18
178:6,24
180:18 181:4
182:3 185:21
186:9 189:1,11
191:3,24 206:6
217:9 220:12
220:13,18
221:12 223:23
235:14 244:17
247:1 294:10
303:17 304:3
305:18 309:22
310:2,19
311:14 316:7
322:5 343:25
344:4 345:8
454:7 455:1,13
456:4
positions 16:19
possess 171:11
197:20 198:1
199:13 487:11
possessed 173:9
179:6 181:11
192:16
possessing
173:21 203:1
possession 32:5
32:11 485:6
possible 11:15
Possibly 35:3
posted 264:21

posture 138:25
potential 474:12
power 376:21,25
Poydras 1:16
2:4,8,12 3:15
4:8,12
PR 153:17
practical 58:17
59:11 63:7
precaution
399:21 400:9
precautions
398:1 400:22
434:19 435:5
premark 147:17
226:1
Premier 3:21
prenegotiated
45:25
preparation
21:12 33:9
preparations
408:3
prepare 20:11
20:21 22:4
23:1 24:1,7,19
25:7,16 26:6
26:21 27:14
28:1,23 29:9
29:22
prepared 20:10
20:17 21:5,25
22:22 23:17
24:16 25:2,12
26:3,17 27:9
27:23 28:20
29:5,19 162:25
165:11 166:17
168:1 170:4
408:17 409:3
495:10,13
preparing 23:12
present 24:24
29:4 68:3,11
69:9 313:4,22

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 534

320:23 321:5
447:16 462:19
463:5 464:3
**presented** 12:24
**president** 15:11
15:14
**presumably**
262:6,9
**pretend** 393:18
393:22
**pretty** 132:3
135:25 226:12
346:2 477:17
**prevented**
372:21 373:5
373:15,24
411:8,18,25
412:15
**preview** 193:11
**previously** 35:8
149:25 310:11
**price** 283:25
**Prices** 147:2
**primarily** 49:9
208:19 344:22
**Print** 42:18
**printed** 41:1
256:17,19,20
260:13,16
262:25 265:13
267:25 268:7
272:23 275:12
**printout** 152:1
154:7
**prior** 17:22
23:22 66:23
67:2 80:3 85:5
85:17 86:7
87:1,8,17
89:22 91:17
92:6,20 93:21
94:8,22 95:14
96:17 97:7
99:5,20 101:10
102:8 105:3

106:18 151:6
263:23 303:21
380:20 404:16
406:22 413:10
416:7 469:1
**priority** 385:15
**probably** 16:4
56:10 108:16
108:17 129:14
177:25 267:3
274:12 304:10
338:1 342:1
385:12,14
421:17
**problem** 139:7
139:12 162:8
166:22 178:14
187:1 259:4
491:17
**procedure** 9:8
19:19 32:8
130:23 495:15
**procedures** 28:6
28:11,17
201:11,20
300:9 416:15
416:22 491:4
**process** 105:25
106:7,9 112:17
211:10 212:1
255:8,11,17
344:16
**procure** 424:22
**procuring**
338:24 340:23
357:20
**produced** 15:6
21:2,4,9 22:16
25:23 26:11
29:13 30:21
31:20 32:16
34:20 62:7
81:22 148:25
148:25 152:16
164:18 167:5

167:10 237:24
256:8 316:25
324:2,8 327:18
327:24 328:8
452:10 466:16
467:22
**producing** 35:7
**production**
32:13 167:22
323:14
**productive**
319:9
**Professional**
9:23 10:5
**prohibition**
495:14
**project** 42:21
127:2,4 215:7
334:5,25 345:6
**promoted** 16:17
16:20
**prompt** 477:6
**proper** 64:24
216:2 380:20
434:19 435:4
**properly** 364:1
364:11 365:21
366:16 367:1
370:6 439:17
471:4,14
**property** 446:2
**proposed**
111:19 196:6
**propounded**
32:13
**provide** 10:17
14:14 28:15
37:5 45:15
57:11 65:21
77:4 78:3,6
83:5 87:14
132:13 171:10
186:3,20 195:9
197:7,9 200:19
201:15 214:21

216:7 223:21
304:8,20 318:1
318:14 324:22
327:23 338:11
338:12,13,15
341:21 347:16
351:1,9 352:20
353:17 355:16
358:2 361:19
389:19 394:3
397:12 398:18
406:6 409:19
419:17 420:23
421:23 422:5
422:13 423:4,9
423:16 425:11
425:12,16,18
426:11,22
428:25 429:12
429:19 430:14
431:7,14
433:22 438:20
479:23 482:22
483:4,11,18
**provided** 37:2
39:17 50:4
65:20 67:4
68:4 69:14
71:15 78:19
79:24 80:5,17
83:17 105:10
105:13 112:22
114:12,16
115:19,22,23
120:4 123:16
150:13 151:25
170:14,19
171:21 173:11
174:20 179:2
181:23 182:2
191:4,13,23
193:18,25
200:2 217:14
250:10,25
251:24 253:2

254:18,23
300:25 304:16
306:7,12
309:20 312:1
329:10 353:11
360:5,22 361:8
362:8 387:4
411:7 420:1,2
423:14 429:23
429:23,24
431:13 451:24
469:5,9 470:7
**provides** 44:3
70:6 71:23
73:7 115:15
202:6 203:14
207:8 214:2,10
**providing** 46:1
46:18 48:24
49:6 51:2,19
51:25 52:10,20
52:24 53:5,15
69:25 77:8
92:10,24 95:1
96:3,21 97:12
99:8 100:1,24
101:14 102:3
103:2 118:21
121:9 132:11
174:7 178:7
189:13 192:22
193:1 223:16
255:5 294:13
338:18 339:15
341:14 342:13
351:10,12
389:1 402:16
403:2 419:23
420:3,21
434:20 435:5
**provision** 60:22
61:2 343:4
**provisions** 67:5
**pull** 309:2
**pulled** 467:23

Case 2:21-cv-00258-JCZ-EJD    Document 817-2    Filed 11/18/25    Page 165 of 187

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 535

**pulling** 468:16
468:17
**purchase** 223:10
**purchased**
223:14
**purpose** 238:18
388:25 390:5
391:12,16,18
**purposes** 9:6
33:14
**pursuant** 9:8
**PUSATERI** 2:2
**push** 390:7
391:1,2,13,20
394:13 396:17
409:25
**pushing** 250:23
362:18 389:1
394:3 397:12
398:18 409:19
410:21 411:11
411:16
**put** 39:7 45:7
47:20 108:7
134:19 167:15
189:4 193:3
198:17 265:7
273:16,18
283:21 312:10
320:18 393:20
393:24 395:4,5
422:6 424:18
469:7
**putting** 383:13
394:5

**Q**

**qualifications**
94:4,19
**qualified** 188:14
366:16 367:1
368:8,21 369:8
439:16
**quality** 40:25
41:22

**question** 9:16
10:19,25 11:3
11:14,18 13:10
14:6,16,21
21:16 23:8
25:6 32:25
33:21 39:19
45:11 47:8
49:25 51:24
59:1 68:24
69:20 70:23
71:5,20 77:12
81:4 83:8
85:21 87:16
88:23 89:17
90:20 91:15
92:15 93:16
94:3 95:12,21
102:10,16
106:6 111:6
115:6 118:14
122:19 131:2
156:1 158:24
159:13,15
160:1,5,21
164:9 170:13
172:4 174:9
178:1,15 180:7
180:9 182:9
183:10,14,20
191:17 192:24
193:21 194:20
197:22 198:21
199:6 200:11
200:13 203:10
204:8 208:2
209:17 222:1,4
225:19,23
228:11 230:18
230:25 231:14
232:20 235:24
245:9 250:14
251:10 255:10
271:5 286:22
287:2,9 290:3

296:25 297:12
302:16 310:14
313:14 314:14
315:8 317:2
320:20 325:20
330:9,14 331:3
340:18 342:1,6
342:7,10
344:11 349:11
357:23 359:13
360:14,15
365:1,3,3,8,17
368:16 380:13
389:17 397:18
422:9 423:21
432:4,9,11
433:18 434:9
434:14 435:1
436:23 445:23
448:18 449:24
452:6 453:7
457:11,22
464:12,13,19
464:21
**questioning**
200:17 445:16
**questions**
100:10 106:15
117:22 123:9
138:22 163:23
164:19 165:13
166:10,14,23
169:2,16
193:12 195:1
213:13 227:19
229:20 250:2
313:16 314:2
316:3,16 318:7
319:7 320:2,3
320:9 322:11
326:1,2,4
331:16 332:12
332:16,19,21
333:19 334:2
364:17 449:20

450:7 458:14
458:18 459:3,6
463:23 466:10
467:2 470:19
470:21,24
480:21 491:14
491:23
**quick** 28:10
60:18 63:22,23
64:1 74:7
146:23 147:19
170:13,13
175:14 184:22
185:21 188:4
217:7 230:18
234:25 244:7
272:21 275:4
276:22 277:2
298:21 311:9
393:7 458:20
481:3 491:23
**quickly** 65:3,8
67:12 226:16
470:20
**quoted** 147:3
263:22 264:8
**quotes** 258:16

**R**

**R.S** 495:8
**Railroad** 2:6
10:12
**rammed** 443:1
**Randy** 2:19
**range** 48:18
103:25 151:12
**rate** 108:5,7
111:22,23
112:2,4,6,21
112:21,24
113:4 120:5,8
121:24 126:9
128:25 149:2
149:24 206:6
209:21 277:10

**rates** 108:9
**re-ask** 52:7
**Re-Notice** 6:3
19:19
**re-read** 28:9
**reached** 47:18
159:22 272:5,9
280:22 282:25
283:1 289:18
296:5
**read** 24:9 31:10
59:3 60:17
61:7 63:22,25
64:14 65:15
66:22 82:25
88:12,21 93:4
120:19 146:23
170:15 279:3
284:22 292:19
292:24 309:3
342:5 432:9
494:7,8
**readily** 279:18
279:19
**reading** 9:10
62:3 65:7,24
67:7 106:22
311:20 322:4
**reads** 315:16
449:8
**ready** 216:3
293:3
**real** 28:10 45:4
60:18 63:22,23
64:1 74:7
146:23 147:18
170:13 175:14
184:22 185:20
188:4 217:6
230:18 234:25
244:7 272:21
275:4 276:21
277:2 298:21
311:9 393:7
**really** 35:14

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 536

44:18 123:12
204:7 205:13
314:19 331:2
333:20 336:25
352:19 389:5
429:15,21
443:17
**reask** 159:12,15
160:5 342:4,6
342:7 365:17
450:11
**reason** 44:18
45:5,13 108:2
119:5 142:23
145:23 228:8
228:12 248:10
248:12,20
274:13 413:17
**reasonable** 91:3
**reasons** 54:3
**recall** 41:25 46:9
48:3 78:15
118:2 123:16
124:1 228:4
274:16,22
279:18 294:14
294:23 296:17
298:16 300:21
301:6,25 302:5
323:22 324:3,9
328:17 471:2
481:1 484:5,20
**recap** 70:23
**receive** 209:20
210:14 249:25
252:9
**received** 207:16
251:3,5 252:10
252:22 253:3
253:25 257:18
259:10,14
291:17 324:13
470:22
**receives** 209:11
211:14 212:2,4

**receiving** 255:11
268:23 324:3,9
**recognize**
260:21
**recognized**
268:4
**recollection**
337:22
**record** 10:7,10
11:22 32:12
65:15 66:22
140:6,9 143:12
146:22 148:4
158:18 170:7
187:12 229:22
239:5 297:24
325:7,9 328:5
333:13
**record's** 346:22
412:11
**recorded** 47:9
289:6
**records** 17:6,10
21:4 27:5,19
32:5,11,15
33:8,14,18,25
34:13 35:19
167:4 327:21
467:18,24
**rectangle**
393:19,23
394:5
**redact** 149:2
277:9
**redacted** 149:9
283:23
**reduce** 60:19
**REED** 154:2,12
154:12
**REESE** 2:11
**refer** 13:6 36:7
313:15 316:2
**reference** 55:23
58:3 245:12
**referenced** 17:5

**referred** 62:3
78:14 79:7
172:14 185:4,6
484:2
**referring** 34:6
36:9 40:20
43:8 171:19
172:15 265:3
266:4 269:19
283:24 290:15
291:3
**refrain** 158:14
**regarding** 20:18
21:6 22:1,23
23:18 24:16,25
25:3,10,13
26:2,4,16,18
27:10,24 28:20
29:6,20 37:1
86:9 87:9,19
100:10 215:15
216:11,15
231:24 232:3
233:17 285:6
286:3 302:2
463:24
**regards** 419:3
**Registered** 9:22
10:5
**regular** 341:3
**regularly** 340:3
**Reisman** 2:8 5:9
13:19,25 14:15
14:20 19:15
21:15 22:6
24:2 30:7,18
31:15 34:4,22
37:9,24 38:10
38:18 40:2
45:10 46:3
47:22 50:12
51:5 52:3,13
52:19 53:19
54:5,25 56:13
62:17 66:13,17

68:14 69:17
70:2,8 71:9,18
72:19 73:2,10
77:9,16 78:22
79:9 81:10,18
82:2,7,11 86:2
88:10,15,19
90:4,13,18,23
91:9 92:12
93:1,13 94:14
95:3 96:5,23
97:2,14 98:2,7
99:10 100:3,14
101:1,16 102:6
102:14 103:17
103:23 104:3,8
104:15 108:23
109:18,24
110:20 114:13
115:4 123:18
124:21 125:1
127:17,24
128:13 130:8
130:12,16
131:9 135:20
139:5,22 141:1
141:8 143:18
145:18 146:3
148:21 149:6
149:12 150:24
151:11,16
152:9 155:19
155:24 156:20
157:24 158:6
159:1,14,21
160:24 161:18
161:24 162:4
162:13,20
163:3,12,21
164:7,21 165:3
165:8,20,24
166:12 167:6
167:11 168:14
168:21 169:5
169:14,22

