```
                                                      Page 1
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4  ALL COAST, LLC      *  CIVIL ACTION
                        *  NO. 21-258, C/W 21-337,
 5                      *  21-464, 21-822, 21-1968,
                        *  21-1969, 21-1982,
 6  VERSUS              *  21-1981, 21-2075,
                        *  21-2227
 7                      *
                        *  SECTION "A"
 8  SHORE OFFSHORE      *  HON. JAY C. ZAINEY
    SERVICES, LLC       *  MAGISTRATE: (4)
 9                      *  HON. KAREN WELLS ROBY
                        *
10                      *  APPLIES TO ALL CASES
11
12
          Videotaped Deposition of WALTER
13  EVERETT, JR., 606 South Spruce Street,
    Vidalia, Louisiana 71373, taken in person and
14  via ZOOM Videoconference, in the offices of
    Jones Walker, LLP, 201 St. Charles Avenue,
15  Suite 5100, New Orleans, Louisiana 70170, on
    Tuesday, the 4th day of April, 2023.
16
17
18
19
20  APPEARANCES: (VIA ZOOM)
21    ARNOLD & ITKIN, LLP
         (By:  John G. Grinnan, Esquire)
22       6009 Memorial Drive
         Houston, Texas 77007
23
           (Attorneys for Claimants)
24
25
```

```
                                                      Page 2
 1  APPEARANCES: (VIA ZOOM)
 2    PALMINTIER LAW GROUP
         (By:  Michael C. Palmintier, Esquire)
 3       618 Main Street
         Baton Rouge, Louisiana 70801
 4
           (Attorneys for Terrynn Tyrell Lyons)
 5
      SPAGNOLETTI LAW FIRM
 6      (By:  Marc E. Kutner, Esquire)
        401 Louisiana Street, 8th Floor
 7      Houston, Texas 77002
 8        (Attorneys for Montrell Smith and
            Randy Rials)
 9
10  APPEARANCES (IN PERSON):
11    PUSATERI, JOHNSTON,
         GUILLOT & GREENBAUM, LLC
12       (By:  Jacob A. Altmyer, Esquire
               Meredith W. Blanque, Esquire)
13       1100 Poydras Street, Suite 2250
         New Orleans, Louisiana 70163
14
           (Attorneys for Modern American
15           Railroad Services, L.L.C., and
             Shore Offshore Services, LLC)
16
      JONES WALKER, LLP
17       (By:  Alfred J. Rufty, III, Esquire
               Sara B. Kuebel, Esquire)
18       201 St. Charles Avenue, Suite 5100
         New Orleans, Louisiana 70170
19
           (Attorneys for Crosby Tugs, LLC)
20
      MEYER ORLANDO, LLC
21       (By:  Cameron A. Hatzel, Esquire)
         13201 Northwest Freeway, Suite 119
22       Houston, Texas 77040
23         (Attorneys for Oceaneering
             International, Inc.)
24
25
```

```
                                                      Page 3
 1  APPEARANCES: (IN PERSON)
 2    LISKOW & LEWIS
         (By:  David L. Reisman, Esquire)
 3       701 Poydras Street, Suite 5000
         New Orleans, Louisiana 70139
 4
           (Attorneys for Dawn Services, LLC)
 5
      ADAMS & REESE, LLP
 6       (By:  Charles A. Cerise, Jr., Esquire
               Edwin C. Laizer, Esquire)
 7       701 Poydras Street, Suite 4500
         New Orleans, Louisiana 70139
 8
           (Attorneys for Harvey Gulf
 9           International Marine, LLC)
10  APPEARANCES (VIA ZOOM):
11    CHAFFE, McCALL, LLP
12       (By:  John M. Ribarits, Esquire)
         801 Travis Street, Suite 1910
13       Houston, Texas 77002
14         (Attorneys for Premier Offshore
             Catering, Inc.)
15
      DAIGLE, FISSE & KESSENICH
16       (By:  Michael W. McMahon, Esquire)
         227 Highway 21
17       Madisonville, Louisiana 70447
18         (Attorneys for Martin Interests)
19    CHAFFE, McCALL, LLP
         (By:  Alexander J. DeGiulio, Esquire)
20       1100 Poydras Street, Suite 2300
         New Orleans, Louisiana 70163
21
           (Attorneys for Chubb Underwriting
22           Agencies, Ltd.)
23
24
25
```

```
                                                      Page 4
 1  APPEARANCES:  (VIA ZOOM)
 2    GALLOWAY, JOHNSON, TOMPKINS,
         BURR & SMITH
 3       (By:  Patrick J. Schepens, Esquire)
         #3 Sanctuary Boulevard, Suite 301
 4       Mandeville, Louisiana 70448
 5         (Attorneys for Coastal Towing, LLC,
             and Talisman Casualty Insurance
 6           Company, LLC)
 7    DEGAN, BLANCHARD & NASH
         (By:  Philip C. Brickman, Esquire)
 8       400 Poydras Street, Suite 2600
         New Orleans, Louisiana 70130
 9
           (Attorneys for U.S. Specialty
10           Insurance Company)
11    FLANAGAN PARTNERS, LLP
         (By:  Laurent J. Demosthenidy, Esquire)
12       201 St. Charles Avenue, Suite 3300
         New Orleans, Louisiana 70170
13
           (Attorneys for Weeks Marine, Inc.,
14           and GOL, LLC)
15    THE MOELLER FIRM, LLC
         (By:  David K. Smith, Esquire)
16       650 Poydras Street, Suite 2516
         New Orleans, Louisiana 70130
17
           (Attorneys for All Coast, LLC)
18
      ALLEN & GOOCH
19       (By:  John H. Hughes, Esquire)
         2000 Kaliste Saloom Road, Suite 400
20       Lafayette, Louisiana 70508
21         (Attorneys for Garber Brothers, LLC)
22    ALLEN & GOOCH
         (By:  Alan J. Meche, Esquire)
23       2000 Kaliste Saloom Road, Suite 400
         Lafayette, Louisiana 70508
24
           (Attorneys for Gulf Logistcs, LLC,
25           and C&G Boats, Inc.)
```

