Transcript of the Testimony of

# Thomas Gibilterra, PE

October 3, 2023

All Coast, LLC v. Shore Offshore Services, LLC, Modern American Railroad Services, L.L.C., and Martin Energy Service, LLC



P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

393

1   Thor, true?
2       A.  Yes, sir.
3       Q.  And through your job at Shore and your
4   experience in the industry through Bisso Marine
5   and Torch, you're someone who's knowledgeable
6   about the expectations of a tugboat in towing a
7   nonself-propelled derrick barge like the Thor,
8   fair?
9       A.  Yes.
10      Q.  Okay.  And through your experience in
11  the industry, you are someone knowledgeable about
12  the expectations of a tugboat when hired to hold a
13  nonself-propelled derrick barge like the Thor
14  against a dock during a hurricane, true?
15      A.  Yes.
16      Q.  Okay.  In providing assistance -- well,
17  strike that.
18      There are certain expectations or duties that
19  you'd expect from a tugboat who's providing you
20  with assistance during a storm like the one in
21  this case at Port Fourchon; is that fair?
22      A.  Yes.
23      Q.  All right.  Tugboats have a duty to act
24  reasonably under the circumstances, fair?
25      A.  Yes.

394

1       Q.  Tugboats have a duty to pay attention to
2   vessels under their tow, fair?
3       A.  Yes.
4       Q.  Tugboats have a duty to pay attention to
5   a vessel when it is providing any tugboat services
6   to that vessel, fair?
7       A.  Yes.
8       Q.  Tugboats holding a vessel against a dock
9   during a hurricane have a duty to take reasonable
10  actions to protect the people on the vessel if
11  they are in danger, fair?
12      A.  Fair.
13      Q.  Tugboats hired to hold a vessel during a
14  dock -- during a hurricane have a duty to take
15  reasonable actions to prevent the vessel from
16  breaking away, true?
17      A.  True.
18      Q.  Tugboats hired to hold a vessel against
19  a dock during a hurricane have a duty to take
20  reasonable actions to prevent the vessel from
21  unmooring, true?
22      A.  True.
23      Q.  Okay.  Last one like this.  Tugboats
24  hired to hold a vessel against a dock during a
25  hurricane have a duty to take reasonable actions

395

1   to keep the vessel moored against the dock, fair?
2       A.  Fair.
3       Q.  All right.  The Thor, on the day of the
4   incident, it was a nonself-propelled vessel, fair?
5       A.  Fair.
6       Q.  The Crosby Endeavor was the tugboat that
7   was hired to provide assistance to the Thor on the
8   day of the incident, true?
9       A.  True.
10      Q.  One of the things the Crosby Endeavor
11  was required to do as part of its job that day was
12  to hold the Thor up against the dock during the
13  hurricane, true?
14      A.  Repeat the question.
15      Q.  One of the things that the Endeavor was
16  required to do as part of its job in providing
17  assistance to the Thor was to hold the Thor
18  against the dock during the hurricane, true?
19      A.  True.
20          MR. RUFTY:  Object to form.
21  EXAMINATION BY MR. GRINNAN:
22      Q.  And to do that, that would require the
23  Crosby Endeavor to have its engines on, true?
24      A.  Correct.
25      Q.  Crosby had a duty to have its engines on

396

1   to assist the Thor during the hurricane, true?
2       A.  True.
3           MR. RUFTY:  Object to form.
4   EXAMINATION BY MR. GRINNAN:
5       Q.  Crosby Endeavor was required to take
6   action in the event that the Thor started coming
7   unmoored, true?
8       A.  True.
9           MR. RUFTY:  Object to form.
10  EXAMINATION BY MR. GRINNAN:
11      Q.  The purpose of that role is to protect
12  people onboard the Thor from being injured, true?
13          MR. RUFTY:  Object to form.
14          THE WITNESS:  That's one of the jobs.
15  EXAMINATION BY MR. GRINNAN:
16      Q.  Okay.  And in this case, you'd agree
17  with me the Crosby Endeavor failed to comply with
18  its duty to act reasonably under the
19  circumstances, because it did nothing, true?
20          MR. REISMAN:  Object to the form.
21          MR. RUFTY:  Form.
22          THE WITNESS:  Yes, that's a form
23  question.  I don't know how to answer that.
24          MR. REISMAN:  We agree on something,
25  hey.

