Transcript of the Testimony of

# DUSTIN BLAIR LOWE, SR.

November 6, 2023

ALL COAST, LLC v. SHORE OFFSHORE SERVICES, LLC, ET ALL



P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

197

1    Q.   Okay.  The bits did not look like
2  that at the time that the -- the THOR moored to
3  the dock, right?
4    A.   I don't believe so.
5    Q.   Okay.  If the bits had looked like
6  that at the time that the THOR was mooring to the
7  dock in the early morning hours of October 26th
8  and -- and the late hours of October 26th and the
9  early morning hours of October 27th, you would
10  not have wanted the THOR to moor to -- to those
11  bits, right?
12    A.   No, sir.
13    Q.   Okay.  If the bits at the dock had
14  never been load tested prior to the THOR arriving
15  at the dock by Martin, that's something that
16  Martin should have told the THOR, correct?
17    A.   That would kind of be out of my
18  purview to answer, you know.
19    Q.   Okay.
20    A.   But I would assume so, yes.
21    Q.   Okay.  If Martin had a policy
22  against allowing vessels to moor at its docks
23  during hurricanes, that's something that Martin
24  should have expressed to the THOR, correct?
25    A.   I'm guessing that's something they

198

1  should have communicated.
2    MS. DANTIN:
3      Objection.
4    MR. ALTMYER:
5      You-all mind if we take a break for
6    about five minutes?
7    THE WITNESS:
8      No problem.
9    MR. CERISE:
10      You are good.
11    THE VIDEOGRAPHER:
12      Off the record.  The time is 1:49.
13    (A short recess was taken.)
14    THE VIDEOGRAPHER:
15      Returning to the record.  The time
16    is 1:56.
17  BY MR. ALTMYER:
18    Q.   I just have a few more questions for
19  you.  I might have some later on after the other
20  attorneys have an opportunity to ask you
21  questions on Zoom and if Mr. Cerise has any other
22  questions, but a few and then I'll pass you on to
23  somebody else until then.
24    A.   Okay.
25    Q.   So here today, you don't have any

199

1  information whatsoever about what the THOR's
2  owners and operators knew or didn't know with
3  respect to how the barge was tied to the dock on
4  October 28th, 2020, correct?
5    A.   No.  Yeah.  Correct.
6    Q.   Okay.  And you also have no
7  information whatsoever about what the THOR's
8  owners and operators knew or did not know -- what
9  communications that the THOR's owners and
10  operators may have participated or may not have
11  participated in with respect to bringing the THOR
12  into Port Fourchon to seek safe harbor, correct?
13    A.   Yes.  Correct.
14    MR. ALTMYER:
15      All right.  I'll pass you on to
16    anybody else.
17    MR. CERISE:
18      Anybody on Zoom?
19    MR. GRINNAN:
20      Yeah.  I have a few questions.
21    MS. DANTIN:
22      All right.  I'll go after you John.
23  CROSS-EXAMINATION BY MR. GRINNAN:
24    Q.   Okay.  Sir, my name is John Grinnan.
25  I represent both Brian Cloyd, amongst some other

200

1  guys, who were on board with you.  You and I have
2  never met before, right?
3    A.   No, sir.
4    Q.   All right.  And I might kind of jump
5  around kind of like Mr. Altmyer did because we
6  have got a bunch of lawyers that have already
7  asked you questions.  I'm going to try and be as
8  brief as possible to respect your time, okay?
9    A.   Yes, sir.
10    Q.   All right.  Now, you were asked a
11  little bit about this earlier, but are you aware
12  of any warnings given to anybody on board the
13  THOR about any prior incidences at Martin's dock
14  and their infrastructure not being able to
15  withstand a storm like this?
16    A.   No, sir.
17    Q.   Is that --
18    MS. DANTIN:
19      Objection.
20  BY MR. GRINNAN:
21    Q.   Is that information that you would
22  have liked to have known or you think that would
23  have been information that people on board the
24  THOR would have liked to have known?
25    A.   Yes.


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

201

```
 1      MS. DANTIN:
 2          Objection.
 3   BY MR. GRINNAN:
 4      Q.   And is that because it directly
 5   impacts safety if a dock has prior knowledge that
 6   its dock cannot withstand a hurricane like the
 7   one you-all were going to go through?
 8      A.   Yes.
 9      MS. DANTIN:
10          Objection.
11   BY MR. GRINNAN:
12      Q.   Would it shock you if Martins had a
13   document that said, as demonstrated in past
14   events, heavy rains, high winds and storm surge
15   are major threats to our company's
16   infrastructure?
17      A.   Would it shock me?
18      MS. DANTIN:
19          Objection.
20      MR. GRINNAN:
21          Yeah.
22      THE WITNESS:
23          No, sir.
24   BY MR. GRINNAN:
25      Q.   Why?
```

