**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ALL COAST, LLC<br><br>VERSUS<br><br>SHORE OFFSHORE SERVICES, LLC; MODERN AMERICAN RAILROAD SERVICES, L.L.C.; and MARTIN ENERGY SERVICES, LLC | CIVIL ACTION NO.: 21-258 c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1982, 21-1981, 21-2075 and 21-2227<br><br>SECTION: A (3)<br><br>JUDGE JAY C. ZAINEY<br><br>MAG. JUDGE EVA J. DOSSIER<br><br>ADMIRALTY - Rule 9(h)<br><br>Applies to: All Cases |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF MARTIN OPERATING PARTNERSHIP, L.P. AND MARTIN ENERGY SERVICES, L.L.C.**

Following the ten-day bench trial in this matter, and in accordance with this Court's instructions, Defendants, Martin Operating Partnership, L.P. and Martin Energy Services, L.L.C. (collectively "Martin"), respectfully submit the following:

**Table of Contents**


I. Proposed Findings of Fact ....................2

A. Martin Dock No. 16 ....................2

B. Thor Arrival at Martin Dock No. 16 ....................5

C. The Breakaway ....................13

II. Proposed Conclusions of Law ....................20

A. Jurisdiction and Venue ....................20

B. Fault in the Abstract ....................20

C. Law Governing a Wharfinger's Duties ....................21

D. Martin Satisfied its Duty of Reasonable Diligence and Cannot be Liable ....................22

E. Limitation of Liability ....................23

F. Inevitable Accident/Act of God ....................26

# I. Proposed Findings of Fact

## A. Martin Dock No. 16

1. Martin Operating Partnership, L.P. leases the property upon which Martin Dock No. 16 sits from the Greater Lafourche Parish Port Commission ("GLPC"). 3 Tr. 770:6-17[1]; Ex. 244

2. Martin Energy Services, L.L.C. operates Martin Dock No. 16 for Martin Operating Partnership, L.P. 4 Tr. 950:11-18; 4 Tr. 951:7-13; Ex. 245.

3. The GLPC conducts annual inspections of the property upon which Martin Dock No. 16 sits, and, on October 5, 2020—less than a month before the incident in question—GLPC conducted an inspection which noted no deficiencies. 3 Tr. 770:23-771:24; Ex. 413.

4. In addition to the annual GLPC inspection, the U.S. Coast Guard also conducted annual inspections of the property upon which Martin Dock No. 16 sits, and on October 26, 2020—two days before the incident in question—the U.S. Coast Guard conducted an inspection which noted no deficiencies. 3 Tr. 768:13-769:2; 3 Tr. 769:19-770:5; Ex. 414.

5. U.S. Coast Guard inspections of Martin's facility for 2016, 2017, 2018, and 2019 also showed no deficiencies. 3 Tr. 769:12-18; Ex. 415-01–04.

6. In addition to the annual GLPC and U.S. Coast Guard inspections, Martin conducts its own monthly inspections of the entire facility including Martin Dock No. 16 and its mooring bollards and bulkheads, which includes 105 questions the inspector should answer. 3 Tr. 772:6-16; Ex. 572.

[1] The citation "3 TR. 770:6-17" means "Day 3 Trial Transcript" at page 770 lines 6 through 17. Similarly, a citation of "7 Tr. 1660:15-1661:14" would mean the "Day 7 Trial Transcript" at page 1660 line 15 through page 1661 line 14. This citation format will be used throughout. The abbreviation "Ex." stands for Exhibit.

7. These monthly Martin inspections are turned into Robbie Plaisance, who is Martin's area manager, and he makes sure that any deficiencies found during the inspections are immediately corrected. 3 Tr. 772:13-16.

8. Martin's monthly inspections for December 2016, December 2017, December 2018, December 2019, and September 30, 2020, show the condition of Martin's mooring bollards as being acceptable. 3 Tr. 772:6-773:15; Ex. 572.

9. Martin also conducts Focused Annual Inspections of its facility by the company's safety representatives. 3 Tr. 773:16-24; Ex. 617, 618 & 619.

10. There is no industry standard requiring that mooring bollards on a dock be load- or pull-tested and the GLPC does not require that such testing be done. 3 Tr. 775:11-17.

11. No Thor fact or expert witness testified that bollard pull tests and/or ultrasonic testing of the bollards in advance of the hurricane without any other known deficiencies was industry standard, required by GLPC, or otherwise regulatorily mandated.

12. As testified to by Martin's Terminal Manager, Robbie Plaisance, who has spent 37 plus years at Dock 16, Martin's philosophy regarding safety and maintenance is a "goal to do no harm to people, property, or planet" and employees are issued gold coins as a reminder of this important goal. 3 Tr. 730:12-14; 3 Tr. 777:5-12.

13. Martin Cummins, who was a Utility 3 Yard Hand for Martin for the three years prior to the incident and the designated Person In Charge for refueling operations, testified that he has seen multiple vessels maneuver around and pivot off of the bollards at Martin Dock No. 16 while connected to the bollards with mooring lines without any movement of the bollards. 3 Tr. 609:1-9; 3 Tr. 683:3-684:4.

14. For example, Martin Cummins testified that he has seen dozens of vessels pull themselves up against a bollard by a mooring line attached to a cathead or capstan on the vessel. 3 Tr. 683:3-684:1.

