**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN THE MATTER OF MODERN AMERICAN RAILROAD SERVICES, LLC, as Owner, and SHORE OFFSHORE SERVICES, LLC, as Bareboat Charterer and Owner *Pro Hac Vice* of D/B THOR PETITIONING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY** | * * * * * * * * * * | **CIVIL ACTION NO. 2:21-CV-00258-JCZ-KWR (lead case) c/w 21-337, 21-464, 21-822, 21-1968, 21-1969, 21-1981, 21-1982, 21-2075**<br>**Pleading applies to all cases.**<br><br>**JUDGE JAY C. ZAINEY**<br><br>**MAGISTRATE JUDGE EVA J. DOSSIER** |

---

**CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

The personal injury claimants, Lewis Andrews, Patrick Burnett, Brian Cloyd, and Wallace McCray ("claimants"), propose that the Court adopt the following findings of fact and conclusions of law following the close of the limitation of liability trial:

## FINDINGS OF FACT

### I. The THOR and its arrival at Port Fourchon.

1. The D/B THOR is a 370-foot-long and 135-foot-wide non-self-propelled derrick barge owned by Modern American Railroad Services, LLC which—in October 2020—was under bareboat charter by Shore Offshore Services, LLC ("Shore"), a company that decommissions offshore platforms that exceeded their useful life. By virtue of being a non-self-propelled vessel, the THOR had to use other vessels with propulsion to move around.

2. In late October 2020, with the support of an assist tug, the ENDEAVOR, the THOR was working for Fieldwood Energy LLC south of Port Fourchon. On October 25, 2020, upon learning of impending Hurricane Zeta, Shore shoreside management and the THOR's superintendent Joe Douglas decided to seek safe harbor at Dock 16 in Port Fourchon. Dock 16 is owned by the Greater Lafourche Port Commission, but is leased by Martin Operating Partnership, L.P. and ran by Martin Energy Services, LLC ("Martin").

3. Shore and superintendent Douglas chose Martin's Dock 16 as a safe harbor because Port Fourchon was the closest port to its location that could receive a vessel the size of THOR. The only other ports that could provide the THOR with refuge from the storm were further west towards Texas. But, with the October 25th forecast showing

that Hurricane Zeta's area of intensity would be headed mostly to Texas,[1] being towed west was unsafe[2] because it carried the risk of the THOR being overtaken by the storm. By choosing Port Fourchon, Shore (1) mitigated that risk, (2) was able to spend the needed 10-12 hours for picking up anchors and preparing to get underway, and (3) bought itself additional time to properly moor up at the dock. Several witnesses at trial testified that Port Fourchon was the most prudent and safe choice for the THOR under the prevailing circumstances.[3]

4. The ENDEAVOR is a 136-foot-long and 40-foot-wide diesel-powered offshore towing and anchor handling tug owned by Crosby Marine Transportation and operated by Crosby Tugs, LLC ("Crosby"). At 9:50 a.m. on October 26, 2020, the ENDEAVOR began towing the THOR towards Martin's Dock 16 in Port Fourchon. But, despite having 15,000 horsepower and the running speed of 14 knots, the ENDEAVOR could not do it on its own (without damaging the THOR). This is so because—instead of a flat bow—the ENDEAVOR has a sharp, steel, V-shaped bow which was designed to cut through the ice and metal in the North Sea. So, two model bow tugs with flat bows, LA MADONNA and LA ELITE, were additionally hired on to assist.

5. Notably, Crosby's offshore operations manager Ivy Danos testified that ***Crosby*** is an expert in tugboats and in selecting the appropriate tugboat arrangement for its customers. Mr. Danos also testified that ***he*** informed Shore (through Shore's broker Mike Grace) that the THOR needed two additional tugs to safely push it into the dock. These three tugs, with the THOR in their tow, arrived at Martin's Dock 16 around 11:38 p.m. on October 26, 2020.

6. Around 4:00 p.m. on October 28, 2020, Hurricane Zeta made landfall in Port Fourchon with 115 mph winds, gusts of at least 130 mph, an 8.5-foot surge, and was classified as a Category 3 hurricane. During this event, the THOR broke away from its moorings at the dock, and the ENDEAVOR broke away from the THOR, resulting in this incident.

## II. Martin and its role in causing this incident.

7. The evidence at trial showed that, at all relevant times, Martin had a hurricane preparedness plan ("HPP"), which included various phases triggered by storm movement at different points in time and was designed to provide information

---

[1] Joint trial exhibit 7, WeatherOps Advisory received by Shore on October 25, 2020 at 2pm, p. 3.

[2] The record is unclear as to whether, with its need to undergo engine repairs, the ENDEAVOR would have even been able to tow the THOR from its location all the way to Texas.

[3] To note, Crosby Tugs, LLC's own corporate representative Wade Savoy, Jr. and both of its captains aboard the ENDEAVOR, Ernest Plaisance and Walter Everet, Jr., ***all*** testified that Port Fourchon was the safest choice for the THOR to weather out to storm. Crosby Tugs, LLC's expert Captain Marc Fazioli was the ***only*** witness at trial who testified that the THOR's best course of action was to have met Hurricane Zeta ***at sea*** as opposed to in port.

needed for a safe and effective response to hurricanes.[4] The explicit purpose of Martin's HPP, which applied across all of its docks, was to give its personnel and customers advance warning and to allow its staff to prepare to evacuate in the event of a hurricane.[5]

8. For instance, Phase II of Martin's HPP was triggered 96-72 hours before landfall or, here, at 4:00 p.m. on October 24-25. It required Martin to, among other things, conduct a facility-wide stand-down safety meeting and to alert its customers of the status of the storm.[6] Martin Cummins, Martin's Utility III operator and the person in charge of the dock, testified that this was not done.

9. Phase III of Martin's HPP was triggered 72-48 hours before landfall or, here, at 4:00 p.m. on October 25-26. It required Martin to, among other things, close, chain and lock all valves on fuel storage tanks, diesel pipelines, and fuel stations.[7] Mr. Cummins testified that this, too, was not done. As he explained, Martin made an ***exception*** in order to render fuel and water services to the THOR. But Martin's Utility IV operator Bruce Stogner, whose testimony was submitted via deposition, testified that—despite Phase III requirements under the HPP—Martin would always leave one or a couple of fuel stations open to service last-minute vessel requests for fuel.

10. Phase IV of Martin's HPP went into effect 48-24 hours before landfall or, here, at 4:00 p.m. on October 26-27. In other words, ***before*** the THOR moored at Martin's Dock 16 shortly before midnight on October 26, Phase IV had already been underway. And Phase IV required Martin to, ***without any exceptions***, evacuate all personnel and customers, secure its facility, and not allow any vessels to be moored at the dock.[8] This means that Martin, through Damon King as the ultimate decision maker on the point, allowed the THOR (and the ENDEAVOR) to arrive and stay at its facility ***in violation*** of its own HPP. Perhaps this was not so surprising considering that Martin's employees, such as Mr. Stogner and Mr. Cummins, testified that they were never trained on or never studied Martin's HPP (and, thus, both wrongly believed that the HPP's requirements were being enforced at the "management's discretion").