171:1,23 172:2
172:7,12 178:9
178:13 179:12
179:16,23
180:2,20 181:7
182:13 183:4,9
183:18 185:25
187:2 188:10
189:15 190:3
190:11,16
194:10 196:19
199:3,15 201:7
201:17 202:1
202:15,21
203:9,19 204:5
204:23 206:24
207:24 208:6
208:14,22
209:24 211:4
211:21 212:8
212:12 214:12
214:19 215:17
219:19 220:2,6
221:3,16,25
222:7 223:18
224:6,18,25
225:8 226:4
230:24 233:3
234:5 236:5
244:2 249:8
251:13,18
264:4 272:15
275:13,18
277:8 281:23
284:10,16
286:21 287:1
290:2 295:4,15
295:23 296:24
298:17 301:16
302:12 303:4
303:19 304:17
304:23 306:9
306:21 307:5
307:11,18
309:12 310:8

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 537

| | | | | |
|---|---|---|---|---|
| 310:24 312:20 | 458:19 460:23 | 265:9 270:2 | 197:22 199:6 | 237:24 238:15 |
| 313:11,23 | 461:9 464:7,17 | **relevant** 169:25 | 201:2 203:22 | 247:25 299:14 |
| 314:15,24 | 465:3,23 467:3 | **religious** 243:11 | 208:2 232:19 | **represent** 10:11 |
| 315:4,10,21 | 467:7 468:2,7 | **rely** 91:5 | 255:10 271:5 | 72:4 256:7 |
| 316:14 317:1,9 | 468:24 469:25 | **relying** 421:3,5 | 349:10 357:22 | 333:21 |
| 318:20 319:19 | 470:17 471:13 | **remained** 471:7 | 359:13 360:17 | **representation** |
| 320:14 321:7 | 471:21 472:4 | **remember** 30:6 | 368:16 380:13 | 56:11 68:25 |
| 321:17 322:19 | 472:23 473:12 | 31:9 35:4 | 397:17 402:23 | 74:11 466:21 |
| 322:24 323:4 | 475:4,13 476:5 | 49:11,18 50:6 | 435:1 445:20 | 469:13 |
| 324:21 325:3,8 | 477:24 478:16 | 50:11 109:14 | 445:23 457:22 | **representative** |
| 325:16 327:9 | 479:15 480:20 | 116:12,13 | 464:21 483:16 | 1:14 10:2 |
| 328:3 329:23 | 481:20 482:2 | 123:23,25 | **repeatedly** | 12:25 13:4,23 |
| 330:7,12 | 482:10,17 | 232:1 233:21 | 317:24 | 22:5 26:8,23 |
| 331:22 332:5,9 | 483:3,10,17,24 | 237:8,9,14 | **repetitive** | 27:16 28:3 |
| 333:3,10 | 485:3,12,20 | 248:20 254:7 | 320:18 | 62:9 77:1 78:1 |
| 334:10 336:13 | 486:3,11,19 | 254:20 255:3 | **rephrase** 11:3 | 78:18 89:20 |
| 336:21 340:7 | 487:2,10,17,23 | 270:1 271:20 | 230:17 231:14 | 118:9,16 121:6 |
| 340:11 341:19 | 488:6,13,20 | 274:22 276:5,8 | 245:8 | 135:9 138:11 |
| 352:25 360:13 | 489:2,4,14,21 | 279:14 283:18 | **replace** 263:10 | 143:6 147:7 |
| 364:25 365:6 | 490:7 491:13 | 286:19 287:24 | **replacement** | 150:10 168:10 |
| 382:16 390:15 | 491:18,24 | 288:22,23,24 | 207:11 209:18 | 170:23 230:19 |
| 393:2 408:20 | 493:5 | 289:8,14 | 209:19 | 233:15 264:15 |
| 421:25 422:15 | **related** 25:11 | 294:16 295:2 | **replied** 269:14 | 454:6,15 455:1 |
| 423:18 424:2 | 26:2,16 28:17 | 297:4 324:7 | **report** 6:18 | 456:11 457:12 |
| 424:15 425:1 | 30:1 218:15 | 328:2 351:2 | 15:14 147:8 | 457:25 464:11 |
| 425:14,25 | 219:6 235:21 | 381:12,13 | 205:15 238:3,5 | 492:4,10,13,24 |
| 426:13,24 | 236:3,13 273:3 | 385:5 459:10 | 238:9,19 | **REQ#YH1849** |
| 427:16,25 | 353:18 495:16 | 468:16,17 | 239:23 240:14 | 7:15 |
| 428:15 429:2 | **relates** 46:11 | 469:10 473:15 | 242:21 243:17 | **request** 32:13 |
| 429:10 430:6 | 47:16 | 476:23 484:11 | 243:25 244:13 | 110:15 114:10 |
| 430:16 431:21 | **relation** 30:9 | **remembered** | 244:20 245:7 | 167:22 234:13 |
| 432:20 433:5 | **relationship** | 297:15 | **reported** 4:14 | 261:7 272:6 |
| 434:8,12 | 21:22 22:19 | **renamed** 154:15 | 495:10 | 273:22 312:11 |
| 435:17 436:2 | 234:21,22 | 154:19 | **reporter** 4:16 | 312:17,18 |
| 436:14,25 | 235:8 336:20 | **repeat** 23:7 | 9:23 10:6,18 | 313:13 314:5 |
| 437:8 442:13 | 343:3,15 | 32:25 33:21 | 10:21 88:13,22 | 315:14 323:13 |
| 443:23 444:16 | 482:18 | 59:1 69:20 | 180:6,8 318:15 | 324:2 452:1 |
| 448:7,14,20 | **relationships** | 77:12 85:21 | 342:5,9 392:23 | 483:25 |
| 449:13,18 | 495:15 | 87:16 89:16 | 432:8,10 495:6 | **requested** 34:12 |
| 450:4,24 | **relay** 251:4 | 94:17 102:10 | 495:22 | 195:16,25 |
| 451:16 452:5 | 258:1 268:25 | 106:5 115:21 | **REPORTER'S** | 262:8 423:17 |
| 452:21,25 | **relayed** 198:4 | 130:11,15 | 495:1 | 449:9 450:2,13 |
| 455:7,19 456:2 | 208:10 263:23 | 174:9 178:12 | **reporting** | 450:18,25 |
| 456:18 457:5 | 264:15 | 180:7 183:14 | 495:10 | 452:14,17 |
| 457:18 458:13 | **relaying** 262:13 | 191:16 193:21 | **reports** 15:16 | **requesting** |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 538

268:24 269:2
**requests** 32:23
33:4,7 34:25
**require** 65:21
346:12 347:25
351:21,21
**required** 64:21
346:25 424:11
427:9 495:4,13
**requirement**
173:17
**requirements**
65:1 317:16
344:20,21
347:15 349:2
350:13 401:6
401:12,18,23
402:4,7 403:15
422:20 424:9
479:9
**requires** 10:19
210:9
**requiring** 431:9
**requisition**
129:16
**Reservation**
327:5,8 328:6
328:18
**reserved** 9:18
**reserving**
159:12 160:4
**Resources** 15:18
**respect** 127:9
154:2,11 251:9
251:10 257:16
288:5 298:4,11
323:10 327:1
468:20 472:12
480:9 482:19
**respects** 479:9
**respond** 280:17
282:16 284:5
455:14
**responded**
259:3 261:13

264:7,20
268:19 273:12
282:10 291:1
291:10
**responding**
32:22 33:6
262:11
**responds** 263:16
268:17 291:7
291:23
**response** 32:22
159:9 160:3
230:13 231:4
258:15 259:4,8
262:1 287:10
294:8 314:14
470:21
**responses** 17:6
20:15,25 31:19
33:2 158:10,11
158:12 171:4
218:13 287:10
294:8,19
298:14 468:10
468:11
**responsibilities**
17:1 459:8
463:25
**responsibility**
199:21 351:18
351:20 359:5
359:18 361:19
361:23 362:4
362:21 363:7
366:4 368:20
384:7 385:1
415:3,9 420:18
420:22 421:12
431:2,7 433:22
434:4,18 435:3
435:14 438:20
438:24 439:6
440:24 441:8
441:16 443:6
445:1,11 446:4

**responsible**
318:15,17
344:23 360:3
360:20 361:6
362:6 363:16
363:25 364:9
365:20 369:7
371:8 402:16
403:2 413:1
418:17 419:6
419:12,23
420:3 421:7
437:16,24
438:12 439:15
442:10 474:7
479:2
**responsive**
32:12,15
157:20
**responsiveness**
9:17
**rest** 387:3
**restate** 11:1
**restroom** 11:11
234:24
**result** 300:9
**resulting** 490:16
**retrieval** 288:14
372:13 383:1
**retrieve** 292:12
**returned** 61:6
**Rev1** 7:12
**review** 20:24
21:8 22:15
23:4,9,25
26:10 27:1
29:12,25 30:4
32:1 67:19
147:18 227:17
272:20
**reviewed** 19:23
23:21 24:9
25:18,20 30:9
30:20 31:6,9
32:18 104:22

105:2 149:25
325:21
**reviewing**
104:19 218:12
287:9 294:7
298:13
**revision** 269:14
**revisions** 231:8
**rhyme** 44:18
45:4,13 108:1
**Rials** 2:19
**Ribarits** 3:19
**Richbourg** 4:11
297:17 333:1
**ride** 286:9
**right** 11:20 12:2
12:6 16:23
18:20 19:18
20:1 31:23
32:19 35:24
39:20 40:5
42:24 51:14
54:22 56:6
58:3,9 60:2,7
60:17 61:7,10
61:14,17,25
63:15,18,21
65:3,5,12,17
65:24 66:10
67:10,12,16,22
70:16,18 72:2
72:9 74:2,8,20
74:24 75:1,3
75:15 76:14
78:17 85:9
90:2,17 98:22
103:14 104:22
105:5,19
106:24 107:5,7
107:8,18
108:19 110:4
111:8,13,20
112:15,20
113:9,17,20,24
114:3 116:7

117:10,18,23
118:3,6 119:8
120:2,8,14,22
120:24 121:3
121:13,18,25
122:6,11 126:7
126:9,12,19
128:22,23
129:3,6 131:5
132:5 133:1,3
133:5,9,19,21
133:23,25
134:6,12,15
135:6 136:5,11
136:15,18,21
137:2,14,16
140:15 141:13
141:25 144:1,3
144:12 145:2,3
145:14 147:14
147:24 148:13
148:15 149:17
149:21 150:1,7
151:23 152:8
153:2,21 154:3
154:16 155:6
158:1 159:12
160:4 166:8
170:2,12
172:11 175:13
175:15,23
176:4,25 177:3
177:7,12 185:7
185:9,13
194:24 196:11
197:8 202:2
204:18 206:13
206:16 207:17
207:20 211:20
217:10 218:12
220:20 226:21
227:3,13,20
228:1,15,21
229:21 236:11
236:16,22

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 539

| | | | | |
|---|---|---|---|---|
| 237:22 238:2,4 | 292:16,17,18 | 422:24 423:5,7 | **RPR** 4:15 | 383:14,16 |
| 238:10,23 | 293:6,9,11,14 | 423:10 424:1 | 495:21 | 405:19 |
| 239:15,24 | 294:20 298:1 | 424:12,25 | **rudimentary** | **sales** 474:9 |
| 240:11,18,22 | 301:12 304:6 | 425:13 426:12 | 393:15 | **salesman** 474:11 |
| 240:23 241:1,3 | 304:16 305:9 | 426:23 427:10 | **Rufty** 2:20 | **Saloom** 4:3 |
| 242:12,13 | 306:4,8,20 | 427:15 428:14 | 138:20 139:20 | **Sanctuary** 3:7 |
| 246:7,19 250:2 | 307:4 316:10 | 429:9,24 430:5 | 186:23,25 | **Sara** 2:21 |
| 250:16,17,21 | 319:12 329:10 | 430:15 431:4,6 | 187:5 224:3,11 | **satisfy** 317:16 |
| 251:6 252:6,11 | 331:15,17,21 | 431:20 432:17 | 226:14 232:6 | 477:19 479:8 |
| 252:14,20,22 | 332:10 333:6 | 433:4,20,24 | 332:22 | **save** 9:15 134:22 |
| 253:15,18 | 336:11 337:2,7 | 434:5 435:23 | **rule** 1:11 19:14 | **saw** 50:3 287:10 |
| 254:2,14,19 | 339:17 340:2,6 | 445:8,24 | 19:20 32:8 | 294:8 |
| 255:9 256:11 | 340:25 342:18 | 448:21 449:1 | 159:20 186:8 | **say-so** 353:10 |
| 256:25 257:10 | 348:3 349:5,15 | 453:5,24 | 437:25 439:1 | **saying** 79:10 |
| 257:14,19,25 | 350:1 351:6,9 | 456:25 457:2 | **rules** 9:7 10:15 | 84:6 98:6,11 |
| 258:6,20,23 | 352:6,10,23 | 459:2 462:14 | 19:19 32:8 | 102:16 114:7 |
| 259:5,10,18,22 | 354:17 355:7 | 465:13 485:15 | 495:14,16 | 158:5 229:22 |
| 259:23 260:1,7 | 357:9,18,21 | 485:23 488:7 | **run** 249:20 | 265:2 282:11 |
| 260:8,10,23,25 | 358:14 359:23 | 492:4,10,13,16 | 258:16 263:17 | 284:5 293:12 |
| 261:14 262:3 | 359:25 362:6 | 492:20 493:6,9 | 264:9,21 | 315:12 318:21 |
| 262:18,21,25 | 363:4 369:19 | **right-hand** | 343:17 348:10 | 319:13,20,22 |
| 263:5,13,20 | 369:21 375:13 | 41:20 66:10 | **running** 249:15 | 319:22 349:19 |
| 264:2,12 265:5 | 376:14 377:10 | **rights** 67:1 | 249:16 257:8 | 358:10 391:11 |
| 265:13,17,20 | 377:14 378:5 | 327:5,8 328:6 | 263:13 401:22 | 396:11 406:14 |
| 266:2,9,10,11 | 378:17 379:7 | 328:18 | 411:10 | 417:18 429:21 |
| 266:21 267:1 | 380:9 383:5,17 | **Road** 4:3 | | 438:19 450:9 |
| 267:18,19,23 | 384:18 385:25 | **roads** 378:8,9,12 | **———————** | 464:24 |
| 267:25 268:8 | 386:24 387:3 | **Roberts** 6:23 | **S** | **says** 32:10 42:18 |
| 268:15,20 | 388:17 391:3 | 122:21 241:11 | **S** 9:1 64:2 | 58:13,20 59:8 |
| 269:10,16,17 | 391:13,23 | 258:22 | **safe** 64:24 138:7 | 63:2 64:1,16 |
| 269:20,24 | 392:5 393:10 | **Roby** 1:9 169:21 | 147:5 266:8 | 67:8 79:11 |
| 270:14,19,20 | 393:12,18 | **Roger** 263:16 | 359:7,20 360:6 | 84:4 85:9,10 |
| 272:16,22 | 395:4 396:18 | **role** 17:16 | 360:23 361:9 | 106:23 110:9 |
| 275:3,9,22 | 397:23 398:4 | 207:21 249:23 | 361:21 380:17 | 110:14 111:3 |
| 276:17 277:14 | 398:18 400:1,5 | **roles** 16:25 | 380:19 409:15 | 113:7,10 |
| 277:16,24 | 401:19,24 | 327:23 335:15 | 435:4 436:7 | 114:11 115:8 |
| 278:7,11,13,18 | 402:4 403:8 | **rolling** 19:7 | **safely** 362:9 | 116:20 136:11 |
| 279:6,12 | 409:4 410:21 | 365:15 | 363:18 401:7 | 149:15 153:8,9 |
| 280:19 281:4 | 410:22 411:11 | **Romain** 15:18 | 402:8,18 403:3 | 153:24 154:1 |
| 281:14,16 | 414:14,20 | **rooms** 447:15 | 439:17 | 154:11 162:6 |
| 282:25 284:8 | 415:15,22 | **root** 298:25 | **safest** 375:5,12 | 162:22 163:6 |
| 284:24 289:7 | 417:12 418:4 | 299:14 | 375:23 403:13 | 166:5,17 |
| 290:6,9,13,24 | 418:10 419:8 | **Rouge** 3:24 | **safety** 15:19 | 167:22 184:24 |
| 291:5,8,14,17 | 419:15 420:13 | **roughly** 55:6 | 200:20,23,24 | 185:12,17 |
| 291:21 292:2,3 | 421:24 422:14 | **round** 26:25 | 201:4 202:4,12 | 188:2 227:12 |
| | | | 202:18 383:12 | |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 540