Page 481

1 Have you got a Bates number for
2 us?
3     MR. GRINNAN:
4         No. I got it off the National
5     Weather Service website.
6 EXAMINATION BY MR. GRINNAN:
7   Q   What I did, and I'll explain it to
8 you, is Exhibit No. 75 is six pages, and it's
9 forecast cone maps on each page. Do you see
10 that, sir?
11  A   Go ahead.
12  Q   Exhibit 75 -- can you see my
13 screen?
14  A   Yes, sir, I can see it.
15  Q   Okay. And if you -- here's the
16 first page, second page, third page, fourth
17 page, fifth page. Six pages. Do you see all
18 six pages, as I just went through there?
19  A   Yes.
20  Q   In each one of those six pages,
21 there is a forecast cone or map, right?
22  A   Yes.
23  Q   Okay. And you've seen these
24 forecast cones before, haven't you?
25  A   Yes.

Page 482

1   Q   Okay. These are the National
2 Weather Service forecast cones that they issue
3 for tropical cyclones, right?
4   A   Yes.
5   Q   Okay. And you'll see that this
6 is -- it was issued Saturday, October 20th --
7 let me strike that. On Page 1 of Exhibit 75,
8 you see that it was issued Saturday,
9 October 24th, 2020. Do you see that?
10  A   Yes, I think I can see it there.
11  Q   Is that better? Can you see it?
12  A   Yeah, okay, I can see it.
13  Q   And if you see, it's 5:00 p.m.
14 Eastern Daylight Time, and it says
15 "Advisory 1." Do you see that?
16  A   Yes.
17  Q   Okay. And at this time, this is
18 for something called Tropical Depression 28.
19 Do you see that?
20  A   Yes.
21  Q   Okay. And if we go to Page No. 2,
22 we see that this is a forecast track cone for
23 the next day, October 25th, 2020. Do you see
24 that?
25  A   Yes.

Page 483

1   Q   And by this point, it's called
2 Tropical Storm Zeta. Do you see that?
3   A   Yes.
4   Q   Okay. And you see this was issued
5 at 5:00 p.m. Eastern Daylight Time, and it's
6 Advisory 5. Do you see that?
7   A   Yes.
8   Q   Okay. And what I'm getting at is,
9 you see that, on Page 1 of Exhibit 75, it's at
10 5:00 p.m. Eastern Daylight Time, Page 2,
11 5:00 p.m. Eastern Daylight Time. It's 24
12 hours apart, right?
13  A   Correct.
14  Q   Okay. And this is -- 5:00 p.m.
15 Eastern Daylight Time is the same thing as
16 4:00 p.m. Central Time, right?
17  A   Correct.
18  Q   Okay. If we go to Page 3, we see
19 that it's for Monday, October 26th at
20 4:00 p.m. Central Daylight Time, Advisory
21 No. 9, Hurricane Zeta, right?
22  A   Correct.
23  Q   Okay. And the next page is from
24 4:00 p.m. Central Daylight Time, October 27th,
25 2020, for Tropical Storm Zeta, right?