Pages 393 to 396



```
                                                   397
 1           THE WITNESS:  Thought I'd agree on that
 2       one.
 3           MR. GRINNAN:  I'm going to object.
 4           MR. GUILLOT:  Ask it again.
 5           THE WITNESS:  Taking the bar next week.
 6   EXAMINATION BY MR. GRINNAN:
 7       Q.  Good luck.
 8           In this case, the Crosby Endeavor failed to
 9   comply with its duty to act reasonably under the
10   circumstances, because it did nothing when the
11   Thor started coming unmoored, true?
12       A.  I'm not going to --
13           MR. RUFTY:  Form.
14           THE WITNESS:  I'm not going to agree to
15       that statement.
16   EXAMINATION BY MR. GRINNAN:
17       Q.  Okay.  So do you believe the Crosby
18   Endeavor acted reasonably under the circumstances?
19       A.  The -- I think they tried to do some
20   things.  Was it adequate?  Not necessarily.  But
21   the way you phrased the question, I can't answer.
22       Q.  All right.  Well, the Crosby Endeavor
23   failed to comply with its duty to take reasonable
24   actions to prevent the Thor from breaking away,
25   true?
```

```
                                                   398
 1       A.  Yes.
 2           MR. RUFTY:  Form.
 3   EXAMINATION BY MR. GRINNAN:
 4       Q.  The Crosby Endeavor failed to comply
 5   with its duty to take reasonable actions to
 6   prevent the Thor from unmooring, true?
 7       A.  Yes.
 8           MR. RUFTY:  Form.
 9   EXAMINATION BY MR. GRINNAN:
10       Q.  The Crosby Endeavor failed to comply
11   with its duty to keep the Thor moored against the
12   dock during the hurricane in this case, true?
13       A.  Yes.
14           MR. RUFTY:  Form.
15   EXAMINATION BY MR. GRINNAN:
16       Q.  To comply with all of those failures,
17   they directly caused the Thor to unmoor in this
18   case and the injuries in this case, true?
19           MR. RUFTY:  Form.
20           THE WITNESS:  That is not the only
21       thing.  I can't agree to that.
22   EXAMINATION BY MR. GRINNAN:
23       Q.  Well, the Crosby Endeavor failures to
24   keep the Thor moored against the dock were a cause
25   of the incident in this case and the injuries,
```

```
                                                   399
 1   fair?
 2           MR. RUFTY:  Form.
 3           THE WITNESS:  I would say there's
 4       partial liability there.
 5   EXAMINATION BY MR. GRINNAN:
 6       Q.  Okay.  They were a cause, true?
 7           MR. RUFTY:  Form.
 8           THE WITNESS:  I can't tell you exactly
 9       what the true full cause is.
10   EXAMINATION BY MR. GRINNAN:
11       Q.  I didn't ask that.  I said, they were a
12   cause, not the full true cause.  They were just a
13   cause.  There might be several causes, but the
14   Crosby failures did cause some of this incident
15   and the injuries, true?
16           MR. RUFTY:  Form.
17           THE WITNESS:  I would not say cause.
18   EXAMINATION BY MR. GRINNAN:
19       Q.  Okay.  The Crosby failures substantially
20   contributed to the Thor coming unmoored on the day
21   of the incident, true?
22           MR. RUFTY:  Form.
23           THE WITNESS:  Yes.
24   EXAMINATION BY MR. GRINNAN:
25       Q.  The Crosby failures substantially
```

```
                                                   400
 1   contributed to the Thor breaking away on the day
 2   of the incident, true?
 3           MR. RUFTY:  Form.
 4           THE WITNESS:  Repeat the question,
 5       please.  I apologize.
 6   EXAMINATION BY MR. GRINNAN:
 7       Q.  The Crosby failures substantially
 8   contributed to the Thor breaking away on the day
 9   of the incident, true?
10           MR. RUFTY:  Form.
11           THE WITNESS:  I'm not going to answer
12       that.
13   EXAMINATION BY MR. GRINNAN:
14       Q.  Okay.  Why?
15           MR. GRINNAN:  I'm going to object, it's
16       nonresponsive.
17           THE WITNESS:  Yes, object to
18       nonresponsiveness.  Let's move on.
19           MR. GUILLOT:  If you can answer his
20       question -- hang on, John.
21           THE WITNESS:  I'm not answering it.
22           MR. GUILLOT:  Just hang on.  If you can
23       answer his question, go ahead and answer it.
24           THE WITNESS:  Yes, I can't answer his
25       question.
```