202

```
 1      A.   Would it shock me that they would
 2   have that information?
 3      Q.   Yeah.
 4      A.   Oh, no, sir.  I'm pretty sure they
 5   would, huh?
 6      Q.   Yeah.  Would it shock you if they
 7   had and just didn't tell anybody about it and let
 8   you-all dock at their --
 9      A.   Oh.
10      Q.   -- at Martin's dock?
11      MS. DANTIN:
12          Objection.
13      THE WITNESS:
14          Yes.  That would shock me if they
15          wouldn't tell nobody.
16   BY MR. GRINNAN:
17      Q.   Why?
18      A.   That's information that should be
19   presented for anybody --
20      Q.   Because it's --
21      A.   -- docking on it.
22      Q.   Because it's dangerous to withhold
23   that information, isn't it?
24      A.   Yes.
25      MS. DANTIN:
```

203

```
 1          Objection.
 2   BY MR. GRINNAN:
 3      Q.   Okay.  And that's why I was asking
 4   would it shock you if Martin's dock would do
 5   something that dangerous and hide information
 6   about how they know that their dock is not safe
 7   for barges --
 8      MS. DANTIN:
 9          Objection.
10   BY MR. GRINNAN:
11      Q.   -- to dock at it?  Does that make
12   more sense now?
13      A.   Yes, sir.
14      Q.   Okay.  If a dock knows that from
15   prior, past events that heavy rains, high winds
16   and storm surge are major threats to Martin's
17   dock, that's the sort of information that dock
18   would be required to provide to the THOR before
19   riding out the storm there; is that fair?
20      MS. DANTIN:
21          Objection.
22      THE WITNESS:
23          Can you repeat the question?
24   BY MR. GRINNAN:
25      Q.   Sure.  If Martin's knew from past
```

204

```
 1   events that heavy rains, high winds and storm
 2   surge are major threats to the dock that THOR was
 3   docked up to, that's the sort of information in
 4   the industry that would be required to be
 5   provided to people on the THOR so they could know
 6   that before they rode out the hurricane there,
 7   fair?
 8      A.   Yes.
 9      MS. DANTIN:
10          Objection.
11   BY MR. GRINNAN:
12      Q.   And it seems like common sense that
13   Martin's would provide that information before
14   allowing the THOR to dock there, right?
15      A.   Yes.
16      MS. DANTIN:
17          Objection.
18   BY MR. GRINNAN:
19      Q.   Would you consider it critical
20   safety information to provide to the THOR from
21   Martin's if Martin's knew that it was dangerous
22   to ride out the hurricane there?
23      A.   Yes.
24      MS. DANTIN:
25          Objection.
```

Pages 201 to 204



**205**

```
 1   BY MR. GRINNAN:
 2       Q.   And if the THOR people on board the
 3   THOR have been told that based on prior events
 4   that the Martin's dock you-all were moored to is
 5   not safe to moor to during the hurricane, is
 6   there any doubt in your mind the people on board
 7   the THOR would have done the right thing and they
 8   would have chosen a different dock to go dock at
 9   during the hurricane?
10       MS. DANTIN:
11          Objection.
12       THE WITNESS:
13          I couldn't answer to what they would
14       have done.
15       MS. DANTIN:
16          Objection.
17   BY MR. GRINNAN:
18       Q.   Well, sure.  And that's why I was
19   kind of asking you, is there any doubt in your
20   mind that people would have done the right thing?
21       A.   No.  I'm sure they would have
22   done --
23       MS. DANTIN:
24          Objection.
25       THE WITNESS:
```

**206**

```
 1       -- the right thing if that's your
 2   question.  Yeah, they would have --
 3       MR. GRINNAN:
 4          Yeah.
 5       THE WITNESS:
 6          -- definitely done the right thing.
 7       MS. DANTIN:
 8          Objection.
 9   BY MR. GRINNAN:
10       Q.   If Joe Douglas had been told by
11   Martin's that, hey, this dock is not safe for
12   you-all to ride out the hurricane, Joe Douglas
13   surely would have gotten the THOR out of there,
14   right?
15       A.   Yes.  Joe is a very competent
16   superintendent.
17       MS. DANTIN:
18          Objection.
19   BY MR. GRINNAN:
20       Q.   And if the THOR had not been
21   marked -- strike that.
22       If the THOR had not been moored to
23   Martin's dock during the hurricane, then this
24   incident wouldn't have occurred because the --
25       MS. DANTIN:
```

**207**

```
 1          Objection.
 2   BY MR. GRINNAN:
 3       Q.   -- THOR would never have docked in
 4   the first place, right?
 5       A.   Yes.  That's correct.
 6       MS. DANTIN:
 7          Objection.
 8   BY MR. GRINNAN:
 9       Q.   Meaning the failure of Martin's dock
10   to warn THOR that Martin's dock was not safe for
11   the THOR to be moored to during the hurricane was
12   the cause of this incident, fair?
13       MS. DANTIN:
14          Objection.
15       THE WITNESS:
16          Can you repeat the question in a way
17       I can answer it?
18       MR. GRINNAN:
19          Yeah, sure.  Well, you just --
20       THE WITNESS:
21          Thank you.
22   BY MR. GRINNAN:
23       Q.   We just talked about how if you-all
24   had been told, people on board the THOR had been
25   told that Martin's dock's not safe and the
```