15. Martin Cummins was not aware of any defects with Martin's bollards as of October 28, 2020, which is consistent with his testimony that Martin's practice was to proactively repair any issues/deficiencies noted during its Facility Monthly Inspections, GLPC Annual Inspections, and U.S. Coast Guard Inspections, and it was not his, nor Martin's practice to conceal deficiencies from GLPC or the U.S. Coast Guard. 3 Tr. 684:5-24.

16. Martin Cummins also had never seen any sinkholes or washouts around bollards 1 through 10 on Martin Dock No. 16. 3 Tr. 682:10-20.

17. Photographs taken of the Thor moored to Martin Dock No. 16 on the day of the incident also reveal no sinkholes or washouts near bollards 1 through 10. Ex. 16.

18. To the extent that limestone was used at Martin Dock No. 16, it was used to remedy trip hazards and other minor deficiencies on the property. 3 Tr. 681:14-23.

19. The bollards at Martin Dock No. 16 are located yards away from the bulkhead and are not tied to the bulkhead in any way. 3 Tr. 744:17-25.

20. Following the incident, bollard no. 6 at Martin Dock No. 16, which extended 45 feet into the ground, was extracted by a 100-ton crane and it took hours to remove. 3 Tr. 775:2-10.

21. As of October 28, 2020, no one had ever complained about a bollard moving at Martin Dock No. 16. 3 Tr. 684:2-4.

22. There was no testimony regarding any known hidden defects at Martin Dock No. 16 prior to the arrival of the Thor.

## B. Thor Arrival at Martin Dock No. 16

1. Less than a month before the incident, Joe Douglas took the DB Thor to Martin's Galveston Facility for Hurricane Delta. 7 Tr. 1602:2-3.

2. Mr. Douglas agreed that it was safer to get out of the path of the hurricane, but Shore Management sent him to a port (i.e. Fourchon) directly in the path of a hurricane. 7 Tr. 1657:14-20; 7 Tr. 1659:15-17; 7 Tr. 1660:19-24.

3. On October 25, 2020, while the Thor was working offshore in the Gulf of Mexico, weather reports showed that Tropical Storm Zeta was forecast to have a 90% probability of becoming a category one hurricane. 7 Tr. 1604:3-1605:3; Ex. 7.

4. The October 25, 2020 weather report also showed that the projected track of Zeta had the storm heading towards Port Fourchon, Louisiana. 7 Tr. 1606:4-7; Ex. 7.

5. Based upon the October 25, 2020 weather report, Joe Douglas and Cody Sims made the decision for the Thor to come into Port Fourchon. 7 Tr. 1605:7-24.

6. Despite the fact that Zeta was tracking towards Port Fourchon, Joe Douglas ignored available weather forecasts, failed to go west and avoid the path of the storm as he had done just a few weeks before, and instead elected to take the Thor and its crew into the cone of uncertainty with the blessing of Shore Management who also ignored the available weather data. 7 Tr. 1606:8-15; 7 Tr. 1662:3-25.

7. According to Joe Douglas, Port Fourchon was adequate for this storm. 7 Tr. 1661:9-14.

8. Without explanation, Joe Douglas did not believe the weather report and did not believe that Zeta would ever become a hurricane because it was late in the hurricane season and the waters were cooling off. 7 Tr. 1715:1-12.

9. Once in port, Joe Douglas had to decide whether to utilize the Stone Dock or the Martin Dock; ultimately choosing Martin because he was familiar with Martin's facilities and was comfortable and felt safe at Martin based upon the way that Martin conducts its business. 7 Tr. 1657:21-25.

10. The Thor arrived at Martin Dock No. 16 at 2300 on October 26, 2020. 7 Tr. 1607:12-24; Ex. 10.

11. Upon arrival at Martin Dock No. 16, Joe Douglas, who was the Superintendent of the Thor, had no discussions with anyone from Martin about how to moor, the structural components of the mooring bollards, or Martin's intentions in light of an impending hurricane. 7 Tr. 1609:5-7.

12. Relying solely upon his 30 years of experience without input from any other source, Joe Douglas testified that he did not need to consult any heavy weather plan, hurricane plan, or other mooring document to tell him how to moor the Thor. 7 Tr. 1612:11-25; 7 Tr. 1664:10-16; 7 Tr. 1684:6-11; 7 Tr. 1685:6-9.

13. Joe Douglas' reliance on the Thor's mooring documents would have been futile considering that the mooring documents were written in a foreign language. Ex. 19.

14. Shore never trained Joe Douglas on how to moor a barge to a dock during a hurricane and nobody from Shore told him how to moor the Thor that day. 7 Tr. 1612:22-25; 7 Tr. 1663:15-19.

15. After the Thor arrived at Martin Dock No. 16, Joe Douglas walked the entire dock, inspected the bollards, did not find any discrepancies, and considered all of the bollards to be in good shape. 7 Tr. 1655:8-1656:8.

16. Joe Douglas stated that Martin Dock No. 16 was a safe place to be. 7 Tr. 1655:19-21.

17. Joe Douglas also testified that had he felt uncomfortable with the condition of Martin Dock No. 16 he would have notified his superiors and requested that the Thor go somewhere else. 7 Tr. 1655:22-1656:5.

18. Joe Douglas did not see any sinkholes or washouts around Martin's bollards. 7 Tr. 1657:9-13.

19. Martin was not involved whatsoever in the mooring of the Thor to Martin Dock No. 16. Joe Douglas testified he did not ask anyone from Martin to provide assistance. Martin did not provide any of the mooring lines that secured the Thor to Martin's Dock No. 16. Martin did not provide any people to assist in putting out the Thor's mooring lines. Douglas did not ask anyone from Martin how to best secure the Thor to the dock. 7 Tr. 1669:18-1670:5.