Phase IV also required Martin to notify the Coast Guard, state police, and other authorities that the facility was evacuated.[9] Martin's corporate representative and chief operating officer Damon King testified that Martin did make this notification.

---

4 Joint trial exhibit 576, Martin's hurricane preparedness plan, at 00651 and 658-662.

5 Joint trial exhibit 576, Martin's hurricane preparedness plan, at 00651.

6 *Id.* at 00659.

7 *Id.* at 00660.

8 *Id.* at 00661.

9 *Id.*

Yet, this notification was false considering that the THOR and its crew were still at Martin's dock and, as Martin knew fully well, did not evacuate ahead of Hurricane Zeta.

11. At trial, Martin maintained—mostly through the testimony of Mr. Cummins and its corporate representative Mr. King—that Martin either (1) could not timely warn the THOR to leave its facility because Martin did not learn of the THOR's intention to stay at its Dock 16 through Hurricane Zeta until after the THOR's fueling and water services were completed around 4:05 p.m. of ***October 27***, or (2) Martin did, through Mr. Cummins, timely inform the THOR that they had no authorization to stay at the dock and that they needed to evacuate. For three reasons, the Court finds both arguments to be uncredible.

First, an email sent to Martin's Mr. Stogner by Shore's director of projects Cody Sims at 2:02 p.m. on ***October 25*** makes it clear that the THOR was seeking "dock space" at Martin's facility.[10] And Mr. Stogner's email sent to Mr. Cummins 8 minutes thereafter shows that Martin was charging Shore for "dockspace and security fee"[11]—which, as Martin's witnesses established at trial, is only charged if the vessel would remain at its dock for more than 24 hours (and is not charged if the vessel is only there to get fuel).

Second, Mr. Cummins testified that, sometime after the October 27th afternoon fueling was completed, he allegedly informed an unknown man from the THOR that they were not allowed to stay at the dock. However, Mr. Cummins was impeached with his deposition testimony when he testified that he never told anyone on the THOR that the vessel was prohibited from staying at the facility during the hurricane. That Martin, indeed, never relayed this to the THOR was further corroborated by the fact that (1) Martin was actively fueling the THOR within 24 hours before Hurricane Zeta made landfall, (2) Mr. Cummins's failure to relay Martin's policy directly to the highest ranking officer aboard the THOR, (3) the testimony of Shore's superintendent Douglas, corporate representative Mr. Sims, and chief operating officer Thomas Gibilterra that Martin never advised Shore of its anti-mooring policy for hurricanes, and (4) Martin also never informed Crosby and the ENDEAVOR about it. Also worth noting is that Mr. Cummins did not even know if Port Fourchon was open at the time he purportedly advised the THOR to leave its facility—*i.e.,* whether the THOR was even able to leave at that point.

And third, the evidence at trial showed that Martin had a history of ignoring its own HPP's requirements by repeatedly allowing and charging vessels to moor at its docks during tropical storms and hurricanes. Shore's expert Captain Gregory Daley identified ***at least 8*** hurricanes and tropical storms from 2019 to 2021 (Hurricane Barry, Tropical Storm Cristobal, Hurricane Marco, Hurricane Laura, Hurricane

---

10 Joint trial exhibit 252, email from Sims to Stogner, p. 1 of 11.

11 *Id.* at p. 2 of 11.

Sally, Hurricane Delta, Tropical Storm Claudette, Hurricane Ida) where Martin allowed a number of vessels to moor at its docks.[12] Even Martin's own corporate representative Damon King reluctantly admitted that there were instances where "a few of these [] have transpired." Mr. Stogner's testimony, too, showed that Martin "most of the time" accommodated last-minute vessels coming to its dock before mandatory evacuations. Thus, though Martin's policy called for ***no exceptions*** in these situations, Martin's practice (and lack of training on that policy) made it just a dead letter on a piece of paper.

Ultimately, by allowing the THOR to moor at its dock within 48 hours of the landfall and by supplying it with fuel 24 hours before the landfall, the Court finds that Martin ***violated*** its own HPP requirements designed to provide a safe response to hurricane conditions at its dock. Had Martin enforced its HPP policy as written and timely informed the THOR about it, Shore's Mr. Sims and Mr. Gibilterra testified that Shore would have made arrangements at the Stone dock in Port Fourchon (which he had contacted at the same time he had first contacted Martin's dock).

12. Bollards are 3.5 feet tall above-the-ground, steel-cased pilings dug 40 feet into the ground and filled with cement that allow vessels to moor by placing ropes and cables around them. According to Martin's corporate representative Mr. King, the purpose of these bollards was to provide tie-up points for vessels coming to Martin dock for fuel transfers in calm weather (*i.e.,* they were not intended to enable vessels to be moored at the dock under hurricane conditions).

13. Under the terms of its lease,[13] Martin was responsible not to exceed the design capacity of its bollards. Mr. King confirmed this. He also confirmed that Martin had a duty to inspect and maintain the bollards at its dock. As Captain Daley testified, when a company leases a dock to a vessel, there is a presumption that the dock is strong enough to maintain the vessel. Yet, the evidence adduced at trial showed that Martin only conducted (undocumented) ***visual*** inspections of the bollards without ever performing any kind of testing on them. Similarly, Martin never properly trained its employees on how to—during these visual inspections—examine the bollards; identify sinkholes and washouts at the dock and how they may affect the structural integrity of the bollards; properly cover or close a sinkhole or a washout, etc. In fact, Mr. Cummins, who was conducting these visual inspections and dock maintenance at Martin, was trained by his superior, area manager Robbie Plaisance, who had also—admittedly—never been trained on dock

[12] The Court recognizes that Martin's witnesses testified that they could not control vessels mooring at its docks once Martin's personnel had already evacuated from the facility. However, unless Martin had a practice of predating them after the fact, its invoices and yard tickets showed that Martin had knowledge of the presence of some of these vessels ahead of the storms. *See, e.g.,* Joint trial exhibit 583 at 02963, 02968, 02978, and 02992; *see also* Joint trial exhibit 596, Martin's discovery responses, at p. 5 (interrogatory #14).

[13] Joint trial exhibit 244 at p. 900, Martin's Dock 16 lease.

maintenance himself. Dr. Thomas Shelton, Harvey Gulf International Marine and Harvey Seas, LLC's expert in metallurgical and mechanical engineering, testified that Martin's training of its personnel was ***inadequate*** because they did not know what kind of defects they needed to look for and why.