227:15 229:8
229:17 230:22
239:23 256:11
257:9 258:10
258:14 261:6
263:7 265:19
269:12,18
270:16 274:10
276:1,3,6
280:17 283:22
292:20 308:17
479:21
**sc_c.pdf** 276:3
**scenario** 80:6
81:6 83:10
87:23 205:12
215:15
**scenarios** 93:25
**scene** 465:1
**school** 18:24
**Schroeder** 3:15
**scope** 364:17
445:17 448:9
455:9,14
**scratch** 14:6
71:4
**screen** 278:5
393:8
**screenshot** 56:9
72:5 151:24
175:1 178:22
**screenshots**
278:9
**sea** 137:21 266:1
266:6,23 267:4
267:7 301:9
**seal** 495:4
**sealing** 9:12
**search** 33:18,25
298:21
**searches** 33:8,13
**SEAS** 35:5
**second** 58:12
63:2,24,25
64:11 65:7

72:20 139:24
157:25 158:8
161:19 170:8
204:6 276:15
288:17 449:19
**secretaries**
15:23 239:21
**section** 1:7 56:9
58:4,11 59:3
60:18 62:4,25
63:24 64:10,11
64:13 65:8,13
65:24 66:20,22
67:7 79:6,8
106:23 113:6
153:5
**sections** 78:13
79:4,11
**secured** 364:1
364:11 365:21
471:5
**see** 35:16 42:18
54:17 58:6,18
64:7 81:11
106:21 108:10
111:22 116:20
129:24 140:2
144:10 153:6
154:8 164:8
169:24 170:1
176:1 227:16
240:6 245:12
256:14 258:14
267:11 268:10
270:17 274:24
276:1,3,6
279:10 289:19
290:22 292:10
308:16 315:22
377:10 393:8
410:12 430:20
455:21 469:12
469:19 476:20
491:20
**seeing** 324:7

448:12
**seek** 138:7 266:8
326:18
**seen** 19:21 40:11
49:20 55:14
59:25 62:6
67:17 72:13
73:15 104:23
147:20 152:18
238:12 275:8
298:14 300:13
300:20 316:21
327:14 452:3
466:17
**segregated**
74:22
**selected** 319:18
**sell** 66:24
**send** 80:20 87:6
107:10 212:15
212:17 217:19
218:1,11
227:17 228:9
228:13 231:8
233:8,11 239:7
253:14,20
255:19,20
261:7 272:11
290:16 314:4,5
315:13 374:22
418:7
**sending** 105:22
137:25 228:4
242:14 254:12
255:14 273:7
292:5 302:5
**sends** 63:18
107:4
**sensitive** 149:3
**sent** 32:23 59:19
60:5,10 63:14
105:19 106:18
107:7 204:25
217:17 227:1,5
228:5 229:1,3

229:13 230:1,6
232:14,21
233:19 237:10
237:11,13
239:9,16
242:11 254:10
254:20 255:1
257:4 271:3
276:6,8,16
279:5,10,15
280:1 282:18
283:16 291:19
293:3,19
302:13,21
372:19 373:3
373:12 382:6,7
**sentence** 58:13
63:2 64:11
65:7,10 66:1,5
111:10 150:6
187:23 188:5
**sentences** 60:18
**separate** 51:10
53:2 296:13
310:11
**separately**
160:22
**September**
119:21,24
128:23 142:1
**series** 194:25
450:7
**serve** 208:8,19
266:6
**service** 6:16
57:11 64:5
124:23 188:1
228:20 229:12
230:1,4,6
232:22 233:1,9
233:17 236:25
279:20 302:1
303:2 310:6,20
320:12 381:23
382:1 422:14

430:2
**services** 1:8,12
1:13,14 2:6,6
2:10 6:4,7,18
10:1,3,11,12
12:25 13:7,16
13:24 14:8,12
15:1,3,24
17:24 18:14
19:20 32:9
41:5 42:17
44:5 51:4,17
57:19,23 72:5
72:10,14 80:12
82:17 101:22
102:20 105:10
110:10 118:5
119:8,9 135:16
144:4,8,22
147:2 149:21
153:8,10,23
155:5,7,13,16
155:22 156:6
156:17 157:4
157:15 160:11
160:15,18,20
160:22 161:5,9
161:16 172:17
173:4,12,17
174:15,16
179:7 180:10
180:15,17
181:1,23
182:10,22
183:1,23 184:1
184:11 185:4,6
185:10,12,15
185:24 186:17
188:6,23,24
189:10 190:10
190:15,22
191:2,11,12
192:11 213:2
216:6 217:13
222:18 227:13

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 541

229:9,18 238:3
243:17 244:20
245:7 250:5
253:2,18
254:18,23
257:2 260:1
285:3,12 310:5
310:21,22,22
311:16 313:3
330:19 334:21
335:3 338:24
340:24,24
342:24 347:1
347:16 348:8
351:2,8 358:1
389:1 394:3
397:13 404:20
409:19 420:21
420:23 421:22
421:23 423:5
423:16 427:14
427:23 428:13
430:14 431:8
435:6 459:8
463:15 467:18
475:21
**set** 32:7 35:10
495:9
**setup** 318:12
**seven** 18:10
164:9
**shallow** 289:23
386:20
**shallowed**
386:14
**share** 405:13,18
406:21 407:7
407:11
**shared** 366:3
408:13 414:13
**SHEET(S)**
494:2
**Ship** 122:5
**shipyard** 246:3
246:15 296:4

305:15
**shock** 385:11
**Shore** 1:8 2:6
10:11 13:16,24
14:7,12 15:2
23:17 24:14,15
24:23,24 25:10
27:8,9,21,23
28:15 29:3,3
35:2,3 37:12
37:18,23 39:1
39:8,9,11,14
39:23 40:15
42:13,17 43:13
43:18,24 46:10
46:13,19 47:1
49:15 50:14,17
50:21 53:4
57:2,23 58:25
59:20 61:20
62:10,15 63:11
63:15 68:4,13
68:18 69:11,15
70:1,21 71:15
72:24 77:4,8
78:3,7,19 80:5
80:7,8,14,15
80:18 81:1,2,7
81:9 82:16,23
83:5,12 84:2,3
84:12,18,19,20
84:23,25 85:20
86:1 88:1
89:14,22 91:16
92:7,10,21,24
93:17,23 94:1
94:9,13,23
95:1,14,17,25
96:4,19,22
97:10,13 98:1
98:12,21,22,24
99:4,9,17,22
100:2,22,25
101:11,14
102:2,4,25

103:3 105:10
105:14 107:8
110:10 112:5,7
114:1,17,19
115:20,23
116:17 118:12
118:21 120:24
121:9 124:5
126:24,25
129:16 130:1,7
130:24 131:7
131:15,19,24
132:12,16
134:19,21
144:4 146:8
147:2 149:21
150:13,23
151:8,19,25
163:11,18,20
170:19,20
174:8 178:8
179:2 181:23
182:2 185:5
189:14 191:4
191:13,24
192:2 193:4
194:2 195:16
195:25 198:9
201:16 204:1
213:1 214:10
215:6,10,13
217:10,11,12
217:13 218:23
219:2,4 220:10
221:21 225:13
235:16 241:21
248:8,9,25
249:1 250:11
251:1,5,8
252:1 253:15
254:12 255:6
255:14,21
256:25 257:2
258:2 259:10
259:14 260:1

261:17 262:16
263:5 265:16
267:1,14,15
269:1,22
271:22,24
272:2,3,8
273:4,17 274:4
276:12 280:23
282:4,9 283:1
283:2,3,12,19
285:3,4 286:5
294:10,13,24
295:17 296:12
296:15 300:25
304:16 306:7
307:10 308:4
308:18,24
309:8,10
310:21 311:15
312:2,2,15
313:3,21 314:9
314:10,11,16
329:10,13,19
330:18 334:3,3
334:21 335:3,5
335:8 337:7,16
337:18 338:4
339:21 341:16
342:15,23
343:2 344:1,5
344:9 345:10
346:10 347:16
351:19 352:3
355:17 356:1
356:13,19
357:10 359:5
359:18 360:3
360:20 361:6
361:19 362:6
362:15,21,21
363:8,16 364:9
364:13 365:20
366:3,10,16
368:7 369:6,19
370:4,13

371:17 373:21
374:6 375:20
381:15,17,18
383:5 395:25
396:12,25
400:7 402:15
403:1,23
405:12 406:19
407:10 408:12
409:13 412:12
412:25 413:8
413:18 416:3
418:17 419:5
419:12,17
420:12 421:3,5
421:21 422:19
422:24 423:2
423:16,25
424:5 425:10
425:13 427:14
427:23 428:14
428:17 430:4
431:8,17
432:14 433:3,9
439:15 440:2,8
441:15 442:16
443:3 444:6
445:9,25
446:20,25
447:3,25 450:1
450:2,18,25
453:8,24 454:3
459:8 463:14
468:21 469:5,7
469:10 470:7
471:14,23
472:16 473:5
476:21,22
477:2,6,12,13
478:3,5,19,22
479:4,5,9,17
479:21 480:6,8
480:14,15,19
481:22 482:12
482:19,23

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 542

483:5,11,12,19
484:5,12,14
490:9,14,18,22
491:1,6,8
**Shore's** 29:17
113:23 164:16
272:2,5 273:13
282:21 326:8
352:9 362:3
420:18 421:11
454:7 473:14
478:2 481:8
**Shoreline**
214:11
**shoreside** 15:24
213:7,9 219:11
236:20,21
239:19,22
241:21 242:17
252:12,13,15
266:15 335:8
354:16 355:17
355:22 356:1
362:21 363:8
368:7,19 369:6
370:13 373:21
374:6 375:20
383:5 396:12
396:25 402:15
403:1 405:12
406:19 407:11
408:12 409:13
412:12,25
413:8,18 416:4
463:15
**shorten** 202:10
**shortly** 60:6
117:8 261:14
262:3,11 336:4
**shots** 278:6
**show** 40:6 81:15
147:15,17
152:14 162:7
162:14 163:6
166:16 167:21

225:24 256:3
258:4 259:23
272:13 277:20
298:18 485:4
485:13,21
486:4,12,20
487:3
**showed** 485:14
**shown** 90:6,24
152:1 157:11
174:5 175:20
176:4,15,17,21
178:21 181:3
181:24 182:11
183:3 184:2
191:9
**shows** 229:4
**side** 66:10 148:1
392:5
**sign** 114:24
**signal** 334:12
**signature** 41:7
105:6 114:21
135:4 146:18
147:23 150:5
227:20 257:9
258:20 262:21
263:15 266:2
268:15 494:18
495:4
**signed** 42:23
61:6 90:3
230:10,20
231:11,12,15
231:16,20
233:6,11
296:12 302:6
302:15
**signing** 9:11
**similar** 119:14
193:12 200:17
237:1 272:4
303:7,11
339:20 343:25
344:4

**simple** 394:23
**simply** 84:6,7,25
160:1,4 191:8
428:19
**Sims** 7:6 42:19
42:24 43:2,5
261:3 269:8
297:7,15
334:24 335:7
335:19 336:2,7
338:3,7 339:14
340:23 341:3
342:21 344:3
346:23 347:19
348:4 349:5,13
349:19 350:1
350:11 351:18
352:19 353:15
356:13,19
357:1,10,25
358:11,21
366:25 369:18
371:6 373:12
374:20 375:4
375:20 379:12
381:4,19,22,25
384:24,25
386:24 397:10
397:24 400:20
401:5 402:2
403:22 405:11
414:18 415:12
416:4 475:5
**single** 57:18
63:9 116:2
162:18 242:18
246:20 316:20
441:23 442:6
442:10 443:2
445:10 464:12
**sir** 11:24 13:22
160:5 320:9
333:17,18,25
334:23 336:12
338:5,14

348:17 364:9
393:8 404:4
417:5 429:18
432:3 458:10
491:22 492:9
**sit** 169:15 450:9
**sitting** 10:12
20:17 89:18
118:8 170:22
**situation** 53:8
61:11 63:19
131:4,6 139:9
151:7 194:15
289:16 375:24
389:25 396:15
428:23
**situations** 95:16
295:20 435:13
436:10 437:17
438:2,25 439:2
439:7 481:12
**six** 166:2 417:3
**size** 196:18,22
272:4 424:6
477:8,10
**sized** 423:25
**skeleton** 401:21
403:13
**skip** 217:6
**slack** 418:18
419:3,7
**slow** 115:5
**small** 226:12
367:20
**smaller** 226:10
**Smith** 2:18 3:6
305:4,6
**sold** 18:19 176:7
223:6,8
**sole** 141:6
**somebody** 47:23
47:25 79:12
266:15 282:3
331:18 340:21
343:16 354:16