Page 484

1   A   Correct.
2   Q   Okay. Go to Page No. 5, Hurricane
3 Zeta, October 28th, 2020, 4:00 a.m. Central
4 Daylight Time. This is 12 hours after the
5 last one (inaudible) that I showed you, right?
6   A   Okay. You cut out for a minute,
7 but yeah, I can see everything you pointed
8 out.
9   Q   On Page 5, it's a -- it's an
10 advisory forecast cone from the National
11 Weather Service for Hurricane Zeta, at
12 4:00 a.m., on October 28th, 2020, fair?
13  A   Fair.
14  Q   Okay. And that is 12 hours after
15 the forecast cone I showed you on Page No. 4,
16 right?
17  A   Correct.
18  Q   All right. And then the
19 (inaudible) page on Exhibit 75 is a forecast
20 advisory for Hurricane Zeta, on October 28th,
21 2020, at 4:00 p.m. Central Daylight Time. Do
22 you see that?
23  A   Yes.
24  Q   Okay. And so we see that, in
25 Exhibit 75, it's the very first advisory for

Page 485

1  Zeta, which was Tropical Depression 28 --
2  A   Uh-huh (affirmative response).
3  Q   -- at 4:00 p.m. Central Time, and
4  there is the same advisory at 4:00 p.m. on
5  Pages 1, 2, 3, 4, and 6, on the next day, is
6  that fair?
7  A   Fair.
8  Q   Okay.  And what I want you to look
9  at is, at the very, very first advisory for
10 what will become Zeta, the forecast cone and
11 the line down the middle is very, very, very
12 close to where the storm made landfall, isn't
13 it?
14 A   It seems to be.
15 Q   Okay.  And if we go to the next
16 day, it's the southeast corner of Louisiana
17 where this storm made landfall, that they're
18 narrowing in on, right?
19 A   Yes.
20 Q   And that's at the very first
21 advisory, October 24th, 2020, right?
22 A   Yes.
23 Q   You go to October 25th, same exact
24 area, right?
25 A   Yes.

Page 486

1  Q   October 26th, same exact area,
2  right?
3  A   Yes.
4  Q   And these aren't -- this isn't like
5  some big area.  This is -- this line is not
6  moving very much at all, to the naked eye, is
7  it?
8  A   No.
9  Q   Okay.  October 27th, same area
10 still.  It hasn't changed, has it?
11 A   It doesn't appear to.
12 Q   12 hours before, it hasn't changed,
13 has it?
14 A   No.
15 Q   And then right here, Page 6 of
16 Exhibit 75, this is right at landfall.  The
17 location where they predicted five days ago,
18 it's basically the same place that it's making
19 landfall, isn't it?
20 A   It seems to be.
21 Q   It might not be the exact point,
22 but it's darn near close and it's almost --
23 there's no discernable difference to the naked
24 eye, is there?
25 A   There doesn't appear to be.

Page 487

1  Q   The National Weather Service, they
2  nailed the location of this landfall five days
3  before landfall -- or four days before the
4  landfall, on October 24th, 2020, didn't they?
5  A   It appears to.
6  Q   Okay.  Now, these National Weather
7  Service forecast cones, these are things that
8  you, as a vessel captain, and that the
9  superintendent of the THOR would get, as the
10 vessel in charge of the THOR, and as the
11 vessel owners (inaudible) --
12     MR. ALTMYER:
13         I don't know if the question
14     finished, but I'm going to object even
15     if it didn't finish.
16 EXAMINATION BY MR. GRINNAN:
17 Q   As somebody who has been out at
18 sea, these National Weather Service forecast
19 cones are something that are provided to all
20 vessels, right?
21     MR. HATZEL:
22         Objection to form.
23     MR. ALTMYER:
24         Objection to form.
25     THE WITNESS:

Page 488

1         I don't know.
2  EXAMINATION BY MR. GRINNAN:
3  Q   Did you have them?
4  A   I saw them.
5  Q   Okay.  And did you know if the THOR
6  saw them?
7      MR. ALTMYER:
8          Objection to form.
9      THE WITNESS:
10         Did I know what?
11 EXAMINATION BY MR. GRINNAN:
12 Q   Do you know if anybody on the THOR
13 saw these forecast cones?
14 A   I don't know.
15     MR. ALTMYER:
16         Form.
17 EXAMINATION BY MR. GRINNAN:
18 Q   Okay.  Well, you do know that these
19 National Weather Service forecast cones, they
20 are readily available (inaudible) --
21 A   Your voice trailed off.
22 Q   The National Weather Service
23 forecast cones (inaudible), in Exhibit 75,
24 they're publicly available by the Weather
25 Service, aren't they?