Pages 397 to 400



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

401

```
 1        MR. GUILLOT:  Okay.
 2   EXAMINATION BY MR. GRINNAN:
 3        Q.  Okay.  Why not?
 4        A.  Because I can't.  I don't like the way
 5   it's worded.
 6        Q.  That's -- so you're just refusing to
 7   answer?
 8        A.  Yes.
 9        Q.  What don't you like about the wording?
10        A.  I just don't.
11        Q.  You just don't, okay.
12        A.  Call me crazy --
13        MR. GUILLOT:  Hold on.  Hold on.  John,
14   can you think of a different way to ask it?
15        Why don't we take a 5-minute break.  Is
16   that okay?
17        MR. GRINNAN:  Sure.
18        THE VIDEOGRAPHER:  Off the record.  The
19   time is now 6:13.
20        (RECESS 6:13-6:20 P.M.)
21        THE VIDEOGRAPHER:  Back on the record.
22   The time is now 6:20.
23   EXAMINATION BY MR. GRINNAN:
24        Q.  All right, sir, we're back from a quick
25   break.  Are you ready to proceed?
```

402

```
 1        A.  Yes, sir.
 2        Q.  All right.  The Crosby failures in this
 3   case substantially contributed to the Thor coming
 4   unmoored, true?
 5        MR. RUFTY:  Form.
 6        THE WITNESS:  The Thor became unmoored
 7   due to the weather conditions and sea
 8   conditions.  That's the cause.  You asked
 9   about the cause.
10        MR. GRINNAN:  I'll object as
11   nonresponsive, as I said "contributed."
12   EXAMINATION BY MR. GRINNAN:
13        Q.  So I'll ask you again.  In this case,
14   the Crosby failures contributed to the Thor coming
15   unmoored during the hurricane, true?
16        MR. RUFTY:  Form.
17        THE WITNESS:  Yes.
18   EXAMINATION BY MR. GRINNAN:
19        Q.  And the purpose of having a boat --
20   strike that.
21        The purpose of having the Crosby Endeavor, a
22   tug, to assist the Thor during the hurricane at
23   Port Fourchon was to protect crew members onboard
24   the Thor from injuries and from damage to the
25   vessel itself, true?
```

403

```
 1        A.  True.
 2        MR. RUFTY:  Form; object to form.
 3   EXAMINATION BY MR. GRINNAN:
 4        Q.  What was the answer?
 5        A.  True.
 6        Q.  Did you review any statements from any
 7   of the crew members onboard the Thor?
 8        A.  Not to my knowledge.
 9        Q.  Did you do any investigation that looked
10   into the actions of the crew members other than
11   Joe Douglas?
12        MR. GUILLOT:  Just hang on a second.
13   I'm objecting only to the extent that it
14   would require him to reveal communications
15   he's had with Shore attorneys.  Subject to
16   that, I'm allowing him to answer.
17        THE WITNESS:  So I apologize, but you
18   have to ask that question again.
19   EXAMINATION BY MR. GRINNAN:
20        Q.  Did you do anything to look into the
21   actions taken by any of the members, crew members,
22   onboard the Thor on the day of the incident other
23   than Joe Douglas and other than having
24   conversations with your lawyers?
25        A.  I found out what some of the members
```