**208**

```
 1   infrastructure is not safe to ride out a
 2   hurricane, you-all would have gone somewhere --
 3       A.   Yes.
 4       Q.   -- else, right?
 5       A.   Yes, definitely.
 6       Q.   The only reason you were there is
 7   because nobody at Martin's warned you that it's
 8   not safe to be docked there during a hurricane,
 9   right?
10       A.   I can't answer to that, brother.
11       MS. DANTIN:
12          Objection.
13       THE WITNESS:
14          I wasn't involved in the operational
15       decisions for that, you know.
16   BY MR. GRINNAN:
17       Q.   Yeah, yeah, yeah.  What I'm getting
18   at is like Martin's failure to warn you that
19   don't dock here because it's not safe, our dock's
20   not safe during hurricanes, that's the cause of
21   this incident, but you-all would have gone
22   somewhere else had you been told that --
23       A.   Oh, yes.
24       Q.   -- right?
25       A.   Yes.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

LOWE, SR., DUSTIN BLAIR 11/6/2023

229

```
 1          Yeah.  I have no -- besides the one
 2     guy that witnessed to me, I have nothing
 3     to say about whether somebody was hurt or
 4     not.
 5  BY MR. GRINNAN:
 6     Q.   Thank you, sir.
 7          Have you ever been on board another
 8  vessel where mooring bits failed?
 9     A.   Mooring bits, no.
10     MS. DANTIN:
11          Object.
12  BY MR. GRINNAN:
13     Q.   Part of the dock failed?
14     A.   No.
15     Q.   And when you got back to the dock
16  after the incident, did you get off the boat?
17     A.   When I got back to the dock after
18  the incident?
19     Q.   Yes.
20     A.   So I was off the barge whenever I
21  did the investigation, the pictures and the --
22  with the captain, which is the superintendent.
23     Q.   And when you were doing that, taking
24  pictures, did you witness parts of the dock that
25  had failed --
```

230

```
 1     A.   Yes.
 2     Q.   -- or there was damage?
 3     A.   As indicated in the pictures, I took
 4  pictures of the mooring bits.
 5     MS. DANTIN:
 6          Objection.
 7  BY MR. GRINNAN:
 8     Q.   Took what?
 9     A.   Took the pictures of the mooring
10  bits.
11     Q.   Okay.  And you had seen that they
12  had failed?
13     A.   Yes.
14     Q.   Okay.  And I guess if they hadn't
15  failed, you would know that the THOR would not
16  have floated away, right?
17     A.   To my knowledge, yes.
18     MS. DANTIN:
19          Objection.
20  BY MR. GRINNAN:
21     Q.   And so one of the causes of the THOR
22  breakaway was those mooring bits or mooring
23  equipment at Martin's dock failing; is that fair?
24     A.   Yes.
25     MS. DANTIN:
```

231

```
 1          Objection.
 2     MR. GRINNAN:
 3          I'll pass the witness.
 4  CROSS-EXAMINATION BY MR. RUFTY:
 5     Q.   Hi.  My name is Alfred Rufty.  I
 6  represent Crosby Tugs.
 7     A.   How are you doing, Alfred?
 8     Q.   I'm good.  How are you today?
 9     A.   All right, brother.
10     Q.   Good.  I'll be brief.
11          You didn't have any conversations
12  with anyone on the tug that day, did you, the day
13  of the breakaway?
14     A.   The day of the incident, no.
15     Q.   Yes.
16     A.   No.
17     Q.   Did you have any conversations with
18  anyone on the tugboat, any tugboat in the two or
19  three days before the incident?
20     A.   Not that I recall, no.
21     Q.   Did you talk to anybody from the
22  tugboats, to your knowledge, after the incident?
23     A.   Yes.  I did meet one of the captains
24  on the dock.  I don't remember his name, but it
25  was more of an introduction and a friendly
```

232

```
 1  conversation.
 2     Q.   If you -- did you talk about the
 3  breakaway?
 4     A.   No.  I kind of avoided all
 5  conversations about it.
 6     MR. RUFTY:
 7          That's all the questions I have for
 8  you.  Thank you.
 9     THE WITNESS:
10          Okay, brother.
11     MR. RUFTY:
12          Oh, no, sir.  I have one more.
13     THE WITNESS:
14          Okay.
15     MR. RUFTY:
16          Excuse me.  I have one more.
17  BY MR. RUFTY:
18     Q.   On the DPR on the day of the
19  hurricane, October 28, 2020, it notes at 1200, I
20  guess that means 1200 hours, wind direction and
21  speed, east, 90 to 115 miles per hour.  Do you
22  recall seeing that?
23     A.   Yes.  I remember seeing the DPR a
24  while ago.
25     Q.   Okay.  And where -- you are the one
```

Pages 229 to 232

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799