20. Martin Cummins similarly testified that Martin did not provide any mooring lines or cables to the Thor, that Martin did not provide any instructions on how the Thor should be moored or what equipment should be used, and, in fact, Martin Cummins testified that the Thor told Martin that they did not need Martin's assistance. 3 Tr. 690:24-692:1.

21. Joe Douglas was 100% confident in the bollards on Martin Dock No. 16. 7 Tr. 1670:14-17.

22. Prior to the breakaway, Joe Douglas directed his clerk to take photographs of the Thor's mooring arrangement so that they could be used as a future teaching tool. 7 Tr. 1613:4-25; Ex. 16.

23. Joe Douglas did not use all ten available bollards on Martin's dock because he "did not need them." 7 Tr. 1615:4-15.

24. Douglas described Shore's Hurricane Plan as "useless" to him. 7 Tr. 10-14.

25. Prior to the arrival of Hurricane Zeta, the Thor's mooring lines and cables were last adjusted at 1400 on October 27, 2020. 7 Tr. 1686:2-16; Ex. 10.

26. Douglas claimed that the mooring lines and cables did not need to be adjusted after 1400 on October 27, 2020, because they were where they needed to be. 7 Tr. 1686:9-16.

27. Shore never trained Douglas on when to replace a mooring wire or line. 7 Tr. 1664:17-21.

28. Based upon the Thor's records, the starboard bow wire and the starboard stern wire used in mooring the Thor had last been replaced in 2015 and 2016, respectively. 7 Tr. 1664:1667:17; Ex. 24 & 25.

29. Douglas testified that he used a turning block to direct the starboard stern wire to the bollard on the dock even though he knew that the use of the turning block would take away some of the mooring wire's capacity. 7 Tr. 1619:1-18; Ex. 23.

30. Douglas claims that he knew that there were fuel lines around Martin Dock No. 16, but he never looked at a chart to confirm. 7 Tr. 1682:9-18.

31. Douglas never considered using the Thor's anchors to assist in keeping the Thor alongside Martin's dock. 7 Tr. 1755:25-1757:15.

32. On October 27, 2020, while at Martin Dock No. 16, the Thor received fuel and potable water, and some members of the Thor's crew went home to check on their families. 7 Tr. 1624:22-1625:7; Ex. 451.

33. Although the Thor could have proceeded west to Galveston, Joe Douglas and the Shore management decided to go to Port Fourchon even though Port Fourchon was in the path of

the storm because they believed that Port Fourchon was more than adequate and a lot of other vessels were also in the port. 7 Tr. 1660:15-1661:14.

34. Nobody from Shore's management came out and inspected Martin Dock No. 16 after the Thor arrived because they counted on Joe Douglas to perform that task. 7 Tr. 1669:6-11.

35. Joe Douglas performed no D over D or other mathematical calculations before choosing to use the Young 511 Block for the starboard stern mooring wire. 7 Tr. 1681:6-9.

36. Nor has Shore ever trained Douglas on D over D calculations. 7 Tr. 1681:10-12.

37. Joe Douglas acknowledged that the starboard stern mooring wire broke at the Young 511 Block. 7 Tr. 1694:11-23.

38. Tommy Gibilterra was unaware of any training that Joe Douglas received from Shore with respect to the mooring of a derrick barge to ride out a hurricane. 8 Tr. 1855:16-18.

39. In October of 2020, there were no written mooring procedures or plans for the Thor. 8 Tr. 1856:22-24; 8 Tr. 1867:2-3.

40. In fact, Shore's safety manual has no chapter on mooring. 8 Tr. 1857:18-21.

41. Tommy Gibilterra acknowledged that he never received a call from Joe Douglas saying that there were any problems with the Martin Dock. 8 Tr. 1862:20-24.

42. In written communications with Martin on October 26, 2020, there was no mention of the Thor intending to stay at Martin's Dock through the hurricane. 8 Tr. 1865:12-1866:12.

43. Shore did not provide a written mooring plan to the U.S. Coast Guard as required for vessels remaining in port. 8 Tr. 1866:13-1867:1.

44. When the forecast for Zeta changed to predicting a Category 2 Hurricane, Gibilterra did not contact Joe Douglas or ask for the Thor's mooring configuration. 8 Tr. 1869:5-15.

45. Shore management failed to oversee how the Thor would be moored for Zeta. 8 Tr. 1831:12-24.

46. In the hours leading up to the breakaway, the winds were coming primarily from the east. 1 Tr. 75:8-16.

47. The Declaration of Inspection signed by Martin Cummins on October 27, 2020, did not certify the Thor's mooring for purposes of riding out a hurricane but rather only showed that the mooring was suitable to conduct a fuel transfer operation during the period of time that the Thor was taking on fuel and water. 3 Tr. 686:23-687:11-16; Ex. 447.

48. Martin Cummins first learned that the Thor intended to remain at Martin's Dock through the storm after the refueling of the Thor had been completed. 3 Tr. 611:19-612:1; 3 Tr. 701:22-702:19.

49. After Martin Cummins learned that the Thor intended to stay at Martin's Dock through the storm, Cummins notified Robbie Plaisance who informed Cummins that the Thor could not stay at Martin's Dock. 3 Tr. 690:6-10.