14. The testimony of several Martin's employees at trial showed that Martin had very little, if any, information on the bollards before this incident. Specifically, Martin ***did not know*** their design capacity, when they were installed or how old they were, what was their useful life, what was their load capacity, how thick was their wall, what was their plumbness or levelness, what was the soil composition around them, how to determine and maintain their structural integrity, and so on.

In his 37 years at Martin's Dock 16, Mr. Plaisance testified that he had no knowledge of the bollards ever being replaced or repaired. The only maintenance done on them was blasting and painting. The Court finds this testimony to be particularly concerning given that Martin (1) ***admitted*** that its Dock 16 had a history of experiencing sinkholes and washouts—even after minor rainstorms, and (2) ***knew*** that heavy rains, high winds, and storm surges posed "major threats" to the infrastructure of its facility.[14]

In fact, only six weeks before this incident, Hurricane Sally damaged Martin's dock. Martin's documents show that, on October 19, 2020—only 9 days before this incident—a third-party vendor delivered limestone to Martin's facility so that Martin could fill in the sinkholes in the bulkheads at the very location of the dock where the THOR would later be moored for Hurricane Zeta.[15] Seemingly, Martin would have its employees fix the sinkholes by using shovels to fill them up with limestone (which had been delivered to its dock "countless times"). And, thereafter, Martin never obtained any independent confirmation that the sinkholes were fixed or to ensure that the integrity of the dock was not compromised.

15. Mr. Plaisance admitted that Martin concealed from Shore the damage that its Dock 16 had sustained in prior storms. And Mr. Cummins testified that Shore was entitled to know about this damage. Yet, Martin never shared this information with Shore.

16. Mr. Cummins conducted a visual inspection of the bollards within a month of this incident. He found them to be "acceptable." However, 4 out of 8 bollards used by the THOR for the mooring ***failed.***[16] Even Martin's own expert, Robert Bartlett,

---

14 Joint trial exhibit 576, Martin's hurricane preparedness plan, at 00689.

15 Join trial exhibit 419, Martin's 10/19/2020 invoice to SBL Construction, LLC for a load of limestone; *see also* Joint trial exhibit 457, Martin's invoice to SBL Construction, LLC showing that the sinkhole was located at #1 bulkhead on the north side.

Also, to note, the evidence at trial showed that it was Martin that was responsible for assigning dock spaces to its customers.

16 Joint trial exhibit 423, photos of the failed bollards.

admitted that at least 3 bollards (M6, M8, and M9) to which the THOR was tied "experienced some form of structural failure." The trial evidence regarding Martin's bollards showed the following:

a. M4: Martin's expert, Mr. Bartlett, opined that M4 exhibited a bend of 85 inches from the top which caused it to be displaced 4 feet from its original axis—*i.e.,* 4 feet from being positioned straight up in the air.[17] Mr. John Leary, Harvey's expert, explained that this means that M4 bent to the point where it could not rebound to its original shape as it exceeded its elastic limit and ***failed*** (by, as Dr. Shelton put it, a ductile tensile overload where the wall thickness had been severely compromised). There was also a subsidence of the ground by this bollard, indicating that it was moved.

b. M6: Dr. Shelton opined that M6 experienced such significant erosion and corrosion that it suffered a 60-70% loss of its wall thickness that could have been seen by visual inspection. Martin's own expert, Mr. Bartlett, agreed that M6—which broke exactly where it was corroded and having lost 71% of its wall thickness—should ***not*** have passed a visual inspection.[18]

c. M8: Dr. Shelton testified that M6 had a collar or a split sleeve welded around it at the mudline to reinforce it. It was bent by Hurricane Zeta approximately 12 feet from the top end, which means that it was plastically deformed and exceeded the strength of its material as a result of being overloaded. It also had missing horns, a hole in the wall of the pipe, and subsidence of the ground around it—all of which would have been visible upon inspection. Mr. Leary agreed. Even Martin's own expert, Mr. Bartlett, had to admit that broken horns on M8 meant that it would have been deemed a failure.[19]

d. M9: Mr. Bartlett testified that M9 suffered a bend of about 11 feet from its top end, was missing a horn, and had a collar placed on it—whose only purpose was to fix it. It was visibly damaged by corrosion.[20] Dr. Shelton explained that it had also had a split collar welded to it, a subsidence of the ground by it, and the visible pitting of the paint (which occurs when corrosion happens underneath the paint and puts pressure inside out, popping the paint off).

Based on the expert testimony, the Court finds that M4, M6, M8, and M9 all failed as a result of this incident.

---

17 Joint trial exhibit 599, Dr. Shelton's figures, p. 8 of 57.

18 Joint trial exhibit 12, photos of mooring bollards, at COASTAL000048-51.

19 *Id.* at COASTAL000054-55.

20 *Id.* at COASTAL000056-58.

17. Mr. Bartlett testified as to the partial sequence of failures between the bollards and the lines. But the Court is not convinced by Mr. Bartlett's theory and model considering that: he did not use the accurate information for wind speeds and direction; did not consider the storm surge and tautness in the lines; and did not include the effect that the ENDEAVOR tied alongside the THOR had on the vessel movement and load sharing. Mr. Bartlett's model admittedly resulted in unrealistic outcomes, such as that it placed the THOR on the west bank at the conclusion of the breakaway—whereas the THOR came to a stop on the north side of the bayou. Another reason why the Court remains unpersuaded by Mr. Bartlett's sequence theory is because he opined that M1 bollard failed first since it was most heavily loaded. But that would have been impossible. How could have the M1 bollard failed first if the THOR's starboard stern cable tied ***to it*** (undisputedly) broke ***last*** after having payed out 26,000 feet? There would have been nothing to hold that cable until it ultimately gave out.

The Court is similarly not convinced that the bollards did not fail because they worked "as intended." Not only did Crosby's corporate representative testify that these bollards were intended only to enable fuel-related moorings in calm weather conditions (which called for different design criteria evaluations than the ones considered by Mr. Bartlett). But the intended function of the bollards was to withstand the load placed on them—which, here, they were unable to do without becoming deformed and losing their structural integrity. Also, Mr. Leary testified that the damaged bollards could not have worked as intended because they were not fully upright and vertical, which changed their geometry and angling to the point that it deprived them of the strength they used to have and affected the mooring lines by transferring the load onto them.

As such, the Court finds that, while it is virtually impossible to determine the specific sequence in which the individual bollards and lines failed, expert testimony and common sense indicate that it is more likely than not that the bollards failed before any of the lines parted. It was the bollards' failure which then caused the load to be distributed to the lines, causing them to break and allowing the THOR to unmoor from the dock.

18. The Court notes that there was discussion at trial about the adequacy of the THOR's mooring arrangement and the sufficiency of its lines. The Court is not persuaded that these factors played a role in this incident.