355:10 368:8
378:16,16
381:14,18
405:12,18
409:13,14
410:17 411:7
412:12,13
414:14 436:12
436:13 439:16
445:9,25
**Somewhat**
331:8
**soon** 58:17
59:10 63:6
261:10
**sorry** 28:9 31:18
82:25 91:22
109:3 123:4
124:23 139:2
165:12 186:24
224:9 234:10
238:25 250:13
260:4 269:12
280:19 292:6
297:2,11 305:9
333:7 349:10
351:4 360:18
364:6,22
366:14 368:16
399:16 408:9
437:3 450:15
**sort** 279:11
339:10 354:15
419:24 433:23
**sorts** 338:23
339:2
**sought** 9:19
326:13,14
**sound** 53:6
287:16
**sounds** 11:20
16:23 333:4
**source** 208:15
**Southern** 75:15
76:8 153:16

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 543

177:10,12,16
177:19
SPAGNOLE...
2:16
speak 11:17
97:19 139:4
297:18
speaking 11:16
50:25 71:6,13
80:11 98:23
107:16 126:21
129:10 136:23
158:8 173:23
208:19 211:14
239:14 244:13
256:13 301:5
303:1
speaks 188:15
special 147:9,10
321:10 416:22
specific 33:9
34:16 38:3
95:12,23 96:15
97:8 99:19
100:19 101:8
137:8 151:19
171:14 199:20
206:9,11,21
209:3 213:13
221:7 223:25
234:20 237:10
239:13 243:15
245:10,17
248:24 250:3,7
253:11 313:12
315:8 329:4
351:10 365:2
388:25
specifically 9:11
9:13 20:5 30:4
30:8 43:7
58:10,12 59:20
64:10 65:14
94:9 95:13
99:23 103:21

106:17 118:17
160:23 179:8
180:10 187:23
199:12 205:9
211:11 219:13
219:14 221:10
236:18 240:11
264:8 296:17
297:5,15
312:16 346:5
464:14 478:19
482:3
specifications
65:1
specifics 116:1
specified 89:25
specify 30:14
91:21 346:11
346:24 477:13
spend 17:20
324:20
spoke 265:19
266:13 479:1
spot 289:22
St 2:21 3:11
15:18
stamps 290:20
stand 35:5
247:18 345:10
stand-by 247:17
247:19,20
265:24
standing 246:2
standpoint
171:5
start 18:3 20:1
20:14 48:22,24
49:6,17 50:17
106:22 112:8,8
112:15,20,24
113:5,7,9,24
119:21 122:8
128:22 129:7
133:25 134:18
136:17 137:13

142:1 144:10
167:3 223:16
223:24 224:1
224:16 225:7
225:15,19
226:17 258:9
268:10 273:23
274:15,19
306:16 332:11
started 31:24
46:20 49:1
53:24 54:4
109:7 117:1
272:12 273:6
274:5,10
335:24 336:3,4
339:13 410:21
448:1
starting 115:13
150:5
starts 61:11
64:12,19
starving 276:22
State 9:23 495:6
stated 23:20
33:20 41:4
84:9 85:1
142:12 468:11
statement 156:3
284:17 298:8
349:24 448:4
474:2
statements
159:2 447:16
448:2
states 1:1 88:1
171:20 219:3
257:5
status 231:24
246:16,18
292:11
statute 495:13
stay 350:14
362:19 363:6
368:10,24

391:21 402:18
406:7
stays 399:11
stenotype
495:10
stick 176:14
stipulate 466:25
stipulated 9:3
Stone 136:10
stop 107:17,19
112:12,16
113:19,19,25
119:24 133:8,8
136:20 137:16
142:2,12
144:11,14
158:21 287:22
381:2
stopped 233:19
337:25
stopping 11:10
storm 7:22
241:17 278:25
279:3 280:9
281:22 282:20
283:9 350:22
355:24 356:24
377:19 380:20
406:23 408:17
409:3 411:11
413:11 418:19
Street 1:16 2:4,8
2:12,17 3:15
3:19,23 4:8,12
strength 368:23
stricken 158:17
strict 64:25
strictly 131:4
200:18 213:6
265:9
strike 93:11
96:12 124:7
153:9 155:10
155:18 157:1
157:19 158:1

159:16,19,25
160:20 370:3
387:24 391:17
391:25 431:13
439:25
striking 158:2
158:10 160:3
strong 291:8
368:9 397:2
structure 162:6
162:22 163:7
163:24 165:14
166:18 167:23
169:8
studying 73:12
stuff 120:19
153:1 315:3
subcharter
66:21,25 484:1
484:7
Subj 6:21,24 7:2
7:4,7,9,12,14
7:17,22
subject 28:17
82:14 115:13
116:20 134:7
138:14 139:18
140:22 142:7
143:8 144:15
144:24 146:2
146:19,25
150:5,14
170:15,17
183:11 227:12
229:10,12
303:24 308:23
309:5,6 311:14
448:22 456:19
457:19 464:18
subjects 235:11
submits 212:7
submitted 35:1
279:22 326:24
Subpart 65:14
65:15,25

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 544

subpoena
  312:18
subscribe
  285:12
subscription
  279:20
subsistence
  147:7
substance
  109:16
substantial
  130:22
substantially
  303:11
substitute 65:19
  67:4,8,9 78:14
  78:18 79:1,4,6
  79:18,24
substitution
  65:20
such-and-such
  354:6
sufficiency
  460:20 461:6
  461:17
sufficient 195:9
  195:12 471:6
  478:1 479:3
  480:13
suggesting
  158:16
Suite 1:16 2:4,8
  2:12,21 3:7,11
  3:15,19 4:3,8
  4:12
Sunday 258:18
  263:8,9,19
  264:11 275:21
  278:21 282:10
superintendent
  261:5 269:9
  406:20 407:10
  409:12 414:12
  414:16
supervision

495:11
supplies 18:19
supply 54:2
supposed 27:6
  61:10 185:2
  279:1 431:19
  432:16
sure 52:21 99:13
  109:25 139:10
  143:1 156:8
  161:11 168:3
  184:4,19
  199:21 216:1
  217:3 237:3
  252:16 268:13
  274:7 276:24
  284:19 299:7
  324:14,17
  328:10 335:18
  335:21 337:13
  340:21 344:13
  346:2 349:12
  357:24 358:10
  360:20 363:8
  366:23 368:20
  370:5 371:8,9
  378:2,5 380:16
  380:19 383:23
  384:4 391:7
  401:17 403:1
  408:12 418:2
  418:11,18
  419:6 421:10
  423:8,13,24,24
  424:23 426:9
  426:20,22
  428:12 430:13
  430:23 432:6
  437:23 439:16
  445:24 457:24
  464:15 474:12
  476:19 483:18
Surely 384:6
surge 418:19
surpass 54:2

surprise 442:24
  443:13
survey 147:9
surveyors
  454:18 455:3
  456:14 457:2
  457:14 458:2
surveys 147:6
swap 264:21
  265:1
Swing 293:25
switching 235:6
  274:18
sworn 10:4
  495:8
system 200:20
  200:23

———— T ————
T 9:1,1 311:25
  316:4 320:13
  320:24 323:18
  323:20,21,21
  323:23,23
  393:24
tail 262:20 266:6
take 11:3 70:10
  104:16 117:12
  140:1 186:9
  205:9 206:4
  226:13 277:2
  318:4 325:10
  331:25 345:23
  395:24 398:1
  434:20 435:5
  435:16 443:5
  445:1,11 446:3
  458:20 481:3
taken 1:15 9:6
  12:7 61:1
  70:13,19
  117:15 170:9
  187:8 235:3,14
  247:1 277:6
  278:10 332:3

400:22 408:4
  440:23 441:8
  441:16 458:24
  495:7
takes 44:5
Talisman 3:9
talk 11:14 17:21
  20:9 53:11
  74:3 171:18
  192:19 209:3
  211:11 239:13
  244:12 288:16
  288:20 304:2
  354:3 382:4
  417:16 439:25
  442:4 476:11
talked 30:6
  49:13 72:9
  77:5 78:4,12
  79:4 107:13
  114:19 115:11
  132:3 133:8
  136:14 141:16
  176:3 210:18
  257:13 273:21
  308:21 327:22
  384:8 386:18
  404:4 414:15
  417:13 440:20
  441:2,3,16
  451:14 466:12
  466:21 474:5
  475:7
talking 31:2
  37:20 50:9,13
  51:1,1,15,21
  69:1 70:19
  75:25 83:24
  86:19 88:3,4
  88:24,25 90:11
  93:19,19,20
  94:4,6,7,20
  97:25 98:20
  119:8 120:17
  120:18 128:6

131:4 140:10
  140:18 143:12
  145:2 173:13
  174:16 187:22
  188:3 193:19
  194:14 195:1
  200:18 203:23
  204:16 206:20
  206:21 208:7
  212:2 217:2
  221:4 236:18
  236:20 239:13
  239:14 240:11
  243:7 249:14
  252:15 253:1
  254:22 261:23
  264:9 277:15
  285:1 288:12
  288:19 294:3,5
  294:24 303:6
  312:17,18
  321:8 322:4
  324:15 343:9
  346:16,17
  353:25 354:1
  389:7 393:14
  397:20,22
  403:14 422:10
  431:23,24
  469:14,20
  475:18
talks 82:15
  173:20
task 248:24
  249:6,12
taxes 147:5
team 215:7
  296:7,18
tell 41:23 45:17
  73:11 95:13
  112:19 113:15
  158:2 165:15
  168:2,15
  169:12 170:3
  179:19 186:15

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 545

| | | | | |
|---|---|---|---|---|
| 204:2 205:13 | **Terrynn** 3:25 | 494:8,10 495:7 | 319:23 348:3 | 349:23 351:5 |
| 286:7 313:19 | **testified** 13:3 | 495:9 | 375:12,23 | 351:14 352:2 |
| 314:10 316:24 | 68:23 73:23 | **Texas** 1:24 2:17 | 398:16 431:12 | 354:21 357:16 |
| 317:12 318:3 | 108:18 164:4 | 3:20 379:6,25 | 439:24 445:8 | 357:18 358:18 |
| 320:1 322:5,20 | 169:3 223:20 | 380:6,17,24 | 445:24 446:12 | 367:18 371:3,4 |
| 323:5 328:4 | 253:24 302:3 | 381:4,19 | 449:1 451:14 | 381:16,17 |
| 351:20 377:9 | 329:9 463:23 | **text** 7:19 25:20 | 470:5 | 389:25 396:7 |
| 378:4 385:17 | 466:22 467:17 | 26:11 27:1 | **things** 57:16 | 405:15 410:13 |
| 396:8 403:23 | 468:20 472:6 | 47:5,14,15 | 103:8 168:6 | 413:15,17 |
| 417:14,20,23 | **testify** 10:6 | 210:23 219:8 | 182:6 333:20 | 414:24 421:17 |
| 417:23 421:5 | 20:10,11,18,22 | 236:15 242:10 | 442:8 | 436:19 438:7 |
| 438:7 450:5 | 21:5,25 22:4 | 252:6 276:8,14 | **think** 45:4 51:23 | 440:8 445:16 |
| 451:5 476:8,12 | 22:23 23:2,17 | 278:2,6,14,20 | 54:23 56:1 | 448:8 449:11 |
| 478:3 491:7 | 24:1,8,16,20 | 280:7 281:3,12 | 73:12,16 | 450:7 453:7 |
| **telling** 71:10 | 25:3,7,13,17 | 282:16,17 | 106:14,21 | 455:20 458:15 |
| 158:14 168:1 | 26:3,7,18,22 | 284:12,18 | 117:25 134:23 | 459:3 468:25 |
| 297:16 484:5 | 27:10,15,23 | 290:9 292:1 | 138:24 141:19 | 470:14 476:8 |
| **tells** 196:10 | 28:2,20,24 | 293:12 | 145:24 158:19 | 484:10 |
| 198:3 | 29:5,10,19,23 | **texted** 290:14 | 159:8,18,19 | **thinks** 186:11 |
| **ten** 16:4 108:17 | 100:13 108:21 | 291:2 292:15 | 160:3 161:22 | **third** 44:4 45:16 |
| 108:19,21,24 | 343:16 377:12 | **thank** 12:6 | 162:2,18,23 | 49:6 50:4 |
| 109:3 | 454:6 468:18 | 31:23 47:25 | 163:25 166:13 | 68:12 84:8 |
| **ten-minute** | 495:9 | 66:18 82:12 | 167:19 168:7 | 92:11,25 95:2 |
| 331:25 | **testifying** 12:10 | 104:9 147:14 | 168:11 169:19 | 195:19 197:11 |
| **tender** 31:3 | 12:11,21 62:8 | 149:7,13 | 170:5 184:18 | 198:12 |
| 233:23 234:2 | 77:2 78:1 | 151:17 180:3 | 189:6 198:16 | **third-party** 46:2 |
| **term** 57:17,22 | 89:19 90:16 | 222:16 224:12 | 198:18 204:10 | 46:19 48:24 |
| 64:6 65:18 | 101:21 102:19 | 250:19 325:6 | 204:12 208:16 | 51:2,19,25 |
| 67:20 78:14 | 118:16 121:5 | 331:18 458:10 | 214:24 220:15 | 52:11 53:12,18 |
| 79:6 170:24 | 135:9 138:11 | 470:15 491:15 | 226:13 237:16 | 53:25 54:11 |
| 248:19 | 143:5 144:21 | 493:6 | 244:5 250:21 | 55:18 69:2,10 |
| **terminated** 43:9 | 150:9 162:11 | **thanks** 19:16 | 254:8 267:2 | 71:25 82:22 |
| 43:12 | 170:3 | 88:18 227:19 | 273:14 274:12 | 87:14 95:9 |
| **terms** 25:1 | **testimony** 77:19 | 257:9 258:19 | 274:25 279:1 | 112:18 113:15 |
| 60:23 61:3 | 102:8 121:12 | 261:12 263:20 | 283:18 294:18 | 130:3 131:5 |
| 78:11 98:14 | 127:8 133:11 | 264:20 266:1 | 299:7 302:22 | 195:3,7 196:14 |
| 129:19,23 | 161:12 168:25 | 268:15 269:14 | 304:10 309:15 | 197:4,12,24 |
| 130:4,5 131:3 | 171:16 186:14 | 270:18 275:19 | 314:13 315:7 | 198:16 199:2 |
| 131:14,19 | 243:17 303:21 | 291:23 493:9 | 315:19 316:13 | 199:10 200:8,9 |
| 196:10 219:16 | 310:3 425:17 | **thereof** 9:19 | 316:23 317:3 | 201:4,5 202:5 |
| 220:14 230:15 | 428:25 429:14 | **thereunder** | 322:8 324:24 | 202:7,13 |
| 231:5 232:3,16 | 463:22 469:1,3 | 79:19 | 326:3 328:8 | 203:15 204:21 |
| 232:25 234:4 | 473:13,16 | **thing** 53:7 | 330:8,24 334:3 | 205:20 207:10 |
| 234:17 252:14 | 476:18,24 | 117:25 119:14 | 341:25 345:11 | 207:16 208:21 |
| 346:25 489:1 | 492:12,15,23 | 243:12,21 | 345:13 349:23 | 209:6,11,20 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 546