Page 489

1  A   I don't know.
2  Q   You don't know that, as somebody
3  who's the captain of a tugboat? You never got
4  any training on that?
5  A   (No response).
6  Q   Do you know?
7  A   Do I know what?
8  Q   If these are publicly available or
9  not.
10 A   Yes. You can watch it on the
11 Weather Channel.
12 Q   Okay. And that's all I'm getting
13 at. So these National Weather Service
14 forecast cones tell vessel owners the forecast
15 path of a hurricane, multiple days out, don't
16 they?
17     MR. ALTMYER:
18         Objection to form.
19     THE WITNESS:
20         The predicted, yes.
21 EXAMINATION BY MR. GRINNAN:
22 Q   Okay. And the National Weather
23 Service forecast cone tells vessel owners the
24 forecasted location of a hurricane or tropical
25 cyclone, in this case, four days in advance,

Page 490

1  right?
2  A   Yes.
3  Q   Okay. The National Weather Service
4  forecast cone tells vessel owners the
5  projected location of a storm at certain dates
6  and certain times, doesn't it?
7      MR. ALTMYER:
8          Objection to form.
9      THE WITNESS:
10         Yes.
11 EXAMINATION BY MR. GRINNAN:
12 Q   And the National Weather Service
13 forecast cone also tells vessel owners about
14 the forecasted strength of the storm at each
15 of these 12-hour increments that you see here
16 on Page 1 of Exhibit 75, right?
17     MR. ALTMYER:
18         Objection to form.
19     THE WITNESS:
20         Yes.
21 EXAMINATION BY MR. GRINNAN:
22 Q   And the National Weather Service
23 forecast cone provides all vessel owners about
24 the time, location and strength of a
25 hurricane, multiple days, and in this case, at

Page 491

1  least four days in advance, of its landfall,
2  right?
3      MR. ALTMYER:
4          Objection to form.
5      THE WITNESS:
6          Yes.
7  EXAMINATION BY MR. GRINNAN:
8  Q   Okay. And so the National Weather
9  Service cone for Hurricane Zeta provided the
10 THOR interests with warnings about the
11 forecasted time, location and strength of the
12 hurricane at least four days before the storm
13 made landfall, true?
14     MR. ALTMYER:
15         Objection to form.
16     THE WITNESS:
17         It appears so.
18 EXAMINATION BY MR. GRINNAN:
19 Q   Okay. And the National Weather
20 Service forecast cone that provided a warning
21 to the vessel owner of the D/B THOR is
22 something that can be used to avoid dangerous
23 hurricanes or tropical storms, multiple days
24 in advance, fair?
25     MR. ALTMYER:

Page 492

1          Objection to form.
2      THE WITNESS:
3          Yes.
4  EXAMINATION BY MR. GRINNAN:
5  Q   Okay. The THOR interests could
6  have used these National Weather Service
7  forecast cones back on October 24th, 2020, to
8  know exactly where it would be dangerous to
9  moor the D/B THOR, based on this forecast,
10 fair?
11     MR. ALTMYER:
12         Objection to form.
13     THE WITNESS:
14         You dropped out on the first
15     part of that question. I don't know.
16 EXAMINATION BY MR. GRINNAN:
17 Q   Sure. These National Weather
18 Service forecast cones can be used by vessel
19 owners, like the THOR interests, to get
20 warnings on where not to moor their vessel, as
21 a hurricane is approaching, multiple days
22 before the storm ever makes landfall, true?
23     MR. ALTMYER:
24         Objection to form.
25     THE WITNESS

Page 493

1      Yes.
2  EXAMINATION BY MR. GRINNAN:
3     Q    Okay.  If these warnings are
4  heeded, these National Weather Service
5  forecast cones can be used by vessel owners,
6  like the THOR interests, to prevent and avoid
7  dangerous situations like the one that you
8  encountered and that the THOR was subjected to
9  on October 28, 2020, fair?
10       MR. ALTMYER:
11            Objection to form.
12       THE WITNESS:
13            It's possible.
14  EXAMINATION BY MR. GRINNAN:
15    Q    Okay.  If the owners of the D/B
16  THOR had looked at this map on October 24th,
17  2020, and made the decision that they were
18  going to make safety the No. 1 priority, they
19  could have sent the vessel outside of this
20  cone, and that would have prevented this
21  entire incident, right?
22       MR. ALTMYER:
23            Objection to form.
24       THE WITNESS:
25            We don't know.