404

```
 1   were doing onboard the barge after it broke free.
 2        Q.  Are you talking about the crew members
 3   who were trying to anchor the Thor --
 4        A.  Yes.
 5        Q.  -- while it was floating away?
 6        A.  Yes.
 7        Q.  Those actions taken by some of the
 8   clients I represent, those were admiral actions,
 9   weren't they?
10        A.  I think they were doing their best job
11   to get that barge stopped.
12        Q.  You appreciate the job that they did in
13   getting that barge stopped, because that was the
14   last line of defense, wasn't it?
15        A.  I appreciate the job that they did.  I
16   wouldn't say it's necessarily the last line of
17   defense.
18        Q.  Well, the crew members onboard the Thor,
19   I'm not talking about Joe Douglas, who took
20   actions to stop the Thor while it was floating
21   down the bayou in the middle of a hurricane, those
22   were brave actions, true?
23        A.  True.
24        Q.  Okay.  There was no negligence involved
25   in those actions taken by any of the crew members
```

```
                                                    405
 1  besides Joe Douglas in trying to stop the Thor
 2  after it became unmoored, true?
 3        MR. GUILLOT: Object to the form of the
 4     question.
 5        You can answer if you're qualified to
 6     answer, if you know.
 7        THE WITNESS: I don't know.
 8  EXAMINATION BY MR. GRINNAN:
 9     Q. To your knowledge, you are aware of no
10  evidence that any of the crew members from CLS or
11  Oceaneering or Premier did anything negligent to
12  cause or contribute to this incident, true?
13        MR. GUILLOT: Hang on one second. I
14     have to object to the extent that that
15     reveals mental impressions of counsel and
16     communications that we've had with him.
17     Outside of that, he can answer.
18        THE WITNESS: I don't know of any.
19  EXAMINATION BY MR. GRINNAN:
20     Q. Okay. Would you agree with me that the
21  20 or so crew members, 21 or so crew members
22  onboard the DB Thor at the time of the incident,
23  they were essential members of the Thor crew at
24  the time?
25     A. Essential members of the crew? I don't
```

```
                                                    406
 1  know if everybody was essential.
 2     Q. Why did y'all make them stay on there,
 3  then?
 4        MR. GUILLOT: Object to the form of the
 5     question.
 6        THE WITNESS: There's no such thing as
 7     slavery or indentured servitude in this
 8     country anymore. Everybody is free to go
 9     whenever they want.
10  EXAMINATION BY MR. GRINNAN:
11     Q. Uh-huh. But my question was -- well,
12  that's not really the way the industry works.
13  Orders flow down from a captain, don't they?
14     A. No. Nobody is forced to stay on any
15  equipment at any time.
16     Q. Okay. Why did y'all request certain
17  crew members to stay onboard during a hurricane,
18  then?
19     A. Well, obviously, Joe Douglas requested,
20  say, the catering person onboard, because he
21  doesn't want to make his own food. I mean, that's
22  kind of where we're at.
23     Q. Okay. Well, all I'm asking you: Isn't
24  it an essential function of the crew to eat?
25     A. Those people are capable of providing
```

```
                                                    407
 1  for themselves, and we've done that in the past.
 2     Q. So you requested that Premier stay
 3  onboard, even though it was unnecessary for them,
 4  and there was a big hurricane approaching --
 5     A. I'm not sure --
 6     Q. -- there's no need to endanger them?
 7     A. You're asking me something that I have
 8  no knowledge of. If they were asked to stay, if
 9  they volunteered to stay, I have no knowledge of
10  that.
11     Q. Okay. Well, let me -- my question, I
12  guess, is a little bit different, since this is
13  what you said. It was completely unnecessary to
14  even request Premier to stay onboard the Thor and
15  endanger them in the path of a hurricane, true?
16        MR. GUILLOT: Object to form.
17        THE WITNESS: No. No.
18  EXAMINATION BY MR. GRINNAN:
19     Q. Okay. I didn't think so. All I'm
20  saying is: The request for them to stay onboard
21  the Thor was made to Premier because they are an
22  essential part of the crew? That's it.
23        MR. GUILLOT: Object to form.
24  EXAMINATION BY MR. GRINNAN:
25     Q. True?
```

```
                                                    408
 1     A. No.
 2     Q. That's fine.
 3     Y'all kept nonessential people onboard the
 4  Thor and kept them in the path of a hurricane
 5  unnecessarily subjecting them to extreme risks of
 6  harm, true?
 7        MR. GUILLOT: Object to form.
 8        THE WITNESS: We cannot keep anybody
 9     against their will from doing anything.
10        MR. GRINNAN: Objection; nonresponsive.
11        THE WITNESS: The answer is no, then.
12  EXAMINATION BY MR. GRINNAN:
13     Q. Okay. No, you didn't leave them there
14  unnecessarily?
15     A. We did not keep them there.
16     Q. Unnecessarily?
17     A. We did not keep them.
18     Q. Why did you request people to be onboard
19  the Thor at all if a hurricane was coming?
20     A. So that they can keep people fed, keep
21  the physical plant going, and have the barge go
22  through the storm with those functions intact.
23     Q. It was the essential part of the crew,
24  right?
25     A. No.
```