50. Robbie Plaisance also informed Martin Cummins that Cummins was to notify everyone on the Thor that he came into contact with that the Thor could not remain at Martin's Dock and that they were not authorized to stay at Martin's Dock through the hurricane. 3 Tr. 690:11-17.

51. Martin Cummins complied with those instructions from Robbie Plaisance and informed members of the Thor that Martin's personnel were evacuating, that the facility would be unmanned, that the gates would be locked, and that there would be no emergency services available. 3 Tr. 690:16-22.

52. When Martin Cummins told the Thor's personnel that the Thor could not remain at Martin's Dock through the hurricane, the Thor personnel replied that they were not leaving. 3 Tr. 693:22-695:15; 3 Tr. 702:23-703:21.

53. When Robbie Plaisance was informed by Martin Cummins that the Thor intended to stay through the hurricane, Plaisance notified Damon King, who was Martin's Senior Vice President, and King ultimately allowed the Thor to stay at Martin's Dock. 3 Tr. 784:12-17.

54. According to Damon King, the decision to allow the Thor to stay was made after he discussed with Robbie Plaisance whether there was any other place within the Port of Fourchon where the Thor could possibly go, and it was determined that the likelihood of the Thor finding another spot was not good, and also that the U.S. Coast Guard would probably not approve of Martin telling the Thor to leave the dock. 4 Tr. 1034:7-25.

55. Moreover, the Thor put Martin in somewhat of a corner when the Thor delayed getting its fuel and water until the last minute and then refused to leave when told that they could not stay. 4 Tr. 961:15-22.

56. Robbie Plaisance did not instruct Martin Cummins to cut the Thor's lines after the Thor refused to leave Martin's Dock because he did not want to put anyone in harm's way. 3 Tr. 777:18-24.

57. Damon King also testified that cutting the Thor's lines was never an option. 4 Tr. 1035:1-2.

58. All in all, because of the collapsing timeframe associated with the approaching storm, the only reasonable decision that could be made was to allow the Thor to stay at the dock. 4 Tr. 1035:3-12.

59. Joe Douglas testified that the U.S. Coast Guard knew that the Thor was at Martin's dock because there was a Coast Guard vessel moored right behind the Thor. 7 Tr. 1692:19-21; Ex. 537.

60. At 1400 on October 27, 2020, the Thor's chief engineer, Ronnie Warren, verified the Four (4) Hour Notice was issued to the U.S. Coast Guard prior to the transfer of 30,000 gallons of fuel which was completed at 1605 that day. 7 Tr. 1691:1-15; Ex. 447.

61. On October 27, 2020, the U.S. Coast Guard issued a Marine Safety Information Bulletin stating the status of Port Fourchon as closed and strongly urging moored vessels to have "mooring lines doubled up with due consideration given to the effects of predicted storm surge," an "outboard anchor rigged at a short stay," and ensuring that there are "sufficient number of officers and crew onboard to tend mooring lines, and/or get underway." Ex. 155.

62. While offshore, the Thor had sufficient time prior to the landfall of Hurricane Zeta to head west to Galveston, Texas, from Ship Shoal Block 259 had Shore's management chosen to do so. 9 Tr. 2289:3-2290:17.

63. The Court also credits Captain Fazioli's expert testimony that the Thor's mooring was entirely deficient and improper because: (1) worn and damaged mooring lines were used; (2) different types of lines and wires were going to the same axis which had different stretch characteristics; (3) short leads were used on the mooring lines and wires which do not allow for sufficient stretching; (4) long crossing leads for spring lines were not used; (5) all mooring lines were not doubled up; (6) all available winch wires on the Thor and bollards on the dock were not used; and (7) all shore side bollards including the bollards astern on the auxiliary dock were not used. 9 Tr. 2264:4-2277:15; Ex. 630.

## C. The Breakaway

1. At the time of landfall, the Thor was moored as drawn by Robert Bartlett utilizing 3D imaging as depicted on Exhibit 622F-005. See also Ex. 622B-001 through 622B-005.

2. Eight out of ten available bollards on the Martin Dock were used in mooring the Thor to Martin Dock No. 16 with Bollard No. 3 and Bollard No. 10 not being used. 4 Tr. 893:4-18.

3. The starboard stern cable was run aft through a snatch block identified as a Young 511 attached to a strap wrapped around a fair lead roller. Ex. 622B-029 through 622B-035.

4. The Young 511 Block used by the Thor with the No. 1 mooring wire was designed for use with a one-inch mooring line or rope, not a mooring wire, and the No. 1 mooring wire was a two-inch wire. 4 Tr. 831:10-17.

5. According to Mr. Bartlett, the improper use of the Young 511 Block created an external force that weakened the No. 1 Mooring Wire. 4 Tr. 832:11-21.

6. Tommy Gibilterra, who was Shore's Director of Operations in October 2020, admitted that reducing the strength of a mooring wire by running it over a sheave or block that was too small would cause it to part at a lesser force. 8 Tr. 1829:3-11.

7. Joe Douglas acknowledged that the starboard stern mooring wire broke at the block. 7 Tr. 1694:11-23.

8. The Thor's No. 1 mooring wire broke because it was rusty, lacked proper lubrication, its metal was thinning, and the wire was bent over a small diameter sheave. 4 Tr. 937:15-21; 4 Tr. 942:23-943:1.

9. The configuration of the starboard stern wire and the Young 511 Block contributed to the breakaway. 4 Tr. 846:17-19.

10. The parting of the No. 1 mooring wire was the catalyst of the breakaway as the stern of the Thor separated from the Dock. Ex. 593 (Video from Chouest boat looking south) (1 Tr. 17).