In terms of the adequacy of the THOR's mooring arrangement, Crosby's corporate representative testified that Crosby had no opinion on the issue. As for Martin, its corporate representative testified that Martin itself had to inspect the moorings of the vessel at its dock. To boot, in its declaration of inspection for the THOR, Martin indicated that the THOR had met federal requirements for vessel moorings.[21] And

---

[21] Joint trial exhibit 447, Martin's declaration of inspection.

its Mr. Plaisance also stated that Martin had no position on the adequacy of the THOR's moorings at the time of the incident. Further, the Court finds that:

a. The Japanese mooring document—and the implied inability of the THOR's crew to understand it—were irrelevant. As Mr. Sims testified, the document did not apply to an 8-point vessel such as the THOR (but to a 4-point vessel used for bridge building in Japan). It had no shown applicability here.

b. Captain Dailey testified that the THOR's moorings were adequate because the THOR did not unmoor from the dock under the Category 1 or Category 2 weather conditions—which is all that had been forecasted before Hurricane Zeta made landfall. It wasn't until the storm reached the unpredicted Category 3-type winds at its zenith that the breakaway ensued.

c. As Crosby's own expert Captain Marc Fazioli conceded, mooring plans are very situational and case-specific because they depend on a number of variables. So, the Court finds it unlikely that the THOR's failure to have a pre-made standardized mooring plan would have decreased the chances of this breakaway. Besides, the plan which Captain Fazioli suggested that the THOR should have used here was made and approved on the day of Hurricane Harvey's 85 mph winds and still resulted in the vessel breaking away from the dock and sinking.

d. The evidence showed that the THOR was ballasted as low as possible without being below the ABS line as per the Coast Guard's regulations. Ballasting the vessel any further, as was shown at trial, would have exposed it to draft, storm surge, running into the pipelines underneath it, etc. as well as compromised the stability of the vessel due to the positioning of the massive crane on the bow of the barge.

e. Captains of the ENDEAVOR, as licensed mariners, should have acquainted themselves with the THOR's mooring arrangement. As Captain Daley explained, understanding where the lines were before Hurricane Zeta would have enabled the tug to know what its movements had to be in different scenarios and how those movements would have affected the vessel and what the vessel was trying to achieve. By not learning the THOR's mooring arrangement in advance, the ENDEAVOR's Coast Guard-credentialed crew was relying on the unlicensed crew aboard the THOR (which was not even able to see the lines as the storm came into the port). Besides, that this was the proper course of action was corroborated not only by Captain Daley. But also by Captain Plaisance's own testimony that he ***himself*** had checked the moorings of the vessel to which he was tied tandem on October 27 at the Crosby Dock and that it makes sense to do so.[22]

---

[22] Crosby's corporate representative Mr. King testified that it was Crosby's policy to check the moorings of the vessels that its tugs tie to, but ***not*** to check them if those vessels were derrick

With respect to the sufficiency of the THOR's mooring lines, the Court is persuaded by Mr. Leary and Dr. Shelton's expert testimony. It finds that the strength of the lines was of no moment because—regardless of how strong these lines were or were not—they were clearly strong enough to bend the bollards, which reinforces the logic that the lines were likely ***not*** the first to part. Further, the Court notes that:

a. Because the THOR only had 8 bitts on the vessel, it sent lines to 8 out of 10 bollards on Martin's dock. Out of the total of 10 mooring lines that the THOR used, 3 of them were doubled. Those doubled lines were soft, nylon lines which, as per superintendent Douglas's testimony, were "fairly new" and only a few months old (their innards were inspected in May 2020 before the beginning of the season).

b. The two hard lines were anchor cables made of steel. While it is true that the usual life of these cables is approximately 2 years, the Court is not convinced that the age of the THOR's starboard stern cable (which exceeded 2 years) somehow indicates compromised strength. This is so because, as Mr. Sims explained, Shore had acquired the THOR from a company that sat in bankruptcy for years. So the anchor cables did not suffer from an extensive usage and there was no evidence that they were damaged by the lack thereof. Also, Dr. Shelton explained that the starboard stern cable, which payed out 2,600 feet before parting, passed the breaking strength determination performed by Bishop Lifting—*i.e.,* it parted ***above*** its proof load. Had this cable been compromised, it wouldn't have parted last. Against this evidence, the Court cannot find that the THOR's use of Young 511 snatch block on a 2-inch stern cable or its (disputed failure to) set a dog was what caused the stern cable to break, as suggested by Mr. Bartlett.

c. The Court was also troubled by the notion that any conclusions as to the strength of the mooring lines, especially of those made of steel (which are a multicomponent system), could reliably be made after-the-fact and upon visual inspection, only.

## II. The ENDEAVOR and Crosby's role in causing the accident.

19. Upon returning to Port Fourchon, the ENDEAVOR left the THOR and proceeded to the Crosby Dock where it arrived at 8:00 a.m. on October 27, 2020. Thinking that his crew would weather the storm there, Captain Ernest Plaisance tied his tug up tandem to another vessel after first having checked that vessel's moorings.

20. Unbeknownst to the THOR, the ENDEAVOR arrived at the Crosby Dock to—among other things—undergo engine repairs on the fuel injectors. As Captain

barges. Curiously, there was nothing in writing to corroborate this policy. So the Court finds Mr. King's testimony on the point uncredible.

Daley explained, this was not necessarily a minor repair because it may lead to consistent changes of the injectors. Once the fuel injectors were replaced on the ENDEAVOR, Crosby tested the engine (but only for engine speed, not for engine load) and returned to the THOR at 8:00 a.m. on October 28, 2020 to serve as an assist tug. That the ENDEAVOR was, indeed, an "assist tug"[23] to the THOR was confirmed by the testimony of Wade Savoy, Jr. (Crosby's own corporate representative and director of quality, health, safety, and environment), Crosby's expert Captain Fazioli, as well as the THOR's superintendent Douglas. The witness testimony at trial showed that the ENDEAVOR's purpose, as the assist tug, was not to serve as a "hood ornament"—but, rather to (1) aid the THOR by holding or pushing it against the dock and, in so doing, alleviate the strain on the THOR's mooring lines, and (2) stabilize the vessel in the event of a breakaway to avoid having it make contact with nearby objects and vessels. This was also corroborated by the Ordinance 71 issued by Greater Lafourche Port Commission for Port Fourchon, which required a non-self-propelled vessel to have a self-propelled vessel with it to stabilize and control it in hurricane conditions.[24]

21. However, at 5:09 a.m. on October 28—while the ENDEAVOR was still moored at the Crosby Dock—Crosby's offshore operations manager Ivy Danos (and 55 other Crosby shoreside personnel) received Hurricane Zeta Intermediate Advisory 16a from Crosby's forecasting software, alerting to possible winds of 85 mph gusting to 105 mph.[25] Mr. Danos testified that he would have reviewed it upon assuming duty at 6 a.m., at which time he also had one of the four "traffic calls" with the ENDEAVOR.