210:14 211:3
211:15 212:5
213:5 217:18
218:1 241:24
249:25 251:16
259:14,18
317:19 468:22
469:9
**Thompson**
293:25
**THOR** 7:7 36:2
36:4 37:4,8,14
38:9 39:3
56:20 57:5,11
111:16 117:3
119:20 122:3
126:16 133:22
137:21 138:1,2
138:6 142:16
144:19 145:8
149:17 196:1
196:16 205:5
249:16,21
261:4,12
265:25 266:5,7
266:23 269:9
269:24 271:17
276:12,13
278:25 279:2
280:9 281:22
282:19 284:3
285:1,8,18
286:4,9,15
287:13,21
291:4,20
292:12,16
293:4,13,19
296:4 305:14
333:23 339:10
339:16 344:15
348:11 349:7
350:2,14
351:13 354:17
355:10,17,23
356:13,21

357:2,10,21
358:3,12 359:8
359:24 360:6
360:23 361:9
361:21 362:9
362:19 363:4
363:18,25
366:6,18 367:3
367:11,20
369:9 370:3,5
372:19 373:4
373:12,14,22
374:22 375:21
378:16 380:17
381:2 382:12
387:1,2,9,14
387:16,20,21
388:12 389:12
389:20 390:1
391:8,21 392:2
392:2,5 393:24
393:25 394:4
394:13 395:8
396:3,14 397:3
398:25 399:3,7
399:11,19,22
400:10,23
401:7 402:4,8
402:17,18
403:3,15
404:15,21
405:7,9,20
406:3,6,22
407:8,12
409:13,17
410:5 411:19
412:5 413:2,10
414:3,13,18
416:6,16 417:9
418:9,15 428:5
430:15 436:1,8
436:12 437:5
437:19 438:15
439:18 447:4
447:12 454:18

454:23 456:15
458:2 459:14
459:21,21
460:1,5,13,21
461:8 462:2,13
462:15 463:4
463:14 465:12
465:21 466:4
471:1 478:18
479:10 484:1
484:14 489:24
490:2,15,19,24
491:2,7
**THOR's** 57:4
269:7 461:18
**thought** 243:5
397:19 436:22
441:1,1
**thoughts** 279:2
280:8 281:21
282:19,21
283:8,10
**three** 37:3
102:23 109:5
134:4 491:22
**three-hour**
280:14,21
282:12 283:23
**throw** 44:25
195:14 319:14
**Thursday** 293:5
293:8
**TICO** 18:2,18
**tie** 286:6,8
364:13 380:8
383:15 387:23
387:24 388:2
440:18
**tied** 286:14,20
362:15 367:25
368:10,24
369:10 372:3
380:19 388:4
392:2 397:3
409:17 417:14

418:25 419:2
440:15 463:4
465:12,21
466:4,8
**time** 6:5 9:18
17:21 22:17
23:16,22 24:13
25:2 31:12
33:22 35:18
40:8,15 42:4
43:8 45:18
48:21 49:4,19
50:2,6,11
52:10 53:17,24
55:1,21,22,23
57:15 58:11
59:21 61:25
62:16 63:10
64:4,4,21
65:18,18 67:25
68:2,8,10 69:7
69:8,16,21,24
70:20 71:1,3,8
71:16 72:24
77:7 78:8,12
78:20 79:25
85:22 87:12,21
89:17 92:9,16
92:23 93:5,8,9
93:24 94:5,11
94:20,25 95:15
96:2,20 97:11
99:7,25 100:23
101:13,24
102:2,21 103:1
104:16 106:6
106:22 112:8,9
112:12 115:9
116:24 118:11
118:14,20
119:2,12,21,24
121:8,16 122:8
122:10 125:7
125:10,12,23
127:11 128:8

128:22 129:7
129:11,12,20
129:21 130:1
130:22 132:8
132:20 133:8
133:13,25
134:9,18,21
135:10 136:17
136:20 137:6
137:13,16
138:5,13
139:17 140:20
142:1,2,12
143:7 144:10
144:11,14,23
145:5,13 146:1
150:12 152:3
163:10,17
164:5,10,13
165:19 170:22
173:6,18 174:6
174:20,23
176:7 178:7,25
180:19 181:5
182:4 184:18
184:23,24
187:23,25,25
188:8 189:1,12
189:23 191:5
191:14,15,17
191:25 192:8
206:11 209:16
215:14 222:19
225:22 235:25
236:25 237:4,6
237:6,11,13
240:1 241:25
245:14,15
247:17 248:2,5
248:9,16
249:19 252:25
253:8 254:8
273:20,23
274:6,15,19
286:13 288:11

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 547

| | | | | |
|---|---|---|---|---|
| 290:19 294:12 | 22:23 23:2,13 | 455:23 468:8 | 400:20 401:4 | 169:17,20 |
| 294:25 295:19 | 23:17,23 24:8 | 491:11 | 402:2 403:22 | 192:19 209:5 |
| 296:19 301:22 | 24:16,20 25:3 | **Tommy** 6:12 | 405:11 414:17 | 235:11 |
| 303:17 304:4 | 25:7,13 26:4,7 | 47:2,18,19,20 | 415:11 416:4 | **TOPS** 293:24 |
| 305:11,12,19 | 26:18,22 27:10 | 48:4,7 83:13 | 417:12 440:20 | **Tough** 239:4 |
| 307:14 309:23 | 27:15,24 28:20 | 86:12 93:6 | 473:18,20 | **toughs** 278:24 |
| 314:1 316:8 | 28:24 29:6,10 | 96:8 97:17 | 474:21 476:11 | **tow** 57:5 147:9,9 |
| 318:4,6,24 | 29:19,23 32:2 | 146:10 149:20 | 478:5,11,25 | 147:11 249:20 |
| 319:14 320:11 | 33:10 55:7 | 196:5 215:7,11 | 479:20 491:12 | 348:10 386:10 |
| 323:11,16 | 62:9 77:2 78:1 | 261:3 265:16 | **TOMPKINS** | 387:20 |
| 324:20 325:10 | 80:11 85:6 | 269:8 270:11 | 3:5 | **towed** 387:21 |
| 331:19 335:1 | 89:9,19 101:21 | 272:9,10 | **tonight** 265:25 | **towing** 3:8 306:3 |
| 337:5 338:2,25 | 102:19 105:3 | 289:14,14,15 | 266:23 | 311:25 316:4 |
| 346:22 348:14 | 118:16 121:5 | 291:17 334:4,5 | **Tony** 258:22 | 320:13,24 |
| 349:11,20 | 135:8 138:11 | 334:14 335:16 | **top** 41:1 45:23 | 356:7 398:25 |
| 352:16,23 | 144:21 170:23 | 335:23 336:3,7 | 47:20 109:17 | **traditionally** |
| 353:14 357:23 | 171:16 174:2 | 337:5,11 338:3 | 110:3 127:5 | 58:24 59:19 |
| 359:14 360:18 | 178:6 184:6 | 338:6,17,24 | 229:8 256:14 | 60:4 63:17 |
| 364:7 368:17 | 229:24 233:14 | 339:14 340:2 | 260:20 268:3,6 | 105:18,18 |
| 380:14 385:13 | 235:12 308:21 | 340:22 341:2 | 272:21 383:16 | **train** 420:22 |
| 397:18 402:24 | 310:3 318:10 | 341:12 342:11 | **topic** 20:10,12 | 434:5,19 435:4 |
| 408:10 423:22 | 319:4 321:3 | 342:21 343:4 | 20:18,22 21:3 | 435:15 438:24 |
| 427:20 431:25 | 325:22 331:19 | 343:24 344:13 | 21:6,21 22:1,4 | 439:6 |
| 432:5 434:3 | 451:15 480:22 | 344:22 345:2 | 22:22,23 23:2 | **training** 419:15 |
| 451:12 458:10 | 484:3 485:5,14 | 345:14,23 | 23:4,15,18 | 419:18,23 |
| 469:8,17 | 485:22 486:4 | 346:4,10,22 | 24:1,8,11,17 | 420:2,4 421:8 |
| 470:15 474:6 | 486:13,21 | 347:19 348:4 | 24:20,22 25:3 | 423:14 433:23 |
| 477:1 480:23 | 487:4 490:11 | 349:5,13,19,25 | 25:7,13,17,25 | 437:16,24 |
| 481:15,22 | 492:12,15 | 350:11 351:18 | 26:4,7,18,22 | 438:13,16,21 |
| 484:2,8,19 | **told** 47:20 158:8 | 352:18 353:15 | 27:10,13,15,18 | 470:6,10 |
| 485:6 490:10 | 165:21,25 | 353:16 356:12 | 27:24 28:2,5 | **transaction** |
| 492:6 | 166:4 168:3 | 356:18,25 | 28:21,24 29:1 | 46:22 |
| **times** 99:2 | 169:9 182:15 | 357:9,24 | 29:6,10,16,20 | **transcribed** |
| 107:17,19,23 | 186:4,10 | 358:11,20 | 29:23 70:24 | 495:10 |
| 151:2 158:9 | 241:12,19 | 366:25 369:18 | 72:21 161:19 | **transcript** 495:3 |
| 164:9 166:1 | 257:20 262:4 | 371:5 372:1,11 | 162:18 163:9 | 495:12,12,13 |
| 208:9,12 | 264:17 282:5 | 372:14,18 | 167:19 199:9 | **transcription** |
| 223:20 308:21 | 296:18,19 | 373:3,13 | 201:8 283:6 | 494:9 |
| 317:23,25 | 297:7 317:13 | 374:20 375:4 | 313:19 315:9 | **trapped** 447:3 |
| **Titan** 272:3,4 | 319:1 321:9 | 375:19 376:5 | 324:19 326:2,5 | **Travis** 3:19 |
| **title** 122:22 | 365:7 381:18 | 377:12 379:5 | 326:6 | **TRENT** 305:25 |
| **today** 10:13,24 | 391:9,9 404:12 | 380:8,16 382:8 | **topics** 20:4 | **trick** 39:19 |
| 12:7,10,15,20 | 406:9 409:14 | 384:7 386:23 | 31:21 33:19 | 51:12 111:6 |
| 12:24 20:17,22 | 412:13 421:17 | 388:9,14,23 | 161:23 164:2 | 464:13 |
| 21:5,25 22:4 | 428:18 451:10 | 397:9,23 | 166:25 168:8 | **Trident** 6:14 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 548

| | | | | |
|---|---|---|---|---|
| **tried** 134:17,21 | 407:14,20,24 | **tug** 57:5 116:11 | 398:3 421:23 | 399:25 |
| 289:13 450:5 | 408:5,17 | 142:22 147:13 | 422:13 423:3,4 | **turned** 410:20 |
| **tries** 480:1 | 409:20 410:6 | 150:7 195:17 | 423:6,8,25 | **two** 36:21 43:23 |
| **trip** 147:8,8 | 411:12,20 | 196:1,2,17,18 | 424:7,23,25 | 56:17 60:18 |
| 380:7 381:4,19 | 412:5,17 413:2 | 196:23 205:7 | 425:5,11,12,22 | 66:1,4 74:6,13 |
| **tropical** 7:22 | 413:20 414:5 | 266:20 280:16 | 426:8,10,21 | 74:18 76:7 |
| 276:1,7 279:10 | 416:7 418:20 | 283:11 284:2 | 427:3,9,11,15 | 78:13 79:3 |
| 279:11,14 | 420:24 423:17 | 299:10 344:14 | 429:1,8,19,24 | 101:14 153:20 |
| 283:16 | 427:24 431:9 | 345:17,24 | 430:2,3 431:13 | 172:4 247:5,6 |
| **Trosclair** | 431:10 434:22 | 346:6,24,25 | 431:16,17 | 247:8 254:23 |
| 227:25 | 435:6,10,16 | 347:8,15,16 | 432:13,14 | 257:6,6,16,23 |
| **trouble** 88:8 | 439:18,22 | 348:6,10,11,11 | 433:11 440:17 | 265:24 266:22 |
| **true** 335:5,6,9 | 440:4 446:5 | 349:8 350:20 | **tugboat's** | 267:6 280:4,12 |
| 335:13 339:11 | 454:8,12,18 | 351:10 353:11 | 423:13 425:23 | 280:13 296:12 |
| 339:12 341:5,9 | 455:4 457:15 | 353:16 354:1,4 | **tugboats** 338:16 | 305:21 308:5 |
| 342:25 356:3 | 458:3 480:9 | 356:20 358:2,7 | 338:21 339:1,3 | 319:4 321:10 |
| 357:12 358:24 | 494:9 495:11 | 386:9 388:10 | 339:6,16,19 | 369:19 473:22 |
| 359:9,21 360:6 | **truly** 90:3 | 388:24 391:7,9 | 340:3 341:14 | 473:23 476:7 |
| 360:24 361:10 | 114:21 115:13 | 396:1,9 404:20 | 342:14,22 | 491:22 |
| 362:10,23 | 146:19 150:4 | 419:17,18,23 | 343:2 348:19 | **tying** 417:11 |
| 363:10,14,19 | **truthfully** 12:20 | 420:21 421:22 | 382:21 383:2 | 419:12 420:17 |
| 363:23 364:2 | **try** 11:13,15,17 | 422:12 423:3,4 | 397:12 399:9 | 440:9 |
| 364:12 365:22 | 134:21 138:25 | 423:10 424:13 | 423:1 | **type** 56:20 57:11 |
| 366:1,6,19,23 | 139:1,4 186:7 | 424:24 425:4 | **tugs** 2:23 36:16 | 204:2 205:16 |
| 367:4,8 368:11 | 344:19,20 | 425:22 426:3 | 48:10 147:5 | 216:21 249:24 |
| 368:25 369:4 | 365:1 386:10 | 427:9,13,22,24 | 195:20,22 | 352:7 353:21 |
| 369:11,15 | 470:19 476:20 | 428:3,3,6,10 | 229:9 233:2 | 422:20 423:8 |
| 370:6,13 | **trying** 35:14 | 428:12 429:1,7 | 234:15 240:25 | **types** 105:22 |
| 372:21 373:6 | 39:18 45:4 | 429:8,20 430:3 | 265:24 266:7 | 350:25 351:2 |
| 373:10,15,19 | 51:12 111:6,9 | 432:25 433:3,8 | 266:22 267:6 | |
| 373:25 374:4,8 | 117:5 159:10 | 433:8,9,10,18 | 267:20 290:16 | **U** |
| 374:16,23 | 167:25 168:5 | 435:5 479:4 | 291:3 338:8,10 | **U** 9:1 |
| 375:6,24 376:3 | 192:5 195:13 | 484:13 | 338:12,13,19 | **U.S** 197:21 |
| 379:17 380:20 | 196:13 197:13 | **tugboat** 340:24 | 340:12,13 | 200:5 |
| 381:4,20 382:2 | 198:10 200:12 | 344:18 347:21 | 343:4,5 350:25 | **ultimate** 274:25 |
| 394:6,10,15,19 | 245:2 246:23 | 349:14,21 | 351:1 371:14 | **unaware** 447:20 |
| 396:3 397:3,13 | 282:23 284:21 | 350:13 351:21 | 387:15,17,19 | **unclear** 90:25 |
| 399:5,12 | 289:11 297:21 | 352:8,20 353:8 | 387:21 389:2 | **Underneath** |
| 400:10,23 | 297:22 303:5 | 353:18 354:12 | 422:20,23 | 110:9 |
| 401:2,8 402:9 | 314:6 323:6,7 | 357:20 369:10 | 425:18 478:8 | **understand** |
| 402:13,19 | 372:8 381:2,2 | 387:13 389:12 | 478:11 | 10:25 11:2,4 |
| 403:4,16 | 384:17 385:24 | 389:16,19 | **turn** 61:23 | 12:9,23 14:3 |
| 404:17,18 | 386:4,5 429:13 | 390:5,9,13,16 | 152:22 212:17 | 32:21 43:16,21 |
| 405:14,21 | 429:22 469:12 | 390:18,22,23 | 290:22 390:25 | 98:5,10 136:24 |
| 406:8,23 | 469:19 | 396:17,23 | 394:13 395:9 | 178:17 193:13 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 549