Page 494

1  EXAMINATION BY MR. GRINNAN:
2     Q    Well, let me ask you this.  If the
3  D/B THOR doesn't go to Port Fourchon and
4  instead gets out of this cone, that is being
5  made public four days in advance, we know that
6  the D/B THOR would never have been subjected
7  to this hurricane, right?
8        MR. ALTMYER:
9             Objection to form.
10       THE WITNESS:
11            It would appear so.
12  EXAMINATION BY MR. GRINNAN:
13    Q    Okay.  And so if the THOR interests
14  had just followed the warnings provided by the
15  National Weather Service, back on
16  October 24th, 2020, that could have prevented
17  this incident, fair?
18       MR. ALTMYER:
19            Objection to form.
20       THE WITNESS:
21            It appears that way.
22  EXAMINATION BY MR. GRINNAN:
23    Q    Okay.  But we know that the THOR
24  interests, they failed to follow the warnings
25  that were being put out by the National

Page 495

1  Weather Service prior to this storm, that
2  said, "Don't go to Port Fourchon," fair?
3        MR. ALTMYER:
4             Objection to form.
5        THE WITNESS:
6             I don't know, on the way you
7   had that worded.
8  EXAMINATION BY MR. GRINNAN:
9     Q    Sure.  We know that the THOR
10  interests ignored the warning, put out on
11  October 24th, 2020, because they ended up
12  putting the THOR right in the path of this
13  hurricane, didn't they?
14       MR. ALTMYER:
15            Objection to form.
16       THE WITNESS:
17            Yeah, but I don't know why,
18   how --
19  EXAMINATION BY MR. GRINNAN:
20    Q    Sure.  And I'm not asking you how
21  or why.  What we do know is that this warning
22  was ignored and that the owner of the D/B THOR
23  put the THOR right in the path of this
24  hurricane, as predicted by the weather
25  service, on October 24th, 2020, right?

Page 496

1        MR. ALTMYER:
2             Objection to form.
3  EXAMINATION BY MR. GRINNAN:
4     Q    Is that true?
5        MR. ALTMYER:
6             Objection to form.
7        THE WITNESS:
8             You're asking me to make an
9    assumption, and I'm not.
10  EXAMINATION BY MR. GRINNAN:
11    Q    No.  Well, here, let's do this a
12  different way.  When you look at Page 1 of
13  Exhibit 75 -- and we'll zoom in -- the
14  projected path of this Hurricane Zeta is
15  basically right over Port Fourchon, isn't it?
16    A    It appears so.
17    Q    Okay.  And despite this warning,
18  being put out on October 24th, 2020, the THOR
19  interests make a decision to moor the THOR at
20  Port Fourchon, true?
21       MR. ALTMYER:
22            Object to form.
23       THE WITNESS:
24            True.
25  EXAMINATION BY MR. GRINNAN:

Page 497

1  Q  Okay. And if safety is the No. 1
2  priority, the THOR interests would not have
3  ignored the National Weather Service's
4  warnings, true?
5      MR. ALTMYER:
6          Object to form.
7      THE WITNESS:
8          I can't say that.
9  EXAMINATION BY MR. GRINNAN:
10  Q  Okay. Well, do you think it's safe
11 to park a boat in the middle of the path of a
12 hurricane?
13  A  No.
14  Q  Okay, neither do I. So what we do
15 know is that, despite these warnings being
16 issued by the National Weather Service, the
17 THOR interests made the decision to send you
18 to Port Fourchon and every crewmember on board
19 the THOR, to Port Fourchon, fair?
20      MR. HATZEL:
21          Objection to form.
22      MR. ALTMYER:
23          Object to form.
24      THE WITNESS:
25          I don't know how fair it is.