Pages 405 to 408



```
                                                    409
 1       Q.  Why would you let -- why would you
 2   request them to stay onboard if it wasn't
 3   essential and the risk was so high?
 4       A.  Because the risk wasn't high when we
 5   looked at the forecast prior to the Thor coming to
 6   dock.  It was going to be somewhat of a nonevent,
 7   and nobody anticipated it.  That's why those
 8   people volunteered to stay onboard.
 9       Q.  Would you let your kids get onboard the
10   Thor when it was being broken away?
11           MR. GUILLOT:  Object to the form of the
12       question.
13   EXAMINATION BY MR. GRINNAN:
14       Q.  You said it wasn't that big of a risk.
15   Would you let your kids on?
16           MR. GUILLOT:  Same objection.
17           THE WITNESS:  Do you really want me to
18       answer that?
19   EXAMINATION BY MR. GRINNAN:
20       Q.  Yes, I want to know --
21       A.  I mean, that's a real question?
22       Q.  Yes, it is.
23       A.  Please tell me you have something more
24   than that.
25           MR. GRINNAN:  Objection; nonresponsive.
```

```
                                                    410
 1           THE WITNESS:  Okay.
 2   EXAMINATION BY MR. GRINNAN:
 3       Q.  Would you have your let your kids get
 4   onboard the Thor when it was being -- when it
 5   broke away?
 6       A.  Look, I value my time.  If this is what
 7   you're going to ask, we're going to have --
 8           MR. REISMAN:  Just answer his question.
 9   EXAMINATION BY MR. GRINNAN:
10       Q.  You're not answering my questions.  It's
11   just a little bit simple.  And when you make
12   comments off the cuff like that, I have to follow
13   up with it.  Frankly, it's the comments that
14   you're making.  So you said it wasn't that big of
15   a risk.  So that's the reason I'm asking you that.
16   You follow?
17       A.  At the time of the forecast, I wouldn't
18   have a problem putting my kids onboard with the
19   forecasted conditions that were going on at the
20   time.
21       Q.  Okay.  Had y'all ever docked the Thor at
22   Martin's dock before?
23       A.  Not that I'm aware of.
24       Q.  I'm sorry?
25       A.  Not that I'm aware of.
```

```
                                                    411
 1   Sorry, you didn't hear me?
 2       Q.  Yes, I didn't hear you.  Sorry.
 3   So to your knowledge, this was the first time
 4   the Thor had ever been moored to the Martin dock?
 5       A.  From what I can recall, yes.
 6       Q.  Have y'all ever moored a vessel at
 7   Martin's dock since then?
 8       A.  Not that I'm aware of or I can recall.
 9       Q.  Why not?
10       A.  I don't know that we've had the reason
11   to go into Port Fourchon since that time for -- to
12   run from a storm.
13       Q.  Did you visit the dock after this
14   incident?
15       A.  Yes.
16       Q.  Okay.  Did you see the bollards ripped
17   out?
18       A.  Yes.
19           MR. McMAHON:  Objection.
20   EXAMINATION BY MR. GRINNAN:
21       Q.  Did you see the dock damaged?
22       A.  Yes.
23       Q.  Okay.  Do you think the bollards and the
24   docking equipment at Martin's dock did their job
25   on the day of the incident?
```

```
                                                    412
 1           MR. McMAHON:  Objection.
 2           THE WITNESS:  No.
 3   EXAMINATION BY MR. GRINNAN:
 4       Q.  They failed, didn't they?
 5           MR. McMAHON:  Objection.
 6           THE WITNESS:  Some of them failed.
 7   EXAMINATION BY MR. GRINNAN:
 8       Q.  The Martin's equipment, some of it
 9   failed during this incident, true?
10       A.  True.
11       Q.  And that was also something that
12   contributed to the Thor breaking away, true?
13           MR. McMAHON:  Objection.
14           THE WITNESS:  Yes.
15   EXAMINATION BY MR. GRINNAN:
16       Q.  Did anybody at Crosby warn anybody at
17   Thor, to your knowledge, that under no
18   circumstances would they ever be providing tug
19   assistance to keep the Thor from breaking away on
20   the day of the incident?
21       A.  No.
22       Q.  Would it surprise you to learn that the
23   Crosby captain was given a direct order not to
24   assist the Thor on the day of the incident from
25   someone at Shore side management from Crosby?
```