11. Post-incident testing by Bishop Lifting of the No. 1 Mooring Wire objectively showed that it parted at 312,000 pounds, which is well below the 396,000 pound breaking strength of a new mooring wire. 4 Tr. 832:22-833:11; Ex. 561.

12. The Court accepts the opinion and analysis of Mr. Bartlett showing that the No. 1 Mooring wire broke first and allowed the stern of the Thor to move away from the dock. 4 Tr. 833:19-834:9.

13. Consequently, the Thor's starboard stern moved away from the dock first. 7 Tr. 1699:11-20; Ex. 593 (Video from Chouest boat looking south) (1 Tr. 17).

14. Once the Thor's No. 1 mooring wire broke, it created a domino effect where the mooring lines to Martin Bollard Nos. 2, 4, and 5 then broke which caused an overload on Martin Bollard No. 6. 4 Tr. 937:15-938:8; 4 Tr. 843:10-19.

15. Before the breakaway, the Thor's remaining mooring lines were in poor condition. 4 Tr. 937:10-14.

16. Thomas Shelton, the Thor's Expert witness, agreed that after the mooring wire to the No. 1 Bollard broke, the load would have shifted to the No. 2 Bollard. And after the lines attached to the No. 2 Bollard broke, the load would have shifted to the No. 4 Bollard. And after the lines attached to the No. 4 Bollard broke, the load would have shifted to the No. 5 Bollard. And after the lines attached to the No. 5 Bollard broke, the load would have shifted to the No. 6 Bollard. And after the line attached to the No. 6 Bollard broke, the load would have shifted to the

No. 7 Bollard. And after the lines attached to the No. 7 Bollard broke, the load would have shifted to the No. 8 Bollard. 5 Tr. 1274:7-25; 5 Tr. 1275:1-22.

17. During the storm all of the Thor's mooring lines failed and parted mooring lines were still connected to Martin Bollard Nos. 1, 2, 4, 5, 7, and 9 post-storm. 4 Tr. 813:7-13; Ex. 622B-007 through 622B-021.

18. Specifically, a piece of the mooring line and the stern mooring wire were found still connected to Martin Bollard No. 1. 4 Tr. 815:6-13.

19. A fragment of a mooring line was found connected to Martin Bollard No. 2. 4 Tr. 816:1-14.

20. Martin Bollard No. 3 was not used in the mooring. 4 Tr. 816:15-817:1.

21. Martin Bollard No. 4 was found to have portions of two mooring lines with eye splices still attached to the bollard. 4 Tr. 817:2-24.

22. Although Martin Bollard No. 4 ultimately deflected, it was still able to perform its intended function as it was strong enough to break the mooring line attached to it. 4 Tr. 914:16-18.

23. Martin Bollard No. 5 was found to have two mooring lines still attached. 4 Tr. 817:25-818:13.

24. Martin Bollard No. 7 was found to have one parted synthetic mooring line with its eye splice attached and a second mooring line was also reported to have parted. 4 Tr. 818:21-819:13.

25. Martin Bollard No. 9 was found to have a mooring wire still attached and it was further determined that this mooring wire, which was attached to the starboard bow winch on the Thor, had payed out over 2,000 feet. 4 Tr. 819:23-820:13.

26. Martin Bollard No. 10 was not used in the mooring. 4 Tr. 820:14-23.

27. The bow starboard cable attached to the M-9 Bollard payed out failing to prevent the Thor from drifting up Bayou Lafourche and making contact with various vessels. Ex. 622B-026; see also Ex. 51 (Cloyd Video) (1 Tr. 99).

28. The Court also credits Mr. Bartlett's expert testimony that the dog on the starboard bow winch for Thor's mooring wire No. 9 was not set because if the dog had been set then the mooring wire would not have payed out as it did without destroying the dog, and an inspection of the dog afterwards showed it to be undamaged. 4 Tr. 836:2-23; 4 Tr. 837:10-12.

29. Additionally, Mr. Bartlett opined that the dog could not have disengaged itself under the circumstances presented here. 4 Tr. 884:19-23.

30. The Court also credits Captain Fazioli's expert testimony that a dog on a vessel's mooring winch should never be set because we want the mooring wire to be able to slip when under tension. Regardless of whether the brake was set or not, the starboard bow winch dog failed to hold the vessel. 9 Tr. 2276:6-2277:15.

31. Joe Douglass admitted that all of Thor's mooring components failed when he testified that "[t]hey all broke." 7 Tr. 1694:20-23; 1701:1-2.

32. The Court credits the uncontradicted testimony of expert witness Mr. Bartlett that all of the Thor's mooring lines failed at less than their nominal strength. 4 Tr. 838:15-21; 4 Tr. 839:19-21; 4 Tr. 841:7-17.

33. Mr. Bartlett found no evidence that Martin's Bollard No. 6 failed before the Thor's mooring lines or cables. 4 Tr. 844:22-23.

34. In fact, Mr. Bartlett opined, and this Court agrees, that the fracture of Martin's Bollard No. 6 was not the initiating event that led to the breakaway. 4 Tr. 842:9-13.

35. Moreover, the net effect of the failure of Martin's Bollard No. 6 had a minimal impact on the increase of load on the remaining lines. 4 Tr. 841:22-842:8.