Once Crosby's shoreside management became aware of this forecast, it should ***not*** have dispatched the ENDEAVOR back to the THOR at 7:45 a.m. on October 28 (which tug Crosby selected for the job without, in violation of its policy, first

---

[23] Much discussion was had at trial about whether Crosby's tug was an assist tug at the time of the incident and/or whether it was only "working as directed" or WAD—which term is not defined in any of Crosby's documents. The evidence at trial overwhelmingly showed that even Crosby's own personnel considered the ENDEAVOR to be an assist tug to the THOR. Moreover, there was not a single notation on Crosby's October 28 wheelhouse log that it was "WAD." *See* Joint trial exhibit 68, Crosby's wheelhouse logs. Besides, even if Crosby logged "WAD" at the time of the incident (which it didn't do), it couldn't have "worked as directed" because it wasn't capable of doing what the THOR was asking it to do—*i.e.,* push it back against the dock. Mr. Danos admitted these points at trial.

[24] Joint trial exhibit 71, GLPC Ordinance 71. To note, Crosby's corporate representative testified that the ENDEAVOR was tied up to the THOR at time of the incident only to seek safe harbor and standby for the weather. This testimony is uncredible because (1) Crosby had its own dock 15 minutes away from the THOR where the ENDEAVOR could have stayed to weather out the storm, and (2) it is ludicrous to conclude that the THOR was paying Crosby $12,000 per day to shield Crosby's own tug from inclement weather.

[25] Joint trial exhibit 475, Crosby StormGeo emails, at p. 42 of 364.

evaluating any horsepower-to-tow ratio).[26] This is so because Crosby, as the tugboat expert, and its captains, as the highest-ranking authorities on these tugboats, ***knew*** the ENDEAVOR's limitations as well as when the prevailing weather conditions would exceed these limitations. And, as Captain Plaisance and Mr. Savoy testified, these limitations included the ENDEAVOR's ***inability*** to push the THOR back against the dock in winds exceeding 75 mph. In other words, as of 6:00 a.m. on October 28, Crosby shoreside management ***knew*** that its vessel would ***not be capable*** of rendering any meaningful assistance to the THOR under the prevailing weather conditions. Shore's expert, Captain Daley, agreed.

22. The reason behind this limitation in the ENDEAVOR's capacity is simple. While the ENDEAVOR was a powerful offshore tug with 15,000 horsepower, its Ice Class V-shaped bow forced it to moor itself parallel with the THOR. That is, the ENDEAVOR positioned itself alongside the THOR, bow to stern, amidships. This configuration precluded the ENDEAVOR from pushing the THOR against the dock in the best way possible—***perpendicular*** to it at a 90-degree angle (without puncturing its hull with metal-to-metal contact). Instead of a perpendicular push, the ENDEAVOR could only move alongside the THOR to give it a side-to-side push or to "twin screw" it. And that would have made no difference in 75+ mph winds. In Captain Daley's words, the ENDEAVOR was simply the wrong tug for this particular job.[27]

Crosby shoreside management knew this as of 6:00 a.m. on October 28. Crosby shoreside management also knew that it was reasonable to expect that the THOR would ask its tug to hold the vessel at or to push it up against the dock. And, as Mr. Danos admitted, when a tug expects to be directed to do something that the tug cannot do, the tug has a ***duty to disclose*** that information to the customer. Captain Daley and Crosby's able-bodied seaman Teddy Collins, Jr. (who also holds a captain's license) also testified to this. Yet, while Shore and the THOR would have greatly benefited from knowing this information, Crosby admittedly never shared this information with them.

---

26 Joint trial exhibit 465, Crosby's TSEMS manual excerpts, p. 212 of 413 ("When assigning vessels to trips, every effort will be made to maximize the horsepower to tow ratio to utilize the horsepower most efficiently.").

To note, Mr. Danos also testified that he was in charge of assigning a vessel to the THOR but that he never even heard of the "horsepower to tow ratio" before this incident. Crosby's Towing Safety Environmental Management System ("TSEMS") manual required Crosby to ensure that all vessels be suitable for the "expected operating conditions." *See* Joint trial exhibit 465, Crosby's TSEMS manual excerpts, p. 160 of 413.

27 The evidence adduced at trial showed that the ENDEAVOR was the wrong choice for this job because (1) it could not have pushed or hold the THOR up against the dock under the prevailing conditions which included winds in excess of 75 mph, and (2) it could not have assisted the THOR in any way, shape, or form after the vessel broke away from the dock—not even to run it into the mud.

23. Captain Daley testified that, as of 6:00 a.m. on October 28—in lieu of ordering the ENDEAVOR back to Martin's Dock 16—Crosby had two choices: Either substitute the ENDEAVOR with a stronger tug (and there were at least four other model bow tugs moored at the Crosby Dock at the time), or supplement it with an additional tug(s). Or, at the very least, discuss these options with the customer. Similarly, as testified by Captain Daley, Crosby's captains should have also realized that there was no sense in being dispatched to do something that they knew they could not do with their tug and should have raised the issue with their shoreside management.

24. In response, Crosby argued at trial that it never relayed its limitations to Shore and the THOR or presented alternative options because they never asked for it.[28] Aside from Crosby's admission that it had a duty to disclose the limitations of its vessel for the tasks it reasonably could have expected that its vessel would be asked to perform, the Court also finds this argument unconvincing because:

   a. Crosby's Mr. Danos testified that it was ***Crosby*** that recommended to Shore that additional tugs be used for the THOR's transition from open water to Port Fourche due to the ENDEAVOR's inability to lead it safely to the dock. If Crosby could have made that recommendation then, it certainly could have made it again on or before October 28.

   b. Crosby's Captain Everett testified that during Hurricane Ida, a year after Zeta, he was aboard Crosby's tug the RELIANT that was tied tandem to D/B HEDRON in Port Fourchon. ***He*** was the one who suggested to the HEDRON's superintendent to allow him to push the derrick barge into the dock, but the superintendent rejected the idea.

   c. Crosby's Towing Safety Environmental Management System ("TSEMS") manual ***required*** its vessel masters and officers on watch to "constantly evaluate the prevailing conditions and determine when the risk involved with any maneuver warrants use of an assist tug."[29]

   d. By sending the ENDEAVOR on a mission that it could not accomplish, Crosby also put its own crew and vessel in jeopardy—especially considering the way in which the ENDEAVOR was moored to the THOR and the rudder effect caused by the configuration. Crosby's corporate representative and Captain Daley both recognized this at trial. So, even if Shore never asked Crosby about the limitations of the vessel that Crosby (as the tug expert) itself chose to assign to the THOR, Crosby should have still relayed this information to Shore for the safety of its own crew and vessel.