198:22,22
204:8 218:13
220:12 234:6,9
235:19 274:7
285:11 299:23
331:3,3,5
339:21 389:6
391:16 450:6
450:10 476:20
**understanding**
43:19,25 83:18
93:5,7 95:19
184:5,7 186:5
219:15 232:13
232:24 326:10
335:4 391:18
495:12
**understands**
390:21 393:7
**understood**
35:12 57:4
108:14 109:12
114:6 138:5
192:18 212:20
225:24 241:22
243:10 249:22
284:9 304:10
**undertaking**
299:21
**underway**
292:20,22
**underwriter**
451:24
**Underwriting**
3:17
**unexecuted**
228:20
**unfairly** 164:1
**unique** 389:25
**UNITED** 1:1
**University**
18:22
**unmoored**
388:12,16
412:5

**unqualified**
383:15
**unredacted**
149:1
**unsigned** 228:20
**unstuck** 387:9
**up-to-date**
242:2,7
**update** 292:8
**updates** 243:7,8
243:9 292:5
**use** 11:10 37:7
37:22 38:2,23
39:23 48:10,13
53:12,17,25
59:4 60:25
65:13 67:3
68:12 69:2,10
85:15 95:23
96:15 97:8
99:19 100:20
101:8 103:15
109:22 111:25
132:15 182:14
213:1 219:6
221:14 236:14
284:5,24 285:2
285:14 314:10
329:5 339:16
340:4,25
341:15,20
342:14,23
343:2 344:15
345:17,25
346:6 348:7
349:8,14,21
351:11 352:8
352:21 357:21
388:24 396:16
419:17 431:14
472:12,17
473:1,5 476:16
477:3 478:2,24
**uses** 479:4
**USI** 329:3,5

**usually** 44:13
112:18

_____
        **V**
_____
**vaguely** 443:4
**valid** 197:20
198:1,14,23
199:13,22
200:4 495:3
**variable-wise**
44:22
**variables** 44:15
**verbal** 220:25
274:17,20
**verbally** 94:9,24
95:6 97:7,10
98:1 99:5,23
101:11 232:4
**verbiage** 130:1
**versus** 1:6 27:8
27:21 28:9,13
54:13 80:7,14
81:8 84:2,11
84:24 86:10,23
87:4 89:15,23
91:18 201:13
476:22
**vessel** 6:5 22:17
23:16,21 24:13
25:1 27:7,8,20
27:22 28:15
31:12 36:13,15
37:20 39:9,14
40:8,14 42:4
43:8 44:4
45:16,19 46:2
46:25 47:1
48:21 49:20
50:3 51:2,2,9
53:3,11,12
55:22 56:9
57:15 58:11
59:21 60:22,25
61:12,25 62:16
63:10 64:2,3,6

64:20 65:9,14
65:19,19,21,23
66:2,5 67:3,4,8
67:9,20,21,25
68:2,8,10 69:2
69:7,14,16,24
70:1,6,20 71:1
71:3,7,15,16
71:24,25 72:24
77:7,8 78:8,12
78:18,19 79:7
79:11,18,24,25
80:1,7,8,13,14
81:1,2,7,8
82:16,22,23
83:6,11,12
84:2,3,4,5,8,14
84:19,20,24,25
86:1,10,11,23
86:23 87:4,5
87:11,21,24
88:1 89:10,14
89:15,23,24,24
91:18,19 92:9
92:23 93:9,24
94:1,5,11,20
94:25 95:15,17
96:2,10,20
97:11 98:15
99:7,25 100:23
101:13,24
102:2,21 103:1
108:8 110:17
110:23,24
111:5,9,10,19
111:25 112:3
112:18 113:15
114:2,8 116:21
118:3,6,11,20
118:21 119:1,3
119:9,11 121:8
121:16 125:10
127:10 128:4,8
129:12,15,18
129:21 130:5

131:6,14 132:8
132:16,19
133:12 134:19
135:10 136:13
137:6 138:12
139:17 140:20
141:16 143:7
144:6,7,23
145:12,25
147:1 148:10
150:12,19,22
150:23 151:8
152:3 154:2,12
154:21 156:24
161:3,6 162:3
163:10,17
164:5 165:19
170:21 171:11
171:11,12,13
171:13,20,21
171:22 173:5,6
173:14,18,21
173:21 174:4,6
174:7,19,20,23
175:24 176:6,8
178:7,25
180:16,19
181:5 182:4
184:18,23,24
185:18,22,23
186:15,17,18
186:21 187:22
187:24 188:2,4
188:7,8,20
189:1,12,23
191:3,5,14,15
191:22,23,25
192:1,4,8,13
192:21,22
193:1,2,4,17
193:25 194:3,5
194:7,8 195:3
195:7,8 196:14
197:5,6,9,12
197:14,17,18

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 550

| | | | | |
|---|---|---|---|---|
| 197:24,24 | 305:19 306:1,4 | 197:15,19,25 | 181:2,5,10,11 | 475:7,15,18,18 |
| 198:5,14,17 | 306:6 308:23 | 207:10 235:22 | 181:12,12,13 | 475:19,24 |
| 199:2,11,19,20 | 308:24 309:7 | 236:4 | 181:16,20,21 | 476:7,12,15 |
| 200:2,3,20,23 | 309:23 310:6 | **vessels** 14:13,14 | 181:24 182:2 | 477:3 480:2 |
| 200:25 201:4,5 | 310:20 311:15 | 24:22 29:2 | 182:11 183:2 | 484:15,16,23 |
| 201:16 202:5,6 | 311:18,19,24 | 36:19,21 37:3 | 184:2,9 185:19 | 490:23 |
| 202:7,12,13 | 312:1 313:15 | 37:8,13,23 | 185:19 187:24 | **vice-president** |
| 203:15,18 | 314:5,20 316:8 | 38:24,25 39:7 | 188:25 191:9 | 1:14 10:3 |
| 204:21 205:4 | 316:16 317:19 | 39:23 43:24 | 202:20,25 | 13:14 15:12,13 |
| 205:14,14,20 | 322:6,7,13,14 | 46:19 48:24 | 203:1,3 210:8 | 17:2,12 41:4 |
| 206:5,19 207:9 | 322:21 344:19 | 49:2,4,7 51:15 | 213:11 214:21 | 334:6 |
| 207:16,23 | 344:21 347:25 | 51:20 52:1,2 | 223:6,8,17,21 | **video** 10:22 |
| 208:21 209:6 | 348:1 350:2,9 | 52:10,11,22,25 | 223:24 225:2,3 | **Videoconfere...** |
| 209:11,13,20 | 351:12,16 | 53:16,18,25 | 225:6,16 236:6 | 1:15 |
| 210:14 211:1,3 | 352:4 353:7,10 | 54:2,2,11 | 240:6 241:2 | **videoed** 10:23 |
| 211:14,15 | 353:21 354:8 | 55:18,24 56:3 | 243:24 244:8 | **videos** 324:10,13 |
| 212:4,5,6,15 | 354:10 362:16 | 56:5,11,17 | 244:25 245:1 | **view** 83:25 |
| 212:16 213:5 | 367:11,21 | 57:9 64:3,21 | 245:16,20 | **vision** 12:17 |
| 214:10,24,24 | 375:13 386:21 | 65:9 68:4,12 | 247:23 248:1,3 | **volume** 138:22 |
| 215:6,10,12,14 | 388:16 389:12 | 68:17 69:10 | 248:14 250:11 | 187:1,7,10 |
| 215:25 216:1 | 389:19 390:8 | 72:14,18 73:20 | 251:1,25 255:7 | **VP** 16:17,20 |
| 216:10 217:1,2 | 393:24,25 | 73:24 74:4,6 | 284:2 289:20 | 17:18,19 |
| 217:10,11,18 | 396:2,13 | 74:14,18 75:23 | 296:9 300:2,11 | 108:24 109:1,3 |
| 217:22 218:2 | 399:23 400:22 | 76:15,22 77:5 | 304:13,15 | 109:13 334:16 |
| 218:11 219:3 | 401:7,24 402:4 | 77:14,23 78:3 | 305:3,21 | |
| 222:19 223:14 | 402:8 403:15 | 78:7,15 79:5 | 306:20 307:4 | **W** |
| 240:22,25 | 416:23 418:2,4 | 82:21 83:14,14 | 308:5,9 312:8 | **W** 1:14 10:2 |
| 241:7,23,24 | 418:6,8 419:20 | 83:15,17 86:13 | 312:9,11,13,22 | **WAD** 271:17 |
| 242:3,11,14 | 420:8,8 421:17 | 87:15 90:7 | 312:24 313:2 | **wait** 64:16 71:10 |
| 244:18,19 | 422:6,11 | 91:11 92:2,10 | 313:20 314:10 | 89:16 106:5 |
| 245:3,4 248:21 | 424:12 425:7,7 | 92:23 94:12 | 317:3,6,11,14 | 115:21 191:16 |
| 249:25 251:16 | 426:5 432:24 | 95:1,8,9,10 | 318:3 319:7 | 201:2 202:9 |
| 252:20 254:3 | 433:13 436:7 | 100:11 101:14 | 321:1,25 | 203:22 216:17 |
| 255:19 257:13 | 447:4 448:1 | 124:3,17 130:2 | 338:21,23 | 218:18 232:19 |
| 259:15,18 | 451:11 456:23 | 130:2 131:5 | 339:2,16 | 234:1 235:24 |
| 272:2,4,6 | 469:8,17 | 132:2 146:8 | 341:22,24 | 242:25 252:25 |
| 273:18,23 | 476:22,23 | 148:14 152:1,8 | 346:1 382:12 | 255:10 274:6 |
| 282:8,8 294:11 | 477:2,6,7,9,11 | 162:7 163:7 | 386:19 401:18 | 306:24 307:14 |
| 294:25 295:13 | 477:14,18 | 170:18 172:14 | 416:16 422:18 | 326:17 329:17 |
| 295:19 296:14 | 478:1,20 | 172:16 173:8 | 424:8,19,20 | 357:22 397:17 |
| 296:19 300:13 | 479:23 480:6 | 174:22 175:2 | 468:22 469:9 | 399:16 402:23 |
| 300:16,21,24 | 480:23 484:1,2 | 178:4,8,10,20 | 469:15,18,23 | 408:9 449:19 |
| 301:3,6,21 | 484:7,8 490:10 | 178:21,24 | 473:15,21,23 | 449:23 492:5 |
| 302:2 303:17 | **vessel's** 193:15 | 179:1,6,8,9 | 473:24 474:14 | 492:21 |
| 304:2,4,9 | 193:23 197:15 | 180:11,13,18 | 474:17,22,23 | **waiting** 129:15 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 551