Page 498

1  EXAMINATION BY MR. GRINNAN:
2   Q  Well, what about what I said is not
3  fair, sir?
4   A  Don't ask me if something is fair.
5   Q  Well, what -- is it an unfair
6  characterization or not? That's what I'm
7  asking.
8       MR. HATZEL:
9           Objection to form.
10      THE WITNESS:
11          I'm not able to determine that.
12 EXAMINATION BY MR. GRINNAN:
13  Q  Yeah, you are. Because I'm not
14 asking you to do anything other than -- if I'm
15 saying it's unfair and -- I want to be on the
16 same page, okay.
17     Okay? Is it fair to say that the
18 THOR interests made the decision to send the
19 THOR to Port Fourchon, which is basically the
20 projected landfall location, on October 24th,
21 2020, of Hurricane Zeta?
22      MR. HATZEL:
23          Object to the form.
24      MR. ALTMYER:
25          Objection to form.

Page 499

1       THE WITNESS:
2           Yes, that decision was made.
3  EXAMINATION BY MR. GRINNAN:
4   Q  Okay. And the same decision was
5  made by the THOR interests to send you to Port
6  Fourchon, true?
7       MR. ALTMYER:
8           Object to form.
9       THE WITNESS:
10          Yes.
11 EXAMINATION BY MR. GRINNAN:
12  Q  Okay. And despite warnings being
13 provided by the Weather Service, the THOR
14 interests decided to send the D/B THOR to Port
15 Fourchon, multiple days after they were first
16 provided with this warning, fair?
17      MR. ALTMYER:
18          Object to form.
19      MR. HATZEL:
20          Object to form.
21      THE WITNESS:
22          I don't know when they received
23      the warning, so I'm not qualified to
24      answer that.
25 EXAMINATION BY MR. GRINNAN:

Page 500

1   Q  Sure. Let's do this a different
2  way. What day did you all head back to Port
3  Fourchon?
4   A  I'm not exactly sure. I think the
5  25th or 26th.
6   Q  Okay. So if this warning came out
7  on October 24th, on Page 1 of Exhibit 75, --
8   A  Yes.
9   Q  -- that's before you went back, the
10 THOR went back to Port Fourchon, on the 26th,
11 right?
12      MR. ALTMYER:
13          Object to form.
14      THE WITNESS:
15          Yes.
16 EXAMINATION BY MR. GRINNAN:
17  Q  Okay. And after this warning was
18 issued by the National Weather Service, THOR
19 made the decision to dock and moor the THOR
20 and send you to Port Fourchon, fair?
21      MR. ALTMYER:
22          Object to form.
23      THE WITNESS:
24          True.
25 EXAMINATION BY MR. GRINNAN:

Page 501

1  Q   Okay. And if safety is the No. 1
2  priority, a vessel owner like the THOR
3  interests, they'd be following warnings that
4  are being given to them ahead of time by the
5  National Weather Service, fair?
6       MR. ALTMYER:
7           Object to form.
8       THE WITNESS:
9           I can't determine the fairness.
10 EXAMINATION BY MR. GRINNAN:
11 Q   Okay. Well, do you think, if
12 safety is the No. 1 priority, that you should
13 subject crewmembers to the risks of being put
14 in the path of a Category 2 or Category 3
15 hurricane?
16      MR. HATZEL:
17          Objection to form.
18      MR. ALTMYER:
19          Objection to form.
20      THE WITNESS:
21          No.
22 EXAMINATION BY MR. GRINNAN:
23 Q   Okay. And despite having
24 information that, well, -- and by that logic,
25 if safety is the No. 1 priority for the THOR

Page 502

1  interests, they wouldn't have sent the THOR
2  and they wouldn't have sent you directly to a
3  port that is in the projected path of
4  Hurricane Zeta, right?
5       MR. ALTMYER:
6           Object to form.
7       THE WITNESS:
8           I don't know that.
9  EXAMINATION BY MR. GRINNAN:
10 Q   Okay. Will you just agree with me
11 that if safety was the No. 1 priority, you
12 wouldn't put a vessel in the projected path of
13 a hurricane, right?
14      MR. ALTMYER:
15          Objection to form.
16      THE WITNESS:
17          I agree with you on that.
18 EXAMINATION BY MR. GRINNAN:
19 Q   Okay. And so by that logic, if
20 safety was the No. 1 priority for the THOR
21 interests, they wouldn't have put the
22 crewmembers on board the D/B THOR into the
23 projected path of the Hurricane Zeta, right?
24      MR. ALTMYER:
25          Objection to form.