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

**413**

1  MR. RUFTY: Object to form.
2  THE WITNESS: Yes, I -- would I be
3  surprised, was that the question?
4  EXAMINATION BY MR. GRINNAN:
5  Q. Yes.
6  A. Yes, I'd be surprised.
7  Q. Why would that surprise you?
8  A. Because that's not what I understand of
9  Crosby tugs in the way they work. They're a
10 pretty reputable outfit.
11 Q. Would it be dangerous from someone from
12 Shore side management to order the Crosby Endeavor
13 to not assist the Thor on the day of the incident,
14 even though the Endeavor was there to do that?
15 A. Yes.
16 MR. REISMAN: Object to form.
17 THE WITNESS: Yes.
18 EXAMINATION BY MR. GRINNAN:
19 Q. At a bare minimum, if the Crosby
20 Endeavor had been ordered not to assist the Thor
21 during the hurricane, Crosby had a duty and
22 responsibility to warn the Thor that it was not
23 going to be providing any assistance, true?
24 A. Yes.
25 MR. RUFTY: Objection; form.

**414**

1  EXAMINATION BY MR. GRINNAN:
2  Q. I'm sorry?
3  A. Yes.
4  Q. Okay. To your knowledge, assuming that
5  Crosby Endeavor was ordered not to assist the
6  Thor, Crosby failed to warn anyone at Shore that
7  the Crosby Endeavor would not be providing any
8  assistance on the day of the incident, true?
9  A. True.
10 MR. RUFTY: Form.
11 EXAMINATION BY MR. GRINNAN:
12 Q. Okay. If Shore had been warned that the
13 Crosby Endeavor was under no circumstances going
14 to provide push-in assistance on the day of the
15 incident, would Shore have taken actions to
16 mitigate against the risks of the Thor floating
17 away on the day of the incident or breaking away?
18 A. I can only --
19 MR. RUFTY: Objection; form.
20 THE WITNESS: Yes, I can only speak for
21 myself and say that I would have taken
22 action.
23 EXAMINATION BY MR. GRINNAN:
24 Q. Okay. And the failure of Crosby to
25 alert and warn, at least you, that they were not

**415**

1  going to provide assistance on the day of the
2  incident, that prevented you from being able to --
3  or having information you needed to know in order
4  to take additional action; is that true?
5  MR. RUFTY: Form.
6  THE WITNESS: It wasn't my job at the
7  time to talk to Crosby or Dawn Services.
8  EXAMINATION BY MR. GRINNAN:
9  Q. Okay. But if Crosby had warned you that
10 they weren't going to be helping, you would have
11 taken additional actions to help prevent the Thor
12 from breaking away, true?
13 MR. RUFTY: Form.
14 THE WITNESS: I believe I would.
15 EXAMINATION BY MR. GRINNAN:
16 Q. Did anyone at Crosby ever tell you or
17 anyone at Shore, to your knowledge, that they
18 would only work as directed, and unless they got
19 an order to help during the hurricane, they
20 wouldn't help?
21 MR. RUFTY: Objection; form.
22 THE WITNESS: Please ask that question
23 again.
24 EXAMINATION BY MR. GRINNAN:
25 Q. Sure. Did anybody at Crosby ever tell

**416**

1  you what their definition of working as directed
2  means?
3  A. No.
4  Q. Did anybody at Crosby tell you that
5  working as directed at Crosby means we will not
6  help any vessels that we have been hired to help,
7  even in a situation where the crew is endangered
8  and we're supposed to push them against the dock
9  during a hurricane?
10 A. No.
11 MR. RUFTY: Form.
12 EXAMINATION BY MR. GRINNAN:
13 Q. Did anybody at Crosby warn you or anyone
14 at Shore that Crosby would be working as directed
15 and would refuse to take any single act to assist
16 the Thor on the day of the incident unless
17 specifically ordered by the Thor?
18 MR. RUFTY: Form.
19 THE WITNESS: I was -- we were not
20 talking to Crosby, but we did not have any
21 communication with Crosby, that I know of.
22 EXAMINATION BY MR. GRINNAN:
23 Q. Okay. And so Crosby didn't tell you
24 that they would refuse to take a single action
25 unless specifically ordered by the Thor boat,