36. Per Mr. Bartlett, at the time of the fracture of Martin's Bollard No. 6, the only things still holding the Thor were Martin Bollard No. 6, one line on Martin Bollard No. 7, and one mooring wire on Martin Bollard No. 9. 4 Tr. 843:20-23.

37. Mr. Bartlett and Thor's expert, Mr. Thomas Shelton, testified that Martin Bollard No. 6 was not designed to hold the entire barge by itself. 4 Tr. 928:24-929:5; 5 Tr. 1270:15-18.

38. The Court also accepts Mr. Bartlett expert opinion that the deflection on Martin Bollards No. 4 and 9 did not contribute to the breakaway. 4 Tr. 846:3-13.

39. The soil properties around the bollards have a remarkably small effect on the point of fixity. 4 Tr. 856:2-12.

40. The Thor interests' expert witness, Jack Leary, never visited the Martin dock. 6 Tr. 1530:11-13.

41. Mr. Leary did not know that there were parted mooring lines from the Thor still attached to Martin's bollards after the breakaway. 6 Tr. 1545:17-1548:3; 6 Tr. 1549:3-8.

42. Mr. Leary also had no opinion on the sequence of lines parting. 6 Tr. 1544:3-5; 6 Tr. 1563:24-25.

43. Mr. Leary also did <u>not</u> opine that the purported failure of Martin's bollards was a cause of the breakaway. 6 Tr. 1553:22-154:1.

44. Mr. Leary did <u>not</u> render any opinions with respect to the soil rigidity around Martin's dock pre-storm because he did not perform any soil testing. 6 Tr. 1533:10-24.

45. Mr. Bartlett in constructing his model used the worst case scenario to calculate the loads involved which was the wind coming from the East. 4 Tr. 867:16-24; 2 Tr. 356:1-10.

46. The wind speed and direction of 90-115 mph from the East used by Mr. Bartlett was the wind speed and direction reported by the crew of the Thor at the time of the incident. 4 Tr. 868:11-869:7; 1 Tr. 204:21-24; Ex. 51 (Video) (1 Tr. 99).

47. Based upon Mr. Bartlett's modeling, which the Court credits, for Martin Bollard No. 6 to have moved to the northwest after it fractured when the line to Martin Bollard No. 6 had been tending in a southwest direction prior to the fracture, the following events had to have occurred: the mooring wire to Bollard No. 1 parted, the mooring line to Bollard No. 2 parted, both lines to Bollard No. 4 parted, the B line to Bollard No. 5 parted and possibly the A line although it was inconclusive, and the mooring line to Bollard No. 8 parted. 4 Tr. 842:14-843:19.

48. Consequently, at the time of the fracture of Bollard No. 6, the only thing still holding the Thor was the line to Bollard No. 6, the line to Bollard No. 7, and the mooring wire to Bollard No. 9. 4 Tr. 843:20-23.

49. Once the breakaway occurred, Joe Douglas did not order that an anchor be dropped from the Thor due to his belief that there were pipelines and fuel lines in the area; however, he did finally drop an anchor and bring the Thor to a stop when clear of the port. 7 Tr. 1636:5-18.

50. Joe Douglas' concerns about using his anchors due to pipelines potentially being in the area were unfounded as there were dredged channels in the vicinity of Martin's dock and you do not dredge where there are pipelines. 9 Tr. 2285:4-2286:16.

51. It was the responsibility of the Barge Thor to notify the U.S. Coast Guard that the Thor was going to remain in port for the hurricane. 9 Tr. 2293:3-7.

52. Martin has no control over whether a vessel comes into a Martin dock after Martin personnel have evacuated for a hurricane; however, if a vessel does come into a Martin dock after

an evacuation has taken place, the vessel will be invoiced for the time that it spent at the Martin dock. 4 Tr. 964:13-24.

53. There is no opposing expert testimony to counter that of Mr. Bartlett and Captain Fazioli regarding the cause of the breakaway or the sequence of events. 5 Tr. 1255:19-22; 5 Tr. 1258:14-19; 6 Tr. 1553:22-1554:1; 6 Tr. 1563:24-25; 9 Tr. 2162:13-18; 9 Tr. 2165:12-17.

54. Captain Fazioli had no criticisms of Martin in this case. 9 Tr. 2318:5-9.

55. Nor did Mr. Leary render any opinions regarding the design criteria for Martin's bollards pre-storm. 6 Tr. 1532:5-1533:9.

56. Thor expert, Captain Greg Daley, testified that the 364-foot vessel Rem Saltire, the 148.5 foot lift boat Great White, and the 284-foot Weeks Barge 111 had moored at Martin's facility during previous hurricanes and did not break away from their moorings, that Martin's bollards were sufficient to hold those vessels in place, and that there was no evidence that those vessels had caused any damage to Martin's bollards. 9 Tr. 2157:3-25; 9 Tr. 2158:1-25; 9 Tr. 2159:1-25; 9 Tr. 2160:1-3.

57. Captain Daley did not render any opinion as to the sequence of the Thor's lines parting. 9 Tr. 2165:12-17.

58. Based upon the totality of the evidence presented at trial, the Court concludes that the breakaway of the Thor was caused solely by the Thor's improper and inadequate mooring configuration, and deficient mooring lines and mooring wires that failed at well below their nominal breaking strengths.

## II. Proposed Conclusions of Law

### A. Jurisdiction and Venue

1. This is a case of admiralty or maritime jurisdiction under 28 U.S.C. § 1333 and is an admiralty or maritime claim within Rule 9(h) of the Federal Rules of Civil Procedure.