---

[28] Shore's Mr. Sims and Mr. Gibilterra testified that, had they been made aware of the ENDEAVOR's limitations, they would have requested additional tugs to be used.

[29] Joint trial exhibit 465, Crosby's TSEMS manual excerpts, p. 285 of 413.

Therefore, the Court finds that—under the facts present here—Crosby had, and breached, its duty to Shore to inform it of the ENDEAVOR's limitations.

25. Moreover, the Court finds that Crosby breached its duty to exercise reasonable care because, in the face of recognized danger, it failed to keep its engine on at the time of Hurricane Zeta's landfall to be able to hold and/or push the barge against the dock. As a result, though the THOR was still tied to Dock 16 at 4:00 p.m. on October 28, 2020 when superintendent Douglas first learned that the breakaway had commenced and radioed the ENDEAVOR,[30] the ENDEAVOR was not able to push on it and bring it any closer to the dock when superintendent Douglas asked for that action to be taken. That the ENDEAVOR's engine was not on before 4:00 p.m. on October 28, in violation of Crosby's policy,[31] is based on the following:

a. Because the ENDEAVOR's engines are mechanical, they do not have a meter, gauge, or a slight glass to digitally track fuel consumption in the day tanks. So this measurement is done based on estimates. Crosby's qualified member of the engine department or "QMED," Rene Artigos, testified that he kept the entries in the tug's engine room logs as accurate and factual as possible. Crosby's engine room logs show that, on October 28, the ENDEAVOR recorded a total of 3 hours of engine running time.[32] This corresponds with the narrative from the wheelhouse logs which shows that (1) the tug spent 15 minutes to get to the THOR from the Crosby Dock—from 7:45 a.m. to 8:00 a.m., and (2) the tug spent 2.5 hours on the water—from the 4:00 p.m. breakaway until it was returned to its dock by an assist tug at 6:30 p.m. after running aground in the Floatation Channel.[33] And because Crosby uses minimal 1-hour increments for engine run time, the total 2.45 hours were, by Crosby's policy, rounded up to 3 hours. The logs are consistent. Had the engines been on before the 4:00 p.m. breakaway, the logs would have shown a longer than a 3-hour period for the engine run time entry.

b. Crosby's engine room logs also show that there was fuel consumption of 200 gallons on October 28. Mr. Artigos explained that (1) Crosby records 100 gallons a day for port generator fuel consumption, and (2) 100 gallons is what one would expect that the consumption of fuel would be for 3 hours of engine running time. Again, had the ENDEAVOR's engine been running

---

30 Captain Everett's testimony confirmed that, when they spoke over the radio, he understood superintendent Douglas's comments that they were "breaking" to mean that the lines only began to part and that the barge did not completely broke away from the dock at that point.

31 Crosby's corporate representative testified that Crosby's policy is that its tugs must keep their engines turned on during hurricane conditions.

32 Joint trial exhibit 484, Crosby's engine room logs, p. 304 of 368.

33 Joint trial exhibit 148, Crosby's wheelhouse logs, at p. 14 of 16.

before 4:00 p.m. or for longer than 3 hours, the fuel consumption would have been higher than what was recorded in the logs.

c. The tug has 2 smokestacks, one for each main engine. It is only when the tug is exerting thrust that the smoke is released and is visible to the naked eye. While it generally may take 10-15 minutes to start up the tug's starboard main and port main engines (which always work together), these engines may also be cranked up in about 1 minute. Captain Daley explained that, while cold engines may take longer to start, engines that had been run in the preceding 12 hours can be started within a minute. Thus, it is more likely than not that the ENDEAVOR's engines were engaged at 4:00 p.m.—when the Cloyd video at Trial Exhibit 51, the 2:32 marker, shows a big cloud of black smoke coming out of its smokestacks—than at 1:00-1:30 p.m. as testified by Crosby's QMED Mr. Artigos (when he, who allegedly engaged the engines at that time, was not even on watch).

d. In addition, (1) Martin's expert, Mr. Bartlett, testified that it was his understanding that the tug's engines were not on at the time of the breakaway, which is why he did not include it into his calculations; (2) Captain Daley testified that he worked on a vessel with the same type of engine as the ENDEAVOR and that it would produce smoke once the engines are turned on; and (3) the Cloyd video shows the tug yielding to the current, which would not have occurred had its engines been on.

11. While the first breakaway occurred when the THOR became unmoored from the dock, the second breakaway happened a few minutes later when the ENDEAVOR got decoupled from the THOR. Following the second breakaway incident, the Court finds that Crosby breached its duty to exercise reasonable care because, in the face of recognized danger, it failed to even attempt to catch the THOR, stabilize it, and prevent it from making contact with nearby vessels and objects. Captain Plaisance, who as a relief captain was in the wheelhouse at the time of the incident, testified that he stopped even looking for the THOR once the ENDEAVOR broke away from it.

12. Master's overriding authority is the authority of a captain of the vessel to act or refuse to act out of concern for the safety of his crew and vessel. This authority is not optional and, under Crosby's TSEMS manual and as per Crosby's expert Captain Fazioli, it must be followed to prevent injury to crews and vessels.[34] In Mr. Danos's words, this authority was born out of prudent, ordinary seamanship obligations owed by captains regardless of whether their customers give them any directives.

As Captain Everett testified, a failure to invoke master's overriding authority when the circumstances call for it constitutes negligence. The Court agrees that this is

34 Joint trial exhibit 156, Crosby's TSEMS excerpt.

what happened here. This is especially so, in the Court's view, because the ENDEAVOR was the "vessel in charge" at the time of the incident and the THOR's "lifeline." And because Crosby's TSEMS manual required its employees, not only to learn and comply with the company's safety rules, but also to be alert and watch how events develop at the dock in order to anticipate and avoid or mitigate hazards.[35] Captain Everett further admitted that (1) he did not need the THOR's permission to use his master's overriding authority on October 28, and that (2) he knew that it would have been beneficial to have another tug on the THOR, but he never suggested that to it. Crosby's corporate representative Mr. Savoy testified that tug captains have master's overriding authority to act even to override a decision made by the THOR's superintendent Douglas. He likewise conceded that Crosby's tug captains didn't exercise their master's overriding authority on the day of this incident.

Based on the above, the Court finds that Crosby and the ENDEAVOR failed to exercise reasonable care in deciding (1) not to invoke master's overriding authority by at least suggesting to Shore the employment of additional tugs, and (2) not to push against the THOR prior to 4:00 p.m. on October 28 (as Captain Everett testified that he suggested to the HERON during Hurricane Ida).