| | | | | |
|---|---|---|---|---|
| 267:9 274:14 | 434:13 436:6 | 181:22 182:21 | 136:2 138:21 | 91:10 103:4,6 |
| 293:2 | 439:24 444:19 | 182:25 183:22 | 140:1,2,17 | 146:11 148:14 |
| **waived** 9:11,14 | 447:1 450:1,8 | 189:4 199:24 | 142:11 143:11 | 151:24 152:2 |
| **waiving** 170:17 | 450:11 453:6 | 208:13 215:2 | 143:12 145:2 | 152:24 154:7 |
| **walk** 20:4,8 | 464:15 466:9 | 224:4 243:18 | 153:2 186:25 | 174:1,6 175:1 |
| 152:25 344:8 | 466:19 470:5 | 268:18 279:3 | 196:17 200:8 | 176:4,15 |
| 344:16 | 470:18 476:20 | 289:9 292:19 | 202:24,24,25 | 178:22 473:22 |
| **WALKER** 2:20 | 491:19 | 329:12,18 | 203:1,2,3,23 | 473:25 475:19 |
| **want** 17:21 | **wanted** 47:17 | 330:4 340:5 | 207:18 212:2 | **Wednesday** |
| 39:22 57:14,15 | 109:25 118:1 | 342:6 345:16 | 216:6 225:25 | 1:17 290:12 |
| 58:4,9 63:22 | 196:1 217:20 | 350:1,3 359:7 | 236:20 245:11 | **week** 257:6,17 |
| 64:10 65:8,25 | 272:4 282:4 | 359:20 360:1 | 249:14 264:9 | 258:15 259:8 |
| 73:8,15 74:2 | 283:4,13 308:1 | 369:20,20 | 277:25 284:5 | 263:12 325:12 |
| 77:2,25 81:11 | 308:15 344:13 | 373:1,4,14 | 292:18 297:21 | 325:13 |
| 91:1,4 98:17 | 348:13,18 | 375:13 380:9 | 297:21 300:15 | **weekly** 217:23 |
| 116:3 122:18 | 372:12 378:11 | 380:20 388:15 | 312:17 313:13 | **Weeks** 3:13 |
| 124:10 127:7 | 384:13,14 | 403:25 408:16 | 314:6,6,7,17 | **welcome** 331:21 |
| 131:1 134:16 | 390:1 422:21 | 409:2 468:19 | 315:11 320:1 | 458:12 |
| 146:14 148:18 | 423:6 427:24 | 470:16 490:15 | 320:17 323:6,7 | **WELLS** 1:9 |
| 151:23 152:21 | 448:4 449:1 | **we'll** 11:12 48:8 | 334:11 354:1 | **went** 39:11 |
| 152:25 154:5 | 476:16 | 56:8 57:1 | 393:6,14 424:7 | 77:15 196:2 |
| 173:16,25 | **wants** 103:18 | 58:22 59:24 | 442:9 444:24 | 291:4 296:11 |
| 174:24 184:17 | 172:13 428:14 | 61:22,22 74:3 | **we've** 19:8 67:17 | 337:25 338:3 |
| 184:21 187:15 | **wasn't** 170:4 | 74:6 80:23 | 70:9 129:24 | 418:9 422:23 |
| 188:4 192:19 | 176:4 272:3 | 81:17,21 84:5 | 141:13 146:7 | 422:25 424:8 |
| 193:14 209:2 | 285:25 287:22 | 106:14,16 | 149:24 159:22 | **weren't** 248:8 |
| 214:22 220:13 | 295:13,13 | 135:1 173:24 | 175:15,19 | 249:4,5 382:13 |
| 226:17 229:21 | 299:9 300:10 | 211:11 276:14 | 187:13 268:5 | 484:17 |
| 234:10 237:22 | 300:10 349:18 | 288:16 304:2 | 309:15 322:25 | **whatsoever** |
| 243:24 244:12 | 349:20 377:2 | 311:8 314:5 | 326:20 328:12 | 465:20 |
| 248:7 252:16 | 388:1 398:12 | 315:14 319:10 | 333:18 412:24 | **wheelhouse** |
| 255:23 259:7 | 398:24 400:14 | 320:4 324:22 | 484:2 | 181:15 197:20 |
| 268:13 271:2,6 | 400:15 410:11 | 324:23 325:4 | **weather** 147:8 | 198:1,14 |
| 273:14 274:7 | 440:9,14 468:9 | 325:11 393:20 | 147:11 276:2,7 | 199:12 200:2 |
| 284:18 287:3 | **waste** 18:6,24 | 393:24 | 279:11,11,15 | **wherewithal** |
| 307:20 308:25 | **watching** 376:6 | **we're** 20:3,8 | 279:23,25 | 447:10 |
| 310:18 311:13 | **watchman** | 31:2 35:6 | 283:16 285:12 | **whichever** |
| 317:4,6,10,11 | 147:6 | 40:10 44:25 | 376:7 | 146:17 |
| 318:2,8,23,24 | **water** 11:12 | 45:6,7 47:24 | **website** 6:7 | **wifi** 334:11 |
| 319:25 320:4,7 | 263:9 387:2,11 | 50:25 51:1,15 | 55:12,18 56:10 | **Wilcox** 11:23 |
| 321:15,22 | **way** 37:16 100:9 | 72:7 73:16 | 56:16 72:5,10 | **willing** 273:19 |
| 334:1 351:15 | 120:20 156:5 | 94:20 103:14 | 72:10,15 73:3 | **Wind** 291:7 |
| 352:4 393:12 | 159:11 160:14 | 103:20 104:7 | 73:12 74:3,9 | 292:5 |
| 405:6 419:15 | 161:8 168:20 | 118:17 119:7 | 75:24 77:24 | **winds** 287:23 |
| 423:2 433:10 | 171:2,3,7 | 119:13 120:4,7 | 78:4 90:6 | **wires** 147:11 |

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 552

**withstand**
418:19 471:6
**witness** 9:5,25
14:2,18,23
19:9 21:18
22:9,12 24:4
30:10 31:17
37:11 38:1,12
38:20 45:12
46:5 51:7
53:21 54:7
62:19 68:16
69:19 70:4
71:22 77:11
78:24 81:12,23
82:5,9,13 86:4
88:9 90:17
92:14 93:3
94:16 95:5
96:7 97:4,16
98:4,9 99:12
100:6,16 101:5
101:18 102:9
104:18 108:25
110:22 114:15
117:11 123:20
125:3 127:19
128:1,15
130:10,14
131:13 135:22
139:2 141:3,10
143:20 145:20
146:6 151:3,20
152:11 156:23
158:16 159:6
161:2 164:4
169:2 172:5,10
172:21,25
178:16 179:11
179:15,21
180:22 181:9
183:6,13
188:18 189:19
190:5,20
194:17 196:21

199:5,18
202:17,23
203:11,21
207:2 208:1,24
210:2 211:6,23
212:14 215:22
219:22 220:8
221:20 226:8
231:1 233:5
234:8 244:9
249:10 251:20
276:19,25
281:25 286:24
287:5 290:5
295:10 296:1
297:1,14 298:8
302:20 303:12
304:19,25
306:11,23
307:7,13
309:14 310:13
311:1 325:14
327:11 329:25
330:10,15
331:20,24
334:7,17
335:12 339:24
340:17 341:8
343:8,21 345:1
345:20 346:15
347:4,11 350:7
350:18 352:1
352:13 353:5
354:20 355:2
355:21 356:6
357:6,15 358:6
358:17 359:2
359:12 360:9
360:16 361:2
361:13 362:2
362:13 363:1
363:13,22
364:5 365:4,10
365:25 366:9
366:22 367:7

367:17 368:4
368:14 369:3
369:14,24
370:9,16,24
371:13,21
372:6,24 373:9
373:18 374:3
374:11,15
375:1,9,16
376:2,10,18,24
377:6,17 378:1
378:21 380:3
380:12,23
381:7 382:20
383:8,20 384:2
384:12,21
385:4,20 386:3
388:20 389:23
390:12,17
391:6 392:8,15
394:9,18 395:1
395:13,21
396:6,21 397:6
397:16 398:7
398:21 399:15
400:4,13 401:1
401:11 402:12
402:22 403:7
403:19 404:3
404:11,24
405:5,24 407:1
407:17,23
408:8,22 409:7
409:23 410:9
410:25 411:15
411:23 412:8
412:20 413:5
413:14,23
414:8,23 415:7
415:18,25
416:10 418:23
419:11 420:7
420:16 421:15
422:2,17
423:20 424:4

424:17 425:3
426:2,15 427:1
427:18 428:2
429:4 430:8,18
432:23 433:7
434:10,15,25
435:9,19 436:4
436:18 437:10
438:6 439:12
439:21 440:7
440:13,15
441:12,20
442:2,18 443:9
443:16 444:2
444:11,18
445:4,19 446:8
446:16,23
447:9,19
448:23 449:16
449:22 451:2,9
451:18 452:7
452:23 453:2
453:17 454:2
454:11,21
456:9,21 457:8
457:21 458:6,9
458:11 460:8
460:16 461:2
461:13,22
462:6,24 463:8
463:19 464:20
465:7,16 466:2
467:10 468:4
468:13 470:16
471:11,19
472:2,21
473:10 475:2
475:11 476:3
477:22 478:14
479:13 480:18
481:18,25
482:8,15 483:1
483:8,15,22
485:1,10,18
486:1,9,17,25

487:8,15,21
488:4,11,18
489:12,19
490:5 491:16
494:18
**WITNESS'**
494:4
**Witnesseth**
63:24
**wondering**
206:12
**word** 52:20
57:18 58:1
64:12 66:2,5
67:8,9,21
111:2 153:19
171:14,17,18
306:17 341:21
351:6 393:6,10
431:14 449:3
474:9,18,23
475:8,20
**words** 65:9
**work** 16:9,12
17:22,23 18:1
37:3,13 39:2
39:11,17 56:20
56:24 57:5
60:5,6,6 61:11
61:17 111:18
116:16 117:7
118:21 129:8
129:12,19,21
130:5 131:6
135:12 138:14
139:18 140:21
142:18 143:8
144:24 145:13
146:1 150:14
195:23 197:7
205:10 216:3
216:11,15,21
242:19,24
246:3 248:8
252:24 253:4

Case 2:21-cv-00258-JCZ-EJD    Document 817-2    Filed 11/18/25    Page 183 of 187

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 553

253:12 270:18
271:24 272:3,8
273:3,4 274:2
274:4,10
293:23 304:5
305:20 308:3
334:20,22
335:1 336:8
337:2,3,4,12
338:17 339:7
346:18,20
352:18 356:22
357:2 358:7
361:14 389:2
398:8,12,14
421:2,8,18
426:3,17 428:5
435:24 436:11
437:6,12,17,21
438:1,9,13
439:1,2,7,9
461:18 478:17
489:23 490:1
491:9
**worked** 18:9
247:16 334:2,3
335:8 337:6,14
341:12,12
342:11,11
345:16 349:17
381:14 418:15
468:9 478:4
**working** 18:3,14
38:8 111:15
119:19 122:2
124:5 126:14
129:2 133:22
136:8 137:19
139:8,10
140:18 142:15
144:18 149:16
196:4,16 198:7
200:8 205:4,5
225:20 238:22
238:22 243:2

245:24,25
246:5,6,7,13
246:17 248:3
336:3 337:16
337:18,20,25
339:14 342:20
346:1 348:1,1
354:2 355:6
361:4 377:2
434:21 435:13
437:4 474:3
490:9
**workmanlike**
64:24
**workplace**
336:11,17
**works** 13:16
246:2 247:19
256:24 335:5
441:24 463:14
**world** 389:18
**wouldn't** 142:24
202:19 282:1
283:10 425:12
426:16 431:18
432:15 438:9
440:17 446:13
448:2
**write** 481:9
**writing** 58:16
59:9,12 60:20
63:5 90:14
92:7,21 93:17
93:23 95:25
96:19 97:5
100:22 101:11
102:25 226:9
232:4 451:22
**written** 20:15
25:10 26:1,15
58:14 59:4
61:13 63:3
66:24 85:25
86:8,20 87:9
87:18 88:5,25

89:13,21 90:11
91:12,16
185:10 218:14
218:19,25
220:22,23
221:1 222:24
235:20 236:1
268:12 294:19
301:14 484:7
**wrong** 350:3
369:20 442:8
454:18 455:3
457:2 469:4
**wrongdoing**
456:13
**wrote** 312:23
313:7 481:6

_____
**X**
_____
**X** 5:1 45:7
**X145** 395:5

_____
**Y**
_____
**y'all** 139:6
278:24 416:23
**y'all's** 279:1
280:8 282:18
444:24
**yeah** 33:1,23
50:1 51:15
54:20 59:2
61:22 69:23
70:12,12 73:6
76:4 77:14
79:3 81:15
85:11,23 87:17
88:20 89:18
90:11 95:6
103:7 104:2,4
106:7 109:22
114:19 117:14
118:15 123:8
128:2 139:7
146:7 149:5,11
156:14,15
163:13 167:7

172:24 174:11
174:11 178:12
179:17 180:25
180:25 183:17
189:7 190:9,9
191:18 192:25
193:22 194:22
197:23 199:9
201:3 203:25
203:25 204:14
205:2 207:3
208:5,12 210:4
212:1 214:8
216:18 218:19
220:5 221:7
223:9,11
224:24 226:12
228:2 229:19
229:19,23
232:21 235:2
236:1,9,21,21
237:21 238:5
239:3 242:9
243:10 245:25
246:8,14 247:5
247:21 248:6
249:18,18,18
250:16,16,16
251:7 252:13
253:1 254:3
257:22 264:17
265:4 270:7
271:6,11,15
272:1 274:12
276:24 277:5
277:12 278:1,1
278:19 280:12
284:15 285:16
289:4 292:24
293:1 294:6,21
294:21,21,22
294:22 298:20
298:20 299:6
302:18,19,21
305:1,24

307:16,16,16
308:13,15
311:12,18
312:19 321:20
323:3,3 330:23
332:2 361:14
362:14 365:11
374:1 378:11
381:17 389:4
389:17 398:24
401:14 406:9
408:23 409:24
411:1 415:11
417:18 419:1
421:4 423:6
427:19,22
428:9,22 434:1
436:5 443:4
450:16 464:24
468:5 470:3
492:22
**year** 18:6,23
50:23
**years** 16:4 18:10
108:17,17,19
108:22,24
109:3,5 341:5
474:3 478:4
**yell** 139:1
**Yesenia** 261:2,6
270:11
**YH1809** 114:11

_____
**Z**
_____
**ZAINEY** 1:8
**Zeta** 7:22 36:4
138:7 145:8
266:10 285:7
285:24 286:4,9
286:12 299:25
300:3 356:3,15
356:21 357:3
357:11 358:13
358:23 360:6
360:24 361:9

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 554

362:10 363:19
364:2,12
365:22 366:19
367:4,12
375:22 377:11
377:13 379:6
379:23 396:15
397:3 398:2
400:10 401:8
417:7 418:20
471:15
**Zoe** 269:8
**Zoom** 1:15,22
2:15 3:1 4:1
47:25 139:6
140:6 187:9

**0**

**000030** 6:17
**000035** 6:17
**000149** 7:7
**000175** 7:15
**000179** 7:12
**000181** 6:22
**000183** 7:2
**000189** 7:5
**000190** 7:5
**000226** 7:23
**000227** 7:18
**000228** 7:18
**000235** 7:10
**000247** 6:24
**000282** 7:20
**000286** 7:20
**000373** 6:10
**000383** 6:10
**000384** 8:2
**000387** 8:2
**000388** 6:6
**000401** 6:6
**000402** 6:19
**000404** 6:19
**000405** 6:15
**000413** 6:15
**00175** 271:10