Page 503

1       THE WITNESS:
2           I guess, reasonable.
3  EXAMINATION BY MR. GRINNAN:
4  Q   Okay. They wouldn't have sent you
5  there either to provide additional assisting
6  services, right?
7       MR. ALTMYER:
8           Objection to form.
9       THE WITNESS:
10          Reasonable.
11 EXAMINATION BY MR. GRINNAN:
12 Q   Reasonable, yes, or --
13      MR. ALTMYER:
14          Same objection.
15      THE WITNESS:
16          Reasonable, yes.
17 EXAMINATION BY MR. GRINNAN:
18 Q   Okay. Would you agree that, if
19 safety is the No. 1 priority, that a vessel
20 owner must listen to the warnings that are
21 given by the National Weather Service on
22 projected hurricane paths?
23      MR. HATZEL:
24          Objection to form.
25      THE WITNESS:

Page 504

1           I agree that they should.
2  EXAMINATION BY MR. GRINNAN:
3  Q   Okay. If safety was really the
4  No. 1 priority, they would have -- strike
5  that. If safety was really the No. 1
6  priority, the THOR interests would have sent
7  you and the D/B THOR outside of the projected
8  cone, because that's the best way to ensure
9  that people were kept safe, fair?
10      MR. HATZEL:
11          Objection to form.
12      MR. ALTMYER:
13          Objection to form.
14      THE WITNESS:
15          Yes.
16 EXAMINATION BY MR. GRINNAN:
17 Q   Okay. And were you involved with
18 actually towing the THOR to the Texas waters
19 before this incident, for another hurricane?
20      MR. HATZEL:
21          Objection, asked and answered.
22      THE WITNESS:
23          No.
24 EXAMINATION BY MR. GRINNAN:
25 Q   Okay. If safety is the No. 1

Page 573

1  A   Correct.
2  Q   Okay.  Did Crosby ever provide you
3  with training on assisting vessels during a
4  hurricane, to keep the vessel moored to a
5  dock?
6  A   No.
7  Q   Did Crosby provide you with
8  training on how Crosby Tugs should assist
9  vessels during a hurricane, to keep the vessel
10 moored to a dock?
11 A   I don't recall.
12 Q   Sitting here today, are you able to
13 identify any training that you can recall that
14 Crosby gave you, that trained you on how a
15 Crosby tug should assist a vessel during a
16 hurricane, to keep the vessel moored to a
17 dock?
18       MR. RUFTY:
19          Asked and answered.
20       THE WITNESS:
21          I don't recall.
22 EXAMINATION BY MR. GRINNAN:
23 Q   Okay.  Did Crosby ever provide you
24 with training on a standard operating
25 procedure for Crosby Tugs to use when

Page 574

1  assisting another vessel, to keep the vessel
2  moored to a dock?
3  A   I don't recall.
4  Q   Okay.  If -- you say you can't
5  recall, but do you know of a TSMS manual or do
6  you know of any written documentation I can go
7  look at to see?
8  A   The TSMS manual would be the place
9  to look.
10 Q   And is it fair to say, sir, so I
11 don't have to ask this each time, that for
12 every bit of training that Crosby provided to
13 you, it would be contained in a TSMS manual?
14 A   No.
15 Q   Okay.  All right, fair enough.  So
16 I'll ask you each time.  Did Crosby ever
17 provide you with any training on the standard
18 operating procedure for Crosby tugs to use
19 when assisting another vessel during a
20 hurricane, to keep the vessel moored to the
21 dock?
22 A   Not specifically.
23 Q   Okay.  Did Crosby -- this term,
24 "working as directed," we've heard a lot about
25 it today.  Did Crosby provide you training on

Page 575

1  what working as directed means?
2  A   Not that I know of.
3  Q   All right.  Did Crosby provide you
4  with any training on what to do in emergency
5  situations, when you are the captain of a
6  Crosby tug, and working as directed?
7  A   In what scenario?
8  Q   How about an emergency situation
9  where a vessel comes on board from a dock
10 during a hurricane.
11 A   Not specifically.
12 Q   Okay.  Did they provide you with
13 any training on what to do in any emergency
14 situation when you are the captain of a Crosby
15 tug and you are working as directed?
16 A   TSMS manual.
17 Q   Sitting here today, you can't
18 recall any?
19       MR. RUFTY:
20          Object to form.
21       THE WITNESS:
22          It would be when -- within the
23    TSMS manual.
24 EXAMINATION BY MR. GRINNAN:
25 Q   Okay.  So -- and I'm not trying to