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
                                                   417
 1   true?
 2       A.  True.
 3       Q.  Don't you think it's dangerous for the
 4   Crosby to be there to assist the Thor and then do
 5   nothing to prevent the Thor from breaking away
 6   when that's what they were hired to do?
 7           MR. REISMAN:  Object to form.
 8           MR. RUFTY:  Form.
 9           THE WITNESS:  Yes, I can't agree with
10       the way that question was stated.
11   EXAMINATION BY MR. GRINNAN:
12       Q.  Do you think it's dangerous to just sit
13   there and stand by and do nothing and let the Thor
14   break away from the dock, when the Crosby had been
15   hired, Crosby Endeavor had been hired to prevent
16   that?
17           MR. REISMAN:  Object to form.
18           MR. RUFTY:  Form.
19           THE WITNESS:  I think it's dangerous to
20       have the additional weight on the side of the
21       Thor.  It helps the Thor break away from the
22       dock if that tug is tied to us and they're
23       not doing anything.
24   EXAMINATION BY MR. GRINNAN:
25       Q.  So you think the Crosby Endeavor's
```

```
                                                   418
 1   actions on the day of the incident and how they
 2   were configured against the Thor were dangerous,
 3   true?
 4           MR. RUFTY:  Objection; form.
 5           THE WITNESS:  I wouldn't say dangerous.
 6       I can't categorize it as such.
 7   EXAMINATION BY MR. GRINNAN:
 8       Q.  Well, when a vessel breaks away, like
 9   the size of the Thor during a hurricane on the
10   bayou, it's a dangerous situation, isn't it?
11       A.  Yes.
12       Q.  Okay.  So the Crosby Endeavor's
13   configuration and how it was configured and
14   pressed up against the Thor increased that risk of
15   danger because that was part of the reason that it
16   broke away, true?
17       A.  It --
18           MR. RUFTY:  Objection; form.
19           THE WITNESS:  It increased the load on
20       the Thor.
21   EXAMINATION BY MR. GRINNAN:
22       Q.  Okay.  And that was dangerous, because
23   it increased the chance the Thor would break away,
24   true?
25       A.  Every little bit, yes.
```

```
                                                   419
 1           MR. RUFTY:  Form.
 2   EXAMINATION BY MR. GRINNAN:
 3       Q.  And why was that?
 4       A.  Why was what?
 5       Q.  Why was their configuration -- why did
 6   their configuration make it so that it added more
 7   stress?
 8       A.  I can't get into the operation of the
 9   mind of Walt Everett or Joe Douglas at the time.
10       Q.  I'm asking you to explain why it's --
11   conceptually, why that is?
12       A.  Why it's extra load?
13       Q.  Yes.
14       A.  It's extra load because every wind and
15   water movement produced forces, and forces is what
16   broke the barge away from the dock, and every
17   little force counts.
18       Q.  I got it.  It was dangerous for the
19   Crosby to dock up along the Thor, add extra mass
20   or weight, and then provide no pushing assistance
21   whatsoever, because it just increased the load,
22   true?
23           MR. RUFTY:  Objection; form.
24           THE WITNESS:  It increased the load.
25       Yes, it increased the load.
```

```
                                                   420
 1   EXAMINATION BY MR. GRINNAN:
 2       Q.  Okay.  Would you consider the Crosby --
 3   strike that.
 4       On the day of the incident, do you agree that
 5   the Thor was under the tow of the Crosby Endeavor?
 6           MR. RUFTY:  Objection.
 7           THE WITNESS:  Wasn't under tow, but it
 8       was being assisted by that boat.
 9   EXAMINATION BY MR. GRINNAN:
10       Q.  In both situations, the Crosby Endeavor
11   tugboat, whether it's providing assistance to the
12   Thor or towing the Thor, that tugboat has duties
13   to the vessel, the Thor, true?
14       A.  True.
15       Q.  Okay.  The Crosby Endeavor, on the day
16   of the incident, had a duty to execute the tug
17   maneuvers as circumstances required to keep people
18   onboard the Thor safe, true?
19       A.  True.
20           MR. RUFTY:  Objection; form.
21   EXAMINATION BY MR. GRINNAN:
22       Q.  Okay.  The Crosby Endeavor had a duty to
23   execute maneuvers as prudence requires under the
24   circumstances and as they developed on the day of
25   the incident for the Thor, true?
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799