2. Venue is proper in this judicial district because the events giving rise to the action occurred in this district. See Verified Complaint for Exoneration From or Limitation of Liability at ¶ 9 (Doc. 1); Fed. R. Civ. P. Supp. R. F(9).

### B. Fault in the Abstract

1. It is well settled in the U.S. Fifth Circuit in admiralty or maritime law cases that mere "fault in the abstract does not give rise to liability." In re Mid-South Towing Co., 418 F.3d 526, 534 (5th Cir. 2005).

2. "Instead, the fault [that gives rise to liability] must be a contributory and proximate cause of the damages sustained." In re Mid-South Towing Co., 418 F.3d 526, 534 (5th Cir. 2005); see also Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 832, 116 S.Ct. 1813, 1815, 135 L.Ed.2d 113 (1996) (affirming "that the requirement of legal or 'proximate' causation, and the related 'superseding cause' doctrine, apply in admiralty notwithstanding our adoption of the comparative fault principle").

3. According to the U.S. Fifth Circuit:

> The defendant's negligence must be a substantial factor in bringing about the harm, with no rule of law relieving the actor of fault. "Substantial" means more than "but for" the negligence, the harm would not have resulted, and more than merely negligible negligence. The gist of it is that some responsibility for the effect must accompany the cause.

Chavez v. Noble Drilling Corp., 567 F.2d 287, 289 (5th Cir. 1978) (citations omitted).

### C. Law Governing a Wharfinger's Duties

1. Well over a century ago, the U.S. Supreme Court set forth the general duties of a wharfinger:

> Although a wharfinger does not guaranty the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction, to remove it, or to give due notice of its existence to vessels about to use the berths.

Smith v. Burnett, 173 U.S. 430, 433, 19 S.Ct. 442, 443, 43 L.Ed. 756 (1899).

2. The U.S. Fifth Circuit, in expounding upon this general statement of the wharfinger's duties, reiterated that a wharfinger is not a guarantor of a vessel's safety, but rather that a wharfinger's duty is one of "reasonable diligence":

> It is well settled that a wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner.

Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A., 521 F.2d 229, 230 (5th Cir. 1975); see In re Frescati Shipping Co., Ltd., 718 F.3d 184, 207 (3d Cir. 2013) ("In the tort context, … a wharfinger is not a guarantor of a visiting ship's safety, but is bound to use reasonable diligence in ascertaining whether the berth themselves and the approaches to them are in an ordinary condition of safety for vessels coming to and lying at the wharf.") (quotation marks and citation omitted), cert. denied, 571 U.S. 1197, 134 S.Ct. 1279, 188 L.Ed.2d 298 (2014).

3. A wharfinger "has no duty to warn of open and obvious conditions that can be reasonably ascertained by a vessel." West v. City of St. Paul, 936 P.2d 136, 138–39 (Ak. 1997).

4. A wharfinger also has no duty to warn a vessel of impending weather conditions. See City of St. Paul, 936 P.2d 136, 139 (Ak. 1997) ("Because most weather conditions are open

and obvious, and can be discovered with reasonable diligence, a wharfinger does not have a duty to warn of such dangers.”).

5. Nor does a wharfinger have a duty to obtain a weather forecast and disseminate it to vessel owners. See In re Aramark Sports and Entertainment Services, LLC, 831 F.3d 1264, 1282 (10th Cir. 2016) (holding based upon “notions of personal responsibility” that “Aramark had no duty to obtain a weather forecast and provide it to the boaters … when the plaintiff could take the same protective steps at least equally easily and well”).

**D. Martin Satisfied its Duty of Reasonable Diligence and Cannot be Liable**

1. Here, the Thor Interests were solely responsible for the mooring of the Thor to Martin’s dock as the evidence shows that Thor Interests controlled all aspects of the mooring, including devising the mooring plan to be implemented, selecting and providing the mooring lines and wires that were to be used, determining which bollards on Martin’s dock would be used, directing the placement of those lines and wires, and providing the personnel who actually handled the lines and wires in securing the vessel to the dock.

2. Martin satisfied its wharfinger’s duty of reasonable diligence to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner, through its own regular inspections of the bollards and the wharf, the inspections performed by the Greater Lafourche Port Commission and the U.S. Coast Guard, and Martin’s immediate correction of any deficiencies noted in those inspections.

3. The Thor Interests and other claimants have failed to meet their burden of proving that Martin failed to exercise reasonable diligence in the performance of Martin’s duties as a wharfinger.

4. Being unable to prove that Martin breached its duty of reasonable diligence as a wharfinger, all of the claims asserted against Martin necessarily fail as a matter of law, and are properly dismissed, with prejudice.

5. To the extent that Martin is alleged to have violated its own Hurricane Plan by allowing the Thor to remain at Dock No. 16 during the landfall of Hurricane Zeta, the alleged violation was mere fault in the abstract and not a contributory or proximate cause of the Thor breaking away from Martin Dock No. 16.

6. Finally, even if Martin's alleged violation of its own Hurricane Plan could somehow be considered a cause in fact of the breakaway, which this Court has not found, the Thor's wholly deficient and unseaworthy mooring would, in any event, be a superseding cause of the breakaway that would absolve Martin of any liability. See Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837, 116 S.Ct. 1813, 1818, 135 L.Ed.2d 113 (1996) ("The doctrine of superseding cause is applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. … Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation.") (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5–3, pp. 165–166 (2d ed. 1994)).