13. At trial, testimony of Crosby's own employees showed that Crosby completely failed to train its crew on:

a. The limitations of their own vessels and how these limitations impact the handling of the vessel under tow (Captain Plaisance's testimony);

b. How to properly operate and moor a tug to a derrick barge in a hurricane situation (Captain Everett and Ivy Danos's testimony);

c. What "working as directed" actually means (Captain Everett's testimony);

d. What to do in the scenarios involving breakaways of a tow (Captain Plaisance's testimony);

e. Crosby's own Hurricane Preparedness Plan and its requirements, resulting in complete ignorance and lack of compliance therewith—such as, e.g., preparation of a voyage assessment form, in-port checklist, and a mooring plan or the formation of a storm committee (Captain Plaisance, QMED Artigos, AB Harris Solomon and Terry Collins, Ivy Danos, and Captain Everett's testimony); and

f. Ordinance 71 (Captain Plaisance and Captain Everett's testimony).

---

[35] Joint trial exhibit 465, Crosby's TSEMS manual excerpts, p. 11 (no. 39) of 413.

14. Ultimately, the THOR and its 85-100 crewmen onboard (including the claimants) came to a stop by dropping an anchor. At trial, there was an implication that the THOR should have dropped its anchors either before and/or after the breakaway. The Court disagrees. Almost every witness at trial testified that dropping an anchor at Martin's Dock 16 in Port Fourchon (1) would have been unsafe and unwise due to the existing pipelines and old metal structures on the waterbed that could have damaged the vessel's hull—as per the posted warnings in the area, and/or (2) would not have prevented the breakaway.

15. In the aftermath of the incident, neither Crosby nor Martin conducted any root cause investigations to determine what contributed to this incident. In violation of the Coast Guard's requirements and despite having alcohol swabs available onboard, Crosby did not even alcohol and drug test its crew. But Shore did. And no crewmember aboard the THOR tested positive.

## Conclusions of Law

### I. The burden-shifting approach in maritime law.

1. When a ship owner seeks to limit its liability to the value of the vessel, the Limitation of Liability Act employs a burden-shifting approach. The personal injury claimant bears the initial burden of establishing a negligent act or an unseaworthy condition that proximately caused the harm. If successfully met, the burden then shifts to the ship owner to prove that the negligent act or the unseaworthy condition was not within its privity or knowledge. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991).

2. The vessel owner has an absolute and non-delegable duty of seaworthiness. *Scurlock Marine, Inc. v. W.W. Patterson Co.*, 1997 WL 472510, at *3 (E.D. La. Aug. 15, 1997); *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991). "Non-delegable" is defined as "not capable of being entrusted to another's care." Black's Law Dictionary (11th ed. 2019). A failure to provide an adequately trained crew is "grounds for finding unseaworthiness." *Stiward v. United States*, 551 F. Supp. 2d 478, 499–500 (E.D. La. 2008).

### II. Martin breached its wharfinger's duties in several respects and contributed to this incident.

3. The duties of a wharfinger have been cemented well over a century ago. As the U.S. Supreme Court noted:

> Although a wharfinger does not guaranty the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction, to

> remove it, or to give due notice of its existence to vessels about to use the berths.[36]

The Fifth Circuit further specified that the wharfinger's duty includes a "duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel" as well as to "ascertain the condition of the berth, to make it safe or warn the ship of any hidden, hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner."[37]

4. Here, the first question is whether Martin breached any of the aforementioned duties that it—as the lessee and custodian of Dock 16—owed to its customers Shore and the THOR. The Court answers that question in the affirmative. Martin breached its wharfinger's duty in two regards.

One, Martin violated its duty to warn of the hazards known to it created by the mooring of a vessel at its dock in hurricane conditions. It did so by (1) failing to notify Shore and the THOR of its HPP requirements designed to provide a safe response to hurricane conditions, and (2) violating those requirements by allowing the THOR to moor at its dock within 48 hours of the landfall and by actively supplying it with fuel 24 hours before the landfall. Had Martin complied with its own policy and the Coast Guard port condition requirements for Port Fourchon, Shore and the THOR would have moored at a different dock—thereby preventing this incident altogether.

And two, Martin breached its duty (also owed under its lease) to exercise reasonable diligence to furnish a safe birth, to avoid damage to the vessel, and to ascertain and warn the vessel of a dangerous condition on its premises which, upon the exercise of reasonable care and inspection, should have been known to it. Martin did so by failing to properly (1) inspect, maintain, and warn of the damaged bollards at its dock which damage—even upon Martin's visual inspection—could have readily been ascertained, and (2) train its personnel to conduct and exercise reasonable care and inspection of these bollards in light of the information which Martin did, and did not, have about them at all relevant times.

Further, the Court notes that the failure of a bollard creates a legal presumption of fault against Martin regarding the bollard's construction and/or maintenance.[38] The evidence at trial, including certain admissions of Martin's own expert Mr. Bartlett,

---

36 *Smith v. Burnett,* 173 U.S. 430, 433 (1899).

37 *Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A*., 521 F.2d 229, 230 (5th Cir. 1975).

38 *Petro United Teminals, Inc. v. J.O. Odfjell Chem. Carr.*, 756 F.Supp. 269, 275 (E.D. La. 1991) ("The failure of the mooring facility, in the circumstances before this Court, creates a presumption of negligence against Petro United in the manner of the structure's construction or its maintenance.").

showed that bollards M4, M6, M8, and M9 ***all***—in one way or another—***failed*** as a result of this incident. No evidence put forth by Martin, or any other party, was sufficient to rebut this presumption against it. Besides, the Court was persuaded by the expert testimony that it was more likely than not that Martin's bollards failed before any of the lines parted—which failure, in turn, led to the load being distributed to the lines, caused them to break, and allowed the THOR to unmoor from the dock.

In so noting, the Court concludes that Martin's breaches of its duty were a contributing factor in this incident.

For completeness, any potential application of the burden-shifting evidentiary presumptions does not change the outcome here. The LOUISIANA Rule, for instance, creates the rebuttable presumption that in collisions or allisions involving a drifting vessel, the drifting vessel is at fault. *Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC,* 615 F.3d 599, 602 (5th Cir. 2010). But the presumption can be rebutted if the non-invoking party can show (1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident—each of which, if sustained, is sufficient to defeat liability. *Id.* at 605. For starters, given that the unmooring of the THOR from Martin's Dock 16 was caused by an ***unpredicted*** Category 3 hurricane, even the invoking party at trial implied that a *vis major* element was involved here. Beyond that, however, the evidence adduced at trial is sufficient for this Court to find that the THOR—as a non-self-propelled vessel that hired an expert (Crosby) for the purpose of providing it with propulsion—acted with reasonable care because (1) it had moored at Martin's dock well-ahead of Hurricane Zeta, (2) was, based on the expert testimony, right to assume that the dock being leased to it was strong enough to hold its vessel, (3) had a proper mooring arrangement, which withstood the forecasted Category 1 and Category 2 weather conditions, and (4) was reasonable in relying on Crosby and its licensed mariners to assist it with preventing a breakaway incident and stabilizing it thereafter—both of which Crosby failed to do. Based on the evidence as a whole, Shore and the THOR acted with reasonable care, thereby rebutting the LOUISIANA presumption.