**0100** 137:16
**02020** 236:4
**04/30/21** 6:14
**06/04/19** 6:12
**0600** 122:9
**0700** 136:18
**08** 336:4
**08/07/20** 7:20
**09** 336:5
**0900** 122:10
**0the** 363:4

**1**

**1** 20:14,15,18
32:4 34:2
167:4 195:3
282:16
**1-B** 58:4,11
60:18 62:4,25
**1:24** 273:10
**1:30** 170:10
**1:42** 273:8
**1:45** 170:10
**10** 5:6 26:18
44:14,19,20
45:1
**10.08.19)pdf**
229:9
**10.22.20** 271:18
**10/08/20** 6:10
**10/16/20** 6:24
7:4
**10/19/20** 7:1
**10/20/20** 6:21
7:11
**10/22/20** 7:14,17
**10/25/20** 7:22
**10/26/20** 6:19
7:6,9
**10/28/20** 6:19
8:2
**10/30/19** 6:14
**10:06** 10:7
**10:07** 268:11
**10:09** 267:21

268:17
**10:11** 257:4
**10:16** 268:20
290:23 292:15
293:5,7
**10:19** 278:22
279:5 281:2,18
282:18
**10:31** 227:2,4
228:3 232:23
**10:32** 260:7
261:23
**10:37** 227:24
**10:49** 261:13
**10:58** 264:20
**10:59** 258:11
269:10
**100** 172:16
184:4 467:11
**103** 6:9
**11** 27:10,13
122:10
**11/03/20** 6:10
**11/10/20** 7:20
**11:00** 273:15
275:2
**11:06** 70:14
**11:23** 70:14
293:18
**11:40** 259:4
**1100** 2:4 3:15
4:8 136:20
144:11
**116** 269:16,19
269:24 274:4
**116-A** 261:11
**11th** 122:9
**12** 27:18,24
108:17,17
126:8
**12:10** 117:16
**12:30** 117:16
**12:34** 281:19
282:11
**126** 6:3 19:6

31:24
**127** 6:5 40:11
184:20,21
481:1
**128** 6:7 72:8
74:10 148:19
148:20 152:2
152:24 154:8
157:9 175:1,11
175:20 176:19
178:22 181:3
181:25 182:12
183:3 184:3
188:25 191:10
**129** 6:9 103:21
104:7 117:20
270:25 271:1
**12th** 119:16
121:22
**13** 28:5,21 66:20
66:22 67:7
79:8 129:7
**130** 6:11 147:18
277:10
**1300** 106:23
**131** 6:13 187:19
**132** 6:16 226:1,7
**133** 6:18 238:1
**134** 6:20 256:5
**135** 6:23 258:5
260:22 264:1,2
**136** 7:1 259:24
261:1 263:25
263:25
**137** 7:3 262:19
**138** 7:6 265:12
**139** 7:8
**13th** 128:19
**14** 29:1,6 129:7
**140** 7:11 269:6
**1400** 144:11
**141** 7:13 270:10
**142** 7:16 272:16
272:18,19
**143** 7:19 277:21

**1434** 495:16
**144** 7:21 275:6
277:18 279:9
**145** 7:24 272:14
392:24 393:1,5
395:5 396:2
**146** 8:1 466:12
470:3
**147** 6:11
**149** 265:11
**14th** 142:1
**15** 20:6 29:16,20
30:9 34:2
44:14,21 45:1
164:16 341:5
**1500** 119:22
**16** 145:9 258:11
263:4 338:1
462:20 463:5
464:3
**1600** 269:16
270:6
**17** 338:1
**175** 270:10
271:4
**179** 269:5
**18** 227:24
229:13 230:2
232:23
**181** 256:4
**183** 259:24
260:25
**187** 6:13
**189** 262:20
**18th** 227:2
**19** 6:3 260:3,6
**190** 262:20,20
**1900** 137:13
**1910** 3:19
**1996** 18:25
**19th** 48:17 134:1
142:2 144:10
274:5,11

**2**

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 555

**2** 21:3,6 32:10
64:10,13 65:8
136:10
**2:03** 187:10
**2:28** 187:10
**20** 54:23 57:3
269:10 280:13
316:15
**2000** 4:3 18:8
**2007** 16:13,14
49:1 109:7,7,8
335:25 340:5
345:15
**201** 2:21 3:11
**2013** 16:22
**2017** 23:15
24:13,24 29:3
40:16 41:14
43:9,10,13
50:18,19 55:21
67:25 68:2,8
68:10,11 69:7
69:9,15,25
71:1,3,4,7,16
77:6,6 78:8
92:8,22 93:24
94:11,25 95:15
96:1,20 97:11
99:7,24 100:23
101:12 102:2
103:1 118:10
118:19 119:1
121:7 127:10
132:8,19
133:12 135:10
137:5 138:13
140:20,21
143:7 144:23
150:11 152:3
163:10,17
170:20,21
173:6,18
174:20 178:6
178:24 179:1
181:23 182:3

185:2 187:22
189:12 191:4
191:24 222:17
222:22 223:2
236:23 237:17
303:17 304:4
305:19 310:19
313:3,21 316:7
320:23 321:5
323:24
**2019** 148:7
150:15 227:2
227:24 229:2
229:13 230:2
232:23 309:11
311:10
**202** 235:23
236:19
**2020** 16:6 21:24
22:21 25:10
26:1,16 28:6
28:11,18 31:13
36:1 37:4,8
38:5,9,13
39:24 42:7,14
46:12 49:15
54:10,15 55:4
56:2,21 57:2,9
73:25 76:2,12
76:15,17,24
80:3 85:6,17
85:23 86:7
87:2,8,17
89:22 91:17
92:6,20 93:22
94:8,23 95:14
95:24 96:16,17
97:7,9 99:5,9
99:20,21
100:21 101:9
101:10 102:5
103:3 106:23
107:2 116:17
117:1 119:16
119:21,25

121:22 122:9
122:10 125:15
125:19,25
126:5,8 128:19
128:23 131:25
132:12,16
133:18 134:1
136:2,18,21
137:12,13,17
140:11 141:14
141:25 142:1,2
142:5,10
143:25 144:11
144:12 145:6
151:6,15
176:12 201:11
212:21 213:2
213:16,20,24
217:9 218:4,16
218:21 219:7
219:18 221:15
222:17,23
223:3 235:10
235:16 236:24
237:18 238:4,7
238:10 243:22
245:18,21,22
246:10 247:2,4
250:11 251:1
252:1,24 253:5
254:17 257:4
258:11 260:3,6
263:4 265:16
267:21 268:11
270:13 271:8
271:23,24
273:5,9 275:22
277:24 280:7
281:2,4,14,19
281:19 283:15
286:12 287:12
295:9 300:25
301:19 303:3
304:6,16 305:7
305:8,10 306:8

312:2,3 316:10
321:16 323:24
326:11 329:9
329:16,21
330:21 349:12
459:13,25
460:4,11,19
461:6,16,25
462:18 463:2
463:11 464:4
464:15 465:2
471:1 472:9,13
472:18 473:2,7
473:20 475:25
478:18 480:10
480:14 482:3
482:11,20,23
483:5,12,19
484:12 487:25
489:24 490:2,8
490:20,24
491:3 492:19
493:1
**2021** 31:4,16,18
**2023** 1:17
**20th** 48:17
487:25
**21** 3:3
**21-1968** 1:5
**21-1969** 1:5
**21-1981** 1:6
**21-1982** 1:5
**21-2075** 1:6
**21-2227** 1:6
**21-258** 1:4
**21-337** 1:4
**21-464** 1:5
**21-822** 1:5
**2100** 265:25
**2200** 273:17
**225** 6:16
**2250** 2:4
**226** 275:5,16
277:15,23

279:8
**227** 3:3 272:20
**228** 272:20
**22nd** 133:17
270:13 271:8
273:21 274:2,9
**2300** 3:15
**235** 267:18,19
**237** 6:18
**238** 278:13
**2400** 119:25
**2400-horsepo...**
74:24 176:18
176:22
**247** 258:6
**24th** 1:17
**25** 54:24
**2516** 4:12
**255** 6:20
**258** 6:23
**259** 7:1
**25th** 275:21
277:24 278:2
278:22 280:6
281:2,18,19
282:10 283:15
**26** 31:4 136:2,18
136:10 137:13
238:4 245:18
245:22 246:10
247:4 267:20
268:11
**262** 7:3
**265** 7:6
**267** 7:8
**269** 7:11
**26th** 31:13
240:15 241:10
265:16 268:18
**270** 7:13
**272** 7:16
**277** 7:19
**279** 7:21
**27th** 137:17
238:6 243:16

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 556

247:9
**28** 21:24 28:18
36:1 46:12
54:10,15 55:4
73:25 76:2,12
76:14,17,24
80:3 85:5,17
85:23 86:7
87:2,8,17
89:22 93:22
94:8,23 95:14
97:7 126:4
131:25 151:6
151:15 176:12
236:24 237:18
238:10 243:22
305:7,8 323:24
326:11 329:8
329:15,21
330:21 349:12
459:13,25
460:4,11,19
461:6,16,25
462:17 463:2
463:11 464:4
464:14 465:2
471:1 492:19
492:25
**282** 277:21
278:5 281:13
**283** 278:21
281:17 290:11
**284** 290:19
**286** 277:21
278:5 281:13
**28th** 16:6 22:21
42:7,14 91:17
92:6,20 96:17
99:5,21 101:10
119:21 125:25
137:12 140:11
145:6 222:17
222:23 223:3
235:10 247:10
286:12 287:12

290:12,24
293:8 303:3
321:16,18
**29th** 142:4,5
144:12 293:6,8
293:17,20
294:1

**3**

**3** 3:7 21:21 22:1
367:11
**3.25** 146:25
150:6 309:6
**3:16** 235:4
**3:24** 235:4
**3:41** 265:17
**3:59** 293:5,9,12
**30** 226:2,18
229:7
**30(b)(6)** 1:11 6:3
19:14,20 32:8
**301** 3:7
**30th** 119:24
128:23
**31** 228:16
229:25
**3300** 3:11
**333** 5:7
**35** 226:3 228:17
229:25
**3600** 76:9
**3600-horsepo...**
75:1 175:9
**37:2554** 495:8
**3700** 4:8
**373** 82:6,8 83:1
83:2 104:2,12
105:5 106:22
109:22 116:3
117:21,22
118:17 120:4,7
120:18 121:13
146:15 150:1
**374** 119:15
120:3,4 122:18

**375** 121:20
127:7
**376** 126:7
**377** 128:18
132:2 133:3
**378** 132:25
133:4,14
**379** 133:17
270:22 271:2,7
275:1
**380** 136:3
**381** 137:11
140:10,16
**382** 141:13
143:12
**383** 104:2,13
105:6 117:21
143:23 145:3
146:15 150:1
**384** 466:11
**387** 466:11
**388** 40:7 41:18
57:14 58:4
63:23 184:23
**389** 63:22 64:9
65:5
**390** 65:12 66:9
**392** 7:24
**396** 66:12,14,16
67:14
**398** 42:16,16
**399** 40:18,19,23
41:9,19
**3rd** 141:14,25
142:10 143:25

**4**

**4** 1:8 22:22,23
65:13,24
**4-B** 79:6
**4:00** 293:11
**4:12** 277:7
**4:23** 277:7
**40** 6:5
**40,000** 261:8

**400** 4:3 61:23
**401** 2:17 40:7
61:24
**402** 237:25
238:2 240:11
244:5 245:11
**403** 238:6
243:16 244:5
**404** 237:25
238:9 243:21
244:3,6
**405** 152:15
187:16
**407** 152:22,22
153:3 154:6
174:13,25
191:20 310:4
**413** 152:15
**414** 187:16
**4200-horsepo...**
75:5 157:10
175:16,21
177:2
**4500** 2:12
**458** 5:8
**466** 8:1
**470** 5:9
**491** 5:10
**494** 495:9
**4th** 148:7 150:15

**5**

**5** 7:23 23:4,15
23:18 163:9
**5:00** 287:11
314:18 371:4
**5:16** 332:4
**5:20** 332:4
**5:30** 371:3
**5:49** 290:12,23
**5000** 1:16 2:8
**5100** 2:21

**6**

**6** 20:5 24:11,17
163:15

**6/9/17** 6:6
**6000-horsepo...**
75:9 177:5
**6009** 1:24
**618** 3:23
**650** 4:12

**7**

**7** 24:22 25:3
31:25
**7:02** 458:25
**7:14** 458:25
**7:39** 493:11
**70005** 12:1
**70058** 1:15 12:5
**701** 1:16 2:8,12
**70130** 4:12
**70139** 1:17 2:9
2:12
**70163** 2:4 3:16
4:8
**70170** 2:22 3:12
**70447** 3:3
**70471** 3:7
**70508** 4:4
**70801** 3:24
**72** 6:7
**77002** 2:17 3:20
**77007** 1:24
**7th** 106:23

**8**

**8** 11:25 25:13
116:25
**8:21** 273:21
**8:38** 270:13
**8:47** 275:22
279:9 280:5,6
**801** 3:19
**851** 1:14 12:4
153:16
**8th** 2:17 107:2

**9**

**9** 23:15 24:24
25:25 26:4

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

30(b)(6) Deposition of Dawn Services, L.L.C. through Michael W. Grace, Jr.
All Coast, LLC v. Shore Offshore Services, LLC

Page 557

| | | | | |
|---|---|---|---|---|
| 29:3 40:16 | | | | |
| 41:14 43:9,10 | | | | |
| 43:13 68:1,11 | | | | |
| 69:8,25 71:4 | | | | |
| 77:6 78:8 | | | | |
| 138:13 140:21 | | | | |
| 163:9 170:20 | | | | |
| 179:1 181:23 | | | | |
| 182:3 185:2,2 | | | | |
| 191:4,24 | | | | |
| 222:16,22 | | | | |
| 223:2 236:23 | | | | |
| 237:17 313:3 | | | | |
| 313:21 320:23 | | | | |
| 321:4 323:24 | | | | |
| **9000** 75:19,22 | | | | |
| **9000's** 76:7 | | | | |
| **9000-horsepo...** | | | | |
| 75:13 177:11 | | | | |