Page 576

1  be a stickler here, but is it your testimony,
2  you can remember it, but I need to look at the
3  TSMS manual, but -- or is it, I don't remember
4  any, and if there is any, you need to look at
5  the TSMS manual?
6  A   Yeah, it would be contained within
7  the TSMS manual.  I don't have any direct
8  recall of any specific training.
9  Q   What does "TSMS" stand for?
10 A   Towing -- oh, shit, my mind's
11 drawing a blank.  But it's -- it's the
12 safety -- towing --
13 Q   Do you know if the -- does the "M"
14 stand for "manual"?
15 A   Yeah, sounds about right.  Towing
16 Safety and Environmental --
17 Q   Oh, T-SEM?
18 A   SMS.
19 Q   T-S-E-M?
20 A   Yes.
21 Q   T-S-E-M?
22 A   Yes.
23 Q   Let's see.
24       MR. RUFTY:
25          Tell him what you know and

Page 653

1  EXAMINATION BY MR. GRINNAN:
2    Q   Is there another source that would
3  contain training materials, on Crosby training
4  they provide to captains on assessing whether
5  you should blindly work as directed?
6       MR. RUFTY:
7           Object to form.  Too vague.
8  EXAMINATION BY MR. GRINNAN:
9    Q   You can answer.
10   A   I'm not aware.
11   Q   Okay.  Did Crosby provide you with
12 any training on situations where you should
13 work or act, even in the absence of any
14 direction or a direct order?
15      MR. RUFTY:
16          Objection.  That's just
17      impossibly vague to understand.  I mean,
18      what are you talking about?  In what
19      scenario are you talking about?
20      MR. GRINNAN:
21          The exact -- the exact scenario
22      he's been testifying about all day, to
23      work as directed, that scenario.  Sorry
24      it's --
25      MR. RUFTY:

Page 654

1           Would you mind rephrasing,
2       counsel?
3       MR. GRINNAN:
4           I'm asking questions about it,
5       but --
6       MR. RUFTY:
7           Would you please rephrase so we
8       can better understand the question?
9       MR. GRINNAN:
10          Sure.  I will.
11 EXAMINATION BY MR. GRINNAN:
12   Q   Did Crosby provide you with any
13 training on situations where it's appropriate
14 to act or take an action, even in the absence
15 of getting any direct order or any direction?
16      MR. RUFTY:
17          Did you understand that?
18      THE WITNESS:
19          No, I would --
20      MR. RUFTY:
21          Did you understand it?
22      THE WITNESS:
23          No, it's -- either I'm burning
24      out or --
25      MR. RUFTY:

Page 655

1           If you don't understand, then
2       you can't answer.
3       THE WITNESS:
4           No.
5       MR. GRINNAN:
6           I can't believe how much you're
7       violating the rules.
8  EXAMINATION BY MR. GRINNAN:
9    Q   All right, sir.  When you work as
10 directed, sometimes you might not get any
11 directions to perform any work, right?
12   A   It could happen.
13   Q   Okay.  Did you get any training
14 from Crosby on certain situations where Crosby
15 says you should take action, even when you're
16 working as directed and no one ever gives you
17 any direct order?
18   A   I don't recall.
19   Q   Okay.  If you had been given
20 training like that, would it be contained in
21 the TSMS manual, to your knowledge?
22   A   I'm not sure.
23   Q   Okay.  As far as you know, is the
24 only source that would contain training like
25 that, the TSMS manual?

Page 656

1    A   I'm not sure.
2    Q   What additional sources does Crosby
3  use to provide training to captains like that?
4    A   I'm not sure.
5    Q   Based on your experience, working
6  for Crosby, what other sources have they
7  provided to you to train you, other than the
8  classes and the TSMS manual?
9    A   That would be it.
10   Q   Okay.  So if they did provide you
11 training on what to do in situations where you
12 should take action, in the absence, even in
13 the absence of a direct order, it would be in
14 one of those classes or the TSMS manual?
15      MR. RUFTY:
16          Asked and answered.
17 EXAMINATION BY MR. GRINNAN:
18   Q   You can answer.
19   A   That's -- that's my assessment.
20      MR. RUFTY:
21          Okay.  The 10 minutes is up, so
22      it's time to --
23 EXAMINATION BY MR. GRINNAN:
24   Q   That's your what?  That's your
25 assessment?