**E. Limitation of Liability**

1. Whether or not a vessel owner can limit its liability involves a two-step process:

> First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness.

Ferrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th Cir. 1976), reh'g denied, 532 F.2d 1375 (5th Cir. 1976).

2. "Privity like knowledge turns on the facts of particular cases." Coryell v. Phipps, 317 U.S. 406, 411, 63 S.Ct. 291, 294, 87 L.Ed. 363 (1943).

3. Under federal maritime law, "the burden is on the party seeking limitation [of liability] to establish that it did not have knowledge or privity of the negligent activity or unseaworthy condition that caused the accident." Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1474 (5th Cir. 1991).

4. In other words, "if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the ship owner must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." SCF Waxler Marine, L.L.C. v. Aris T M/V, 24 F.4th 458, 472 (5th Cir. 2022) (brackets omitted).

5. Privity or knowledge is imputed to a business organization "where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." Coryell v. Phipps, 317 U.S. 406, 410, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943); Cupit v. McClanahan Contractors, Inc., 1 F.3d 346, 348 (5th Cir. 1993), cert denied, 510 U.S. 1113, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1994).

6. Moreover, when the Limitation Plaintiff is a business organization, "knowledge … is judged not only by what the [organization's] managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss." Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1474 (5th Cir. 1991).

7. In other words, "demonstrating a lack only of actual knowledge does not meet the owner's burden to show a lack of privity or knowledge. Privity or knowledge does not necessarily require a showing of actual knowledge. It is deemed to exist if the shipowner has the means of obtaining knowledge, or if he would have obtained the knowledge by reasonable inspection. Knowledge is not only what the shipowner knows, but what he is charged with discovering." Brister v. A.W.I., Inc., 946 F.2d 350, 358 (5th Cir. 1991), reh'g denied, 949 F.2d 1160 (5th Cir. 1991); China Union Lines, Ltd. v. A.O. Andersen & Co., 364 F.2d 769, 787 (5th Cir. 1966), cert. denied, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967).

8. Consequently, "[w]ith the duty to make inquiry the measure of the knowledge is not what the owner knows, but what he is charged with finding out." Avera v. Florida Towing Corp., 322 F.2d 155, 166 (5th Cir. 1963).

9. "[I]nsufficient equipment or an insufficiently competent and trained crew" can render a vessel unseaworthy. SCF Waxler Marine, L.L.C. v. Aris T M/V, 24 F.4th 458, 472 (5th Cir. 2022).

10. Moreover, a shipowner's failure to properly train its captain and crew defeats its right to limit liability. Trico Marine Assets Inc. v. Diamond B Marine Services Inc., 332 F.3d 779, 790 (5th Cir. 2003), reh'g and reh'g en banc denied, 73 Fed. Appx. 85 (5th Cir. 2003).

11. Here, the Thor Interests had an obligation to assure themselves by proper inquiry or by personal inspection that the Thor was properly moored in all respects to ride out the storm. See The Linseed King, 285 U.S. 502, 510, 52 S.Ct. 450, 452, 76 L.Ed. 903 (1932).

12. Because the Thor Interests, through the exercise of reasonable diligence, could have ascertained how the Thor was moored to Martin Dock No. 16, but nevertheless failed to do so,

privity or knowledge of the negligent mooring of the Thor is properly imputed to the Thor Interests. See The Linseed King, 285 U.S. 502, 511–12, 52 S.Ct. 450, 453, 76 L.Ed. 903 (1932).

13. In this regard, "[n]egligent failure to discover constitutes pri[vity] and knowledge within the meaning of the limitation statute." Gabarick v. Laurin Maritime (America), Inc., 900 F.Supp.2d 669, 677 (E.D. La. 2012), aff'd, 551 Fed. Appx. 228 (5th Cir. 2014), cert. denied, 573 U.S. 917, 134 S.Ct. 2824, 189 L.Ed.2d 786 (2014).

14. Because the Thor Interests are deemed to have privity and knowledge of the acts of negligence or unseaworthiness that was the proximate cause of the breakaway, the Thor Interests are not entitled to limit their liability.

## F. Inevitable Accident/Act of God

1. When a vessel breaks free from her moorings and a collision occurs, "the burden is heavily upon the vessel asserting" an Act of God or inevitable accident defense. Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960) (Brown, J.).

2. According to the U.S. Supreme Court, when a collision is caused by a vessel drifting from her moorings, the vessel "must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill could not have prevented." The Louisiana, 70 U.S. 164, 173, 18 L. Ed. 85 (1865).

3. In other words, a vessel asserting such a defense "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960) (Brown, J.).

4. Here, the Thor Interests cannot avail themselves of an Act of God or inevitable accident defense because they have not met the heavy burden of demonstrating that "human skill

and precaution, and a proper display of nautical skill" in mooring the Thor could not have prevented the Thor from breaking away from its moorings.

Respectfully submitted:

**DAIGLE FISSE & KESSENICH, PLC**

/s/ Kirk N. Aurandt
MICHAEL W. MCMAHON (#23987)
KIRK N. AURANDT (#25336)
ETHAN M. GARNER (#40368)
P. O. Box 5350
Covington, Louisiana 70434-5350
Telephone: (985) 871-0800
Facsimile: (985) 871-0899
Email: mmcmahon@daiglefisse.com
kaurandt@daiglefisse.com
egarner@daiglefisse.com
***Attorneys for Martin Energy Services, L.L.C. and Martin Operating Partnership, L.P.***