## III. Crosby is not legally entitled to exoneration/limitation of its liability.

5. While it is true that unseaworthiness and independent negligence are separate concepts, the same factual basis has been used to assert both theories of recovery. *Cabahug v. Text Shipping Co.,* 98-0786 (La. App. 1 Cir. 5/12/00), 760 So. 2d 1243, 1251 (citing *Brunner v. Maritime Overseas Corporation,* 779 F.2d 296, 298 (5th Cir.1986)).[39]

[39] *See also Waldron v. Moore-McCormack Lines, Inc.,* 386 U.S. 724, 729–30, 87 S. Ct. 1410, 1413, 18 L. Ed. 2d 482 (1967) (Justice White, Harlan, Brennan, and Stewart, dissenting) ("While it is true that unseaworthiness is legally independent of negligence, it cannot be denied that in many cases unseaworthiness and negligence overlap. And on the facts of this case I think the claim of negligence was identical with the claim of unseaworthiness.") (internal citation omitted).

6. General principles of maritime law, like the common law principles of tort, impose upon a defendant a duty to exercise reasonable care. *Casaceli v. Martech Int'l, Inc.,* 774 F.2d 1322, 1328–29 (5th Cir. 1985); *Daigle v. Point Landing, Inc.,* 616 F.2d 825, 827 (5th Cir.1980). This duty of reasonable care includes a duty to warn of harm that is reasonably foreseeable under the circumstances. *Bubla v. Bradshaw,* 795 F.2d 349, 353 (4th Cir.1986). And it applies to tugs. *Aiple Towing Co. v. M/V Lynne E. Quinn,* 534 F. Supp. 409, 411 (E.D. La. 1982); *In re Lewis & Clark Marine, Inc.,* 50 F. Supp. 2d 925, 929 (E.D. Mo. 1999).

7. The Court finds that Crosby breached its duty to exercise reasonable care because, in the face of recognized peril, it did not (1) warn Shore and the THOR of the known limitations of its tug as they pertain to the task that Crosby could have reasonably expected to perform, (2) communicate with Shore and the THOR during the period preceding the breakaway incidents, (3) keep its engines on and engaged to be able to promptly assist and push the THOR up against the dock immediately upon request, (4) attempt to catch the THOR after unmooring from it, stabilize it, and prevent it from running into vessels and objects in its vicinity, (5) exercise its master's overriding authority to independently undertake any steps to help the THOR, including but not limited to suggesting that a different or an extra tug(s) be employed for the job.

8. In addition to a duty to exercise reasonable care, a tug is also required to (1) pay attention to the actions of the vessel under tow, (2) foresee what effects those actions might have, and (3) execute maneuvers "as prudence require[s] under the circumstances as they develop[]." *River Pars. Co. v. M/V FLAG ADRIENNE,* 2002 WL 1453826, at *5 (E.D. La. July 2, 2002); *Remolcadores de Malaga, S.A. v. United States*, 1990 WL 128214, at *5 (E.D. La. Aug. 24, 1990); *Houston Towing Co. v. United States,* 23 F.2d 528, 530 (S.D. Tex. 1928). The Court notes that Crosby's TSEMS manual also required its employees to be alert and watch how events develop at the dock in order to be anticipate and avoid or mitigate hazards.[40]

9. The Court finds that Crosby did not act "as prudence required under the circumstances as they developed" because it did not take ***any*** corrective or proactive steps to help the THOR before ***or*** after either of the two breakaway incidents—which is what it was retained to do in the first place. The Court also finds that Crosby's negligence contributed to this accident because, had its tugs undertaken any action upon (independently) recognizing the precariousness of the THOR's situation, the accident more likely than not would have been prevented or—at minimum—mitigated. The claimants satisfied their burden to show that Crosby's negligence proximately caused their injuries.

10. Because the claimants made their showing, the burden shifted to Crosby to prove that the negligent acts of its tugs were not within its privity and knowledge. The

[40] Joint trial exhibit 465, Crosby's TSEMS manual excerpts, p. 11 (no. 39) of 413.

Court finds that Crosby did not, and could not, meet this burden because Crosby (1) knew and admitted to not sharing the crucial information with the THOR—*i.e.,* the limitations of its tug's capacity to complete the task it was expected to perform, and (2) Crosby failed to train its crew on a host of significant aspects relevant to its operations under the prevailing conditions that existed at the time of this incident. And failure to train, under the law, equals privity. *Complaint of Bowmech Marine, Inc.,* 1992 WL 266098, at *3 (E.D. La. Sept. 24, 1992).

11. As a result, Crosby is not entitled to the exoneration from or limitation of its liability in this case.

## III. SUMMARY

1. The Court's conclusions relative to the limitation phase of the trial are summarized below:

   a. Martin is liable under general maritime law for the part that its failures played in the unmooring and the ensuing collisions/allisions between the THOR and nearby vessels and objects and, consequently, for the claimants' resulting injuries. Martin's conduct was negligent. Martin's (in)actions were within its privity and knowledge.

   b. Crosby is liable under general maritime law the part that its failures played in the unmooring and the ensuing collisions/allisions between the THOR and nearby vessels and objects and, consequently, for the claimants' resulting injuries. Crosby's conduct was negligent. Crosby's (in)actions were within its privity and knowledge. Accordingly, Crosby is not entitled to exoneration or limitation of its liability under the Limitation of Liability Act.

   c. Shore and the THOR were not negligent. And there is no comparative fault to be attributed to the claimants.

2. Fault is apportioned as follows:

| | |
|---|---|
| Martin: | 50% |
| Crosby: | 50% |
| Shore: | 0%. |

3. The Court's injunction restraining prosecution of the claimants' claims in state court is dissolved.

New Orleans, Louisiana this ______ day of____________, 2026.

______________________________
United States District Judge

Respectfully submitted,
**ARNOLD & ITKIN, LLP**

/s/ John G. Grinnan
J. Kyle Findley (#34922)
kfindley@arnolditkin.com
Kala F. Sellers (#36182)
ksellers@arnolditkin.com
John G. Grinnan (#42044)
**ARNOLD & ITKIN LLP**
6009 Memorial Drive
Houston, TX 77007
Tel: 713.222.3800
Fax: 713.222.3850

**ATTORNEYS FOR CLAIMANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing pleading was served on counsel of record by electronic means, including the CM/ECF system, on August 31, 2026.

/s/ John G. Grinnan (#42044)